Stephen F. English, OSB No. 730843
SEnglish@perkinscoie.com
Thomas R. Johnson, OSB No. 010645
TRJohnson@perkinscoie.com
Douglas R. Pahl, OSB No. 950476
DPahl@perkinscoie.com
Matthew P. Gordon, *pro hac vice*
MGordon@perkinscoie.com
Brian Samuelson, OSB No. 165476
BSamuelson@perkinscoie.com
Perkins Coie LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Telephone:  503.727.2000
Facsimile:  503.727.2222

*Attorneys for Plaintiff FamilyCare, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PATRICK ALLEN, in his official Capacity as DIRECTOR OF OREGON HEALTH AUTHORITY, an agency of the State of Oregon, <br><br> Plaintiff, <br><br> v. <br><br> FAMILYCARE, INC., an Oregon non-profit corporation, <br><br> Defendant. | No. 3:18−cv−00212−MO (LEAD) <br> No. 6:18−cv−00296−MO <br><br> PLAINTIFF FAMILYCARE, INC.'S FOURTH AMENDED COMPLAINT <br><br> Breach of Contract - Specific Performance; Declaratory Judgment; Judicial Review of Agency Action; Breach of Contract— Damages; Breach of Covenant of Good Faith and Fair Dealing; Intentional Interference with Business Relations; Breach of Contract; Civil Rights Violation and Conspiracy to Commit Civil Rights Violation <br><br> NOT SUBJECT TO MANDATORY ARBITRATION <br><br> JURY TRIAL REQUESTED <br><br> Prayer Amount: $111,800,000 <br><br> ORS 21.160(1)(e) and 21.160(3) |

FAMILYCARE, INC., an Oregon non-profit corporation,

                Plaintiff,

      v.

OREGON HEALTH AUTHORITY, an agency of the State of Oregon, and PATRICK ALLEN, both individually and in his official capacity as director of the Oregon Health Authority, and LYNNE SAXTON

                Defendants.

Plaintiff FamilyCare, Inc. ("FamilyCare"), for its claims against the Oregon Health Authority ("OHA"), alleges the following:

## PARTIES

**1.**

FamilyCare is an Oregon non-profit corporation and a certified Coordinated Care Organization ("CCO") created to achieve the "Triple Aim" of better health, better health care, and lower per-capita costs pursuant to ORS 414.625. FamilyCare's principal place of business is in Portland, Oregon. As a certified CCO, FamilyCare has contracted with the State of Oregon, by and through OHA, to provide services for the Oregon Health Plan ("OHP"), the state's Medicaid program. FamilyCare has managed and coordinated health care services to Oregon's Medicaid population since 1985. Until 2018, FamilyCare was the second-largest CCO in Oregon, managing and coordinating integrated physical, mental, and dental health services for more than 120,000 OHP members in the Tri-County area and in Marion County.

**2.**

OHA is an agency of the State of Oregon. OHA is responsible for administering Oregon's Medicaid program, and OHA contracts with CCOs, such as FamilyCare, for the

PAGE  2-     FOURTH AMENDED COMPLAINT

management and coordination of health services to OHP members.  OHA's principal place of business is in Salem, Oregon.

**3.**

Patrick Allen is the director of the Oregon Health Authority.  Lynne Saxton is the former director of the Oregon Health Authority.

**4.**

Even though FamilyCare was the second-largest CCO in Oregon, its rates were the lowest among the 16 Oregon CCOs in 2015, 2016, 2017 and 2018.  Over the course of the last five years, OHA has used erroneous data and actuarially unsound methods to continually and systematically reduce FamilyCare's rates.  These rate reductions have caused FamilyCare to sustain substantial operating losses, depleting its reserves and ultimately forcing FamilyCare to shut down its Medicaid business and cease providing services to Oregon Health Plan members.  Dating back to 2015, FamilyCare has repeatedly alerted OHA that basic errors in the data and methodology used to set capitation rates were resulting in unsustainable, unfair, and actuarially unsound rates.  OHA ignored FamilyCare's communications, knowingly and purposefully refusing to correct the errors.  Rather than addressing the numerous problems that FamilyCare had identified, OHA undertook to implement a smear campaign aimed at undermining FamilyCare in the eyes of the public, its providers, its patients, and the Oregon legislature.  This campaign, which sought to falsely portray FamilyCare as an "outlier" that was "more concerned with the bottom line and increasing revenues than the health of Oregonians," was designed to harm FamilyCare's business and prevent it from successfully challenging OHA's unlawful conduct in the setting of Medicaid capitation rates.  Finally, in late 2017, OHA succeeded in forcing FamilyCare to exit the Medicaid market and begin shutting down its Medicaid business.  OHA knew that there were material errors in the underlying data used to set FamilyCare's proposed 2018 rates.  OHA also knew that accepting these rates would cause FamilyCare to incur losses in 2018 that exceeded FamilyCare's available reserves.  This knowledge

PAGE  3-    FOURTH AMENDED COMPLAINT

notwithstanding, OHA and Pat Allen presented FamilyCare with a take-it-or-leave-it contract with just 24 hours' notice, forcing FamilyCare to reject the full 2018 rate amendment and to agree instead to a one-month rate amendment to allow FamilyCare's members extra time to transition to other CCOs.  FamilyCare is filing these claims against OHA to protect its ability to offer vital services to vulnerable Oregonians in the future, to ensure the integrity and transparency of OHA's rate setting processes and to safeguard the stability of Oregon's Medicaid program.

## JURISDICTION AND VENUE

### 5.

The Court has jurisdiction over FamilyCare's claim for violations of civil rights under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331, as this matter arises under the Constitution and laws of the United States.  The Court has supplemental jurisdiction over FamilyCare's state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy.  The Court has personal jurisdiction over the Defendants because they reside within and/or sufficient contacts with the state of Oregon and, in the case of Defendants OHA and Patrick Allen, have consented to the Court's jurisdiction by removing this case from Oregon state court to this Court.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 because all defendants are residents of the State in which the District is located and a substantial part of the events or omissions giving rise to FamilyCare's claims occurred in this District.

## GENERAL ALLEGATIONS

**I.  OHA is the public agency that administers Oregon's Medicaid program and pays capitation rates to FamilyCare for providing critically important managed and coordinated care to Oregonians.**

### 6.

The Social Security Amendments of 1965 created Medicaid, a joint federal and state program that, together with the Children's Health Insurance Program (CHIP), supplies federal funds to states that agree to maintain a medical assistance program for the benefit of elderly,

PAGE  4-    FOURTH AMENDED COMPLAINT

blind, or permanently disabled individuals and for the benefit of families with dependent children.  The United States Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS") is the federal agency that provides funds to the states that participate in the Medicaid program.  Once a state chooses to join the Medicaid program, it must follow the federal government's statutory and regulatory requirements to receive federal funds.

**7.**

The Patient Protection and Affordable Care Act of 2010 (Pub L 111-148) and the Health Care and Education Reconciliation Act of 2010 (Pub L 111-152) (together, the "Affordable Care Act" or "ACA") expanded the Medicaid program to include additional low-income individuals and their families ("Medicaid Expansion").  The Supreme Court's ruling in *National Federation of Independent Business v. Sebelius*, 132 S Ct 2566 (2012), effectively made Medicaid Expansion a state option.

**8.**

Social Security Act Sections 1115 and 1915 authorize waivers and demonstrations that states can use to test new or existing ways to pay for health services in Medicaid and CHIP.  Primarily through waivers and demonstrations, including the Section 1115 Demonstration Project, Oregon expanded its Medicaid program before the implementation of the ACA.  In 2011, the Oregon Legislature and Governor created CCOs, which are community-based organizations that connect health care providers, community members, and risk-bearing entities.

**9.**

In 2012, CMS approved an amendment and extension of Oregon's Section 1115 Demonstration Project, which was a five-year health system transformation proposal that relied on CCOs to manage the health care of beneficiaries previously covered by Medicaid and those who joined the program under the Medicaid Expansion.  Oregon's waiver was further extended on January 12, 2017, for the period January 12, 2017, through June 30, 2022.  CMS granted the extension to "build on Oregon's progress and improve the coordinated care model, maintaining

PAGE  5-    FOURTH AMENDED COMPLAINT

Coordinated Care Organizations' ("CCOs") focus on integration of physical, behavioral, and oral health care through a performance-driven system aimed at improving health outcomes and restraining costs."

**10.**

There are now 16 CCOs that contract with OHA to provide managed and coordinated care, including physical, mental, and dental health services, to Medicaid-eligible individuals throughout Oregon. OHA funds the cost of providing these services by making per-member-per-month, or "capitation," payments. The capitation payments are based on rates developed and established by OHA.

**11.**

Because CMS funds a portion of the capitation payments, the payments must comply with federal law and regulations. Under federal law and regulations, OHA's payment rates to the CCOs, including FamilyCare, must be actuarially sound. 42 CFR § 438.4(b).

**12.**

In addition, federal regulations require that all managed care contracts "[c]omply with all applicable Federal and State laws and regulations." 42 CFR § 438.3(f).

**13.**

On information and belief, OHA wants to reduce the number of CCOs in Oregon so that OHA will have more control over the CCOs. On further information and belief, OHA has targeted FamilyCare as one of the CCOs to be eliminated. FamilyCare was the second largest CCO in Oregon, and yet, in 2015, 2016, and 2017, OHA has set FamilyCare's capitation rates lower than the rates of all other CCOs.

**II.     OHA's actions towards FamilyCare are in contravention with OHA's goals of improving best practices, transparency, and preventive care for Oregonians.**

**14.**

PAGE 6-     FOURTH AMENDED COMPLAINT

OHA represents that Oregon's CCO model includes six key elements: (1) "Best practices to manage and coordinate care"; (2) "Shared responsibility for health"; (3) "Transparency in price and quality"; (4) "Measuring performance"; (5) "Paying for outcomes and health"; and (6) "A sustainable rate of growth." According to OHA, a best practice for CCOs is to use "[v]alue-based benefit design that create[s] incentives for consumers to use evidence-based services." With respect to transparency, OHA represents, "Cost and quality data that is readily available, reliable and clear helps patients understand their health plan and provider choices and it helps purchasers make decisions about choosing health plans." In addition, OHA represents that "[i]ncreased transparency on price and quality can also lead to increased accountability."

**15.**

OHA represents that "[p]aying for better quality care and better health outcomes, rather than just more services, is essential to the model." Accordingly, OHA represents that Oregon's CCO model focuses on "primary care and prevention" to "better manage chronic conditions and keep people healthy and out of the emergency department." In fact, OHA represents that a "robust primary care system is at the heart of the [CCO] model; primary care payments should support both an effective primary care infrastructure and the provision of high-quality primary and preventive services."

