IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| PATRICK ALLEN, in his official capacity as DIRECTOR OF OREGON HEALTH AUTHORITY, an agency of the State of Oregon, | )<br>)<br>)<br>)<br>)   Case No.<br>)   3:18-cv-00212-MO |
|           Plaintiff, | )   (Leading)<br>)   Case No. |
|           vs. | )   6:18-cv-00296-MO<br>)   (Trailing) |
| FAMILYCARE, INC., an Oregon non-profit corporation, | )<br>) |
| | )   VOLUME I<br>) |
|           Defendant. | )   VIDEOTAPED FRCP<br>)   30(b)(6)<br>)   DEPOSITION OF<br>) |
| FAMILYCARE, INC., an Oregon non-profit corporation | )   WILLIAM MURRAY<br>) |
| | )   Taken in Behalf of |
|           Plaintiff, | )   Defendants<br>) |
|           vs. | )   July 16, 2018<br>) |
| OREGON HEALTH AUTHORITY, an agency of the State of Oregon, and PATRICK ALLEN, both individually and in his official capacity as director of the Oregon Health Authority, | )   1120 N.W. Couch<br>)   Street, 10th Floor<br>)   Portland, OR 97209<br>)<br>)<br>)<br>) |
| | ) |
|           Defendants. | )<br>) |

Teresa L. Dunn,

Court Reporter

CSR, CCR, RPR

Ex. 12

Page 1 of 18

William Murray, 7/16/2018          Allen v. FamilyCare, Inc.

2

APPEARANCES:


For the Plaintiff:

MR. THOMAS R. JOHNSON
MS. ALETTA BRENNER
Perkins Coie, LLP
Tenth Floor
1120 N.W. Couch Street
Portland, OR 97209
503-727-2076
trjohnson@perkinscoie.com
abrenner@perkinscoie.com


For the Defendants:

MR. DAVID B. MARKOWITZ
MS. LAURA SALERNO OWENS
Special Assistant Attorneys General
Markowitz Herbold Glade & Mehlhaf, P.C.
Suite 3000
1211 S.W. Fifth Avenue
Portland, OR 97204
503-295-3085
davidmarkowitz@markowitzherbold.com
laurasalerno@markowitzherbold.com

MR. THEODORE C. FALK
Senior Assistant Attorney General
Oregon Department of Justice
1162 Court Street, N.E.
Salem, OR 97301
503-947-4430
theodore.falk@doj.state.or.us


Also Present:
Camille Schmitt, Videographer
Greg Scott
Laura Robison
Renee Steiman
Artur Suchorzewski



Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

William Murray, 7/16/2018          Allen v. FamilyCare, Inc.

61

Q.    Does FamilyCare have a plan to reopen its Medicaid and Medicare business?

A.    FamilyCare does not have a plan because it does not understand what the requirements would be to have a plan or to develop a plan.

Q.    Why don't you -- why doesn't FamilyCare understand the requirements for starting a new contract?

A.    Because OHA has announced that they are looking at what's called CCO 2.0 which will be a whole different set of -- potentially different set of requirements to be able to contract.

And there is no open procurement process now by which FamilyCare could submit an application today to reenter that line of business.

Q.    And perhaps it's too obvious, but I will ask it anyway.

FamilyCare's Medicaid business and Medicare business is wholly dependent on the existence of contracts with OHA and CMS?

A.    I'm not sure I understand your question. The way FamilyCare enters both of those lines of business is through a contract with either CMS or OHA.

William Murray, 7/16/2018          Allen v. FamilyCare, Inc.

68

primary concern and that was used in 2017 and '18 rates.

Q.   Explain how OHA or its actuaries used the claw-back in the 2017 rates.

MR. JOHNSON:   Object to the form of the question.

THE WITNESS:   The agreement prohibits the use of the claw-back or settlement credit as being used in any form as basis for reducing FamilyCare's future rates.

So that discussion with regards to that provision of the contract was intended to make sure that -- that FamilyCare did not receive funds and then have those funds taken back in a future year.

The rate development process for 2017 actually resulted in reductions to FamilyCare's base data for primary care that had never been done before.

So there were changes following -- immediately following the signing of that agreement or shortly thereafter where there were reductions or claw-backs in FamilyCare's base data related to that period of time.

