1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


PATRICK ALLEN, in his
official capacity as
DIRECTOR OF OREGON HEALTH
AUTHORITY, an agency of
the State of Oregon,

        Plaintiff,

  v.                   No. 3:18-cv-00212-MO(Leading)
                         6:18-cv-00296-MO(Trailing)

FAMILYCARE, INC., an
Oregon non-profit
corporation,

        Defendant.
_____

FAMILYCARE, INC., an Oregon
non-profit corporation,

        Plaintiff,

    v.

OREGON HEALTH AUTHORITY,
an agency of the State of
Oregon; and PATRICK ALLEN,
both individually and in
his official capacity as
director of the Oregon
Health Authority,

        Defendants.


VIDEO DEPOSITION OF JEFF HEATHERINGTON

TUESDAY, JUNE 5, 2018

PORTLAND, OREGON

Jeff Heatherington, 6/5/2018          Allen v. FamilyCare Inc.

2

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the deposition of JEFF HEATHERINGTON was taken before Marilynn Hoover, a Certified Shorthand Reporter in Oregon; on Tuesday, June 5, 2018, at the hour of 9:06 A.M.; at 1120 N.W. Couch Street, 10th Floor, in Portland, Oregon.

                         APPEARANCES

MARKOWITZ HERBOLD, P.C.

    BY MR. MATTHEW A. LEVIN

        MS. BRITTANY SIMPSON

    1211 S.W. Fifth Avenue, Suite 3000

    Portland, Oregon 97204

    Telephone:  503-295-3085

    E-mail:  MattLevin@markowitzherbold.com

    Appearing as Special Assistant Attorneys

    General for OHA, Patrick Allen

HART WAGNER, LLP

    BY MS. HOLLY E. PETTIT

    1000 S.W. Broadway, Suite 2000

    Portland, Oregon 97205

    Telephone:  503-222-4499 x1148

    E-mail:  HEP@hartwagner.com

    On behalf of the Witness

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Jeff Heatherington, 6/5/2018         Allen v. FamilyCare Inc.

3

APPEARANCES (CONT.)

PERKINS COIE, LLP

    BY MR. STEPHEN F. ENGLISH

        MR. BRIAN P. SAMUELSON

    1120 N.W. Couch Street, 10th Floor

    Portland, Oregon 97209

    Telephone:  503-727-2003

    E-mail:  SEnglish@perkinscoie.com

            BSamuelson@perkinscoie.com

    On behalf of FamilyCare, Inc., and the Witness


OREGON DEPARTMENT OF JUSTICE, TRIAL DIVISION

    BY MS. RENEE STINEMAN

    100 S.W. Market Street

    Portland, Oregon 97201

    Telephone:  971-673-1880

    E-mail:  Renee.Stineman@doj.state.or.us


ALSO PRESENT:  Ms. Camille Schmitt, videographer

                Mr. Bill Murray, Ms. Amanda Beane

                Mr. Matthew Mertens

Jeff Heatherington, 6/5/2018        Allen v. FamilyCare Inc.

100

primary care physicians are paid for their time,
they're not paid for procedures.  You know, the
multitude of their -- or the bulk of their billing
is based on a time situation.

And Medicare, at this point, pays about 30
to 35 percent of what the commercial payers pay.
And, frankly, I think commercial payers don't pay
enough in that regard.  But if you are looking at a
person whose income depends on billing for time and
it's based on that, then if you're taking for one
patient a third of that, you can only afford so many
of them, and so you limit the amount of time you
spend with them.  You also limit the amount of --
number of patients that you will see in that
process.

What we did in terms of primary care was
we raised the reimbursement so that we were
competing for time with the commercial payers.  What
that did was that allowed us to -- We had -- We had
a growth of about 85,000 patients in 2014.  We had
no problem assigning those people and getting them
accepted in practices.  If we had kept our
reimbursement where it was, we simply would not have
had the appropriate access for that growth.

The other thing that happened was that we

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Jeff Heatherington, 6/5/2018        Allen v. FamilyCare Inc.

101

found that the referrals to specialists were at a higher risk level rather than, "Oh, well, I don't want to deal with this; I'll send it off to somebody else."  Because that's -- that's what primary care does, you know:  If it gets a little bit complicated and they're not getting paid much, they just shift it up.  That's standard human behavior, you know, economic behavior, I guess you'd call it.

So if we raised it to where we raised it, you know, then we had adequate access, we had better acceptance by all of our primary cares and they treated the patients better, because we changed their attitudes, because attitudes are somewhat based on, you know, what they -- what kind of payment they receive.

Now, had we reduced that reimbursement, you know, then we're going backwards in terms of access.  And access is, you know, one of the first considerations under the Oregon Health Plan, is do you have adequate access.

