DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-14-26
Baltimore, Maryland   21244-1850



CENTERS FOR MEDICARE & MEDICAID SERVICES
CENTER FOR MEDICAID & CHIP SERVICES

**Disabled and Elderly Health Programs Group**

AUG 0 7  2014

Suzanne Hoffman, Acting Director
State of Oregon, Oregon Health Authority
500 Summer Street, NE E49
Salem, OR 97301-1079

Dear Ms. Hoffman:

The Centers for Medicare & Medicaid Services (CMS) began a consultation process to discuss capitation rate-setting with each state expanding Medicaid coverage to newly eligible beneficiaries effective January 1, 2014.  We began that work by distributing a rate-setting consultation guide to all states on September 4, 2013, followed by an all-state call to review the guide on September 12, 2013.  We completed that process by reviewing the most recently available rate setting documentation for each state and discussing the consultation guide questions with state staff (and consulting actuaries where appropriate).

Oregon's initial consultation call was held on September 30, 2013, between my staff, actuaries from CMS' Office of the Actuary (OACT), and Oregon's staff, including your actuary, from the Oregon Health Authority (OHA) to discuss the state's planned approach to setting rates for newly eligible beneficiaries.  Since that time, CMS and the state have communicated by teleconference and email a number of times to ask and answer substantive questions about Oregon's Coordinated Care Organization (CCO) rate development.

While we believe we have reached resolution on our concerns specific to the rates set for the newly eligible population from January through June 2014, we have identified issues that are endemic to the state's rate-setting methodology that will require improvements on a prospective basis.  Below we summarize the issues related to the newly eligible population, describe CMS's more fundamental concerns with Oregon's rate development, and propose a path for moving forward on approval of your 2014 rates.

<u>2014-Specific Issues</u>

We expressed concerns about the state's treatment of rate development for the newly eligible population differently than rate development for current enrollees, in the following ways:

- *Increased risk/contingency margin.*  The state, without sufficient justification, had built in a higher profit/risk/contingency margin for the newly eligible beneficiary rates than what is assumed in the rates for currently eligible beneficiaries.



Hoffman

EXHIBIT NO. 1026

6-21-18

**Schmitt Reporting**

OHA-HC000162

Exhibit 4
Page 1 of 4

Suzanne Hoffman
Page 2

- *Assumption of higher provider payment rates.* The state, without sufficient justification, had assumed a higher rate of provider reimbursement in the CCO rates for the newly eligible population than what is assumed in the rates for currently eligible beneficiaries.

- *Lack of risk mitigation strategy.* The state had not intended to implement any risk mitigation strategy to address the high level of uncertainty in the underlying assumptions made regarding a population for which there is minimal experience.

We are pleased that the state has agreed to address those high-risk practices for 2014. Specifically, the state has agreed in writing that:

- You will remove the increased risk margin on a prospective basis, and instead build in an assumption for increased ER utilization of 10 percent that will be applied to base rate data. Please note we have additional questions concerning this adjustment through our review of your amendment to the actuarial certification.

- You will distribute the network adequacy adjustment (i.e. provider payment rates) through all the CCO rate cohorts rather than applying the adjustment solely to the newly eligible rate cohorts.

- You will apply a minimum medical-loss ratio (MLR) requirement to your newly eligible rates that starts July 1, 2014.

Overarching Rate-Setting Issues

- *Lack of encounter data.* Oregon's lack of encounter data remains a concern. While the extensive use of subcapitation and alternative payment methodologies by the CCOs presents barriers to collecting accurate and reliable encounter data, encounter data reporting remains a Federal regulatory requirement and the lack of reliable experience data is impeding the state's ability to set reasonable and accurate rates. Moreover, it is a clear expectation that the state submit complete and accurate encounter data to CMS to comply with Transformed Medicaid Statistical Information System requirements. Therefore, the state must take affirmative steps to ensure that the CCOs report appropriate encounter data, including pricing information.

- *Rate-setting methodology.* Our review of your rate setting methodology has raised questions about compliance with CMS' requirements for actuarially sound rates as outlined in 42 CFR 438.6(c). We continue to find gaps between OHA's work (including its assumptions, methodology, and projected rate ranges) and the CCOs' rates (including their assumptions, methodology, and final rates). OHA has acknowledged that the majority of the CCO rates fall outside of rate ranges developed, and the assumptions and projections from OHA seem to differ greatly from the assumptions and rates developed by the CCOs. In addition, it is not clear how OHA can determine whether or not the CCOs have followed generally accepted actuarial principles and practices if the CCOs are primarily responsible for setting the rates and if the CCOs offer no further information on how the rates were developed. Reasonableness checks – as described by your staff – are

OHA-HC000163

Exhibit 4
Page 2 of 4

Suzanne Hoffman
Page 3

not a substitute for an evaluation that would be necessary to attest to the actuarial soundness of the assumptions, methodologies, and subsequent final rates.

We recognize that remedying the data deficiencies and methodological gaps in your rate-setting structure will take time. As such, the CMS is amenable to the state submitting a corrective action plan that reflects the steps the state will take to address the issues we have identified on a prospective basis.

The corrective action plan must be submitted to CMS no later than 120 days after receiving this letter. The corrective action plan must provide specific interim deliverables by specific dates that will result in improvements to your rate-setting methodology in the 2015 rating period; and include full completion of the corrective action plan by 2016.

At a minimum, we expect the corrective action plan to include the following elements:

1. A description of the future rate setting process;
2. A description of the data that will be collected and reported for use in rate setting;
3. An explanation of the role of the certifying actuary in the rate development process and how the certifying actuary will meet the requirements in 42 CFR 438.6;
4. A description of the information that will be included in future rate certifications, including sufficient information on the data, assumptions, and methodologies used to develop the rates.

Upon receipt of Oregon's written acceptance and willingness to proceed as outlined above; we will proceed with disposition of the January 1, 2014 through December 31, 2018 contracts and the amendments for which CMS has completed its review, including the rates for January 1, 2014 through June 30, 2014. Subsequent amendments will be reviewed in consideration of this agreement.

My staff is always available to discuss these issues with you. Please contact Debbie Dombrowski at (312) 353-1403 if you would like to have further conversations.

Sincerely,

Barbara Coulter Edwards
Director

Cc:    Judy Mohr Peterson, Medicaid Director, Division of Medical Assistance Programs
Rhonda Busek, Interim Director, Division of Medical Assistance Programs
Carol Peverly, Associate Regional Administrator, Region X

OHA-HC000164

Exhibit 4
Page 3 of 4

OHA-HC000165

Exhibit 4
Page 4 of 4