## David Marriott

| | |
|---|---|
| **From:** | Joel VanEtta |
| **Sent:** | Tuesday, November 03, 2015 9:53 AM |
| **To:** | David Marriott |
| **Subject:** | FW: Materials you requested |
| **Attachments:** | IPC Transcription - House Interim Committee on Health Care dated September 28-2015-with JH comments.docx; Joint Interim Committee on Ways and Means Care dated September 30 2015 - Edited for spelling and grammer.docx; Senate Interim Committee on Health Care dated September 29-2015.docx |

**From:** Jeff Heatherington [mailto:JeffH@familycareinc.org]
**Sent:** Tuesday, November 03, 2015 9:18 AM
**To:** Joel VanEtta <JVanEtta@allisonpr.com>
**Subject:** FW: Materials you requested

**From:** Jeff Heatherington
**Date:** Monday, November 2, 2015 at 5:27 PM
**To:** "Sen.ElizabethSteinerHaward@state.or.us"
**Subject:** Materials you requested

Jeff Heatherington LHD (Hon)
President and CEO
825 NE Multnomah, Suite 1400
Portland OR  97232
(503) 471-2102



This message is intended for the sole use of the individual and entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended addressee, nor authorized to receive for the intended addressee, you are hereby notified that you may not use, copy, disclose or distribute to anyone the message or any information contained in the message. If you have received this message in error, please immediately advise the sender by reply email and delete the message.  Thank you.

1

Exhibit 9
Page 1 of 93
ALLISON00000219

**HOUSE INTERIM COMMITTEE ON
HEALTH CARE**

**September 28, 2015**

**ORGANIZATIONAL MEETING
AND
INFORMATIONAL MEETING**

**[CCOs rate discussion only]**

Coyner:    So we embarked on a redevelopment of 2015 rates in early April and the Oregon Health Authority contracted or at least started, expanded our contract with Optamus as the actuarial firm that would help us in a redevelopment of the 2015 rates. So part of the purpose of that was, we had increased scrutiny from CMS and that's due primarily to the 100% federal funding of the ACA expansion population. So you'll recall in 2014 we received about, over 360,000 new members onto the Oregon Health Plan. Zach and I will refer to those as the ACA expansion population, but they were unique in that we had little to no information about them before they came onto the plan and they are 100% federally funded. So across the country CMS has increased scrutiny in the actuarial soundness of those ACA rates as well as implementing new guidelines about how those rates are to be calculated. We used a prior methodology through 2014 that was what we called in house the cost template methodology. CMS provided us a notice of corrective action in July of 2014 and said that we needed to use a new methodology to compute the rates. That new methodology was completed in late fall of 2014 and Coordinated Care Organizations then sent a letter to the former Governor Kitzhaber with concerns about those rates.

Based on that feedback and a very long list, 103 questions on those 2015 rates, Director Saxton convened the CCOs and the decision was made to redevelop the 2015 rates.

Can you advance a slide? The primary concerns that were outlined by the Coordinated Care Organizations about the original 2015 rates were four fold. One was that they were developed in a black box where they did not have an opportunity to examine the methodology. The second was that they were concerned about the unexplained variance between the Coordinated Care Organizations, particularly for Coordinated Care Organizations that were in the same region. Third, they wanted to have more input into the process of rate development. And finally they were concerned about actuarial soundness. So in the new methodology that Zach's going to walk through, we paid particular attention to these points to increase transparency, involve CCOs throughout the process, and ensure that the rates are developed in an actuarial sound manner and that minimize unexplained variation between the Coordinated Care Organization rates.

Exhibit 9
Page 2 of 93
ALLISON00000220

Chair:    Can I interrupt for a minute?  You originally gave the CCOs a 2015 rate that was designed in some way.  This is a question of recalculating the 2015 rate going backwards [inaudible] forward, is that right?

Coyner:    Chair Greenlick, that is correct.

Chair:    Thank you.

Man:    Mr. Chair?  I guess just following up on yours, yes, so clearly it was retroactive rather than…

Man:    Well, it will be.

Man:    Yeah.

Chair:    The prospect of calculation retroactively applied I think.

Man:    Here we go.  Thank you, that's the clarification I was after.

Coyner:    Chair Greenlick, yes.  And let me speak to this shortly and we will probably have more time to discuss it once we've heard from Zach.  But CMS largely dictated our decision to make those payments retroactive to January 1 and that was due to their concerns about the original rates that were submitted and their actuarial soundness and their willingness to approve those.

Chair:    We'll talk about that after.  Let's keep going with this.

Coyner:    So I'm going to turn it over to Zach to talk more about specifics of the methodology that we've used for the redeveloped rates.

Aters:    So before we get into the details of the methodology I want to touch base on actuarial soundness.  It's already been mentioned a half dozen times since the beginning of this conversation and I think it's important for everyone to understand what's meant from the perspective of certifying rates and in fact what actuarial soundness is, it really just means that the actuary that is certifying the rates has followed a certain guideline, actuarial standard practice which we are bounded to professionally and in addition to that has incorporated all emerging information that's been available.  What it is not, it's not just a data driven process, and I think that's another important aspect of this that I want to make sure we're clear on.  We do ask for claims information and counter information clearly to help understand the baseline but we also ask for the total financial picture from all the CCOs which is part of the rates being actuarially sound from our perspective.  We have to know what their total financial picture is and we spend a large amount of time having conversations with each CCO to make sure that not only do we understand their business model but we understand all of the incentives and other payments that fall outside of encounters and claims.

Exhibit 9
Page 3 of 93
ALLISON00000221

Chair:      Is this something different that you just said?  You said it's not a [inaudible] project your slide says it's not a budget driven process.  Is that the same thing?

Aters:      Chair Greenlick, Committee, yes, it is very similar, and let me just go back and talk through what is meant by "it's not a budget driven process." Actuarial soundness, if you follow all of those protocols and guidelines that I just mentioned, really is all about evaluating risk.  It's about looking at internal and external influences on your program that will help the state evaluate the risk that any one CCO has for the various populations.  So when I say it's not a budget driven process, basically what I'm saying is we don't set out with a predetermined outcome.  What we're asked to do is evaluate the risk of the Oregon Medicaid Program, we report that risk, and then we work with OHA to understand how that maps to any type of budgetary restraints that may be in place.

Chair:      Well, you may not consider it an issue but we do.  We have a budget for the Medicaid and it seems to us from our naïve perspective that that's the beginning of the process and the question is how do you distribute that budget.  You can't independently do the rates and then come up with rates that are twice the amount of money we have to pay those rates.  I mean in that sense, it is a budget or at least a budget constrained process.

Aters:      Chair Greenlick, I can't disagree with you that certainly there is a budget perspective but I think the nuance here is that in order to help you understand your program you need to know if you do have that issue where, that if their expenditures are exceeding any type of sustainable growth that you understand that it is and then therefore we dive in and try to understand what's the drivers behind that so that it can be corrected in the future.  Furthermore, we do part of the rate process that we'll get into.  We are very much driven to matching payment to risk where we do evaluate the risk of each CCO and to the extent that a percentage of sustainable growth per se is chosen, we then allocate that to each of the CCOs based on that risk that's been developed through the rate setting process.

Chair:      We can get back to this and we will get back to it later, but our basic notion when we designed this was that the issue would to be have a budget, increase it by no more than 3.4% and then use risk assessment to fairly distribute that budget among the 16 CCOs based on the risk of their population.  If that's not a correct, I mean, if you weren't working on the same assumption we were working on when we designed it, that's going to be a problem.

Coyner:     Chair Greenlick and the Committee, OHA works closely with the actuaries so they are telling us what, where the program is and they are certifying rate ranges so then it gives us the opportunity to look for the budgetary impacts within a rate range.  So Zack's certifying not a specific point estimate or PMPM but a rate range.  And that gives us the opportunity to establish the sustainable rate of growth within that rate range or at least close to it.

Exhibit 9
Page 4 of 93
ALLISON00000222

Man:          Mr. Chairman?

Chair:        Yes, sir?

Man:          I'm sorry, but I just wanted to follow up a little bit further on this because I do think this is the issue of contention and one that we have a lot of discussion about. I guess the piece that I didn't understand is that you said would be corrected in the future, and I think those were your words, "corrected in the future." But actually the way this worked out we corrected it retrospectively, which is both unprecedented and unbusinesslike, and frankly pretty untenable in my view. But, I don't know, am I missing something here?

Chair:        I think it will be useful to [inaudible]. It seems to me the question is, first we want to get a sense of are the rates right, and then we can get into that very important political question you're raising is whether it ought to have been readjusted in the middle of the year. That's really a huge question.

Man:          Well, yes, and I think that is a good question. But the other part is it's very unbusinesslike to adjust rates retroactively regardless of whether they are actuarially sound or whatever because budgets has been set and expenses, expenditures have been allocated and yeah, and I see Mrs. Saxton is here and may the director can help.

Chair:        Yeah, we can have a little discussion about it, but let's continue with this first if that makes sense.

Aters:        This next slide really just sets the stage on exactly what we are thinking about when we embark on any type of rate setting exercise and really we refer to it as the four determinants of risk and really to boil it down, it's who are the members of the population so we'll be receiving the services, what types of services will they be receiving, regionally where were those services be provided, and that's important for this program because there are 16 CCOs statewide, and depending on where they are in the state, that dictates a lot of the practice patterns and such that come through and that needs to be considered. And of course the delivery system. And again, I'll go back to my comment delivery system comes into play here because you have 16 very different CCOs and they deliver the care in very different ways.

              So the goals that we set out, first and foremost, the first primary goal of this process was to be transparent, and we set up the various touch points along the way, both in person and weekly calls to not only share analyses but to discuss methodologies, solicit feedback from all the stakeholders and in fact, that feedback was indeed incorporated in the final methodology that was chosen, and we found it to be very helpful as part of the process.

              As we continue into the existing rates that we're currently working on which are 2016, that process continues where we have those meetings and touch points, again on a weekly basis, and solicit feedback from the stakeholders as a whole.

Exhibit 9
Page 5 of 93
ALLISON00000223

I mentioned the four rating regions. Actually I didn't mention that there were four, I just mentioned the rating regions. There are four...

Kennemer: Excuse me. I'm sorry, I'm just a little slow today. So we've been touching basis on a weekly basis? Who touches bases with whom?

Coyner: Chair Greenlick and Representative Kennemer, I can explain a little bit more. We have, at the beginning of the process it became clear that many of the Coordinated Care Organizations had either an in-house or a consulting actuary who wanted to be able to weigh in to the methodology. So we decided to hold weekly webinars, they're Fridays where Optamus opens their models no matter where they are, and talks about them in detail and asks for feedback. So that happened on a weekly basis. We hold a monthly rates work group meeting as well.

Kennemer: Excuse me, but how many are participating?

Coyner: I can give you those numbers but it's approximately 30 people on the call each week. We do track, I can provide all of the, who has attended for each webinar, as well as the rate support group meetings which probably run about 50 participants. And then we've had over 100 individual meetings with CCOs since April. So that means either Optamus has come physically to Oregon, we've met one-on-one with each CCO four or five times for the 2015 redevelopment, and we've met one time on the 2016 rates we will be meeting all of the CCOs Thursday and Friday to talk about the rate ranges for 2016. So it's been an ongoing process and a combination of individual meetings so that we can talk with each CCO on a personal private basis, as well as these open webinars on Fridays and rates workgroup meetings once a month.

