We don't think we should go to them directly and go around the executive branch. It'll just lead to confusion and I think it would probably not serve the state well. That's number one.

Number two, the programs we're talking about that really investments back to the community, to this point it's been done very well. They work through the agencies that have the expertise already. There's one CCO helping support their public health department. Lane has been working to do housing. The program started by Legacy in Portland for mental health is a great one. It's going to change mental health and drug and alcohol treatment in the Tri-County area. The problem for them is what we call the back door, in other words the housing that's available. You're gonna have to work with the Housing Authority there and produce funds that would help them do that and do it in a way that…we're using agencies that have some expertise already in partnering with them, not trying to do it themselves. So far they've done…I think one of the reasons they haven't had a complete use of their expenditures is they're still working on how to do this in a way that really is thoughtful, not just throwing money at something and losing that money and working through people who have some expertise and knowledge. So when this thing kind of gets started, I was amazed that people were calling me. I'm getting calls from general government committees. I'm getting calls from housing people saying what's going on, we're counting on partnering with these people. I'm getting calls from the HUB saying we're planning on partnering with our CCO to make sure kids are ready for, you know, first grade or kindergarten now. Those things are starting to happen. We don't want that process to stop and I'm fearful that if we get away from what we're really trying to here, we'll get [someone sneezing] back to, maybe not a fee for service, maybe a capitated program for providers and hospitals, but we won't be making the investments in what we call the social determinates of health which are the real drivers of health care costs. We won't be getting those issues.

Representative McLane I think was spot on. I think what he's trying to ask is, you know, the program we were sold was we are going to go outside of health care that we normally think of it and start dealing with the social problems that people have and end up driving their health care costs. I see 25 patients a day. About half of them are there not because they've got a headache or a bellyache of something else going on, it's because they got no housing, they got a drug and alcohol problem, they've just gone through a divorce, whatever it is, that's the real problems. And I give them a pill and send them home thinking I've done something for them, and I have not solved their problem or given them an avenue where they can solve their problem. Now I can call my local CCO up and say you got a social worker? This is a social problem, it's not a medical problem. It's a social problem. You solve that problem, they don't need me. They shouldn't be seeing me. They shouldn't be at the ER on Friday night with a headache now because they got a migraine. They're there because they've got a social problem. And that's what we're trying to do here. And that's why I'm almost…that's probably my biggest concern about what's happened so far in this process. And yet if you talk to the executive director, she agrees with me. That's where we're

Exhibit 9
Page 46 of 93
ALLISON00000264

trying to go to. The question is are we going to get there with what we were doing right now. I'm fearful that what we're doing right now will put us backwards, we're not going to be moving forward in the area we should and you'll feel like you've had a bait and switch on you. I don't want that to happen, Representative McLane.

Co-Chair:    Senator Winters, then Senator Shield…

Winters:    Just very quickly and it's one that really troubled me, not only that we're actually going back to where we were but also, you know, most of us that have been in business and most of us that do budgeting, we craft our budget and that's the same way with CCOs. They have done their budget. And now in some instance we're telling them that you're gonna have to go back eight months and you're gonna have to go and reduce your budget back eight months. I don't know how many of you that have ran a business and have it where you had that happen and say that you can actually forward and exist. That to me was one of most painful pieces that I saw when we looked at when we had our discussion in committee. You know, I'd say how many ribs could I no longer buy, you know, if I had that happen to me. It's unconscionable to me for us to ask and have our partners. And all of us have, when we looked at winners and losers, some areas of our state have more resources and availability than others. Not everything in this state is equal. Not all of our hospitals and what have you and our communities aren't equal. And so, I think we're gonna have to have some very serious conversations on, one, how they actuarial was done and what they took into consideration and, two, how much are we gonna be able to go back and say to our partners who all in good faith stepped forward on this new reform that we asked them to do, that they worked with us for months and years to get us to where we are today, and where we made the request to the feds and say we're plowing new grounds and they said yes, and then suddenly we say but oh, by the way, now you know what, we're gonna make…we're gonna say that the budget that you put in place is no longer applicable. And it's not one month or two months that we're asking you; we're asking you eight months. And that was when I sat and listened the other day, caused probably the biggest pain for me as a business owner. I find…asking ourselves the question, and this is not just this particular issue that has to do with CCOs but the same thing that has to do when we talked about the K waiver. We're asking our communities to step up to the plate to become partnerships. That's been our new buzz word in this building. Private, public partnerships. And so we've got to ask ourselves, are we going to continue to ask them for commitments that we're not going to be able to follow.

I'll just leave it at that. Because we have asked our communities to have a global budget, to work with the issues that we say that we need to make the state of Oregon healthy, and yet we come along and we say but you know what right now we're gonna tell you that you roll back that budget eight months. And we're doing the same thing over with the K waiver with our private partners. Friends, we've got some serious policy issues that we are going to have to work on. And I'll leave it at that. It's not…it's not about one area of the state that can actually

Exhibit 9
Page 47 of 93
ALLISON00000265

do all this because they've got the resources to do it. We've got to come at this as a full state of Oregon and not just those who are fortunate enough to have resources. I...I...it bothersome to me. For this person who was back when we did have social workers in the hospital, when I was University of Oregon Medical School, social service was a part of the delivery of service. And that was back in 1959, '60s. I'm gonna date myself in age, but you know right there with Devlin. He was right there with me as a partners.

[Laughter]

Co-Chair:      So, okay. Senator Shields.

Shields:       Thank you, Mr. Chair. The discussion that we had earlier about the transparency, the legislature might also want to take a look over the coming years of whether or not the public interest would be better served by adding some sunshine into how the CCOs operate as well. Billions of dollars of patient care is at stake. And these organizations are meeting behind closed doors and we might want to take a look at providing some sunshine into how they're operating as well.

Co-Chair:      Couple of items. One, I think that the co-chairs of the committee saw this as simmering issue that we wanted to get out on the table so that's why it's actually on the agenda. And secondarily, I think that we've given clear evidence that there's going to be a lengthy and long discussion that's probably going to extend not only through the next few meetings here in the short session, but I think it will take a couple of years before we have all of the issues settled. It's extremely complex.

I think the other issue that's apparent is that most of us are experienced in that even when we create a new program when we distribute $5 million, we have disagreements about the distribution formula. And to give some reference to this, total OHA budget now is approaching $20 billion. And we can take $3 billion off of that for PEBB and OWEBB and maybe another billion plus for public health and for mental health, but these are dollars that we've never seen before in health care in the state here.

And I think...finally, I think we do have to recognize the realities that we are counting on promises from the federal government and the reality is over half of the states are expansion states now and we are a relatively small state in terms of population, perhaps not geography. So the federal government is getting more and more scrutiny on this because you can talk about the good things when you're doing the press releases but then when it gets down to the bottom line, the federal government will start to find ways to roll back on some of those commitments. I think you only have to ask some of our non recognized tribes to recognize what the record of the federal government is on promises.

So I just think this is going to be a lengthy discussion between the executive branch and the legislature, and we just wanted to get it out on the table today.

Exhibit 9
Page 48 of 93
ALLISON00000266

Yes, Senator Whitsett.

Whitsett:    I just very briefly want to comment. I'm a veterinarian not a physician, but have been in small business for a lot of years. Independent practitioners and private health care provider organizations must have the ability to make [someone coughing] return on their investment. They must. And that includes for providing Medicaid services because we're channeling all of the patients into Medicaid and now we're saying we can't make a profit on that. The alternative is to have absolutely no private health care providers other than a _____ boutique practices.

Co-Chair:    Any additional discussion on this?

Seeing none. Any objections to item before the Committee.

Seeing none. Motion carried.

We'll go on to item number 7.

[1:00.09 - end of discussion o CCO Rates]

Exhibit 9
Page 49 of 93
ALLISON00000267

**SENATE INTERIM COMMITTEE ON**
**HEALTH CARE**

**September 29, 2015**
**ORGANIZATIONAL MEETING**
**AND**
**INFORMATIONAL MEETING**

[01.06:7]

| | |
|---|---|
| Chair: | Okay, we will resume the Senate Interim Committee on Health Care.  Again, it is September 29 and I will open an organizational meeting for the adoption of committee rules. |
| Kruse: | Madam Chair, I move we adopt the proposed committee rules dated 9/29/15. |
| Chair: | Senator Kruse moves to adopt the proposed committee rules dated 9/29/15.  Is there any discussion? |
| Man: | Yeah, Madam Chair, just briefly, there was, I would have felt better if the changes would have been vetted with the Republican Caucus before they were made, but other than that. |
| Chair: | Thank you.  Is there any further discussion?  Any opposition?  They are passed.  And just to let you know, the last two items on the agenda have been eliminated so we'll have more time for questions and comments on the rate setting.  With that, I will open an informational hearing on the Coordinated Care Organization rate setting process and would like to invite Lori Coyner, Zach Aters and Mark Fairbanks to come forward to give us an overview. |
| | And while you're getting ready, I apologize.  I have to leave at 3:40 for about 10 minutes but I'll be right back. |
| Woman: | Madam Chair, I have a couple of bill signings so I'll be popping in and out as well. |
| Chair: | It's bill signing day.  Okay. |
| Fairbanks: | Well thank you very much.  Good afternoon, Chair Monnes Anderson and the Members of the Committee.  For the record, my name is Mark Fairbanks and I am the Chief Financial Officer at the Oregon Health Authority.  And today I'm going to provide you a brief update on the financial information that's been provided by the CCOs and then specifically describe the impact analysis that we have prepared to evaluate the impact of redeveloped rates effective January 1, 2015.  And I think this brief presentation will set up some context to help and assist with the rest of the presentation that my colleagues will be making on rate development.  So you have been provided with several pieces of information, financial information.  Again, these are from the CCOs.  We have a statewide, I'm just going to make some brief comments about this. |

Exhibit 9
Page 50 of 93
ALLISON00000268

And yes, and then zero in on the impact analysis. You'll see that the statewide impact, the actual margin profile, all the way through to our projection, is quite a bit larger in 2014. That's because of the impact of the ACA population in that year, in 2014. You have graphical presentations that will show the individual margins by CCO year over year and CCO to CCO, including also a graph on the medical loss ratio, which is the relationship of direct medical expenses to direct medical revenue. And also the profile of the cash in investment status as of March 31, 2015, first quarter.

We have just received the 2015 quarter two information. We're finalizing that. We expect to post it next week, but I can tell the committee that rolling forward the information with the actual quarter two has a de minimus impact on the margin profile that we have displayed here on our analysis. You'll note that the CCOs had a positive margin, all of them, for the first quarter of this year. And I'd like to point your attention now to the slide that is talking about the impact of the 2015 rate redevelopment, and you'll notice that we've listed all of the CCOs and we have estimated the margin for the year 2015.

It's important to note that that estimate is based on the quarter one actual results and assumes that the expense relationships for medical expenses and administrative costs remains the same throughout the year. We've had one CCO contact us and I would expect others to do so over the coming days and weeks to fine tune the estimates. They are the ones that have the visibility to their contracts and their actual operating realities, so I'd like to point out that Willamette Valley, Bill Guest has run the numbers and has indicated that instead of a possible 9% or an estimated 9% margin, they would expect that to be closer to 3% and that's because of their provider contracts. It's because the increase that they expect here, these redevelopment rates, would flow through to their medical expenses.

So I'd like to just talk a little about the context for this. I mentioned how it was derived and its basis just to give us some level of a proxy or an approximation for an impact. You will notice that overall there is a $13.4 million increase statewide for the CCO rate adjustment that has been developed and that my colleagues will talk about. That represents .03% of the total revenue for the CCOs for that time period, so less than one half of a percent. The two, I'd call them outliers, you can see some of the variability that occurs based on size and operating model and a variety of factors. We have FamilyCare of having a decrease of $55 million, and Willamette Valley would be the largest increase at 35.1. Those represent 8.5% in the case of Willamette Valley of their total revenue, expected revenue. And the FamilyCare, $55 million represents about 10.3 of net revenue for that CCO.

So as you can see, there are 10 CCOs that would expect an increase and six with a decrease. The profitability profile, the margins, are listed on the right column. Family care is slightly over 1%, I guess close to break even while you'll see the spread that exists with the others.

Exhibit 9
Page 51 of 93
ALLISON00000269

The last comment I'd like to make is that the analysis indicates that there are sufficient reserves which is one of the key metrics we look at quarterly for the CCOs for liquidity for those that are getting a decrease to transition. But for any CCO that has a cash flow issue, we are ready to assist them in allowing a sufficient time for the recruitment to occur.

So with that I would turn it over to my colleagues.

Coyner:    Good afternoon, Chair Monnes Anderson and the Committee. For the record, my name is Lori Coyner. I'm Director of Health Analytics for the Oregon Health Authority. I'm going to start with some opening remarks and then the presentation will be a mix of Zach who I'm going to have introduce himself next, and then we'll be going back and forth through the presentation.

