

**manatt**

manatt | phelps | phillips



| | |
|---|---|
| To: | Oregon Health Authority |
| From: | Anne Karl, Manatt, Phelps & Phillips LLP |
| Date: | November 30, 2017 |
| Subject: | Assessment of Process for Setting 2018 Rates for Coordinated Care Organizations |

You have asked us to review the process used by the Oregon Health Authority (OHA or "the State"), working with its actuary, Optumas, to develop the calendar year 2018 capitation rates for Coordinated Care Organizations (CCOs) to evaluate whether the State's process complies with federal statutes, rules, guidance, and waiver terms (collectively, "federal requirements") and state law and regulations related to CCOs.[1]

Based on our review of the documents provided, conversations with OHA staff, and discussions with Optumas, we conclude that the State generally complied with the federal requirements, with the exception of a few minor areas. Specifically, the State did not consider medical loss ratio in the development of rates, and the Centers for Medicare & Medicaid Services (CMS) may require that the State resubmit the rates after taking into account historic and projected medical loss ratios. Additionally, the State did not comply with requirements in the special terms and conditions governing the State's waiver related to the development of the non-benefit component of the rate—namely, how it develops profit margins and how it accounts for flexible services. CMS may mandate minor adjustments to the rates to comply with these requirements, though it is unclear whether the requirements related to developing profit margins have taken effect. In addition to the two areas where CMS may conclude that the State did not fully comply with federal requirements related to developing rates, CMS may also request that the State submit additional documentation to describe in greater detail various adjustments and assumptions that Optumas made.

---

[1] We note that there were no state statutory or regulatory provisions directly affecting the CCO rate-setting process.

**Manatt, Phelps & Phillips, LLP**
7 Times Square, New York, New York 10036
Telephone: 212.790.4500

Exhibit 19
Page 1 of 26

MPP00000284



## I.    Background

### A.    The Oregon Health Plan and CCOs

Oregon, like many other states, contracts with organizations to arrange and pay for services to its Medicaid and Children's Health Insurance Program (CHIP) enrollees.[2] Oregon's program, referred to as the Oregon Health Plan, is authorized as a demonstration project under Section 1115 of the Social Security Act.[3]

Under Section 1115, the Secretary of Health and Human Services has broad latitude to waive federal requirements and authorize federal expenditures that would not otherwise be available to enable states to test innovative approaches to administering their Medicaid programs. All federal laws and rules apply to Section 1115 demonstrations, unless the Special Terms and Conditions (STCs) governing the 1115 demonstration expressly state otherwise. In addition to specifying which federal laws and rules do not apply to the demonstration, the STCs establish a framework for how the state may implement the program, impose obligations on the state related to spending and reporting, and describe the oversight process of the CMS.

The Oregon Health Plan is the State's longstanding 1115 demonstration. It was first authorized in 1994 and has been amended frequently as the program has evolved. In 2012, CMS approved an amendment to the Oregon Health Plan allowing the State to shift the delivery of care from managed care entities to CCOs—defined as community-based comprehensive managed care organizations (MCOs) that operate under a risk contract with the State.[4] The 2012 amendment also held the State accountable for achieving certain cost growth targets. The STCs were subsequently amended again in 2013, 2014, 2015, and 2016. In January 2017, the demonstration was extended through June 2022.

A brief overview of the waiver terms relevant to this analysis are below.

#### 1.    Global budgets

STC 36 provides that the State will employ "global budgets" to compensate CCOs. The STCs define a global budget as "representing the total cost of care for all services for which the CCOs

---

[2] Rate setting for Medicaid managed care is subject to more stringent requirements than rate setting for CHIP. See 42 C.F.R. § 457.1203. Oregon, however, incorporates CHIP in the Medicaid managed care rate-setting process. For example, a CCO will receive the same rate for a seven-year-old child, regardless of whether that child is covered through CHIP or Medicaid. In other words, Oregon voluntarily applies Medicaid's more stringent rate-setting requirements to its CHIP enrollees.

[3] Social Security Act § 1115(a).

[4] STC ¶ 24. All citations to the STCs refer to the most current set of STCs, which reflect the extension approved January 12, 2017 through June 30, 2022. The STCs are available at https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/or/or-health-plan2-ca.pdf.

Exhibit 19
Page 2 of 26
MPP00000285



manatt | phelps | phillips

are responsible and held accountable for managing, either through performance incentives and/or being at financial risk for paying for health care services."[5] The STCs specify that the CCOs bear financial risk under the global budget for all health care services included in Attachment F to the STCs.[6]

### 2.    Bending the Medicaid cost curve

One of the primary goals of the 2012 demonstration amendment was to reduce cost growth in Medicaid. Under the 2012 amendment, the State was required to reduce cost growth in Medicaid by 2 percentage points below the projected trend of 5.4% included in the President's budget. The State achieved its goal of bringing cost growth down to 3.4% by June 30, 2015.[7] Under the 2017 demonstration extension and amendment, the State continues to be required to keep the Medicaid cost growth trend at 3.4%.[8]

### 3.    Setting capitation rates

The STCs provide that the State must meet the requirements of 42 C.F.R. Part 438— the rules governing Medicaid managed care organizations—"unless a requirement of part 438 has been identified in the waiver authorities for this demonstration."[9] The only provisions of Part 438 that have been waived allow the State to shorten the time period for disenrollment without cause and to contract with only one plan for dental services and one plan for mental health services.[10] Accordingly, all federal rules related to rate setting apply to Oregon's setting of CCO rates.

Federal rules require that capitation payments to managed care organizations be "based only upon services covered under the state plan and additional services [necessary to comply with mental health parity requirements]."[11] The STCs, however, contemplate that CCOs will "consider using alternative services including, 'in-lieu of services' pursuant to 438.3(e)(2), 'health-related services,' 'flexible services,' and 'non-encounterable services,'" as well as value-added services.[12] The STCs specify that health-related or flexible services may not be included as costs in developing capitation rates, while "in lieu of" services may be included in capitation rates in accordance with requirements at 42 C.F.R. § 438.3(e)(2).

---

[5] STC ¶ 36(b). State statute defines global budget as "a total amount established prospectively by the Oregon Health Authority to be paid to a coordinated care organization for the delivery of, management of, access to and quality of the health care delivered to members of the coordinated care organization." OR. REV. STAT. §414.025(8).

[6] STC ¶ 36(b).

[7] STCs Section II.

[8] STC ¶ 47.

[9] STC ¶ 27.

[10] STCs, Waiver List and Expenditure Authorities, ¶ 7.

[11] 42 C.F.R. § 438.3(c)(1)(ii).

