IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

|  |  |  |
|---|---|---|
| PATRICK ALLEN, in his official capacity as DIRECTOR OF OREGON HEALTH AUTHORITY, an agency of the State of Oregon, | ) ) ) ) ) ) | Case No. 3:18-cv-00212-MO (Leading) |
| Plaintiff, | ) ) | Case No. 6:18-cv-00296-MO (Trailing) |
| vs. | ) ) |  |
| FAMILYCARE, INC., an Oregon non-profit corporation, | ) ) |  |
| | ) | VOLUME II |
| Defendant. | ) ) ) ) | VIDEOTAPED FRCP 30(b)(6) DEPOSITION OF |
| FAMILYCARE, INC., an Oregon non-profit corporation | ) ) ) | WILLIAM MURRAY |
| Plaintiff, | ) ) | Taken in Behalf of Defendants |
| vs. | ) ) | July 17, 2018 |
| OREGON HEALTH AUTHORITY, an agency of the State of Oregon, and PATRICK ALLEN, both individually and in his official capacity as director of the Oregon Health Authority, | ) ) ) ) ) ) ) ) | 1120 N.W. Couch Street, 10th Floor Portland, OR 97209 |
| Defendants. | ) ) |  |

Teresa L. Dunn,

Court Reporter

CSR, CCR, RPR

Exhibit 53
Page 1 of 14

William Murray, 7/17/2018          Allen v. FamilyCare, Inc.

237

Q.    Were there any additional ones?

A.    I believe that FamilyCare has documented all of those in an e-mail or other -- communications otherwise to OHA.

FamilyCare also communicated with CMS. I believe that information is all consistent. And I believe that from the production documents that OHA has a copy of all of those communications also.

Q.    And the methodology concerns, those were also entirely and completely communicated in writing to OHA and CMS?

A.    I don't know if we communicated -- we did not communicate nearly as much obviously with CMS as we did with OHA.

So CMS's may be a subset of those, whereas, OHA's, our communications were a much more comprehensive list.

Q.    Did FamilyCare calculate what the dollar impact to FamilyCare would have been during 2018 if the errors and changes that it had requested had been accomplished?

A.    We provided OHA with a number of calculations with regards to individual components or pieces of the rate development.

William Murray, 7/17/2018          Allen v. FamilyCare, Inc.

238

We did not -- well, I believe in -- through the communications -- let me answer your question.

I don't believe there is a summary list that FamilyCare every -- ever prepared of all of those on a single piece of paper.

They were communicated at various times during the rate development process related to the piece that was being reviewed at that time.

And there were several summary documents including ones that were provided I believe for the last time in kind of summary fashion in a meeting with OHA on December 14th.

Q.   Did FamilyCare ever calculate whether the changes that it was requesting would have had a sufficient beneficial impact on its revenue for 2018 to allow it to continue in business?

A.   FamilyCare in that last summary that was provided to OHA on December 14th, I believe one of those documents contained a schedule that showed about $60 million worth of adjustments.

And on that schedule there was a question mark with regards to the risk component piece, the redetermination piece.

William Murray, 7/17/2018                Allen v. FamilyCare, Inc.

239

FamilyCare also provided OHA a separate schedule at that point in time with the number we just talked about that was approximately $50 million for that.

There is some interplay between all those numbers, but the 60 and 50 is 110.  And as I said there is some interplay between those two.

So the amount that FamilyCare provided to OHA would have come close to or exceeded -- it would have been somewhere in that range of the $95 million, yes.

Q.    Is there a calculation or analysis that has been prepared by or on behalf of FamilyCare that shows that its requested changes in rates would have been sufficient to allow it to stay in business in 2018?

A.    Can you restate the question?  I'm trying to understand the question.

Q.    All right.  Has an analysis been prepared either by you or at your request the conclusion of which is that if your rate change request had been honored your rates would have gone up enough to cover your projected deficit for 2018?

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Exhibit 53
Page 4 of 14

William Murray, 7/17/2018                Allen v. FamilyCare, Inc.

281

which I hypothetically can't think of a reason of that right now.

