

State of Oregon

# Oregon Health Authority Should Improve Efforts to Detect and Prevent Improper Medicaid Payments

November 2017

Secretary of State
**Dennis Richardson**

Audits Division, Director
**Kip Memmott**

Report 2017 – 25
November 2017

Exhibit 87
Page 1 of 44
SOS0015488

This page intentionally left blank.

Exhibit 87
Page 2 of 44
SOS0015489

# Oregon Health Authority Should Improve Efforts to Detect and Prevent Improper Medicaid Payments

## Report Highlights

Our audit found that Oregon Health Authority (OHA) recovery efforts are appropriate and reasonable, but the agency should strengthen efforts to detect and prevent improper payments in Oregon's $9.3 billion per year Medicaid program. Prevention of improper payments is more cost-effective than attempting to recover improper payments. We also found that delays in processing eligibility for thousands of Oregon's Medicaid recipients resulted in millions of dollars of avoidable Medicaid expenditures, a critical issue the agency failed to disclose until raised in a May 2017 Auditor Alert. Furthermore, OHA did not timely disclose relevant information, which impeded our audit work. OHA's new management has been more proactive and transparent in addressing these issues.

## Background

An improper payment is defined by the federal government as "any payment that should not have been made or was made in an incorrect amount (including overpayments and underpayments) under statutory, contractual, administrative, or other legally applicable requirements or where documentation is missing or not available."

## Purpose of Audit

The primary purpose of the audit was to determine if the Oregon Health Authority could improve processes to prevent, detect, and recover improper Medicaid payments. The secondary purpose was to follow-up on OHA's progress to resolve issues we raised in our May 2017 Auditor Alert.

## Key Findings

Within the context that Medicaid is a very complex and challenging program to administer, we found:

1. OHA has gaps in procedures for preventing certain improper payments. Insufficient management of the agency's processes for identifying and resolving payment and eligibility issues, prioritization of staffing resources, and efforts to address technology issues put taxpayer dollars at risk.

2. OHA lacks well-defined, consistent, and agency-wide processes to detect certain improper payments, especially related to coordinated care. We identified approximately 31,300 questionable payments based on our review of 15 months of data. OHA needs to continue researching these claims to determine how many were improper; OHA reported that only a small percentage were improper based on preliminary research of 2,700 claims.

3. OHA recovery efforts appear appropriate and reasonable, but may be underutilized due to OHA's limited procedures for detecting improper payments.

4. OHA reported completing the action plan to determine eligibility for the remaining backlog of 115,200 Medicaid recipients. Approximately 47,600 (41%) were deemed ineligible as a result, although this figure may decrease slightly through the end of November. Failure to address this issue in a timely fashion resulted in approximately $88 million in avoidable expenditures.

## Recommendations

Drawing from national leading practices, our report includes eight recommendations to OHA focused on strengthening efforts to detect and prevent improper payments. Oregon Health Authority agrees with our recommendations. The agency's response can be found at the end of the report.



Secretary of State, Dennis Richardson
Oregon Audits Division, Kip Memmott, Director

Exhibit 87
Page 3 of 44
SOS0015490

## About the Secretary of State Audits Division

The Oregon Constitution provides that the Secretary of State shall be, by virtue of his office, Auditor of Public Accounts. The Audits Division performs this duty. The division reports to the elected Secretary of State and is independent of other agencies within the Executive, Legislative, and Judicial branches of Oregon government. The division has constitutional authority to audit all state officers, agencies, boards, and commissions and oversees audits and financial reporting for local governments.

### Audit Team

Will Garber, CGFM, MPA, Deputy Director

Andrew Love, Audit Manager

Ian Green, M.Econ, CFE, CGAP, Principal Auditor

Rebecca Brinkley, MPA, CFE, Senior Auditor

Wendy Kam, CFE, MBA, Staff Auditor

Kathy Davis, Staff Auditor

Eli Ritchie, MPA, Staff Auditor

Laura Fosmire, MS, Communications Specialist

The audit team would also like to acknowledge the assistance of Teresa Furnish, CISA, Audit Manager and Erika Ungern, CISSP, CISA, Principal Auditor for their tremendous efforts relating to the Auditor Alert.

This report is intended to promote the best possible management of public resources. Copies may be obtained from:

website:     sos.oregon.gov/audits

phone:      503-986-2255

mail:       Oregon Audits Division
            255 Capitol Street NE, Suite 500
            Salem, Oregon  97310

We sincerely appreciate the courtesies and cooperation extended by the Oregon Health Authority's new director and employees of the Oregon Health Authority and Department of Human Services during the course of this audit.

Exhibit 87
Page 4 of 44

SOS0015491



Secretary of State Audit Report

# Oregon Health Authority Should Improve Efforts to Detect and Prevent Improper Medicaid Payments

## Introduction

The primary purpose of the audit was to determine if the Oregon Health Authority (OHA) could improve processes to prevent, detect, and recover improper Medicaid payments.  The secondary purpose was to follow-up on OHA's progress to resolve Medicaid eligibility issues we raised in our May 2017 Auditor Alert.

Our audit found that OHA's recovery efforts are appropriate and reasonable, but the agency should strengthen efforts to detect and prevent improper payments in Oregon's $9.3 billion per year Medicaid program.  Prevention of improper payments is more cost-effective than attempting to recover improper payments; however, both methods are necessary to ensure the integrity of the Medicaid program.  We also found that delays in processing eligibility for thousands of Oregon's Medicaid recipients resulted in millions of dollars of avoidable Medicaid expenditures, a critical issue the agency failed to disclose until raised in a May 2017 Auditor Alert.

### Medicaid is a critical safety net program that provides health care to one in four Oregonians

Medicaid is a state and federal government program that provides health care coverage to low-income adults, children, pregnant women, elderly adults, and people with disabilities.  It is financed through federal and state funding and is administered by each state.  Approximately 1 million Oregonians are enrolled in the state's Medicaid Program, the Oregon Health Plan.  This represents approximately 27% of the state's population.

Medicaid is a critical safety net program that helps low-income individuals and families receive access to health care services.  Examples include, but are not limited to, inpatient and outpatient hospital stays, medical screenings and preventative services, dental care, maternity care, and behavioral health care[1].

OHA administers Oregon's Medicaid program and sets guidelines regarding eligibility and services in accordance with federal requirements.

---

[1] Behavioral health includes mental health and substance abuse treatment.

Exhibit 87
Page 5 of 44
SOS0015492

Department of Human Services (DHS) staff work in partnership with OHA to ensure qualified individuals receive Medicaid coverage.

Medicaid is distinct from Medicare. Medicare is a federally funded program geared toward seniors and people with disabilities. Medicare has different eligibility requirements than Medicaid. Some Oregonians qualify for both Medicaid and Medicare and are known as dual eligible. For dual eligible clients, Medicare pays covered medical claims before Medicaid.

### One in three dollars spent by the state is for Medicaid

Medicaid represents a significant portion of Oregon's state and federal expenditures. For example, the state spent approximately $9.3 billion on Medicaid programs in fiscal year 2016. About $1.2 billion came from the state general fund, with additional state funding generated through provider assessments, a funding strategy used in 48 other states. Approximately $2.6 billion in Medicaid expenditures relates to work performed by DHS, with the remaining $6.7 billion expended by OHA.

**Figure 1: Oregon Spends One-third of the State Budget on Medicaid**



Transportation (6%)

Medicaid (35%)   Human Services (12%)   Education (21%)   Public Safety (6%)   Other (20%)

Source: State of Oregon Financial Condition Report, FY2016, Report 2017-14.

The federal share of Medicaid expenditures varies by type of expenditure and by medical assistance program. For example, rates vary based on such spending categories as health care delivery, administrative, or technology expenditures. For payments made on behalf of clients for health care services, the federal share has ranged each year from about 64% for most clients up to 100% for clients deemed newly eligible for Medicaid. OHA reported that in Fiscal Year (FY) 2016 Oregon's state contribution for Medicaid was 18%, with the remaining 82% paid with federal funds.

Beginning in calendar year 2017, the federal government started reducing its share of funding for newly eligible clients. By 2020, Oregon will need to contribute a 10% match for the approximately 360,000 newly eligible

Exhibit 87
Page 6 of 44
SOS0015493

clients, which translates into hundreds of millions of dollars in additional state Medicaid funding over the next decade.

## Medicaid expansion increased caseloads by about 400,000

President Obama signed the federal Patient Protection and Affordable Care Act, commonly called the Affordable Care Act (ACA), on March 23, 2010. Oregon began implementing ACA provisions in January 2014. The ACA enabled Oregon to expand its Medicaid program to cover individuals who were not previously eligible. As a result, Medicaid eligibility in Oregon grew from approximately 600,000 individuals in 2013 to more than 1 million by the end of 2014, where it has remained.

Total Medicaid expenditures have likewise increased. During FY2013, expenditures for Medicaid at DHS and OHA totaled about $5.5 billion; in FY2016, this increased to about $9.3 billion. These expenditures, which consist of medical assistance payments as well as administrative expenses, are processed through several different computer systems at DHS and OHA.

Figure 2: Total Medicaid Spending has Grown Over the Past Decade

Source: State of Oregon Financial Condition Report, FY2016, Report 2017-14.

OHA primarily uses the Medicaid Management Information System (MMIS) to pay health care providers for services they render to individuals who are eligible for Medicaid. During FY 2016, MMIS processed more than $6.7 billion in payments to providers, including about $4.9 billion to Coordinated Care Organizations (CCO) as capitated payments based on Medicaid enrollments. Both OHA and DHS expenditures are included in the figures above.

In December 2015, OHA implemented a new computer application, the Oregon Eligibility System (ONE), specifically designed to determine whether individuals are eligible for Medicaid according to the new ACA requirements. This system provides the needed core functionality to process most Medicaid applications. DHS uses other legacy computer systems to determine eligibility for other specific groups of Medicaid clients, but intends to begin transferring more clients into the ONE system.

Figure 3: IT System Handling of Medicaid Population, as of 9/24/2017

| | |
|---|---|
| 267,375 | Legacy Systems |
| + 775,857 | ONE System |
| 1,043,232 | Total Eligible |

Source: OHA

Exhibit 87
Page 7 of 44
SOS0015494

As of September 2017, approximately 74% of all Medicaid clients had their eligibility determined through the ONE system, as shown in Figure 3.

## Medicaid is a very complex program

Medicaid is one of the most complex government programs in the country. Each state operates its Medicaid program differently within parameters set by the U.S. Centers for Medicare and Medicaid Services (CMS). CMS is responsible for oversight of state programs and approves waivers to federal requirements.

Federal regulations and waivers provide states with flexibility as to how they administer Medicaid, including what services they provide.

