**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

FamilyCare, Inc.,              )
                              )
    Plaintiff                 )
                              )
vs.                           )   Civil Action No.
                              )   6:18-cv-00296-MO
Oregon Health Authority,      )
et al,                        )
                              )
    Defendants.               )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF LEWIS & ELLIS
BY AND THROUGH THEIR REPRESENTATIVE
JACQUELINE LEE
Taken for the Plaintiff
September 11, 2018

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF LEWIS & ELLIS, BY

AND THROUGH THEIR REPRESENTATIVE JACQUELINE LEE,

produced as a witness at the instance of the Plaintiff,

and duly sworn, was taken in the above-styled and

numbered cause on September 11, 2018, from 10:16 a.m. to

7:14 p.m., before Pennie Futrell, CSR in and for the

State of Texas, reported by machine shorthand, at the

office of Wilson, Elser, Moskowitz, Edelman & Dicker,

LLP, 901 Main Street, Suite 4800, Dallas, Texas 75202,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

Exhibit 2
Page 1 of 28

**50**

of Medicare Advantage plans or the reviews that are done by CMS or L & E of Medicaid submissions?

MR. JINDAL:  Objection, compound.

THE WITNESS:  Yes.

Q.  (By Mr. Gordon)  And you described your reviews for -- on behalf of CMS for Medicare Advantage plans as relatively surface level, is that right?

A.  Yes.

Q.  The reviews that CMS or L & E perform of Medicaid rate submissions are similarly surface level?

A.  That is my understanding.

MR. JINDAL:  Objection, foundation, speculation.

Q.  (By Mr. Gordon)  And --

THE REPORTER:  Say it -- objection, foundation, what?

MR. JINDAL:  Speculation.

Q.  (By Mr. Gordon)  And so safe to say that CMS or L & E reviews of Medicaid rate submissions on behalf of CMS may not identify all the issues with the rate submissions that would be identified by a more significant audit level investigation?

A.  That's a fair statement.

Q.  I have a question, just coming back to an earlier question I asked you, Ms. Lee, about your

Exhibit 2
Page 2 of 28

**96**

instructions.

Q.    The rate setting --

A.    Guide.

Q.    -- checklist?

A.    Yes, that.

Q.    Did you consider any other information from CMS in your review or report other than the rate setting guidance document that you just referenced?

A.    That was primarily it.

Q.    Did you consult the Medicaid managed care regulations regarding rate setting -- regarding Medicaid capitation rate setting?

            MR. JINDAL:  Objection, vague.

            THE WITNESS:  Yes.

Q.    (By Mr. Gordon)  Which ones did you consult?

A.    Oh, I don't know then.  I don't know.

Q.    And how did they inform your report?

A.    I don't know what they were, so I don't know.

Q.    You don't know how they -- how the Medicaid managed care regulations informed your report?

A.    No -- no.  I -- I was assessing actuarial soundness of the rates.

Q.    Right.  And I'm just trying to understand, in your opinion about the rate setting methodology by Optumas, are you opining as to whether or not Optumas's

Exhibit 2
Page 3 of 28

97

rate setting complied with CMS's regulations regarding Medicaid managed care rate setting?

A.    No, that was Manatt's job.

Q.    Are you -- strike that.

In your opinion about the rate setting methodology employed by Optumas, did you opine as to whether or not Optumas's rate setting complied with the CMS Medicaid rate setting guidance document that you identified?

A.    Yes, I reviewed that document to ensure that we were -- that they had addressed each of those items, but I was not assessing that that was everything that they needed to include or -- that was, again, more Manatt's job to make sure that that was legal and everything.

Q.    Where in your report does it reference any assessment of whether or not Optumas followed the Medicaid rate setting guidance from CMS?

A.    I'm guessing it doesn't.  I don't know short of reading it through.  I'm assuming you do know or don't know.

Q.    Let me ask you this:  In your report, which is Exhibit 1220, does this report contain all the analyses and assessments that you performed in your review of Optumas's rate development for 2018?

Exhibit 2
Page 4 of 28

**100**

You have that in front of you?

A.   Yes.

Q.   Exhibit 1274, is this the Medicaid guidance document that you were referencing earlier in your testimony?

A.   Yes.

Q.   And this has a number -- as you page through it, there are a number of different standards, et cetera, that are spelled out here in -- in bulleted form, correct?

A.   Yes.

Q.   And this is intended as a checklist of sorts for -- for actuaries when they're developing Medicaid and managed care rates for states, correct?

