Lori A. Coyner, 8/30/2018                      FamilyCare v. OHA

49

Q.  Do you do any work with any CCOs in Oregon?

A.  I am currently doing some consulting work with some CCOs in Oregon.

Q.  Which ones?

A.  Can I ask for this to be confidential?

MR. WILSON:  You can.

THE WITNESS:  Yeah.

So we -- our clients typically want to, you know, be confidential.

So I currently work with Trillium which is in Lane County and Health Share of Oregon.

Q.  (By Mr. Gordon)  And what's the nature of your work for Trillium and Health Share?

A.  Well, for Trillium I do regular advising on any -- on policy topics, issues that come up. And we are -- we have been doing some pre -- what's called pre-procurement assessment, so there is going to be an RFP -- or an RFA that's coming out to reprocure the CCOs in January, and so we're doing some analysis for Trillium on that.

Health Share we're also doing a pre-procurement assessment.

Q.  The -- the -- the RFA is coming out in

Lori A. Coyner, 8/30/2018                    FamilyCare v. OHA

63

access to while you were at OHA?

A.    What do you mean by "access"?

Q.    Were you able to see that information, that financial information?

A.    I -- when I was health analytics director I -- I, as part of my, you know, work around the redevelopment of the 2015 rates and the 2016 rates, I did see rolled-up financial information meaning summary information.  I didn't look at line level claims or information at a real granular level since I was a director.  So I -- I did look at comparisons between CCOs at a rolled-up level, like at -- in an Excel spreadsheet.  I don't recall whether that was the specific information that FamilyCare was asking for or not.

Q.    Are you subject to any restrictions on your employment because you had access to and viewed that financial information during your time at OHA?

MR. WILSON:  Objection, ambiguous.

THE WITNESS:  Can you be more specific?

Q.    (By Mr. Gordon)  Sure.

Did you agree to not work for any entities or do any type of work after leaving

Lori A. Coyner, 8/30/2018                FamilyCare v. OHA

64

OHA because you had viewed this in -- this financial information?

MR. WILSON:  Objection, ambiguous. Agreed with who?

MR. GORDON:  With anybody.

THE WITNESS:  I did not sign a -- any statement that said I would not work for another entity when I left OHA.

Q.  (By Mr. Gordon)  Did you otherwise agree to not work for any entity or -- or undertake any particular type of work?

A.  That was not discussed when I left OHA.

Q.  Okay.  So as far as you understand, you're not subject to any restrictions on the type of work you do or the entity for whom you work based on your prior employment at OHA and your access to financial information submitted by CCOs during that time?

MR. WILSON:  Objection, ambiguous.

THE WITNESS:  Yeah, can you restate that question?

Q.  (By Mr. Gordon)  As far as you understand -- I'll -- I'll restate it slightly. As far as you understand, are you subject to any restrictions on the type of work you do or the

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Exhibit 6
Page 3 of 8

Lori A. Coyner, 8/30/2018                    FamilyCare v. OHA

65

entity for whom you work based on your prior employment at OHA and your access to financial information submitted by CCOs during that employment?

MR. WILSON:  Same objection.

THE WITNESS:  So who -- who would -- can you -- who would require -- require this? I'm -- it's a long sentence so I'm starting -- I -- I'm having a difficult time parsing it out.

Q.  (By Mr. Gordon)  Are there any restrictions you're aware of on -- on your employment?

A.  Restrictions by whom?

Q.  By anybody.

A.  That was not discussed when I left my employment.

Q.  Okay.  So you're not aware of any restrictions?

A.  I didn't talk about that with the I want to say human resources at OHA, no.

Q.  Did you discuss that with anybody?

A.  As -- as I remember right now, no.

Q.  Okay.  How about when you were hired on at HMA, were there any discussions about restrictions on what you could do based upon

Lori A. Coyner, 8/30/2018                    FamilyCare v. OHA

84

question asking, but I want you to understand my question, so that's fine.

A.   Well, and -- and this is -- I'm -- I'm just trying to understand the question.

Q.   Sure.  Yeah --

A.   Because --

Q.   -- I want you to understand.

A.   -- there's -- I -- I guess what I want to know is are you asking about a governance structure or how payment to providers?  Because those are different.

Q.   Well, there could be differences in both.  And what I'm trying to understand is, did -- did you consider or analyze whether differences among the CCOs in either governance structure or how they made their payments to providers, what impact, if any, that might have on the data, the claim data, or the other data they submitted to OHA?

A.   And what time period are you asking this about?

Q.   While you were at OHA.

A.   So when I was involved in rate -- in the redevelopment of the 2015 rates and the 2016 rates, when we looked at each CCO's

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Exhibit 6
Page 6 of 8

Lori A. Coyner, 8/30/2018                FamilyCare v. OHA

85

expenditures, there were certainly instances where we would pay attention to how those payments were made to providers.

For example, there's one CCO that pays -- everything's paid as you mentioned subcapitation, so they make all of their payments as a subcap payment, and they don't put the dollar amount on that -- that claim. So we would have -- you know, so the actuaries would make estimates on those in order to understand, you know, what those dollar amounts were. So we did look at, you know -- at dollar amounts to understand whether there was some subcapitation or fee for service.

I don't recall having the information at a -- like through claims that you can tell. And so some of that information would have to come from discussions with the CCOs about how they were making payments, whether they were -- you know, how they were paying their providers. And we would -- and so those would happen in either phone conversations or face-to-face meetings with the CCOs to get a better understanding of how they were paying their provider, you know, their -- their networks and -- and hospitals

Lori A. Coyner, 8/30/2018                    FamilyCare v. OHA

86

and -- and that's -- and so at that level, yes, that was part of -- of the overall analysis of the financial data.

Q.    Did you take part in those discussions with CCOs?

A.    I don't recall right now.  You know, to -- you know, all the specific meetings I had, but -- but I did meet -- I did take part in meetings with actuaries and CCOs to talk about their -- what we call, you know, their base data or with the roll-ups of, you know, how -- how the data.

Q.    And these were discussions that you referenced with CCOs about how they were making payments, how they were paying their providers, those types of discussions?

A.    We would have those types of discussions in terms of, you know, whether they were engaged in value-based payment, whether they paid bonuses to their providers, to try to get a sense for the full financial picture.

Q.    Miss Coyner, you were with OHA during the time period that the five-year CCO contract was signed; is that right?

A.    No, I was not I don't believe.