IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FAMILYCARE, INC., an Oregon )
non-profit corporation, )
                           )
      Plaintiff, )   Case No. 6:18-cv-00296-MO
                           )
  v. )
                           )
OREGON HEALTH AUTHORITY, an )
agency of the State of Oregon, )
PATRICK ALLEN, both )   September 21, 2018
individually and in his )
official capacity as director )
of the Oregon Health Authority,)
and LYNNE SAXTON, )
                           )
      Defendants. )   Portland, Oregon
_____)

**Oral Argument**

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT CHIEF JUDGE

APPEARANCES

FOR PLAINTIFF:                Mr. Stephen F. English
                             Ms. Alletta Brenner
                             Mr. Thomas R. Johnson
                             Perkins Coie, LLP
                             1120 N.W. Couch Street, 10th Floor
                             Portland, OR 97209


                             Mr. Matthew P. Gordon
                             Mr. Nicholas H. Hesterberg
                             Perkins Coie, LLP
                             1201 Third Avenue, Suite 4800
                             Seattle, WA 98101


FOR DEFENDANTS OREGON
HEALTH AUTHORITY and
PATRICK ALLEN:                Mr. David Markowitz
                             Mr. Matthew A. Levin
                             Markowitz Herbold PC
                             1211 S.W. Fifth Avenue, Suite 3000
                             Portland, OR 97204

                             Ms. Carla Scott
                             Oregon Department of Justice
                             100 S.W. Market Street
                             Portland, OR 97201


FOR DEFENDANT
LYNNE SAXTON:                 Mr. Peter R. Mersereau
                             Mersereau Shannon, LLP
                             111 S.W. Columbia Street, Suite 1100
                             Portland, OR 97201

ALSO PRESENT:                 Mr. Gregory A. Chaimov
                             Mr. Christopher McCracken
                             Ms. Elizabeth Knight
                             Mr. Jeffrey D. Hern
                             Ms. Sonia Montalbano
                             Mr. Eric Lindenauer

COURT REPORTER:          Bonita J. Shumway, CSR, RMR, CRR
                         United States District Courthouse
                         1000 S.W. Third Ave., Room 301
                         Portland, OR   97204
                         (503) 326-8188

(P R O C E E D I N G S)

(September 23, 2018; 9:05 a.m.)

THE CLERK:  This is the time set for oral argument in Case No. 6:18-cv-296-MO, FamilyCare, Inc. v. Oregon Health Authority, et al.

Counsel, please state your name for the record.

MR. MARKOWITZ:  Yes.  David Markowitz, special assistant attorney general for the State of Oregon, also representing Pat Allen.

MS. SCOTT:  Carla Scott, assistant attorney general for the State of Oregon, representing Oregon Health Authority and Patrick Allen in his official capacity.

MR. LEVIN:  Good morning, Your Honor.  Matt Levin, special assistant attorney general, on behalf of Oregon Health Authority and Mr. Allen.

MR. ENGLISH:  Good morning, Your Honor.  Stephen English on behalf of plaintiff FamilyCare.

MS. BRENNER:  Good morning.  Alletta Brenner on behalf of plaintiff FamilyCare.

MR. GORDON:  Good morning, Your Honor.  Matthew Gordon on behalf of FamilyCare.

MR. JOHNSON:  Your Honor, Tom Johnson representing FamilyCare.

MR. HESTERBERG:  Good morning, Your Honor.  Nick Hesterberg on behalf of FamilyCare.

THE COURT:  Thank you all for being here and for your thoughtful preparation for this hearing.  I appreciate the hard work that went into it, and it was of great assistance to me in trying to be prepared for this hearing.

I've vacillated between trying to give you my tentative thoughts first, which I typically do, or just starting into hearing your arguments, and I think I'll probably do a little of each.

So I would like to start with the APA claims, Claims 4 and 11.  And what -- Yes?

MS. SCOTT:  I will be speaking to that.

THE COURT:  All right.

Mr. Johnson, you've been taken off the bench and put in --

MR. JOHNSON:  They're putting me in the game.

THE COURT:  Don't forget to take your warmups off there.

I think on this one, which is fundamentally more of a legal issue than the other ones, which are grounded in both law and facts, I'll give you my tentative views first and then hear further argument.

So these are both claims seeking judicial review of rate setting under the APA, the state APA, and to summarize -- I don't mean to leave out pieces of arguments that I know are in play, but to just give sort of a broad summary of the theory

there, there are really two basic theories advanced by FamilyCare for why they're entitled to state -- to judicial review of the rate setting:  One is that there is here an agency order based on an erroneous interpretation of the law, or otherwise violates the law; and the second is that there is an agency order not supported by substantial evidence.  And those are the two broad streams of APA review in both federal and state law.

OHA's motion for summary judgment rests on I think two broad grounds.  The first is that CMS has conclusively determined that the 2017 rates are actuarially sound and that this means therefore that OHA is necessarily in compliance with relevant federal law, and then by derivation necessarily in compliance with state law that incorporates federal law.

Sort of derivatively, that no law requires more than CMS approval, that FamilyCare is not entitled itself to actuarially sound rates as an independent matter on its own, but just CMS approval of the actuarial soundness of the rates, and therefore the actual rate-setting decision that matters here isn't FamilyCare's view of the actuarial soundness of the rates but CMS's approval or not of such rates, so that if that decision is wrong, then the remedy would have been federal APA review of CMS's decision.  That's sort of broad outline of number one.

And number two is that the Oregon APA doesn't provide

the remedy FamilyCare seeks, just approval or loss of funding.

Both parties in advancing their arguments refer to my prior opinion and order, particularly at pages 7 and 8 and pages 12 and 13. So I want to say at the outset that my prior opinion and order on a motion to dismiss plays out like they often do at summary judgment, where one has to pay careful attention to rulings that are just procedural rulings on a motion to dismiss and rulings that are more substantive.

So at page 7 and 8, cited by plaintiff, by FamilyCare, I engaged in a fairly typical motion to dismiss analysis, focusing on whether certain claims in the abstract could even be brought. I held that three categories of claims that I looked at -- and I want to digress here, of course, and state again the obvious: that I am only analyzing what was set in front of me by the motions I had. And so I looked at three categories of claims: Section 1983, APA, and contract claims.

As to the APA, I only held that for motion to dismiss purposes, plaintiff had a right to sue. There wasn't a barrier at the door, either by failure to state a claim or by preemption to bringing a lawsuit, to filing such claims.

So in terms of the dichotomy I mentioned a moment ago, it's almost entirely, almost completely a procedural ruling that the claims could survive a motion to dismiss and the challenges essentially were a failure to state a claim and preemption.

OHA relies on my ruling at page 12 to 13, which looks at whether actuarially sound rates are the sort of statutorily protected interest covered by the due process clause for Section 1983 purposes.

A shorthand way of talking about it -- it's not quite accurate -- is that it looks at whether they are the sort of -- that those statutory grants created a sort of property interest protected by the due process clause.  And for the reasons I stated, I found that "FamilyCare does not have a protected property interest in receiving actuarially sound rates from OHA."

Now, the setting is Section 1983 here and due process, but the ruling is more substantive than procedural, and will come up later.

The impact, in my view, tentatively speaking, of those two rulings together is that I believe it means that OHA is correct when it asserts that CMS's determination of actuarial soundness is conclusive for our purposes and therefore means that FamilyCare's theory that the rate setting was based on an erroneous understanding of the law or violated the law must fail.

And it further means, I believe, that FamilyCare's theory that OHA's order wasn't supported by substantial evidence also fails for this slightly different reading, that the only agency decision FamilyCare can contest if it wants to

contest actuarial soundness is CMS's decision, and that otherwise it does not have the remedy on this particular theory that it seeks against OHA.

And that's something I sort of, I admit, glancingly adverted to in the earlier opinion when I noted that the claim could go forward, there was a right to sue, but that it would be in trouble if it was grounded in a claim to actuarial soundness, sort of independent claimed actuarial soundness.

So that's how I read my former opinion, and that's how I read the state statutes that are cross referenced with the relevant federal care statutes, and my tentative ruling, I guess I'd say, on Claims 4 and 11.

Since my ruling sort of puts the ball in FamilyCare's court, I'll start with FamilyCare for your argument.

MR. JOHNSON:  Thank you, Your Honor.

THE COURT:  I didn't mean to say "my ruling."  My tentative thoughts.  I'm sincere about that.  I'm here to hear oral argument, so I don't want you to feel like you've already lost.

MR. JOHNSON:  I understand.  Thank you, Your Honor.

So I think there are -- OHA's principal argument is that because in 42 C.F.R. Section 485, quoting 4(b), it states that CMS is reviewing and approving the rates on an actuarially sound basis; that any other inquiry under federal law is foreclosed.  And they also cite the statute 42 Section

1396b(m)(2)(A)(iii), which doesn't actually say anything about CMS reviewing the rates.  It says there that CMS will review the contract.

So there's nothing in the statute itself that forecloses the -- that states that CMS is reviewing and approving the rates.  It's only in one provision of the regulations.

And another piece of --

THE COURT:  Why does that matter if it is in one provision of the regulations?

MR. JOHNSON:  And I'll get to that, Your Honor.

One of the things -- another thing you wrote in your opinion -- and I understand that that was in a different posture -- was on page 22, when talking about the statute 1396b, the statute does not contain an express preemption provision and it does not expressly indicate that the secretary's approval is the only mechanism to review the actuarial soundness of the rates.

And that's correct.  There is nothing in any of the statutory framework or the regulatory framework that says that once CMS acts, there is nothing else to do.

THE COURT:  I want to pause there because it comes up repeatedly in the briefing, and I can understand why, but this relationship between a ruling at the motion to dismiss and summary judgment is important.  And so that's really an

expression of a very different idea than the one we're handling right now, which is to say that preemption itself doesn't foreclose the possibility of bringing a claim such that I should grant a motion to dismiss it.  It doesn't mean that something very close to the same arguments once fleshed out at summary judgment don't go in the opposite direction.  I mean, that happens a lot between motions to dismiss and summary judgment.

MR. JOHNSON:  I understand that, Your Honor.  But the point that I want to make clear is that our claims are under federal law, and we are bringing a state APA claim challenging the state action in interpreting federal law is broader than just the actuarial soundness of the rates.  If you look at 485.5(b), it lays out what the State -- the steps that the State is required to take in setting the rates, the data that they are supposed to utilize, the degree to which they are supposed to certify the rates on a rate cell basis, which admittedly I believe was not done here by Optumas or the State. And so that is an independent set of state requirements that is unrelated to 485.4(b).

THE COURT:  Well, are there any of them that are unrelated to the actuarial soundness of the rates?

MR. JOHNSON:  And in terms of how we -- we actually, our state APA claim, you mentioned the substantial evidence and the erroneous interpretation of the law.  We also have a claim

under 183.484(4)(b), saying that the State acted outside their prior practice and that they acted outside their discretion.

And so for those claims, I would submit that those claims don't rely just solely on a claim by us that the rates weren't actuarially sound as a legal matter, but --

THE COURT:  That wasn't quite my question.  My question was do any of those theories -- for example, do any of those alleged violations of practice, procedure, state law or otherwise, do any of them get at any other problem than actuarial soundness?

MR. JOHNSON:  And I think they do.  I can't say that actuarial soundness would be completely removed from that inquiry in court or the record that we would want to develop, in the sense that I think as a factual matter, actuarial soundness might come to play in that determination, but if the State is required under 485.5(b) to utilize certain steps in appropriate order and to utilize certain base data in putting together the rates, we have a right under 183.484(4)(c) to say that the -- that there's not substantial evidence to support the work that they did and the data that they --

THE COURT:  I think that argument works -- I mean, it clearly works in some hypothetical settings.  And what I'm trying to get at is if this setting fits it.

So if you had underlying legal requirements that you want to contend weren't followed here, and some of them had the

goal of resulting in actuarial soundness, but there were others, you know, a requirement that you in setting rates seek out minority-owned CCOs, for example, then you'd say the failure to follow that really didn't have anything to do with actuarial soundness, and it would be an independent theory for which you could seek APA review for failing to follow one of the legal underpinnings of the order.

But if all that you complain about here, even the underlying requirements that you've mentioned, if they all were driving towards actuarial soundness, then I'm not sure you've come up with an independent theory that isn't foreclosed by CMS's decision.

MR. JOHNSON:  There are -- and Mr. Gordon just passed a note saying 485 but it's 438.

In terms of the steps that they must take, and it says the State must take these steps and analyze this data, I think that there are aspects of that protocol and the base data that they have to use that are separate from just an actuarial soundness inquiry.

THE COURT:  Such as?

MR. JOHNSON:  Identify and develop the base utilization and price data, the trend factors, and the --

THE COURT:  I don't know how you contend that that doesn't have to do with actuarial soundness.

MR. JOHNSON:  So in terms of the legal determination

of whether something is actuarially sound or not, I think it's a separate question as to -- to the extent that the facts would come to play as actuarial soundness, in the sense that at the hearing we would be able to present evidence to say that the data that the State relied on was insufficient, and there might be testimony relating to the actuarial soundness, but the State has an independent obligation under the regulation to utilize proper data in making the decisions that it made, separate and apart from whether or not the rates are actuarially sound.

THE COURT:  Let me ask it this way.  Is there a set of information that you say is required to be determined accurately that wasn't analyzed in determining actuarial soundness?

MR. JOHNSON:  I think the State has an obligation in any decision that it is going to make to base its decision on substantial evidence, and the way that Oregon --

THE COURT:  I was really asking a historical question.  Was there a set of data in setting the 2017 rates that you contend was not supported by substantial evidence that was also not relied on in determining the rates?

MR. JOHNSON:  The --

THE COURT:  Because in my example, you would say, well, if they inadequately canvassed potential CCOs for minority-owned businesses, they didn't take that set of data and use it to determine actuarial soundness.  So I'm looking

for whether you have something you say was a part of the agency order not supported by substantial evidence that was also not relied on in setting actuarially sound rates.

MR. JOHNSON:  There's nothing that I can think of right here, Your Honor, that says that, because all of the data that we would say that they needed to rely on, the decisions that they had to make in order to set proper rates that are entitled to our review under the APA, it all went up in the funnel to go to CMS.

The issue at that level, though -- and we put in the testimony of Jackie Lee.  Jackie Lee was -- the State in late 2017 hired Lewis & Ellis, an actuarial firm, to kind of give an independent -- they called it an independent review, and just to say everything that Optumas and the State did here was okay. And what she testified to just a week and a half ago was that that CMS review is a surface-level review.  They are not doing the type of work that the State does or Optumas does to set rates.

And so if we are left with a federal APA claim challenging the work of a federal actor, then we are relying on, then, a very limited record to determine whether or not the State analyzed all of the things it needed to do under the federal regulations when that is not a robust review at the federal level.  It is only a surface-level review.

THE COURT:  I'm not sure why that's so.  This is an

imperfect analogy, but we have federal APA review of agency orders all the time, say, in the environmental setting, where the plaintiff isn't suing the people who gave the federal agency the data, it's suing the federal agency.  But in doing that, they get to engage in a complete and thorough exhausting review of the data provided.  So they don't -- they don't sue somebody who provided comment in the notice and comment period, but they are entitled to completely dismantle the accuracy of what was provided.

Why couldn't that be true here?

MR. JOHNSON:  But I would argue in the environmental context, this kind of thing comes up all the time.  For instance just down the road from us, the Columbia Gorge, this exact same type of situation happens, in the sense that the Columbia Gorge Commission is a commission established by federal law, and it is members of the -- Oregon and Washington appoint people, and Congress tasks them with coming up with a management plan to manage the Columbia Gorge.  And they can amend that plan, the Columbia Gorge Commission can amend that plan, and they have.  And that has to be approved then by the Forest Service, so the equivalent here of CMS.  And the Friends of the Columbia Gorge have brought multiple cases under the APA, challenging amendments and actions that the commission has taken, which is effectively a state agency, a joint state agency, saying that even though that review and the Forest

Service approves that amendment, they bring the -- the Friends of the Columbia Gorge bring an action, APA action challenging the amendment, and the fact that the National Forest Service has amended that or approved that does not foreclose bringing an APA action challenging that.

THE COURT:  Before you continue, I want to make sure you've read all of the notes that have been passed to you in the last couple minutes.

MR. JOHNSON:  So I got a note from one of my colleagues -- I don't know who it is, Your Honor -- but OHA and Optumas chose not to use the correct data; they used other data.  And so the baseline for what we are arguing here, it is about all of the data that goes into that, the determination that the State is making about which data they are going to utilize.  And so it's not necessarily that this is data that, you know, is not going in front of CMS, it's data that they're not seeing because OHA and Optumas are choosing not to use certain data.

THE COURT:  I mean, I guess the real point isn't in the weeds about the accuracy of the data, because if we get that far, then you defeat summary judgment at a minimum by saying that there's a fight about whether there was accurate data or not.

The real fight is what does the statutory scheme leave with regards to what you can sue about, because that's

the difference perhaps between this case and the Columbia Gorge, is what are the rights that the statute has left FamilyCare with in terms of what it can legitimately complain about. And if it's -- if it's that you can complain about not receiving actuarially sound rates, then you get to argue whether the process here involved a lack of substantial evidence to support the rates that were set. If you can't complain about that, if you're not left with the right to complain about actuarially sound rates, then the data that went into setting those rates is, in my view, also not something you can complain about.

MR. JOHNSON: But if that's the case, then if Optumas and the State completely misled and lied and did -- and put together a phony report, then -- and that's all State action, and because the federal government is somehow hoodwinked that they are relying on data that is not incorrect intentionally, then we are left with no remedy because --

THE COURT: That's not the case. You don't have to show that the agency order was intentionally not supported by substantial evidence. If they hoodwinked the federal government and the federal government issues an order that's not supported by substantial evidence or based on an erroneous interpretation of the law, you win.

MR. JOHNSON: Under -- you're saying under a federal APA claim, right?

THE COURT:  You said no remedy.

MR. JOHNSON:  But the state legislature here in Oregon, in putting together 183.484, they know and they have excused certain aspects of their government from an APA claim. There's -- the Oregon legislature could have excluded the CMS review from any APA review, and they haven't done that here. So --

THE COURT:  I agree with that.  That's why I denied the motion to dismiss.  The question is really what sorts of claims, among all the claims that you could bring seeking APA review of orders in this arena, which of them -- which of them do you have a right to complain about or not.

MR. JOHNSON:  Which orders we have a right to complain?

THE COURT:  What types of orders really.  You're suggesting that they didn't prohibit, as they have in some other arenas, any lawsuit, but I've already made clear you can bring a suit, it's just left for another day post motion to dismiss now here today what sorts of things you really can complain about.

So what I really want to hear, I guess, is your best argument for why you think you do get to complain about either actuarial soundness itself or at least the data that went into it.

MR. JOHNSON:  Under 438.4(a), Your Honor, the

obligation to produce actuarial sound rates is independent of the obligation -- the review by CMS under 438.4(b). There it states that actuarially sound capitation rates are projected to provide all reasonable, appropriate, and attainable costs. There's nothing there about whether or not -- that is an independent obligation that the State has separate and apart from the review by CMS.

Again, in the statute itself, it says that we have -- that the payments to the CCOs have to be made on an actuarially sound basis. It doesn't --

THE COURT: Your payments to CCOs, right?

MR. JOHNSON: The payments by the State to us have to be made on an actuarially sound basis. There's nothing in the statute itself that says that the federal review forecloses our right to have that, and then in 438.4(a), that we have a right that is separate from the CMS review.

THE COURT: All right. Thank you very much.

MS. SCOTT: The State agrees with Your Honor's tentative reasoning, and I don't have anything further to add unless you have questions for the State.

THE COURT: I'd like you to respond to the arguments you just heard.

MS. SCOTT: Okay. Well, I think the issue before this Court now is whether OHA complied with the applicable legal requirements in setting FamilyCare's rates and submitting

them to CMS.

Under the APA, the --

THE COURT:  Did state law create in any way, including 438.4(a) or any other statute or rule, does it create an obligation for your client to provide to FamilyCare actuarially sound rates?

MS. SCOTT:  No, Your Honor.  Under the APA, you look to the underlying substantive law to see what the state agency was required to do, and here that law requires only that OHA develop rates and submit them to CMS for approval, and there is no dispute in the record here that OHA did that.  And so we feel --

THE COURT:  What do you make of 438.4(a)?

MS. SCOTT:  That is just a definition of what actuarially sound capitation rates are.  Subsection (b) then explains that CMS shall approve the rates for actuarial soundness according to that definition, and that is what happened here.

THE COURT:  All right.  Thank you.

I'd like to turn to the First Amendment retaliation claim.  And here, rather than give my tentative views, I'll just hear whether you have anything you wish to add to what you've submitted in writing.

And so I'll start with the moving party.

MR. MARKOWITZ:  Yes, Your Honor.  David Markowitz on

behalf of Pat Allen.

And I'd like to focus the Court's attention first on the motion to dismiss and just review very briefly the history of what happened with the claims against Mr. Allen.

In the third amended complaint, facts were alleged that essentially charged Mr. Allen with having acted in a manner to violate the well-established constitutionally protected rights, which the Court ruled did not exist at that level. And all of the claims against Mr. Allen were dismissed with prejudice.

Following that time, and without any further leave of Court, the FamilyCare allegations changed in their conclusion to say that the same conduct that had been previously used to support the now dismissed allegations could be used to support the contention that Mr. Allen's motive was retaliatory for the free speech expression that FamilyCare had been engaging in for years. And by changing the allegations as they did, this clearly brings us to the pleading requirements that are expressed in *Ashcroft v. Iqbal*. We cited that case, as we obviously would do in our opening brief on a motion to dismiss, and for some reason FamilyCare totally ignored it in its response, and I want to make sure that because of its being ignored, the Court does not focus on that case as it should in fact do.

*Iqbal* --

THE COURT: You've described a problem different than *Iqbal v. Twombly*. You've described not a particularity problem but sort of a -- I guess you'd call it a sleight of hand problem, that late in the game they've switched theories on you.

But what is the inadequacy of the pleading here under *Iqbal v. Twombly*?

MR. MARKOWITZ: Under *Iqbal*, the requirement is first to ignore for the purpose of testing the truth of the pleading any pure conclusions. And the type of conclusions that were alleged in *Iqbal* are the same types of conclusions that are alleged here. They are formulaic, nonfact-specific allegations that the public official acted with improper motive, with no description of any fact that would support that position. The simple additional allegation after the pleadings changed to reflect the conclusion, with no factual support, that there was a prohibited motive on Mr. Allen's part. And under *Iqbal*, those allegations, which are essentially just conclusions, formulaic recitations of what the claim requires, are to be ignored.

The second step of the *Iqbal* test and method for analyzing the pleadings is to then look at the well-pleaded facts and to not just ask if those demonstrate a conceivable claim, but whether the claim is plausible.

And here the only facts that were in the first

pleading and then in the next -- last pleading was that Mr. Allen shortly after taking over the job as director, called for an independent investigation. The answer of that investigation FamilyCare did not like. And that approximately ten days before the end of the year, when FamilyCare had not yet declared officially whether it was going to continue in business in 2018, Mr. Allen demanded, according to the allegation, demanded that within 24 hours they make up their mind.

Those are the only facts that have been alleged, and the question is is it -- is that conduct just as likely to have occurred for a non-constitutionally prohibited way.

And in fact what --

THE COURT: I'm not sure that's the test. I mean something could be plausible without being -- losing in the competition, which is just as likely.

MR. MARKOWITZ: Well, the *Iqbal* opinion indicates that it is not sufficient in a qualified immunity case against a public official alleged to have made constitutional violations to simply take facts which have a possible consequence or a possible motivation. The Court has to evaluate the other alternative reasons that have been given by the public official for the conduct.

In that case, FBI Director Mueller, Robert Mueller, had other explanations for why significant numbers of Arab

Muslims were incarcerated, which the Court found to be just as likely, and therefore the case was dismissed.

In this case, Mr. Allen, if he made the demand that is alleged by him, is just as likely, if not more so, to have made that demand because of the fact that because over 100,000 Oregonians were about to lose the company that provided all of the expenses for their medical care.

THE COURT:  Why doesn't my consideration of that explanation require me to consider your argument under summary judgment instead of a motion to dismiss?

MR. MARKOWITZ:  Because *Iqbal* says that the Court is to use its judicial experience and common sense.  And in applying that test or that judicial --

THE COURT:  My judicial experience and common sense doesn't tell me the facts.  I mean, if I knew from some other source that was appropriate at the MTD stage all about the timing and the rational for the so-called ultimatum, then I could apply common sense and say that's a big deal, Mr. Allen would be worried about that.  But I only know the contrary explanation from facts outside the complaint, right?

MR. MARKOWITZ:  Well, in *Iqbal*, the Court granted the motion to dismiss because of its analysis of the legitimate reason for why the FBI director's investigation was appropriate.  It looked to the fact that Osama bin Laden and his associates were Arab Muslims, and used that as the

rationale for the fact that a high percentage of the people who were incarcerated following 9-11 were Arab Muslims.  They went beyond the naked pleadings to use common sense and apply judicial experience.

THE COURT:  The same core of your argument is what applies to your motion for summary judgment, right?

MR. MARKOWITZ:  It is, Your Honor.  The same argument we have renewed.  We believe that it should be dismissed on motion to dismiss, but we have raised the exact same issue in summary judgment.

THE COURT:  And the core of both motions is just that there isn't evidence of really for lack of -- as a sort of a shorthand, a bad intent?

MR. MARKOWITZ:  Exactly, Your Honor.

And the evidence which is alleged is alleged to span a period of years, and it's alleged to have been the conduct of numerous individuals employed within OHA and Optumas, and the law is very clear that Mr. Allen is only responsible for his own conduct and his own motives.  And allegations, when you strip away the conclusions and you look about the facts directed only to Mr. Allen, who arrived on the scene a few months before FamilyCare went out of business, those allegations are simply not sufficient either for pleading purpose or to defeat our summary judgment motion.

THE COURT:  So I'll hear a better list in just a

moment from your opponent, but my list of the allegations that support that the expressive conduct was a substantial or motivating factor are the delivery of the so-called ultimatum. That's a fact that's relied on, saying, we complained and we get an ultimatum that's unusual and harsh.

Second, the email that says he's disappointed in FamilyCare's contact with the state legislator.

The third, I think -- I'm not sure about this one, but I think it's that Mr. Allen didn't give FamilyCare the process it was due in the 2018 rate setting, somewhat longer out in time but still relatively close in time to the expressive conduct.

And fourth, if I have this right, that prior to Mr. Allen's arrival, there is more evidence of adverse action that's motivated by the expressive conduct, and that he comes on board, that ship is already on its course, and he does nothing to change it.  In fact, he perpetuates the prior plan to punish FamilyCare for its expressive conduct.

Why isn't that enough to defeat summary judgment?

MR. MARKOWITZ:  Because those are unsupported allegations.

THE COURT:  Unsupported that he delivered an ultimatum?

MR. MARKOWITZ:  No, that, as I said, there are -- there is --

THE COURT: I don't think unsupported will work. There is an email, there is an ultimatum.

MR. MARKOWITZ: Right. There is no question that there is a dispute of fact as to whether on December 20th, there was an ultimatum or a request.

THE COURT: Sure. There's a dispute of fact as to which I'm supposed to view it in the light most favorable to your opponent.

MR. MARKOWITZ: The question is whether that conduct was motivated for an impermissible retaliatory purpose or for the appropriate purpose of attempting to transition 100,000 people to the medical care that they needed.

THE COURT: Right. There --

MR. MARKOWITZ: There is no evidence --

THE COURT: There are two interpretations that I could give to the facts. Why don't I use FamilyCare's interpretation here, as I typically am obligated to do at summary judgment?

