IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FAMILYCARE, INC., an Oregon     )
non-profit corporation,         )
                                )
          Plaintiff,            )    Case No. 6:18-cv-00296-MO
                                )
     v.                         )
                                )
OREGON HEALTH AUTHORITY, an     )
agency of the State of Oregon,  )
PATRICK ALLEN, both             )    October 5, 2018
individually and in his         )
official capacity as director   )
of the Oregon Health Authority, )
and LYNNE SAXTON,               )
                                )
          Defendants.           )    Portland, Oregon
_____ )

Oral Argument

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT CHIEF JUDGE

APPEARANCES

FOR PLAINTIFF:                Ms. Alletta Brenner
                             Perkins Coie, LLP
                             1120 N.W. Couch Street, 10th Floor
                             Portland, OR 97209


                             Mr. Matthew P. Gordon
                             Perkins Coie, LLP
                             1201 Third Avenue, Suite 4800
                             Seattle, WA 98101


FOR DEFENDANTS OREGON
HEALTH AUTHORITY and
PATRICK ALLEN:               Ms. Brittany Simpson
                             Markowitz Herbold PC
                             1211 S.W. Fifth Avenue, Suite 3000
                             Portland, OR 97204


FOR INTERVENOR
DEFENDANT TRILLIUM:          Mr. Jeffrey D. Hern
                             Schwabe, Williamson & Wyatt
                             1211 S.W. Fifth Avenue, Suite 1600
                             Portland, OR 97204

FOR INTERVENOR
DEFENDANT
PACIFICSOURCE:               Mr. Eric A. Lindenauer
                             Garvey Schubert Barer
                             121 S.W. Morrison Street, 11th Floor
                             Portland, OR 97204


FOR INTERVENOR
DEFENDANT HEALTH
SHARE:                       Mr. Gregory A. Chaimov
                             Mr. Christopher F. McCracken
                             Davis Wright Tremaine, LLP
                             1300 S.W. Fifth Avenue, Suite 2400
                             Portland, OR 97204

FOR SCHRAMM HEALTH
PARTNERS:                  Ms. Sonia A. Montalbano
                           Elliott, Ostrander & Preston, PC
                           707 S.W. Washington, Suite 1500
                           Portland, OR 97205

FOR EASTERN OREGON
COORDINATED CARE:          Mr. Frank V. Langfitt
                           Miller Nash Graham & Dunn LLP
                           111 S.W. Fifth Avenue, Suite 3400
                           Portland, OR 97204

COURT REPORTER:            Bonita J. Shumway, CSR, RMR, CRR
                           United States District Courthouse
                           1000 S.W. Third Ave., Room 301
                           Portland, OR  97204
                           (503) 326-8188

(P R O C E E D I N G S)

(October 5, 2018; 10:05 a.m.)

THE CLERK:  Your Honor, this is the time set for oral argument in Case No. 6:18-cv-296-MO, FamilyCare, Inc. v. Oregon Health Authority, et al.

Counsel, please state your name for the record.

MS. SIMPSON:  Good morning, Your Honor.  Brittany Simpson on behalf of OHA.

MS. BRENNER:  Good morning.  Alletta Brenner on behalf of FamilyCare, Inc.

MR. GORDON:  Good morning, Your Honor.  Matthew Gordon on behalf of FamilyCare.

MS. MONTALBANO:  Sonia Montalbano on behalf of Schramm Health Partners.

MR. McCRACKEN:  Good morning.  Chris McCracken for Health Share, Your Honor.

MR. CHAIMOV:  Good morning, Your Honor.  Greg Chaimov for Heath Share.

MR. LINDENAUER:  Eric Lindenauer for PacificSource Community Solutions.

MR. HERN:  Jeff Hern on behalf of Trillium Community Health Plan.

MR. LANGFITT:  Good morning, Your Honor.  Frank Langfitt on behalf of Eastern Oregon.

THE COURT:  Thank you all for being here and for your

help in teeing up this issue for resolution today.

There is a specific three-document motion and a more general, I'll call it, all-document motion. I'd like to start with the general, not the specific motion, and so I'll just start with some tentative thoughts and then maybe some follow-up questions. Perhaps what would be helpful is to give you some idea of what I think the principal obstacles are for each side, and then follow up with more specific questions.

So for the general motion, I think FamilyCare's core problem is a lack of specificity. In an ideal world, what I would be resolving is a specific request for a particular document, with an explanation for how that document advances FamilyCare's need to do something.

Here, I think the core argument from FamilyCare is that it needs Mr. Murray's help to assist expert witnesses in the preparation of their expert reports. And so, again, nothing is ever really ideal, but if it were an ideal world, we'd say -- you'd be saying, here's the point an expert is trying to advance in the upcoming report, here's why they need Mr. Murray to advance it instead of doing it without him, and here's why Mr. Murray needs this document to perform that function. And that's missing from the general motion.

Now, I want to say how I understand that overlays with the protective order, because that's not the methodology of the protective order nor of most protective orders. The

protective order contemplates that if you have AEO designation really, or any confidential or AEO designation, and the party who desires the document to have -- to have greater access to a document disagrees with that, that the designating party and the desiring party are supposed to meet first and take a look at redaction or sanitization somehow, and if they can't resolve the matter, then it can be set up for court resolution, with the burden being on the designating party to justify the designation.

And that's fine as far as it goes, and here FamilyCare, both in the specific and also in the general motion, makes the argument that this -- well, really more in the specific motion, make the argument that this involves aggregate data and isn't really necessary to be AEO.  And Health Share in particular responds by saying it's not aggregate and here's why it's not aggregate.

If we got that far -- and we don't get that far in the general motion -- then I think it would be incumbent for me to be able to resolve it to understand better the specific need, for what purpose -- that is, for what is the expert up to -- and the specific document that supports it.  And that would allow me to evaluate the request to de-designate better.

So that's a long way of saying that the core problem with the general motion is that it sort of completely sidesteps that whole process, however that might be formulated, and is

really just a request for me to set aside the protective order and in a general way redo what Judge Armstrong did across the board.

So that's my core problem with FamilyCare, and I'll follow up with some specific questions, but I want to lay out the core problem so you can start thinking about it.

Health Share's core problem is one that almost all -- maybe all of the other CCOs joined in, and that is that they make three arguments, each of which has a fairly significant problem.

The first is that almost all of this material isn't relevant, premised on the idea that the requested documents don't go to the core issue in the case, the actuarial soundness of the rates set by OHA for FamilyCare.  And I've been misunderstood before, and I'm willing to contemplate the possibility that I'm bad at explaining what I'm saying, but I don't know how you could sit through our last hearing and come away with the idea that the core issue in this case is the actuarial soundness of the rates set by OHA, since that's the precise issue I excised from the case.  It's the only issue that's ever been on the table that's not in the case anymore. And so the argument that these are irrelevant because they don't help solve that issue doesn't advance the ball very much.

Then we take up two arguments that FamilyCare makes why this -- really they get at why what Judge Armstrong did

should be redone because things have changed.  One is that we're going to have a non -- it's described as a noncompetitive bidding process.  And this isn't so much a problem as a question.  I guess I've come away from reading the briefs unsure of the status of this upcoming bid.  Is it going to be noncompetitive?  Is it likely to be noncompetitive but not certain until it's certain?  You can't really say that it's noncompetitive because it could go a different direction?  Is that Health Share's argument?  I just don't know.

And then the last is that FamilyCare says, well, look, a lot of these are -- by the time they get around to being disclosed to us, they're going to be stale.  And that is a way in which the landscape could change from the time Judge Armstrong set this all up.  He could set up a system that over time is now starting to deal with stale documents.

And the answer is that they're not stale, but I don't know what makes them not stale.  Part of why I don't know what makes them not stale is I can't tell when they've become stale, and if I don't know what makes a document stale, I don't know what makes them non-stale.  So the argument I read leads me to believe that in five or six or seven years, you could still advance the idea that they're still not stale.

More specifically, it's currently the case, if I understand it, that the look-back will be two years but might be three, and it's sort of like the change in bidding.  I don't

know what to make of that.  Is it now two years but might be three?  Does the "might" mean that we sweep in a third year?  Or more fundamentally, it's also said not to be stale because FamilyCare's going to seek, as it always has, some newer documents.  And that seems like a non sequitur to me.  That FamilyCare might seek new documents doesn't tell me whether the documents they're currently seeking are stale really.  It has nothing to do with it.

So I need to know more about whether they're stale or not, because on the general motion, you know, if the documents are generally stale and if the bidding process is generally going to be noncompetitive, then against all of my normal instincts, I might have to rethink the entire setup of what Judge Armstrong did.

So those are general thoughts.  I'll start with FamilyCare with some specific questions, and then let you respond to my general concerns.

First, you asked for access for Bill Murray and Art Suchorzewski.  Is that how you say his last name?

MR. GORDON:  I believe that's close.

THE COURT:  Well, I'd like to be right, not close, if I can.

MR. GORDON:  Suchorzewski.

THE COURT:  Suchorzewski.  All right.

And I don't understand why you need both.  I mean,

specifically, what does Mr. Suchorzewski add that Mr. Murray doesn't provide?  Because if he adds nothing, then we don't need two; one will do.

Can you help me with that?

MR. GORDON:  Sure.  Thank you, Your Honor.

On your specific -- do you want me to address that specific question now?

THE COURT:  Yes.

MR. GORDON:  So on that point, the reason that we need two is because there are so many AEO documents.  As we've indicated in our briefing, there are more than 19,000 documents that have been designated AEO.  Many of those we believe have been over-designated and have been the subject of previous motions.  But Mr. Suchorzewski has been deeply involved.  He is not -- he doesn't have the expertise that Mr. Murray has, to be clear, but he has been deeply involved in helping with litigation and in reviewing documents, so he has acquired a deep knowledge of the case.

And because there -- if we were only talking about 50, 100 documents, then it would be fine to just have Mr. Murray.  But given the volume of AEO documents out there, it's helpful to have an additional person who is able to look at them and assist Mr. Murray, because Mr. Murray is very bright and he's very capable, but he's only one person.

THE COURT:  So you're just going to divide it up into

9500 documents each or something?

MR. GORDON:  I don't know that they have that particular game plan, but I know that they work very closely together on reviewing these -- reviewing the documents that have been produced in litigation and work with each other.

THE COURT:  Thank you.

MR. GORDON:  You're welcome.

THE COURT:  What does Mr. Murray provide?  Well, am I right that the core need you're expressing here is for Mr. Murray to see these documents in order to assist in the preparation of the expert reports?

MR. GORDON:  That's part of it, Your Honor.  And part of it is just more generally to assist in litigation. Mr. Murray is probably the most knowledgeable person at FamilyCare about the rate-setting issues and about the data issues and about, in particular --

THE COURT:  I understand that he's very knowledgeable.  I don't need you to go into much detail on that.

MR. GORDON:  Okay.  So it's not just the expert reports, it's also general assistance with litigation.  He's -- I've done my best to get up to speed on this.  Our expert is very good, but Mr. Murray knows this stuff certainly better than I do, and he has more informed knowledge about the particulars than even our expert does.

THE COURT:  What is the core idea your experts will be trying to present?

MR. GORDON:  So there will be a number of ideas that our experts are representing.  And they go to both the -- whether or not the -- how the rates were set, whether there were errors in the data.  And that's a big piece, because that goes to both the experts and also the general -- general issues in this case about how FamilyCare was treated vis-a-vis other CCOs.

As Your Honor knows, we have arguments in this case, we have claims in this case for retaliatory treatment, that rates were set in a way and comparisons were set in a way that were misleading and inaccurate, and among the ways they were misleading and inaccurate is in how they portrayed FamilyCare versus how they portrayed other CCOs.  And to really be able to dig into -- get into those claims for litigation requires an understanding of the data that OHA and Optumas were looking at with respect to FamilyCare, and Mr. Murray has been able to look at that data and he has identified errors in the way that OHA and Optumas treated that data and the ways they manipulated that data and how they reconciled it.

What he can't see is what OHA and Optumas did with similar data that was produced to OHA by other CCOs.  And that's critical in understanding how OHA treated --

THE COURT:  So in answer to my question, one of the

core ideas your experts will be trying to present is that the data was treated differently and the rate setting was treated differently as among FamilyCare and other CCOs?

MR. GORDON:  That is correct, Your Honor.  That is one of the ideas that the expert is getting at.  I mentioned that one because that's a particular one where Mr. Murray's expertise is particularly important.

THE COURT:  And so you're contending, I suppose, in this that the errors that Mr. Murray was able to find in the FamilyCare data are the sorts of errors that your experts would not be able to find without his help in the other CCO data?

MR. GORDON:  It's certainly more difficult for the experts to get there.

THE COURT:  Why?

MR. GORDON:  Why?  Because Mr. Murray has a deeper understanding of how the data was presented initially and what it means.  And he certainly has talked to the expert.

But here's the problem --

THE COURT:  He has a deeper understanding of what other CCOs' data means than your own expert's?

MR. GORDON:  Of the process, of the process of submitting the data --

THE COURT:  I'm asking this because, you know, there's a wide variation, I understand that, in cases between what clients know and what experts know.  I mean, you have

cases where, you know, the client could take a vacation during the whole trial and nobody would miss him because the lawyers and the experts know more than they do about the case.

But it's relatively unusual to advance the idea that you have hired experts who don't know as much as your client about something else -- not about your own company data, because that's completely understandable, but about other companies' data.

MR. GORDON:  Well, it's about the own company data and how it compares to the other CCOs' data.  The other CCOs have varying types of structures and they report their data in various ways and Mr. Murray knows that.

And the challenge here is that Mr. Murray can't even have those detailed conversations with the expert about -- about the data that the expert has seen from the other side. He could talk about stuff in the abstract, but when it comes down to the specifics -- and I can tell you I've been in meetings with Mr. Murray and with the expert, where the expert says, okay, well, we can't show you this, or Mr. Murray has to leave the room.  It's a big impediment and it's going to continue to be --

THE COURT:  Well, that happens.  It means almost nothing to me because that just means there's a protective order in the case.  I mean, I'd be shocked if you haven't had that experience before, since it's happened in many cases that

I've had in front of me litigated where people leave the room in the middle of trial.  So that's just the nature of protective orders.  I need to know why it's bad, not that it's happening.

MR. GORDON:  Sure.

THE COURT:  So one of the things you're telling me is that you're missing out on the opportunity to sit there with data and have Mr. Murray offer insights about that data that you're not confident you can get just from your experts?

MR. GORDON:  Because the expert is coming from outside, it doesn't have the knowledge of this industry that -- and particularly the Oregon CCO industry that Mr. Murray has and the historical perspective.  Part of it is just he has this historical perspective.  He's been with FamilyCare for a number of years.  He was with another CCO.  He can -- if he is allowed to look at the data himself, he just brings to it a different set of knowledge and understanding informed in part by his historical experience than an expert, no matter how good the expert is, who comes at it from the outside.

THE COURT:  I want to be clear on what you're asking for, then, in what I call the general motion not the three-document motion.  You're asking for a wholesale revision in the system set up by Judge Armstrong.  You're not -- this isn't a motion going through 19,000 documents and saying, here are the documents, maybe 19,000, that we need, and this is why

we need them.  You're asking me to redo the whole regime, right?

MR. GORDON:  No, I'm not asking to redo the whole regime.  It's not a wholesale change.  It would not be setting aside the protective order.

THE COURT:  It's not document by document, right?  You're asking me to say -- Well, are you asking me to say -- de-designate 19,000 documents?

MR. GORDON:  Absolutely not, Your Honor.

THE COURT:  What are you asking?

MR. GORDON:  I'm simply asking that two individuals be added as additional persons under the protective over.  So they would sign on to the protective order.  They would be subject to all of the restrictions of the protective order, including paragraphs 2 and 3 that say they can't use this material for any other purpose, and particularly not for any business purpose.

THE COURT:  Well, the protective order currently, if I'm reading it, doesn't allow for AEO viewing by parties or employees, right?  That's the core of it?

MR. GORDON:  That is correct.

THE COURT:  So you're asking me to amend that piece of the protective order to allow AEO viewing by these two people?

MR. GORDON:  By two people.

And to be clear, the protective order does not currently allow -- that's why we brought the motion.  It does contemplate that additional people might be allowed under the terms of the protective order, and that's what we bring it under.  And it's just for two people, it's not for everybody.

THE COURT:  It asks for two people and not for specific documents but just for all AEO documents, all 19,000?

MR. GORDON:  That is correct.

And the problem is, Your Honor, again because of the over-designation of documents, we have nearly 20,000 documents that are AEO.  We've tried --

THE COURT:  If we'd keep ahold of this argument.  It started at 19 and now it's 20.

MR. GORDON:  I was trying to round it.  It's above 19.  We'll call it 19.

THE COURT:  All right.

MR. GORDON:  So 19,000 documents that have been designated as AEO.  And we have tried over and over to approach this from different angles.  We've gone back to OHA, we've gone to Optumas, we've gone to the CCOs and said, you've over-designated the documents.  They've responded.  In some circumstances they have de-designated several thousand documents.

And then we've tried to go on a document-by-document basis, and the process takes a long time, we get stonewalled,

we don't make much progress.

We tried an omnibus motion.  We've tried a variety of different approaches, Your Honor, and now here we are just a few months before trial and there's still all these documents that have been designated as AEO.  The problems created by that have just become more and more significant, both in working with the expert and in preparing for trial and --

THE COURT:  If your two clients were inserted into the protective order and given access to AEO documents, what would the future limitations be on them post trial?

MR. GORDON:  So the future limitations are spelled out in the protective order in paragraphs 10 and paragraph 14 -- Well, paragraphs 2, 3, 10, and 14.

So 2 and 3 say you can't use this information for any other purpose.

Paragraph 10 talks about limitations on participating --

THE COURT:  Any other purpose than trial and witness prep?

MR. GORDON:  That's correct, Your Honor.  It talks about the documents shall be used only in this proceeding, shall be restricted solely to the litigation of this case, shall not be used by any party or any person listed under these certain paragraphs for any business, commercial or competitive purpose.

