IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FAMILYCARE, INC., an Oregon            )
non-profit corporation,                )
                                       )
            Plaintiff,                 )    Case No. 6:18-cv-00296-MO
                                       )
       v.                              )
                                       )
OREGON HEALTH AUTHORITY, an            )
agency of the State of Oregon,         )
PATRICK ALLEN, both                    )    November 2, 2018
individually and in his                )
official capacity as director          )
of the Oregon Health Authority,        )
and LYNNE SAXTON,                      )
                                       )
            Defendants.                )    Portland, Oregon
_____)

Oral Argument

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT CHIEF JUDGE

APPEARANCES

FOR PLAINTIFF:                    Mr. Stephen F. English
                                  Mr. Thomas R. Johnson
                                  Perkins Coie, LLP
                                  1120 N.W. Couch Street, 10th Floor
                                  Portland, OR 97209


                                  Mr. Matthew P. Gordon
                                  Mr. Nicholas H. Hesterberg
                                  Perkins Coie, LLP
                                  1201 Third Avenue, Suite 4800
                                  Seattle, WA 98101


FOR DEFENDANTS OREGON
HEALTH AUTHORITY and
PATRICK ALLEN:                    Mr. David B. Markowitz
                                  Mr. Matthew A. Levin
                                  Ms. Laura R. Salerno Owens
                                  Markowitz Herbold PC
                                  1211 S.W. Fifth Avenue, Suite 3000
                                  Portland, OR 97204


FOR DEFENDANT LYNNE
SAXTON:                           Mr. Peter R. Mersereau
                                  Ms. Beth Plass
                                  Mersereau Shannon LLP
                                  111 S.W. Columbia Street, Suite 1100
                                  Portland, OR 97201


FOR INTERVENOR
DEFENDANT HEALTH
SHARE:                            Mr. Christopher F. McCracken
                                  Davis Wright Tremaine, LLP
                                  1300 S.W. Fifth Avenue, Suite 2400
                                  Portland, OR 97204

FOR SCHRAMM HEALTH
PARTNERS:                    Ms. Sonia A. Montalbano
                             Elliott, Ostrander & Preston, PC
                             707 S.W. Washington, Suite 1500
                             Portland, OR 97205


COURT REPORTER:              Bonita J. Shumway, CSR, RMR, CRR
                             United States District Courthouse
                             1000 S.W. Third Ave., Room 301
                             Portland, OR   97204
                             (503) 326-8188

(P R O C E E D I N G S)

(November 2, 2018; 2:06 p.m.)

THE CLERK:  We're here today for oral argument in Case No. 6:18-cv-296-MO, FamilyCare, Inc. v. Oregon Health Authority, et al.

Counsel, please state your name for the record.

MR. ENGLISH:  Stephen English on behalf of plaintiff FamilyCare, Your Honor.

MR. GORDON:  Good afternoon, Your Honor.  Matthew Gordon on behalf of FamilyCare.

MR. HESTERBERG:  Nick Hesterberg on behalf of FamilyCare.

MR. MERSEREAU:  Good afternoon, Your Honor.  Peter Mersereau on behalf of Lynne Saxton.

MS. PLASS:  Beth Plass on behalf of Lynne Saxton.

MS. SALERNO OWENS:  Laura Salerno Owens, special assistant attorney general, on behalf of defendant Oregon Health Authority and Patrick Allen, in his official capacity.

MR. LEVIN:  Good afternoon, Your Honor.  Matt Levin on behalf of defendants Patrick Allen, in his official capacity, and Oregon Health Authority, special attorney general.

MR. MARKOWITZ:  And, Your Honor, David Markowitz, special assistant attorney general for the Oregon Health Authority and Pat Allen, in his official capacity.

THE COURT:  Thank you all for being here and for your helpful briefing in this matter.

I'd like to give some tentative thoughts, and I emphasize that we're not here for an empty exercise -- they're just tentative -- but I hope it helps guide the discussion.

So there's several issues in front of me regarding Ms. Saxton's motion for summary judgment and they're grounded -- her motion, that is, are grounded in really four broad arguments.

One is that FamilyCare's claim is barred by the settlement agreement.  And I mean no disrespect to that argument to say that I've fundamentally already ruled on it and I'm not going to reconsider my ruling, and I deny that theory for granting summary judgment here.

The second is that FamilyCare's claim is time barred by the statute of limitations.  And that has a couple of theories, one legal, perhaps, and one factual.

The first is that in cases like this, retaliatory act claims under Section 1983, that the doctrine of continuing violation, which can be viewed as an exception to the tort doctrine, the way we analyze tort claims under statutes of limitations, simply does not apply.  See *Morgan*.  And I understand, I think, the holding of *Morgan*.  I don't think it goes as far as to say that there's simply no such thing as the continuing violation theory in tort cases for retaliatory

conduct brought under Section 1983.  I think it can apply.

So then the factual question, does it apply here, and I look at that in, I think, two different silos.  I don't think, for example, that there's any way to make a continuing violation out of all the acts that constitute both rate setting and what's been called the smear campaign.  Those have to be analyzed separately.

So within those two silos would one think of the acts fairly attributable to the responsibility of Ms. Saxton involved in rate setting as a continuing series of violations or discrete acts.  And then the same question as to the smear campaign.  One can read a lot of cases about the continuing violation doctrine and come away not certain how you figure out what is or isn't a continuing violation.  I think it's fairly clear under the, say, hostile workplace environment cases that the point of the continuing violation doctrine in that setting is to allow one -- a plaintiff -- to accumulate acts that by themselves might not constitute a hostile work environment that taken together do, and apply a single statute of limitations to the last few acts that put it over the top and made it a hostile work environment.  That's not our case, but that's a clear application of the continuing violation doctrine.  And if that's all that's involved, then these acts, under the two silos I just discussed, don't amount to a continuing violation.

There are cases that posit a somewhat broader

application of the doctrine by just saying are they sort of all related to the same end.  I don't think that's what's applicable here, and in my view, the continuing violation as a factual matter, not a legal matter, does not apply here, and therefore that the acts, both in speech and in rate setting, have to be viewed as discrete acts of -- adverse acts as to which a statute of limitations applies separately to each.

It's clear to me, however, what really doesn't need to be argued is that if these incidents otherwise satisfy the rules of evidence, that they can be brought into the jury's awareness at trial, even though they might be beyond the statute of limitations, not for liability purposes but to prove motive, intent, or any applicable mens rea.

Continuing -- I appreciate your patience as I go through the whole thing.  Continuing, the third theory is a straight-up theory that just -- a more traditional summary judgment theory that plaintiff has, as a matter of failing to show material facts where there's a dispute, just not met its standard for summary judgment.  In other words, that there just wasn't, for summary judgment purposes, retaliation.

And that has three subparts, the three elements of retaliation.  The first argument Ms. Saxton makes is that FamilyCare's expressive conduct here, its speech was not addressing a matter of public concern.  I won't beat that one to death.  You're free to make argument about it.  I'm just

saying on the briefing I'm simply not persuaded that that's true. I think it is on a matter of public concern. I think it's beyond the level of a private party just complaining about how much they're getting paid under a contract, and I take into account both content and context, the context of which involves both the Oregon legislature and the press and other things. And so I believe it to be a matter of public concern.

I say "it," that is, it involved a matter of public concern. And one of the things we'll have to discuss when we're done here is that I'm not -- I haven't really been given yet -- I intend to see that it happens -- a sort of an item-by-item list of the exact pieces of conduct -- speech or otherwise -- that plaintiff wants to attribute at trial to Ms. Saxton so that we can engage some day -- not today -- in an item-by-item evaluation of whether each item involves public concern or other -- or meets some other required criterion. But certainly there are enough pieces of expressive conduct here that in my view address a matter of public concern to get past that stage of summary judgment.

The second argument on retaliation is Ms. Saxton's argument that there's simply no true adverse action. And that involves two subparts. The first is that you can't really retaliate through authorized government activities; that here plaintiff alleges that rate setting is an adverse action against it, and since Ms. Saxton was engaged in, under her job,

the authorized government activity of rate setting, that just can't be retaliation.

And in my view, I think that's not the case. I think you can do what you're authorized to do as a government actor or agency and still do it in a retaliatory way. I think *Carpinteria* is an example of that, and it cites other examples of that. So I think that as a sort of a legal theory for why you -- I should grant summary judgment because you simply can't retaliate through rate setting, I reject that argument.

And the second -- excuse me.

The second is similar: that you can't retaliate through speech, that a government agency when criticized, or perhaps in other settings, is entitled to engage in speech, and when it engages in protected speech, that cannot be retaliation.

And that's true as far as it goes. It sort of begs the question because I think it is correct that a government agency can engage in speech that's protected, and that such protected speech can't amount to actionable retaliation. But I also think it's the case that a government actor can engage in expressive conduct that is not protected and can constitute retaliation. And so where is the dividing line?

And I think Ms. Saxton hinted as much in her reply memo at page 20, when she asserted that it had its speech rights, at least when the speech at issue does not include a

threat of adverse action.

I'm not sure that's where I draw the line.  I think of it more as when the government actor is engaged in speech that's within the confines of what he or she is authorized to do, it's legitimate speech, then it can be protected speech by virtue of being within sort of the wheelhouse of the government job that is being implemented.

And that's where I disagree with plaintiff's assertions or focus on harm as the dividing line.  There's some extent to which the briefing seems to suggest that if the speech is intentionally harmful, it can't be protected and must be retaliatory.  And just again thinking more broadly than our case about what is or isn't protected government speech that cannot be retaliatory versus that which can be, there are any number of government actors who are entitled to engage in deliberately harmful speech that can be protected.  OSHA can come in and say, "This factory is not safe."  CDC can come in and say, "All the meat from this company shouldn't be eaten by anybody," and it can, in fact, even intend to put them out of business and be well within protected speech.

So it's not enough that there's harm.  I'm not even sure there's enough that there's intentional harm.  The question really is is it what the agency is authorized by its charter, so to speak, to do versus something beyond that.

And so we'll try to sort through how to tell

protected speech from unprotected speech, but as a complete bar, just the idea that no speech can amount to retaliation if it's speech, I disagree, and therefore I think it likely that plaintiff's case, to some degree, to some -- for some of the speech involved, gets past that layer of summary judgment.

And the third is whether FamilyCare's expressive action was the causation, the substantial or motivating factor for the adverse action. And, again, I think the parties have agreed that in some way, at least, we apply the fundamental *McDonnell Douglas* framework to that. I believe plaintiff here has, in fact, met its prima facie case, if you think about it as a *McDonnell Douglas* case, by virtue of temporal proximity, expression of opposition to the speech by defendant, and disparate impact. I don't mean that in the -- in the equal protection sense, but just the differing impact on FamilyCare compared to others.

And I also think it probable -- I'll hear argument on it -- that Ms. Saxton has sufficiently adduced for summary judgment purposes a legitimate nondiscriminatory explanation for it, in terms of cost cutting. The way I think of that is that there's enough there even in the light most favorable to the nonmoving party to say that such an explanation has been adequately supported.

So it really boils down to has that reason for the activity here, the adverse actions complained of, been knocked

down by plaintiff.  And you have to think about that in two settings:  rate setting and speech.  The speech is a lot harder to apply this framework to.  The rate setting, once again a plaintiff -- this plaintiff, like others, is entitled to go back to the well of its prima facie case to use those same things again at this stage, and so the combination, I think, of the temporal proximity between the expressive conduct and the harm and the expressed opposition to the speech and the differing impact on this actor versus other CCOs is probably enough -- again, in my tentative view, it's enough to defeat summary judgment there.

I do want to say here that it's at this point that Ms. Saxton makes the point that what I need to look at has to sort of satisfy a logic screen that has three parts to it:  one is that Ms. Saxton has to have known about the expressive conduct.  And that's, of course, true, and it points to, for example, emails that are recited among the list of things that are expressive conduct that Ms. Saxton would have disliked, on which she's not copied.

So, of course, it's true that FamilyCare could be in a position -- was, I suppose, in a position to show that merely not being copied doesn't mean she didn't know about it, but it did require before today for FamilyCare to give me something to go on to know that.  So if all you have is an email and she's not copied on it, and there's no other evidence in front of me

showing that she would have known about it, and you don't just have respondeat superior, then that's not enough.  Then it would fail to meet this first logic bar; that you don't have enough for summary judgment to show that she knew about it.

And the second two are obvious but I think need to be applied as filters to the speech that can be taken into account on causation, and that is that the expressive conduct had to have occurred before she left, and it had to have occurred prior to, not after the punishment, so to speak, the adverse action.  So I think it's important before trial that we apply those three logic bars as filters to the speech that works.

I'm going to go that far and then we'll talk about qualified immunity when we've finished up talking about statute of limitations and the elements of retaliation.

It's your motion, so I'll start with you, Mr. Mersereau.

MR. MERSEREAU:  Thank you, Your Honor.  On behalf of defendant Lynne Saxton --

THE COURT:  Just a moment.

Thank you.  I thought I missed a critical point but I just missed a lozenge, that's all.

Go ahead, sir.

MR. MERSEREAU:  Thank you.

I appreciate the Court's framing of the issues in the way you have.  I think both of us have briefed the motion

pretty much along the same lines.  I don't have much to say about the statute of limitations, and prefer to rest on our papers for that argument.

THE COURT:  All right.

MR. MERSEREAU:  We're in general agreement that the cutoff is the two-year period before April of 2018, so any discrete acts which the plaintiff would claim are damaging acts and were caused by retaliatory conduct that occurred before April of 2016 are time barred, in our view.  And I'm not sure that's inconsistent with what the Court just indicated.

THE COURT:  And you agree, do you, that -- while not usable for liability, they are often admissible at trial for other purposes?

MR. MERSEREAU:  I do agree with that.

THE COURT:  All right.

MR. MERSEREAU:  Your Honor, I'd like to focus on the basic elements that we have briefed on the speech retaliation claim, but not focus in particular on the protected speech element, with the exception of these few comments:  We do want to make it clear that our position is on that element that a vendor with a state agency certainly can engage in protected speech, as long as it is not exclusively related to its contract with the state and its needs for more financial compensation under its contract.

And so in the context of this case, to the extent

plaintiff could come forward with evidence suggesting it engaged in speech on such matters as CMS's involvement in the Oregon Health Plan, rate setting generally, as opposed to speech that involves simply its own financial interest.

And I'll give you an example, Your Honor.  This is Exhibit 45 to the Hesterberg declaration, and this is offered to show an example of FamilyCare's speech in this case, a PowerPoint presentation submitted to the legislature.  And here we are on page 2, where FamilyCare highlights its presentation by noting, "For three years in a row, OHA's rates for FamilyCare have been explicitly calculated to produce an operating loss."

Well, that's just an example of one of many where in these communications either with the legislature or media, FamilyCare is simply saying, we are not being treated fairly in our contract with the State.

It is our position that is not a matter of public concern.  That is a matter of FamilyCare.

THE COURT:  I have two questions about that.  First, what if the contract itself is a matter of public concern?  I mean, the cases all -- the cases in your favor involve private contracts of very little public concern.  But what if the contract as to which a party is complaining that they're not being treated well is itself of great public concern?

MR. MERSEREAU:  I don't think that makes a difference

if the speaker is speaking about the speaker's financial interest on a personal financial level.

THE COURT:  Well, that assumes that financial interest can never be a matter of public concern.  If you're just talking about money, the public can't be concerned about it.  That can't be right, can it?  You can talk about how much -- if the contract itself is of great public concern and you're not getting paid enough to forward the public concern involved in the contract, why wouldn't that also be of public concern?

MR. MERSEREAU:  Well, in that setting perhaps it would have more to public receptivity and a public interest. What I'm suggesting to you, Your Honor, is that if a communication by a vendor -- it could be a Xerox copy machine vendor, for all that goes -- is simply, "We aren't getting enough money under our contract and you aren't following the contract and treating us fairly," that's a parochial private matter for that contractor to argue.

THE COURT:  I agree with your hypothetical, but I still remain concerned that if you move from the arena of a Xerox vendor to, say, a government contractor who is going to build the next moonshot, that you might transfer everything about that contract into the field of public concern.

Second question:  So your argument, even if it fails as to the possibility that there's a public concern here, I

guess would be that you'd have to analyze the speech piece by piece. I mean, how does this play out at trial? If I rule against you that this is a matter of public concern, is it your view that therefore I have to look at each proposed witness statement and exhibit to decide whether piece by piece it involves a matter of public concern or not?

MR. MERSEREAU: Yes.

THE COURT: All right.

MR. MERSEREAU: That is our view.

And let me add one final point to this first element before moving on. And that is to just reflect upon that *Alpha Energy* case that both parties cited. That was the only case we could find that was reasonably close on point. And the reason why, as we interpreted that decision, the Court found that speech to be a matter of public concern was because it did not involve that vendor's contractual interest, it involved speech relating to an employment -- totally unrelated employment matter that was of public concern.

And so this leads to my final point on this first element, Judge, and that is qualified immunity.

THE COURT: I'm going to come to that later.

MR. MERSEREAU: If I could just make a point.

THE COURT: I'll talk about qualified immunity.

MR. MERSEREAU: All right.

So I'd like to focus on the next two elements;

namely, the evidence in this record to establish an adverse action and the evidence in this record establishing that defendant Lynne Saxton personally participated with a retaliatory animus in the adverse action.

THE COURT:  I want to ask you then about retaliation. Let's talk about speech instead of rate setting for a moment. I'm wondering if you actually disagree with the proposition just for starts as a general proposition that has to be applied to this case later that there is speech by government actors that can be retaliatory if sort of outside their responsibilities, and other speech that wouldn't be, speech sort of within their core responsibilities.  Do you actually disagree with that proposition at all?

MR. MERSEREAU:  No, I don't, but I think the speech, in order to meet that category, would have to have a threat of an adverse action, would have to be --

THE COURT:  So that's what you've said in your brief, that you think the dividing line is sort of what goes outside the protected circle of speech that your client could engage in that's protected is threat of an adverse action.  Why is it just that?  Why is threat?

First of all, it strikes me that there are government actors who can, in fact, threaten adverse action and be protected.  On the other hand, there are nonthreatening things that would seem to be outside the circle of protected conduct.

So I took your threat of action to be telling somebody, you know, "Shut up or we're going to shut you down," that sort of threat.  But what if you don't say anything to the client, you just internally say, "Go hurt this person"?

MR. MERSEREAU:  It is our view of the law, primarily the *Mulligan* case, that as we've phrased it, speech on speech is not actionable in a First Amendment retaliation case as a matter of law.  That is our position, Your Honor, and we believe *Mulligan* is right on point on that.

What is occurring here is that FamilyCare -- and there's plenty of evidence in this record -- was consistently speaking about rates, about treatment compared to other CCOs.

THE COURT:  For now I just want to make sure I understand your dividing line.  Your dividing line is almost everything your client said is protected speech that cannot constitute retaliation?

MR. MERSEREAU:  Yes.

THE COURT:  Except to -- and the dividing line is between that sort of speech and threats of adverse action.  Those would be unprotected and susceptible of being retaliatory?

MR. MERSEREAU:  Yes.

And to use Your Honor's phraseology, speech that is in Lynne Saxton's wheelhouse as the director of OHA is protected unless it goes out of her wheelhouse and contains

improper threats of retaliatory action, adverse actions or whatever.

And I'm here to tell you, Your Honor --

THE COURT:  Well, why isn't Lynne Saxton, if this happens, saying to somebody, "I want you to go hurt this company" outside her wheelhouse?

MR. MERSEREAU:  I think that would be.  I think that is a speech that has a threat of an overt adverse action.

THE COURT:  I must have misunderstood what you meant by threat, then, because that speech where nobody is threatened, there's no receiver of a threat, it's just go harm somebody, it's sort of a "who will rid me of this troublesome priest" kind of speech.

MR. MERSEREAU:  I don't believe that speech that directs someone to harm someone else -- whether it's a contractual relationship or anything else -- by a state actor is protected speech.

THE COURT:  Again, not to put you -- not to quibble about this, but I'm struggling where the line is, because I can imagine if that's the line for all cases, any number of cases where a government agency could, in fact, directly and legitimately in a protected way threaten harm.  I don't know why harm is the problem.  Government agencies every day threaten harm to people.  "If you don't fix up this building, we're going to find you in violation.  If you don't clean up

your act, you know, we won't give you your next permit," et cetera.  They threaten harm all the time.

MR. MERSEREAU:  I guess what we need to do is define the term "harm."  When you used it initially, I was assuming it was the type of harm that was beyond the normal communication by, in this case, Lynne Saxton.

THE COURT:  It's not so much the threat that matters, it's threatening illegitimate damage?

MR. MERSEREAU:  Yes.

THE COURT:  All right.  Thank you.

MR. MERSEREAU:  Your Honor, the challenge in this case on the speech side of the retaliation is frankly the record before you.  We have 130 footnotes, we have 70 exhibits, and basically in our motion papers, we challenged FamilyCare to come up with evidence of which exact speech are you saying was retaliatory and which emails and which communications or which conduct on behalf of Lynne Saxton do you believe showed the kind of retaliatory animus that is needed to establish this kind of claim.

And in our view, as we argued in our reply, they failed to do so.  What you have is a literal travel log through the daily work of an executive for a state agency like this over a three-year period, quotidian acts and documents showing that Lynne Saxton participated in meetings with the people that she designated to deal with rates, for example.  She attends

meetings.

What's missing, Your Honor, is any evidence that could be reasonably inferred to be retaliatory and animus on her part to punish or retaliate against FamilyCare for its speech.

And getting back to Your Honor's earlier point, it's critical to know exactly what speech we're dealing with here, because in our view, each example of protected speech needs to be linked to specific retaliatory conduct, and that requires admissible evidence.  And we don't see it in all 70 exhibits. What you see is an executive director basically doing her job on a policy level.  What's missing in all of these communications is any inference that could reasonably be drawn that in saying what she said and doing what she did she had the requisite state of mind that's required for one of these speech retaliation cases.

Your Honor, I was here several weeks ago in the courtroom, and one of my colleagues, in what was undoubtedly a rhetorical flourish, said that he thought that Mr. Murray was the most dangerous man in the room.  And we all recognize that as a rhetorical flourish, a piece of advocacy at the time, and it had a context within his argument.  These documents --

THE COURT:  The only reason that really bothered me was I thought I was the most dangerous man.

