BethAnne Darby, 7/25/2018                    FamilyCare v. OHA, et al.

Page 197

1102 a document Bates stamped LO -- OHA_LIT_00802826 to 28.

Q. What is this document?

A. The attachments say they are external statements. One is for the State of Reform, and the other one is for the Portland Business Journal.

Q. And -- and is this language language that you and your team put together for Lynne Saxton's review and approval?

A. That's what it -- it looks like it's from me to Robb Cowie, with a cc to Lynne and her assistant, Theresa.

Q. In the first paragraph at the -- this is the second page of the document, for State of Reform it reads, Recently, the -- the Portland Tribune published excerpts from a draft communications plan drafted by OHA staff. The staff proposed sharing negative information about FamilyCare with the media. FamilyCare is one of 16 coordinated care organizations OHA contracts with to provide Oregon Health Plan members access to health services. This was not in any way supported by OHA leadership. It was inappropriate and shelved.

Page 198

Why was it inappropriate?

A. I don't recall writing this. I'm sorry. It was in 2017. I don't recall the exact thinking behind the words.

Q. Okay. Was the draft communications plan an appropriate thing for OHA to do?

A. I think planning tools are always appropriate.

Q. Would it have been appropriate for OHA to target FamilyCare in the media?

A. That didn't happen. So I -- that would be speculation on my part, and I wouldn't want to do that.

Q. Would it be appropriate for OHA to try to cast FamilyCare as an outlier amongst CCOs?

A. That didn't happen. It wouldn't be appropriate for me to speculate on that point.

Q. Okay. Would it be appropriate for OHA to attempt to disseminate information about HIV members without fully vetting or understanding the information that OHA was disseminating?

A. That didn't happen. It would be inprop -- inappropriate for me to speculate.

Q. Okay.

THE WITNESS: Can we take a quick break?

Page 199

Would this be an okay time? I know we're al -- you said we're almost done.

MR. JOHNSON: Yeah.

THE WITNESS: But I also heard you say you needed a break, too.

MR. JOHNSON: Yeah. That's fine.

THE WITNESS: Okay.

MR. JOHNSON: That's great.

THE VIDEOGRAPHER: We are off the record. The time is 3:30 p.m.

(Recess from 3:31 p.m. to 3:44 p.m.)

(Deposition Exhibits Numbers 1103 through 1107 marked for identification.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:43 p.m.

Q. (By Mr. Johnson) And I'm going -- Ms. Darby, I'm going to show you a -- this is 1103, 1104, 1105, 1106 and 1107. Okay. So I -- let me explain something. So -- so the way we got these -- I explained to you earlier that this is the way we got the text messages.

A. Uh-huh.

Q. And -- and for these, the first four, 1103, 1104, 1105, and 1106, it wasn't

Page 200

apparent -- it's not apparent on here who you're texting with; right? Because you're, you know -- well I guess you could text to yourself; right?

A. I don't know.

Q. Okay.

A. Yeah.

Q. But then if you look at 1107 -- and I think I solved the riddle.

A. Okay.

Q. So if you look at 1107, do you see that you're having this conversation with Lynne Saxton?

Do you see that it says, You gave the direction to me, I verbally gave direction to the team.

Do you see that?

A. Yes.

Q. And that's the same text at 1103 -- 11 -- not time, I'm talking about the exhibit number.

A. Yes. I see that.

Q. So does that refresh your recollection that this series of texts that are in 1103 to 1106 is an exchange that you're having with

BethAnne Darby, 7/25/2018                    FamilyCare v. OHA, et al.

Page 201

Lynne Saxton?
A. Yes.
Q. Okay. And it -- and at the top of 1107 it says, Please add Kate to call then.
What -- what call was she referring to?
A. I -- I don't know.
Q. Okay. Do you recall having a -- a call with Lynne Saxton and Kate Nass on or about 11/8/2017 relating to the -- the article that Nick Budnick had put out?
A. I don't -- I don't recall.
Q. And -- and in this -- the first text that's on 1103, you say, You gave direction to me, I verbally gave direction to the team.
Are you referring to the direction to start work on the communications plan project?
A. There was -- as we've discussed, there was a draft document that was shelved on August 8th. We were probably talking about it -- that it was shelved.
Q. But -- but the -- there when you say, You gave the direction to me, I verb -- oh, so you're saying -- I get it. Sorry.
You're saying that the direction was the direction to shelve the plan?

Page 202

A. I -- I -- I don't have more context than you do, but I would assume that's what we were talking about in August.
Q. And -- and do -- do you have -- so the phone that this -- these texts were contained on, that's the phone that you gave back to OHA when you left their employment?
A. I assume so, yes. I don't -- it's a -- this says, Sprint. I didn't ever have Sprint, so I don't know who the originator of this particular...
Q. The -- the personal smartphone that you had at that time, do you still have that smartphone?
A. No. I don't.
Q. And what kind of -- when did you get rid of that smartphone?
A. Maybe -- the battery died and the face cracked, so maybe in November, earlier this year. I have AT&T, though, for both my personal and my work at OHA.
(Deposition Exhibit Number 1108 marked for identification.)
Q. (By Mr. Johnson) Mark as Exhibit 1108 a document Bates stamped OHA_LIT_00449534 to 37.

Page 203

So if you can -- if you look at the first e-mail in that chain, it's an e-mail from Mark Fairbanks to Zach Aters.
Do you see that?
A. Uh-huh.
Q. And he's asking, Can you please resurrect the data that drove the question of HIV with FamilyCare?
Do you see that?
A. Yes.
Q. And I'm just -- does seeing this document refresh your recollection at all about any of the discussion relating to that HIV issue?
A. I don't think -- it looks like he first included me in this string about four e-mails later. I don't -- what are you wanting to know specifically?
Q. I guess my question is: So -- so a couple -- a few exhibits ago --
A. Uh-huh.
Q. -- there was an article about the HIV aspect of the communications plan.
Do you recall that, there was an article?

Page 204

A. I recall the article around the draft document, yeah.
Q. And -- and when that article came out in around this time period --
A. Uh-huh.
Q. -- you know, beginning of August, is that -- do you recall that was the first time you had ever heard mention of the HIV issue?
Or was that something that you recall having conversations with people at OHA prior to this time frame?
A. I recall that I was aware of it in -- that it was happening -- I was aware that it was happening when -- at the time it happened.
Q. So there -- that there was -- you recall that there were discussions about HIV prior to this, and you were -- you were aware of those discussions?
A. (No response.)
Q. I guess -- so what I'm -- so this is what I'm trying to understand; okay?
A. Uh-huh.
Q. So obviously at this point in time, early August 2017, you're talking about here -- people within OHA are talking about an analysis

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Exhibit 6
Page 2 of 2