**Stephen F. English**, OSB No. 730843
SEnglish@perkinscoie.com
**Thomas R. Johnson**, OSB No. 010645
TRJohnson@perkinscoie.com
**Heidee Stoller**, OSB No. 072835
HStoller@perkinscoie.com
**Matthew J. Mertens**, OSB No. 146288
MMertens@perkinscoie.com
**Sasha A. Petrova**, OSB No. 154008
SPetrova@perkinscoie.com
PERKINS COIE LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Telephone:  503.727.2000
Facsimile:  503.727.2222

**Matthew Gordon**, *pro hac vice*
MGordon@perkinscoie.com
**David B. Robbins**, OSB No. 070630
DRobbins@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

Attorneys for Plaintiff *FamilyCare, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **FAMILYCARE, INC.**, an Oregon non-profit corporation,<br><br>     Plaintiff,<br><br>  v.<br><br>**OREGON HEALTH AUTHORITY**, an agency of the State of Oregon, and **LYNNE SAXTON**,<br><br>     Defendants. | No. 6:18−cv−00296−MO<br><br>PLAINTIFF FAMILYCARE, INC.'S FIFTH AMENDED COMPLAINT<br><br>Breach of Contract—Damages; Breach of Covenant of Good Faith and Fair Dealing; Breach of Contract; Civil Rights Violation<br><br>NOT SUBJECT TO MANDATORY ARBITRATION<br><br>JURY TRIAL REQUESTED<br><br>Prayer Amount: $125,000,000<br>ORS 21.160(1)(e) and 21.160(3) |

152090837.5

Plaintiff FamilyCare, Inc. ("FamilyCare") alleges the following:

**PARTIES**

**1.**

FamilyCare is an Oregon non-profit corporation and was a certified Coordinated Care Organization ("CCO") created to achieve the "Triple Aim" of better health, better health care, and lower per-capita costs pursuant to ORS 414.625. FamilyCare's principal place of business is in Portland, Oregon. As a certified CCO, FamilyCare contracted with the State of Oregon, by and through Oregon Health Authority ("OHA"), to provide services for the Oregon Health Plan ("OHP"), the state's Medicaid program. FamilyCare managed and coordinated health care services to Oregon's Medicaid population from 1985 until early 2018. During that period, FamilyCare was the second-largest CCO in Oregon, managing and coordinating integrated physical, mental, and dental health services for more than 120,000 OHP members in the Tri-County area and in Marion County.

**2.**

OHA is an agency of the State of Oregon. OHA is responsible for administering Oregon's Medicaid program, and OHA contracts with CCOs, such as FamilyCare, for the management and coordination of health services to OHP members. OHA's principal place of business is in Salem, Oregon.

**3.**

Lynne Saxton is the former director of the Oregon Health Authority.

**4.**

Even though FamilyCare was the second-largest CCO in Oregon, its rates were the lowest among the 16 Oregon CCOs in 2015, 2016, 2017 and 2018. Over the years, OHA used erroneous data and unreasonable, inadequate, and biased rate-setting methods to continually and systematically reduce FamilyCare's rates. These rates caused FamilyCare to sustain substantial operating losses, depleted its reserves, and ultimately forced FamilyCare to shut down its

PAGE 2-    FIFTH AMENDED COMPLAINT

Medicaid business and cease providing services to OHP members. Dating back to 2015, FamilyCare repeatedly alerted OHA that basic errors in the data and methodology used to set capitation rates resulted in unsustainable, unfair, and inadequate rates. OHA ignored FamilyCare's communications and knowingly and purposefully refused to correct the errors until after FamilyCare shut down. Rather than addressing the numerous problems that FamilyCare had identified, OHA undertook to implement a smear campaign aimed at undermining FamilyCare in the eyes of the public, its providers, its patients, and the Oregon legislature. This campaign, which falsely portrayed FamilyCare as an "outlier" that was "more concerned with the bottom line and increasing revenues than the health of Oregonians," was designed to harm FamilyCare's business and prevent it from successfully challenging OHA's unlawful conduct in the setting of Medicaid capitation rates. Finally, in late 2017, OHA succeeded in forcing FamilyCare to exit the Medicaid market and shut down its Medicaid business. OHA knew that there were material errors in the underlying data used to set FamilyCare's 2017 rates and the proposed 2018 rates. OHA also knew that accepting the proposed 2018 rates would cause FamilyCare to sustain additional losses in 2018 that would exceed FamilyCare's available and required reserves. This knowledge notwithstanding, OHA and Pat Allen presented FamilyCare with a take-it-or-leave-it contract with just 24 hours' notice, forcing FamilyCare to reject the full 2018 rate amendment and to agree instead to a one-month rate amendment to allow FamilyCare's members extra time to transition to other CCOs. FamilyCare is filing these claims against OHA to ensure the integrity and transparency of OHA's rate setting processes and to safeguard the stability of Oregon's Medicaid program.

Other unreasonable and biased rate-setting methods used by OHA and Optumas over the past five years include, but are not limited to, the following: (1) base data expense exclusions (*e.g.*, the Clawback for FamilyCare's reimbursement to primary care providers); (2) reclassification of certain medical expenses to administrative expenses and reduction in the administrative expense allowance; (3) application of a regional expense allowance; (4)

PAGE  3-    FIFTH AMENDED COMPLAINT

selectively and inconsistently switching between cost-relativity and risk-scoring methods across different categories; and (5) changing the basis for rate components between statewide data, regional data, and plan-specific data.  OHA has used some or all of these questionable methods to develop 2017 and 2018 rates for FamilyCare that are lower than other CCOs' rates, significantly lower than the other CCO that serves residents in the Tri-County region, and that are insufficient to cover FamilyCare's operating expenses.  OHA and Optumas have created a menu of actuarial levers used to adversely impact FamilyCare.

## JURISDICTION AND VENUE

### 5.

The Court has jurisdiction over FamilyCare's claim for violations of civil rights under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331, as this matter arises under the Constitution and laws of the United States.  The Court has supplemental jurisdiction over FamilyCare's state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy.  The Court has personal jurisdiction over the Defendants because they reside within and/or have sufficient contacts with the state of Oregon and, in the case of Defendant OHA, has consented to the Court's jurisdiction by removing this case from Oregon state court to this Court. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because all Defendants are residents of the State in which the District is located and a substantial part of the events or omissions giving rise to FamilyCare's claims occurred in this District.

## GENERAL ALLEGATIONS

**I.     OHA is the public agency that administers Oregon's Medicaid program and pays capitation rates to FamilyCare for providing critically important managed and coordinated care to Oregonians.**

### 6.

The Social Security Amendments of 1965 created Medicaid, a joint federal and state program that, together with the Children's Health Insurance Program ("CHIP"), supplies federal funds to states that agree to maintain a medical assistance program for the benefit of elderly,

PAGE  4-      FIFTH AMENDED COMPLAINT

152090837.5

blind, or permanently disabled individuals and for the benefit of families with dependent children.  The United States Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS") is the federal agency through which funds are provided to the states that participate in the Medicaid program.  Once a state chooses to join the Medicaid program, it must follow the federal government's statutory and regulatory requirements to receive federal funds.

## 7.

The Patient Protection and Affordable Care Act of 2010 (Pub L 111-148) and the Health Care and Education Reconciliation Act of 2010 (Pub L 111-152) (together, the "Affordable Care Act" or "ACA") expanded the Medicaid program to include additional low-income individuals and their families ("Medicaid Expansion").  The Supreme Court's ruling in *National Federation of Independent Business v. Sebelius*, 132 S Ct 2566 (2012), effectively made Medicaid Expansion a state option.

## 8.

Social Security Act Sections 1115 and 1915 authorize waivers and demonstrations that states can use to test new or existing ways to pay for health services in Medicaid and CHIP.  42 U.S.C. §§ 1315, 1396n.  Primarily through waivers and demonstrations, including the Section 1115 Demonstration Project, Oregon expanded its Medicaid program before the implementation of the ACA.  In 2011, the Oregon Legislature and Governor created CCOs, which are community-based organizations that connect health care providers, community members, and risk-bearing entities.

## 9.

In 2012, CMS approved an amendment and extension of Oregon's Section 1115 Demonstration Project, which was a five-year health system transformation proposal that relied on CCOs to manage the health care of beneficiaries previously covered by Medicaid and those who joined the program under the Medicaid Expansion.  Oregon's waiver was further extended

PAGE  5-    FIFTH AMENDED COMPLAINT

152090837.5

on January 12, 2017, for the period January 12, 2017, through June 30, 2022. CMS granted the extension to "build on Oregon's progress and improve the coordinated care model, maintaining Coordinated Care Organizations' ("CCOs") focus on integration of physical, behavioral, and oral health care through a performance-driven system aimed at improving health outcomes and restraining costs."