**16.**

OHA recently released a "groundbreaking study" conducted by Portland State University on the "overall savings to the Oregon health care system through the Patient Centered Primary Care Home (PCPCH) Program." The study showed that "for every $1 increase in primary care expenditures for this comprehensive model of care, there is an average $13 in savings to the health care system."

**17.**

An additional, innovative feature of Oregon's CCO model is that the CCOs are to be "managed within fixed global budgets." ORS 414.620(1). In fact, one of OHA's contracting

PAGE 7-    FOURTH AMENDED COMPLAINT

criteria for a CCO is the CCO's "demonstrated experience and capacity for . . . [o]perating within a fixed global budget." ORS 414.625(1)(c). OHA encourages and represents to CCOs that it wants CCOs to demonstrate the ability to operate within a global budget in order to promote innovation and cost-minimization. Under the global budget concept, OHA represents that it does not and may not make rate decisions based on a CCO's expenditures in specific categories. OHA's conduct and actions have contradicted this global budget concept in that OHA is not allowing certain CCOs, including FamilyCare, to operate within a sustainable fixed global budget. Rather, OHA has ignored the fixed global budget and has penalized CCOs for reimbursement rates to providers that OHA represents are too high.

**18.**

In addition, OHA has misapplied the fixed global budget model by approving global budgets for FamilyCare that were insufficient for FamilyCare to cover its operating costs in 2016, 2017, and 2018. The insufficient global budgets caused FamilyCare to incur operating losses in 2016, 2017, and 2018. OHA approved insufficient global budgets for FamilyCare even though FamilyCare achieved 100% of its quality incentive metrics under its contract with OHA.

**III.    In 2015, FamilyCare sought and obtained a temporary injunction against OHA in this Court, after which OHA entered into a settlement agreement with FamilyCare.**

**19.**

Since 1985, FamilyCare has contracted with OHA, or its predecessor agency, to manage and coordinate health care services to Oregonians enrolled in the OHP. FamilyCare has a five-year contract with OHA that, subject to certain exceptions, may not be amended more than once in each 12-month period. FamilyCare's current five-year contract, as amended and extended (the "Contract") began in 2014 and was set to terminate at the end of 2018. As of 2014, FamilyCare managed and coordinated health care services to OHP members in the Tri-County area (Multnomah, Washington, and Clackamas Counties) and in certain zip codes in Marion County.

**20.**

On December 24, 2014, OHA presented FamilyCare with a contract amendment containing the capitation rates for 2015 and required FamilyCare to sign the contract amendment with the new rates by January 1, 2015.  The new rates represented a 9.7% decrease in FamilyCare's rates as compared to 2014, and FamilyCare immediately notified OHA that the rates were incorrect.  In April 2015, OHA contracted with an outside actuarial firm, Optumas, to reexamine and redevelop the 2015 capitation rates and to develop the 2016 capitation rates.

**21.**

In connection with the dispute over the 2015 rates, FamilyCare requested, among other things, the rate review tools and trend models that OHA and its actuary used to develop the 2015 rates.  Contrary to OHA's representation that Oregon's CCO model values transparency, OHA refused to provide the requested information to FamilyCare.  A true and correct copy of OHA's response to FamilyCare is attached hereto as Exhibit 1.

**22.**

On May 27, 2015, FamilyCare sued OHA in this Court, alleging that the 2015 capitation rates were not actuarially sound.

**23.**

After FamilyCare sued OHA, FamilyCare served document requests on OHA for, among other things, the rate review tools and trend models that OHA and its actuary used to develop the 2015 rates, and again, OHA refused to produce the requested documents.

**24.**

In August 2015, OHA presented the 2015 capitation rates that were redeveloped by Optumas (the "Redeveloped 2015 Rates").  OHA's and Optumas's Redevelopment 2015 Rates rely on a "regional approach" that purport to "minimize variability within a given region."  Although OHA acknowledged that the rate development methodology must comply with CMS regulations, FamilyCare expressed serious concerns to OHA that, among other things: (a) the rate development process presumes that certain regional base data cost differences were

PAGE  9-     FOURTH AMENDED COMPLAINT

attainable by all contributing CCOs, (b) OHA has not provided a summation of the adjustments from the CCO reported financial statements to the contributions of the CCO to the regional base data; and (c) OHA has not provided a summation of the Optumas studies used to create the adjustments applied to the regional base data to develop the regional base rates.  In addition, FamilyCare expressed concerns to OHA about the underlying data used to set the rates, noting among other things that it was unable to reconcile certain figures provided by OHA regarding enrollment in the Oregon Health Plan with FamilyCare's own enrollment data, which it shared with OHA.  FamilyCare requested from OHA the data necessary to confirm the methodology underlying the Redeveloped 2015 Rates are actuarially sound.  OHA did not provide the data FamilyCare requested.

**25.**

The Redeveloped 2015 Rates further decreased FamilyCare's capitation rates by $54,485,814, which was an additional 10.9% reduction in FamilyCare's capitation rates as compared to 2014.  The certification of the Redeveloped 2015 Rates marked a departure from OHA's historical practice of certifying that each managed care organization's rates were actuarially sound.  For the Redeveloped 2015 Rates, OHA and Optumas certified only that the regional rates were actuarially sound.

**26.**

FamilyCare refused to sign the contract amendment incorporating the Redeveloped 2015 Rates, and in March 2016, OHA notified FamilyCare that its refusal to do so was, according to OHA, a breach of contract.

**27.**

On March 29, 2016, FamilyCare sued OHA again, seeking a declaratory judgment that: FamilyCare is not contractually bound to sign the amendment with the Redeveloped 2015 Rates; FamilyCare's receipt of capitation payments for 2015 did not place FamilyCare in default under

any contract; and OHA may not terminate FamilyCare's contract for the provision of health care services.

**28.**

On April 6, 2016, OHA notified FamilyCare of its intent to terminate FamilyCare's contract, thereafter instituted administrative proceedings to do so. On May 12, 2016, this Court issued an Amended Temporary Restraining Order to enjoin OHA from terminating FamilyCare's contract until the Court could resolve FamilyCare's motion for preliminary injunction and OHA's motion to dismiss its complaint for declaratory relief.

**29.**

To resolve these pending lawsuits, the parties entered into a settlement agreement effective as of May 22, 2016 (the "Settlement Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit 2.

**30.**

Under the Settlement Agreement, FamilyCare agreed to sign the amendment with the Redeveloped 2015 Rates. The Redeveloped 2015 Rates were $54,485,814 less than the amount that FamilyCare was paid in 2015. This difference in rates resulted in an overpayment from OHA to FamilyCare in 2015. In exchange for FamilyCare's approval of the Redeveloped 2015 Rates, OHA agreed to reduce the overpayment to FamilyCare by $24.8 million (the "Settlement Credit"). After the effective date of the Settlement Agreement, FamilyCare paid OHA $29,685,814.

**31.**

The Settlement Agreement provides that, other "than application of the terms of the Section 1115 Demonstration Project to aggregate state expenditures, OHA shall not use rates paid to FamilyCare under the Contract for 2016 or the Settlement Credit as a basis for limiting the amount that can be paid to FamilyCare in future rate years."

**32.**

PAGE  11-    FOURTH AMENDED COMPLAINT

The Settlement Agreement states:

> "It is OHA's goal that all CCOs have confidence in the rate-setting process. To achieve that goal, OHA agrees to establish a process for CCOs to request a verification from an Independent Consulting Actuary, with reasonable limits on the scope and timeline for requests for verification."

Despite OHA's promise to establish an independent rate verification process, OHA never followed through on this commitment.

**IV.    OHA presented FamilyCare with an incomplete copy of the 2017 contract amendment and, despite OHA's purported commitment to transparency, refused to provide data to FamilyCare sufficient to ensure the rates are actuarially sound.**

**33.**

On or about October 11, 2016, OHA released the 2017 capitation rates for Oregon's CCOs. Like the rates released for the prior two rate years, FamilyCare's 2017 rates were, on average, the lowest of those offered to all CCOs. Because these rates failed to cover FamilyCare's reasonable cost of providing services under its contract with OHA, they would cause FamilyCare to incur significant operating losses in 2017. In connection with this release, OHA made available the CCO Rate Development Actuarial Certification (the "Certification") that was prepared by OHA's outside actuarial firm, Optumas. A true and correct copy of the Certification is attached hereto as Exhibit 3. The Certification states that "OHA asked Optumas to explore the drivers for CCOs that experienced significant increases."

**34.**

Before releasing the 2017 rates, OHA stated that it would issue the contract amendment for 2017 concurrently with the rates. That statement turned out to be false. OHA did not concurrently issue the contract amendment for 2017 with the 2017 rates. On or about November 1, 2016, OHA sent FamilyCare an incomplete contract amendment for 2017. The contract amendment for 2017 omits several attachments, including, but not limited to, FamilyCare's transformation plan attachment to Exhibit K.

**35.**

PAGE   12-    FOURTH AMENDED COMPLAINT

During this time, FamilyCare requested that OHA act upon its promise of transparency, both to the public and subject to the Agreement.  Concerned that the rates being offered would be inadequate to cover its reasonable costs, FamilyCare requested data sufficient to validate that the rates developed by OHA and its actuary were actuarially sound.  OHA's silence in response to these requests was deafening.

**36.**

On or around August 23, 2016, CMS addressed a similar request for documents.  CMS sought input from managed care organizations ("MCOs"), asking for a robust explanation from an MCO if it believed certain data should not be disclosed.  CMS directed that "**Generalized, conclusory claims of competitive harm are not a sufficient basis for us to invoke the Exemption**." (Emphases in original.)  CMS instructed MCOs that, if they chose to assert that any requested information should be withheld, they must, among other things: (1) Identify such information "clearly and specifically"; (2) Provide written comments and evidence showing that the designated information "constitutes commercial or financial information" protected by the exemption and that "disclosure of such information is likely to cause your organization substantial competitive harm"; (3) "Explicitly state the specific, reasonably foreseeable, substantial competitive harm that is likely to flow by releasing such information"; and (4) "Explain, in detail, any specific harm that will flow from the affirmative use of particular information by your competitors."  A true and correct copy of the August 23 CMS letter is attached hereto as Exhibit 4.

**V.    Despite its promise to Family Care to pursue an alternate dispute resolution ("ADR"), OHA failed to do so, while requiring FamilyCare to sign an incomplete version of the 2017 Amendment.**

**37.**

OHA required that FamilyCare sign the incomplete version of the 2017 Amendment before January 1, 2017.  The 2017 Amendment was to be calculated by OHA, per the parties' Agreement, without using "the Contract for 2016 or Settlement Credit" as a basis for calculating

PAGE   13-     FOURTH AMENDED COMPLAINT

FamilyCare's capitation rate in future years.  Federal law also required that the 2017 Amendment be actuarially sound, that is, the projected capitation rates and other revenue sources provide for all reasonable, appropriate, and attainable costs.  OHA gave FamilyCare insufficient data, or basis otherwise, to conclude that the 2017 Amendment was developed consistent with the parties' Settlement Agreement or federal law.