Q.   (By Mr. Markowitz) Well, the base data

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Ex. 12
Page 4 of 18

William Murray, 7/16/2018                Allen v. FamilyCare, Inc.

69

had already been submitted before the settlement agreement, correct?

A.    I do not remember.    I believe the base data was submitted probably around the first of May and the settlement agreement was towards the end of May.

There was ongoing exchange of information that happened throughout the rate-setting process.

Q.    So what do you allege that OHA or its actuaries did to the base data that was designed to achieve a claw-back?

A.    They disregarded or made a deduction from the base data after its submission by FamilyCare and after the signing of the settlement agreement.

Q.    Well, isn't that a part of the normal process that there are adjustments to the base data?

A.    There had not been previously that adjustment in the rate-setting process.

Q.    What adjustments to the base data occurred after the settlement agreement that FamilyCare contends was done as a claw-back?

A.    The adjustment to base data for primary

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

William Murray, 7/16/2018                Allen v. FamilyCare, Inc.

75

agreement claw-back?

A.    They did not admit that and they did not provide us with information to the contrary.

Q.    Have you ever -- has FamilyCare ever seen -- ever obtained any written or oral statement that linked these two adjustments to the desire to claw back?

A.    FamilyCare because of the lack of information that was provided in response to our questions has not seen any documents that you describe, but we haven't seen any of the requested documents with regards to the development of those amounts.

Q.    Other than the fact that the two adjustments were made after the settlement agreement and the fact that neither of these adjustments had occurred in earlier years, what other support does FamilyCare have for its position that these two adjustments were made in violation of the 2016 settlement agreement?

A.    FamilyCare -- I believe I have talked earlier about FamilyCare had made known for a long time its policy of increasing primary care rates, a policy that at one point in time OHA thought was inventive and had supported that.

William Murray, 7/16/2018                Allen v. FamilyCare, Inc.

76

So it had been in place. It had already been happening without any concern expressed by OHA.

And so the fact that it was expressed retroactively was of concern to us in regards to the claw-back provision.

The other point is that it was focused on primary care spending. There are many other components of the rates and of medical expenses.

So it was isolated to one component that FamilyCare had been vocal about it increasing that component. And it was not -- we are not aware of any analysis and asked for analysis about comparisons of the other components of medical spend.

So it appeared to us to be a singling out of that single component and it was a component that we had previously made known -- widely known to everybody without any expression of concern.

Q.   The substantial increase in primary care payments started when?

MR. JOHNSON:  Object to the form of the question.

THE WITNESS:  That had started, I don't

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

William Murray, 7/16/2018          Allen v. FamilyCare, Inc.

83

not know because we have requested but not yet received that information.

What I have talked about is that those changes were made subsequent to the settlement agreement, were different from what had been previously done, and did reduce FamilyCare's rates.

Q.   Is FamilyCare contending that as a result of the breach of the 2016 settlement agreement it is entitled to any damages greater than the amount of the adjustment that it received under that agreement?

A.   Could you restate that question?

Q.   All right.  There was an adjustment of approximately $24 million under the 2016 settlement agreement, correct?

A.   Correct.

Q.   Is FamilyCare contending that its damages for breach of the settlement agreement are greater than that amount?

A.   I'm not an attorney, but what I would say is that FamilyCare's claim is that the rates for 2017 and '18 need to be actuarially sound.

So to the extent there was adjustments greater than the 24.8 that make the rates not

William Murray, 7/16/2018          Allen v. FamilyCare, Inc.

84

actuarially sound, yes, FamilyCare would have a claim to that.

Q.    Is there any provision in the 2016 settlement agreement that requires rates to be actuarially sound?

A.    I do not believe that the settlement agreement in and of itself creates a requirement separate from other things that the rates be actuarially sound.

MR. MARKOWITZ:  Okay.  We're going to take a quick break to change our disk and use the facilities.

(Recess taken from 10:52 a.m. to 11:05 a.m.)

Q.    (By Mr. Markowitz) Okay.  Let's go to topic 12 and topic 16.

12 is the damages, remedies, and penalties sought by FamilyCare.  And 16 is goodwill, which may or may not be included as a part of the damage claim.