Q.    When did you raise the rates to be commensurate with commercial rates for primary care providers?

A.    At towards the end of -- We had raised them at the beginning of 2014, and then we raised

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Jeff Heatherington, 6/5/2018          Allen v. FamilyCare Inc.

102

them to the commercial level and made that announcement somewhere, I believe, in October or November of 2014.

Q.    And did the rates at the commercial level kick in in the end of 2014 or the beginning of 2015?

A.    I think they began at the beginning of 2015.  Now -- Well, the final rates did.

Q.    The final rates.  Health Share did not increase rates, either in the first instance or the second instance, in the way that FamilyCare did?

A.    Well, I'm not sure exactly how Health Share, you know, does their reimbursements.  I haven't seen their contracts, I don't know exactly what they do.  But the differential between Health Share and -- the major difference between Health Share and FamilyCare is the bulk of our -- a lot of our patients use private practices, while the bulk of Health Share's is primarily in the county clinics, and there's a whole different reimbursement model within that system.

Q.    That results in providers getting lower reimbursements from Health Share than the same providers would get from FamilyCare, if there was an overlap?

A.    No.  That results in -- For instance, the

Jeff Heatherington, 6/5/2018          Allen v. FamilyCare Inc.

208

point in that direction; but, again, we haven't seen the bulk of what we've asked for in discovery.

Q.    What information have you seen that you think points to this connection?

A.    In terms of e-mails between OHA staff and other parties.

Q.    What other parties?

A.    Well, there would be Optimus and there would be the governor's office.  And we haven't seen any discovery with relationship to conversations with other CCOs or legislators.

Q.    And do you recall seeing anything in discovery that effectively said, "We are treating FamilyCare differently because of its exercise of First Amendment rights or complaining about the rates"?

A.    I don't think that would ever be written down, but the answer is no.

Q.    So you mentioned e-mails -- communications with Optimus.

Let me go back to the letter from yesterday, I think, from Mr. English.

Did you review that letter from --

A.    I did not.

Q.    Okay.  So FamilyCare has alleged that OHA

Ex. 16
Page 7 of 10

THE WITNESS:  I got deflected.

MR. LEVIN:  Yeah, nice try.

(Record read.)

THE WITNESS:  I think I would answer that yes, because I think the entire -- what we've gone through in the last four years was part of an overall plan to put FamilyCare out of business, and the actions that they took eventually did result in our having to close down.

Q.   BY MR. LEVIN:  Well, I want to try to separate -- my question is designed to separate out the concept of the rates that were set and just focus on communications that were made.  Okay?

So if I just focus on communications and ignore the rates that were set for FamilyCare, are you aware of any communications made by anyone at OHA, at any time, about anything, that caused money damages for FamilyCare?

A.   Indirectly, yes.  And it would be the things that OHA said particularly to legislators about how they set rates -- because I don't think you can separate this -- which caused us to have continuing low rates and eventually forced us out of business.  And I think all of those communications were generated by the Oregon Health Authority.

Jeff Heatherington, 6/5/2018        Allen v. FamilyCare Inc.

255

rates in the successive years.

Q.    But isn't it true that, in trying to get new rates, FamilyCare was seeking additional money?

A.    We were seeking a fair rate, and that would have -- that would have meant additional money, yes.

Q.    So can you think of any statement made by anyone from OHA, at any time, about anything, that caused any members to leave FamilyCare?

A.    Not any members, no.

Q.    How about providers?

A.    I don't recall any providers that left.

Q.    So did FamilyCare develop any information that showed that the individual rate cells were not actuarially sound?

A.    Well, besides using the statements by OHA which said they were only actuarially sound by region, and we continually provided to legislators that the law requires "by rate cell" and so on.  So the OHA's own statement indicated that they weren't doing it according to federal regulations.

Q.    Do you have an understanding whether OHA said that the rates are not actuarially sound with respect to each rate cell, or whether OHA was saying, "We have not verified by rate cell whether

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Jeff Heatherington, 6/5/2018          Allen v. FamilyCare Inc.

291

STATE OF OREGON        )
                       )  SS.
COUNTY OF MULTNOMAH     )

I, MARILYNN HOOVER, CSR No. 04-0387 for the State of Oregon, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced by me to typewritten form; and that the same is a true, correct, and complete transcript of the said proceedings.

Before completion of the deposition, review of the transcript [ ] was [X] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed shall be appended hereto.

I further certify that I am not interested in the outcome of the action.

Witness my hand this 11th day of June 2018.

_____

MARILYNN HOOVER, RPR

CSR No. 04-0387; Exp. 03/31/2020

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554