Aters: So, going back to the topic of the rating regions. We ultimately landed on four rating regions. This was in fact one of the areas where we solicited feedback from the stakeholders. Originally we proposed three, but _____ a productive discussion in an iterative process as far as the analysis, we landed on four and the four that we chose as a group are shown on this slide. The regions really are split based on geography, but more importantly what you don't see on that slide is there definitely is a difference in the way the care is provided between those regions, and the driver of that generally is the utilization of AB hospitals versus the DRG hospitals, which is important.

This slide is going to get into some of the more nuanced portions of the methodology and one of the, in addition to transparency, the second goal of our approach was to explain any type of variance. We knew there was going to be variance. If you have 16 CCOs operating in a state there's certainly going to be differences in risk across those CCOs for the same population. In fact what we didn't know is the reasons why. All we could do at the time is just look at reports or summaries. So the goal was for us to dig in and really understand what the differences were. So the purpose here is to not get rid of the variance, but to get rid of the unexplained variance, and any variance that continues can be explained.

Exhibit 9
Page 6 of 93
ALLISON00000224

The tool that we're going to use to do that, one of the tools, is going to be a risk score tool. It's going to be the CDPS plus RX tool and really what that does, it looks at each member individually, their experience. It looks at their diagnoses, it looks at their pharmacy utilization, it assigns them a numerical risk score and if each person gets assigned that risk score you can then roll that up into what CCOs they belong to, and you can then get CCOs' specific risk scores and we have further examples to really drive that point home. But this gets to Chair Greenlick's comment where the idea here is that if you start with that 3.4% increase you need to make sure that you disburse that accordingly to the risk of the population, and that's what we're attempting to do by incorporating this concept of risk score.

This next page really just builds on that, so if we did not have a risk score and in particular this is going to be a real example of TANF population, which is one of your more traditional populations in Medicaid, and when I said variance still exists, if we did not apply risk score for this particular region, this is the tri-county region which encapsulates FamilyCare and Health Share of Oregon, you could see that the regional rate came in at 317.53. Without any kind of risk mechanism, both entities would have received 317.53.

| | |
|---|---|
| Chair: | Or that subgroup of the population? |
| Aters: | Yeah, this is just a one rating core TANF population of your entire Medicaid population. |
| Chair: | There are 13 different risk… |
| Aters: | There are 13 different categories similar to this, yes. |
| Kennemer: | Can you explain how those two entities, because this is a good example, they both operate in the metro area, why their risk scores would be different? |
| Aters: | Chair Greenlick and Members of the Committee, we'll have a slide that I think will answer that question in a moment. So you can see that $317.53 would have been the regional rate. However, upon evaluation of the risk score and again, I'll go back to the transparency. The risk score tool, the results, not only summary results but the actual detail for each of the CCOs were shared with each of the stakeholders, so you can see that FamilyCare in this instance has a .94. .94 means healthier than the 1.0, so healthier than the norm. The 1.0 would be the norm for that particular region and cohort. Health Share of Oregon obviously would have a higher acuity associated with it because they're the only two CCOs in that region so when you would aggregate them it has to get back to a 1.0. |
| Keny-Guyer: | Can I ask a question, Chair? |
| Chair: | Who just asked? Yes. |

Exhibit 9
Page 7 of 93
ALLISON00000225

Keny-Guyer:    Thank you. Can you please explain - so one is healthier than the other population and they're both from the regional area, they're both similar demographics, TANF population. The obvious question would be, what if one organization is doing a better job of keeping their population healthier. So what are you basing those risk factors on? When you say health and population, what goes into that determination?

Aters:    It's a couple things. One of them is demographics. The tool actually has a demographic component which will look at age and gender. And then the other component will be the diagnoses based where it actually attributes members to more chronic illnesses, and that's going to be based on diagnoses that come through on the claims and also the pharmacy utilization that those members utilize.

Keny-Guyer:    Okay, so just stop right there. You just said several things that raise the same kind of issues that were in the hearing earlier today. If some are prescribing pharmaceuticals more than others or are providing higher cost kinds of therapies, then it seems like that all of a sudden starts driving up the cost and then you reimburse and we start going down the road toward a fee for service as opposed to the global budget keeping them healthy. So the way in which you...

Chair:    It isn't about the nature of what they provide us about, what risk we think; it's the underlying risk.

Keny-Guyer:    Exactly, but they're determining risk based on utilization of certain services.

Chair:    It's not based on utilization, it's based on the existence of the disease.

Aters:    Yeah.

Keny-Guyer:    Hmm, but you went beyond that and you said pharmaceutical assignments.

Man:    No, he didn't say that.

Keny-Guyer:    Okay.

Aters:    Let me back up.

Keny-Guyer:    Okay, back up, because I was trying to listen to each of the different things that feed into that, and the other piece of that is you say you provided that data and I keep seeing shake from the audience, no, we weren't given that data, so I think this is the crux of...

Chair:    Let's not worry about why the audience is shaking their heads...

Keny-Guyer:    I know, but there's a discrepancy...

Chair:    Let's worry about us shaking our heads.

Exhibit 9
Page 8 of 93
ALLISON00000226

Keny-Guyer:   Yeah.

Coyner:   Chair Greenlick and Representative Keny-Guyer, we've provided the risk score data at the patient for member level to each CCO and we can provide documentation of that. So we went through rolled up summaries but then when the CCOs asked to have it, and so it was delivered at a member level to each of the CCOs. Additionally, Optamus went through a couple different models. We got feedback during our actuarial webinars and the CCOs themselves to ask about what was better.

If you go back one slide. And Optamus analyzed whether the increase in cost for a member was correlated or associated with the risk score and the risk score was only applied for those cohorts or those individual groups where there is a relationship between the risk and cost, and that's important because we do see variation in members that have underlying disease and they, between the CCOs, and then also it can be differentiated as well by age distribution within a CCO, or gender. And so it's not utilization of services but trying to understand utilization and those, match those members to the actual cost of providing them care.

Chair:   If you have a question, ask.

Man:   Question, Chair Greenlick.

Chair:   Go ahead.

Man:   Thank you. Simple question just on your calculation here. You said this balance is to zero so on this TANF population, is FamilyCare roughly twice the size as Health Share of Oregon?

Aters:   Yes, one is substantially larger than the other.

Coyner:   It's the opposite though. Health Share is roughly twice the size.

Chair:   That's not related to the risk.

Coyner:   No.

Man:   No, but then that balance is to a neutral then?

Aters:   This isn't about budget or about your share of population, this is just about do I have more women who get pregnant versus single guys who are healthy. I mean, that's what this is about.

Chair:   Within…..

Woman:   In a smaller category, TANF is…

Chair:   It actually averages to one.

Exhibit 9
Page 9 of 93
ALLISON00000227

Aters:      Yes.

Chair:      But the risk [inaudible] averages so long within a region. If that's a weighted average, the .94 and the 1.03, and when you put it together with [inaudible] we'll say average [inaudible]. So it's simply differentiating, in this case, all the members of the region which is two members, and it's based on the underlying propensity to consume services, not on how many services they actually use. And that's, to the extent to which risk adjustment works, if it's under the utilization pattern and gets basic to the underlying propensity. We need to see if it works or it doesn't work.

Aters:      So, another way to say this, FamilyCare, for whatever reason, drew a healthier population of these randomly assigned TANF. Like they drew better cards in the lottery of the situation versus Health Share. Is that another?

Chair:      That's what the data would suggest.

Aters:      Yes.

Chair:      Was your question, well how could it happen, and it's an important one which I think we'll get to.

Man:        So at some point, I'm trying to understand the risk of the risk. So we're talking about this risk. What I'm trying to understand is, and I appreciate the factors that have gone into the tables, but given a comment you made earlier about when these people actually came into the pool and how much we knew about them then, and how much we may know now, I'm concerned about the risk of the risk we're calculating on that in short history.

Aters:      Chair Greenlick and Committee Members, I think the important piece of this is to segment the rate setting process into rate setting for the expansion or the ACA versus the traditional or non-ACA. Your comment that you just made is more applicable to the expansion. We didn't know anything about them when the 2014 rates were set.

Man:        Right.

Aters:      But what we're talking about right here is a traditional population that has been around since really the inception.

Chair:      It's a very important issue and one I wanted to get to which I missed in the meetings we had before, because this is only related to the pre-ACA expansion population.

Aters:      That's correct.

Chair:      And that was the one that was the big problem.

80285860.1 0105026-00003

9

Exhibit 9
Page 10 of 93
ALLISON00000228

Aters:      Yes.

Chair:      I mean, the extent to which the government was asking you to do something, it's only the expansion population.

Aters:      Right.

Chair:      So this is all important but it's on the 650,000 people, not on the 350,000 people and I assume you'll talk about how you did that [inaudible].

Coyner:     That's the last three categories of this.

Chair:      That's three categories of the…

Coyner:     The last three categories.

Chair:      But they're the ones that made the big difference.

Coyner:     That's the biggest difference of that.

Chair:      Soldier on.

Aters:      This is where the slide is the controversy, right?

Chair:      Yeah, soldier on.

Aters:      So we can come back to risk scores after we finish because I think finishing the slides is going to add some perspective to the process and like we just mentioned, there's a dichotomy here that needs to be recognized. ACA versus non-ACA, okay? And it's a very important one. The ACA rates, expansion rates as I mentioned, and this is not unique to Oregon, it happened all over the nation. When the rates were set in 2014 the actuaries that were setting the rates had no data on those expansion individuals. There was a lot of theory out there, and you can go out and find the papers now about the theory, but the benefit we have now is, we actually have emerging experience that put the theory to test.

However, because of that, we had to come up with very, two distinct processes here when we're developing rates for your program, and let's talk about the non-expansion first. We have already mentioned, what we tried to do is match payment to risk by using a tested mechanism that's used not only in other Medicaid programs but it's also used in Medicare and it's also used in commercial rate development. So it's not a tool that Optamus nor the state has developed. It's a nationally recognized tool to actually accomplish matching payment to risk. What this table here shows on this slide, it shows that the shift that actually occurred between the ACA and the non-ACA. So for example, in FamilyCare's case I'm going to talk off the top, but both of these are fairly similar in the sense that the total ACA actually declines. The rates are being reduced and

10

Exhibit 9
Page 11 of 93
ALLISON00000229

I have a slide, the following slide's going to give you a little perspective behind that.

However, what's more important on this slide is the non-ACA. It actually increased. Not only did it increase, but it increased at a rate that far surpasses your sustainable rate of growth as defined by your existing waiver.

Now there are some drivers of that in discussions with the stakeholders and in our work that we noticed and brought to the table, one of which was mentioned earlier at the beginning of this meeting which is pharmacy. Pharmacy costs are sky high and there's a couple of different reasons - breakthrough therapy drugs for one, but also the increased cost of generics are no longer a safe haven to drive down costs. They're getting very very expensive and it's increasing the trend and therefore it's going to have some sort of impact on how the rate of growth for these nonexpansion members compares to the 3.4 which was developed back in 2012 or so.

So the other component of this, and I mentioned at the beginning of this slide, but I'll reiterate, that when you look at the expansion rates it's actually a decline. Such a decline that it is somewhat, when you look at the numbers, that you have to wonder what was that rate and how did it shake out with the actual experience. What's driving, for example, the 29.8% reduction for the expansion.