Aters:    Madam Chair, Members of the Committee, Zach Aters, Senior Actuary for Optumas Consulting. What we'd like to present to you today is give you a walk-through of not only the rate methodology but some of the nuances and insights into both some of the assumptions, observations and data that have gone into the rate development. The slide that we have pulled up right now, we're going to start with this, because I think it is an important nuance in our discussions of the rate development. It has been mentioned in other meetings that we want to ensure that the rate development process is not just including fee for service data, and in fact this slide shows that we take extensive measures to make sure that we are including the total financial expenditures of all CCOs in the rate development. What is shown on the screen is the profile of those expenditures for the most recent based data that was used in the current rate setting process, and as you can see, approximately 77% of those expenditures would be classified as encounters, 16% as subcapitation, and 7% as incentive or other payments. And I think it's an important perspective to keep in mind as we walk you through how we then took these expenditures and developed a rate.

Coyner:    I'm going to walk through, just like I said, a little bit of a high level overview about where we were in 2012 and 2014 which was the beginning of the waiver period. What's unfolded for 2015 and '16 and then where we plan to go. Part of this is to get a conceptual view of the things that have changed during this time period as well as what the next steps are. So I think I'll start by saying that we don't envision this rate redevelopment as the end but really as one step in a process that's going to be moving forward. So before the expansion, population was included as part of the Oregon Health Plan. So for 2012 and 2014, many of you were here and we adopted a global budget and what that means is that we started to provide payments to coordinated care organizations that included funding for physical health and mental health and then eventually rolled on dental services as well.

So when we speak about global budget what we really mean is that we combine many different funding streams and put them into a single what we

Exhibit 9
Page 52 of 93
ALLISON00000270

call per member per month payment for the CCOs so that they could more easily manage their own budgets.

We also had a cost template methodology. That was the methodology used to compute the rates and our internal actuary signed those rates but the cost template methodology allowed the CCOs much more freedom in terms of estimating and providing the trend assumptions and those sorts of things in the rate determination. And CCO specific rates were developed.

This was moving along pretty smoothly until the game changer happened and that was really the implementation of the Affordable Care Act expansion population. And part of the reason that that changed the landscape is that the federal government was funding all of these new enrollees and they consist now of about a third of all of the Oregon Health Plan, or a third of the enrollees for the coordinated care organizations. And because they were funding those individuals, there became much more scrutiny on the dollars and the rates, and Zach's going to talk a little bit more about the evolution of that.

So it became apparent we were told by CMS in a Notice of Corrective Action that we received in July of 2014 that we needed to move away from the cost template methodology and move toward an actuarially sound process that included encounters and other financial data like that that Zach just discussed in the previous slide.

Moving forward, what we planned to do, and let me back up. So, this move and requirement by CMS to adopt the actuarial standards of practice and follow their new guidelines has made it more difficult though not impossible to continue with this idea of a global budget and a sustainable rate of growth. So what the work moving forward is to, we've engaged Manat(?) as a consulting firm along with Optumas to review strategies that will allow us to continue to move towards a sustainable rate of growth, continue to count subcapatitation and incentive payments, and not just fee for service payments, so that we're moving in a direction that supports alternative payment strategies as well as efficiency. And we plan to do that in collaboration with the CCOs and we will be submitting an amendment to our waiver that outlines in more detail what that will look like.

| | |
|---|---|
| Man: | Can I ask you a quick question? So the email traffic between you and the consultants as you're developing the rates, is that public record? |
| Coyner: | Chair Monnes Anderson and Members of the Committee, yes it is. |
| Man: | Follow up. Have there been public records requests of that information? |
| Coyner: | Chair Monnes Anderson and the Committee, yes. I'm not, I don't know off the top of my head whether it was a public records request for all of those. |

Exhibit 9
Page 53 of 93
ALLISON00000271

We have had public records requests around the rate setting process. We do have a litigation and so we've had a production request for all of those emails.

Man:    Okay. Last follow up. So when those public records requests have come in, have you supplied the records that have been requested?

Coyner:    Chair Monnes Anderson and Members of the Committee, yes we have.

Man:    Thank you.

Chair:    Please proceed. I know you have to leave at three.

Coyner:    Chair Monnes Anderson and Members of the Committee, Zach Aters was going to be on a plane this afternoon but he's changed his flight so that he will be here both today and tomorrow because of the importance of this discussion.

Chair:    Thank you very much. Okay, that's good to know.

Coyner:    So this graph just shows, this is the biennial average so that's why we show a little, 1% of the state share for the expansion population. But this emphasizes the amount of federal dollars that we're receiving for our health system transformation and coordinated care organizations. So you'll see in this ACA rates group, because of those 99% of federal funding for the 2015 to 2017 biennium, the CMS has a very strong focus on what the rates are for that particular sub-population.

Next slide. And I'm not going to walk through all of these bullets on this particular slide. Just focus on the bottom bullet. So I've shown you the dollars, and CMS and Office of the Actuary have increased their guidance around how rates need to be set for the expansion population. And I'm going to let Zach walk through the history around this just so that you understand why those guidelines have been changed and are more heavily scrutinized.

Aters:    So, a little bit of background around the increased oversight. The catalyst here was really the expansion and as Lori alluded to, the reason for the oversight was because when the expansion entered into the various Medicaid programs around the nation, it was federal dollar at risk, full federal dollar, and not only were the rates significantly high as we'll see later on in the slides, but it was a significant portion of the case load growth across all states across the nation. So there was a lot of concern around the methodology that was being used to develop these rates.

What happened was at random, the GAO did an audit on several of the rate developments across the nation, had some questions around some of the methodologies that they encountered, and the outcome of that was additional guidance, technical guidance. The first of the documents were released in 2014 and really, it was surrounding what was expected of any state or actuary when developing a rate for the expansion population. One of the unique

Exhibit 9
Page 54 of 93
ALLISON00000272

things about the expansion population at that time was there was no data on the expansion population so the states and the actuaries are being asked to set a rate with little to no experience. There was a lot of theories as to what acuity level the expansion would look like. Some anticipated that that population would be very chronic and have a lot of pent up demand. Others anticipated that population would be young and healthy. Now that we have the benefit of time and you'll see in later slides, we know that it was the latter that has actually, that we're seeing in the emerging data. They are actually younger and healthier and that's being supported by the actual expenditures being reported when you compare to the rates that were originally set.

So a lot of that just lays the groundwork. Some of the guidance that was out there that we're expected to uphold to is that knowing that the rates were set with little to no experience, in that 2014 guidance it clearly states that the states and the actuaries should explore emerging data as it becomes available and if it's determined that projection error is significant in the expansion rates that corrections should be made.[i] And that's really what we have done in this existing rate cycle where we have taken 2014 data and the first three to four months of 2015 and investigated that data to really get a reasonable estimate of what the ultimate level of this population as far as expenditures and risk will look like. And again, we'll cover that in later slides.

The last piece before we move on in the additional oversight is that now all of the rate submissions that the states submit to CMS are actually reviewed by third party actuaries, and there is a session of Q&As that go back and forth. And the real purpose behind that is to ensure that all actuarial standards of practice are at least considered somewhere in the rate methodology, in essence serve as some level of peer review from one actuary to another.

Coyner:    We we've set the state from the federal perspective I think and the next question is why did we choose to redevelop rates at the beginning of 2015 for calendar year 2015. I will say that it was not a decision that was made lightly. We had received the corrective action from CMS and have internal actuary compute the rates. They were delivered to the coordinated care organizations on December 24th of 2014, very little time for them to review. As a result of that and the resulting variation that was noted in the rates, the coordinated care organizations sent a letter to former Governor Kitzhaber with a list of concerns, and they're highlighted here on this slide.

The three main are, there was variation or variance between the CCOs that wasn't explained, they didn't understand why two different CCOs within a region would have different rates. There was a lack of transparency in how the rates were developed and the CCOs expressed concern that they were not asked to provide input in the process.

And then some concerns around this actuarial soundness. We also in March received the first round of questions from these original rates. There were 103

Exhibit 9
Page 55 of 93
ALLISON00000273

questions we had consulted at that time with Optumas, and they expressed that this was a very large number of questions relative to other states where they work. And Lynne Saxton, Director Saxton, held a meeting with the CCOs to talk about the issues, and it was then decided to redevelop the rates and at that time we did not have a decision about what the effective date of those rates would be.

Once the rates were complete, we met with CMS on two different occasions by phone. We had been briefing them I believe two times as we underwent the rate redevelopment process to vet the methodology, let them know what we were doing, and keep them apprised. But they were unwilling to give us any guidance about effective date until they had an opportunity to understand where we were landing with the new rates. When they found out that these redeveloped rates were quite different and we'll show you where there are swings between both CCOs and the Affordable Care Act population, the expansion and a standard traditional, they were unwilling to certify two sets of rates in one year unless they yielded the same results, and we couldn't provide that. So we were therefor able to make those rates retroactive which we communicated with the CCOs in August.

Next slide. So that gives the background and kind of where we are. I'm going to turn over some of the discussion to Zach to talk more specifically about the methodology that we came up with through this 8 month process of rate redevelopment.

Aters:      Okay. So this slide, we've already mentioned the phrase quite a few times in this presentation, actuarial soundness, and I think it's important to really discuss what is that. The first thing I'd like to address is actuarial soundness does not negate the idea of sustainable growth and division that is in the Oregon program. In fact, if followed, actuarial soundness lays a great foundation for its success and we will see that in future rate cycles. The key piece here is that actuarial soundness is really just a process that is embedded in our professional principles, actual standards of practice guidelines, and all it is, it just helps us evaluate the risk of any particular program. And that's really all we're doing here. We are not coming at this where we have a predetermined outcome because if you go down that path you really never understand the true risk of your program. So what we've done, and what we were asked to do, is evaluate the true risk of the program, bring that evaluation to the table, and let's see how that compares with this whole idea of sustainable growth. Some of our observations and findings I think you'll find interesting and we show them in the slides forthcoming.

Chair:      But doesn't that mean that you're rewarding those who provide expensive services?

Aters:      Not at all. Madam Chair and Members of the Committee, I know that's a common thought, and I hear that a lot. But that's why I opened up with

Exhibit 9
Page 56 of 93
ALLISON00000274

remarks. Actuarial soundness does not mean the idea of just counting services. The very first slide that we showed was the fact that we're including all expenditures, incentives, subcapitation and fee for service. Not only are we including all services, but we have multiple touch points and discussions with each CCO to understand their business model and not only their financial risk but the external risk that they're up against. Provider contracting, location. There's a lot more that goes into actuarial sound rates than just calculating averages and summing up numbers. So the short answer to your question is, this does not reward those that over utilize. In fact, if followed, again with care, it helps you identify those that are being efficient and identify those that are not.

Okay. Before we get into more of the details, this is just again, to give you a framework of how we think, and we'll hopefully shed some light into my response to the last question, and that is, how do we go about a rate setting process. And we refer to this as four determinants of risk, and we take this approach with every rate setting exercise that we do. And it basically boils down to the who, what, where and how. It's as simple as that but it gets more complex very quickly. And basically what that is, is the population - who's being covered. Who are they, what are their risk profiles, how do they differ, what type of external influences are going on in the economy that can impact them in the future. The services - what kind of Medicaid benefits are they eligible for, and what do they utilize. And this is an important one for the Oregon program. Regional - where are these individuals receiving their care, where to they reside, what care is available to them. It gets to the point of the whole access to care, again, another aspect of actuarial soundness that goes beyond just summing and averaging. And then finally, the delivery system. Again, this is an important one for your program because you have 16 CCOs, all different sizes and different business models. And the difference in business models sometimes drives differences in utilization and in the way that the care is provided. So certainly we have to consider that as well.

Coyner:    So when we began the rate redevelopment process, we wanted to focus our attention in particular on the identified issues that were brought forward by the CCOs. So you'll see we wanted to match payment to risk. How does that address the CCO's concerns? Well that is one way that we can reduce variability long term and make sure that the payments that we're making matched the risk of the population, meaning that if a CCO happens in a particular year to have more members with chronic disease, then it's going to cost them more to take care of those members than a CCO that has many fewer. We also, this improved credibility, what does that mean. Well, CCOs vary in size and some are quite small when we think about a rate setting process, so we wanted to reduce any swings that might happen just because of the small size of the CCO from year to year so that we get towards the sustainable rate of growth. It's part of the reason also that we adopted a regional approach so that we can minimize variability both between the CCOs and from year to year.