[12] STC ¶ 36(d).

3

Exhibit 19
Page 3 of 26

MPP00000286


manatt | phelps | phillips

Federal rules specify that capitation rates include a non-benefit component to account for administrative expenses, risk margin, cost of capital, taxes, licensing and regulatory fees, and contribution to reserves. The rules require that the non-benefit component of the rate include "reasonable, appropriate, and attainable" expenses related to these categories but otherwise afford states flexibility in how to develop the non-benefit component of the rate. The STCs, however, also require that the State "will develop capitation rates with a profit margin that varies by CCO, as opposed to a fixed percentage of premium for each CCO."[13] The STCs require that capitation rates for CCOs identified as high performing—defined as "those showing quality improvement and cost reduction in the previous years"[14]—have higher profit margins built into their capitation rates than lower performing CCOs. The STCs require that this aspect of the capitation rate development "be a separate mechanism from the incentive pool."[15] The STCs are silent, however, on when the requirement to vary profit margins based on CCO performance takes effect. The STCs specify that the State "will" develop these differential profit margins, but they do not say at what point the State must begin doing so.

### 4.    Transparency

The STCs emphasize transparency in administering the Oregon Health Plan. The references to transparency do not, however, address the rate-setting process. The STCs require that the State comply with transparency requirements outlined in federal rules if it intends to extend the demonstration.[16] Additionally, the STCs require the State to provide Oregon Health Plan enrollees with information needed to make informed choices, including with respect to CCO performance on state-selected quality measures.[17] There are no requirements expressly requiring transparency in the rate-setting process, and thus no further analysis is required.

### B.    CMS Oversight of Managed Care Rate Setting

CMS must review and approve all contracts with managed care plans[18] and all capitation rates paid to those managed care plans.[19] States must submit along with the rates an actuary's certification that the rates are actuarially sound and were developed in a manner that complies with federal requirements, including specifically that the rates are based only on services covered under the State Plan, services needed to comply with mental health parity requirements, or services that a plan offers to enrollees as an option in lieu of other covered services—referred to as an "in lieu of" service (unless another statute or regulation specifies that the costs of such "in

---

[13] STC ¶ 36(e)(ii)
[14] Id.
[15] Id.
[16] STC ¶ 8(b)
[17] STC ¶ 33
[18] 42 CFR § 438.3(a)
[19] 42 CFR § 438.4(b).

4

Exhibit 19
Page 4 of 26
MPP00000287



manatt | phelps | phillips

lieu of" service may not be accounted for in developing the capitation rate).[20] Federal financial participation is not available if the managed care contract or its rates does not have prior approval from CMS.[21]

Prior to 2013, CMS did not generally review the processes each state used to set capitation rates, relying instead on the certification by an actuary that the rates were actuarially sound and developed in compliance with the applicable rules. Beginning in fall 2013, however, CMS began reviewing more actively the processes used by states to set rates. Working with the CMS Office of the Actuary, CMS issued a "rate-setting consultation guide" describing in more detail how states should set capitation rates and met with states to discuss their processes for setting rates. CMS also expressed the intent to improve its oversight of capitated arrangements.[22] In 2015, the GAO issued a report concluding that further oversight of Medicaid managed care programs was necessary, specifically noting that CMS needed better data and processes to ensure that managed care payments were appropriate.[23]

As part of its efforts to improve oversight of Medicaid managed care programs, including managed care capitation rates, CMS issued a sweeping final rule in May 2016 (referred to as the "2016 final rule").[24] As CMS noted in the preamble to the 2016 final rule, the rule was intended to "adopt[ ] procedures and standards to ensure accountability and strengthen program integrity to ensure the appropriate stewardship of [Medicaid] funds."[25]

The rule, among other things, established detailed standards for developing rates.[26] These standards include requirements related to the age of data used to set rates, guidelines for establishing trend rates, the factors that may be considered when setting the non-benefit component of the rate, the scope of appropriate adjustments to capitation rates, and the parameters for risk adjustment approaches.

CMS also issued an updated rate-setting consultation guide, providing sub-regulatory guidance on how states should develop capitation rates in order to comply with the standards set forth in the 2016 final rule. The most recent rate-setting consultation guide, titled the 2017 – 2018 Medicaid Managed Care Rate Development Guide (the "Guide"), applies to rating periods starting

---

[20] 42 C.F.R. § 438.4(b)(6).

[21] 42 C.F.R. § 438.806.

[22] Statement by Cindy Mann, Director, Center for Medicaid and CHIP Services, to Committee on Oversight & Government Reform (July 29, 2014).

[23] GAO, High-Risk Series: An Update, GAO-15-290, Feb. 11, 2015.

[24] Medicaid and Children's Health Insurance Program (CHIP) Programs; Medicaid Managed Care, CHIP Delivered in Managed Care, and Revisions Related to Third Party Liability, 81 Fed. Reg. 27,497 (May 6, 2016). The proposed rule can be found at Medicaid and Children's Health Insurance Program (CHIP) Programs; Medicaid Managed Care, CHIP Delivered in Managed Care, 80 Fed. Reg. 31,097 (June 1, 2015).

[25] 81 Fed. Reg. at 27,501.

[26] 42 CFR § 438.5.

5

Exhibit 19
Page 5 of 26

MPP00000288



manatt | phelps | phillips

July 1, 2017 through June 30, 2018—the period encompassing the rates reviewed here.[27] The rate-setting consultation guide provides detailed specifications for how states should develop rates and how CMS expects that states will document their rate-setting processes.

### C.    OHA Rate Setting

For calendar years 2011 to 2014, OHA established rates for CCOs using a rate-setting methodology developed by OHA's in-house actuaries. Under that methodology, the CCOs reported their costs and expected trends, and OHA reviewed those projections for reasonableness. OHA would increase or decrease rates to remain consistent with the target growth rate specified in the Section 1115 demonstration STCs.

In its review of the 2014 rates, CMS expressed concerns with OHA's rate-setting process, and required that the State submit a corrective action plan outlining how OHA would improve its rate-setting process going forward.[28] OHA later engaged Optumas, an outside actuarial firm, to develop revised rates for calendar year 2015. Optumas subsequently developed the rates for calendar years 2016, 2017, and 2018.

## II.    Analysis of Rate-Setting Process for Calendar Year 2018

We have reviewed the process used by OHA to establish the CCO rates for calendar year 2018. This review is limited to the process used to establish the rates, not whether those rates are actuarially appropriate. We understand that OHA has engaged the actuarial firm Lewis & Ellis to perform an independent actuarial review of the 2018 rates. When this document references an independent actuarial review, it is referring to the review by Lewis & Ellis.