Q. And in the rate-setting process who would have judged whether the rate chosen by the CCO was reasonable?

A. Ultimately the actuary is certifying those rates. So I believe the actuarial requirements are that the actuary understand the data, understand the reasons behind it, understand if there's something out there that requires that.

The rules talk about the fact that the rates paid have to be sufficient so that there is market to provide those services.

So in a purely hypothetical some high-cost, far-off, out of the region where there's one provider that the costs there are so extraordinary that you had to do that, it might be reasonable.

Q. We're going to turn to topic 8 which is the interference with business relationships.

And in a prior interrogatory answer FamilyCare identified four entities that it contended their business relationship was interfered because of the OHA Communications

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Exhibit 53
Page 5 of 14

William Murray, 7/17/2018              Allen v. FamilyCare, Inc.

282

Plan and they were Children's Health Alliance, Northwest Primary Care Group, Recovery Works Northwest, and South Tabor Family Physicians. And I want to ask you questions about each of those.

Why is it that FamilyCare contends that the Communications Plan interfered with the relationship that existed between FamilyCare and Children's Health Alliance?

A.    After the publishing of the Communications Plan and prior to the termination of FamilyCare's agreement those are four providers that expressed concerns about FamilyCare's viability given the focus of the Communications Plan and the impacts that OHA seemed to be having on FamilyCare.

Q.    Did all four communicate in writing? Orally?  Or both?

A.    I believe there are variants of that, those two options for each one of those.

Q.    So let's talk about them individually.

A.    Okay.

Q.    What communication existed with Children's Health Alliance on the subject of Children's Health Alliance's reaction to the

William Murray, 7/17/2018                Allen v. FamilyCare, Inc.

283

Communications Plan?

A.   So Children's Health Alliance had e-mailed with FamilyCare during that period of time.

Children's Health Alliance also issued letters from its -- either Children's Health Alliance or entities represented -- that represented Children's Health Alliance to the governor and others expressing concerns.

And with regards to that one the CEO of Children's Health Alliance actually called me.

Q.   Who was that?

A.   Deborah Rumsey.

Q.   And what did she say?

A.   She told me that given all that had happened that Children's Health Alliance had previously only had a contract with FamilyCare and that given the concern raised by the Communications Plan that Children's Health Alliance had the need now to sign with another CCO -- so Health Share -- because of its concern over its book of business going forward and if FamilyCare were to be put out of business that it would lose a significant revenue stream.

Q.   Your testimony is that she specifically

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Exhibit 53
Page 7 of 14

William Murray, 7/17/2018          Allen v. FamilyCare, Inc.

284

mentioned to you the Communication Plan?

A.    She mentioned the Communications Plan. It may have been in combination with -- it probably was in combination with a -- we had a lengthy conversation on the phone.

So it included, you know, other discussions than just the Communications Plan.

Q.    Wasn't her concern that led to termination of the contract whether FamilyCare would remain in business?

A.    Her concern was whether FamilyCare would remain in business or be allowed to remain in business by OHA, yes.

Q.    Did she give any credence to any derogatory statement that had been included in the Communications Plan?

MR. JOHNSON:    Object to the form of the question.

THE WITNESS:    She --

Q.    (By Mr. Markowitz) Did she articulate anything that she felt that was in the Communications Plan that had caused her any concern other than that you might go out of business?

A.    She expressed concern about how could

William Murray, 7/17/2018          Allen v. FamilyCare, Inc.

285

OHA do something as that.

Q.    What communications with Northwest Primary Care Group existed on the subject of the Communications Plan?

A.    I know with regards to that there were verbal conversations with Bill Guest and probably some other individuals within the contracting unit at FamilyCare.

There is also a written communication from them that expresses, once again, concern about FamilyCare's ability to stay in business.

And as a result of that they moved forward with termination of their contract with concern over their financial -- the financial impact of FamilyCare.

Q.    Northwest Primary Care Group, did any representative say they believed any derogatory information that is contained in the Communications Plan?

A.    My understanding is they expressed similar concerns to Deborah Rumsey, that they didn't see how a state agency could do that.

Q.    And Recovery Works Northwest, why are they on the list?

A.    So Recovery Works Northwest actually the

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Exhibit 53
Page 9 of 14

William Murray, 7/17/2018                Allen v. FamilyCare, Inc.