Due to this flexibility, there is substantial variation among the states in terms of Medicaid eligibility, covered benefits, and provider payment rates. In addition, waivers and demonstration programs[2] allow states to operate their Medicaid program outside of normal federal rules. Oregon participates in multiple demonstration programs and waivers.

## Oregon pioneered coordinated care model

Since 1994, Oregon Medicaid benefits have been delivered through the Oregon Health Plan. The Oregon Health Plan was a pioneering demonstration project that differed from traditional Medicaid in that medical services are provided in accordance with a prioritized list, which ranks health care conditions and associated treatments in order of clinical effectiveness and cost-effectiveness. These medical services are provided through managed care plans that operate similarly to traditional employer provided insurance programs. The state makes a monthly payment that covers a host of services, regardless of the amount of services a client receives. This payment method is known as capitation.

In 2012, these plans were expanded to include dental and some behavioral health services. Previously, medical, dental, and some behavioral health care were not coordinated under one organization.

OHA has reported that the coordinated care model has saved the state millions of dollars and improved the quality of care for Oregonians receiving Medicaid. One of the features of the coordinated care model is a pay-for-performance program where OHA distributes incentive payments to organizations that have met or exceeded targets geared at improving client outcomes. For example, one metric is the percent of adolescents receiving well-care visits. These metrics can also be used to drive down costs, such as reducing the number of clients who seek routine health care services through an emergency department.

---

[2] Pilot projects designed to test and measure the effect of potential program changes, for example, the Oregon Health Plan.

Exhibit 87
Page 8 of 44
SOS0015495

## Oregon uses two payment methodologies for Medicaid

About 85% of Medicaid clients in Oregon are enrolled with one of Oregon's 16 CCOs (see a list of all 16 CCOs in Figure 6). CCOs deliver health care services under contracts with OHA for a CMS approved monthly rate, known as a capitated payment. CCOs submit encounter data back to OHA to show what services were performed so outcomes can be measured and future rates can be based on services provided. This is shown in Figure 5 on page 10.

Some Medicaid clients, such as tribal members, are not required to enroll in a CCO and can choose to receive health care services from doctors, pharmacies, and other professionals who submit individual claims to OHA for these services. This practice is known as fee-for-service (FFS) and is shown in Figure 4 below. FFS is generally considered more expensive than coordinated care.

### Figure 4: Visual of Fee-For-Service Payment Model



In a fee-for-service (FFS) model, the Medicaid client visits a healthcare provider. The provider bills OHA directly for approved services provided and OHA then pays the provider. FFS costs represent about 27% of the costs for Oregon's Medicaid program.

In a coordinated care model, as shown below, CCOs manage health care for thousands of clients. OHA pays CCOs a set rate each month per client to cover approved services. CCOs pay providers in their networks for services rendered and send detailed encounter data to OHA. This data shows the services provided and helps set future rates for capitated payment. Coordinated care capitation and other non-FFS payments represent about 73% of costs for Oregon's Medicaid program.

Exhibit 87
Page 9 of 44
SOS0015496



Figure 5: Visual of Coordinated Care Payment Model

**Figure 6: Oregon's 16 CCOs**

AllCare

Cascade Health Alliance

Columbia Pacific

Eastern Oregon

FamilyCare

Health Share

InterCommunity Health Network

Jackson Care Connect

PacificSource Community Solutions Central Oregon

PacificSource Community Solutions Columbia Gorge

PrimaryHealth

Trillium Community Health Plan

Umpqua Health Alliance

Western Oregon Advanced Health

Willamette Valley Community Health

Yamhill Community Care

## OHA is responsible for program integrity processes to prevent, detect, and recover improper Medicaid payments

An improper payment is defined by the federal government as "any payment that should not have been made or was made in an incorrect amount (including overpayments and underpayments) under statutory, contractual, administrative, or other legally applicable requirements or where documentation is missing or not available."

Serving as the single state Medicaid agency, OHA is responsible for all aspects of Oregon's Medicaid program, including preventing, detecting, and recovering improper payments.

Nationwide, CMS estimates Medicaid has an approximate 10% improper payments rate, which includes both under- and over-payments as well as fraud, waste, and abuse. Given the billions of dollars flowing through Medicaid, improper payments may amount to millions of dollars annually. In Oregon, both OHA and CCOs make Medicaid payments.

According to the Government Accountability Office (GAO), organizations should use program integrity practices to ensure the wise use of taxpayer dollars. Program integrity refers to efforts to prevent and reduce provider fraud, waste, and abuse in the Medicaid program. They consist of three primary processes: prevention, detection, and recovery.

Exhibit 87
Page 10 of 44

SOS0015497

- Prevention is the process for ensuring that only appropriate payments are made through pre-payment processes such as system controls, contract management, prior authorization, and external quality reviews.
- Detection is the process by which OHA and CCOs identify payments that were improperly made through tools such as financial audits, claims analysis, and data-matching.
- Recovery is the process for collecting improper payments from a provider, CCO, or client. Both OHA and CCOs can execute improper payment recovery efforts. Improper payments are recovered through either reimbursements or reductions of future payments. The federal share of any improper payment is returned to the federal government, while the state retains the state share.

See appendix B on page 36 for more information on GAO's management framework.

Specific controls or procedures can be used by OHA and CCOs across these three processes. For example, data matching can serve as a detective control, but can also be utilized for prevention and recovery efforts.

As noted later in the report, OHA began an initiative in 2016 to strengthen the agency's program integrity efforts.

## Numerous federal and state entities are involved in managing Medicaid

Throughout the report we reference various government entities and the role they have in processes to prevent, detect, and recover improper Medicaid payments. This section provides a summary of selected stakeholders with additional details found in the body of the report.

Within the federal government, we highlight three entities. The first is the Center for Medicare and Medicaid Services (CMS), which is the federal agency ultimately responsible for overseeing Medicaid and Medicare. CMS oversees the Medicaid program at the federal level, and sets standards, issues guidance, and approves Oregon's Medicaid program among many other duties. The second federal partner is the U.S. Treasury. The Treasury's Do Not Pay Center, is dedicated to reducing improper payments across all federal programs operated at the state level. The third is the Government Accountability Office (GAO), which has issued a number of audit reports on the Medicaid program and various frameworks for managing risks.

Within state government, there are numerous entities. These units reside largely within OHA, which is ultimately responsible for Oregon's Medicaid program. The Office of Program Integrity (OPI) is responsible for overseeing activities within OHA relating to detecting, preventing, and recovering improper Medicaid payments. Within OPI is the Provider Audit Unit (PAU), which conducts FFS audits. The Office of Payment Accuracy and Recovery (OPAR) is a shared service with the Department of Human Services. Within OPAR are the Data Match Unit, Overpayment Writing Unit,

Exhibit 87
Page 11 of 44
SOS0015498

Overpayment Recovery Unit, Health Insurance Group, Personal Injury Lien Group, Medical Payment Recovery Group, and an external Recovery Audit Contractor.  Units within OPAR generally focus on processes to prevent, detect, and recover improper payments.

Other units within OHA also play key roles, but are not highlighted in detail in the report below.  For example, the Health Systems division operates the Medicaid program and performs work such as setting policy, performing health analytics, overseeing FFS providers, overseeing CCOs, conducting contract management, managing the MMIS (Medicaid Management Information System), and processing eligibility.  The Office of Information Services performs work related to managing MMIS and various Medicaid related computer systems.  The Department of Human Services also operates a number of Medicaid related programs, but these are administratively overseen by OHA.

External third parties also play a significant role.  The largest group is the state's 16 CCOs that provide Medicaid services through provider networks to about 800,000 clients.  Providers, typically a doctor's office, can also operate within the FFS model and bill OHA directly.  The MMIS is managed, in part, through a third party vendor, DXC (formerly Hewlett Packard Enterprises).  OHA also contracts out the actuarial rate setting process to a third party actuary, Optumas, and works with External Quality Review Organizations, such as HealthInsight.

Exhibit 87
Page 12 of 44
SOS0015499

## Objective, Scope, and Methodology

### Objectives

Our primary audit objective was to determine whether OHA can improve processes for detecting, preventing, and recovering improper Medicaid payments.

Our secondary objective was to follow-up on OHA's progress to resolve issues we raised in our May 2017 Auditor Alert. See Appendix A on page 35.

### Scope

The audit focused on the activities, entities, and data involved with detecting, preventing, and recovering Medicaid improper payments. Our work also included following up on a backlog of eligibility determinations.

Our audit work was limited by prior agency management. At times, we were prevented direct access to staff, had our interviews with staff monitored, had our information requests delayed, and were occasionally provided with incomplete and/or inaccurate information. In September 2017, Governor Brown appointed a new agency director, after which staff responsiveness and access improved.

### Methodology

To address our objective, we executed a multi-faceted methodology that included, but was not limited to: conducting interviews, reviewing various reports, examining contracts with CCOs, conducting a survey of all 16 CCOs, and analyzing more than 200 million records of Medicaid payment and encounter data. We conducted interviews with approximately 40 state leaders, employees, and other related individuals.

We reviewed reports and documentation pertaining to the Medicaid program, with a particular focus on improper payments. Documentation included reports from the GAO and CMS, state and federal laws and policies, and a sample of annual External Quality Reviews of CCOs. We also compared contracts from other states noted as leading practice states to Oregon's contracting.

To assess the reliability of the data used in this audit, we traced a sample of randomly selected claims across multiple files and systems to provide reasonable assurance that the information we obtained was complete and accurate. Additionally, we provided a variety of data verification techniques such as comparing control totals, verifying data formatting, and reviewing scripts and coding used to generate this information. No errors were identified during this testing. Furthermore, we gained an understanding of the internal controls around this data and how the agency uses this information during the courses of normal business processes.

Exhibit 87
Page 13 of 44
SOS0015500

We also used multiple independent verifiers of our analysis and vetted results with OHA.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective. We believe that the evidence obtained and reported provides a reasonable basis to achieve our audit objective.

## Impediment to audit completion

*Government Auditing Standards* require that we report circumstances that interfere with the completion of our audits[3]. In particular, we are required to report potential scope limitations.

Some employees informed us that their manager had directed them to not respond directly to auditor follow-up questions and to send responses through managers identified as points of contact for this audit. Preventing direct follow-up slowed our work, potentially limited our access, and created a bottleneck for both us and OHA. We had questions that staff could answer in minutes, but were instead required to ask managers, who sometimes provided incorrect information because they lacked the same level of familiarity as staff.

In addition, OHA management monitored our contacts with agency staff. In one example, an employee was flanked by two managers and OHA's Chief Auditor for an audit interview. In another example, a total of six agency staff, including OHA's prior Chief Financial Officer/Chief Operations Officer at the time, accompanied one auditor around during a tour of OHA's eligibility processing center.