A.   Yes.

Q.   Did you go through this document, 1274, and identify for each of these steps whether or not Optumas, in fact, took the step?

A.   I didn't -- we did not go in that detail, no.

Q.   Okay.  So is it fair to say you don't know whether or not Optumas's rate development methodology complied with all the steps set forth in CMS's rate guidance document, Exhibit 1274?

A.   No.

Q.   No, you don't know?

**DEPOSITION OF LEWIS & ELLIS BY AND THROUGH THEIR REPRESENTATIVE JACQUELINE LEE**
**September 11, 2018**

101

A.   No, I -- yeah, I don't know.  That was --
yeah.

Q.   Did you or L & E see this project as a
stepping stone to potentially landing a rate setting job
with the State of Oregon?

A.   Yes, I did.

Q.   So how did that impact your proposal to OHA?

MR. JINDAL:  Objection, misstates the
testimony, calls for speculation, lack of foundation.

MS. SCHWARTZ:  Objection, form.

THE WITNESS:  I wanted to present a
competitive proposal to OHA that would exhibit our
experience and ability to do this work so that we would
be chosen and I could develop a relationship with the
staff at OHA.

Q.   (By Mr. Gordon)  And then subsequent to this
work, you did, in fact, submit a response to an RFP for
Oregon's rate setting work, correct?

A.   Yep.

Q.   And you were not selected?

A.   That's correct.

Q.   Were you informed why you were not selected?

A.   Yes, I did not score as high.

Q.   Were you informed why you did not score as
high?

Exhibit 2
Page 6 of 28

**130**

Q.   Did you evaluate the substantive actuarial soundness of the capitation rates or the methodology used to develop the rates?

MR. JINDAL:  Object to the form; vague.

THE WITNESS:  I evaluated the methodology.

Q.   (By Mr. Gordon)  Just the methodology?

A.   It included an evaluation of actual numbers that resulted in the rates, but I was not saying that the rates -- that I would also certify to those rates.

Q.   Did L & E perform any financial analyses to assess the adequacy or appropriateness of the 2018 capitation rates?

MR. JINDAL:  Object to the form; compound, vague.

THE WITNESS:  Can you restate the question, please?

Q.   (By Mr. Gordon)  Did you not understand it or do you want me to repeat it?

A.   I don't really understand it.

Q.   Okay.  Did L & E perform any analyses to assess the adequacy of the 2018 capitation rates?

MR. JINDAL:  Same objection.  And I don't think it's the same question.

MR. GORDON:  No, it's a different

Exhibit 2
Page 7 of 28

**140**

rates that were projected to provide for all reasonable, appropriate, and attainable costs?

MR. JINDAL:  Objection, calls for a legal conclusion, incomplete hypothetical --

MS. SCHWARTZ:  Speculation.

MR. JINDAL:  -- and speculation.  I'm sorry.

THE WITNESS:  I'm sorry, can you repeat the question?

Q.   (By Mr. Gordon)  Would you need to understand the impact on final rates of cuts to base data to fully evaluate whether or not those cuts would result in rates that were projected to provide for all reasonable, appropriate, and attainable costs?

A.   Yes.

MR. JINDAL:  Same objections.

MS. SCHWARTZ:  Form.

THE WITNESS:  Yes.

Q.   (By Mr. Gordon)  Let's go back to Exhibit 1276, page 3, scope of services again.

Are you there, Ms. Lee?

A.   Page 3?

Q.   Yes.

A.   Yes.

Q.   Paragraph 2, scope of services?

Exhibit 2
Page 8 of 28

**142**

A.    That's correct.

Q.    Okay.  And that's what's reflected in the scope of services on page 3 of Exhibit 1276, the contract?

MR. JINDAL:  I'm going to object to the form; vague.

THE WITNESS:  I was not supposed to make a -- I was not supposed to provide an opinion on the policy decision -- decision to truncate the base data. I was, however, instructed to evaluate whether the base data that was truncated, whether or not that was -- the amount was appropriate.

Q.    (By Mr. Gordon)  Okay.  So to -- to clarify, you weren't -- strike that.

To clarify, you did not provide an opinion on the policy decision to truncate base data, correct?

A.    That's correct.

Q.    But you reviewed the implementation of that policy decision?

A.    Yes.

Q.    And, similarly, you did not provide an opinion with respect to OHA's policy decision to review administrative costs or opportunities to improve efficiency, correct?