MR. MARKOWITZ: Because what you would typically do does not apply, according to *Iqbal*, in the setting of a qualified immunity case of a public official who is charged with having been -- making retaliatory decisions. It is not sufficient. The normal standard for pleadings in summary judgment does not apply in this setting. He is entitled to, as a public official, the requirement that plausibility rather

than possibility be established.  It has to be -- you have to weigh the likelihood that when he made the demand that they make up their mind within a relatively short period of time, that he did so for the purpose of accomplishing good that he was hired to accomplish, as opposed to some retaliatory purpose for conduct that had preceded him.

THE COURT:  All right.  Thank you.

Who will respond?

MR. GORDON:  I will, Your Honor.  Thank you.

It appears from the argument that the main issue here is Mr. Allen's intent.  So I'll focus my comments there, and certainly if the Court would like me to address other elements of the First Amendment claim, I'm happy to do so.

But I understand that from the -- from Mr. Markowitz's argument and from Your Honor's questions, that the intent of Mr. Allen is really what's at issue.

So under the law, the issue is whether or not there was a substantial or motivating factor behind his actions to punish FamilyCare for its First Amendment conduct.

THE COURT:  We'll get to the appropriate standard to apply, but first with that standard in mind, what are the factual allegations you're relying on to show the substantial or motivating factor?

MR. GORDON:  Sure.  So there are three -- under the law there are three things that plaintiffs can show.  Any one

of the three is enough to show substantial or motivating factor. One is proximity in time between the expression and the retaliation.

Here you have very close proximity in time between -- and if we just focus for the moment on the ultimatum, understanding that that's not the only conduct that is at issue here, but if we talk about the ultimatum on December 20th, several days before that, FamilyCare had reached out to a state senator, and we know that Mr. Allen didn't like that. We saw his email and we've also -- also in the record is deposition testimony from Mr. Clancy, who was at the December 20th meeting, who said that the reason Mr. Allen changed his mind and delivered the ultimatum was because he was unhappy that they had gone out and spoken to the legislators.

You also have just within weeks of that FamilyCare going to the press, and there's an article in the record from the Lund Report that talks about FamilyCare's outreach to the press in response to OHA's dissemination of the purportedly independent reviews that it had obtained.

So at the end of November, OHA sends out press releases saying, hey, we've got independent actuarial reviews and legal review and our rates are good; we're not making any changes.

FamilyCare responded with detailed bullet points that it sent to the press, explaining the limitation of those.

THE COURT:  Would you slow down --

MR. GORDON:  I'm sorry.

THE COURT:  -- for the court reporter's purpose.

MR. GORDON:  Absolutely.

THE COURT:  It's not even 10:00 yet.  She's still warming up.

MR. GORDON:  I was going to say after 10:00 I can go faster.  My apologies.

So we have, focusing on the ultimatum on December 20th, two events of publicly protected speech within -- one within days and one within a couple weeks of that.  So that's evidence about temporal proximity.

And the law here on First Amendment retaliation is not what OHA suggests on temporal proximity.  The law according to the Ninth Circuit is a three- to eight-month period of time easily supports retaliation.  That's the *Alpha Energy Savers* case.

So that's -- we've got temporal proximity easily.

Secondly --

THE COURT:  What do you do about the idea that the expressive conduct, yes, happens sort of at the tail end, if you will, just prior to the adverse action but had been going on for a long time before that?  So when do you start the clock in terms of looking at expressive conduct?

MR. GORDON:  That's a good question.  When you have a

continuing course of expressive conduct over multiple years, as you do here, and a continuing course of retaliatory action by the State, much of it by Ms. Saxton before she resigned because of the smear campaign, but then, as Your Honor noted, when Mr. Allen takes over on September 1, 2017, he continues the course of conduct that Ms. Saxton had set in place before he took over.  So --

THE COURT:  Let me pose it more as a hypothetical, then.  If you have two years of expressive conduct, and then at the end of year two, you know, ten days later, you have adverse action, is that enough to have this temporal proximity to infer that the adverse action is because of or motivated by the protected activity?

MR. GORDON:  So if the question is does protected speech over the course of a couple of years and the final act happens two weeks before the adverse action, do you look just back to the final action?

THE COURT:  I'm asking doesn't that sort of substantially weaken the inference that one would normally draw?  If you have protected activity ten days, adverse action, then I get the inference, I get how a rational jury could rely on that to make an inference.  But if you have two years of protected activity and then ten days and then adverse action, then the inference is greatly weakened, wouldn't you agree?

MR. GORDON:  I would not agree in these

circumstances.

THE COURT:  I didn't ask you about these circumstances.  I asked you about my hypothetical.

MR. GORDON:  Not necessarily.  So if your hypothetical is that the state actor did nothing over those two years --

THE COURT:  It is.

MR. GORDON:  -- and then acted at the ten days, the Ninth Circuit has -- I haven't seen a case that directly addresses that, but the Ninth Circuit says that the temporal proximity issue is very factually specific and very contextual.

THE COURT:  I was asking your opinion on whether in my hypothetical the inference is substantially weakened.  What do you think?

MR. GORDON:  I don't think so.

THE COURT:  Why not?

MR. GORDON:  Because you still have -- you still have an incident of protected speech that is in close temporal proximity to a retaliatory action.

THE COURT:  The difference is that the protected activity makes me mad so I punish the speaker and I know that that's why I did it, because it happened a short time after the thing that made me mad.  But if I've been getting mad for two years, you know, it's just harder to say that that's the only motivation.

So your answer really here is it's not two years of protected activity or expressive activity followed by punishment, it's years of expressive activity mixed in with various forms of punishment before Mr. Allen arrives, and then Mr. Allen arrives -- well, there's expressive activity and then Mr. Allen takes his actions shortly after the expressive activity that occurs on his watch, right?

MR. GORDON:  That's correct, except I don't think the case law suggests that you have to just look at expressive activity that occurred on Mr. Allen's watch.  If he's continuing a course of conduct that was in retaliation for expressive activity that occurred prior to his watch, I think you can look back to that as well.

THE COURT:  In what way does he continue the path that you contend OHA was on prior to his arrival?

MR. GORDON:  In several ways.  Number one, the path that FamilyCare alleges OHA was on was a path of setting rates that were insufficient for FamilyCare, doing so while ignoring known errors that were raised by FamilyCare, and doing so in a bid to put FamilyCare out of business.

And he does that.  He continues to ignore the error rates.  He asks for an independent review but limits the scope of that review, in an attempt to whitewash that, and then finally he takes the action that -- Well, before we get to the ultimatum, recall that in this time period, FamilyCare's rates

were not yet set.  OHA announced that it was finally going to look into this what's called the redetermination issue, and it's going to -- so the rates that were sent to FamilyCare were tentative at that point in time because the redetermination was going to change the rates.

Mr. Allen does nothing to ensure that FamilyCare gets the information about the redetermination and what their final rates will be in time to sign the contract by the end of the year.  In fact, he shortens that time period for them to sign their contract, knowing that FamilyCare cannot accept the rates as they are and knowing that the rates are not final at that point in time.

THE COURT:  What do you make of the *Iqbal/Twombly* or, for that matter, the *Ashcroft* argument that I should pay close attention to the alternative explanation here?

MR. GORDON:  There's -- I don't think it carries much water, Your Honor.

THE COURT:  Let's talk first about methodology and then facts.

MR. GORDON:  Sure.

THE COURT:  Methodologically speaking, do those cases instruct me, either at the motion to dismiss or the summary judgment stage, to pay -- to somehow compare and evaluate the relative strengths of the competing explanations for the conduct?

MR. GORDON:  No.  And specifically not even at the motion for summary judgment stage.

THE COURT:  Well, at some level the alternative explanation for what the government was up to ends up carrying the day in those cases, doesn't it?

MR. GORDON:  Well, it can under certain circumstances, but what the Ninth Circuit has said is that the fact that the government actor could have taken that action under the law or the fact that government actor has another explanation for why they took that action, that's not something that the Court can rule on in favor of the government, even at the summary judgment stage.  So in this particular --

THE COURT:  If that were true, then the government would have lost in *Ashcroft*.

MR. GORDON:  Well, but this is a different case, Your Honor, and this is a case about First Amendment retaliation, where the issue is the intent of the party, and the Ninth Circuit has said repeatedly the intent of the government actor here is something that is difficult or not susceptible to resolution on summary judgment.

Now, admittedly --

THE COURT:  I'm not going to resolve it.  I'm not going to -- but I guess I'm asking, are you saying that it's zero weight, the alternative explanation has zero weight in my analysis?

MR. GORDON:  No, I'm not saying it has zero weight. I'm saying if the government actor comes forward with an alternative explanation --

THE COURT:  Which it has here, right?

MR. GORDON:  -- then you go to the second and the third prongs, and this is substantial or motivating factor test, which are evidence that the defendant expressed opposition to the speech to anybody, and then evidence that the proffered explanations were false or pretextual.

So if you don't have the temporal proximity, if you don't have evidence that the defendant expressed opposition to the speech, and you don't have evidence that the proffered explanations were false or pretextual, then under those circumstances, the government may be entitled to summary judgment.

Here we have all three.  We discussed the temporal proximity.

Second is the evidence that the defendant expressed opposition to speech.  Your Honor mentioned the email.  We also have the deposition testimony from Mr. Clancy, who said that Mr. Allen said that's why he changed his mind, he was mad that FamilyCare reached out to the legislator.

And then the third thing, evidence that the proffered explanations were false or pretextual.

So here Mr. Allen says, "I gave them the ultimatum

because I was worried about the planning for the transfer of the more than 100,000 FamilyCare members."  That's his reason why he did that.  There's evidence that that is false or pretextual.

Number one, the contingency planning for that transfer was already underway because FamilyCare had already said, you know, "We're worried about the rates and we may not be able to sign this contract."  Exhibit 107 to -- that we submitted in support of this is an email discussing the contingency planning that had taken place before December 20th. And Mr. Allen, in fact, said, "This looks promising."

So contingency planning was already happening.  So that suggests that his explanation, "We needed to do contingency planning or we needed to do this transfer" was pretextual.

The other thing that was the time crunch was illusory.  So, Mr. Allen said, "We needed to do this because we had to make a decision before the end of the year."  Right after the ultimatum and FamilyCare comes back and says, "We can't sign this," OHA asks FamilyCare to stay on for an extra month, into January 2018, to help facilitate the transfer of members from FamilyCare over to Health Share.

If OHA was willing to allow FamilyCare to sign a one-month extension for that purpose, there's no reason why OHA couldn't have allowed FamilyCare to stay on for another month

or two months to wait and see what the results of the redetermination were going to be and wait and see what its final rates were actually going to be.

So here you have evidence of all three things. You only need one of the three to survive summary judgment under the substantial or motivating factor.

THE COURT: Thank you.

Mr. Markowitz.

MR. MARKOWITZ: Your Honor, on the time proximity issue, if you look at the cases that raise that as a factor, there is always something unusual or suspicious about the time of the official's conduct. It typically did not need to be at the time the conduct was taken, and its most likely or typical explanation is it was proximate to when the speech or other expression had occurred.

Here the most likely reason for why such an ultimatum would have been made is because it was 10 or 11 days before the end of the year. This type of an ultimatum, if it was made, asking FamilyCare to make up its mind, logically would occur right then, and it has no logical tie to any part of the four years of expression that FamilyCare had been engaging in unabated.

As to the issue of outreach to the legislator, there was -- in the record there is a clear explanation that there had been a stand-down agreement that Mr. Allen understood was

in place, where both sides were going to work to a resolution without either side taking their issues public, and of course Mr. Allen was frustrated when FamilyCare breached that agreement and took public disclosure of the current then situation.

And as far as the attempt to whitewash it, the argument made by counsel is that Mr. Allen came on board and stopped the process and called for an independent investigation of the rate-setting process, both a regulatory investigation by attorneys and an actuarial investigation by an independent actuarial firm, for the purpose of whitewashing the rates that had preceded it.

That conclusion is supported with no evidence. The only thing that they used to support that conclusion is the fact that there were limitations placed on one part of that examination, but in the record, there are explanations as to why those limitations were in place. There was a very short time period, and the examination by the independent actuarial firm had to be very directed, and it was directed to the specific complaint that was being leveled, and that is that there was targeted disparate treatment as to certain CCOs versus others. And that's what the so-called whitewashed investigation was specifically aimed at asking, and that's what Lewis & Ellis looked at, was whether there was any evidence to support that Optumas had been asked to or had, in fact,

targeted any of the CCOs in its rate-setting process.  There was no restrictions relating to that important question.

So when you actually analyze the facts that are in the record and the explanations that are given by the public official for his conduct, I think under *Ashcroft v. Iqbal*, you have to apply the common sense and judicial experience of applying more the likely explanation and dismiss these claims either on the motion to dismiss or the summary judgment.

THE COURT:  Thank you.

We've covered really two sets of claim so far.  I grant summary judgment on Claims 4 and 11 for the reasons we've discussed, for the tentative views that I set out earlier, which I find to be appropriate reasons for granting summary judgment there.

I deny the motion to dismiss, and I deny the motion for summary judgment on the retaliation claim, again for the reasons we discussed.  I agree that the factual predicate for the expressive conduct being a substantial or motivating factor in the adverse action that Mr. Allen sort of stepped into the stream of bad conduct and perpetuated it is weak, but there are other facts that adequately support that inference sufficient to defeat summary judgment and certainly the motion to dismiss.

I'm going to take a break, and we'll start next with the breach of contract or settlement agreement claims.

THE CLERK:  Court is in recess.

(A recess is then taken.)

THE COURT:  Before we continue, I do want to say a word about methodology on the retaliation claim, since that was the subject of some debate.

I agree with Mr. Markowitz that *Ashcroft v. Iqbal* and its interpretation of *Twombly* read together do, of course, require a plausibility standard not a possibility standard, and that plausibility has to be evaluated in the light of a lot of things, but specifically including competing explanations.  I think that's all correct.

So I just want to be clear here that I think that that standard is met on the pleadings for the motion to dismiss purposes and on the record for summary judgment, for the motion for summary judgment purposes.

I'd like to turn to the breach of the settlement agreement claims.  I'm not going to give tentative views, I just want to state my own views that the core issue here really settles down to was there a breach.  I mean, you know the elements, and so the real question is was there a breach, and that really seems to me to turn on what happened here.  Was there legitimate rate setting or was there what we might call clawback.

And so the path of arguments here is -- and you'll have to correct me if I've missed your arguments, but the path of the arguments is essentially that FamilyCare starts out by

making what might be termed a prima facie case of -- here I won't call it expressive activity but just complaining, followed by bad rates, close enough in time that one could infer clawback instead of legitimate ratemaking.

And I'm going to have to digress for a moment here. Both sides cite employment cases generally, and both sides sort of make some use of the *McDonnell Douglas* framework. Nobody actually applies that framework, and I'm not going to either. I think that's correct, that it's just a useful analogy to think about. So I'm not applying the framework, but since both sides have talked about it, I think it's a useful way to think about the progress of arguments here.

So there is this sort of prima facie case made just by the trio of complaining, bad rates, and timing. And then OHA gives an explanation for that, which is essentially cost containment and worries about the expenditure growth rate.

And again, sort of not really employing but thinking about that same framework, FamilyCare gives reasons why -- gives its reasons why it thinks it can show that OHA's proffered reason for what happened here is wrong or pretextual.

And then finally -- and I'm now focusing on particularly, say, page 13 of the reply brief, OHA makes the argument that that won't work, just making a prima facie case and then attempting to knock down our proffered -- OHA's proffered explanation isn't good enough because there may be

other explanations, and they haven't done anything to support their own explanation.  They've just knocked down ours -- or tried to knock down ours.

And, of course, if we're thinking about *McDonnell Douglas*, the reason that's set up is that it's thought to be probably something a rational jury could rely on if something allegedly bad occurs, and then the defendant explains why it wasn't really bad, there was no bad motive, and you show that motive is a pretext, the thought behind the *McDonnell Douglas* framework is, well, if you give one -- maybe you don't have to give an explanation, but if you give one and it's wrong, then that's powerful evidence that what you did was bad.

So applying that here, if I applied something like that thought process, then it's probably not enough for OHA to say, "Well, hey, you may have knocked down our proffered explanation, but that won't work.  You've done nothing to support your own explanation," since knocking down OHA's proffered explanation is probably -- goes a long way towards beating summary judgment here.

So I still think the core is was there clawback or not.  I want to hear about that.  But I also want to hear about why -- whether OHA's proffered explanation has really been undercut for summary judgment purposes, and if so, isn't that something I ought to take into account.

Once again, I'll start with the moving party.

MR. MARKOWITZ:  Thank you, Your Honor.

I'll discuss only the issue that you've raised, and that's the question of whether there's sufficient evidence of breach.  And I think the Court has to start by focusing on what it is that this contract actually prohibited.

THE COURT:  Actually, I couldn't quite hear that.  What?

MR. MARKOWITZ:  What the contract actually prohibited.

THE COURT:  All right.

MR. MARKOWITZ:  Paragraph 8 of the settlement agreement in 2016 stated that OHA shall not use -- and those are the operative prohibitions -- shall not use rates paid under the 2016 contract or the settlement credit as a basis for limiting future rate amounts.

So the key is that OHA would be in breach of this clause.  It has used the settlement credit in a way to affect rates.  This is not a motive issue, as these constitutional cases often turn on.  This is a question of whether there was prohibited conduct.  And the conduct that was prohibited was using A to accomplish B, using the settlement credit in order to adjust rates.

And if you simply look at the definition of "use," we're talking about employing or using something in order to accomplish the stated purpose.

There is absolutely no evidence in the record, no testimony by any witness, and no document from any party produced, and no expert analysis proffered by FamilyCare that shows any use of the settlement credit in accomplishing the reduced rates.

THE COURT:  What would that evidence look like?

MR. MARKOWITZ:  It would either be a request from OHA or it would be the conduct at Optumas actually doing it.

THE COURT:  I'm sorry, what would that last one be?

MR. MARKOWITZ:  It would be the conduct of Optumas that did the rate setting, demonstrating how that was used in the process.

THE COURT:  If there were documents by Optumas actually showing that we're reducing rates by the amount we paid earlier?

MR. MARKOWITZ:  Right, that they had applied in their calculations some use in any way of that settlement credit.

And what we have is the production of detailed analysis -- some of which we've put into the record -- which shows precisely how every rate cell was calculated, and that there was never, in either 2017 rates or 2018 rates, any utilization of the settlement credit as a part of that process.

THE COURT:  Can I pause you there for just a moment.

So you wanted to take intent or motive out of the equation, but couldn't it be here in this way:  That if you can

get to a certain rate without use of the settlement credit through a series of analysis of the data, but you wouldn't go to that rate except out of a motive to recoup what you'd paid in settlement, would that matter if that were your motive for getting to that rate?

MR. MARKOWITZ:  Well, again, the contract does not prohibit ill motive.  It prohibits conduct in utilizing the settlement credit to adjust rates.

THE COURT:  Well, is it utilizing the settlement credit to adjust rates if you wouldn't have adjusted rates but for the settlement credit, but the settlement credit makes you want to adjust rates in a way you wouldn't otherwise have done, so you then take ordinary steps to adjust rates but only because of the settlement credit?  Is that using the settlement credit to adjust rates or not?

MR. MARKOWITZ:  No, it's not.  The contract does not attempt to adjust the motives or prohibit ill thought.  It prohibits --

THE COURT:  So if I have plenty of good reasons to adjust the rates, which I wouldn't have done but for the settlement credit, because, you know, I also have reasons not to adjust the rates, and of my many choices, I pick adjusting the rates through legitimate reasons but only because I want to get back what I paid in settlement, the contract does not prohibit that?

MR. MARKOWITZ:  It does not prohibit it.  It prohibits the use -- you could only say it prohibits it if we ignored half of the contract phrase.

THE COURT:  Meaning use?

MR. MARKOWITZ:  It talks about you can't have the rates as a basis for adjusting, and perhaps if all we were talking about was the settlement credit having been a basis within their thought process, the hypothetical you're proposing would apply.

But this goes on.  It's more than that.  It restricts use as a basis, and both have to be present.

THE COURT:  All right.

MR. MARKOWITZ:  Now, let me explain the evidence as we've put it into the record that shows that even the hypothetical you've raised does not apply here.

In this case, the adjustments that they complain about started long before the settlement agreement was in place and were not aimed solely at any one CCO.  As the record shows, the adjustments for the 2017 rates started, and the analysis started based on data that was submitted before the settlement agreement was in place and before this contract had any application.  They were already -- OHA and Optumas were already looking at cost containment.  And the cost containment that was in place was not aimed at any one CCO.

Let me just spend a moment talking about this because

it's very important that the Court understand this rate setting.  The rates that are set for the cells -- you heard that this morning.  The cell would be, for example, all of the members who were age 6 to 16, children in that category.  A rate is set for all the members in that category, and it's set regionally, so that the same rate for every member in that cell is the same whether it's FamilyCare or Health Share.  There's one rate regionally is how this is set.

So what happened every year, and in this year also, all of the base data -- and sometimes it's called encounter data -- is reported in from the CCOs, and that base data is data reflecting what the members' conduct had been in seeking treatment and the payments that the providers had received.  It has nothing to do with settlement credits.  What it has to do with is what the patient's history has been and the provider's payment has been.

Now, in 2016, for 2017 rates, the decision was made that certain levels of voluntary overpayments would be adjusted out of that base data.  That was not just applied on the FamilyCare base data, it was applied on nine of the 16 CCOs who had made voluntary -- what were perceived to be voluntary payments in excess of reasonable levels.  All of them were adjusted.

And when the adjustment is made to base data, it doesn't just impact the rate for the CCO whose data was

adjusted.  It adjusts for the region.  So even though there was adjustment of base data submitted by FamilyCare, there was for eight others for the same reason.  And when that adjustment was made, it didn't just affect the rates of FamilyCare, it affected the rates of everyone in the region, which meant Health Share and FamilyCare suffered the same consequence of that rate adjustment.

There is no difference --

THE COURT:  You mean the same consequence because it's the same rate adjustment?

MR. MARKOWITZ:  Because the data from all of the CCOs in the region are aggregated to come to a single --

THE COURT:  I understood that part.  I guess what I'm really getting at is did the rate adjustment end up adversely affecting FamilyCare more than other CCOs?

MR. MARKOWITZ:  No.  It can't.

THE COURT:  I don't mean did it adversely affect them by giving them a worse rate.  I mean, did it have a worse impact?

MR. MARKOWITZ:  The adjustment cannot do so because the rate is a regional rate that impacts everybody the same. It doesn't matter whether the base data is being adjusted from one or the other.  The fact is if nine of the 16 CCOs made payments in excess of what were believed to be appropriate levels, then all nine are reduced, and that flows through to

the rate reduction for virtually every CCO.

Now, the only reason there is any difference between the payment to one CCO's member in a rate cell versus another member's CCO in that same rate cell is that they are risk adjusted. The last step in this process after the rate has been set by the initial process is that if the members in one group happen to be needing of more care, they have more severe physical conditions, then that population might cause the rate adjustment to occur because of risk. But that happened across all of the CCOs, based only on unadjusted risk data submitted by the CCOs, and it occurs on a cell-by-cell basis based on the data which has not been affected by any change.

The only thing that OHA is alleged to have done with Optumas is in 2017 and 2018, made broad reductions in base data, based on the belief that there were bonuses being paid to providers and overpayments being made to providers that were unsustainable. And because they were unsustainable, they were reduced across the board, affecting everyone, with no difference for FamilyCare, and nothing in that process, not one step in the process ever looked at or used, utilized or employed the settlement credits that took place.

This process started before the settlement, continued through the settlement, and ended after the settlement without any change being made because of or utilizing the settlement credit. It was coincidental at best. It was simply because

2017 rates are set at that time, and the settlement agreement took place both before and -- both after and before the completion of that process.

So there is no coincidence of timing here, no timing proximity that would lead to an inference that something ill has happened.  What we have in this case is in the complaint, when the complaint was originally filed about this breach of contract, it was filed on information and belief.  The complaint does not allege any specific fact that reflects that the settlement agreement was used as a part of the rate-setting process.  It was set on information and belief, based on the coincidence of the rates ultimately being applied after the settlement agreement.

But their experts give us a long list of reasons for why those rates are impactful and negative.  They say there are errors in the data.  They say that the regional methodology is inappropriate.

FamilyCare comes forward with a laundry list of explanations as to why they are being harmed by this data, and nowhere in those explanations do they cite to a single place where the settlement credit was utilized to impact them.  They have done a detailed analysis from expanded discovery that the Court allowed, both of witnesses' testimony and Optumas documents, and the third-party review documents, and nowhere have their experts found a single place where the consideration

was made by utilizing that which was prohibited from being used.

So yes, there was a coincidence of timing, but that coincidence is no more than 2017 follows 2016.  The rates were going to be set for '17, after the settlement occurred necessarily.

They complain before and after, and they give very specific examples of why they think they don't have actuarially sound rates, and none of those examples include any utilization of that which was prohibited by the settlement agreement.

So we think the record at summary judgment requires that as to the contract settlement agreement allegations, they have not met their burden of proof.

THE COURT:  Thank you.

MR. GORDON:  Your Honor, just one point of clarification about Your Honor's comments at the beginning.  In terms of temporal proximity, Your Honor talked about proximity to complaints and then the implementation of the reimbursement review.

THE COURT:  I'm sorry, I should have said settlement agreement.

MR. GORDON:  I just wanted to make sure we're on the same page.  So the settlement agreement was signed in late May of 2016.

THE COURT:  Right.

MR. GORDON:  And to be clear, what we're talking about under this claim is the so-called reimbursement policy.  And that starts in early July 2016, shortly after the settlement agreement is signed, and it ends up making deductions from FamilyCare's base data that are similar to the amount that is paid out under the settlement agreement.

Now, counsel said that this -- that this process started long before the settlement agreement.  That's not the evidence in the record.  The only thing that OHA has pointed to in support of that is a brief email discussion a few months before that, where they talk about they might -- they're seeing this increase in costs.  But there's no evidence in the record --

THE COURT:  Well, if a few months before the settlement agreement there's a discussion saying, "Costs are more than we thought, we're going to have to do something about it," why isn't that important?

MR. GORDON:  It's relevant -- excuse me -- but it's just -- there's more discussion, talking about costs.  There's no indication that they ever did anything -- that they ever took it up again or anything until shortly after the settlement agreement is signed.  And that's where they --

THE COURT:  I guess, in my view, if OHA says well prior to the settlement agreement, "Costs are rising, we're going to have to do something about it," and then they later do

something about it, it is something I feel like I should pay close attention to at a minimum, that this occurred well before the settlement agreement.

MR. GORDON:  That there were mere discussions about it, there's some relevance to that, but the fact that they were mere discussions, there was never anything further about operationalizing this.  At most, it would go to the question of whether the reimbursement policy itself was proper or improper. Our contentions here are both that the reimbursement policy itself, the way it was conceived and conceptualized and the rationale for the policy itself was improper, but also that the way it was implemented was improper.  Your Honor asked about if it adversely affected FamilyCare more than others.  Absolutely. The cuts to FamilyCare's base data were far in excess of the cuts to any other -- any other CCO.

And if you'll allow me, I'd like to talk about --

THE COURT:  That's based on the differences in reimbursements or what?

MR. GORDON:  So two things.  When I say the cuts to FamilyCare's base data were much higher, just the gross number. So in 2017, they take $34 million out of FamilyCare's base data that would have otherwise flowed through to the rate setting. In 2018, they removed $26 million from FamilyCare's base data. Each time that's tens of millions of dollars more than they take out of anybody else.