So --

THE COURT:  Meaning that in the future, on the 2020 or 2021 bidding process -- let's just start with Mr. Murray couldn't use any of these documents or the information contained therein in that process?

MR. GORDON:  That is correct.

And then it goes on --

THE COURT:  Not only on the bidding process but for any other business purpose?

MR. GORDON:  That is correct.  He could not use it for any business purpose.

And then at the insistence of the CCOs, there are additional protections inserted that restrict anybody who views AEO documents from assisting a CCO, FamilyCare, any CCO or any entity who seeks to compete with FamilyCare or CCO with Medicaid program rate-setting, including contract bids in Oregon through the rate-setting process for the '20-21 rates.

There are also restrictions in the Optumas protective order restricting a person's ability to assist anybody who might be competing with Optumas.

And then finally, paragraph 14 of the protective order talks about how at the conclusion of this case, all the documents that have been produced that are AEO or confidential have to be destroyed or returned.

So there are multiple levels of protection in the

protective order that Mr. Murray and Mr. Suchorzewski would be subject to.  And these are far more protections than have been placed on other people who have been granted access to the AEO documents, like Jackie Lee, the actuary for Lewis & Ellis.  She was provided a multitude of AEO documents, including the stuff that CCOs claim is the core trade secret information, including things that Optumas has designated as AEO in this case, and not one of the CCOs or Optumas raised any concerns about that, about Ms. Lee accessing those documents, and no restrictions were placed on her employment.

And this stands in stark contrast to when the protective order was being discussed, and at that point in time we were talking about our independent actuary gaining access to these documents.  The CCOs came in and they said, no, the independent actuary can't have access to the documents, and all these problems would ensue, and they insisted on these additional restrictions.

I pointed out to the Court we have these restrictions in place, paragraphs 2 and 3, the confidentiality provisions. The actuary is subject to the actuarial code of ethics, the same thing that they now point to with respect to Ms. Lee. They said that's not enough.

THE COURT:  Thank you.  I believe I understand that argument.  I appreciate it.  Thank you.

Let me turn to the CCOs for a moment.  Who will speak

first to these issues?

MR. McCRACKEN:  I will, Your Honor.

THE COURT:  So a core argument made here -- I believe you joined it, if you didn't also make it -- is that the requested documents are largely irrelevant because the core issue in the case is the actuarial soundness of the rates provided by OHA to FamilyCare.  I guess I don't understand why you made that argument.

MR. McCRACKEN:  Your Honor, for purposes of this general motion, let's set aside relevance, because I think the key -- the bigger questions are whether they have sufficiently tailored the relief they're requesting and whether they have sufficiently shown --

THE COURT:  All right.  So I am going to assume, then, that the documents are relevant.  In fact, if anything, the current shape of the case headed towards trial makes the documents even more relevant than they might have seemed, you know, six months ago.  Now they're at the core of the case, in my view.

And so just a couple quick questions -- more limited questions, is what I mean, and then we'll get more broadly to your concerns about tailoring.

So you also asserted that these documents, in fact, are not stale.  Can you help me understand that argument better?

MR. McCRACKEN:  Well, one key thing, Your Honor, is that it's not that they might seek documents in the future, it's that FamilyCare is currently requesting that Health Share produce, pursuant to direct subpoena, the most recent documents we have through 2018.  It's not -- they are asking for fresher and fresher documents.  While some old documents might be of less competitive value than fresher documents, they are currently seeking the freshest available documents.  And we've suggested to them that they should cut off their subpoena at January 1, 2018, and they have declined that suggestion and are insisting that we produce it in 2018.

THE COURT:  Let's talk about cutting off the subpoena January 1, 2018.  Prior to that, what's your current opinion on the relative staleness?  I recognize staleness is a progressive concept, meaning it's not a bimodal decision, it just becomes more stale over time.  But what's your opinion on the staleness of documents prior to that cutoff date?

MR. McCRACKEN:  With respect to the upcoming procurement, the evidence in the record is that OHA is likely to look back three years.

THE COURT:  Are the documents stale if OHA only looks back two years?

MR. McCRACKEN:  You could make the argument that the latest year, 2014 might be stale, but there's still a large volume of documents from '15 and '16 and '17 --

THE COURT:  What does it mean to only look back -- in the upcoming bidding process, what does it mean to look back two years?

MR. McCRACKEN:  I'm not an expert on that process, but I think that OHA, in evaluating this and setting rates, has its actuaries consider data on a rolling basis, and it's how far back they go to gather up the data that they look at to make the actuarial projections into the future.

THE COURT:  They're going to look back at the prior two years of work, basically.  What are those two years, if it's two years?

MR. McCRACKEN:  '17 and '18.

THE COURT:  And three years makes it '16, '17, and '18?

MR. McCRACKEN:  Yes.

THE COURT:  So '15 is arguably, under your position, stale even at three years, and '16 at two years, but '17 and '18, since they could be looked at, are never stale?

MR. McCRACKEN:  I think that's correct, except for the one key thing about the staleness argument, and tying the staleness argument to the 2020 procurement, is that it assumes the CCOs and FamilyCare only compete in the procurement arena. They don't.  They also compete for provider contracts.  And so fashioning some remedy based on staleness tied to the procurement process fails to include the fact that these

2014-2015 documents would be useful today and useful immediately for FamilyCare to compete with Health Share and the other CCOs in the provider arena.

THE COURT:  In the provider arena, when do they become stale?

MR. McCRACKEN:  Some of these contracts are four-, five-year-old contracts.

THE COURT:  Therefore --

MR. McCRACKEN:  If FamilyCare knows that a particular CCOs has tied in a particular rate for a pharmaceutical item at X dollars, FamilyCare can use that information to underbid that CCO.

THE COURT:  What is the evidence you have that says that the period for looking backwards is three years?

MR. McCRACKEN:  I believe it's Mr. Larry Soderberg's declaration.  He submitted a couple.  I think the most recent one was Document No. 230.

THE COURT:  And it says what?

Mr. Chaimov?

MR. CHAIMOV:  Thank you, Your Honor.  I happen to have this at my fingertips.  In paragraph 11, Mr. Soderberg testifies that he expects OHA to look back to consider the 2016 rates in the upcoming procurement.

THE COURT:  Thank you.

What can you tell me about whether the upcoming

bidding process will be competitive versus less so?

MR. McCRACKEN:  Not much.

THE COURT:  So you think it's entirely in flux at this point?

MR. McCRACKEN:  We know that the State has issued a request for -- a notice that they're going to do a request for applications process.  FamilyCare has taken the position that that is a noncompetitive process.  Nothing in the record supports that proposition.  Their September 7 letter to the Court cited no regulation or any other authority for the proposition that a request for application process was going to be done competitive.

By regulation, the OHA regulations governing requests for application, OHA may award multiple contracts or make a single award or a limited number of awards to meet -- to any applicant who meets OHA's needs.

So there is a high likelihood, or at least -- I don't know if it's a high likelihood, but it is within OHA's authority to make a single award for a particular region, in which case there is going to be a winner and a loser.

THE COURT:  All right.  Thank you.

MR. McCRACKEN:  And --

THE COURT:  If you -- if Mr. Murray, just as a hypothetical, were, in fact, allowed access to AEO documents as an amendment or exception to the current protective order, but

allowed access with all the restrictions in the protective order that currently apply to anyone who sees AEO documents, and if Mr. Murray in the future followed to a T all of the restrictions of the protective order, would your client be harmed?

MR. McCRACKEN:  Mr. Murray is the one individual our client had in mind whether we negotiated for the AEO protections.  He's the most dangerous man in the room, you might want to say.  I mean that with professional respect.  He is the chief operating officer of our main competitor.  He's not asking for a particular document from us, he's asking to see all of our documents.  He competes with Health Share on a daily basis.  He competes with them in the procurement process, in the rate setting, and in provider contracting.

The reason we've got the AEO protection in place is because sometimes you can't ring the bell -- or unring the bell, and the one bell we don't want to get rung is Mr. Murray. Yes, we would be harmed.  And we'd be harmed immediately because the --

THE COURT:  Well, if I could paraphrase your answer, then, if he were able to follow it strictly, your client would not be harmed, but you think it's not humanly possible, even for a decent person, to so compartmentalize his brain?

MR. McCRACKEN:  That's why we have AEO protections, and this is the best example I know of for an individual to be

screened by AEO protection.  The COO of our chief competitor wants to see all of our most sensitive information.  We think he might not be able to forget some of that.  And that's what we put in place a year ago, and nothing has changed.  The most they can say is they're having trouble writing one portion of one expert report.  That's exactly what we would have anticipated a year ago.

THE COURT:  Of course, it's not at all unusual at the outset of cases to have competitors gain access to highly sensitive information under protective orders.  So the idea that in litigation a party would have to disclose sensitive information to a competitor happens every day in this country.

I guess I hear you making two arguments to that, and I want to make sure I have it straight.  One I suppose rather obvious one is that, in fact, you're not a party, you've been sort of hauled into this involuntarily; and two is that it's not -- we're not at the starting gate.  We're not crafting a protective order in this case.  You had one under which you produced documents, and you thought you were going to get the protection of that order.  And so it's not quite an estoppel argument, but it's the idea that you might have litigated this differently if you had known the games -- the rules of the game were going to be changed.

Have I got those two arguments right?

MR. McCRACKEN:  That's correct.  And it's not just

us, Health Share or Optumas or the other CCOs that have relied on the protective order.  There's another dozen subpoenas to everybody else in this -- in the tri-county region.  All of the key players in the Medicaid market have also responded to document subpoenas in reliance on the protective order.

THE COURT:  So your response to the argument that there's a critical piece of our expert report that we're really having difficulty completing because of this limitation is "too bad"?

MR. McCRACKEN:  That's not the argument that they put on -- that they put admissible evidence on.  The argument that they put admissible evidence on is that Mr. Murray has had to leave the room during certain conversations, and there's a -- one portion of a model that they can't -- they're having difficulty on.  No expert has -- they offer no declaration from an expert saying, "I'm unable to do my job, I'm unable to render an opinion because I need to show Mr. Murray some documents.  I don't understand the documents without Mr. Murray."  No one has offered that declaration.  Mr. Murray hasn't offered that declaration.  All we have is the announcements of counsel that we're having some problems.  Those are the types of inconveniences that are attendant to any AEO protection.

THE COURT:  Thank you.

Mr. Chaimov, can I turn to you for just a moment?

MR. CHAIMOV:  Of course, Your Honor.

THE COURT:  I have to ask you to respond to something you didn't write, and see if that -- see if you can just help me, because understanding data use in rate setting, in terms of the time period involved, is something I'd like to try to nail down better than I have in my mind currently.

You and your co-counsel have suggested that in the upcoming 2020 rate setting, the idea that one would look back two years means prior year rates, and therefore one would be looking back at '17 and '18.

MR. CHAIMOV:  Yes, Your Honor.

THE COURT:  And so I'm just going to say that OHA in their motion for summary judgment, the memo in support, at page 27, says the following:  Understanding why those claims fail requires an explanation of the details of the rate-setting process.  Actuarial professionals develop CCOs rates based on base data, which includes encounter data and financial data. Optumas uses data from prior years in developing rates for prospective years.  For 2017, Optumas used data from 2015 and '16, and for 2018, it used data from 2016 and '17.

I don't know if that's enough to go on.  It makes me concerned that the data we're talking -- we may be talking about apples and oranges here, but it makes me concerned that I should consider the idea that the data for 2020 being looked at is base data from '18 and '19, not '17 and '18.

Can you help me with that at all or is that not enough to go on?

MR. CHAIMOV:  Yes, Your Honor, I can help you with that.  Mr. Soderberg has testified on that point.  When -- and it may be in conflict with what OHA has written.  When OHA works on rates for a coming year, for 2020, they do so in 2019, for example.

THE COURT:  Right.

MR. CHAIMOV:  And so in 2019, OHA, for 2020, would be looking at 2017 and 2018 if two years; 2016 if three years.  So there's that additional year added in because OHA is making a decision for an out year.

For example -- I appreciate this is not in the record, but I think it was earlier this week, if not late last week, OHA announced to CCOs what their rates would be for 2019.  So in 2018, they're doing the job for 2019.

THE COURT:  Looking at data that may be base data or your rates or both from '17 and '18 -- or '16 and '17?

MR. GORDON:  '16 and '17, or if they were doing three.

THE COURT:  Thank you.

Do you disagree with that at all?

MR. GORDON:  Yes.  And I have some additional information about the upcoming procurements if that would be helpful.

But first on that point, for the 2017 rates, the base data -- and it was set in 2016, and so the base data used was only one year of base data.  It was 2015 base data.

For 2018, same thing:  they were set in 2017, so they used 2016 base data.

So, in fact, OHA in its rate setting only uses the one year of base data for that particular year.  So in setting rates in 2019 or 2020, they're going to only use -- if past practice guides future, they're only using one year of base data.

Now -- but there's a critical point here that I think is maybe being overlooked in this dialogue.  OHA sets the rates.  The CCOs don't compete and they don't submit bids for rates.  In other states, it works differently.  In Washington, for example, the -- they're called MCOs in Washington -- they submit rates.  They've done rates so they submit bids.

Here what we're talking about when we're talking about a look-back is what OHA looks back.  It's data that's already set in stone, if you will.  It's claims data from 2018, 2017, whatever the year is.  And when we're talking about rate setting, we're talking about something that OHA does independently with Optumas.  It's not something that the CCOs are doing on their own.

THE COURT:  So your argument is that you cannot use that data to affect the outcome of rate setting?  If you look

at competitor data, you're not able to use that to make it more likely that you'd win in competitive rate setting?

MR. GORDON:  Well, there is no competitive rate setting.

THE COURT:  I'm asking is that your argument, that since it's not competitive in the Washington sense, you really can't make competitive use of the data here.

MR. GORDON:  Certainly not in rate setting, because the CCOs don't do the rate setting.  OHA does the rate setting. They do it independently.

Now, of course, the CCOs can ask questions and give input, but at the end of the day, it's OHA working with Optumas who sets the rates.  There is not a competitive rate-setting process.

THE COURT:  You can make other business use of it, do you agree?

MR. GORDON:  Of base data from 2016?

THE COURT:  You're looking for data, your opponents are foaming at the mouth that it will be a horrible thing for them competitively.  I'd be surprised if you had a really good argument that they have nothing to worry about.  So what is it that they legitimately have to worry about?

MR. GORDON:  What do they legitimately have to worry about?  I think what you heard from them is that they don't trust Mr. Murray, basically; that he's not going to adhere to

the protective order.

THE COURT:  Let's assume that he didn't.  I just want to get at the core of this.  Assume that he saw this information and wanted to make business use of it.  It would be quite damaging, right?

MR. GORDON:  I don't know that it would be, Your Honor, for a number of reasons.  First of all, the CCO procurement that is coming up in 2020 is an RFA -- and I have documents here that I can share with the Court and with opposing counsel.  It is a request for applications.  And what OHA has said about a request for applications is they said, "With an RFA, generally every qualified applicant is awarded a contract without a competitive comparison between applicants."

So -- and then I have a slide that was presented at the most recent Oregon Health Policy Board meeting on September 11th, 2018, where they say in no uncertain terms it will be an RFA.  So according to OHA, it's going to be an RFA, and according to OHA, that means it's not competitive.

THE COURT:  What about other business uses?

MR. GORDON:  Well, keep in mind, when Mr. McCracken talks about our competitor, FamilyCare is not in the CCO business anymore.  It has 15 people left.  Now, there's a possibility that it might try and get back into the CCOs business again, but that's where the staleness of this information comes into play.

And, Your Honor asked a very good question about when does information become stale.  I don't think there's a hard-and-fast answer.  The best guidance we have I think is from the district court in D.C., in the *Biles* decision.  And in the *Biles* decision, it's a unique -- not a unique case, but it's very -- it deals with very similar type of information, not in the Medicaid context, but I believe it was in the Medicare Advantage context.

And there the Court said once information is a couple years old, because pricing -- as we all know, healthcare is a dynamic market; pricing changes.  So what they're talking about as being at the core of their trade secrets, as I understand it, is information about what they pay for certain things.  Those things tend to change over time.  And so what the Court in *Biles* said is information that is a couple years old is stale.

Another point to remember here is that all these, you know, foaming at the mouth, competitive harm, all of that is -- this is Health Share, who already has access to much of the same information about FamilyCare for two reasons:  one, OHA back in February, without FamilyCare's consent --

THE COURT:  I'm familiar with this set of facts and I understand your use of it.  It doesn't help me really resolve why you need it, and I'd be unlikely to give it to you because they got what they shouldn't have gotten.  I'm not going to

multiply harms here.

So I guess I'd say that argument is not going to carry the day for you.

MR. GORDON:  Understood.  I just point it out because the information asymmetry is something that is specifically called out by the Court in *Biles*.  And the Court says when there's --

THE COURT:  Information asymmetry is usually talking about parties in litigation.

MR. GORDON:  Well, it's talking about parties who are -- in the *Biles* case, they're talking about parties who have access to information, parties who don't have access to information.

THE COURT:  Right.  But usually we worry about information asymmetry from competitors who are suing each other.  Here we don't have -- we're not talking about a party.

MR. GORDON:  We're not talking about a party, but the question is the potential for competitive harm.  And what *Biles* recognized is that when -- that potential is greatest when there's an information asymmetry.

THE COURT:  You can't have it both ways, I guess is at the core of it.  You can't say there's no real competitive advantage to this information because it's stale, but you should give it to us because our competitors got this highly valuable information from us.  So it's either got no value so

we don't care that they got it, or it's got a lot of value and then we do care.

So which is it?  Is it valuable or not?

MR. GORDON:  Well, and that's not the argument I'm making, Your Honor.  I'm saying that in evaluating whether or not there's competitive harm, if Mr. Murray violates all these protections, because that's what we're talking about, what we have to consider is the landscape, and part of the landscape is the fact that they already have this information from FamilyCare.  So there already is an information asymmetry. We're not saying -- we haven't gone to court and --

THE COURT:  I guess my problem with that argument is you have an information asymmetry that doesn't matter if the information is of no real value, and it matters a lot if it is. And you've been trying to persuade me that the information you're seeking really doesn't have much competitive value.