MR. MERSEREAU:  What's missing in this record, Your

Honor, is even a rhetorical flourish, even an offhand comment by Lynne Saxton, and yet she's being sued in her individual capacity not the official capacity. And we think that requires evidence to show something other than inferences that have the tensile strength of gossamer. When you actually look at these, read them, they fall apart.

And the Court spent the first five minutes here giving us a framework of the legal arguments. And I agree with you on those. But the challenge on summary judgment is where is the evidence in this record to show the requisite intent? FamilyCare would have you draw the weakest of inferences to get to a jury on this issue. And we don't think it's there. And I have several exhibits lined up just to give you examples -- I'm not going to go through them now because I think I made the point -- but the kinds of evidence that they show are Lynne Saxton saying such things as, "Boy, we had a tough day in the legislature today."

Are we supposed to infer from making that comment that she's going to go to the mattresses and go after FamilyCare? Well, it's too weak an inference, and there's certainly no evidence that she intended to do that.

FamilyCare argues -- this is page 24 of its memorandum -- that there is ample evidence that Saxton participated in the reimbursement adjustment.

Now, this is getting a little bit into the rate

piece -- and maybe I should hold until you want to go to that next, Your Honor -- but, again, even with the ratemaking attributed to Lynne Saxton, at its core it's nothing more than attending meetings. She asked Optumas, she asked Mr. Fairbanks and she asked others to do the number crunching, the analytical work. She's not an actuary. There were several cooks stirring that rate broth, and Lynne Saxton did not have a ladle in the broth.

Now, they have an argument about supervisory responsibility. Again, we think this is a constitutional tort that requires a type of scienter which is a retaliatory animus.

THE COURT: Can I ask you, when you're on the subject of retaliatory animus, in the *McDonnell Douglas* framework as to rate setting, you proffer a legitimate nondiscriminatory reason of cost cutting and cost overruns. What is the legitimate nondiscriminatory reason for the allegation that there's speech that was retaliatory?

MR. MERSEREAU: The performance of her job day by day, overseeing these processes, communicating with her subordinates, communicating with the legislature.

Your Honor, it's alleged in this case -- apparently by FamilyCare -- that it's all right for Mr. Heatherington and Mr. Murray to communicate with the legislature of their concerns regarding everything, but here we have examples in this record where OHA responds with legislative reports,

comments on legislation, proposed bills, where OHA says, "We have problems with this bill."

That cannot possibly be retaliatory conduct.  That's what they're supposed to do.  So that's where I believe there are legitimate nondiscriminatory reasons for that speech.

THE COURT:  All right.  Thank you very much.

Go ahead.

MR. GORDON:  Thank you, Your Honor.

I'd like to begin the discussion of the statute of limitations issue briefly.

THE COURT:  Yes.

MR. GORDON:  And I think the proper frame for looking at this is not necessarily -- not necessarily the continuing acts versus --

THE COURT:  Can you move that microphone closer to you?

MR. GORDON:  Is that better?

It's not necessarily the strict continuing acts versus discrete acts framework.  It's to look at what the Ninth Circuit said in *Coszalter*.  And what the Ninth Circuit said in *Coszalter* is that we have to look at all of the acts together, even if some of the acts themselves don't rise to the level of constituting an adverse action.  Taken together, they might.

And so when I look at that decision and that language in *Coszalter*, that echoes the language in *Morgan*, in talking

about the hostile work environment, the notion that there may be a cumulative effect of a number of acts that crosses the line cumulatively into an adverse action, even if none of the individual acts do.

Now, we're not conceding at all that there aren't adverse actions here that standing alone constitute -- or acts that standing alone constitute adverse actions, but the point is in considering the sum total of the actions Saxton took, we believe that that is all relevant not just to the question of intent or motive or telling a story, but also to whether or not there were adverse actions taken under *Coszalter*.

THE COURT:  Why wouldn't that make continuing -- sort of the continuing conduct exception the rule?  I mean, your expression of that exception to the general rule, looking at discrete acts, would sort of wipe out the general rule, wouldn't it?

MR. GORDON:  Well, I don't know that it wipes it out entirely, but in these particular types of cases, in the Section 1983 First Amendment retaliation cases, the Ninth Circuit has said we have to look at all of them and we have to consider them as a whole and the cumulative effect of them, whether or not they're before or after the statute of limitations.

On the public concern issue, counsel tries to argue that this is -- that the concerns raised by FamilyCare were

just about how much FamilyCare was getting in rates, and he cited to Exhibit 45. Exhibit 45, of course, is just one of many exhibits that detail specific communicative acts that FamilyCare took. But even Exhibit 45 talks about things like the actuarial soundness of the rates and transparency of the rate-setting process, and transparency goes to the public evaluation of the agency's function, of course. And that under *Ing* is --

THE COURT: You agree that the expressive conduct to satisfy an element of the claim has to be a matter of public concern, and do I need to apply that then line by line to the speech in this case?

MR. GORDON: To every single act of speech?

THE COURT: Yes. I mean, if you said something as a matter of public concern on Monday, and on Tuesday what you said was not a matter of public concern, then does the jury only hear about Monday not Tuesday?

MR. GORDON: I think -- I think potentially, but I think that what's said --

THE COURT: I don't -- I can't decide that potentially today. I mean, what's your answer?

MR. GORDON: Well, my answer is that I think the other comments could be part of the context in which it's all viewed. But an isolated communication that is not a matter of public concern, I would agree that that's not the type of

speech that's at issue in this --

THE COURT: Well, sure. You just don't think there are any isolated communications in the case.

MR. GORDON: There may be. I'm not trying to say that every instance you have to consider all together. I'm just trying to --

THE COURT: Do you also agree that I don't have a record in front of me that allows me to do that?

MR. GORDON: I don't agree with that. Well --

THE COURT: Have you segregated out each instance of speech that you claim Ms. Saxton objected to and retaliated against so that line by line I know?

MR. GORDON: I don't know that we have every single instance in the record. We have identified numerous instances of public speech.

THE COURT: Well, sure. You've identified virtually all the speech for Saxton and Allen that you want me to care about, but I don't know where you have segregated out speech that you want to hold Saxton responsible for in a way that I can tell what's public and what isn't.

MR. GORDON: Well, we've talked about things that are clearly public, like, you know, presentations to the legislature, letters to CMS, you know, presentations to the State of Reform conference, presentations at the legislation date.

THE COURT:  Well, I guess what I'm wondering is if today I say that I think there are clearly some items of speech that are matters of public concern and that it appears there are some that are not, it's true, right, that we'll leave this hearing today and nobody will know which is which for trial purposes?  You won't know which exhibits are in and which are out.  You'll just have general guidelines from me, right?

MR. GORDON:  We'll have general guidelines but I think we could, under the existing law, I don't think it's that difficult an inquiry, but --

THE COURT:  All right.

MR. GORDON:  But yes --

THE COURT:  Is it your position that the idea I expressed to your opponent that a contract can by itself, the nature of the contract can be so public that even pay discussions under the contract become a matter of public concern?

MR. GORDON:  Absolutely, Your Honor.  And this contract is right within the wheelhouse of the question you asked.  Even if -- even if there are instances of communication that are strictly about FamilyCare's rates, remember these are rates that FamilyCare receives to provide -- to pay for health care services for Medicaid-eligible individuals.  FamilyCare has over 120,000 -- or had at one point up to 120,000 Medicaid-eligible individuals.  And the key part of the rate

setting and of the federal regulations related to rate setting is the notion that the rates be sufficient for the Medicaid managed care organization to cover all of the services that are required under the terms of the contract for the member population.

THE COURT:  All right.  I'm going to ask you to move on just for time's sake, then.  I want to talk about this dividing line about the sort of speech, and I'm going to just set aside rate setting for a moment as a legitimate potential mechanism for retaliation and just talk about speech as a legitimate possible form of retaliation.

Do you first of all agree with the general proposition that there's speech that a government agency can engage in or government actor can engage in that's protected and therefore can't be retaliatory even if it's highly disliked?

MR. GORDON:  I think that's right.

THE COURT:  And some that can?

MR. GORDON:  Correct.

THE COURT:  And where is the line?

MR. GORDON:  The line, I think the Ninth Circuit has not specifically identified the line, but it's given us some guidance.

So, for example, I think Your Honor is right that if it's speech that's outside the bounds of the person's

employment, or to put it another way, if it's not in the wheelhouse of what the person does in his or her day-to-day job, then that is one way that the speech can be not protected. And we have that here.  We have a communications plan directed by Ms. Saxton that was so bad and so wrong that she was forced to resign because of it and issue an apology letter.  She acknowledged this is not acceptable behavior for a public agency.

So it --

THE COURT:  My task, since the two of you agree on the general framework, is to separate out items of speech eventually -- or your task, eventually mine, is to separate out items of speech piece by piece, right?

MR. GORDON:  That may be, but I don't agree that that's the only animating principle here.  I think that there's another animating principle that's been identified by the Ninth Circuit, which is whether or not the speech is tied to a governmental benefit.  That's not -- it doesn't have to be, but if it is, then that's the type of speech that also is actionable.

And the speech here --

THE COURT:  Speech that is tied to a government benefit you contend is -- speech by a government actor that's related to a government benefit is actionable?

MR. GORDON:  That's my understanding of the case law,

Your Honor, yes.  And --

THE COURT:  I find that hard to believe.  I mean, that would shut down all kinds of speech every day by thousands of government actors.

MR. GORDON:  Not every type of speech.  I'm not saying that every type of speech is necessarily tied to a governmental benefit.

THE COURT:  That's why I asked the question a second time, because I thought that's what you were saying.

MR. GORDON:  I'm not saying every single incident of speech, but I'm saying that's where -- my understanding of where the courts have wrestled with the line between saying something about somebody in his private capacity, like the *Mulligan* case, saying bad things about him but it doesn't have anything to do with governmental benefit versus saying something that's problematic and is tied to a governmental benefit.

And we think that is what is at issue here, Your Honor, because the whole purpose of the smear campaign -- or excuse me, one key purpose of the smear campaign was specifically to undermine FamilyCare in the eyes of the legislature, the press, and the public, and to undermine FamilyCare's efforts -- remember, this comes out on the heels of FamilyCare introducing legislation to make the rate-setting process more transparent and to make it -- to make it more

strict with respect to actuarial soundness.

THE COURT:  All right.  Thank you.

I want to move on to the *McDonnell Douglas* framework, then, and we'll start with rate setting, I guess.

So the idea is that you first have to make a prima facie case, and I've tentatively given you that, so I assume you have no argument with that.

And I've second tentatively said that your opponent had sufficiently proffered a legitimate nondiscriminatory reason.  Do you agree with that?

MR. GORDON:  I do not agree with that.

THE COURT:  Why not?

MR. GORDON:  Because I think the reason is actually pretextual.  So I think the reason that's given for the rate-setting cuts is --

THE COURT:  I'm going to accept that answer, and the only reason I'm stopping you is that in my view, that just conflates step two and step three, which is perfectly all right.  You can have a legitimate nondiscriminatory explanation that you intend to show is pretextual.

So let's move on to that.  Why do you think it's pretextual?

MR. GORDON:  The best example comes in connection with the so-called reimbursement adjustment that was implemented for the 2017 and 2018 rates.  And we talked about

this last time, but there are a number of things about that that indicate that it was pretextual.

One, from the beginning, they sought to target FamilyCare and specifically FamilyCare's reimbursement policy.

Number two, this was a new thing that OHA had never done before, and remember it's done right after the settlement agreement and right after the legislation, during the time the legislation was introduced.

Number three, there is no reimbursement policy.  They create a two- or three-page document after the fact.  So they've got a post hoc creation of a policy, and also they post hoc look for legal justification for this policy.

So if you remember from last time, they specifically tried to identify a regulation that purportedly said they can do what they can do.  The regulation said nothing of the sort, and they admitted that.

THE COURT:  So I have the same question with regard to speech.  The explanation is, as you heard, that the speech was legitimate because it -- I mean, you've advanced the idea that this whole conversation among people was a matter of public concern, so their answer on speech, their legitimate nondiscriminatory reason is this is exactly what we're supposed to do as a government agency in this arena.

What's pretextual about that proffered explanation?

MR. GORDON:  So to be clear, we're not claiming that

every action -- that every incident of speech engaged in by Ms. Saxton is retaliatory. There are many examples of her reaching out to the legislature, et cetera, in the ways that are not problematic, but she crosses the line with the smear campaign because now it's not just about telling their side of the story, now they're actively seeking to discredit, undermine FamilyCare. They're talking about reaching out to find HIV-positive patients who have switched from FamilyCare to Health Share, as part of the campaign to discredit FamilyCare and build up its competitor, Health Share.

So that -- that type of speech crosses the line between kind of responding and advocating to the legislature and actively targeting FamilyCare.

THE COURT: All right. Thank you.

I want to move on while I have you here. I'll start with you, and turn to you, Mr. Mersereau, on qualified immunity.

Here's my problem -- so you can remain standing because I'm going to come to you immediately.

Here's my problem on qualified immunity. In the last ten minutes, you've told me that as to this line about permissible speech that cannot be retaliatory versus speech that can be retaliatory, you've told me that the Court of Appeals has not identified the line and that courts have wrestled with where that line might be.

That sounds like a quintessential qualified immunity case:  no clear authority tells Ms. Saxton what kind of speech she can engage in versus not engage in.  Why isn't that qualified immunity?

MR. GORDON:  And to be clear, what I was saying was the exact contours have not been defined.  But what is, I think, clear, as Your Honor's question indicates, that speech that's outside the context of what a person is authorized to do, that is -- that does fall outside the line that's clearly established.

THE COURT:  What case makes that clear?  I'm pretty sure no case uses the word I now regret saying, which is "wheelhouse."  So what case tells someone who is in Ms. Saxton's position, you can speak back against a vendor in this setting but only so far, and here's where you crossed the line?

MR. GORDON:  I think *Addison* is probably the case that comes closest.

THE COURT:  What's its holding?

MR. GORDON:  The holding in *Addison* was -- so *Addison* tries to wrestle with *Mulligan*, and basically says *Mulligan* is -- does not stand quite as broadly as counsel suggested that it stands.  So *Addison* talks about that if the objective in making private comments is to punish somebody, then that crosses the line.

THE COURT:  So it's a subjective test?  And can you say things -- can you say to the legislature truthfully, "We're concerned about cost overruns, but if your subjective intent in doing so is to punish FamilyCare, it's unprotected speech"?  Or is it an objective test somehow?  Do I have to know the intent of the speaker or can I just look at the speech to know whether it's inside or outside the line?

MR. GORDON:  And I think this collapses somewhat into what is the intimate third factor here, the substantial and motivating factor, and this is why I think you see cases in the Ninth Circuit like *Coszalter* and *Alpha*, where they say, look, qualified immunity, if it turns out that what the plaintiff is saying is true here, then this was retaliation and there is no qualified immunity.

THE COURT:  I understand that's how you always look at qualified immunity at summary judgment.  You assume that what plaintiff has said is true.

MR. GORDON:  Well, I'm just saying what the Court said in sending the case to trial, they said, look, if it turns out that --

THE COURT:  I understand what you're saying.  And I'm just saying that what you think is important about that case is true in qualified immunity and summary judgment and 1983 in every single case.  So it's probably not helping me much in this case.

MR. GORDON:  Well, I think what that case indicates to me, as I read it, is that these -- when you're talking about Section 1983 First Amendment retaliation claims, because it's clearly established that you cannot retaliate against somebody for exercising protected speech, the question of whether or not it was retaliation is one that goes to the -- if there's sufficient evidence up front, then it goes to the jury, and that's what the -- that's what the Ninth Circuit said in *Coszalter*.

THE COURT:  So I guess what I'm hearing you tell me is that if the speech is, in fact, retaliatory, it cannot be protected and must go to trial?

MR. GORDON:  If it is --

THE COURT:  All that does is punt downfield what it means to be retaliatory, which is what we're struggling with, because I think you would have to agree, it's certainly my view that you can as a government actor engage in speech that is oppositional to your vendor's speech and can be because you don't like what the vendor has said or done and you want to respond to it and be protected speech.

Do you disagree with that possibility?

MR. GORDON:  The possibility that a government actor could --

THE COURT:  Could engage in speech that was oppositional to the vendor and driven in part by the fact that

you, the government actor, don't like what the vendor has said, and nevertheless not be actionable under a retaliation theory.

MR. GORDON:  I'm not sure if I understand that question differently than the other question you asked about is there a situation in which government speech can be nonretaliatory or not be actionable.

THE COURT:  Let me try it this way.  I agree with the proposition that if something fits the statutory definition of retaliation, that it's clear that you cannot engage in that conduct as a government actor.  I just find that not illuminating at all because the whole question is what is or what is not retaliatory speech.

So I accept your advanced proposition that it's possible to engage in retaliatory speech or even for a plaintiff to adequately allege such and have the case have to go to trial.

What I'm struggling with is what qualifies sufficiently as retaliatory speech in this setting, and I thought you'd agreed with me earlier that a government actor could do a number of things in the speech arena, including speech that contradicts what the vendor has said and not be retaliating.

MR. GORDON:  Yes, I do agree with that.

THE COURT:  So now I'm trying to find out what makes it retaliatory?  Subjective motivation or the character of the

speech itself?

MR. GORDON: I don't know that it's -- I don't know if you can divide it neatly between the two, but certainly if the objective of the speech is to harm the plaintiff, and particularly, as I said before, if the objective is to disrupt the government benefits that the plaintiff has, that is speech that is actionable.

Keep in mind this is not -- I don't think we're talking about a close call here. Ms. Saxton acknowledged that the speech was outside the bounds of what was acceptable for a government agency. She was forced to resign over it. She issued an apology where she said that. So I don't think we're getting close to the line --

THE COURT: I agree that it's likely that at the end of the day there will be speech that gets through all of these filters. What I'm struggling with now is how to set up boundaries that tell us item by item how to do that. Because if I just sit here and say, well, speech that qualifies as retaliatory under the statute defeats summary judgment, and speech that doesn't qualify as retaliatory under the statute doesn't defeat summary judgment, I could have done that at the start of this hearing because that would have helped you not at all.

MR. GORDON: Well, I guess -- I guess I look at it and I think there is speech that is clearly retaliatory here.

THE COURT:  I know that.  I'm trying to find out why you think it's retaliatory, and particularly the subjective versus objective difference.  Because, for example, I mean, I can think of off the top of my head a number of instances where a government actor in response to a private speaker would be subjectively mad and wish that the speaker, the private speaker, was hurt, but just engage in speech that's legitimate.

You know, if somebody says, "The EPA is a kangaroo agency, corrupt," and the EPA head says, "That's not true, and in fact, the speaker doesn't even know what he's talking about, and you should take into account that he has no experience with EPA," well, all that is legitimate speech, but the head of the EPA might wish this guy fell off a cliff.

Do I look at what's motivating the speech or the content of the speech alone?

MR. GORDON:  Well, you -- in determining whether it's an adverse action?  Is that the question?  Because, of course, you have to look at the motivation --

THE COURT:  We started down this path by determining what qualifies for qualified immunity or not, but it ultimately turns on what do the cases tell Ms. Saxton about the kind of speech she can engage in or not.  Right now you're telling me that what she should have known in advance is that if her heart was pure, she could engage in a lot of speech, but if she wished FamilyCare harm, then her speech is illegitimate.

That's a tough test to apply here.

MR. GORDON: Except I'm not looking into her heart so much as looking at the content of the smear campaign. I think we can --

THE COURT: If you only want me to look at the content of the smear campaign, then that's a different test than the one you were sort of advancing a few minutes ago where you said you weren't sure but that both might be important.

Do you care about the motive for the speech, the subjective intent of the speaker or not?

MR. GORDON: Yes, yes. And I think in this case the subjective intent of the speaker is evidenced by what's in, among other things, the smear campaign.

THE COURT: All right. And then second as to qualified immunity, we discussed to some degree the line between public concern versus not, and you've talked about -- I talked about and you agreed the possibility, for example, that if the contract itself is a contract that the public should care a lot about, that really almost any speech about that contract might be public concern.

Is there any authority for that that Ms. Saxton should have been aware of prior to speaking?

MR. GORDON: Well, you don't need authority for that particular proposition because there's ample evidence in the record of -- that FamilyCare's speech was well beyond just the

contents of its contract and how much it was getting paid.  So FamilyCare is advancing legislation that would apply to OHA and to all CCOs.  FamilyCare is talking about things like transparency.

And there are numerous cases from the Ninth Circuit that say matters related to the functioning of government are of inherent public concern.  Things that are relevant to the public's evaluation of the performance of governmental agencies are matters of public concern.  Those are both from *Ing*.

THE COURT:  All right.  Thank you.  Thank you very much.

MR. GORDON:  Your Honor, may I mention one other thing?

THE COURT:  Yes.

MR. GORDON:  Just briefly, and this is something that Your Honor specifically asked about on the subject of the missing texts.  Counsel talked about what evidence there is and there isn't.  And just briefly to say that there are numerous texts here, and we're not asking the Court to rule on the motion for sanctions here, but just to recognize that there are numerous texts that were deleted by Ms. Saxton and others that come during an important period of time in this case.  So there is evidence --

THE COURT:  If you got an adverse inference from those -- I'm not going to rule on that today, and I have no

opinion yet, but if you obtained an adverse inference on those that would plug into my analysis where?

MR. GORDON:  Well, it plugs into your analysis at summary judgment because --

THE COURT:  Right, but where at summary judgment?

MR. GORDON:  It only plugs into your analysis at summary judgment I think if it's a close call whether or not there is sufficient evidence to get past summary judgment.  We don't think that's the case here, though.  We don't think it's a close call at all.

THE COURT:  Specifically are you saying that it would apply to the rebuttal you have to make under *McDonnell Douglas* of the legitimate nondiscriminatory reason that one of the things you'd adduce would be the adverse inference from the deleted texts?

MR. GORDON:  I don't think it's just relevant to that necessarily.

THE COURT:  What else?