**10.**

CCOs contract with OHA to provide managed and coordinated care, including physical, mental, and dental health services, to Medicaid-eligible individuals throughout Oregon. OHA funds the cost of providing these services by making per-member-per-month, or "capitation," payments. The capitation payments are based on rates developed and established by OHA.

**11.**

Because CMS funds a portion of the capitation payments, the payments must comply with federal law and regulations. Under federal law and regulations, OHA's payment rates to the CCOs, including FamilyCare, must be actuarially sound. 42 CFR § 438.4(b).

**12.**

In addition, federal regulations require that all managed care contracts "[c]omply with all applicable Federal and State laws and regulations." 42 CFR § 438.3(f).

**13.**

On information and belief, OHA singularly targeted the elimination of FamilyCare as one of the state's CCOs. FamilyCare was the second largest CCO in Oregon, and yet, in 2015, 2016, and 2017, OHA set FamilyCare's capitation rates lower than the rates of every other CCO. OHA also knew that the proposed 2018 rates would cause FamilyCare to sustain additional losses in 2018 that would put FamilyCare out of business.

PAGE  6-     FIFTH AMENDED COMPLAINT

152090837.5

## II.    OHA's actions towards FamilyCare were in contravention with OHA's goals of improving best practices, transparency, and preventive care for Oregonians.

### 14.

During the relevant time period, OHA represented that Oregon's CCO model includes six key elements: (1) "Best practices to manage and coordinate care"; (2) "Shared responsibility for health"; (3) "Transparency in price and quality"; (4) "Measuring performance"; (5) "Paying for outcomes and health"; and (6) "A sustainable rate of growth."  According to OHA, a best practice for CCOs is to use "[v]alue-based benefit design that create[s] incentives for consumers to use evidence-based services."  With respect to transparency, OHA represented, "Cost and quality data that is readily available, reliable and clear helps patients understand their health plan and provider choices and it helps purchasers make decisions about choosing health plans."  In addition, OHA represented that "[i]ncreased transparency on price and quality can also lead to increased accountability."

### 15.

OHA represented that "[p]aying for better quality care and better health outcomes, rather than just more services, is essential to the model."  Accordingly, OHA represented that Oregon's CCO model focused on "primary care and prevention" to "better manage chronic conditions and keep people healthy and out of the emergency department."  OHA further represented that a "robust primary care system is at the heart of the [CCO] model; primary care payments should support both an effective primary care infrastructure and the provision of high-quality primary and preventive services."

### 16.

OHA released a "groundbreaking study" conducted by Portland State University on the "overall savings to the Oregon health care system through the Patient Centered Primary Care Home (PCPCH) Program."  The study showed that "for every $1 increase in primary care

PAGE  7-    FIFTH AMENDED COMPLAINT

152090837.5

expenditures for this comprehensive model of care, there is an average $13 in savings to the health care system."

**17.**

An additional, innovative feature of Oregon's CCO model is that the CCOs are to be "managed within fixed global budgets." ORS 414.570(1) (formerly ORS 414.620). In fact, one of OHA's contracting criteria for a CCO is the CCO's "demonstrated experience and capacity for . . . [o]perating within a fixed global budget." ORS 414.625(1)(c). OHA encourages and represents to CCOs that it wants CCOs to demonstrate the ability to operate within a global budget in order to promote innovation and cost-minimization. Under the global budget concept, OHA represents that it does not and may not make rate decisions based on a CCO's expenditures in specific categories. OHA's conduct and actions have contradicted this global budget concept in that OHA did not allow certain CCOs, including FamilyCare, to operate within a sustainable fixed global budget. Rather, OHA ignored the fixed global budget and penalized CCOs for setting reimbursement rates for health care providers that OHA represents are too high.

**18.**

In addition, OHA misapplied the fixed global budget model by approving global budgets for FamilyCare that were insufficient for FamilyCare to cover its operating costs in 2016, 2017, and 2018. The insufficient global budgets caused FamilyCare to incur operating losses in 2016, 2017, and 2018. OHA approved insufficient global budgets for FamilyCare even though FamilyCare achieved 100% of the quality incentive metrics required under its contract with OHA.

**III.** **In 2015, FamilyCare sought and obtained a temporary injunction against OHA, after which OHA entered into a settlement agreement with FamilyCare.**

**19.**

Between 1985 and early 2018, FamilyCare contracted with OHA, or its predecessor agency, to manage and coordinate health care services to Oregonians enrolled in the OHP. In its

PAGE 8- FIFTH AMENDED COMPLAINT

final years as a CCO, FamilyCare had a five-year contract with OHA that, subject to certain exceptions, could not be amended more than once in each 12-month period.  That contract, as amended and extended (the "Contract") began in 2014 and was initially set to expire at the end of 2018; OHA subsequently extended it through 2019.  Under the Contract, FamilyCare managed and coordinated health care services to OHP members in Oregon's Tri-County area (Multnomah, Washington, and Clackamas Counties) and in certain zip codes in Marion County.

**20.**

On December 24, 2014, OHA presented FamilyCare with a contract amendment containing the capitation rates for 2015 and required FamilyCare to sign the contract amendment with the new rates by January 1, 2015.  The new rates represented a 9.7% decrease in FamilyCare's rates from those paid in 2014. FamilyCare immediately notified OHA that the rates were incorrect.  In April 2015, OHA contracted with an outside actuarial firm, Optumas, to reexamine and redevelop the 2015 capitation rates and to develop capitation rates for 2016.

**21.**

In connection with the dispute over the initial 2015 rates, FamilyCare requested, among other things, the rate review tools and trend models that OHA and its actuary used to develop the 2015 rates.  Contrary to OHA's representation that Oregon's CCO model values transparency, OHA refused to provide the requested information to FamilyCare.

**22.**

On May 27, 2015, in part because the rates were not timely revised or redeveloped, FamilyCare sued OHA, alleging that the 2015 capitation rates were, inadequate and not actuarially sound.

**23.**

After FamilyCare sued OHA, FamilyCare served document requests on OHA for, among other things, the rate review tools and trend models that OHA and its actuary used to develop the 2015 rates, and again, OHA refused to produce the requested documents.

PAGE  9-      FIFTH AMENDED COMPLAINT

152090837.5

**24.**

In August 2015, OHA presented revised 2015 capitation rates that it redeveloped with the assistance of Optumas (the "Redeveloped 2015 Rates"). OHA's and Optumas's Redeveloped 2015 Rates relied on a "regional approach" that purported to "minimize variability within a given region." Although OHA acknowledged that the rate development methodology must comply with CMS regulations, FamilyCare expressed serious concerns to OHA that, among other things: (a) the rate development process presumed that the new region-wide rates were attainable by all CCOs within a region, without regard to individual CCO's reported base data and underlying costs , (b) OHA had not provided a summary of the adjustments it took from the CCO's financial statements to calculate the contributions of the CCO to the regional base data; and (c) OHA had not provided a summary of the Optumas studies used to create the adjustments applied to the regional base data to develop the regional base rates. In addition, FamilyCare expressed concerns to OHA about the underlying data used to set the rates, noting among other things that it was unable to reconcile certain figures provided by OHA regarding enrollment in the Oregon Health Plan with FamilyCare's own enrollment data, which had been shared with OHA. FamilyCare requested from OHA the data necessary to confirm that the methodology underlying the Redeveloped 2015 Rates were actuarially sound. OHA did not provide the data FamilyCare requested.

**25.**

The Redeveloped 2015 Rates further decreased FamilyCare's capitation rates by $54,485,814, which was an additional 10.9% reduction in FamilyCare's capitation rates as compared to 2014. The certification of the Redeveloped 2015 Rates marked a departure from OHA's historical practice of certifying that each CCO's rates were actuarially sound, instead only certifying that the regional rates were actuarially sound.

PAGE  10-    FIFTH AMENDED COMPLAINT

**26.**

FamilyCare refused to sign the contract amendment incorporating the Redeveloped 2015 Rates and, in March 2016, OHA notified FamilyCare that it considered the refusal to do so to be a breach of contract.

**27.**

On March 29, 2016, FamilyCare sued OHA again, seeking a declaratory judgment that: FamilyCare is not contractually bound to sign the amendment with the Redeveloped 2015 Rates; FamilyCare's receipt of capitation payments for 2015 did not place FamilyCare in default under any contract; and OHA may not terminate FamilyCare's contract for the provision of CCO services.