**38.**

While simultaneously requiring FamilyCare to sign the incomplete 2017 Amendment, and for consideration, OHA and FamilyCare entered into a contract, the Dispute Resolution Agreement, on December 30, 2016.  As consideration for entering the Dispute Resolution Agreement, FamilyCare agreed to "sign the 2017 Amendment before December 31, 2016, but that by so signing, FamilyCare will not waive any rights to contest—or any grounds for contesting—the 2017 rates."  In exchange, FamilyCare agreed to delay filing any lawsuit against OHA, disclose to OHA what FamilyCare believed its claims were, and cooperatively work to resolve the dispute between the parties.

**39.**

On December 30, 2016, although FamilyCare notified OHA that FamilyCare still did not have a full contract to review, and in reliance on the representations made by OHA and consistent with the Dispute Resolution Agreement contract, FamilyCare signed an incomplete version of the 2017 Amendment and transmitted the contract to OHA.  That same day, OHA returned to FamilyCare a "fully Executed 2017 contract," with this version containing "[t]he Exhibit K Attachment 1, Transformation  Plan."  OHA claimed that this was "omitted from the CCO's contract in error."  OHA stated that as to other portions of the 200-page plus document "[t]here is no other change to the attachment and has been imbedded in the executed contract."  As of December 30, 2016, OHA transmitted to FamilyCare the final agency order on the 2017 Amendment.

**40.**

PAGE  14-    FOURTH AMENDED COMPLAINT

Under the terms of the Dispute Resolution Agreement, OHA agreed that the "parties intend to conduct free and open discussion between them regarding the appropriate application of actuarial rates including such issues as appropriateness of the methodology, whether geographic areas come in to play with respect to methodology, the actuarial soundness of the rates, an explanation by OHA as to why OHA believes the rates are sound in light of CMS approvals, and any alternative actuarially sound methodology proposed by FamilyCare." The parties agreed that their actuaries would be present at the meetings, and that they would participate in good faith in at least three substantive discussions. The parties further committed that "they will work cooperatively and provide information that either OHA's actuary or FamilyCare's actuary believes is relevant and necessary to evaluate actuarial rates, subject to protection of confidential information." If the parties were to conclude that the Dispute Resolution required review of such confidential information, they further agreed to "cooperatively work toward an agreement for protection of Confidential Information." Upon receipt of the requested data, the parties agreed that FamilyCare would "demonstrate why the actuarial methodology is unsound and provide a specific alternative proposal based on methodology within the limits of OHA's waiver," provided OHA provided data that FamilyCare's actuary believed to be relevant and necessary to evaluate actuarial rates. Despite repeated requests from FamilyCare and its actuary, OHA provided none of the data necessary to evaluate actuarial rates.

**41.**

The parties' first Dispute Resolution meeting occurred on January 17, 2017. At that meeting, FamilyCare and its independent actuary explained the data that FamilyCare would need to evaluate the 2017 rates and the process by which they were developed. OHA presented nothing at the first meeting, nor did it provide any time frame as to when it would respond to FamilyCare's requests. FamilyCare sent a follow-up letter on January 25, 2017, again outlining the data its actuary needed to complete the work contemplated by the Dispute Resolution

PAGE  15-    FOURTH AMENDED COMPLAINT

Agreement.  OHA responded, tersely, on February 3, 2017,  but provided no substantive response to FamilyCare's inquiries and merely agreed to meet with FamilyCare's counsel to discuss the status of the parties' efforts under the Dispute Resolution protocol.

**42.**

FamilyCare met with counsel for OHA, not OHA or its actuaries, for a status conference on February 6, 2017.  At that meeting, OHA did not report progress on a single document request from FamilyCare but, instead, requested that FamilyCare again explain the documents sought under the Dispute Resolution protocol.  In the spirit of cooperation, on February 6, 2017, FamilyCare requested a subset of the same documents from OHA mentioned at the January 17, 2017, meeting and attached exemplars to help facilitate the process.  On February 8, 2017, OHA refused to produce any documents from FamilyCare's February 6, 2017, request, claiming that it would have to ask all potentially involved CCOs whether it considered any of the OHA's data to include a CCO's trade secret information.

**43.**

On February 9, 2017, FamilyCare responded to OHA, reiterating that not all the information requested implicates other CCOs and that OHA had agreed to work cooperatively to develop a process for protecting any confidential information.  A true and correct copy of the February 9, 2017, letter is attached as Exhibit 5.  At least one of FamilyCare's requests was targeted to the 2017 Reimbursement Review adjustments to FamilyCare's cost data, which could explain OHA's basis for cutting FamilyCare's costs by $34 million.  FamilyCare also requested that OHA agree to complete the second Dispute Resolution discussion by February 16, 2017—30 days from the first discussion as agreed to by the parties.  OHA refused to meet with FamilyCare as required by the parties' Dispute Resolution agreement.

**44.**

On February 21, 2017, OHA responded to FamilyCare's February 9, 2017, letter.  OHA changed its position that the February 6, 2017, status conference constituted a meeting, despite the fact that no representative from OHA was present, OHA's actuary was not present, and counsel for OHA's statement that it was a status conference.  OHA also indicated that it did not believe it was required to provide any information to FamilyCare, despite OHA's commitment in the Dispute Resolution Agreement, even if the data is not subject to any confidentiality protection.  OHA then provided opaque promises of participating in another meeting with FamilyCare, all the while stating that it was separately seeking federal approval of the 2017 capitation rates through CMS.

**45.**

To FamilyCare's extreme disappointment, OHA continued its practice of stonewalling any request for information.  OHA refused to provide FamilyCare with any of the information sought under the Dispute Resolution Agreement, including any explanatory data or justification to support its reduction of $34 million in costs from FamilyCare's base data, which resulted in lower capitation rates for FamilyCare in 2017.  OHA also refused to honor its promises under the Dispute Resolution Agreement to work cooperatively toward an agreement for confidential information, to explain to FamilyCare why it believes its rate development process was actuarially sound, or to participate in substantive meetings to further the Dispute Resolution Process.

**VI.   OHA used the Dispute Resolution Process to further its secretive smear campaign against FamilyCare.**

**46.**

Documents recently released by OHA in response to a public records request reveal why OHA did not work cooperatively and in good faith towards a resolution of the dispute between the parties as it had promised:  OHA was using the dispute resolution process as a delay tactic while it formulated a public relations campaign to smear FamilyCare, and it used the process as a

cover to obtain information from FamilyCare to use in that smear campaign.  As set forth in detail below, OHA began creating its so-called "communications plan" almost immediately after signing the Dispute Resolution Agreement, and it continued to develop the plan throughout the time it had promised FamilyCare that it would engage in the dispute resolution process.  Moreover, OHA co-opted materials it had requested from FamilyCare—and FamilyCare had shared in the good-faith belief that doing so would help facilitate resolution—for use in crafting its communications plan.

**47.**

During the negotiation of the Dispute Resolution Agreement, OHA insisted on removing a provision from that agreement that would have prevented the parties from communicating with third parties or the media about the dispute resolution process.  The reason, unbeknownst to FamilyCare at the time, was that OHA intended to use the media during the dispute resolution process.  At 10:16 A.M. on January 3, 2016, the morning of the first business day after FamilyCare and OHA executed the Dispute Resolution Agreement without that provision, OHA director Lynne Saxton directed the Director of OHA's External Relations Division, BethAnne Darby, to develop a "communications plan for the dispute resolution process."  Over the next week, OHA personnel compiled the communications plan it had created in 2016 and related materials for use in developing the new plan.  Ms. Darby delegated the task of drafting the communications plan to Courtney Crowell, telling her, "We will want to create a comms plan for Lynne [Saxton] as soon as possible."

**48.**

The first face to face meeting was scheduled for January 17, 2017.  The parties agreed that they would have actuaries present, as well as top-level management, for the parties.  FamilyCare appeared with its CEO and COO, its actuary, and its counsel.  OHA appeared with counsel from the Oregon Department of Justice, an actuary from Optumas, and Mark Fairbanks of the OHA.  The meeting began at 9:00 A.M. at the offices of FamilyCare's counsel.

PAGE  18-    FOURTH AMENDED COMPLAINT

FamilyCare's counsel presented a PowerPoint presentation, outlining in detail, the scope of FamilyCare's concerns, the scope of what it felt were inappropriate actuarial applications to FamilyCare, and questions FamilyCare had with the rate-setting process. The presentation also identified data FamilyCare's actuary needed to fully evaluate the process. FamilyCare coordinated its presentation with comments and explanations from its actuary. The Oregon Department of Justice lawyers, acting as counsel for OHA, requested that FamilyCare provide it with an electronic copy of the PowerPoint presentation. FamilyCare had invested significant time and effort in creating that slide deck, and it contained sensitive information intended to fulfill its obligations under the Dispute Resolution Agreement and to provide OHA with a detailed list of questions its actuary had regarding OHA's rate-setting process. Nevertheless, in the spirit of good faith, and in the belief that providing OHA with the slide deck would help facilitate resolution of the dispute—and that OHA was requesting the slide deck in good faith to use in furtherance of the goals of the Dispute Resolution Agreement—FamilyCare agreed. At precisely 9:46 A.M, while the parties were meeting, FamilyCare emailed an electronic version of the presentation to counsel for OHA. FamilyCare continued with its presentation, soliciting comments from FamilyCare's actuary to more precisely address the questions FamilyCare was concerned about. At the conclusion of the presentation, while the parties were still engaged in what was supposed to be a three-hour meeting, OHA representatives asked for time to consider the information presented before responding. FamilyCare provided a private room for OHA representatives to use. After spending more than one hour in that room, OHA representatives returned to the meeting room at approximately 11:25 A.M., but only to tell FamilyCare that they were not prepared to respond to any of the issues FamilyCare had and that they were leaving. At no time during the meeting did OHA's actuary volunteer information or answer a question.

**49.**

On information and belief, OHA representatives used the time they spent in the private room to discuss how to use FamilyCare's transparency and good faith to OHA's advantage in

PAGE 19-    FOURTH AMENDED COMPLAINT

crafting its communications plan, rather than to analyze how to advance the goals of or fulfill the promises made under the Dispute Resolution Agreement. Unbeknownst to FamilyCare, and without notifying FamilyCare, before leaving the dispute resolution meeting, OHA representatives forwarded FamilyCare's slide deck to individuals at OHA who were not present at that meeting. In fact, before OHA representatives returned to the meeting room, Ms. Saxton had received a copy of the slide deck and, at 11:23 A.M., forwarded it to Ms. Darby, telling her that it "will be helpful to us in developing our communication strategy." Ms. Darby, in turn, forwarded the slide deck to Ms. Crowell, the individual she had tasked with creating the communications plan.