Does FamilyCare contend that a part of its damages is the damage to its goodwill?

A.    Yes.

Q.    And how does FamilyCare calculate the goodwill loss that it attributes to the claims

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

William Murray, 7/16/2018                 Allen v. FamilyCare, Inc.

95

than having an OHA Medicaid contract?

A.   There have not been any specific discussions about what that would be.

Up to this point in time we have been focused on, you know, wrap-up of the two contracts.

Q.   Did -- did FamilyCare have goodwill value separate and apart from the value generated through its OHA Medicaid contract?

A.   Once again, I'm not the valuation expert and we have those coming, but -- working -- but generally my understanding is that the company itself has goodwill value.

And that's what we are asking our experts about, not a specific contract, per se. It's really the contracts -- or the loss of the contracts' impact on the company's goodwill.

Q.   What damages does FamilyCare assert in this case other than the loss of its goodwill?

A.   So FamilyCare has asserted with regards to the rates -- the differential in the rates between what FamilyCare believes need to be actuarially sound rates and the rates that were being paid.  So there's the pure rate differential.

William Murray, 7/16/2018            Allen v. FamilyCare, Inc.

96

And then there are the other -- once again, I'm not an attorney, but the other legal assertions with regards to the enterprise value and the other damages that result from the actions of OHA.

Q.   Well, enterprise value and goodwill and rate differential.  Are there other damages that are being asserted?

A.   Well, I think the whole -- FamilyCare believes it should be treated equally and fairly or it should have been treated equally and fairly.

And to the extent there are other claims, those are legal determinations, but FamilyCare's desire is to be treated equally and fairly and if it wasn't that there are damages related to the treatment of FamilyCare.

Q.   Well, my question is does FamilyCare assert in this case any damages for which it wants relief other than compensation for its lost enterprise value and goodwill and, secondly, the rate differential between the rates it was offered and the rates it should have been offered?

A.   I know in some of the documents that

William Murray, 7/16/2018                 Allen v. FamilyCare, Inc.

97

have been filed we have asked to not be excluded or somehow put at a disadvantage with regards to any future contracting with OHA and to the extent that did happen that FamilyCare could be restored as quickly as possible to the point it was at when the contract was terminated.

Q.   Any other damages asserted or other remedies sought?

A.   Not from my layman's perspective.  We want to be treated equally and fairly and if we weren't those are legal issues at that point in time.

Q.   Let me be clear.  I'm not asking you questions as Bill Murray layman, CPA.

I'm asking you as the officially designated spokesperson for FamilyCare on the topic of the damages, remedies, and penalties sought by FamilyCare in the present action.

You have given me your complete list?

A.   I have given you my list as FamilyCare. The other are discussions that we have had with legal counsel around those legal remedies.

Q.   All right.  On a rate differential for what years does FamilyCare contend that it is entitled to damages for rate differential?

William Murray, 7/16/2018          Allen v. FamilyCare, Inc.

121

and other limitations.

Q.    So your complaint, FamilyCare's complaint, goes on to allege that OHA has targeted FamilyCare as one of the CCOs to be eliminated.

What evidence does FamilyCare have for that allegation?

A.    That FamilyCare's rates or the rate-setting process were the lowest of the CCOs and that FamilyCare was losing money and ultimately would be put out of business as it has been at this point in time with regards to the Medicaid contract.

Q.    There was always every year a CCO with the lowest rate?

A.    That's correct.

Q.    And was it OHA's intent to put the lowest-rate CCO out of business in earlier years?

A.    The disparity in the rates --

Q.    Answer my question.    Was it the OHA intent to put the lowest CCO out of business?

A.    I do not know what OHA's intent was.

Q.    So let's turn to topic 18, the draft Communication Plan.

William Murray, 7/16/2018          Allen v. FamilyCare, Inc.

124

MR. JOHNSON:  And exclude from this answer conversations you have had with counsel.

Q.    (By Mr. Markowitz) I don't agree with that exclusion.  You may proceed.

MR. JOHNSON:  Same instruction.