Before we get into that question, this is just another graphical representation of what actually occurred from the statewide I mentioned. Think of the rate setting process as ACA versus non-ACA and you can see for the non-ACA overall you have significant increase in rates. In the ACA of course you have a significant decrease. The weighted average, the bar to the far right, is fairly flat. So there was somewhat of a subsidization going on behind the scenes. Once we took a deeper dive into the rates, it was clear to us that there was money that had been shifted over into the ACA cohorts that was taken away from the non-ACA cohorts. We found that out be evaluating the risk like I started off the conversation with, which is what we were asked to do. The result of our rate setting actually shifted some of the funds back into the non-ACA but took it away from the ACA. Again, it's just based on the whole idea of the very first slide; what we said was actuarial soundness is not setting rates with a predetermined outcome, so if you do set down that path, it may lead to some offsetting consequences such as subsidization between the expansion and non-expansion in this case.

Man:     So I think you explained why there's such a wild swing, right? That's a pretty big swing. Can you explain why there's such a difference between FamilyCare and Health Share?

Aters:    Yes. So, are you referring to the non-expansion of the TANF example?

Exhibit 9
Page 12 of 93
ALLISON00000230

Man:        I'm just ___ the slide up here, so you know, I mean one of the CCOs are I think
            rightfully concerned about, they had concerns about the rates at the beginning of
            2015, now they're saying rates changed potentially in the middle, and it looks
            even worse than when they were complaining back in January.

Aters:      Yes.

Man:        And I'm trying to get my brain around how we can do that to them, and is it
            justified and why from your all's perspective, I think that's what I'm trying to
            understand.

Aters:      Yes, I can speak a little bit about what is behind these numbers. I can speak to,
            we mentioned that we used a risk score to apply to the non-ACA but in fact we
            did explore the risk score tool for the ACA as well, so we could see that
            underlying risk of those individuals to see if it supported this. We did not use that
            in the rate development, and the reason is because if you think, if 2014 is the first
            year of experience for this group, what we did at face value, the experience is
            coming in far short of what was expected. However, when you look at the
            average duration, duration by definition is the number of months individuals have
            been enrolled in the program and what we know is that the longer individuals are
            enrolled in the program, they learn how to navigate that program. Therefore, the
            utilization potentially will increase over time, and what we found was that the
            average duration for the ACA was generally around 4 to 5-1/2 months, very short,
            but you would expect that because a lot of them were just being phased in to the
            program in 2014.

            You compare that with your non-ACA, TANF for example, and the average
            duration is commensurate with something, 9-1/2 to 10-1/2 months out of the year
            which is really more norm. Because of that low duration, it would have been, it
            potentially subjected the process to bias, because you would have been basing a
            risk score on a population that only had 4 to 5 months of enrollment, so we did
            not do that. So what we did is we actually took the reported expenditures from
            each of the CCOs. When I say reported expenditures, it's not just the
            expenditures associated with encounters or claims. Again, it's their total financial
            picture that's associated with the expansion population. So in this case, you can
            see the FamilyCare, the reported PMPM for 2014 was 233.10. That's a reported
            number that was provided to us via financials. It's nothing that we've calculated.
            The premium that was paid in 2014 for this population was $516.08. Now again,
            I want to reiterate. Those rates were set with no data, and they were set with a
            conservative mind set, because no one really knew, everyone was afraid of the
            population because it was expected to inflate the roles of the Medicaid program
            significantly, and it could bankrupt a program if not considered in totality as far as
            being conservative when you set those rates. That's what's happened here.
            That's where CMS and the federal government have gotten involved and looking
            at this they knew that the rates were set with no data. So what they did is they
            produced a lot of guidelines and said states as you get emerging data, we would

Exhibit 9
Page 13 of 93
ALLISON00000231

like you to incorporate them in your rate development and true them up as necessary so that payment better aligns with risk.

Now, what we did is we started with the recorded expenditures but my comment earlier was that you need to be careful and not take 2014 at face value because it can mislead you. The 233.10 is a fairly low number when compared to the premium that was received. In fact, upon our durational study, looking to see that it was four to five months of duration, we actually account for that and we inflate that number five to 10% higher just because of nothing more than an increase of duration for the members, assuming that as they will learn how to use their benefit at a faster rate in the next contract period so you can see off to the right the calendar year 2015 rate that was ultimately set that goes along with the 233 and the 516, is 362.14. Is there a question?

Man:    How can it be then that FamilyCare has such a much lower rate than Health Share? Wouldn't their two ACA populations, if you don't have any experience, I hope I'm saying this right, I'm not an actuary, wouldn't they need to be similar?

Aters:  Not necessarily. You can see off to the left. I've been talking off of the aggregate or the total ACA, which is the bottom line. But as you can see, there's actually three sub-populations. And if you look at the age bands associated with those, this gets to one of the questions earlier about risk score, what drives that. Certainly we could all agree that a 50-54 year old male would be riskier than a 20-24 year old male, just because of the demographics, and that's what's going to happen here. That's one aspect of this is that the mix of individuals just based on demographics along is going to drive a difference in the potential. So that's going to be one component.

The next component of this is just really going to boil down to general law of insurance which says 20% of your population makes up 80% of your spend, and that's true pretty much in all insurance. It's why insurance exists. If you think about what that means is, if you start taking that 20% that's really the driver of the expenditures and you start carving that up, it's not likely that each entity, managed care entity or in this case CCO, ends up with the exact same distribution of those 20% of individuals which is why…

Chair:  The age distribution is basically the same in the two populations.

Aters:  It's very close, but I will say that the factors associated with those age groups increase exponentially. So even if the average age is off by one to three years, it has significant impact on the risk.

Keny-Guyer: Can I say something, Chair?

Chair:  Go ahead.

Keny-Guyer: So what you just said a few sentences ago about how, and I love FamilyCare and Health Share so this alone doesn't say whether one is performing better than the

80285860.1 0105026-00003                              13

Exhibit 9
Page 14 of 93
ALLISON00000232

other, we're only talking about inputs and not outputs or health outcomes at all, which is a challenge because we're still very early on in the process, and that's really the meat of all this, but just in terms of the input. So FamilyCare spent an average of $233 per member per month for the total ACA population and Health Share is $291. And what I understood you to say which is similar to what you said earlier when I asked the question, was that part of the risk approach and part of the re-jiggling of this is that you look at what they were given and what they spent and one is a lot less than the other, and so as such why let them take home all that money, let's fine tune it and reduce it something closer to what they've paid.

The question is, and what many people in the community are saying, is that that kind of reformulating leads people to think "oh, well those that have higher expenditures going to get more per member per month" and it starts driving in that direction. So the concern is, and there's no way to know from this whether one has it better than the other. It could be they're putting more into population-based strategies and keeping a healthier population and not having to spend as much. That's what we'd like to see. It could be that one spends less because they're not getting out to as many people and not serving their population as well. There's no way to know the numbers, so I'm not asking this with any bias, I'm just saying that the calculations that go into this that are based in part on what they've spent per member per month in the past in my view is not a good reflection of what it should be in the future. I feel like we're doing this really early in the process not knowing what the outcomes are. There's no outcome in how we're keeping people healthy that's in this calculation at all. So a lot of it is based on…

Chair:      Let me answer that question. [Inaudible] clear I believe is the big fallacy in the 2015 rates of the ACA population because of [inaudible]. I don't really think that the past expenditure is the right relationship. But my assumption is that your 2016 rates will not do it that way, right? The 2016 rates you'll be using the risk adjusted model for the whole population?

Aters:      Chair Greenlick, Members of the Committee, the intent here is that in 2016, that we continue down the path of the methodology that's been set forth because, which would imply that we don't use risk adjustment for expansion because of the issue that I just mentioned. We don't have any new data that we didn't have when we set 2015. If we used risk adjustment for the 2016 rates, we're going to be applying risk adjustment in some cases on members that don't even have six months of membership in the program, which means that their risk score could be biased or skewed become that credible.

Chair:      But then that's really going to give credibility to the problem that Representative Keny-Guyer raises. I mean I think we all have real problems with using the expenditure data for the population as an estimate of risk rather than using the underlying phenomena.

Exhibit 9
Page 15 of 93
ALLISON00000233

Aters:    Well, there is no new data that's out there that we haven't used for the rate development. Absent of any new compelling information that would indicate some kind of massive shift in risk, the change in the expansion rate is going to be very predictable. In fact, it's going to be the secular trend that we assumed.

Chair:    We have some real doubt about the use of the, the way the, I mean after I met with you I became quite satisfied that your risk adjustment model would work, and then found out you're not using it for a third of the population. You're using something much more questionable and much less...

Aters:    For expansion, and again, we've actually ran the analysis for the expansion and in a lot of cases what we would show if we actually applied the risk score, that the increase would be even more severe than it is shown.

Chair:    I don't care about the answer. I care about the method.

Aters:    Yeah, as we do as well. But it's important to understand that using the risk score tool with not an appropriate number of months of duration is going to skew the process of potentially more with using the tool.

Coyner:   Representative Greenlick and the Committee, I want to address a few of the points that Representative Keny-Guyer brought up from more of a policy perspective. So as Zach has described, we plan to use the risk adjustment tool but likely won't have sufficient data until we undergo the 2017 rate setting process. I do want to bring up a couple points. So one of them is that CMS's guidelines require us for the ACA expansion population to use what's called emerging experience. What that means is use the expenditure data in order to calculate or to inform the rate setting. And because those dollars are 100% federal we have to comply in order to receive those funds. However, we are engaging a process right now with consulting firm Manat(?) and Optamus and we will be bringing in the CCOs in a collaborative process to start to talk about how we move forward.

So we see this 2015 process that we just underwent as a level setting and you'll notice in that bar graph that we needed to do it in order to get the non-expansion rates up to where they needed to be and adjust the expansion rates because of the requirements from the federal government. But then moving forward we need to really think about how to get to the methodology that is in keeping with the global budget. But you can't raise rates at 3.4% if what your base rate isn't matching payment to risk. So we needed to level set, and then we need to have some serious discussions because we did see that the non-ACA population, the expenditures were much higher than 3.4% and that's a concern.

So the next steps are to engage CCOs to talk about how we do that, to work with Optamus, to see if there are ways to reward efficiency so where you're talking about CCOs who are providing good care for less, how do we reward that. Frankly, these methods aren't being applied anywhere in the country and so it's going to take us the next six to eight months of serious work to come up with an

Exhibit 9
Page 16 of 93
ALLISON00000234

expanded methodology. We see this as the beginning and not the end to be able to apply to 2017. So I know there are a lot of concerns. We at the urgency of CMS needed to level set our rates and then in many ways the harder work needs to happen where we can meet the spirit of the waiver and the idea of a sustainable rate of growth and marry this new requirement that CMS put in with their guidelines that were published in September of 2014 that require us to actuarially sound rates that use financial data.

So its added complexity to our ability to compute rates that meet the global budget, be we think we can get there. It's just going to be some work.

**Man:** So I continue having a problem with it. So this reported, the ACA, the 233 or the 291, was as of August. But what I'm trying to understand, when we shut down last session we had the CCOs' report when they came in and one of the things they talked about is the point at which people are coming in to the program, even though in theory, let's say January 1st. In some cases we have CCOs that don't have enough physicians so they're not even coming in yet because there's no physician, so I'm trying to understand the impact that has on this cost per patient and how accurate that is to be able to base what the actual costs are, because in some cases it isn't six months, in some cases, it's this much. I guess I'm not getting the connection between if we're going to use the cost per patient.

**Coyner:** And Optamus too that into account with what's called the durational adjustment, so rather than taking setting the rates based on only what we saw happening right as of, you know, with the 2014 data, they added with the idea that there was going to be more utilization because of these reasons that you brought up, so they added 5 to 10% to the rates on top of it just with the… and that was not, they didn't just pick a number, but it was through analysis of how long people were on, and then what they call, which we haven't discussed, penetration analysis. So how long have the new members been on Oregon Health Plan and then how many services did they use and did that increase over time. You want to add to that?