Exhibit 9
Page 57 of 93
ALLISON00000275

We've worked very hard to improve transparency in the rate development process. We hold weekly actuarial calls where the CCOs' internal actuaries and consulting actuaries have an opportunity to look at the models that Optumas is working on provide feedback. There are many instances where feedback was given. Optumas would go back, rerun numbers, come back to the group and in some instances change their approach based on the feedback. We also held monthly rates workgroup meetings. Those were attended largely by each CCO's CEO and CFO. They are open to any people that the CCOs wanted to bring. And then we've had over 100 individual meetings with the CCOs. That's one on one meetings, many times Optumas is here in person to talk about the rate setting process. So the first meetings were to look at their financial information, compare it with three different sources to ask questions to understand where the data comes from and then continue to meet along the whole process.

And finally, we needed to ensure that the methodology will approved by CMS, and what that means is that we needed to be consistent with the new guidance from CMS and the office of the actuary. See the guidance.

And finally, and Zach has already spoken to this, is we needed to look at the expansion population rates now that we had 2014 data. Look at it, see where we were with the experience that happened in 2014, and compare it to the rates that were paid and make any necessary adjustments.

Aters:      Okay. As we progress through these slides we're going to use the term rating region. So we've included a slide to show you what we mean. One of the four determinants of risk that I discussed talked about the where, and this addresses that. So you have 16 very different CCOs that operate in different parts of the state. Each of them have different business models, contracting, available hospitals. And that certainly will dictate the way the care is provided and the expenditures that are reported because if the hospitals that are available to that particular CCO are more of the AB hospitals, then costs, all those being equal, those costs are going to be higher than if they had a D or G hospital, such as more in line with an urban area. So the idea here is to divide the state up into regions that will accommodate or group like populations and CCOs together. This is one area where through that _____ process and that transparent process the state benefitted and so did the methodology. We brought what we thought was a reasonable proposal but we came with an open mind, and we said "here's one of a proposal we'd like to solicit feedback from the broader group." We did solicit that feedback and the proposal was to move to four rating regions instead of the three that we had proposed. And we took that back, did the analysis, and it did improve the numbers. HOW So we did move forward with the four rating regions that were proposed, not just by options from state but by the stakeholders and the CCO groups as a whole.

Man:       Madam Chair?

Exhibit 9
Page 58 of 93
ALLISON00000276

Chair:          Yes?

Man:            Thank you.  Is it Zach?

Aters:          Yes.

Man:            So who set the four regions?

Aters:          Are you referring to who had the suggestion from the CCOs or who ultimately…

Man:            Who ultimately made the decision how the four regions were divided for rate setting?

Aters:          At the end of the day, with the certification, it's my signature on the certifications so that decision would be part of that certification, but it's not made in a silo, it's made with agreement from the state, and in this case, agreement from the CCOs.

Man:            Madam Chair, it just seems to me that there is some extreme variations in some of those regions as it relates to the differences, and I just don't know how you can square that with the divisions that have been made, so.

Aters:          Madam Chair, Members of the Committee, I'm not sure the variations that are being referred to but I'm happy to address those if…

Man:            In terms of cost?

Aters:          …yes, okay.

Man:            And operation.

Aters:          The cost, definitely there's a difference, and I'll give you an example.  If you don't use rating region and I will refer to a TANF What year did they use? population, it's a nonexpansion population, it's a staple population of the Medicaid program, it has been in existence since the inception of Medicaid.  If you go statewide, the variance that you speak of is significant, and in fact, there is no rate range that would encapsulate that variance.  The variance is in the neighborhood of about 40% from your high to low CCO.

                Now there are drivers through that variance and if you're looking at the costs or the rates on a sheet without having access to the drivers, I think it is a bit puzzling on what exactly is going on.  But one of the drivers is going to be the AB hospital utilization that I spoke of.  That's one reason that rating regions are necessary.

                The second region is going to be just the risk of the population and actually that's our next slide, so I won't spend too much talking about that.  But

Exhibit 9
Page 59 of 93
ALLISON00000277

certainly there's going to be a different mix and risk, even if you're talking about TANF population between the various CCOs and it's the same population. The profile risk of each member is very different and depending on what type of risk profile on aggregate a CCO ends up with can drive the differences in cost as well. And then lastly, of course, is just the way that the CCO directs the care certainly will impact that. But those are three areas that could impact variance that you would see if you're just comparing rates.

Man:    Sure. So Madam Chair, so I'm one of the non-providers on the committee. Doctor, nurse, cigarette salesman...

[Laughter]

...and married to a provider, and then doctor. So I guess I'm a pear, that's all I am. So I probably have the least understanding of the mechanics. So I've been listening to you guys, really been trying to pay attention, so if I understand this right, and correct me if I'm wrong, CMS said that we had to take corrective action because the rates were off. Right so far. I'm getting heads shaking yes. So CMS told OHA to make the rates retroactive, is that right? Because that's what I heard.

Coyner:    Madam Chair and the rest of the Committee, yes, though that's a later step in the process. So we had multiple forces saying redevelop rates and then once we redeveloped them had to say well when are they going to start, and that's what I meant by effective date, and then yes, CMS wanted us to take those rates and go back to the beginning of the year.

Man:    Okay, so I'm a small business guy pretty much my entire life, either owned or managed them. So I'm trying to figure out how, because I think a lot of these essentially are run as small business models, at least in the outlying areas. I assume that it's a bigger business in the metro area, but it's still a business. So how is it that these businesses are supposed to be able to make up that kind of money in a retroactive period, by the end of the year, is that when they're supposed to make it up?

Coyner:    Chair Monnes Anderson and the Members of the Committee, when Mark presented, so I'm just going to go back to that and Mark may want to jump in, but eight, how many of the CCOs received an increase?

Fairbanks:    Ten.

Coyner:    Ten. Ten of the CCOs received an increase. We will be making those payments before the end of the year at their request so that they can manage their books. The CCOs that require a recoupment, we can do that by the end of the year. We have also given them the option to take that longer into 2016 and we will work with them around that. And that's on a case by case basis.

Exhibit 9
Page 60 of 93
ALLISON00000278

Man:    Madam Chair, follow up. Well, we're still talking about real money regardless of how you spread it out. I mean I've paid credit card bills before so I understand that, and you can spread them out, but it's still, some of these numbers are pretty large. So what kind of impacts are we talking about on the CCOs from essentially these paybacks are retroactivity.

Coyner:    Chair Monnes Anderson and the Members of the Committee, on the handout that Mark Fairbanks walked you through, I think, let me show you, it looks like this, just so you know. There's a page 7, and on that page it shows the estimated margin after the payments are reconciled.

Man:    Okay. So follow up. So why is OHA setting margins?

Coyner:    We aren't setting margins, we are just estimating them. These would be estimated through the end of the year, but we've received financial information from the CCOs and I'm going to let Mark speak more to that.

Fairbanks:    Yes, thank you for that question, Senator. Mark Fairbanks, Madam Chair and the Committee. This exercise was not intended to set rates. We don't set rates for CCOs. Excuse me, not rates, I'm talking about margin. What this did was we decided that as part of the process to do the due diligence, to look at the landscape, look at each of the CCOs, look at all of them in total, look at them individually. Based on their financial profile make a conservative projection. Look at what would happen to margin. Look at their relative stability in terms of their insolvency, their liquidity and their available cash reserves, and could they sustain this. And it is our opinion that in almost all cases those with a decrease can make this transition. If not, as Lori pointed out and I mentioned earlier, we'll work with them to spread the recruitment out to a period of time that they could better accommodate it from cash flow. I'd also share with the Committee that in my experience the activity of CMS that flows through the states on Medicaid rates and Medicare, and I know physician reimbursement sometimes will be retroactive, it's not necessarily to this magnitude because we're talking about what I believe is a level set year and I personally would not expect to see this kind of activity short of some major shift in federal policy or state policy for that matter. For this kind of event I think this is an episode and I think that Zach's going to talk about a little bit of 2016 development and what that is already indicating to us in terms of the stability of the model.

Man:    Yes, so follow up, Madam Chair. So Katrina was an episode. So my question really is is what's the impact to the CCOs, because my understanding, again, business guy, so I have a budget for the year. I'm working off of that budget. I get nine months into the year and somebody says hey, guess what, you know what you were getting paid before, you're not getting paid. As a matter of fact, we need to take money back from you. That to me sounds like a serious episode. So is this a puddle in a parking lot or is this a Katrina type event for these CCOs. I mean that's really what I'm trying to get at.

Exhibit 9
Page 61 of 93
ALLISON00000279

Fairbanks:    Yes, and based on our proxy, we believe that yes, it's not I'd say a very pleasant event, but it is one that we think that the CCOs are able to sustain.

Chair:    And I just need to follow up on that because I know in 2014 and their rates that they knew, the CCOs knew before 2014 what rates they were going to have. And when I look at what the insurance division does, they come out with their rates for the carriers for the following year. And so that's one of the things that I'm struggling with that you would implement a rate retroactively to January when they've already didn't have time to adjust to this change that really affects their business model. So in my mind it makes better yes, work on your methodology but certainly not go retroactively, go prospectively to January 2016.

Aters:    Madam Chair, Members of the Committee, that discussion is more in line with policy, but it does relate to natural perspective that I think is important here, and that is, I mentioned earlier in the presentation that the rates submissions are reviewed by a third party actuary that is a contractor of the federal government. That dictates whether the rates get approved. Upon approval, essentially the actuary, the office of the actuary that approves those rates, is taking on the same responsibility as I did when I signed those rates. And that means that they are bound by all of the applicable actuarial standards of practice to ensure that those rates are appropriate for the population being covered. Now again, we have some forthcoming slides that are going to show you some numbers, but the dilemma is going to be that if you put two sets of rates in front of an actuary and you tell them to certify those and one of them is at least twice as high as the other, I'm not sure how that actuary defends that both are actuarially sound and appropriate for the services and populations in question. And that therein is the dilemma.  Blather

Coyner:    Madam Chair and Members of the Committee, to add onto Zach's point, CMS has to certify the rates, and we believed at the time when we made this very tough decision to redevelop the rates that they were not going to certify the rates, that the office of the actuary had so many significant concerns that they would not be certified.  And then what that does is put all those federal dollars in jeopardy.  And after redeveloping the rates CMS again said we have significant concerns with your original rates and we will not certify those and this new set together, and therefore you need to go back to January 1 so it's not something that we chose to do but a mechanism that we have to do in order to ensure that CMS will certify the 2015 rates.

Chair:    And we have that in writing from CMS that says that they will deny payment for expansion population?

Coyner:    There is a letter that is included in your packet from CMS. But it does not go so far as to say they will deny a payment of expansion.

Chair:    Proceed.

Exhibit 9
Page 62 of 93
ALLISON00000280

Aters:    Thank you. Okay. The next slide is going to get into really the backbone of the methodology and one of the ideas here is we already have shown the regions and now what we're going to discuss is the risk score and explained variance. The question was brought up earlier about when you look at a rate sheet or expenditures in a particular region, what's some of the drivers between, why are they so different. And one of the differences is really what has shown up on the screen, and really just visually, I'll just explain what this is and won't get caught up in the numbers on the axis. But basically what this represents is the old adage that 20% of your population make up 80% of your spend. That's just a rule of insurance. It's really why insurance exists. And that holds true in the Medicaid program and what this shows is that as you progress left or right, on the left hand side, those are going to be individuals that have a low risk score. A risk score is a tool, it's an assessment tool that is used nationwide in Medicare, in commercial markets, and in Medicaid markets. And what it does, it identifies individuals with chronic illnesses and it gives them a score based on those chronic illnesses in addition to giving them a score based on their demographics, what age band, what gender that they are. And so you would expect someone with a low risk score to have low annual expenditures. This is what this graph shows. As you move left or right, you can see that it's sloping and off to the right, the right hand tail of this, those are members with the highest risk score, and you can see they have extremely high spend. So if you were to carve this graph up you would find that it is true that about 20% of the population make up 80% of the spend.

So now I go back to the question that was asked. What drives the differences. Also a secondary question that we've been asked - isn't a TANF population a TANF population if I operate in the same region, don't I get the same risk. This will hopefully provide insight into the answer that it's no, because you will only get the same risk if you get the same percentage of that 20% that really is the driver of the cost. And the chances of that happening, particularly when you're talking about four or five or six CCOs operating in a region, not likely. And that's actually what we've seen in the risk score assessment and that's why, one of the reasons why you see variance if you're just looking at reported expenditures or the rate sheets that we've developed.

So the next slide tries to really get at what the risk score's doing. The comment on variance, this is going to show you exactly how that is intertwined in the rates. Absence of risk factor in this example, and this is an actual example for the TANF cohort for the tri-county rating region and it encapsulates FamilyCare and Health Share. The regional PMPM for this population is $317.53. So all else being equal, both entities would receive that amount to cover the population. And again, without further inspection, you would think that may be appropriate. But upon further investigation what you'll see is, when you evaluate the risk score, FamilyCare actually has a significant lower risk score. A number below one means healthier than normal. A number above one means more chronic or sicker than normal. So in this case, you can see that FamilyCare has a risk score of .94, Health Share

Exhibit 9
Page 63 of 93
ALLISON00000281

has a risk score of 1.03, and what we do then is apply that to the regional and then that creates a variance that you will see in the rates that we've developed so that FamilyCare where we received 299.20, Health Share will receive 328.07. Going back to one of the first slides, this is really the undertone of trying to match payment to risk, because without some kind of tool to do this, what you're going to, the unintentional consequence would be to overpay one plan and underpay another.