After completing our review, we conclude that the State generally complied with the process for setting rates with the exception of the following areas:

- Optumas did not expressly consider the medical loss ratio in developing rates, instead using it as a monitoring tool to evaluate the appropriateness of rates currently in place;
- Optumas explicitly included flexible services as an element of the non-benefit component of the rate, while the STCs require that flexible services be paid out of cost savings and not incorporated in the rate; and
- Optumas used a standard risk margin for all CCOs rather than providing higher risk margins for high-performing CCOs, as required under the STCs. We note, however, that the STCs are ambiguous as to when the State must begin developing a differential risk margin, and thus

---

[27] 2017 – 2018 Medicaid Managed Care Rate Development Guide, April 2017, available at: https://www.medicaid.gov/medicaid/managed-care/downloads/guidance/2018-medicaid-rate-guide.pdf.
[28] CMS informed OHA by letter dated August 7, 2014.

6

Exhibit 19
Page 6 of 26
MPP00000289



**manatt**
manatt | phelps | phillips

CMS may conclude that the State is not currently required to develop a differential risk margin.

CMS may require that the State re-develop 2018 rates to account for these changes, or CMS may instead require that the State incorporate these changes into future rate-setting processes.

Additionally, we conclude that CMS may request additional documentation with respect to the following areas:

- The rationale for why only one year of base data was used;
- The data sources requested by the actuary;
- The methodology for establishing trend;
- The approach to developing the general administration and care management/flexible services elements of the non-benefit component;
- The aggregate impact of non-material adjustments to the base data;
- The process for developing risk corridors;
- The hospital reimbursement adjustment amounts; and
- The process for setting rates for the new adult group.

If CMS does request additional documentation regarding some or all of these areas, CMS will likely permit the State to provide supplemental documentation in the course of the rate approval process. It is unlikely that CMS would disapprove the rates based on a lack of documentation.

### A.    Compliance with 42 C.F.R. Part 438

CCOs are considered Medicaid managed care organizations. Under the terms of the STCs, all requirements of Part 438 apply to CCOs except that (1) most enrollees only have 30 days to disenroll without cause, rather than the standard 90-day period and (2) the State may contract with only one prepaid ambulatory health plan to deliver dental care and one prepaid ambulatory health plan to deliver outpatient and acute inpatient mental health services.[29] No state laws or rules pertaining to CCOs provide any additional or different requirements related to rate-setting.

The provisions within Part 438 that affect rate setting are outlined below. For each provision, the analysis indicates whether OHA's process complied with the rules and whether the rate-setting certification sufficiently documents OHA's process.

---

[29] STC ¶ 27. We are not aware of whether the State is using this waiver authority, but it is immaterial to this analysis.

7

Exhibit 19
Page 7 of 26

MPP00000290



**manatt** | phelps | phillips

### 1. Section 438.3(c): Standard contract requirements – Payment

The final capitation rates must be specifically identified in the applicable contract submitted for CMS review and approval, based only upon services covered under the State plan or services necessary to comply with mental health parity requirements.[30] Additionally the capitation rates must represent a payment amount "adequate to allow the MCO . . . to efficiently deliver covered services to enrollees in a manner compliant with contractual requirements."[31]

When developing the capitation rates, Optumas indicated that the rates only account for services covered under the State plan or necessary to comply with mental health parity.

- o *Conclusion:* Complies with requirements.

### 2. Section 438.3(e): Standard contract requirements – Services that may be covered by an MCO

Rates may not account for services voluntarily provided by a managed care organization, but rates must account for the utilization and actual cost of "in lieu of" services, unless a statute or regulation specifically requires otherwise.

During the period of the base data, plans were not offering "in lieu of" services, and therefore the cost or utilization of "in lieu of" services were not accounted for in rate setting.

- o *Conclusion:* Complies with requirements.

### 3. Section 438.4: Actuarial soundness

Rates must be projected to provide for "all reasonable, appropriate, and attainable costs that are required under the terms of the contract and for the operation of the MCO"[32] for the time period and population covered under the contract. CMS must review and approve rates as actuarially sound before federal matching funds are available. To be considered actuarially sound, rates must:

- Be developed in accordance with the rate development standards discussed below in Section II.A.4;
- Be appropriate for the populations to be covered and services to be furnished under the contract;

---

[30] 42 C.F.R. § 438.3(c)
[31] *Id.*
[32] 42 C.F.R. § 438.4(a).

Exhibit 19
Page 8 of 26
MPP00000291

# manatt
manatt | phelps | phillips

- Be adequate so that the MCO can meet the requirements to ensure adequate access to and coordination of services;
- Be specific to payments for each rate cell[33] under the contract;
- Not enable payments from one rate cell to cross-subsidize payments from another rate cell;
- Be certified by an actuary as meeting the applicable requirements;
- Meet any applicable special contract provisions;
- Be provided to CMS in a format and within a timeframe that meets CMS's requirements; and
- Be developed in such a way that the MCO would reasonably achieve a medical loss ratio standard of at least 85% for the rate year.[34]

Under the rules, payments must be actuarially sound for each rate cell under the contract between the MCO and the state. Further, actuarial soundness is evaluated based on whether the rates provide for all reasonable, appropriate, and attainable costs "for the operation of *the* MCO"[35] (emphasis added), suggesting that a determination of actuarial soundness must be made *for each MCO at the rate cell level.* The rules governing rate certifications found at 42 C.F.R. § 438.7 and discussed below in Section II.A.6 further specify that the actuary must certify "the final capitation rate paid per rate cell under *each* risk contract" and permits states to pay different rates to each MCO, "so long as each capitation rate per rate cell . . . is independently developed."[36] In sum, the state must ensure that rates are actuarially sound for each MCO.

Although states are required to ensure that rates are actuarially sound for each specific MCO, states are *not* required to account for all costs of each MCO when developing rates. Instead, states must ensure that rates provide for all "reasonable, appropriate, and attainable" costs. If a state determines that particular costs are unreasonable or inappropriate, the rate need not be sufficient to cover such excess costs, so long as the level of costs that the rate covers is attainable.

States have multiple tools for ensuring that rates are appropriate for each MCO and are not required to build rates specific for each MCO. For example, states may use risk adjustment models to account for variations in the health of enrolled populations across plans.[37] Risk adjustment models, by definition, look at the health status of enrollees across multiple plans, confirming that states may build statewide or regional rates that are then adjusted to take into account the

---

[33] A rate cell is defined as "a set of mutually exclusive categories of enrollees that is defined by one or more characteristics for the purpose of determining the capitation rate and making a capitation payment; such characteristics may include age, gender, eligibility category, and region or geographic area." 42 C.F.R. § 438.2.