286

communication I'm aware of is a written communication from them talking about the loss of FamilyCare and the adverse impact it would have on them and obviously -- or the reason for writing that was because of the events that were happening to FamilyCare.

Q.    Is that one of the entities that did an op ed piece on your behalf?

A.    My understanding is that they just chose to wrote -- write that letter.  I don't have any understanding other than that.

Q.    But it was very supportive of FamilyCare?

A.    It was a supportive letter of FamilyCare, yes, very much so.

Q.    Doesn't reference the Communications Plan, it references the fact that if you go out of business it will negatively impact them?

A.    That's correct.

Q.    South Tabor Family Physicians, why are they listed?

A.    Same thing, a discussion -- I believe this one was primarily verbal with them.  I believe there was some also e-mail conversation about the fact that the money that FamilyCare

William Murray, 7/17/2018          Allen v. FamilyCare, Inc.

287

had provided them had allowed them to, if I'm remembering correctly, allowed them to employ a number of mid-levels and the loss of -- the loss of that revenue would -- would impact them adversely.

Q.   Did any of these four entities cease doing business with FamilyCare before January -- end of January 2018?

A.   I believe the termination agreement or the termination by Northwest Primary Care was received prior to that date, yes.

Q.   All right.  So for the other three you continued doing business with them up until the point that your relationship with OHA ended?

A.   Right, with regards to Children's Health Alliance they had entered into another contract so they were no longer a single contract with FamilyCare.

Q.   And there was a one-month interruption in business with Children's Health Alliance?

A.   They had actually entered into another contract prior to -- another contract to be able to serve OHA members with Health Share.  And they had done that prior to January 1, 2018.

Q.   Well, did Children's Health Alliance

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Exhibit 53
Page 11 of 14

William Murray, 7/17/2018                Allen v. FamilyCare, Inc.

288

continue to serve FamilyCare patients up until the end of January?

A.    Yes, they did.

Q.    All right.  So all of the patients of all four of these entities continued to be reimbursed by FamilyCare -- their treatment was still reimbursed by FamilyCare up until the date that FamilyCare went out of business?

A.    If I remember correctly Northwest Primary Care terminated I believe at the end of the year or prior to that.

So I believe the statement may not be true with regards to Northwest Primary Care.

Q.    And as to that entity FamilyCare was losing money on all of the patient care with Northwest Primary Care Group; is that correct?

A.    What do you mean by losing money?

Q.    Well, you were in a negative position with your rates at the end of 2017, early January 2018.  This was a losing contract for you.

A.    Well, FamilyCare lost money for 2017 in its entirety.  So that statement -- to the extent you are making that statement tied to a single provider it would be applicable to all

William Murray, 7/17/2018          Allen v. FamilyCare, Inc.

289

providers.

Q.    All right.  So explain how FamilyCare can calculate any damage as a result of not being the insurer for any of the patients that were treated by Northwest Primary Care Group.

MR. JOHNSON:  Object to the form of the question, calls for a legal conclusion.

Q.    (By Mr. Markowitz) I don't want legal conclusions.  I want your explanation of damages, financial damages caused by inability to serve those patients.

A.    So if the rates had been actuarially sound for 2017 that event wouldn't have occurred.

MR. MARKOWITZ:  Let's take a break.

(Recess taken from 12:48 p.m. to 1:05 p.m.)

MR. MARKOWITZ:  I have no further questions.

(Deposition concluded at 1:06 p.m.)

(Signature reserved.)

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Exhibit 53
Page 13 of 14

William Murray, 7/17/2018          Allen v. FamilyCare, Inc.

290

C E R T I F I C A T E

I, Teresa L. Dunn, a Certified Shorthand Reporter for Oregon, do hereby certify that, pursuant to stipulation of counsel for the respective parties hereinbefore set forth, WILLIAM MURRAY personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and that the foregoing transcript, pages 144 to 291, both inclusive, constitutes a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof. Witness my hand and CSR stamp at Vancouver, Washington, this 18th day of July, 2018.

_____
TERESA L. DUNN
Certified Shorthand Reporter
Certificate No. 00-0367
Commission Expires:  6/30/20

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Exhibit 53
Page 14 of 14