Front line employees provide auditors with valuable information that may not be observed by an organization's management team. Staff may also possess detailed knowledge about an agency's programs that management may not know. Employees are generally more comfortable sharing information when their manager or internal auditor is not present.

Although audit requests can be time consuming, as was the case with some of our requests on this audit, it is important to provide timely and accurate information to allow auditors to efficiently do their work. This is especially true for documentation that is readily available.

OHA delayed answering requests and at times provided incomplete or erroneous information. For example, in February, the audit team inquired about a list of carve outs to perform the testing mentioned on page 16. Five months later, OHA provided an answer that ended up being incomplete.

---

[3] U.S. Government Accountability Office, Generally Accepted Government Auditing Standards (2011 Revision), GAO-12-331G, 7.11

Exhibit 87
Page 14 of 44

SOS0015501

In mid-September, the agency informed us for the first time about dozens of other carve outs. Another example was when the agency took more than a month to provide a copy of an existing draft contract.

Since taking over the agency on September 1, 2017, the new Director of OHA and Chief Financial Officer have taken immediate and decisive action to address these issues. Response timeliness and direct access improved dramatically after September 7, when we updated him and OHA's new CFO on the status of our requests. Another example occurred on October 31 when OHA proactively informed the audit team of a significant issue relating to dual eligible clients that resulted in improper drawdowns of federal funds and overpayments to CCOs. Lastly, on November 17, OHA informed our office of ongoing efforts to resolve 18 items relating to possible payment errors and other issues. The estimated initial impact of these issues is $186 million[4], including the issue with dual eligible clients and a few items that may yield savings to the state. These recent efforts are appreciated.

---

[4] See OHA's website for details: http://www.oregon.gov/oha/HSD/OHP/Pages/Medicaid-Issues-Resolution.aspx

Exhibit 87
Page 15 of 44
SOS0015502

## Audit Results: Oregon Health Authority Should Improve Efforts to Detect and Prevent Improper Medicaid Payments

Prevention of improper payments is more cost-effective than attempting to recover improper payments already issued. Oregon Health Authority (OHA) recovery efforts are satisfactory, but the agency should do more to strengthen efforts to prevent improper payments.

The lack of strong improper payment detection procedures poses a significant risk to Oregon's Medicaid program.

The lack of strong improper payment detection procedures poses a significant risk to Oregon's Medicaid program. Robust program integrity efforts, including processes for prevention, detection, and recovery of improper payments, could do more to mitigate this risk.

OHA program integrity efforts have gaps and weaknesses, with system controls lacking in certain areas. CCOs, who are key stakeholders in detecting improper payments, also generally appear to lack effective and proactive improper payment detection and recovery processes. Understaffing and unclear contract and administrative rules language make an already complex program even more difficult to manage. We offer several recommendations for improving contract language, clarifying administrative rules, and improving program integrity.

As of August 31, 2017, OHA reported completing its action plan to clear a backlog of 115,200 eligibility determinations. However, the agency was only able to provide preliminary data to the audit team due to federal regulations and processing timeframes. Our office plans to verify the accuracy of these redetermination efforts once the final data becomes available. We plan to report the results of our testing in a future report.

### Audit testing detected risk of potential duplicate payments

We identified about 31,300 potential duplicate payments over the 15 months reviewed.

We analyzed Fee-For-Service (FFS) and Coordinated Care Organizations (CCO) capitated payments and identified thousands of detailed claims that could have been potential duplicate payments. Specifically, for the 15 months we reviewed, we identified approximately 31,300 potential duplicate payment claims. These potential duplicate payments represent a small percent of monthly payments. Not all of these potential duplicates are improper given complexities described in the following paragraphs.

Medicaid clients have freedom of choice regarding where they receive certain services, due to provisions in Federal law, CCO contracts, Oregon Medicaid Waivers, or DHS|OHA programs. Native Americans who qualify for Medicaid have the freedom to choose their providers and can participate in FFS or CCOs.

The CCO contract describes services for which the CCO is responsible or for which they must provide care coordination. Carve out services are a subset of Medicaid services that are not included in the CCO contract and therefore are not included in the capitation rate the CCOs receive to provide services. Examples of these services include mental health drugs

Exhibit 87
Page 16 of 44
SOS0015503

and personal care services in adult foster homes. These services are billed on a FFS basis, even if the person is a member of a CCO.

OHA could not provide a comprehensive inventory of all carve out services. Without an inventory it is difficult to manage carve outs and detect or prevent potential duplicate payments. Additionally, controls within MMIS that should prevent these duplicates need increased management attention. Our testing identified some claims that bypassed these controls due to how they were billed. We are not reporting how these controls were bypassed, as it could result in future improper payments.

OHA management agrees there is a risk with these potential duplicate payments and has reported they intend to be more proactive in managing and testing controls that would mitigate that risk.

Our testing methodology likely identified false positives. OHA needs to conduct further research on these 31,300 potential duplicates to determine whether any of these specific claims are improper and the dollar amounts associated with them. OHA has researched over 2,700 of them to date and reported to us that the vast majority were appropriate and that only a small percentage needed adjustments.

An example of an improper duplicative claim we found involved an office inappropriately billing a normal visit as FFS, when it was covered under a CCO's capitated payment. After bringing this to their attention, OHA reported it was taking action to prevent this improper payment from occurring in the future and to recover these funds.

In 2011, the Oregon Audits Division conducted an audit of MMIS[5], which found that the Medicaid payment system was generally working as intended with a few exceptions. One of those exceptions was duplication between FFS and CCO payments for a specific set of clients with unique or special circumstances. This was due to an implementation error in the then-new MMIS system. Medicaid administrators estimated that approximately $10 million in overpayments occurred between the system startup in December 2008 and October 2010, due to a programming error with one system control. The report noted these errors were significant, but only represented a small percentage of total payments.

In the spring of 2017, OHA implemented new controls to prevent certain duplicate payments after they detected some potential improper payments. Due to ongoing OHA work to resolve this issue, we are not reporting the specific control OHA implemented. However, given what OHA found and the results of our testing, we determined more work is needed to prevent and detect improper payments. Controls need to be put in place, documented, and tested on a routine basis to ensure their effectiveness.

---

[5] As noted in audit report 2011-12, one MMIS control weakness resulted in $10 million in overpayments, but generally the system was working as intended. http://sos.oregon.gov/Documents/audits/full/2011/2011-12.pdf

Exhibit 87
Page 17 of 44
SOS0015504

System controls in the form of edits and audits are discussed further in following section.

## OHA should enhance efforts to prevent improper payments

OHA relies on MMIS[6], the state system that issues payments for services covered under Medicaid, as its key tool for preventing improper payments. Within MMIS, there are controls that prevent improper claims from being paid called edits and audits.

System edits and audits ensure that a claim adheres to program rules before being paid. Edits review the claim for information such as format, provider and recipient eligibility, consistency, and reasonableness. For example, an edit could prevent payments for gender-specific services, such as maternity care, for a male client. Audits review the claim against historical information to prevent payment for duplicate services and to ensure service limits are not exceeded. For example, an audit could prevent payment for a service that was paid for in the prior month.

### Critical system controls need more attention

Given the importance of these controls to Oregon's multi-billion dollar Medicaid system, OHA should proactively manage them to ensure optimal effectiveness. However, the agency does not periodically test all of these controls to ensure that they are working as intended. The agency only tests new or modified controls.

Further, OHA does not maintain a comprehensive inventory of edits or audits. Specifically, the agency was unable to provide a comprehensive system edit and audit inventory, including types of claims that would trigger preventative controls. To generate such an inventory, OHA would have to manually review and assess approximately 1,500 controls. Audit work identified several system edits and audits that were inactive; however, OHA were unaware that these controls were turned off due to poor system documentation.

Having a strategic framework and a firm understanding of these controls, including what they do, and when they trigger is critical for preventing improper payments. Gaps within these edits and audits can increase the risk that MMIS issues improper payments. Without mapping out and formally documenting the preventative control environment, OHA lacks the knowledge it needs to ensure it has complete coverage, especially around duplicate payments, potentially putting millions of taxpayer dollars at risk.

OHA's 2017 budget, which the legislature subsequently approved, requested two additional staff for the business unit that manages MMIS

---

[6] As noted in audit report 2017-09, MMIS generally processes capitated payments appropriately, but manual inputs and overrides in the Oregon Eligibility System need better monitoring: http://sos.oregon.gov/audits/Documents/2017-09.pdf

Exhibit 87
Page 18 of 44
SOS0015505

enhancements, including testing of the system and improving preventative controls. OHA's budget justification for these positions noted "the demand for changes and enhancements consistently outpaces the capacity of two people." Additional staffing should improve proactive testing of the system as well as enhance the system's functionality.

### Contractor hired in 2016 to help improve Medicaid program integrity

OHA began efforts to improve program integrity in 2016 after recognizing the growing risks associated with a new eligibility system and the growth in the Medicaid caseload. These efforts involved hiring a contractor to assess OHA's strengths and weaknesses across the Medicaid program, including a detailed look at the people, processes, and technology involved in administering the program.

OHA's goal is to incorporate recommendations into a 2018 program integrity strategic plan.

The scope of work has increased several times over the past year. A number of deliverables are still outstanding, but OHA's goal is to incorporate recommendations into a 2018 program integrity strategic plan. OHA's head of program integrity said that the quality and breadth of the work performed will help him identify opportunities to improve the Medicaid program. The forward-looking goal is to develop specific steps OHA can take to triage and implement the recommendations it has received.

## OHA should explore opportunities to improve processes to detect improper payments

Currently, OHA detects potential improper payments through various processes, including provider audits, data analytics, financial statement analysis, data matching, and identifying other insurance that should pay on a claim before Medicaid.

However, OHA can improve improper payment detection efforts. For example, OHA's Provider Audit Unit (PAU) within the Office of Program Integrity (OPI) does not currently audit healthcare providers under the CCO model. OHA reported that not auditing providers under the CCO model has been an area of concern for a number of years, and in 2016, OHA requested authority to add seven additional auditors to OPI to address this issue. This request was granted by the Oregon Legislature in 2017 and OPI has started the process of hiring auditors. CCO provider audits will help ensure the accuracy of claims data used to determine CCO payments. The Data Matching Unit could also improve its practices by using more data matching tools for detecting improper payments.

### OHA should strengthen oversight of payments to CCOs

PAU consists of nine staff members who audit claims and providers that fall under the Fee-For-Service (FFS) payment model. PAU executes audits when they receive tips on potential issues with a provider or identify irregular billing through data analytics. PAU's research analyst queries

Exhibit 87
Page 19 of 44
SOS0015506

claims and identifies providers that may be outliers through various analytic techniques. Suspect claims are sent to an auditor to review, who then requests supporting documentation from the provider.