Exhibit 2
Page 9 of 28

143

A.    Yes.

Q.    But you did review the policy -- I'm sorry, the implementation of that policy decision?

A.    Yes.

Q.    What is your understanding of why the agency's policy decisions about truncating base data and reviewing administrative costs were specifically excluded from the scope of your review?

MR. JINDAL:  Object to the form; speculation, foundation.

THE WITNESS:  It is my understanding that that was covered under the -- under the regulatory review performed by -- performed by Manatt.

Q.    (By Mr. Gordon)  Was this OHA's decision to exclude its policy decisions to truncate base data and review administrative costs from the scope of your review?

A.    Yes.

MR. JINDAL:  Object to the form.  Same -- same objections; speculation, foundation.

THE WITNESS:  Yes.

Q.    (By Mr. Gordon)  Did L & E have any information -- I'm sorry, strike that.

Did L & E have any input into this decision about the scope of the review?

Exhibit 2
Page 10 of 28

**145**

the two rate cycles.

Q.    How about the policy decision to review administrative costs or opportunities to improve efficiency, what information were you provided regarding that decision?

A.    I really don't know what those two things are, so I didn't -- we didn't really discuss that nor do I -- did I really review what those items mean --

Q.    Okay.

A.    -- and how they impacted things.

Q.    Okay.  So are you saying that you -- you don't understand what -- what they're talking about here when they say the policy decision to review administrative costs or opportunities to improve efficiency?

A.    That's correct.

Q.    So given that, any opinion rendered in your report would necessarily not include an opinion on whether the decision to truncate base data was actuarially sound, correct?

MS. SCHWARTZ:  Objection, calls --

MR. JINDAL:  Objection, misstates testimony.

MS. SCHWARTZ:  Speculation.

MR. JINDAL:  Join.

THE WITNESS:  I -- I did not provide an

Exhibit 2
Page 11 of 28

**146**

opinion on the policy decision to truncate data.

Q.    (By Mr. Gordon)  Who was responsible for determining the timeline of your review and report?

A.    OHA.

Q.    Did you, L & E, have any input into the timeline?

A.    They discussed it with us briefly.  We knew it was going to be a large project for the time that they had indicated, but we felt comfortable with it so -- but we did have a discussion if we needed more time, we could simply ask for it.

Q.    Did you ask for a longer time period up front?

A.    No.

Q.    Did you think the timeline was aggressive?

MR. JINDAL:  Objection, vague.

THE WITNESS:  I -- I think it was aggressive but attainable.

Q.    (By Mr. Gordon)  What was the reason for the aggressive timeline?  Or what -- strike that.

What were you informed about the reason for the aggressive timeline?

A.    Again, I think they wanted -- if they had issues with the rates that were currently in place, they wanted to take a corrective action sooner rather than later, so the sooner they could get that information,

Exhibit 2
Page 12 of 28

**173**

THE WITNESS:  Well, no, I would be able to say that it was this.  I mean, they employed it the same way across all CCOs.  I guess the conclusions may have been different.

Q.    (By Mr. Gordon)  Which conclusions may have been different?

A.    The -- the conclusion to that, like, for instance, the CCOs that were above the threshold and the CCOs that were below the threshold may have been different so therefore we would have investigated maybe different CCOs versus the ones that we were investigating because that calculation was done incorrectly.

Q.    Are the -- is your opinion about the implementation of the reimbursement review methodology premised on an assumption that the rate of growth calculations were risk adjusted?

A.    Yes.

MR. JINDAL:  Object --

THE WITNESS:  Sorry.

MR. JINDAL:  Object to the form; calls for speculation.

Q.    (By Mr. Gordon)  So if that assumption is incorrect, then your opinion no longer holds?

MR. JINDAL:  Object to the form;

Exhibit 2
Page 13 of 28

174

speculation, incomplete hypothetical.

THE WITNESS:  Okay.  So can you ask the question one more time?

Q.  (By Mr. Gordon)  Sure.

So let's go back.  I said, "Is your opinion about the implementation of the reimbursement review methodology premised on an assumption that the rate of growth calculations were risk adjusted."  You said, "Yes."

A.  Yes.

Q.  And so my follow-up question was, so if that assumption, i.e., the assumption about rate of growth calculations being risk adjusted, is incorrect, then your opinion no longer holds?

MR. JINDAL:  Same objection.

MS. SCHWARTZ:  Objection, calls for speculation.

MR. JINDAL:  Join.