And the second point is they specifically target FamilyCare in a different way.  So they take -- they reduce FamilyCare's base data to account for higher primary care reimbursement rates in both 2017 and 2018.  They don't do that to any other CCO.  So they start out by removing incentive payments from a number of CCOs, including FamilyCare.  And if you look at the chronology in 2017, the way this all starts is there's an email exchange with Optumas and OHA, where they say, we're diving into the primary care reimbursement as between FamilyCare and Health Share.  And then they go through a number of rounds of base data cuts.  And after the first round, where they've taken $16 million from FamilyCare and from some other CCOs, they say -- Optumas says, "At this point the rate of growth is down to about 3.8 percent, exclusive of pharmacy.  We think this data is ready to go."

Three more rounds of base data cuts followed, including most critically a fourth round.  The fourth round targets FamilyCare and FamilyCare only, an additional $6 million out of FamilyCare's base data tied to primary care reimbursement.  This happens after a meeting between Lynne Saxton and others.  Before that, Optumas had said, "We think the data is ready to go."

So you have this series of base data cuts that end up hitting FamilyCare far harder than anybody else, that end up targeting a particular feature of FamilyCare's costs that they

target for nobody else, and you have this fourth round that mysteriously just hits FamilyCare and nobody else.

And keep in mind that the primary care reimbursement rates that they targeted, this is something that FamilyCare had advised OHA of many years before.  OHA knew that FamilyCare was increasing rates for primary care providers.  In fact, back in 2013, OHA lauded that in a quarterly report, called that a promising practice.  At no time did OHA ever say, "Don't do that, that's not sustainable, we're going to later have to cut your base data because that's going to increase your costs."

And that's important in a number of reasons.  And one, in thinking about how this reimbursement policy was set up, OHA chose to use 2014 to 2015 to calculate its rate of growth.  OHA knows at that time that FamilyCare implemented an increase to rates that it paid to primary care providers, started in late 2014 and it really went into effect primarily in 2015.

THE COURT:  What would have been, in your view, a legitimate time period to use?

MR. GORDON:  Well, it certainly -- there are a number of different time periods you could have used.  I think it would have made sense to look over a longer period of time.  When you're just choosing a one-year number, you know, you're not controlling for a lot of things that happen.

And even more importantly, what they do in

calculating this rate --

THE COURT:  You say you would have chosen longer. Based on what do I know that choosing that period of time to look at rate of growth is somehow inappropriate?

MR. GORDON:  It's not necessarily inappropriate, Your Honor, but it -- but the fact that they chose that instead of over a longer period of time, based -- and remember they knew that choosing that window, 2014 to 2015, was likely to show FamilyCare in a bad light because they knew they had increased primary care reimbursement.

And then they do a second thing.  And this is critical:  They calculate the 2014 to 2015 change in costs without doing it on a risk-adjusted basis.  And the reason that matters is because if you don't account for the change in risk of FamilyCare's population between 2014 and 2015, you have no idea whether that rate of growth is due partially or entirely to the increased risk of FamilyCare's population during that time.  That undermines OHA's entire basis for doing this, which, as they say, unsustainable rates of growth, based on business decisions and you're paying too much out.

If FamilyCare's risk of its members increase between 2014 and 2015, the observed rate of growth is attributable at least in part and maybe entirely to that.  And, in fact, FamilyCare's risk was increasing during that time, and in fact OHA knew about that.  So they choose a window of time where

they know they have increased reimbursements, they know that the risk of FamilyCare's population is increasing, but they don't account for that in their calculations.

And this is a critical point.  The Lewis & Ellis actuary, who was hired to evaluate the rate setting -- and this is something OHA points to.  They say she concluded that the implementation of the reimbursement policy was unbiased.  At her deposition, she said, "I thought the risk -- I thought the rate of growth calculation was done on a risk-adjusted basis because that's how you should do it."  And her conclusion was based on that assumption.  Her conclusion was wrong.  It was not done on that basis.

Her conclusion was also based on -- for 2018 was based on an assumption that the information she was provided by Optumas about how Optumas chose this particular threshold was accurate.  Well, it turns out Optumas supplied different information to CMS later about how it reached that 7 percent.

So she admitted that her conclusions about this being unbiased were based on information, and we know that at least some of that information was --

THE COURT:  Do you agree with Mr. Markowitz's assertion that there isn't a record in this case, no direct evidence of use of the settlement credit to set rates or otherwise affect FamilyCare?

MR. GORDON:  There's no direct evidence that says we

are going to use the settlement credit as basis for reducing the rates. And you wouldn't expect it because you know that they knew that they --

THE COURT: I didn't ask if you expect it. I just ask if you agree that it was absent.

MR. GORDON: It's absent in part because the witnesses who testified about this had a startling lack of recollection about how things happened.

THE COURT: So your case at summary judgment depends on making an inference about why this was done, that it was done in order to -- that it was, in fact, a use of the settlement credit, because of the way it was implemented, the decisions that OHA made in terms of how it implemented this rate setting and the rate-setting process?

MR. GORDON: It is based on inferences, but that's appropriate at summary judgment, particularly when the inferences are reasonable. And we think the inferences are reasonable. Your Honor asked -- mentioned if they just took ordinary steps in rate setting. The steps they took in 2016 were not ordinary. They'd never done this before.

And Your Honor also suggested that if their reasons for why they were doing it weren't shown to be wrong or otherwise, that that would call it into question. And they were. So they set out a reimbursement. They set out to do this, and then only later did they ask whether or not they had

legal support for it.

You see an email late in July where Optumas's actuary is sending them excerpts from the Medicaid and Medicare final rule, and then they end up putting a regulatory citation into their reimbursement review document, which is also created after the fact. There was no reimbursement policy. They went ahead and did it, and then after the fact wrote it up. And they included in that document the citation to a regulation that offers no support whatsoever for what they've done.

THE COURT: Thank you.

Mr. Markowitz.

MR. MARKOWITZ: Well, again, Your Honor, I think counsel's argument confirms that they've had the opportunity to develop exquisite detail about every step of how the process took place, and he's able to report many complaints about errors and methodology challenges, but none of that involves a breach of this agreement.

THE COURT: His argument isn't that the rate setting was flawed and we think it should be better. His argument is that the particular flaws pointed out support a reasonable inference of an attempt to get back the money paid in settlement. What's wrong with that argument?

MR. MARKOWITZ: Because it ignores the terms of the contract, that the contract doesn't just prohibit bad motives, doesn't prohibit the untethered desire to get even. What it

prohibits is use.  You can only support their position if you ignore the language of the contract.  The prohibition is specific that in the calculation process, the payment and the prior rates could not be used, and no such thing happened.

THE COURT:  Thank you.

MR. GORDON:  Your Honor --

THE COURT:  That's all right.

I disagree with OHA's interpretation of the contract. I think that use of the settlement credit can involve the sorts of things alleged by FamilyCare here, and that the inferences from the way in which this was all implemented, in the light most favorable to the nonmoving party, can support a jury verdict of breach.  And so I deny summary judgment on Claims 2, 3, and 5, breach of settlement agreement claims.

We're left on substantive claims with -- or summary judgment claims from OHA with Claim 9, tortious interference with economic relationships.  So, in my view -- so you all know the elements:  existence of a professional relationship, the intentional interference with that relationship by a third party via improper means or improper purpose, and causal connection between the interference and the harm plus damages.

And here, although I'll hear argument on any element you think matters, the two I think the parties have spent the most time on and seem to be most important are first was there an improper means or purpose, and second is there this causal

connection.

So as to the improper means or purpose, FamilyCare -- well, so I'll hear you on improper means or purpose.

On causation, OHA's principal argument is that the harm to these economic relationships came from FamilyCare going out of business, which is why the providers left them. FamilyCare's main response, if I have this right, is to cite Mr. Murray's deposition testimony, quoting CCO leaders who say that they're concerned about OHA's conduct towards FamilyCare and what that will mean going forward.

So I do think that on that prong, causation, it's going to turn on the admissibility or not of that evidence. If that evidence is admissible, in my view it's enough to defeat summary judgment. And if it's not admissible, there's not enough here to defeat summary judgment on causation.

So that's where I'd like to focus on the causation prong, but I'll otherwise hear you on improper means or purpose. Again, I'll start with the moving party.

MR. MARKOWITZ: Thank you, Your Honor. I'll limit my comments to the causation issue. I think the other issue is adequately briefed on both sides.

As to causation, Mr. Murray, as a 30(b)(6) witness, did report conversations that he had had with nonparty third-party witnesses which FamilyCare is offering for the purpose of asserting the truth of what he reports had been said

to him.

In fact, the interrogatory answers from FamilyCare list only four businesses that allegedly had the relationship impaired because of the conduct, and all four of those businesses, we have put in the record the contemporaneous and direct either testimony or other statements made by those businesses as to the actual reason for their either departure or the fact that they weren't departing.

THE COURT:  You put that into the record in what format?

MR. MARKOWITZ:  We have put in, for example, the emails and statements that were being made by those individuals about -- what it all comes down to is they were concerned about the fact that FamilyCare was going to be going out of business and they needed to find a substitute in order to be paid.

THE COURT:  Who do I pay attention to for summary judgment purposes as between Mr. Murray quoting CCO leaders saying that they have a business concern about the relationship because of OHA's conduct towards FamilyCare and your evidence directly from some of those same CCOs?

MR. MARKOWITZ:  Well, it would be -- I think you're right, Your Honor, that if the testimony of Mr. Murray is admissible for the purpose of proving the truth of the third-party statements, then that creates the question of fact against the better evidence that we've submitted, but still a

question of fact.

THE COURT:  Well, why isn't it admissible under 803(3)?

MR. MARKOWITZ:  Because it is just hearsay.

THE COURT:  It's hearsay unless it fits under 803(3). Why doesn't it fit under 803(3?)

MR. MARKOWITZ:  Because the witnesses were expressing if Mr. Murray is correct and he is accurately reporting what they said --

THE COURT:  I don't get to inquire into that, right?

MR. MARKOWITZ:  That is correct, but I'm assuming it in what I say.

Then they are expressing concern, that is true, about the way they perceive that FamilyCare is being treated, but they are not stating the specific issue of this case, which is the reason for their having chosen to sign up with another business, which they say directly in the information that we submitted.

THE COURT:  Thank you.

Mr. Johnson.

MR. JOHNSON:  Your Honor, as we submit in our surreply, this does -- the statements that were made to Mr. Murray by the other -- by these four providers are admissible under 803(3).

THE COURT:  Specifically what piece of 803(3)?

MR. JOHNSON:  Of motive and intent.  And we cited the *Municipal Revenue* case, which is the same exact --

THE COURT:  I understand that case.  Motive and intent to do what?  And what quote shows that motive and intent?  That's two questions.

MR. JOHNSON:  So, for instance, Children's Health Alliance, Deborah Rumsey, who is the executive director of that provider, says to Mr. Murray that we are now going to contract with Health Share, the competitor, because of the communications plan.  That, in its entirety, the motive for what -- that decision that her entity is making, and the reason is relevant.  If Ms. Rumsey said, "We are switching over to Health Share, contracting with Health Share because of something that happened two years ago," then I don't think that the second half of that statement --

THE COURT:  Do you have Mr. Murray's testimony in front of you?

MR. JOHNSON:  It is Exhibit 53 of the Hesterberg deposition, the portion that's not filed under seal.

THE COURT:  And says what?

MR. JOHNSON:  And what he testifies -- and I'll just do the question and answer.

"And what did she say?"

She told me -- this is page 7 of Exhibit 53. Mr. Markowitz asks:

"And what did she say?

"Answer:  She told me that given all that had happened, that Children's Health Alliance had previously only had a contract with FamilyCare, and that given the concern raised by the communications plan, that Children's Health Alliance had the need now to sign with another CCO -- so Health Share -- because of its concern over its book of business going forward and if FamilyCare were to be put out of business that it would lose a significant revenue stream.

"Question:  Your testimony is that she specifically mentioned to you the communications plan?

"Answer:  She mentioned the communications plan.  It may have been in combination -- it probably was in combination with a -- we had a lengthy conversation" at the time.

So her -- the motive and intent of -- under 803(3) of the decision and the reason for the decision is admissible as an exception to the hearsay rule.

THE COURT:  Do you have any argument you want to add to what you submitted in writing on improper means or purpose?

MR. JOHNSON:  We -- no, I think the -- the improper purpose is all over the communications plan itself, Exhibits 28 and 31.  There you have a state agency making a decision that they are going to look for opportunities to hurt the credibility of FamilyCare, and that is the definition of improper purpose, under the *Top Service* (ph) and other cases, is an intent to inflict injury.  That is precisely what the communications plan intent is.

In terms of improper --

THE COURT:  Thank you.  I don't need to hear more.

I deny summary judgment on Claim 9, although I think it might be in part, and here's why:  In my view, the only Claim 9 claims that can go forward are those that are specifically linked to Mr. Murray's testimony, which for summary judgment purposes I find likely to be grounded in admissible evidence.  So that will limit the -- that's my limit to the causation that has been shown sufficient to defeat summary judgment.

So to the degree that you want to allege, for example, tortious interference with economic relationships, and those relationships aren't mentioned by Mr. Murray, in my view you don't have enough on causation to defeat summary judgment.

MR. JOHNSON:  So those four providers?

THE COURT:  Yes.

And then I want to reiterate, because we discussed

earlier the relationship between rulings at motions to dismiss and rulings on summary judgment, and so my ruling today on the admissibility of this evidence under 803(3) is a summary judgment ruling. It doesn't mean that the landscape for admissibility might alter between now and trial or at trial such that I'd have to come out differently. We'll see how that happens at trial, either at the pretrial conference or at trial itself.

Thank you for your briefing on the counterclaim for recoupment, along with FamilyCare's motion to dismiss that counterclaim. I agree that counterclaim is not currently ripe for resolution, and so I grant FamilyCare's motion to dismiss the counterclaim.

OHA has moved for summary judgment on essentially all of FamilyCare's damages. And I'm relying now on the list of those damages at page 36 of the motion for summary judgment, and page 40 of the response.

Candidly, the more accurate list, in my view, is at page 36, and there are two pieces of what's being sought in damages that in my view are out of the case. The first is goodwill as to Allen. So you've framed it on page 40 as just a claim for goodwill. But if your only claim for goodwill is against Mr. Allen, I've already kicked that out of the case on qualified immunity. That's gone as to Allen.

And then to the degree that you're seeking damages

flowing from failure to receive actuarially sound rates per se, then that claim, because I've granted summary judgment, is also out of the case.

And on the rest of the damages described at page 36 or page 40, I deny OHA's motion for summary judgment.

FamilyCare also asserts that it shouldn't be cabined by that list. And I don't know what to make of that. I'm not ruling on that today. I think that's a real issue. In fact, you might be cabined by that list, but I'm not deciding that question today.

If you'll give me just a moment here. I used to be able to hold all this in my head at once, but --

I want to verify what I think is clear from the briefing, that FamilyCare is, for our trial purposes, dropping Claims 7 and 8. Is that correct?

MR. ENGLISH: We're checking, Your Honor. I believe so.

MR. JOHNSON: Yes, Your Honor.

THE COURT: All right. Then we're left with sort of upcoming issues and scheduling.

Mr. Chaimov, are you here for this reason, the down-designation issue?

MR. CHAIMOV: Yes, Your Honor.

THE COURT: I appreciate your patience.

So there are three items in question, but since that

was -- you can go ahead and come forward, then, sir.

Are there any other CCOs represented here on this issue?  Go ahead and come forward.  Sit over here.  Go ahead and be seated if you can.

I apologize, I didn't know so many of you were here.  Now thinking about it, I should have taken this issue up first, although I'm sure you're fascinated by all of it.  My concern is that since this was teed up for oral argument, FamilyCare has moved to remove the AEO designation entirely as to two witnesses, Murray and --

MR. ENGLISH:  Suchorzewski.  Art Suchorzewski, Your Honor.

THE COURT:  And is that in replacement of your position on the three items or just in addition?

MR. ENGLISH:  It's in addition, Your Honor.  And I can address both of those and my colleagues here.

THE COURT:  So I'm prepared to discuss the three items that were briefed and ready for today.

I guess you might have a concern that -- well, I don't know your position in light of yesterday's motion to essentially undesignate all of it.  Do you have a concern or would you like to go forward with oral argument right now?

MR. LANGFITT:  Your Honor, speaking -- Frank Langfitt for Eastern Oregon, speaking for the CCOs, the motion filed yesterday, we would request the opportunity to file a written

response, and so --

THE COURT: Well, I intend to give you that, certainly. I'm just asking whether you want to still go forward today with these three items or wrap it all up at once in an omnibus hearing that would cover everything at once. What's your preference? I'll ask each of you in turn.

Mr. Chaimov?

MR. CHAIMOV: Thank you, Your Honor. Our preference is to go forward today on the three documents, but we would, if the relative consensus of the group was to postpone and take it all, go with our colleagues.

THE COURT: All right.

Sir, your view?

MR. MCCRACKEN: I'm with Health Share.

THE COURT: All right. Thank you.

Yes?

MS. MONTALBANO: I'm here on behalf of Optumas, Your Honor, Sonia Montalbano. I think our preference would be to wrap them all up together and address them at one time.

THE COURT: Mr. Langfitt?

MR. LANGFITT: I think all together at one time, Your Honor.

MS. KNIGHT: Elizabeth Knight here for AllCare. I would agree that they should be heard together if possible.

MR. HERN: Jeff Hern on behalf of Trillium Community

Health Plan.  I would agree as well, both be heard at the same time.

MR. LINDENAUER:  Eric Lindenauer for PacificSource Community Solutions.  I would agree we should hear them all together, without -- the caveat being that there may be some distinct differences, I think, between the other CCOs and Health Share, but that's not a sufficient reason not to hear it all at once.

THE COURT:  All right.  I'm sure they respect you a great deal, Mr. Chaimov, but you've been overruled by your colleagues.

MR. CHAIMOV:  I'm used to that, Your Honor.

THE COURT:  So the motion was filed yesterday.  Normally you'd have a couple weeks.  Is that about right for what you want to do to respond to this motion?

MR. LANGFITT:  For Eastern Oregon, yes, Your Honor.

THE COURT:  So we'll set it out a couple weeks.

Ms. Scheele.

Your response will be due, counting from yesterday -- It was filed yesterday, right?

MR. GORDON:  No, Your Honor.  I believe it was filed on Tuesday.

THE COURT:  Tuesday?

MR. GORDON:  There was a separate motion filed yesterday.

THE COURT: All right. Thank you.

From Tuesday, then.

THE CLERK: From the 18th, two weeks out would be the 2nd, October 2nd.

THE COURT: All right. And I'll, of course, treat this as a discovery motion with no reply. So I'll get that on October 2nd, and would you all be prepared to hear it shortly after that?

MR. CHAIMOV: Yes, Your Honor.

THE COURT: I have 10-5, the entire morning free. Let's start with that. Will that work for FamilyCare, sometime in the morning of 10-5?

MR. ENGLISH: I'm starting a trial with Judge Hernandez October 22nd, and I don't in my mind right now recall specifically what -- whether or not I'm supposed to be in his courtroom that day, as I am this afternoon. But I am more than happy to have my colleagues handle that, Your Honor.

THE COURT: All right. Just one at a time, then.

Mr. Chaimov, are you available in the morning?

MR. CHAIMOV: Yes, Your Honor.

THE COURT: 10-5 work?

MS. MONTALBANO: Yes, Your Honor.

MR. LANGFITT: Yes, Your Honor.

MS. KNIGHT: Your Honor, it does not work for me but I can have a colleague handle it if it works for everybody

else.

THE COURT:  Thank you very much.

MR. HERN:  Yes, Your Honor.

MR. LINDENAUER:  Yes, Your Honor.

THE COURT:  10-5 at 10:00 a.m., we'll take up this motion in which I will consider both the previously briefed issue of the three, and larger issues raised.

I'll tell you right now, the main thing I'm interested in -- and I'm not expressing any tentative views at all, just -- well, I shouldn't say the main thing.  One of the things I clearly want to discuss is FamilyCare takes the position that there are reasons why what would typically be serious confidentiality concerns maybe at the outset of the case have since been reduced.  I think three, perhaps.  One, that the nature of the ratemaking program going forward reduces the competitive nature of the process; two, that a bunch of other people have been given access to this information, so a little bit of the cat-out-of-the-bag sort of argument.  And I forget the third.  There's the argument about the two gentlemen involved.

MR. ENGLISH:  Your Honor, the two gentlemen involved, Mr. Murray and Mr. Suchorzewski, are willing to sign the current confidentiality agreement.  And I can get into this now or later, but their ability -- our ability to produce at least one of the expert reports is impacted by their inability to see

it.

THE COURT:  I know that's what you've already -- I'm trying to think.  I thought you maybe argued that independent of them, other people had access to it and were going to be in the competitive process anyway.

MR. ENGLISH:  That is correct, Your Honor.  And we have AEO information we can supply to the Court and counsel that shows that information, the asymmetry of that.

THE COURT:  So there's a basic dynamic in play in terms of important confidentiality concerns and trial preparation concerns, and that's on a scale.  And I'm curious whether those two things have shifted the scale in favor of trial preparation or confidentiality in any meaningful way.

So we'll take that up, and so I don't know what that means in terms of expert witness preparation.

MR. ENGLISH:  Well, Your Honor, we have worked hard to try to make our experts have information available to them and interpretation of information available to them that will allow them to produce a comprehensive, accurate report.  They can't do it without input from Mr. Murray, who is intimately familiar with the process.

THE COURT:  So if you prevail on the 5th of October, how quickly after that will you be able to -- will you still be able to meet the current expert deadline?

MR. ENGLISH:  Not as to at least one of them.  I

think it's due the 28th.  So we are already -- that's why I was seeking today to have them execute the confidentiality agreement that has been in place and signed by others with the same restrictions.

THE COURT:  You're asking to have the result today that we're going to be arguing about on the 5th?

MR. ENGLISH:  No, the argument on the 5th, as I understand it, is the de-designation of approximately 19,000 currently AEO-designated documents.

THE COURT:  Those also, I think -- you filed a motion on September 18th to permit access to AEO documents?

MR. ENGLISH:  Yes.

THE COURT:  And I assume you're wanting to, in the same schedule, respond to that, right?

MR. CHAIMOV:  Oh, yes, Your Honor.

THE COURT:  So they haven't responded yet.  I'm not going to give you any today.

MR. ENGLISH:  I guess the point --

THE COURT:  If you get anything on that, it will be October 5th.

MR. ENGLISH:  Then I need more time for that expert report, Your Honor, and I need to talk with my client to see how much more time is needed.

THE COURT:  So on October 5th, I'll want you, like any good lawyer, to be prepared to lose, even though you assume

you'll win, and rapidly provide the information if you should lose.  And I want you to be prepared either way to tell me on the 5th how quickly you can move forward on your expert testimony --

MR. ENGLISH:  We'll do so.

THE COURT:  -- your expert reports.

MR. ENGLISH:  Yes, sir.  So right now there are expert reports that are due -- that are impacted by your ruling that are due in advance of the 5th.  And may we assume the Court has allowed us to delay the filing of those until some point after the 5th?

THE COURT:  What's the due date on expert reports?

MR. LEVIN:  The 28th, Your Honor.

THE COURT:  You'd like to wait also or not?

MR. LEVIN:  No, Your Honor.  This is an issue that is based on documents that were given to FamilyCare months ago. The fact that we're --

THE COURT:  I don't want to argue.  I just want to know your position on timing.

MR. LEVIN:  No.

THE COURT:  All right.  I am going to allow you to wait until the 5th to receive a deadline for those that were due on the 28th, although if you lose, I'll expect them to be ready to go very quickly, because they would have been due on the 28th anyway.

MR. ENGLISH:  However we define "very quickly," I understand that.

THE COURT:  Well, I'll help you define it.

And that means that I'll give you certainly the opportunity to wait, if you choose to take it.  That's what I was really asking.

MR. MARKOWITZ:  Yes, we would like to submit our expert reports on the same date that FamilyCare was doing so.

MR. ENGLISH:  That's fair, Your Honor.

THE COURT:  So both sides can wait on the 9-28 deadline until we set a new deadline on 10-5 for those reports. And I'll assume for now that it means we move straight forward with the PTC on November 30th.

MR. ENGLISH:  Yes.  We understand that, Your Honor.

THE COURT:  Is there then a reason -- we set a while back a 10-22 hearing.  And I can't figure out if there's still a reason for it.  Is there?

MR. ENGLISH:  I won't be here.  I'll be in Judge Hernandez's courtroom making opening statements unless that case settles, Your Honor.

THE COURT:  It seems like it's a place-setting date that nobody needs anymore.  Am I missing something?

MR. JOHNSON:  It may be, Your Honor, that last night, Lynne Saxton filed for summary judgment.

THE COURT:  Well, we have a hearing set on that on

11-2.

So I'm going to cancel the 10-22 hearing.

MR. ENGLISH:  Thank you, Your Honor.

THE COURT:  Is Ms. Saxton's attorney here?

MR. MERSEREAU:  Yes, Your Honor.

THE COURT:  Go ahead and come forward, sir.  Thank you for being here.

So you filed your motion and you've received it and we're on a pace to go ahead and hear that on 11-2?

MR. MERSEREAU:  That's our understanding.

THE COURT:  All right.  Thank you.

Anything further from OHA?

MR. MARKOWITZ:  No, Your Honor.

THE COURT:  From FamilyCare?

MR. ENGLISH:  No, Your Honor.

THE COURT:  Any CCO?

MR. CHAIMOV:  No, Your Honor.

THE COURT:  Ms. Saxton?

MR. MERSEREAU:  No, Your Honor.

THE COURT:  Thank you all.  We'll be in recess.

THE CLERK:  Court is in recess.

(Proceedings concluded at 11:22 a.m.)