MR. GORDON:  That's right.

THE COURT:  So I don't care about information asymmetry about valueless information.

MR. GORDON:  Well, if Your Honor -- I guess the point is if Your Honor believes that the information is of value, then I would ask that you consider the fact that there is an existing asymmetry, that this would only kind of level the playing field.  We have taken the position that it's not a competitive value.  To the extent there is, there are robust

protections in the protective order that would apply to Mr. Murray and to Mr. Suchorzewski.

THE COURT:  I'd like to hear your response to the final argument.  So I understand the view -- you want to suggest that your client will abide by the protective order, and I think you can -- if you're the CCOs here, you can advance the argument that that is of grave concern without trying to suggest that your client is a bad man.  So it's just the nature of humans and how the mind works.  That's the argument.

I'm less concerned about your response to that than the idea that we're not writing on a blank slate here.  We set up certain protections that excluded Mr. Murray, and so then there was performance under that system that excluded Mr. Murray on the idea that he would be excluded, and now post performance, we want to change that.

So isn't that an additional argument not to undo what Judge Armstrong did, since parties performed in reliance on that set of rules?

MR. GORDON:  Well, I think -- first of all, a number of things have changed, and the landscape in which we entered into and agreed to the protective order is very different than it is now.  We were set to go to trial in January of -- just about six months -- or actually less than six months after the protective order was entered.  So we did not concede that any of this information was trade secret, but we were being

resisted to getting access to this, so we agreed to the terms of the protective order because without -- because trial was coming up so quickly.

The second thing, when you talk -- so obviously that has changed now.

As to performance, we certainly did not expect that there would be such a rampant over-designation of documents as AEO.  We did not expect that there would be 19,000.

And keep in mind they've designated far more than that.  They've had to de-designate.

We did not expect that they would designate publicly available documents, blank pages, aggregated data as AEO.  We thought that under the protective order, they would take the obligation to do this only in good faith seriously, and only designate the most core information.

And so that has not proven true.  And we've -- as I mentioned before, we've tried a number of ways to deal with that within the terms of the protective order, and we've been unsuccessful, and here we are in October now, and there are still all these AEO documents outstanding, and now we've seen how much of an impediment it has been to expert reports, but also to trial preparation, and we've been able to better understand how much of an impediment it's going to be in the next few months getting ready for trial.

And so we've --

THE COURT:  Why -- what is the obstacle to you being more specific than you've been about particular needs grounded in particular documents?

MR. GORDON:  Well, so the obstacle -- we've done that.  We've talked about particular documents before with the various parties.  And it's just --

THE COURT:  Let me be a little more specific.

What would -- what's the obstacle to presenting the Court with a list of specific documents that you think you need and an explanation by categories, by large groups or whatever, as to why you need them?  Not in general terms but because there's this issue in this expert report that Mr. Murray needs to be able to review these documents in order to be the client assist he should be on that.  What gets in the way of doing that?

MR. GORDON:  Sure.  So several things:  Number one is again the massive volume of documents; number two is that there are documents that it's hard to know --

THE COURT:  I'm sorry to interrupt.  I'm not doing that because -- to be rude, but just to try to make the best use of our time here.

So it strikes me that your argument is that you have a need to see these documents.  I guess that's not because you know you need all of them, because part of what you say about there being 19,000 of them is that you can't really be specific

because you don't know what's in them.  But at the same time, your argument sort of depends on having a need for these documents.  I mean, do you know that you need all 19,000 of them in some way?

MR. GORDON:  Do I know I need all?  I can't tell you because I don't know what all 19,000 are.  So I can't tell you that.

What I can tell you --

THE COURT:  You and your experts have access to them.

MR. GORDON:  That is correct, but I can't catalog in my mind.  I haven't personally looked at all 19,000.  There are certainly specific ones that could be identified, but the other part of this problem is that some of these documents I can't tell the importance of and the expert may not be able to tell the importance of.  Only somebody that has a deep knowledge like Mr. Murray could tell us whether or not this was an important document to see.

THE COURT:  That's at the core of why you can't go item by item?

MR. GORDON:  That is correct.  We could specify some documents, but we don't know what we don't know, and there may be many other documents that I can't appreciate the significance of, but Mr. Murray would because he understands the context, both historical and within the industry.  That's I think probably the biggest challenge, in addition to the volume

of documents.

THE COURT:  So, in your view, specifically gaining access to 250 of these documents because you can identify them as at the core of your need doesn't cut it because you'd be leaving unexamined by the only person you think can do a complete and proper job of examining them all of the other documents, and only Mr. Murray can properly examine these documents for their usefulness at trial?

MR. GORDON:  I mean, I can examine them but I don't have the historical knowledge.  Mr. Murray will see things that I don't -- that I don't see in the documents, that the expert won't see.

And if we come with 250 documents, another problem is that this would be, I think, an ongoing iterative process if we identified 250, and then Mr. Murray looked at those and then he might realize that there are others that he hasn't seen that are implicated by what he sees in them.  That would be, I think, a difficult ongoing process.

We've tried doing things document by document before, and it's been really time-consuming and slow and really difficult, and we've been met with a lot of resistance on the other side.

So we thought this was a simple solution so that we wouldn't have to keep going back and back and back on these things, and just let two people see them, being subject to all

the same protections under the protective order, the robust protections that should mollify any concerns, particularly given the noncompetitive procurement and that the information is several years old.

THE COURT:   Thank you.

Go ahead.

MR. McCRACKEN:   I'd like to respond to a couple points, Your Honor, one about the competitive nature of the upcoming process.

We know there's going to -- not everyone is going to qualify when they submit their application.  It's -- and to qualify, you need to build a provider network and be able to demonstrate that you can deliver Medicaid services to your members.  The information that they seek would help FamilyCare unfairly develop its provider network.  It would help them compete for qualifying.

THE COURT:   How?

MR. McCRACKEN:   They would be able to show that they are in a position to contract with the providers.

THE COURT:   How would they use the information they see from you to do that?

MR. McCRACKEN:   By going out -- going out and, you know, discussing -- they're going to have to present to OHA a showing that they can deliver, and part of that is what do you have in place already or what do you expect to be able to have

in place with hospitals and doctors and dentists in order to provide Medicaid to your members.  And by having our information, they'll be able to go out to providers, dentists, hospitals, and come to terms with them, either --

THE COURT:  You're saying they'll use your information to underbid you and tell OHA, "We have a pool of providers, doctors, et cetera, who are willing to sign up with us if you give us the bid"?

MR. McCRACKEN:  That, yes.

And in addition, once they get a contract from the State, that information that they gained from us, if it's de-designated, will help them adjust those contracts in the future.  It has competitive value outside of the procurement process.

THE COURT:  You agree that in terms of any upcoming bidding process, if this were a race, they're still tying their shoes and you're way ahead of them, right?

MR. McCRACKEN:  I don't know.

THE COURT:  They don't even exist right now.

MR. McCRACKEN:  They exist.  They're an entity.

THE COURT:  Well, they're not ready to compete, right?

MR. McCRACKEN:  They haven't told us one way or another whether they clearly intend to compete.  They refuse to say they're not going to compete.  I think we might be ahead of

them, since they backed out of the market for a year.

THE COURT:  That seems like a pretty safe proposition, right, that you're ahead of them right now in any bidding process?

MR. McCRACKEN:  Yeah.

THE COURT:  You have customers and they don't.

MR. McCRACKEN:  True.  But that doesn't mean --

THE COURT:  That doesn't mean that you lose.  I'm just trying to make a minor point that if you worry about them gaining some big advantage over you in the bidding process, you're way ahead of them.

MR. McCRACKEN:  It may let them unfairly get back up to speed if they get our information.

THE COURT:  Sure.

MR. McCRACKEN:  It may be what they desperately need in order to be a qualified applicant.

THE COURT:  Thank you very much.

You had another point you wanted to make?

MR. McCRACKEN:  I wanted to talk about the number of AEO documents that have been designated.  They make it sound like a huge amount, and I don't think it is.  There are a total -- OHA tells us -- and OHA did the designating, not the CCOs by the way.  OHA tells us there's like 19,600 documents designated AEO.  That's out of 324,000 that have been produced.  So it's about 6 percent of the total documents produced are

AEO, which is not an unreasonable number.

THE COURT:  I don't know how you decide what's a reasonable number of AEO documents out of 300,000.  Based on what?

MR. McCRACKEN:  If it started to get up to 50 percent and someone thinks every document is -- or every other document is AEO, that would be suspect.  That's not where we're at. It's one out of 20, one out of -- far fewer.

And another key point is that --

THE COURT:  It's enough that going through them one by one and litigating them one by one is unworkable between now and trial, right?

MR. McCRACKEN:  The case, Your Honor, is now two years old, and FamilyCare has had these documents for over a year -- or nine months since 2017.  I think the majority were produced by OHA in fall of 2017.  We're through discovery.  As far as I know, most of the depositions have been taken.

At this point, with the qualified teams of lawyers on both sides, the key documents have risen to the top, and if they want to bring us -- if they are concerned that some of those key documents, the things that have been marked as deposition exhibits, documents the expert actually is looking at or documents that might be on the preliminary trial exhibit list, if they want to bring those to us, we're happy to look at them under the procedures in the protective order and assess

whether those have been improperly designated as AEO.  And we've done it in the past.  And contrary to counsel's assertions that it's been a hard process, we've done it pretty quickly.  And just -- and we've done it repeatedly, and it's resulted in a lot of down-designations.  We have down-designated, the CCOs collectively, thousands and thousands of documents.  Again, we didn't mark them AEO.  OHA did, using instructions we gave.  They were probably a little generous.

And we're happy to work to back off that generosity.  In May, for example -- in April, for example, Health Share down-designated 464 documents.  In late May, FamilyCare came to us with a list of 50 multiple CCO documents that they wanted us to review.  We recommended that all of those be down-designated to no designation, that two be confidential, and that one remain AEO.

At no point during either of those steps has FamilyCare said we got the designations wrong.  We gave them -- the process is working.  We're willing to work with that process.  We've had requests to review deposition transcripts.  We've responded to those and down-designated.

The relief they are seeking is not commensurate with what they have put in the record as the problem they're having.  They're asking to see -- that our competitor's chief operating officer see every document marked AEO by any party or third party or CCO in this case.  If they've got a specific document

their expert needs -- and they haven't identified anything at this point.  They haven't said their expert needs to see a triangulation report or, you know, a batch of base data. They've just said Mr. Murray has to leave the room from time to time.

THE COURT:  Thank you.

MR. McCRACKEN:  And that's difficult for them.  But that's what -- those were the goalposts we set last year, when we put the protective order into place, and nothing has changed.

THE COURT:  Thank you.

MR. GORDON:  Your Honor --

THE COURT:  Are you willing to have a cutoff date of January 1 of 2018?

MR. GORDON:  On the 2018 point that Health Share raised, we have subpoenaed documents continuing after 2018. Those -- if you look at the search terms -- and what we're talking about is search terms for emails.  Those are not likely to produce the types of documents that are at issue here.

But specifically you asked are we willing to have a cutoff of January 1, 2018 for AEO access for Mr. Murray and Mr. Suchorzewski?  Was that the question?

THE COURT:  Yes.

MR. GORDON:  Can I have one moment?

THE COURT:  Yes.

MR. GORDON:  Thank you.

(There is a pause in the proceedings.)

MR. GORDON:  Yes, Your Honor.

THE COURT:  Thank you.

We'll be in recess.  So I'll give you my ruling very shortly.  I'm going to recess permanently.  I'm not coming back on the bench.  I'll give you my ruling in writing very shortly.

MS. SIMPSON:  Your Honor --

THE COURT:  Yes?

MS. SIMPSON:  I have one issue.  The expert reports, will your ruling address the deadline to produce them?

THE COURT:  So you're asking for two weeks, no matter how I rule?

MS. SIMPSON:  We are not asking for two weeks, Your Honor.  If you rule against FamilyCare, depending on what your order is, we're ready to produce them now.  We could have them produced on Monday by 5:00 p.m.  We're asking for one week if you rule in favor of FamilyCare.  We think that's plenty of time.

THE COURT:  And you're asking for two weeks no matter how I rule or if I rule in your favor?

MR. GORDON:  We've asked for two weeks if you rule in our favor from the date of your order so that Mr. Murray --

THE COURT:  I'm not trying to play games here.  I'm going to think about this, and I don't know how I'm going to

rule.  So let's just walk through this.  Go ahead and be seated.

If I rule in your favor, meaning grant your general motion, then you want two weeks?

MR. GORDON:  Yes, Your Honor.

THE COURT:  If I deny your motion, you're ready to go?

MR. GORDON:  We would be -- unless you were to deny it right this moment, yes, we'd be ready to produce our expert reports within a day of denial, a day or two.

THE COURT:  And if it's something in between, like I say you have to be more specific and seek specific documents which will require some time?

MR. GORDON:  That would require some time.

THE COURT:  Then you would want what?

MR. GORDON:  Well, then I suppose in that situation --

THE COURT:  On your expert deadline is what I'm asking.

MR. GORDON:  Sure.  So I guess in that situation, we'd be presenting additional information to you and then there would be additional rulings.  So I guess the deadline would be continued until after the further ruling in that situation.

THE COURT:  Right.  The only way to make that work if I do it is to have the whole thing happen very fast, otherwise

we start running out of time.

MR. GORDON:  That is correct.  Agreed.

THE COURT:  So a couple, three weeks at most you could make that happen, specific litigation on a batch of documents that are specifically identified, incorporated in your expert report, and get it done in three weeks?

MR. GORDON:  So are you asking if we could identify the documents, submit those to you, and then turn around and --

THE COURT:  Litigate it, get your answer, turn around, put it or not into your expert report and get your expert report out, how long?

MR. GORDON:  I think three weeks would be sufficient, Your Honor, with the understanding that that would -- there may --

THE COURT:  With the understanding that the first piece of that, the litigation over specific documents would happen rapidly?

MR. GORDON:  Correct.

THE COURT:  Yes.

MS. SIMPSON:  Your Honor, our *Daubert* motions are due by the end of October, and so the three weeks concerns us because we have upcoming deadlines that we have to meet related to the expert reports.  We're ready to go, so we think a week is --

THE COURT:  It concerns all of us.  It concerns me,

too.

Do you wish to be heard on deadlines at all? Anything about that bother you?

MR. CHAIMOV:  No, Your Honor.  We're available to proceed at whatever pace you would like.

THE COURT:  All right.  Thank you for raising that.

MS. MONTALBANO:  Your Honor, is your ruling then also going to address Optumas's documents?  Because there is the concern of competition, but there's also trade secrets that are involved in there, and our position is slightly different in some ways than the CCOs.

THE COURT:  Yes, they will address that.

MS. MONTALBANO:  Okay.

THE COURT:  Thank you.

THE CLERK:  This court is in recess.

(Proceedings concluded at 11:14 a.m.)

--oOo--


        I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


*/s/Bonita J. Shumway*                    *October 11, 2018*
_____       _____
BONITA J. SHUMWAY, CSR, RMR, CRR       DATE
Official Court Reporter

MR. CHAIMOV: [7]
4/16 24/19 28/25 29/10
30/2 30/8 51/3
MR. GORDON: [65]
MR. HERN: [1]  4/20
MR. LANGFITT: [1]
4/22
MR. LINDENAUER: [1]
 4/18
MR. McCRACKEN:
[35]  4/14 21/1 21/8
21/25 22/17 22/22 23/3
23/11 23/14 23/18 24/5
24/8 24/14 25/1 25/4
25/21 26/5 26/23 27/24
28/9 42/6 42/17 42/21
43/8 43/17 43/19 43/22
44/4 44/6 44/11 44/14
44/18 45/4 45/12 47/6
MS. BRENNER: [1]
4/8
MS. MONTALBANO:
[3]  4/12 51/6 51/12
MS. SIMPSON: [5]  4/6
48/7 48/9 48/13 50/19
THE CLERK: [2]  4/2
51/14
THE COURT: [110]

'

'15 [2]  22/25 23/16
'16 [6]  22/25 23/13
23/17 29/20 30/18
30/19
'17 [10]  22/25 23/12
23/13 23/17 29/10
29/20 29/25 30/18
30/18 30/19
'18 [7]  23/12 23/14
23/18 29/10 29/25

'19 [1]  29/25
'20 [1]  19/17
'20-21 [1]  19/17

-

--o0o [1]  52/2

/

/s/Bonita [1]  52/9

1

10 [3]  18/12 18/13
 18/16
100 [1]  10/20
1000 [1]  3/11
10:05 [1]  4/2
10th [1]  2/4
11 [2]  24/21 52/9
111 [1]  3/6
1120 [1]  2/4
11:14 [1]  51/16
11th [2]  2/18 33/16
1201 [1]  2/7
121 [1]  2/18
1211 [2]  2/11 2/14
1300 [1]  2/22
14 [3]  18/13 18/13
 19/21
15 [1]  33/22
1500 [1]  3/3
1600 [1]  2/14
19 [3]  17/13 17/15
 17/15
19,000 [11]  10/11 15/24
 15/25 16/8 17/7 17/17
 38/8 39/25 40/3 40/6
 40/11
19,600 [1]  44/23

2

20 [2]  17/13 45/8
20,000 [1]  17/10

2014 [1]  22/24
2014-2015 [1]  24/1
2015 [3]  24/1 29/19
 31/3
2016 [6]  24/22 29/20
 30/10 31/2 31/5 32/17
2017 [7]  29/19 30/10
 31/1 31/4 31/20 45/15
 45/16
2018 [17]  1/7 4/2 22/5
 22/10 22/11 22/13
 29/20 30/10 30/16 31/4
 31/19 33/16 47/14
 47/15 47/16 47/21 52/9
2019 [5]  30/6 30/9
 30/15 30/16 31/8
2020 [8]  19/2 23/21
 29/8 29/24 30/6 30/9
 31/8 33/8
2021 [1]  19/3
21 [1]  19/17
230 [1]  24/17
2400 [1]  2/22
250 [3]  41/3 41/13
 41/15
27 [1]  29/14