MR. GORDON:  Well, it's relevant to any evaluation of the sufficiency of the evidence to create a genuine dispute of material fact.

THE COURT:  All right.  Thank you very much.

MR. GORDON:  Thank you, Your Honor.

THE COURT:  Let's go to qualified immunity.

MR. MERSEREAU:  All right.  You asked Mr. Gordon

whether there was a case that made it clear where the line was drawn in terms of protected speech versus nonprotected speech by state actors such that would meet our facts in this case.

The answer, in our view, is there are no cases in the Ninth Circuit or anywhere else you'll see in these briefs that provide the kind of clear notice of the transgression as required in the *County of San Diego* case cited on page 24.

Mr. Gordon referred to the *Addison* case. That is a Judge Simon opinion in this district court in 2017. That could not possibly provide notice to Lynne Saxton for conduct that occurred in 2016 and prior to her resignation.

So the answer to your question is there are no cases putting her on notice as to what categories of her speech are protected and what aren't.

THE COURT: Thank you.

You said at page 20 of your reply brief: "No case clearly establishes that the head of state agency can violate the First Amendment when she or her agency exercises its own rights, at least when the speech at issue does not include a threat of adverse action."

I take from that that if the speech includes a threat of adverse action, as we've discussed what that means, you believe that case or no case, she's on notice about that, right?

MR. MERSEREAU: I think that's a generally fair

statement, but I'd like to hedge my bets and see the case. I think in principle you're right, if there is such a case, it might provide clear notice. We're not aware of one in this context.

THE COURT: All right. Thank you.

Anything else?

MR. MERSEREAU: Yes, very briefly.

Secondly, Your Honor -- and this is an important point for us to make. This notion of a smear campaign has taken on a life of its own in this lawsuit. The Court has heard that reference a number of times, you've seen it in pleadings. You've seen reference to this so-called communications plan that was in draft form in February of 2017. Never saw the light of day, was shelved. There's no disputed evidence about that.

But most importantly, Your Honor, Lynne Saxton didn't write the communication plan. In fact, it was Lynne Saxton who said, "This is not sufficient. We're going to put it on the shelf." It was never made public until there was a Public Records Act request, and to suggest, as Mr. Gordon has, that there's any evidence in this record that would support an argument that when she resigned, she admitted and conceded any kind of improper speech or improper retaliation conduct is absolutely untrue. What she said in her resignation letter is that some of the language in that draft communication plan was

not appropriate. So she took one for the team, so to speak, and off she went.

But there is no admission by Lynne Saxton of any retaliatory speech. And that's what we've been talking about here, our communications with the legislature, the media, and internally via emails, not this draft communication plan.

And so the evidence of a so-called smear campaign in this record is missing.

THE COURT: All right. Thank you.

Here's what I'm going to do. I'm going to take a brief recess now. I'm going to ask the two lawyers who have spoken today to create some space at their desks for a brief criminal matter, since they've been waiting. We'll take a break after the criminal matter and pick up where I need to at that time.

So all of you can take at least a 20-minute break until we get back to this case.

THE CLERK: Court is in recess.

(A recess is then taken.)

MR. GORDON: Your Honor, with your permission.

THE COURT: Yes.

MR. GORDON: Your Honor asked me about a case regarding -- a case that would put Ms. Saxton on notice, and I cited the Court to *Addison*. During the break, I was reminded that the *Coszalter* case also discusses retaliatory speech.

It's at pages 975 through 977 of that case. And specifically the Court identifies things like an unwarranted assignment of blame, a reprimand containing a false accusation, ongoing verbal harassment and humiliation as examples -- threat of disciplinary action as examples of speech that could constitute adverse actions.

THE COURT: Thank you.

MR. GORDON: Thank you.

THE COURT: All right. Let me do in some instances formally what I only did tentatively, and give you my other formal rulings where I just simply left things hanging.

I formally deny Ms. Saxton's motion for summary judgment on the basis that FamilyCare's claim is barred by the settlement agreement, and I rule as follows on the statute of limitations that the continuing violation doctrine does not apply here on these facts to this setting, not because it can never apply, but because it simply doesn't apply on these facts.

And I reject plaintiff's, in my view, very broad formulation of the continuing violation doctrine, but I nevertheless find that for those acts outside the applicable statute of limitations, that at a later time it is certainly possible that a sufficient case can be made for their admissibility for other purposes other than liability.

I'll take up now each of the three parts of whether

summary judgment should be granted on the retaliation claim sort of on its own elements.

So I find that there is in this case enough expressive conduct by FamilyCare that involves a matter of public concern to defeat summary judgment. Some day we'll have to do that item by item. I'm not able to do that today on the record I have in front of me, and I'm not sure whether that should be just left to a motion in limine based on witness statements and exhibit lists before trial or whether we should try to do something sooner than that, but in any event, there's enough there to defeat summary judgment.

And so that's because, in my view, there's some of the speech that's been identified that I think fits almost any definition of public concern, and in my view, context matters, and there is, I think, some speech that would otherwise not be a matter of public concern, but because it involves this particular contract in this setting can be elevated to a matter of public concern.

I don't mean to suggest by that that any speech about a contract that the public should care about is public concern speech, just that the context of the particular speech matters, and more speech is likely to be on a matter of public concern when it -- the contract involves something the public cares about a lot than would be the case for a purely private contract.

I find that the idea that just engaging in the legitimate activity of rate setting cannot, sort of as a matter of law, qualify as retaliation is a principle I disagree with and deny summary judgment, to the degree that's the theory that Ms. Saxton is advancing on rate setting.

I struggle with what to say about speech on the so-called smear campaign, the theory of summary judgment being that protected expressive speech by a government actor in response to, say, in our case, a vendor is protected by the First Amendment and therefore can't be retaliation.  And here each side can state sort of hornbook generalities that are true but not particularly helpful.

So it's true, for example, that protected First Amendment speech by a government agency can't be the basis of retaliation and sort of by definition isn't retaliation.  And it's true also that retaliatory speech isn't protected and can be the subject of a legitimate claim.  Neither of those principles advances the ball downfield very far, so here I think what's important is that in my view there's enough speech in the light most favorable to the nonmoving party here that I think is unprotected by First Amendment protections for government speakers in this setting, so as to defeat summary judgment on this score.

Where is that line?  To give away my upcoming ruling on qualified immunity, the answer to that question is nobody

knows clearly.  I think it involves, at a minimum, an objective test having to do with the content of the speech being outside the legitimate activities of the government actor involved.

Now, I don't think that the presence or absence of harm matters very much, nor do I think that the speech being internal versus external matters very much.  A government actor can speak to another government actor in a way that's unprotected.  Instead I think it's sort of the legitimacy of the nature of the speech and its goals as discerned from the speech itself that matter, and so at a later time we'll have to do our best again to go line by line to see what's protected speech versus not protected speech, but there's enough here to defeat summary judgment on that element.

On causation, whether the expressive action was the substantial motivating factor here, I think that plaintiff -- I find that plaintiff established its prima facie case, that Ms. Saxton proffered legitimate nondiscriminatory reasons both for speech and for rate setting, and that plaintiff -- again for summary judgment purposes -- did enough to show those explanations to be potentially pretextual to defeat summary judgment.

And I'll say again formally what I said informally earlier, that in evaluating the evidence for all of these things, there's sort of good news and bad news for plaintiff. One is that the evidence to get through these funnels has to be

known to Ms. Saxton, has to be shown to be known to Ms. Saxton in some way, has to -- the expressive conduct has to predate the adverse action, and the adverse action has to predate Ms. Saxton's departure to qualify.

The good news hasn't arrived yet.  I'll just say this:  Without ruling in any way on the sanctions motion, I think I have to to some degree if necessary someday take into account either at summary judgment or perhaps otherwise any adverse inference or other sanction that may flow from deleted texts.  And so we'll just have to plug that in if the day comes that that is what happens to Ms. Saxton as best we can.

On qualified immunity, I think it abundantly clear from our discussion today that the line between protected speech here by a government actor -- I'm not now talking about the public concern issue but protected speech by a government actor here versus not is not at all clear, and therefore did not put Ms. Saxton on anything like clear notice, so that much of the speech that I've seen in the pleadings I think is speech for which she has qualified immunity.

To the degree there is speech that falls clearly outside the line, which can happen either because of a case that makes it clear or because it's just readily knowable, so that if a government actor, for example, says, "I want to put this company out of business," and that's not a legitimate goal of the agency in that setting at that time, then that, I think,

falls within the readily knowable, even if not found in a case holding, sort of conduct for which one doesn't get qualified immunity.

So to the degree there is such speech here, it will fall outside qualified immunity, and I can't today -- I don't have a clear enough record in front of me today to go line by line and say what gets qualified immunity and what doesn't. I'll just say that I will apply what seems to me to be the very clear idea that this line is not something that is the clear subject of any holding relevant at the time except in the most extreme instances.

I deny summary judgment on the all damage claims summary judgment, consistent with my former rulings on this summary judgment, and I deny the motion to strike Exhibit 51 as mooted by FamilyCare's recent communications with the Court.

I'd like to now turn to the motion to stay.

So, first, FamilyCare's position?

MR. ENGLISH:  Yes, Your Honor.  Stephen English on behalf of FamilyCare.

There's not a whole bunch that the defense and we have agreed upon.  This is one of those.  So we are seeking a stay of the case in its entirety as it goes forward on the appeal of Mr. Allen, as the declaratory relief suit, which is currently on appeal, is heard, and presumably as Ms. Saxton's appeal goes forward.  I'm leaping ahead here, but I'm assuming

that that appeal will be taken as well.

The standard for the Court is set out --

THE COURT:  Not to -- I'll just turn to Mr. Mersereau in a moment --

MR. ENGLISH:  Sure.

THE COURT:  -- but she's in a very different position from Mr. Allen, in that I've largely granted her request for qualified immunity.  So even -- well, let me have you pause for a moment because your calculus of why we should do it rests at least in part on the idea that Ms. Saxton was going to appeal, right?

MR. ENGLISH:  In part, but even if she doesn't appeal, Your Honor.

THE COURT:  Let's just nail that down and then I'll come back to you.  Is that all right?

It's probably unfair to ask, but I'll only ask in the event that you actually already know the answer, whether Ms. Saxton intends to appeal the qualified immunity ruling, which is the only ruling as to which she has the interlocutory right to seek appeal.

MR. MERSEREAU:  And the answer is I don't know.  I need to digest your ruling, Your Honor.

THE COURT:  Do you have an idea about how long it would take you to know?

MR. MERSEREAU:  Midweek next week.

THE COURT:  Thank you.

So without knowing, your position is I ought to stay anyway?

MR. ENGLISH:  Yes, Your Honor.  And --

THE COURT:  And stay because Mr. Allen won't be at the trial and it's a duplicative -- it's two trials if I don't stay?

MR. ENGLISH:  I can go through the elements, but I want to start with obviously this is an abuse of discretion standard, so you are protected in that regard.  And I think I can go through why a stay would make sense, Your Honor.

THE COURT:  Go ahead.

MR. ENGLISH:  To begin with, we are asking for a stay except for resolution of the motion for summary judgment, which you've just heard on the qualified immunity, and then on the pending sanctions motion, and then on the pending motion for partial reconsideration of the AEO documents.  And tied to that to some degree is the third-party discovery from Health Share.

THE COURT:  Are you also seeking to just simply, whether by motion for reconsideration or some other way, wrap up down-designation as an issue?

MR. ENGLISH:  Yes, Your Honor.  I mean, fundamentally we took what you said at the last hearing and modified our request to significantly fewer number of documents.

THE COURT:  I understand where you are, I just wanted

to be clear is what you're really interested in is a resolution of the entire down-designation issue, whether I grant or deny the specific motion you filed, because if I denied it, we'd still leave unresolved a lot of issues there for the future. You want to go all the way through the end of that trial?

MR. ENGLISH:  I do, Your Honor, because what we are hopeful is that if we have these issues that the Court has determined adversely to us, or adversely to Mr. Allen decided, and we end up coming back for a trial of all matters, I don't want to have the same delay in that regard.  So we could be doing certain things now.

THE COURT:  And they seem largely unrelated to the issues on appeal.

MR. ENGLISH:  I believe so, Your Honor, yes.

THE COURT:  Thank you.

MR. ENGLISH:  But I can go through the standard set out in *Rohan*, but if you're familiar --

THE COURT:  I just want your top three reasons for granting a stay.  One is that you've actually just said you want a stay with these exceptions.  I assume your top reason is that you don't want to pay for two trials.

MR. ENGLISH:  Yes.  And, Your Honor, we will be appealing your rulings, despite the fact that you may well -- 98 percent certain you're right, but you know that 2 percent is out there, Your Honor.

THE COURT:  I don't know if some judges are offended by the notion of appeals or not.  I'm not, so --

MR. ENGLISH:  It would -- the appeals are relatively -- I'm kind of morphing into my 54(b) argument, Your Honor, but in any event, the -- we will be appealing this.  A stay would allow us to get the appeals on the legal issues which don't have factual context determined.

THE COURT:  Well, just to be clear, though, you'll appeal them some day, and I've got to grant your Rule 54(b) motion to have it all be on appeal at once, right?

MR. ENGLISH:  Well, we've asked for three -- a limited appeal, but yes, Your Honor, fundamentally, yes.

THE COURT:  All right.  Any other reasons I haven't discussed for why you think a stay is the right answer here?

MR. ENGLISH:  Well, number one is the trial moves forward against OHA without Mr. Allen, which means that if you are correct in your ruling, we will undoubtedly have a second trial on the same basic issues.

Number two --

THE COURT:  And your view of the duplicative nature of those two trials is that they fundamentally overlap almost entirely?

MR. ENGLISH:  I don't know if they do, Your Honor. I've looked at the res judicata issue because I was considering whether or not that might be to my benefit, in all candor.  I

don't think -- I do believe that the context of the entire setting is such that it makes sense in a matter of judicial economy to have everything done at the same time.

THE COURT:  All right.

MR. ENGLISH:  And then, finally, the hardship to the parties if the case isn't stayed, FamilyCare is going to have to go through two trials.

THE COURT:  Thank you.

MR. ENGLISH:  Those are the top three, Your Honor.

THE COURT:  What's OHA's position?

MR. LEVIN:  Thank you, Your Honor.  OHA's position boils down to the same thing, which is the State wants to avoid the expense of having two trials and two sets of appeals.

THE COURT:  What do you think of the carve-outs from the stay?

MR. LEVIN:  We agree with the carve-outs, Your Honor. We tried to come up with carve-outs that we believed would allow us to officially resolve some issues as the appeal is pending on issues that we think are going to be alive no matter what happens.

THE COURT:  Thank you.

MR. LEVIN:  Thank you, Your Honor.

THE COURT:  You know the answer to this question yet or is that bound up in the other?

MR. MERSEREAU:  It's bound up with the other, Your

Honor.

THE COURT: So for today's purposes, you take no position?

MR. MERSEREAU: Yes.

THE COURT: I'll say this: I'm -- well, to be candid, I'm like any judge who has put this much into a case reluctant to stay it at all. I'm sure you are too at some level.

But I'm sympathetic to the arguments for a stay, and I'll just say that I would like to have the total quantum of decisions on the table before I answer this question, so I want to wait to hear from Mr. Mersereau hopefully mid next week so I'll know whether it's a trial of Saxton and OHA and not Allen, or just OHA without Saxton or Allen going forward in January, what we're duplicating and what we're not before I make my final decision.

Does waiting until the latter part of next week for an important decision that has to do with upcoming expenses pose a challenge that I ought to rethink that for any of you?

Starting with plaintiff, any upcoming deadline that the expense could be avoided if I ruled today, but if I wait, you'll have to incur an expense?

MR. ENGLISH: We have moved separately to vacate the deadline, Your Honor, but I mean, I honestly can't say that yes, the delay of a week would be such that it would impose any

more undue hardship than what I think is the more fundamental underlying issue of the stay.

THE COURT:  OHA?

MR. LEVIN:  OHA doesn't disagree with that, Your Honor.

THE COURT:  All right.  Anything about this that poses a challenge for your client?

MR. MERSEREAU:  No, Your Honor.

THE COURT:  All right.  Then I'll take under advisement the motion for a stay, hoping to hear from you as soon as possible so that I can rule sometime next week on the motion for a stay.

MR. ENGLISH:  And, Your Honor, I assume by your answer that the 54(b) certification will be part of that or not?

THE COURT:  I think so, yes.  I haven't looked at that in any real degree of care yet.  I'm aware of it and I've looked at it briefly, but it makes sense to try to answer both at once.

MR. ENGLISH:  And just so we're clear that the three dismissed claims that we're seeking the -- I'd like to use the word "rifle shot" on are the APA claims from the 2017 and 2018 rates and then the breach of the health plan services contract claim.

THE COURT:  Right.

MR. ENGLISH:  Thank you, Your Honor.

THE COURT:  Yes, sir?

MR. MERSEREAU:  Your Honor, we'll commit to giving our response to you by Wednesday noon.

THE COURT:  Thank you.

There are a number of other pending matters in front of me.

MR. McCRACKEN:  Your Honor, I'm sorry to interrupt. Chris McCracken for Health Share.

THE COURT:  Would you come forward so the court reporter can hear you better?  Right there is fine.

MR. McCRACKEN:  (Complies.)

On behalf of Health Share, we'd like to let the Court know our position, if we can give our position on the carve-out issue.  We don't object to the stay.  In fact, we welcome it, but we believe it should be broader.  I believe by noon on Wednesday, we could also provide the Court a brief letter or brief on our position.

The other CCOs also had an interest in the carve-out portion of the motion, and they might want to join as well.

THE COURT:  Only the down-designation or AEO issue or other issues that might be carved out?

MR. McCRACKEN:  I believe for the other CCOs, it is just the AEO down-designation issue.

For Health Share, we also had some discovery pending

against us we'd like to let the Court know about.

THE COURT:  All right.  I'll welcome your brief by noon on Wednesday.

MR. McCRACKEN:  Thank you.

MS. MONTALBANO:  And, Your Honor, Sonia Montalbano on behalf of Optumas.  We'd also like to submit a letter by the same deadline if possible.

THE COURT:  That's fine.  Thank you very much.

MS. MONTALBANO:  Thank you, Your Honor.

THE COURT:  Does anyone else want to write me a letter next week while I'm here?  My birthday is not until December, so you'll have to hold off on birthday cards.

MR. ENGLISH:  Depending on what those say, I'd like at least 24 hours to do a quick response.

THE COURT:  That's fine.

I am, in fact, all week next week in Washington, D.C., so I expect that I'll be able to answer by Friday, and if I get all that I need by Wednesday and then Thursday, I hope to do that, but the latest would be the following -- I guess Monday is a federal holiday -- the following Tuesday.

Anything else today from plaintiff?

MR. ENGLISH:  No, Your Honor.

THE COURT:  From Ms. Saxton?

MR. MERSEREAU:  No, Your Honor.

THE COURT:  From OHA?

MR. LEVIN:  No, Your Honor.

THE COURT:  Thank you all.  We'll be in recess.

THE CLERK:  This court is in recess.

THE COURT:  Actually, I am going to ask -- I'm going to ask the parties to think about one other thing that I'd like to -- that may result in an additional carve-out, which is why I want to bring it up.

Right now what I've left on the table is that the only way to go through piece by piece and analyze my summary judgment ruling on Ms. Saxton is what would normally be the case, which is that you would apply it by way of filing motions in limine against, or witness or exhibit objections against your opponent's pretrial submissions, which punts this down the road quite a ways.

I'm willing to do that, but I'd like the parties to think about whether it makes sense to try to resolve this issue of what speech is public versus private and what speech can be retaliatory versus not retaliatory sooner than that, which would be a carve-out.  So I'll just invite you to discuss it and let me know by Wednesday at noon.

MR. ENGLISH:  You want our position on whether or not that makes sense?

THE COURT:  Yes.

MR. ENGLISH:  Thank you, Your Honor.

(Proceedings concluded at 3:58 p.m.)