**28.**

On April 6, 2016, OHA notified FamilyCare of its intent to terminate FamilyCare's contract and thereafter instituted administrative proceedings to do so. On May 12, 2016, the state court issued an Amended Temporary Restraining Order to enjoin OHA from terminating FamilyCare's contract until the court could resolve FamilyCare's motion for preliminary injunction and OHA's motion to dismiss its complaint for declaratory relief.

**29.**

To resolve these pending lawsuits, the parties entered into a settlement agreement effective as of May 22, 2016 (the "Settlement Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit 1.

**30.**

Under the Settlement Agreement, FamilyCare agreed to sign the amendment with the Redeveloped 2015 Rates, which, as noted, represented a $54,485,814 reduction from the capitation payments that FamilyCare received under the original 2015 rates. In exchange for FamilyCare's approval of the Redeveloped 2015 Rates, OHA agreed to reduce FamilyCare's

PAGE  11-     FIFTH AMENDED COMPLAINT

152090837.5

overpayment liability for 2015 by $24.8 million (the "Settlement Credit"). After the effective date of the Settlement Agreement, FamilyCare paid OHA $29,685,814.

**31.**

The Settlement Agreement provides that, other "than application of the terms of the Section 1115 Demonstration Project to aggregate state expenditures, OHA shall not use rates paid to FamilyCare under the Contract for 2016 or the Settlement Credit as a basis for limiting the amount that can be paid to FamilyCare in future rate years."

**32.**

The Settlement Agreement states:

> "It is OHA's goal that all CCOs have confidence in the rate-setting process. To achieve that goal, OHA agrees to establish a process for CCOs to request a verification from an Independent Consulting Actuary, with reasonable limits on the scope and timeline for requests for verification."

Despite OHA's promise to establish an independent rate verification process, OHA never followed through on this commitment.

**IV.    OHA presented FamilyCare with an incomplete copy of the 2017 contract amendment and, despite OHA's purported commitment to transparency, refused to provide data to FamilyCare sufficient to ensure the rates are actuarially sound.**

**33.**

On or about October 11, 2016, OHA released the 2017 capitation rates for Oregon's CCOs. Like the rates released for the prior two rate years, FamilyCare's 2017 rates were, on average, the lowest of those offered to all CCOs. Because these rates failed to cover FamilyCare's reasonable cost of providing services under its contract with OHA, they would cause FamilyCare to sustain significant operating losses in 2017. In connection with this release, OHA made available the CCO Rate Development Actuarial Certification (the "Certification") that was prepared by OHA's outside actuarial firm, Optumas. The Certification states that "OHA asked Optumas to explore the drivers for CCOs that experienced significant increases" in per-member, per-month costs.

PAGE   12-     FIFTH AMENDED COMPLAINT

152090837.5

**34.**

Before releasing the 2017 rates, OHA stated that it would issue the contract amendment for 2017 concurrently with the rates.  That statement turned out to be false.  OHA did not concurrently issue the contract amendment for 2017 with the 2017 rates.  On or about November 1, 2016, OHA sent FamilyCare an incomplete contract amendment for 2017.  The contract amendment for 2017 omitted several attachments.

**35.**

During this time, FamilyCare requested that OHA act upon its promise of transparency, both to the public and under the Settlement Agreement.  Concerned that the rates being offered would be inadequate to cover its reasonable costs, FamilyCare requested data sufficient to validate that the rates developed by OHA and its actuary were supportable and otherwise actuarially sound.  OHA's silence in response to these requests was deafening.

**36.**

On or around August 23, 2016, CMS addressed a similar request for documents involving a Freedom of Information Act ("FOIA") request for information relating to all Medicare Advantage organizations in an unrelated matter.  CMS sought input from the managed care organizations ("MCOs"), asking for a robust explanation if they believed certain data should not be disclosed to the requestor under a FOIA exemption.  CMS directed that "**Generalized, conclusory claims of competitive harm are <u>not</u> a sufficient basis for us to invoke the Exemption**." (Emphases in original.)  CMS instructed MCOs that, if they chose to assert that any requested information should be withheld, they must, among other things: (1) Identify such information "clearly and specifically"; (2) Provide written comments and evidence showing that the designated information "constitutes commercial or financial information" protected by the exemption and that "disclosure of such information is likely to cause your organization substantial competitive harm"; (3) "Explicitly state the specific, reasonably foreseeable, substantial competitive harm that is likely to flow by releasing such information"; and

152090837.5

(4) "Explain, in detail, any specific harm that will flow from the affirmative use of particular information by your competitors." .

**V.    Despite its promise to Family Care to pursue an alternate dispute resolution ("ADR"), OHA failed to do so, while requiring FamilyCare to sign an incomplete version of the 2017 Amendment.**

**37.**

OHA required that FamilyCare sign the incomplete version of the 2017 Amendment before January 1, 2017.  The 2017 Amendment was to be calculated by OHA, per the parties' Settlement Agreement, without using "the Contract for 2016 or Settlement Credit" as a basis for calculating FamilyCare's capitation rate in future years.  Federal law also required that the 2017 Amendment be actuarially sound, that is, the projected capitation rates and other revenue sources provide for all reasonable, appropriate, and attainable costs.  OHA gave FamilyCare insufficient data or other factual basis to conclude that the 2017 Amendment was developed consistent with the parties' Settlement Agreement or federal law.

**38.**

To avoid immediately addressing the 2017 rate inadequacies and the incomplete version of the 2017 Amendment that was presented, OHA and FamilyCare entered into a Dispute Resolution Agreement on December 30, 2016.  In the Dispute Resolution Agreement, FamilyCare agreed to "sign the 2017 Amendment before December 31, 2016, but that by so signing, FamilyCare will not waive any rights to contest—or any grounds for contesting—the 2017 rates."  In exchange, FamilyCare agreed to delay filing any lawsuit against OHA, disclose to OHA what FamilyCare believed its claims were, and cooperatively work to resolve the dispute between the parties.

**39.**

On December 30, 2016, although FamilyCare notified OHA that FamilyCare still did not have a full contract to review, and in reliance on the representations made by OHA and consistent with the Dispute Resolution Agreement contract, FamilyCare signed an incomplete

PAGE   14-     FIFTH AMENDED COMPLAINT

152090837.5

version of the 2017 Amendment and transmitted the contract to OHA.  That same day, OHA returned to FamilyCare a "fully Executed 2017 contract," with this version containing "[t]he Exhibit K Attachment 1, Transformation Plan."  OHA claimed that this had been "omitted from the CCO's contract in error."

**40.**

OHA baited FamilyCare into signing and executing an incomplete 2017 Agreement on December 30, 2016, with an empty promise that OHA would provide FamilyCare with the data it had been requesting for months.  OHA's actions were in contravention of OHA's statutory and contractual requirement to provide FamilyCare with a complete contract in advance of FamilyCare signing the contract.  OHA then signed and executed the incomplete 2017 Amendment, inserting afterwards the missing portions of the 2017 Amendment.  On information and belief, OHA withheld certain attachments to FamilyCare's contract amendment for 2017 so that FamilyCare would be forced to sign the contract amendment without having a meaningful opportunity to negotiate contract terms.

**41.**

Under the terms of the Dispute Resolution Agreement, OHA agreed that the "parties intend to conduct free and open discussion between them regarding the appropriate application of actuarial rates including such issues as appropriateness of the methodology, whether geographic areas come in to play with respect to methodology, the actuarial soundness of the rates, an explanation by OHA as to why OHA believes the rates are sound in light of CMS approvals, and any alternative actuarially sound methodology proposed by FamilyCare."  The parties agreed that their actuaries would be present at the meetings, and that they would participate in good faith in at least three substantive discussions.  The parties further negotiated a process by which they could exchange information and provide presentations regarding rate-setting in an attempt to reach agreement on appropriate and agreeable rates as part of the mediation effort.

PAGE   15-    FIFTH AMENDED COMPLAINT

**42.**

The parties' first Dispute Resolution meeting occurred on January 17, 2017.  At that meeting, FamilyCare and its independent actuary explained the data that FamilyCare would need to evaluate the 2017 rates and the process by which they were developed.  OHA presented nothing at the first meeting, nor did it provide any time frame as to when it would respond to FamilyCare's requests.