## 50.

As OHA drafted its communications plan, it took care to make sure to use FamilyCare's slide deck to its advantage and to synchronize its messaging with the dispute resolution process. At 2:54 P.M. on January 20, 2017, Ms. Crowell provided Ms. Darby with "a first draft of the FamilyCare communications plan." Later that day, apparently dissatisfied that the first draft did not rely heavily enough on FamilyCare's slide deck, Ms. Darby directed Ms. Crowell's attention back to the slide deck as a source of information about FamilyCare's strategy and "themes" that she wanted to counter. Ms. Darby also asked OHA counsel for information about the timing of the dispute resolution process to "help us plan our communications."

## 51.

At 10:40 A.M. on January 26, 2017, Ms. Crowell sent Ms. Darby an updated draft of the communications plan. Twenty-three minutes later, Ms. Darby forwarded the draft to Ms. Saxton and told her that Ms. Crowell "use[d] the slides that FC [FamilyCare] presented at the last session" and that Ms. Darby had conferred with, among others, OHA's finance director in building out the communications plan. All at this activity was done with the full awareness, approval, and encouragement of the top OHA official, Lynne Saxton, contrary to what she later stated in her letter of apology. This activity described above took place before any litigation was

PAGE 20-    FOURTH AMENDED COMPLAINT

filed and during the period in which OHA had promised to participate in good faith pursuant to the terms of the Dispute Resolution Agreement.

**52.**

Meanwhile, as set forth above, FamilyCare continued to try to engage OHA in further meetings pursuant to the Dispute Resolution Agreement and to get OHA to fulfill its promises, including the promise to give a presentation about its rate-setting process and to provide information that FamilyCare's actuary had identified as necessary to his analysis. All the while, FamilyCare was completely unaware of what OHA was doing behind the scenes. OHA never substantively engaged in the dispute resolution process, never delivered the promised presentation to FamilyCare, and never produced the promised information.

**53.**

OHA did, however, ask FamilyCare to narrow and provide more specificity regarding its requests for information and, with respect to the information FamilyCare sought that implicated data submitted by other plans to CCOs in connection with the rate-setting process, to provide exemplars of that information. FamilyCare obliged, sending OHA specific requests along with spreadsheets reflecting sensitive, internal FamilyCare financial data. Without seeking or obtaining permission from FamilyCare, OHA sent those spreadsheets to each of the fifteen other CCOs. Yet even after providing FamilyCare's data, and thereby creating an asymmetry of information among the plans, OHA asserted that similar data from the other CCOs was trade secret and refused to provide it to FamilyCare.

**54.**

At 3:19 P.M. on February 18, 2017, Ms. Saxton signaled her approval of the communications plan which had been sent to her on January 26, 2017, telling Ms. Darby that she had reviewed it, and there were some "new developments that I think will build on the already good start you have outlined….Thank you!"

**55.**

PAGE 21-    FOURTH AMENDED COMPLAINT

The "communications plan" that OHA created during the dispute resolution process was a smear campaign targeting FamilyCare and seeking to undermine it in the eyes of the public and the legislature, all the while hoping to publicly portray a façade of neutrality.  The plan was, in OHA's own words, designed to:

o    Portray FamilyCare as an "outlier" that is "more concerned with the bottom line and increasing revenues than the health of Oregonians";

o    Use media to "hurt [FamilyCare's] credibility in the news";

o    "Highlight FamilyCare as an outlier and only worried about profit margins";

o    Promote HealthShare, the other CCO that operates in FamilyCare's service area, "as a truly inclusive CCO that provides greater access to Oregonians with high cost medical needs";

o    Use vulnerable Medicaid enrollees as pawns by getting "a few discrete examples of OHP members with high cost medical issues (i.e. HIV) who chose Health Share b/c FamilyCare couldn't provide them with the care they need."

The communications plan also specifies that OHA would carry out the plan in a secretive manner so that OHA could pretend to be neutral.  The plan states that OHA would hide its involvement through "off the record" discussions with news media and by using "legislators and/or other lobbyists to pitch stories to news media if possible so that OHA can staff [sic] neutral."

**56.**

After details of OHA's communications plan became publicly known, Ms. Saxton sent a letter of apology to FamilyCare.  In that letter, dated August 7, 2017, Ms. Saxton acknowledged that "sharing negative information about FamilyCare with media" is "not an acceptable strategy for OHA or any state agency."  But Ms. Saxton sought to downplay the communications plan as a "draft" that was "developed by OHA staff in the heat of ongoing litigation" and "was not implemented or acted on in any way."  In her apology letter, Ms. Saxton did not mention that she had directed the creation of the communications plan, that she had signaled approval of the

PAGE  22-    FOURTH AMENDED COMPLAINT

"draft" as a "good start," that other executive-level OHA personnel were involved in creation of the plan, that the plan was developed during and for the dispute resolution process--not the heat of litigation--or that OHA co-opted materials shared in good faith by FamilyCare during that process for use in developing the plan. The following day, August 8, 2017, Governor Kate Brown announced that Ms. Saxton had tendered her resignation, effective August 31, 2017.

**57.**

Despite Ms. Saxton's claim that the communications plan was not implemented or acted on in any way, OHA did implement its communications plan, at least in part, by, among other things, sending "targeted press releases" to The Portland Business Journal, Willamette Week, Portland Tribune, Oregon Public Broadcasting, the Oregonian and The Lund Report.  OHA has also sent personalized emails to journalists and conducted other outreach to further its messaging.  And media reported that OHA's position is that FamilyCare "is just trying to pad its profits."  Ms. Saxton made statements to the media consistent with the messaging in the communications plan, telling journalists, among other things, that the disagreement between the parties "has been driven by FamilyCare's goal to be paid more Medicaid dollars" and trying to undermine FamilyCare by implying that it is upset simply because "they didn't get the rate they wanted for 2017."  Additionally, OHA also published reports, including the January 2017 publication of "Oregon's Health System Transformation Quarterly Legislative Report" containing financial comparisons that portrayed FamilyCare as an "outlier."  Documents obtained as part of the recently released communications plan show that OHA was aware that the financial information presented was not comparable and that OHA chose to present the financial comparisons in a way that would fulfill its communications plan to portray FamilyCare as an "outlier" that is "more concerned with the bottom line and increasing revenues than the health of Oregonians."  OHA also issued a press release dated April 11, 2017, regarding the motion to dismiss it filed in this lawsuit, and implying that FamilyCare's business decisions—not the low rates from OHA—were to blame for any financial difficulties FamilyCare was having and that

PAGE  23-    FOURTH AMENDED COMPLAINT

FamilyCare's focus was not on the health and care of OHA members.  That press release, which is no longer available on OHA's website, is a continuation of the communications plan discussed above.

58.

Despite the misstatements in Ms. Saxton's apology, Governor Brown's spokesman recently told the media that Ms. Saxton had "taken full responsibility for" the communications plan.  The spokesman confirmed that Ms. Saxton resigned "as a consequence of" the communications plan.  Media reports about a letter from Ms. Saxton to OHA employees stating that "staff" made mistakes "when they were thinking out loud in the midst of an adversarial litigation process" show that she continues to misrepresent the circumstances of the communications plan.

**VIII.   OHA and Patrick Allen presented and proposed a 2018 contract amendment with actuarially unsound rates, and demanded that FamilyCare sign it without notice of the amount of compensation FamilyCare would be entitled to under the contract.**

59.

On September 1, 2017, following Ms. Saxton's resignation at Governor Brown's request, Patrick Allen assumed leadership of OHA as its new interim director.  By the time that Mr. Allen took up this position, the process of setting the 2018 rates was well underway, and already, problems were once again evident.  Based on preliminary figures and analysis provided by OHA, FamilyCare believed that the 2018 rates reflected many of the same data errors and actuarially unsound methodology as prior rate years, and that as a result, they may be insufficient to cover FamilyCare's reasonable, appropriate and attainable costs of providing the medical care required under the terms of its contract with OHA.  As it had in prior years, FamilyCare was diligent in providing information to OHA about its concerns with the soundness of the 2018 rates and OHA's methodology for arriving at those rates.

**60.**

On October 10, 2017, responding to ongoing questions about the soundness of its rate-setting methodology, OHA announced that it was "temporarily pausing the 2018 rate development process" to conduct an actuarial and regulatory review of the 2018 rate development methodology.  On October 31, 2017, OHA announced that it had selected actuarial firm Lewis & Ellis to perform the actuarial review, and the law firm Manatt, Phelps, & Phillips LLP to perform the regulatory review by comparing the 2018 rate development methodology against CMS regulations and Oregon's 1115 waiver to validate compliance.  The statement of work for the actuarial review stated that "a review of and opinion with respect to OHA's policy decisions to truncate base data and review administrative costs or opportunities to improve efficiency is not within the scope of the engagement."

**61.**

On or around October 31, 2017, OHA sent FamilyCare a draft of the proposed contract amendment for 2018.  OHA explained that the rates in the draft contract amendment "may change based on the outcome of the pending independent reviews and redetermination analysis."

**62.**

OHA admits that these rates were calculated using the same methods that were used to set the 2017 rates. These methods continue to be actuarially unsound.

**63.**

OHA's method for calculating the 2018 rates violates the Settlement Agreement. The Settlement Agreement provides that "OHA shall not use rates paid to FamilyCare under the Contract for 2016 or the Settlement Credit as a basis for limiting the amount that can be paid to FamilyCare in future rate years." Nevertheless, on information and belief OHA considered the Settlement Credit and used it as a factor in setting the 2018 rates.

**64.**

The 2018 rates offered to FamilyCare were $95 million lower than FamilyCare's projected costs. After operating at a loss for 2016 and 2017 because of OHA's actuarially unsound rates, accepting OHA's 2018 rates would deplete FamilyCare's reserves by June 2018 and would force FamilyCare out of the Medicaid market.

**65.**

On December 4, 2017, OHA released the reports from actuarial and regulatory review conducted by Lewis & Ellis and Manatt, Phelps, & Phillips.  Lewis & Ellis confirmed that "CY2018 rates were developed in a similar methodology as CY2017 rates."  Based on the information provided by OHA and Optumas, Lewis & Ellis concluded that Optumas appeared to have followed generally accepted actuarial principles in the development of the rates, but clarified that "L&E did not audit [raw claim] data but relied on OHA and Optumas to provide accurate base data for the[] CCOs."  Moreover, Lewis & Ellis recommended that Optumas "strengthen the documentation and communication regarding changes made to the base data because inconsistencies appear and lack of detail calls into question the methodologies employed by Optumas."