THE WITNESS:  So what I know is that there were e-mails that went from OHA to the press about FamilyCare's financial status and comparison of FamilyCare's financial status to other -- compared to other CCOs and that that is one of the elements contained in the Communications Plan document to highlight FamilyCare as an outlier and only concerned about profits.

And there are e-mails alerting the press to -- e-mails or other correspondence, I'm not sure if it was an e-mail, but other things relating to pointing out FamilyCare's financial performance compared to other CCOs.

Q.    (By Mr. Markowitz) Did any provider or patient ever advise FamilyCare that it had received communications from OHA which FamilyCare later concluded to have been part of the Communications Plan?

A.    What I know from FamilyCare is that

William Murray, 7/16/2018          Allen v. FamilyCare, Inc.

125

FamilyCare receives thousands, if not hundreds of thousands, of calls from members.

Members would call at times and state things they were told by an OHA representative on the line that we believed not to be accurate or complete and that we would relay those to OHA.

Q.   What statements?

A.   Statements about being incorrectly enrolled in the plan.  Statements that they wanted to be enrolled in FamilyCare and hadn't been.  Statements that they had been removed from FamilyCare.

Q.   Those kind of contacts have existed for years?

A.   They -- that's what I meant to say is that those have been for years.

There were those that existed during the time covered by the Communications Plan.  So I do not know how to differentiate those and FamilyCare would not have a way to differentiate those.

Q.   Can you identify any specific OHA employee who did, in fact, anything pursuant to the Communications Plan?

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

William Murray, 7/16/2018                    Allen v. FamilyCare, Inc.

134

OHA had?

MR. JOHNSON:  Object to the form of the question, draft publication.

THE WITNESS:  Can you restate the question or just re-read the question?

Q.    (By Mr. Markowitz) So in August of 2017 we know that the newspaper article came out about the draft Communications Plan.

What change, if any, took place as a result of that in the FamilyCare Communications Plan?

MR. JOHNSON:  Object to the form of the question.  You keep calling it a draft Communications Plan without establishing that.

THE WITNESS:  I don't -- I don't think there was a change, per se, in the Communications Plan.

This was something that came out that was significant to FamilyCare.  So FamilyCare evaluated that event and then decided what to do as a result of that.

So it wasn't -- it is more a response to something that happened to FamilyCare.

Q.    (By Mr. Markowitz) And what decision was made as to what to do?

A.    FamilyCare chose to make sure that individuals that FamilyCare had been talking to were aware of what OHA had done.

Q.    And so there was additional outreach by FamilyCare that was caused by the decision to react to the draft Communications Plan?

A.    There was outreach in response to that just as there would be outreach, you know, given whatever event had transpired.

So FamilyCare had communicated previously with legislators and the public.  And with regards to the Communications Plan FamilyCare communicated with legislators and others about that.

Q.    Who did they communicate with?

A.    Legislators.  I believe FamilyCare put out a brief press release on that.  FamilyCare received numerous calls from media once Mr. Budnick's story was out in the public.  And FamilyCare responded to those inquiries.

Q.    And isn't it correct that within FamilyCare the executives thought it was positive that Mr. Budnick had made public the existence of that draft plan?

A.    I haven't heard the word positive.  What

William Murray, 7/16/2018          Allen v. FamilyCare, Inc.

142

                         C E R T I F I C A T E


          I, Teresa L. Dunn, a Certified Shorthand
Reporter for Oregon, do hereby certify that,
pursuant to stipulation of counsel for the
respective parties hereinbefore set forth,
WILLIAM MURRAY personally appeared before me at
the time and place set forth in the caption
hereof; that at said time and place I reported
in Stenotype all testimony adduced and other
oral proceedings had in the foregoing matter;
that thereafter my notes were reduced to
typewriting under my direction; and that the
foregoing transcript, pages 1 to 141, both
inclusive, constitutes a full, true and accurate
record of all such testimony adduced and oral
proceedings had, and of the whole thereof.
Witness my hand and CSR stamp at Vancouver,
Washington, this 18th day of July, 2018.


                    _____
                    TERESA L. DUNN
                    Certified Shorthand Reporter
                    Certificate No. 00-0367
                    Commission Expires:  6/30/20


              Schmitt Reporting & Video, Inc.
     (360) 695-5554 -- (503) 245-4552 -- (855) 695-5554