**Aters:** Sure. The penetration adjustment is key here because really what that boils down to, it gets to your comment, is it would be the percent of the population they're receiving services, so if there is some sort of access that would be deflated and in fact, that's what we saw, which is why we considered that. If you look at the, well, we have to start off with the reported 233.10. Certainly where we end up at 362 is much much higher than the 233.10 and part of that is the durational adjustment of 5 to 10 and the other part of it is that we actually are projecting a much higher trend for the expansion population because of some of the reasons that you just mentioned.

**Man:** Chair Greenlick? I've got a more generalized question here on timing and some of the work that we did in this last session. It looks like that you here in your health policy say that CMS responded in a formal letter on August 21, 2015 regarding the development rates with a preference to do that in January 1. Then when we read the letter it says okay, basically fine, you've got to meet these

Exhibit 9
Page 17 of 93
ALLISON00000235

requirements that you've provided here from CMS. But it also says that once the state submits its contracts and rate certifications CMS will review those in accordance with our standards. But we had put a requirement on OHA to have those available to CCOs within prior 60 days, and what I'm seeing here in this document is that you say the 2016 rates will be provided to CCOs for review not less than 60 days prior to January 1. The intent of our legislation was not for review but an executable contract 60 days prior to. So where is the miss there? We were pretty specific about executable contract, 60 days prior. What I'm seeing here is review 60 days, and we specifically wanted to avoid that.

Coyner:    Representative Greenlick and the Committee, we submitted, for the 2015 redeveloped rates, we submitted, the certification and the rates went to CMS with the executable contract amendment on August 28. The 2015 redeveloped rates went to with a contract rate sheets and as far as this an executable contract went to CCOs on I believe September 1st, it might be the 2nd, I'd have to verify that, for a 60 day review. The 2016 rates we're targeting right now to have complete on October 16 and CCOs will be receiving executable contracts with contract rate sheets for 2016 within, by November 1, and that will allow them 60 days to have those, and we will have CMS reviewing that concurrently.

Man:    Okay.

Woman:    Can I ask for clarification on that?

Chair:    Representative Weidner, go ahead.

Weidner:    I tried to contain myself before you, Mr. Chair, but I do have one simple question. I like to keep things simple. How many people are enrolled as of this date, the actual number, how many people are enrolled as of this date?

Woman:    In Oregon?

Weidner:    Yes.

Woman:    In the entire state?

Weidner:    Yeah.

Woman:    As of this morning, 1.12 million people. I'm sorry, Lynne Saxton, Director of the Oregon Health Authority.

Chair:    Does that answer you?

Weidner:    Yeah, that was it. Just wanted the actual number of what we had there.

Chair:    It's about two thirds [inaudible] population of about one third, the so-called ACA expansion population, which is 100% paid by the federal government during 2015 but less than 100% paid by the federal government in 2016, is that right?

80285860.1 0105026-00003                    17

Exhibit 9
Page 18 of 93
ALLISON00000236

Aters:    Mr. Chair, probably would be forced to get kind of a breakdown of those numbers and everything to who is actually going onto the system, because this is over a third of the population, or about a third of the population that's on here.

Chair:    Representative Keny-Guyer?

Keny-Guyer:    Thank you, Mr. Chair. So I just want to understand. On the 2015 rates they were given to the CCOs on September 1 for a 60 day review, is that right? September 15th rates, is that what you were saying? The 60 day review for the CCOs that started in September 1, is that September 1 of 2015?

Coyner:    Yes.

Keny-Guyer:    For the 2015 rates?

Coyner:    For the 2015 redeveloped rates.

Keny-Guyer:    And so these are the ones that they get 60 days to review, but it's retroactive to January 1. So if they're taking a huge cut and they've already spent money and they say we can't do that, the purpose of a 60 day review was to look ahead and say "yes, we would like to enter this contract with you", or "no, at this point it's not going to meet our needs."

Coyner:    There's been a memo that was released that has a schedule to have either the recoupment or the payments, because many of the CCOs are receiving more funding, to be completed by the end of calendar year 2015. However, a CCO that is for one reason or another is not able to have that completed by the end or doesn't, it's going to be a hardship, they will contact us and we will work with them and we can extend that recoupment beyond 2015. We did ask and for those CCOs that are receiving payments they wanted to be able to complete those before the end of the year for their financial analysis and books and those that have to have a recoupment, then we're extending that process and going to work with them on an individual basis.

Chair:    How much is the [inaudible] number for the money they have to give you back?

Coyner:    I don't have that number with me, but we can get it for you.

Chair:    [Inaudible] magnitude of that, is it $1,000, $1 million, $100 million? You must have some idea.

Coyner:    We did work with Mark Fairbanks' CFO's office to look at both the financial impact overall as well as the financial impact to the state budget. It is costing some state dollars to increase the non-ACA rates and as we were going through that process we ensured that we still stayed under the 2% test, which is part of our sustainable rate of growth.

80285860.1 0105026-00003

18

Exhibit 9
Page 19 of 93
ALLISON00000237

| | |
|---|---|
| Chair: | I'm asking a simple question. You're asking FamilyCare and Umpqua I think to give you back money. How much is that money that you're asking to give back? |
| Coyner: | We can give you the, I don't have the data with me. It was in the slides we submitted so if you give us 15 minutes we'll find it. |
| Chair: | In the slides that we have in front of us? |
| Coyner: | Not in your slides, perhaps in the slides from this morning. We'll give it to you, our CFO can get it for you. |
| Chair: | You don't have any idea of what the, aren't you the main numbers person, as we say? You're going to walk in here and tell me you don't know anything of the magnitude of that number? I find it hard to believe. |
| Saxton: | The analysis we made on the magnitude of the numbers was the reference I made in this morning's hearing that we went back to them with each of their specific amounts and said please notify us if there's any problem here, so I'd like to give you... |
| Chair: | They'd been notifying us, thank you. The question is, what is the magnitude, do you not literally, I mean are you really saying it with a straight face? You're telling me you don't remember the magnitude of that number? |
| Man: | I don't have the numbers in front of me. |
| Chair: | I'm sure you don't have them in front of you. |
| Coyner: | Representative Greenlick, I oversee the actuarial aspect of this and then we worked with a finance that computed the total dollars and the impact to each of the CCOs. |
| Chair: | There's actually an analysis that created that number. You developed that number as a part of the actuarial analysis. I'm trying to avoid bringing up CCOs but I'll be glad to bring some up and ask them to tell me, but I think you ought to know this. |
| Coyner: | We have it, I just don't know each CCOs' impact on the top of my head and I don't have it in front of me. |
| Man: | I'm sure they know. |
| Woman: | But it's in the order of millions. |
| Man: | So let's keep going. |

Exhibit 9
Page 20 of 93
ALLISON00000238

| | |
|---|---|
| Coyner: | I know that the state budget…the impact of the state budget was around $40 million but I don't have the numbers in front of me and I don't want to speak to it until I do. |
| Man: | Mr. Chair? |
| Chair: | Yes? |
| Man: | Yes, I want to bring up one of my concerns just hearing the numbers and everything. |
| Coyner: | We have the numbers now. |
| Fairbanks: | Here's the exhibit and I apologize. I'm Mark Fairbanks. I'm the CFO for the Oregon Health Authority, and I think the ____ magnitude Senator, excuse me, Representative Greenlick, is between let's say $6 million and $55 million. |
| Chair: | So you're asking somebody to write you a check for $55 million because you didn't give them the right rates at the beginning of this year, is that what you're telling me? |
| Fairbanks: | Well I think that that is going to be a function as well of not only the CMS guidelines and requirements but also the actual, in these slides, we also indicate the reserves and the liquidity profile for the CCOs so I believe we did a sensitivity going out through the year using just the actual reported results which is the best we had at the time. For the first quarter to go through the year to see some level of sensitivity to it, if we had these adjustments go to January 1 what the impact would be on margin and what the impact would be given their liquidity and their reserves and based on that analysis, as you can see in these graphs, it looked like it was a sustainable adjustment. |
| Woman: | You have these in your packet as part of our submittal. |
| Man: | Mr. Chair, while we actually still have the CFO up here, real quick. I guess they're looking at all of that. This gets into something, and I brought this up on the House Floor… |
| Chair: | I remember. |
| Man: | …is, and I brought this up even when we started this program on the House Floor is with the declining federal dollars, how are we going to pay for this? I mean, this is a small piece, and pretty soon those federal dollars are gone, and there's going to be no guarantee of federal dollars. How are we going to pay for this? |
| Chair: | Wait a minute. The federal dollars aren't gone. |
| Man: | No, I said… |

Exhibit 9
Page 21 of 93
ALLISON00000239

Chair:          Maybe reduced…

Man:            …they're reducing, we're just looking at the 10% but there's no guarantee after 2020 of those federal dollars and it can be 50% or whatever.

Chair:          We'll let the next Chair and Committee worry about 2020.

Man:            Well what's the plan going forward because, are we just going to shut everything down?  So it doesn't make sense to me if we don't start planning right now for 2020 when there's no guarantee of federal dollars.

Fairbanks:      Yeah, I can go ahead and respond, Representative Greenlick, and thank you for the question.  There is a tool that we developed, actually was developed before I arrived in late May, early June, in this position.  So I apologize for my fumbling, I'm still a little bit of a new guy and that's my bad.

Chair:          Happy to have you here.

Fairbanks:      But the answer to the question is, we really have looked hard at the sensitivity and built the model to look out over a six year plan so this biennium and the next and the next.  By the way, the ACA is federally funded 100% for 2016, it drops to 90 in 2017.  Then it goes down from there and I believe to 2020.  Correct, our baseline sensitivity model would indicate that we're going to have in the next biennium maybe as much as a $490 to a $500 million issue, and that's based on a set of…

Chair:          That's 17-19.

Fairbanks:      Pardon me?

Chair:          That's 17-19.

Fairbanks:      17-19, yes, sir.  So there are several levers that we would have to look at.  Some of them would have to do with how we are a waiver strategy for the renewal of our waiver and how we are going to address transformation funding in dollars.  Some of them will have to do with the fact that we have estimated that number based on no growth in the general fund.  We've estimated that under a very conservative set of assumptions around case load, so there are probably four or five levers that we're staring out right now and hopefully we'll find more to ameliorate the issue and have a solid plan for filling the gap.

Chair:          Including the gap in the hospital tax is one of the pieces this [inaudible] funds available?

Fairbanks:      Yes.  That is one of the levers, yes, sir.

Man:            I'm sorry for pushing on it Mr. Chair, it's just something, if we're not thinking about this, there's a lot of people that are going to get hurt.

Exhibit 9
Page 22 of 93
ALLISON00000240

Chair:        I agree with you [inaudible] doing anything about, but I think we need to worry about 2015 and 2016 first.  Representative Lively?

Lively:       I want to just see if I can, I'm trying to look at which charts, and I think I have the one up, so I'm just trying to understand, because it says estimated change in rates retro to January 1, and I'll start with the one at top that says "All Care Health Plan" it shows a $7.8 million deduction and based on that deduction note, it still says estimated, so I'm trying to understand, so that to me if I'm reading that correctly says they owe us under the new rate system back to January, they owe us $7.8 million but yet if I read this chart also, it also says that they still have a 13% margin.  I guess I'm…it doesn't make any sense to me what's going on here.  I mean I can see the $55 million, Jackson Care Connect is $10 million, and it's still a 3% margin.  So that 3% is based on…back to January but not necessarily based on where they're going to end the year if they pay that money back.  Is that correct?  I mean I don't…

Coyner:       Those estimated margins are based on projections given the new rates.