Chair:      But don't you think that okay, you've used three months of 2015?

Aters:      For the expansion population, and I think that's a nuance here.

Chair:      But this is based on 2014?

Aters:      This is for the nonexpansion so this would be 2014 data.

Chair:      Right.

Aters:      Yes.

Chair:      And so with the expansion don't you think you need more time to make sure that your baseline rate is really what you're projecting that it should be?

Aters:      Yeah. Madam Chair, Members of the Committee, that's a great question, and in fact, it's one that we thought of as well as we were developing the rate, so let's take a step back. The 2014 rates were developed with no data. It was none.

Chair:      Right.

Aters:      Wherein today we have more, we have the first year of data and we have the first year of 2014 and we have the first quarter of 2015 for the expansion population. Again, taking it at face value, one may think that 15 months of data is appropriate, but in fact, you need to understand that the expansion population, they didn't just all enroll in the program as of the start of the year, they came in throughout the year. And that's borne out by, if you look at their average duration which by definition is the number of months that they're enrolled in the program, it's about four and a half to five and a half months of duration, it's fairly low. And if you compare that to a control group such as TANF, again, a population that's been around for a while, their average duration will be anywhere from nine and a half to ten and a half months, and that's about average for any population that's been enrolled and stabilized. So the idea here is that once we've seen that, we had the same thought and the same comment as let's be careful on using 2014 data, emerging data, but it does give us more information than we had when the rates were set with no data, right? While it may not indicate where the ultimate level of expenditures lay, it certainly is better information than was available previously. And so what we did is we actually took the 2014 data and we'll actually show this on

15

Exhibit 9
Page 64 of 93
ALLISON00000282

a slide, but we added some conservatism to it. We call it a durational adjustment. We increase it by 5% to 10% just from the fact that it had a low duration. So it increases it to get to your point that we didn't necessarily trust it at face value. We think that it could go higher.

In addition to that, the expansion population has a higher trend than the nonexpansion, so when you project that into…

Chair:        Higher trend, higher?

Aters:        …utilization. When we set rates we have to project it out into a time period and you do that by using trend, and the trend that we use for expansion is slightly higher than nonexpansion, again to try to accommodate potentially some pent up demand and some of the unknown risk that may still yet is to be observed or as the dust settles on the expansion.

Chair:        Senator Shields has a question.

Shields:      Thank you, Madam Chair. I'm a little puzzled by what seems to be six different ways you're trying to show some validity to these numbers. So the expansion population has basically been set in the metropolitan area, Portland metropolitan region, and you're just dealing with the previous cohorts. And I guess one thing that I'm a little puzzled with too is as you look at those two CCOs in the region, you have one that is trying to focus primarily on primary care and putting a big focus there. Then you have another one that is the majority of which are hospital systems. Can you tell me how you took into account those two different factors. And my thoughts are also that the one that focuses on primary care and accessibility in primary care offices might attract more infants, and I was thinking that infants are more likely to be in the emergency room. So I was wondering, you talk about how the variance is explained, but there's really nothing in here that tells us the methodology or what those risk factors were and I think I would like to see that. And I'd also like to see any type of validated explanation of this CDPS RX, is there anything in the literature that validates it?

Aters:        Madam Chair, Members of the Committee, there's an endless supply of documents and validation for the various risk tools, CDPS plus RX being one of many. Certainly we could provide some documents to speak to that.

To your comment on the…

Shields:      Could you send that to the professional staff and _____ distribute it.

Woman:       Yes.

Aters:        To your comment on validating the rates in six different ways, again, this is a very complex process. So I think one thing that I should make clear that we develop rates on rating covert basis. So the reason that we're speaking of

Exhibit 9
Page 65 of 93
ALLISON00000283

ACA and then jumping to TANF is because those are very two different rating cohorts. When we certify rates, we're certifying the rate for each individual rating cohort for a program. We're not just certifying the aggregate rate that a lot of times you will see on a financial projection. That really has no bearing in our certification. We are actually certifying the expansion rate, the TANF rate, the child is 6 to 18 rate and to your point, we also have rate cohorts that address the infants. So how was the different delivery systems addressed? Certainly that comes through in the data that's provided. I'm going to relate that, too, to the risk score because I think it's relevant. Whether you're in a CCO that has a focus on primary care or your CCO that has a focus on hospital type services, if…if I'm an individual that has rheumatoid arthritis and I go to the doctor, whether it's a physician or a hospital, I'm going to have a claim that is going to get picked up by that tool that says I have rheumatoid arthritis. It does not matter if I went to the hospital, out-patient, or physician, because I'm going to end up taking pharmaceuticals to address the issue as I go to my physician to get treated. So the individual that would get assigned a risk score would get assigned the same risk score in both of those entities.

And so, to get at your…the question on, you know, how they treat the care, I think that's where efficiencies come into play. And if one CCO can treat it more efficiently than the other, then they're actually going to be able to provide the care at a lower rate than what the premium would indicate and, therefore, get rewarded for that efficiency.

Shields:    May I follow up? So I understand that for a large number of these populations, but then with the ACA expansion, you basically said we're going to set aside what we know about the validity rating and we're just gonna kind of do an average of what the cost is. But if the average on a region that only has two CCOs, it's very high for one and that doesn't really seem to be using the risk factors. It's…

Aters:    Sure. Madam Chair, Members of the Committee, the intent here is to use risk score in the future for the expansion population. But for the very reason that I explained that we did not trust the 2014 expenditures at face value to…to reflect the starting point as a rate development, because we had to…because of low duration. Low duration creates bias and can skew risk adjustment numbers as well. So, you cannot use risk adjustment with any type of certainty and apply it to develop the rate because just for the fact that it has a low duration, those risk scores could change. And so, that was a point of discussion with the larger group, the work groups, the touch points, definitely discussed on the actuarial user groups _____ and there was consensus for the…the other consulting actuaries representing CCOs that participate in those that it was probably better to…to wait to use that risk score tool until that duration of the expansion population gets a bit more mature, and we certainly want to run that.

Exhibit 9
Page 66 of 93
ALLISON00000284

That being said, we have ran the risk score on the population, so we do have those numbers and it does bear out in the case of the Tri-County area. But again the population for FamilyCare has a significantly lower risk score than that of Health Share. We did not use that information. We used it just internally so we can again observe and set the stage and understand the program. But we certainly did take a look at that.

Coyner:     Chair Monnes Anderson and Members of the Committee, we can provide a handout that shows those risk scores, if you'd like.

Shields:    Okay. Last question, Madam Chair. Thank you.

Would you explain the relativity cost factor? What is that?

Aters:      Yeah, absolutely. Madam Chair, Members of the Committee, the relative cost factor really is, in lieu of using a risk factor, what we need to do is…we're certifying a regional rate, but we have to have a way to then break apart that regional rate to attribute the cost back to each CCO. So the relative cost factor is basically taking the costs that were reported by each of the CCOs for their expansion population and we're using that as a starting point to develop the rates, before we do the durational adjustment and project it forward. So if you boil that down, essentially, what the relative cost factor does, it just gets that regional cost back to the costs that FamilyCare and Health Share reported for their expansion population and their financial template.

Chair:      Proceed.

Aters:      And that's actually a good segueway into the slide that we have up right now. And this is going to show you really what we've been talking about and hopefully provide insight into why we had that dichotomy between ACA and non-ACA because I know that gets a little cumbersome talking about two different rate setting processes within one. But as we have shown here, FamilyCare…this is again Tri-County region, FamilyCare is the top, Health Share is the bottom.

The calendar year '14 rate is the actual premium that each of the plans were receiving. I'm just going to talk off of the total ACA line. So, for FamilyCare, they received 516.08 per member per month for…on average for each expansion member that they had. Health Share received 494. Remember that those are the rates that were developed with no data. They were developed with theory and no one really knew if the individuals were going to be chronic or healthy, so therefore they're on the high side.

The reported PMPMs for the same time period, now that we have the benefit of looking back and seeing some emerging experience, FamilyCare reports 233.10; Health Share reports 286.26. Now, if you compare that 233.10 to the 516.08, that gets to my comment earlier where if you're going to ask an actuary to defend a rate that is that much higher than what the actual

Exhibit 9
Page 67 of 93
ALLISON00000285

experience or emerging experience indicates, you really would need to understand some of the drivers behind that.

And now that's gonna lead me to the last column on the right. When I said we did not just use the '14 experience at face value, we actually inflated it for the durational impact and we also have an increased trend higher than the non-expansion population. So for FamilyCare, the aggregate rate that we set for '15 comes in at 362.14 compared to the reported expenditures of 233.10 for '14.

So my point in telling you that is that we did build some conservatism in the expansion rates. It does account for a significant annual increase year over year to address the comment earlier that maybe we don't know where the dust is going to settle on the expansion. So we are being conservative. We just know more than we did when the original '14 rates were set, and those were set too conservatively.

And I guess the last point that I will make is that…again, the 2014 technical guidance that I mentioned earlier in the conservation, it is the expectation of OAC and CMS that the states and the actuaries involved review actual emerging experience and make appropriate adjustments when projection error is significant. And in this case, projection error was significant.

Chair:      Does profitability come into this at all?

Aters:      Madam Chair, Members of the Committee…

Chair:      Seems like those that had the highest net profits were the CCOs that had the largest cuts. And I'd like…I'd like to understand, and maybe that's gonna come…is that gonna come?

Aters:      Madam Chair, Members of the Committee, I can certainly speak to that and hand it over to Mark and Lori. The short answer is the actuarial sound process of setting the rates does not directly involve reviewing profitability or influence by any type of budgetary restriction. My opening comments were the actuarial sound process is really about evaluating the risk. And once we have done that, we then bring it to the finance team which then compares our results to actual financial results. And what you would hope to see is some correlation. But by no means does the financial results guide the results of the rates. If you develop rates and it's not supported or substantiated by the financial…actual expenditures or results, then I think you need to go back and you have to ask yourself, well, where…what am I missing? But in this case, your example actually shows good correlations, so the…hopefully that addresses your question.

Chair:      Okay.

Exhibit 9
Page 68 of 93
ALLISON00000286

Aters:    It's not directly used in the actuarial sound process, but certainly once we provide the rates to the state, it's certainly reviewed.

Chair:    Okay. And I'm just thinking of Care Oregon and…who's a part of Health Share and the way maybe they distribute their profits, whereas FamilyCare doesn't have that model and therefore their numbers are right there for you to see.

Coyner:    Senator Monnes Anderson and Members of the Committee, there are different business models. The CCOs certainly have a wide variety of business practices. And that's part of the reason that the rate setting process does not examine the financial…or doesn't use the margin or profitability when computing rates. But to Zach's point, we did look…we do want to make sure…I mean, _____ would be an extreme example, but we want to make sure that, let's say, for the non-ACA population we were going to make a big decrease and then if you saw that that CCO already was not operating, you know, in the black, then to Zach's point, we'd have to go back to the actuaries and say this…there's something wrong with your model because it's not going to be sustainable. So we did have…once the rates were…the rate ranges were developed, then we…the state, the Oregon Health Authority selects the percentile where we…where the point in the rate range where…for the payment. And once we…we modeled where to select that and to make sure that…and then worked with Mark's team to look at the financials.

Chair:    It's just that when we're talking about profitability which I really hate to do it in the health care system because when I have a Hep C patient email me and say look at the profits, and I'm not able to have my health care taken care of, you know, that' another issue, but yeah, go ahead, proceed.

Aters:    Okay. So, we've walked you through some of the process and the thinking behind using risk score and splitting the process into the ACA vs. the non-ACA. This slide is a very important slide because it gives you a glimpse of what actually occurred in an observation. So I made the comment earlier when I first started the presentation that some of the key observations were a bit, I think, surprising and this is one of them.

So, by taking a step back and evaluating the true risk of this program as opposed to developing rates with a predetermined outcome with sustainable growth in mind, what we actually noticed was there's a significant shift between the expansion and the non-expansion rates. Now, that's gonna go back to Lori's initial comment surrounding the methodologies that were in place prior to 2014, the cost template methodology, but, you know, the take away here is that when we evaluated the risk, the non-ACA-actually it's showing up on the screen-had an increase of 12.8%. Far exceeding the idea of sustainable growth. So you gotta ask yourself what's driving that? Well, there's a couple of things driving that. One of them is accelerated trends due to pharmacy. Pharmacy trends are sky high all over the country in all

80263014.1 0105026-00003

20

Exhibit 9
Page 69 of 93
ALLISON00000287

programs, Medicaid included. But more importantly, there was a subsidization going on within the program where funds and expenditures were being transferred over into the ACA because this whole idea of sustainable growth and measuring it was only being applied to the non-ACA and that, I think, that some non-intended consequences in the…the previous methodology and the templates that were being used.