[34] 42 C.F.R. § 438.4(b).

[35] 42 C.F.R. § 438.4(a).

[36] 42 C.F.R. § 438.7.

[37] 42 C.F.R. § 438.5(g).

9

Exhibit 19
Page 9 of 26

MPP00000292



**manatt**

manatt | phelps | phillips

specific health status of each plan's enrollees. If states were required to build each rate using only the MCO's data, there would be no need for risk adjustment. Further, the preamble to the 2016 final rule clarifies that the non-benefit component may be developed "at the aggregate level and incorporated into the rate cell level,"[38] clarifying that a rate can be actuarially sound at the rate cell level even if each component was not developed at the rate cell level. This same logic applies at the MCO level—a rate cell may be actuarially sound for the applicable MCO, even if every aspect of the rate was not developed specifically for the plan.

In sum, each rate cell must be actuarially sound for each MCO, but the state may develop actuarially sound rates using statewide or regional data that is adjusted to account for reasonable and appropriate costs and tailoring it to the MCO's specific circumstances using tools like risk adjustment.

Here, Optumas developed regional base rates that were then adjusted to reflect the unique circumstances of each CCO.  By using regional data, Optumas ensured that CCOs operating in higher-cost regions would have higher rates than those operating in lower-cost regions. Optumas then made several adjustments to the rates intended to account for reasonable and appropriate costs. As is discussed further in Section II.A.4, in some cases, Optumas's adjustments had the effect of increasing rates to account for new services (e.g., applied behavioral analysis). In other cases, the adjustments decreased rates where Optumas, working with the State, concluded that the data showed unreasonably high provider payment levels. Nothing in federal rules prohibits these types of adjustments. These regional base rates were then further adjusted using a CCO-specific risk score to account for both the health of the population and the mix of higher- or lower-cost hospitals used. Rates were identified for each CCO at the rate cell level in the appendices to the actuarial certification.

> o   *Conclusion:* Complies with the process requirements to develop rates at the rate cell level that are tailored to each MCO and that are intended to account for reasonable, appropriate, and attainable costs. We defer to independent actuarial review to determine whether the individual rate cells account for all reasonable and appropriate costs.

> 4.    Section 438.5: Rate development standards

When developing actuarially sound capitation rates, a state must follow certain steps in an appropriate order or explain why those steps are not applicable. Specifically, the actuary must:

- *Base data.* Identify and develop the base utilization and price data, with the state providing all validated encounter data, fee-for-service data, and audited financial reports that

---

[38] 81 Fed. Reg. at 27,572.

Exhibit 19
Page 10 of 26
MPP00000293



demonstrate experience for the applicable populations for at least the three most recent and complete years prior to the rating period and that the actuaries are using the most appropriate data, which should be no older than from the three most recent and complete prior years for the Medicaid population or a similar population.

- *Trend.* Develop and apply trend factors, including cost and utilization, to base data that are developed from actual experience of the Medicaid population or similar population.

- *Non-benefit component.* Develop the non-benefit component of the rate to account for reasonable expenses related to plan administration, taxes, licensing and regulatory fees, contribution to reserves, risk margin, cost of capital, and other operational costs.

- *Adjustments.* Make appropriate and reasonable adjustments to account for changes to the base data, programmatic changes (e.g., new benefits added to the managed care benefit package), non-benefit components, and any other adjustment necessary.

- *Medical loss ratio.* Take into account the plan's past medical loss ratio in developing the capitation rates and consider the projected medical loss ratio.

- *Risk adjustment.* If applying a risk adjustment model, select a risk adjustment methodology that uses generally accepted models and apply it in a budget neutral manner.

After reviewing the rate certification, we conclude that the State's actuary generally complied with the requirements, except for a few select areas highlighted below. We summarize below our findings with respect to each of the rate development components. The conclusions below address only whether Optumas developed each of the required components of the rate; we defer to independent actuarial review to determine whether each of the components was developed consistent with generally accepted actuarial practice. Additionally, the conclusions below do not apply to whether Optumas provided sufficient documentation of its approach; our assessment of the documentation is found in Section II.A.5 (with respect to special contract provisions related to payment) and Section II.A.6 (with respect to other aspects of rate development).

- *Base data.* In developing rates, Optumas used only data from the most recent complete year—CY 2016—not the three most recent complete years, as specified in the rules. All data was for the Medicaid population.

  o *Conclusion:* Complies with all requirements, except the requirement to use three years of data. Additional rationale for why only one year of data was used is necessary.

- *Trend.* Optumas developed region-specific trends for both price and utilization based on data from the Medicaid population.

11

Exhibit 19
Page 11 of 26

MPP00000294



manatt | phelps | phillips

- o *Conclusion:* Complies with all requirements.

- *Non-benefit component.* Optumas developed region-specific administrative loads using financial data from CCOs in the region. The administrative loads included separate components for administration, care management/flexible services, profit, and risk/contingency. Administrative loads varied by region with respect to the amounts allocated for administration and care management/flexible services, while the amounts for profit and risk/contingency were uniform across regions. Additionally, Optumas accounted for taxes and fees when developing the non-benefit component. The rate certification indicates that Optumas will update the non-benefit components as more information about the health insurance provider fee and the hospital and managed care tax become available.

  - o *Conclusion:* Complies with requirements to develop non-benefit component accounting for all types of non-benefit expenses specified in the rules.

- *Adjustments.* Optumas made several adjustments to the data to account for, among other things, incomplete data (through the under-reporting/reconciliation adjustment), changes in covered services (through the applied behavioral analysis, mammogram, and Assertive Community Treatment and Supported Employment Services adjustments, for example), and changes in the health status of the population (through the redetermination adjustment).

  Additionally, Optumas adjusted the base data at a regional level to remove reimbursement increases deemed unsustainable. Under the rules, states and their actuaries may apply any adjustment, so long as it "reasonably supports the development of an accurate base data set for the purposes of rate setting." Since, as discussed above in Section II.A.3, actuarially sound rates must be projected to provide for all "reasonable, appropriate, and attainable" costs that are required under the contract, the State has latitude to make adjustments to ensure that rates account only for "reasonable" and "appropriate" costs (provided that they are "attainable"). If the State concludes that some reimbursement levels exceed reasonable and appropriate costs for services, then the State is permitted to make adjustments to reduce costs to reasonable and appropriate levels. Further, at least one CCO in each region was **not** found to have unreasonable rate increases, suggesting that the lower reimbursement levels were "attainable."