PAU also employs registered nurses to audit claims for medical necessity. For example, the nurses will compare current medical practices for specific diagnoses against claims submitted by providers. When a provider charges for a more expensive service than medically necessary, PAU has the ability to recover those funds because of the nurses on staff. A simple example would be if an individual sprained his or her ankle, but the provider billed for surgery as the treatment. The nurse could determine that surgery, a much more expensive medical claim, was not medically necessary for a sprained ankle. Only licensed health care professionals can make these determinations, especially in more complex situations.

All FFS providers under contract with OHA and DHS are subject to PAU audits. In 2016, PAU detected and recovered approximately $3.4 million from FFS audits and identified an additional $750,000 in preventable future costs[7]. However, FFS providers make up only about 25% of the total Medicaid expenditures, leaving most payments unaudited.

Notwithstanding a recommendation we made in a 2002 audit, Medicaid administrators have never prioritized auditing CCO encounter claims data used to set rates for most Medicaid payments[8]. Auditing this claims data could be achieved by comparing provider records against the data submitted to OHA. Furthermore, the federal government provides a specific optional protocol[9] for performing this validation work, but OHA has never opted to contract with an independent external review organization to perform this work.

The federal government, through the Payment Error Rate Measurement (PERM), audits Medicaid payments every three years through the use of statistical modeling. In 2015, Oregon's PERM FFS error rate was estimated to be about 9%, which is lower than the national average. PERM also performs a limited review of payments to CCOs and found Oregon's error rate to be 0.4%, which is marginally higher than the national average.

During the 2015 PERM review, CMS identified an issue with individuals covered by both Medicare and Medicaid that resulted in CCOs getting

---

[7] Also known as cost avoidance.

[8] In 2002, the Oregon Audits Division recommended the Medicaid program validate encounter data used to set capitated payment rates, see http://sos.oregon.gov/Documents/audits/full/2002/2002-02.pdf. However, For 14 years, no action on this recommendation was taken despite the vast majority of Medicaid payments being made with capitated payments. In 2016, OHA started the process to request additional funding and hire new staff.

[9] For further information see guidance CMS has posted on its website entitled External Quality Review Protocol #4, https://www.medicaid.gov/medicaid/quality-of-care/downloads/eqr-protocol-4.pdf

Exhibit 87
Page 20 of 44
SOS0015507

overpayments for dual-eligible individuals. In October 2017, OHA released information on this issue. The initial estimated impact is approximately $74 million over three years.

It is important to note that coordinated care data, also known as encounter data, are not claims for payment. Rather, they are a record of services rendered to Medicaid recipients. The data is used to develop future rates. Detecting improper encounter data can help minimize the risk that future rates are set too high. Lacking validation of encounter data increases the risk that OHA develops capitated payments on improper encounter data and potentially sets rates too high.

In 2016, OPI developed a Policy Option Package to expand their improper payment detection efforts to include reviewing providers under the coordinated care model. In 2017, the legislature authorized seven additional auditor positions and base funding for the purchase of advanced software to analyze health care data.

These budget items will allow OPI to better perform audits of coordinated care providers going forward. OHA has already begun the process of interviewing individuals for some positions with a plan to post additional jobs in the coming months. OHA has also purchased sophisticated software to perform advanced analytics on Medicaid claims. This ongoing effort will help strengthen PAU's efforts to prevent, detect, and recover improper payments.

### *OHA could better identify potential improper payments by allocating more resources to its data matching efforts*

The Data Match Unit (DMU) is a shared service between DHS and OHA, comprised of seven staff. The DMU identifies clients who could be ineligible for benefits due to receiving benefits in another state, being incarcerated, or deceased based on state death records. The DMU then provides this information to other units to take appropriate action.

The DMU matches current Oregon Medicaid clients to other states where they may also be receiving benefits. Staff perform research to determine the state of residency for matched clients. However, DMU typically only reviews about a third of 10,000 matched records each quarter due to staffing resources. The DMU also finds 3,000 to 4,000 clients identified as potentially incarcerated each month. DMU reported they review at least 80% of these matches.

The DMU also identifies deceased Oregonians through Oregon's Vital Records Database, but does not use a broader list of deceased individuals maintained by the U.S. Social Security Administration (SSA). This list is known as the Death Master File (DMF). OPAR reported the DMF did not add significant value to their processes. However, out-of-state deaths are not captured in Oregon's Vital Records database. In addition, our prior

Exhibit 87
Page 21 of 44
SOS0015508

audit, which used the DMF, found that payments were made for deceased individuals in other states.[10]

OHA could improve its detection capabilities by taking advantage of other data matching techniques. OHA does not use free data matching resources offered by the United States Treasury. The Treasury's Do Not Pay Center works with states that operate federal programs to identify and prevent potential improper payments by performing advanced data matching against a multitude of data sources, some of which are only available to the federal government. OPI has assigned a Policy Analyst to complete further research on the Do Not Pay Center in relation to OHA's current data matching practices.

By using Do Not Pay's services, states can get better data matching results than they could on their own. The center is also fully funded by the federal government, so the only investment OHA would need to make is paying for staff to follow up on the results of the data matching.

### Federal rule changes put more emphasis on program integrity

Program integrity efforts are funded in partnership between the state (50%) and federal government (50%). However, Oregon must repay federal funds within a year for detected improper payments even if the state is unable to recover them, except for certain cases such as bankruptcy. While the requirement to return the federal share is reasonable, it may act as a disincentive for states to fund and implement robust program integrity functions. This is one reason, the federal government, through the U.S. Treasury Do Not Pay Center, is fully funding certain program integrity activities.

In 2016, CMS issued new managed care rules[11] including requiring enhanced federal oversight and program integrity efforts. States are also required to increase the transparency and accuracy of their capitated rate setting process. This will require OHA to better monitor CCOs as well as improve its program integrity efforts around prevention and detection. In addition, OHA will be responsible for receiving an independent audit at least every three years on the accuracy, truthfulness, and completeness of encounter data submitted by each CCO.

### Data matching can also improve client experience

Beyond detecting potential improper payments, data matching can be used to improve service delivery and client experience. During the annual eligibility determination process, a significant portion of Medicaid recipients do not respond to mailings from OHA, which results in these

States can access advanced data matching services from the U.S. Treasury's Do Not Pay Center free of charge. The Do Not Pay Center can get better data matching results than states can get on their own.

Data matching can also be used to improve service delivery and client experience.

---

[10] Report 2013-10, Public Assistance: Improve Eligibility Procedures and Consider Approaches of Other States, http://sos.oregon.gov/audits/Documents/2013-10.pdf

[11] According to CMS, this final rule is the first major update to Medicaid and CHIP managed care regulations in more than a decade: https://federalregister.gov/a/2016-09581

Exhibit 87
Page 22 of 44
SOS0015509

clients no longer being eligible for Medicaid. This percentage has varied and has ranged from 15% to 28%. A significant portion of these non-responders may otherwise qualify for Medicaid.

A non-response situation can happen because the individual moved, but forgot to report a change of address to OHA. Losing Medicaid benefits immediately increases risks and challenges to clients and families eligible for these services. OHA could proactively identify eligible clients who relocate prior to benefit termination. OHA can also retroactively restore benefits up to a maximum of 90 days if a client re-engages with the agency. This limits the financial risk for these clients.

The Oregon Department of Motor Vehicles and United States Postal Service maintain databases that could be used to improve the accuracy of mailings when people move. According to CMS, other states have entered into agreements with their state's Department of Motor Vehicles and the United States Postal Service to improve the accuracy of their address information. The federal government gives states the flexibility to perform this work.

CCOs also report changes they receive to OHA. OHA could explore opportunities to improve this process to prevent more individuals from temporarily losing access to health care services. This could also save the state money, as individuals who re-apply enter the program in FFS rather than the less expensive, and more effective, coordinated care program.

Updated address information can also be used to help determine an individual's residency. While automatic termination of benefits based on this data alone is prohibited by federal law, it could trigger a request for information. The client must validate the new address prior to the state taking adverse action. Our testing found approximately 400 individuals were on the Oregon Health Plan as of May 2017, but had obtained a driver's license in another state during the prior year. If OHA had requested additional information about each individual's state of residency and each individual was deemed ineligible as a result of that process, this data match could have potentially yielded approximately $645,000 in savings ($150,000 state funds). These estimates do not account for staff costs, but the costs to investigate the 8 matches per week would likely be less than the potential savings.

OHA uses many processes to help reduce the risk associated with improper payments. The following two sections highlight some examples of processes that are effective, but alone are not enough to address all controllable risks.

### *Third Party Liability detects other insurance responsible for medical bills*

The Medicaid program is the payor of last resort, meaning that other insurance should be exhausted before Medicaid will pay a claim. When Medicaid clients have other insurance, it is called third party liability. We found that OHA's processes to detect third party liability appear

Exhibit 87
Page 23 of 44
SOS0015510

reasonable. Three groups within OHA identify and recover these payments from insurance companies:

- The Personal Injury Lien Unit detects and recovers payments made when a client was involved in a personal injury situation, such as a car accident, and when Medicaid paid the claim before the other insurance.
- The Health Insurance Group identifies clients who have other medical insurance. The Medical Payment Recovery Unit recovers in these circumstances.
- As required by federal guidelines, OHA has a Recovery Audit Contractor, which works with the Health Insurance Group to also identify and recover third party liability claims. Federal law mandates the contractor receive a set percentage of the total funds recovered.

### *Financial audits and analysis provide good high-level review*

Each quarter, CCOs send OHA detailed financial statements. OHA staff review the statements for accuracy and to identify any inconsistencies or unusual fluctuations.

CCOs are also required to submit their annual audited financial statements, which OHA uses with the quarterly statements to reconcile the encounter data at a high level. This encounter data is later used in the actuarial rate setting process for capitated payments. OHA performs additional work to clean this data and identify only final claims after accounting for voids and adjustments.

This process, known as triangulation, has the potential to identify large irregularities, which could be the result of improper payments. It is unlikely to detect improper payments at the claim level. Financial audits and analysis alone are not always sufficient, as has been shown by financial fraud cases like Enron.

## Some CCOs appear to perform only limited activities to detect improper payments

CCOs are required to develop their own policies and procedures for detecting fraud, waste, and abuse. These policies vary considerably between the CCOs with some having strong written documentation and reported procedures, while others lacked sufficient detail.

We surveyed all 16 CCOs to understand their internal processes to identify improper payments. We gained access to this confidential information through a clause in OHA's contracts with the CCOs. The responses we received varied widely in methods and amounts reported. When asked how each CCO identifies improper payments within their provider network, some CCOs reported that they delegate these functions to their subcontractors, while others reported using specialized software on claims that identify outliers and specific kinds of fraud, waste, and abuse.