THE WITNESS:  It is still consistent. I'm struggling with whether or not it is unbiased because I don't know.

Q.  (By Mr. Gordon)  Okay.  So if that assumption is incorrect, then you don't know whether it was unbiased?

A.  Right.  Yes.

Exhibit 2
Page 14 of 28

**256**

in response to the change in the Medicaid managed care final role?

A.   I think it has to do with that.  And I believe during that same time, an Actuarial Standard of Practice came out, the 46 or 49, that came out during that time, too.  So there's just a lot more pressure put on that industry to have transparency and better communicate their results to the intended parties.

Q.   I want to ask you about the sentence in the middle of this last paragraph.  You say, "L & E recommends that further documentation be provided to adequately document the changes to ensure that intended users, i.e., CCOs, and other qualified actuaries are able to perform an objective appraisal of reasonableness."

Why is it important that other qualified actuaries or CCOs are able to perform an objective appraisal of reasonableness?

A.   They're -- Optumas is required to do that per ASOP 41.

Q.   They are required to do what?

A.   Provide adequate documentation such that other qualified users or actuaries are able to perform an objective appraisal of reasonableness.

Q.   Okay.  And so I take it that your

Exhibit 2
Page 15 of 28

257

recommendation that further documentation be provided for that purpose means that the documentation that you reviewed or the report that you reviewed was not sufficient so that intended users or other qualified actuaries could perform an objective appraisal of reasonableness?

A.    That's correct.

MR. JINDAL:  Objection, leading.

THE WITNESS:  Sorry.

Q.    (By Mr. Gordon)  So --

A.    That's correct.

Q.    So in that respect, Optumas's report did not qualify -- I'm sorry, did not comply with ASOP 41's requirement for sufficient documentation for other qualified actuaries to be able to perform an objective appraisal of reasonableness?

A.    Yes.

MR. JINDAL:  Objection, leading.

THE WITNESS:  That's correct.

Q.    (By Mr. Gordon)  In what other ways did Optumas's rate development methodology not comply with applicable actuarial standards of practice?

MR. JINDAL:  Objection, misstates the testimony.

THE WITNESS:  I did not find any other

Exhibit 2
Page 16 of 28

269

Do you know whether FamilyCare's ever had an MLR in excess of 100 percent?

A.    Do I know if they have?

Q.    Yes.

MR. JINDAL:  Objection, vague as to time.

THE WITNESS:  I -- I don't remember.

Q.    (By Mr. Gordon)  What, if any, analyses did Optumas do about -- as to whether -- strike that.  Start over.

What, if any, evidence did you see that Optumas performed any analyses as to whether the rates that resulted after the cuts to base data would -- were projected to provide for all reasonable, appropriate, and attainable costs?

A.    I didn't see any evidence of that type of an analysis performed.

Q.    Would such an analysis be something that, in your opinion, should be performed?

A.    Yes.

MR. JINDAL:  Object to the form.

THE WITNESS:  Yes.

Q.    (By Mr. Gordon)  Why?

A.    Because that would help you understand the -- what your projected loss ratios are, which was a recommendation that I made, because then you can have,

Exhibit 2
Page 17 of 28

278

bottom.  Okay?

A.  Yes.  Okay.

Q.  And you see where it says "methodology" there?

A.  Yes.

Q.  And they -- what Optumas says here is, "The first step in understanding the drivers of the high ROG, rate of growth, was to define significant ROG.  Optumas approached this by bifurcating the ROG into two categories, controllable and noncontrollable."

Right?  And this is what you recalled --

A.  Great.

Q.  -- right?

A.  That's correct, yeah.  So far consistent.

Q.  So far consistent.

MR. JINDAL:  Before we go any further, I'm going to object to the use of this document to the extent it's incomplete.  As I understand your representation, it's part of the rate certification.  I mean, just looking at the face of it, a page of it's missing.

You can proceed with whatever representations you want to make regarding it, but I don't want it to be -- I want it to be clear that those are your representations not hers.  It seems as though she hasn't seen the document.

Exhibit 2
Page 18 of 28

DEPOSITION OF LEWIS & ELLIS BY AND THROUGH THEIR REPRESENTATIVE JACQUELINE LEE
September 11, 2018

**279**

MR. GORDON: Understood. I'm -- yeah, I'm representing that this was an appendix to a later rate certification. I noted that it does say page 2 at the bottom. My understanding is this -- is that it's complete. If there's another page, there's another page. But understood, Counsel.