--oOo--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


*/s/Bonita J. Shumway*                    *September 24, 2018*
_____        _____
BONITA J. SHUMWAY, CSR, RMR, CRR        DATE
Official Court Reporter

MR. CHAIMOV: [7]
70/22 72/7 73/11 74/8
74/19 77/14 80/16

MR. ENGLISH: [21]
4/15 70/15 71/10 71/14
74/12 75/20 76/5 76/15
76/24 77/6 77/11 77/17
77/20 78/4 78/6 78/25
79/8 79/13 79/17 80/2
80/14

MR. GORDON: [36]
4/19 29/8 29/23 31/1
31/3 31/6 31/24 32/13
32/24 33/3 33/7 33/14
33/16 34/7 34/15 35/15
35/19 35/25 36/5 36/14
36/25 37/4 53/14 53/21
53/25 54/17 55/3 55/18
57/19 58/4 59/24 60/5
60/14 62/5 73/20 73/23

MR. HERN: [2]  72/24
75/2

MR. HESTERBERG:
[1]  4/23

MR. JOHNSON: [31]
4/21 5/14 9/14 9/19
10/10 11/8 11/22 12/10
13/12 13/20 13/24
14/13 14/20 15/3 16/10
17/8 18/11 18/23 19/1
19/12 19/24 20/11
65/20 65/25 66/5 66/17
66/20 67/25 68/22
70/17 79/22

MR. LANGFITT: [4]
71/22 72/20 73/15
74/22

MR. LEVIN: [4]  4/12
78/12 78/14 78/19

MR. LINDENAUER: [2]
 73/2 75/3

MR. MARKOWITZ:
[39]  4/6 21/24 23/7
24/16 25/10 25/20 26/6
26/13 27/19 27/23 28/2
28/8 28/13 28/18 39/8
44/25 45/7 45/10 46/6
46/9 46/15 47/5 47/15
47/25 48/4 48/12 50/10
50/15 50/19 61/11
61/22 63/18 64/10
64/20 65/3 65/6 65/10
79/6 80/12

MR. MCCRACKEN: [1]
 72/13

MR. MERSEREAU: [3]
80/4 80/9 80/18

MS. BRENNER: [1]
4/17

MS. KNIGHT: [2]
72/22 74/23

MS. MONTALBANO:
[2]  72/16 74/21

MS. SCOTT: [6]  4/9
5/10 20/17 20/22 21/6
21/13

THE CLERK: [4]  4/2
41/24 74/2 80/20

THE COURT: [149]

## $

$16 [1]  56/12
$16 million [1]  56/12
$26 [1]  55/23
$34 [1]  55/21
$34 million [1]  55/21
$6 [1]  56/19
$6 million [1]  56/19

## '

'17 [1]  53/5

--o0o [1]  81/2

## /

/s/Bonita [1]  81/9

## 1

10 [1]  39/17
10-22 [2]  79/16 80/2
10-5 [5]  74/10 74/12
 74/21 75/5 79/11
100 [1]  2/16
100,000 [3]  25/5 28/11
 38/2
1000 [1]  3/3
107 [1]  38/8
10:00 [1]  31/5
10:00 a.m [1]  75/5
10:00 l [1]  31/7
10th [1]  2/5
11 [5]  5/10 9/12 26/2
 39/17 41/11
11-2 [2]  80/1 80/9
1100 [1]  2/19
111 [1]  2/19
1120 [1]  2/5
11:22 [1]  80/22
12 [2]  7/4 8/1
1201 [1]  2/8
1211 [1]  2/13
13 [3]  7/4 8/1 43/22
1396b [2]  10/1 10/15
16 [3]  49/4 49/20 50/23
183.484 [3]  12/1 12/18
 19/3
18th [2]  74/3 77/11
19,000 [1]  77/8
1983 [3]  7/16 8/4 8/12

## 2

2013 [1]  57/7
2014 [6]  57/13 57/16

**2014... [4]** 58/8 58/12 58/15 58/22
**2015 [6]** 57/13 57/17 58/8 58/12 58/15 58/22
**2016 [7]** 45/12 45/14 49/17 53/4 53/24 54/3 60/19
**2017 [13]** 6/11 14/18 15/12 32/5 46/21 48/19 49/17 51/14 52/1 53/4 55/21 56/4 56/7
**2018 [11]** 1/7 4/2 24/7 27/10 38/21 46/21 51/14 55/23 56/4 59/13 81/9
**20th [5]** 28/4 30/7 30/11 31/10 38/10
**21 [1]** 1/7
**22 [3]** 10/14 79/16 80/2
**22nd [1]** 74/14
**23 [1]** 4/2
**24 [2]** 24/8 81/9
**28 [2]** 68/2 79/10
**28th [4]** 77/1 78/13 78/23 78/25
**2nd [3]** 74/4 74/4 74/7

# 3

**3.8 percent [1]** 56/14
**30 [1]** 63/22
**3000 [1]** 2/13
**301 [1]** 3/3
**30th [1]** 79/13
**31 [1]** 68/3
**326-8188 [1]** 3/4
**36 [3]** 69/16 69/19 70/4

# 4

**40 [3]** 69/17 69/21 70/5
**42 [2]** 9/22 9/25
**438 [1]** 13/14

**438.4 [5]** 19/25 20/2 20/15 21/4 21/13
**4800 [1]** 2/8
**485 [2]** 9/22 13/14
**485.4 [1]** 11/20
**485.5 [2]** 11/14 12/16

# 5

**503 [1]** 3/4
**53 [2]** 66/18 66/24
**5th [9]** 76/22 77/6 77/7 77/20 77/24 78/3 78/9 78/11 78/22

# 6

**6:18-cv-00296-MO [1]** 1/4
**6:18-cv-296-MO [1]** 4/4

# 7

**7 percent [1]** 59/17

# 8

**803 [7]** 65/3 65/5 65/6 65/24 65/25 67/21 69/3
**8188 [1]** 3/4

# 9

**9-11 [1]** 26/2
**9-28 [1]** 79/10
**97201 [2]** 2/16 2/20
**97204 [2]** 2/14 3/3
**97209 [1]** 2/5
**98101 [1]** 2/9
**9:05 [1]** 4/2

# A

**a.m [3]** 4/2 75/5 80/22
**ability [2]** 75/24 75/24
**able [6]** 14/4 38/8 61/15 70/12 76/23 76/24
**about [83]**

**above [1]** 81/6
**above-entitled [1]** 81/6
**absent [2]** 60/5 60/6
**absolutely [3]** 31/4 46/1 55/13
**abstract [1]** 7/11
**accept [1]** 35/10
**access [3]** 75/17 76/4 77/11
**accomplish [3]** 29/5 45/21 45/25
**accomplishing [2]** 29/4 46/4
**according [4]** 21/17 24/7 28/20 31/14
**account [4]** 44/24 56/3 58/14 59/3
**accuracy [2]** 16/8 17/20
**accurate [5]** 8/6 17/22 59/16 69/18 76/19
**accurately [2]** 14/12 65/8
**across [2]** 51/9 51/18
**act [1]** 32/15
**acted [5]** 12/1 12/2 22/6 23/13 33/8
**action [19]** 11/12 17/2 17/2 17/5 18/14 27/14 31/22 32/2 32/11 32/12 32/16 32/17 32/20 32/23 33/19 34/24 36/8 36/10 41/19
**actions [3]** 16/23 29/18 34/6
**activity [12]** 32/13 32/20 32/23 33/21 34/2 34/2 34/3 34/5 34/7 34/10 34/12 43/2
**actor [6]** 15/20 33/5 36/8 36/9 36/18 37/2
**acts [1]** 10/21

**actual [2]** 6/19 64/7
**actually [10]** 10/1 11/23 39/3 41/3 43/8 45/5 45/6 45/8 46/8 46/14
**actuarial [29]** 6/18 6/20 8/18 9/1 9/7 9/8 10/18 11/13 11/22 12/10 12/12 12/14 13/1 13/5 13/10 13/18 13/24 14/3 14/6 14/12 14/25 15/12 19/23 20/1 21/16 30/21 40/10 40/11 40/18
**actuarially [18]** 6/11 6/17 8/2 8/10 9/23 12/5 14/1 14/9 15/3 18/5 18/9 20/3 20/9 20/13 21/6 21/15 53/8 70/1
**actuary [2]** 59/5 61/2
**add [3]** 20/19 21/22 67/24
**addition [2]** 71/14 71/15
**additional [2]** 23/15 56/18
**address [3]** 29/12 71/16 72/19
**addresses [1]** 33/10
**adequately [2]** 41/21 63/21
**adjust [9]** 45/22 47/8 47/10 47/12 47/13 47/15 47/17 47/20 47/22
**adjusted [8]** 47/10 49/18 49/23 50/1 50/22 51/5 58/13 59/9
**adjusting [2]** 47/22 48/6
**adjustment [8]** 49/24

50/2 50/3 50/7 50/10 50/14 50/20 51/9
**adjustments [2]** 48/16 48/19
**adjusts [1]** 50/1
**admissibility [3]** 63/12 69/3 69/5
**admissible [7]** 63/13 63/14 64/23 65/2 65/24 67/22 68/16
**admit [1]** 9/4
**admitted [1]** 59/18
**admittedly [2]** 11/18 36/21
**advance [1]** 78/9
**advanced [1]** 6/1
**advancing [1]** 7/2
**adverse [8]** 27/14 31/22 32/10 32/12 32/16 32/20 32/23 41/19
**adversely [3]** 50/14 50/17 55/13
**adverted [1]** 9/5
**advised [1]** 57/5
**AEO [4]** 71/9 76/7 77/9 77/11
**AEO-designated [1]** 77/9
**affect [4]** 45/17 50/4 50/17 59/24
**affected [3]** 50/5 51/12 55/13
**affecting [2]** 50/15 51/18
**after [21]** 23/15 24/2 31/7 33/22 34/6 38/19 51/5 51/23 52/2 52/12 53/5 53/7 54/3 54/21 56/11 56/20 61/6 61/7 74/8 76/23 78/11
**afternoon [1]** 74/16

**again [9]** 7/14 20/8 41/16 43/17 44/25 47/6 54/21 61/12 63/18
**against [6]** 9/3 22/4 22/9 24/18 64/25 69/23
**age [1]** 49/4
**agency [13]** 1/7 6/4 6/6 8/25 15/1 16/1 16/4 16/4 16/24 16/25 18/19 21/8 68/3
**aggregated [1]** 50/12
**ago [4]** 7/22 15/15 66/14 78/16
**agree [11]** 19/8 32/24 32/25 41/17 42/5 59/21 60/5 69/11 72/24 73/1 73/4
**agreement [25]** 39/25 40/4 41/24 42/16 45/12 48/17 48/21 52/1 52/10 52/13 53/10 53/12 53/21 53/23 54/4 54/6 54/8 54/15 54/22 54/24 55/3 61/17 62/14 75/23 77/3
**agrees [1]** 20/18
**ahead [6]** 61/7 71/1 71/3 71/3 80/6 80/9
**aimed [3]** 40/23 48/18 48/24
**al [1]** 4/5
**all [63]** 5/1 5/12 13/8 13/9 15/5 15/8 15/22 16/2 16/12 17/7 17/13 18/14 19/10 20/4 20/17 21/19 22/9 25/6 25/16 29/7 37/16 39/4 42/10 45/10 48/6 48/12 49/3 49/5 49/10 49/22 50/11 50/25 51/10 56/7 62/7 62/11 62/17 64/4 64/13 67/2 68/2 69/14 70/12

**A**

**all... [20]** 70/19 71/7 71/21 72/4 72/11 72/12 72/15 72/19 72/21 73/4 73/8 73/9 74/1 74/5 74/7 74/18 75/10 78/21 80/11 80/20

**AllCare [1]** 72/23

**allegation [2]** 23/15 24/8

**allegations [11]** 22/12 22/14 22/17 23/12 23/18 26/19 26/23 27/1 27/21 29/22 53/12

**allege [2]** 52/9 68/19

**alleged [12]** 12/8 22/5 23/11 23/12 24/10 24/19 25/4 26/15 26/15 26/16 51/13 62/10

**allegedly [2]** 44/7 64/3

**alleges [1]** 34/17

**ALLEN [35]** 1/7 2/12 4/9 4/12 4/15 22/1 22/4 22/6 22/9 24/2 24/7 25/3 25/18 26/18 26/21 27/9 29/16 30/9 30/12 32/5 34/4 34/5 34/6 35/6 37/21 37/25 38/11 38/17 39/25 40/3 40/7 41/19 69/21 69/23 69/24

**Allen's [5]** 22/15 23/17 27/14 29/11 34/10

**Alletta [2]** 2/3 4/18

**Alliance [3]** 66/7 67/4 67/7

**allow [4]** 38/23 55/16 76/19 78/21

**allowed [3]** 38/25 52/23 78/10

**almost [2]** 7/22 7/22

**along [1]** 69/10

**Alpha [1]** 31/16

**already [11]** 9/18 19/17 27/16 38/6 38/6 38/12 48/22 48/22 69/23 76/2 77/1

**also [23]** 2/21 4/8 8/24 9/25 11/25 14/20 15/2 18/10 30/10 30/10 30/15 37/19 44/21 47/21 49/9 55/11 59/13 60/21 61/5 70/2 70/6 77/10 78/14

**alter [1]** 69/5

**alternative [5]** 24/22 35/15 36/3 36/24 37/3

**although [4]** 62/22 68/11 71/7 78/23

**always [1]** 39/11

**am [6]** 7/14 28/17 74/16 74/16 78/21 79/22

**amend [2]** 16/19 16/19

**amended [2]** 17/4 22/5

**amendment [7]** 17/1 17/3 21/20 29/13 29/19 31/13 36/16

**amendments [1]** 16/23

**among [1]** 19/10

**amount [2]** 46/14 54/6

**amounts [1]** 45/15

**analogy [2]** 16/1 43/9

**analysis [8]** 7/11 25/22 36/25 46/3 46/19 47/2 48/19 52/22

**analyze [2]** 13/16 41/3

**analyzed [2]** 14/12 15/22

**analyzing [2]** 7/14 23/22

**announced [1]** 35/1

**another [8]** 10/8 10/12

**19/18 36/9 38/25 51/3 65/16 67/8

**answer [3]** 24/3 34/1 66/22

**Answer: [2]** 67/2 67/16

**Answer: She [2]** 67/2 67/16

**answers [1]** 64/2

**any [44]** 9/24 10/19 11/21 12/7 12/7 12/9 12/9 14/15 19/6 19/17 21/3 21/4 22/11 23/10 23/14 29/25 30/22 39/20 40/24 41/1 46/2 46/2 46/4 46/17 46/21 48/18 48/21 48/24 51/2 51/12 51/24 52/9 53/9 55/15 55/15 56/5 62/22 67/24 71/2 75/9 76/13 77/17 77/25 80/16

**anybody [3]** 37/8 55/25 56/24

**anymore [1]** 79/22

**anything [10]** 10/1 13/4 20/19 21/22 44/1 54/20 54/21 55/6 77/19 80/12

**anyway [2]** 76/5 78/25

**APA [23]** 5/9 5/23 5/23 6/7 6/22 6/25 7/16 7/17 11/11 11/24 13/6 15/8 15/19 16/1 16/23 17/2 17/5 18/25 19/4 19/6 19/10 21/2 21/7

**apart [2]** 14/9 20/6

**apologies [1]** 31/8

**apologize [1]** 71/5

**APPEARANCES [1]** 2/2

**appears [1]** 29/10

**applicable [1]** 20/24

**application [1]** 48/22

**applied [5]** 44/13 46/16

# A

**applied... [3]** 49/19 49/20 52/12

**applies [2]** 26/6 43/8

**apply [8]** 25/18 26/3 28/20 28/24 29/21 41/6 48/9 48/15

**applying [4]** 25/13 41/7 43/10 44/13

**appoint [1]** 16/17

**appreciate [2]** 5/2 70/24

**appropriate [9]** 12/17 20/4 25/16 25/24 28/11 29/20 41/13 50/24 60/16

**approval [6]** 6/16 6/18 6/21 7/1 10/17 21/10

**approve [1]** 21/16

**approved [2]** 16/20 17/4

**approves [1]** 17/1

**approving [2]** 9/23 10/6

**approximately [2]** 24/4 77/8

**Arab [3]** 24/25 25/25 26/2

**are [98]**

**aren't [1]** 68/21

**arena [1]** 19/11

**arenas [1]** 19/17

**argue [3]** 16/11 18/5 78/18

**argued [1]** 76/3

**arguing [2]** 17/12 77/6

**argument [28]** 1/15 4/3 5/21 9/14 9/18 9/21 12/21 19/22 25/9 26/5 26/7 29/10 29/15 35/14 40/7 43/23 61/13 61/18

61/19 61/22 62/22 63/4 67/24 71/8 71/22 75/18 75/19 77/7

**arguments [9]** 5/7 5/24 7/2 11/5 20/21 42/23 42/24 42/25 43/12

**arrival [2]** 27/14 34/15

**arrived [1]** 26/21

**arrives [2]** 34/4 34/5

**Art [1]** 71/11

**article [1]** 30/16

**as [65]** 1/8 6/17 7/17 12/5 12/14 13/20 14/2 14/3 19/16 22/17 22/19 22/23 24/2 24/11 24/16 25/1 25/4 25/25 26/12 27/24 28/4 28/6 28/17 28/24 29/5 32/1 32/4 32/8 34/13 35/11 39/10 39/23 40/6 40/6 40/16 40/21 45/14 45/18 46/22 48/6 48/11 48/13 48/18 52/10 52/19 53/12 56/9 58/19 60/1 63/2 63/22 63/22 64/7 64/17 65/21 67/22 69/21 69/21 69/24 71/9 73/1 74/6 74/16 76/25 77/7

**Ashcroft [5]** 22/19 35/14 36/14 41/5 42/5

**ask [7]** 14/10 23/23 33/2 60/4 60/5 60/25 72/6

**asked [4]** 33/3 40/25 55/12 60/18

**asking [9]** 14/17 32/18 33/12 36/23 39/19 40/23 72/3 77/5 79/6

**asks [3]** 34/22 38/20 66/25

**aspects [2]** 13/17 19/4

**asserting [1]** 63/25

**assertion [1]** 59/22

**asserts [2]** 8/17 70/6

**assistance [1]** 5/3

**assistant [3]** 4/8 4/10 4/14

**associates [1]** 25/25

**assume [4]** 77/13 77/25 78/9 79/12

**assuming [1]** 65/11

**assumption [2]** 59/11 59/14

**asymmetry [1]** 76/8

**at [89]**

**attainable [1]** 20/4

**attempt [4]** 34/23 40/6 47/17 61/21

**attempting [2]** 28/11 43/24

**attention [5]** 7/7 22/2 35/15 55/2 64/16

**attorney [4]** 4/8 4/10 4/14 80/4

**attorneys [1]** 40/10

**attributable [1]** 58/22

**AUTHORITY [6]** 1/6 1/9 2/11 4/5 4/11 4/15

**available [3]** 74/19 76/17 76/18

**Ave [1]** 3/3

**Avenue [2]** 2/8 2/13

**away [1]** 26/20

# B

**back [7]** 32/17 34/13 38/19 47/24 57/6 61/21 79/16

**bad [10]** 26/13 41/20 43/3 43/14 44/7 44/8 44/8 44/12 58/9 61/24

**bag [1]** 75/18

**ball [1]** 9/13

**barrier [1]** 7/18
**base [23]** 12/17 13/17 13/21 14/15 49/10 49/11 49/19 49/20 49/24 50/2 50/22 51/14 54/5 55/14 55/20 55/21 55/23 56/3 56/11 56/16 56/19 56/23 57/10
**based [18]** 6/4 8/20 18/22 48/20 51/10 51/11 51/15 52/11 55/17 58/3 58/7 58/19 59/11 59/13 59/14 59/19 60/15 78/16
**baseline [1]** 17/12
**basic [2]** 6/1 76/9
**basis [14]** 9/24 11/17 20/10 20/13 45/14 48/6 48/7 48/11 51/11 58/13 58/18 59/9 59/12 60/1
**be [83]**
**beating [1]** 44/19
**because [56]** 9/22 10/22 14/22 15/5 17/17 17/20 17/25 18/15 18/17 22/22 25/5 25/5 25/11 25/22 27/20 28/19 30/13 32/3 32/12 33/17 33/22 35/4 38/1 38/6 38/17 39/17 43/25 47/14 47/21 47/23 48/25 50/9 50/11 50/20 51/9 51/17 51/24 51/25 57/10 58/9 58/14 59/10 60/2 60/6 60/12 61/23 64/4 64/19 65/4 65/7 66/9 66/13 67/9 68/25 70/2 78/24
**been [31]** 5/13 6/22 17/7 22/13 22/16 24/10 24/22 26/16 28/22 31/22 33/23 39/17 39/21 39/25 40/25 44/22 48/7 49/12 49/15 49/16 51/6 51/12 57/18 63/25 67/17 68/17 73/10 75/14 75/17 77/3 78/24
**before [30]** 1/17 17/6 20/23 24/5 26/22 30/8 31/23 32/3 32/6 32/16 34/4 34/24 38/10 38/18 39/17 42/2 48/17 48/20 48/21 51/22 52/2 52/2 53/7 54/8 54/11 54/14 55/2 56/21 57/5 60/20
**beginning [1]** 53/16
**behalf [8]** 4/14 4/17 4/19 4/21 4/25 22/1 72/17 72/25
**behind [2]** 29/18 44/9
**being [18]** 5/1 22/22 24/15 40/20 41/18 50/22 51/15 51/16 51/24 52/12 52/19 53/1 59/18 64/12 65/14 69/19 73/5 80/7
**belief [3]** 51/15 52/8 52/11
**believe [6]** 8/16 8/22 11/18 26/8 70/16 73/21
**believed [1]** 50/24
**below [1]** 81/4
**bench [1]** 5/13
**best [2]** 19/21 51/25
**better [3]** 26/25 61/19 64/25
**between [16]** 5/5 10/24 11/7 18/1 30/2 30/4 51/2 56/9 56/20 58/15 58/21 62/21 64/17 69/1 69/5 73/6

**beyond [1]** 26/3
**bid [1]** 34/20
**big [1]** 25/18
**bin [1]** 25/24
**bit [1]** 75/18
**board [3]** 27/16 40/7 51/18
**Bonita [3]** 3/2 81/9 81/10
**bonuses [1]** 51/15
**book [1]** 67/9
**both [22]** 1/7 5/19 5/22 6/7 7/2 26/11 40/1 40/9 43/6 43/6 43/10 48/11 52/2 52/2 52/23 55/9 56/4 63/21 71/16 73/1 75/6 79/10
**breach [10]** 41/24 42/15 42/18 42/19 45/4 45/16 52/7 61/17 62/13 62/14
**breached [1]** 40/3
**break [1]** 41/23
**Brenner [2]** 2/3 4/18
**brief [3]** 22/20 43/22 54/10
**briefed [3]** 63/21 71/18 75/6
**briefing [3]** 10/23 69/9 70/14
**briefly [1]** 22/3
**bring [4]** 17/1 17/2 19/10 19/18
**bringing [4]** 7/20 11/3 11/11 17/4
**brings [1]** 22/18
**broad [5]** 5/25 6/7 6/10 6/23 51/14
**broader [1]** 11/12
**brought [2]** 7/12 16/22
**bullet [1]** 30/24
**bunch [1]** 75/16

**B**

**burden [1]** 53/13
**business [10]** 24/7 26/22 34/20 58/20 63/6 64/14 64/18 65/17 67/10 67/11
**businesses [4]** 14/24 64/3 64/5 64/7
**but [85]**

**C**

**C.F.R [1]** 9/22
**cabined [2]** 70/6 70/9
**calculate [2]** 57/13 58/12
**calculated [1]** 46/20
**calculating [1]** 58/1
**calculation [2]** 59/9 62/3
**calculations [2]** 46/17 59/3
**call [4]** 23/3 42/21 43/2 60/23
**called [10]** 15/13 24/2 25/17 27/3 35/2 40/8 40/22 49/10 54/2 57/7
**came [2]** 40/7 63/5
**campaign [1]** 32/4
**can [31]** 8/25 10/23 15/4 16/18 16/19 17/25 18/3 18/4 18/11 19/17 19/19 29/25 31/7 34/13 36/6 36/11 43/19 46/23 46/25 62/1 62/9 62/12 68/13 71/1 71/4 71/16 74/25 75/23 76/7 78/3 79/10
**can't [7]** 12/11 18/7 38/20 48/5 50/16 76/20 79/16
**cancel [1]** 80/2

**cannot [2]** 35/10 50/20
**canvassed [1]** 14/23
**capacity [2]** 1/8 4/12
**capitation [2]** 20/3 21/15
**care [11]** 9/11 25/7 28/12 51/7 56/3 56/9 56/19 57/3 57/6 57/15 58/10
**careful [1]** 7/6
**Carla [2]** 2/15 4/10
**carries [1]** 35/16
**carrying [1]** 36/4
**case [32]** 1/4 4/4 18/1 18/12 18/18 22/19 22/23 24/18 24/24 25/2 25/3 28/21 31/17 33/9 34/9 36/15 36/16 43/1 43/13 43/23 48/16 52/6 59/22 60/9 65/15 66/2 66/3 69/20 69/23 70/3 75/14 79/20
**cases [7]** 16/22 35/21 36/5 39/10 43/6 45/19 68/6
**cat [1]** 75/18
**cat-out-of-the-bag [1]** 75/18
**categories [2]** 7/12 7/16
**category [2]** 49/4 49/5
**causal [2]** 62/20 62/25
**causation [8]** 63/4 63/11 63/15 63/16 63/20 63/22 68/17 68/22
**cause [2]** 51/8 81/6
**caveat [1]** 73/5
**CCO [11]** 48/18 48/24 49/25 51/1 51/4 55/15 56/5 63/8 64/17 67/8

**CCO's [1]** 51/3
**CCOs [19]** 13/3 14/23 20/9 20/11 40/21 41/1 49/11 49/20 50/11 50/15 50/23 51/10 51/11 56/6 56/13 64/20 71/2 71/24 73/6
**cell [8]** 11/17 46/20 49/3 49/6 51/3 51/4 51/11 51/11
**cell-by-cell [1]** 51/11
**cells [1]** 49/2
**certain [9]** 7/11 12/16 12/17 17/18 19/4 36/6 40/21 47/1 49/18
**certainly [5]** 29/12 41/22 57/20 72/3 79/4
**certified [1]** 81/7
**certify [2]** 11/17 81/4
**Chaimov [5]** 2/21 70/21 72/7 73/10 74/19
**challenges [2]** 7/24 61/16
**challenging [5]** 11/11 15/20 16/23 17/2 17/5
**change [6]** 27/17 35/5 51/12 51/24 58/12 58/14
**changed [4]** 22/12 23/15 30/12 37/21
**changes [1]** 30/23
**changing [1]** 22/17
**charged [2]** 22/6 28/21
**checking [1]** 70/16
**CHIEF [1]** 1/18
**children [1]** 49/4
**Children's [3]** 66/6 67/3 67/7
**choices [1]** 47/22
**choose [2]** 58/25 79/5
**choosing [4]** 17/17

**choosing... [3]** 57/23 58/3 58/8

**chose [4]** 17/11 57/13 58/6 59/15

**chosen [2]** 58/2 65/16

**Christopher [1]** 2/21

**chronology [1]** 56/7

**Circuit [5]** 31/15 33/9 33/10 36/7 36/18

**circumstances [4]** 33/1 33/3 36/7 37/14

**citation [2]** 61/4 61/8

**cite [4]** 9/25 43/6 52/20 63/7

**cited [3]** 7/9 22/19 66/1

**claim [27]** 7/19 7/24 9/5 9/7 11/3 11/11 11/24 11/25 12/4 15/19 18/25 19/4 21/21 23/19 23/24 23/24 29/13 41/10 41/16 42/3 54/2 62/16 68/11 68/13 69/22 69/22 70/2

**claimed [1]** 9/8

**claims [26]** 5/9 5/9 5/22 7/11 7/12 7/16 7/20 7/23 9/12 11/10 12/3 12/4 19/10 19/10 22/4 22/9 41/7 41/11 41/24 42/16 62/13 62/14 62/15 62/16 68/13 70/15