3

300,000 [1]  45/3
3000 [1]  2/11
301 [1]  3/11
324,000 [1]  44/24
326-8188 [1]  3/12
3400 [1]  3/6

4

464 [1]  46/11
4800 [1]  2/7

5

50 [2]  10/20 46/12
50 percent [1]  45/5

**5**

**503 [1]** 3/12
**5:00 p.m [1]** 48/17

**6**

**6 percent [1]** 44/25
**6:18-cv-00296-MO [1]** 1/4
**6:18-cv-296-MO [1]** 4/4

**7**

**707 [1]** 3/3

**8**

**8188 [1]** 3/12

**9**

**9500 [1]** 11/1
**97204 [6]** 2/11 2/15 2/18 2/23 3/7 3/11
**97205 [1]** 3/4
**97209 [1]** 2/4
**98101 [1]** 2/7

**A**

**a.m [2]** 4/2 51/16
**abide [1]** 37/5
**ability [1]** 19/19
**able [16]** 6/19 10/22 12/15 12/18 13/9 13/11 26/21 27/3 32/1 38/22 39/13 40/14 42/12 42/18 42/25 43/3
**about [64]**
**above [2]** 17/14 52/6
**above-entitled [1]** 52/6
**Absolutely [1]** 16/9
**abstract [1]** 14/16
**access [16]** 6/3 9/18 18/9 20/3 20/13 20/15 25/24 26/1 27/9 34/19 35/12 35/12 38/1 40/9 41/3 47/21

**accessing [1]** 20/9
**according [2]** 33/17 33/18
**acquired [1]** 10/17
**across [1]** 7/2
**actually [2]** 37/23 45/22
**actuarial [6]** 7/13 7/19 20/20 21/6 23/8 29/16
**actuaries [1]** 23/6
**actuary [4]** 20/4 20/13 20/15 20/20
**add [1]** 10/1
**added [2]** 16/12 30/11
**addition [2]** 40/25 43/10
**additional [10]** 10/22 16/12 17/3 19/13 20/17 30/11 30/23 37/16 49/21 49/22
**address [4]** 10/6 48/11 51/8 51/12
**adds [1]** 10/2
**adhere [1]** 32/25
**adjust [1]** 43/12
**admissible [2]** 28/11 28/12
**advance [6]** 5/19 5/20 7/23 8/22 14/4 37/6
**advances [1]** 5/12
**advantage [3]** 34/8 35/23 44/10
**AEO [38]** 6/1 6/2 6/14 10/10 10/12 10/21 16/19 16/23 17/7 17/11 17/18 18/5 18/9 19/14 19/23 20/3 20/5 20/7 25/24 26/2 26/7 26/15 26/24 27/1 28/23 38/8 38/12 38/20 44/20 44/24 45/1 45/3 45/7 46/1 46/7 46/15 46/24

**accessing [1]** 20/9
**47/21**
**affect [1]** 31/25
**after [3]** 37/23 47/16 49/23
**again [5]** 5/16 17/9 33/24 39/17 46/7
**against [2]** 9/12 48/15
**agency [1]** 1/7
**aggregate [3]** 6/14 6/16 6/16
**aggregated [1]** 38/12
**ago [3]** 21/18 27/4 27/7
**agree [2]** 32/16 43/15
**agreed [3]** 37/21 38/1 50/2
**ahead [6]** 42/6 43/17 43/25 44/3 44/11 49/1
**ahold [1]** 17/12
**al [1]** 4/5
**all [44]** 4/25 5/3 7/7 7/8 7/11 8/14 9/12 9/24 16/14 17/7 17/7 17/16 18/4 19/22 20/15 21/14 25/21 26/1 26/3 26/12 27/2 27/8 28/3 28/20 30/1 30/22 33/7 34/10 34/17 34/18 36/6 37/19 38/20 39/24 40/3 40/5 40/6 40/11 41/6 41/25 46/13 50/25 51/2 51/6
**all-document [1]** 5/3
**ALLEN [2]** 1/7 2/10
**Alletta [2]** 2/3 4/9
**allow [4]** 6/22 16/19 16/23 17/2
**allowed [4]** 15/15 17/3 25/24 26/1
**almost [3]** 7/7 7/11 14/22
**already [5]** 31/19 34/19 36/9 36/10 42/25
**also [12]** 6/11 9/3

# A

**also... [10]**  11/21 12/7 19/18 21/4 21/23 23/23 28/4 38/22 51/7 51/9

**always [1]**  9/4

**am [2]**  11/8 21/14

**amend [1]**  16/22

**amendment [1]**  25/25

**among [2]**  12/13 13/3

**amount [1]**  44/21

**and it's [1]**  14/20

**angles [1]**  17/19

**announced [1]**  30/15

**announcements [1]**  28/21

**another [7]**  15/15 28/2 34/17 41/13 43/24 44/18 45/9

**answer [5]**  8/16 12/25 26/20 34/3 50/9

**anticipated [1]**  27/7

**any [22]**  6/2 16/16 16/16 18/14 18/18 18/23 18/23 18/24 19/4 19/9 19/11 19/14 19/14 20/8 25/10 25/15 28/22 37/24 42/2 43/15 44/3 46/24

**anybody [2]**  19/13 19/19

**anymore [2]**  7/21 33/22

**anyone [1]**  26/2

**anything [3]**  21/15 47/1 51/3

**APPEARANCES [1]**  2/2

**apples [1]**  29/23

**applicant [3]**  25/16 33/12 44/16

**applicants [1]**  33/13

**application [3]**  25/11

**applications [3]**  25/7 33/10 33/11

**apply [2]**  26/2 37/1

**appreciate [3]**  20/24 30/13 40/22

**approach [1]**  17/18

**approaches [1]**  18/3

**April [1]**  46/10

**are [62]**

**arena [3]**  23/22 24/3 24/4

**arguably [1]**  23/16

**argument [32]**  1/15 4/4 5/14 6/12 6/13 7/22 8/9 8/20 17/12 20/24 21/3 21/8 21/24 22/23 23/20 23/21 27/21 28/6 28/10 28/11 31/24 32/5 32/21 35/2 36/4 36/12 37/4 37/7 37/9 37/16 39/22 40/2

**arguments [5]**  7/9 7/24 12/10 27/13 27/24

**Armstrong [6]**  7/2 7/25 8/14 9/14 15/23 37/17

**around [3]**  8/11 50/8 50/10

**Art [1]**  9/18

**as [31]**  1/8 6/10 6/10 8/2 8/3 9/4 10/10 12/10 13/3 14/5 14/5 16/12 17/18 18/5 20/7 25/23 25/24 34/10 34/12 34/12 38/6 38/7 38/12 38/16 39/11 41/4 45/16 45/17 45/21 46/1 46/22

**aside [3]**  7/1 16/5 21/10

**ask [3]**  29/2 32/11 36/22

**asked [4]**  9/18 34/1

**asking [21]**  13/23 15/20 15/22 16/1 16/3 16/7 16/7 16/10 16/11 16/22 22/5 26/11 26/11 32/5 46/23 48/12 48/14 48/17 48/20 49/19 50/7

**asks [1]**  17/6

**asserted [1]**  21/23

**assertions [1]**  46/3

**assess [1]**  45/25

**assist [6]**  5/15 10/23 11/10 11/13 19/19 39/14

**assistance [1]**  11/21

**assisting [1]**  19/14

**assume [3]**  21/14 33/2 33/3

**assumes [1]**  23/21

**asymmetry [8]**  35/5 35/8 35/15 35/20 36/10 36/13 36/19 36/23

**at [61]**

**attendant [1]**  28/22

**authority [6]**  1/6 1/9 2/9 4/5 25/10 25/19

**available [3]**  22/8 38/12 51/4

**Ave [1]**  3/11

**Avenue [5]**  2/7 2/11 2/14 2/22 3/6

**award [3]**  25/14 25/15 25/19

**awarded [1]**  33/12

**awards [1]**  25/15

**away [2]**  7/18 8/4

# B

**back [21]**  8/24 17/19 22/20 22/22 23/1 23/2 23/7 23/9 24/22 29/8 29/10 31/18 31/18

**B**

**back... [8]** 33/23 34/21 41/24 41/24 41/24 44/12 46/9 48/6
**backed [1]** 44/1
**backwards [1]** 24/14
**bad [4]** 7/16 15/3 28/9 37/8
**ball [1]** 7/23
**Barer [1]** 2/17
**base [12]** 29/17 29/25 30/17 31/1 31/2 31/3 31/3 31/5 31/7 31/9 32/17 47/3
**based [3]** 23/24 29/16 45/3
**basically [2]** 23/10 32/25
**basis [3]** 17/25 23/6 26/13
**batch [2]** 47/3 50/4
**be [105]**
**because [47]** 5/24 7/22 8/1 8/8 9/3 9/10 10/2 10/10 10/19 10/23 12/6 13/6 13/15 13/23 14/2 14/7 14/23 15/10 17/9 21/5 21/10 26/16 26/19 28/8 28/17 29/4 30/11 32/8 34/10 34/24 35/4 35/23 35/24 36/7 38/2 38/2 39/11 39/20 39/23 39/24 40/1 40/6 40/23 41/3 41/4 50/22 51/8
**because there [1]** 10/19
**become [4]** 8/18 18/6 24/5 34/2
**becomes [1]** 22/15
**been [30]** 7/14 7/21 10/12 10/13 10/13

10/14 10/16 11/5 12/18 14/17 15/14 17/17 18/5 19/23 20/2 20/3 27/15 36/15 38/18 38/21 38/22 39/2 41/20 41/21 44/20 44/24 45/17 45/21 46/1 46/3
**before [7]** 1/17 7/15 14/25 18/4 38/17 39/5 41/19
**behalf [6]** 4/8 4/10 4/12 4/13 4/21 4/24
**being [11]** 4/25 6/8 8/12 20/12 29/24 31/12 34/12 37/25 39/1 39/25 41/25
**believe [7]** 8/21 9/20 10/12 20/23 21/3 24/15 34/7
**believes [1]** 36/21
**bell [3]** 26/16 26/17 26/17
**below [1]** 52/4
**bench [1]** 48/7
**best [4]** 11/22 26/25 34/3 39/20
**better [6]** 6/19 6/22 11/23 21/25 29/6 38/22
**between [4]** 13/24 33/13 45/11 49/11
**bid [2]** 8/5 43/8
**bidding [10]** 8/3 8/25 9/11 19/3 19/8 23/2 25/1 43/16 44/4 44/10
**bids [3]** 19/16 31/13 31/16
**big [3]** 12/6 14/20 44/10
**bigger [1]** 21/11
**biggest [1]** 40/25
**Biles [6]** 34/4 34/5 34/15 35/6 35/11 35/18

**Bill [1]** 9/18
**bimodal [1]** 22/15
**blank [2]** 37/11 38/12
**board [2]** 7/3 33/15
**Bonita [3]** 3/10 52/9 52/10
**both [10]** 1/7 6/11 9/25 12/4 12/7 18/6 30/18 35/21 40/24 45/19
**bother [1]** 51/3
**brain [1]** 26/23
**Brenner [2]** 2/3 4/9
**briefing [1]** 10/11
**briefs [1]** 8/4
**bright [1]** 10/24
**bring [3]** 17/4 45/20 45/24
**brings [1]** 15/16
**Brittany [2]** 2/10 4/7
**broadly [1]** 21/21
**brought [1]** 17/2
**build [1]** 42/12
**burden [1]** 6/8
**business [9]** 16/17 18/24 19/9 19/11 32/15 33/4 33/19 33/22 33/24
**but [52]** 5/17 7/5 7/16 8/6 8/16 8/24 9/1 10/14 10/16 10/21 10/24 11/3 11/23 13/18 14/4 14/7 14/16 17/7 19/8 22/16 22/24 23/5 23/17 25/18 25/25 26/22 27/21 29/23 30/14 31/1 31/11 32/12 33/24 34/5 34/7 35/14 35/17 35/23 37/25 38/21 39/11 39/20 40/1 40/10 40/12 40/21 40/23 41/9 44/7 47/7 47/20 51/9

**called [2]** 31/15 35/6
**came [2]** 20/14 46/11
**can [28]** 6/7 7/6 9/22 10/4 14/17 15/9 15/15 21/24 24/11 24/25 27/5 28/25 29/3 30/1 30/3 32/11 32/15 33/9 37/6 37/6 40/8 41/3 41/5 41/7 41/9 42/13 42/24 47/24
**can't [21]** 6/6 8/7 8/18 12/22 14/13 14/19 16/15 18/14 20/15 26/16 28/14 32/7 35/21 35/22 39/25 40/5 40/6 40/10 40/13 40/18 40/22
**cannot [1]** 31/24
**capable [1]** 10/24
**capacity [1]** 1/8
**care [4]** 3/5 36/1 36/2 36/18
**carry [1]** 35/3
**case [25]** 1/4 4/4 7/13 7/18 7/20 7/21 8/23 10/18 12/8 12/10 12/11 14/3 14/24 18/22 19/22 20/7 21/6 21/16 21/18 25/20 27/18 34/5 35/11 45/13 46/25
**cases [4]** 13/24 14/1 14/25 27/9
**catalog [1]** 40/10
**categories [1]** 39/10
**cause [1]** 52/6
**CCO [11]** 13/11 15/12 15/15 19/14 19/14 19/15 24/12 33/7 33/21 46/12 46/25
**CCOs [27]** 7/8 12/9

12/15 12/23 13/3 14/10 17/20 19/12 20/6 20/8 20/14 20/25 23/22 24/3 24/10 28/1 29/16 30/15 31/13 31/22 32/9 32/11 33/23 37/6 44/23 46/6 51/11
**CCOs' [2]** 13/20 14/10
**certain [6]** 8/7 8/7 18/24 28/13 34/13 37/12
**certainly [6]** 11/23 13/12 13/17 32/8 38/6 40/12
**certified [1]** 52/7
**certify [1]** 52/4
**cetera [1]** 43/7
**Chaimov [4]** 2/21 4/17 24/19 28/25
**challenge [2]** 14/13 40/25
**change [5]** 8/13 8/25 16/4 34/14 37/15
**changed [6]** 8/1 27/4 27/23 37/20 38/5 47/10
**changes [1]** 34/11
**chief [4]** 1/18 26/10 27/1 46/23
**Chris [1]** 4/15
**Christopher [1]** 2/21
**circumstances [1]** 17/22
**cited [1]** 25/10
**claim [1]** 20/6
**claims [4]** 12/11 12/16 29/14 31/19
**clear [3]** 10/16 15/20 17/1
**clearly [1]** 43/24
**client [8]** 14/1 14/5 26/4 26/7 26/21 37/5 37/8 39/13

**clients [2]** 13/25 18/8
**close [2]** 9/20 9/21
**closely [1]** 11/3
**co [1]** 29/7
**co-counsel [1]** 29/7
**code [1]** 20/20
**Coie [2]** 2/3 2/6
**collectively [1]** 46/6
**come [4]** 7/17 8/4 41/13 43/4
**comes [3]** 14/16 15/19 33/25
**coming [5]** 15/10 30/6 33/8 38/3 48/6
**commensurate [1]** 46/21
**commercial [1]** 18/24
**Community [2]** 4/20 4/21
**companies' [1]** 14/8
**company [2]** 14/6 14/9
**compares [1]** 14/10
**comparison [1]** 33/13
**comparisons [1]** 12/12
**compartmentalize [1]** 26/23
**compete [9]** 19/15 23/22 23/23 24/2 31/13 42/16 43/21 43/24 43/25
**competes [2]** 26/12 26/13
**competing [1]** 19/20
**competition [1]** 51/9
**competitive [19]** 18/24 22/7 25/1 25/12 32/2 32/3 32/6 32/7 32/13 33/13 33/18 34/18 35/18 35/22 36/6 36/16 36/25 42/8 43/13
**competitively [1]** 32/20
**competitor [5]** 26/10

**competitor... [4]** 27/1 27/12 32/1 33/21
**competitor's [1]** 46/23
**competitors [3]** 27/9 35/15 35/24
**complete [1]** 41/6
**completely [2]** 6/24 14/7
**completing [1]** 28/8
**concede [1]** 37/24
**concept [1]** 22/15
**concern [2]** 37/7 51/9
**concerned [4]** 29/22 29/23 37/10 45/20
**concerns [7]** 9/17 20/8 21/22 42/2 50/21 50/25 50/25
**concluded [1]** 51/16
**conclusion [1]** 19/22
**confident [1]** 15/9
**confidential [3]** 6/2 19/23 46/14
**confidentiality [1]** 20/19
**conflict [1]** 30/5
**conformed [1]** 52/7
**consent [1]** 34/21
**consider [5]** 23/6 24/22 29/24 36/8 36/22
**consuming [1]** 41/20
**contained [1]** 19/5
**contemplate [2]** 7/15 17/3
**contemplates [1]** 6/1
**contending [1]** 13/8
**context [3]** 34/7 34/8 40/24
**continue [1]** 14/21
**continued [1]** 49/23
**continuing [1]** 47/16

**contract [4]** 19/16 33/13 42/19 43/10
**contracting [1]** 26/14
**contracts [5]** 23/23 24/6 24/7 25/14 43/12
**contrary [1]** 46/2
**contrast [1]** 20/11
**conversations [2]** 14/14 28/13
**COO [1]** 27/1
**COORDINATED [1]** 3/5
**core [22]** 5/9 5/14 6/23 7/4 7/6 7/7 7/13 7/18 11/9 12/1 13/1 16/20 20/6 21/3 21/5 21/18 33/3 34/12 35/22 38/15 40/18 41/4
**corporation [1]** 1/3
**correct [13]** 13/4 16/21 17/8 18/20 19/6 19/10 23/19 27/25 40/10 40/20 50/2 50/18 52/5
**Couch [1]** 2/4
**could [17]** 7/17 8/8 8/13 8/14 8/21 14/1 14/16 19/10 22/23 23/18 26/20 40/12 40/16 40/20 48/16 50/4 50/7
**couldn't [1]** 19/4
**counsel [4]** 4/6 28/21 29/7 33/10
**counsel's [1]** 46/2
**country [1]** 27/12
**county [1]** 28/3
**couple [6]** 21/20 24/16 34/9 34/15 42/7 50/3
**course [3]** 27/8 29/1 32/11
**court [16]** 1/1 1/18 3/10 6/7 20/18 25/10 33/9 34/4 34/9 34/14 35/6