--o0o--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


/s/Bonita J. Shumway                    November 5, 2018
_____              _____
BONITA J. SHUMWAY, CSR, RMR, CRR        DATE
Official Court Reporter

**MR. ENGLISH: [26]** 4/6 53/17 54/4 54/11 55/3 55/7 55/12 55/21 56/5 56/13 56/15 56/21 57/2 57/10 57/14 57/22 58/4 58/8 59/22 60/12 60/19 60/25 62/12 62/21 63/20 63/23

**MR. GORDON: [52]** 4/8 25/7 25/11 25/16 26/16 27/12 27/17 27/21 28/3 28/8 28/12 28/20 29/7 29/11 29/17 30/16 30/18 30/20 31/13 31/24 32/4 32/9 33/10 33/12 33/22 34/24 36/4 36/16 36/19 37/7 37/17 37/25 38/12 38/21 39/2 39/22 40/1 40/23 41/15 42/1 42/10 42/22 43/11 43/14 44/2 44/5 44/15 44/18 44/22 47/19 47/21 48/7

**MR. HESTERBERG: [1]** 4/10

**MR. LEVIN: [6]** 4/18 58/10 58/15 58/21 60/3 62/25

**MR. MARKOWITZ: [1]** 4/22

**MR. McCRACKEN: [4]** 61/7 61/11 61/22 62/3

**MR. MERSEREAU: [33]** 4/12 13/16 13/22 14/4 14/13 14/15 15/24 16/10 17/6 17/8 17/21 17/23 18/13 19/4 19/16 19/21 20/6 20/13 21/2 21/8 21/10 22/24 24/17 44/24 45/24 46/6 54/20

54/24 58/24 59/3 60/7 61/2 62/23

**MS. MONTALBANO: [2]** 62/4 62/8

**MS. PLASS: [1]** 4/14

**MS. SALERNO OWENS: [1]** 4/15

**THE CLERK: [3]** 4/2 47/17 63/2

**THE COURT: [119]**

**-**

**--o0o [1]** 64/2

**/**

**/s/Bonita [1]** 64/9

**1**

**1000 [1]** 3/7
**10th [1]** 2/4
**1100 [1]** 2/18
**111 [1]** 2/18
**1120 [1]** 2/4
**120,000 [2]** 29/24 29/24
**1201 [1]** 2/8
**1211 [1]** 2/14
**130 [1]** 21/13
**1300 [1]** 2/22
**1500 [1]** 3/2
**1983 [5]** 5/19 6/1 26/19 37/23 38/3

**2**

**2 percent [1]** 56/24
**20 [2]** 9/24 45/16
**20-minute [1]** 47/16
**2016 [2]** 14/9 45/11
**2017 [4]** 33/25 45/9 46/13 60/22
**2018 [6]** 1/7 4/2 14/6 33/25 60/22 64/9
**24 [3]** 23/22 45/7 62/14
**2400 [1]** 2/22

**2:06 [1]** 4/2

**3**

**3000 [1]** 2/14
**301 [1]** 3/7
**326-8188 [1]** 3/8
**3:58 [1]** 63/25

**4**

**45 [4]** 15/6 27/2 27/2 27/4
**4800 [1]** 2/8

**5**

**503 [1]** 3/8
**51 [1]** 53/14
**54 [3]** 57/4 57/9 60/14

**6**

**6:18-cv-00296-MO [1]** 1/4
**6:18-cv-296-MO [1]** 4/4

**7**

**70 [2]** 21/13 22/10
**707 [1]** 3/2

**8**

**8188 [1]** 3/8

**9**

**97201 [1]** 2/18
**97204 [3]** 2/14 2/22 3/7
**97205 [1]** 3/3
**97209 [1]** 2/5
**975 [1]** 48/1
**977 [1]** 48/1
**98 percent [1]** 56/24
**98101 [1]** 2/9

**A**

**able [2]** 49/6 62/17
**about [74]**
**above [1]** 64/6

**above-entitled [1]** 64/6
**absence [1]** 51/4
**absolutely [2]** 29/18 46/24
**abundantly [1]** 52/12
**abuse [1]** 55/9
**accept [2]** 33/16 39/13
**acceptable [2]** 31/7 40/10
**account [4]** 8/5 13/6 41/11 52/8
**accumulate [1]** 6/17
**accusation [1]** 48/3
**acknowledged [2]** 31/7 40/9
**act [4]** 5/18 21/1 27/13 46/20
**action [25]** 8/21 8/24 10/1 11/7 11/8 13/10 18/2 18/4 18/16 18/20 18/23 19/1 19/19 20/1 20/8 25/23 26/3 35/1 41/17 45/20 45/22 48/5 51/14 52/3 52/3
**actionable [7]** 9/19 19/7 31/20 31/24 39/2 39/6 40/7
**actions [7]** 11/25 20/1 26/6 26/7 26/8 26/11 48/6
**actively [2]** 35/6 35/13
**activities [2]** 8/23 51/3
**activity [3]** 9/1 11/25 50/2
**actor [20]** 9/4 9/20 10/3 12/9 20/16 30/14 31/23 38/17 38/22 39/1 39/10 39/19 41/5 50/8 51/3 51/6 51/7 52/14 52/16 52/23

**actors [5]** 10/15 18/9 18/23 32/4 45/3
**acts [23]** 6/5 6/8 6/11 6/17 6/20 6/23 7/5 7/6 7/6 14/7 14/7 21/23 25/14 25/18 25/19 25/21 25/22 26/2 26/4 26/6 26/15 27/3 48/21
**acts versus [1]** 25/14
**actually [7]** 18/7 18/12 23/5 33/13 54/17 56/19 63/4
**actuarial [2]** 27/5 33/1
**actuary [1]** 24/6
**add [1]** 17/10
**Addison [6]** 36/17 36/20 36/20 36/23 45/8 47/24
**additional [1]** 63/6
**address [1]** 8/18
**addressing [1]** 7/24
**adduce [1]** 44/14
**adduced [1]** 11/18
**adequately [2]** 11/23 39/15
**adjustment [2]** 23/24 33/24
**admissibility [1]** 48/24
**admissible [2]** 14/12 22/10
**admission [1]** 47/3
**admitted [2]** 34/16 46/22
**advance [1]** 41/23
**advanced [2]** 34/19 39/13
**advances [1]** 50/18
**advancing [3]** 42/7 43/2 50/5
**adverse [30]** 7/6 8/21 8/24 10/1 11/8 11/25 13/9 18/1 18/4 18/16

18/20 18/23 19/19 20/1 20/8 25/23 26/3 26/6 26/7 26/11 41/17 43/24 44/1 44/14 45/20 45/22 48/6 52/3 52/3 52/9
**adversely [2]** 56/8 56/8
**advisement [1]** 60/10
**advocacy [1]** 22/21
**advocating [1]** 35/12
**AEO [3]** 55/17 61/21 61/24
**after [7]** 13/9 23/19 26/22 34/6 34/7 34/10 47/14
**afternoon [3]** 4/9 4/13 4/19
**again [11]** 10/12 11/8 12/3 12/6 12/10 20/18 24/2 24/10 51/11 51/18 51/22
**against [10]** 8/25 17/3 22/4 28/12 36/14 38/4 57/16 62/1 63/12 63/12
**agencies [2]** 20/23 43/8
**agency [17]** 1/7 9/5 9/12 9/18 10/23 14/21 20/21 21/22 30/13 31/8 34/23 40/11 41/9 45/17 45/18 50/14 52/25
**agency's [1]** 27/7
**ago [2]** 22/17 42/7
**agree [18]** 14/11 14/14 16/19 23/8 27/9 27/25 28/7 28/9 30/12 31/10 31/14 33/10 33/11 38/16 39/7 39/23 40/14 58/16
**agreed [4]** 11/9 39/19 42/17 53/21
**agreement [4]** 5/11 14/5 34/7 48/14

**ahead [4]** 13/22 25/7 53/25 55/12

**al [1]** 4/5

**alive [1]** 58/19

**all [70]**

**allegation [1]** 24/16

**allege [1]** 39/15

**alleged [1]** 24/21

**alleges [1]** 8/24

**ALLEN [13]** 1/7 2/12 4/18 4/20 4/25 28/17 53/23 54/7 55/5 56/8 57/16 59/13 59/14

**allow [3]** 6/17 57/6 58/18

**allows [1]** 28/8

**almost [4]** 19/14 42/19 49/13 57/21

**alone [3]** 26/6 26/7 41/15

**along [1]** 14/1

**Alpha [2]** 17/11 37/11

**already [2]** 5/12 54/17

**also [14]** 9/20 11/17 16/9 26/10 28/7 31/19 34/11 47/25 50/16 55/19 61/17 61/19 61/25 62/6

**always [1]** 37/15

**am [2]** 62/16 63/4

**Amendment [7]** 19/7 26/19 38/3 45/18 50/10 50/14 50/21

**among [3]** 12/17 34/20 42/13

**amount [3]** 6/24 9/19 11/2

**ample [2]** 23/23 42/24

**analysis [3]** 44/2 44/3 44/6

**analytical [1]** 24/5

**analyze [3]** 5/21 17/1 63/9

**analyzed [1]** 6/7

**animating [2]** 31/15 31/16

**animus [5]** 18/4 21/18 22/3 24/11 24/13

**another [3]** 31/1 31/16 51/7

**answer [15]** 27/21 27/22 33/16 34/21 45/4 45/12 50/25 54/17 54/21 57/14 58/23 59/11 60/14 60/18 62/17

**any [27]** 6/4 7/13 10/14 14/6 20/20 22/2 22/13 28/3 42/19 42/21 44/19 46/21 46/22 47/3 49/10 49/13 49/19 52/6 52/8 53/10 57/5 57/13 59/6 59/19 59/20 59/25 60/17

**anybody [1]** 10/19

**anyone [1]** 62/10

**anything [7]** 19/3 20/16 32/15 46/6 52/17 60/6 62/21

**anyway [1]** 55/3

**anywhere [1]** 45/5

**APA [1]** 60/22

**apart [1]** 23/6

**apology [2]** 31/6 40/12

**apparently [1]** 24/21

**appeal [13]** 53/23 53/24 53/25 54/1 54/10 54/13 54/18 54/20 56/13 57/9 57/10 57/12 58/18

**appealing [2]** 56/23 57/5

**appeals [5]** 35/24 57/2 57/3 57/6 58/13

**APPEARANCES [1]** 2/2

**appears [1]** 29/3

**applicable [3]** 7/3 7/13 48/21

**application [2]** 6/22 7/1

**applied [2]** 13/6 18/8

**applies [1]** 7/7

**apply [17]** 5/22 6/1 6/2 6/19 7/4 11/9 12/3 13/10 27/11 42/1 43/2 44/12 48/16 48/17 48/17 53/8 63/11

**appreciate [2]** 7/14 13/24

**appropriate [1]** 47/1

**April [2]** 14/6 14/9

**are [61]** 5/8 6/25 7/1 8/17 10/14 10/15 12/17 12/18 13/5 14/7 14/9 14/12 15/9 15/15 18/22 18/24 21/15 23/15 23/18 25/5 28/3 28/21 29/2 29/3 29/4 29/4 29/6 29/6 29/20 29/21 29/21 30/3 34/1 35/2 35/4 43/5 43/6 43/7 43/9 43/9 43/18 43/20 44/11 45/4 45/12 45/13 50/11 53/21 55/10 55/13 55/19 55/25 56/6 57/1 57/3 57/17 58/9 58/19 59/7 60/22 61/6

**aren't [4]** 16/15 16/16 26/5 45/14

**arena [3]** 16/20 34/23 39/20

**argue [2]** 16/18 26/24

**argued [2]** 7/9 21/20

**argues [1]** 23/22

# A

**argument [16]** 1/15 4/3 5/12 7/22 7/25 8/20 8/21 9/9 11/17 14/3 16/24 22/22 24/9 33/7 46/22 57/4

**arguments [3]** 5/9 23/8 59/9

**arrived [1]** 52/5

**as [81]**

**aside [1]** 30/9

**ask [8]** 18/5 24/12 30/6 47/11 54/16 54/16 63/4 63/5

**asked [10]** 24/4 24/4 24/5 29/20 32/8 39/4 43/16 44/25 47/22 57/11

**asking [2]** 43/19 55/13

**asserted [1]** 9/24

**assertions [1]** 10/9

**assignment [1]** 48/2

**assistant [2]** 4/17 4/24

**assume [4]** 33/6 37/16 56/20 60/13

**assumes [1]** 16/3

**assuming [2]** 21/4 53/25

**at [72]**

**attending [1]** 24/4

**attends [1]** 21/25

**attorney [3]** 4/17 4/21 4/24

**attributable [1]** 6/9

**attribute [1]** 8/13

**attributed [1]** 24/3

**authority [10]** 1/6 1/9 2/11 4/5 4/18 4/21 4/25 36/2 42/21 42/23

**authorized [6]** 8/23 9/1 9/4 10/4 10/23 36/8

**Ave [1]** 3/7

**Avenue [3]** 2/8 2/14 2/22

**avoid [1]** 58/12

**avoided [1]** 59/21

**aware [3]** 42/22 46/3 60/17

**awareness [1]** 7/11

**away [2]** 6/13 50/24

# B

**back [6]** 12/5 22/6 36/14 47/17 54/15 56/9

**bad [3]** 31/5 32/14 51/24

**ball [1]** 50/18

**bar [2]** 11/2 13/3

**barred [4]** 5/10 5/15 14/9 48/13

**bars [1]** 13/11

**based [1]** 49/8

**basic [2]** 14/17 57/18

**basically [3]** 21/14 22/11 36/21

**basis [2]** 48/13 50/14

**be [106]**

**beat [1]** 7/24

**because [35]** 9/8 9/17 17/15 20/10 20/19 22/8 23/14 31/6 32/9 32/19 33/13 34/19 35/5 35/19 38/3 38/16 38/18 39/11 40/17 40/22 41/3 41/17 42/24 44/4 48/16 48/17 49/12 49/16 52/21 52/22 54/9 55/5 56/3 56/6 57/24

**become [1]** 29/16

**been [11]** 6/6 8/10 11/22 11/25 15/11 31/16 36/6 42/22 47/4 47/13 49/13

**before [14]** 1/17 12/23 13/8 13/10 14/6 14/8 17/11 21/13 26/22 34/6 40/5 49/9 59/11 59/15

**begin [2]** 25/9 55/13

**beginning [1]** 34/3

**begs [1]** 9/16

**behalf [12]** 4/7 4/10 4/11 4/14 4/15 4/17 4/20 13/17 21/17 53/19 61/13 62/6

**behavior [1]** 31/7

**being [11]** 5/1 10/6 10/7 12/22 15/15 15/24 19/20 23/2 50/7 51/2 51/5

**believe [14]** 8/7 11/10 19/9 20/14 21/17 25/4 26/9 32/2 45/23 56/14 58/1 61/16 61/16 61/23

**believed [1]** 58/17

**below [1]** 64/4

**benefit [7]** 31/18 31/23 31/24 32/7 32/15 32/17 57/25

**benefit you [1]** 31/23

**benefits [1]** 40/6

**best [3]** 33/23 51/11 52/11

**Beth [2]** 2/17 4/15

**bets [1]** 46/1

**better [2]** 25/17 61/11

**between [7]** 12/7 19/19 32/12 35/12 40/3 42/16 52/13

**beyond [5]** 7/11 8/3 10/24 21/5 42/25

**bill [1]** 25/2

**bills [1]** 25/1

**birthday [2]** 62/11 62/12

**bit [1]** 23/25

## B

**blame [1]** 48/3
**boils [2]** 11/24 58/12
**Bonita [3]** 3/6 64/9 64/10
**both [11]** 1/7 6/5 7/5 8/5 8/6 13/25 17/12 42/8 43/9 51/17 60/18
**bothered [1]** 22/23
**bound [2]** 58/24 58/25
**boundaries [1]** 40/17
**bounds [2]** 30/25 40/10
**Boy [1]** 23/16
**breach [1]** 60/23
**break [3]** 47/14 47/16 47/24
**brief [7]** 18/17 45/16 47/11 47/12 61/17 61/18 62/2
**briefed [2]** 13/25 14/17
**briefing [3]** 5/2 8/1 10/10
**briefly [5]** 25/10 43/15 43/18 46/7 60/18
**briefs [1]** 45/5
**bring [1]** 63/7
**broad [2]** 5/9 48/19
**broader [2]** 6/25 61/16
**broadly [2]** 10/12 36/22
**broth [2]** 24/7 24/8
**brought [2]** 6/1 7/10
**build [2]** 16/22 35/10
**building [1]** 20/24
**bunch [1]** 53/20
**business [2]** 10/20 52/24
**but [76]**

## C

**calculated [1]** 15/11
**calculus [1]** 54/9

**call [3]** 40/9 44/7 44/10
**called [5]** 6/6 33/24 46/12 47/7 50/7
**campaign [12]** 6/6 6/12 32/19 32/20 35/5 35/9 42/3 42/6 42/13 46/9 47/7 50/7
**can [67]**
**can't [14]** 8/22 9/2 9/8 9/11 9/19 10/11 16/5 16/6 27/20 30/15 50/10 50/14 53/5 59/24
**candid [1]** 59/6
**candor [1]** 57/25
**cannot [9]** 9/14 10/14 19/15 25/3 35/22 38/4 38/11 39/9 50/2
**capacity [7]** 1/8 4/18 4/21 4/25 23/3 23/3 32/13
**cards [1]** 62/12
**care [7]** 28/17 29/23 30/3 42/9 42/19 49/20 60/17
**cares [1]** 49/23
**Carpinteria [1]** 9/6
**carve [7]** 58/14 58/16 58/17 61/14 61/19 63/6 63/19
**carve-out [4]** 61/14 61/19 63/6 63/19
**carve-outs [3]** 58/14 58/16 58/17
**carved [1]** 61/22
**case [63]** 1/4 4/4 6/21 9/3 9/20 10/13 11/4 11/11 11/12 12/5 14/25 15/7 17/12 17/12 18/9 19/6 19/7 21/6 21/12 24/21 27/12 28/3 31/25 32/14 33/6 36/11 36/12 36/13 36/17 37/19

37/22 37/24 37/25 38/1 39/15 42/11 43/22 44/9 45/1 45/3 45/7 45/8 45/16 45/23 45/23 46/1 46/2 47/17 47/22 47/23 47/25 48/1 48/23 49/3 49/24 50/9 51/16 52/21 53/1 53/22 58/6 59/6 63/11
**case: [1]** 36/2
**case:  no [1]** 36/2
**cases [17]** 5/18 5/25 6/12 6/15 6/25 15/21 15/21 20/20 20/20 22/16 26/18 26/19 37/10 41/21 43/5 45/4 45/12
**categories [1]** 45/13
**category [1]** 18/15
**causation [3]** 11/7 13/7 51/14
**cause [1]** 64/6
**caused [1]** 14/8
**CCOs [5]** 12/9 19/12 43/3 61/19 61/23
**CDC [1]** 10/17
**certain [3]** 6/13 56/11 56/24
**certainly [6]** 8/17 14/21 23/21 38/16 40/3 48/22
**certification [1]** 60/14
**certified [1]** 64/7
**certify [1]** 64/4
**cetera [2]** 21/2 35/3
**challenge [4]** 21/11 23/9 59/19 60/7
**challenged [1]** 21/14
**character [1]** 39/25
**charter [1]** 10/24
**CHIEF [1]** 1/18
**Chris [1]** 61/9
**Christopher [1]** 2/21

**circle [2]** 18/19 18/25
**Circuit [9]** 25/20 25/20 26/20 30/21 31/17 37/11 38/8 43/5 45/5
**cited [4]** 17/12 27/2 45/7 47/24
**cites [1]** 9/6
**claim [11]** 5/10 5/15 14/7 14/18 21/19 27/10 28/11 48/13 49/1 50/17 60/24
**claiming [1]** 34/25
**claims [6]** 5/19 5/21 38/3 53/12 60/21 60/22
**clean [1]** 20/25
**clear [23]** 6/15 6/22 7/8 14/20 34/25 36/2 36/5 36/7 36/11 39/9 45/1 45/6 46/3 52/12 52/16 52/17 52/22 53/6 53/9 53/9 56/1 57/8 60/20
**clearly [8]** 28/22 29/2 36/9 38/4 40/25 45/17 51/1 52/20
**client [4]** 18/19 19/4 19/15 60/7
**cliff [1]** 41/13
**close [5]** 17/13 40/9 40/13 44/7 44/10
**closer [1]** 25/15
**closest [1]** 36/18
**CMS [1]** 28/23
**CMS's [1]** 15/2
**Coie [2]** 2/4 2/8
**collapses [1]** 37/8
**colleagues [1]** 22/18
**Columbia [1]** 2/18
**combination [1]** 12/6
**come [11]** 6/13 10/17 10/17 15/1 17/21 21/15

35/19 43/22 54/15 58/17 61/10
**comes [4]** 32/23 33/23 36/18 52/10
**coming [1]** 56/9
**comment [2]** 23/1 23/18
**comments [3]** 25/1 27/23 36/24
**comments: [1]** 14/19
**comments: We [1]** 14/19
**commit [1]** 61/3
**communicate [1]** 24/23
**communicating [2]** 24/19 24/20
**communication [7]** 16/14 21/5 27/24 29/20 46/17 46/25 47/6
**communications [8]** 15/14 21/16 22/13 28/3 31/4 46/13 47/5 53/15
**communicative [1]** 27/3
**company [3]** 10/18 20/6 52/24
**compared [2]** 11/16 19/12
**compensation [1]** 14/24
**competitor [1]** 35/10
**complained [1]** 11/25
**complaining [2]** 8/3 15/23
**complete [1]** 11/1
**Complies [1]** 61/12
**conceded [1]** 46/22
**conceding [1]** 26/5
**concern [39]** 7/24 8/2 8/7 8/9 8/16 8/18 15/18 15/20 15/22 15/24 16/4

16/7 16/8 16/10 16/23 16/25 17/3 17/6 17/15 17/18 26/24 27/11 27/15 27/16 27/25 29/3 29/17 34/21 42/16 42/20 43/7 43/9 49/5 49/14 49/16 49/18 49/20 49/22 52/15
**concerned [3]** 16/5 16/20 37/3
**concerns [2]** 24/24 26/25
**concluded [1]** 63/25
**conduct [22]** 6/1 7/23 8/12 8/17 9/21 12/7 12/16 12/18 13/7 14/8 18/25 21/17 22/9 25/3 26/13 27/9 39/10 45/10 46/23 49/4 52/2 53/2
**conference [1]** 28/24
**confines [1]** 10/4
**conflates [1]** 33/18
**conformed [1]** 64/7
**connection [1]** 33/23
**consider [2]** 26/21 28/5
**considering [2]** 26/8 57/24
**consistent [1]** 53/13
**consistently [1]** 19/11
**constitute [7]** 6/5 6/18 9/21 19/16 26/6 26/7 48/5
**constituting [1]** 25/23
**constitutional [1]** 24/10
**containing [1]** 48/3
**contains [1]** 19/25
**contend [1]** 31/23
**content [5]** 8/5 41/15 42/3 42/6 51/2
**contents [1]** 43/1
**context [11]** 8/5 8/5

**context... [9]** 14/25 22/22 27/23 36/8 46/4 49/14 49/21 57/7 58/1

**continuing [18]** 5/19 5/25 6/4 6/10 6/12 6/14 6/16 6/22 6/24 7/3 7/14 7/15 25/13 25/18 26/12 26/13 48/15 48/20

**contours [1]** 36/6

**contract [25]** 8/4 14/23 14/24 15/16 15/20 15/23 16/7 16/9 16/16 16/17 16/23 29/14 29/15 29/16 29/19 30/4 42/18 42/18 42/20 43/1 49/17 49/20 49/23 49/25 60/23

**contractor [2]** 16/18 16/21

**contracts [1]** 15/22

**contractual [2]** 17/16 20/16

**contradicts [1]** 39/21

**conversation [1]** 34/20

**cooks [1]** 24/6

**copied [3]** 12/19 12/22 12/25

**copy [1]** 16/14

**core [2]** 18/12 24/3

**corporation [1]** 1/3

**correct [4]** 9/17 30/19 57/17 64/5

**corrupt [1]** 41/9

**cost [4]** 11/20 24/15 24/15 37/3

**Coszalter [7]** 25/20 25/21 25/25 26/11 37/11 38/9 47/25

**Couch [1]** 2/4

**could [21]** 12/20 15/1

16/14 17/18 17/22 18/19 20/21 22/3 22/13 27/23 29/9 38/23 38/24 39/20 40/21 41/24 45/9 48/5 56/10 59/21 61/17