**43.**

To FamilyCare's extreme disappointment, OHA continued its practice of stonewalling any request for information.  OHA refused to provide FamilyCare with any of the information sought under the Dispute Resolution Agreement, including any explanatory data or justification to support its reduction of $34 million in costs from FamilyCare's base data, which resulted in lower capitation rates for FamilyCare in 2017.  OHA also refused to honor its promises under the Dispute Resolution Agreement to work cooperatively toward an agreement for confidential information, to explain to FamilyCare why it believed its rate development process was actuarially sound, or to participate in substantive meetings to further the Dispute Resolution Process.

**VI.    OHA used the Dispute Resolution Process to further its secretive smear campaign against FamilyCare.**

**44.**

Documents released by OHA in response to a public records request reveal why OHA did not work cooperatively and in good faith towards a resolution of the dispute between the parties as it had promised:  OHA was using the dispute resolution process as a delay tactic while it formulated a public relations campaign to disparage and smear FamilyCare, and it used the process as a cover to obtain information from FamilyCare to use in that campaign.  As set forth in detail below, OHA began creating its so-called "communications plan" almost immediately after signing the Dispute Resolution Agreement, and it continued to develop the plan throughout

PAGE   16-    FIFTH AMENDED COMPLAINT

the time it had promised FamilyCare that it would engage in the dispute resolution process. Moreover, OHA inappropriately used materials it had requested from FamilyCare—and FamilyCare had shared in the good-faith belief that doing so would help facilitate resolution— for use in crafting its communications plan.

**45.**

During the negotiation of the Dispute Resolution Agreement, OHA insisted on removing a provision from that agreement that would have prevented the parties from communicating with third parties or the media about the dispute resolution process. The reason, unbeknownst to FamilyCare at the time, was that OHA intended to use the media during the dispute resolution process. At 10:16 A.M. on January 3, 2016, the morning of the first business day after FamilyCare and OHA executed the Dispute Resolution Agreement without that provision, OHA director Lynne Saxton directed the Director of OHA's External Relations Division, BethAnne Darby, to develop a "communications plan for the dispute resolution process." Over the next week, OHA personnel compiled the communications plan it had created in 2016 and related materials for use in developing the new plan. Ms. Darby delegated the task of drafting the communications plan to Courtney Crowell, telling her, "We will want to create a comms plan for Lynne [Saxton] as soon as possible."

**46.**

At the January 17, 2017 OHA-FamilyCare meeting, FamilyCare appeared with its CEO and COO, its actuary, and its counsel. OHA appeared with counsel from the Oregon Department of Justice, an actuary from Optumas, and Mark Fairbanks of the OHA. The meeting began at 9:00 A.M. at the offices of FamilyCare's counsel. FamilyCare's counsel presented a PowerPoint presentation, outlining in detail the scope of FamilyCare's concerns, the scope of what it felt were inappropriate actuarial applications to FamilyCare, and questions FamilyCare had with the rate-setting process. The presentation also identified data FamilyCare's actuary needed to fully evaluate the process. FamilyCare coordinated its presentation with comments and explanations

PAGE  17-    FIFTH AMENDED COMPLAINT

from its actuary.  The Oregon Department of Justice lawyers, acting as counsel for OHA, requested that FamilyCare provide it with an electronic copy of the PowerPoint presentation. FamilyCare had invested significant time and effort in creating that slide deck, and it contained sensitive information intended to fulfill its obligations under the Dispute Resolution Agreement and to provide OHA with a detailed list of questions its actuary had regarding OHA's rate-setting process.  Nevertheless, in the spirit of good faith, and in the belief that providing OHA with the slide deck would help facilitate resolution of the dispute—and that OHA was requesting the slide deck in good faith to use in furtherance of the goals of the Dispute Resolution Agreement— FamilyCare agreed.  At precisely 9:46 A.M., while the parties were meeting, FamilyCare emailed an electronic version of the presentation to counsel for OHA.  FamilyCare continued with its presentation, soliciting comments from FamilyCare's actuary to more precisely address the questions FamilyCare was concerned about.  At the conclusion of the presentation, while the parties were still engaged in what was supposed to be a three-hour meeting, OHA representatives asked for time to consider the information presented before responding.  FamilyCare provided a private room for OHA representatives to use.  After spending more than one hour in that room, OHA representatives returned to the meeting room at approximately 11:25 A.M., only to tell FamilyCare that they were not prepared to respond to any of the issues FamilyCare had and that they were leaving.  At no time during the meeting did OHA's actuary volunteer information or answer a question.

**47.**

On information and belief, OHA representatives used the time they spent in the private room to discuss how to use FamilyCare's transparency and good faith to OHA's advantage in crafting its communications plan, rather than to analyze how to advance the goals of or fulfill the promises made under the Dispute Resolution Agreement.  Unbeknownst to FamilyCare, and without notifying FamilyCare, before leaving the dispute resolution meeting, OHA representatives forwarded FamilyCare's slide deck to individuals at OHA who were not present

PAGE   18-    FIFTH AMENDED COMPLAINT

152090837.5

at that meeting.  In fact, before OHA representatives returned to the meeting room, Ms. Saxton had received a copy of the slide deck and, at 11:23 A.M., forwarded it to Ms. Darby, telling her that it "will be helpful to us in developing our communication strategy."  Ms. Darby, in turn, forwarded the slide deck to Ms. Crowell, the individual she had tasked with creating the communications plan.

**48.**

As OHA drafted its communications plan, it took care to make sure to use FamilyCare's slide deck to its advantage and to synchronize its messaging with the dispute resolution process. At 2:54 P.M. on January 20, 2017, Ms. Crowell provided Ms. Darby with "a first draft of the FamilyCare communications plan."  Later that day, apparently dissatisfied that the first draft did not rely heavily enough on FamilyCare's slide deck, Ms. Darby directed Ms. Crowell's attention back to the slide deck as a source of information about FamilyCare's strategy and "themes" that she wanted to counter.  Ms. Darby also asked OHA counsel for information about the timing of the dispute resolution process to "help us plan our communications."

**49.**

At 10:40 A.M. on January 26, 2017, Ms. Crowell sent Ms. Darby an updated draft of the communications plan.  Twenty-three minutes later, Ms. Darby forwarded the draft to Ms. Saxton and told her that Ms. Crowell "use[d] the slides that [FamilyCare] presented at the last session" and that Ms. Darby had conferred with, among others, OHA's finance director in building out the communications plan.  All at this activity was done with the full awareness, approval, and encouragement of the top OHA official, Lynne Saxton, contrary to what she later stated in her letter of apology.  This activity described above took place before any litigation was filed and during the period in which OHA had promised to participate in good faith pursuant to the terms of the Dispute Resolution Agreement.

PAGE   19-    FIFTH AMENDED COMPLAINT

**50.**

Meanwhile, as set forth above, FamilyCare continued to try to engage OHA in further meetings pursuant to the Dispute Resolution Agreement and to get OHA to fulfill its promises, including the promise to give a presentation about its rate-setting process and to provide information that FamilyCare's actuary had identified as necessary to his analysis. All the while, FamilyCare was completely unaware of what OHA was doing behind the scenes. OHA never substantively engaged in the dispute resolution process, never delivered the promised presentation to FamilyCare, and never produced the promised information.

**51.**

OHA did, however, ask FamilyCare to narrow and provide more specificity regarding its requests for information and, with respect to the information FamilyCare sought that implicated data submitted by other plans to CCOs in connection with the rate-setting process, to provide exemplars of that information. FamilyCare obliged, sending OHA specific requests along with spreadsheets reflecting sensitive, internal FamilyCare financial data. Without seeking or obtaining permission from FamilyCare, OHA sent those spreadsheets to each of the fifteen other CCOs. Yet even after providing FamilyCare's data, and thereby creating an asymmetry of information among the plans, OHA asserted that similar data from the other CCOs constituted protected trade secrets and refused to provide it to FamilyCare.

**52.**

At 3:19 P.M. on February 18, 2017, Ms. Saxton signaled her approval of the communications plan which had been sent to her on January 26, 2017, telling Ms. Darby that she had reviewed it, and there were some "new developments that I think will build on the already good start you have outlined….Thank you!"

**53.**

The "communications plan" that OHA created during the dispute resolution process was a smear campaign targeting FamilyCare and seeking to undermine it in the eyes of the public and

PAGE  20-    FIFTH AMENDED COMPLAINT

152090837.5

the legislature, all the while hoping to publicly portray a façade of neutrality.  The plan was, in OHA's own words, designed to:

- Portray FamilyCare as an "outlier" that is "more concerned with the bottom line and increasing revenues than the health of Oregonians";

- Use media to "hurt [FamilyCare's] credibility in the news";

- "Highlight FamilyCare as an outlier and only worried about profit margins";

- Promote HealthShare, the other CCO that operates in FamilyCare's service area, "as a truly inclusive CCO that provides greater access to Oregonians with high cost medical needs";

- Use vulnerable Medicaid enrollees as pawns by getting "a few discrete examples of OHP members with high cost medical issues (i.e. HIV) who chose Health Share b/c FamilyCare couldn't provide them with the care they need."