**66.**

On December 4, 2017, OHA announced its proposed approach to implementing the recommendations of the completed reviews and finalizing the 2018 rates.  OHA proposed no change to the 2018 rates, but indicated that it would work with Optumas to prepare an addendum to the rate certification to address provider reimbursement analysis, analysis of the rate cell outlier identified in the independent actuarial review, the use of medical loss ratios, and the development of non-medical loads.  OHA further noted "the need to analyze the impact of the recently completed redetermination clean-up work on 2018 CCO rates."  OHA indicated that it planned "to work with Optumas to analyze this impact, along with any other emerging issues that may materially affect rates, to determine if a prospective amendment to the rates is necessary."

PAGE  26-    FOURTH AMENDED COMPLAINT

**67.**

In addition to its concerns with the soundness of OHA's rate-setting methodology, FamilyCare has also long identified errors in the data used to develop its capitation rates. The rates presented to FamilyCare for 2018 appeared, like the rates offered for prior years, to be riddled with errors that materially impacted what would be paid to FamilyCare and other CCOs. Among other issues, FamilyCare pointed out—as it had in years and months past—that basic errors in enrollment and eligibility data caused many FamilyCare members to be classified in the wrong age or category of aid cohort for purposes of determining the capitation rate at which FamilyCare was compensated for those members. Due to the particular mix of members enrolled in FamilyCare's plan, these data and methodology errors—which impacted certain categories of Oregon Health Plan members more than others—had a disproportionate impact on FamilyCare in reducing the amount paid to it under its contract with OHA. Throughout December 2017, FamilyCare continued to request clarification from OHA on this issue and discuss its concerns related to the 2018 rates and the data used to calculate those rates.

**68.**

That OHA's management of the data it relied on to set its capitation rates, and of enrollment data in particular, was plagued with errors was publicly confirmed by the Oregon Secretary of State on November 29, 2017, with the release of the Secretary's formal audit report on improper Medicaid payments made by OHA. In this report, the Secretary of State's auditors concluded that due to systemic problems in OHA's system of tracking eligibility and enrollment data for Oregon Health Plan members, OHA had spent "millions of dollars of avoidable Medicaid expenditures," noting that this "critical issue" had not been publicly disclosed until it was raised in May 2017 by an Auditor Alert by the Secretary of State. FamilyCare had previously identified these same errors and brought them to OHA's attention years before the Secretary of State's audit, but OHA had declined to address them and failed to notify CMS of these issues.

PAGE 27-    FOURTH AMENDED COMPLAINT

**69.**

On December 8, 2017, OHA agreed that the data errors identified by FamilyCare necessitated a redetermination analysis that would materially affect FamilyCare's compensation under the 2018 Amendment.  Although FamilyCare had repeatedly alerted OHA to these errors for several years and requested a prompt assessment of the impact of the errors on the 2018 rates, OHA committed to give FamilyCare a "preliminary analysis" of the necessary redetermination no earlier than December 29, 2017—the last business day of the year and the last day to sign the 2018 Amendment—in order to permit FamilyCare to determine whether the adjusted 2018 rates, based on this re-determination, would allow FamilyCare to sign the 2018 rate amendment and continue providing services to Medicaid patients throughout the full term of FamilyCare's five year contract with OHA.

**70.**

In a good faith effort to aid OHA in determining the impact of these data errors on CCO capitation rates, both historically and in 2018, and in an attempt to reach a resolution of these issues in a way that would permit FamilyCare to sign the full 2018 rate amendment and continue serving Oregon's Medicaid population into the future, FamilyCare provided detailed information and analysis to OHA regarding how the correction of these errors could impact its rates.  In addition, FamilyCare provided OHA with detailed information on its finances and estimated premium deficiency for 2018, as well as information regarding what additional compensation FamilyCare would require and how it might be provided.  In sharing this information with OHA, FamilyCare reasonably believed that Mr. Allen and OHA would work with FamilyCare to arrive at a mutually acceptable resolution that would result in both actuarially sound rates and permit FamilyCare to continue to operate, thereby avoiding unnecessary disruption to Oregon's Medicaid system and the vulnerable Oregonians it serves.  Upon information and belief, rather than using the information provided by FamilyCare to aid in arriving at a mutually acceptable

solution to the problems with the 2018 rate amendment, Mr. Allen and OHA used that information to aid in their policy decision and plan to put FamilyCare out of business.

**71.**

Following these disclosures, OHA's dialogue with FamilyCare about resolving the data errors that had impacted its rates came to an abrupt end. Instead, on December 20, 2017, Mr. Allen gave FamilyCare an ultimatum. Mr. Allen demanded that FamilyCare decide within 24 hours whether to sign the 2018 rate amendment. In requiring FamilyCare to accept or reject the 2018 Amendment by December 21, 2017, Mr. Allen moved the deadline for signing that agreement up by ten days. Mr. Allen shorted the deadline and made this demand even though OHA had yet to provide any of the promised analysis on what compensation FamilyCare would receive in 2018 once the data errors were corrected, and despite the fact that under ORS 414.652, OHA is required to "give a coordinated care organization at least 60 days' advance notice of any amendments the authority proposes to existing contracts between the authority and the coordinated care organization, or to contracts to be renewed, including the global budget paid to the coordinated care organization under the contract."

**72.**

In response to Mr. Allen's demand and new deadline, FamilyCare asked whether, in light of this change, OHA would provide the promised rate re-determination analysis earlier in order to allow FamilyCare to review that information prior to deciding whether to accept or reject the 2018 Amendment. Mr. Allen responded that OHA would not be providing any further information prior to this new signing deadline of December 21, and stated that OHA was no longer contingency planning for a *potential* transition of FamilyCare out of Oregon's Medicaid managed care marketplace, but that it was in fact implementing a transition plan to move FamilyCare's members and providers to other CCOs.

**73.**

PAGE   29-     FOURTH AMENDED COMPLAINT

Faced with actuarially unsound rates that would cause FamilyCare to run a deficit in 2018 exceeding the amount of its available reserves, and lacking any information from OHA about what compensation FamilyCare would actually receive in 2018 upon the correction of its acknowledged data errors impacting CCO capitation rates, FamilyCare was unable to sign the 2018 Amendment on December 21, 2017, as demanded 24 hours earlier by Mr. Allen.

**74.**

Instead, on December 22, 2017, FamilyCare and OHA entered into a shortened one-month 2018 rate amendment to allow FamilyCare to continue serving its Medicaid members during January 2018 so that those members had more time to transition from FamilyCare to other CCOs. On the same date, FamilyCare and OHA entered into a personal services contract to assist with the transition.

**75.**

On December 29, 2017 at 4:55 p.m., with five minutes left in the last business day of the year, OHA emailed FamilyCare confirming the agency's rate setting process had indeed been materially impacted by these previously acknowledged data errors, which FamilyCare had been raising for years. OHA's email included a "Preliminary Redetermination Analysis" of the impact of these errors on the 2018 rates. However, although OHA's "Analysis" provided some additional detail on the scope of these errors' impact, OHA still failed to provide an estimate of what FamilyCare's rates would be under the 2018 rate amendment, stating merely that this preliminary review "indicate[d] a potential impact of 0-5% on 2018 Tri-County rates." In other words, OHA stated that FamilyCare's compensation under the 2018 rate amendment, had it been able to sign that agreement for its full term, could have increased by tens of millions of dollars, or not at all. OHA's "Analysis" provided nothing in the way of information about the impact of these errors on capitation rates paid to CCOs for work performed in 2017 and other prior rate years.

**76.**

On January 1, 2018, pursuant to its agreement with OHA, FamilyCare began the process of shutting down its Medicaid business.  In the course of doing so, it has been forced to lay off approximately 250 employees and transition its 115,000 FamilyCare members to other CCOs, primarily Health Share of Oregon.

**77.**

FamilyCare's forced shut down of its Medicaid business has also had a detrimental impact on the providers with whom it contracts and the Medicaid patients it serves.  As a result of FamilyCare's exit from the Medicaid market, primary care and mental health providers throughout the Tri-County region may be forced to turn away Medicaid patients or close their doors altogether.  For example, in 2015, Recovery Works NW developed an innovative method for treating patients suffering from opioid addiction.  Recovery Works' method, which combines intensive behavioral therapy with medical treatments for the physical symptoms of addiction and withdrawal, requires a higher reimbursement rate than traditional outpatient treatment models, but is also more successful.  Unfortunately, most Medicaid patients do not have access to these treatments.  In 2016, FamilyCare became the only CCO to cover treatment at Recovery Works after it realized that Recovery Works' method is less costly in the long run because it reduces expensive inpatient treatment and emergency room visits.  As a result of this partnership, Recovery Works took steps in 2017 to significantly expand its services to Medicaid patients in the Tri-County region.  Recovery Works has publicly stated that because FamilyCare is the only CCO who provides coverage for its services, and other CCOs have indicated that they are unwilling, or unable, to pay reimbursement rates sufficient to support its business, more than 350 Medicaid patients who currently receive services from Recovery Works may end up losing their access to this care and being forced to abandon the progress they have made in their addiction treatment under this model of care.

**78.**

PAGE  31-    FOURTH AMENDED COMPLAINT

On January 23, 2018, a month after OHA forced FamilyCare to accept or reject the full 2018 rate amendment without knowing the rates it would actually receive under that amendment, and after FamilyCare was as a result forced from the Medicaid market, OHA issued a "CY18 Rate Update" stating that the agency had made a "policy decision" to update the 2018 rates to address the data errors that it had previously recognized, retroactively effective from January 1, 2018.  Although this Rate Update did not address all of the other data and methodology problems affecting the 2018 rates that FamilyCare had identified, it did result in a material impact on the rates to be paid under the 2018 rate Amendment.  The Rate Update stated that as a result of OHA's proposed rate "redetermination", the capitation rates paid to CCOs under the 2018 rate amendment would increase by roughly 2-3%.  For FamilyCare, this change in its rates would have resulted in an increase of no less than $20 million in additional compensation under the contract had FamilyCare continued to provide Medicaid services to Oregon Health Plan members throughout 2018.  OHA stated falsely in materials provided to CCOs on January 24, 2018 regarding the "redetermination" that the agency was only "made aware of" the underlying data error that had resulted in the need to correct the 2018 rates in "late in 2017."  In fact, FamilyCare had been informing OHA about these data errors for years, and OHA's internal communications show that it was in fact aware of these errors and had been for years.

**79.**

The enrollment and eligibility errors admitted by OHA and corrected in the January 23, 2018 "policy decision" also infected OHA's capitation rates for 2015, 2016 and 2017.  As a result of these errors, FamilyCare was underpaid for the services it provided for those years pursuant to its contract with OHA.  Were OHA to correct these known errors for these prior rate years, it would generate tens of millions of dollars in additional compensation to FamilyCare for services previously rendered during those years.  To date, OHA continues to be silent as to the impact of these data errors on past rates and what compensation it will provide to FamilyCare and other CCOs who were underpaid as a result.