Lively:       Through the end of the year?

Coyner:       Uh-huh.

Lively:       For the 2015?

Coyner:       Yes.

Lively:       They are based on that?

Coyner:       And the reason that the rate, the amounts are estimated is that we have to project the member months or how…

Lively:       Sure.

Coyner:       …you know, the enrollment.  And so it's the best estimate now.

Chair:        What percentage of that 2015 rate is that $55 million for FamilyCare?

Coyner:       Can you repeat the question please.

Chair:        What percent of the total payments in 2015 is that $55 million you're asking them to return?  Is that 2% of the budget, 5% of the budget, I mean of what you paid them.  You understand…

Coyner:       Right.

Chair:        You understand the situation…

Coyner:       Yes.

Exhibit 9
Page 23 of 93
ALLISON00000241

Chair:      …is that we have…we get the political blowback from these kinds of things. And nobody's come to us to complain about the fact that you're gonna give them an extra $12 million. That has not been on an agenda. I have nothing to deal with those, but I have had to deal with people…

Man:        Imagine that.

[Laughter]

Chair:      Strange, but I have had to deal, and so has everybody else at the table, deal with people who say they screwed up in the rate, maybe they did, maybe they didn't. They notice we have some money in the bank and they're coming after us. So we'll end up with zero balance because we have the deep pocket and that's who they're coming after. Other than feeling more paranoid statements than that, that's what we've all had to…had to deal with in at least the two plans that have to give back the money. There's not a lot of question about your…the validity of your method for people who are getting money. Although I suspect when they get the 2016 rates, they might have a problem. So that's…

Coyner:     Representative Greenlick…

Chair:      …what we're dealing with, and that's why we're passing some of it back to you. And Zach can sit there and pretend he's just a technician, that's great. These are political questions we're asking now.

Coyner:     So, let me just say a couple of things here and first let me say thank you to the Committee because this is very hard stuff, it's very complex, it's not what you all spend every day dealing with, and it has created a tremendous challenge for you as policymakers and it's created a tremendous problem for Oregon's system transformation.

So, the piece that I want to bring forward is that, and I was drawing a chart here that we may bring back to you which is what we want and what we have to do and what we're getting to have health system transformation in Oregon. And I want to underscore because these people who've been working around the clock for seven months are deep into the schedule and the requirements that CMS requires for Oregon. And I know and am committed to a global budget that allows us to transform health care. That's why we're all here. That's why we're all working so hard. That is, quite frankly, why we redeveloped the 2015 rates, is we had to level set. The federal government and others said you have to level set. You have to get on more solid ground than you are currently on. Now for all of you and for me and for much of this team that was a process and a set of rates that we inherited. We were not there. I was not there when this work was done. And so, it is not optimal in any business sense ever to have a retroactive rate making process. And we agonized over that. However, when we talked to CMS about could we just go back to here, could we just…their answer was a resounding no. And we can go into that in great detail with you. But we signed a contract with

Exhibit 9
Page 24 of 93
ALLISON00000242

CMS for about $9.8 billion and over the course of the last two years of the implementation of Oregon's Health Plan, they have changed the rules. They have changed the rules as...and I'm not blaming them. They have had...they stood up the largest social program in this country since Social Security and they've had a few surprises. We've had a few surprises. So I think...and we're getting the number you asked for. I want to be sure you know what. But I think the important thing here is we're very clear this is not optimal. We're very clear the best business practice is a 60 day notice so that the CCOs who, we need to say this, are doing a remarkable job in very difficult circumstances, but so that they can go out and sign their provider contracts to drive health care transformation. And the easy choice for us, although it wouldn't have been an easy choice, would be to not redevelop 2015 rates and lay low and hope that things got better.

Unfortunately, CMS had zero interest in that plan and neither did I because to your point, Representative Weidner, we need to know where we stand financially every single day or this program will not be successful for the most vulnerable people in our state. So we committed ourselves to a really complex process that required a lot of time and effort. I want to commend the 16 CCOs for leaning into the problem. If you'd like to hear from the CCOs who think the process went well, we're happy to bring them forward.

Chair:      I just do it by the big numbers they get, they'll be the happiest as could be...

Coyner:     Well...but...

Chair:      ...as to how much money they get returned.

Coyner:     But there's...

Chair:      Down to the bottom where they're not happy.

Coyner:     Understood. But there is a methodology here that is the basis of those numbers, and it is a sound methodology. We can talk about what you...the work that we have done for 2015, we're going to see on Thursday the 2015 rate ranges for all 16 CCOs. And my expectation is that we have achieved our goal of moving forward to better stability in the system and my personal goal, all of your goal, all of our goal, is to a system that allows us to continue to transform health care.

Chair:      But, Madam Administrator, here's where I am with that and here's why I'm so worried about this process.

Coyner:     Yes.

Chair:      I do not believe where you are going now leads us to the place where we can sustain transformation. I believe...you saw that number, the raw increase for the existing population would be over 6%. We are committed to a 3.4% maximum budget, 3.4% per person increase year to year. I believe the only way that that's going to be sustainable in terms of what we have to tell the CCOs from up here is

Exhibit 9
Page 25 of 93
ALLISON00000243

that there is a 3.4% budget increase, there is a fair methodology that distributes that total budget among all of you.

Coyner:    Right.

Chair:    And if you think it's not enough money to do the job, then you better figure out a new way to deliver health care to those people. But that discipline only works if they believe…or at least if we believe that the methodology you're using is a legitimate methodology to fairly distribute the budget that we have, because the budget we have is all the budget we have. And that's why…that's why we're pushing on you so hard because for a third of the population, I don't believe there's any evidence that that is a sustainable way of calculating rates. And I cannot say to FamilyCare, don't worry, everything is fine.

Coyner:    No.

Chair:    I mean I say to them…I have said to them, don't worry, everything's fine on the existing population, but I can't say that based on any evidence that anything's fine because we're not going to go forward to this. It's not where we're going to 2017. It's got to be something else, right? I mean, yeah, it does have to be something else. I can answer my own question. But that's the problem we have because we designed this system, we have to defend it, but it has to be a fair game.

Coyner:    At the…let me see if I can ask a question that would be helpful. At the core of that concern, is it that you believe that it is impossible to discern a difference between the populations of Health Share and FamilyCare? Is that…

Chair:    Absolutely no.

Coyner:    Okay.

Chair:    And I'd say that you may have done it adequately. I'm willing to defend the way you do it for two-thirds of the population, but I'm not willing to defend the way you do it for the other third. And that's what you're asking me to give back money on, on the other third of the population. Is that a fair game? I think it's nonsense. I don't think it's a fair game at all.

Coyner:    Zach, do you have any experience with other states in the country that would be helpful here in terms of moving forward with the sustainable number?

Aters:    Well, I can speak to states where we're working and that expanded and they're seeing the same phenomena which is the original rates that were set were too high. And the federal government is requiring them to use emerging experience to level set those rates. That is what we have attempted to do in this most recent rate setting and that's what's being asked across the nation for the various states. In fact, it's explicitly listed in the 2014 guidelines that CMS put out because of the expansion rates and because of their observations.

80285860.1 0105026-00003

25

Exhibit 9
Page 26 of 93
ALLISON00000244

Man:        I feel like I want to say something that's politically incorrect but it's direct because it's probably what we're starting [rustling papers - inaudible] I think the concern from FamilyCare is that, you know, they look very profitable relative to the rest of some of their peers, and then…because they're set up differently, they have a different business model than some of their peers do, they're being penalized.  They look like they are extraordinary profitable relative to their peers when their peers have different ways of…they run their business…their business model is done differently.  Now, I don't have any way to like reconcile that, right, like they look very, you know, they're…they look very successful and they getting a very large clawback and that seems very unfair and I…we can't…we're struggling to reconcile that and they're, they feel like [inaudible] punished for their business model which is they think these other entities, the other CCOs, probably are doing as well as they are but it's not as revealed as clearly.

Coyner:     Can we respond?

Man:        Yes.

Man:        You should probably ask the Chair.

Chair:      Yeah, let me…hold on a minute.  We're going to…we are way over time over here, soon be over time.

[Cross-talk]

Chair:      I'm glad we really had some time to deal with it but get this question and Keny-Guyer and after that maybe one other question.  Then I want you to spend a few minutes on the other issues.

Coyner:     Happy to.

Chair:      So we'd be done maybe at a quarter…

Coyner:     Yup.

Chair:      …quarter to 4:00.  Yes, go ahead, if you remember what his question was.

Fairbanks:  Representative Greenlick and the Committee, I do want to come back…and again apologize, I've got these numbers in front of me…

Chair:      [inaudible]

Fairbanks:  The impact…Mark Fairbanks, I'm sorry.

Chair:      Thank you.

Fairbanks:  Chief Financial Officer.  The overall impact on the retro rates would represent less than 1% of total revenue for the CCOs.

Exhibit 9
Page 27 of 93
ALLISON00000245

Chair:          For FamilyCare?

Fairbanks:      For FamilyCare would be .09%.

Chair:          Less than 1%?

Fairbanks:      Yeah.

Chair:          Thank you very much. That's very helpful. Go ahead. You want to…

Coyner:         So you want to respond?

Aters:          So in response to the question, the…it is a true statement that the two entities have very different business models. However, one key thing to remember in the rate setting process, the financial MLR does not…

Fairbanks:      I do want to correct my statement.

Chair:          It can't be 1%.

Fairbanks:      No, it's…but it's…

Chair:          That would mean they have a $5 billion…

Fairbanks:      Right. It's 9%. My correction.

Chair:          Thank you.

Fairbanks:      Okay.

Aters:          The financial gain, loss that you refer to or the various different business models that would reflect what you would see on a financial statement is not taken consideration directly in this rate setting. This is a result of us actually soliciting their expenditures as reported. Having conversations with them to understand to the extent that they are subcaptitated arrangements, understanding the nuances with them, and then building the rate from there. So how they report through their financials with the related entities is not directly correlated with the base data and how these rates were calculated.

Chair:          Representative Keny-Guyer.

Keny-Guyer:     Thank you. I just wanted to build a little bit on what Representative Nosse was saying. Two things. One is in trying to understand why within one region the per member per month would be so much lower and again we hear this from CCOs across the state, it's just that the one serving my constituents are the ones that I paid the most attention to, and the ones that I care most about. I care about them all but I want to make sure that the people in my region have access to good health care in different models. They doing…they're both doing great work in different ways. And I applaud that and would like to give that more of a chance.

Exhibit 9
Page 28 of 93
ALLISON00000246

In eleven of the categories here Health Share gets significantly more in eight of them and a teeny bit less, in some cases pennies less, in the other three. And so I would love to see what the different…like you have more pregnant women or more people, you know, guys that are…I mean when you look at the ratio, it looks pretty similar in terms of the ACA, 19-44, 45-54, 55-64. I'm assuming that those are grouped because they have somewhat similar risk profiles, a 36, a 42, somewhat similar, that's why you have the breakdown, I'm assuming. And so why would be so different? Like I would love to see the actual information. You have a lot more women than men, I mean…that may be there and I'd be curious as to why it is that a group when you're arbitrarily assigning people to Health Share or FamilyCare one would end up being by nature a healthier category of populations. So I'm very curious about that.

Because the follow up question, of course, is…

Chair:       Wasn't entirely random assignment.

Woman:       It wasn't to begin with. But it's random after…

Keny-Guyer:  Yeah, so you follow your provider to begin with but now it's random as I understand it. So maybe by luck of the draw one got a healthier population than the other or maybe they are doing things to engage community healthcare workers and others to keep the population healthy. Those are the questions that we are trying to figure out without penalizing and cutting people off with a need.