Now that we have evaluated the true risk and went through a level setting process, yes, we have a significant decrease in ACA. We've already showed you a slide that shows you why. The…what we didn't cover is that the 12.8% increase for your traditional population such as your TANF, your children populations had significant increases.

Now, what you would hope…and when I opened up my comments is that actuarial soundness being the backbone of this methodology should put the program in a spot where it actuals promotes and allows the success of sustainability. And we…one of the reasons we're in town is to present rates for Thursday and Friday for the 2016 time period. And while the 2015 flux…there was a lot of fluctuation, not only between the ACA and the non-ACA, but also between CCOs because of the allocation due to risk. What we see in 2016 is exactly what we were hoping would happen that once you go through the level set and you allocate that risk appropriately, that you then get that predictable growth, sustainable growth. And I think members of the committee will find that the rates that we…will be discussed later in the week promote the whole idea of predictable growth. I mean, you don't have these large fluctuations. It was more of just level setting.

Chair:    I still get nervous about having a base…a base rate in a short of time. If there is fluctuation next year, it's not going to make any difference because it's…you're using a base that may not be a true base.

Aters:    Madam Chair, Members of the Committee, it's…it's a good concern, but I'll go back to my comment that while the base is I would say in its infancy, it hasn't matured, it is better than having no base. And I think that is really what's on the table here is you're comparing rates here that were set with no data and then the rates that were set in this last two cycles were set with emerging data. And while not ideal, that is the most recent data that is available, if…as we're measuring emerging experience in 2014, do I expect that expansion rate to move? Yes. Which direction? It's hard to say but it…I would anticipate that that rate will come down because again this population is a healthy population and we…even with the rates that we've proposed that are really behind the large decreases for some of the plans, has a lot of conservatism built in which you can see from the…from the slide that we showed. So, yes, there's…there certainly will be some movement and expansion, but not as much movement as you've seen in the 2015 because that rate was set just…just way too high because no one knew much about the expansion at all.

Exhibit 9
Page 70 of 93
ALLISON00000288

Chair:          So, I go back, I was a part of the…this transformation process way from the beginning. And we wanted the CCOs to focus on health outcomes. And outcome, I'm not sure how that's a part the rate setting.

Coyner:         Chair Monnes Anderson and Members of the Committee, we have a couple of mechanisms for assessing outcomes. So you will recall that we have a quality pool and the CCOs are paid incentives for meeting quality pool matrix. There's 17 right now. And that is 4% of their total expenditures. Additionally, you know, we know that this year is hard. We know that it involves a level setting. And as Zach said when we taken a look at the draft rates that will be…the final rates we'll be presenting, rate ranges, to the CCOs on Thursday, Friday, we see that we've hit a spot where if we can have a more predictable sustainable rate of growth and we don't expect these big swings. However, it's a first step. And we have engaged some a consulting firm and Optumas to work on some of the topics that you just mentioned. So rewarding alternative payments, looking at how we reward for value and quality, and that will be the work once we have the 2016 rates done over…between now and April and we will be submitting a waiver and amendment that will outline that in more detail. So we aren't finished with this methodology, but we…and we plan to add moving forward, you know, more ability to assess outcomes and other pieces.

Chair:          Okay. Senator Knopp, you have a question, and then Senator Shields.

Knopp:          I actually do. So in the ORS 411, 413, 414, there's a bunch of definitions. One of them talks about the global budget. And it says that the global budget means a total amount established prospectively by the Oregon Health Authority to coordinated care organizations for the delivery of, management of, and access to, and quality of health care delivery to members of a coordinated care organizations. So was that taken into account as we…somebody made the decision to retroactively apply these rates?

Coyner:         Chair Monnes Anderson and Members of the Committee, yes. The global budget is basically a per member per month payment that accomplishes those things that you outlined in that ORS. So it's not paid…we don't pay an annual sum, but a per member per month payment.

Shields:        Thank you, Madam Chair. If you all had to say what the top three determinants of risk separating the typical Health Share client from the typical FamilyCare client, what would those three be? What's the driver and the difference between the populations, setting aside, of course, the ACA expansion because they're not even part of that risk pool, just the rest.

Aters:          Okay. Madam Chair, Members of the Committee, the overall driver of the difference in risk is the fact that FamilyCare has not as many members with chronic illnesses as Health Share. That comes out of the results of the risk score tool. As my earlier comments, the risk score tool is ran on a member

Exhibit 9
Page 71 of 93
ALLISON00000289

level and so it's actually tracks the members and assigns them to a particular chronic ailment and then weights it and puts the math behind it. But if you were to look at the details behind the risk scores and behind the .94 and 1.05, what you would see is that there's a disproportionate share of members with those chronic ailments in Health Share than in FamilyCare.

Shields:
One final question. Could it be that FamilyCare is helping people move those ailments and actually is doing a better job?

Aters:
Madam Chair, Members of the Committee, certainly you would hope that there's some…that that is true. That's the purpose of health care. But I'll go back to my example of rheumatoid arthritis, once you have a chronic illness, you always have the chronic illness. It's not like having pneumonia and you hope that you get over it. All you can do is really control the symptoms and improve your life style going forward by efficient treatment. So can you move through some of those chronic ailments? You cannot. The purpose of the risk tool is to identify truly chronic illnesses. And that I think gets to Lori's statement in that future rate cycles, we will be looking into how the various treatment patterns and…are going on for someone with RA in Health Share vs. RA in FamilyCare.

Shields:
Another final question, Madam Chair. So, does that determine when they come onto the plan, or is it…can they be determined to be chronic after they've been a Health Share patient for two years or six months or one month? Or is it just when they begin?

Ater:
Sure. Madam Chair, Members of the Committee, the risk score tool is ran based on the eligibility of each of the plans for the base year in question. So the risk scores that we have been sharing with the Committee during this presentation were based on the 2014 time period. So when…when did the member, you know, receive that diagnoses? Some of them probably received it while they were enrolled; other probably have had it for years and whether they received it before they, you know, became Medicaid eligible or when they were enrolled in another plan is probably a little all of the above.

Chair:
All right. Thank you. Thank you very much. Hopefully you'll stay around in case there are questions. We have several representatives from CCOs that I want to make **sure** have a chance to talk for about not more than 10 minutes, 5 to 10 minutes. Let's start with Jeff Heatherington and Tim Freeman.

Chair:
Welcome back.

Freeman:
Thank you, you ready for me.

Chair:
I'm ready for you.

Exhibit 9
Page 72 of 93
ALLISON00000290

Freeman:    Great. Thank you for having me. I sure appreciate being here. For the record my name is Tim Freeman. I'm a recovering state legislator and a Douglas County Commissioner.

[Laughter]

I'm here today on the panel with the CCO's, I'm on the board of our local CCO in Douglas County. But I'm also...

Chair:    Is that AllCare?

Freeman:    Our—our CCO is Umpqua Health Alliance.

Chair:    Umpqua, that's right.

Freeman:    But I'm also on the board of a group of non-profits that do this work around serving the same group of people. So I want you to know that I know I'm here representing the CCO, but I'm also on the Community Cancer Center Non-Profit Board. I'm on the Community Action Network Board of Directors. I also serve on the Community Health Allowance, which is the Mental Health Nonprofit in our area. I serve on the Douglas County Public Health Network, which is a new non-profit for public health services in Douglas County. I—of course, serve on the state's Early Learning Council, and I chair the local Early Childhood Development Council for the Hub in our area, so I have lots of hats to wear. And the reason I bring that up is because all these groups work together. And so, when you talk about you're going to look at doing rates different for any one of those groups, it affects all of them. And I think it's important to realize that. It's easy for the folks that set here before to look at numbers, and they look at numbers in their box. They don't look at numbers outside of what is encounter data. So the encounter data is very important and I appreciate that work. But the fact is the CCO's have been asked to be much more involved than just the specific delivering of healthcare in our community. Certainly do that so I wanted to make sure I'm breaking that up.

I wanted to talk just briefly about the experience that we all had. I know Senator Knopp's new, he wasn't there when we did that. But he was certainly there for the tail end of it. But we set down in 2009, 2010 and specifically in 2011, we started the transformation of healthcare in a meaningful way. You and I served as co-chairs along with Rep. Greenlick on the special, special committee, Joint Committee on Health Care Transformation, and we did that work. And one of the major reasons we came together to do that, was this whole discussion you just had around actuarial sound.

This actuarial sound numbers and talk about numbers is what led us for 20 years in the Oregon Health Care Plan. And it led us to a point where we were $247,000,000 short in the budget, so we had to transform health care. We looked at all this stuff, it seemed like, I mean it was just like a déjà vu sitting

Exhibit 9
Page 73 of 93
ALLISON00000291

here from almost six years ago, hearing all this stuff. When in fact, we recognized, in the work that we did, that we had to look at more than just the health care costs, that is affected by, by these CCO's and these services. We set together, you and I and others, and we started the transformation of health care and we had multiple stake holders come to the table. And when we started, virtually every stake holder group was against the idea of transforming health care. They all opposed it, they had all carved out their little niche and said, leave it alone, don't mess with it. And again, we set in front of them and had meetings and discussed and took input and decided there was a better way.

There was a way of looking at the entire picture of costs, and the way that providing care would make sure that we were looking at downstream costs and other costs associated with the state and things we had to do. And we came up with this coordinated care model concept, and we negotiated with them the idea that if they found ways to cut costs, and provide better outcomes, that they wouldn't be punished for it. That we wouldn't take the money away. And, it looks to me like, it looks like the last presentation they started with, we have 16 CCO's and they're all doing well. That should have been the end of the conversation. Many of us were wondering if any of them were going to do well when they started. The fact that 16 of them are up and going and all running and operating in the black, we should stop for a minute and sort of celebrate that because we were very fearful that wasn't going to happen.

Then we go on to say, well 10 of them we're going to have to cut their rates a little bit. Six of them, we're going to give them more money. Another way of saying that is 10 of them did exactly what we asked them to do. We asked them to go out and find innovative ways to be collaborative in their community, to find ways to lower costs, to create healthier populations, and if we did that we wouldn't punish you. And here we are today talking about rates again, in just a very few short years. So I'm sad to hear that. I think that we are really going against the principles and the agreement and the negotiated position we had when we did this work.

I'll remind everybody, after all those months of meetings, after all those hours of listening to testimony, after all those 1,000's of pages of input that we received, and after we negotiated an agreement with providers and providers groups around this state, and after they signed a floor letter supporting and agreeing to enter this brand experiment with us, and we passed these bills across the floor with large bi-partisan majorities, we're back here today not only talking about going back to the old model, that caused us to have to do this work, but going back to the old model retroactively to last January. I can't even imagine how further from the promise made we can get then we are here today.

Thank you for your time.

Exhibit 9
Page 74 of 93
ALLISON00000292

Chair:              Thank you so much.  Thanks so much for coming out here.

Heatheringon:       Good afternoon, Madam Chair, Members of the Committee.  For the record, my name is Jeff Heatherington.  I'm the President and CEO of FamilyCare, and for the history, FamilyCare is a 31 year old Medicaid managed care company.  We're the oldest one now in the state and I'm pleased to say I've been in charge of FamilyCare ever since the day it started.  It doesn't mean I'm the oldest one in the state, however.

I'd like to, I'd like to address a few things right up front.  And it does not necessarily get us off to a happy start.  First of all, I want to talk about a couple of things that were represented here in testimony by the OHA.  Number one, they talk about the fact that this is a transparent process and a collaborative process.  I will tell you that none of that is true for FamilyCare's experience.  We have asked and asked and asked for multiple types of information.  We have gotten none of it.

In response to Senator Shield's question about were the Freedom of Information Act requests granted, the answer is no.  They were not.  We have not received any emails that we have asked for.  We have not received any other information that we have asked for.  And, in fact, we have a letter here that is in your packet that says that the OHA considers this information requested is a trade secret of the Oregon Health Authority.  Now, I don't know how you can get there and then say you have had transparency, but you will not.  We asked for multiple types of information.

One of the things that was most interesting that some members of the legislature were told was, well we only denied them three columns of information.  This is representative of about thirty some odd pages, I didn't count, but this is what was denied us in terms of information, and every page is a new number of columns.  By the time you get page four, you have 49 columns, most of them blacked out.  So when they say they were transparent and they let us know what happened, that is not accurate.  We haven't seen the information.  We don't know how the information was arrived at.  And we don't know what kind of adjustments they made during that process.

The next thing you were told was that CMS made them redo the rates.  We filed a demand for admission with the Oregon Health Authority, and that is a legal term that requires them to admit or deny certain questions.