  - o *Conclusion:* The State is permitted to make adjustments in the rate-setting process, and there is nothing in rule or guidance that precludes the State from making adjustments to ensure that reimbursement levels are reasonable. We defer to the independent actuarial review to determine whether the adjustments made were "appropriate and reasonable."

12

Exhibit 19
Page 12 of 26

MPP00000295



- *Medical loss ratio.* Optumas did not take into account prior medical loss ratios or projected medical loss ratios when establishing the rates. Optumas indicated in a conference call that it monitors historical and emerging medical loss ratio data to ensure that the rates currently in place are appropriate, enabling Optumas to evaluate whether the assumptions and adjustments it made during the rate-setting process appear valid. Optumas confirmed that it does not consider medical loss ratios when setting the rates. Federal rules and guidance provide few details on how states must account for medical loss ratios when setting rates, but the preamble to the 2016 final rule states multiple times that medical loss ratio experience must be considered as part of rate development.

  - *Conclusion:* The medical loss ratio should be considered as part of rate development, in addition to ongoing monitoring. We recommend revising the process to include comparing rates to historic and projected medical loss ratios. CMS may require that the State submit additional information related to the medical loss ratio.

- *Risk adjustment.* Optumas applied two factors to develop a risk score for each CCO. One adjustment accounts for the health of the CCO's enrolled population. The other adjustment accounts for the mix of utilization at so-called A/B hospitals—rural hospitals reimbursed based on a cost-to-charge ratio and that are generally costlier than other hospitals.[39] The health status risk factor was developed using a national risk adjustment model, while the A/B hospital adjustment is unique to Oregon. The risk adjustment methodology was applied on a budget-neutral basis in each region.

  - *Conclusion:* Generally complies with requirements, except that the A/B hospital adjustment may not constitute a "generally accepted model." We defer to the independent actuarial review to determine the appropriateness of the A/B hospital adjustment.

    5.    Section 438.6: Special contract provisions related to payment

Any risk-sharing mechanism, such as reinsurance, risk corridors, or stop-loss limits must be described in the contract and must be developed in accordance with the rules generally applicable to rate setting and consistent with generally accepted actuarial principles and practices.[40] Incentive arrangements may not provide for payments in excess of 105% of the approved capitation payments.[41]

---

[39] OR. ADMIN. R. § 410-125-0090.
[40] 42 C.F.R. § 438.6(b)(1).
[41] 42 C.F.R. § 438.6(b)(2).

13

Exhibit 19
Page 13 of 26

MPP00000296


manatt | phelps | phillips

The rules further specify that rates may not include amounts for "pass-through" payments to providers—amounts required by the state to be added to the contract payments between the plan and hospitals, physicians, or nursing facilities that are not otherwise specifically permitted under federal rules—unless CMS has approved the specific pass-through payments.[42] States seeking approval of pass-through payments to hospitals must calculate the "base amount," which is the difference between the amount Medicare fee-for-service would have paid for the services subject to the pass-through payment and what the Medicaid managed care organizations did pay for the services (excluding any pass through payments). The total amount of the pass-through payments can be no more than the lesser of the base amount (adjusted downward by some factor for rates beginning after July 1, 2018) or the magnitude of the pass-through payments made to hospitals in contracts approved or submitted for approval prior to July 5, 2016.[43]

The State's contract with CCOs contains three elements[44] that would be considered "special contract provisions related to payment" under the final managed care rule. First, the contract with CCOs establishes risk corridors for applied behavioral analysis and hepatitis C drugs.[45] Additionally, the contract includes a quality incentive program under which CCOs may receive payments from a quality pool that are in addition to their premium payments.[46] Finally, the contract requires that CCOs make supplemental payments to hospitals.[47] Below is a further analysis of whether each of these payment provisions complies with requirements:

- *Risk corridors.* The rate development materials and certification do not describe how the risk corridors were developed or whether they are consistent with generally accepted actuarial principles.

    o *Conclusion:* Further description of how the risk corridors were developed is needed, including an assurance that they were developed consistent with standard actuarial principles and practice. CMS may require additional documentation.

- *Incentive programs.* The rate development and certification do not address the incentive programs, including confirming that after accounting for incentive program payments the total payments will not exceed 105% of the actuarially sound capitation amount.

    o *Conclusion:* Since the incentive payments are, by definition, in excess of the actuarially sound rates, this does not have implications for the rates themselves,

---

[42] 42 C.F.R. § 438.6(d).

[43] 42 C.F.R. § 438.6(d).

[44] Note that the contract also references potential additional payments authorized under 42 C.F.R. § 438.6(c). These payments have not yet been approved by CMS.

[45] See CCO Contract, Exhibit C, Section 6.

[46] See CCO Contract, Exhibit B, Part 9, Section 12.

[47] See CCO Contract, Exhibit B, Part 6, Section 14.

14

Exhibit 19
Page 14 of 26
MPP00000297



**manatt**

manatt | phelps | phillips

but CMS may request an assurance that the incentive payments will lead to total payments of no more than 105% of the actuarially sound rates.

- *"Pass-through" payments.* The rate development and certification describe how the capitation rates are increased to account for the required hospital reimbursement adjustment payments to hospitals. The materials do not, however, include calculations of the "base amount" or any documentation to support that the total amount of pass-through payments is no more than the lesser of the base amount or the total dollar amount of pass-through payments as of July 5, 2016.[48]

  - o *Conclusion:* To approve the inclusion of pass-through payments in the rates, CMS may require documentation of the base amount and that the total dollar amount of the pass-through payments does not exceed the amount permitted under the rules.

### 6.    Section 438.7: Rate certification submission

States must submit to CMS for review and approval all rate certifications concurrent with the review and approval process for contracts. The rate certification must document the following:

- *Base data.* A description of the base data used and of how the actuary determined which base data set was appropriate to use for the rating period;

- *Trend.* Each trend factor, including trend factors for changes in the utilization and price of services, applied to develop capitation rates must be described in sufficient detail so that CMS or another actuary can evaluate the calculation and reasonableness of the trend and any meaningful difference in how a trend differs between the rate cells, service categories, or eligibility categories;

- *Non-benefit component.* The non-benefit component of the rate must be described in sufficient detail so that CMS or another actuary can identify each type of non-benefit expense that is included and evaluate the reasonableness of the cost assumptions underlying each expense;

- *Adjustments.* An adequate description of all adjustments used to develop the capitation rates so that CMS or an actuary applying generally accepted actuarial principles and understand how each material adjustment was developed and the reasonableness of the adjustment, the cost impact of each material adjustment and the aggregate cost impact of non-material adjustments, where in the process the adjustment was applied, and a list of all non-material adjustments used in the rate development process;

---

[48] The rate certification specifies that the State has consistently required the same percentage adjustment for the hospital reimbursement adjustment, but the rule requires that the total aggregate *dollar* amount of payments be no more than the total aggregate dollar amount of payments in contracts as of July 5, 2016.