Exhibit 87
Page 24 of 44

SOS0015511

Seven CCOs reported detecting less than $100 in improper payments in 2016.

When asked for the dollar amount of detected improper payments for 2016, seven CCOs reported identifying less than $100, with six of those reporting $0 or that they do not track improper payments. Meanwhile, five of the CCOs reported more than $1 million, as shown in Figure 7. There appeared to be no correlation between the number of enrolled Medicaid clients per CCO and the reported amounts of improper payments. In other words, smaller CCOs could report larger findings and larger CCOs could report smaller findings. As noted earlier, CMS estimates the national improper Medicaid payment rate to be about 10%.

**Figure 7: Seven CCOs Reported Detecting Less than $100 in Improper Payments; Five Found More than $1,000,000 in 2016**



Improper Payments Detected in 2016, self-reported by CCOs

As with any survey, it is possible that respondents interpreted the questions differently. As such, the audit team held two conference calls with CCO representatives to answer their questions about the survey in an attempt to minimize these differences.

Capitated payments to CCOs represent the majority of state Medicaid spending in Oregon, but OHA largely focuses its program integrity efforts within the FFS system and depends on CCOs to monitor their own provider networks. As a result, CCO efforts are vital to ensuring Medicaid payments are appropriate and public funds are safeguarded.

The variance in practices and policies by CCOs, as well as the discrepancy between detected improper payments and federal estimates, raises great concern that improper payments are not being consistently prevented or detected within this large section of state Medicaid spending. Since OHA is ultimately responsible for Medicaid payments, it is imperative that OHA monitor CCO efforts. In addition, failing to detect improper payments within CCO networks could influence future capitated rates.

## OHA management has not prioritized program integrity functions

Oregon's Medicaid program has been identified as one of the most complex programs in the nation, due to the large number of CCOs relative to the

Exhibit 87
Page 25 of 44
SOS0015512

state's population, as well as the waivers and demonstration projects currently in use.  Ensuring program integrity for such a large, complex, and expensive program would be challenging for government agencies even in the best of circumstances.

### *Despite growing expenditures, staffing levels for program integrity processes are stagnant*

Medicaid has grown tremendously over the past decade due to increasing medical inflation and expansion of the Medicaid program under the ACA. The increased volume of expenditures increases risk for OHA, yet staffing has remained flat in areas such as Provider Audit Unit (PAU), Office of Payment Accuracy & Recovery (OPAR), and units managing processes around preventing improper payments, while other areas of OHA have grown.

Staffing size alone is not the only factor that influences the effectiveness of program integrity efforts.  OPAR reported lean process improvement activities have contributed heavily to increases in cost avoidance.  These improvements are good, especially the preventative measures, but there is still an opportunity to continue improving the effectiveness of program integrity efforts.

When risk increases, management should consider how to mitigate the growing exposure, such as hiring additional staff to oversee program integrity efforts.  However, we believe OHA is faced with a strategic quandary as hiring additional staff to detect improper payments may result in a significant return of federal funding.  In other words, the state could choose to spend more money, but could end up with a net loss of funds.  If CMS increased the incentives to perform this work, such as fully funding certain program integrity functions, it may address some of these understaffing issues.

Regardless of whether CMS provides additional funding incentives, OHA should align staffing to address risks relating to improper payments. Oregonians contribute significant tax dollars to the federal government and those resources should be well managed.  OHA's CFO has committed to take action to continue improving program integrity efforts.  As previously discussed, OHA is in the process of adding seven new auditors to OPI to address some of these staffing needs.

### *Lack of clarity around contract language and administrative rules complicates program integrity efforts*

OHA has never sanctioned a CCO despite documented compliance issues and authority under federal regulations and contractual terms.  However, Oregon's contracts do not clearly link compliance issues to corresponding sanctions.  Agency staff reported that this reticence to apply accountability measures stemmed from the fear of CCOs leaving the state Medicaid system.

Despite caseloads growing by about 50% and expenditures nearly doubling since 2012, program integrity staffing has remained largely unchanged in key areas such as PAU and OPAR.

Exhibit 87
Page 26 of 44
SOS0015513

We reviewed findings from a sample of annual External Quality Reviews (EQR) performed on CCOs. All four CCOs had findings that may contribute to a higher risk of improper Medicaid payments. Findings of particular concern were those in the Information System Capabilities Assessment, because of their direct impact on data accuracy and completeness. According to the agency, these findings are not comprehensively tracked for correction and compliance. EQR findings are also not considered contract compliance issues.

Instead of sanctions, OHA prefers collaborative methods to produce solutions. For example, a CCO that is out of compliance could work collaboratively with OHA to develop a corrective action plan to remedy the issue. While partnership and collaboration may be appropriate in many cases, a lack of clear expectations and penalties for violations could create an environment where controls meant to prevent improper payments are ignored.

OPI also reported that several Oregon Administrative Rules lack the clarity needed to develop audit findings in cases where potential improper payments were made to providers. OPI plans to hire additional staff to perform a comprehensive review of administrative rules and OHA's contracts to ensure they have the clarity needed to develop audit findings. OPI will also be more involved in the development of administrative rules going forward, further expanding the scope of work OPI has been doing for several years.

Without clearly defined rules and contracts, it is difficult for OHA to hold providers and CCOs accountable. Establishing clearly defined rules and contract terms can help prevent submissions of improper claims as well as facilitating recovery of any improper payments.

## Leading practices can inform prevention and detection efforts

Because states have flexibility within federal guidelines to develop and structure Medicaid programs, programs can vary dramatically from state to state. Due to this variation, it is difficult to identify best practices from other states that apply to the Oregon Medicaid program. However, the following are examples of several leading practices that are applicable to Oregon.

GAO recommends that states work to prevent improper payments in addition to the recovery of those funds after detecting an issue. CMS encourages states to use sophisticated analytic techniques and data matching as part of these endeavors. Even with more sophisticated analytics, there will always be a need for recovery efforts based on medical records audit findings.

The state of Tennessee has been recognized by CMS, and noted by OHA staff and other states, for excellence in the areas of program integrity and contract administration. CMS noted that Tennessee has strong managed

Exhibit 87
Page 27 of 44
SOS0015514

care contracts and contained all the necessary elements to have strong program integrity. Our comparison of contracts found that Arizona's contracts included a table of CCO deliverables with clearly communicated timelines, contacts, and expectations.

The Washington State Health Care Authority has begun working with the U.S. Treasury Do Not Pay Center to perform advanced data matching and improve program integrity activities. The U.S. Treasury is also actively exploring other opportunities across the nation to work with states who manage federal programs.

The states of Mississippi, Massachusetts, California, North Carolina, and Louisiana are collaborating in a federally-sponsored partnership that gives state Medicaid agencies access to, and training in sophisticated data tools in order to identify dual payments, improper payments, and potential fraud.

Using a dedicated team of Medicaid auditors, Massachusetts has identified more than $233 million in potential duplicate payments and more than $288 million in potentially unnecessary payments over a five-year period.

With the application of the new federal rules, states will be required to certify that encounter data is complete and accurate. States such as Washington have hired external quality review organizations to perform the CMS protocol for encounter data validation.

OPI reported its involvement in CMS Technical Assistance Groups (TAGs) covering issues such as data analytics and managed care oversight, and in the CMS sponsored Healthcare Fraud Prevention Partnership, which includes members from the federal and state government, as well as commercial insurers and private organizations. OPI also has a strong working relationship with the Oregon Department of Justice Medicaid Fraud Control Unit (MFCU). We also noted OPI's participation in CMS's Medicaid Integrity Institute that offers free trainings to Medicaid auditors and program integrity professionals.

## OHA's recovery efforts appear appropriate and reasonable

More should be done to prevent improper payments rather than using the "pay and chase" recovery model, according to CMS.

OHA is required to recover funds associated with improper Medicaid payments and must make all reasonable efforts to collect on debt before it can be written off. OHA has developed multiple processes to recover improper Medicaid payments, as shown in Figure 8. These recovery efforts are adequate, but more should be done to prevent improper payments rather than using the "pay and chase" recovery model, according to CMS.

Client overpayments are identified by the Overpayment Writing Unit (OWU) and recovered directly by the Overpayment Recovery Unit (ORU). The ORU recovers these payments from the client by setting up payment plans. Reasonable efforts to collect client debt are made before it is written off.

Exhibit 87
Page 28 of 44
SOS0015515

Figure 8: Units Involved in Recovering Improper Medicaid Payments

| From insurance companies | From providers | From clients |
|---|---|---|
| Personal Injury Lien Unit | Provider Audit Unit | Overpayment Recovery Unit |
| Medical Payment Recovery Unit | Surveillance and Utilization Unit (SURS) | Fraud Investigation Unit |
| Recovery Audit Contractor | Recovery Audit Contractor | Overpayment Writing Unit |

Provider overpayments are recovered automatically through reductions of future claims. Federal funds are paid back to the federal government through reductions of future grant funds. The federal government must be reimbursed within a year of identifying an improper payment.

Staffing for the Office of Payment Accuracy and Recovery has remained relatively flat for the past five years at 158 FTE, while total recoveries and cost avoidance have increased during the same time frame. This indicates the continuous improvement efforts are achieving some positive results. Cost avoidance refers to the amounts that the agency saves, by reducing future costs. Total recoveries and cost avoidance from 2015-2017 are more than $165 million, as shown in Figure 9.

Client overpayments are collected in a central location that spans multiple federal programs such as TANF, SNAP, and childcare. By centralizing client collections, the agency is able to achieve efficiencies of scale and leverage methods already used for collecting on other programs. Client write-offs for Medicaid are relatively low. Accounts receivables are set up within the system for provider and CCO overpayments, which are recovered timely from future claims.

While current recovery processes are adequate, as noted above, detection efforts were inadequate. Therefore, OHA is likely not detecting many improper payments that could be recovered.

**Figure 9: OHA's Reported Medicaid Recoveries and Cost Avoidance, 2015-2017**

Personal Injury Lien recoveries- $4.6 million

Health Insurance Group cost avoidance- $139.1 million

Medical Payment Recovery recoveries- $19.1 million

Recovery Audit Contractor recoveries- $2.1 million

Overpayment Recovery Unit recoveries - $1 million

Provider Audit Unit recoveries and cost avoidance - $4.1 million

Exhibit 87
Page 29 of 44
SOS0015516

## OHA Reported Resolving Eligibility Determination Backlog in August, but Delays Cost State Millions in Avoidable Expenses

**Figure 10: Timeline of Events, 2013-2017**



2013

CoverOregon failure, Approx. $300 million spent

2014

Federal waiver to delay annual eligibility determinations

Two additional federal waivers extending delay

Federal waiver for limited, streamlined redeterminations

2015

Additional waiver extending delay and authorizing limited, streamlined redeterminations

2016

Full redeterminations resume in March 2016 plan to complete February 2017

Written waivers expire, OHA reported receiving verbal approval from CMS

OHA missed goal to complete all redeterminations

2017

Auditor Alert issued, OHA confirms backlog publically, Governor orders resolution by August 31st

Auditors become aware of issue, hold meetings

OHA reports completing work in August

Since the failure of Cover Oregon in 2013 until March 2016, annual Medicaid eligibility determinations were halted and restarted several times with approval from the federal government. As a result, a significant backlog occurred, with OHA taking two or more years to complete eligibility redeterminations for many individuals.