Q.    (By Mr. Gordon)  So they go on to say, "The chart below summarizes the components of the noncontrollable rate of growth," and they identify five different components here.

And you said so far it was consistent when we got to controllable and noncontrollable. This seems to be inconsistent with what's reflected on page 10 of your report and was communicated to you by Optumas.

Would you agree with that?

A.    I agree.

Q.    In particular, there's the redetermination number that was not part of what you were told, and then there's the policy impact that were not part of the noncontrollable components that you were informed of.

Would you agree with that?

A.    I guess my question would be is the 7 percent from my report still 7 percent or did they move that according to the -- such that if you remove these

**DEPOSITION OF LEWIS & ELLIS BY AND THROUGH THEIR REPRESENTATIVE JACQUELINE LEE**
September 11, 2018

280

extras, that maybe they -- because you said there's a new version of the certification.  If you remove these, then my numbers are pretty close, although not exactly.

So my question would be, I -- I don't understand how this is relative to my 7 percent.

Q.    Well, if you go to the next page of that, that first paragraph there may help answer the question. See, it says --

A.    Okay.

Q.    -- "Optumas was directed by OHA to focus on CCOs that have a" --

A.    Seven.

Q.    -- "percent change" --

A.    Okay.

Q.    -- "in base data greater than 7 percent"?

A.    Yep.

Q.    And they say that's the 7.18 percent rounded. And 7.18 --

A.    Yes.

Q.    -- percent on the previous chart appears to reflect the sum of the noncontrollable --

A.    Yeah.

Q.    -- components of the rate of growth.  You would --

A.    That's correct.

Exhibit 2
Page 20 of 28

**281**

Q.    -- agree with me?

A.    Yes, I agree.

Q.    "Any CCO that had a change in base data greater than 7 percent had its reported incentives and underlying reimbursement levels reviewed," at the top of the next page, correct?

A.    That's correct.

Q.    This is not what you were told by Optumas when you inquired about how they selected the 7 percent?

A.    No.  And they appear to be missing the controllable piece.

Q.    Well, they don't have anything in here about the sustainable rate of growth, right?

A.    Correct.  But they do say that there were two categories, controllable and noncontrollable.  And they appear to have, at least in my very quick read here, not commented on the controllable piece.

Q.    If you had been informed by -- well, let me -- let me back up a second.  Let's go back to page 10 of your report.

Were your conclusions and opinions expressed in your report based on the assumption that the information Optumas provided you about how the 7 percent was developed for the CY2018 rate development cycle, as reflected at the top of page 10 in your

Exhibit 2
Page 21 of 28

**282**

report, were, in fact, accurate?

A.    Yes.

Q.    And if that was not, in fact, accurate, does that now undermine the opinions and conclusions you've reached in your report?

MR. JINDAL:  Objection, incomplete hypothetical, calls for speculation.

THE WITNESS:  Yes.

Q.    (By Mr. Gordon)  As you sit here today, do you know whether the information provided to you as reflected at the top of page 10 is accurate as to how the 7 percent was derived or whether the information reflected in Exhibit 1281 is accurate as to how the 7 percent was derived?

A.    Do you know the date of this document?

Q.    Well, unfortunately, this is one of the deficiencies that you identified is that documents are not dated.  This document does not appear to be dated, so I don't know.  My understanding is that it postdates --

A.    Okay.

Q.    -- your report.

A.    Then I -- I do not know -- I would like to think that this is updated information that they uncovered after my discussions, so I would lean that

Exhibit 2
Page 22 of 28

**283**

this new exhibit is more accurate than mine.

Q.   If it's -- if it's later dated?

A.   If it's later dated.

Q.   You said, "I would like to think this is updated information that they've uncovered."  As opposed to what?

I mean, what's the other --

A.   I don't know.

Q.   What's the other possibility?

MR. JINDAL:  Objection, calls for speculation.  I believe it misstates the testimony.

THE WITNESS:  I don't -- I don't really know what else would have happened other than they learned something new.

Q.   (By Mr. Gordon)  Well, by the date of your report, November 30th, 2017, Optumas and OHA should have known how they selected that 7 percent figure, right?

A.   Yes.

Q.   Because that 7 percent figure was critical to their -- their explanation for the reimbursement review policy, right?

MR. JINDAL:  Objection, leading.

THE WITNESS:  Yes.