**claims: [1]** 7/16

**claims: Section [1]** 7/16

**Clancy [2]** 30/11 37/20

**clarification [1]** 53/16

**clause [3]** 8/3 8/8 45/17

**clawback [3]** 42/22

**clear [7]** 11/10 19/17 26/18 39/24 42/11 54/1 70/13

**clearly [3]** 12/22 22/18 75/11

**client [2]** 21/5 77/22

**clock [1]** 31/23

**close [7]** 11/5 27/11 30/4 33/18 35/14 43/3 55/2

**CMS [20]** 6/10 6/16 6/18 9/23 10/2 10/2 10/5 10/21 15/9 15/16 16/21 17/16 19/5 20/2 20/7 20/16 21/1 21/10 21/16 59/17

**CMS's [5]** 6/21 6/23 8/17 9/1 13/12

**Coie [2]** 2/4 2/8

**coincidence [4]** 52/4 52/12 53/3 53/4

**coincidental [1]** 51/25

**colleague [1]** 74/25

**colleagues [5]** 17/10 71/16 72/11 73/11 74/17

**Columbia [8]** 2/19 16/13 16/15 16/18 16/19 16/22 17/2 18/1

**combination [2]** 67/18 67/19

**come [9]** 8/14 12/15 13/11 14/3 50/12 69/6 71/1 71/3 80/6

**comes [7]** 10/22 16/12 27/15 37/2 38/19 52/18 64/13

**coming [1]** 16/17

**comment [2]** 16/7 16/7

**comments [3]** 29/11 53/16 63/20

**commission [4]** 16/15 16/15 16/19 16/23

**common [5]** 25/12 25/14 25/18 26/3 41/6

**communications [6]** 66/10 67/6 67/15 67/17 68/2 68/8

**Community [2]** 72/25 73/4

**company [1]** 25/6

**compare [1]** 35/23

**competing [2]** 35/24 42/9

**competition [1]** 24/16

**competitive [2]** 75/16 76/5

**competitor [1]** 66/9

**complain [12]** 13/8 18/3 18/4 18/8 18/9 18/11 19/12 19/14 19/20 19/22 48/16 53/7

**complained [1]** 27/4

**complaining [2]** 43/2 43/14

**complaint [6]** 22/5 25/20 40/20 52/6 52/7 52/9

**complaints [2]** 53/18 61/15

**complete [1]** 16/5

**completely [4]** 7/22 12/12 16/8 18/13

**completion [1]** 52/3

**compliance [2]** 6/12 6/14

**complied [1]** 20/24

**comprehensive [1]** 76/19

**conceivable [1]** 23/23

**conceived [1]** 55/10

**conceptualized [1]** 55/10

**concern [7]** 64/18 65/13 67/5 67/9 71/7 71/19 71/21

**concerned [2]** 63/9 64/13

**concerns [3]** 75/13 76/10 76/11

**concluded [2]** 59/6 80/22

**conclusion [7]** 22/12 23/16 40/13 40/14 59/10 59/11 59/13

**conclusions [6]** 23/10 23/10 23/11 23/18 26/20 59/18

**conclusive [1]** 8/18

**conclusively [1]** 6/10

**conditions [1]** 51/8

**conduct [34]** 22/13 24/11 24/23 26/16 26/19 27/2 27/12 27/15 27/18 28/9 29/6 29/19 30/6 31/21 31/24 32/1 32/6 32/9 34/11 35/25 39/12 39/13 41/5 41/18 41/20 45/20 45/20 46/8 46/10 47/7 49/12 63/9 64/4 64/19

**conference [1]** 69/7

**confidentiality [5]** 75/13 75/23 76/10 76/13 77/2

**confirms [1]** 61/13

**conformed [1]** 81/7

**Congress [1]** 16/17

**connection [2]** 62/21 63/1

**consensus [1]** 72/10

**consequence [3]** 24/21 50/6 50/9

**consider [2]** 25/9 75/6

**consideration [2]** 25/8 52/25

**constitutional [2]** 24/19 45/18

**constitutionally [2]** 22/7 24/12

**contact [1]** 27/7

**contain [1]** 10/15

**containment [3]** 43/16 48/23 48/23

**contemporaneous [1]** 64/5

**contend [4]** 12/25 13/23 14/19 34/15

**contention [1]** 22/15

**contentions [1]** 55/9

**contest [2]** 8/25 9/1

**context [1]** 16/12

**contextual [1]** 33/11

**contingency [4]** 38/5 38/10 38/12 38/14

**continue [4]** 17/6 24/6 34/14 42/2

**continued [1]** 51/22

**continues [2]** 32/5 34/21

**continuing [3]** 32/1 32/2 34/11

**contract [22]** 7/16 10/3 35/8 35/10 38/8 41/24 45/5 45/8 45/14 47/6 47/16 47/24 48/3 48/21 52/8 53/12 61/24 61/24 62/2 62/8 66/8 67/4

**contracting [1]** 66/13

**contrary [1]** 25/19

**controlling [1]** 57/24

**conversation [1]** 67/20

**conversations [1]** 63/23

**core [4]** 26/5 26/11

**corporation [1]** 1/3

**correct [12]** 8/17 10/19 17/11 34/8 42/10 42/24 43/9 65/8 65/11 70/15 76/6 81/5

**cost [3]** 43/15 48/23 48/23

**costs [8]** 20/4 54/12 54/15 54/19 54/24 56/25 57/10 58/12

**Couch [1]** 2/5

**could [17]** 7/12 7/23 9/6 13/6 19/5 19/10 22/14 24/15 25/18 28/16 32/21 36/8 43/3 44/6 48/2 57/21 62/4

**couldn't [4]** 16/10 38/25 45/6 46/25

**counsel [4]** 4/6 40/7 54/7 76/7

**counsel's [1]** 61/13

**counterclaim [4]** 69/9 69/11 69/11 69/13

**counting [1]** 73/19

**couple [5]** 17/8 31/11 32/15 73/14 73/17

**course [11]** 7/13 27/16 32/1 32/2 32/6 32/15 34/11 40/2 42/6 44/4 74/5

**court [24]** 1/1 1/18 3/2 9/14 12/13 20/24 22/8 22/12 22/23 24/21 25/1 25/11 25/21 29/12 31/3 36/11 41/25 45/4 49/1 52/23 76/7 78/10 80/21 81/11

**Court's [1]** 22/2

**Courthouse [1]** 3/2

**courtroom [2]** 74/16 79/19

**cover [1]** 72/5
**covered [2]** 8/3 41/10
**create [2]** 21/3 21/4
**created [2]** 8/7 61/5
**creates [1]** 64/24
**credibility [1]** 68/5
**credit [21]** 45/14 45/17 45/21 46/4 46/17 46/22 47/1 47/8 47/10 47/11 47/11 47/14 47/15 47/21 48/7 51/25 52/21 59/23 60/1 60/12 62/9
**credits [2]** 49/14 51/21
**critical [1]** 59/4
**critical: [1]** 58/12
**critical: They [1]** 58/12
**critically [1]** 56/17
**cross [1]** 9/10
**CRR [2]** 3/2 81/10
**crunch [1]** 38/16
**CSR [2]** 3/2 81/10
**curious [1]** 76/11
**current [3]** 40/4 75/23 76/24
**currently [2]** 69/11 77/9
**cut [1]** 57/9
**cuts [6]** 55/14 55/15 55/19 56/11 56/16 56/23
**cv [2]** 1/4 4/4

**D**

**damages [6]** 62/21 69/15 69/16 69/20 69/25 70/4
**data [56]** 11/15 12/17 12/20 13/16 13/17 13/22 14/5 14/8 14/18

14/24 15/5 16/4 16/6 17/11 17/12 17/13 17/14 17/15 17/16 17/18 17/20 17/23 18/9 18/16 19/23 47/2 48/20 49/10 49/11 49/11 49/12 49/19 49/20 49/24 49/25 50/2 50/11 50/22 51/10 51/12 51/15 52/16 52/19 54/5 55/14 55/20 55/21 55/23 56/3 56/11 56/15 56/16 56/19 56/22 56/23 57/10
**date [4]** 78/12 79/8 79/21 81/10
**David [3]** 2/12 4/7 21/25
**day [3]** 19/18 36/5 74/16
**days [8]** 24/5 30/8 31/11 32/10 32/20 32/23 33/8 39/17
**de [1]** 77/8
**de-designation [1]** 77/8
**deadline [4]** 76/24 78/22 79/11 79/11
**deal [2]** 25/18 73/10
**debate [1]** 42/4
**Deborah [1]** 66/7
**December [5]** 28/4 30/7 30/11 31/10 38/10
**December 20th [5]** 28/4 30/7 30/11 31/10 38/10
**deciding [1]** 70/9
**decision [14]** 6/19 6/22 6/23 8/25 9/1 13/12 14/15 14/15 38/18 49/17 66/11 67/22 67/22 68/3

**decisions [5]** 14/8 15/6 28/22 58/20 60/13
**declared [1]** 24/6
**deductions [1]** 54/5
**defeat [8]** 17/21 26/24 27/19 41/22 63/13 63/15 68/17 68/22
**defendant [5]** 2/18 37/7 37/11 37/18 44/7
**Defendants [2]** 1/10 2/11
**define [2]** 79/1 79/3
**definition [4]** 21/14 21/17 45/23 68/5
**degree [3]** 11/16 68/19 69/25
**delay [1]** 78/10
**delivered [2]** 27/22 30/13
**delivery [1]** 27/3
**demand [3]** 25/3 25/5 29/2
**demanded [2]** 24/7 24/8
**demonstrate [1]** 23/23
**demonstrating [1]** 46/11
**denied [1]** 19/8
**deny [5]** 41/15 41/15 62/13 68/11 70/5
**departing [1]** 64/8
**Department [1]** 2/15
**departure [1]** 64/7
**depends [1]** 60/9
**deposition [5]** 30/10 37/20 59/8 63/8 66/19
**derivation [1]** 6/13
**derivatively [1]** 6/15
**described [3]** 23/1 23/2 70/4
**description [1]** 23/14
**designated [1]** 77/9

**designation [3]** 70/22 71/9 77/8

**desire [1]** 61/25

**detail [1]** 61/14

**detailed [3]** 30/24 46/18 52/22

**determination [4]** 8/17 12/15 13/25 17/13

**determine [2]** 14/25 15/21

**determined [2]** 6/11 14/11

**determining [2]** 14/12 14/20

**develop [4]** 12/13 13/21 21/10 61/14

**dichotomy [1]** 7/21

**did [25]** 12/20 15/14 18/13 21/3 21/11 22/8 22/17 24/4 29/4 33/5 33/22 38/3 39/12 44/12 46/11 50/14 50/17 50/18 54/20 57/8 60/25 61/7 63/23 66/23 67/1

**didn't [10]** 9/16 13/4 14/24 19/16 27/9 30/9 33/2 50/4 60/4 71/5

**difference [5]** 18/1 33/20 50/8 51/2 51/19

**differences [2]** 55/17 73/6

**different [8]** 8/24 10/13 11/1 23/1 36/15 56/2 57/21 59/16

**differently [1]** 69/6

**difficult [1]** 36/19

**digress [2]** 7/13 43/5

**direct [3]** 59/22 59/25 64/6

**directed [3]** 26/21

**direction [1]** 11/6

**directly [3]** 33/9 64/20 65/17

**director [4]** 1/8 24/2 24/24 66/7

**director's [1]** 25/23

**disagree [1]** 62/8

**disappointed [1]** 27/6

**disclosure [1]** 40/4

**discovery [2]** 52/22 74/6

**discretion [1]** 12/2

**discuss [3]** 45/2 71/17 75/11

**discussed [4]** 37/16 41/12 41/17 68/25

**discussing [1]** 38/9

**discussion [3]** 54/10 54/15 54/19

**discussions [2]** 55/4 55/6

**dismantle [1]** 16/8

**dismiss [24]** 7/5 7/8 7/10 7/17 7/23 10/24 11/4 11/7 19/9 19/19 22/3 22/20 25/10 25/22 26/9 35/22 41/7 41/8 41/15 41/22 42/12 69/1 69/10 69/12

**dismissed [4]** 22/9 22/14 25/2 26/8

**disparate [1]** 40/21

**dispute [3]** 21/11 28/4 28/6

**dissemination [1]** 30/18

**distinct [1]** 73/6

**DISTRICT [4]** 1/1 1/2 1/18 3/2

**diving [1]** 56/9

**do [58]** 5/6 5/8 7/6

10/21 12/7 12/7 12/9 12/11 13/4 13/24 15/22 19/12 19/22 21/9 21/13 22/20 22/24 28/17 28/19 29/13 31/20 31/20 31/23 32/2 32/16 33/14 35/13 35/21 38/13 38/14 38/17 42/2 42/6 49/14 49/14 50/20 52/20 54/16 54/25 54/25 56/4 57/8 57/25 58/3 58/11 59/10 59/21 60/24 63/11 64/16 66/4 66/16 66/22 67/24 71/21 73/15 76/20 78/5

**document [3]** 46/2 61/5 61/8

**documents [7]** 46/13 52/24 52/24 72/9 77/9 77/11 78/16

**does [26]** 8/9 9/2 10/9 10/15 10/16 15/17 15/17 17/4 17/24 21/4 22/23 27/16 28/20 28/24 32/14 34/14 34/21 35/6 47/6 47/16 47/24 48/1 48/15 52/9 65/22 74/24

**doesn't [16]** 6/25 10/1 11/2 11/4 13/24 20/10 25/8 25/15 32/18 36/5 49/25 50/22 61/24 61/25 65/6 69/4

**doing [9]** 15/16 16/4 34/18 34/19 46/8 58/13 58/18 60/22 79/8

**dollars [1]** 55/24

**don't [35]** 5/16 5/24 9/18 11/6 12/4 13/23 16/6 16/6 17/10 18/18 20/19 28/1 28/16 33/15 34/8 35/16 37/10 37/11

**D**

**don't... [17]** 37/12 44/10 50/17 53/8 56/4 57/8 58/14 59/3 65/10 66/14 68/10 68/22 70/7 71/20 74/14 76/14 78/18
**done [14]** 11/18 19/6 44/1 44/16 47/12 47/20 51/13 52/22 59/9 59/12 60/10 60/11 60/20 61/9
**door [1]** 7/19
**Douglas [3]** 43/7 44/5 44/9
**down [12]** 16/13 31/1 39/25 42/18 43/24 44/2 44/3 44/15 44/17 56/14 64/13 70/22
**down-designation [1]** 70/22
**draw [1]** 32/20
**driving [1]** 13/10
**dropping [1]** 70/14
**due [12]** 8/3 8/8 8/12 27/10 58/16 73/19 77/1 78/8 78/9 78/12 78/23 78/24
**during [2]** 58/17 58/24
**dynamic [1]** 76/9

**E**

**each [3]** 5/8 55/24 72/6
**earlier [4]** 9/5 41/12 46/15 69/1
**early [1]** 54/3
**easily [2]** 31/16 31/18
**Eastern [2]** 71/24 73/16
**economic [3]** 62/17 63/5 68/20
**effect [1]** 57/16

**effectively [1]** 16/24
**eight [2]** 31/15 50/3
**eight-month [1]** 31/15
**either [13]** 7/19 19/22 26/23 35/22 40/2 41/8 43/8 46/7 46/21 64/6 64/7 69/7 78/2
**element [1]** 62/22
**elements [2]** 29/12 42/19
**elements: [1]** 62/18
**elements: existence [1]** 62/18
**Elizabeth [2]** 2/22 72/23
**Ellis [3]** 15/12 40/24 59/4
**else [6]** 10/21 55/25 56/24 57/1 57/2 75/1
**email [8]** 27/6 28/2 30/10 37/19 38/9 54/10 56/8 61/2
**emails [1]** 64/12
**employed [2]** 26/17 51/21
**employing [2]** 43/17 45/24
**employment [1]** 43/6
**encounter [1]** 49/10
**end [11]** 24/5 30/20 31/21 32/10 35/8 38/18 39/18 50/14 56/23 56/24 61/4
**ended [1]** 51/23
**ends [2]** 36/4 54/4
**Energy [1]** 31/16
**engage [1]** 16/5
**engaged [1]** 7/10
**engaging [2]** 22/16 39/21
**English [2]** 2/3 4/17
**enough [9]** 27/19 30/1

32/11 43/3 43/25 44/14 63/13 63/15 68/22
**ensure [1]** 35/6
**entire [2]** 58/18 74/10
**entirely [4]** 7/22 58/16 58/23 71/9
**entirety [1]** 66/10
**entitled [7]** 6/2 6/16 15/8 16/8 28/24 37/14 81/6
**entity [1]** 66/11
**environmental [2]** 16/2 16/11
**equation [1]** 46/25
**equivalent [1]** 16/21
**Eric [2]** 2/23 73/3
**erroneous [4]** 6/4 8/20 11/25 18/22
**error [1]** 34/21
**errors [3]** 34/19 52/16 61/16
**essentially [7]** 7/24 22/6 23/18 42/25 43/15 69/14 71/21
**established [3]** 16/15 22/7 29/1
**et [1]** 4/5
**evaluate [3]** 24/22 35/23 59/5
**evaluated [1]** 42/8
**even [11]** 7/12 13/8 16/25 31/5 36/1 36/11 48/14 50/1 57/25 61/25 77/25
**events [1]** 31/10
**ever [4]** 51/20 54/20 54/20 57/8
**every [5]** 46/20 49/6 49/9 51/1 61/14
**everybody [2]** 50/21 74/25
**everyone [2]** 50/5

**everyone... [1]** 51/18
**everything [2]** 15/14 72/5
**evidence [41]** 6/6 8/24 11/24 12/19 14/4 14/16 14/19 15/2 18/7 18/20 18/22 26/12 26/15 27/14 28/14 31/12 37/7 37/8 37/11 37/12 37/18 37/23 38/3 39/4 40/13 40/24 44/12 45/3 46/1 46/6 48/13 54/9 54/12 59/23 59/25 63/12 63/13 64/19 64/25 68/16 69/3
**exact [3]** 16/14 26/9 66/2
**Exactly [1]** 26/14
**examination [2]** 40/16 40/18
**example [6]** 12/7 13/3 14/22 49/3 64/11 68/20
**examples [2]** 53/8 53/9
**except [2]** 34/8 47/3
**exception [1]** 67/23
**excerpts [1]** 61/3
**excess [3]** 49/22 50/24 55/14
**exchange [1]** 56/8
**excluded [1]** 19/5
**exclusive [1]** 56/14
**excuse [1]** 54/18
**excused [1]** 19/4
**execute [1]** 77/2
**executive [1]** 66/7
**exhausting [1]** 16/5
**Exhibit [3]** 38/8 66/18 66/24
**Exhibit 107 [1]** 38/8
**Exhibit 53 [2]** 66/18

**Exhibits [1]** 68/2
**Exhibits 28 [1]** 68/2
**exist [1]** 22/8
**existence [1]** 62/18
**expanded [1]** 52/22
**expect [3]** 60/2 60/4 78/23
**expenditure [1]** 43/16
**expenses [1]** 25/7
**experience [4]** 25/12 25/14 26/4 41/6
**expert [10]** 46/3 75/25 76/15 76/24 77/21 78/3 78/6 78/8 78/12 79/8
**experts [3]** 52/14 52/25 76/17
**explain [1]** 48/13
**explaining [1]** 30/25
**explains [2]** 21/16 44/7
**explanation [19]** 25/9 25/20 35/15 36/4 36/10 36/24 37/3 38/13 39/14 39/24 41/7 43/15 43/25 44/2 44/11 44/16 44/17 44/18 44/22
**explanations [11]** 24/25 35/24 37/9 37/13 37/24 40/16 41/4 42/9 44/1 52/19 52/20
**express [1]** 10/15
**expressed [4]** 22/19 37/7 37/11 37/18
**expressing [3]** 65/7 65/13 75/9
**expression [5]** 11/1 22/16 30/2 39/15 39/21
**expressive [16]** 27/2 27/12 27/15 27/18 31/21 31/24 32/1 32/9 34/2 34/3 34/5 34/6 34/9 34/12 41/18 43/2

**exquisite [1]** 61/14
**extension [1]** 38/24
**extent [1]** 14/2
**extra [1]** 38/20

**F**

**facie [3]** 43/1 43/13 43/23
**facilitate [1]** 38/21
**fact [34]** 17/3 22/24 23/14 24/13 25/5 25/24 26/1 27/4 27/17 28/4 28/6 35/9 36/8 36/9 38/11 40/15 40/25 50/23 52/9 55/5 57/6 58/6 58/23 58/24 60/11 61/6 61/7 64/2 64/8 64/14 64/24 65/1 70/8 78/17
**factor [8]** 27/3 29/18 29/23 30/2 37/6 39/6 39/10 41/18
**factors [1]** 13/22
**facts [14]** 5/20 14/2 22/5 23/23 23/25 24/10 24/20 25/15 25/20 26/20 28/16 35/19 41/3 41/21
**factual [4]** 12/14 23/16 29/22 41/17
**factually [1]** 33/11
**fail [1]** 8/21
**failing [1]** 13/6
**fails [1]** 8/24
**failure [4]** 7/19 7/24 13/4 70/1
**fair [1]** 79/9
**fairly [1]** 7/10
**false [4]** 37/9 37/13 37/24 38/3
**familiar [1]** 76/21

**FAMILYCARE [91]**

**FamilyCare's [26]** 6/20 8/19 8/22 9/13 20/25 27/7 28/16 30/17 34/25 54/5 55/14 55/20 55/21 55/23 56/3 56/19 56/25 58/15 58/17 58/21 58/24 59/2 63/7 69/10 69/12 69/15

**far [5]** 17/21 40/6 41/10 55/14 56/24

**fascinated [1]** 71/7

**faster [1]** 31/8

**favor [2]** 36/11 76/12

**favorable [2]** 28/7 62/12

**FBI [2]** 24/24 25/23

**feature [1]** 56/25

**federal [21]** 6/7 6/13 6/14 6/22 9/11 9/24 11/11 11/12 15/19 15/20 15/23 15/24 16/1 16/3 16/4 16/16 18/15 18/20 18/21 18/24 20/14

**feel [3]** 9/18 21/12 55/1

**few [3]** 26/21 54/10 54/14

**Fifth [1]** 2/13

**fight [2]** 17/22 17/24

**figure [1]** 79/16

**file [1]** 71/25

**filed [11]** 52/7 52/8 66/19 71/24 73/13 73/20 73/21 73/24 77/10 79/24 80/8

**filing [2]** 7/20 78/10

**final [6]** 32/15 32/17 35/7 35/11 39/3 61/3

**finally [3]** 34/24 35/1 43/21

**find [3]** 41/13 64/15 68/15

**firm [3]** 15/12 40/11 40/19

**first [17]** 5/6 5/20 6/10 21/20 22/2 23/8 23/25 29/13 29/19 29/21 31/13 35/18 36/16 56/11 62/24 69/20 71/6

**fit [1]** 65/6

**fits [2]** 12/23 65/5

**flawed [1]** 61/19

**flaws [1]** 61/20

**fleshed [1]** 11/5

**Floor [1]** 2/5

**flowed [1]** 55/22

**flowing [1]** 70/1

**flows [1]** 50/25

**focus [5]** 22/2 22/23 29/11 30/5 63/16

**focusing [4]** 7/11 31/9 43/21 45/4

**follow [2]** 13/4 13/6

**followed [4]** 12/25 34/2 43/3 56/16

**following [2]** 22/11 26/2

**follows [1]** 53/4

**foreclose [2]** 11/3 17/4

**foreclosed [2]** 9/25 13/11

**forecloses [2]** 10/5 20/14

**forecloses the [1]** 10/5

**foregoing [1]** 81/4

**Forest [3]** 16/21 16/25 17/3

**forget [2]** 5/16 75/19

**format [1]** 64/10

**former [1]** 9/9

**forms [1]** 34/4

**formulaic [2]** 23/12 23/19

**forward [15]** 9/6 37/2 52/18 63/10 67/10 68/13 71/1 71/3 71/22 72/4 72/9 75/15 78/3 79/12 80/6

**found [3]** 8/9 25/1 52/25

**four [5]** 39/20 64/3 64/4 65/23 68/23

**fourth [4]** 27/13 56/17 56/17 57/1

**framed [1]** 69/21

**framework [7]** 10/20 10/20 43/7 43/8 43/10 43/18 44/10

**Frank [1]** 71/23

**free [2]** 22/16 74/10

**Friends [2]** 16/21 17/1

**front [3]** 7/15 17/16 66/17

**frustrated [1]** 40/3

**fundamentally [1]** 5/18

**funding [1]** 7/1

**funnel [1]** 15/9

**further [6]** 5/21 8/22 20/19 22/11 55/6 80/12

**future [1]** 45/15

## G

**game [2]** 5/15 23/4

**gave [2]** 16/3 37/25

**general [3]** 4/8 4/10 4/14

**generally [1]** 43/6

**gentlemen [2]** 75/19 75/21

**get [20]** 10/11 12/9 12/23 16/5 17/20 18/5 19/22 27/5 29/20 32/21 32/21 34/24 47/1 47/24

**get... [6]** 61/21 61/25 65/10 74/6 75/23 77/19
**gets [1]** 35/6
**getting [3]** 33/23 47/5 50/14
**give [17]** 5/5 5/20 5/25 15/12 21/21 27/9 28/16 42/16 44/10 44/11 44/11 52/14 53/7 70/11 72/2 77/17 79/4
**given [6]** 24/22 41/4 67/2 67/5 75/17 78/16
**gives [3]** 43/15 43/18 43/19
**giving [1]** 50/18
**glancingly [1]** 9/4
**go [21]** 9/6 11/6 15/9 31/7 37/5 47/2 55/7 56/10 56/15 56/22 68/13 71/1 71/3 71/3 71/22 72/3 72/9 72/11 78/24 80/6 80/9
**goal [1]** 13/1
**goes [3]** 17/13 44/18 48/10
**going [39]** 14/15 17/14 17/16 24/6 30/16 31/7 31/22 35/1 35/3 35/5 36/22 36/23 39/2 39/3 40/1 41/23 42/16 43/5 43/8 53/5 54/16 54/25 57/9 57/10 60/1 63/5 63/10 63/12 64/14 64/14 66/8 67/10 68/4 75/15 76/4 77/6 77/17 78/21 80/2
**gone [2]** 30/14 69/24
**good [11]** 4/13 4/16 4/18 4/20 4/24 29/4 30/22 31/25 43/25

**goodwill [3]** 69/21 69/22 69/22
**Gordon [3]** 2/7 4/21 13/13
**Gorge [7]** 16/13 16/15 16/18 16/19 16/22 17/2 18/2
**got [3]** 17/9 30/21 31/18
**government [12]** 18/15 18/21 18/21 19/4 36/4 36/8 36/9 36/11 36/13 36/18 37/2 37/14
**grant [3]** 11/4 41/11 69/12
**granted [2]** 25/21 70/2
**granting [1]** 41/13
**grants [1]** 8/7
**great [2]** 5/3 73/10
**greatly [1]** 32/24
**Gregory [1]** 2/21
**gross [1]** 55/20
**grounded [3]** 5/19 9/7 68/15
**grounds [1]** 6/10
**group [2]** 51/7 72/10
**growth [8]** 43/16 56/14 57/14 58/4 58/16 58/19 58/22 59/9
**guess [9]** 9/12 17/19 19/21 23/3 36/23 50/13 54/23 71/19 77/18

## H

**had [46]** 7/15 7/18 12/24 12/25 15/7 22/13 22/16 24/5 24/25 29/6 30/8 30/14 30/19 31/22 32/6 38/6 38/10 38/18 39/15 39/21 39/25 40/12 40/19 40/25

47/19 77/25    40/25 46/16 48/21 49/12 49/13 49/21 56/21 57/4 58/9 60/7 60/25 61/13 63/23 63/23 63/25 64/3 67/3 67/4 67/4 67/7 67/19 76/4
**half [3]** 15/15 48/3 66/15
**hand [1]** 23/3
**handle [2]** 74/17 74/25
**handling [1]** 11/1
**happen [2]** 51/7 57/24
**happened [12]** 21/18 22/4 33/22 42/20 43/20 49/9 51/9 52/6 60/8 62/4 66/14 67/3
**happening [1]** 38/12
**happens [6]** 11/7 16/14 31/21 32/16 56/20 69/7
**happy [2]** 29/13 74/17
**hard [2]** 5/2 76/16
**harder [2]** 33/24 56/24
**harm [2]** 62/21 63/5
**harmed [1]** 52/19
**harsh [1]** 27/5
**has [36]** 6/10 7/6 14/7 14/14 16/20 16/23 17/4 18/2 20/6 24/21 29/1 33/9 36/7 36/9 36/18 36/24 37/1 37/4 39/20 42/8 44/22 45/4 45/17 49/14 49/14 49/15 49/16 51/5 51/12 52/6 54/9 68/17 69/14 71/9 77/3 78/10
**have [123]**
**haven't [4]** 19/6 33/9 44/1 77/16
**having [4]** 22/6 28/22 48/7 65/16
**he [25]** 25/3 27/15