35/6 36/11 39/9 51/15 52/11
**court and [1]** 36/11
**Courthouse [1]** 3/10
**crafting [1]** 27/17
**created [1]** 18/5
**critical [3]** 12/24 28/7 31/11
**CRR [2]** 3/10 52/10
**CSR [2]** 3/10 52/10
**current [3]** 21/16 22/13 25/25
**currently [8]** 8/23 9/7 16/18 17/2 22/3 22/8 26/2 29/6
**customers [1]** 44/6
**cut [2]** 22/9 41/4
**cutoff [3]** 22/17 47/13 47/21
**cutting [1]** 22/12
**cv [2]** 1/4 4/4

**D**

**D.C [1]** 34/4
**daily [1]** 26/13
**damaging [1]** 33/5
**dangerous [1]** 26/8
**data [53]**
**date [4]** 22/17 47/13 48/23 52/10
**Daubert [1]** 50/20
**Davis [1]** 2/22
**day [5]** 27/12 32/12 35/3 49/10 49/10
**de [5]** 6/22 16/8 17/22 38/10 43/12
**de-designate [3]** 6/22 16/8 38/10
**de-designated [2]** 17/22 43/12
**deadline [3]** 48/11 49/18 49/22

**deadlines [2]** 50/22 51/2

**deal [2]** 8/15 38/17

**deals [1]** 34/6

**decent [1]** 26/23

**decide [1]** 45/2

**decision [4]** 22/15 30/12 34/4 34/5

**declaration [4]** 24/16 28/15 28/19 28/20

**declined [1]** 22/10

**deep [2]** 10/18 40/15

**deeper [2]** 13/15 13/19

**deeply [2]** 10/14 10/16

**DEFENDANT [3]** 2/13 2/16 2/20

**Defendants [2]** 1/10 2/9

**deliver [2]** 42/13 42/24

**demonstrate [1]** 42/13

**denial [1]** 49/10

**dentists [2]** 43/1 43/3

**deny [2]** 49/6 49/8

**depending [1]** 48/15

**depends [1]** 40/2

**deposition [2]** 45/22 46/19

**depositions [1]** 45/17

**described [1]** 8/2

**designate [5]** 6/22 16/8 38/10 38/11 38/15

**designated [16]** 10/12 10/13 17/18 17/21 17/22 18/5 20/7 38/9 43/12 44/20 44/24 46/1 46/6 46/11 46/13 46/20

**designating [3]** 6/4 6/8 44/22

**designation [6]** 6/1 6/2 6/9 17/10 38/7 46/14

**designations [2]** 46/5 46/17

**desires [1]** 6/3

**desiring [1]** 6/5

**desperately [1]** 44/15

**destroyed [1]** 19/24

**detail [1]** 11/18

**detailed [1]** 14/14

**details [1]** 29/15

**develop [2]** 29/16 42/15

**developing [1]** 29/18

**dialogue [1]** 31/12

**did [11]** 7/2 7/25 9/14 12/22 37/17 37/24 38/6 38/8 38/11 44/22 46/7

**didn't [4]** 21/4 29/3 33/2 46/7

**different [6]** 8/8 15/16 17/19 18/3 37/21 51/10

**differently [4]** 13/2 13/3 27/22 31/14

**difficult [4]** 13/12 41/18 41/21 47/7

**difficulty [2]** 28/8 28/15

**dig [1]** 12/16

**direct [1]** 22/4

**direction [1]** 8/8

**director [1]** 1/8

**disagree [1]** 30/22

**disagrees [1]** 6/4

**disclose [1]** 27/11

**disclosed [1]** 8/12

**discovery [1]** 45/16

**discussed [1]** 20/12

**discussing [1]** 42/23

**district [5]** 1/1 1/2 1/18 3/10 34/4

**divide [1]** 10/25

**do [25]** 5/13 9/8 10/3 10/6 11/24 14/3 24/4 25/6 28/16 30/6 30/22

32/9 32/10 32/15 32/23 36/2 38/14 40/3 40/5 41/5 42/21 42/24 42/25 49/25 51/2

**doctors [2]** 43/1 43/7

**document [24]** 5/2 5/3 5/12 5/12 5/21 6/3 6/4 6/21 8/19 15/22 16/6 16/6 17/24 17/24 24/17 26/11 28/5 40/17 41/19 41/19 45/6 45/6 46/24 46/25

**document-by-docume nt [1]** 17/24

**documents [95]**

**does [11]** 9/2 10/1 11/8 11/25 17/1 17/2 23/1 23/2 31/21 32/9 34/2

**doesn't [12]** 7/23 9/6 10/2 10/15 15/11 16/19 34/23 36/13 36/16 41/4 44/7 44/8

**doing [7]** 5/20 30/16 30/19 31/23 39/14 39/19 41/19

**dollars [1]** 24/11

**don't [45]** 6/17 7/13 7/17 7/23 8/9 8/16 8/17 8/19 8/19 8/25 9/25 10/2 11/2 11/18 14/5 18/1 21/7 23/23 25/17 26/17 28/18 29/21 31/13 31/13 32/9 32/24 33/6 34/2 35/12 35/16 36/1 36/18 40/1 40/6 40/21 40/21 41/9 41/11 41/11 43/18 43/19 44/6 44/21 45/2 48/25

**done [8]** 11/22 25/12 31/16 39/4 46/2 46/3 46/4 50/6

**down [7]** 14/17 29/6

**D**

**down... [5]** 46/5 46/6 46/11 46/13 46/20
**down-designated [4]** 46/6 46/11 46/13 46/20
**down-designations [1]** 46/5
**dozen [1]** 28/2
**due [1]** 50/20
**Dunn [1]** 3/6
**during [3]** 14/1 28/13 46/16
**dynamic [1]** 34/11

**E**

**each [5]** 5/8 7/9 11/1 11/5 35/15
**earlier [1]** 30/14
**EASTERN [2]** 3/5 4/24
**either [3]** 35/25 43/4 46/16
**Elliott [1]** 3/3
**Ellis [1]** 20/4
**else [2]** 14/6 28/3
**emails [1]** 47/18
**employees [1]** 16/20
**employment [1]** 20/10
**encounter [1]** 29/17
**end [2]** 32/12 50/21
**enough [4]** 20/22 29/21 30/2 45/10
**ensue [1]** 20/16
**entered [2]** 37/20 37/24
**entire [1]** 9/13
**entirely [1]** 25/3
**entitled [1]** 52/6
**entity [2]** 19/15 43/20
**Eric [2]** 2/17 4/19
**errors [4]** 12/6 12/19 13/9 13/10
**estoppel [1]** 27/20

**et [2]** 4/5 43/7
**et cetera [1]** 43/7
**ethics [1]** 20/20
**evaluate [1]** 6/22
**evaluating [2]** 23/5 36/5
**even [6]** 11/25 14/13 21/17 23/17 26/22 43/19
**ever [2]** 5/17 7/21
**every [5]** 27/12 33/12 45/6 45/6 46/24
**everybody [2]** 17/5 28/3
**everyone [1]** 42/10
**evidence [4]** 22/19 24/13 28/11 28/12
**exactly [1]** 27/6
**examine [2]** 41/7 41/9
**examining [1]** 41/6
**example [6]** 26/25 30/7 30/13 31/15 46/10 46/10
**except [1]** 23/19
**exception [1]** 25/25
**excised [1]** 7/20
**excluded [3]** 37/12 37/13 37/14
**exhibit [1]** 45/23
**exhibits [1]** 45/22
**exist [2]** 43/19 43/20
**existing [1]** 36/23
**expect [4]** 38/6 38/8 38/11 42/25
**expects [1]** 24/22
**experience [2]** 14/25 15/18
**expert [37]** 5/15 5/16 5/18 6/20 11/11 11/20 11/22 11/25 13/5 13/17 14/14 14/15 14/18 14/18 15/10 15/18

15/19 18/7 23/4 27/6 28/7 28/15 28/16 38/21 39/12 40/14 41/11 45/22 47/1 47/2 48/10 49/9 49/18 50/6 50/10 50/11 50/23
**expert's [1]** 13/20
**expertise [2]** 10/15 13/7
**experts [11]** 12/1 12/4 12/7 13/1 13/10 13/13 13/25 14/3 14/5 15/9 40/9
**explaining [1]** 7/16
**explanation [3]** 5/12 29/15 39/10
**expressing [1]** 11/9
**extent [1]** 36/25

**F**

**fact [8]** 21/15 21/23 23/25 25/24 27/15 31/6 36/9 36/22
**facts [1]** 34/22
**fail [1]** 29/14
**fails [1]** 23/25
**fairly [1]** 7/9
**faith [1]** 38/14
**fall [1]** 45/16
**familiar [1]** 34/22
**FAMILYCARE [37]** 1/3 4/4 4/10 4/12 5/14 6/11 7/4 7/14 7/24 8/10 9/6 9/16 11/15 12/8 12/14 12/18 13/3 13/10 15/14 19/14 19/15 21/7 22/3 23/22 24/2 24/9 24/11 25/7 33/21 34/20 36/10 42/14 45/14 46/11 46/17 48/15 48/18
**FamilyCare's [4]** 5/9 5/13 9/4 34/21

## F

**far [8]** 6/10 6/17 6/17 20/2 23/7 38/9 45/8 45/17
**fashioning [1]** 23/24
**fast [2]** 34/3 49/25
**favor [4]** 48/18 48/21 48/23 49/3
**February [1]** 34/21
**few [2]** 18/4 38/24
**fewer [1]** 45/8
**field [1]** 36/24
**Fifth [4]** 2/11 2/14 2/22 3/6
**final [1]** 37/4
**finally [1]** 19/21
**financial [1]** 29/17
**find [2]** 13/9 13/11
**fine [2]** 6/10 10/20
**fingertips [1]** 24/21
**first [8]** 6/5 7/11 9/18 21/1 31/1 33/7 37/19 50/15
**five [2]** 8/21 24/7
**five-year-old [1]** 24/7
**Floor [2]** 2/4 2/18
**flux [1]** 25/3
**foaming [2]** 32/19 34/18
**follow [4]** 5/6 5/8 7/5 26/21
**follow-up [1]** 5/6
**followed [1]** 26/3
**following: [1]** 29/14
**following: Understanding [1]** 29/14
**foregoing [1]** 52/4
**forget [1]** 27/3
**formulated [1]** 6/25
**four [1]** 24/6

**Frank [2]** 3/5 4/23
**fresher [3]** 22/5 22/6 22/7
**freshest [1]** 22/8
**front [1]** 15/1
**function [1]** 5/22
**fundamentally [1]** 9/3
**further [1]** 49/23
**future [8]** 18/10 18/11 19/2 22/2 23/8 26/3 31/9 43/13

## G

**gain [1]** 27/9
**gained [1]** 43/11
**gaining [3]** 20/13 41/2 44/10
**game [2]** 11/3 27/22
**games [2]** 27/22 48/24
**Garvey [1]** 2/17
**gate [1]** 27/17
**gather [1]** 23/7
**gave [2]** 46/8 46/17
**general [18]** 5/3 5/4 5/9 5/22 6/11 6/18 6/24 7/2 9/10 9/15 9/17 11/21 12/7 12/7 15/21 21/10 39/11 49/3
**generally [4]** 9/11 9/11 11/13 33/12
**generosity [1]** 46/9
**generous [1]** 46/8
**get [20]** 6/17 7/25 8/11 11/22 12/16 13/13 15/9 17/25 21/21 26/17 27/19 33/3 33/23 43/10 44/12 44/13 45/5 50/6 50/9 50/10
**gets [1]** 39/14
**getting [3]** 13/5 38/1 38/24
**give [7]** 5/6 32/11

34/24 35/24 43/8 48/5 48/7
**given [3]** 10/21 18/9 42/3
**go [15]** 7/13 8/8 11/18 12/4 17/24 23/7 29/21 30/2 37/22 40/18 42/6 43/3 49/1 49/7 50/23
**goalposts [1]** 47/8
**goes [3]** 6/10 12/7 19/7
**going [34]** 8/2 8/5 8/12 9/4 9/12 10/25 14/20 15/24 21/14 23/9 25/6 25/11 25/20 27/19 27/23 29/12 31/8 32/25 33/17 34/25 35/2 38/23 41/24 42/10 42/10 42/22 42/22 42/23 43/25 45/10 48/6 48/25 48/25 51/8
**gone [4]** 17/19 17/19 17/20 36/11
**good [11]** 4/7 4/9 4/11 4/15 4/17 4/23 11/23 15/18 32/20 34/1 38/14
**Gordon [2]** 2/6 4/12
**got [10]** 6/17 26/15 27/24 34/25 35/24 35/25 36/1 36/1 46/17 46/25
**gotten [1]** 34/25
**governing [1]** 25/13
**Graham [1]** 3/6
**grant [1]** 49/3
**granted [1]** 20/3
**grave [1]** 37/7
**greater [1]** 6/3
**greatest [1]** 35/19
**Greg [1]** 4/17
**Gregory [1]** 2/21
**grounded [1]** 39/2
**groups [1]** 39/10

**G**

**guess [10]** 8/4 21/7 27/13 35/2 35/21 36/12 36/20 39/23 49/20 49/22
**guidance [1]** 34/3
**guides [1]** 31/9

**H**

**had [11]** 14/24 15/1 26/7 27/18 27/22 28/12 32/20 38/10 44/18 45/14 46/19
**happen [4]** 24/20 49/25 50/4 50/17
**happened [1]** 14/25
**happening [1]** 15/4
**happens [2]** 14/22 27/12
**happy [2]** 45/24 46/9
**hard [3]** 34/3 39/18 46/3
**hard to [1]** 39/18
**hard-and-fast [1]** 34/3
**harm [3]** 34/18 35/18 36/6
**harmed [4]** 26/5 26/18 26/18 26/22
**harms [1]** 35/1
**has [40]** 7/9 9/4 9/7 10/14 10/15 10/16 10/17 11/24 12/18 12/19 13/15 13/17 13/19 14/15 14/19 15/12 15/13 20/7 23/5 24/10 25/5 25/7 27/4 28/12 28/15 28/19 30/4 30/5 33/11 33/22 34/19 38/5 38/16 38/21 40/15 43/13 45/14 46/16 47/4 47/9

**hasn't [2]** 28/20 41/16
**hauled [1]** 27/16
**have [99]**
**haven't [6]** 14/24 36/11 40/11 43/23 47/1 47/2
**having [7]** 27/5 28/8 28/14 28/21 40/2 43/2 46/22
**he [33]** 8/14 10/2 10/14 10/15 10/16 10/17 11/24 12/19 12/22 13/17 13/19 14/16 15/13 15/15 15/15 15/15 15/16 19/10 24/16 24/22 26/9 26/12 26/13 26/21 27/3 33/2 33/3 37/14 39/14 40/23 41/15 41/16 41/17
**he's [9]** 10/24 10/24 11/17 11/21 15/14 26/8 26/10 26/11 32/25
**headed [1]** 21/16
**HEALTH [20]** 1/6 1/9 2/9 2/20 3/2 4/5 4/14 4/16 4/22 6/15 7/7 8/9 22/3 24/2 26/12 28/1 33/15 34/19 46/10 47/15
**healthcare [1]** 34/10
**hear [2]** 27/13 37/3
**heard [2]** 32/24 51/2
**hearing [1]** 7/17
**Heath [1]** 4/18
**help [13]** 5/1 5/15 7/23 10/4 13/11 21/24 29/3 30/1 30/3 34/23 42/14 42/15 43/12
**helpful [3]** 5/6 10/22 30/25
**helping [1]** 10/16
**her [1]** 20/10
**Herbold [1]** 2/10

**here [22]** 4/25 5/14 6/10 11/9 14/13 15/24 18/3 21/3 29/23 31/11 31/17 32/7 33/9 34/17 35/1 35/16 37/6 37/11 38/19 39/21 47/19 48/24
**here's [5]** 5/18 5/19 5/21 6/16 13/18
**here's the [1]** 13/18
**Hern [2]** 2/13 4/21
**high [2]** 25/17 25/18
**highly [2]** 27/9 35/24
**him [2]** 5/20 14/2
**himself [1]** 15/16
**hired [1]** 14/5
**his [5]** 1/8 9/19 13/11 15/17 26/23
**historical [5]** 15/13 15/14 15/18 40/24 41/10
**Honor [37]** 4/3 4/7 4/11 4/16 4/17 4/23 10/5 11/12 12/10 13/4 16/9 17/9 18/3 18/20 21/2 21/9 22/1 24/20 29/1 29/11 30/3 33/7 34/1 36/5 36/20 36/21 42/8 45/13 47/12 48/3 48/8 48/15 49/5 50/13 50/20 51/4 51/7
**HONORABLE [1]** 1/17
**horrible [1]** 32/19
**hospitals [2]** 43/1 43/4
**how [25]** 5/12 5/23 7/17 9/19 12/5 12/8 12/14 12/15 12/21 12/24 13/16 14/10 15/18 19/22 23/6 37/9 38/21 38/23 42/17 42/20 45/2 48/13 48/21 48/25 50/11