**counsel [4]** 4/6 26/24 36/22 43/17

**County [1]** 45/7

**couple [1]** 5/16

**course [5]** 12/16 12/20 27/2 27/7 41/17

**court [23]** 1/1 1/18 3/6 14/10 17/14 23/7 35/23 37/18 43/19 45/9 46/10 47/18 47/24 48/2 53/15 54/2 56/7 61/10 61/13 61/17 62/1 63/3 64/11

**Court's [1]** 13/24

**Courthouse [1]** 3/6

**courtroom [1]** 22/18

**courts [2]** 32/12 35/24

**cover [1]** 30/3

**create [3]** 34/10 44/20 47/12

**creation [1]** 34/11

**criminal [2]** 47/13 47/14

**criterion [1]** 8/16

**critical [2]** 13/20 22/7

**criticized [1]** 9/12

**crossed [1]** 36/15

**crosses [4]** 26/2 35/4 35/11 36/25

**CRR [2]** 3/6 64/10

**crunching [1]** 24/5

**CSR [2]** 3/6 64/10

**cumulative [2]** 26/2 26/21

**cumulatively [1]** 26/3

**currently [1]** 53/24

**cutoff [1]** 14/6

**cuts [1]** 33/15

**cutting [2]** 11/20 24/15

**cv [2]** 1/4 4/4

**D**

**D.C [1]** 62/17

**daily [1]** 21/22

**damage [2]** 21/8 53/12

**damaging [1]** 14/7

**dangerous [2]** 22/20 22/24

**date [2]** 28/25 64/10

**David [2]** 2/12 4/23

**Davis [1]** 2/21

**day [13]** 8/14 20/23 23/16 24/18 24/19 31/2 31/2 32/3 40/15 46/14 49/5 52/10 57/9

**day-to-day [1]** 31/2

**deadline [3]** 59/20 59/24 62/7

**deal [1]** 21/25

**dealing [1]** 22/7

**death [1]** 7/25

**December [1]** 62/12

**decide [2]** 17/5 27/20

**decided [1]** 56/8

**decision [4]** 17/14 25/24 59/16 59/18

**decisions [1]** 59/11

**declaration [1]** 15/6

**declaratory [1]** 53/23

**defeat [7]** 12/10 40/21 49/5 49/11 50/22 51/13 51/20

**defeats [1]** 40/19

**defendant [6]** 2/16 2/20 4/17 11/13 13/18 18/3

**defendants [3]** 1/10 2/11 4/20

**defense [1]** 53/20

**define [1]** 21/3

**defined [1]** 36/6
**definition [3]** 39/8
49/14 50/15
**degree [8]** 11/4 42/15
50/4 52/7 52/20 53/4
55/18 60/17
**delay [2]** 56/10 59/25
**deleted [3]** 43/21 44/15
52/9
**deliberately [1]** 10/16
**denied [1]** 56/3
**deny [6]** 5/13 48/12
50/4 53/12 53/14 56/2
**departure [1]** 52/4
**Depending [1]** 62/13
**designated [1]** 21/25
**designation [4]** 55/21
56/2 61/21 61/24
**desks [1]** 47/12
**despite [1]** 56/23
**detail [1]** 27/3
**determined [2]** 56/8
57/7
**determining [2]** 41/16
41/19
**did [7]** 12/23 17/15
22/14 24/7 48/10 51/19
52/16
**didn't [2]** 12/22 46/16
**Diego [1]** 45/7
**difference [2]** 15/25
41/3
**different [3]** 6/3 42/6
54/6
**differently [1]** 39/4
**differing [2]** 11/15 12/9
**difficult [1]** 29/10
**digest [1]** 54/22
**directed [1]** 31/4
**directly [1]** 20/21

**director [3]** 1/8 19/24
22/11
**directs [1]** 20/15
**disagree [7]** 10/8 11/3
18/7 18/13 38/21 50/3
60/4
**discerned [1]** 51/9
**disciplinary [1]** 48/5
**discovery [2]** 55/18
61/25
**discredit [2]** 35/6 35/9
**discrete [5]** 6/11 7/6
14/7 25/19 26/15
**discretion [1]** 55/9
**discuss [2]** 8/9 63/19
**discussed [4]** 6/24
42/15 45/22 57/14
**discusses [1]** 47/25
**discussion [3]** 5/5 25/9
52/13
**discussions [1]** 29/16
**disliked [2]** 12/18
30/16
**dismissed [1]** 60/21
**disparate [1]** 11/14
**dispute [2]** 7/18 44/20
**disputed [1]** 46/14
**disrespect [1]** 5/11
**disrupt [1]** 40/5
**district [5]** 1/1 1/2 1/18
3/6 45/9
**divide [1]** 40/3
**dividing [7]** 9/22 10/9
18/18 19/14 19/14
19/18 30/8
**do [56]** 6/19 9/4 9/4 9/5
10/5 10/24 12/12 14/11
14/14 14/19 18/12 21/3
21/17 21/21 23/21 24/5
25/4 26/4 27/11 28/7
28/8 30/12 32/15 33/10
33/11 33/21 34/15

34/15 34/23 36/9 37/5
38/21 39/20 39/23
40/17 41/14 41/21 42/9
47/10 48/9 49/6 49/6
49/10 51/2 51/5 51/11
54/9 54/23 56/6 57/23
58/1 58/14 59/18 62/14
62/19 63/15
**doctrine [8]** 5/19 5/21
6/13 6/16 6/22 7/1
48/15 48/20
**document [1]** 34/10
**documents [4]** 21/23
22/22 55/17 55/24
**does [14]** 5/22 6/2 7/4
9/25 17/2 27/16 31/2
36/9 36/22 38/14 45/19
48/15 59/17 62/10
**doesn't [12]** 7/8 12/22
31/18 32/14 40/20
40/21 41/10 48/17 53/2
53/7 54/12 60/4
**doing [4]** 22/11 22/14
37/4 56/11
**don't [49]** 5/23 6/3 6/24
7/2 11/14 13/1 13/3
14/1 15/25 18/14 19/3
20/14 20/22 20/24
20/25 22/10 23/12
25/22 26/17 27/20 28/2
28/7 28/9 28/13 28/18
29/9 31/14 38/19 39/1
40/2 40/2 40/8 40/12
42/23 44/9 44/9 44/16
49/19 51/4 53/5 54/21
55/6 56/9 56/21 57/1
57/7 57/23 58/1 61/15
**done [6]** 8/10 34/6 34/6
38/19 40/21 58/3
**Douglas [5]** 11/10
11/12 24/13 33/3 44/12
**down [12]** 11/24 12/1

**down... [10]** 19/2 32/3 41/19 54/14 55/21 56/2 58/12 61/21 61/24 63/13

**down-designation [4]** 55/21 56/2 61/21 61/24

**downfield [2]** 38/14 50/18

**draft [3]** 46/13 46/25 47/6

**draw [2]** 10/2 23/11

**drawn [2]** 22/13 45/2

**driven [1]** 38/25

**duplicating [1]** 59/15

**duplicative [2]** 55/6 57/20

**during [3]** 34/7 43/22 47/24

# E

**each [7]** 7/7 8/15 17/4 22/8 28/10 48/25 50/11

**earlier [3]** 22/6 39/19 51/23

**eaten [1]** 10/18

**echoes [1]** 25/25

**economy [1]** 58/3

**effect [2]** 26/2 26/21

**efforts [1]** 32/23

**either [3]** 15/14 52/8 52/21

**element [6]** 14/19 14/20 17/10 17/20 27/10 51/13

**elements [6]** 7/21 13/14 14/17 17/25 49/2 55/8

**elevated [1]** 49/17

**eligible [2]** 29/23 29/25

**Elliott [1]** 3/2

**else [7]** 20/15 20/16 44/18 45/5 46/6 62/10 62/21

**email [1]** 12/24

**emails [3]** 12/17 21/16 47/6

**emphasize [1]** 5/4

**employment [3]** 17/17 17/17 31/1

**empty [1]** 5/4

**end [4]** 7/2 40/14 56/5 56/9

**Energy [1]** 17/12

**engage [18]** 8/14 9/13 9/18 9/20 10/15 14/21 18/19 30/14 30/14 36/3 36/3 38/17 38/24 39/9 39/14 41/7 41/22 41/24

**engaged [4]** 8/25 10/3 15/2 35/1

**engages [1]** 9/14

**engaging [1]** 50/1

**English [3]** 2/3 4/7 53/18

**enough [16]** 8/17 10/21 10/22 11/21 12/10 12/10 13/2 13/4 16/8 16/16 49/3 49/11 50/19 51/12 51/19 53/6

**entire [2]** 56/2 58/1

**entirely [2]** 26/18 57/22

**entirety [1]** 53/22

**entitled [4]** 9/13 10/15 12/4 64/6

**environment [4]** 6/15 6/18 6/21 26/1

**EPA [4]** 41/8 41/9 41/12 41/13

**equal [1]** 11/14

**establish [2]** 18/1 21/18

**established [3]** 36/10

**establishes [1]** 45/17

**establishing [1]** 18/2

**et [3]** 4/5 21/2 35/3

**et cetera [2]** 21/2 35/3

**evaluating [1]** 51/23

**evaluation [4]** 8/15 27/7 43/8 44/19

**even [20]** 7/11 10/19 10/21 11/21 16/24 23/1 23/1 24/2 25/22 26/3 27/4 29/15 29/20 29/20 30/15 39/14 41/10 53/1 54/8 54/12

**event [3]** 49/10 54/17 57/5

**eventually [2]** 31/12 31/12

**every [11]** 20/23 27/13 28/5 28/13 32/3 32/5 32/6 32/10 35/1 35/1 37/24

**everything [4]** 16/22 19/15 24/24 58/3

**evidence [25]** 7/10 12/25 15/1 18/1 18/2 19/11 21/15 22/2 22/10 23/4 23/10 23/15 23/21 23/23 38/7 42/24 43/17 43/23 44/8 44/20 46/15 46/21 47/7 51/23 51/25

**evidenced [1]** 42/12

**exact [3]** 8/12 21/15 36/6

**exactly [2]** 22/7 34/22

**example [14]** 6/4 9/6 12/17 15/5 15/7 15/13 21/25 22/8 30/24 33/23 41/3 42/17 50/13 52/23

**examples [6]** 9/6 23/13 24/24 35/2 48/4 48/5

**except [4]** 19/18 42/2

## E

**except... [2]** 53/10 55/14
**exception [4]** 5/20 14/19 26/13 26/14
**exceptions [1]** 56/20
**exclusively [1]** 14/22
**excuse [2]** 9/10 32/20
**executive [2]** 21/22 22/11
**exercise [1]** 5/4
**exercises [1]** 45/18
**exercising [1]** 38/5
**exhibit [8]** 15/6 17/5 27/2 27/2 27/4 49/9 53/14 63/12
**Exhibit 45 [3]** 15/6 27/2 27/2
**Exhibit 51 [1]** 53/14
**exhibits [5]** 21/13 22/10 23/13 27/3 29/6
**existing [1]** 29/9
**expect [1]** 62/17
**expense [3]** 58/13 59/21 59/22
**expenses [1]** 59/18
**experience [1]** 41/11
**explanation [5]** 11/19 11/22 33/19 34/18 34/24
**explanations [1]** 51/20
**explicitly [1]** 15/11
**expressed [2]** 12/8 29/14
**expression [2]** 11/13 26/14
**expressive [13]** 7/23 8/17 9/21 11/6 12/7 12/15 12/18 13/7 27/9 49/4 50/8 51/14 52/2
**extent [2]** 10/10 14/25

**external [1]** 51/6
**extreme [1]** 53/11
**eyes [1]** 32/21

## F

**facie [4]** 11/11 12/5 33/6 51/16
**fact [13]** 10/19 11/11 18/23 20/21 34/10 38/11 38/25 41/10 44/21 46/17 56/23 61/15 62/16
**factor [4]** 11/7 37/9 37/10 51/15
**factory [1]** 10/17
**facts [4]** 7/18 45/3 48/16 48/18
**factual [4]** 5/17 6/2 7/4 57/7
**fail [1]** 13/3
**failed [1]** 21/21
**failing [1]** 7/17
**fails [1]** 16/24
**fair [1]** 45/25
**Fairbanks [1]** 24/4
**fairly [4]** 6/9 6/14 15/15 16/17
**fall [3]** 23/6 36/9 53/5
**falls [2]** 52/20 53/1
**false [1]** 48/3
**familiar [1]** 56/17
**FAMILYCARE [38]** 1/3 4/4 4/8 4/10 4/12 11/15 12/20 12/23 15/9 15/11 15/15 15/18 19/10 21/14 22/4 23/11 23/20 23/22 24/22 26/25 27/1 27/4 29/22 29/23 32/21 32/24 34/4 35/7 35/8 35/9 35/13 37/4 41/25 43/2 43/3 49/4 53/19 58/6

**FamilyCare's [12]** 5/10 5/15 7/23 11/6 15/7 29/21 32/23 34/4 42/25 48/13 53/15 53/17
**far [5]** 5/24 9/16 13/12 36/15 50/18
**favor [1]** 15/21
**favorable [2]** 11/21 50/20
**February [1]** 46/13
**federal [2]** 30/1 62/20
**fell [1]** 41/13
**few [3]** 6/20 14/19 42/7
**fewer [1]** 55/24
**field [1]** 16/23
**Fifth [2]** 2/14 2/22
**figure [1]** 6/13
**filed [1]** 56/3
**filing [1]** 63/11
**filters [3]** 13/6 13/11 40/16
**final [3]** 17/10 17/19 59/16
**finally [1]** 58/5
**financial [5]** 14/23 15/4 16/1 16/2 16/3
**find [11]** 17/13 20/25 32/2 35/7 39/10 39/24 41/1 48/21 49/3 50/1 51/16
**fine [3]** 61/11 62/8 62/15
**finished [1]** 13/13
**first [19]** 5/18 7/22 8/22 13/3 15/19 17/10 17/19 18/22 19/7 23/7 26/19 30/12 33/5 38/3 45/18 50/10 50/13 50/21 53/17
**fits [2]** 39/8 49/13
**five [1]** 23/7
**fix [1]** 20/24

**F**

**Floor [1]** 2/4
**flourish [3]** 22/19 22/21 23/1
**flow [1]** 52/9
**focus [4]** 10/9 14/16 14/18 17/25
**following [3]** 16/16 62/19 62/20
**follows [1]** 48/14
**footnotes [1]** 21/13
**forced [2]** 31/5 40/11
**foregoing [1]** 64/4
**form [2]** 30/11 46/13
**formal [1]** 48/11
**formally [3]** 48/10 48/12 51/22
**former [1]** 53/13
**formulation [1]** 48/20
**forward [7]** 15/1 16/8 53/22 53/25 57/16 59/14 61/10
**found [2]** 17/14 53/1
**four [1]** 5/8
**frame [1]** 25/12
**framework [7]** 11/10 12/3 23/8 24/13 25/19 31/11 33/3
**framing [1]** 13/24
**frankly [1]** 21/12
**free [1]** 7/25
**Friday [1]** 62/17
**front [7]** 5/6 12/25 28/8 38/7 49/7 53/6 61/6
**function [1]** 27/7
**functioning [1]** 43/6
**fundamental [2]** 11/9 60/1
**fundamentally [4]** 5/12 55/22 57/12 57/21
**funnels [1]** 51/25

**G**

**general [11]** 4/17 4/22 4/24 14/5 18/8 26/14 26/15 29/7 29/8 30/12 31/11
**generalities [1]** 50/11
**generally [2]** 15/3 45/25
**genuine [1]** 44/20
**get [8]** 8/18 23/11 44/8 47/17 51/25 53/2 57/6 62/18
**gets [3]** 11/5 40/15 53/7
**getting [8]** 8/4 16/8 16/15 22/6 23/25 27/1 40/13 43/1
**give [8]** 5/3 12/23 15/5 21/1 23/13 48/10 50/24 61/14
**given [4]** 8/10 30/22 33/6 33/14
**giving [2]** 23/8 61/3
**go [25]** 7/14 12/4 12/24 13/12 13/22 19/4 20/5 20/11 23/14 23/19 23/19 24/1 25/7 38/12 39/16 44/24 51/11 53/6 55/8 55/11 55/12 56/5 56/16 58/7 63/9
**goal [1]** 52/24
**goals [1]** 51/9
**goes [10]** 5/24 9/16 16/15 18/18 19/25 27/6 38/6 38/7 53/22 53/25
**going [23]** 5/13 13/12 16/21 17/21 19/2 20/25 23/14 23/19 30/6 30/8 33/16 35/19 43/25 46/18 47/10 47/10

**good [5]** 4/9 4/13 4/19 51/24 52/5
**Gordon [5]** 2/7 4/10 44/25 45/8 46/20
**gossamer [1]** 23/5
**got [3]** 34/11 43/24 57/9
**government [41]** 8/23 9/1 9/4 9/12 9/17 9/20 10/3 10/6 10/13 10/15 16/21 18/9 18/22 20/21 20/23 30/13 30/14 31/22 31/23 31/24 32/4 34/23 38/17 38/22 39/1 39/5 39/10 39/19 40/6 40/11 41/5 43/6 50/8 50/14 50/22 51/3 51/6 51/7 52/14 52/15 52/23
**governmental [5]** 31/18 32/7 32/15 32/16 43/8
**grant [3]** 9/8 56/2 57/9
**granted [2]** 49/1 54/7
**granting [2]** 5/14 56/19
**great [2]** 15/24 16/7
**grounded [2]** 5/8 5/8
**guess [8]** 17/1 21/3 29/1 33/4 38/10 40/24 40/24 62/19
**guidance [1]** 30/23
**guide [1]** 5/5
**guidelines [2]** 29/7 29/8
**guy [1]** 41/13

**H**

**had [11]** 9/24 13/7 13/8 22/14 22/22 23/16 29/24 33/9 34/5 61/19 61/25

**hand [1]** 18/24
**hanging [1]** 48/11
**happen [1]** 52/21
**happens [4]** 8/11 20/5 52/11 58/20
**harassment [1]** 48/4
**hard [1]** 32/2
**harder [1]** 12/2
**hardship [2]** 58/5 60/1
**harm [15]** 10/9 10/21 10/22 12/8 20/11 20/15 20/22 20/23 20/24 21/2 21/4 21/5 40/4 41/25 51/5
**harmful [2]** 10/11 10/16
**has [36]** 5/16 7/17 7/21 11/11 11/18 11/22 11/24 12/13 12/14 12/15 18/8 20/8 26/20 27/10 29/24 30/21 35/24 37/17 38/19 39/1 39/21 40/6 41/11 46/9 46/10 46/20 51/25 52/1 52/2 52/2 52/3 52/19 54/19 56/7 59/6 59/18
**hasn't [1]** 52/5
**have [92]**
**haven't [3]** 8/10 57/13 60/16
**having [2]** 51/2 58/13
**he [4]** 10/4 22/19 27/1 41/11
**he's [1]** 41/10
**head [4]** 41/4 41/9 41/12 45/17
**health [18]** 1/6 1/9 2/11 2/20 3/1 4/4 4/18 4/21 4/24 15/3 29/22 35/9 35/10 55/18 60/23 61/9

**hear [5]** 11/17 27/17 59/12 60/10 61/11
**heard [4]** 34/18 46/11 53/24 55/15
**hearing [4]** 29/5 38/10 40/22 55/23
**heart [2]** 41/23 42/2
**Heatherington [1]** 24/22
**hedge [1]** 46/1
**heels [1]** 32/23
**helped [1]** 40/22
**helpful [2]** 5/2 50/12
**helping [1]** 37/24
**helps [1]** 5/5
**her [21]** 5/8 8/25 9/23 19/25 20/6 22/4 22/11 23/2 24/18 24/19 31/2 35/2 41/23 41/25 42/2 45/11 45/13 45/13 45/18 46/24 54/7
**Herbold [1]** 2/13
**here [50]** 4/3 5/1 5/4 5/14 6/2 7/3 7/4 7/23 8/10 8/18 8/23 11/10 11/25 12/12 15/8 16/25 19/10 20/3 22/7 22/17 23/7 24/24 26/6 31/4 31/15 31/21 32/18 35/15 37/9 37/13 40/9 40/18 40/25 42/1 43/19 43/20 44/9 47/5 48/16 50/10 50/18 50/20 51/12 51/15 52/14 52/16 53/4 53/25 57/14 62/11
**here's [4]** 35/18 35/20 36/15 47/10
**Hesterberg [3]** 2/7 4/11 15/6
**highlights [1]** 15/9

**highly [1]** 30/15
**him [1]** 32/14
**hinted [1]** 9/23
**his [7]** 1/8 4/18 4/20 4/25 22/22 31/2 32/13
**HIV [1]** 35/8
**HIV-positive [1]** 35/8
**hoc [2]** 34/11 34/12
**hold [3]** 24/1 28/19 62/12
**holding [5]** 5/23 36/19 36/20 53/2 53/10
**holiday [1]** 62/20
**honestly [1]** 59/24
**Honor [60]** 4/8 4/9 4/13 4/19 4/23 13/17 14/16 15/5 16/13 19/8 20/3 21/11 22/2 22/17 23/1 24/2 24/21 25/8 29/18 30/24 32/1 32/19 43/12 43/16 44/23 46/8 46/16 47/20 47/22 53/18 54/13 54/22 55/4 55/11 55/22 56/6 56/14 56/22 56/25 57/5 57/12 57/23 58/9 58/11 58/16 58/22 59/1 59/24 60/5 60/8 60/13 61/1 61/3 61/8 62/5 62/9 62/22 62/24 63/1 63/24
**Honor's [3]** 19/23 22/6 36/7
**HONORABLE [1]** 1/17
**hope [2]** 5/5 62/18
**hopeful [1]** 56/7
**hopefully [1]** 59/12
**hoping [1]** 60/10
**hornbook [1]** 50/11
**hostile [4]** 6/15 6/18 6/21 26/1
**hours [1]** 62/14
**how [11]** 6/13 8/4