The communications plan also specifies that OHA would carry out the plan in a secretive manner so that OHA could pretend to be neutral.  The plan states that OHA would hide its involvement through "off the record" discussions with news media and by using "legislators and/or other lobbyists to pitch stories to news media if possible so that OHA can staff [sic] neutral."

**54.**

After details of OHA's communications plan became publicly known, Ms. Saxton sent a letter of apology to FamilyCare.  In that letter, dated August 7, 2017, Ms. Saxton acknowledged that "sharing negative information about FamilyCare with media" is "not an acceptable strategy for OHA or any state agency."  But Ms. Saxton sought to downplay the communications plan as a "draft" that was "developed by OHA staff in the heat of ongoing litigation" and "was not implemented or acted on in any way."  In her apology letter, Ms. Saxton did not mention that she had directed the creation of the communications plan, that she had signaled approval of the "draft" as a "good start," that other executive-level OHA personnel were involved in creation of the plan, that the plan was developed during and for the dispute resolution process--not the heat of litigation--or that OHA co-opted materials shared in good faith by FamilyCare during that

PAGE  21-    FIFTH AMENDED COMPLAINT

152090837.5

process for use in developing the plan. The following day, August 8, 2017, Governor Kate Brown announced that Ms. Saxton had tendered her resignation, effective August 31, 2017.

**55.**

Despite Ms. Saxton's claim that the communications plan was not implemented or acted on in any way, OHA did implement its communications plan, at least in part, by, among other things, sending "targeted press releases" to The Portland Business Journal, Willamette Week, Portland Tribune, Oregon Public Broadcasting, the Oregonian and The Lund Report. OHA has also sent personalized emails to journalists and conducted other outreach to further its messaging. And media reported that OHA's position is that FamilyCare "is just trying to pad its profits." Ms. Saxton made statements to the media consistent with the messaging in the communications plan, telling journalists, among other things, that the disagreement between the parties "has been driven by FamilyCare's goal to be paid more Medicaid dollars" and trying to undermine FamilyCare by implying that it is upset simply because "they didn't get the rate they wanted for 2017." Additionally, OHA also published reports, including the January 2017 publication of "Oregon's Health System Transformation Quarterly Legislative Report" containing financial comparisons that portrayed FamilyCare as an "outlier." Documents obtained as part of the recently released communications plan show that OHA was aware that the financial information presented was not comparable and that OHA chose to present the financial comparisons in a way that would fulfill its communications plan to portray FamilyCare as an "outlier" that is "more concerned with the bottom line and increasing revenues than the health of Oregonians." OHA also issued a press release dated April 11, 2017, regarding the motion to dismiss it filed in this lawsuit, implying that FamilyCare's business decisions—not the low rates from OHA—were to blame for any financial difficulties FamilyCare was having and that FamilyCare's focus was not on the health and care of OHA members. That press release, which is no longer available on OHA's website, is a continuation of the communications plan discussed above.

PAGE  22-    FIFTH AMENDED COMPLAINT

**56.**

Despite the misstatements in Ms. Saxton's apology, Governor Brown's spokesman told the media that Ms. Saxton had "taken full responsibility for" the communications plan. The spokesman confirmed that Ms. Saxton resigned "as a consequence of" the communications plan. Media reports about a letter from Ms. Saxton to OHA employees stating that "staff" made mistakes "when they were thinking out loud in the midst of an adversarial litigation process" show that she continued to misrepresent the circumstances of the communications plan.

**VIII.  OHA and Patrick Allen presented and proposed a 2018 contract amendment with biased, inaccurate, and actuarially unsound rates, and demanded that FamilyCare sign it without notice of the amount of compensation FamilyCare would be entitled to under the contract.**

**57.**

On September 1, 2017, following Ms. Saxton's resignation at Governor Brown's request, Patrick Allen assumed leadership of OHA as its new interim director. By the time that Mr. Allen took up this position, the process of setting the 2018 rates was well underway, and already, problems were once again evident. Based on preliminary figures and analysis provided by OHA, FamilyCare believed that the 2018 rates reflected many of the same data errors and biased methodology as prior rate years, and that, as a result, they may be insufficient to cover FamilyCare's reasonable, appropriate and attainable costs of providing the medical care required under the terms of its contract with OHA. As it had in prior years, FamilyCare was diligent in providing information to OHA about its concerns with the soundness of the 2018 rates and OHA's methodology for arriving at those rates.

**58.**

On October 10, 2017, responding to ongoing questions about the soundness of its rate-setting methodology, OHA announced that it was "temporarily pausing the 2018 rate development process" to conduct an actuarial and regulatory review of the 2018 rate

152090837.5

development methodology.  On October 31, 2017, OHA announced that it had selected actuarial firm Lewis & Ellis to perform the actuarial review, and the law firm Manatt, Phelps, & Phillips LLP to perform the regulatory review by comparing the 2018 rate development methodology against CMS regulations and Oregon's 1115 waiver to validate compliance.  The statement of work for the actuarial review stated that "a review of and opinion with respect to OHA's policy decisions to truncate base data and review administrative costs or opportunities to improve efficiency is not within the scope of the engagement."

**59.**

On or around October 31, 2017, OHA sent FamilyCare a draft of the proposed contract amendment for 2018.  OHA explained that the rates in the draft contract amendment "may change based on the outcome of the pending independent reviews and redetermination analysis."

**60.**

OHA's method for calculating the 2018 rates violates the Settlement Agreement. The Settlement Agreement provides that "OHA shall not use rates paid to FamilyCare under the Contract for 2016 or the Settlement Credit as a basis for limiting the amount that can be paid to FamilyCare in future rate years." Nevertheless, on information and belief OHA considered the Settlement Credit and used it as a factor in setting the 2018 rates.

**61.**

The 2018 rates offered to FamilyCare were $95 million lower than FamilyCare's projected costs. After operating at a loss for 2016 and 2017 because the rates OHA set for those years did not cover FamilyCare's costs, accepting OHA's 2018 rates would have eroded FamilyCare's reserves by August 2018 and would have forced FamilyCare out of the Medicaid market.

**62.**

On December 4, 2017, OHA released the reports from actuarial and regulatory review conducted by Lewis & Ellis and Manatt, Phelps, & Phillips.  Based on the information provided

PAGE  24-    FIFTH AMENDED COMPLAINT

152090837.5

by OHA and Optumas, Lewis & Ellis concluded that Optumas appeared to have followed generally accepted actuarial principles in the development of the rates, but clarified that "L&E did not audit [raw claim] data but relied on OHA and Optumas to provide accurate base data for the[] CCOs."  Moreover, Lewis & Ellis recommended that Optumas "strengthen the documentation and communication regarding changes made to the base data because inconsistencies appear and lack of detail calls into question the methodologies employed by Optumas."

## 63.

On December 4, 2017, OHA announced its proposed approach to implementing the recommendations of the completed reviews and finalizing the 2018 rates.  OHA proposed no change to the 2018 rates, but indicated that it would work with Optumas to prepare an addendum to the rate certification to address provider reimbursement analysis, analysis of the rate cell outlier identified in the independent actuarial review, the use of medical loss ratios, and the development of non-medical loads.  OHA further noted "the need to analyze the impact of the recently completed redetermination clean-up work on 2018 CCO rates."  OHA indicated that it planned "to work with Optumas to analyze this impact, along with any other emerging issues that may materially affect rates, to determine if a prospective amendment to the rates is necessary."

## 64.

In addition to its concerns with the soundness of OHA's rate-setting methodology, FamilyCare had also identified errors in the data used to develop its capitation rates.  The rates presented to FamilyCare for 2018 appeared, like the rates offered for prior years, to be riddled with errors that materially impacted what would be paid to FamilyCare and other CCOs.  Among other issues, FamilyCare pointed out—as it had in years and months past—that basic errors in enrollment and eligibility data caused many FamilyCare members to be classified in the wrong age or category of aid cohort for purposes of determining the capitation rate at which FamilyCare was compensated for those members.  Due to the particular mix of members enrolled in

PAGE  25-    FIFTH AMENDED COMPLAINT

FamilyCare's plan, these data and methodology errors—which impacted certain categories of Oregon Health Plan members more than others—had a disproportionate impact on FamilyCare in reducing the amount paid to it under its contract with OHA.  Throughout December 2017, FamilyCare continued to request clarification from OHA on this issue and discuss its concerns related to the 2018 rates and the data used to calculate those rates.