PAGE   32-    FOURTH AMENDED COMPLAINT

**80.**

Had FamilyCare been afforded access to full and complete information about what its rates would actually be under the 2018 rate amendment and what was owed to it for services previously rendered under past amendments, FamilyCare would have reconsidered whether to sign the 2018 rate amendment, permitting it to continue to serve Oregon's Medicaid population throughout 2018 and beyond. Instead, because of OHA and Director Allen's conduct in requiring FamilyCare to accept or reject the full 2018 rate amendment by December 21, 2017, with just 24 hours' notice and without sufficient information about what its capitation rates would actually be in 2018, FamilyCare's leadership and board of directors were deprived of the opportunity to make a fully-informed judgment in determining whether FamilyCare should sign the full 2018 rate amendment and thereby continue to operate its Medicaid line of business. Faced on December 20, 2017 with a contract amendment to which it could not legally agree, FamilyCare was forced to reject the full 2018 rate amendment, agreeing instead to a one-month agreement in order to permit the orderly transfer of its members to other CCOs. As a result of these actions by Mr. Allen and OHA, FamilyCare began shutting that Medicaid business down: laying off hundreds of employees, terminating numerous agreements with contractors and providers, and transferring all of its members to other CCOs. As a consequence, FamilyCare has suffered a near-total loss of its enterprise value.

## FIRST CLAIM FOR RELIEF

### (Defendants Patrick Allen and Lynne Saxton)

### (Deprivation of Civil Rights)

**81.**

FamilyCare incorporates by reference all of the foregoing allegations.

**82.**

The First Amendment to the United States Constitution guarantees FamilyCare's right to comment on the actions of government officials, to petition the government for redress of grievances, and to access the courts.

**83.**

FamilyCare has exercised its First Amendment rights by, among other things, requesting information necessary to evaluate the Defendants' rate-setting decisions; notifying Defendants that the rates were incorrect and unsound and identifying errors in the data and methodology used to set the rates for FamilyCare and other CCOs; requesting that Defendants correct those errors and redress the harm they caused; communicating with the Oregon legislature, the media, and CMS about Oregon's Health Program; proposing policy changes to increase transparency and improve the overall system; raising concerns about OHA's compliance with state and federal law, it's use of taxpayer funds, and procedural and systemic irregularities in the administration of the agency; refusing to sign contract amendments with erroneous and unsound rates; and filing lawsuits against Defendants, including this suit.

**84.**

Acting under color of state law, Defendants retaliated against FamilyCare for FamilyCare's exercise of its First Amendment rights by, among other things, setting rates that were unreasonable, biased, actuarially unsound, and based on erroneous data and methodology; refusing to correct known errors in data and methodology, developing and implementing a smear campaign against FamilyCare, refusing to grant FamilyCare the procedural protections guaranteed by law, and implementing a policy decision and plan to put FamilyCare out of business. Defendants have continued targeting FamilyCare even after FamilyCare was forced to close its Medicaid business. FamilyCare's protected expression was a substantial or motivating factor in the Defendants' decision to act as they did.

**85.**

As a result of Defendants' retaliation against FamilyCare's exercise of its First Amendment rights, FamilyCare has suffered an indivisible injury through the loss of its Medicaid business and tangible and intangible assets, including its relationships with providers and employees, and its goodwill.

**86.**

The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Corporations are "persons" within the meaning of this provision.

**87.**

Under Oregon law, businesses have a property interest in their "goodwill." That term is defined to include: "favor or advantage in the way of custom that a business has acquired beyond the mere value of what it sells whether due to the personality of those conducting it, the nature of its location, its reputation for skill or promptitude or any other circumstance incidental to the business and tending to make it permanent."

**88.**

At all times relevant to this complaint, FamilyCare enjoyed substantial goodwill among members and providers. This goodwill was the product of, among other things, FamilyCare's commitment to providing high-quality, low-cost preventive care with reasonable reimbursement for providers.

**89.**

As a Coordinated Care Organization and signee of the 2015 contract with OHA, FamilyCare also has a legitimate claim of entitlement to, and thus a property interest in, unbiased, actuarially sound capitation rates for the 2018 year.

**90.**

Patrick Allen deprived and conspired to deprive FamilyCare of its constitutionally protected property interests described above, without due process of law. Allen, acting under

color of law, committed due process violations by forcing FamilyCare to decide whether to sign the full 2018 Amendment on December 20, 2017, in violation of ORS 414.652(4) and without notice of the compensation FamilyCare would be entitled to under the contract.

### 91.

Lynne Saxton and Patrick Allen's conduct violates 42 U.S.C. § 1983.

### 92.

FamilyCare is entitled to damages from Lynne Saxton and Patrick Allen, in his individual capacity, for injury resulting from the deprivation of rights secured by the Constitution, in an amount to be proven at trial, not less than $50,000,000.

### 93.

FamilyCare is also entitled to injunctive relief directing Patrick Allen, in his official capacity as Director of OHA, to cease all efforts to retaliate against FamilyCare and to prevent Mr. Allen from prohibiting FamilyCare, directly or indirectly, from entering a bid for future Medicaid contracts with OHA.

### SECOND CLAIM FOR RELIEF

### (Breach of Settlement Agreement—Specific Performance)

### 94.

FamilyCare incorporates by references all of the foregoing allegations.

### 95.

The Settlement Agreement between FamilyCare and OHA is valid and binding.

### 96.

After FamilyCare and OHA entered into the Settlement Agreement, OHA represented to FamilyCare that it had made a policy decision to reduce OHA's payments to FamilyCare because of the amount that FamilyCare pays to primary care providers for preventive care services.  OHA represented to FamilyCare that it had made a policy decision to limit the increase of primary care

payments to 1.5% per year. FamilyCare requested a copy of the formal policy decision, and OHA responded that it would "work something up."

**97.**

Beginning in November 2014, FamilyCare began reimbursing certain primary care providers at a $65 per unit conversion factor. FamilyCare was very transparent and upfront with OHA about the increase in reimbursements to primary care providers, as FamilyCare had been evaluating its reimbursement to primary care providers and adjusting the unit conversion factor since 2014. FamilyCare submitted this information to OHA in its cost templates that were part of the rate setting process. FamilyCare increased its payments to primary care providers to match the amount that private insurance companies paid to primary care providers. FamilyCare decided to match the payments made by private insurance companies to primary care providers to ensure that its Medicaid-eligible OHP members would have the same access to primary and preventive care that members of private health insurance plans have. This increased access to primary care results in improved outcomes and reduced health care expenses overall.

**98.**

Equal access to primary care providers is essential to achieving better health outcomes for OHP members. Primary care providers are less willing to see OHP members when the members' managed care organizations, including CCOs, pay less than private insurance plans pay for preventive care services. Moreover, increased preventive care services is a focus of Oregon's CCO model and is in line with OHA's represented philosophy that "primary care and prevention" allow health plans and providers "to better manage chronic conditions and keep people healthy and out of the emergency department." The recent study by Portland State University bears this out. For every $1 increase spent on primary and preventive care services there is an average $13 of savings to the health care system. Reducing capitation rates due to increased payments to primary care providers leads to the perverse result of less preventive care, leading to more specialist appointments and more emergency room visits. OHA represents

PAGE 37-    FOURTH AMENDED COMPLAINT

frequently that specialty care and emergency room visits are indicators of worse health outcomes, worse health care services, and higher costs. According to OHA, that is not the "Oregon Way."

**99.**

FamilyCare has consistently operated within its global budget and continues to do so, even though the global budgets for 2015, 2016, 2017, and 2018 were insufficient to cover FamilyCare's operating expenses. In addition, FamilyCare has met 100% of its quality incentive metrics under its contract with OHA. Under Oregon's CCO model and the global budget concept, OHA should not penalize FamilyCare for increases in specific rates of reimbursement.

**100.**

Despite OHA's representation that it encourages preventive care and that it evaluates CCOs based on their ability to operate within a global budget, OHA reduced FamilyCare's rates in 2017 and again in 2018 by tens of millions of dollars (the "Clawback") because, according to OHA, FamilyCare has paid and continues to pay too much to primary care providers to deliver preventive care services to Oregon's Medicaid-eligible population. In addition, the Clawback will affect bonus payments that are due to certain primary care providers who achieve quality incentive metrics for work performed under the 2017 amendment.

**101.**

ORS 414.652 prohibits OHA from making retroactive rate amendments to FamilyCare's contract unless (1) the amendment does not result in a claim by OHA for the recovery of amounts paid by OHA to FamilyCare before the date of the amendment; or (2) CMS notified OHA, in writing, that the amendment is a condition for approval of the contract with FamilyCare by CMS. The Clawback—OHA's plan to reduce FamilyCare's payments in 2017, and again in 2018, by unilaterally implementing a reduction in FamilyCare's costs by at least $34 million because of the reimbursement amount FamilyCare has paid to primary care providers since November 2014—is a claim by OHA to recover amounts paid to FamilyCare before the

PAGE  38-    FOURTH AMENDED COMPLAINT

proposed 2017 rates were issued.  Thus, the Clawback would be a retroactive rate amendment in violation of Oregon law.

**102.**

More importantly, OHA's Clawback violates the Settlement Agreement.  Under the Settlement Agreement, OHA covenanted that it would "not use rates paid to FamilyCare under the Contract for 2016 or the Settlement Credit as a basis for limiting the amount that can be paid to FamilyCare in future rate years," unless required under the Section 1115 Demonstration Project (the "Waiver").  The Waiver does not require OHA to implement the Clawback.  Spending under Oregon's Medicaid program is so far below any limit in the Waiver that the Waiver has no practical effect at all on FamilyCare's budget.  OHA is in breach of the Settlement agreement by reducing FamilyCare's 2017 and 2018 rates to penalize FamilyCare for the rates it received from OHA in 2016 and/or for the Settlement Credit that FamilyCare received pursuant to the Agreement.  This Clawback is inconsistent with OHA's otherwise stated policies, indicating that OHA made a choice to recoup payments made to FamilyCare in the form of the 2016 rates and/or the Settlement Credit by reducing FamilyCare's 2017 rates.

**103.**

On information and belief, in developing the 2017 and 2018 capitation rates, OHA asked Optumas to analyze certain cost drivers that were unique to FamilyCare, including, but not limited to, FamilyCare's increased reimbursement rate to primary care providers.  On information and belief, OHA then used the information gathered by Optumas to target FamilyCare for the Clawback and/or to cap FamilyCare's 2017 and 2018 rates for primary care services at an amount below FamilyCare's reimbursement rate.  On information and belief, FamilyCare is aware of other CCO's whose reimbursements to primary care providers are at or possibly above FamilyCare's reimbursement levels.