So it is a little hard on the sniff test to look at the enormous, you know, and when Health Share category gets a few cents more, I mean, FamilyCare gets a few cents more but in every other category you know it's 729 versus 604 for part of the ACA 55 to 64. There's a sniff test here that's, you know, questionable in my mind, and on top of that as Rep. Nosse said, there are different profit sharing. It's one of the few not-for-profit models. And Chair Greenlick, when you asked all the CCO's to get up and talk about what their models were, I was astounded at how many were for-profits, and then we had one that was being bought by the out-of-state, an out-of-state for profit holding company or entity that testified this morning and they're getting an increase. And so, to the extent to which you're going beyond doing a total, like by-population gender. I get that. I would love to see that data. But then when you start going into utilization and how many times, you know, it starts looking like a fee for service and you get, you get rewarded for higher utilization, which could be a good thing or it could be a bad thing. So, that part makes me nervous. Then, if you're starting to do it, to the degree to which you feel like they are taking Oregon State dollars out of the system. We have to figure out a way that is apples to apples. We talked about that in the earlier hearing today. Because some, you know, have other entities where they're parking the money, and that is not so visible to us. And so that is of grave concern. And if that kind of information is going into a—the risk analysis, and the question of we do not want to run ourselves into the ground. We want to

Exhibit 9
Page 29 of 93
ALLISON00000247

make sure that we're reinvesting dollars here. Those were the kind of questions that were brought up last time that made me very nervous.

Chair:        Okay, [inaudible].

Coyner:       So we're happy to provide that detail briefing, and it would be great if we could do it in the next couple days, at any, at your availability.

Chair:        Okay, thank you very much. Can we move to the next sub-topic.

Coyner:       I did have a correction handed to me that the ACA Federal Funds dropped to 95% in 2017, and then they go down to 90%.

Chair:        Okay.

Coyner:       We'll send you the six year projection, which has those footnotes, and then we'll show you where the Feds fall off. At what percent at what time. Okay.

Chair:        You have a few minutes more.

Coyner:       Okay, so, my understanding.

Chair:        Thank you for being here.

Coyner:       Thank you. This is very, very critical to the ongoing future of the Oregon Health System Transformation and we really value your engagement and your keen questions. Thank you.

              We want, I understand that you wanted to hear about the vision for the Oregon Health Authority and the—specifically the limited duration of...

Chair:        The issue of balancing them.

Coyner:       Yes. So which would you like to do first?

Chair:        Let's do the balancing.

Coyner:       Okay. So you all have in your packets a chart that looks like this. Which show the limited duration positions. As you know, when I started the Oregon Health Authority, we had more people than we had authorized positions and we're going, immediately took on a trueing up of our positions, their classification, the number of people bottom line that worked at the Oregon Health Authority. We've completed that work.

              This chart shows at the bottom of each division, the limited duration positions in need of resolution. Our Financial Team and our Chief Operating Officer are working on strategies for those positions. You'll see that there are zero in the office of the Chief Financial Officer. There are eight in the Office of Equity and Inclusion. Zero in the External Relations Division. Ten in Health Systems.

80285860.1 0105026-00003                29

Exhibit 9
Page 30 of 93
ALLISON00000248

Twelve in Health Policy. Twenty at the Public Health Department. And so we're well on our way to completing this work.

It was very difficult to communicate throughout the process, because we were working hard to get accurate numbers. It took us six months. We got them. We're clear and we have a solution on its way, but we're still working through those details with DAS. I don't have a fait accompli to give you today. I just have accurate numbers, which, with all due respect is a big part of the challenge.

Man:      So the resolution, I'm trying to understand the bottom line…

Coyner:   Yes.

Man:      Is zero, is that…

Coyner:   It is depending on the division. So if you look, for example, the Equity, the Office of Equity Inclusion, we will be seeking eight positions that were originally designated as limited duration positions, they should have been…

Man:      Oh—okay.

Coyner:   Permanent positions.

Man:      Permanent positions.

Coyner:   They're permanent ongoing jobs including Civil Rights Investigators and others. But that was the part that we had to sort out.

Man:      So one is sorted out and then eight are not. There's nine total. Eight are in need of resolution. One is resolved. Is that the way to shorten that.

Coyner:   Yes.

Man:      Sorry to interrupt.

Chair:    And what about the public? What does the 16 and the 20 mean?

Coyner:   The Public Health Division, after looking at which of those limited durations, and as scheduled the work ends, the project is ended, etc., we still need 20 additional positions in public health to get the right staffing for the work, and the right positions in the right classification.

Chair:    And going forward you don't need 40 of the [inaudible].

Coyner:   No, no. And that was determined by the Public Health Division after exhaustive review of functions.

Chair:    Okay, it's interesting. I heard the director of that division said she was only losing five positions.

80285860.1 0105026-00003

30

Exhibit 9
Page 31 of 93
ALLISON00000249

Coyner:     It gets very complicated.  I'm happy to walk through it, but her bottom line is 20.

Chair:      20.

Coyner:     Resolution LDs required.

Woman:      Can I ask a question.

Chair:      Sure.

Woman:      So how many limited duration position people have already left?  Have been given notice and left?

Coyner:     So they don't—we—this has been a point of frequent confusion.  We did not end any limited durations prematurely.  Right.  So limited durations are usually 18 months in tenure.  They were not used that way at the Oregon Health Authority.

Woman:      Uh-huh.

Coyner:     But we did not say this is going to end early.  All limited durations go for their full contracted period—or agreed to period.  So.

Woman:      Okay.

Hayden:     One quick question going back to the executable contracts.  Is there a Plan B in the event that CMS doesn't, it was testified that…

Coyner:     I'm sorry, could you restate that, Rep. Hayden?

Hayden:     Rep. Hayden, asking a question here.  Going back to the executable contract, with the 60 days' notice, it was testified that CMS approval is running concurrent with the executable contracts that have been sent to the CCO's, what is the Plan B if CMS does not approve those?

Coyner:     That is the plan, I mean if CMS does not approve those.  Is to identify in collaboration with CMS.  If they were not to approve the work we've been doing now, which we have been checking with them on a regular basis.  We are in regular communication, exhaustive communication with them.  If for any reason they did not approve the rates at this point, we would have a very serious conversation with them about what alternative they would propose.  And we would collaborate with them and work with them until we had a solution in hand.  But we have been putting exhaustive efforts into not having that occur.

Man:        It sounds like you only have about 14 days to do that if that does happen.

Coyner:     That's correct.

Chair:      [Laughs]

Exhibit 9
Page 32 of 93
ALLISON00000250

Coyner:    Okay, so any more questions on the positions on the limited.

Chair:    Future vision.

Coyner:    Future vision.

Chair:    Take five minutes and share your future vision.

Coyner:    To have a stable, productive and universally embraced rate processed certainly would be [laughter] one of my key goals. When I took this position on January 29th, I identified the priorities for the Oregon Health Authority for the year. They were, quality care for our members. We want to thank the CCO's for helping us to insure that we have made significant progress there, however, we expect to be improving behavioral health integration and oral health care as well in collaboration with the CCO's.

Number two is financial sustainability. We have thrown ourselves at financial sustainability with an intensity that has been urgent, unfortunate and complex, and it is our goal as an agency to even that out both through having rates be on a regularly scheduled basis, but also on having clarity for our legislative board of directors. As to all the takes and puts for financial sustainability for the Oregon Health System Transformation.

Third was to align ourselves better with the Coordinated Care Organization so we could be faster in our responses to them so that we could improve billing, and we have done that. We have consolidated DMAP and AMH into one division and our new Division Lead, Dr. Varsha Shahaan begins November 1st leading that division and has actually started work already in her understanding of the system.

Finally, our goal was to reduce health disparities. We have lots of progress to make there on all fronts. We have a work plan for doing that which we are beginning to implement.

And finally, a couple of key things that came in that were not expected when we started in January. And one was the regulation and oversight of the Medical Marijuana Program at the Public Health Division. That work is well under way. I am very happy to tell you that we have just hired our team. Completed hiring our team that you asked us to hire yesterday, and the work is underway in partnership with our Medicaid Advisory Committee and with our other partners in doing that work.

We are also underway with Public Health Modernization. One of our exciting and really great opportunities in Oregon as we face these other challenges in Health System Transformation is we know that Oregon is very fortunate to have Public Health and Medicaid Health under one division. Other states have called and said, boy, that would make it a lot easier if we had a correlation and a collaboration between public health for the entire state and for the Medicaid population.

Exhibit 9
Page 33 of 93
ALLISON00000251

Finally, we've talked since January about the March to Kentucky. It's important to note that I have seen the system. We've demonstrated. We've had a presentation to the CCO's and our stakeholders on the one eligibility system. It's not going to address all the challenges we address as a state, but it will address a number of the challenges that have been inordinately frustrating for everyone, including pairing mothers with their newborn children. So that piece of work is underway.

I'm happy to talk to you about some of the exciting things we are learning, as we get into the behavioral health mapping and visit with people about the opportunities for behavioral health integration into the physical health setting. It does offer us candidly an opportunity for further savings and efficiencies, while we improve care, and I'm personally very excited about that, and we're also getting a lot of very good data on the oral health side, which shows us that there are additional efficiencies and opportunities to improve oral healthcare for Oregonians before us as well. So with that I'll stop. I want to express my appreciation, both for your tenacity, but also for your willingness to lean in. This is the time as we go into health system transformation 2.0 where we all need to lean in and find answers to the challenges that we face as a state. The Federal Government has increasing requirements for us. I do believe it is possible for us to meet those requirements and transform care in a global budget, but it's going to take more engagement not less. So I encourage you to stay with us in the quest for improved care for Oregonians. Thank you.

Chair:    I will save you time on the December Agenda, and in between if you want to get in touch with any of us, we're all very interested.

Woman:    Chair can I ask one thing?

Chair:    Yes, one question.

Woman:    Sorry, I thought we were still in the position, in the LD position—I was going to ask some more questions.

Coyner:    Oh yeah, sure.

Woman:    And then we went to kind of a wrap up, so I hate to go back too much. Other than in November when you come, if you could please let us know how many LD positions were terminated. Maybe at the result of the, end of their 18 months. I had heard, and maybe that's just the rumor mill, that some people were terminated before the end of that. But I think some of the other questions are like in the Radon Department, a grant was being expected any day. And so if LD positions are like, this is exactly the length of your contract and then we let someone go and a grant gets renewed a month later, we may lose those people. So having some— you know, I'd love to just hear the thinking and we can do this offline too. But if you can come back in November, we didn't leave enough time for this particular one and I know it has caused a lot of heartache. I just want to make sure that we

Exhibit 9
Page 34 of 93
ALLISON00000252

don't.  We need to right size, I agree.  We need good functional assessments, thank you.  We need stakeholder input, and I don't to what degree that happened, but we also need some flexibility in the system.

Coyner:    Yeah.

Woman:    So that we don't lose people.  And so how you balanced all those and what actually happened I would love to hear from you because again we've been hearing from others.

Coyner:    Understood.  And I want to be clear, we did lay off 31 Management Services Employees.  Those were not the Limited Duration.  So we will bring you the numbers and I'll make an appointment.  We'll get that done, we can easily get that done before November.

Woman:    Okay.

Chair:    And also, I do want to know if you have 139 vacant positions as of this date in the Public Health Division alone?

Coyner:    I think currently I can get you a current vacancy, because we've been.

Chair:    Great.