One of the questions was, "Did CMS require you to make these rates retroactive, and did CMS require you to redo the rates?"  To date, they have not answered that question.  So for them to get up here and say that it did nothing, we've seen, we'll show you what the chair asked for.  In other words, do you have that in writing?  I think you should keep asking for that, because I don't think it exists, at least we have not seen it to date and we've been asking for this information for a long time.

Exhibit 9
Page 75 of 93
ALLISON00000293

The—with regard to actuarial soundness. The one thing you did not hear in this entire discussion, was that the rates for the individual CCO's were actuarially sound. They were not. The actuarial opinion clearly states that the regional rates are actuarially sound, and then clearly states that the rates for individual CCO's are not part of that certification. So they didn't certify individual CCO rates, and this is the first time in 30 years that they have not certified individual CCO rates, and our contract requires that they do so. And what bothers me about the testimony that in this three hearings, to date, is the truths that have been told only half way, that literally give you a wrong impression of what's going on. Because we have not all signed off on this. We are not all happy with this. Even the people that got the raises, will, in some cases tell you they don't think this was a good process.

Now the last thing that I'd like to talk about, and hopefully don't go over my time, is the question that was asked is, "Does profitability come into this rate setting process?" I would assert that it has, because of the way that they carefully worded each of their answers. That they used the cost templates that the plans turn in. Those cost templates do not separate profitability out from expenses. In other words, when most of the plans who have related entities submit their cost templates, profitability gets passed on to sub organizations is listed as an expense and counted as an expense.

So when you see the difference between FamilyCare's expense, as you did up on that slide versus say, Health Share's. Health Share has a capitated model for their related entities. Nothing wrong with that and this is not a criticism of Health Share, because it's a perfectly legitimate business plan. But they pass profitability through on—on to their subcapitated entities. The OHA has not counted those. And you can tell that by the graph that you see, because the graph that you see on that margin shows that FamilyCare had a whopping net margin, we had $73 Million in net profits, and that shows up on the cost reports that we turn in.

The cost report that's turned in by Health Share shows that they had fourteen and a half million dollars in net profits, and that's accurate. The problem with that is if you look at the, I hope I have that here, maybe I don't. There's a sheet right at the top, it shows a number of figures with the CCO's across the top, highlighted in yellow. That one that Senator Kruse has. If you look at that, it will show clearly down at the bottom, FamilyCare $73 Million in net profits, and yeah, and Health Share had 14.5. Well it doesn't show in the AHA reports, but it does show clearly in the Audited Financials of some of their subcontractors is that CareOregon had a net profit that solicited under the Tri-County Area of some $76 Million. Now if you add those two together, you get $91 Million. What's not shown, because the other audited reports are not as clear as CareOregon's, is what's the net profitability under Medicaid for Providence, Tuality, Kaiser and the three mental health county operations. So that's not in there, and there's no way for me to guess what they might be,

Exhibit 9
Page 76 of 93
ALLISON00000294

but that's not counted in their rate setting process, and they were very clear about that.

They told you that their rate setting process included basically their direct service costs, their subcapitated costs and their incentives. They left out again, they left out profits because they didn't consider that, you know. But I will tell you one thing, and I will close with this, every time we went and talked to them about what they were doing with the rates, both the January rates and these, the first thing out of the bureaucrats mouths was, well you guys made a lot of money this year. Now if someone says it once to me, I'll write it off. But when they say it six or seven times, over and over again, I think somehow it's playing into their methodology. Now it's just my belief, but I think they do. They included it. I firmly believe that $55 Million is nothing more than a claw back and, you know, there's all sorts of things wrong with, in my opinion, with what they did with these rates, but the biggest thing that's wrong with it, I'll go back to what the former recovering Rep. Tim Freeman said, and that is, "You know, this was a global budget, and it was a five year contract. It never was expected that we would spend all of our money within a budget year, and then move to zero and do it again in the next year."

We have distributed over $5 Million of our profitability in the year 2015, and we have more to distribute. We understood that's the way it was supposed to work—was that this was an ongoing operation. We didn't know it was year to year. And we think that the OHA is wrong in their methodology. They're wrong in their policy, and they have—the question that Senator Knopp asked, which was not answered, we believe the law is very clear that the rates are supposed to be set on a prospective basis, that they have no right to set them retroactively, and, you know, this is a whole departure from what was intended for the CCO program. Thank you.

Man:            First I'd like to say that former Rep. Freeman's not actually recovering, he's a County Commissioner now, so... [laughter].

Woman:         [Inaudible]

Man:            Jeff, you're talking about proprietary information, which I understand in private sector businesses. How does a public entity have proprietary information?

Heatheringon:   Beats me. There were some CCO's that said they were concerned about individual, individually identifiable providers, and that is not what we asked for. And we understand that that is really a trade secret of the individual CCO. But we were asking, we were asking for more global members, nothing that was individually identifiable, either by patient or by contract.

Man:            Thank you, Senator.

Exhibit 9
Page 77 of 93
ALLISON00000295

[Inaudible cross-talk]

Knopp:    Commissioner Freeman, first of all, he indicated that I was new. I'm actually recycled. [Laughter]. I did miss that period where you guys had some votes on some of this stuff. But, I have uh, can you give me an example of a risk adjustment and what we're talking about, because I am the lay person up here, so.

Freeman:    So, thank you, Vice-Chair, Sen. Kruse, and Sen. Knopp, and thank you for asking me that. And the example that we all heard 100 times was the air conditioner. The air conditioner in the window, right. We all heard that—let me use a different one, that really got me in this line of thinking. Because much like you, I am not a health care provider, I mean I own a gas station, so I'm not at all in the same place a lot of the people are on this. So the example that I heard, from one of the managed care organizations was, is they had a situation on their managed care organization where over time they had gotten to where they had a lot of babies being born, prematurely, addicted to drugs, from mothers that were addicted to drugs. And they were above the average and really going the wrong direction on that. And, of course, that brings in a lot of dollars. A premature baby born, and with all the issues associated with the health care costs, is very expensive. But down steam it is also very expensive. You have all the costs of what can be very high needs children throughout a lifetime, so a very expensive situation for the state and for the taxpayers of the state.

So this particular MCO identified that and said we're going to try something. And what they did, is they figured out what they wanted to try, knowing they wouldn't get paid for it, but they wanted to try this, and they found recovering, addicted women, in their community, and they hired them. They bought them cars and they sent them out into the community to find these women that were pregnant and becoming pregnant and they were addicted to drugs. And they brought them in for a variety of levels of treatment, connected them with housing, found ways to treat them with their addiction, through their health care, prenatal, and they found that they were able to move that dial. Babies were being born, more to term, healthier, and not addicted to drugs, and that was a very good thing. So guess what happened the next year when they did the risk adjustment. Oh they don't have that need anymore, so they took the money away.

That's the exact example that I remember of what we do not want to do. That's the problem with actuarial soundness. That's the problem with risk adjustment. It moves the whole entire idea of incentives and innovation away from the direction that's the cost savings for the total system, and it moves it to just the encounter data, and I think that is a huge mistake, and that is what I'm fearful this, and I, I heard the presentation. I know there's a few extra things in there, but I'm really fearful of moving backward.

Exhibit 9
Page 78 of 93
ALLISON00000296

Knopp:          Can I follow up.

Chair:          Yeah.

Knopp:          So, I appreciate you humanizing it, because sometimes we tend to get stuck on numbers in the legislature and look to the lives behind those numbers and see that. So, either one of you, or both of you. So you obviously have indicated that there's a problem. It sounds like there's several more people behind you that will indicate the same thing. So from a legislative perspective, what would you like to see the outcome be, and how can a legislature play a part in helping achieve that.

Freeman:        I have a short answer then you can go.

Heatheringon:   Go ahead.

Freeman:        Give it time. Excuse me, Sen. Kruse, Sen. Knopp, give it time. Let the process work for a while. This was an experiment, or an attempt, or an agreement over a period of time. You know, one thing that we didn't talk about, and I haven't heard yet, maybe some people will talk about it. We have this very small amount of data from a few months of the expanded populations. In rural Oregon, we haven't been able to hire the providers to spend the money on yet. So it's—we haven't had enough time to really see what's going on, so my advice is, slow down. We did a huge amount of change in a very quick period of time. Let it play out for a little while. Give it a little bit of time, sort of the dust to settle and see where it lands.

Heatheringon:   Sen. Kruse, Sen. Knopp, Members of the Committee. Having been in front of this body for way too many years, I would say that, you know, my first bit of advice is listen carefully. Just because you hear a lot of talk, and a lot of numbers and a lot of explanations, does not mean you are getting answer, and I think a lot of that has happened in the last two days.

                The other thing is, is in addition to getting the answer that you want, which is important, I think that the other thing is to clearly lay down to the agency what the policy issues are that you want them to follow. One of them is the global budget with a prospective rate. You know, everything you heard today is exactly the, 180% different direction from what the legislature said they wanted. And I think, you know, I know you only come into session every year, but maybe you have to say it again. And then the other thing I would say, if you don't see you get what you want, then you have to go to the head of the Executive Department and say, why aren't your agencies behaving the way we put down in law.

Chair:          Anything else.

Man:            It is interesting. I think one of the things we were supposed to do is get away from counting beans, clear and simple, and yet it still seems like we get back

80263014.1 0105026-00003

30

Exhibit 9
Page 79 of 93
ALLISON00000297

to counting things, and, and to a degree I know it's impossible not to count some things, but anyway.

Woman:    Mr. Chair.

Chair:    Yes.

Hayward:    I don't really know, and this is sort of a general comment rather than specifically for Commissioner Freeman or Mr. Heatherington. I completely appreciate the concerns that are being raised. That being said, I think it is important to remember that it was not the health authority's decision to revamp the rates. That was at the direction of CMS. It's unclear about whether CMS is pushing to do this retroactively or not, I—we need a little bit more clarity on that. But, it's not as if the health authority set the rates knowing that they were going to have to turn around and set them lower again. I agree that this is not playing out in ways that are easy for some of the CCO's. There's no question about that. I think your point about counting beans is real but the slides that we saw from Mr. Aters and others suggest that they are looking at more than just beans. They're looking at more than just a fee-for-service component and they are taking into account a range of services that the CCO's are providing in their communities. Not just the ones that are traditional. Mr. Heatherington, you seem like you really don't agree with anything I'm saying.

Heatherington:    Well, I...I wouldn't make it personal, Senator Kruse and Senator Steiner Hayward, but I think the information that you've been given is inaccurate and I'm...that's what I would say.

Hayward:    Then, Senator Kruse, I've had the privilege of hearing presentation on this twice in the past two days because I also serve on the Human Services Subcommittee, and we had a presentation on this issue yesterday. And I don't wish to belabor any points, but I'm very concerned about the ongoing disagreement between what materials have been provided and the methodology, and I don't really know how to approach that, Senator, and I...and colleagues, I'd be interested in your thoughts because we have the Health Authority, several people getting up here and saying here's what we did, here's how we did it, here are the numbers, here's the information we provided people, here's how we engage people, and we've got Mr. Heatherington sitting here saying none of that is accurate. And I don't know how to handle that. And I'd really appreciate guidance from any of you to think about that question.

Man:    I agree...

Man:    [Inaudible]

Man:    I mean, I asked to sit on the dais and listen to testimony and I agreed with the Chair that I would not speak. That was sort of the deal because...

Exhibit 9
Page 80 of 93
ALLISON00000298

Man:            But she's not here, so [inaudible] [laughter]

Man:            She may be watching…

Woman:          I'm still here.

[laughter]

Man:            That was close.

Man:            But I gave you permission, so you're okay.

Man:            I think this is one of those things where there's truth on both sides, and there's half-truths on both sides, too. I think that, from what I've been able to uncover in the last three or four weeks, that there's money in other systems and CCOs that's not being counted. An optimist could access that and could include it in their rates. I've got numbers now for the first quarter of this year that I just received and if they are correct…I haven't had a chance to look at them…the rate…the encounter data and cost for FamilyCare and Health Share is almost exactly the same for the first quarter. So why is one getting cuts and one getting more pay? I think there is also a situation here where the amount of money being paid for the expanded population may have been higher than it should have been, but we don't know yet because that's just ramping up. And the basic principle we have for those CCOs has been violated. The basic principle is we have a global budget that's prospective, is a five year program, and any savings that occur either by actions of the CCOs or "questionable overpayment by somebody" gets plowed back into the system and used to get more future savings as we attack the real issues here, which are people with multiple social issues. Now they're the ones driving the cost. We're now looking at 5% of the population driving a huge part of the cost—some people say up to 50%. That 5% have a lot of emotional, drug and alcohol, poverty issues, housing issues, and the idea is to attack that through the CCOs. We can't do this when money is being pulled back out. So that's my biggest concern here. We can argue forever about who gets what. But when we start pulling that kind of money out…and I assume since it's federal money it's not going back into the system, it's going back to the federal government I would assume…I may be wrong in that assumption, but we need to keep that money in the state and we…but we also need all the CCOs accountable for reinvesting that money in their communities in an effective fashion. I don't expect them to do that in twelve months, but over the period of two or three years I want to see a lot of housing built in Portland. I don't want to be stepping over people in the street any more in Portland. I mean I come up here to visit and I'm shocked by the way the City looks, and CCOs are designed to help deal with those issues, so I'll stop there. My biggest concern here is the basic principles of the CCOs have been violated and that's my biggest concern.