15

Exhibit 19
Page 15 of 26

MPP00000298



- *Risk adjustment.* A description of the prospective risk adjustment methodologies sufficiently detailed so that CMS or an actuary can understand and evaluate the data used, the model uses, the method for calculating the relative risk factors and the reasonableness and appropriateness of the method, the magnitude of the adjustment, the predictive value of the methodology compared to prior rating periods, and any concerns with the risk adjustment mode; and

- *Special contract provisions.* A description of any special contract provisions related to payment that are applied in the contract.

The rate-setting consultation guide issued by CMS provides additional detail on the information that CMS would like included within the rate-setting certification. The rate-setting consultation guide is discussed further in Section II.C.

After reviewing the rate certification, we conclude that Optumas touched on each of the elements required in the rate certification but that it could provide additional detail to enable CMS or its actuaries to understand better the methodologies used when developing the rates. Specifically, we conclude the following:

- *Base data.* The certification did not document what base data was requested and why any base data requested was not provided by the State. Additionally, the certification did not provide a rationale for why only one year of base data was used to develop rates.

  - *Conclusion:* Additional documentation would be helpful. CMS may request additional details.

- *Trend.* The certification describes at a high level how the trend was developed for each population and each category of service in a given rating region. The certification notes that the average trends were "evaluated and weighted to best reflect the expected annual trend"[49] but does not provide any detail on what factors informed how Optumas weighted particular trends. CMS could conclude that there is not sufficient detail for it to understand how each trend was calculated and whether such calculation was reasonable.

  - *Conclusion:* Additional documentation would be helpful. CMS may request additional details on the methodology used.

- *Non-benefit component.* The certification states that the non-benefit component, particularly the elements related to general administration, case management/flexible services, underwriting profit, and risk/contingency margin, were developed using "a combination of CCO financial data reported on financial report L.6 and State-directed

---

[49] Actuarial Certification, § 2.05.

Exhibit 19
Page 16 of 26
MPP00000299



manatt | phelps | phillips

policies."[50] There are no additional details on how financial data was used to estimate the administrative costs.

    o   *Conclusion:* Additional documentation would be helpful. CMS may request additional details on the methodology used.

- *Adjustments.* The certification and its accompanying appendices describe for most adjustments (1) how the adjustment was developed, (2) the cost impact of the adjustment, and (3) where in the rate-setting process the adjustment was used. Unlike for the other adjustments, the certification and its accompanying appendices do not describe the per member per month impact of the reimbursement adjustment (the materials only provide an aggregate cost impact). Additionally, there is no list of non-material adjustments and their aggregate cost impact.

    o   *Conclusion:* A list of the non-material adjustments and their aggregate cost impact should be included; CMS may request this documentation. Additionally, for clarity and consistency, Optumas should consider providing a per member per month impact of the reimbursement adjustment.

- *Risk adjustment.* The certification provides significant detail on the health status risk adjustment methodology used, as well as how the A/B hospital adjustment was calculated. The certification also touches on the data used, the model used, an assessment of the predictive value of the methodology, and the actuary's assessment of the risk adjustment methodology.

    o   *Conclusion:* Complies with requirements.

- *Special contract provisions.* As is discussed more fully in Section II.A.5, the rate certification does not describe the actuarial basis for the risk corridor or the magnitude of the incentive payments. Additionally, the certification does not document that the total amount of pass-through payments complies with the caps in the rules.

    o   *Conclusion:* CMS may require additional documentation on each of these items. It is unclear whether they will require such documentation be provided as part of the rate approval (the subject of this analysis) or the contract approval (not evaluated here).

    7.     Sections 438.604, .606: Certification of data

Any data that managed care plans, including CCOs, submit to a state must be certified by the plan's chief executive officer, chief financial officer, or an individual who reports directly to the chief executive officer or chief financial officer with delegated authority to sign on behalf of the

---

[50] Actuarial Certification, § 2.06.

Exhibit 19
Page 17 of 26

MPP00000300



**manatt** | phelps | phillips

chief executive officer or chief financial officer. The certification must attest that the information specified is accurate, complete, and truthful. The certification must be made concurrently with the submission of the data.

Here, the State requires that the chief executive officer, the chief financial officer, or their delegate certify that the information submitted is accurate, complete, and truthful using the Encounter Data Certification and Validation Report Form. The State requires that the certification form be submitted at the same time as each set of encounter data or pharmacy transaction data.[51] Based on conversations with OHA, it is our understanding that one CCO includes caveats with each data submission.

- o  *Conclusion:* Complies with requirements. Federal rules mandate that the State *require* certifications along with each data submission, which the State does. There is some risk that CMS could conclude that, since the State does not reject the CCO's certification as invalid because of the caveats, it is not truly requiring the certification.

## B.    Special Terms and Conditions

In addition to meeting the requirements of 42 C.F.R. Part 438, the rate setting must also comply with the STCs governing the Oregon Health Plan.

### 1.    Global budgets

The STCs require that the State reimburse CCOs using "global budgets," which "represent the total cost of care for all services for which the CCOs are responsible and held accountable for managing, either through performance incentives and/or being at financial risk for paying for health care services." The STCs specify that the CCOs bear financial risk under the global budget for all services included in Attachment F to the STCs.

The rate certification indicates that the rates account for all services covered by the CCOs.

- o  *Conclusion:* Complies with requirements.

### 2.    Bending the Medicaid cost curve

Under the STCs, the State must ensure that the growth in Medicaid costs not exceed 3.4% per year.[52] Rate setting, however, is governed by 42 C.F.R. Part 438. Part 438 does not authorize a

---

[51] See Encounter Data Certification and Validation Report Form, available at
http://www.oregon.gov/oha/HSD/OHP/CCO/Data%20Certification%20and%20Validation%20Report%20Form,%2010-1-2014.doc.
[52] STC ¶ 47.

18

Exhibit 19
Page 18 of 26
MPP00000301



**manatt**
manatt | phelps | phillips

state to expressly account for target growth rates when establishing capitation rates (though, as discussed above, the state may make adjustments to reflect "reasonable" and "appropriate" costs). Nothing in the STCs allows the State to explicitly consider the target growth rate when setting capitation rates. Accordingly, the 3.4% trend rate target does not affect rate setting.