OHA restarted annual eligibility determinations[12] in March 2016 and had reported to the legislature that this effort would be complete by February 2017. OHA reported the effort would encompass eligibility determinations of the approximately 1 million clients on Medicaid. However, the agency did not meet this deadline.

In 2016, OHA recognized the need to bring together a team of subject matter experts in forecasting, budgeting, finance, operations, and policy to monitor the restarted redetermination process. This was a proactive effort by OHA to monitor the new process to help ensure that every Oregonian on Medicaid went through an eligibility redetermination.

In September 2016, this team determined that a check of individuals whose records resided in legacy systems was necessary to determine if they were eligible for on-going benefits. Addressing this issue was tabled until January 2017, because agency leadership decided that was the best approach given resource limitations and improvements that were being made to the Oregon Eligibility System. In January 2017, OHA resumed work on the issue and began identifying a significant backlog.

Based on our review of the numerous legislative hearings OHA had in 2016 and 2017, the legacy system backlog was never reported to the Legislature.

In April 2017, two of our audit teams became aware of this issue and began meeting weekly with OHA officials. As a result of those meetings, OHA was able to refine its process to get a reliable estimate of the backlog by reconciling multiple eligibility systems. In May 2017, OHA confirmed publicly for the first time that one out of every ten Medicaid clients – more than 115,200 – had yet to undergo the required eligibility re-determination.

On May 17, 2017 we issued an Auditor Alert regarding thousands of Oregonians whose eligibility had yet to be re-determined by OHA. We issued this interim report because Government Auditing Standards recommend timely reporting of critical issues to "alert officials to matters needing immediate attention" so they can take corrective action before a

---

[12] OHA completed some limited eligibility determinations prior to March 2016

Exhibit 87
Page 30 of 44
SOS0015517

final report is completed.[13]  Following the Auditor Alert, OHA stepped up its ongoing efforts to address the issue.  On May 23, Governor Brown ordered OHA to resolve the backlog by August 31.  OHA reported it had completed its action plan to process eligibility determinations for all 115,200 clients in the backlog by August 31.  See Figure 10 on page 30 for a timeline of events.

Approximately 400 full-time staff worked on the action plan between June and August to complete the work by Governor Brown's deadline.  These staff also continued their ongoing routine eligibility work. Initial estimates from OHA place staff time and contractor costs for all eligibility work during the summer at more than $5 million.

### *Preliminary outcomes reported by OHA show more than half of backlog was eligible*

Of these 115,200 clients in the backlog, OHA reported about 47,600 (41%) were either determined no longer eligible or closed due to non-response from the client, as shown in Figure 11 on page 32.  OHA concluded that about 24,100 clients (21%) no longer met the program's eligibility requirements, such as having income above certain limits.

An additional 23,500 clients (20%) failed to respond to mailings from OHA and were removed from the Medicaid caseload.  Medicaid requires information directly from the members to evaluate eligibility.  If clients do not respond to requests for information, after significant effort and due process, the individual is no longer eligible for Medicaid.  OHA determined more than 67,600 clients (59%) are still eligible for Medicaid.  Traditionally, a proportion of non-responders will re-apply for Medicaid and are eligible; therefore, we expect the overall eligibility rate to rise slightly through the end of November.  Historical trends indicate the rate may rise above 60%.

### *Potential for millions in avoidable expenses*

Individuals are eligible for Medicaid until they are found to be ineligible in accordance with federal regulations.  As a result, payments for individuals in the backlog would have been improper only if they continued to receive benefits after an individual was determined ineligible.  Regardless, expenses resulted because these clients remained on the caseload past the point when OHA reported they should have gone through an annual eligibility determination.  In other words, these expenses could have been avoided had OHA's work been timely.

It is impossible to assess after the fact whether all of these individuals would have been determined to be no longer eligible at an earlier date.

---

[13] U.S. Government Accountability Office, Generally Accepted Government Auditing Standards (2011 Revision), GAO-12-331G, A7.02g

Exhibit 87
Page 31 of 44

SOS0015518

However, we believe roughly the same percentage of individuals would have been deemed ineligible a few months earlier.

Our estimate of avoidable expenses between March and September is approximately $88 million ($19 million state contribution), as shown in Figure 11 below.  These expenditures represent approximately 5% of total monthly payments in the Medicaid Program.

**Figure 11: Action Plan Outcomes**

| Determination | Number | Percent | Estimated Avoidable Expenditures March-September 2017 |
|---|---|---|---|
| Eligible | 67,600[*] | 59%[*] | Not applicable |
| Ineligible | 24,100 | 21% | $38.5 million in capitated payments<br><br>$ 6.2 million in FFS payments[#] |
| Failed to respond & benefits closed | 23,500[±] | 20%[±] | $ 37.6 million in capitated payments[±]<br><br>$ 6.0 million in FFS payments[±] |
| Totals | 115,200 | 100% | $ 88 million |

[*]Will rise over time   [±] Will fall over time   [#]Does not include FFS claims submitted after September 2017

Of the $88 million, estimated avoidable expenses for individuals participating in coordinated care were about $76 million, of which about $17 million would have been a state contribution.  OHA reported expenses for CCO clients averaged about $383 per member per month, which was the basis for this estimate.

Total estimated avoidable expenditures for individuals participating in FFS were about $12 million[14], of which about $3 million would have been the state contribution.  OHA reported expenses for FFS clients averaged about $153 per member per month, which was the basis for this estimate.

Although improper payments were unlikely to have resulted for most of the individuals noted above, there is a subset for which an improper payment may have occurred.  Approximately 14,100 individuals in this population were deemed ineligible prior to March 2017, but OHA never removed them from the caseload as intended.  OHA had first identified these 14,100 individuals in an internal meeting in January 2017.  Federal

---

[14] This total may rise if additional FFS claims are submitted.

Exhibit 87
Page 32 of 44
SOS0015519

requirements mandate that everyone must be afforded due process before eligibility is terminated. As a result, OHA went through due process again in June for these 14,100 clients. The costs associated with these individuals are included in the figures above.

### *Opportunity lost due to delayed completion*

An opportunity was lost with the delay in completing eligibility determinations. If OHA had performed this work earlier, it would have freed up a tremendous amount of state resources in a time of budget shortfalls. After subtracting staff costs, we estimate approximately $15 million in state funds could had been saved if this work was completed before March 2017.

OHA reported that other states, such as Illinois, New Jersey, and Arkansas also had similar problems with eligibility determinations. However, unlike Oregon, those states were more transparent about their backlogs.

### *Subsequent report on the accuracy of these eligibility determinations to follow*

We were unable to validate the completion and accuracy of OHA's redetermination efforts in time for us to include the analysis in this report. We plan to verify the accuracy of these redetermination efforts once the final data becomes available, and issue a subsequent report that discusses our testing of the action plan. Our office is also considering a review of Medicaid eligibility determinations as part of a future performance audit.

Exhibit 87
Page 33 of 44
SOS0015520

## Recommendations

We offer the following recommendations to assist OHA with efforts to improve Oregon's Medicaid program integrity function. We recommend that OHA:

1. Develop a comprehensive inventory of MMIS system controls and proactively test the effectiveness and completeness of those controls.

2. Adopt leading practices highlighted in the report, such as setting clear standards for acceptable program integrity efforts, and including clear expectations in CCO contracts about when a sanction will occur and the automatic penalty that will be imposed for non-compliance.

3. Increase oversight of CCO program integrity efforts, such as approving CCO's fraud, waste, and abuse policies and reviewing how CCO's prevent, detect, and recover improper payments.

4. Develop robust efforts to validate the accuracy and completeness of encounter data, which may include hiring an External Quality Reviewer or developing internal monitoring efforts through the Office of Program Integrity.

5. Review and clarify Oregon Administrative Rules so Medicaid providers can be held accountable for improper payments.

6. Work with U.S. Treasury Do Not Pay center on utilizing free, sophisticated data mining techniques and explore other internal opportunities for data matching.

7. Work with CMS to explore pilot incentive programs to increase efforts to prevent, detect, and recover improper payments.

8. Ensure there is an annual reconciliation process for all individuals in the agency's various computer systems to verify their eligibility is appropriately re-determined.

Exhibit 87
Page 34 of 44
SOS0015521

## Appendix A: May 17, 2017 Auditor Alert[15]



# Auditor Alert
## May 17, 2017

### The Oregon Health Authority May Be Providing Medicaid Benefits to Ineligible Recipients[1]

During the course of audit work, we detected a risk where a substantial number of current Medicaid recipients may be ineligible to receive assistance. As of May 1, 2017 preliminary analysis by the Oregon Health Authority (OHA) has identified approximately 86,000 individuals, representing about 8% of the State's entire Medicaid population, who have not undergone the federally required annual benefit eligibility determination process. About 14,100 people have been sent renewal notifications but have not returned applications. The preliminary analysis did not clearly identify why the remaining 71,600 have not been redetermined.

Failure to timely and properly validate ongoing benefits could have significant fiscal impact. Medicaid benefits are funded by both federal and state monies. Providing Medicaid benefits to ineligible recipients may place federal funding to Oregon in jeopardy and result in a misuse of state monies. In Oregon, most Medicaid recipients receive medical services through enrollment in provider networks called Coordinated Care Organizations. At an average monthly cost of $430 per enrolled client, coverage for these individuals costs about $37 million per month. OHA needs to take expedient action to appropriately process renewals for these individuals to ensure they are eligible for assistance.

#### Next Steps and Recommended Actions

The Secretary of State's Office recognizes the complexity of this effort and the substantive work burden it has placed on OHA. The Secretary of State's Office will be issuing two audits this year examining Medicaid related matters. The first audit to be released during the spring will discuss controls in place for two critical Medicaid information systems. A subsequent audit examining improper Medicaid payments will be issued later in the year. The scope of the Medicaid improper payment audit will include follow-up work on the issue discussed herein. In addition to the Secretary of State's work on this issue, we recommend OHA and the State Legislature consider the following actions:

1. OHA should work with the federal regulatory authorities to ensure federal Medicaid funding is not jeopardized while OHA resolves these eligibility determination issues.