Q.   (By Mr. Gordon)  And it was very important to your conclusion about the -- whether or not the

Exhibit 2
Page 23 of 28

**284**

reimbursement review was unbiased and executed equitably across all CCOs, correct?

MR. JINDAL: Objection, leading.

THE WITNESS: That's correct.

Q. (By Mr. Gordon) Let's go to page 11 of your report, please.

A. (Witness complies.)

Q. You say -- and I'm in the second paragraph -- I'm sorry, the second sentence of the first paragraph.

Do you see that?

A. "The continued"?

Q. Yeah, "The continued use of the sustainable rate of growth, not accounting for actual and projected national trends, may lead to an appropriate number but could be overlooking key information, such as the aging of the population, i.e., proportion of membership in the most costly categories of aid."

Why -- why would that matter?

A. It would cause rates to be too low.

Q. Do you have any indication that Optumas and OHA's continued use of the sustainable rate of growth did not -- or strike that.

Do you have any indication that Optumas and OHA's continued use of the sustainable rate of growth took into account key information, such as the

312

Q.   I -- I'm not sure --

A.   Okay.

Q.   -- where this snippet is from, I'm sorry.
I -- I assume it's from the reimbursement --

A.   Yeah, it's --

Q.   -- review policies that were attached to
the --

A.   Correct.

Q.   -- two different rate certifications.

A.   Yeah, I think that's what it was.

And this just was the ongoing frustration
that we had with Optumas that -- and I -- I specifically
asked them about this, of which they actually attempted
to explain how this was accurate.  And we, again, were
going around in circles with them about the
documentation, about where some of the numbers were
coming from.  And it was clear based on these two pieces
that they were just verily -- very careless in their
documentation.

And, to me, that's just kind of where I
took it from is just the ongoing frustration with --
with trying to follow what was going -- going on.

Q.   Given that you, a FSA qualified actuary with
access to all the information you had, were confused and
frustrated with Optumas's documentation, would you

Exhibit 2
Page 25 of 28

313

expect that other individuals who were less qualified than you and had less -- access to less information would have been able to follow or understand Optumas's documentation?

MR. JINDAL:  Object to the form. Objection, it's argumentative as well.

THE WITNESS:  Yes, I think I've made that statement in writing and verbally that I was extremely disappointed in Optumas's documentation.

Q.   (By Mr. Gordon)  Why is the documentation important, the actuary's documentation?

MR. JINDAL:  Objection, asked and answered.

THE WITNESS:  It's important because you are providing a rate to companies and -- and to the state as to what they should be paying for these services.  And if -- as you stated, if I as a -- you know, given all the information in front of me can't follow what's happening, to me it is -- it opens you to a lot of risk because I can't follow it.

And, granted, I didn't do the work, but I know how challenging it is to go back when you do a project this size to be able to go back and pinpoint how you did what, where, and why.  And lack of documentation really just makes everyone's life more challenging, and

Exhibit 2
Page 26 of 28

**325**

                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF OREGON


FamilyCare, Inc.,            )
                             )
        Plaintiff            )
                             )
vs.                          )   Civil Action No.
                             )   6:18-cv-00296-MO
Oregon Health Authority,     )
et al,                       )
                             )
        Defendants.          )


                    REPORTER'S CERTIFICATION
                  DEPOSITION OF JACQUELINE LEE
                     SEPTEMBER 11, 2018

     I, Pennie Futrell, a Certified Shorthand Reporter in

and for the State of Texas, hereby certify to the

following:

     That the witness, JACQUELINE LEE, was duly sworn by

the officer and that the transcript of the oral

deposition is a true record of the testimony given by

the witness;

     That a copy of this certificate was served on all

parties and/or the witness shown herein on

_____.

     I further certify that pursuant to FRCP Rule

30(f)(i) that the signature of the deponent:

          __X__ was requested by the deponent or a party

before the completion of the deposition and that the

signature is to be before any notary public and returned

Exhibit 2
Page 27 of 28

**326**

within 30 days from the date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor.

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that the amount of time used by each party at the deposition is as follows:

Mr. Matthew Gordon      - (7:02)

Mr. Anit Jindal        - (0:00)

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken, and further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

Certified to by me on this, the 13th day of September 2018.

PENNIE FUTRELL, CSR No. 4108
Expiration Date: 12/31/19
Firm Registration No. 526
Corporate Plaza I, Suite 152
4950 N. O'Connor Road
Irving, Texas 75062
972.719.5000
972.717.3985 (fax)

Exhibit 2
Page 28 of 28