**he... [23]** 27/16 27/17 27/22 28/24 29/2 29/4 29/4 30/13 32/5 32/6 34/14 34/21 34/21 34/22 34/24 35/9 37/21 37/21 38/3 63/23 63/25 65/8 66/21

**he's [3]** 27/6 34/10 61/15

**head [1]** 70/12

**HEALTH [20]** 1/6 1/9 2/11 4/4 4/11 4/14 38/22 49/7 50/6 56/10 66/6 66/9 66/13 66/13 67/3 67/7 67/8 72/14 73/1 73/7

**hear [16]** 5/20 9/17 19/21 21/22 26/25 44/21 44/21 45/6 62/22 63/3 63/17 68/10 73/4 73/7 74/7 80/9

**heard [4]** 20/22 49/2 72/24 73/1

**hearing [8]** 5/2 5/4 5/7 14/4 72/5 79/16 79/25 80/2

**hearsay [3]** 65/4 65/5 67/23

**held [2]** 7/12 7/17

**help [2]** 38/21 79/3

**her [7]** 59/8 59/10 59/11 59/13 59/18 66/11 67/21

**Herbold [1]** 2/13

**here [67]** 5/1 6/3 6/20 7/13 8/12 9/17 11/18 12/25 13/8 15/5 15/14 16/10 16/21 17/12 18/6 19/2 19/6 19/19 21/9 21/11 21/18 21/21 23/6

23/12 23/25 28/17 29/10 30/4 30/7 31/13 32/2 34/1 35/15 36/19 37/4 37/16 37/25 39/4 39/16 42/11 42/17 42/20 42/23 43/1 43/5 43/12 43/20 44/13 44/19 46/25 48/15 52/4 55/9 62/10 62/22 63/15 70/11 70/21 71/2 71/3 71/5 71/16 72/17 72/23 79/18 80/4 80/7

**here's [1]** 68/12

**Hern [2]** 2/22 72/25

**Hernandez [1]** 74/14

**Hernandez's [1]** 79/19

**Hesterberg [3]** 2/7 4/25 66/18

**hey [2]** 30/21 44/15

**high [1]** 26/1

**higher [2]** 55/20 56/3

**him [3]** 25/4 29/6 64/1

**hired [3]** 15/12 29/5 59/5

**his [19]** 1/8 4/12 25/25 26/18 26/19 29/18 30/10 30/12 34/6 34/7 34/12 34/15 37/21 38/2 38/13 41/5 61/18 61/19 74/15

**historical [1]** 14/17

**history [2]** 22/3 49/15

**hits [1]** 57/2

**hitting [1]** 56/24

**hold [1]** 70/12

**Honor [71]** 4/13 4/16 4/20 4/22 4/24 9/15 9/20 10/11 11/9 15/5 17/10 19/25 21/7 21/25 26/7 26/14 29/9 32/4 35/17 36/16 37/19 39/9 45/1 53/15 53/17 55/12

58/6 60/18 60/21 61/12 62/6 63/19 64/22 65/21 70/16 70/18 70/23 71/12 71/15 71/23 72/8 72/18 72/22 73/12 73/16 73/21 74/9 74/17 74/20 74/22 74/23 74/24 75/3 75/4 75/21 76/6 76/16 77/15 77/22 78/13 78/15 79/9 79/14 79/20 79/23 80/3 80/5 80/13 80/15 80/17 80/19

**Honor's [3]** 20/18 29/15 53/16

**HONORABLE [1]** 1/17

**hoodwinked [2]** 18/15 18/20

**hours [1]** 24/8

**how [19]** 9/9 9/10 11/23 13/23 32/21 46/11 46/20 49/8 57/12 59/10 59/15 59/17 60/8 60/13 61/14 69/6 76/23 77/23 78/3

**However [1]** 79/1

**hurt [1]** 68/4

**hypothetical [7]** 12/22 32/8 33/3 33/5 33/13 48/8 48/15

**I**

**I'd [8]** 9/12 20/21 21/20 22/2 42/15 55/16 63/16 69/6

**I'll [26]** 5/7 5/20 9/14 10/11 21/21 21/24 26/25 29/11 44/25 45/2 62/22 63/3 63/17 63/18 63/19 66/21 72/6 74/5 74/6 75/8 77/24 78/23 79/3 79/4 79/12 79/18

**I'll discuss [1]** 45/2
**I'm [45]** 9/17 9/17 12/22 13/10 14/25 15/25 24/14 27/8 28/7 29/13 31/2 32/18 36/22 36/22 36/23 37/1 37/2 41/23 42/16 43/5 43/8 43/10 43/21 46/9 50/13 53/20 65/11 69/15 70/7 70/9 71/7 71/17 72/3 72/14 72/17 73/9 73/12 74/13 74/15 75/8 75/9 76/2 76/11 77/16 80/2
**I've [6]** 5/5 19/17 33/23 42/24 69/23 70/2
**idea [3]** 11/1 31/20 58/16
**Identify [1]** 13/21
**if [91]**
**ignore [3]** 23/9 34/21 62/2
**ignored [4]** 22/21 22/23 23/20 48/3
**ignores [1]** 61/23
**ignoring [1]** 34/18
**iii [1]** 10/1
**ill [3]** 47/7 47/17 52/5
**illusory [1]** 38/17
**immunity [3]** 24/18 28/21 69/24
**impact [4]** 8/15 49/25 50/19 52/21
**impacted [2]** 75/25 78/8
**impactful [1]** 52/15
**impacts [1]** 50/21
**impaired [1]** 64/4
**imperfect [1]** 16/1
**impermissible [1]** 28/10

**implementation [2]** 53/18 59/7
**implemented [5]** 55/12 57/14 60/12 60/13 62/11
**important [7]** 10/25 41/2 49/1 54/17 57/11 62/24 76/10
**importantly [1]** 57/25
**improper [14]** 23/13 55/8 55/11 55/12 62/20 62/20 62/25 63/2 63/3 63/17 67/25 68/1 68/6 68/9
**in [291]**
**inability [1]** 75/25
**inadequacy [1]** 23/6
**inadequately [1]** 14/23
**inappropriate [3]** 52/17 58/4 58/5
**INC [2]** 1/3 4/4
**incarcerated [2]** 25/1 26/2
**incentive [1]** 56/5
**incident [1]** 33/18
**include [1]** 53/9
**included [1]** 61/8
**including [4]** 21/4 42/9 56/6 56/17
**incorporates [1]** 6/14
**incorrect [1]** 18/16
**increase [4]** 54/12 57/10 57/15 58/21
**increased [3]** 58/9 58/17 59/1
**increasing [3]** 57/6 58/24 59/2
**independent [18]** 6/17 9/8 11/19 13/5 13/11 14/7 15/13 15/13 20/1 20/6 24/3 30/19 30/21 34/22 40/8 40/10 40/18

**indicate [1]** 10/16
**indicates [1]** 24/17
**indication [1]** 54/20
**individually [1]** 1/8
**individuals [2]** 26/17 64/12
**infer [2]** 32/11 43/4
**inference [9]** 32/19 32/21 32/22 32/24 33/13 41/21 52/5 60/10 61/21
**inferences [4]** 60/15 60/17 60/17 62/10
**inflict [1]** 68/7
**information [15]** 14/11 35/7 52/8 52/11 59/14 59/17 59/19 59/20 65/17 75/17 76/7 76/8 76/17 76/18 78/1
**initial [1]** 51/6
**injury [1]** 68/7
**input [1]** 76/20
**inquire [1]** 65/10
**inquiry [3]** 9/24 12/13 13/19
**instance [2]** 16/13 66/6
**instead [3]** 25/10 43/4 58/6
**instruct [1]** 35/22
**insufficient [2]** 14/5 34/18
**intend [1]** 72/2
**intent [12]** 26/13 29/11 29/16 36/17 36/18 46/24 66/1 66/4 66/5 67/21 68/7 68/8
**intentional [1]** 62/19
**intentionally [2]** 18/16 18/19
**interest [3]** 8/3 8/7 8/10
**interested [1]** 75/9

**interference [4]** 62/16 62/19 62/21 68/20

**interpretation [7]** 6/4 11/25 18/23 28/17 42/6 62/8 76/18

**interpretations [1]** 28/15

**interpreting [1]** 11/12

**interrogatory [1]** 64/2

**intimately [1]** 76/20

**into [18]** 5/3 5/7 17/13 18/10 19/23 35/2 38/21 41/19 44/24 46/19 48/14 56/9 57/16 60/23 61/4 64/9 65/10 75/23

**investigation [7]** 24/3 24/4 25/23 40/8 40/9 40/10 40/23

**involve [1]** 62/9

**involved [3]** 18/6 75/20 75/21

**involves [1]** 61/16

**Iqbal [15]** 22/19 22/25 23/2 23/7 23/8 23/11 23/17 23/21 24/17 25/11 25/21 28/20 35/13 41/5 42/5

**Iqbal/Twombly [1]** 35/13

**is [261]**

**isn't [12]** 6/20 13/11 16/3 17/19 26/12 27/19 43/25 44/23 54/17 59/22 61/18 65/2

**issue [25]** 5/19 15/10 20/23 26/9 29/10 29/16 29/17 30/6 33/11 35/2 36/17 39/10 39/23 42/17 45/2 45/18 63/20 63/20 65/15 70/8 70/22

**issues [4]** 18/21 40/2 70/20 75/7

**it [195]**

**it's [42]** 7/22 8/5 10/6 13/14 14/1 16/4 17/15 17/16 18/4 18/4 19/18 26/16 27/9 31/5 33/24 34/1 34/3 35/3 36/23 43/9 43/11 44/5 44/11 44/14 47/16 48/10 49/1 49/5 49/7 49/10 50/10 54/18 54/18 58/5 60/6 63/11 63/13 63/14 65/5 71/15 77/1 79/21

**items [4]** 70/25 71/14 71/18 72/4

**its [20]** 6/17 14/15 22/21 22/22 25/12 25/22 27/16 27/18 29/19 39/2 39/13 39/19 41/1 42/6 43/19 57/13 58/21 66/10 67/9 67/9

**itself [11]** 6/16 10/4 11/2 19/23 20/8 20/14 55/8 55/10 55/11 68/2 69/8

## J

**Jackie [2]** 15/11 15/11

**January [1]** 38/21

**January 2018 [1]** 38/21

**Jeff [1]** 72/25

**Jeffrey [1]** 2/22

**job [1]** 24/2

**Johnson [4]** 2/4 4/22 5/13 65/20

**joint [1]** 16/24

**JUDGE [3]** 1/18 74/13 79/18

**judgment [47]** 6/9 7/6 10/25 11/6 11/8 17/21

25/10 26/6 26/10 26/24 27/19 28/18 28/24 35/23 36/2 36/12 36/20 37/15 39/5 41/8 41/11 41/14 41/16 41/22 42/13 42/14 44/19 44/23 53/11 60/9 60/16 62/13 62/16 63/14 63/15 64/17 68/11 68/15 68/18 68/22 69/2 69/4 69/14 69/16 70/2 70/5 79/24

**judicial [7]** 5/22 6/2 25/12 25/13 25/14 26/4 41/6

**July [2]** 54/3 61/2

**July 2016 [1]** 54/3

**jury [3]** 32/21 44/6 62/12

**just [61]** 5/6 5/25 6/18 7/1 7/7 11/13 12/4 13/13 13/18 15/13 15/15 16/13 19/18 20/22 21/14 21/22 22/3 23/18 23/23 24/11 24/16 25/1 25/4 26/11 26/25 30/5 30/15 31/22 32/16 33/24 34/9 42/11 42/17 43/2 43/9 43/13 43/23 44/2 46/23 48/25 49/19 49/25 50/4 53/15 53/22 54/19 55/20 57/2 57/23 60/4 60/18 61/24 65/4 66/21 69/21 70/11 71/14 72/3 74/18 75/10 78/18

**Justice [1]** 2/15

## K

**keep [1]** 57/3

**key [1]** 45/16

**kicked [1]** 69/23

**K**

**kind [2]** 15/12 16/12
**knew [6]** 25/15 57/5 58/7 58/9 58/25 60/3
**Knight [2]** 2/22 72/23
**knock [2]** 43/24 44/3
**knocked [2]** 44/2 44/15
**knocking [1]** 44/17
**know [27]** 5/24 13/2 13/23 17/10 17/16 19/3 25/19 30/9 32/10 33/21 33/24 38/7 42/18 47/21 57/23 58/3 59/1 59/1 59/19 60/2 62/17 70/7 71/5 71/20 76/2 76/14 78/19
**knowing [2]** 35/10 35/11
**known [1]** 34/19
**knows [1]** 57/14

**L**

**lack [3]** 18/6 26/12 60/7
**Laden [1]** 25/24
**landscape [1]** 69/4
**Langfitt [2]** 71/23 72/20
**language [1]** 62/2
**larger [1]** 75/7
**last [5]** 17/8 24/1 46/9 51/5 79/23
**late [5]** 15/11 23/4 53/23 57/16 61/2
**later [7]** 8/14 32/10 54/25 57/9 59/17 60/25 75/24
**lauded [1]** 57/7
**laundry [1]** 52/18
**law [27]** 5/19 6/4 6/5 6/8 6/13 6/14 6/14 6/15 8/20 8/21 9/24 11/11

11/12 11/25 12/8 16/16 18/23 21/3 21/8 21/9 26/18 29/17 29/25 31/13 31/14 34/9 36/9
**lawsuit [2]** 7/20 19/17
**lawyer [1]** 77/25
**lays [1]** 11/14
**lead [1]** 52/5
**leaders [2]** 63/8 64/17
**least [5]** 19/23 58/23 59/19 75/24 76/25
**leave [3]** 5/24 17/25 22/11
**Lee [2]** 15/11 15/11
**left [8]** 15/19 18/2 18/8 18/17 19/18 62/15 63/6 70/19
**legal [8]** 5/19 12/5 12/24 13/7 13/25 20/25 30/22 61/1
**legislator [3]** 27/7 37/22 39/23
**legislators [1]** 30/14
**legislature [2]** 19/2 19/5
**legitimate [5]** 25/22 42/21 43/4 47/23 57/19
**legitimately [1]** 18/3
**lengthy [1]** 67/19
**let [4]** 14/10 32/8 48/13 48/25
**Let's [2]** 35/18 74/11
**level [6]** 15/10 15/16 15/24 15/24 22/9 36/3
**leveled [1]** 40/20
**levels [3]** 49/18 49/22 50/25
**Levin [2]** 2/12 4/13
**Lewis [3]** 15/12 40/24 59/4
**lied [1]** 18/13
**light [5]** 28/7 42/8 58/9

**like [20]** 5/9 7/5 9/18 20/21 21/20 22/2 24/4 29/12 30/9 42/15 44/13 46/6 55/1 55/16 63/16 71/22 77/24 78/14 79/7 79/21
**likelihood [1]** 29/2
**likely [9]** 24/11 24/16 25/2 25/4 39/13 39/16 41/7 58/8 68/15
**limit [3]** 63/19 68/16 68/16
**limitation [1]** 30/25
**limitations [2]** 40/15 40/17
**limited [1]** 15/21
**limiting [1]** 45/15
**limits [1]** 34/22
**Lindenauer [2]** 2/23 73/3
**linked [1]** 68/14
**list [9]** 26/25 27/1 52/14 52/18 64/3 69/15 69/18 70/7 70/9
**little [2]** 5/8 75/18
**LLP [3]** 2/4 2/8 2/19
**logical [1]** 39/20
**logically [1]** 39/19
**long [5]** 31/23 44/18 48/17 52/14 54/8
**longer [4]** 27/10 57/22 58/2 58/7
**look [15]** 11/13 21/7 23/22 26/20 32/16 34/9 34/13 35/2 39/10 45/23 46/6 56/7 57/22 58/4 68/4
**looked [5]** 7/13 7/15 25/24 40/24 51/20
**looking [3]** 14/25 31/24 48/23

**looks [3]** 8/1 8/6 38/11
**lose [5]** 25/6 67/11 77/25 78/2 78/23
**losing [1]** 24/15
**loss [1]** 7/1
**lost [2]** 9/19 36/14
**lot [3]** 11/7 42/8 57/24
**Lund [1]** 30/17
**LYNNE [4]** 1/9 2/18 56/20 79/24

## M

**mad [4]** 33/21 33/23 33/23 37/21
**made [27]** 14/8 19/17 20/9 20/13 24/19 25/3 25/5 29/2 33/23 39/17 39/18 40/7 43/13 49/17 49/21 49/24 50/4 50/23 51/14 51/16 51/24 53/1 57/22 60/13 64/6 64/12 65/22
**main [4]** 29/10 63/7 75/8 75/10
**make [16]** 11/10 14/15 15/7 17/6 21/13 22/22 24/8 29/3 32/22 35/13 38/18 39/19 43/7 53/22 70/7 76/17
**makes [3]** 33/21 43/22 47/11
**making [11]** 14/8 17/14 28/22 30/22 43/1 43/23 54/4 60/10 66/11 68/3 79/19
**manage [1]** 16/18
**management [1]** 16/18
**manner [1]** 22/7
**many [4]** 47/22 57/5 61/15 71/5

**Market [1]** 2/16
**Markowitz [8]** 2/12 2/13 4/7 21/25 39/8 42/5 61/11 66/25
**Markowitz's [2]** 29/15 59/21
**Matt [1]** 4/13
**matter [7]** 6/17 10/9 12/5 12/14 35/14 47/4 50/22
**matters [3]** 6/19 58/14 62/23
**Matthew [3]** 2/7 2/12 4/20
**may [9]** 37/14 38/7 43/25 44/15 53/23 67/17 73/5 78/9 79/23
**maybe [4]** 44/10 58/23 75/13 76/3
**McCracken [1]** 2/21
**McDonnell [3]** 43/7 44/4 44/9
**me [22]** 5/3 5/15 7/15 14/10 25/9 25/15 29/12 32/8 33/21 33/23 35/22 42/20 42/24 48/13 48/25 54/18 55/16 66/24 67/2 70/11 74/24 78/2
**mean [14]** 5/24 9/16 11/4 11/6 12/21 17/19 24/14 25/15 42/18 50/9 50/17 50/18 63/10 69/4
**Meaning [1]** 48/4
**meaningful [1]** 76/13
**means [13]** 6/12 8/16 8/19 8/22 62/20 62/25 63/2 63/3 63/17 67/25 76/15 79/4 79/12
**meant [1]** 50/5
**mechanism [1]** 10/17
**Medicaid [1]** 61/3

**medical [2]** 25/7 28/12
**Medicare [1]** 61/3
**meet [1]** 76/24
**meeting [2]** 30/12 56/20
**member [2]** 49/6 51/3
**member's [1]** 51/4
**members [7]** 16/16 38/2 38/22 49/4 49/5 51/6 58/21
**members' [1]** 49/12
**mentioned [8]** 7/21 11/24 13/9 37/19 60/18 67/14 67/16 68/21
**mere [2]** 55/4 55/6
**Mersereau [2]** 2/18 2/19
**met [2]** 42/12 53/13
**method [1]** 23/21
**Methodologically [1]** 35/21
**methodology [4]** 35/18 42/3 52/16 61/16
**MICHAEL [1]** 1/17
**might [10]** 12/15 14/5 42/21 43/1 51/8 54/11 68/12 69/5 70/9 71/19
**million [4]** 55/21 55/23 56/12 56/19
**millions [1]** 55/24
**mind [8]** 24/9 29/3 29/21 30/12 37/21 39/19 57/3 74/14
**minimum [2]** 17/21 55/2
**minority [2]** 13/3 14/24
**minority-owned [2]** 13/3 14/24
**minutes [1]** 17/8
**misled [1]** 18/13
**missed [1]** 42/24
**missing [1]** 79/22

**mixed [1]** 34/3
**MO [2]** 1/4 4/4
**moment [7]** 7/21 27/1 30/5 43/5 46/23 48/25 70/11
**money [1]** 61/21
**Montalbano [2]** 2/23 72/18
**month [4]** 31/15 38/21 38/24 38/25
**months [5]** 26/22 39/1 54/10 54/14 78/16
**more [25]** 5/18 6/15 7/8 8/13 25/4 27/14 32/8 38/2 41/7 48/10 50/15 51/7 51/7 53/4 54/16 54/19 55/13 55/24 56/16 57/25 68/10 69/18 74/16 77/21 77/23
**morning [9]** 4/13 4/16 4/18 4/20 4/24 49/3 74/10 74/12 74/19
**MOSMAN [1]** 1/17
**most [8]** 28/7 39/13 39/16 55/7 56/17 62/12 62/24 62/24
**motion [38]** 6/9 7/5 7/8 7/10 7/17 7/23 10/24 11/4 19/9 19/18 22/3 22/20 25/10 25/22 26/6 26/9 26/24 35/22 36/2 41/8 41/15 41/15 41/22 42/12 42/13 69/10 69/12 69/16 70/5 71/20 71/24 73/13 73/15 73/24 74/6 75/6 77/10 80/8
**motions [4]** 7/15 11/7 26/11 69/1

**motivated [3]** 27/15 28/10 32/12
**motivating [7]** 27/3 29/18 29/23 30/1 37/6 39/6 41/18
**motivation [2]** 24/21 33/25
**motive [15]** 22/15 23/13 23/17 44/8 44/9 45/18 46/24 47/3 47/4 47/7 66/1 66/3 66/4 66/10 67/21
**motives [3]** 26/19 47/17 61/24
**move [2]** 78/3 79/12
**moved [2]** 69/14 71/9
**moving [3]** 21/24 44/25 63/18
**Mr [11]** 2/3 2/4 2/7 2/7 2/12 2/12 2/18 2/21 2/21 2/22 2/23
**Mr. [62]** 4/15 5/13 13/13 22/4 22/6 22/9 22/15 23/17 24/2 24/7 25/3 25/18 26/18 26/21 27/9 27/14 29/11 29/15 29/16 30/9 30/11 30/12 32/5 34/4 34/5 34/6 34/10 35/6 37/20 37/21 37/25 38/11 38/17 39/8 39/25 40/3 40/7 41/19 42/5 59/21 61/11 63/8 63/22 64/17 64/22 65/8 65/20 65/23 66/8 66/16 66/25 68/14 68/21 69/23 70/21 72/7 72/20 73/10 74/19 75/22 75/22 76/20
**Mr. Allen [28]** 4/15 22/4 22/6 22/9 24/2 24/7 25/3 25/18 26/18 26/21 27/9 29/16 30/9

**30/12 32/5 34/4 34/5** 34/6 35/6 37/21 37/25 38/11 38/17 39/25 40/3 40/7 41/19 69/23
**Mr. Allen's [5]** 22/15 23/17 27/14 29/11 34/10
**Mr. Chaimov [4]** 70/21 72/7 73/10 74/19
**Mr. Clancy [2]** 30/11 37/20
**Mr. Gordon [1]** 13/13
**Mr. Johnson [2]** 5/13 65/20
**Mr. Langfitt [1]** 72/20
**Mr. Markowitz [4]** 39/8 42/5 61/11 66/25
**Mr. Markowitz's [2]** 29/15 59/21
**Mr. Murray [9]** 63/22 64/17 64/22 65/8 65/23 66/8 68/21 75/22 76/20
**Mr. Murray's [3]** 63/8 66/16 68/14
**Mr. Suchorzewski [1]** 75/22
**Ms [5]** 2/3 2/15 2/22 2/23 80/4
**Ms. [5]** 32/3 32/6 66/12 73/18 80/18
**Ms. Rumsey [1]** 66/12
**Ms. Saxton [3]** 32/3 32/6 80/18
**Ms. Scheele [1]** 73/18
**MTD [1]** 25/16
**much [7]** 20/17 32/3 35/16 55/20 58/20 75/2 77/23
**Mueller [2]** 24/24 24/24
**multiple [2]** 16/22 32/1
**Municipal [1]** 66/2
**Murray [10]** 63/22

**Murray... [9]** 64/17 64/22 65/8 65/23 66/8 68/21 71/10 75/22 76/20

**Murray's [3]** 63/8 66/16 68/14

**Muslims [3]** 25/1 25/25 26/2

**must [3]** 8/21 13/15 13/16

**my [43]** 5/5 5/20 7/2 7/4 8/1 8/15 9/9 9/11 9/13 9/16 9/16 12/6 12/6 14/22 17/9 18/10 21/21 25/8 25/14 27/1 29/11 31/8 33/3 33/13 36/24 42/17 47/22 54/23 62/17 63/13 63/19 68/12 68/16 68/21 69/2 69/18 69/20 70/12 71/7 71/16 74/14 74/17 77/22

**mysteriously [1]** 57/2

# N

**N.W [1]** 2/5
**naked [1]** 26/3
**name [1]** 4/6
**National [1]** 17/3
**nature [2]** 75/15 75/16
**necessarily [6]** 6/12 6/13 17/15 33/4 53/6 58/5
**need [6]** 39/5 39/12 67/7 68/10 77/21 77/22
**needed [8]** 15/6 15/22 28/12 38/13 38/14 38/17 64/15 77/23
**needing [1]** 51/7
**needs [1]** 79/22

**negative [1]** 52/15
**never [3]** 46/21 55/6 60/20
**new [1]** 79/11
**next [2]** 24/1 41/23
**Nicholas [1]** 2/7
**Nick [1]** 4/24
**night [1]** 79/23
**nine [3]** 49/20 50/23 50/25
**Ninth [5]** 31/15 33/9 33/10 36/7 36/17
**no [49]** 1/4 4/4 6/15 18/17 19/1 21/7 21/11 23/13 23/16 27/24 28/3 28/14 36/1 37/1 38/24 39/20 40/13 41/2 44/8 46/1 46/1 46/2 46/3 47/16 50/8 50/16 51/18 52/4 52/4 53/4 54/12 54/20 57/8 58/15 59/22 59/25 61/6 61/9 62/4 68/1 73/21 74/6 77/7 78/15 78/20 80/13 80/15 80/17 80/19
**nobody [4]** 43/7 57/1 57/2 79/22
**non [2]** 1/3 24/12
**non-constitutionally [1]** 24/12
**non-profit [1]** 1/3
**none [2]** 53/9 61/16
**nonfact [1]** 23/12
**nonfact-specific [1]** 23/12
**nonmoving [1]** 62/12
**nonparty [1]** 63/23
**normal [1]** 28/23
**normally [2]** 32/19 73/14
**not [120]**
**note [2]** 13/14 17/9

**noted [2]** 9/5 32/4
**notes [1]** 17/7
**nothing [12]** 10/4 10/19 10/21 15/4 20/5 20/13 27/17 33/5 35/6 44/16 49/14 51/19
**notice [1]** 16/7
**November [2]** 30/20 79/13
**November 30th [1]** 79/13
**now [22]** 8/12 11/2 19/19 20/24 22/14 36/21 43/21 48/13 49/17 51/2 54/7 66/8 67/7 69/5 69/15 71/6 71/22 74/14 75/8 75/23 78/7 79/12
**nowhere [2]** 52/20 52/24
**number [10]** 6/24 6/25 34/16 38/5 55/20 56/6 56/10 57/11 57/20 57/23
**numbers [1]** 24/25
**numerous [1]** 26/17