**however [1]** 6/25
**huge [1]** 44/21
**humanly [1]** 26/22
**humans [1]** 37/9
**hypothetical [1]** 25/24

**I**

**I'd [9]** 5/3 9/21 14/24 29/5 32/20 34/24 35/2 37/3 42/7
**I'll [6]** 5/3 5/4 7/4 9/15 48/5 48/7
**I'm [26]** 7/15 7/16 7/16 13/23 16/3 16/11 16/19 23/4 28/16 28/16 29/12 32/5 34/22 34/25 36/4 36/5 37/10 39/19 39/19 44/8 48/6 48/6 48/24 48/24 48/25 49/18
**I've [5]** 7/14 8/4 11/22 14/17 15/1
**idea [12]** 5/7 7/12 7/18 8/22 12/1 14/4 27/10 27/21 29/8 29/24 37/11 37/14
**ideal [3]** 5/10 5/17 5/17
**ideas [3]** 12/3 13/1 13/5
**identified [5]** 12/19 40/12 41/15 47/1 50/5
**identify [2]** 41/3 50/7
**if [68]**
**immediately [2]** 24/2 26/18
**impediment [3]** 14/20 38/21 38/23
**implicated [1]** 41/17
**importance [2]** 40/14 40/15
**important [2]** 13/7

**improperly [1]** 46/1
**in [203]**
**inaccurate [2]** 12/13 12/14
**INC [3]** 1/3 4/4 4/10
**include [1]** 23/25
**includes [1]** 29/17
**including [4]** 16/15 19/16 20/5 20/6
**inconveniences [1]** 28/22
**incorporated [1]** 50/5
**incumbent [1]** 6/18
**independent [2]** 20/13 20/15
**independently [2]** 31/22 32/10
**indicated [1]** 10/11
**individual [2]** 26/6 26/25
**individually [1]** 1/8
**individuals [1]** 16/11
**industry [3]** 15/11 15/12 40/24
**information [42]** 18/14 19/4 20/6 24/11 27/2 27/10 27/12 30/24 33/4 33/25 34/2 34/6 34/9 34/13 34/15 34/20 35/5 35/8 35/12 35/13 35/15 35/20 35/23 35/25 36/9 36/10 36/13 36/14 36/15 36/18 36/19 36/21 37/25 38/15 42/3 42/14 42/20 43/3 43/6 43/11 44/13 49/21
**informed [2]** 11/24 15/17
**initially [1]** 13/16
**input [1]** 32/12
**inserted [2]** 18/8 19/13

**insights [1]** 15/8
**insisted [1]** 20/16
**insistence [1]** 19/12
**insisting [1]** 22/11
**instead [1]** 5/20
**instincts [1]** 9/13
**instructions [1]** 46/8
**intend [1]** 43/24
**interrupt [1]** 39/19
**INTERVENOR [3]** 2/13 2/16 2/20
**into [12]** 10/25 11/18 12/16 12/16 18/8 23/8 27/16 33/23 33/25 37/21 47/9 50/10
**involuntarily [1]** 27/16
**involved [4]** 10/14 10/16 29/5 51/10
**involves [1]** 6/13
**irrelevant [2]** 7/22 21/5
**is [174]**
**isn't [5]** 6/14 7/11 8/3 15/24 37/16
**issue [10]** 5/1 7/13 7/18 7/20 7/20 7/23 21/6 39/12 47/19 48/10
**issued [1]** 25/5
**issues [4]** 11/15 11/16 12/7 21/1
**it [115]**
**it goes [1]** 19/7
**it's [68]**
**item [3]** 24/10 40/19 40/19
**iterative [1]** 41/14
**its [3]** 23/6 31/6 42/15

**J**

**Jackie [1]** 20/4
**January [5]** 22/10 22/13 37/22 47/14 47/21

## J

**January 1 [4]** 22/10 22/13 47/14 47/21
**Jeff [1]** 4/21
**Jeffrey [1]** 2/13
**job [3]** 28/16 30/16 41/6
**joined [2]** 7/8 21/4
**JUDGE [7]** 1/18 7/2 7/25 8/13 9/14 15/23 37/17
**judgment [1]** 29/13
**just [35]** 5/4 7/1 8/9 10/20 10/25 11/13 11/20 14/23 15/2 15/9 15/13 15/16 17/5 17/7 18/3 18/6 19/3 21/20 22/15 25/23 27/25 28/25 29/3 29/12 33/2 35/4 37/8 37/22 39/6 39/20 41/25 44/9 46/4 47/4 49/1
**justify [1]** 6/8

## K

**keep [4]** 17/12 33/20 38/9 41/24
**key [7]** 21/11 22/1 23/20 28/4 45/9 45/19 45/21
**kind [1]** 36/23
**know [41]** 7/17 8/9 8/17 8/17 8/19 8/19 9/1 9/9 9/10 11/2 11/3 13/23 13/25 13/25 14/1 14/3 14/5 15/3 21/18 25/5 25/18 26/25 29/21 33/6 34/10 34/18 39/18 39/24 40/1 40/3 40/5 40/6 40/21 40/21 42/10 42/23 43/18 45/2 45/17

## L

47/3 48/25
**knowledge [6]** 10/18 11/24 15/11 15/17 40/15 41/10
**knowledgeable [2]** 11/14 11/18
**known [1]** 27/22
**knows [4]** 11/23 12/10 14/12 24/9

## L

**lack [1]** 5/10
**landscape [4]** 8/13 36/8 36/8 37/20
**Langfitt [2]** 3/5 4/24
**large [2]** 22/24 39/10
**largely [1]** 21/5
**Larry [1]** 24/15
**last [5]** 7/17 8/10 9/19 30/14 47/8
**late [2]** 30/14 46/11
**latest [1]** 22/24
**lawyers [2]** 14/2 45/18
**lay [1]** 7/5
**leads [1]** 8/20
**least [1]** 25/17
**leave [4]** 14/20 15/1 28/13 47/4
**leaving [1]** 41/5
**Lee [3]** 20/4 20/9 20/21
**left [1]** 33/22
**legitimately [2]** 32/22 32/23
**less [4]** 22/7 25/1 37/10 37/23
**let [5]** 9/16 20/25 39/7 41/25 44/12
**let's [5]** 19/3 21/10 22/12 33/2 49/1
**letter [1]** 25/9
**level [1]** 36/23
**levels [1]** 19/25

**Lewis [1]** 20/4
**like [14]** 5/3 8/25 9/5 9/21 20/4 29/5 37/3 40/16 42/7 44/2 44/21 44/23 49/11 51/5
**likelihood [2]** 25/17 25/18
**likely [4]** 8/6 22/19 32/2 47/18
**limitation [1]** 28/8
**limitations [3]** 18/10 18/11 18/16
**limited [2]** 21/20 25/15
**Lindenauer [2]** 2/17 4/19
**list [3]** 39/9 45/24 46/12
**listed [1]** 18/23
**Litigate [1]** 50/9
**litigated [2]** 15/1 27/21
**litigating [1]** 45/11
**litigation [10]** 10/17 11/5 11/13 11/21 12/16 18/22 27/11 35/9 50/4 50/16
**little [2]** 39/7 46/8
**LLP [4]** 2/3 2/6 2/22 3/6
**long [3]** 6/23 17/25 50/11
**look [17]** 6/5 8/11 8/24 10/22 12/19 15/16 22/20 23/1 23/2 23/7 23/9 24/22 29/8 31/18 31/25 45/24 47/17
**look-back [2]** 8/24 31/18
**looked [4]** 23/18 29/24 40/11 41/15
**looking [7]** 12/17 24/14 29/10 30/10 30/17 32/18 45/22
**looks [2]** 22/21 31/18

## L

**lose [1]** 44/8
**loser [1]** 25/20
**lot [5]** 8/11 36/1 36/14 41/21 46/5
**LYNNE [1]** 1/9

## M

**made [2]** 21/3 21/8
**main [1]** 26/10
**majority [1]** 45/15
**make [20]** 6/13 7/9 9/1 18/1 21/4 22/23 23/8 25/14 25/19 27/14 32/1 32/7 32/15 33/4 39/20 44/9 44/18 44/20 49/24 50/4
**makes [10]** 6/12 7/24 8/17 8/18 8/19 8/20 21/16 23/13 29/21 29/23
**making [3]** 27/13 30/11 36/5
**man [2]** 26/8 37/8
**manipulated [1]** 12/20
**many [4]** 10/10 10/12 14/25 40/22
**mark [1]** 46/7
**marked [2]** 45/21 46/24
**market [3]** 28/4 34/11 44/1
**Markowitz [1]** 2/10
**massive [1]** 39/17
**material [2]** 7/11 16/16
**matter [5]** 6/7 15/18 36/13 48/12 48/20
**matters [1]** 36/14
**Matthew [2]** 2/6 4/11
**may [11]** 25/14 29/22 30/5 30/17 40/14 40/21 44/12 44/15 46/10

**maybe [4]** 5/5 7/8 15/25 31/12
**McCracken [3]** 2/21 4/15 33/20
**MCOs [1]** 31/15
**me [27]** 6/18 6/22 7/1 8/20 9/5 9/6 10/4 10/6 14/23 15/1 15/6 16/1 16/7 16/7 16/22 20/25 21/24 24/25 29/4 29/21 29/23 30/1 34/23 36/15 39/7 39/22 50/25
**mean [12]** 9/2 9/25 13/25 14/24 21/21 23/1 23/2 26/9 40/3 41/9 44/7 44/8
**meaning [3]** 19/2 22/15 49/3
**means [6]** 13/17 13/20 14/22 14/23 29/9 33/18
**Medicaid [5]** 19/16 28/4 34/7 42/13 43/2
**Medicare [1]** 34/8
**meet [3]** 6/5 25/15 50/22
**meeting [1]** 33/15
**meetings [1]** 14/18
**meets [1]** 25/16
**members [2]** 42/14 43/2
**memo [1]** 29/13
**mentioned [2]** 13/5 38/17
**met [1]** 41/21
**methodology [1]** 5/24
**MICHAEL [1]** 1/17
**middle [1]** 15/2
**might [19]** 6/25 8/24 9/1 9/2 9/6 9/13 17/3 19/20 21/17 22/2 22/6 22/24 26/9 27/3 27/21

**Miller [1]** 3/6
**mind [6]** 26/7 29/6 33/20 37/9 38/9 40/11
**minor [1]** 44/9
**misleading [2]** 12/13 12/14
**miss [1]** 14/2
**missing [2]** 5/22 15/7
**misunderstood [1]** 7/15
**MO [2]** 1/4 4/4
**model [1]** 28/14
**mollify [1]** 42/2
**moment [4]** 20/25 28/25 47/24 49/9
**Monday [1]** 48/17
**Montalbano [2]** 3/2 4/13
**months [6]** 18/4 21/18 37/23 37/23 38/24 45/15
**more [23]** 5/2 5/8 6/12 8/23 9/3 9/9 10/11 11/13 11/24 13/12 14/3 18/6 18/6 20/2 21/17 21/20 21/21 22/16 32/1 38/9 39/2 39/7 49/12
**morning [6]** 4/7 4/9 4/11 4/15 4/17 4/23
**Morrison [1]** 2/18
**MOSMAN [1]** 1/17
**most [11]** 5/25 11/14 22/4 24/16 26/8 27/2 27/4 33/15 38/15 45/17 50/3
**motion [19]** 5/2 5/3 5/4 5/9 5/22 6/12 6/13 6/18 6/24 9/10 15/21 15/22 15/24 17/2 18/2 21/10 29/13 49/4 49/6

## M

**motions [2]** 10/14 50/20

**mouth [2]** 32/19 34/18

**Mr [7]** 2/6 2/13 2/17 2/21 2/21 3/5 48/23

**Mr. [56]**

**Mr. Chaimov [2]** 24/19 28/25

**Mr. Larry [1]** 24/15

**Mr. McCracken [1]** 33/20

**Mr. Murray [43]** 5/20 5/21 10/1 10/15 10/21 10/23 10/23 11/8 11/10 11/14 11/23 12/18 13/9 13/15 14/12 14/13 14/18 14/19 15/8 15/12 19/3 20/1 25/23 26/3 26/6 26/17 28/12 28/17 28/19 28/19 32/25 36/6 37/2 37/12 37/14 39/12 40/16 40/23 41/7 41/10 41/15 47/4 47/21

**Mr. Murray's [2]** 5/15 13/6

**Mr. Soderberg [2]** 24/21 30/4

**Mr. Suchorzewski [5]** 10/1 10/14 20/1 37/2 47/22

**Ms [3]** 2/3 2/10 3/2

**Ms. [2]** 20/9 20/21

**Ms. Lee [2]** 20/9 20/21

**much [11]** 7/23 8/3 11/18 14/5 18/1 25/2 34/19 36/16 38/21 38/23 44/17

**multiple [3]** 19/25 25/14 46/12

**multiply [1]** 35/1

**multitude [1]** 20/5

**Murray [45]** 5/20 5/21 9/18 10/1 10/15 10/21 10/23 10/23 11/8 11/10 11/14 11/23 12/18 13/9 13/15 14/12 14/13 14/18 14/19 15/8 15/12 19/3 20/1 25/23 26/3 26/6 26/17 28/12 28/17 28/19 28/19 32/25 36/6 37/2 37/12 37/14 39/12 40/16 40/23 41/7 41/10 41/15 47/4 47/21 48/23

**Murray's [2]** 5/15 13/6

**my [13]** 7/4 9/12 9/17 11/22 12/25 21/19 24/21 28/16 29/6 36/12 40/11 48/5 48/7

## N

**N.W [1]** 2/4

**nail [1]** 29/5

**name [2]** 4/6 9/19

**Nash [1]** 3/6

**nature [3]** 15/2 37/8 42/8

**nearly [1]** 17/10

**necessary [1]** 6/14

**need [24]** 5/13 5/19 6/20 9/9 9/25 10/3 10/10 11/9 11/18 15/3 15/25 16/1 28/17 34/24 39/9 39/11 39/23 39/24 40/2 40/3 40/5 41/4 42/12 44/15

**needs [7]** 5/15 5/21 25/16 39/2 39/12 47/1 47/2

**negotiated [1]** 26/7

**network [2]** 42/12 42/15

**never [1]** 23/18

**new [1]** 9/6

**newer [1]** 9/4

**next [1]** 38/24

**nine [1]** 45/15

**no [20]** 1/4 4/4 15/18 16/3 20/9 20/14 25/10 28/15 28/15 28/19 32/3 33/16 35/22 35/25 36/14 46/14 46/16 48/12 48/20 51/4

**No. [1]** 24/17

**No. 230 [1]** 24/17

**nobody [1]** 14/2

**non [4]** 1/3 8/2 8/20 9/5

**non-profit [1]** 1/3

**non-stale [1]** 8/20

**noncompetitive [7]** 8/2 8/6 8/6 8/8 9/12 25/8 42/3

**nor [1]** 5/25

**normal [1]** 9/12

**not [102]**

**nothing [8]** 5/17 9/8 10/2 14/23 25/8 27/4 32/21 47/9

**notice [1]** 25/6

**now [21]** 5/23 8/15 9/1 10/7 17/13 18/3 20/21 21/18 31/11 32/11 33/22 37/14 37/22 38/5 38/19 38/20 43/19 44/3 45/11 45/13 48/16

**number [11]** 12/3 15/14 25/15 33/7 37/19 38/17 39/16 39/17 44/19 45/1 45/3

## O

**o0o [1]** 52/2

**obligation [1]** 38/14

**obstacle [3]** 39/1 39/4 39/8

**obstacles [1]**  5/7
**obvious [1]**  27/15
**obviously [1]**  38/4
**October [5]**  1/7 4/2 38/19 50/21 52/9
**of Schramm [1]**  4/14
**off [3]**  22/9 22/12 46/9
**offer [2]**  15/8 28/15
**offered [2]**  28/19 28/20
**officer [2]**  26/10 46/24
**official [2]**  1/8 52/11
**OHA [39]**  4/8 7/14 7/19 12/17 12/20 12/22 12/23 12/24 17/19 21/7 22/19 22/21 23/5 24/22 25/13 25/14 29/12 30/5 30/5 30/9 30/11 30/15 31/6 31/12 31/18 31/21 32/9 32/12 33/11 33/17 33/18 34/20 42/23 43/6 44/22 44/22 44/23 45/16 46/7
**OHA's [2]**  25/16 25/18
**okay [3]**  11/20 14/19 51/13
**old [6]**  22/6 24/7 34/10 34/15 42/4 45/14
**omnibus [1]**  18/2
**on [64]**
**once [2]**  34/9 43/10
**one [41]**  7/7 8/1 10/3 10/24 12/25 13/5 13/6 13/6 15/6 20/8 22/1 23/20 24/17 26/6 26/17 27/5 27/6 27/14 27/15 27/18 28/14 28/19 29/8 29/9 31/3 31/7 31/9 34/20 39/16 42/8 43/23 45/8 45/8 45/10 45/11 45/11 45/11 46/14

**ones [1]**  40/12
**ongoing [2]**  41/14 41/18
**only [19]**  7/20 10/19 10/24 18/21 19/8 22/21 23/1 23/22 31/3 31/6 31/8 31/9 36/23 38/14 38/14 40/15 41/5 41/7 49/24
**operating [2]**  26/10 46/23
**opinion [3]**  22/13 22/16 28/17
**opponents [1]**  32/18
**opportunity [1]**  15/7
**opposing [1]**  33/10
**Optumas [13]**  12/17 12/20 12/22 17/20 19/18 19/20 20/7 20/8 28/1 29/18 29/19 31/22 32/12
**Optumas's [1]**  51/8
**or [60]**
**oral [2]**  1/15 4/3
**oranges [1]**  29/23
**order [42]**  5/24 5/25 6/1 7/1 11/10 14/24 16/5 16/13 16/14 16/18 16/23 17/1 17/4 18/9 18/12 19/19 19/22 20/1 20/12 25/25 26/2 26/4 27/18 27/20 28/2 28/5 33/1 37/1 37/5 37/21 37/24 38/2 38/13 38/18 39/13 42/1 43/1 44/16 45/25 47/9 48/16 48/23
**orders [3]**  5/25 15/3 27/10
**OREGON [13]**  1/2 1/3 1/6 1/7 1/9 1/10 2/9 3/5 4/4 4/24 15/12 19/17