**how... [9]** 10/25 16/6 17/2 27/1 37/15 40/16 40/17 43/1 54/23
**however [1]** 7/8
**humiliation [1]** 48/4
**hurt [3]** 19/4 20/5 41/7
**hypothetical [1]** 16/19

**I**

**I'd [10]** 5/3 14/16 17/25 25/9 46/1 53/16 60/21 62/13 63/5 63/15
**I'll [19]** 11/17 13/15 15/5 17/23 35/15 48/25 51/22 52/5 53/8 54/3 54/14 54/16 59/5 59/10 59/13 60/9 62/2 62/17 63/19
**I'm [55]** 5/13 7/25 8/1 8/10 10/2 10/21 13/12 14/9 16/13 17/21 18/7 20/3 20/19 23/13 28/4 28/5 29/1 30/6 30/8 32/5 32/10 32/11 33/16 33/17 35/19 36/11 37/18 37/21 38/10 39/3 39/17 39/24 40/16 41/1 42/2 43/25 47/10 47/10 47/11 49/6 49/7 52/14 53/25 53/25 57/2 57/4 59/5 59/6 59/7 59/9 60/17 61/8 62/11 63/4 63/15
**I've [9]** 5/12 33/6 33/8 52/18 54/7 57/9 57/24 60/17 63/8
**idea [8]** 11/2 29/13 33/5 34/19 50/1 53/9 54/10 54/23
**identified [6]** 28/14

**identifies [1]** 48/2
**identify [1]** 34/14
**if [75]**
**illegitimate [2]** 21/8 41/25
**illuminating [1]** 39/11
**imagine [1]** 20/20
**immediately [1]** 35/19
**immunity [23]** 13/13 17/20 17/23 35/17 35/20 36/1 36/4 37/12 37/14 37/16 37/23 41/20 42/15 44/24 50/25 52/12 52/19 53/3 53/5 53/7 54/8 54/18 55/15
**impact [3]** 11/14 11/15 12/9
**implemented [2]** 10/7 33/25
**important [7]** 13/10 37/22 42/8 43/22 46/8 50/19 59/18
**importantly [1]** 46/16
**impose [1]** 59/25
**improper [3]** 20/1 46/23 46/23
**in [232]**
**INC [2]** 1/3 4/4
**incident [2]** 32/10 35/1
**incidents [1]** 7/9
**include [2]** 9/25 45/19
**includes [1]** 45/21
**including [1]** 39/20
**inconsistent [1]** 14/10
**incur [1]** 59/22
**indicate [1]** 34/2
**indicated [1]** 14/10
**indicates [2]** 36/7 38/1
**individual [2]** 23/2 26/4

**individually [1]** 1/8
**individuals [2]** 29/23 29/25
**infer [1]** 23/18
**inference [6]** 22/13 23/20 43/24 44/1 44/14 52/9
**inferences [2]** 23/4 23/11
**inferred [1]** 22/3
**informally [1]** 51/22
**lng [2]** 27/8 43/9
**inherent [1]** 43/7
**initially [1]** 21/4
**inquiry [1]** 29/10
**inside [1]** 37/7
**instance [3]** 28/5 28/10 28/14
**instances [5]** 28/14 29/20 41/4 48/9 53/11
**instead [2]** 18/6 51/8
**intend [3]** 8/11 10/19 33/20
**intended [1]** 23/21
**intends [1]** 54/18
**intent [7]** 7/13 23/10 26/10 37/3 37/5 42/10 42/12
**intentional [1]** 10/22
**intentionally [1]** 10/11
**interest [6]** 15/4 16/2 16/4 16/12 17/16 61/19
**interested [1]** 56/1
**interlocutory [1]** 54/19
**internal [1]** 51/6
**internally [2]** 19/4 47/6
**interpreted [1]** 17/14
**interrupt [1]** 61/8
**INTERVENOR [1]** 2/20
**intimate [1]** 37/9
**into [15]** 7/10 8/4 13/6 16/23 23/25 26/3 37/8

**I**

**into... [8]** 41/11 42/2 44/2 44/3 44/6 52/7 57/4 59/6

**introduced [1]** 34/8

**introducing [1]** 32/24

**invite [1]** 63/19

**involve [2]** 15/21 17/16

**involved [7]** 6/10 6/23 8/8 11/5 16/9 17/16 51/3

**involvement [1]** 15/2

**involves [9]** 8/5 8/15 8/22 15/4 17/6 49/4 49/16 49/23 51/1

**is [265]**

**isn't [9]** 6/14 10/13 20/4 28/20 36/3 43/18 50/15 50/16 58/6

**isolated [2]** 27/24 28/3

**issue [17]** 9/25 23/12 25/10 26/24 28/1 31/6 32/18 45/19 52/15 55/21 56/2 57/24 60/2 61/15 61/21 61/24 63/16

**issued [1]** 40/12

**issues [10]** 5/6 13/24 56/4 56/7 56/13 57/6 57/18 58/18 58/19 61/22

**it [132]**

**it's [61]** 6/14 7/8 8/3 9/20 10/5 10/21 11/3 12/10 12/12 12/20 13/10 13/15 20/11 20/12 20/15 21/7 21/8 22/6 23/12 23/20 24/3 24/21 24/22 25/18 25/19 27/23 29/4 29/9 30/15 30/22 30/25 31/1

33/21 34/6 35/5 37/1 37/4 37/7 37/24 38/3 38/16 39/9 39/13 40/2 40/14 41/2 41/16 44/7 44/9 44/16 44/19 48/1 50/13 50/16 51/8 52/22 54/16 55/6 55/6 58/25 59/13

**it: [1]** 12/14

**it: one [1]** 12/14

**item [9]** 8/12 8/12 8/15 8/15 8/15 40/17 40/17 49/6 49/6

**item-by-item [2]** 8/12 8/15

**items [3]** 29/2 31/11 31/13

**its [23]** 7/18 7/23 9/24 10/23 11/11 12/5 14/22 14/23 14/24 15/4 15/9 22/4 23/22 24/3 35/10 36/19 43/1 45/18 46/10 49/2 51/9 51/16 53/22

**itself [7]** 15/20 15/24 16/7 29/14 40/1 42/18 51/10

**J**

**January [1]** 59/14

**job [5]** 8/25 10/7 22/11 24/18 31/3

**Johnson [1]** 2/3

**join [1]** 61/20

**judge [4]** 1/18 17/20 45/9 59/6

**judges [1]** 57/1

**judgment [36]** 5/7 5/14 7/17 7/19 7/20 8/19 9/8 11/5 11/19 12/11 13/4 23/9 37/16 37/23 40/19 40/21 44/4 44/5 44/7 44/8 48/13 49/1 49/5

49/11 50/4 50/7 50/23 51/13 51/19 51/21 52/8 53/12 53/13 53/14 55/14 63/10

**judicata [1]** 57/24

**judicial [1]** 58/2

**jury [3]** 23/12 27/16 38/7

**jury's [1]** 7/10

**just [69]**

**justification [1]** 34/12

**K**

**kangaroo [1]** 41/8

**Keep [1]** 40/8

**key [2]** 29/25 32/20

**kind [9]** 20/13 21/18 21/19 35/12 36/2 41/21 45/6 46/23 57/4

**kinds [2]** 23/15 32/3

**knew [1]** 13/4

**knocked [1]** 11/25

**know [32]** 12/22 12/24 19/2 20/22 21/1 22/7 26/17 28/12 28/13 28/18 28/22 28/23 29/5 29/6 37/5 37/6 40/2 40/2 41/1 41/8 41/10 54/17 54/21 54/24 56/24 57/1 57/23 58/23 59/13 61/14 62/1 63/20

**knowable [2]** 52/22 53/1

**knowing [1]** 55/2

**known [5]** 12/15 13/1 41/23 52/1 52/1

**knows [1]** 51/1

**L**

**ladle [1]** 24/7

**language [3]** 25/24 25/25 46/25

**L**

**largely [2]** 54/7 56/12
**last [5]** 6/20 34/1 34/13 35/20 55/23
**later [4]** 17/21 18/9 48/22 51/10
**latest [1]** 62/19
**latter [1]** 59/17
**Laura [2]** 2/13 4/16
**law [5]** 19/5 19/8 29/9 31/25 50/3
**lawsuit [1]** 46/10
**lawyers [1]** 47/11
**layer [1]** 11/5
**leads [1]** 17/19
**leaping [1]** 53/25
**least [6]** 9/25 11/9 45/19 47/16 54/10 62/14
**leave [2]** 29/4 56/4
**left [4]** 13/8 48/11 49/8 63/8
**legal [6]** 5/17 7/4 9/7 23/8 34/12 57/6
**legislation [6]** 25/1 28/24 32/24 34/7 34/8 43/2
**legislative [1]** 24/25
**legislature [12]** 8/6 15/8 15/14 23/17 24/20 24/23 28/23 32/22 35/3 35/12 37/2 47/5
**legitimacy [1]** 51/8
**legitimate [19]** 10/5 11/19 24/14 24/15 25/5 30/9 30/11 33/9 33/19 34/19 34/21 41/7 41/12 44/13 50/2 50/17 51/3 51/17 52/24
**legitimately [1]** 20/22
**let [7]** 17/10 39/7 48/9 54/8 61/13 62/1 63/20

**let's [4]** 18/6 33/21 44/24 54/14
**letter [5]** 31/6 46/24 61/17 62/6 62/11
**letters [1]** 28/23
**level [5]** 8/3 16/2 22/12 25/22 59/8
**Levin [2]** 2/12 4/19
**liability [3]** 7/12 14/12 48/24
**life [1]** 46/10
**light [3]** 11/21 46/14 50/20
**like [28]** 5/3 5/18 12/4 14/16 17/25 21/22 25/9 27/4 28/22 32/13 36/1 37/11 38/19 39/1 43/3 46/1 48/2 52/17 53/16 59/6 59/10 60/21 61/13 62/1 62/6 62/13 63/5 63/15
**likely [3]** 11/3 40/14 49/22
**limine [2]** 49/8 63/12
**limitations [11]** 5/16 5/22 6/19 7/7 7/12 13/14 14/2 25/10 26/23 48/15 48/22
**limited [1]** 57/12
**line [39]** 9/22 10/2 10/9 18/18 19/14 19/14 19/18 20/19 20/20 26/3 27/11 27/11 28/12 28/12 30/8 30/20 30/21 30/22 32/12 35/4 35/11 35/21 35/24 35/25 36/9 36/16 36/25 37/7 40/13 42/15 45/1 50/24 51/11 51/11 52/13 52/21 53/6 53/7 53/9
**lined [1]** 23/13

**lines [1]** 44/1
**linked [1]** 22/9
**list [2]** 8/12 12/17
**lists [1]** 49/9
**literal [1]** 21/21
**little [2]** 15/22 23/25
**LLP [4]** 2/4 2/8 2/17 2/21
**log [1]** 21/21
**logic [3]** 12/14 13/3 13/11
**long [2]** 14/22 54/23
**look [17]** 6/3 12/13 17/4 23/5 25/19 25/21 25/24 26/20 34/12 37/6 37/11 37/15 37/19 40/24 41/14 41/18 42/5
**looked [3]** 57/24 60/16 60/18
**looking [4]** 25/12 26/14 42/2 42/3
**loss [1]** 15/12
**lot [6]** 6/12 12/2 41/24 42/19 49/24 56/4
**lozenge [1]** 13/21
**LYNNE [19]** 1/9 2/16 4/14 4/15 13/18 18/3 19/24 20/4 21/6 21/17 21/24 23/2 23/15 24/3 24/7 45/10 46/16 46/17 47/3

**M**

**machine [1]** 16/14
**mad [1]** 41/6
**made [5]** 6/20 23/14 45/1 46/19 48/23
**make [14]** 6/4 7/25 14/20 17/22 19/13 26/12 32/24 32/25 32/25 33/5 44/12 46/9 55/11 59/15

**makes [10]** 7/22 12/13 15/25 36/11 39/24 52/22 58/2 60/18 63/16 63/22
**making [2]** 23/18 36/24
**man [2]** 22/20 22/24
**managed [1]** 30/3
**many [3]** 15/13 27/3 35/2
**Markowitz [3]** 2/12 2/13 4/23
**material [2]** 7/18 44/21
**Matt [1]** 4/19
**matter [35]** 5/2 7/4 7/4 7/17 7/24 8/2 8/7 8/8 8/18 15/17 15/18 15/20 16/4 16/18 17/3 17/6 17/15 17/18 19/8 27/10 27/15 27/16 27/24 29/16 34/20 47/13 47/14 49/4 49/16 49/17 49/22 50/2 51/10 58/2 58/19
**matters [11]** 15/2 21/7 29/3 43/6 43/9 49/14 49/21 51/5 51/6 56/9 61/6
**Matthew [3]** 2/7 2/12 4/9
**mattresses [1]** 23/19
**may [7]** 26/1 28/4 31/14 43/12 52/9 56/23 63/6
**maybe [1]** 24/1
**McCracken [2]** 2/21 61/9
**McDonnell [5]** 11/10 11/12 24/13 33/3 44/12
**me [32]** 5/6 7/8 9/10 12/23 12/25 17/10

18/22 20/12 22/23 28/8 28/8 28/17 29/7 32/20 35/21 35/23 37/24 38/2 38/10 39/7 39/19 41/22 42/5 47/22 48/9 49/7 53/6 53/8 54/8 61/7 62/10 63/20
**mean [14]** 5/11 11/14 12/22 15/21 17/2 26/13 27/14 27/21 32/2 34/19 41/3 49/19 55/22 59/24
**means [3]** 38/15 45/22 57/16
**meant [1]** 20/9
**meat [1]** 10/18
**mechanism [1]** 30/10
**media [2]** 15/14 47/5
**Medicaid [3]** 29/23 29/25 30/2
**Medicaid-eligible [2]** 29/23 29/25
**meet [3]** 13/3 18/15 45/3
**meetings [3]** 21/24 22/1 24/4
**meets [1]** 8/16
**member [1]** 30/4
**memo [1]** 9/24
**memorandum [1]** 23/23
**mens [1]** 7/13
**mention [1]** 43/12
**merely [1]** 12/21
**Mersereau [7]** 2/16 2/17 4/14 13/16 35/16 54/3 59/12
**met [2]** 7/18 11/11
**MICHAEL [1]** 1/17
**microphone [1]** 25/15
**mid [1]** 59/12
**Midweek [1]** 54/25
**might [12]** 6/18 7/11

16/22 25/23 35/25 41/13 42/8 42/20 46/3 57/25 61/20 61/22
**mind [2]** 22/15 40/8
**mine [1]** 31/12
**minimum [1]** 51/1
**minute [1]** 47/16
**minutes [3]** 23/7 35/21 42/7
**missed [2]** 13/20 13/21
**missing [5]** 22/2 22/12 22/25 43/17 47/8
**misunderstood [1]** 20/9
**MO [2]** 1/4 4/4
**modified [1]** 55/23
**moment [5]** 13/19 18/6 30/9 54/4 54/9
**Monday [3]** 27/15 27/17 62/20
**money [2]** 16/5 16/16
**Montalbano [2]** 3/1 62/5
**moonshot [1]** 16/22
**mooted [1]** 53/15
**more [11]** 7/16 10/3 10/12 14/23 16/12 24/3 32/25 32/25 49/22 60/1 60/1
**Morgan [3]** 5/22 5/23 25/25
**morphing [1]** 57/4
**MOSMAN [1]** 1/17
**most [6]** 11/21 22/20 22/24 46/16 50/20 53/10
**motion [20]** 5/7 5/8 13/15 13/25 21/14 43/20 48/12 49/8 52/6 53/14 53/16 55/14 55/16 55/16 55/20 56/3 57/10 60/10 60/12

**M**

**motion... [1]** 61/20
**motions [1]** 63/11
**motivating [4]** 11/7 37/10 41/14 51/15
**motivation [2]** 39/25 41/18
**motive [3]** 7/13 26/10 42/9
**move [6]** 16/20 25/15 30/6 33/3 33/21 35/15
**moved [1]** 59/23
**moves [1]** 57/15
**moving [1]** 17/11
**Mr [9]** 2/3 2/3 2/7 2/7 2/12 2/12 2/16 2/21 59/12
**Mr. [15]** 13/16 22/19 24/4 24/22 24/23 35/16 44/25 45/8 46/20 53/23 54/3 54/7 55/5 56/8 57/16
**Mr. Allen [5]** 53/23 54/7 55/5 56/8 57/16
**Mr. Fairbanks [1]** 24/4
**Mr. Gordon [3]** 44/25 45/8 46/20
**Mr. Heatherington [1]** 24/22
**Mr. Mersereau [3]** 13/16 35/16 54/3
**Mr. Murray [2]** 22/19 24/23
**Ms [3]** 2/13 2/17 3/1
**Ms. [34]** 5/7 6/9 7/22 8/14 8/20 8/25 9/23 11/18 12/13 12/15 12/18 28/11 31/5 35/2 36/2 36/14 40/9 41/21 42/21 43/21 47/23 48/12 50/5 51/17 52/1

52/1 52/4 52/11 52/17 53/24 54/10 54/18 62/23 63/10
**Ms. Saxton [28]** 6/9 7/22 8/14 8/25 9/23 11/18 12/13 12/15 12/18 28/11 31/5 35/2 36/2 40/9 41/21 42/21 43/21 47/23 50/5 51/17 52/1 52/1 52/11 52/17 54/10 54/18 62/23 63/10
**Ms. Saxton's [6]** 5/7 8/20 36/14 48/12 52/4 53/24
**much [18]** 8/4 9/23 14/1 14/1 16/7 21/7 25/6 27/1 37/24 42/3 43/1 43/11 44/22 51/5 51/6 52/17 59/6 62/8
**Mulligan [5]** 19/6 19/9 32/14 36/21 36/21
**Murray [2]** 22/19 24/23
**must [3]** 10/11 20/9 38/12
**my [30]** 5/13 7/3 8/18 9/3 12/10 17/19 22/18 27/22 31/10 31/25 32/11 33/17 35/18 35/20 38/16 41/4 44/2 46/1 48/10 48/19 49/12 49/14 50/19 50/24 53/13 57/4 57/25 59/15 62/11 63/9

**N**

**N.W [1]** 2/4
**nail [1]** 54/14
**name [1]** 4/6
**namely [1]** 18/1
**nature [3]** 29/15 51/9 57/20

**neath [1]** 40/3
**necessarily [5]** 25/13 25/13 25/18 32/6 44/17
**necessary [1]** 52/7
**need [9]** 7/8 12/13 13/5 21/3 27/11 42/23 47/14 54/22 62/18
**needed [1]** 21/18
**needs [2]** 14/23 22/8
**Neither [1]** 50/17
**never [5]** 16/4 34/5 46/14 46/19 48/17
**nevertheless [2]** 39/2 48/21
**new [1]** 34/5
**news [3]** 51/24 51/24 52/5
**next [10]** 16/22 17/25 21/1 24/2 54/25 59/12 59/17 60/11 62/11 62/16
**Nicholas [1]** 2/7
**Nick [1]** 4/11
**Ninth [9]** 25/19 25/20 26/19 30/21 31/16 37/11 38/8 43/5 45/5
**no [29]** 1/4 4/4 5/11 5/24 8/21 11/2 12/25 18/14 20/11 23/21 33/7 34/9 36/2 36/12 37/13 41/11 43/25 45/4 45/12 45/16 45/23 46/14 47/3 58/19 59/2 60/8 62/22 62/24 63/1
**nobody [3]** 20/10 29/5 50/25
**non [1]** 1/3
**non-profit [1]** 1/3
**nondiscriminatory [9]** 11/19 24/14 24/16 25/5 33/9 33/19 34/22 44/13 51/17

**none [1]** 26/3
**nonmoving [2]** 11/22 50/20
**nonprotected [1]** 45/2
**nonretaliatory [1]** 39/6
**nonthreatening [1]** 18/24
**noon [4]** 61/4 61/16 62/3 63/20
**nor [1]** 51/5
**normal [1]** 21/5
**normally [1]** 63/10
**not [126]**
**nothing [2]** 24/3 34/15
**notice [7]** 45/6 45/10 45/13 45/23 46/3 47/23 52/17
**noting [1]** 15/10
**notion [4]** 26/1 30/2 46/9 57/2
**November [3]** 1/7 4/2 64/9
**now [18]** 19/13 23/14 23/25 24/9 26/5 35/5 35/6 36/12 39/24 40/16 41/22 47/11 48/25 51/4 52/14 53/16 56/11 63/8
**number [14]** 10/15 20/20 24/5 26/2 34/1 34/5 34/9 39/20 41/4 46/11 55/24 57/15 57/19 61/6
**numerous [4]** 28/14 43/5 43/18 43/21