**65.**

That OHA's management of the data it relied on to set its capitation rates, and of enrollment data in particular, was plagued with errors was publicly confirmed by the Oregon Secretary of State on November 29, 2017, with the release of the Secretary's formal audit report on improper Medicaid payments made by OHA.  In this report, the Secretary of State's auditors concluded that due to systemic problems in OHA's system of tracking eligibility and enrollment data for Oregon Health Plan members,  OHA had spent "millions of dollars of avoidable Medicaid expenditures," noting that this "critical issue" had not been publicly disclosed until it was raised in May 2017 by an Auditor Alert by the Secretary of State.  FamilyCare had previously identified these same errors and brought them to OHA's attention years before the Secretary of State's audit, but OHA had declined to address them and failed to notify CMS of these issues.

**66.**

On December 8, 2017, OHA agreed that the data errors identified by FamilyCare necessitated a redetermination analysis that would materially affect FamilyCare's compensation under the 2018 Amendment.  Although FamilyCare had repeatedly alerted OHA to these errors for several years and requested a prompt assessment of the impact of the errors on the 2018 rates, OHA committed to give FamilyCare only a "preliminary analysis" of the necessary redetermination no earlier than December 29, 2017—the last business day of the year and the last day to sign the 2018 Amendment—in order to permit FamilyCare to determine whether the adjusted 2018 rates, based on this re-determination, would allow FamilyCare to sign the 2018

PAGE  26-     FIFTH AMENDED COMPLAINT

rate amendment and continue providing services to Medicaid patients throughout the full term of FamilyCare's five year contract with OHA.

**67.**

In a good faith effort to aid OHA in determining the impact of these data errors on CCO capitation rates, both historically and in 2018, and in an attempt to reach a resolution of these issues in a way that would permit FamilyCare to sign the full 2018 rate amendment and continue serving Oregon's Medicaid population into the future, FamilyCare provided detailed information and analysis to OHA regarding how the correction of these errors could impact its rates. In addition, FamilyCare provided OHA with detailed information on its finances and estimated premium deficiency for 2018, as well as information regarding what additional compensation FamilyCare would require and how it might be provided. In sharing this information with OHA, FamilyCare reasonably believed that Mr. Allen and OHA would work with FamilyCare to arrive at a mutually acceptable resolution that would result in both appropriate, unbiased, sound rates and permit FamilyCare to continue to operate, thereby avoiding unnecessary disruption to Oregon's Medicaid system and the vulnerable Oregonians it serves. Upon information and belief, rather than using the information provided by FamilyCare to aid in arriving at a mutually acceptable solution to the problems with the 2018 rate amendment, Mr. Allen and OHA used that information to aid in their policy decision and plan to put FamilyCare out of business.

**68.**

Following FamilyCare's data sharing with OHA, OHA's dialogue with FamilyCare about resolving the data errors that had impacted its rates came to an abrupt end. Instead, on December 20, 2017, Mr. Allen gave FamilyCare an ultimatum. Mr. Allen demanded that FamilyCare decide within 24 hours whether to sign the 2018 rate amendment, as is, despite OHA's acknowledgement on December 8, 2017 that data errors identified by FamilyCare necessitated a redetermination analysis that would materially affect FamilyCare's compensation under the 2018 Amendment. In requiring FamilyCare to accept or reject the 2018 Amendment, as is, by

PAGE  27-    FIFTH AMENDED COMPLAINT

December 21, 2017, Mr. Allen moved the deadline for signing that agreement up by ten days. Mr. Allen shorted the deadline and made this demand even though OHA had yet to provide any of the promised analysis on what compensation FamilyCare would receive in 2018 once the data errors were corrected, and despite the fact that under former ORS 414.652 and the Contract, OHA is required to "give a coordinated care organization at least 60 days' advance notice of any amendments the authority proposes to existing contracts between the authority and the coordinated care organization, or to contracts to be renewed, including the global budget paid to the coordinated care organization under the contract."

### 69.

In response to Mr. Allen's demand and new deadline, FamilyCare asked whether, in light of this change, OHA would provide the promised rate re-determination analysis earlier in order to allow FamilyCare to review that information prior to deciding whether to accept or reject the 2018 Amendment. Mr. Allen responded that OHA would not be providing any further information prior to this new signing deadline of December 21, and stated that OHA was no longer contingency planning for a *potential* transition of FamilyCare out of Oregon's Medicaid managed care marketplace, but that it was in fact implementing a transition plan to move FamilyCare's members to other CCOs.

### 70.

Faced with actuarially unsound and otherwise improper and incomplete rates that would cause FamilyCare to run a deficit in 2018 exceeding the amount of its available reserves, and lacking any information from OHA about what compensation FamilyCare would actually receive in 2018 upon the correction of acknowledged data errors impacting CCO capitation rates, FamilyCare was unable to sign the 2018 Amendment on December 21, 2017, as demanded 24 hours earlier by Mr. Allen.

PAGE  28-    FIFTH AMENDED COMPLAINT

152090837.5

**71.**

Instead, on December 22, 2017, FamilyCare and OHA entered into a shortened one-month 2018 rate amendment to allow FamilyCare to continue serving its Medicaid members during January 2018 so that those members had more time to transition from FamilyCare to other CCOs. On the same date, FamilyCare and OHA entered into a personal services contract to assist with the transition.

**72.**

On December 29, 2017 at 4:55 p.m., with five minutes left in the last business day of the year, OHA emailed FamilyCare confirming the agency's rate setting process had indeed been materially impacted by previously acknowledged data errors, which FamilyCare had been raising for years.  OHA's email included a "Preliminary Redetermination Analysis" of the impact of these errors on the 2018 rates.  However, although OHA's "Analysis" provided some additional detail on the scope of these errors' impact, OHA still failed to provide an estimate of what FamilyCare's rates would be under the 2018 rate amendment, stating merely that this preliminary review "indicate[d] a potential impact of 0-5% on 2018 Tri-County rates."  In other words, OHA stated that FamilyCare's compensation under the 2018 rate amendment, had it been able to sign that agreement for its full term, could have increased by tens of millions of dollars, or not at all.  OHA's "Analysis" provided nothing in the way of information about the impact of these errors on capitation rates paid to CCOs for work performed in 2017 and other prior rate years.

**73.**

On January 1, 2018, pursuant to its agreement with OHA, FamilyCare began the process of shutting down its Medicaid business.  In the course of doing so, it was forced to lay off over 330 employees and transition its 115,000 FamilyCare members to other CCOs, primarily Health Share of Oregon.

152090837.5

**74.**

FamilyCare's forced shut down of its Medicaid business has also had a detrimental impact on the providers with whom it contracted and the Medicaid patients it served.  As a result of FamilyCare's exit from the Medicaid market, primary care and mental health providers throughout the Tri-County region were forced to turn away Medicaid patients or close their doors altogether.

**75.**

On January 23, 2018, less than a month after OHA forced FamilyCare to accept or reject the full 2018 rate amendment without knowing the rates it would actually receive under that amendment, and after FamilyCare was as a result forced from the Medicaid market, OHA issued a "CY18 Rate Update" stating that the agency had made a "policy decision" to update the 2018 rates to address the data errors that it had previously recognized, retroactively effective from January 1, 2018.  Although this Rate Update did not address all of the other data and methodology problems affecting the 2018 rates that FamilyCare had identified, it did result in a material impact on the rates to be paid under the 2018 rate Amendment.  The Rate Update stated that as a result of OHA's proposed rate "redetermination", the capitation rates paid to CCOs under the 2018 rate amendment would increase by roughly 2-3%.  For FamilyCare, the rate increase was higher, demonstrating that that the errors OHA belatedly fixed had a disproportionate negative affect on FamilyCare, and this change in its rates would have resulted in an increase of no less than $20 million in additional compensation under the contract had FamilyCare continued to provide Medicaid services to Oregon Health Plan members throughout 2018.  OHA stated falsely in materials provided to CCOs on January 24, 2018 regarding the "redetermination" that the agency was only "made aware of" the underlying data error that had resulted in the need to correct the 2018 rates in "late in 2017."  In fact, FamilyCare had been informing OHA about these data errors for years, and OHA's internal communications show that it was in fact aware of these errors and had been for years.