**104.**

PAGE  39-    FOURTH AMENDED COMPLAINT

In addition, OHA and Optumas used a variety of actuarially unsound methods to give FamilyCare lower capitation rates for 2017 and 2018 as compared to other CCOs.  For example, the cost-relativity factor reflects a comparison of different CCOs' costs incurred in delivering specific services to certain populations.  Under the cost-relativity factor, CCOs that spend more money to deliver the same services that are delivered by other CCOs for less money will receive higher capitation rates from OHA.  In other words, CCOs that spend more will get more.

**105.**

The other actuarially unsound methods used by OHA and Optumas over the past five years include, but are not limited to, the following: (1) base data expense exclusions (*e.g.*, the Clawback for FamilyCare's reimbursement to primary care providers); (2) reclassification of certain medical expenses to administrative expenses and reduction in the administrative expense allowance; (3) application of a regional expense allowance; (4) selectively and inconsistently switching between cost-relativity and risk-scoring methods across different categories; and (5) changing the basis for rate components between statewide data, regional data, and plan-specific data.  OHA has used some or all of these questionable methods to develop 2017 and 2018 rates for FamilyCare that are lower than all of the other CCOs' rates, significantly lower than the other CCO that serves residents in the Tri-County region, and that are insufficient to cover FamilyCare's operating expenses.  OHA and Optumas have created a menu of actuarial levers used to adversely impact FamilyCare.

**106.**

FamilyCare does not know the extent to which OHA and Optumas selectively used multiple actuarially unsound methods to penalize FamilyCare because OHA has refused to provide FamilyCare access to the underlying data that supports the 2017 and 2018 rates.  OHA's selective use of actuarially unsound methods is an impermissible use of the rates paid to FamilyCare in 2016 and is, therefore, a violation of the Agreement.

**107.**

PAGE  40-    FOURTH AMENDED COMPLAINT

OHA baited FamilyCare into signing and executing an incomplete 2017 Agreement on December 30, 2016, with an empty promise that OHA would provide FamilyCare with the data it had been requesting for months. OHA's actions were in contravention of OHA's requirement to provide FamilyCare with a complete contract in advance of FamilyCare signing the contract. OHA then signed and executed the incomplete 2017 Amendment, inserting afterwards the missing portions of the 2017 Amendment. On information and belief, OHA withheld certain attachments to FamilyCare's contract amendment for 2017 so that FamilyCare will be forced to sign the contract amendment without having a meaningful opportunity to negotiate contract terms.

**108.**

FamilyCare has fully performed its obligations under the Agreement.

**109.**

FamilyCare has suffered substantial and irreparable harm from the 2017 and 2018 Amendments. The global budgets that OHA approved for FamilyCare in 2015 and 2016 were insufficient to cover FamilyCare's operating expenses. Likewise, the 2017 Amendment was insufficient to cover FamilyCare's operating expenses for 2017. As a result, because the rates offered in the full 2018 rate amendment presented to FamilyCare on December 20, 2017 were insufficient to allow FamilyCare to continue operating into the future, FamilyCare was forced to reject the full 2018 Amendment and begin shutting its Medicaid business down while operating under a one-month contract.

**110.**

FamilyCare seeks specific performance of OHA's obligation to "not use rates paid to FamilyCare under the Contract for 2016 or the Settlement Credit as a basis for limiting the amount that can be paid to FamilyCare in future rate years," including, but not limited to, 2017.

## THIRD CLAIM FOR RELIEF

### (Declaratory Relief)

**111.**

FamilyCare incorporates by references all of the foregoing allegations.

**112.**

OHA's Clawback and its use of actuarially unsound methods impermissibly penalize FamilyCare for the rates paid to FamilyCare under the 2016 contract and FamilyCare's Settlement Credit under the Agreement.  In breach of the Agreement, the Clawback and OHA's actuarially unsound methods reduced the payments that would otherwise be made to FamilyCare in 2017 and 2018 based on the decision to penalize FamilyCare for the rates OHA paid to FamilyCare in 2016 and the Settlement Credit.

**113.**

A justiciable controversy exists because OHA and FamilyCare disagree as to whether the Clawback and OHA's use of actuarially unsound methods violate the Agreement by reducing FamilyCare's 2017 and 2018 rates based on the rates paid to FamilyCare under the 2016 contract and the Settlement Credit.

**114.**

FamilyCare seeks a declaration that OHA is enjoined from implementing the Clawback or any other actuarially unsound methods that are in any way based on or because of the rates paid to FamilyCare in 2016 and the Settlement Credit, to limit the amount that can be paid to FamilyCare for subsequent rate years, including, but not limited to, 2017.

## FOURTH CLAIM FOR RELIEF

### (Judicial Review of 2017 Rate Amendment Under ORS 183.480(3) and ORS 183.484)

**115.**

FamilyCare incorporates by references all of the foregoing allegations.

**116.**

Pursuant to ORS 183.480(3), a party may seek judicial review of final agency order.

**117.**

On December 30, 2016, OHA provided FamilyCare with an executed version of the 2017 Amendment, reflecting OHA's final decision on the 2017 capitation rates as they apply to FamilyCare.

**118.**

OHA erroneously interpreted the laws requiring it to set actuarially sound rates. ORS 183.484(5)(a). Additionally, OHA acted outside the range of discretion delegated by law, inconsistent with its administrative rules and prior agency practice, and in violation of statute. ORS 183.484(5)(b). Specifically, OHA utilized actuarially unsound rate-setting processes in establishing the 2017 capitation rates as they apply to FamilyCare, in contravention with Oregon law, federal law, and Actuarial Standards of Practice ("ASOP"), including but not limited to: 42 USC § 1396b(m)(2)(A); 42 CFR § 438.4; ORS §§ 414.625 and 414.652; OAR 410-141-3010(15); and ASOP 49.

**119.**

OHA's 2017 rate-setting order is not supported by substantial evidence or substantial reason. ORS 183.484(5)(c). OHA does not have an actuarially sound basis to make a $34 million reduction to FamilyCare's costs, resulting in an inequitable reduction in FamilyCare's rates and subsequent payments by OHA to FamilyCare in 2017. Nor may OHA use actuarially unsound methods to give FamilyCare rates that fail to provide for all of FamilyCare's reasonable, appropriate and attainable costs of providing the medical care required under the terms of its contract with OHA, for the time period and the population covered by that contract. In addition, OHA may not pay FamilyCare rates that are erroneously low due to known and acknowledged mistakes in the underlying data used to create those rates.

**120.**

PAGE 43- FOURTH AMENDED COMPLAINT

As a result of OHA's conduct of reducing FamilyCare's payments by implementing a unilateral reduction in FamilyCare's costs by more than $34 million, using unsound methods to justify paying FamilyCare an amount that does not provide for all reasonable, appropriate, and attainable costs, and paying FamilyCare an amount that is arbitrarily reduced due to underlying errors in the data used to create those rates, FamilyCare has suffered substantial and irreparable harm, as alleged above.

### 121.

Pursuant to ORS 183.497, FamilyCare requests an award of attorneys' fees and costs incurred in this matter.

### FIFTH CLAIM FOR RELIEF

### (Breach of Settlement Agreement—Damages)

### 122.

FamilyCare incorporates by references all of the foregoing allegations.

### 123.

OHA breached its obligations under the Settlement Agreement to not use the 2016 Rates or the Settlement Credit as the basis for future rate reductions by implementing the Clawback and by using other actuarially unsound methods to reduce FamilyCare's 2017 rates and then carrying forward the detrimental impact of that Clawback and using other actuarially unsound methods to reduce FamilyCare's 2018 rates.

### 124.

OHA's development of FamilyCare's 2017 and 2018 rates was not actuarially sound and thus violated federal law requiring that Medicaid capitation rates be actuarially sound.

### 125.

OHA's breach of the Settlement Agreement and its violation of federal requirements for actuarial soundness resulted in a decrease to FamilyCare's 2017 rates and has thus damaged

FamilyCare by reducing the monthly payments OHA made to FamilyCare in 2017 and now 2018.

**126.**

FamilyCare seeks damages, in an amount to be proven at trial, of at least $54 million, from OHA resulting from OHA's implementation of the Clawback and other actuarially unsound methods in developing the 2017 and 2018 rates.

**SIXTH CLAIM FOR RELIEF**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing, Settlement Agreement— Damages)**

**127.**

FamilyCare incorporates by references all of the foregoing allegations.

**128.**

The Settlement Agreement contains an implied covenant of good faith and fair dealing that protects FamilyCare's objectively reasonable contractual expectations.

**129.**

Among other things, FamilyCare had an objectively reasonable expectation, based on the Settlement Agreement, that OHA would not reduce FamilyCare's rates to recover amounts paid to FamilyCare before the proposed 2017 and 2018 rates were issued.

**130.**

OHA breached the implied covenant of good faith and fair dealing by cutting FamilyCare's 2017 and 2018 rates in a manner that violated FamilyCare's reasonable contractual expectations.

**131.**

FamilyCare seeks damages, in an amount to be proven at trial, of at least $54 million, from OHA resulting from OHA's implementation of the Clawback and other actuarially unsound methods in developing the 2017 and 2018 rates.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Dispute Resolution Agreement—Damages)

**132.**

FamilyCare incorporates by references all of the foregoing allegations.

**133.**

As described above, OHA did not fulfill its obligations under the Dispute Resolution Agreement. Among other things, OHA did not act in good faith. OHA's actions demonstrate that it never intended to fulfill its promises and instead duped FamilyCare into executing the Dispute Resolution Agreement and foregoing litigation while it developed its campaign to smear FamilyCare.

**134.**

FamilyCare fulfilled its obligations under the Dispute Resolution Agreement. It executed the agreement in good faith, it participated in the dispute resolution process in good faith, and it in good faith sought to resolve the dispute between the parties short of litigation. FamilyCare expended significant time, money, and resources in negotiating, preparing for, and participating in the dispute resolution process, all in the good-faith belief that OHA was executing the agreement with the intent of attempting to resolve the dispute.

**135.**

FamilyCare incurred significant expenses in connection with the Dispute Resolution Agreement, including attorney and actuarial fees, in reliance on the promises OHA made in that agreement.

**136.**

FamilyCare seeks damages, in an amount to be proven at trial, of at least $300,000, to reimburse it for the costs it incurred in connection with negotiating, preparing for, and performing under the Dispute Resolution Agreement.

## EIGHTH CLAIM FOR RELIEF

**(Breach of the Implied Covenant of Good Faith and Fair Dealing, Dispute Resolution Agreement—Damages)**

**137.**

FamilyCare incorporates by references all of the foregoing allegations.

**138.**

The Dispute Resolution Agreement contains an implied covenant of good faith and fair dealing that protects FamilyCare's objectively reasonable contractual expectations. Among other things, FamilyCare had an objectively reasonable expectation, based on the Dispute Resolution Agreement, that OHA would engage in the dispute resolution process in good faith.