Coyner:    Because we—once we knew how many employees we had, we began to fill legitimate vacancies quickly.

Chair:    Thank you so much.

Coyner:    Thank you.

Chair:    Closing the Informational Hearing on the Oregon Health Authority.  Opening the Informational Hearing on Ambulatory Surgery Centers.

[1:45:33]

Exhibit 9
Page 35 of 93
ALLISON00000253

## JOINT INTERIM COMMITTEE ON
## WAYS AND MEANS

### September 30, 2015

### ORGANIZATIONAL MEETING
### AND
### INFORMATIONAL MEETING

Co-Chair:    I will open the Joint Committee on Ways and Means for September 30, 2015. We have a fairly long agenda but it's a fairly simple agenda. It's primarily…actually it's all that it is, it's retroactive approval _____ and acceptance of reports.

[Skipping to Agenda Item #6 - Oregon Health Authority - Redevelopment of 2015 CCO Rates]

[19:09.0]

Co-Chair:    Oregon Health Authority. Another good news. Oregon Health Authority, Redevelopment of 2015 CCO Rates. Senator Bates.

Bates:    Thank you, Mr. Co-Chair.

[Laughter]

Bates:    I'd like to read this _____ and then leave immediately for Southern Oregon.

[Laughter]

Bates:    Human Services Subcommittee recommends the Interim Joint Committee on Ways and means acknowledge receipt of a report of Development…or Redevelopment of the 2015 Rates for Coordinated Care Organizations. The Oregon Health Authority released original 2015 rates in December of 2014. By the way, they were released Christmas Eve to be signed by the corporate…by the CCOs by New Year's Eve, and everybody left town in between. CCOs expressed a number of concerns. In addition the Center for Medicare and Medicaid Services provided their own guidance. This include the requirement that the Oregon Health Authority use a methodology that _____ as guidance for actuary soundness, as well as the need to incorporate more recent data for the Affordable Care Act and Medicaid expansion population. As a result of these concerns, the Oregon Health Authority contracted with Optumas, an actuarial firm, to re-examine the methodology, incorporate additional data and redevelop the 2015 rates. The redeveloped rates were released in August of 2015. Initially these rates were intended to be effective July 1, 2015, but that date was moved back to January 1, 2015, after CMS expressed concerns.

The new methodology for the redeveloped 2015 rates includes a regional approach that all CCOs within a region start with the same base rates. Each CCO's rates are then adjusted for the risks associated with a specific client

Exhibit 9
Page 36 of 93
ALLISON00000254

population for the non-ACA population.  New data was included for the ACA population.  Statewide the overall rates have not changes much.  However, the rates related to the ACA population have gone down 4.7% compared to the original 2015 rates, while the rates for the non-ACA population including _____ have gone up 4.9%.  Some CCOs will be paid a higher overall rate while others will pay a lower rate compared to the original '15 rates.

Human Services Subcommittee recommends acknowledging receipt of the report.  We're just acknowledging receipt of the report here.  As most of you know, this has become highly contentious.  So the horrible he-said-she-says sort of thing…my approach to this is is that we need more information.  I've asked LC to go back and give us an assessment of the original agreement we signed with the federal government, the 3.4% guarantee and ceiling, to see if they violated their contract with us and what that contract really said.  Our understanding was, and maybe in error, that if overall we have a global budget that we don't go up more than 3.4% on an annual basis per member per month, that we then have the right to adjust inside the state how we have that money spent.  And the idea is that if you have savings resulting either from overpayment by the federal government or actions you've taken yourself that you can reinvest those savings into your local community to produce better health.  You all heard the story about the air conditioner, but it really goes into things more important, housing for mentally ill and drug and alcohol people, which we have a shortage of.  Making sure you're meeting your matrix and your CCO in your local community do the things you're supposed to be doing to get people healthier.  Making sure your kids are healthy to go to school.  Making sure we have less people in corrections because we've taken care of drug and alcohol issues.  All those things that drive what CCOs are supposed to do.

The rates developed, I believe, were developed with honesty from Optumas.  I'm not sure they had all the information they needed to do that.  I don't know that for sure.  We're going to try to find that out.  I was contacted by Senator Monnes Anderson and Senator Cruz asking that we sit down, get real data, dig into it deeply, find out from a point of view what the DOJ tells us and what LC tells and what is real and not real as far as our relationship with CMS is concerned.  We're gonna ask the Governor to allow us to talk to CMS directly and see what they're really saying to us and work with the department at the same time, Oregon Health Authority, on these issues, and see if we can get some clarify on this and come back with something that I think will be more acceptable to all parties.

At the present time several CCOs are taking huge hits.  They are complaining that the process was not fair.  Some are getting a little more money.  They're claiming the process was excellent, absolutely perfect.  Some are in between and they're saying, you know, we'll take these hits, we just don't want to ruffle…riffle the water here.  We're in a situation where we have to have our '16 rates up doggone quick and we haven't even finished our '15 rates.  So we've got time sequences we have to meet, too.

Exhibit 9
Page 37 of 93
ALLISON00000255

And I can spend about four or five more hours talking to you about what's going on here. It's just too complex to do in this short a time. I think there is a path forward. I think it's through OHA and through the department and through the Governor's Office, but we have to have more certainty about what CMS is saying, what our responsibility is, and, frankly, a little push back to them what their responsibility is, too. The idea of clawing back millions of dollars from CCOs is something that really is…we have to avoid somehow. We can't…you can't run a business in the future if you're not certain that the funds you're receiving are gonna be pulled back for whatever reason later on. So those kinds of issues have to be resolved and very quickly. We're gonna have to have some answers here in three or four, five weeks, because we've got to set '16 rates and we don't want to go through this process all again and have everyone in the situation where people are suing each and the other. I think ridiculous things are happening.

So I'll leave it there. We're going to get together with the House also. Again, Representative Nathanson wisely was not here for this session.

[Laughter]

Bates:      She's a very intelligent woman and knows what she's doing, but we're gonna ask our colleagues from the House, R&D, to help us out on this, and walk through this very carefully and come up with a program that lead us into a situation where we can take care of the '15 rates and move forward to '16 in a way we can have some understanding of which our high hope will be acceptable to be. It will not be liked by people, acceptable to people. Had a long conversation with HealthShare yesterday, long conversation with FamilyCare. You know, I don't want those people in the same room with weapons, would be very bad. Okay. People calling each other liars. It's not true. This is honest people doing the best job they can in a very complex situation that we need to resolve and I'm afraid it's going to fall on us to resolve this.

Co-Chair:   Senator Girod, then Senator _____ and Senator Johnson.

Girod:      Thank you. And some of what I would require, probably the rest of the committee wouldn't want to see, but I would really like to see the distribution formula and how it…how it actually apply. So if you're gonna use a new methodology to distribute money, I'd like to know how it works. I'm very concerned because CCOs in Portland, it's all predicated on the number of patients you have and economy of scales kick in. So a CCO that has a tremendous population will do a lot better than a CCO that is more rural. And so I want to make sure that that is adequately demonstrated in the distribution formula. So, yeah, I agree with Doc Bates says, this is going to be contentious as all distribution formulas will be, but the devil's gonna be in the details.

Co-Chair:   We have Senator Winters next then…

80285565.1 0105026-00003                                    3

Exhibit 9
Page 38 of 93
ALLISON00000256

Winters:    And the rate setting, you know, what I…in our discussion I think that was missing and I think it's important to drill into that. When we did the transformations and created the CCOs, we did it with the idea that we weren't going back to fee for service. I think we need to understand it. The rate that I looked at is where we are. The new rates takes us back to the same kind of process that we had before we ever did the CCOs and that is not the intent of what we passed in this body in creating CCOs to begin with. Because we said to CCOs, you will be community-driven. We said that you will be more than just being reactionary in providing medical care. You will be getting into primary prevention. You will be doing all these things and, oh, by the way, you will be adding behavior health. That was the instruction that we gave to CCOs. And when I looked and listened to, you know, some of the components that didn't…that went into setting the rates of the actuarial, it's like we were back again doing those kinds of components to go into fee for service. And I think therein lies a major part of the problem. And there were distinctly winners and losers. So, you know, I think it's a hard conversation. And the conversation that Oregon…and when we got…we received the waivers and the conversation which CMS was that Oregon was pioneering for the rest of this country in doing the health transformation and doing the community engagement and actually going towards prevention for the first time. So I…I think we've got a long conversation and I'm glad that we're taking the approach to bring in LC and others and our agreement with CMS as well as looking at how we do set the components that go into setting the actuarial rates.

Co-Chair:    Representative McLane.

McLane:    Thank you, Mr. Chair. Senator Bates…question…Senator Winters' response is something that I'm concerned about. I just want to make sure I understand. Does this report indicate that the CCO funding mechanism that has been approved by this legislature and implemented this part of our transformation is going to change from a capitated rate to a fee based rate?

Bates:    The answer is yes and no. Okay. It's still to a degree a capitated rate, is based on a per member per month in various categories. So from that point of view it's a capitated rate. But the basic principle that you'll have a global budget and by that not meaning just you have mental health, drug and alcohol and physical health and dental health, but you have a global fixed budget that if you have savings in, you reinvest. That's being lost here. And that's the part that's most concerning to me. And I think that's what you're looking for fan answer. The rates that have been proposed have not been accepted. They won't be accepted till contracts are actually signed by the CCOs. At the present time I don't think those contracts have been signed, at least I'm not aware of any of them being signed. So this is just a report we're receiving that opens up the entire discussion about this.

And what we'd like to see before anybody signs any of those contracts that we have a good look at it, know where we stand legally with the federal government and have an opportunity to make adjustments in those rates with, I would say if

Exhibit 9
Page 39 of 93
ALLISON00000257

nothing else, some common sense involved, and so it passed the sniff test and the gut test that we're doing the right thing.

McLane: Thank you. Chair Devlin, I...I'm very concerned. I will say having voted for the transformation and having had my vote questioned multiple times as a Republican who voted for Medicaid expansion and having defended that vote, and still proud of that vote today, it was the right vote. It was premised on promises to us.

Winters: Right.

McLane: That this was a health care transformation. It was over five years and it was capitated. And I for one having witnessed in my short tenure here the complete debacle of Cover Oregon sold to us in a bait and switch method. If we're going to change, if I'm hearing that the health care transformation that I voted for is about to be changed, then this is another example of this branch being sold something by the executive branch only to be changed later. That is unacceptable. And I hope my colleagues will join me in putting our foot down. We are a separate but equal branch charged with caring for the policy and the purse of the people. And we are given information and told about a health care transformation and then later told that the executive branch can come in and change that, that is unacceptable. We've got to give this time. And the only way in my mind this thing...and I'll just leave it at that. I'm glad you're in the middle of it, Senator Bates, because you're one of the few people in the middle of it who helped develop it that I trust. And so, I'm looking forward to your care of our branch's interest and the people's interest as this is being discussed. Thank you.

Bates: Thank you for those words, and I'll try to live up to that trust. You and I have had a long relationship that I trust you and you trust me. And our two districts actually butt up to each other somehow from Prineville to _____, I don't know how that happens. We do share a lot and I appreciate your kind words. Thank you.

Co-Chair: Senator Whitsett.

Whitsett: It's called Roxy Ann actually.

[Laughter]

Whitsett: It's my understanding that the original $1.9 billion waiver was predicated on meeting certain matrix and that the future amount of money that would be brought would...could come into the state would be based meeting those matrix and the ability to keep that money would be based on those matrix. We seem to be changing the matrix. We're certainly not meeting the 3.4% cap and the matrix are in litigation, and I'm wondering what is our exposure in the state. I mean could you handicap that for us? What is the likelihood that we're going to end up paying some of that money back or all of it back?