Exhibit 9
Page 81 of 93
ALLISON00000299

| | |
|---|---|
| Man: | In just a minute I'll turn the gavel over to you… |
| Man: | I'm sorry… |
| Woman: | Oh no!  I think it's fine. |
| Man: | May I speak?  In response to Senator Hayward's question as to what we do next, I would suggest, because we have a chair of policy committee and a co-chair of a budget committee dealing with this issue, that between…in the next few weeks we get a group together that doesn't violate quorum issues and we figure out what it is we want to hear during next legislative days.  Senator Bates, do you think that's an appropriate approach? |
| Bates: | Yeah, we may have to set a plan…we're running out of time.  Yeah, I know it's a real problem, and so we're going to have to make some tough decisions and hopefully we can work with the agency and come up with something that will work for all parties in a reasonable fashion, and CMS. |
| Man: | Our other partners who aren't in the room right now. |
| Man: | Okay, you can have control back, Madame Chair. |
| Chair: | Okay, I think we'll move to the next panel. |
| Man: | Thank you. |
| Chair: | Deb, is it Berggren?  Dave Nieman, and Sean Jessup?  Thank you for coming. |
| Woman: | Thank you. |
| Nieman: | Somebody start? |
| Chair: | Someone start, yeah. |
| Nieman: | Okay, sorry.  I'll go first.  Just give me one second to boot.  There we are. Good afternoon.  Chair Monnes-Anderson and Members of the Committee. For the record my name is Dave Nieman.  I am a fellow of the Society of Actuaries and a member of the American Academy of Actuaries.  Currently I serve as a senior consulting actuary for Wakely Consulting Group.  The Oregon Health Authority invited me here today to discuss my experience as a consulting actuary supporting CCOs through the 2015 rate development process.  Please note that I have participated in the rate setting process since the inception of CCOs, so I was there in September 2012 when the initial global budgets were set.  It is important to note that the opinions expressed are those of the speaker.  They do not represent those of the Society of Actuaries, American Academy of Actuaries, nor the Actuarial Standard Boards, nor Wakely Consulting Group, nor any Oregon CCO.  These are my opinions.  In addition to participating in the Oregon rate setting process, I have in excess of |

33

Exhibit 9
Page 82 of 93
ALLISON00000300

ten years of Medicaid rate setting experience, worked in Minnesota, Iowa, Michigan, witnessed what's unfolding in Illinois. So I have a broad sense of, you know, experience across the country. I am also an active participant on Society of Actuaries Medicaid Work Group, which has included various speaking engagements and publications.

So in my experience, you know, through the past ten years of Medicaid rate setting, those most effective are supported by a clear understanding of the data used and the methodology applied. Two critical components to achieve this success are communication and collaboration. The 2015 process implemented, including the weekly checkpoints, which were attended by all of my actuarial counterparts within all of the various CCOs, met my expectations on both fronts. Never in a rate setting process previous have I had the opportunity to engage in the consulting actuaries and the, you know, the department staff, more than once or twice. I was given an opportunity weekly in a public forum, as well as multiple meetings I a private forum. Hiring the external actuaries to support the process resulted in significant improvements relative to the initial September 2012 rate setting process. I clearly understood the underlying base data and its applicability, the projection factors, and the models utilized to develop rates. This is the first time in my actuarial career than an Excel based model to set rates was provided to me. This is the ultimate…you know, gives me the ultimate comfort in the process that took place. Also, again, at each step in the process and on weekly forums I was able to solicit feedbacks. At no time did I feel my feedback was given thought and consideration. Of course, we're not always going to agree…the state entities and the CCO…on the final decision. However, the decisions made throughout the process never lacked support via data or reasoning. I participated in many state engagements in which my feedback was blown off. It didn't happen throughout this process.

From an actuarial perspective, the process implemented followed generally accepted practices and principles. The following are some examples. First, I think it's important to understand that the rates were rebased. The prior global budget that we've been pushing forward was based on 2012 capitation rates, which was based on 2010 experience. A rebase, or a reset, I mean Medicaid populations have high churn. They change rapidly. However, this never occurred until this 2015 rate development process. And the outcome of doing this is updating the underlying data for improved alignment of program specific risks and capitation rates. The benefits include, as mentioned previously, is a proper allocation of rates within an area and rates between eligibility categories. There is also a redistribution of funds between the ACA and non ACA, which was shown. An important detail that has been left out of every presentation to date is this mitigates the risk of minimum loss ratio or medical loss ratio payment. So if you recall, to the extent that medical loss ratio for the ACA was less than 80%, there is going to be checks cut back to CMS. So I think what would have been helpful through this process is to see what's the rate change, what's the effective rate change. Because the starting,

Exhibit 9
Page 83 of 93
ALLISON00000301

or the rates of the ACA starting point weren't adjusted to reflect the likelihood of payment, and in doing this it keeps money in the system. By shifting from the ACA to the non ACA, more money stayed within the system. The base data used were appropriate. Most recent data sources were utilized. All expense data were incorporated, including those related to alternative payment methodologies. I spent countless hours on the phone communicating the various payment methodologies underlying CCOs within my work, and getting the proper allocation of those expenses, those that happen outside of the adjudication process. Medical expenses were reconciled to medical expenses from related entity financial statements. Again, countless hours for us to do the reconciliation process to adjust financial exhibits to reflect the true underlying expenses at the entity level, and not the subcapitation arrangement reflected in such organization. The risk adjustment process is consistent with the other states in which I work. It's an improvement in the rate setting process relative to prior years as it recognizes population morbidity differences within a region. There was also careful consideration given to the appropriateness of risk adjustment factors for each eligibility category. It's been previously mentioned that the ACA groups, the experience didn't have an appropriate duration for risk adjustment, that cost based relativity was applied. However, for certain eligibility categories like newborns, the risk adjustment is an implied in the rate setting process, given the inability of organizations, or health systems, have a likelihood of at risk newborns. So that specifically...that rate category is not risk adjusted. And OHA committed to monitoring results tied to _____ improvement opportunities, which I think is important. It's not just a one-time deal. So in my opinion the process was fair. All data and methods were publicly discussed. And the conclusions reached were supported and clearly communicated.

So far the focus of my presentation has been on the state rate setting process. It's critical to not forget our federal partner, CMS. It is clear through CMS guidance and actions there is an enhanced emphasis on the Medicaid rate setting process and its oversight. The changes discussed today align with new expectations. It is reasonable to assume that the changes implemented will be well received by CMS, now and into the future rate setting development periods. A process that allows for efficient review by CMS significantly reduces the administrative burden on the program. Thank you for the opportunity for me to share my experiences working through the 2015 rate development process.

Chair:    Thank you very much. Appreciate it.

Berggren:    Good afternoon, Chair Monnes-Anderson and Members of the Committee. For the record, my name is Deb Berggren and I am the Rates Manager for CareOregon, serving three Coordinated Care Organizations, Yamhill, Columbia-Pacific, and Jackson Care Connect. I am here today to discuss our experience with the rate development process. Again, thank you for the

80263014.1 0105026-00003

35

Exhibit 9
Page 84 of 93
ALLISON00000302

opportunity to meet with this Committee. I would like to share my experience with just how the process unfolded. As the rate manager for CareOregon, I'm proud to provide rate setting assistance to three community based CCOs. Yamhill CCO is located in McMinnville, and predominantly services 22,000 members in Yamhill County. Jackson Care Connect is located in Medford and numbers 29,000 members. Columbia-Pacific...I'll defer and let Mimi Hayley tell you more about that. But I would like to point out that it is located on the Coast and serves members living in Clatsop, Columbia, and Tillamook counties.

So I help CCOs across a diverse spectrum. Overall, I found the process to improve the rate methodology to be both transparent and fair. The new revised rate methodology I believe will better ensure that the state of Oregon can consistently and accurately develop actuarially sound rates in a predictable and timely fashion. It's important for the CCOs that I serve that there is a rate development process in place that will consistently and predictably produce rates that will be efficiently approved by CMS. It's very important. In June 2015, CMS released draft guidance that clearly sends the message that the CMS approval process will be driven by actuarial principles, processes, and documentation. They are our partners. Fortunately, I do see this as a positive development requiring all managed care...excuse me...management _____ care entities to use data driven approaches to develop fair, transparent and financially sustainable rates. The new rate methodology process will better position both the state of Oregon and CCOs to meet CMS' rate setting expectations.

In general I believe that this new rate methodology was well designed and will prove to be sustainable, reliable, and a valuable tool for current and future rate setting. During the last six months, as the new improved rate methodology was being developed, both OHA and Optumas demonstrated very strong leadership over the improvement process. Effecting major change across multiple organizations can be a daunting task, but overall the revision process was extremely well organized and effectively and efficiently implemented. I appreciated the opportunities for consistent and complete communication with both OHA and Optumas. Early on in the revision process the state proved to be a very collaborative partner, acknowledging and responding to CCO needs, questions, and concerns. One example was the state establishing not only a monthly rate workgroup, but also choosing to implement a weekly actuary meeting to discuss assumptions and solve for answers to technical issues. Providing that weekly forum for communication between all stakeholders was invaluable. That critical step helped to make the process more organized, collaborative, and transparent. Ideas were shared, problems were solved, but most importantly OHA and Optumas took great effort to keep CCOs abreast on how the rate revision process was being evolved into a sustainable model. Thank you.

Chair:                    Thank you very much.

Exhibit 9
Page 85 of 93
ALLISON00000303

Jessup:    Good afternoon, Chair Monnes-Anderson and Members of the Committee. For the record my name is Sean Jessup, and I'm the Director of Medicaid Programs at Moda Health and the Eastern Oregon CCO. I'm here today to talk about our experience with the rate setting process. So I'll start off by saying that having in-house actuaries within our CCO was a key factor in understanding the details, approach, and assumptions used by Optumas throughout the rate redevelopment process. Additionally, having in-house actuaries that understand our organization, our finances, the nuances of our utilization data, and the unique features of our CCO, such as our alternative payment methodology, how we allocate for costs that are not in the encounter data, and our rural geography, were all essential components to our interaction with Optumas and OHA. And I would say being able to speak actuary to actuary was key. Overall we felt there was adequate transparency throughout the process. We understood the approach and models and assumptions that were being used. Both OHA and Optumas staff were available to us when needed to answer questions. And additionally, there was regular communication about how CMS and the Office of Actuary were responding to the approach and assumptions Optumas was using or planning to use.

As a reminder for the Committee, EOCCO operates in twelve rural and frontier counties in Eastern Oregon. We serve nearly 50,000 members across 50,000 square miles, and our members have limited access to care and services. And because we are a rural only CCO there are some unique funding issues that must be addressed as part of any rate development process. For example, there are ten rural hospitals operating within our twelve county geography. Seven of the ten are Type A Critical Access Hospitals and five of the ten are part of Health Districts. As part of the rate setting process we had to ensure that we continue to receive adequate funding to reimburse our rural hospitals at their cost of providing care to Medicaid members so that they can continue to provide and expand upon the services available within their local communities. And Optumas did account for our prevalence of Type A Critical Access Hospital utilization within our CCO and adjusted our rate accordingly.

Another unique feature of our CCO is the fact that we have no tertiary hospitals within our twelve county geography. And this feature is significant because not all hospital…high level hospital care such as trauma care, complicated deliveries and neonatal care are provided at larger tertiary centers, and for us those tertiary centers are primarily located out of state in Boise, Idaho, and the Tri-Cities in Washington State, and in Central Oregon or in Portland.

Now during the review of the proposed methodology to pay CCOs for newborn deliveries, we noted through the initial methodology that out of state hospital costs were not going to be included in the methodology. Well, this was a huge concern for us as the majority of our high cost deliveries are performed out of state, and when we provided this feedback to Optumas about

Exhibit 9
Page 86 of 93
ALLISON00000304

this issue they modified the methodology to include the out of state hospital costs for all the CCOs.

And then I'd say that finally throughout the rate redevelopment process we were able to submit data and report substantiating our 2015 emerging experience, which would not have been available in the initial 2015 rate setting. This was particularly important for us as we began to see higher costs and trends for the ACA population as they began to use higher levels of service in 2015, and additionally we were able to provide emerging experience and our increased utilization of utilization of high cost specialty medications specifically around paying for more Hep-C medications.