- o *Conclusion:* Requirement does not impact rate setting.

### 3. Setting capitation rates

As discussed above, the State must comply with all aspects of 42 C.F.R. Part 438, unless a requirement has been expressly waived under the STCs. None of the waiver authorities granted relate to capitation rate setting, and thus the State must comply with the rate-setting requirements found at 42 C.F.R. Part 438. An analysis of the State's compliance with that process is found in Section II.A.

The STCs impose two additional requirements related to rate setting, as described in Section I.A.3 and analyzed further below.

- *Flexible Services.* STC 36(d)(ii)(3) requires that "health-related services," including "flexible services," must be paid from the CCO's savings and will not be considered in setting capitation rates.

  When developing the non-benefit component of the rates, Optumas specifically provided an upward adjustment to account for the costs of "care management and flexible services." Although there is no prohibition on accounting for care management costs when setting capitation rates, flexible services should not have been considered in developing the rates.

  - o *Conclusion:* To comply with the STCs, rates should not reflect separate adjustment for flexible services. Rates may need to be adjusted to reflect only the reasonable, appropriate, and attainable costs of care management.

- *Profit Margin.* STC 36(e)(ii) requires that the State "will develop capitation rates with a profit margin that varies by CCO, as opposed to a fixed percentage of premium for each CCO." This STC requires that capitation rates for CCOs identified as high performing—defined as "those showing quality improvement and cost reduction in the previous years"—have higher profit margins built into their capitation rates than lower performing CCOs. The STCs require that this aspect of the capitation rate development "be a separate mechanism from the incentive pool." The STCs, however, do not expressly indicate *when* the State must begin developing differential risk margins linked to performance—the STCs state only that Oregon "will" do so.

19

Exhibit 19
Page 19 of 26

MPP00000302



Optumas applied a uniform profit margin of 1% for all CCOs, regardless of performance. The State indicates that it is developing measures to determine which CCOs are high performing and intends to establish differential risk margins in the future once the measures are in place.

- o *Conclusion:* Profit margins should vary by CCO based on performance, as indicated by quality improvement and cost reductions. Rates may need to be adjusted to comply with this requirement. Because the STCs are ambiguous on when the State must begin developing this differential risk margin, CMS may conclude that the State is permitted to have a uniform risk margin in 2018.

### C.    The 2017-2018 Medicaid Managed Care Rate Development Guide

The 2017 – 2018 Medicaid Managed Care Rate Development Guide ("the Guide") released by CMS contains 28 pages of instructions as to what must be included in the State's actuarial demonstration—24 pages addressing rate setting for standard Medicaid managed care products, two addressing rate setting for managed long-term services and supports, and two addressing rate setting for the new adult group.

Much of the Guide reiterates and amplifies the content of the managed care rule, but in some places the Guide specifies an additional level of detail that CMS expects to see in the rate certifications. For example, the Guide expands upon the requirement in the rule that in developing rates states must incorporate adjustments to "address appropriate programmatic changes,"[53] by specifying that the programmatic changes could come from "requirements or conditions of any applicable waivers" or "requirements or conditions of any litigation to which the state is subjected."[54]

Additionally, the Guide provides requirements related to setting rates for the new adult group. The Guide specifies that states that have previously covered the new adult group provide information "related to how the capitation rates or the rate development process has changed since the most recent rate certification."[55] The Guide then lists several specific pieces of information that the states must provide.

Since the Guide closely tracks the final managed care rule, the analysis set forth in Section II.A above applies here. In places where our analysis indicates that CMS may require additional documentation in the rate certification in order to comply with 42 C.F.R. § 438.7, the Guide provides a roadmap to what documentation CMS may require. Most notably, the rate certification includes no documentation specific to the new adult population. It is our understanding that

---

[53] 42 C.F.R. § 438.5(f).
[54] Medicaid Managed Care Rate Development Guide, Section I.3B.vii.
[55] Medicaid Managed Care Rate Development Guide, Section III.

Exhibit 19
Page 20 of 26
MPP00000303

**manatt**
manatt | phelps | phillips

Optumas used the same process to establish rates for the new adult group that it used for the rest of the managed care population. Nevertheless, CMS may require additional details on how specific aspects of the rates for the new adults were developed.

> o *Conclusion:* The process used to develop the rates generally complies with the requirements set forth in the Guide. CMS may require additional documentation that is specified in the Guide, particularly with respect to the process used to set rates for the new adult group.

### D.    Actuarial Standards of Practice

The Guide also specifies that all rates must be developed in accordance with the actuarial standards of practice, highlighting as "especially relevant" Actuarial Standard of Practice (ASOP) 49.[56]

ASOP 49, titled Medicaid Managed Care Capitation Rate Development and Certification, was released in March 2015 by the Actuarial Standards Board to "establish guidance for actuaries preparing, reviewing, or giving advice on capitation rates for Medicaid programs."[57] ASOP 49 provides guidance on the form and structure of capitation rates, the use of base data, appropriate adjustments to base data, and various other components of rate setting. As noted in the Guide, the new applicable requirements under 42 C.F.R. § 438.4 "are consistent with ASOP 49."

ASOP 49 also includes as an appendix background on Medicaid managed care rate setting and an overview of current practice. The description of current practice is not incorporated as an official standard of practice, but instead as a frame of reference for how rates are ordinarily developed. In its description of current practice, the appendix states that "actuaries may publish a databook that outlines the baseline data, adjustments to the baseline data, actuarial assumptions, and the development of capitation rates." Additionally, the appendix notes that states may hold public meetings to discuss rate development with the plans. Finally, plans may provide written comments, and the actuary reviews comments and makes adjustments, if needed.

Since ASOP 49 and Part 438 are aligned, Oregon's process for developing the rates complies with the process outlined in ASOP 49 to the extent it complies with the process requirements of Part 438. With respect to the current practice described in the appendix to ASOP 49 (but not incorporated as a standard of practice), it is our understanding that Optumas worked closely with each CCO to validate its data, held public meetings to discuss the rate-setting process, accepted written questions and comments on the process, and provided responses in writing to

---

[56] Medicaid Managed Care Rate Development Guide, Section I.
[57] ASOP 49, March 2015, available at http://www.actuarialstandardsboard.org/wp-content/uploads/2015/03/asop049_179.pdf.

21

Exhibit 19
Page 21 of 26

MPP00000304



the CCOs' questions. It is also our understanding that Optumas did not publish a databook containing the underlying base data.