2. The Legislature should require OHA to report on its efforts to resolve these issues and fiscal impacts to the Legislature no later than September 30, 2017.

---

[1] Auditor Alerts provide information on significant audit issues or concerns that have come to the attention of the Audits Division through an audit or otherwise and require immediate action by management. While not in full compliance with rigorous audit standards, Auditor Alerts serve as a reporting vehicle that is flexible, timely, and focused on a singular issue.

### Secretary of State, Dennis Richardson
### Oregon Audits Division, Kip Memmott, Director

Page 1

---

[15] Only 86,000 of the 115,200 clients in the backlog were noted in the alert due to our concerns at the time that they may be appropriate.

Exhibit 87
Page 35 of 44
SOS0015522

## Appendix B: Government Accountability Office framework for managing fraud risks in federal programs

**Commit to combating fraud by creating an organizational culture and structure conducive to fraud risk management.**

- Demonstrate a senior-level commitment to combat fraud and involve all levels of the program in setting an antifraud tone.
- Designate an entity within the program office to lead fraud risk management activities.
- Ensure the entity has defined responsibilities and the necessary authority to serve its role.

**Evaluate outcomes using a risk-based approach and adapt activities to improve fraud risk management.**

- Conduct risk-based monitoring and evaluation of fraud risk management activities with a focus on outcome measurement.
- Collect and analyze data from reporting mechanisms and instances of detected fraud for real-time monitoring of fraud trends.
- Use the results of monitoring, evaluations, and investigations to improve fraud prevention, detection, and response.

**Plan regular fraud risk assessments and assess risks to determine a fraud risk profile.**

- Tailor the fraud risk assessment to the program, and involve relevant stakeholders.
- Assess the likelihood and impact of fraud risks and determine risk tolerance.
- Examine the suitability of existing controls, prioritize residual risks, and document a fraud risk profile.

**Design and implement a strategy with specific control activities to mitigate assessed fraud risks and collaborate to help ensure effective implementation.**

- Develop, document, and communicate an antifraud strategy, focusing on preventive control activities.
- Consider the benefits and costs of controls to prevent and detect potential fraud, and develop a fraud response plan.
- Establish collaborative relationships with stakeholders and create incentives to help ensure effective implementation of the antifraud strategy.

Source: GAO. | GAO-15-593SP

Exhibit 87
Page 36 of 44
SOS0015523



OFFICE OF THE DIRECTOR

Kate Brown, Governor



500 Summer St NE E20
Salem OR 97301
Voice: 503-947-2340
Fax: 503-947-2341
www.Oregon.Gov/OHA
www.health.oregon.gov

November 28, 2017

Mr. Kip Memmott
Director, Audits Division
Secretary of State,
255 Capitol St. NE, Suite 500
Salem, OR 97301

RE:   Oregon Health Authority Response to Final Draft Improper Medicaid Payment Performance Audit
      Report

Dear Mr. Memmott,

This letter provides a written response to the Audits Division's final draft audit report titled, *Oregon Health Authority Should Improve Efforts to Detect and Prevent Improper Medicaid Payments,* as provided to the Oregon Health Authority (OHA) on November 22, 2017 (referred to herein as the "final draft report"). Thank you for the opportunity to review and respond to the final draft report.

I appreciate your close attention to OHA's Medicaid enrollment and eligibility processes and your commitment to producing an accurate audit. OHA is responsible for providing access to critical healthcare services for nearly 1 million Oregonians and for driving transformation of the state's healthcare system. OHA is also a large, complex agency and has a duty to be transparent, accountable, and make wise use of public resources. As the agency's new director, audits are an important part of my and my team's ability to assess what is working well and where improvement is needed, as well as possible vulnerabilities, risks, and opportunities. The final draft report identifies several areas for improvement with which we agree and are either currently taking steps to address or will begin doing so. However, there are findings and conclusions with which we disagree and areas where additional clarification or context is needed to present a complete and accurate analysis.

It is also important to note that, since September 1, the new OHA leadership team has worked closely with managers and staff to gain an understanding of ongoing and emerging issues. OHA has lacked rigor and comprehensiveness in its research, analysis, resolution, and communication of significant operational issues. This has been evident throughout our research of recently disclosed issues, including those relating to payments for dual eligible clients and retroactive eligibility terminations, and underlies some of the findings noted in the final draft report. As you are aware, I am establishing a formal issue resolution process to ensure that OHA leadership is aware of, understands the scope of, and implements effective resolutions to ongoing and emerging issues.

While we establish the framework for this process, we have begun documenting known issues, both past and ongoing. We have shared a preliminary summary of those issues with you, as documented in a letter to Governor Kate Brown on November 17 and as noted in the final draft report. Many of these issues still require additional research and analysis to assess the cause, scope, impact, and next steps for resolution.

Exhibit 87
Page 37 of 44

SOS0015524

Mr. Kip Memmott
November 29, 2017
Page 2 of 8

Through the issue resolution process, which will include a review of existing documentation of issues and risks, we will create and regularly update an issue log and prioritize the research, analysis, and resolution of issues. We will provide updates to the Governor and legislators about this work on a bi-weekly basis, and we will post regular updates to our website. We will notify you of these updates and continue to provide you with copies of our completed internal audits.

This letter includes our responses to the findings and recommendations, as well as our responses to those aspects of the final draft report that require additional clarification or with which we disagree.

**FINAL DRAFT COMMENTS**
We reviewed the final draft report for accuracy and completeness to ensure that the narrative provides appropriate context for the analysis, findings, and recommendations. We appreciate the audit team's significant efforts to obtain a complete and accurate understanding of the Medicaid program and our existing program integrity functions. However, we identified a few issues that require additional clarification and points with which we disagree, as outlined below.

*Report Highlights*[1]
This section provides a high-level summary of the audit findings, including the following conclusive statement: "[D]elays in processing eligibility for thousands of Oregon's Medicaid recipients resulted in millions of dollars of avoidable Medicaid expenditures, a critical issue the agency failed to disclose until raised in a May 2017 Auditor Alert."

It is not accurate to characterize the cost of benefits provided to clients who were eligible for the Oregon Health Plan at the time those costs were incurred as avoidable for three important reasons. These reasons are also recognized in the final draft report.[2] First, Oregon Health Plan clients remain eligible for benefits until they are determined no longer eligible. Second, it is not possible to assess whether a client who was determined no longer eligible would have also been determined no longer eligible at some earlier date. As such, we cannot conclude whether and to what extent any expenses could have been avoided if redeterminations had occurred sooner. Finally, many clients whose benefits were terminated were closed due to non-response, and benefits for some of these clients may still be retroactively reinstated through the end of November 2017. As recognized in the final draft report, the number of clients in the clean-up population whose benefits had been terminated as of November 6 dropped from the original count of 55,000 (48%) to 47,600 (41%) due to retroactive reinstatements. The number of people whose benefits were terminated due to non-response, as well as those initially found ineligible, may continue to decline until the end of the 90-day retroactive benefits period.

We also believe that the statement about the agency's failure to disclose the eligibility redetermination clean-up issue is overstated. It is more accurate to state that OHA has lacked rigor and comprehensiveness in its research, analysis, resolution, and communication (both internal and external) of significant operational issues. As previously noted, this has also been evident to OHA's new leadership team and I am establishing a formal issue resolution process to address this. We note that the agency did communicate generally about the redetermination clean-up work in correspondence with the federal government and in testimony to legislative committees. Converted case renewals – the process of renewing clients and moving them from legacy systems into the current system – were completed by the February 2017 date reported

---
[1] See page 3 of the final draft report.
[2] See pages 30-32 of the final draft report.

Exhibit 87
Page 38 of 44
SOS0015525

Mr. Kip Memmott
November 29, 2017
Page 3 of 8

to the legislature, and OHA noted the need for clean-up work related to redeterminations. We agree that OHA should have been more specific and proactive in quantifying and communicating about the size of the redetermination clean-up population, but we also understand that the agency first quantified the size of this population in May 2017, just prior to the release of the Auditor Alert. We are committed to improving the transparency of Medicaid operations going forward.

### Key Findings[3]
This section summarizes the key audit findings. The first three findings relate to procedures for preventing, detecting, and recovering improper payments. The final finding relates to the timeliness and impact of OHA's redetermination clean-up work. Our comments on these findings are discussed below.

### Key Finding 1
We concur with the finding that OHA has gaps in procedures for preventing certain improper payments and that insufficient management of our processes for identifying and resolving issues and processes for prioritizing resources to address them have contributed to these gaps and our ability to address them timely. As previously noted, I am establishing a formal issue resolution process to address this.

### Key Finding 2
We also agree that OHA can improve its internal controls and testing of system edits as it relates to prevention of improper payments. As noted later in the final draft report, OHA does have several processes in place to detect and prevent improper payments that are well-defined, consistent, and agency-wide. These processes include work performed by the Provider Audit Unit (PAU) and Data Matching Unit (DMU), as well as data validation performed by actuaries and the triennial federal Payment Error Rate Measurement (PERM) audit.

The second finding also states that the audit team identified approximately 31,300 questionable payments. It is also noted that OHA provided additional analysis of a sample of 2,700 of these payments, indicating that the vast majority (98%) of the sampled claims were appropriate payments. This analysis included the application of program rules, including services provided to clients enrolled in Coordinated Care Organizations (CCOs) that are reimbursed on a fee-for-service (FFS) basis (carve outs). We expect that the application of program rules to the remaining payments will significantly reduce the number of payments requiring further research.

We agree that additional research is required to quantify the scope of any improper payments, identify next steps for resolution and measures to improve prevention and detection of future improper payments. We have already made adjustments for most of the payment errors identified in the 2,700-payment sample, and we will review and adjust any errors noted in the remaining payments. However, the statement that the audit identified 31,300 questionable payments implies a level of conclusiveness that is inconsistent with the analysis of the 2,700-payment sample and the recognition that further research and analysis are required. It is also inconsistent with the acknowledgement in the final draft report[4] that "[n]ot all of these potential duplicates are improper" in recognition of the complexity of the program rules noted above.

---

[3] See page 3 of the final draft report.
[4] Please see page 16 of the final draft report.

Exhibit 87
Page 39 of 44
SOS0015526

Mr. Kip Memmott
November 29, 2017
Page 4 of 8

*Key Finding 3*
We agree that improper payment detection procedures can be enhanced, particularly through the use of technology and analytic tools and implementation of more rigorous and comprehensive processes for researching, analyzing, and resolving issues. However, the characterization of OHA's current procedures as "limited" is overstated and inconsistent with existing detection work performed by various teams throughout OHA, which is also recognized in the final draft report.