# O

**o0o [1]** 81/2
**obligated [1]** 28/17
**obligation [6]** 14/7 14/14 20/1 20/2 20/6 21/5
**observed [1]** 58/22
**obtained [1]** 30/19
**obvious [1]** 7/14
**obviously [1]** 22/20
**occur [2]** 39/19 51/9
**occurred [6]** 24/12 34/10 34/12 39/15 53/5 55/2
**occurs [3]** 34/7 44/7

occurs... [1] 51/11
October [6] 74/4 74/7 74/14 76/22 77/20 77/24
October 22nd [1] 74/14
October 2nd [2] 74/4 74/7
October 5th [2] 77/20 77/24
off [2] 5/13 5/16
offering [1] 63/24
offers [1] 61/9
official [9] 1/8 4/12 23/13 24/19 24/23 28/21 28/25 41/5 81/11
official's [1] 39/12
officially [1] 24/6
often [2] 7/6 45/19
Oh [1] 77/15
OHA [42] 6/12 8/1 8/11 8/16 9/3 17/10 17/17 20/24 21/9 21/11 26/17 30/20 31/14 34/15 34/17 35/1 38/20 38/23 38/24 43/15 43/22 44/14 45/12 45/16 46/7 48/22 51/13 54/9 54/23 56/8 57/5 57/5 57/7 57/8 57/13 57/14 58/25 59/6 60/13 62/16 69/14 80/12
OHA's [14] 6/9 8/23 9/21 30/18 43/19 43/24 44/17 44/22 58/18 62/8 63/4 63/9 64/19 70/5
okay [2] 15/14 20/23
omnibus [1] 72/5
on [152]
once [7] 10/21 11/5

73/8
one [42] 5/18 6/3 6/24 7/6 10/6 10/9 10/12 11/1 13/6 17/9 27/8 29/25 30/2 31/11 31/11 32/19 34/16 38/5 38/24 39/5 40/15 43/3 44/10 44/11 46/9 48/18 48/24 49/8 50/23 51/3 51/6 51/19 53/15 57/12 57/23 72/19 72/21 74/18 75/10 75/14 75/25 76/25
one-month [1] 38/24
one-year [1] 57/23
ones [1] 5/19
only [31] 7/14 7/17 8/25 10/6 10/17 15/24 21/9 23/25 24/10 25/19 26/18 26/21 30/6 33/24 39/5 40/14 45/2 47/13 47/23 48/2 51/2 51/10 51/13 54/9 56/18 60/25 62/1 64/3 67/4 68/12 69/22
opening [2] 22/20 79/19
operationalizing [1] 55/7
operative [1] 45/13
opinion [7] 7/3 7/5 9/5 9/9 10/13 24/17 33/12
opponent [2] 27/1 28/8
opportunities [1] 68/4
opportunity [3] 61/13 71/25 79/5
opposed [1] 29/5
opposite [1] 11/6
opposition [3] 37/8 37/11 37/19
Optumas [21] 11/18

15/14 15/17 17/11 17/17 18/12 26/17 40/25 46/8 46/10 46/13 48/22 51/14 52/23 56/8 56/13 56/21 59/15 59/15 59/16 72/17
Optumas's [1] 61/2
or [103]
oral [5] 1/15 4/3 9/18 71/8 71/22
order [15] 6/4 6/6 7/3 7/5 8/23 12/17 13/7 15/2 15/7 18/19 18/21 45/21 45/24 60/11 64/15
orders [4] 16/2 19/11 19/13 19/15
ordinary [3] 47/13 60/19 60/20
OREGON [20] 1/2 1/3 1/6 1/7 1/9 1/10 2/11 2/15 4/4 4/8 4/11 4/11 4/14 6/25 14/16 16/16 19/3 19/5 71/24 73/16
Oregonians [1] 25/6
original [1] 81/6
originally [1] 52/7
Osama [1] 25/24
other [28] 5/19 9/24 12/9 17/11 19/17 21/4 24/22 24/25 25/15 29/12 38/16 39/14 41/21 44/1 50/15 50/23 55/15 55/15 56/5 56/12 63/20 64/6 65/23 68/6 71/2 73/6 75/17 76/4
others [6] 13/2 40/22 50/3 55/13 56/21 77/3
otherwise [8] 6/5 9/2 12/9 47/12 55/22 59/24 60/23 63/17
ought [1] 44/24

**our [20]** 8/18 11/10 11/24 15/8 20/14 22/20 26/24 30/22 43/24 44/15 55/9 65/21 70/14 72/8 72/11 72/18 75/24 76/17 79/7 80/10
**ours [2]** 44/2 44/3
**out [38]** 5/24 7/5 11/5 11/14 13/3 26/22 27/11 30/8 30/14 30/20 34/20 37/22 41/12 42/25 46/24 47/3 49/19 54/6 55/21 55/25 56/5 56/19 58/20 59/16 60/24 60/24 61/20 63/6 64/14 67/11 69/6 69/20 69/23 70/3 73/17 74/3 75/18 79/16
**outline [1]** 6/23
**outreach [2]** 30/17 39/23
**outset [2]** 7/4 75/13
**outside [3]** 12/1 12/2 25/20
**over [14]** 24/2 25/5 32/1 32/5 32/7 32/15 33/5 38/22 57/22 58/7 66/12 67/9 68/2 71/3
**overpayments [2]** 49/18 51/16
**overruled [1]** 73/10
**own [6]** 6/17 26/19 26/19 42/17 44/2 44/17
**owned [2]** 13/3 14/24

## P

**pace [1]** 80/9
**PacificSource [1]** 73/3
**page [12]** 7/9 8/1 10/14 43/22 53/23 66/24

**pages [2]** 7/3 7/4
**paid [9]** 45/13 46/15 47/3 47/24 51/15 54/6 57/15 61/21 64/15
**Paragraph [1]** 45/11
**part [10]** 15/1 23/17 39/20 40/15 46/22 50/13 52/10 58/23 60/6 68/12
**partially [1]** 58/16
**particular [5]** 9/2 36/12 56/25 59/15 61/20
**particularity [1]** 23/2
**particularly [3]** 7/3 43/22 60/16
**parties [2]** 7/2 62/23
**party [10]** 21/24 36/17 44/25 46/2 52/24 62/12 62/20 63/18 63/24 64/24
**passed [2]** 13/13 17/7
**Pat [2]** 4/9 22/1
**path [5]** 34/14 34/16 34/17 42/23 42/24
**patience [1]** 70/24
**patient's [1]** 49/15
**PATRICK [3]** 1/7 2/12 4/12
**pause [2]** 10/22 46/23
**pay [5]** 7/6 35/14 35/23 55/1 64/16
**paying [1]** 58/20
**payment [3]** 49/16 51/3 62/3
**payments [7]** 20/9 20/11 20/12 49/13 49/22 50/24 56/6
**PC [1]** 2/13
**people [6]** 16/3 16/17 26/1 28/12 75/17 76/4

**per [1]** 70/1
**perceive [1]** 65/14
**perceived [1]** 49/21
**percent [2]** 56/14 59/17
**percentage [1]** 26/1
**perhaps [3]** 18/1 48/6 75/14
**period [11]** 16/7 26/16 29/3 31/15 34/25 35/9 40/18 57/19 57/22 58/3 58/7
**periods [1]** 57/21
**Perkins [2]** 2/4 2/8
**permit [1]** 77/11
**perpetuated [1]** 41/20
**perpetuates [1]** 27/17
**Peter [1]** 2/18
**ph [1]** 68/6
**pharmacy [1]** 56/14
**phony [1]** 18/14
**phrase [1]** 48/3
**physical [1]** 51/8
**pick [1]** 47/22
**piece [2]** 10/8 65/25
**pieces [2]** 5/24 69/19
**place [14]** 32/6 38/10 40/1 40/17 48/17 48/21 48/24 51/21 52/2 52/20 52/25 61/15 77/3 79/21
**place-setting [1]** 79/21
**placed [1]** 40/15
**plaintiff [7]** 1/4 2/3 4/17 4/19 7/9 7/18 16/3
**plaintiffs [1]** 29/25
**plan [11]** 16/18 16/19 16/20 27/17 66/10 67/6 67/15 67/17 68/2 68/8 73/1
**planning [5]** 38/1 38/5 38/10 38/12 38/14
**plausibility [3]** 28/25 42/7 42/8

**plausible [2]** 23/24 24/15
**play [4]** 5/25 12/15 14/3 76/9
**plays [1]** 7/5
**pleaded [1]** 23/22
**pleading [6]** 22/18 23/6 23/9 24/1 24/1 26/23
**pleadings [5]** 23/15 23/22 26/3 28/23 42/12
**please [1]** 4/6
**plenty [1]** 47/19
**plus [1]** 62/21
**point [10]** 11/10 17/19 35/4 35/12 53/15 56/1 56/13 59/4 77/18 78/11
**pointed [2]** 54/9 61/20
**points [2]** 30/24 59/6
**policy [7]** 54/2 55/8 55/9 55/11 57/12 59/7 61/6
**population [4]** 51/8 58/15 58/17 59/2
**portion [1]** 66/19
**Portland [6]** 1/10 2/5 2/14 2/16 2/20 3/3
**pose [1]** 32/8
**position [6]** 23/14 62/1 71/14 71/20 75/12 78/19
**possibility [3]** 11/3 29/1 42/7
**possible [3]** 24/20 24/21 72/24
**post [1]** 19/18
**postpone [1]** 72/10
**posture [1]** 10/14
**potential [1]** 14/23
**powerful [1]** 44/12
**practice [3]** 12/2 12/8

**preceded [2]** 29/6 40/12
**precisely [2]** 46/20 68/7
**predicate [1]** 41/17
**preemption [4]** 7/20 7/25 10/15 11/2
**preference [3]** 72/6 72/8 72/18
**prejudice [1]** 22/10
**preparation [4]** 5/2 76/11 76/13 76/15
**prepared [5]** 5/4 71/17 74/7 77/25 78/2
**present [3]** 2/21 14/4 48/11
**press [4]** 30/16 30/18 30/20 30/25
**pretext [1]** 44/9
**pretextual [6]** 37/9 37/13 37/24 38/4 38/15 43/20
**pretrial [1]** 69/7
**prevail [1]** 76/22
**previously [3]** 22/13 67/4 75/6
**price [1]** 13/22
**prima [3]** 43/1 43/13 43/23
**primarily [1]** 57/16
**primary [7]** 56/3 56/9 56/19 57/3 57/6 57/15 58/10
**principal [2]** 9/21 63/4
**prior [10]** 7/3 7/4 12/2 27/13 27/17 31/22 34/12 34/15 54/24 62/4
**probably [5]** 5/7 44/6 44/14 44/18 67/18
**problem [4]** 12/9 23/1 23/2 23/4

**procedural [3]** 57/8 7/7 7/22 8/13
**procedure [1]** 12/8
**proceedings [3]** 1/16 80/22 81/5
**process [26]** 8/3 8/8 8/13 18/6 27/10 40/8 40/9 41/1 44/14 46/12 46/22 48/8 51/5 51/6 51/19 51/20 51/22 52/3 52/11 54/7 60/14 61/14 62/3 75/16 76/5 76/21
**produce [3]** 20/1 75/24 76/19
**produced [1]** 46/3
**production [1]** 46/18
**professional [1]** 62/18
**proffered [10]** 37/9 37/12 37/23 43/20 43/24 43/25 44/15 44/18 44/22 46/3
**profit [1]** 1/3
**program [1]** 75/15
**progress [1]** 43/12
**prohibit [7]** 19/16 47/7 47/17 47/25 48/1 61/24 61/25
**prohibited [8]** 23/17 24/12 45/5 45/9 45/20 45/20 53/1 53/10
**prohibition [1]** 62/2
**prohibitions [1]** 45/13
**prohibits [5]** 47/7 47/18 48/2 48/2 62/1
**projected [1]** 20/3
**promising [2]** 38/11 57/8
**prong [2]** 63/11 63/17
**prongs [1]** 37/6
**proof [1]** 53/13
**proper [3]** 14/8 15/7 55/8

**property [2]** 8/7 8/10
**proposing [1]** 48/8
**protected [12]** 8/3 8/8 8/9 22/8 31/10 32/13 32/14 32/20 32/23 33/18 33/20 34/2
**protocol [1]** 13/17
**provide [4]** 6/25 20/4 21/5 78/1
**provided [5]** 16/6 16/7 16/9 25/6 59/14
**provider [1]** 66/8
**provider's [1]** 49/15
**providers [8]** 49/13 51/16 51/16 57/6 57/15 63/6 65/23 68/23
**proving [1]** 64/23
**provision [3]** 10/6 10/10 10/16
**proximate [1]** 39/14
**proximity [14]** 30/2 30/4 31/12 31/14 31/18 32/11 33/11 33/19 37/10 37/17 39/9 52/5 53/17 53/17
**PTC [1]** 79/13
**public [8]** 23/13 24/19 24/23 28/21 28/25 40/2 40/4 41/4
**publicly [1]** 31/10
**punish [3]** 27/18 29/19 33/21
**punishment [2]** 34/3 34/4
**pure [1]** 23/10
**purportedly [1]** 30/18
**purpose [20]** 23/9 26/24 28/10 28/11 29/4 29/5 31/3 38/24 40/11 45/25 62/20 62/25 63/2

63/3 63/18 63/25 64/23 67/25 68/2 68/6
**purposes [9]** 7/18 8/4 8/18 42/13 42/14 44/23 64/17 68/15 70/14
**put [10]** 5/14 15/10 18/13 34/20 46/19 48/14 64/5 64/9 64/11 67/11
**put in [1]** 5/14
**puts [1]** 9/13
**putting [4]** 5/15 12/17 19/3 61/4

## Q

**qualified [3]** 24/18 28/21 69/24
**quarterly [1]** 57/7
**question [21]** 12/6 12/7 14/2 14/18 19/9 24/11 28/3 28/9 31/25 32/14 41/2 42/19 45/3 45/19 55/7 60/23 64/24 65/1 66/22 70/10 70/25
**Question: [1]** 67/13
**Question: Your [1]** 67/13
**questions [3]** 20/20 29/15 66/5
**quickly [4]** 76/23 78/3 78/24 79/1
**quite [3]** 8/5 12/6 45/6
**quote [1]** 66/4
**quoting [3]** 9/22 63/8 64/17

## R

**raise [1]** 39/10
**raised [6]** 26/9 34/19 45/2 48/15 67/6 75/7
**rapidly [1]** 78/1
**rate [46]** 5/23 6/3 6/19

8/19 11/17 27/10 40/9 41/1 42/21 43/16 45/15 46/11 46/20 47/1 47/3 47/5 49/1 49/5 49/6 49/8 49/25 50/7 50/10 50/14 50/18 50/21 50/21 51/1 51/3 51/4 51/5 51/8 52/10 55/22 56/13 57/13 58/1 58/4 58/16 58/22 59/5 59/9 60/14 60/14 60/19 61/18
**rate-setting [5]** 6/19 40/9 41/1 52/10 60/14
**ratemaking [2]** 43/4 75/15
**rates [85]**
**rather [2]** 21/21 28/25
**rational [3]** 25/17 32/21 44/6
**rationale [2]** 26/1 55/11
**reached [3]** 30/8 37/22 59/17
**read [4]** 9/9 9/10 17/7 42/6
**reading [1]** 8/24
**ready [4]** 56/15 56/22 71/18 78/24
**real [4]** 17/19 17/24 42/19 70/8
**really [20]** 6/1 10/25 13/4 14/17 19/9 19/15 19/19 19/21 26/12 29/16 34/1 41/10 42/17 42/20 43/17 44/8 44/22 50/14 57/16 79/6
**reason [19]** 22/21 25/23 30/12 38/2 38/24 39/16 43/20 44/5 50/3 51/2 58/13 64/7 65/16 66/11 67/22 70/21 73/7 79/15 79/17

**reasonable [5]** 20/4 49/22 60/17 60/18 61/20
**reasoning [1]** 20/19
**reasons [14]** 8/8 24/22 41/11 41/13 41/17 43/18 43/19 47/19 47/21 47/23 52/14 57/11 60/21 75/12
**recall [2]** 34/25 74/14
**receive [2]** 70/1 78/22
**received [2]** 49/13 80/8
**receiving [2]** 8/10 18/5
**recess [4]** 41/25 42/1 80/20 80/21
**recitations [1]** 23/19
**recollection [1]** 60/8
**record [21]** 4/6 12/13 15/21 21/11 30/10 30/16 39/24 40/16 41/4 42/13 46/1 46/19 48/14 48/18 53/11 54/9 54/13 59/22 64/5 64/9 81/5
**recoup [1]** 47/3
**recoupment [1]** 69/10
**redetermination [4]** 35/2 35/4 35/7 39/2
**reduce [1]** 56/2
**reduced [4]** 46/5 50/25 51/18 75/14
**reduces [1]** 75/15
**reducing [2]** 46/14 60/1
**reduction [1]** 51/1
**reductions [1]** 51/14
**refer [1]** 7/2
**referenced [1]** 9/10
**reflect [1]** 23/16
**reflecting [1]** 49/12
**reflects [1]** 52/9

**regards [1]** 17/25
**region [3]** 50/1 50/5 50/12
**regional [2]** 50/21 52/16
**regionally [2]** 49/6 49/8
**regulation [2]** 14/7 61/8
**regulations [3]** 10/7 10/10 15/23
**regulatory [3]** 10/20 40/9 61/4
**reimbursement [14]** 53/18 54/2 55/8 55/9 56/4 56/9 56/20 57/3 57/12 58/10 59/7 60/24 61/5 61/6
**reimbursements [2]** 55/18 59/1
**reiterate [1]** 68/25
**relating [2]** 14/6 41/2
**relationship [6]** 10/24 62/18 62/19 64/3 64/18 69/1
**relationships [4]** 62/17 63/5 68/20 68/21
**relative [2]** 35/24 72/10
**relatively [2]** 27/11 29/3
**releases [1]** 30/21
**relevance [1]** 55/5
**relevant [4]** 6/13 9/11 54/18 66/12
**relied [4]** 14/5 14/20 15/3 27/4
**relies [1]** 8/1
**rely [4]** 12/4 15/6 32/21 44/6
**relying [4]** 15/20 18/16 29/22 69/15
**remedy [5]** 6/22 7/1 9/2 18/17 19/1

**remember [1]** 58/7
**remove [1]** 71/9
**removed [2]** 12/12 55/23
**removing [1]** 56/5
**renewed [1]** 26/8
**repeatedly [2]** 10/23 36/18
**replacement [1]** 71/13
**reply [2]** 43/22 74/6
**report [7]** 18/14 30/17 57/7 61/15 63/23 76/19 77/22
**reported [1]** 49/11
**REPORTER [2]** 3/2 81/11
**reporter's [1]** 31/3
**reporting [1]** 65/8
**reports [7]** 63/25 75/25 78/6 78/8 78/12 79/8 79/11
**represented [1]** 71/2
**representing [3]** 4/9 4/11 4/22
**request [3]** 28/5 46/7 71/25
**require [2]** 25/9 42/7
**required [4]** 11/15 12/16 14/11 21/9
**requirement [3]** 13/2 23/8 28/25
**requirements [5]** 11/19 12/24 13/9 20/25 22/18
**requires [4]** 6/15 21/9 23/19 53/11
**resigned [1]** 32/3
**resolution [3]** 36/20 40/1 69/12
**resolve [1]** 36/22
**respect [1]** 73/9
**respond [4]** 20/21 29/8 73/15 77/14

**responded [2]** 30/24 77/16

**response [6]** 22/22 30/18 63/7 69/17 72/1 73/19

**responsible [1]** 26/18

**rest [1]** 70/4

**restrictions [2]** 41/2 77/4

**restricts [1]** 48/10

**rests [1]** 6/9

**result [1]** 77/5

**resulting [1]** 13/1

**results [1]** 39/1

**retaliation [8]** 21/20 30/3 31/13 31/16 34/11 36/16 41/16 42/3

**retaliatory [6]** 22/15 28/10 28/22 29/5 32/2 33/19

**revenue [2]** 66/2 67/12

**review [30]** 5/22 6/3 6/7 6/23 10/2 10/17 13/6 15/8 15/13 15/16 15/16 15/23 15/24 16/1 16/6 16/25 19/6 19/6 19/11 20/2 20/7 20/14 20/16 22/3 30/22 34/22 34/23 52/24 53/19 61/5

**reviewing [3]** 9/23 10/2 10/5

**reviews [2]** 30/19 30/21

**right [49]** 5/12 7/18 9/6 11/2 12/18 15/5 18/8 18/25 19/12 19/13 20/11 20/15 20/15 20/17 21/19 25/20 26/6 27/13 28/3 28/13 29/7 34/7 37/4 38/18 39/20

45/10 46/16 48/12 53/25 62/7 63/7 64/22 65/10 70/19 71/22 72/12 72/15 73/9 73/14 73/20 74/1 74/5 74/14 74/18 75/8 77/14 78/7 78/21 80/11

**rights [2]** 18/2 22/8

**ripe [1]** 69/11

**rising [1]** 54/24

**risk [11]** 51/4 51/9 51/10 58/13 58/14 58/17 58/21 58/24 59/2 59/8 59/9

**risk-adjusted [2]** 58/13 59/9

**RMR [2]** 3/2 81/10

**road [1]** 16/13

**Robert [1]** 24/24

**robust [1]** 15/23

**Room [1]** 3/3

**round [4]** 56/11 56/17 56/17 57/1

**rounds [2]** 56/11 56/16

**rule [4]** 21/4 36/11 61/4 67/23

**ruled [1]** 22/8

**ruling [11]** 7/23 8/1 8/13 9/11 9/13 9/16 10/24 69/2 69/4 70/8 78/8

**rulings [6]** 7/7 7/7 7/8 8/16 69/1 69/2

**Rumsey [2]** 66/7 66/12

# S

**S.W [4]** 2/13 2/16 2/19 3/3

**said [17]** 19/1 27/24 30/12 36/7 36/18 37/20 37/21 38/7 38/11 38/17 53/20 54/7 56/21 59/8

**same [23]** 11/5 16/14 22/13 23/11 26/5 26/7 26/9 43/18 49/6 49/7 50/3 50/6 50/9 50/10 50/21 51/4 53/23 64/20 66/2 73/1 77/4 77/14 79/8

**Savers [1]** 31/16

**saw [1]** 30/9

**SAXTON [7]** 1/9 2/18 32/3 32/6 56/21 79/24 80/18

**Saxton's [1]** 80/4

**say [38]** 7/4 9/12 9/16 10/1 11/2 12/11 12/18 13/3 14/4 14/11 14/22 15/1 15/6 15/14 16/2 22/13 25/18 31/7 33/24 42/2 43/22 44/15 48/2 52/15 52/16 55/19 56/8 56/13 57/8 58/2 58/19 59/6 63/8 65/12 65/17 66/23 67/1 75/10

**saying [12]** 12/1 13/14 16/25 17/22 18/24 27/4 30/21 36/23 37/1 37/2 54/15 64/18

**says [16]** 10/2 10/20 13/16 15/5 20/8 20/14 25/11 27/6 33/10 37/25 38/19 54/23 56/13 59/25 66/8 66/20

**scale [2]** 76/11 76/12

**scene [1]** 26/21

**schedule [1]** 77/14

**scheduling [1]** 70/20

**Scheele [1]** 73/18

**scheme [1]** 17/24

**scope [1]** 34/22

**Scott [2]** 2/15 4/10

**se [1]** 70/1

**seal [1]** 66/19
**seated [1]** 71/4
**Seattle [1]** 2/9
**second [9]** 6/5 23/21 27/6 37/5 37/18 56/1 58/11 62/25 66/15
**Secondly [1]** 31/19
**secretary's [1]** 10/17
**Section [5]** 7/16 8/4 8/12 9/22 9/25
**see [7]** 21/8 39/1 39/2 61/2 69/6 75/25 77/22
**seeing [2]** 17/17 54/11
**seek [2]** 13/2 13/6
**seeking [5]** 5/22 19/10 49/12 69/25 77/2
**seeks [2]** 7/1 9/3
**seem [1]** 62/24
**seems [2]** 42/20 79/21
**seen [1]** 33/9
**senator [1]** 30/9
**sending [1]** 61/3
**sends [1]** 30/20
**sense [9]** 12/14 14/3 16/14 25/12 25/14 25/18 26/3 41/6 57/22
**sent [2]** 30/25 35/3
**separate [6]** 13/18 14/2 14/8 20/6 20/16 73/24
**September [5]** 1/7 4/2 32/5 77/11 81/9
**September 1 [1]** 32/5
**September 18th [1]** 77/11
**series [2]** 47/2 56/23
**serious [1]** 75/13
**Service [4]** 16/21 17/1 17/3 68/6
**set [29]** 4/3 7/14 11/19 14/10 14/18 14/24 15/7

15/17 18/7 32/6 35/1 41/12 44/5 49/2 49/5 49/5 49/8 51/6 52/1 52/11 53/5 57/12 59/23 60/24 60/24 73/17 79/11 79/15 79/25
**sets [1]** 41/10
**setting [30]** 5/23 6/3 6/19 8/12 8/19 11/15 12/23 13/2 14/18 15/3 16/2 18/10 20/25 27/10 28/20 28/24 34/17 40/9 41/1 42/21 46/11 49/2 52/10 55/22 59/5 60/14 60/14 60/19 61/18 79/21
**settings [1]** 12/22
**settlement [50]** 41/24 42/15 45/11 45/14 45/17 45/21 46/4 46/17 46/22 47/1 47/4 47/8 47/9 47/11 47/11 47/14 47/14 47/21 47/24 48/7 48/17 48/20 49/14 51/21 51/22 51/23 51/23 51/24 52/1 52/10 52/13 52/21 53/5 53/10 53/12 53/20 53/23 54/4 54/6 54/8 54/15 54/21 54/24 55/3 59/23 60/1 60/12 61/22 62/9 62/14
**settles [2]** 42/18 79/20
**several [2]** 30/8 34/16
**severe [1]** 51/7
**shall [3]** 21/16 45/12 45/13
**Shannon [1]** 2/19
**Share [10]** 38/22 49/7 50/6 56/10 66/9 66/13 66/13 67/8 72/14 73/7
**she [12]** 15/15 32/3 59/6 59/8 59/14 59/18

66/23 66/24 67/1 67/2 67/13 67/16
**She's [1]** 31/5
**shifted [1]** 76/12
**ship [1]** 27/16
**short [3]** 29/3 33/22 40/17
**shortens [1]** 35/9
**shorthand [2]** 8/5 26/13
**shortly [5]** 24/2 34/6 54/3 54/21 74/7
**should [12]** 11/4 22/23 26/8 35/14 53/20 55/1 59/10 61/19 71/6 72/24 73/4 78/1
**shouldn't [2]** 70/6 75/10
**show [7]** 18/19 29/22 29/25 30/1 43/19 44/8 58/8
**showing [1]** 46/14
**shown [2]** 60/22 68/17
**shows [6]** 46/4 46/20 48/14 48/18 66/4 76/8
**Shumway [3]** 3/2 81/9 81/10
**side [1]** 40/2
**sides [6]** 40/1 43/6 43/6 43/11 63/21 79/10
**sign [8]** 35/8 35/9 38/8 38/20 38/23 65/16 67/8 75/22
**signature [2]** 81/7 81/7
**signed [4]** 53/23 54/4 54/22 77/3
**significant [2]** 24/25 67/12
**signing [1]** 81/4
**similar [1]** 54/5
**simple [1]** 23/15
**simply [4]** 24/20 26/23

**simply... [2]** 45/23 51/25

**since [7]** 9/13 42/3 43/10 44/17 70/25 71/8 75/14

**sincere [1]** 9/17

**single [3]** 50/12 52/20 52/25

**sir [4]** 71/1 72/13 78/7 80/6

**Sit [1]** 71/3

**situation [2]** 16/14 40/5

**sleight [1]** 23/3

**slightly [1]** 8/24

**slow [1]** 31/1

**smear [1]** 32/4

**so [129]**

**so-called [4]** 25/17 27/3 40/22 54/2

**solely [2]** 12/4 48/18

**Solutions [1]** 73/4

**some [17]** 12/22 12/25 19/16 22/21 25/15 29/5 36/3 42/4 43/7 46/17 46/19 55/5 56/12 59/20 64/20 73/5 78/10

**somebody [1]** 16/7

**somehow [3]** 18/15 35/23 58/4

**something [23]** 9/4 11/5 14/1 15/1 18/10 24/15 36/10 36/19 39/11 44/6 44/6 44/13 44/24 45/24 52/5 54/16 54/25 55/1 55/1 57/4 59/6 66/14 79/22