**original [1]**  52/6
**Ostrander [1]**  3/3
**other [29]**  7/8 11/5 12/8 12/15 12/23 13/3 13/11 13/20 14/7 14/10 14/10 14/15 16/16 18/15 18/18 19/9 20/3 24/3 25/10 28/1 31/14 32/15 33/19 35/16 40/12 40/22 41/6 41/22 45/6
**others [1]**  41/16
**otherwise [1]**  49/25
**our [22]**  7/17 10/11 11/22 11/25 12/4 20/13 26/6 26/10 26/12 27/1 27/2 28/7 33/21 35/24 39/21 43/2 44/13 46/23 48/23 49/9 50/20 51/10
**out [18]**  7/5 10/21 15/7 18/12 20/18 30/12 35/4 35/6 42/22 42/22 43/3 44/1 44/24 45/3 45/8 45/8 50/1 50/11
**outcome [1]**  31/25
**outset [1]**  27/9
**outside [3]**  15/11 15/19 43/13
**outstanding [1]**  38/20
**over [13]**  8/14 10/13 16/12 17/10 17/18 17/18 17/21 22/16 34/14 38/7 44/10 45/14 50/16
**over-designated [2]**  10/13 17/21
**over-designation [2]**  17/10 38/7
**overlays [1]**  5/23
**overlooked [1]**  31/12
**own [4]**  13/20 14/6 14/9 31/23

**p.m [1]** 48/17
**pace [1]** 51/5
**PACIFICSOURCE [2]** 2/17 4/19
**page [1]** 29/13
**pages [1]** 38/12
**paragraph [4]** 18/12 18/16 19/21 24/21
**paragraphs [5]** 16/15 18/12 18/13 18/24 20/19
**paraphrase [1]** 26/20
**part [9]** 8/17 11/12 11/12 15/13 15/17 36/8 39/24 40/13 42/24
**participating [1]** 18/17
**particular [13]** 5/11 6/15 11/3 11/16 13/6 24/9 24/10 25/19 26/11 31/7 39/2 39/3 39/5
**particularly [4]** 13/7 15/12 16/16 42/2
**particulars [1]** 11/25
**parties [7]** 16/19 35/9 35/10 35/11 35/12 37/17 39/6
**parties who [1]** 35/10
**PARTNERS [2]** 3/2 4/14
**party [11]** 6/2 6/4 6/5 6/8 18/23 27/11 27/15 35/16 35/17 46/24 46/25
**past [2]** 31/8 46/2
**PATRICK [2]** 1/7 2/10
**pause [1]** 48/2
**pay [1]** 34/13
**PC [2]** 2/10 3/3
**people [9]** 15/1 16/24 16/25 17/3 17/5 17/6

**percent [2]** 44/25 45/5
**perform [1]** 5/21
**performance [3]** 37/13 37/15 38/6
**performed [1]** 37/17
**Perhaps [1]** 5/6
**period [2]** 24/14 29/5
**Perkins [2]** 2/3 2/6
**permanently [1]** 48/6
**person [6]** 10/22 10/24 11/14 18/23 26/23 41/5
**person's [1]** 19/19
**personally [1]** 40/11
**persons [1]** 16/12
**perspective [2]** 15/13 15/14
**persuade [1]** 36/15
**pharmaceutical [1]** 24/10
**piece [4]** 12/6 16/22 28/7 50/16
**place [6]** 20/19 26/15 27/4 42/25 43/1 47/9
**placed [2]** 20/3 20/10
**Plaintiff [2]** 1/4 2/3
**plan [2]** 4/22 11/3
**play [2]** 33/25 48/24
**players [1]** 28/4
**playing [1]** 36/24
**please [1]** 4/6
**plenty [1]** 48/18
**point [18]** 5/18 10/9 20/12 20/21 25/4 30/4 31/1 31/11 34/17 35/4 36/20 44/9 44/18 45/9 45/18 46/16 47/2 47/15
**pointed [1]** 20/18
**points [1]** 42/8
**Policy [1]** 33/15
**pool [1]** 43/6
**portion [2]** 27/5 28/14

**Portland [9]** 1/10 2/4 2/11 2/15 2/18 2/23 3/4 3/7 3/11
**portrayed [2]** 12/14 12/15
**position [5]** 23/16 25/7 36/24 42/19 51/10
**possibility [2]** 7/16 33/23
**possible [1]** 26/22
**post [2]** 18/10 37/14
**potential [2]** 35/18 35/19
**practice [1]** 31/9
**precise [1]** 7/20
**preliminary [1]** 45/23
**premised [1]** 7/12
**prep [1]** 18/19
**preparation [3]** 5/16 11/11 38/22
**preparing [1]** 18/7
**present [3]** 12/2 13/1 42/23
**presented [2]** 13/16 33/14
**presenting [2]** 39/8 49/21
**Preston [1]** 3/3
**pretty [2]** 44/2 46/3
**previous [1]** 10/13
**pricing [2]** 34/10 34/11
**principal [1]** 5/7
**prior [5]** 22/13 22/17 23/9 29/9 29/18
**probably [3]** 11/14 40/25 46/8
**problem [13]** 5/10 6/23 7/4 7/6 7/7 7/10 8/3 13/18 17/9 36/12 40/13 41/13 46/22
**problems [3]** 18/5 20/16 28/21

**procedures [1]** 45/25
**proceed [1]** 51/5
**proceeding [1]** 18/21
**proceedings [4]** 1/16 48/2 51/16 52/5
**process [30]** 6/25 8/3 9/11 13/21 13/21 17/25 19/3 19/5 19/8 19/17 23/2 23/4 23/25 25/1 25/7 25/8 25/11 26/13 29/16 32/14 41/14 41/18 42/9 43/14 43/16 44/4 44/10 46/3 46/18 46/19
**procurement [9]** 22/19 23/21 23/22 23/25 24/23 26/13 33/8 42/3 43/13
**procurements [1]** 30/24
**produce [6]** 22/4 22/11 47/19 48/11 48/16 49/9
**produced [8]** 11/5 12/23 19/23 27/19 44/24 44/25 45/16 48/17
**professional [1]** 26/9
**professionals [1]** 29/16
**profit [1]** 1/3
**program [1]** 19/16
**progress [1]** 18/1
**progressive [1]** 22/14
**projections [1]** 23/8
**proper [1]** 41/6
**properly [1]** 41/7
**proposition [3]** 25/9 25/11 44/3
**prospective [1]** 29/19
**protection [5]** 19/25

**protections [9]** 19/13 20/2 26/8 26/24 36/7 37/1 37/12 42/1 42/2
**protective [39]** 5/24 5/25 5/25 6/1 7/1 14/23 15/3 16/5 16/12 16/13 16/14 16/18 16/23 17/1 17/4 18/9 18/12 19/18 19/21 20/1 20/12 25/25 26/1 26/4 27/10 27/18 28/2 28/5 33/1 37/1 37/5 37/21 37/24 38/2 38/13 38/18 42/1 45/25 47/9
**proven [1]** 38/16
**provide [3]** 10/2 11/8 43/2
**provided [2]** 20/5 21/7
**provider [6]** 23/23 24/3 24/4 26/14 42/12 42/15
**providers [3]** 42/19 43/3 43/7
**provisions [1]** 20/19
**publicly [1]** 38/11
**purpose [8]** 6/20 16/16 16/17 18/15 18/18 18/25 19/9 19/11
**purposes [1]** 21/9
**pursuant [1]** 22/4
**put [7]** 27/4 28/10 28/11 28/12 46/22 47/9 50/10

## Q

**qualified [3]** 33/12 44/16 45/18
**qualify [2]** 42/11 42/12
**qualifying [1]** 42/16
**question [6]** 8/4 10/7 12/25 34/1 35/18 47/22
**questions [8]** 5/6 5/8

21/21 32/11
**quick [1]** 21/20
**quickly [2]** 38/3 46/4
**quite [2]** 27/20 33/5

## R

**race [1]** 43/16
**raised [2]** 20/8 47/16
**raising [1]** 51/6
**rampant [1]** 38/7
**rapidly [1]** 50/17
**rate [18]** 11/15 13/2 19/16 19/17 24/10 26/14 29/4 29/8 29/15 31/6 31/20 31/25 32/2 32/3 32/8 32/9 32/9 32/13
**rate-setting [5]** 11/15 19/16 19/17 29/15 32/13
**rates [21]** 7/14 7/19 12/5 12/12 19/17 21/6 23/5 24/23 29/9 29/16 29/18 30/6 30/15 30/18 31/1 31/8 31/13 31/14 31/16 31/16 32/13
**rather [1]** 27/14
**read [1]** 8/20
**reading [2]** 8/4 16/19
**ready [6]** 38/24 43/21 48/16 49/6 49/9 50/23
**real [2]** 35/22 36/14
**realize [1]** 41/16
**really [17]** 5/17 6/2 6/12 6/14 7/1 7/25 8/7 9/7 12/15 28/7 32/6 32/20 34/23 36/16 39/25 41/20 41/20
**reason [2]** 10/9 26/15
**reasonable [1]** 45/3
**reasons [1]** 33/7

**R**

reasons: [1] 34/20
reasons: one [1] 34/20
recent [3] 22/4 24/16 33/15
recess [3] 48/5 48/6 51/15
recognize [1] 22/14
recognized [1] 35/19
recommended [1] 46/13
reconciled [1] 12/21
record [6] 4/6 22/19 25/8 30/14 46/22 52/5
redaction [1] 6/6
redo [3] 7/2 16/1 16/3
redone [1] 8/1
refuse [1] 43/24
regime [2] 16/1 16/4
region [2] 25/19 28/3
regulation [2] 25/10 25/13
regulations [1] 25/13
related [1] 50/22
relative [1] 22/14
relatively [1] 14/4
relevance [1] 21/10
relevant [3] 7/12 21/15 21/17
reliance [2] 28/5 37/17
relied [1] 28/1
relief [2] 21/12 46/21
remain [1] 46/15
remedy [1] 23/24
remember [1] 34/17
render [1] 28/17
repeatedly [1] 46/4
report [9] 5/19 14/11 27/6 28/7 39/12 47/3 50/6 50/10 50/11

REPORTER [2] 3/10 52/11
reports [7] 5/16 11/11 11/21 38/21 48/10 49/10 50/23
representing [1] 12/4
request [8] 5/11 6/22 7/1 25/6 25/6 25/11 33/10 33/11
requested [2] 7/12 21/5
requesting [2] 21/12 22/3
requests [2] 25/13 46/19
require [2] 49/13 49/14
requires [2] 12/16 29/15
resistance [1] 41/21
resisted [1] 38/1
resolution [2] 5/1 6/7
resolve [3] 6/6 6/19 34/23
resolving [1] 5/11
respect [4] 12/18 20/21 22/18 26/9
respond [3] 9/17 29/2 42/7
responded [3] 17/21 28/4 46/20
responds [1] 6/15
response [3] 28/6 37/3 37/10
restrict [1] 19/13
restricted [1] 18/22
restricting [1] 19/19
restrictions [7] 16/14 19/18 20/9 20/17 20/18 26/1 26/4
resulted [1] 46/5
retaliatory [1] 12/11
rethink [1] 9/13

returned [1] 19/24
review [3] 39/13 46/13 46/19
reviewing [3] 10/17 11/4 11/4
revision [1] 15/22
RFA [4] 33/8 33/12 33/17 33/17
right [23] 9/21 9/24 11/9 16/2 16/6 16/20 17/16 21/14 25/21 27/24 30/8 33/5 35/14 36/17 43/17 43/19 43/22 44/3 44/3 45/12 49/9 49/24 51/6
ring [1] 26/16
risen [1] 45/19
RMR [2] 3/10 52/10
robust [2] 36/25 42/1
rolling [1] 23/6
room [6] 3/11 14/20 15/1 26/8 28/13 47/4
round [1] 17/14
rude [1] 39/20
rule [8] 48/13 48/15 48/18 48/21 48/21 48/22 49/1 49/3
rules [2] 27/22 37/18
ruling [5] 48/5 48/7 48/11 49/23 51/7
rulings [1] 49/22
rung [1] 26/17
running [1] 50/1

**S**

S.W [7] 2/11 2/14 2/18 2/22 3/3 3/6 3/11
safe [1] 44/2
said [11] 9/3 17/20 20/14 20/22 33/11 33/11 34/9 34/15 46/17 47/2 47/4

**same [5]** 20/21 31/4 34/20 40/1 42/1
**sanitization [1]** 6/6
**saw [1]** 33/3
**SAXTON [1]** 1/9
**say [17]** 5/18 5/23 8/7 9/19 16/7 16/7 16/15 18/14 26/9 27/5 29/12 33/16 35/2 35/22 39/24 43/25 49/12
**saying [9]** 5/18 6/15 6/23 7/16 15/24 28/16 36/5 36/11 43/5
**says [6]** 8/10 14/19 24/13 24/18 29/14 35/6
**SCHRAMM [2]** 3/2 4/14
**Schubert [1]** 2/17
**Schwabe [1]** 2/14
**screened [1]** 27/1
**search [2]** 47/17 47/18
**seated [1]** 49/2
**Seattle [1]** 2/7
**second [1]** 38/4
**secret [2]** 20/6 37/25
**secrets [2]** 34/12 51/9
**see [16]** 11/10 12/22 26/12 27/2 29/3 29/3 39/23 40/17 41/10 41/11 41/12 41/25 42/21 46/23 46/24 47/2
**seek [5]** 9/4 9/6 22/2 42/14 49/12
**seeking [4]** 9/7 22/8 36/16 46/21
**seeks [1]** 19/15
**seemed [1]** 21/17
**seems [2]** 9/5 44/2
**seen [3]** 14/15 38/20 41/16
**sees [2]** 26/2 41/17

**sense [1]** 32/6
**sensitive [3]** 27/2 27/10 27/11
**September [2]** 25/9 33/16
**September 11th [1]** 33/16
**September 7 [1]** 25/9
**sequitur [1]** 9/5
**seriously [1]** 38/14
**services [1]** 42/13
**set [21]** 4/3 6/7 7/1 7/14 7/19 8/14 8/14 12/5 12/12 12/12 15/17 15/23 21/10 31/2 31/4 31/19 34/22 37/11 37/18 37/22 47/8
**sets [2]** 31/12 32/13
**setting [20]** 11/15 13/2 16/4 19/16 19/17 23/5 26/14 29/4 29/8 29/15 31/6 31/7 31/21 31/25 32/2 32/4 32/8 32/9 32/9 32/13
**setup [1]** 9/13
**seven [1]** 8/21
**several [3]** 17/22 39/16 42/4
**shall [3]** 18/21 18/22 18/23
**shape [1]** 21/16
**share [12]** 2/21 4/16 4/18 6/15 22/3 24/2 26/12 28/1 33/9 34/19 46/10 47/15
**Share's [2]** 7/7 8/9
**She [1]** 20/4
**shocked [1]** 14/24
**shoes [1]** 43/17
**shortly [2]** 48/6 48/7
**should [6]** 8/1 22/9 29/24 35/24 39/14 42/2

**shouldn't [1]** 34/25
**show [3]** 14/19 28/17 42/18
**showing [1]** 42/24
**shown [1]** 21/13
**Shumway [3]** 3/10 52/9 52/10
**side [3]** 5/8 14/15 41/22
**sides [1]** 45/19
**sidesteps [1]** 6/24
**sign [2]** 16/13 43/7
**signature [2]** 52/7 52/7
**significance [1]** 40/23
**significant [2]** 7/9 18/6
**signing [1]** 52/4
**similar [2]** 12/23 34/6
**simple [1]** 41/23
**simply [1]** 16/11
**Simpson [2]** 2/10 4/8
**since [7]** 7/19 14/25 23/18 32/6 37/17 44/1 45/15
**single [2]** 25/15 25/19
**sit [2]** 7/17 15/7
**situation [3]** 49/17 49/20 49/23
**six [4]** 8/21 21/18 37/23 37/23
**slate [1]** 37/11
**slide [1]** 33/14
**slightly [1]** 51/10
**slow [1]** 41/20
**so [91]**
**Soderberg [2]** 24/21 30/4
**Soderberg's [1]** 24/15
**solely [1]** 18/22
**solution [1]** 41/23
**Solutions [1]** 4/20
**solve [1]** 7/23
**some [22]** 5/5 5/5 5/7

**some... [19]** 7/5 9/4 9/16 17/21 22/6 23/24 24/6 27/3 28/17 28/21 30/23 40/4 40/13 40/20 44/10 45/20 49/13 49/14 51/11
**somebody [1]** 40/15
**somehow [1]** 6/6
**someone [1]** 45/6
**something [9]** 5/13 11/1 14/6 29/2 29/5 31/21 31/22 35/5 49/11
**sometimes [1]** 26/16
**Sonia [2]** 3/2 4/13
**sorry [1]** 39/19
**sort [4]** 6/24 8/25 27/16 40/2
**sorts [1]** 13/10
**sound [1]** 44/20
**soundness [3]** 7/13 7/19 21/6
**speak [1]** 20/25
**specific [23]** 5/2 5/4 5/8 5/11 6/11 6/13 6/19 6/21 7/5 9/16 10/6 10/7 17/7 39/2 39/7 39/9 39/25 40/12 46/25 49/12 49/12 50/4 50/16
**specifically [6]** 8/23 10/1 35/5 41/2 47/20 50/5
**specificity [1]** 5/10
**specifics [1]** 14/17
**specify [1]** 40/20
**speed [2]** 11/22 44/13
**spelled [1]** 18/11
**stale [23]** 8/12 8/15 8/16 8/17 8/18 8/18 8/19 8/20 8/22 9/3 9/7 9/9 9/11 21/24 22/16