## O

**o0o [1]** 64/2
**object [1]** 61/15
**objected [1]** 28/11
**objections [1]** 63/12
**objective [6]** 36/23 37/5 40/4 40/5 41/3 51/1
**obtained [1]** 44/1
**obvious [1]** 13/5
**obviously [1]** 55/9
**occurred [4]** 13/8 13/8 14/8 45/11
**occurring [1]** 19/10
**off [4]** 41/4 41/13 47/2 62/12
**offended [1]** 57/1
**offered [1]** 15/6
**offhand [1]** 23/1
**official [6]** 1/8 4/18 4/20 4/25 23/3 64/11
**officially [1]** 58/18
**often [1]** 14/12
**OHA [11]** 19/24 24/25 25/1 34/5 43/2 57/16 59/13 59/14 60/3 60/4 62/25
**OHA's [3]** 15/10 58/10 58/11
**on [114]**
**once [3]** 12/3 57/10 60/19
**one [30]** 5/10 5/17 5/17 6/8 6/12 6/17 7/24 8/9 12/14 15/13 17/10 22/15 22/18 27/2 29/24 31/3 32/20 34/3 38/6 42/7 43/12 44/13 46/3 47/1 51/25 53/2 53/21 56/19 57/15 63/5
**ongoing [1]** 48/3
**only [13]** 17/12 22/23 27/17 31/15 33/17 36/15 42/5 44/6 48/10 54/16 54/19 61/21 63/9
**operating [1]** 15/12
**opinion [2]** 44/1 45/9
**opponent [2]** 29/14 33/8
**opponent's [1]** 63/13
**opposed [1]** 15/3
**opposition [2]** 11/13 12/8
**oppositional [2]** 38/18 38/25
**Optumas [2]** 24/4 62/6
**or [78]**
**oral [2]** 1/15 4/3
**order [1]** 18/15
**OREGON [13]** 1/2 1/3 1/6 1/7 1/9 1/10 2/11 4/4 4/17 4/21 4/24 8/6 15/3
**organization [1]** 30/3
**original [1]** 64/6
**OSHA [1]** 10/16
**Ostrander [1]** 3/2
**other [30]** 7/19 8/6 8/16 8/16 9/6 9/13 12/9 12/25 14/13 18/11 18/24 19/12 23/4 27/23 39/4 42/13 43/12 48/10 48/24 48/24 52/9 55/20 57/13 58/24 58/25 61/6 61/19 61/22 61/23 63/5
**others [4]** 11/16 12/4 24/5 43/21
**otherwise [4]** 7/9 8/13 49/15 52/8
**ought [2]** 55/2 59/19
**our [27]** 6/21 10/12 14/2 14/9 14/20 15/16 15/17 16/16 17/9 19/5 19/8 21/14 21/20 21/20 22/8 45/3 45/4 47/5 50/9 51/11 52/13 55/23 61/4 61/14 61/14 61/18 63/21
**out [28]** 6/5 6/13 10/19

## O

**out... [25]** 17/2 19/25 26/15 26/17 28/10 28/18 29/7 31/11 31/12 32/23 35/3 35/7 37/12 37/20 39/24 41/1 52/24 54/2 56/17 56/25 61/14 61/19 61/22 63/6 63/19
**out that [1]** 37/20
**outs [3]** 58/14 58/16 58/17
**outside [13]** 18/10 18/18 18/25 20/6 30/25 36/8 36/9 37/7 40/10 48/21 51/2 52/21 53/5
**over [4]** 6/20 21/23 29/24 40/11
**overlap [1]** 57/21
**overruns [2]** 24/15 37/3
**overseeing [1]** 24/19
**overt [1]** 20/8
**Owens [2]** 2/13 4/16
**own [4]** 15/4 45/18 46/10 49/2

## P

**p.m [2]** 4/2 63/25
**page [6]** 9/24 15/9 23/22 34/10 45/7 45/16
**pages [1]** 48/1
**paid [3]** 8/4 16/8 43/1
**papers [2]** 14/3 21/14
**parochial [1]** 16/17
**part [9]** 22/4 27/23 29/25 35/9 38/25 54/10 54/12 59/17 60/14
**partial [1]** 55/17
**participated [3]** 18/3 21/24 23/24
**particular [5]** 14/18

26/18 42/24 49/17 49/21
**particularly [3]** 40/5 41/2 50/12
**parties [5]** 11/8 17/12 58/6 63/5 63/15
**PARTNERS [1]** 3/1
**parts [2]** 12/14 48/25
**party [5]** 8/3 11/22 15/23 50/20 55/18
**past [3]** 8/19 11/5 44/8
**Pat [1]** 4/25
**path [1]** 41/19
**patience [1]** 7/14
**patients [1]** 35/8
**PATRICK [4]** 1/7 2/12 4/18 4/20
**pause [1]** 54/8
**pay [3]** 29/15 29/22 56/21
**PC [2]** 2/13 3/2
**pending [5]** 55/16 55/16 58/19 61/6 61/25
**people [3]** 20/24 21/24 34/20
**percent [2]** 56/24 56/24
**perfectly [1]** 33/18
**performance [2]** 24/18 43/8
**perhaps [4]** 5/17 9/13 16/11 52/8
**period [3]** 14/6 21/23 43/22
**Perkins [2]** 2/4 2/8
**permissible [1]** 35/22
**permission [1]** 47/20
**permit [1]** 21/1
**person [3]** 19/4 31/2 36/8
**person's [1]** 30/25
**personal [1]** 16/2
**personally [1]** 18/3

**persuaded [1]** 8/1
**Peter [2]** 2/16 4/13
**phrased [1]** 19/6
**phraseology [1]** 19/23
**pick [1]** 47/14
**piece [10]** 17/1 17/2 17/5 17/5 22/21 24/1 31/13 31/13 63/9 63/9
**pieces [2]** 8/12 8/17
**plaintiff [24]** 1/4 2/3 4/7 6/17 7/17 8/13 8/24 11/10 12/1 12/4 12/4 14/7 15/1 37/12 37/17 39/15 40/4 40/6 51/15 51/16 51/18 51/24 59/20 62/21
**plaintiff's [3]** 10/8 11/4 48/19
**plan [7]** 15/3 31/4 46/13 46/17 46/25 47/6 60/23
**Plass [2]** 2/17 4/15
**play [1]** 17/2
**pleadings [2]** 46/12 52/18
**please [1]** 4/6
**plenty [1]** 19/11
**plug [2]** 44/2 52/10
**plugs [2]** 44/3 44/6
**point [14]** 6/16 12/12 12/13 13/20 17/10 17/13 17/19 17/22 19/9 22/6 23/15 26/7 29/24 46/9
**points [1]** 12/16
**policy [5]** 22/12 34/4 34/9 34/11 34/12
**population [1]** 30/5
**portion [1]** 61/20
**Portland [7]** 1/10 2/5 2/14 2/18 2/22 3/3 3/7
**pose [1]** 59/19

**poses [1]** 60/7
**posit [1]** 6/25
**position [17]** 12/21
12/21 14/20 15/17 19/8
29/13 36/14 53/17 54/6
55/2 58/10 58/11 59/3
61/14 61/14 61/18
63/21
**positive [1]** 35/8
**possibility [4]** 16/25
38/21 38/22 42/17
**possible [5]** 30/11
39/14 48/23 60/11 62/7
**possibly [2]** 25/3 45/10
**post [2]** 34/11 34/11
**potential [1]** 30/9
**potentially [3]** 27/18
27/21 51/20
**PowerPoint [1]** 15/8
**predate [2]** 52/2 52/3
**prefer [1]** 14/2
**presence [1]** 51/4
**presentation [2]** 15/8
15/9
**presentations [3]**
28/22 28/23 28/24
**press [2]** 8/6 32/22
**Preston [1]** 3/2
**presumably [1]** 53/24
**pretextual [6]** 33/14
33/20 33/22 34/2 34/24
51/20
**pretrial [1]** 63/13
**pretty [2]** 14/1 36/11
**priest [1]** 20/13
**prima [4]** 11/11 12/5
33/5 51/16
**primarily [1]** 19/5
**principle [4]** 31/15
31/16 46/2 50/3

**principles [1]** 50/18
**prior [3]** 13/9 42/22
45/11
**private [9]** 8/3 15/21
16/17 32/13 36/24 41/5
41/6 49/24 63/17
**probable [1]** 11/17
**probably [4]** 12/9
36/17 37/24 54/16
**problem [3]** 20/23
35/18 35/20
**problematic [2]** 32/16
35/4
**problems [1]** 25/2
**proceedings [3]** 1/16
63/25 64/5
**process [2]** 27/6 32/25
**processes [1]** 24/19
**produce [1]** 15/11
**proffer [1]** 24/14
**proffered [3]** 33/9
34/24 51/17
**profit [1]** 1/3
**proper [1]** 25/12
**proposed [2]** 17/4 25/1
**proposition [7]** 18/7
18/8 18/13 30/13 39/8
39/13 42/24
**protected [37]** 9/14
9/18 9/19 9/21 10/5
10/11 10/13 10/16
10/20 11/1 14/18 14/21
18/19 18/20 18/24
18/25 19/15 19/25
20/17 20/22 22/8 30/14
31/3 38/5 38/12 38/20
45/2 45/14 50/8 50/9
50/13 50/16 51/11
51/12 52/13 52/15
55/10
**protection [1]** 11/15
**protections [1]** 50/21

**prove [1]** 7/12
**provide [5]** 29/22 45/6
45/10 46/3 61/17
**proximity [2]** 11/12
12/7
**public [55]** 7/24 8/2 8/7
8/8 8/15 8/18 15/17
15/20 15/22 15/24 16/4
16/5 16/7 16/8 16/9
16/12 16/12 16/23
16/25 17/3 17/6 17/15
17/18 26/24 27/6 27/10
27/15 27/16 27/25
28/15 28/20 28/22 29/3
29/15 29/16 31/7 32/22
34/21 42/16 42/18
42/20 43/7 43/9 46/19
46/19 49/5 49/14 49/16
49/18 49/20 49/20
49/22 49/23 52/15
63/17
**public's [1]** 43/8
**punish [3]** 22/4 36/24
37/4
**punishment [1]** 13/9
**punt [1]** 38/14
**punts [1]** 63/13
**pure [1]** 41/24
**purely [1]** 49/24
**purportedly [1]** 34/14
**purpose [2]** 32/19
32/20
**purposes [8]** 7/12 7/20
11/19 14/13 29/6 48/24
51/19 59/2
**put [9]** 6/20 10/19
20/18 31/1 46/18 47/23
52/17 52/23 59/6
**putting [1]** 45/13

**Q**

**qualified [23]** 13/13

## Q

**qualified... [22]** 17/20 17/23 35/16 35/20 36/1 36/4 37/12 37/14 37/16 37/23 41/20 42/15 44/24 50/25 52/12 52/19 53/2 53/5 53/7 54/8 54/18 55/15
**qualifies [3]** 39/17 40/18 41/20
**qualify [3]** 40/20 50/3 52/4
**quantum [1]** 59/10
**question [18]** 6/2 6/11 9/17 10/23 26/9 29/19 32/8 34/17 36/7 38/5 39/4 39/4 39/11 41/17 45/12 50/25 58/23 59/11
**question: [1]** 16/24
**question: So [1]** 16/24
**questions [1]** 15/19
**quibble [1]** 20/18
**quick [1]** 62/14
**quintessential [1]** 36/1
**quite [2]** 36/22 63/14
**quotidian [1]** 21/23

## R

**raised [1]** 26/25
**rate [23]** 6/5 6/10 7/5 8/24 9/1 9/9 12/2 12/3 15/3 18/6 23/25 24/7 24/14 27/6 29/25 30/1 30/9 32/24 33/4 33/15 50/2 50/5 51/18
**rate-setting [3]** 27/6 32/24 33/15
**ratemaking [1]** 24/2
**rates [10]** 15/10 19/12 21/25 27/1 27/5 29/21

**rea [1]** 7/13
**reaching [2]** 35/3 35/7
**read [3]** 6/12 23/6 38/2
**readily [2]** 52/22 53/1
**real [1]** 60/17
**really [9]** 5/8 7/8 8/10 8/22 10/23 11/24 22/23 42/19 56/1
**reason [12]** 11/24 17/13 22/23 24/14 24/16 33/10 33/13 33/14 33/17 34/22 44/13 56/20
**reasonably [3]** 17/13 22/3 22/13
**reasons [4]** 25/5 51/17 56/18 57/13
**rebuttal [1]** 44/12
**receiver [1]** 20/11
**receives [1]** 29/22
**recent [1]** 53/15
**receptivity [1]** 16/12
**recess [5]** 47/11 47/18 47/19 63/2 63/3
**recited [1]** 12/17
**recognize [2]** 22/20 43/20
**reconsider [1]** 5/13
**reconsideration [2]** 55/17 55/20
**record [16]** 4/6 18/1 18/2 19/11 21/13 22/25 23/10 24/25 28/8 28/14 42/25 46/21 47/8 49/7 53/6 64/5
**Records [1]** 46/20
**reference [2]** 46/11 46/12
**referred [1]** 45/8
**reflect [1]** 17/11
**Reform [1]** 28/24

**regard [3]** 34/17 55/10 56/10
**regarding [3]** 5/6 24/24 47/23
**regret [1]** 36/12
**regulation [2]** 34/14 34/15
**regulations [1]** 30/1
**reimbursement [4]** 23/24 33/24 34/4 34/9
**reject [2]** 9/9 48/19
**related [5]** 7/2 14/22 30/1 31/24 43/6
**relating [1]** 17/17
**relationship [1]** 20/16
**relatively [1]** 57/4
**relevant [5]** 26/9 43/7 44/16 44/19 53/10
**relief [1]** 53/23
**reluctant [1]** 59/7
**remain [2]** 16/20 35/18
**remember [4]** 29/21 32/23 34/6 34/13
**reminded [1]** 47/24
**reply [3]** 9/23 21/20 45/16
**reporter [3]** 3/6 61/11 64/11
**reports [1]** 24/25
**reprimand [1]** 48/3
**request [3]** 46/20 54/7 55/24
**require [1]** 12/23
**required [4]** 8/16 22/15 30/4 45/7
**requires [3]** 22/9 23/3 24/11
**requisite [2]** 22/15 23/10
**res [1]** 57/24
**resign [2]** 31/6 40/11
**resignation [2]** 45/11

**R**

**resignation... [1]** 46/24
**resigned [1]** 46/22
**resolution [2]** 55/14 56/1
**resolve [2]** 58/18 63/16
**respect [1]** 33/1
**respond [1]** 38/20
**respondeat [1]** 13/2
**responding [1]** 35/12
**responds [1]** 24/25
**response [4]** 41/5 50/9 61/4 62/14
**responsibilities [2]** 18/11 18/12
**responsibility [2]** 6/9 24/10
**responsible [1]** 28/19
**rest [1]** 14/2
**rests [1]** 54/9
**result [1]** 63/6
**retaliate [5]** 8/23 9/9 9/11 22/4 38/4
**retaliated [1]** 28/11
**retaliating [1]** 39/22
**retaliation [29]** 7/20 7/22 8/20 9/2 9/15 9/19 9/22 11/2 13/14 14/17 18/5 19/7 19/16 21/12 22/16 26/19 30/10 30/11 37/13 38/3 38/6 39/2 39/9 46/23 49/1 50/3 50/10 50/15 50/15
**retaliatory [37]** 5/18 5/25 9/5 10/12 10/14 14/8 18/4 18/10 19/21 20/1 21/16 21/18 22/3 22/9 24/11 24/13 24/17 25/3 30/15 35/2 35/22 35/23 38/11 38/15 39/12 39/14 39/18

39/25 40/19 40/20 40/25 41/2 47/4 47/25 50/16 63/18 63/18
**rethink [1]** 59/19
**rhetorical [3]** 22/19 22/21 23/1
**rid [1]** 20/12
**rifle [1]** 60/22
**right [47]** 14/4 14/15 16/6 17/8 17/24 19/9 21/10 24/22 25/6 29/4 29/7 29/11 29/19 30/6 30/17 30/24 31/13 33/2 33/19 34/6 34/7 35/14 41/22 42/14 43/10 44/5 44/22 44/25 45/24 46/2 46/5 47/9 48/9 54/11 54/15 54/20 56/24 57/10 57/13 57/14 58/4 60/6 60/9 60/25 61/11 62/2 63/8
**rights [2]** 9/25 45/19
**rise [1]** 25/22
**RMR [2]** 3/6 64/10
**road [1]** 63/14
**Rohan [1]** 56/17
**room [2]** 3/7 22/20
**row [1]** 15/10
**rule [9]** 17/2 26/13 26/14 26/15 43/19 43/25 48/14 57/9 60/11
**ruled [2]** 5/12 59/21
**rules [1]** 7/10
**ruling [8]** 5/13 50/24 52/6 54/18 54/19 54/22 57/17 63/10
**rulings [3]** 48/11 53/13 56/23

**S**

**S.W [5]** 2/14 2/18 2/22 3/2 3/7

**safe [1]** 10/17
**said [29]** 18/17 19/15 22/14 22/19 25/20 25/20 26/20 27/14 27/16 27/19 33/8 34/14 34/15 37/17 37/19 37/19 38/8 38/19 39/1 39/21 40/5 40/12 42/8 45/16 46/18 46/24 51/22 55/23 56/19
**sake [1]** 30/7
**Salerno [2]** 2/13 4/16
**same [10]** 6/11 7/2 12/5 14/1 34/17 56/10 57/18 58/3 58/12 62/7
**San [1]** 45/7
**sanction [1]** 52/9
**sanctions [3]** 43/20 52/6 55/16
**satisfy [3]** 7/9 12/14 27/10
**saw [1]** 46/14
**SAXTON [52]** 1/9 2/16 4/14 4/15 6/9 7/22 8/14 8/25 9/23 11/18 12/13 12/15 12/18 13/18 18/3 20/4 21/6 21/17 21/24 23/2 23/16 23/23 24/3 24/7 26/8 28/11 28/17 28/19 31/5 35/2 36/2 40/9 41/21 42/21 43/21 45/10 46/16 46/17 47/3 47/23 50/5 51/17 52/1 52/1 52/11 52/17 54/10 54/18 59/13 59/14 62/23 63/10
**Saxton's [7]** 5/7 8/20 19/24 36/14 48/12 52/4 53/24
**say [30]** 5/12 5/24 6/15 8/8 10/17 10/18 11/22 12/12 14/1 16/21 19/3

**say... [19]** 19/4 28/4 29/2 37/2 37/2 37/11 40/18 43/6 43/18 50/6 50/9 51/22 52/5 53/7 53/8 59/5 59/10 59/24 62/13

**saying [21]** 7/1 8/1 15/15 20/5 21/15 22/14 23/16 32/6 32/9 32/10 32/11 32/12 32/14 32/15 36/5 36/12 37/13 37/18 37/21 37/22 44/11

**says [5]** 25/1 36/21 41/8 41/9 52/23

**SCHRAMM [1]** 3/1

**scienter [1]** 24/11

**score [1]** 50/23

**screen [1]** 12/14

**Seattle [1]** 2/9

**second [10]** 5/15 8/20 9/10 9/11 13/5 16/24 32/8 33/8 42/14 57/17

**Secondly [1]** 46/8

**Section [4]** 5/19 6/1 26/19 38/3

**see [8]** 5/22 8/11 22/10 22/11 37/10 45/5 46/1 51/11

**seek [1]** 54/20

**seeking [4]** 35/6 53/21 55/19 60/21

**seem [2]** 18/25 56/12

**seems [2]** 10/10 53/8

**seen [3]** 46/11 46/12 52/18

**segregated [2]** 28/10 28/18

**sending [1]** 37/19

**sense [6]** 11/15 55/11

**separate [2]** 31/11 31/12

**separately [3]** 6/7 7/7 59/23

**series [1]** 6/10

**services [3]** 29/23 30/3 60/23

**set [4]** 30/9 40/16 54/2 56/16

**sets [1]** 58/13

**setting [30]** 6/5 6/10 6/16 7/5 8/24 9/1 9/9 12/2 12/3 15/3 16/11 18/6 24/14 27/6 30/1 30/1 30/9 32/24 33/4 33/15 36/15 39/18 48/16 49/17 50/2 50/5 50/22 51/18 52/25 58/2

**settings [1]** 9/13

**settings: [1]** 12/2

**settings: rate [1]** 12/2

**settlement [3]** 5/11 34/6 48/14

**several [4]** 5/6 22/17 23/13 24/6

**Shannon [1]** 2/17

**SHARE [7]** 2/21 35/9 35/10 55/18 61/9 61/13 61/25

**she [35]** 9/24 10/4 12/22 13/1 13/4 13/8 21/25 21/25 22/14 22/14 22/14 23/21 24/4 24/4 24/5 31/5 31/6 35/4 36/3 40/11 40/11 40/12 41/22 41/23 41/24 41/24 45/18 46/22 46/22 46/24 47/1 47/2 52/19 54/12 54/19

**she's [7]** 12/19 12/24 23/2 23/19 24/6 45/23

**shelf [1]** 46/19

**shelved [1]** 46/14

**shot [1]** 60/22

**should [12]** 9/8 24/1 41/11 41/23 42/18 42/22 49/1 49/8 49/9 49/20 54/9 61/16

**shouldn't [1]** 10/18

**show [9]** 7/18 12/21 13/4 15/7 23/4 23/10 23/15 33/20 51/19

**showed [1]** 21/17

**showing [2]** 13/1 21/23

**shown [1]** 52/1

**Shumway [3]** 3/6 64/9 64/10

**shut [3]** 19/2 19/2 32/3

**side [3]** 21/12 35/5 50/11

**signature [2]** 64/7 64/7

**significantly [1]** 55/24

**signing [1]** 64/4

**silos [3]** 6/3 6/8 6/24

**similar: [1]** 9/11

**similar: that [1]** 9/11

**Simon [1]** 45/9

**simply [11]** 5/22 5/24 8/1 8/21 9/8 15/4 15/15 16/15 48/11 48/17 55/19

**since [3]** 8/25 31/10 47/13

**single [5]** 6/19 27/13 28/13 32/10 37/24

**sir [2]** 13/22 61/2

**sit [1]** 40/18

**situation [1]** 39/5

**smear [11]** 6/6 6/11 32/19 32/20 35/4 42/3 42/6 42/13 46/9 47/7 50/7

**S**

**so [96]**
**so-called [4]** 33/24
46/12 47/7 50/7
**some [29]** 5/3 8/14
8/16 10/9 11/4 11/4
11/4 11/9 25/22 29/2
29/4 30/18 30/22 42/15
46/25 47/12 48/9 49/5
49/12 49/15 52/2 52/7
55/18 55/20 57/1 57/9
58/18 59/7 61/25
**somebody [7]** 19/2
20/5 20/12 32/13 36/24
38/4 41/8
**someday [1]** 52/7
**somehow [1]** 37/5
**someone [3]** 20/15
20/15 36/13
**something [11]** 10/24
12/23 23/4 27/14 32/13
32/16 39/8 43/15 49/10
49/23 53/9
**sometime [1]** 60/11
**somewhat [2]** 6/25
37/8
**Sonia [2]** 3/1 62/5
**soon [1]** 60/11
**sooner [2]** 49/10 63/18
**sorry [1]** 61/8
**sort [25]** 7/1 8/11 9/7
9/16 10/6 10/25 12/14
18/10 18/12 18/18 19/3
19/19 20/12 26/12
26/15 30/8 34/15 42/7
49/2 50/2 50/11 50/15
51/8 51/24 53/2
**sought [1]** 34/3
**soundness [2]** 27/5
33/1
**sounds [1]** 36/1