PAGE  30-    FIFTH AMENDED COMPLAINT

**76.**

The enrollment and eligibility errors admitted by OHA and corrected in the January 23, 2018 "policy decision" also infected OHA's capitation rates for 2015, 2016 and 2017. As a result of these errors, FamilyCare was underpaid for the services it provided for those years pursuant to its contract with OHA. Were OHA to correct these known errors for these prior rate years, it would generate tens of millions of dollars in additional compensation to FamilyCare for services previously rendered during those years. To date, OHA continues to be silent as to the impact of these data errors on past rates and what compensation it will provide to FamilyCare and other CCOs who were underpaid as a result.

**77.**

Had FamilyCare been afforded access to full and complete information about what its rates would actually be under the 2018 rate amendment and what was owed to it for services previously rendered under past amendments, FamilyCare would have reconsidered whether to sign the 2018 rate amendment, permitting it to continue to serve Oregon's Medicaid population throughout 2018 and beyond. Instead, because of OHA and Director Allen's conduct in requiring FamilyCare to accept or reject the full 2018 rate amendment by December 21, 2017, with just 24 hours' notice and without sufficient information about what its capitation rates would actually be in 2018, FamilyCare's leadership and board of directors were deprived of the opportunity to make a fully-informed judgment in determining whether FamilyCare should sign the full 2018 rate amendment and thereby continue to operate its Medicaid line of business. Faced on December 20, 2017 with a contract amendment to which it could not legally agree, FamilyCare was forced to reject the full 2018 rate amendment, agreeing instead to a one-month agreement in order to permit the orderly transfer of its members to other CCOs. As a result of these actions by Mr. Allen and OHA, FamilyCare began shutting down its Medicaid business, laying off hundreds of employees, terminating numerous agreements with contractors and

PAGE 31-    FIFTH AMENDED COMPLAINT

providers, and transferring all of its members to other CCOs. As a consequence, FamilyCare has suffered a near-total loss of its enterprise value.

**78.**

Shortly after OHA forced FamilyCare from the market, and continuing through rate-setting in 2019 and subsequent years, OHA revised the rate-setting process to address many of the issues previously raised by FamilyCare. These changes would have resulted in disproportionately large increases in FamilyCare's rates had FamilyCare not been forced to shut down in January 2018 and would have enabled FamilyCare to remain in business for additional years.

**FIRST CLAIM FOR RELIEF**

**(Lynne Saxton)**

**(Deprivation of Civil Rights)**

**79.**

FamilyCare incorporates by reference all of the foregoing allegations.

**80.**

The First Amendment to the United States Constitution guarantees FamilyCare's right to comment on the actions of government officials, to petition the government for redress of grievances, and to access the courts.

**81.**

FamilyCare has exercised its First Amendment rights by, among other things, requesting information necessary to evaluate the OHA's rate-setting decisions; notifying Defendants that the rates were incorrect and unsound and identifying errors in the data and methodology used to set the rates for FamilyCare and other CCOs; requesting that Defendants correct those errors and redress the harm they caused; communicating with the Oregon legislature, the media, and CMS about Oregon's Health Program; proposing policy changes to increase transparency and improve the overall system; raising concerns about OHA's compliance with state and federal law, its

PAGE  32-    FIFTH AMENDED COMPLAINT

152090837.5

misuse of taxpayer funds, and procedural and systemic irregularities in the administration of the agency; refusing to sign contract amendments with erroneous and unsound rates; and filing lawsuits against Defendants, including this suit.

**82.**

Acting under color of state law, Defendant Saxton retaliated against FamilyCare for FamilyCare's exercise of its First Amendment rights by, among other things, setting rates that were unreasonable, biased, actuarially unsound, and based on erroneous data and methodology; refusing to correct known errors in data and methodology, developing and implementing a smear campaign against FamilyCare, refusing to grant FamilyCare the procedural protections guaranteed by law, and implementing a policy decision and plan to put FamilyCare out of business. FamilyCare's protected expression was a substantial or motivating factor in Defendant Saxton's decision to act as she did.

**83.**

As a result of Defendant Saxton's retaliation against FamilyCare's exercise of its First Amendment rights, FamilyCare has suffered an indivisible injury through the loss of its Medicaid business and tangible and intangible assets, including its relationships with providers and employees, and its goodwill.

**84.**

The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Corporations are "persons" within the meaning of this provision.

**85.**

Under Oregon law, businesses have a property interest in their "goodwill." That term is defined to include: "favor or advantage in the way of custom that a business has acquired beyond the mere value of what it sells whether due to the personality of those conducting it, the nature of

PAGE  33-    FIFTH AMENDED COMPLAINT

its location, its reputation for skill or promptitude or any other circumstance incidental to the business and tending to make it permanent."

**86.**

At all times relevant to this complaint, FamilyCare enjoyed substantial goodwill among members and providers. This goodwill was the product of, among other things, FamilyCare's commitment to providing high-quality, low-cost preventive care with reasonable reimbursement for providers.

**87.**

As a Coordinated Care Organization and signee of the 2015 contract with OHA, FamilyCare also has a legitimate claim of entitlement to, and thus a property interest in, unbiased, actuarially sound capitation rates for the 2018 year.

**88.**

Defendant Saxton's conduct violates 42 U.S.C. § 1983.

**89.**

FamilyCare is entitled to damages from Defendant Saxton for injury resulting from the deprivation of rights secured by the Constitution, in an amount to be proven at trial, not less than $125,000,000.

**SECOND CLAIM FOR RELIEF**

**(Breach of Settlement Agreement—Damages)**

**90.**

FamilyCare incorporates by references all of the foregoing allegations.

**91.**

The Settlement Agreement between FamilyCare and OHA is valid and binding.

**92.**

After FamilyCare and OHA entered into the Settlement Agreement, OHA represented to FamilyCare that it had made a policy decision to reduce OHA's payments to FamilyCare because

PAGE  34-    FIFTH AMENDED COMPLAINT

of the amount that FamilyCare pays to primary care providers for preventive care services. OHA represented to FamilyCare that it had made a policy decision to limit the increase of primary care payments to 1.5% per year. FamilyCare requested a copy of the formal policy decision, and OHA responded that it would "work something up."

**93.**

Beginning in November 2014, FamilyCare began reimbursing certain primary care providers at a $65 per unit conversion factor. FamilyCare was very transparent and upfront with OHA about the increase in reimbursements to primary care providers, as FamilyCare had been evaluating its reimbursement to primary care providers and adjusting the unit conversion factor since 2014. FamilyCare submitted this information to OHA in its cost templates that were part of the rate setting process. FamilyCare increased its payments to primary care providers to match the amount that private insurance companies paid to primary care providers to ensure that its Medicaid-eligible OHP members, including the tens of thousands of new individuals added in Medicaid expansion, would have the same access to primary and preventive care that members of private health insurance plans have. This increased access to primary care results in improved outcomes and reduced health care expenses overall.

**94.**

Equal access to primary care providers was, and is, essential to achieving better health outcomes for OHP members. Primary care providers are less willing to see OHP members when the members' managed care organizations, including CCOs, pay less than private insurance plans pay for preventive care services. Moreover, increased preventive care services has been a focus of Oregon's CCO model and is in line with OHA's represented philosophy that "primary care and prevention" allow health plans and providers "to better manage chronic conditions and keep people healthy and out of the emergency department." The study by Portland State University bears this out. For every $1 increase spent on primary and preventive care services there is an average $13 of savings to the health care system. Reducing capitation rates due to increased

PAGE  35-    FIFTH AMENDED COMPLAINT

152090837.5

payments to primary care providers leads to the perverse result of less preventive care, leading to more specialist appointments and more emergency room visits. OHA represents frequently that specialty care and emergency room visits are indicators of worse health outcomes, worse health care services, and higher costs. According to OHA, that is not the "Oregon Way."

**95.**

FamilyCare consistently operated within its global budget and met 100% of its quality incentive metrics under its contract with OHA. Under Oregon's CCO model and the global budget concept, OHA should not penalize FamilyCare for increases in specific rates of reimbursement.

**96.**

Despite OHA's representation that it encourages preventive care and that it evaluates CCOs based on their ability to operate within a global budget, OHA reduced FamilyCare's rates in 2017 and again in 2018 by tens of millions of dollars (the "Clawback") because, according to OHA, FamilyCare paid too much to primary care providers to deliver preventive care services to Oregon's Medicaid-eligible population. In addition, the Clawback affected bonus payments that were due to certain primary care providers who achieved quality incentive metrics for work performed under the 2017 amendment.