**139.**

OHA breached the implied covenant of good faith and fair dealing by, among other things, not engaging in good faith and by using the dispute resolution process to gather information to use in its smear campaign against FamilyCare.

**140.**

FamilyCare incurred significant expenses in connection with the Dispute Resolution Agreement, including attorney and actuarial fees, in reliance on the promises OHA made in that agreement.

**141.**

FamilyCare seeks damages, in an amount to be proven at trial, of at least $300,000 to reimburse it for the costs it incurred in connection with the Dispute Resolution Agreement.

## NINTH CLAIM FOR RELIEF

### (Intentional Interference with Business Relations—Damages)

**142.**

FamilyCare incorporates by references all of the foregoing allegations.

**143.**

FamilyCare's business relationships—both existing and prospective—with health care providers, OHP members, and FamilyCare's own employees constitute relationships that result in a pecuniary benefit to FamilyCare.

**144.**

OHA knew that its communications plan was substantially certain to interfere with the relationships among FamilyCare and its providers, members, and employees.  OHA implemented its communications plan, at least in part, by seeking to discredit FamilyCare through media and legislative contacts.

**145.**

The predominant and improper purpose of OHA's communications plan was to injure FamilyCare.  OHA acted with improper means, including misrepresentation, defamation, and disparaging falsehoods about FamilyCare.

**146.**

The communications plan was not made during the course of a discretionary function and did not reflect a policy choice among several alternatives.

**147.**

OHA's actions have already contributed to at least one provider group enrolling with FamilyCare's competitor, thereby causing disruption to the business relationship between FamilyCare and the provider group and economic harm to FamilyCare.

**148.**

OHA's communications plan and false and disparaging messaging has caused and will likely cause further disruption of FamilyCare's business relationships, with resulting damages to FamilyCare in an amount to be proved at trial, but no less than $7.5 million.

**TENTH CLAIM FOR RELIEF**

**(Breach of Contract)**

**149.**

FamilyCare incorporates by references all of the foregoing allegations.

**150.**

The Contract between OHA and FamilyCare is valid and binding.

**151.**

FamilyCare's Contract with OHA contains an implied covenant of good faith and fair dealing that protects FamilyCare's objectively reasonable contractual expectations. Among other things, FamilyCare had an objectively reasonable expectation, based on the Contract and applicable law, that OHA would present annual Rate Amendments that were reasonable, unbiased, actuarially sound, and free of errors in underlying data and methodology.

**152.**

OHA breached its obligations under the Contract by presenting FamilyCare with Rate Amendments for 2017 and 2018 that were unreasonable, biased, actuarially unsound, and based on erroneous data and methodology.

**153.**

As a result of errors in data and methodology, including errors in eligibility and enrollment data, OHA further breached the Contract by failing to pay FamilyCare amounts owed under the Contract.

**154.**

FamilyCare seeks damages, in an amount to be proven at trial, of at least $54,000,000 from OHA resulting from the breach of its contractual obligations under the Contract, including damages based on breaches based on rates applicable through January 31, 2018.

**ELEVENTH CLAIM FOR RELIEF**

**(Judicial Review of 2018 Rate Amendment Under ORS 183.480(3) and ORS 183.484)**

**155.**

FamilyCare incorporates by references all of the foregoing allegations.

**156.**

Pursuant to ORS 183.480(3), a party may seek judicial review of final agency order.

**157.**

On December 22, 2017, at OHA's request, FamilyCare signed a one-month contract extension, reflecting OHA's final decision on the 2018 capitation rates as they apply to FamilyCare.

**158.**

OHA erroneously interpreted the laws requiring it to set actuarially sound rates. ORS 183.484(5)(a). Additionally, OHA acted outside the range of discretion delegated by law, inconsistent with its administrative rules and prior agency practice, and in violation of statute and the Fourteenth Amendment to the United States Constitution. ORS 183.484(5)(b). Specifically, OHA utilized actuarially unsound rate-setting processes in establishing the 2018 capitation rates as they apply to FamilyCare, in contravention with Oregon law, federal law, and Actuarial Standards of Practice ("ASOP"), including but not limited to: 42 USC § 1396b(m)(2)(A); 42 CFR § 438.4; ORS §§ 414.625 and 414.652; OAR 410-141-3010(15); and ASOP 49. Additionally, OHA, acting under color of law, committed due process violations by forcing FamilyCare to decide whether to sign the full 2018 Amendment on December 20, 2017, without notice of the compensation FamilyCare would be entitled to under the contract.

**159.**

OHA's 2018 rate-setting order is not supported by substantial evidence or substantial reason. ORS 183.484(5)(c). OHA does not have an actuarially sound basis to make a $26 million reduction to FamilyCare's costs, resulting in an inequitable reduction in FamilyCare's rates. Nor may OHA use actuarially unsound methods to establish rates for FamilyCare that fail to provide for all of FamilyCare's reasonable, appropriate and attainable costs of providing the medical care required under the terms of its contract with OHA, for the time period and the population covered by that contract

**160.**

Pursuant to ORS 183.497, FamilyCare requests an award of attorneys' fees and costs incurred in this matter.

## PRAYER FOR RELIEF

WHEREFORE, FamilyCare prays for an order and judgment as follows:

**A.    On FamilyCare's First Claim for Relief:**

1.    For a declaration that Defendants have deprived and conspired to deprive FamilyCare of its property interests without due process of law, in violation of 42. U.S.C. § 1983;

2.    For damages against Lynne Saxton and Patrick Allen in an amount equal to the injury sustained as a result of the deprivation of FamilyCare's constitutional rights, in an amount not less than $50,000,000;

3.    For an award of attorney's fees incurred by Plaintiff in preparing, filing and prosecuting this action; and

4.    For injunctive relief directing Patrick Allen, in his official capacity as Director of OHA, to cease all efforts to retaliate against FamilyCare and to prevent Mr. Allen from prohibiting FamilyCare, directly or indirectly, from entering a bid for future Medicaid contracts with OHA.

5.      For such other prospective relief as may be just and equitable, including ancillary relief.

**B.      On FamilyCare's Second Claim for Relief:**

1.      For specific performance of OHA's obligation not to use rates paid to FamilyCare under the 2016 contract or the Settlement Credit as a basis for limiting the amount that can be paid to FamilyCare in future rate years, including, but not limited to, 2017;

2.      For its costs and disbursements incurred herein; and

3.      For such other relief the Court deems just and proper.

**C.      On FamilyCare's Third Claim for Relief:**

1.      For a declaration that OHA is enjoined from implementing the Clawback and from using any other actuarially unsound methods, which are based on the rates paid to FamilyCare under the 2016 contract and the Settlement Credit, to limit the amount that can be paid to FamilyCare in future rate years, including, but not limited to, 2017;

2.      For its costs and disbursements incurred herein; and

3.      For such other relief the Court deems just and proper.

**D.      On FamilyCare's Fourth Claim for Relief:**

1.      For an order compelling OHA to comply with the Agreement;

2.      For an order directing OHA not to implement the Clawback and not to use any actuarially unsound methods, to limit the amount that can be paid to FamilyCare in future rate years, including, but not limited to, 2017, when the basis for doing so is the rates paid to FamilyCare under the 2016 contract and the Settlement Credit;

3.      For an order reversing and remanding OHA's 2017 rate-setting order;

4.      For repayment of direct losses caused by the OHA's failure to use an actuarially sound rate-setting processes in establishing the 2017 capitation rates;

5.      For such ancillary relief as necessary to redress the effects of 2017 OHA's rate-setting order;

6.      For an award of attorneys' fees and costs incurred in this matter; and

7.      For such other relief the Court deems just and proper.

**E.      On FamilyCare's Fifth Claim for Relief:**

1.      For an order awarding FamilyCare damages, not less than $54,000,000, for OHA's use of rates paid to FamilyCare under the 2016 contract or the Settlement Credit as a basis for limiting the 2017 and 2018 rates paid to FamilyCare;

2.      For its costs and disbursements incurred herein; and

3.      For such other relief the Court deems just and proper.

**F.      On FamilyCare's Sixth Claim for Relief:**

1.      For an order awarding FamilyCare damages, not less than $54,000,000, for OHA's use of rates paid to FamilyCare under the 2016 contract or the Settlement Credit as a basis for limiting the 2017 and 2018 rates paid to FamilyCare;

2.      For its costs and disbursements incurred herein; and

3.      For such other relief the Court deems just and proper.

**G.      On FamilyCare's Seventh Claim for Relief:**

1.      For an order awarding FamilyCare damages, not less than $300,000, for OHA's breach of the Dispute Resolution Agreement;

2.      For its costs and disbursements incurred herein; and

3.      For such other relief the Court deems just and proper.

**H.      On FamilyCare's Eighth Claim for Relief:**

1.      For an order awarding FamilyCare damages, not less than $300,000, for OHA's breach of the Dispute Resolution Agreement;

PAGE  53-    FOURTH AMENDED COMPLAINT

2.      For its costs and disbursements incurred herein; and

3.      For such other relief the Court deems just and proper.

**I.      On FamilyCare's Nine Claim for Relief:**

1.      For an order awarding FamilyCare damages, not less than $7,500,000, for OHA's intentional interference with its business relationships;

2.      For its costs and disbursements incurred herein; and

3.      For such other relief the Court deems just and proper.

**J.      On FamilyCare's Tenth Claim for Relief:**

1.      For an order awarded FamilyCare damages, not less than $54,000,000, for OHA's breach of the Contract;

2.      For its costs and disbursements incurred herein; and

3.      For such other relief the Court deems just and proper.

**K.      On FamilyCare's Eleventh Claim for Relief:**

1.      For an order reversing and remanding OHA's 2018 rate-setting order;

2.      For repayment of direct losses caused by the OHA's failure to use an actuarially sound rate-setting processes in establishing the 2018 capitation rates;

3.      For such ancillary relief as necessary to redress the effects of 2018 OHA's rate-setting order;

4.      For an award of attorneys' fees and costs incurred in this matter; and

5.      For such other relief the Court deems just and proper.

DATED:  April 25, 2018

**PERKINS COIE LLP**

By: */s/ Stephen F. English*
    Stephen F. English, OSB No. 730843
    SEnglish@perkinscoie.com
    Thomas R. Johnson, OSB No. 010645
    TRJohnson@perkinscoie.com
    Douglas R. Pahl, OSB No. 950476
    DPahl@perkinscoie.com
    Alletta Brenner, OSB No. 142844
    ABrenner@perkinscoie.com
    Brian P. Samuelson, OSB No. 165476
    BSamuelson@perkinscoie.com
    1120 N.W. Couch Street, 10th Floor
    Portland, OR  97209-4128
    Telephone:  503.727.2000
    Facsimile:  503.727.2222

Attorneys for Plaintiff FamilyCare, Inc.

PAGE  55-    FOURTH AMENDED COMPLAINT