Bates: Can I answer that?

Exhibit 9
Page 40 of 93
ALLISON00000258

Co-Chair:     Yeah.

Bates:        The biggest matrix we have to meet is maintaining a per member per month 3.4% cost, and we have met that matrix. We're actually below it. The old OHP Plus which is kind of a standard…Medicaid patient, they are over the 3.4% but the overall program with the expanded population is overall below the 3.4%. So we are meeting that matrix and we are not likely to have a problem there.

              One of the issues we have to deal with, though, is inside the expanded population costs to this point have lower than expected and payment against those costs have been higher because of unexpected less cost to that population. We don't know for sure that's gonna persist. They're starting to ramp up the cost in the first part of 2015 as people who are in the system start learning what's available to them. At this point the CCOs are overall keeping the costs below 3.4% and meetings of other matrix also. Emergency room use is down. Hospitalization is down. They are going some of the things they're supposed to do and being quite successful at them.

              I'm a little disappointed, and I'll be honest about both sides here that some of the reinvestments need to be made locally are still a little slow and they are doing it in a way I think they're trying to be careful about. Again I'll go back to housing for mental health, especially in rural areas. Getting that taken care of is going to be a big issue for us. But they've got the money there, but if we start clawing that money back and sending it back to the federal government, we're not going to have the funds to continue the program as we want to continue.

              One of the questions is where are we with CMS legally. Do they have a right to claw back money out of the expansion population or do they not have the right to do that based on our previous waiver? I'm going to ask LC and Department of Justice to look at that and give us a straight answer. It's a tough question. We need…those are the kinds of things we need to resolve to know what we really stand. I do not believe we're in a situation now where we're going to have to give the 1.9 billion back. I don't think that's the issue. The issue really going forward is what's fair, how do we maintain the basic principle of putting money back in if you have savings into your system. You may have more savings in the future. And really start taking care of the people who need to be taken care of. So I don't think we're at risk right now for what you're concerned about. I reserve the right to talk to you about it in six months, Doug.

Co-Chair:     Senator Shields, Senator Steiner Hayward, Representative Whisnant, and then Senator Johnson.

Shields:      Thank you, Mr. Co-Chair. I do want to thank the Health Authority for reaching out to me before the meeting yesterday and I wasn't able to accept that invitation. I think that helped explain some of my grumpiness yesterday when I was trying to figure out what exactly was going on in the rate setting. So I do appreciate the invitation and will take you up on the invite next time.

Exhibit 9
Page 41 of 93
ALLISON00000259

There are a number of things to be concerned about in the hearing, but I think one thing that jumped out at me towards the end was that concerns about the public records requests and how transparency of the processes worked. Representative McLane and some others have worked very diligently over the years with me to kind of open that box in how the health insurance rate review process worked. And DCBS came to the conclusion that the filings of the…in the rate review process were public record and they cannot be redacted because they could not prove it would be injurious to competition. So as I look at some of the documents, I think I'd be happy to work with the Health Authority moving forward to try to figure out the way to make this more transparent. I think as we make it more transparent, there'll be a little bit less grumpiness of the players involved, including myself.

Co-Chair:   Senator Steiner Hayward, I forgot Senator Girod was in the queue before you.

Steiner Hayward:  Absolutely.

Girod:   Oh, that's okay. I can wait. I've already had my turn once.

Co-Chair:   Okay. Senataor Steiner Hayward,

Steiner Hayward:  Thank you, Mr. Chair. Thank you, Senator Girod. In no particular order, this is obviously something that I've, like Senator Bates but without his depth of knowledge, I've been thinking about a lot and trying to get up to speed. Senator Girod originally mentioned a desire to understand how the formula worked. I would commend to your attention the webinar that the Health Authority has available and the hearings of the Ways and Means Subcommittee on Human Services for Monday morning and the Senate Health Committee yesterday where there were very detailed explanations about exactly that formula, about the actuarial principles that were used, about how the costs of the CCOs were assessed. And I know that the Health Authority was very generous with their time about having their staff sit down. Mr. Aters is over here who is the…one of the actuaries principally involved, has been very generous with his time with anybody who's interested. So for anyone who really wants to understand how these rates were calculated, that information is available. Health Authority is happy to provide it, and I commend it to your attention.

The second thing is there has been a lot of concern about what materials were or were not made available. And I agree with Senator Shields that it's important to sort of tease apart this question of public records. I did have a conversation with the Health Authority yesterday where they pointed out to me that they had kept a detailed meeting and communication log on this whole issue, and they are happy to make that available, if need be, that shows exactly who was present at every meeting on this issue and what materials were provided to participants. So that information is available and that will help clear up some of the questions about who provided what information to whom at any one time.

Exhibit 9
Page 42 of 93
ALLISON00000260

With regard to the issue of fee for service, Representative McLane, if I thought that we were returning to a fee for service method, I would be equally outraged and I completely agree with you. That was not the principle, the premise on which we started this. I completely agree with you on that. My understanding, and I may have misunderstood something, my understanding is that the Health Authority has no desire and has not done anything to push us back toward a fee for service model. Some of the CCOs have yet to fully transition away from a fee for service model, but that's not within the Health Authority's control. This legislature wisely chose to allow CCOs to manage this however they saw fit, to not micromanage on the state level, to understand that there are regional differences and some CCOs are moving more quickly toward alternative payment methodologies, not a fee for service model. That's a hard transition to make in a very…turning the health care system and how we pay for it is kind of like turning five Titanics roped together, right, it's pretty tricky. And I agree with you completely. That is our ultimate goal. And I don't think anything that's happening right now is moving away for it.

The actuarial considerations that were made about what kinds of costs the CCOs were incurring included an assessment for fee for service payments that were made by the CCOs out of their capitated rate, out of their global budget, it came from a capitated rate. So if you look at the graphs available, made available to us yesterday, you will definitely see some fee for service component, but that's on a CCO by CCO basis. And you'll also see that other things such as community interventions and things like that were taken into consideration.

One of the other things that I found very interesting that I've been looking at is this question of risk adjustment. And that was taken into consideration. And it turns out that for a range of reasons some CCOs not only have larger populations, they have riskier populations. And some CCOs also with larger populations for some reason have risk populations…populations that are less at risk for high costs. And that was part of the question that I think that came into consideration. So that's an important part of the calculation. You have a riskier population. It's going to cost you more to take of them. You have a lower risk population with few chronic diseases with a better track…you know, with fewer major health complications, obviously it's going to be less expensive to care for them.

I think that we are going to have to pay very close attention to this going on. I personally am very committed to continuing to learn more and staying closely involved. And I think that we are moving in the right direction. Yes, this is a contentious concern and, yes, we have to be paying attention to it. I also think we have to take into consideration the issue that some of us are concerned about, about a for-profit CCO vs. a not-for-profit CCO. And that's some of the ways that we're running into trouble here. I'm not saying that you can't make money off of being a health care provider. Most health care providers earn salaries and put money in the bank and save for retirement and things like that. But I can make a pretty good argument that using Medicaid dollars to make a profit when those are your and my taxpayer dollars and when those dollars are intended for

Exhibit 9
Page 43 of 93
ALLISON00000261

helping our state's neediest populations, most vulnerable populations, get on a path towards good health and self-sufficiency, I begin to struggle with the concept of a for profit corporation. So I think that's going to something that we have to consider further.

Thank you for letting me speak for so long just to address some of the concerns that have been raised.

Co-Chair: Okay. I'll see if I can get back into some of the…so I'm going to go to Senator Girod, then Representative Whisnant, then Senator Johnson, and then I'll come back.

Girod: Thank you, Chair. And this would be question for Senator Bates. And I'll give you an example of what I have in my district. I have three rural hospitals. I have Stayton, Silverton and Lebanon. Silverton and Stayton have always been in a feud with Salem over rates. They belong to the same CCO. How, within that CCO, are the rates determined so that the rural hospitals can keep open? And I have a personal story to tell. I wouldn't be here if Stayton wasn't there. I went into anaphylatic shock. I would not have made it to Salem; I would have died. So it's important for the Canyon and other areas to have these rural hospitals.

Bates: Well, first off, I'm glad you're still here.

Girod: Thanks. Not everybody said that.

[Laughter]

Bates: I'm glad you're still here. You survived that. There was an adjustment in the formula setting for A and B hospitals. They're given a higher rate because they're cost based and that hopefully will help them out. The question again, as all the questions, was that adjustment adequate. Was there enough cost…cost based information presented for Optumas to make a reasonable decision about what they receive for their rate. And that's the open question in all these issues, right, and one we need to look at. Our A and B hospitals are absolutely vital to us, absolutely vital. And you're a good example of that. If I'm driving in Central Oregon and I have an anaphylaxic reaction and I'm near Burns, I want…I want good health care there. And we have it there [someone coughing] hospitals. The question becomes quite frankly was there enough money put in the A and B hospitals and [inaudible] staying them. I do not know that answer right now. That's something we have to look at very carefully. There about, I think somewhat less than 10% of the total cost for hospitalization in this country…in this state, so it's not a huge amount but a percentage point difference for them can make them stay open or cause them to close down. And we understand that. They have issues of maintaining their staff, both nursing and physicians and nurse practitioners, and we have to be very careful about that. It's not just a matter of crunching some numbers to get there. They gotta know what the reality on the grounds is for those places, whether it's Ontario or in your district or out in the

Exhibit 9
Page 44 of 93
ALLISON00000262

Coast, those areas must be maintained.  I'm not sure that enough money's been put in there by Optumas or not.  We need more information.

Co-Chair:    Okay.  Thank you.

Bates:    That's where we'd be looking at.  I don't know if that's a good enough answer for you.

Co-Chair:    Representative Whisnant.

Whisnant:    Thank you, Mr. Chair.  Mr. Chair, this action before this Committee is to accept the report; is that correct?

Co-Chair:    That's correct.

Whisnant:    Thank you.  I'd like to follow up please.

Co-Chair:    Yes.

Whisnant:    I'll be voting yes to accept the report.  I'd like to get to my colleague, Representative McLane, Republican leader's comments of Cover Oregon.  I'm very concerned about this.  I hope the people that Dr. Bates intended to monitor this issue, I hope we're not trying to cover something up.  This whole state of Oregon is under a microscope by the public if we don't do things right.  If we're just manipulating numbers and getting another, you know, calculation to com=e up with numbers that make this work, we're gonna have more egg on face and I hope that will be monitored by the executive branch and the legislative branch.  Thank you.

Co-Chair:    [inaudible] Where am I?  Ah, Senator Johnson.

Johnson:    My comment is going to belie an in depth knowledge of this subject, but a couple of things occurred to me listening to Dr. Bates talk and making reference to plowing savings back into the system, and you mentioned mental health and drug and alcohol housing.  How do we separate the functions that are supposed to be done by Oregon Housing and Community Development vs. CCOs.  I would hate to see the CCOs suddenly in the housing development business.  It seems to me that there is considerable subjectivity in these expenditures and I don't know how you match one CCO buying an air conditioner for the older lady in the apartment vs. buying somebody else a car.  I mean it seems to me that there's quite a bit of fluidity.

And the other thing that is somewhat concerning to me is if the legislature starts approaching CMS independently rather than going through some common funnel, how do we make sure that everybody gets the same information.

Bates:    Two questions.  I'll take the last one first.  If we deal with CMS directly, it will be through the Governor's Office.  We're going to ask for that permission to do so.

80285565.1 0105026-00003                                10

Exhibit 9
Page 45 of 93
ALLISON00000263