So in closing we felt that OHA and Optumas took into consideration the unique needs and features of operating within a rural geography as rates were developed, and while this process has and continues to be a tremendous amount of work for our staff, we were satisfied with the overall process. And our hope moving forward is that we will not now see an over-correction to this level setting of the rates and that we will begin to see future years and build towards the sustainable rate of growth that is aligned with the global budget. Thank you.

Chair:       Appreciate it. Thanks so much for coming. All right. Questions? All right. Mimi Hayley and Tayo Akins? And I believe that's it for this segment. We're almost on schedule. There isn't anyone else that was going to…please proceed.

Hayley:      Thank you very much. Chairwoman Monnes-Anderson, Members of the Committee. For the record my name is Mimi Hayley. I am the Executive Director of Columbia-Pacific CCO, and I have served in that role since its inception in September of 2012. As Deb Berggren mentioned, Columbia-Pacific CCO includes three rural counties in the Northwest of Oregon. That's Columbia, Tillamook, and Clatsop counties. We serve approximately 25,000 members and we've had a very interesting growth pattern. I would call it a stair step growth pattern. We started with 7,000 members. Within two months the state rolled over 5500 fee for service open card patients onto our CCO, folks who had never experienced managed Medicaid before. And with the ACA we grew by 80% to over 28,000 members by the end of 2014. And that was a stunning growth given that we had no commensurate increase in the number of primary care behavioral health or dental providers in that service area.

So I do want to address, as you've heard, a lot of technical details about the rate setting processes. As an executive of a CCO I can't actually understand a lot of those details, but I do understand there were several features of the process that were very important to me and my CCO. I do believe that this new rate setting process, while this is a bumpy year, will ultimately lead to better sustainability and more predictability in terms of the rates that we can

Exhibit 9
Page 87 of 93
ALLISON00000305

expect to receive to care for the members that we have. Unlike some of the CCOs…in fact maybe all of the CCOs…we saw an immediate increase in the utilization of the ACA population that enrolled with our CCO. We did not appear to have some of the laggardly behaviors, and in fact we saw increases in utilization that were consistent with the population that we enrolled, which were largely older, uninsured adults. So increases in imaging and a lot of outpatient surgical procedures. Our CCO is served primarily by eight major clinics. Some of them are system clinics—Providence, Adventist, OHSU. Several of them are federal qualified health centers. All of our hospitals are Critical Access, or AB Hospitals as you've heard referenced before. And all of our outpatient services are provided by those same outpatient…excuse me, by those same AB Hospitals. Some of our services, as Sean mentioned, are provided in the Portland area. All of the addiction services in our CCO require travel to Portland.

So it was very important to us that the state and Optumas deployed several methodologies that really accounted for the unique characteristics of Columbia-Pacific CCO. The first was to apply these emerging trends of the ACA experience to the base year data. That was very important and we appreciated the fact that OHA took the additional time that they needed to take, some of which was unintended, but they did use that extra time to allow that emerging date to support the trends that we had seen early on. We were able to provide them with information that saw what we were seeing with our ACA population, which was different from the other CCOs, including those CCOs that Deb referenced that she supports on behalf of CareOregon.

The other significant change in this rate setting methodology that we appreciated was the factoring of the AB Hospitals in the rate setting process. As I mentioned, we asked that the AB factors be applied to both outpatient hospital services as well as inpatient services, as the majority of our services are provided on an outpatient basis. And they did take that into account with the rate adjustment process for our CCO and the other CCOs that rely on Critical Access Hospitals. And as you recall and know, Critical Access Hospitals are paid on a cost basis, not on a contracted rate basis. And so for our CCO those services approximate 60% of our total medical spend, which is a significant amount of the dollars coming into our CCO and therefore the adjustment was critical to our ability to be able to continue to provide services.

The third thing that we appreciated was the underlying risk adjusted, member specific risk adjustment methodology that allowed the underlying risk of the CCO's specific population to be accounted for in the rate setting process. And you've heard about that quite a bit from the prior presenters, but that has been a critical change in the rate setting process—to look at the risk of our population, which is different from the risk of other populations in the CCO. So that was an additional factor that was taken into account.

80263014.1 0105026-00003

39

Exhibit 9
Page 88 of 93
ALLISON00000306

And the fourth that represented the state and Optumas' willingness to listen to us was the issue of the rating regions. Columbia-Pacific was originally put into the same rating region as the Portland Metro area, and the delivery system and the population I would argue are significantly different. And so they did create a fourth rating region, which is the Northwest Region. There are four CCOs in that region, of which we are one, and I believe that is much more reflective of a shared delivery system and care experience for the members that we serve.

I will say that although profitability has been mentioned a couple of times and is not really a factor in the rate setting process, I will say that Columbia-Pacific has not been one of those CCOs that is sustainable without the financial backing of CareOregon. We…our margin in 2013 was about $100,000, and that's off a revenue base of about $50 million. Our margin in 2014 was about $800,000. And I think you can all appreciate that that is insufficient for transformation. If we're really going to transform our health system in some of the ways that we all hope CCOs are able to do, then we need to have sufficient margin to be able to do that. And several…prior testimony indicated, and I believe it was Senator Bates who said that we should be plowing that money back into our communities, and that is exactly what we are doing with whatever it is we generate. So I do believe that going forward that we need to figure out how to reconcile the global budget with this new rate setting methodology that CMS is requiring of the state of Oregon and of the CCOs within that. I think we can do that together. I'm fairly optimistic that we can find a way to do that. I do believe that there are some things that we all need to take into account, including the unsustainable trend with pharmacy costs, and I don't think that's news to anybody. It's not unique to Medicaid and it's certainly not unique to this state. But it is something that will be a budget buster if we don't collectively address it. So I think that moving forward we have an opportunity to set the rates in 2015. I think that we're going to hear more this week about our 2016 rates. And that gives us an opportunity then to move on and to move forward with figuring out some of these other things that allow alternative payment methodology and transformation and innovation to be part of the process of the setting of the rates. Thank you very much.

| | |
|---|---|
| Chair: | Thank you so much. |
| Akins: | Good afternoon. Good afternoon, Chair Anderson and Members of the Committee. For the record my name is Tayo Akins and I am the CE of Cascade Health Alliance. I'm here today to discuss my experience regarding the rate… |
| Chair: | Could you put your…yeah…no… |
| Woman: | You don't have to be that close. |

80263014.1 0105026-00003

40

Exhibit 9
Page 89 of 93
ALLISON00000307

| | |
|---|---|
| Chair: | Yeah. |
| Akins: | Okay. Let me start over. Good afternoon… |
| Chair: | No, you're too close… |
| Woman: | They're very sensitive. You can just talk normal. |
| Akins. | Oh. All right. Good afternoon, Chair Anderson and Members of the Committee. For the record my name is Tayo Akins and I'm the CE of Cascade Health Alliance based in Klamath Falls, Klamath County. I'm here today to discuss my experience regarding the rates redevelopment process. So I'm going to break down my…the process into three major buckets. Cascade Health Alliance is one of the smallest CCOs and we went into effect in September 2013. As a result of the ACA expansion, we attracted members who were actually more chronically ill. And as you probably know, Klamath County has one of the worst health care outcome. So as we looked through this rate setting…and I've been on the job for seven months…so I'll describe this in buckets. So looking through…I'm going to describe it…one…previous rate setting, the current rate settings, and the impacts. |

So prior in 2015 as I got on board and talked to my interim, obviously my predecessors here [inaudible] but also talked to my prior interim CEO, the rate…the prior rate process was described as follows: lack of transparency, chaos and frustration, inconsistency regarding data, variation in rate settings, last minute deadline to sign a contract. So that was the prior process.

This current process, which I was part of, was data driven, with structured approach to rate setting, which has actuarial soundness. It was painfully transparent. And it was painfully collaborative. As part of you might know, I've been other state. Oregon happens to be one of those application states. So you apply. If you meet the standards you get the membership. If this was an hour and piece state where you procure the Medicare process, this would not be as transparent. So this process from our perspective was very transparent, was very structured around data. We can understand it. We talked to our actuary to understand the logic that drives everything behind it. And because we have one of the worst health outcome, obviously the rate aligns with risk. We're taking on more risk. We have more emerging experience. And I'm not…I mean I know a lot of people talked about emerging experience. It's basically, we're taking on a lot more chronic ill members. So we want to take care of our members and transform the delivery of care. And this rate setting process aligns and rebased in such a way that we are fairly compensated for the members that you and I are allowed to…for our members.

So, I haven't talked about the current…the previous process and the current process, the impacts. These are the impacts. Rate of state's transparency,

Exhibit 9
Page 90 of 93
ALLISON00000308

need for documentation, which we've talked about in terms of data. Each rate cell must be actuarially sound. And Optumas, I mean they were really transparent. I've never...I've been...out of all the states that we've looked at [inaudible] in terms of my prior life, this is as transparent as it can humanly possibly be. And obviously, in order to...as part of the waiver, this is a three-way partnership. CMS, OHA, and Oregon. So, in order to reach sustainable growth rate, you need to base line as part of the global budgets. And obviously, as Zach indicated, all this has to be actuarially sound in order for him to certify it and has to meet CMS requirement in order for it to be actuarially sound and obviously that benefits us. Thank you for allowing me to share my experience.

Chair:     That's wonderful. Thank you. Thank you very much. All right. I would love to call OHA back, but I won't, only because...I think that...first of all, thank you, everyone who testified. It's extremely important to have this onboard. We do have one more item on the agenda, but what...what I will want to work on with OHA is regarding I think the rates. Lynne, do you want to come up? The rates are going to be set October 6th, is that what you said for the 2015? What I had heard is there is concern about the 2015 rates. You know, 2016, you're going to have those ready and then 2016 will go. So it's the retroactivity in the 2015 rates that is a real issue for the losers, not for the winners of course because they would love to have more money. And the third thing...okay, rates, retroactivity, and then the third thing was the request for public records. You know, one CCO said it was not provided, and you did say they were provided. So those are three things that I would like to talk with you, not here, but, you know, in the future, so that we can...I have no idea if there are legislators that are going to want to have legislation or not, but I think that for me and I'm sure there are members that might want to speak with you, so...

Man:     Can I make one quick comment?

Chair:     Yeah.

Man:     I am concerned about what appears to be the lack of transparency in this document. And I think this document actually, I'm 90% sure is incorrect. I was very familiar with the Karen Kirsch rate review case and if you look at that great journalistic website, the one report going back to 2009...

[laughter]

...you'll notice that what...my understanding is that what the Department of Justice said is that for something to be withheld it not just has to be a trade secret that might affect a competitor, but it has to be injurious to competition in the marketplace, and I think what the OJ told the Department of Consumer and Business Services is you have to disclose the rate filings because you can't argue that it's injurious to competition, that that argument did not hold.

Exhibit 9
Page 91 of 93
ALLISON00000309

|   |   |
|---|---|
| | So I would be interested in having you guys take a second look at this memo and get back to me whether or not you still believe the Kirsch matter means that you don't have to provide public records of this matter. |
| Woman: | So, Chair Monnes-Anderson, Members of the Committee, thank you for this time today. I believe I know the letter you are referencing… |
| Chair: | Your name, Lynne. |
| Saxton: | Lynne Saxton, Director of the Oregon Health Authority. Can you give me the date of the letter and who it was sent to? I don't have it before me. |
| Man: | Yes, August 25, 2015, to Kelly Knivila at Stoel Rives. |
| Saxton: | So, with regard to that letter, I certainly am happy to check with our attorney so we can get back…her name is Reneé Stineman…and probably I'll just have her respond directly to you. I'm happy to answer all the questions you asked and any other questions there are, but I know we're anxious to wrap up. There is…obviously, we have, in the redevelopment of 2015 rates, which was we all agree collectively is not a desirable process. However, we do have to have rates. We do have to have rates approved by CMS. We will be working with the CCOs tomorrow…Thursday, not tomorrow…to begin looking at the 2016 rates. I've looked at the preliminary data. I think the CCOs are going to see sustainable opportunities…sustainability there, number one. Number two, one of my goals when I started this job at the end of January was to ensure that all the partners to Oregon's health transformation leaned in. And I want to thank the committee today for leaning in and going through the exhaustive discussion that rate setting requires and we will have more information available to you this week, so we'll look forward to sharing that with you. I and my office are happy to answer any questions any time. We've been meeting individually with members and we're happy to do that. |
| Chair: | Thank you so much… |
| Saxton: | Thank you. |
| Chair: | …appreciated for everyone. All right. All right, the last agenda item is a presentation on Ambulatory Surgical Centers and Extended Care. Marilynn Daberkow, Shelley Yuva, Catherine Seiler, and Chris Skagen. |

[2:28:10.9]

[end of meeting relating to CCO rate setting]

---

[i] Need evidence of the need for "correction" and "when".

Exhibit 9
Page 92 of 93
ALLISON00000310

Exhibit 9
Page 93 of 93
ALLISON00000311