- o *Conclusion:* ASOP 49 and Part 438 are aligned. To the extent that the process complies with the requirements of Part 438, it complies with ASOP 49. With respect to adherence to current practice around transparency in rate setting, we conclude that, though not required by law, rule, guidance, or STC, the State's process was generally consistent with the process described as current practice in the appendix to ASOP 49, with the exception of publishing a databook of all base data.

*       *       *

In sum, we have identified only minor process concerns with respect to the development of the 2018 rates, as well as minor concerns with respect to the documentation submitted. We anticipate the State will be able to address these relatively minor concerns during the ongoing rate approval process.[58]

---

[58] We understand that several questions were posed to the Legislature regarding the CCO rate-setting process. We include below those questions and our responses, noting the sections in this memorandum more fully addressing these issues.

1. *Question:* Do federal regulations (Medicaid Managed Care Rule - 42 CFR 438) require that capitation rates developed for managed care organizations (Oregon's coordinated care organizations) be actuarially sound for each rate cell for each CCO contract?

    *Answer:* Yes. Rates must be actuarially sound for each rate cell for each CCO, but Oregon is not required to account for all costs of each CCO when developing rates. Instead, Oregon must ensure that rates provide for all "reasonable, appropriate, and attainable" costs. If the State determines that particular costs are unreasonable or inappropriate, the rate need not be sufficient to cover such excess costs, so long as the level of costs that the rate covers is attainable. Oregon, like other states, has multiple tools for ensuring that rates are appropriate for each CCO and are not required to build rates specific for each CCO. A full discussion of this issue is found in Section II.A.3.

2. *Question:* Does anything in Oregon law allow the state to deviate from following the Medicaid Managed Care regulations?

    *Answer:* No. Oregon statute and rules related to CCOs do not impose any requirements on rate-setting. Additionally, state law does not supersede federal Medicaid requirements, and all federal Medicaid requirements apply unless CMS grants a waiver of such requirements.

3. *Question:* Does Oregon's 1115 waiver with the federal government allow the state to deviate from following the Medicaid Managed Care regulations?

    *Answer:* Yes, but only to allow the State to shorten the time period for disenrollment without cause and to contract with only one plan for dental services and one plan for mental health services. The State must comply with all federal rules related to rate setting. See Section I.A.3 for a more detailed discussion.

22

Exhibit 19
Page 22 of 26
MPP00000305



**manatt**
manatt | phelps | phillips

Please let us know if you have any questions concerning the above.

4. *Question:* Broadly speaking, if the Oregon Health Authority submitted capitation rates to CMS that were not actuarially sound for each CCO contract, would the agency be in violation of federal or Oregon laws or regulations?

*Answer:* Yes. If the rates were not actuarially sound for each CCO contract, the State would be out of compliance with federal rules. In such a case, CMS would likely require that the State re-develop and re-submit rates. See Section II.A.3 for a broader discussion of what it means for rates to be actuarially sound for each CCO.

5. *Question:* Does OHA's policy decision to truncate primary care reimbursements for some CCOs in developing the capitation rates violate the global budget provisions in state law or any federal regulations, include 42 CFR 438.6(c)?

*Answer:* No. The State may make adjustments to costs in base data to reflect "reasonable, appropriate, and attainable costs" of participating in the managed care program. The State is not required to develop cost-based rates for each CCO. See Sections II.A.3 and II.A.4 for further discussions.

6. *Question:* By withholding base data used to develop CCO capitation rates from public view based on a trade secret designation, is the state violating the transparency standards in federal regulations or Oregon statutes?

*Answer:* No. The federal rules and STCs require transparency with respect to the modification or phase out of the waiver itself—not the development of the rates. There are no provisions in federal rules or STCs that require the State to publish its base data. Similarly, there are no state statutes or rules requiring that the State make publicly available the data used in developing rates.

23

Exhibit 19
Page 23 of 26

MPP00000306



**Appendix: Conflicts Disclosure**



Anne O. Karl
Manatt, Phelps & Phillips, LLP
Direct Dial: (212) 790-4578
E-mail: AKarl@manatt.com

November 30, 2017                                        Client-Matter: 64051-030

Laura Robison
Chief Financial Officer
Actuarial Services Unit, Oregon Health Authority

    Re:    Disclosure of prior work with Oregon Health Authority

Dear Ms. Robison:

Manatt, Phelps & Phillips, LLP ("Manatt") has been engaged by the Oregon Department of Justice (DOJ) for the benefit of the Oregon Health Authority (OHA) to perform an independent review of the process used to set capitation rates that will be paid to Coordinated Care Organizations (CCOs) in 2018. The intent of the review is to determine whether the process used by OHA and its contracted actuary, Optumas, complied with federal and state regulatory requirements. I, Anne Karl, am a partner at Manatt and am the lead attorney performing this review. I understand that CCOs are interested in understanding what work I or others at Manatt have done for OHA in the past.

I have not worked previously worked on an engagement for OHA, and OHA is not currently a client of Manatt, other than for the current engagement described above. My colleagues at Manatt have previously worked on engagements with OHA. Specifically, Manatt has worked on the following engagements with OHA:

- Webinar on privacy issues related to substance use disorder treatment information under 42 C.F.R. Part 2;

- Advising on health reform objectives prior to the 2014 implementation of the Affordable Care Act (funded through the Robert Wood Johnson Foundation); and

- Assisting, as a subcontractor to Optumas, in developing and securing CMS approval for an amendment to the State's 1115 Demonstration waiver.

These prior engagements do not compromise the independence of the review. The first two engagements did not address CCOs or rate-setting. Under the third engagement, my colleagues from Manatt assisted the State in developing and negotiating specific language in the special terms and conditions setting out the high-level parameters for CCO rate setting, but my colleagues did not work with Optumas or OHA on the actual development of rates. Further, we ensured that no individuals from Manatt who worked on that project participated in the regulatory review of the 2018 rates.

7 Times Square, New York, New York 10036  Telephone: 212.790.4500  Fax: 212.790.4545
Albany | Los Angeles | New York | Orange County | Palo Alto | Sacramento | San Francisco | Washington, D.C.

Exhibit 19
Page 24 of 26

MPP00000307

# manatt
manatt | phelps | phillips

---

# manatt
manatt | phelps | phillips

Laura Robison
November 30, 2017
Page 2

I am confident that this regulatory review reflects an independent assessment of the State's process to develop CCO payment rates, and the review identifies several areas where the rate-setting process deviated from requirements and indicates that CMS may require that the State re-develop rates or supplement documentation.

Sincerely,

Anne O. Karl

Cc: Ted Falk

MPP00000308

Exhibit 19
Page 26 of 26