*Key Finding 4*
This finding is very similar to the statement included in the *Report Highlights* section previously discussed in this letter. Please refer to that discussion for our comments on this finding.

**Audit Results[5]**
The key findings noted in this section of the final draft report are also addressed in the *Report Highlights* or *Key Findings*. Please refer to our comments related to those sections, as previously discussed in this letter. We note two additional comments on the findings contained in the *Audit Results* below.

*State and Federal Investment in Program Integrity Efforts[6]*
The final draft report discusses requirements to repay federal funds associated with any identified improper payments and possible disincentives or strategic decisions a state may face in investing in program integrity functions. While we agree with the facts surrounding requirements to repay federal funds, OHA has a responsibility to ensure program integrity and to take reasonable measures to identify and recover improper payments, regardless of funding source. It is important to recognize the cost-benefit analysis that the state and the federal government must perform in investing in program integrity efforts.

*Opportunity Lost Due to Delayed Completion[7]*
As discussed in the *Report Highlights* section of this letter, it is not possible for the audit to conclude whether and to what extent expenses could have been avoided if redeterminations had occurred sooner. It is also important to note that the Medicaid portion of OHA's budget is driven by caseload forecasts, which included a forecast of the impact of future redeterminations on the caseload.

**RECOMMENDATIONS**
Below you will find our detailed responses to each recommendation included in the final draft report.

| RECOMMENDATION 1 | | |
|---|---|---|
| Develop a comprehensive inventory of MMIS system controls and proactively test the effectiveness and completeness of those controls. | | |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities (Generally expected within 6 months)** | **Name and phone number of specific point of contact for implementation** |
| Agree | January 2019 | Bob Costa (503-947-5213) |

---

[5] Please see pages 16 through 29 of the final draft report.
[6] Please see page 26 final draft report.
[7] Please see page 33 of the final draft report.

Exhibit 87
Page 40 of 44
SOS0015527

Mr. Kip Memmott
November 29, 2017
Page 5 of 8

**OHA Response to Recommendation 1:**
We agree that OHA should develop a comprehensive inventory of MMIS system controls. We also agree that OHA has opportunities to enhance or improve upon current procedures for testing and monitoring the effectiveness and completeness of these controls. We note that the frequency of improper payments due to system edits is extremely low, but we agree that OHA has not had a documented plan for testing claims edits.

A team of OHA staff from the Office of Payment Accuracy and Recovery (OPAR), the Office of Program Integrity (OPI), the Provider Services Unit, and the MMIS BSU will be formed to review processes, identify opportunities for improvement, and propose prioritization of resources to address identified areas for improvement. These may include recommendations for process changes or enhancements or documentation of existing procedures.

We acknowledge that the documentation for existing procedures should be improved, but it is important to note existing, effective procedures. Many FFS claims are auto-adjudicated through the MMIS system, with some claims requiring manual intervention to finalize payment. The PAU within OPI monitors for spikes in the usage of certain edits and requests validation of the edit from the Claims Unit, when appropriate. The Claims Unit coordinates with the MMIS BSU to review the correctness of the edit.

The audit team identified a specific gap in our procedures to review and verify that system edits are working as intended. As a result, OHA has identified a small percentage of questionable payments that will require adjustments. OHA's Health Systems Division (HSD) has developed a preliminary approach to address this noted deficiency. This approach will include:
- Development of testing processes for the top 20% of MMIS edits with the most significant financial impact.
- Monitoring of remaining edits to confirm accurate functionality, using daily MMIS reports that detail denied or partially-denied claims and the edit that stopped payment. A monthly report will be created to flag edits not shown on the daily reports for testing.

It is estimated that one full-time staff could effectively test and validate 10 edits per week, or approximately 500 edits per year, and monitor all remaining edits. We will need to evaluate existing resources and constraints related to ongoing technology projects, but we expect to implement these activities by January 2019.

| RECOMMENDATION 2 |
| --- |
| Adopt leading practices highlighted in the report, such as setting clear standards for acceptable program integrity efforts, and including clear expectations in CCO contracts about when a sanction will occur and the automatic penalty that will be imposed for non-compliance. |

| Agree or Disagree with Recommendation | Target date to complete implementation activities (Generally expected within 6 months) | Name and phone number of specific point of contact for implementation |
| --- | --- | --- |
| Agree | January 2019 | Fritz Jenkins (503-947-1109) Rhonda Busek (503-945-6552) |

Exhibit 87
Page 41 of 44
SOS0015528

Mr. Kip Memmott
November 29, 2017
Page 6 of 8

**OHA Response to Recommendation 2:**
We agree with this recommendation and had begun taking steps to address it prior to this audit. OPI has hired an Operations and Policy Analyst 4 (OPA4) to work with HSD and with CCOs to strengthen the program integrity and accountability constructs over the next two contract cycles.  As the 2018 CCO contract is in the final stages of review, we expect to complete implementation with the 2019 CCO contract.

| RECOMMENDATION 3 Increase oversight of CCO program integrity efforts, such as approving CCO's fraud, waste, and abuse policies and reviewing how CCO's prevent, detect, and recover improper payments. | | |
|---|---|---|
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities (Generally expected within 6 months)** | **Name and phone number of specific point of contact for implementation** |
| Agree | January 2019 | Fritz Jenkins (503-947-1109) |

**OHA Response to Recommendation 3:**
We agree with this recommendation and had begun taking steps to address it prior to this audit. As noted in our response to Recommendation 2, OPI has hired an OPA4 to work with HSD and with CCOs to strengthen the program integrity and accountability constructs over the next two contract cycles. OPI is also in the process of hiring seven Government Auditor 2 (GA2) positions to audit the medical claims of network providers. In addition, OPI supports systematic training of CCO Compliance Officers, as coordinated by the External Quality Review Organization (EQRO), Health Insights. OPI works with Health Insights to set the agenda, provide the subject matter experts and facilitate sessions related to compliance, auditing, and oversight. As the 2018 CCO contract is in the final stages of review, we expect to complete implementation with the 2019 CCO contract.

| RECOMMENDATION 4 Develop robust efforts to validate the accuracy and completeness of encounter data, which may include hiring an External Quality Reviewer or developing internal monitoring efforts by the Office of Program Integrity. | | |
|---|---|---|
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities (Generally expected within 6 months)** | **Name and phone number of specific point of contact for implementation** |
| Agree | January 2019 | Fritz Jenkins (503-947-1109) Chelsea Guest (503-383-6260) |

**OHA Response to Recommendation 4:**
We agree with this recommendation and had begun taking steps to address it prior to this audit. While several teams throughout OHA validate encounter data on a regular basis to ensure accurate metrics reporting, rate development, and contract compliance, encounter data is not currently audited against medical chart notes. As noted in our response to Recommendation 3, OPI is also in the process of hiring seven GA2 positions to audit medical claims of network providers. The target date to complete implementation activities also aligns with the implementation of the 2019 CCO contract.

Exhibit 87
Page 42 of 44
SOS0015529

Mr. Kip Memmott
November 29, 2017
Page 7 of 8

| RECOMMENDATION 5 | | |
|---|---|---|
| Review and clarify Oregon Administrative Rules so Medicaid providers can be held accountable for improper payments. | | |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities (Generally expected within 6 months)** | **Name and phone number of specific point of contact for implementation** |
| Agree | July 2018 | Fritz Jenkins (503-947-1109) Rhonda Busek (503-945-6552) |

**OHA Response to Recommendation 5:**
We agree with this recommendation and had begun taking steps to address it prior to this audit. As noted in our response to Recommendation 2, OPI has hired an OPA4 to work with HSD and with CCOs to strengthen the program integrity and accountability constructs over the next two contract cycles. This position will also review Medicaid administrative rules and work with stakeholders to update them for clarity and to enhance program integrity.

| RECOMMENDATION 6 | | |
|---|---|---|
| Work with U.S. Treasury Do Not Pay center on utilizing free, sophisticated data mining techniques and explore other internal opportunities for data matching. | | |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities (Generally expected within 6 months)** | **Name and phone number of specific point of contact for implementation** |
| Agree | January 2018 | Fritz Jenkins (503-947-1109) Chuck Hibner (503-932-6338) |

**OHA Response to Recommendation 6:**
We agree with the recommendation and plan to have OPI's newly hired OPA 4 review the program. While we are aware of the U.S. Treasury Do Not Pay program and have previously considered the utility of this service, we are always looking for high-value activities and resources to ensure program integrity. OPI has also hired an additional Research Analyst 4 and is investing in specialized program integrity software to enhance OPI's data analysis capabilities.

| RECOMMENDATION 7 | | |
|---|---|---|
| Work with CMS to explore pilot incentive programs to increase efforts to prevent, detect, and recover improper payments. | | |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities (Generally expected within 6 months)** | **Name and phone number of specific point of contact for implementation** |
| Agree | October 2018 | Fritz Jenkins (503-947-1109) |

**OHA Response to Recommendation 7:**
OPI will engage with CMS and other state program integrity offices, through the Medicaid Integrity Institute and the National Association for Medicaid Program Integrity (NAMPI), to explore potential pilot incentive programs. The target date to complete implementation is aligned with the scheduled date for the next NAMPI national conference.

Exhibit 87
Page 43 of 44
SOS0015530

Mr. Kip Memmott
November 29, 2017
Page 8 of 8

| RECOMMENDATION 8 | | |
|---|---|---|
| Ensure there is an annual reconciliation process for all individuals in the agency's various computer systems to verify their eligibility is appropriately re-determined. | | |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities (Generally expected within 6 months)** | **Name and phone number of specific point of contact for implementation** |
| Agree | January 2018 | OHA: Fritz Jenkins (503-947-1109) DHS: Sam Osborn (503-373-1758) |

**OHA Response to Recommendation 8:**
We agree that the annual renewal process should be completed for all individuals determined eligible for Medicaid, CHIP and other medical programs. OHA has implemented monitoring processes and reports to keep annual renewal on track. As of September 2017, the Member Services Unit, the primary team responsible for eligibility determinations, is housed within DHS. As the single state Medicaid agency, OHA is ultimately responsible for the eligibility process and will collaborate with DHS on additional process improvements to conduct regular review and reconciliation across the eligibility determination systems.

\*\*\*

Thank you and your team for your work on this audit engagement and for the opportunity to respond to the final draft report. Please contact OHA's chief financial officer, Laura Robison, at 503.877.8957 with any questions.

Sincerely,

Patrick M. Allen
Director

CC:        Fariborz Pakseresht, Director, DHS
            Laura Robison, Chief Financial Officer, OHA
            Dave Lyda, Chief Audit Officer, OHA/DHS

Exhibit 87
Page 44 of 44
SOS0015531