**sometime [1]** 74/11

**sometimes [1]** 49/10

**somewhat [1]** 27/10

**Sonia [2]** 2/23 72/18

**sorry [3]** 31/2 46/9 53/20

**sort [19]** 5/25 6/15 6/23 8/2 8/6 8/7 9/4 9/8 9/13 23/3 26/12 31/21 32/18 41/19 43/6 43/13 43/17 70/19 75/18

**sorts [3]** 19/9 19/19 62/9

**sought [1]** 69/19

**sound [19]** 6/11 6/17 8/2 8/10 9/24 12/5 14/1 14/9 15/3 18/5 18/9 20/1 20/3 20/10 20/13 21/6 21/15 53/9 70/1

**soundness [23]** 6/18 6/20 8/18 9/1 9/8 9/8 10/18 11/13 11/22 12/10 12/12 12/15 13/1 13/5 13/10 13/19 13/24 14/3 14/6 14/13 14/25 19/23 21/17

**source [1]** 25/16

**span [1]** 26/15

**speaker [1]** 33/21

**speaking [5]** 5/11 8/15 35/21 71/23 71/24

**special [2]** 4/7 4/14

**specific [7]** 23/12 33/11 40/20 52/9 53/8 62/3 65/15

**specifically [8]** 36/1 40/23 42/9 56/1 65/25 67/14 68/14 74/15

**speech [8]** 22/16 31/10 32/15 33/18 37/8 37/12 37/19 39/14

**spend [1]** 48/25

**spent [1]** 62/23

**spoken [1]** 30/14

**stage [4]** 25/16 35/23 36/2 36/12

**stand [1]** 39/25

**stand-down [1]** 39/25

**standard [6]** 28/23 29/20 29/21 42/7 42/7 42/12

**start [10]** 5/9 9/14 21/24 31/23 41/23 44/25 45/4 56/5 63/18 74/11

**started [6]** 48/17 48/19 48/20 51/22 54/8 57/16

**starting [2]** 5/7 74/13

**startling [1]** 60/7

**starts [3]** 42/25 54/3 56/7

**state [48]** 1/7 4/6 4/8 4/11 5/23 6/2 6/8 6/14 7/14 7/19 7/24 9/10 11/11 11/12 11/14 11/15 11/18 11/19 11/24 12/1 12/8 12/16 13/16 14/5 14/6 14/14 15/11 15/14 15/17 15/22 16/24 16/24 17/14 18/13 18/14 19/2 20/6 20/12 20/18 20/20 21/3 21/8 27/7 30/8 32/3 33/5 42/17 68/3

**stated [3]** 8/9 45/12 45/25

**statement [1]** 66/15

**statements [5]** 64/6 64/12 64/24 65/22 79/19

**states [6]** 1/1 1/18 3/2 9/22 10/5 20/3

**stating [1]** 65/15

**statute [8]** 9/25 10/4 10/14 10/15 18/2 20/8 20/14 21/4

**statutes [2]** 9/10 9/11

**statutorily [1]** 8/2

**S**

**statutory [3]** 8/7 10/20 17/24
**stay [2]** 38/20 38/25
**step [4]** 23/21 51/5 51/20 61/14
**Stephen [2]** 2/3 4/16
**stepped [1]** 41/19
**steps [7]** 11/14 12/16 13/15 13/16 47/13 60/19 60/19
**still [9]** 27/11 31/5 33/17 33/17 44/20 64/25 72/3 76/23 79/16
**stopped [1]** 40/8
**straight [1]** 79/12
**stream [2]** 41/20 67/12
**streams [1]** 6/7
**Street [3]** 2/5 2/16 2/19
**strengths [1]** 35/24
**strip [1]** 26/20
**subject [1]** 42/4
**submit [4]** 12/3 21/10 65/21 79/7
**submitted [8]** 21/23 38/9 48/20 50/2 51/10 64/25 65/18 67/25
**submitting [1]** 20/25
**Subsection [1]** 21/15
**substantial [17]** 6/6 8/23 11/24 12/19 14/16 14/19 15/2 18/6 18/20 18/22 27/2 29/18 29/22 30/1 37/6 39/6 41/18
**substantially [2]** 32/19 33/13
**substantive [4]** 7/8 8/13 21/8 62/15
**substitute [1]** 64/15
**such [7]** 6/21 7/20 11/3 13/20 39/16 62/4 69/6

**Suchorzewski [3]** 71/11 71/11 75/22
**sue [4]** 7/18 9/6 16/6 17/25
**suffered [1]** 50/6
**sufficient [7]** 24/18 26/23 28/23 41/21 45/3 68/17 73/7
**suggested [1]** 60/21
**suggesting [1]** 19/16
**suggests [3]** 31/14 34/9 38/13
**suing [2]** 16/3 16/4
**suit [1]** 19/18
**Suite [3]** 2/8 2/13 2/19
**summarize [1]** 5/23
**summary [48]** 5/25 6/9 7/6 10/25 11/6 11/7 17/21 25/9 26/6 26/10 26/24 27/19 28/18 28/23 35/22 36/2 36/12 36/20 37/14 39/5 41/8 41/11 41/13 41/16 41/22 42/13 42/14 44/19 44/23 53/11 60/9 60/16 62/13 62/15 63/14 63/15 64/16 68/11 68/15 68/18 68/22 69/2 69/3 69/14 69/16 70/2 70/5 79/24
**supplied [1]** 59/16
**supply [1]** 76/7
**support [19]** 12/19 18/7 22/14 22/14 23/14 23/16 27/2 38/9 40/14 40/25 41/21 44/1 44/17 54/10 61/1 61/9 61/20 62/1 62/12
**supported [7]** 6/6 8/23 14/19 15/2 18/19 18/22 40/13
**supports [1]** 31/16

**supposed [4]** 11/16 11/17 28/7 74/15
**sure [12]** 13/10 15/25 17/6 22/22 24/14 27/8 28/6 29/24 35/20 53/22 71/7 73/9
**surface [2]** 15/16 15/24
**surface-level [2]** 15/16 15/24
**surreply [1]** 65/22
**survive [2]** 7/23 39/5
**susceptible [1]** 36/19
**suspicious [1]** 39/11
**sustainable [1]** 57/9
**switched [1]** 23/4
**switching [1]** 66/12

**T**

**tail [1]** 31/21
**take [17]** 5/16 11/15 13/15 13/16 14/24 24/20 41/23 44/24 46/24 47/13 55/21 55/25 56/2 72/10 75/5 76/14 79/5
**taken [8]** 5/13 16/24 36/8 38/10 39/13 42/1 56/12 71/6
**takes [4]** 32/5 34/6 34/24 75/11
**taking [2]** 24/2 40/2
**talk [5]** 30/7 35/18 54/11 55/16 77/22
**talked [2]** 43/11 53/17
**talking [7]** 8/5 10/14 45/24 48/7 48/25 54/1 54/19
**talks [2]** 30/17 48/5
**target [2]** 56/1 57/1
**targeted [3]** 40/21 41/1 57/4
**targeting [1]** 56/25

**targets [1]** 56/18
**tasks [1]** 16/17
**teed [1]** 71/8
**tell [3]** 25/15 75/8 78/2
**temporal [9]** 31/12 31/14 31/18 32/11 33/10 33/18 37/10 37/16 53/17
**ten [5]** 24/5 32/10 32/20 32/23 33/8
**tens [1]** 55/24
**tentative [10]** 5/6 5/20 9/11 9/17 20/19 21/21 35/4 41/12 42/16 75/9
**tentatively [1]** 8/15
**termed [1]** 43/1
**terms [12]** 7/21 11/23 13/15 13/25 18/3 31/24 53/17 60/13 61/23 68/9 76/10 76/15
**test [4]** 23/21 24/14 25/13 37/7
**testified [2]** 15/15 60/7
**testifies [1]** 66/21
**testimony [13]** 14/6 15/11 30/11 37/20 46/2 52/23 63/8 64/6 64/22 66/16 67/13 68/14 78/4
**testing [1]** 23/9
**than [18]** 5/19 6/15 8/13 11/1 11/12 12/9 21/21 23/1 29/1 38/2 48/10 50/15 53/4 54/16 55/13 55/24 56/24 74/16
**Thank [25]** 5/1 9/15 9/20 20/17 21/19 29/7 29/9 39/7 41/9 45/1 53/14 61/10 62/5 63/19 65/19 68/10 69/9 72/8

72/15 74/1 75/2 80/3 80/6 80/11 80/20
**that [642]**
**that's [60]** 6/23 9/4 9/9 9/9 10/19 10/25 15/25 17/25 18/12 18/14 18/18 18/21 19/8 24/14 25/18 27/4 27/4 27/5 27/15 30/6 31/12 31/16 31/18 31/25 33/22 33/24 34/8 36/10 37/21 38/2 40/22 40/23 42/10 43/9 44/5 44/12 45/3 54/8 54/22 55/17 55/24 57/9 57/10 57/11 59/10 60/15 62/7 63/16 66/5 66/19 68/16 69/24 70/8 73/7 76/2 76/11 77/1 79/5 79/9 80/10
**their [25]** 7/2 12/1 12/2 19/4 22/12 24/8 25/7 29/3 35/7 35/10 40/2 44/2 46/16 48/8 52/14 52/25 53/13 59/3 60/21 61/5 62/1 64/7 65/16 75/24 75/25
**them [26]** 11/21 12/9 12/25 16/17 19/11 19/11 21/1 21/10 35/9 37/25 49/22 50/17 50/18 52/21 61/3 63/6 72/19 72/19 73/4 76/4 76/17 76/18 76/19 76/25 77/2 78/23
**then [67]** 5/20 6/13 6/22 13/3 13/10 15/20 15/21 16/20 17/21 18/5 18/9 18/12 18/14 18/17 20/15 21/15 23/22 24/1 25/17 32/4 32/9 32/9 32/21 32/23 32/23 32/24 33/8 34/4 34/5

34/23 35/19 36/13 37/5 37/8 37/13 37/23 39/20 40/4 42/1 43/14 43/21 43/24 44/7 44/11 44/14 47/13 50/25 51/8 53/18 54/25 56/10 58/11 60/25 61/4 61/7 64/24 65/13 66/14 68/25 69/25 70/2 70/19 71/1 74/2 74/18 77/21 79/15
**theories [3]** 6/1 12/7 23/4
**theory [6]** 5/25 8/19 8/23 9/2 13/5 13/11
**there [90]**
**there's [26]** 10/4 12/19 15/4 17/22 19/5 20/5 20/13 28/6 30/16 34/5 35/16 38/3 38/24 45/3 49/7 54/12 54/15 54/19 54/19 55/5 56/8 59/25 63/14 75/19 76/9 79/16
**therefore [4]** 6/12 6/19 8/19 25/2
**these [9]** 5/22 13/16 32/25 33/2 41/7 45/18 63/5 65/23 72/4
**they [124]**
**they knew [1]** 60/3
**They'd [1]** 60/20
**they're [5]** 5/15 6/2 17/16 54/11 63/9
**they've [5]** 23/4 44/2 56/12 61/9 61/13
**thing [12]** 10/12 16/12 33/23 37/23 38/16 40/14 51/13 54/9 58/11 62/4 75/8 75/10
**things [12]** 10/12 15/22 19/19 29/25 39/4 42/9 55/19 57/24 60/8 62/10 75/11 76/12

| | | |
|---|---|---|
| **think [56]**  5/7 5/18 6/9 9/21 12/11 12/14 12/21 13/17 14/1 14/14 15/4 19/22 20/23 27/8 27/9 28/1 33/14 33/15 34/8 34/12 35/16 41/5 42/10 42/11 43/9 43/10 43/11 43/11 44/20 45/4 53/8 53/11 56/15 56/21 57/21 60/17 61/12 61/19 62/9 62/23 62/23 63/11 63/20 64/21 66/14 68/1 68/11 70/8 70/13 72/18 72/21 73/6 75/14 76/3 77/1 77/10 | **though [4]**  15/10 16/25 50/1 77/25 | **too [1]**  58/20 |
| | **thought [9]**  44/5 44/9 44/14 47/17 48/8 54/16 59/8 59/8 76/3 | **took [9]**  32/7 36/10 40/4 51/21 52/2 54/21 60/18 60/19 61/15 |
| | **thoughtful [1]**  5/2 | **Top [1]**  68/6 |
| | **thoughts [2]**  5/6 9/17 | **tortious [2]**  62/16 68/20 |
| | **three [17]**  7/12 7/15 29/24 29/25 30/1 31/15 37/16 39/4 39/5 56/16 70/25 71/14 71/17 72/4 72/9 75/7 75/14 | **totally [1]**  22/21 |
| | | **towards [4]**  13/10 44/18 63/9 64/19 |
| | **threshold [1]**  59/15 | **transcript [3]**  1/16 81/5 81/6 |
| | **through [6]**  47/2 47/23 50/25 51/23 55/22 56/10 | **transfer [4]**  38/1 38/6 38/14 38/21 |
| **thinking [4]**  43/17 44/4 57/12 71/6 | | **transition [1]**  28/11 |
| | **tie [1]**  39/20 | **treat [1]**  74/5 |
| **thinks [1]**  43/19 | **tied [1]**  56/19 | **treated [1]**  65/14 |
| **third [11]**  2/8 3/3 22/5 27/8 37/6 37/23 52/24 62/19 63/24 64/24 75/19 | **time [43]**  4/3 16/2 16/12 22/11 27/11 27/11 29/3 30/2 30/4 31/15 31/23 33/22 34/25 35/4 35/8 35/9 35/12 38/16 39/9 39/11 39/13 40/18 43/3 52/1 55/24 57/8 57/14 57/19 57/21 57/22 58/3 58/7 58/18 58/24 58/25 62/24 67/20 72/19 72/21 73/2 74/18 77/21 77/23 | **treatment [2]**  40/21 49/13 |
| | | **trend [1]**  13/22 |
| | | **trial [8]**  69/5 69/5 69/7 69/7 70/14 74/13 76/10 76/13 |
| **third-party [3]**  52/24 63/24 64/24 | | **tried [1]**  44/3 |
| **this [103]** | | **Trillium [1]**  72/25 |
| **this particular [1]**  36/12 | | **trio [1]**  43/14 |
| | | **trouble [1]**  9/7 |
| **this rate [1]**  58/1 | | **true [3]**  16/10 36/13 65/13 |
| **Thomas [1]**  2/4 | | |
| **thorough [1]**  16/5 | **timing [6]**  25/17 43/14 52/4 52/4 53/3 78/19 | **truth [3]**  23/9 63/25 64/23 |
| **those [37]**  6/7 8/7 8/16 12/3 12/3 12/7 12/8 18/10 23/18 23/23 24/10 26/22 27/20 30/25 33/5 35/21 36/5 37/13 40/17 45/12 52/15 52/20 53/9 64/4 64/6 64/12 64/20 68/13 68/21 68/23 69/16 71/16 76/12 77/10 | **today [10]**  19/19 69/2 70/8 70/10 71/18 72/4 72/9 77/2 77/5 77/17 | **try [1]**  76/17 |
| | | **trying [4]**  5/4 5/5 12/23 76/3 |
| | **together [9]**  8/16 12/18 18/14 19/3 42/6 72/19 72/21 72/24 73/5 | **Tuesday [3]**  73/22 73/23 74/2 |
| | | **turn [6]**  21/20 42/15 42/20 45/19 63/12 72/6 |
| | **told [2]**  66/24 67/2 | **turns [1]**  59/16 |
| | **Tom [1]**  4/22 | **two [27]**  6/1 6/7 6/10 6/25 8/16 28/15 31/10 32/9 32/10 32/16 32/22 |

**two... [16]** 33/5 33/23 34/1 39/1 41/10 55/19 62/23 66/5 66/14 69/19 71/9 74/3 75/16 75/19 75/21 76/12

**Twombly [4]** 23/2 23/7 35/13 42/6

**type [4]** 15/17 16/14 23/10 39/18

**types [2]** 19/15 23/11

**typical [2]** 7/10 39/13

**typically [5]** 5/6 28/17 28/19 39/12 75/12

**U**

**ultimately [1]** 52/12

**ultimatum [15]** 25/17 27/3 27/5 27/23 28/2 28/5 30/5 30/7 30/13 31/9 34/25 37/25 38/19 39/16 39/18

**unabated [1]** 39/22

**unadjusted [1]** 51/10

**unbiased [2]** 59/7 59/19

**under [38]** 5/23 9/24 11/10 12/1 12/16 12/18 14/7 15/8 15/22 16/22 18/24 18/24 19/25 20/2 21/2 21/7 23/6 23/8 23/17 25/9 29/17 29/24 36/6 36/9 37/13 39/5 41/5 45/14 54/2 54/6 65/2 65/5 65/6 65/24 66/19 67/21 68/6 69/3

**undercut [1]** 44/23

**underlying [3]** 12/24 13/9 21/8

**undermines [1]** 58/18

**underpinnings [1]** 13/7

**understand [10]** 9/20 10/13 10/23 11/9 29/14 49/1 66/3 77/8 79/2 79/14

**understanding [3]** 8/20 30/6 80/10

**understood [2]** 39/25 50/13

**underway [1]** 38/6

**undesignate [1]** 71/21

**unhappy [1]** 30/13

**UNITED [3]** 1/1 1/18 3/2

**unless [3]** 20/20 65/5 79/19

**unrelated [2]** 11/20 11/22

**unsupported [3]** 27/20 27/22 28/1

**unsustainable [3]** 51/17 51/17 58/19

**untethered [1]** 61/25

**until [4]** 54/21 78/10 78/22 79/11

**unusual [2]** 27/5 39/11

**up [28]** 8/14 10/22 13/11 15/8 16/12 16/17 24/8 29/3 31/6 36/4 36/4 39/19 44/5 50/14 54/4 54/21 56/23 56/24 57/13 61/4 61/7 65/16 71/6 71/8 72/4 72/19 75/5 76/14

**upcoming [1]** 70/20

**us [6]** 12/4 16/13 20/12 22/18 52/14 78/10

**use [24]** 13/18 14/25 17/11 17/17 25/12 26/3 28/16 43/7 45/12 45/13 45/23 46/4 46/17 47/1 48/2 48/4 48/11 57/13 57/19 59/23 60/1 60/11

**used [14]** 17/11 22/13 22/14 25/25 40/14 45/17 46/11 51/20 52/10 53/2 57/21 62/4 70/11 73/12

**useful [2]** 43/9 43/11

**using [4]** 45/21 45/21 45/24 47/14

**utilization [3]** 13/22 46/22 53/9

**utilize [5]** 11/16 12/16 12/17 14/7 17/15

**utilized [2]** 51/20 52/21

**utilizing [4]** 47/7 47/9 51/24 53/1

**V**

**vacillated [1]** 5/5

**various [1]** 34/4

**verdict [1]** 62/13

**verify [1]** 70/13

**versus [2]** 40/22 51/3

**very [16]** 11/1 11/5 15/21 20/17 22/3 26/18 30/4 33/11 33/11 40/17 40/19 49/1 53/7 75/2 78/24 79/1

**via [1]** 62/20

**view [13]** 6/20 8/15 18/10 28/7 54/23 57/18 62/17 63/13 68/12 68/21 69/18 69/20 72/13

**views [6]** 5/20 21/21 41/12 42/16 42/17 75/9

**violate [1]** 22/7

**violated [1]** 8/20

**violates [1]** 6/5

**violations [2]** 12/8 24/20

**virtually [1]** 51/1

**voluntary [3]**  49/18 49/21 49/21

## W

**WA [1]**  2/9
**wait [6]**  39/1 39/2 78/14 78/22 79/5 79/10
**want [28]**  7/4 7/13 9/18 10/22 11/10 12/13 12/25 17/6 19/21 22/22 42/2 42/11 42/17 44/21 44/21 47/12 47/23 67/24 68/19 68/25 70/13 72/3 73/15 75/11 77/24 78/2 78/18 78/18
**wanted [2]**  46/24 53/22
**wanting [1]**  77/13
**wants [1]**  8/25
**warming [1]**  31/6
**warmups [1]**  5/16
**was [152]**
**Washington [1]**  16/16
**wasn't [5]**  7/18 8/23 12/6 14/12 44/8
**watch [3]**  34/7 34/10 34/12
**water [1]**  35/17
**way [21]**  8/5 14/10 14/16 21/3 24/12 34/14 43/11 44/18 45/17 46/17 46/25 47/12 55/10 55/12 56/2 56/7 60/12 62/11 65/14 76/13 78/2
**ways [1]**  34/16
**we [83]**
**we'll [8]**  29/20 41/23 69/6 73/17 75/5 76/14 78/5 80/20
**we're [18]**  11/1 30/22

38/7 44/4 45/24 46/1 53/22 54/1 54/16 54/24 56/9 57/9 62/15 70/16 70/19 77/6 78/17 80/9
**we've [8]**  30/10 30/21 31/18 41/10 41/11 46/19 48/14 64/25
**weak [1]**  41/20
**weaken [1]**  32/19
**weakened [2]**  32/24 33/13
**weeds [1]**  17/20
**week [1]**  15/15
**weeks [6]**  30/15 31/11 32/16 73/14 73/17 74/3
**weigh [1]**  29/2
**weight [3]**  36/24 36/24 37/1
**well [33]**  11/21 14/23 20/23 22/7 23/22 24/17 25/21 34/5 34/13 34/24 36/3 36/6 36/15 44/10 44/15 47/6 47/9 54/14 54/23 55/2 57/20 59/16 61/12 63/3 64/21 65/2 71/19 72/2 73/1 75/10 76/16 79/3 79/25
**well-established [1]** 22/7
**well-pleaded [1]**  23/22
**went [8]**  5/3 15/8 18/9 19/23 26/2 26/22 57/16 61/6
**were [60]**  7/24 13/1 13/9 18/7 22/5 22/9 23/10 23/25 25/1 25/6 25/25 26/2 26/2 34/18 34/19 35/1 35/3 35/3 36/13 37/9 37/13 37/24 39/2 39/3 40/1 40/15 40/17 46/13 47/4 48/6 48/18 48/22 48/22 49/4

49/21 49/22 50/24 51/15 51/16 51/17 51/17 53/4 55/4 55/5 55/14 55/20 59/19 60/20 60/22 60/24 64/12 64/13 65/7 65/22 67/10 71/5 71/18 76/4 78/16 78/22
**weren't [4]**  12/5 12/25 60/22 64/8
**what [91]**
**what's [6]**  29/16 35/2 61/22 69/19 72/6 78/12
**whatsoever [1]**  61/9
**when [19]**  8/17 9/5 10/14 15/23 24/5 26/19 29/2 31/23 31/25 32/4 39/14 40/3 41/3 49/24 50/3 52/7 55/19 57/23 60/16
**where [13]**  7/6 16/2 36/17 40/1 52/21 52/25 54/11 54/22 56/8 56/11 58/25 61/2 63/16
**whether [30]**  7/11 8/2 8/6 14/1 14/9 15/1 15/21 17/22 18/6 20/5 20/24 21/22 23/24 24/6 28/4 28/9 29/17 33/12 40/24 44/22 45/3 45/19 49/7 50/22 55/8 58/16 60/25 72/3 74/15 76/12
**which [42]**  5/6 5/18 5/19 8/1 10/1 11/2 11/16 11/17 13/6 16/24 17/14 19/11 19/11 19/13 22/8 23/18 24/16 24/20 25/1 26/15 28/7 37/4 37/7 41/13 43/15 46/19 46/19 47/20 50/5 51/12 53/1 53/10 58/19 61/5 62/11 63/6 63/24

**which... [5]** 65/15 65/17 66/2 68/14 75/6

**while [2]** 34/18 79/15

**whitewash [2]** 34/23 40/6

**whitewashed [1]** 40/22

**whitewashing [1]** 40/11

**who [18]** 16/3 16/7 17/10 26/1 26/21 28/21 29/8 30/11 30/12 37/20 49/4 49/20 59/5 60/7 63/8 64/16 66/7 76/20

**whose [1]** 49/25

**why [36]** 6/2 10/9 10/23 15/25 16/10 19/8 19/22 24/25 25/8 25/23 27/19 28/16 33/16 33/22 36/10 37/21 38/3 38/24 39/16 40/17 43/18 43/19 44/7 44/22 52/15 52/19 53/8 54/17 60/10 60/22 63/6 65/2 65/6 68/12 75/12 77/1

**will [17]** 5/11 8/14 10/2 28/1 29/8 29/9 31/22 35/8 63/10 68/16 73/19 74/11 75/6 76/18 76/23 76/23 77/19

**willing [2]** 38/23 75/22

**win [2]** 18/23 78/1

**window [2]** 58/8 58/25

**wish [1]** 21/22

**within [8]** 24/8 26/17 29/3 30/15 31/11 31/11 31/11 48/8

**without [9]** 22/11 24/15 40/2 47/1 51/23 58/13 73/5 76/20 81/6

**witness [3]** 46/2 63/22

**witnesses [4]** 60/7 63/24 65/7 71/10

**witnesses' [1]** 52/23

**won't [4]** 43/2 43/23 44/16 79/18

**word [1]** 42/3

**work [11]** 5/3 12/20 15/17 15/20 28/1 40/1 43/23 44/16 74/11 74/21 74/24

**worked [1]** 76/16

**works [3]** 12/21 12/22 74/25

**worried [3]** 25/19 38/1 38/7

**worries [1]** 43/16

**worse [2]** 50/18 50/18

**would [55]** 5/9 6/22 9/6 12/3 12/12 12/13 13/5 14/2 14/4 14/22 15/6 16/11 22/20 23/14 25/19 28/19 29/12 31/1 32/19 32/25 36/14 39/17 39/19 45/16 46/6 46/7 46/8 46/9 46/10 47/4 48/9 49/3 49/18 52/5 55/7 55/22 57/18 57/22 58/2 60/23 64/21 67/11 71/22 71/25 72/5 72/9 72/18 72/24 73/1 73/4 74/3 74/7 75/12 78/24 79/7

**wouldn't [6]** 32/24 47/2 47/10 47/12 47/20 60/2

**wrap [2]** 72/4 72/19

**writing [2]** 21/23 67/25

**written [1]** 71/25

**wrong [6]** 6/22 43/20 44/11 59/11 60/22 61/22

**wrote [2]** 10/12 61/7

**year [8]** 24/5 32/10 35/9 38/18 39/18 49/9 49/9 57/23

**years [13]** 22/17 26/16 32/1 32/9 32/15 32/22 33/6 33/24 34/1 34/3 39/21 57/5 66/14

**yes [22]** 4/7 5/10 21/25 31/21 53/3 68/24 70/18 70/23 72/16 73/16 74/9 74/20 74/22 74/23 75/3 75/4 77/12 77/15 78/7 79/7 79/14 80/5

**yesterday [5]** 71/25 73/13 73/19 73/20 73/25

**yesterday's [1]** 71/20

**yet [4]** 24/6 31/5 35/1 77/16

**you [196]**

**you give [1]** 44/10

**you'd [5]** 13/3 23/3 47/3 73/14 78/14

**you'll [4]** 42/23 55/16 70/11 78/1

**you're [13]** 18/8 18/24 19/15 29/22 48/8 57/23 57/23 58/20 64/21 69/25 71/7 77/5 77/13

**you've [15]** 5/13 9/18 13/9 13/10 17/7 21/23 23/1 23/2 44/16 45/2 48/15 69/21 73/10 76/2 80/8

**your [114]**

**Z**

**zero [3]** 36/24 36/24 37/1