22/21 22/24 23/17 23/18 24/5 34/2 34/16 35/23
**staleness [7]** 22/14 22/14 22/16 23/20 23/21 23/24 33/24
**stands [1]** 20/11
**stark [1]** 20/11
**start [6]** 5/3 5/5 7/6 9/15 19/3 50/1
**started [2]** 17/13 45/5
**starting [2]** 8/15 27/17
**state [4]** 1/7 4/6 25/5 43/11
**states [4]** 1/1 1/18 3/10 31/14
**status [1]** 8/5
**steps [1]** 46/16
**still [6]** 8/21 8/22 18/4 22/24 38/20 43/16
**stone [1]** 31/19
**stonewalled [1]** 17/25
**straight [1]** 27/14
**Street [2]** 2/4 2/18
**strictly [1]** 26/21
**strikes [1]** 39/22
**structures [1]** 14/11
**stuff [3]** 11/23 14/16 20/5
**subject [5]** 10/13 16/14 20/2 20/20 41/25
**submit [5]** 31/13 31/16 31/16 42/11 50/8
**submitted [1]** 24/16
**submitting [1]** 13/22
**subpoena [3]** 22/4 22/9 22/12
**subpoenaed [1]** 47/16
**subpoenas [2]** 28/2 28/5
**such [1]** 38/7
**Suchorzewski [8]** 9/19

9/23 9/24 10/1 10/14 20/1 37/2 47/22
**sufficient [1]** 50/12
**sufficiently [2]** 21/11 21/13
**suggest [2]** 37/5 37/8
**suggested [2]** 22/9 29/7
**suggestion [1]** 22/10
**suing [1]** 35/15
**Suite [6]** 2/7 2/11 2/14 2/22 3/3 3/6
**summary [1]** 29/13
**support [1]** 29/13
**supports [2]** 6/21 25/9
**suppose [3]** 13/8 27/14 49/16
**supposed [1]** 6/5
**sure [6]** 10/5 15/5 27/14 39/16 44/14 49/20
**surprised [1]** 32/20
**suspect [1]** 45/7
**sweep [1]** 9/2
**system [3]** 8/14 15/23 37/13

**T**

**table [1]** 7/21
**tailored [1]** 21/12
**tailoring [1]** 21/22
**take [4]** 6/5 7/24 14/1 38/13
**taken [3]** 25/7 36/24 45/17
**takes [1]** 17/25
**talk [4]** 14/16 22/12 38/4 44/19
**talked [2]** 13/17 39/5
**talking [16]** 10/19 20/13 29/22 29/22 31/17 31/17 31/20

**talking... [9]**  31/21 34/11 35/8 35/10 35/11 35/16 35/17 36/7 47/18
**talks [4]**  18/16 18/20 19/22 33/21
**teams [1]**  45/18
**teeing [1]**  5/1
**tell [11]**  8/18 9/6 14/17 24/25 40/5 40/6 40/8 40/14 40/14 40/16 43/6
**telling [1]**  15/6
**tells [2]**  44/22 44/23
**tend [1]**  34/14
**tentative [1]**  5/5
**terms [10]**  17/4 29/4 33/16 38/1 38/18 39/11 43/4 43/15 47/17 47/18
**testified [1]**  30/4
**testifies [1]**  24/22
**than [17]**  10/11 11/24 11/25 13/20 14/3 15/18 18/18 20/2 21/17 22/7 29/6 37/10 37/21 37/23 38/9 39/2 51/11
**Thank [18]**  4/25 10/5 11/6 20/23 20/24 24/20 24/24 25/21 28/24 30/21 42/5 44/17 47/6 47/11 48/1 48/4 51/6 51/14
**that [333]**
**that's [41]**  5/22 5/24 6/10 6/23 7/4 7/19 7/21 7/21 9/20 11/12 12/6 12/24 13/6 14/7 15/2 16/20 17/2 17/4 18/20 20/22 23/19 26/24 27/3 27/6 27/25 28/10 29/21 31/18 33/24 36/4 36/7 36/17 37/9 39/23 40/18

40/24 44/24 45/7 47/7 47/8 48/18
**their [13]**  5/16 14/11 22/9 25/9 29/13 30/15 31/23 34/12 41/8 42/11 43/16 47/1 47/2
**them [39]**  8/17 8/18 8/20 10/23 16/1 18/10 22/9 26/13 32/20 32/24 39/11 39/24 39/25 40/1 40/4 40/9 41/3 41/6 41/9 41/17 41/25 42/15 43/4 43/12 43/17 44/1 44/3 44/9 44/11 44/12 45/10 45/11 45/25 46/7 46/17 47/7 48/11 48/16 48/16
**then [30]**  5/5 5/8 6/7 6/18 7/24 8/10 9/12 9/16 10/2 10/20 15/21 17/24 19/7 19/12 19/21 21/15 21/21 26/21 33/14 36/2 36/22 37/12 41/15 41/15 49/4 49/15 49/16 49/21 50/8 51/7
**there [36]**  5/2 10/10 10/11 10/19 10/21 12/3 12/5 13/13 15/7 19/12 19/18 19/25 25/17 25/20 32/3 32/13 34/9 36/10 36/22 36/25 36/25 37/13 38/7 38/8 38/19 39/17 39/25 40/11 40/21 41/16 44/21 48/2 49/21 50/13 51/8 51/10
**there's [19]**  13/24 14/23 18/4 22/24 28/2 28/7 28/13 30/11 31/11 33/22 34/2 35/7 35/20 35/22 36/6 39/12 42/10 44/23 51/9

**therefore [2]**  24/8 29/9
**therein [1]**  19/5
**these [28]**  7/22 8/11 11/4 11/10 16/23 18/4 18/23 19/4 20/2 20/14 20/16 20/16 20/18 21/1 21/23 23/25 24/6 34/17 36/6 38/20 39/13 39/23 40/2 40/13 41/3 41/7 41/24 45/14
**they [94]**
**they'll [2]**  43/3 43/5
**they're [24]**  8/12 8/16 8/22 9/7 9/9 21/12 21/18 23/9 25/6 27/5 28/14 30/16 31/8 31/9 31/15 34/11 35/11 42/23 43/16 43/20 43/21 43/25 46/22 46/23
**they've [7]**  8/18 17/21 31/16 38/9 38/10 46/25 47/4
**thing [6]**  20/21 22/1 23/20 32/19 38/4 49/25
**thing: [1]**  31/4
**thing:  they [1]**  31/4
**things [11]**  8/1 15/6 20/7 34/13 34/14 37/20 39/16 41/10 41/19 41/25 45/21
**think [30]**  5/7 5/9 5/14 6/18 21/10 23/5 23/19 24/16 25/3 26/22 27/2 30/14 31/11 32/24 34/2 34/3 37/6 37/19 39/9 40/25 41/5 41/14 41/18 43/25 44/21 45/15 48/18 48/25 50/12 50/23
**thinking [1]**  7/6
**thinks [1]**  45/6

**third [4]** 2/7 3/11 9/2 46/24
**this [72]**
**those [22]** 9/15 10/12 12/16 14/14 20/9 23/10 27/24 28/22 29/14 34/14 41/15 43/12 45/21 45/24 46/1 46/13 46/16 46/20 47/8 47/17 47/18 50/8
**thought [3]** 27/19 38/13 41/23
**thoughts [2]** 5/5 9/15
**thousand [1]** 17/22
**thousands [2]** 46/6 46/6
**three [15]** 5/2 7/9 8/25 9/2 15/22 22/20 23/13 23/17 24/14 30/10 30/20 50/3 50/6 50/12 50/21
**three-document [2]** 5/2 15/22
**through [7]** 7/17 15/24 19/17 22/5 45/10 45/16 49/1
**tied [2]** 23/24 24/10
**time [18]** 4/3 8/11 8/13 8/15 17/25 20/12 22/16 29/5 34/14 39/21 40/1 41/20 47/4 47/5 48/19 49/13 49/14 50/1
**time-consuming [1]** 41/20
**today [2]** 5/1 24/1
**together [1]** 11/4
**told [1]** 43/23
**too [2]** 28/8 51/1
**top [1]** 45/19
**total [2]** 44/22 44/25

**towards [1]** 21/16
**trade [4]** 20/6 34/12 37/25 51/9
**transcript [3]** 1/16 52/5 52/6
**transcripts [1]** 46/19
**treated [5]** 12/8 12/20 12/24 13/2 13/2
**treatment [1]** 12/11
**Tremaine [1]** 2/22
**tri [1]** 28/3
**tri-county [1]** 28/3
**trial [14]** 14/2 15/2 18/4 18/7 18/10 18/18 21/16 37/22 38/2 38/22 38/24 41/8 45/12 45/23
**trial and [1]** 18/7
**triangulation [1]** 47/3
**tried [7]** 17/11 17/18 17/24 18/2 18/2 38/17 41/19
**TRILLIUM [2]** 2/13 4/21
**trouble [1]** 27/5
**true [2]** 38/16 44/7
**trust [1]** 32/25
**try [3]** 29/5 33/23 39/20
**trying [8]** 5/19 12/2 13/1 17/14 36/15 37/7 44/9 48/24
**turn [4]** 20/25 28/25 50/8 50/9
**two [33]** 7/24 8/24 9/1 10/3 10/10 16/11 16/23 16/25 17/5 17/6 18/8 22/22 23/3 23/10 23/10 23/11 23/17 27/13 27/16 27/24 29/9 30/10 34/20 39/17 41/25 45/13 46/14 48/12 48/14 48/20 48/22 49/4 49/10
**tying [2]** 23/20 43/16

**type [1]** 34/6
**types [3]** 14/11 28/22 47/19

# U

**unable [2]** 28/16 28/16
**uncertain [1]** 33/16
**under [11]** 16/12 17/3 17/5 18/23 23/16 27/10 27/18 37/13 38/13 42/1 45/25
**underbid [2]** 24/11 43/6
**understand [14]** 5/23 6/19 8/24 9/25 11/17 13/24 20/23 21/7 21/24 28/18 34/12 34/23 37/4 38/23
**understandable [1]** 14/7
**understanding [9]** 12/17 12/24 13/16 13/19 15/17 29/4 29/14 50/13 50/15
**understands [1]** 40/23
**Understood [1]** 35/4
**undo [1]** 37/16
**unexamined [1]** 41/5
**unfairly [2]** 42/15 44/12
**unique [2]** 34/5 34/5
**UNITED [3]** 1/1 1/18 3/10
**unless [1]** 49/8
**unlikely [1]** 34/24
**unreasonable [1]** 45/1
**unring [1]** 26/16
**unsuccessful [1]** 38/19
**unsure [1]** 8/5
**until [2]** 8/7 49/23
**unusual [2]** 14/4 27/8
**unworkable [1]** 45/11
**up [19]** 5/1 5/6 5/8 6/7

## U

**up... [15]**  6/20 7/5 7/24 8/14 8/14 10/25 11/22 15/23 23/7 33/8 37/12 38/3 43/7 44/12 45/5

**upcoming [11]**  5/19 8/5 22/18 23/2 24/23 24/25 29/8 30/24 42/9 43/15 50/22

**us [18]**  8/12 26/11 28/1 35/24 35/25 40/16 43/8 43/8 43/11 43/23 44/22 44/23 45/20 45/24 46/12 46/12 50/21 50/25

**use [16]**  16/15 18/14 19/4 19/10 24/11 29/4 31/8 31/24 32/1 32/7 32/15 33/4 34/23 39/21 42/20 43/5

**used [6]**  18/21 18/23 29/19 29/20 31/2 31/5

**useful [2]**  24/1 24/1

**usefulness [1]**  41/8

**uses [3]**  29/18 31/6 33/19

**using [2]**  31/9 46/7

**usually [2]**  35/8 35/14

## V

**vacation [1]**  14/1

**valuable [2]**  35/25 36/3

**value [8]**  22/7 35/25 36/1 36/14 36/16 36/21 36/25 43/13

**valueless [1]**  36/19

**variation [1]**  13/24

**variety [1]**  18/2

**various [2]**  14/12 39/6

**varying [1]**  14/11

**versus [2]**  12/15 25/1

**very [14]**  7/23 10/23 10/24 11/3 11/17 11/23 34/1 34/6 34/6 37/21 44/17 48/5 48/7 49/25

**view [3]**  21/19 37/4 41/2

**viewing [2]**  16/19 16/23

**views [1]**  19/13

**violates [1]**  36/6

**vis [2]**  12/8 12/8

**vis-a-vis [1]**  12/8

**volume [4]**  10/21 22/25 39/17 40/25

## W

**WA [1]**  2/7

**walk [1]**  49/1

**want [14]**  5/23 7/5 10/6 15/20 26/9 26/17 27/14 33/2 37/4 37/15 45/20 45/24 49/4 49/15

**wanted [4]**  33/4 44/18 44/19 46/12

**wants [1]**  27/2

**was [25]**  12/8 12/23 13/2 13/2 13/9 13/16 15/15 17/14 20/5 20/12 24/17 25/11 30/14 31/2 31/2 31/3 33/14 34/7 37/13 37/24 37/25 38/2 40/16 41/23 47/22

**Washington [4]**  3/3 31/14 31/15 32/6

**way [13]**  6/23 7/2 8/13 12/12 12/12 12/19 39/14 40/4 43/17 43/23 44/11 44/23 49/24

**ways [6]**  12/13 12/20 14/12 35/21 38/17 51/11

**we [85]**

**we'd [5]**  5/18 7/12 26/18 49/9 49/21

**we'll [3]**  17/15 21/21 48/5

**we're [25]**  8/2 27/17 27/17 28/7 28/21 29/22 31/17 31/17 31/20 31/21 35/16 35/17 36/7 36/11 37/11 45/7 45/16 45/24 46/9 46/18 47/17 48/16 48/17 50/23 51/4

**we're talking [1]**  29/22

**we've [25]**  10/10 17/11 17/19 17/19 17/20 17/24 18/2 22/8 26/15 38/16 38/17 38/18 38/20 38/22 38/25 39/4 39/5 41/19 41/21 46/2 46/3 46/4 46/19 46/20 48/22

**week [4]**  30/14 30/15 48/17 50/23

**weeks [9]**  48/12 48/14 48/20 48/22 49/4 50/3 50/6 50/12 50/21

**welcome [1]**  11/7

**well [21]**  6/12 8/10 9/21 11/8 14/9 14/19 14/22 16/7 16/18 18/13 22/1 26/20 32/3 33/20 35/10 36/4 36/20 37/19 39/4 43/21 49/16

**were [25]**  5/17 10/19 12/5 12/6 12/12 12/12 12/13 12/13 12/17 18/8 20/10 20/13 25/24 26/21 27/19 27/23 30/19 31/4 37/22 37/25 43/16 45/15 46/8 47/8 49/8

**what [72]**

**what's [5]**  22/13 22/16

# W

**what's... [3]** 39/8 40/1 45/2
**whatever [3]** 31/20 39/10 51/5
**when [16]** 8/18 14/16 20/11 24/4 30/4 30/5 31/17 31/20 33/20 34/1 35/6 35/19 35/19 38/4 42/11 47/8
**where [7]** 13/6 14/1 14/18 15/1 33/16 33/24 45/7
**whether [12]** 9/6 9/9 12/5 12/5 21/11 21/12 24/25 26/7 36/5 40/16 43/24 46/1
**which [9]** 7/9 8/13 25/20 27/18 29/17 36/3 37/20 45/1 49/13
**While [1]** 22/6
**who [18]** 6/3 10/22 14/5 15/19 19/13 19/15 19/19 20/3 20/25 25/16 26/2 32/13 34/19 35/10 35/11 35/12 35/15 43/7
**whole [5]** 6/25 14/2 16/1 16/3 49/25
**wholesale [2]** 15/22 16/4
**why [19]** 5/19 5/21 6/16 7/25 7/25 8/17 9/25 13/14 13/15 15/3 15/25 17/2 21/7 26/24 29/14 34/24 39/1 39/11 40/18
**wide [1]** 13/24
**will [17]** 8/24 10/3 12/1 12/3 13/1 20/25 21/2 25/1 31/19 32/19 33/17 37/5 41/10 43/12 48/11 49/13 51/12

**Williamson [1]** 2/14
**willing [5]** 7/15 43/7 46/18 47/13 47/20
**win [1]** 32/2
**winner [1]** 25/20
**wish [1]** 51/2
**within [4]** 25/18 38/18 40/24 49/10
**without [8]** 5/20 13/11 28/18 33/13 34/21 37/7 38/2 52/6
**witness [1]** 18/18
**witnesses [1]** 5/15
**won't [1]** 41/12
**work [6]** 11/3 11/5 23/10 46/9 46/18 49/24
**working [3]** 18/6 32/12 46/18
**works [3]** 30/6 31/14 37/9
**world [2]** 5/10 5/17
**worry [5]** 32/21 32/22 32/23 35/14 44/9
**would [52]** 5/6 5/11 6/18 6/22 10/20 13/10 14/2 16/4 16/13 16/13 18/10 20/1 20/16 24/1 26/4 26/18 26/21 27/6 27/11 29/8 29/9 30/9 30/15 30/24 33/4 33/6 36/22 36/23 37/1 37/14 38/7 38/8 38/11 38/13 39/8 40/23 41/14 41/17 42/14 42/15 42/18 42/20 45/7 49/8 49/14 49/15 49/22 49/22 50/12 50/13 50/16 51/5
**wouldn't [1]** 41/24
**Wright [1]** 2/22
**write [1]** 29/3
**writing [3]** 27/5 37/11 48/7

**written [1]** 30/5
**wrong [1]** 46/17
**Wyatt [1]** 2/14

# Y

**Yeah [1]** 44/5
**year [17]** 9/2 22/24 24/7 27/4 27/7 29/9 30/6 30/11 30/12 31/3 31/7 31/7 31/9 31/20 44/1 45/15 47/8
**years [23]** 8/21 8/24 9/1 15/15 22/20 22/22 23/3 23/10 23/10 23/11 23/13 23/17 23/17 24/14 29/9 29/18 29/19 30/10 30/10 34/10 34/15 42/4 45/14
**yes [15]** 10/8 23/15 26/18 29/11 30/3 30/23 43/9 47/23 47/25 48/3 48/9 49/5 49/9 50/19 51/12
**you [148]**
**you'd [3]** 5/18 32/2 41/4
**you're [25]** 10/25 11/7 11/9 13/8 15/6 15/7 15/9 15/20 15/22 15/23 16/1 16/7 16/22 27/15 32/1 32/18 36/16 37/6 43/5 43/17 44/3 44/11 48/12 48/20 49/6
**you've [4]** 17/20 27/15 36/15 39/2
**your [87]**