**space [1]** 47/12
**speak [5]** 10/24 13/9
36/14 47/1 51/7
**speaker [8]** 16/1 37/6
41/5 41/6 41/7 41/10
42/10 42/12
**speaker's [1]** 16/1
**speakers [1]** 50/22
**speaking [3]** 16/1
19/12 42/22
**special [3]** 4/16 4/21
4/24
**specific [3]** 22/9 27/3
56/3
**specifically [7]** 30/22
32/21 34/4 34/13 43/16
44/11 48/1
**speech [161]**
**speech here [1]** 31/21
**spent [1]** 23/7
**spoken [1]** 47/12
**stage [2]** 8/19 12/6
**stand [1]** 36/22
**standard [4]** 7/19 54/2
55/10 56/16
**standing [3]** 26/6 26/7
35/18
**stands [1]** 36/23
**start [5]** 13/15 33/4
35/15 40/22 55/9
**started [1]** 41/19
**Starting [1]** 59/20
**starts [1]** 18/8
**state [13]** 1/7 4/6 14/21
14/23 15/16 20/16
21/22 22/15 28/24 45/3
45/17 50/11 58/12
**statement [2]** 17/5 46/1
**statements [1]** 49/9
**STATES [3]** 1/1 1/18
3/6
**statute [12]** 5/16 6/19

7/7 7/12 13/13 14/2
25/9 26/22 40/19 40/20
48/14 48/22
**statutes [1]** 5/21
**statutory [1]** 39/8
**stay [18]** 53/16 53/22
55/2 55/5 55/7 55/11
55/13 56/19 56/20 57/6
57/14 58/15 59/7 59/9
60/2 60/10 60/12 61/15
**stayed [1]** 58/6
**step [2]** 33/18 33/18
**Stephen [3]** 2/3 4/7
53/18
**still [3]** 9/5 16/20 56/4
**stirring [1]** 24/6
**stopping [1]** 33/17
**story [2]** 26/10 35/6
**straight [1]** 7/16
**straight-up [1]** 7/16
**Street [2]** 2/4 2/18
**strength [1]** 23/5
**strict [2]** 25/18 33/1
**strictly [1]** 29/21
**strike [1]** 53/14
**strikes [1]** 18/22
**struggle [1]** 50/6
**struggling [4]** 20/19
38/15 39/17 40/16
**subject [4]** 24/12 43/16
50/17 53/10
**subjective [6]** 37/1
37/3 39/25 41/2 42/10
42/12
**subjectively [1]** 41/6
**submissions [1]** 63/13
**submit [1]** 62/6
**submitted [1]** 15/8
**subordinates [1]** 24/20
**subparts [2]** 7/21 8/22
**substantial [3]** 11/7
37/9 51/15

**such [11]** 5/24 9/18 11/22 15/2 23/16 39/15 45/3 46/2 53/4 58/2 59/25
**sued [1]** 23/2
**sufficiency [1]** 44/20
**sufficient [5]** 30/2 38/7 44/8 46/18 48/23
**sufficiently [3]** 11/18 33/9 39/18
**suggest [3]** 10/10 46/20 49/19
**suggested [1]** 36/22
**suggesting [2]** 15/1 16/13
**suit [1]** 53/23
**Suite [5]** 2/8 2/14 2/18 2/22 3/2
**sum [1]** 26/8
**summary [36]** 5/7 5/14 7/16 7/19 7/20 8/19 9/8 11/5 11/18 12/11 13/4 23/9 37/16 37/23 40/19 40/21 44/4 44/5 44/7 44/8 48/12 49/1 49/5 49/11 50/4 50/7 50/22 51/13 51/19 51/20 52/8 53/12 53/13 53/14 55/14 63/9
**superior [1]** 13/2
**supervisory [1]** 24/9
**support [1]** 46/21
**supported [1]** 11/23
**suppose [1]** 12/21
**supposed [3]** 23/18 25/4 34/22
**sure [12]** 10/2 10/22 14/9 19/13 28/2 28/16 36/12 39/3 42/8 49/7 54/5 59/7

**switched [1]** 35/8
**sympathetic [1]** 59/9

**T**

**table [2]** 59/11 63/8
**take [11]** 8/4 41/11 45/21 47/10 47/13 47/16 48/25 52/7 54/24 59/2 60/9
**taken [7]** 6/19 13/6 25/23 26/11 46/10 47/19 54/1
**talk [6]** 13/12 16/6 17/23 18/6 30/7 30/10
**talked [5]** 28/21 33/25 42/16 42/17 43/17
**talking [10]** 13/13 16/5 25/25 35/7 38/2 40/9 41/10 43/3 47/4 52/14
**talks [2]** 27/4 36/23
**target [1]** 34/3
**targeting [1]** 35/13
**task [2]** 31/10 31/12
**team [1]** 47/1
**tell [6]** 10/25 20/3 28/20 38/10 40/17 41/21
**telling [4]** 19/1 26/10 35/5 41/22
**tells [2]** 36/2 36/13
**temporal [2]** 11/12 12/7
**ten [1]** 35/21
**tensile [1]** 23/5
**tentative [3]** 5/3 5/5 12/10
**tentatively [3]** 33/6 33/8 48/10
**term [1]** 21/4
**terms [3]** 11/20 30/4 45/2

42/6 51/2
**texts [5]** 43/17 43/19 43/21 44/15 52/10
**than [10]** 10/12 23/4 24/3 39/4 42/7 48/24 49/10 49/24 60/1 63/18
**Thank [31]** 5/1 13/17 13/20 13/23 21/10 25/6 25/8 33/2 35/14 43/10 43/10 44/22 44/23 45/15 46/5 47/9 48/7 48/8 55/1 56/15 58/8 58/11 58/21 58/22 61/1 61/5 62/4 62/8 62/9 63/2 63/24
**that [510]**
**that's [59]** 6/21 6/21 6/23 6/23 7/2 8/1 9/3 9/16 9/18 10/2 10/4 10/8 12/16 13/2 13/21 14/10 15/13 16/17 18/17 18/20 20/20 22/15 25/3 25/4 27/25 28/1 30/14 30/17 30/25 31/15 31/16 31/18 31/19 31/23 31/25 32/8 32/9 32/11 32/16 33/14 36/8 36/9 37/15 38/8 38/8 41/7 41/9 42/1 42/6 44/9 45/25 47/4 49/12 49/13 50/4 51/7 52/24 62/8 62/15
**their [8]** 18/10 18/12 24/23 34/21 34/21 35/5 47/12 48/23
**them [7]** 10/19 23/6 23/14 26/20 26/21 26/21 57/9
**themselves [2]** 6/18 25/22
**then [30]** 6/2 6/11 6/23

**then... [27]** 10/5 13/2 13/2 13/12 18/5 20/10 27/11 27/16 30/7 31/3 31/19 33/4 36/24 37/13 38/7 41/25 42/6 42/14 47/19 52/25 54/14 55/15 55/16 58/5 60/9 60/23 62/18

**theories [1]** 5/17

**theory [9]** 5/13 5/25 7/15 7/16 7/17 9/7 39/2 50/4 50/7

**there [51]** 6/25 7/19 8/17 10/14 11/21 12/11 18/9 18/22 18/24 23/12 23/23 24/6 25/4 26/1 26/5 26/11 28/2 28/4 29/2 29/3 29/20 34/1 34/9 35/2 37/13 39/5 40/15 40/25 42/21 43/5 43/17 43/18 43/18 43/20 43/22 44/8 45/1 45/4 45/12 46/2 46/19 47/3 49/3 49/11 49/15 52/20 53/4 56/4 56/25 61/6 61/11

**there's [28]** 5/6 5/24 6/4 7/18 8/21 10/9 10/21 10/22 10/22 11/21 12/25 16/25 19/11 20/11 23/20 24/16 30/13 31/15 38/6 42/24 46/14 46/21 49/10 49/12 50/19 51/12 51/24 53/20

**therefore [6]** 7/5 11/3 17/4 30/15 50/10 52/16

**these [20]** 6/23 7/9 14/19 15/14 22/12 22/15 22/22 23/5 24/19

**they [23]** 7/1 7/10 7/11 14/12 21/2 21/20 23/6 23/15 24/9 25/23 34/3 34/9 34/11 34/13 34/14 34/15 34/16 37/11 37/19 56/12 57/21 57/23 61/20

**they're [8]** 5/4 5/7 8/4 15/23 25/4 26/22 35/6 35/7

**they've [2]** 34/11 47/13

**thing [6]** 5/24 7/15 34/5 43/13 58/12 63/5

**things [20]** 8/6 8/9 12/6 12/17 18/24 23/16 27/4 28/21 32/14 34/1 37/2 39/20 42/13 43/3 43/7 44/14 48/2 48/11 51/24 56/11

**think [96]**

**thinking [1]** 10/12

**third [6]** 2/8 3/7 7/15 11/6 37/9 55/18

**third-party [1]** 55/18

**this [104]**

**this: [1]** 59/5

**this: I'm [1]** 59/5

**Thomas [1]** 2/3

**those [16]** 6/6 6/8 12/5 13/11 19/20 23/9 43/9 43/25 44/1 48/21 50/17 51/19 53/21 57/21 58/9 62/13

**though [3]** 7/11 44/9 57/8

**thought [5]** 13/20 22/19 22/24 32/9 39/19

**thoughts [1]** 5/3

**thousands [1]** 32/3

**threat [13]** 10/1 18/15 18/20 18/21 19/1 19/3 20/8 20/10 20/11 21/7 45/20 45/21 48/4

**threaten [4]** 18/23 20/22 20/24 21/2

**threatened [1]** 20/11

**threatening [1]** 21/8

**threats [2]** 19/19 20/1

**three [14]** 7/21 7/21 12/14 13/11 15/10 21/23 33/18 34/9 34/10 48/25 56/18 57/11 58/9 60/20

**three-page [1]** 34/10

**three-year [1]** 21/23

**through [16]** 7/15 8/23 9/9 9/12 10/25 21/21 23/14 40/15 48/1 51/25 55/8 55/11 56/5 56/16 58/7 63/9

**Thursday [1]** 62/18

**tied [5]** 31/17 31/22 32/6 32/16 55/17

**time [15]** 5/15 14/9 21/2 22/21 32/9 34/1 34/7 34/13 43/22 47/15 48/22 51/10 52/25 53/10 58/3

**time's [1]** 30/7

**times [1]** 46/11

**today [15]** 4/3 8/14 12/23 23/17 27/21 29/2 29/5 43/25 47/12 49/6 52/13 53/5 53/6 59/21 62/21

**today's [1]** 59/2

**together [4]** 6/19 25/21 25/23 28/5

**told [2]** 35/21 35/23

**too [2]** 23/20 59/7

**took [5]** 19/1 26/8 27/4

**T**

**took... [2]** 47/1 55/23
**top [5]** 6/20 41/4 56/18 56/20 58/9
**tort [4]** 5/20 5/21 5/25 24/10
**total [2]** 26/8 59/10
**totally [1]** 17/17
**tough [2]** 23/16 42/1
**traditional [1]** 7/16
**transcript [3]** 1/16 64/5 64/6
**transfer [1]** 16/22
**transgression [1]** 45/6
**transparency [3]** 27/5 27/6 43/4
**transparent [1]** 32/25
**travel [1]** 21/21
**treated [2]** 15/15 15/24
**treating [1]** 16/17
**treatment [1]** 19/12
**Tremaine [1]** 2/21
**trial [16]** 7/11 8/13 13/10 14/12 17/2 29/5 37/19 38/12 39/16 49/9 55/6 56/5 56/9 57/15 57/18 59/13
**trials [5]** 55/6 56/21 57/21 58/7 58/13
**tried [2]** 34/14 58/17
**tries [2]** 26/24 36/21
**troublesome [1]** 20/12
**true [13]** 8/2 8/21 9/16 12/16 12/20 29/4 37/13 37/17 37/23 41/9 50/11 50/13 50/16
**truthfully [1]** 37/2
**try [5]** 10/25 39/7 49/10 60/18 63/16
**trying [4]** 28/4 28/6 39/24 41/1

**Tuesday [3]** 27/15 27/17 62/20
**turn [3]** 35/16 53/16 54/3
**turns [3]** 37/12 37/19 41/21
**two [22]** 6/3 6/8 6/23 8/22 12/1 13/5 14/6 15/19 17/25 31/10 33/18 34/5 34/10 40/3 47/11 55/6 56/21 57/19 57/21 58/7 58/13 58/13
**two-year [1]** 14/6
**type [7]** 21/5 24/11 27/25 31/19 32/5 32/6 35/11
**types [1]** 26/18

**U**

**ultimately [1]** 41/20
**under [19]** 5/19 5/21 6/1 6/15 6/23 8/4 8/25 14/24 16/16 26/11 27/7 29/9 29/16 30/4 39/2 40/19 40/20 44/12 60/9
**underlying [1]** 60/2
**undermine [3]** 32/21 32/22 35/6
**understand [6]** 5/23 19/14 37/15 37/21 39/3 55/25
**understanding [2]** 31/25 32/11
**undoubtedly [2]** 22/18 57/17
**undue [1]** 60/1
**unfair [1]** 54/16
**UNITED [3]** 1/1 1/18 3/6
**unless [1]** 19/25
**unprotected [5]** 11/1 19/20 37/4 50/21 51/8

**unrelated [2]** 17/17 56/12
**unresolved [1]** 56/4
**until [5]** 24/1 46/19 47/17 59/17 62/11
**untrue [1]** 46/24
**unwarranted [1]** 48/2
**up [19]** 7/16 13/13 19/2 20/24 20/25 21/15 23/13 29/24 35/10 38/7 40/16 47/14 48/25 55/21 56/9 58/17 58/24 58/25 63/7
**upcoming [3]** 50/24 59/18 59/20
**upon [2]** 17/11 53/21
**us [10]** 13/25 16/17 23/8 30/22 40/17 46/9 56/8 57/6 58/18 62/1
**usable [1]** 14/12
**use [3]** 12/5 19/23 60/21
**used [1]** 21/4
**uses [1]** 36/12

**V**

**vacate [1]** 59/23
**vendor [10]** 14/21 16/14 16/15 16/21 36/14 38/19 38/25 39/1 39/21 50/9
**vendor's [2]** 17/16 38/18
**verbal [1]** 48/4
**versus [16]** 10/14 10/24 12/9 25/14 25/19 32/15 35/22 36/3 41/3 42/16 45/2 51/6 51/12 52/16 63/17 63/18
**very [12]** 15/22 25/6 43/10 44/22 46/7 48/19 50/18 51/5 51/6 53/8

**very... [2]** 54/6 62/8
**via [1]** 47/6
**view [18]** 7/3 8/18 9/3 12/10 14/9 17/4 17/9 19/5 21/20 22/8 33/17 38/16 45/4 48/19 49/12 49/14 50/19 57/20
**viewed [3]** 5/20 7/6 27/24
**violate [1]** 45/17
**violation [12]** 5/20 5/25 6/5 6/13 6/14 6/16 6/22 6/24 7/3 20/25 48/15 48/20
**violations [1]** 6/10
**virtual [1]** 11/12
**virtually [1]** 28/16
**virtue [1]** 10/6

**W**

**WA [1]** 2/9
**wait [2]** 59/12 59/21
**waiting [2]** 47/13 59/17
**want [25]** 12/12 14/19 18/5 19/13 20/5 24/1 28/17 28/19 30/7 33/3 35/15 38/19 42/5 52/23 55/9 56/5 56/10 56/18 56/20 56/21 59/11 61/20 62/10 63/7 63/21
**wanted [1]** 55/25
**wants [2]** 8/13 58/12
**was [55]** 7/23 8/25 11/7 12/21 17/12 17/13 17/15 17/18 19/11 21/4 21/5 21/5 21/15 22/17 22/18 22/19 22/24 22/24 24/17 27/1 27/16 31/5 31/5 32/20 33/24 34/2 34/5 34/8 34/19

34/20 36/5 36/5 36/20 37/13 38/6 38/24 40/10 40/10 40/11 41/7 41/24 42/25 43/1 45/1 45/1 46/13 46/14 46/17 46/19 46/19 46/25 47/24 51/14 54/10 57/24
**Washington [2]** 3/2 62/16
**wasn't [1]** 7/20
**way [18]** 5/21 6/4 9/5 11/9 11/20 13/25 20/22 28/19 31/1 31/3 39/7 51/7 52/2 52/6 55/20 56/5 63/9 63/11
**ways [2]** 35/3 63/14
**we [69]**
**we'd [4]** 56/3 61/13 62/1 62/6
**we'll [12]** 8/9 10/25 13/12 29/4 29/8 33/4 47/13 49/5 51/10 52/10 61/3 63/2
**we're [21]** 4/3 5/4 8/10 14/5 19/2 20/25 22/7 26/5 34/22 34/25 37/2 38/15 40/8 40/12 43/19 46/3 46/18 59/15 59/15 60/20 60/21
**we've [6]** 13/13 19/6 28/21 45/22 47/4 57/11
**weak [1]** 23/20
**weakest [1]** 23/11
**Wednesday [5]** 61/4 61/17 62/3 62/18 63/20
**week [8]** 54/25 59/12 59/17 59/25 60/11 62/11 62/16 62/16
**weeks [1]** 22/17
**welcome [2]** 61/15 62/2

**well [33]** 10/20 12/5 15/13 15/24 16/3 16/11 20/4 23/20 26/17 27/22 28/2 28/9 28/16 28/21 29/1 37/18 38/1 40/18 40/24 41/12 41/16 42/23 42/25 44/3 44/19 54/1 54/8 56/23 57/8 57/11 57/15 59/5 61/20
**went [1]** 47/2
**were [7]** 14/8 24/6 26/11 26/25 32/9 42/7 43/21
**weren't [1]** 42/8
**what [95]**
**what's [15]** 6/6 7/2 22/2 22/12 22/25 27/19 27/21 28/20 34/24 36/19 41/14 42/12 50/19 51/11 58/10
**whatever [1]** 20/2
**wheelhouse [7]** 10/6 19/24 19/25 20/6 29/19 31/2 36/13
**when [16]** 8/9 9/12 9/14 9/24 9/25 10/3 13/13 21/4 23/5 24/12 25/24 38/2 45/18 45/19 46/22 49/23
**where [30]** 7/18 9/22 10/2 10/8 15/9 15/13 20/10 20/19 20/21 23/9 24/25 25/1 25/4 28/18 30/20 32/11 32/12 35/25 36/15 37/11 40/12 41/4 42/7 44/2 44/5 45/1 47/14 48/11 50/24 55/25
**whether [23]** 8/15 11/6 17/5 20/15 26/10 26/22 31/17 37/6 38/5 41/16 44/7 45/1 48/25 49/7

**whether... [9]** 49/9 51/14 54/17 55/20 56/2 57/25 59/13 63/16 63/21

**which [37]** 5/20 7/7 8/5 10/10 10/14 12/19 14/7 15/23 21/15 21/16 21/16 21/16 24/11 27/23 29/5 29/5 29/6 29/6 31/17 33/18 36/12 38/15 39/5 52/19 52/21 53/2 53/23 54/19 54/19 55/14 57/7 57/16 58/12 63/6 63/11 63/13 63/18

**while [3]** 14/11 35/15 62/11

**who [9]** 10/15 16/21 18/23 20/12 35/8 36/13 46/17 47/11 59/6

**whole [6]** 7/15 26/21 32/19 34/20 39/11 53/20

**why [18]** 9/7 16/9 17/14 18/20 18/21 20/4 20/23 26/12 32/8 33/12 33/21 36/3 37/10 41/1 54/9 55/11 57/14 63/6

**will [10]** 20/12 29/5 40/15 53/4 53/8 54/1 56/22 57/5 57/17 60/14

**willing [1]** 63/15

**wipe [1]** 26/15

**wipes [1]** 26/17

**wish [2]** 41/6 41/13

**wished [1]** 41/25

**within [8]** 6/8 10/4 10/6 10/20 18/12 22/22 29/19 53/1

**without [5]** 52/6 55/2 57/16 59/14 64/6

**witness [3]** 17/4 49/8 63/12

**won't [4]** 7/24 21/1 29/6 55/5

**wondering [2]** 18/7 29/1

**word [2]** 36/12 60/22

**words [1]** 7/19

**work [5]** 6/18 6/21 21/22 24/6 26/1

**workplace [1]** 6/15

**works [1]** 13/11

**would [41]** 6/8 12/18 13/1 13/3 14/7 16/12 17/1 18/15 18/16 18/25 19/20 20/7 23/11 26/15 27/25 32/3 38/16 40/22 41/5 43/2 44/2 44/11 44/14 45/3 46/21 47/23 49/15 49/24 54/24 55/11 57/3 57/6 58/17 59/10 59/25 59/25 61/10 62/19 63/10 63/11 63/19

**wouldn't [4]** 16/9 18/11 26/12 26/16

**wrap [1]** 55/20

**wrestle [1]** 36/21

**wrestled [2]** 32/12 35/25

**Wright [1]** 2/21

**write [2]** 46/17 62/10

**wrong [1]** 31/5

## X

**Xerox [2]** 16/14 16/21

## Y

**year [2]** 14/6 21/23

**years [1]** 15/10

**yes [26]** 17/7 19/17 19/22 21/9 25/11 27/14

29/12 32/1 39/23 42/11 42/11 43/14 46/7 47/21 53/18 55/4 55/22 56/14 56/22 57/12 57/12 59/4 59/25 60/16 61/2 63/23

**yet [6]** 8/11 23/2 44/1 52/5 58/23 60/17

**you [190]**

**you'd [3]** 17/1 39/19 44/14

**you'll [5]** 29/7 45/5 57/8 59/22 62/12

**you're [12]** 7/25 9/4 16/4 16/8 24/12 37/21 38/2 41/22 46/2 56/1 56/17 56/24

**you've [10]** 18/17 28/16 34/19 35/21 35/23 42/16 46/11 46/12 55/15 56/19

**your [106]**