**97.**

OHA's Clawback violated the Settlement Agreement. Under the Settlement Agreement, OHA covenanted that it would "not use rates paid to FamilyCare under the Contract for 2016 or the Settlement Credit as a basis for limiting the amount that can be paid to FamilyCare in future rate years," unless required under the Section 1115 Demonstration Project (the "Waiver"). The Waiver did not require OHA to implement the Clawback. Spending under Oregon's Medicaid program was so far below any limit in the Waiver that the Waiver has no practical effect at all on FamilyCare's budget. OHA breached the Settlement Agreement by reducing FamilyCare's 2017 and 2018 rates to penalize FamilyCare for the rates it received from OHA in 2016 and/or for the

PAGE  36-     FIFTH AMENDED COMPLAINT

Settlement Credit that FamilyCare received pursuant to the Agreement.  The Clawback is inconsistent with OHA's otherwise stated policies promoting primary care, indicating that OHA made a choice to recoup payments made to FamilyCare under the Settlement Agreement by reducing FamilyCare's 2017 and 2018 rates.

**98.**

On information and belief, in developing the 2017 and 2018 capitation rates, OHA asked Optumas to analyze certain "cost drivers" that were unique to FamilyCare, including, but not limited to, FamilyCare's increased reimbursement rate to primary care providers.  On information and belief, OHA then used the information gathered by Optumas to target FamilyCare for the Clawback and/or to cap FamilyCare's 2017 and 2018 rates for primary care services at an amount below FamilyCare's reimbursement rate.  On information and belief, FamilyCare is aware of other CCOs whose reimbursement rates to primary care providers are at or above FamilyCare's reimbursement levels.  On information and belief, FamilyCare is aware of other CCOs whose reimbursement rates to providers, other than primary care, were higher than FamilyCare's reimbursements to those same provide types.  OHA and Optumas did not take into account these other cost drivers, instead choosing to focus on FamilyCare's unique and innovative payment model for primary care as a way to isolate FamilyCare from other CCOs and reduce its 2017 and 2018 capitation rates by implementing rate development methodologies that were biased and disproportionately impacted FamilyCare.

**99.**

FamilyCare has fully performed its obligations under the Settlement Agreement.

**100.**

OHA's Clawback impermissibly penalized FamilyCare for the rates paid to FamilyCare under the 2016 contract and FamilyCare's Settlement Credit under the Settlement Agreement.  In breach of the Settlement Agreement, the Clawback reduced the payments that would otherwise

PAGE  37-    FIFTH AMENDED COMPLAINT

be made to FamilyCare in 2017 and 2018 based on the decision to penalize FamilyCare for the rates OHA paid to FamilyCare in 2016 and the Settlement Credit.

**101.**

OHA breached its obligations under the Settlement Agreement to not use the 2016 Rates or the Settlement Credit as the basis for future rate reductions by implementing the Clawback to reduce FamilyCare's 2017 rates and then carrying forward the detrimental impact of that Clawback and using other biased and actuarially unsound methods to reduce FamilyCare's 2018 rates.

**102.**

OHA's development of FamilyCare's 2018 rates was biased and not actuarially sound and thus violated federal law requiring that Medicaid capitation rates be actuarially sound.

**103.**

OHA's breach of the Settlement Agreement resulted in a decrease to FamilyCare's 2017 and 2018 rates and thus damaged FamilyCare by reducing the monthly payments OHA made to FamilyCare in 2017 and 2018.

**104.**

FamilyCare seeks damages, in an amount to be proven at trial, of at least $54 million, from OHA resulting from OHA's implementation of the Clawback in developing the 2017 and 2018 rates.

**THIRD CLAIM FOR RELIEF**

**105.**

FamilyCare incorporates by references all of the foregoing allegations.

**106.**

The Contract between OHA and FamilyCare is valid and binding.

PAGE  38-    FIFTH AMENDED COMPLAINT

**107.**

FamilyCare's Contract with OHA contains an implied covenant of good faith and fair dealing that protects FamilyCare's objectively reasonable contractual expectations.  Among other things, FamilyCare had an objectively reasonable expectation, based on the Contract and applicable law, that OHA would present annual Rate Amendments that were timely, reasonable, unbiased, actuarially sound, adequate, and free of errors in underlying data and methodology.

**108.**

OHA breached its obligations under the Contract by presenting FamilyCare with a Rate Amendment for 2017 that was unreasonable, biased, and based on erroneous data and methodology, and a Rate Amendment for 2018 that was unreasonable, biased, actuarially unsound, and based on erroneous data and methodology, and by forcing FamilyCare to decide whether to sign the full 2018 Amendment on December 20, 2017, in violation of former ORS 414.652(4) and without notice of the rates to which FamilyCare would be entitled under the contract.

**109.**

As a result of errors in data and methodology, including errors in eligibility and enrollment data, OHA further breached the Contract by failing to pay FamilyCare amounts owed under the Contract.

FamilyCare has suffered substantial and irreparable harm from the 2017 and 2018 Amendments.  The global budgets OHA approved for FamilyCare were insufficient to cover FamilyCare's operating expenses, resulting in financial losses for FamilyCare. After incurring a loss in 2016, the 2017 Amendment was again insufficient to cover FamilyCare's operating expenses for 2017 and further depleted FamilyCare's reserves.  As a result, and because the rates offered in the full 2018 rate amendment presented to FamilyCare on December 20, 2017 were insufficient to allow FamilyCare to continue operating into the future, FamilyCare was forced to

PAGE   39-    FIFTH AMENDED COMPLAINT

reject the full 2018 Amendment and begin shutting its Medicaid business down while operating under a one-month contract.

**110.**

FamilyCare seeks damages, in an amount to be proven at trial, of at least $125,000,000 from OHA resulting from the breach of its contractual obligations under the Contract, including damages based on breaches based on rates applicable through January 31, 2018.

## PRAYER FOR RELIEF

WHEREFORE, FamilyCare prays for an order and judgment as follows:

**A.     On FamilyCare's First Claim for Relief:**

1.      For a declaration that Defendant Lynne Saxton has deprived and conspired to deprive FamilyCare of its property interests without due process of law, in violation of 42. U.S.C. § 1983;

2.      For damages against Lynne Saxton in an amount equal to the injury sustained as a result of the deprivation of FamilyCare's constitutional rights, in an amount not less than $125,000,000;

3.      For an award of attorney's fees incurred by Plaintiff in preparing, filing and prosecuting this action; and

4.      For such other prospective relief as may be just and equitable, including ancillary relief.

**B.     On FamilyCare's Second Claim for Relief:**

1.      For an order awarding FamilyCare damages, not less than $54,000,000, for OHA's use of rates paid to FamilyCare under the 2016 contract or the Settlement Credit as a basis for limiting the 2017 and 2018 rates paid to FamilyCare;

2.      For its costs and disbursements incurred herein; and

3.      For such other relief the Court deems just and proper.

PAGE  40-     FIFTH AMENDED COMPLAINT

152090837.5

C.      **On FamilyCare's Third Claim for Relief:**

1.      For an order awarded FamilyCare damages, not less than $125,000,000, for OHA's breach of the Contract;

2.      For its costs and disbursements incurred herein; and

3.      For such other relief the Court deems just and proper.


DATED:  April 27, 2021                              **PERKINS COIE LLP**


By: *s/ David B. Robbins*
                                **Stephen F. English**, OSB No. 730843
                                SEnglish@perkinscoie.com
                                **Thomas R. Johnson**, OSB No. 010645
                                TRJohnson@perkinscoie.com
                                **Heidee Stoller**, OSB No. 072835
                                HStoller@perkinscoie.com
                                **Matthew J. Mertens**, OSB No. 146288
                                MMertens@perkinscoie.com
                                **Sasha A. Petrova**, OSB No. 154008
                                SPetrova@perkinscoie.com
                                Perkins Coie LLP
                                1120 N.W. Couch Street, 10th Floor
                                Portland, OR  97209-4128
                                Telephone:  503.727.2000

                                **Matthew Gordon**, *pro hac vice*
                                MGordon@perkinscoie.com
                                **David B. Robbins**, OSB No. 070630
                                DRobbins@perkinscoie.com
                                Perkins Coie LLP
                                1201 Third Avenue, Suite 4900
                                Seattle, WA 98101-3099
                                Telephone:  206.359.8000

                                *Attorneys for Plaintiff FamilyCare, Inc.*


PAGE  41-     FIFTH AMENDED COMPLAINT

152090837.5