IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FAMILYCARE, INC., an Oregon      )
non-profit corporation,          )
                                 )
          Plaintiff,             )   Case No. 6:18-cv-00296-MO
                                 )
     v.                          )
                                 )
OREGON HEALTH AUTHORITY, an      )   June 22, 2021
agency of the State of Oregon,   )
and LYNNE SAXTON,                )
                                 )
          Defendants.            )   Portland, Oregon
_____  )

Oral Argument

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES

FOR PLAINTIFF:              Mr. Matthew J. Mertens
                           Perkins Coie, LLP
                           1120 N.W. Couch Street, 10th Floor
                           Portland, OR 97209


                           Mr. Matthew P. Gordon
                           Perkins Coie, LLP
                           1201 Third Avenue, Suite 4800
                           Seattle, WA 98101


FOR DEFENDANT OREGON
HEALTH AUTHORITY:          Mr. David B. Markowitz
                           Ms. Anna Marie Joyce
                           Ms. Laura R. Salerno Owens
                           Markowitz Herbold PC
                           1455 S.W. Broadway, Suite 1900
                           Portland, OR 97201


FOR DEFENDANT LYNNE
SAXTON:                    Mr. Edwin A. Harnden
                           Mr. Chris M. Morgan
                           Barran Liebman LLP
                           601 S.W. Second Avenue, Suite 2300
                           Portland, OR 97204


COURT REPORTER:            Bonita J. Shumway, CSR, RMR, CRR
                           United States District Courthouse
                           1000 S.W. Third Ave., Room 301
                           Portland, OR  97204
                           (503) 326-8188

(P R O C E E D I N G S)

(June 22, 2021; 9:03 a.m.)

* * * * *

THE COURTROOM DEPUTY:  Your Honor, this is the time and place set for oral argument in Case No. 6:18-cv-296-MO, FamilyCare, Inc. versus Oregon Health Authority, et al.

Counsel, for the record, can you introduce yourself.

THE COURT:  I'm going to pause you there before you even get a first sentence out.  The current rule in court -- I'm not sure if Ms. Stephens mentioned this already, forgive me if she has.  The current rule in court is for nonjury trials, for hearings of any kind, if you have been vaccinated, you're welcome to take your mask off.  You don't have to.  No one who wants to leave it on should feel any pressure otherwise.  But if you're vaccinated and want to take your mask off, you're free to do so.

A unanimous vote on that one.  Some of you might want to leave your masks on just improve the look a little.

MR. GORDON:  The thought had occurred to me.

THE COURT:  All right.  Now I can hear you better. Go ahead.

MR. GORDON:  Matthew Gordon for FamilyCare.

THE COURT:  Go ahead.

MR. MERTENS:  Good morning, Your Honor.  Matt Mertens for FamilyCare.

MR. MARKOWITZ:  Dave Markowitz, special assistant attorney general for the State of Oregon.

MS. SALERNO OWENS:  Laura Salerno Owens, special assistant attorney general for the State of Oregon.

MS. JOYCE:  Anna Joyce, special attorney general for the State of Oregon.

MR. MORGAN:  Chris Morgan, Your Honor, special assistant attorney general for the State of Oregon, representing defendant Saxton.

MR. HARNDEN:  Ed Harnden, representing Lynne Saxton.

THE COURT:  Thank you all for being here.

I've reviewed what you've submitted.  There are several things that are not really in dispute, and that's common for motions like this.  It's not disputed that there are missing items.  I guess that may be the only thing that's actually truly undisputed.  It doesn't appear that there's a lot of heat or fight over whose fault that is, although the degree of fault may be in dispute.

What is in dispute is how valuable or important, how relevant to the case the missing items might or might not be, and what is in dispute is to the degree to which they're replicable in some way.  So those are big questions for any sanctions hearing.

We don't impose sanctions even for destruction of evidence if what's destroyed is of no or minor value.  So one

question is what's the value.  And with that question, as with several other questions, there's sort of a -- I guess I'd call it an unresolved issue of burden of production or burden of proof.  I think really it's not so much unresolved as the law just says that you have to be flexible in cases and try to decide as best you can who should be held responsible for proving the value.  So sort of a totality of circumstances analysis of who should be held responsible for proving the value.

My inclination here in this case is to hold the custodian responsible for proving or disproving that it's valuable, but that's one question in the case:  What's the value of what has been lost or destroyed?

And then the second I mentioned already, and that's by what means might it be replicated in whole or in part.  And I do have some questions about that.  I don't have a clear grasp of what efforts have been made to circle the bases that way; in other words, to understanding that one person doesn't have those items anymore, to go to senders or receivers in a sort of a hub to see whether that can be replicated.  And then once I'm clear on replicability, at least as I've defined it, then I'll have a clearer grasp about what ends up being a discretionary decision about whether to impose sanctions, and if yes, the level of sanctions, anywhere from a permissive inference to a mandatory inference to suppression.

The suppression question is one that I don't think is -- I don't have enough to go on here.  That idea is that the custodian isn't allowed to try to prove anything at trial that might be -- might have been disproved by the missing items. And I don't know what that involves here.  I don't know what it is that FamilyCare thinks it might face by way of something being proven that it can't rebut because it's missing what might rebut it.  So if we get that far, we'll have to talk about remedy, once we take that step.

So I'll start with FamilyCare.  Starting with -- this you have briefed, but I'll hear anything you want to add on the issue of value or centrality or relevance.

MR. GORDON:  Thank you, Your Honor.  Would you prefer that we remain seated and speak into the microphone here?

THE COURT:  Yes.  The masks have been a gift to me since I'm old enough to be starting to lose my hearing, and with masks on I can say, well, I have to have this in to hear you.  Now I'm just going to leave them in and hope nobody notices.  So away we go.

MR. GORDON:  Well, please let me know if you can't hear me.

THE COURT:  I can hear you great right now.

MR. GORDON:  With respect to value, Your Honor, I think you're right to note that this can be a difficult thing to ascertain because, of course, the information is gone, and

so we don't have the actual text to look at.

So what courts do, and I think what Rule 37(e)(1) or Rule 37(e) supposes that you might do is kind of look at, as you indicated, the totality of the circumstances and figure out under the circumstances what indications, what indicia are there of the potential value of the missing case -- or the missing information.

THE COURT:  There's really two totality analyses. You've hit one of them.  One is that you look -- with totality, you look at value.  You try to determine value.  But also with totality, you look at whose job is it, whose burden is it.  I'd like you to start with the latter one first.

MR. GORDON:  Sure.

THE COURT:  Why is it not your burden to show value here, or is it your burden?  Do you think it is?

MR. GORDON:  I don't think it is, Your Honor.  I think your indications earlier on that it's the custodian's burden to show that they weren't valuable here because the custodian, of course, had these records in their custody, and they were responsible for the deletion.

And under the circumstances, what Rule 37 -- or the commentary to Rule 37(e) says is that under certain circumstances the -- it may be readily apparent that the missing information was of low value, and so in such circumstances it may be -- the burden may be appropriately

placed on the party claiming sanctions. On the other hand, there are circumstances in which that's not the case. And so the rule indicates a flexibility on the burden of proof.

OHA in their briefing says that the burden of proof is on FamilyCare here, and they quote a case from Judge McShane. It's actually not what Judge McShane said in that case. He said that the burden of proof is one of preponderance of the evidence. This is the *Omnigen* case.

But Judge McShane actually noted from another case decision that said, "Once spoliation is shown, the burden of proof logically shifts to the guilty party to show that no prejudice resulted from the spoliation because that party is in a much better position to show what was destroyed and should not be able to benefit from its wrongdoing."

And that's the analysis that I think is most applicable here. If you hold FamilyCare to the burden of proving something that is completely out of its control, as the rule -- the commentary to the rule suggests, that's an unfair burden where we don't know what was in those texts.

But there is some --

THE COURT: On the issue of value, then is it your position that one should assume value because it's missing or -- I think you may have been about to head that way. Do you have something to indicate value even though you don't claim the burden is yours?

MR. GORDON:  Yes.  I don't think you should just assume value because something is missing.  What I think you do in this circumstance is you look to what evidence you have and what inferences can you make from that evidence, and you really -- what we have here are a number of things.  First of all, Lynne Saxton testified that she used her phone only for business purposes.  So we know that the texts that were deleted were business related.  So that helps.

Second, we know that from the texts that we have been able to recover, that Ms. Saxton texted with people who were custodians in this case.  So OHA had identified them as people likely to have relevant information, including people like BethAnne Darby and Robb Cowie, who were her communications specialists, her director of communications, her director of external relations.  So she communicated with people who were instrumental in the communications plan that really is one of the main issues here, the creation and implementation of the communications plan.

So she used it for business purposes.  She texted with relevant people.  And we also know that the time frame is relevant here.  It's from October 2016, when the 2017 rates were released, through August of 2017.  And during that time period you have the release of the rates, the dispute resolution process, the creation of the communications plan, the release of that communications plan through a report as

part of a public records request, and OHA's subsequent attempts to try and explain away that communications plan, including by Ms. Saxton and Ms. Darby and Mr. Cowie.

So she was texting with the relevant people during the relevant time, and then probably most importantly, we know from the existing texts that they texted about this topic. So we see texts -- and these are Exhibits 27, 28, and 29 to Amanda Beane's declaration. We see texts from BethAnne Darby, talking about they need to get the next draft of the communications plan to Saxton. And then a minute later, we see another text explaining why they need to get it to her. She says, "ASAP, Lynne thinks she didn't know FC bills were coming."

And if you recall, part of the communications plan goal was to defeat FamilyCare's efforts in the legislature. So here they are texting about the very topic, the communications plan.

But perhaps most telling is the exchange that we see on August 8, 2017, which is right around the time that Ms. Saxton announced her resignation as director of OHA, following the media firestorm that exploded once this communications plan was made public.

And the texts here are discussed in our reply brief on page 14 and attached as Exhibit 5 to the declaration of Mr. Mertens. And this is a text exchange among Mr. Cowie, Ms. Darby, and Ms. Saxton, where they are about to go to the

media, and they're texting about what their story is going to be to the media about the communications plan.  And BethAnne Darby says -- and I'm paraphrasing -- something along the lines of, "I can tell them that you told me something and I communicated that to the staff."

So you see them in that text message talking about how they're going to spin the story to the media, and then later that same day, you see an email from Robb Cowie, the communications director, to an Oregonian reporter, and it basically regurgitates what they talked about in that text message.  He tells the Oregonian reporter, as Ms. Saxton mentioned on the call, she gave that direction verbally to BethAnne, communicate it to the staff.  This is at Exhibit 16 to the declaration of Ms. Salerno Owens.

So the available evidence here, the timing, the fact that it was used for business purposes, the people she was communicating with, and the fact that she was communicating with them about the topic at issue, the communications plan and the spin on that communications plan, all suggest that the -- that the texts that we don't have are likely to contain useful information.

And I think an important point here that may or may not have come through in the briefing is that we're not just talking about Ms. Saxton deleting text messages.  Ms. Saxton said she deleted her text messages daily, and that's why we

don't have them.  But to Your Honor's question about what efforts were made to replicate these text messages, we tried to get them from the other custodians, but many of the text messages that are missing from Ms. Saxton are also missing from other custodians.  Most of them -- most of these messages involve communications with other custodians.

THE COURT:  Can I ask missing because, like Ms. Saxton, all the text messages are missing or missing because text messages from Ms. Saxton are missing?

MR. GORDON:  So we have nearly every text message from Ms. Saxton are missing from Ms. Saxton's phone.  We got one text message for which she was the custodian.  But from the other custodians, 12 other custodians here who communicated with Ms. Saxton -- and this is just based on the matrix that was provided by OHA -- they also were not produced from these other custodians' phones.

THE COURT:  My question was is that because the other custodians' phones are missing almost all of their text messages or are they missing merely or only their text messages involving Ms. Saxton?

MR. GORDON:  Some of the text messages -- some of the custodians we received almost nothing from, but some we received quite a number of text messages from, and it appears that messages with Ms. Saxton were selectively deleted and selectively missing.

THE COURT:  Last question.  I know the answer, but I want to make sure I have it clear in my mind.  Another timing issue that matters is the degree to which Ms. Saxton or any custodian deleted following clear knowledge of a requirement not to delete for litigation purposes.  And that's present in this case for all the deletions you're referring to?

MR. GORDON:  Yes.  So first of all, I don't think the standard is clear knowledge, I think it's reasonably anticipated litigation.

THE COURT:  No, I know that, but how clearly it was communicated to a custodian does affect my analysis for the degree of sanction, if there is a sanction.

MR. GORDON:  Sure.

THE COURT:  Custodians frequently who don't understand litigation and, you know, aren't in the business of doing anything other than cycling things off normally, and then they do it because they didn't really understand the one piece of legalese they got that told them not to.  So that's a different case.

So I do care about the degree to which a custodian clearly understood the obligation not to delete for litigation hold purposes.  What's your position on that here?

MR. GORDON:  So recall here that Ms. Saxton had already been through litigation with FamilyCare.  They had just settled earlier in 2016.  So she was already -- she was no

stranger to litigation and was no stranger to litigation with this litigant. In early October, she sends an email saying, "We anticipate litigation over the rates." So in her own words, she says she anticipated.

The litigation hold notice comes out in December, and I believe Ms. Saxton said in her declaration or her deposition testimony that that's the first time that she knew for sure that there was going to be litigation with FamilyCare or that it was very likely. But she said -- so we have a period of time that's in dispute between the parties of October 2016 to December 2016, where she said she anticipated litigation. OHA takes the position that's not enough, but OHA admits that her obligation for litigation purposes kicked in no later than the date of -- in December of the litigation hold notice. And most of the text messages at issue postdate that. Many of them postdate the filing of this litigation in February of 2017.

THE COURT: Thank you.

Who would like to respond?

MS. SALERNO OWENS: I would, Your Honor. Thank you.

So, Your Honor, I want to address your first question, which is what is the value of the missing information. Because that really is the key inquiry for a sanction.

And, Your Honor, the relevant time period here, based on FamilyCare's allegations, is February 18th, 2017, when

Ms. Saxton allegedly signaled her approval of the draft communications plan, until August 8th, 2017, when the governor announced her resignation.

THE COURT:  Why do you contend that prior to February doesn't really matter much?

MS. SALERNO OWENS:  The reason for that, Your Honor, is the sanctions that FamilyCare seeks.  The sanctions they seek is an instruction about implementation.  They want Your Honor to tell the jury that they must presume that the unrecoverable text messages contained evidence of implementation.  And, of course, the --

THE COURT:  Of the communications plan?

MS. SALERNO OWENS:  Exactly, of the draft communication plan.  And that draft communication plan could only have been implemented once Ms. Saxton allegedly approved it and until she resigned.  And so that's the relevant time period.

Moreover, Your Honor, to have this implementation has to be with external people outside of OHA.  And so that's Exhibit -- I think it's Exhibit 6 -- sorry, Exhibit 13 of Ms. Beane's declaration.  It has a chart of all the people external to OHA for whom there's unrecoverable text messages. And when you apply this parameter, Your Honor, of implementation of this time frame, we're talking about six text messages.

Moreover, Your Honor, we know that two of those text messages don't evidence implementation. One of them is with Senator Gelser, and FamilyCare was able to recover that text message, and they acknowledge in their papers that it was not evidence of implementation. In fact, it had nothing to do with this case.

Another text message is from Sean Kolmer, who is a senior vice president of a nonprofit health care, and the metadata shows that that message was from him to Ms. Saxton. So that would not suggest evidence of implementation.

So what we're left with, Your Honor, are four text messages: one with Knute Buehler, an Oregon state representative; one with Lorissa Bounds, chief of staff to Greg Walden; one with Cedric Hayden, Oregon state representative; and one with Berri Leslie, deputy chief of staff.

So we have four messages. I want to point out a few things about these messages, Your Honor. First, not one of these unrecoverable text messages during the relevant implementation phase is with any member of the media, which according to FamilyCare's allegations in its complaint, the key audience here for implementation was legislators, media, and people external to OHA.

The second is that FamilyCare hasn't alleged that any of these individuals played a key role in the implementation of the draft communications plan, and for instance you'll notice

that most of them are state representatives and, of course, FamilyCare's concern was about a senate bill that wasn't with the state representatives, it was with the state senators.

More importantly, Your Honor, I want to focus on your question about the burden.  Right?  And the burden here is plausible and concrete evidence about what the unrecovered evidence could contain.  And FamilyCare has not shown that these four unrecoverable messages, this handful of text messages with external people, that it's plausible that this is the evidence of implementation.

I think the thing to keep in mind, Your Honor, when you ask the question about what's the value here, is that in other cases that have been cited, the evidence that was destroyed was key to the case.  For instance, in *DV Communications*, it was the draft business plan that was publicly available information.  It was central to the case.

That's not what we have here.  We have a handful of unrecoverable text messages, four with external people.

Moreover, OHA does have --

THE COURT:  I want to just press that a little so I understand your argument better.

The number really doesn't tell me a lot about value, right?  I mean, you can have four or you can have 400, and the value in the abstract, without knowing what's in them, could be found in either number, right?

MS. SALERNO OWENS:  I hear what you're saying, Your Honor, and yes.

THE COURT:  Well, you hit four pretty hard.  I guess I'm trying to figure out why you think four matters.  I suppose that if you're sort of hunting around for value, you're more likely to find it in 4,000 e-mails than four.  That is one point you're making, right?

MS. SALERNO OWENS:  That is one point.  There are additional points.

THE COURT:  So why do you think the number of missing emails matters, other than the one I just expressed?

MS. SALERNO OWENS:  I think the number matters because of what we talked about earlier, totality of circumstances.  So let's put this in context.  Yes, it's true that there are four unrecoverable messages.  However, we do have over nearly 5,000 text messages which have been produced, some with these custodians.  And so this is not the only message that's missing, this is one message among many others, and we also have all of the emails that have been perfectly preserved.

The next point, Your Honor, is that when we think about this --

THE COURT:  Before you get to your next point, let me wrap up this a little more.

So one explanation for why four matters is that

you're making the argument they haven't really presented a plausible theory for value.  And so that rests partly on the number and partly on, in your view, the recipients -- or senders or receivers of these text messages.  And so I guess your argument is that there's no plausible theory that the particular people involved in what you've winnowed down to four or six messages could be important, central to implementation.  That's your theory, right?  There isn't a way to link these folks to being at the center of this case.

MS. SALERNO OWENS:  That's correct, Your Honor.  And, again, when we're looking at plausibility, when you look at are there other reasons why Ms. Saxton may have been texting these individuals, there are plausible concrete reasons beyond FamilyCare or any CCO.  These are individuals, these representatives, who deal with many, many bills that OHA deals with.  OHA has a variety of topics to be dealing with with these lawmakers completely apart from FamilyCare.

THE COURT:  Thank you.

Your next point?

MS. SALERNO OWENS:  My next point is that the instruction that FamilyCare seeks, Your Honor, which you know is a severe one, one is that no custodian can testify to the contrary of these messages, or that the jury must assume these messages contain adverse inference is not proportionate with what Rule 37(e) provides.  Rule 37(e) is very clear that

perfection is not the standard of preservation. And I just want to make clear that in the numbers here -- and I understand Your Honor's point about numbers themselves are not instructive, but we do have 99.99 percent preservation on the part of OHA. Every e-mail has been preserved. With certain custodians such as BethAnne Darby, for instance, only five of her text messages are unrecoverable, where we produced over 900 of her text messages. For Mr. Cowie, only 27, when we've produced over 300 of his text messages.

And so I think the challenge here is that sanctions are generally used to level the playing field. When a party is deprived of evidence that they can't otherwise get to prove their case, then you use the sanctions to level that playing field. That's not what we have here.

THE COURT: I've read this in your brief. Just to hear it from you, what's your explanation for how the messages went missing? Just to explain why I'm asking that question -- I think it's obvious, but one consideration in sanctions is what happened, why did it go missing. And negligence versus intentionality matters a great deal for that purpose.

MS. SALERNO OWENS: So I'd like to start with Ms. Saxton. With her, we know it was negligence. It was a misunderstanding. She thought her texts, like her emails, were being backed up, and she was half right. Her emails were backed up, and we have all her emails.

I think it's notable that her behavior actually did not change throughout the time period, because in her mind she thought she was complying with the litigation hold. And so that's why she didn't stop changing her -- change her behavior with the text messages, because she understood I'm just removing it from the screen. And there's nothing to challenge that understanding or to challenge her testimony.

This is different from other cases where there was intention, such as sledgehammers or throwing computers in dumps, like the *Taylor* case cited in the reply. That's not what happened here.

Your Honor asked about other custodians. And so, for instance, Mr. Cowie, he dropped his phone and the screen cracked, and so he took the phone in to be fixed. Those messages had been lost from dropping his phone. It was again negligence, you know, destruction, but it was nothing intentional.

For BethAnne Darby, FamilyCare had the opportunity to depose her about this, and she testified that she never intentionally deleted her text messages to hide them, she's not sure why some of them weren't recovered, and ultimately we were able to recover all of them.

And if I may speak to the point about replication, because Your Honor had a question about that. I want to make it clear that OHA did not just tell FamilyCare, oh, these

messages went missing, deal with it.  We went to great efforts to recover those messages, and our efforts were very successful.  Let me give you some examples.  With BethAnne Darby, from going to all other custodians and using forensic tools, we were able to recover all but five missing text messages, and we produced over 900 to FamilyCare.

With Ms. Saxton, we -- once we realized there was a universe of text messages that we could not recover from other custodians and other efforts, we had Ms. Saxton sit down with her calendar and with a calendar of Mr. Cowie and go through what was she doing that day, what were her efforts, fill out what she thought the text message might relate to, and if she couldn't definitively state what it was, mark it unknown.  And we did all that before her deposition, so she was then available to be deposed on this.

I think that leads to the point about what FamilyCare has been able to do to try to remedy any prejudice they might suffer, and that is they had the opportunity to do hours of depositions, of discovery requests, interrogatories, requests for admissions, getting documents, public requests from other lawmakers.

And my final point, Your Honor, is unfortunately OHA did not have that opportunity with Mr. Heatherington's messages because we didn't realize they were unrecoverable until after the close of discovery.

But in totality, Your Honor, you asked what's the value. The value here is not enough to take this away from the jury about being able to decide credibility, what happened here, with the jury being instructed to presume a handful of messages had evidence of implementation or witnesses not being able to testify.

THE COURT: Thank you very much.

Your reply?

MR. GORDON: Thank you, Your Honor.

The point about value, counsel tries to narrow down the number to as small a number as possible by doing a couple things that I think are misleading.

Number one, by trying to shrink down the temporal scope of when things are relevant, based on her representation that the remedies we seek just relate to implementation, that's not accurate. The remedies we seek -- and this is on page 23 of our rebuttal brief -- talk about implementation but also talk about motive. And motive, and Ms. Saxton's motive are key -- key to this case. And Your Honor talked about what's at the center of this case.

THE COURT: Motive to do what?

MR. GORDON: Motive for retaliating against FamilyCare. The claim against Saxton and also the claim against OHA both involve an element of bad faith. The retaliation claim involves elements of retaliation.

THE COURT:  My question is I'm aware that a big part of your case is a motive to retaliate, but a motive to retaliate by doing what?

MR. GORDON:  Well, what we've alleged are two different things.  One is punitive rate setting and second -- which is more at issue today -- is the communications plan or what the press dubbed the smear campaign to disparage FamilyCare and undermine its credibility.

THE COURT:  How would either of those acts of retaliation and bad motive predate February?

MR. GORDON:  Well, because the creation of the communications plan, that started in early January 2017.  That was the first time -- that's the first email we have where Ms. Saxton says we need to get a communications plan going.  So texts about why she's doing that would certainly be relevant.

Also, the communications plan --

THE COURT:  What's your theory of when this bad motive first could have arisen?

MR. GORDON:  Well, it could have arisen much earlier than that, Your Honor, because we see that text that says "let's get this going," but that communications plan built on prior communications plans that they developed for the prior litigation with FamilyCare.  And so certainly --

THE COURT:  What I'm asking is motive to retaliate is grounded in something that happens that creates a motive to

retaliate.  When did -- what is it that you contend happened that would create a motive to retaliate?

MR. GORDON:  In terms of FamilyCare's conduct?

THE COURT:  No, in terms of Ms. Saxton.

MR. GORDON:  I'm sorry?

THE COURT:  In terms of Ms. Saxton.  You say she has a motive to retaliate, or may.

MR. GORDON:  Right.

THE COURT:  So motive to hurt.  You know, you cheated on my wife or something, I don't know.  So what happened that created the motive to retaliate and when did it happen?

MR. GORDON:  So there were a number of different events that happened over the course of -- really from 2016 going forward of FamilyCare speaking out to the press, FamilyCare speaking out to legislators, FamilyCare introducing bills for more transparency, and --

THE COURT:  And so your theory of motive to retaliate did go back far, far earlier, to even to prior to litigation?

MR. GORDON:  As we've -- yeah, as we discussed several years ago now in the hearing for the summary judgment, we submitted a list of FamilyCare's public statements over the years that we think Ms. Saxton retaliated against or retaliated because of FamilyCare exercising its First Amendment right over time in a variety of venues and being very critical of OHA and Ms. Saxton, including at various conferences, et cetera.

THE COURT: So you don't think the number is six, you think it's what?

MR. GORDON: Well, that's part of the problem, Your Honor. We don't know how big the number is.

THE COURT: I know you don't know. I didn't ask what you knew. I asked what you thought.

MR. GORDON: I think it's much bigger than 78. So 78 is the number OHA says -- OHA says we identified 338 sets of -- or metadata corresponding to 338 texts from Ms. Saxton, and of those we ruled out most of them as we think not responsive, leaving 78. The actual universe is actually much larger than 338. Ms. Saxton was the director of OHA for two and a half years.

THE COURT: So there's been an effort made to do some winnowing down to 78 at least?

MR. GORDON: That's correct.

THE COURT: In what way do you disagree with that effort?

MR. GORDON: Well, I disagree with the notion that 338 is the overall universe. That's only the universe where they were able to identify metadata. And if you think about a director of an agency over two and a half years having only 338 texts, that amounts to just a couple texts a week, which isn't plausible here because Ms. Saxton herself said she deleted texts daily. And if you're deleting texts daily, it indicates

that you're texting on a daily basis.  And of the data that we do have, the matrix provided by OHA, we see multiple days on which she is sending out multiple texts just that could be possibly relevant.  So the overall universe here is in likelihood much larger than 338.  We don't know how many other texts were deleted that do not have any metadata associated with them.  The reduction from 338 to 78 is something we've just had to take OHA at its word for.  They said, we ruled out some 250 as being unresponsive.  But then what --

THE COURT:  You have no window into why that happened?  None at all?

MR. GORDON:  We have some short answers to written questions.  OHA was very -- not forthcoming about this.  We had to press and press and press for information about this.  And I say OHA.  Their counsel.  We had to press and press and press for information.  It took them over a month and a half just to give us the matrix after they said they would, and then they gave us short, unresponsive answers, and they wouldn't tell us much about the 338, and they wouldn't tell us much about the process they went through.

THE COURT:  You have no window, no information given to you as to why that reduction occurred?  And by "no," I mean zero.  You have zero information?

MR. GORDON:  No, no.  I'm not saying that, Your Honor.  I'm saying --

THE COURT:  You have some?

MR. GORDON:  Very limited information, some, yes.

THE COURT:  Of the information you have, do you have reason to disagree with the reduction from 300-something to 78?

MR. GORDON:  We don't have enough to really question it one way or the other.  So no, Your Honor.

THE COURT:  You don't have a reason to disagree?

MR. GORDON:  I don't have a reason to disagree.

THE COURT:  You feel there's not even enough there to begin to know whether you could agree or disagree?

MR. GORDON:  I think that's right, Your Honor.  And I think it's also important, Ms. Owens -- Ms. Salerno Owens, excuse me, referenced RFPs and other efforts at discovery.  We tried to get discovery that would be helpful here.  We asked for billing records so we could see what is the real universe of texts that we're talking about from Ms. Saxton's OHA-issued cell phone, and OHA refused to provide those billing records. So we made an effort to ascertain what is the real number here. We wanted to know more about the process they went through, and they didn't provide that information.

THE COURT:  You have similarly explanations from other custodians in sort of the wheel and hub that you'd have surrounding Ms. Saxton for why their texts are also missing? You know Ms. Saxton's explanation.

MR. GORDON:  We do.

THE COURT: And you have their explanations. For all of them, for Ms. Saxton, and then you have now the explanations for why they went missing?

MR. GORDON: No, we don't, Your Honor.

THE COURT: You have statements for why they went missing?

MR. GORDON: Well, the statement that was said in court today about Mr. Cowie dropping his phone, that's the first I'm aware of that. That's not in their briefing. And the same thing about Ms. Darby's testimony. She just says, I didn't delete text messages. That's not an explanation for why her messages were deleted. And we still have nothing with respect to all the other custodians. There were 12 custodians that Ms. Saxton texted with whose messages weren't recoverable.

So we now have a statement about a phone being dropped that we're hearing for the first time. There's no evidence of that in the record -- in the record of that, as far as I'm aware.

We have a statement from Ms. Darby that she didn't delete messages, but that doesn't tell us why her messages were deleted or some of her messages were deleted.

And then we also have no explanation at all for the other ten custodians about why their messages with Ms. Saxton were deleted, and in particular why for many of them those messages were selectively deleted. As I mentioned, for many of

those custodians, we did receive a number of text messages.

THE COURT:  I think I interrupted what you wanted to say about waiver, but I'll have some more questions.  Go ahead with what you were going to say.

MR. GORDON:  I was going to say, Your Honor, that they -- I wanted to address a couple other points that were raised.

Counsel talked about perfection is not the standard. That is certainly true that perfection is not the standard, but to say that OHA has preserved 99.99 percent is really not the relevant inquiry here.  We're not talking about perfection or anything close to perfection.  We're talking about Ms. Saxton, who is a key -- probably the key person in this case, intentionally deleting every single text, or at least most of them.  It's a little unclear whether she deleted all of them or just most of them.  And we're talking about 12 other custodians' text messages with her also being deleted.  So FamilyCare is not asking for perfection.

THE COURT:  Why isn't the overall ratio something I ought to take into account?  You said it was not important. But if in the total universe of information you can get from your opponent you get 99 percent of all that's out there that could be retrieved and useful to you, then why isn't that at least a factor I should take into account?

MR. GORDON:  Well, I think you can take into account

that other information was provided in this case, but the question is that -- back to one of the original questions Your Honor asked about replicable.  Do we have the same information that might have been in those text messages?  Do we have --

THE COURT:  I guess I'm asking more in the abstract just as a principle for Rule 37.

MR. GORDON:  Sure.

THE COURT:  If you had a case in which we'll just say 99 percent -- 99 percent of everything that could be produced in discovery is, in fact, obtained and produced in discovery, then just as a starting point, why wouldn't that be an important fact to consider as to whether sanctions are appropriate?

MR. GORDON:  I think it is something that you would consider on the inquiry into prejudice, because the goal here is to understand how much of the destruction or the spoliation may have prejudiced the non-spoliating party.  So if it was --

THE COURT:  In a case where there was only a few things percentage-wise missing is you'd want some evidence that what was missing, you know, was the smoking gun, so to speak.  You'd want some evidence that yeah, they produced a lot, a lot of what really didn't hurt them, and the thing that really hurt them, they didn't produce.  That's the inquiry you want to make, right?

MR. GORDON:  That is an inquiry you might make.  And

I think here one way to look at this is OHA talks about, well, we produced all these emails, and the same topics are discussed in emails.  But if you look at the emails talking about the communications plan -- excuse me -- and the text messages on the other hand talking about the communications plan, you see a very different level of discussion and a different level of candor about the communications plan as between the texts and the emails.  And this is reflective in the emails I referenced earlier, Exhibits 27, 28, and 29, and then Exhibit 5 to the Mertens declaration, where they're talking about -- they're saying things in text that they don't say in emails.

And that's not surprising, because I think most of us understand that text is a different form of communication.  It's less guarded, it's more on the fly, more likely to reveal things like somebody's true motive behind something.  And so we don't have --

THE COURT:  I think most of us understand you shouldn't say anything in text or emails that you care about.  That's all right.  That's for another day.

MR. GORDON:  I don't disagree with you about that.

THE COURT:  So what I'd be looking for to determine that a piece of a large picture that's missing has more value than one might assume by its size proportionately; in other words, what I'd be looking for -- I'm just using smoking gun not because I'm really looking for the critical piece of

evidence, but to say that yes, a lot was produced, a small amount wasn't, but the small amount has outsized value shown in what ways.  And one of the things you'd be looking for is selectivity.  If you have -- if, for example, all text messages are deleted to anybody on any subject, then wouldn't that show less selectivity, less intentionality, I'm hiding what I really want to hide, than if, you know, just on the critical date with the critical person texts are missing?

MR. GORDON:  And I think we have both here.  So we have Ms. Saxton saying she deleted everything.  Now, you can read that two ways.  You can read there's no intentionality.

THE COURT:  Does she disagree that she deleted everything?

MR. GORDON:  I don't think we have enough information.  She testified that she deleted these emails daily.  We've only received one email from when she was the custodian -- excuse me, one text when she was the custodian.  So we don't have any basis to disagree that she deleted things daily.

THE COURT:  So let's assume for the moment then that she deletes everything.  Certainly you can delete everything in order to hide what you really want to delete, but if you're looking for selectivity as a way to show heightened value, it's missing with Ms. Saxton, isn't it?

MR. GORDON:  Selectivity I think is missing with

Ms. Saxton, but it's not missing with the other 12 custodians, because those other custodians, we have selective deletion of text messages with Ms. Saxton.  So --

THE COURT:  You can credibly claim here today that you've got evidence that ten or so other people are only missing texts from Ms. Saxton from their phone records.

Go ahead.

MR. GORDON:  So there were 12 custodians.  Of the 12, half produced no texts at all and half produced a varying number of texts.  Of that --

THE COURT:  Meaning they also, as best you know, deleted all their texts?

MR. GORDON:  We don't know.  We don't know what happened to their texts.  Again, for these 12, we don't have any explanation other than what you heard from counsel today about why the messages were deleted.

THE COURT:  So half there's no texts at all, and half produced some but not all texts?

MR. GORDON:  Right.  And I cannot represent to the Court that the only texts that were deleted from their phones were ones related to Ms. Saxton.  Again, we asked for the billing records and we didn't get them.  All we have are OHA's representations and the bare numbers.  We can see from the bare numbers that they didn't delete some messages because we got them, but then there were some messages with Ms. Saxton that

they did delete and we didn't get.  So that's the extent of what I can tell the Court.

The final thing I would note for the Court is we have asked for -- FamilyCare has asked for a range of different sanctions here.  And counsel focused on the -- particularly on the mandatory jury instruction.  And the Court under Rule 37(e)(2) has the authority to issue a mandatory or a permissive adverse jury instruction.  We've also asked under Rule 37(e)(1) for alternative sanctions, including bars on evidence, attorney's fees and costs, et cetera, or other instructions to the jury.  So there are a range of sanctions that we've requested here, and those are laid out in our briefing.

THE COURT:  I understood your request for attorney's fees and costs not to be -- of course it's not an evidentiary sanction.  You just want your attorney's fees and costs for this motion here, right?

MR. GORDON:  That's correct, Your Honor.  Yes.

THE COURT:  All right.  So when I do tell a jury to do something with evidence or in a case, I like to be pretty clear about what it is that I'm asking them or telling them to do.  So what is the inference?  Let's start with permissive inference or mandatory.  The inference would be the same.  What is the inference you want me to tell the jury to draw from the facts they'll hear about these texts?

MR. GORDON:  So with the permissive inference -- and

I would note that as a number of cases that we've cited have dealt with, oftentimes the Court kind of leaves the exact contours of the inference for later.  I'm not suggesting that we do that here, but I've noted that.

THE COURT:  To be clear, I will leave it for later, I will not resolve that today, but I do want to know what it is you think you're entitled to.

MR. GORDON:  Sure.  So what we've requested in the briefing is a permissive -- an adverse jury instruction instructing the jury that it should presume that OHA destroyed the Saxton text messages to prevent FamilyCare from obtaining documents establishing that OHA implemented the communications plan and otherwise retaliated against FamilyCare.  That's what we've requested as a mandatory jury instruction.

THE COURT:  So the way this is played out for me across the occasions I've had to do this, it can be -- it can be fairly vague or fairly specific.  I've given them -- I've given adverse instructions as vague as the following:  You've heard evidence about these text messages.  You may infer from this that the text messages contained evidence that was negative to Ms. Saxton or OHA.  That's the vague side.

And then more specific, you know, wouldn't be like this case, but where you could infer that a particular fact is true would be established by the missing evidence.

So you're asking for something sort of right in the

middle, right?

MR. GORDON:  What we ask for in the briefing on the mandatory or permissive instruction, we mentioned -- we suggested one that the jury may but need not presume OHA destroyed the messages to prevent FamilyCare from obtaining evidence that would support FamilyCare's case.  That's the general one.

And then the more specific piece of that would be including evidence that OHA implemented the communications plan and that Saxton was retaliating against FamilyCare for exercise of its First Amendment rights.

So I agree with Your Honor that there are a range of possible adverse inferences from the general, which we suggest just that they destroyed the messages to prevent evidence that would be helpful to FamilyCare's case or hurtful to OHA's case, and then the more specific would be specifically about the motive for the communications plan and the implementation of the communications plan.

THE COURT:  All right.  Thank you.

For Ms. Saxton, anything you wish to add?

MR. MORGAN:  We don't want to be repetitive, Your Honor, so unless you have specific questions, we don't have anything additional to add.

THE COURT:  I'll take this under advisement.  I am persuaded that the most I would do in this case is a permissive

inference, and I'm persuaded that the most I would do for the contours of a permissive inference is what I'll call the vague version, which is:  You may assume upon hearing this evidence that the missing texts contain evidence negative to OHA or Ms. Saxton.  But I'm not sure I'll do that, and therefore I don't know whether I'll award attorney fees or not for this hearing today.

Thank you all.  We'll be in recess.

THE COURTROOM DEPUTY:  Court is in recess.

THE COURT:  I'm sorry.  Back on the record.

Let me be clear.  When I say "under advisement," what I'm probably going to do is just try to take this up in the context of trial itself to see about centrality.  Sometimes centrality is hard to measure until I see it in more precise detail.  So I don't think I'll get you an answer before trial. I may be able to answer it after a pretrial conference, once I've looked at exhibits, seen deposition designations and the like, but I wouldn't -- I wouldn't be surprised if it's a question I don't answer until it's appropriate just before or during trial.

MR. GORDON:  Your Honor, may I ask a question?

THE COURT:  Yes.

MR. GORDON:  Since Your Honor is inclined to not rule on this until trial, and since we have a while until trial, one possible way to uncover more information about this in the

intervening months would be to get those billing records that we requested from OHA.

THE COURT: So I don't want to do that on the fly here. You should go through the normal channels. You can file -- even though -- so to the degree that that is outside time limits, I'm going to allow you the opportunity to file a motion to compel for those things, and I'll rule on it, since we have time, on a more formal record.

MS. SALERNO OWENS: Your Honor?

THE COURT: Yes.

MS. SALERNO OWENS: I'm just wondering if we are going to allow more discovery motions, might we have an opportunity to look into Mr. Heatherington's missing text messages?

THE COURT: Yes, through the same mechanism, motion to compel. So I don't want to reopen anything else, but it's an issue that is worth, given the time we have, trying to nail down. So you can move to compel the billing records. You can move for what you think is missing.

MS. SALERNO OWENS: We'd like to take his deposition and issue limited discovery.

THE COURT: You'll start with just records, and we'll see where it gets.

MS. SALERNO OWENS: Thank you, Your Honor.

THE COURT: Thank you all. We'll be in recess.

THE COURTROOM DEPUTY: This court is in recess.

(Proceedings concluded at 9:55 a.m.)

--o0o--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


*/s/Bonita J. Shumway*                    *July 7, 2021*
_____    _____
BONITA J. SHUMWAY, CSR, RMR, CRR       DATE
Official Court Reporter

MR. GORDON: [54]
MR. HARNDEN: [1]  4/9
MR. MARKOWITZ: [1]  3/25
MR. MERTENS: [1]  3/23
MR. MORGAN: [2]  4/6 37/20
MS. JOYCE: [1]  4/4
MS. SALERNO OWENS: [14]
 4/2 14/18 15/5 15/12 17/25
 18/7 18/11 19/9 19/19 20/20
 39/8 39/10 39/19 39/23
THE COURT: [71]
THE COURTROOM DEPUTY:
 [3]  3/2 38/8 39/25

**-**

**--o0o [1]**  41/2

**/**

**/s/Bonita [1]**  41/9

**1**

**1000 [1]**  2/20
**10th [1]**  2/4
**1120 [1]**  2/4
**12 [7]**  12/13 29/13 30/16 34/1
 34/8 34/8 34/14
**1201 [1]**  2/7
**13 [1]**  15/20
**14 [1]**  10/23
**1455 [1]**  2/11
**16 [1]**  11/13
**18th [1]**  14/25
**1900 [1]**  2/11

**2**

**2016 [5]**  9/21 13/25 14/10
 14/11 25/13
**2017 [7]**  9/21 9/22 10/18 14/16
 14/25 15/2 24/12
**2021 [3]**  1/6 3/2 41/9
**22 [2]**  1/6 3/2
**23 [1]**  23/16
**2300 [1]**  2/16
**250 [1]**  27/9
**27 [3]**  10/7 20/8 32/9
**28 [2]**  10/7 32/9
**29 [2]**  10/7 32/9

**3**

**300 [1]**  20/9
**300-something [1]**  28/4
**301 [1]**  2/20
**326-8188 [1]**  2/21
**338 [8]**  26/8 26/9 26/12 26/20

26/22 27/5 27/7 27/19
**37 [9]**  7/2 7/3 7/21 7/22 19/25
 19/25 31/6 35/7 35/8

**4**

**4,000 [1]**  18/6
**400 [1]**  17/23
**4800 [1]**  2/7

**5**

**5,000 [1]**  18/16
**503 [1]**  2/21

**6**

**601 [1]**  2/16
**6:18-cv-00296-MO [1]**  1/4
**6:18-cv-296-MO [1]**  3/5

**7**

**78 [6]**  26/7 26/7 26/11 26/15
 27/7 28/4

**8**

**8188 [1]**  2/21
**8th [1]**  15/2

**9**

**900 [2]**  20/7 22/6
**97201 [1]**  2/12
**97204 [2]**  2/16 2/20
**97209 [1]**  2/4
**98101 [1]**  2/7
**99 percent [3]**  30/22 31/9 31/9
**99.99 [2]**  20/4 30/10
**9:03 [1]**  3/2
**9:55 [1]**  40/2

**A**

**a.m [2]**  3/2 40/2
**able [10]**  8/14 9/10 16/3 21/22
 22/5 22/17 23/3 23/6 26/21
 38/16
**about [70]**
**above [1]**  41/6
**above-entitled [1]**  41/6
**abstract [2]**  17/24 31/5
**according [1]**  16/20
**account [3]**  30/20 30/24 30/25
**accurate [1]**  23/16
**acknowledge [1]**  16/4
**across [1]**  36/16
**acts [1]**  24/9
**actual [2]**  7/1 26/11
**actually [5]**  4/16 8/6 8/9 21/1
 26/11
**add [3]**  6/11 37/20 37/23

**additional [2]**  18/9 37/23
**address [2]**  14/20 30/6
**admissions [1]**  22/20
**admits [1]**  14/12
**adverse [5]**  19/24 35/8 36/9
 36/18 37/13
**advisement [2]**  37/24 38/11
**affect [1]**  13/11
**after [3]**  22/24 27/17 38/16
**again [4]**  19/11 21/15 34/14
 34/21
**against [6]**  23/22 23/23 23/24
 25/22 36/13 37/10
**agency [2]**  1/7 26/22
**ago [1]**  25/20
**agree [2]**  28/10 37/12
**ahead [4]**  3/21 3/23 30/3 34/7
**al [1]**  3/6
**all [33]**  3/20 4/11 9/6 11/19
 12/8 12/18 13/6 13/7 15/21
 18/19 20/25 21/22 22/4 22/5
 22/14 27/11 29/1 29/13 29/22
 30/15 30/22 32/2 32/19 33/4
 34/9 34/12 34/17 34/18 34/22
 35/18 37/19 38/8 39/25
**allegations [2]**  14/25 16/20
**alleged [2]**  16/23 24/4
**allegedly [2]**  15/1 15/15
**allow [2]**  39/6 39/12
**allowed [1]**  6/3
**almost [2]**  12/18 12/22
**along [1]**  11/3
**already [4]**  3/10 5/14 13/24
 13/25
**also [14]**  7/10 9/20 12/4 12/15
 18/19 23/17 23/23 24/16 28/12
 28/23 29/22 30/17 34/11 35/8
**alternative [1]**  35/9
**although [1]**  4/17
**am [1]**  37/24
**Amanda [1]**  10/7
**Amendment [2]**  25/23 37/11
**among [2]**  10/24 18/18
**amount [2]**  33/2 33/2
**amounts [1]**  26/23
**analyses [1]**  7/8
**analysis [3]**  5/8 8/15 13/11
**Anna [2]**  2/10 4/5
**announced [2]**  10/19 15/3
**another [5]**  8/9 10/10 13/2 16/7
 32/19
**answer [4]**  13/1 38/15 38/16
 38/19
**answers [2]**  27/12 27/18
**anticipate [1]**  14/3

# A

**anticipated [3]** 13/9 14/4 14/11
**any [12]** 3/12 3/14 4/22 13/3 16/19 16/23 19/14 22/17 27/6 33/5 33/18 34/15
**anybody [1]** 33/5
**anymore [1]** 5/19
**anything [8]** 6/3 6/11 13/16 30/12 32/18 37/20 37/23 39/16
**anywhere [1]** 5/24
**apart [1]** 19/17
**apparent [1]** 7/23
**appear [1]** 4/16
**APPEARANCES [1]** 2/2
**appears [1]** 12/23
**applicable [1]** 8/16
**apply [1]** 15/23
**appropriate [2]** 31/13 38/19
**appropriately [1]** 7/25
**approval [1]** 15/1
**approved [1]** 15/15
**are [44]**
**aren't [1]** 13/15
**argument [5]** 1/14 3/5 17/21 19/1 19/5
**arisen [2]** 24/18 24/19
**around [2]** 10/18 18/5
**as [33]** 5/1 5/4 5/6 5/21 7/3 8/17 9/11 9/25 10/19 10/23 11/11 20/6 21/9 23/11 23/11 25/19 25/19 26/10 27/9 27/22 29/17 29/18 29/25 31/6 31/11 31/12 32/7 33/23 34/11 36/1 36/14 36/18 36/18
**ASAP [1]** 10/11
**ascertain [2]** 6/25 28/18
**ask [5]** 12/7 17/12 26/5 37/2 38/21
**asked [9]** 21/12 23/1 26/6 28/14 31/3 34/21 35/4 35/4 35/8
**asking [6]** 20/17 24/24 30/18 31/5 35/20 36/25
**assistant [3]** 4/1 4/4 4/8
**associated [1]** 27/6
**assume [6]** 8/22 9/2 19/23 32/23 33/20 38/3
**attached [1]** 10/23
**attempts [1]** 10/1
**attorney [5]** 4/2 4/4 4/5 4/8 38/6
**attorney's [3]** 35/10 35/13 35/15
**audience [1]** 16/21

**August [3]** 9/22 10/18 15/2
**August 8 [1]** 10/18
**August 8th [1]** 15/2
**authority [4]** 1/6 2/9 3/6 35/7
**available [3]** 11/15 17/16 22/15
**Ave [1]** 2/20
**Avenue [2]** 2/7 2/16
**award [1]** 38/6
**aware [3]** 24/1 29/9 29/18
**away [3]** 6/19 10/2 23/2

# B

**back [3]** 25/18 31/2 38/10
**backed [2]** 20/24 20/25
**bad [3]** 23/24 24/10 24/17
**bare [2]** 34/23 34/23
**Barran [1]** 2/15
**bars [1]** 35/9
**based [3]** 12/14 14/24 23/14
**bases [1]** 5/17
**basically [1]** 11/10
**basis [2]** 27/1 33/18
**be [50]**
**Beane's [2]** 10/8 15/21
**because [25]** 6/7 6/25 7/18 8/12 8/22 9/2 12/7 12/9 12/17 13/17 14/22 18/13 21/2 21/5 21/24 22/24 24/11 24/20 25/23 26/24 31/15 32/12 32/25 34/2 34/24
**been [18]** 3/12 5/13 5/17 6/4 6/15 8/23 9/9 13/24 15/15 17/13 18/16 18/19 19/12 20/5 21/15 22/17 26/14 31/4
**before [6]** 1/16 3/8 18/23 22/14 38/15 38/19
**begin [1]** 28/10
**behavior [2]** 21/1 21/4
**behind [1]** 32/15
**being [12]** 4/11 5/22 6/7 19/9 20/24 23/3 23/4 23/5 25/24 27/9 29/15 30/17
**believe [1]** 14/6
**below [1]** 41/4
**benefit [1]** 8/14
**Berri [1]** 16/15
**best [2]** 5/6 34/11
**BethAnne [7]** 9/13 10/8 11/2 11/13 20/6 21/18 22/3
**better [3]** 3/20 8/13 17/21
**between [2]** 14/10 32/7
**beyond [1]** 19/13
**big [3]** 4/22 24/1 26/4
**bigger [1]** 26/7
**bill [1]** 17/2

**billing [5]** 28/15 28/17 34/22 39/1 39/18
**bills [3]** 10/12 19/15 25/16
**Bonita [3]** 2/19 41/9 41/10
**both [2]** 23/24 33/9
**Bounds [1]** 16/13
**brief [3]** 10/22 20/15 23/17
**briefed [1]** 6/11
**briefing [6]** 8/4 11/23 29/9 35/12 36/9 37/2
**Broadway [1]** 2/11
**Buehler [1]** 16/12
**built [1]** 24/21
**burden [16]** 5/3 5/3 7/11 7/14 7/15 7/18 7/25 8/3 8/4 8/7 8/10 8/16 8/19 8/25 17/5 17/5
**business [6]** 9/7 9/8 9/19 11/16 13/15 17/15

# C

**calendar [2]** 22/10 22/10
**call [3]** 5/2 11/12 38/2
**campaign [1]** 24/7
**can [26]** 3/7 3/20 5/6 5/20 6/17 6/22 6/24 9/4 11/4 12/7 17/23 17/23 19/22 30/21 30/25 33/10 33/11 33/21 34/4 34/23 35/2 36/16 36/16 39/4 39/18 39/18
**can't [3]** 6/7 6/20 20/12
**candor [1]** 32/7
**cannot [1]** 34/19
**care [3]** 13/20 16/8 32/18
**case [33]** 1/4 3/5 4/20 5/10 5/12 7/6 8/2 8/5 8/7 8/8 8/9 9/11 13/6 13/19 16/6 17/14 17/16 19/9 20/13 21/10 23/19 23/20 24/2 30/13 31/1 31/8 31/18 35/19 36/23 37/6 37/15 37/15 37/25
**cases [4]** 5/5 17/13 21/8 36/1
**cause [1]** 41/6
**CCO [1]** 19/14
**Cedric [1]** 16/14
**cell [1]** 28/17
**center [2]** 19/9 23/20
**central [2]** 17/16 19/7
**centrality [3]** 6/12 38/13 38/14
**certain [2]** 7/22 20/5
**certainly [4]** 24/15 24/23 30/9 33/21
**certified [1]** 41/7
**certify [1]** 41/4
**cetera [2]** 25/25 35/10
**challenge [3]** 20/10 21/6 21/7
**change [2]** 21/2 21/4

**changing [1]** 21/4
**channels [1]** 39/4
**chart [1]** 15/21
**cheated [1]** 25/9
**chief [2]** 16/13 16/15
**Chris [2]** 2/15 4/7
**circle [1]** 5/17
**circumstance [1]** 9/3
**circumstances [8]** 5/7 7/4 7/5 7/21 7/23 7/25 8/2 18/14
**cited [3]** 17/13 21/10 36/1
**claim [5]** 8/24 23/23 23/23 23/25 34/4
**claiming [1]** 8/1
**clear [11]** 5/16 5/21 13/2 13/4 13/8 19/25 20/2 21/25 35/20 36/5 38/11
**clearer [1]** 5/22
**clearly [2]** 13/10 13/21
**close [2]** 22/25 30/12
**Coie [2]** 2/3 2/6
**come [1]** 11/23
**comes [1]** 14/5
**coming [1]** 10/12
**commentary [2]** 7/22 8/18
**common [1]** 4/14
**communicate [1]** 11/13
**communicated [4]** 9/15 11/5 12/13 13/11
**communicating [2]** 11/17 11/17
**communication [3]** 15/14 15/14 32/13
**communications [33]** 9/13 9/14 9/16 9/18 9/24 9/25 10/2 10/9 10/13 10/15 10/21 11/2 11/9 11/18 11/19 12/6 15/2 15/12 16/25 17/15 24/6 24/12 24/14 24/16 24/21 24/22 32/4 32/5 32/7 36/12 37/9 37/17 37/18
**compel [3]** 39/7 39/16 39/18
**complaint [1]** 16/20
**completely [2]** 8/17 19/17
**complying [1]** 21/3
**computers [1]** 21/9
**concern [1]** 17/2
**concluded [1]** 40/2
**concrete [2]** 17/6 19/13
**conduct [1]** 25/3
**conference [1]** 38/16
**conferences [1]** 25/25
**conformed [1]** 41/7

**consider [2]** 31/12 31/15
**consideration [1]** 20/18
**contain [4]** 11/20 17/7 19/24 38/4
**contained [2]** 15/10 36/20
**contend [2]** 15/4 25/1
**context [2]** 18/14 38/13
**contours [2]** 36/3 38/2
**contrary [1]** 19/23
**control [1]** 8/17
**corporation [1]** 1/3
**correct [4]** 19/10 26/16 35/17 41/5
**corresponding [1]** 26/9
**costs [3]** 35/10 35/14 35/15
**Couch [1]** 2/4
**could [13]** 15/14 17/7 17/24 19/7 22/8 24/18 24/19 27/3 28/10 28/15 30/23 31/9 36/23
**couldn't [1]** 22/13
**counsel [6]** 3/7 23/10 27/15 30/8 34/15 35/5
**couple [3]** 23/11 26/23 30/6
**course [6]** 6/25 7/19 15/11 17/1 25/13 35/14
**court [14]** 1/1 1/17 2/19 3/9 3/11 29/8 34/20 35/2 35/3 35/6 36/2 38/9 40/1 41/11
**Courthouse [1]** 2/19
**courts [1]** 7/2
**Cowie [8]** 9/13 10/3 10/24 11/8 20/8 21/13 22/10 29/8
**cracked [1]** 21/14
**create [1]** 25/2
**created [1]** 25/11
**creates [1]** 24/25
**creation [3]** 9/17 9/24 24/11
**credibility [2]** 23/3 24/8
**credibly [1]** 34/4
**critical [4]** 25/24 32/25 33/7 33/8
**CRR [2]** 2/19 41/10
**CSR [2]** 2/19 41/10
**current [2]** 3/9 3/11
**custodian [10]** 5/11 6/3 7/19 12/12 13/4 13/11 13/20 19/22 33/17 33/17
**custodian's [1]** 7/17
**custodians [21]** 9/11 12/3 12/5 12/6 12/13 12/13 12/22 13/14 18/17 20/6 21/12 22/4 22/9 28/22 29/13 29/13 29/23 30/1 34/1 34/2 34/8
**custodians' [3]** 12/16 12/18 30/17

**custody [1]** 7/19
**cv [2]** 1/4 3/5
**cycling [1]** 13/16

**D**

**daily [6]** 11/25 26/25 26/25 27/1 33/16 33/19
**Darby [9]** 9/13 10/3 10/8 10/25 11/3 20/6 21/18 22/4 29/19
**Darby's [1]** 29/10
**data [1]** 27/1
**date [3]** 14/14 33/7 41/10
**Dave [1]** 4/1
**David [1]** 2/9
**day [3]** 11/8 22/11 32/19
**days [1]** 27/2
**deal [3]** 19/15 20/20 22/1
**dealing [1]** 19/16
**deals [1]** 19/15
**dealt [1]** 36/2
**December [3]** 14/5 14/11 14/14
**December 2016 [1]** 14/11
**decide [2]** 5/6 23/3
**decision [2]** 5/23 8/10
**declaration [6]** 10/8 10/23 11/14 14/6 15/21 32/10
**defeat [1]** 10/14
**defendant [3]** 2/9 2/14 4/9
**Defendants [1]** 1/8
**defined [1]** 5/21
**definitively [1]** 22/13
**degree [6]** 4/18 4/21 13/3 13/12 13/20 39/5
**delete [8]** 13/5 13/21 29/11 29/20 33/21 33/22 34/24 35/1
**deleted [22]** 9/7 11/25 12/24 13/4 21/20 26/24 27/6 29/12 29/21 29/21 29/24 29/25 30/15 30/17 33/5 33/10 33/12 33/15 33/18 34/12 34/16 34/20
**deletes [1]** 33/21
**deleting [3]** 11/24 26/25 30/14
**deletion [2]** 7/20 34/2
**deletions [1]** 13/6
**depose [1]** 21/19
**deposed [1]** 22/15
**deposition [4]** 14/6 22/14 38/17 39/20
**depositions [1]** 22/19
**deprived [1]** 20/12
**deputy [1]** 16/15
**designations [1]** 38/17
**destroyed [7]** 4/25 5/13 8/13 17/14 36/10 37/5 37/14
**destruction [3]** 4/24 21/16

**destruction... [1]** 31/16
**detail [1]** 38/15
**determine [2]** 7/10 32/21
**developed [1]** 24/22
**did [10]** 20/19 21/1 21/25 22/14 22/23 25/1 25/11 25/18 30/1 35/1
**didn't [13]** 10/12 13/17 21/4 22/24 26/5 28/20 29/11 29/19 31/22 31/23 34/22 34/24 35/1
**different [8]** 13/19 21/8 24/5 25/12 32/6 32/6 32/13 35/4
**difficult [1]** 6/24
**direction [1]** 11/12
**director [6]** 9/14 9/14 10/19 11/9 26/12 26/22
**disagree [9]** 26/17 26/19 28/4 28/7 28/8 28/10 32/20 33/12 33/18
**discovery [8]** 22/19 22/25 28/13 28/14 31/10 31/10 39/12 39/21
**discretionary [1]** 5/23
**discussed [3]** 10/22 25/19 32/2
**discussion [1]** 32/6
**disparage [1]** 24/7
**disproved [1]** 6/4
**disproving [1]** 5/11
**dispute [6]** 4/13 4/18 4/19 4/21 9/23 14/10
**disputed [1]** 4/14
**DISTRICT [4]** 1/1 1/2 1/17 2/19
**do [36]** 3/16 5/16 7/2 7/3 7/15 8/23 9/2 13/17 13/20 15/4 16/5 18/10 18/15 20/4 22/17 22/18 23/21 26/14 26/17 27/2 27/6 28/3 28/25 31/3 31/4 35/18 35/19 35/21 36/4 36/6 36/16 37/25 38/1 38/5 38/12 39/3
**documents [2]** 22/20 36/12
**does [3]** 13/11 17/19 33/12
**doesn't [5]** 4/16 5/18 15/5 17/22 29/20
**doing [5]** 13/16 22/11 23/11 24/3 24/15
**don't [41]** 3/13 4/24 5/16 6/1 6/2 6/5 6/5 7/1 7/16 8/19 8/24 9/1 11/20 12/1 13/7 13/14 16/2 25/10 26/1 26/4 26/5 27/5 28/5 28/7 28/8 29/4 32/11 32/16 32/20 33/14 33/18 34/13 34/13 34/14 37/21 37/22 38/6 38/15

38/19 39/3 39/16
**down [6]** 19/6 22/9 23/10 23/13 26/15 39/18
**draft [6]** 10/9 15/1 15/13 15/14 16/25 17/15
**draw [1]** 35/23
**dropped [2]** 21/13 29/16
**dropping [2]** 21/15 29/8
**dubbed [1]** 24/7
**dumps [1]** 21/10
**during [4]** 9/22 10/4 16/18 38/20
**DV [1]** 17/15
**DV Communications [1]** 17/15

**E**

**e-mail [1]** 20/5
**e-mails [1]** 18/6
**earlier [6]** 7/17 13/25 18/13 24/19 25/18 32/9
**early [2]** 14/2 24/12
**Ed [1]** 4/10
**Edwin [1]** 2/14
**effort [3]** 26/14 26/18 28/18
**efforts [8]** 5/17 10/14 12/2 22/1 22/2 22/9 22/11 28/13
**either [2]** 17/25 24/9
**element [1]** 23/24
**elements [1]** 23/25
**else [1]** 39/16
**email [4]** 11/8 14/2 24/13 33/16
**emails [13]** 18/11 18/19 20/23 20/24 20/25 32/2 32/3 32/3 32/8 32/8 32/11 32/18 33/15
**ends [1]** 5/22
**enough [7]** 6/2 6/16 14/12 23/2 28/5 28/9 33/14
**entitled [2]** 36/7 41/6
**established [1]** 36/24
**establishing [1]** 36/12
**et [3]** 3/6 25/25 35/10
**et cetera [2]** 25/25 35/10
**even [6]** 3/9 4/24 8/24 25/18 28/9 39/5
**events [1]** 25/13
**every [3]** 12/10 20/5 30/14
**everything [5]** 31/9 33/10 33/13 33/21 33/21
**evidence [30]** 4/25 8/8 9/3 9/4 11/15 15/10 16/2 16/5 16/10 17/6 17/7 17/10 17/13 20/12 23/5 29/17 31/19 31/21 33/1 34/5 35/9 35/19 36/19 36/20 36/24 37/6 37/9 37/14 38/3 38/4

**evidentiary [1]** 35/14
**exact [1]** 36/2
**Exactly [1]** 15/13
**example [1]** 33/4
**examples [1]** 22/3
**exchange [2]** 10/17 10/24
**excuse [3]** 28/13 32/4 33/17
**exercise [1]** 37/10
**exercising [1]** 25/23
**Exhibit [6]** 10/23 11/13 15/20 15/20 15/20 32/9
**Exhibit 13 [1]** 15/20
**Exhibit 16 [1]** 11/13
**Exhibit 5 [2]** 10/23 32/9
**Exhibit 6 [1]** 15/20
**exhibits [3]** 10/7 32/9 38/17
**Exhibits 27 [2]** 10/7 32/9
**existing [1]** 10/6
**explain [2]** 10/2 20/17
**explaining [1]** 10/11
**explanation [6]** 18/25 20/16 28/24 29/11 29/22 34/15
**explanations [3]** 28/21 29/1 29/2
**exploded [1]** 10/20
**expressed [1]** 18/11
**extent [1]** 35/1
**external [6]** 9/15 15/19 15/22 16/22 17/9 17/18

**F**

**face [1]** 6/6
**fact [6]** 11/15 11/17 16/5 31/10 31/12 36/23
**factor [1]** 30/24
**facts [1]** 35/24
**fairly [2]** 36/17 36/17
**faith [1]** 23/24
**FAMILYCARE [34]** 1/3 3/6 3/22 3/25 6/6 6/10 8/5 8/16 13/24 14/8 15/7 16/3 16/23 17/7 19/14 19/17 19/21 21/18 21/25 22/6 22/16 23/23 24/8 24/23 25/14 25/15 25/15 25/23 30/18 35/4 36/11 36/13 37/5 37/10
**FamilyCare's [8]** 10/14 14/25 16/20 17/2 25/3 25/21 37/6 37/15
**far [4]** 6/8 25/18 25/18 29/17
**fault [2]** 4/17 4/18
**FC [1]** 10/12
**February [4]** 14/16 14/25 15/4 24/10
**February 18th [1]** 14/25

## F

feel [2]  3/14 28/9
fees [4]  35/10 35/14 35/15 38/6
few [2]  16/16 31/18
field [2]  20/11 20/14
fight [1]  4/17
figure [2]  7/4 18/4
file [2]  39/5 39/6
filing [1]  14/16
fill [1]  22/11
final [2]  22/22 35/3
find [1]  18/6
firestorm [1]  10/20
first [14]  3/9 7/12 9/5 13/7 14/7 14/20 16/17 24/13 24/13 24/18 25/23 29/9 29/16 37/11
five [2]  20/6 22/5
fixed [1]  21/14
flexibility [1]  8/3
flexible [1]  5/5
Floor [1]  2/4
fly [2]  32/14 39/3
focus [1]  17/4
focused [1]  35/5
folks [1]  19/9
following [2]  10/20 13/4
following: [1]  36/18
following:  You've [1]  36/18
foregoing [1]  41/4
forensic [1]  22/4
forgive [1]  3/10
form [1]  32/13
formal [1]  39/8
forthcoming [1]  27/13
forward [1]  25/14
found [1]  17/25
four [11]  16/11 16/16 17/8 17/18 17/23 18/3 18/4 18/6 18/15 18/25 19/6
frame [2]  9/20 15/24
free [1]  3/16
frequently [1]  13/14

## G

gave [2]  11/12 27/18
Gelser [1]  16/3
general [6]  4/2 4/4 4/5 4/8 37/7 37/13
generally [1]  20/11
get [16]  3/9 6/8 10/9 10/11 12/3 18/23 20/12 24/14 24/21 28/14 30/21 30/22 34/22 35/1 38/15 39/1
gets [1]  39/23

getting [1]  22/20
gift [1]  6/15
give [2]  22/3 27/17
given [4]  27/21 36/17 36/18 39/17
go [12]  3/21 3/23 5/19 6/2 6/19 10/25 20/19 22/10 25/18 30/3 34/7 39/4
goal [2]  10/14 31/15
going [14]  3/8 6/18 11/1 11/7 14/8 22/4 24/14 24/21 25/14 30/4 30/5 38/12 39/6 39/12
gone [1]  6/25
Good [1]  3/24
Gordon [2]  2/6 3/22
got [4]  12/11 13/18 34/5 34/24
governor [1]  15/2
grasp [2]  5/17 5/22
great [3]  6/22 20/20 22/1
Greg [1]  16/13
grounded [1]  24/25
guarded [1]  32/14
guess [5]  4/15 5/2 18/3 19/4 31/5
guilty [1]  8/11
gun [2]  31/20 32/24

## H

had [17]  3/19 7/19 9/11 13/23 13/24 16/5 21/15 21/18 21/24 22/9 22/18 23/5 27/8 27/13 27/15 31/8 36/16
half [8]  20/24 26/12 26/22 27/16 34/9 34/9 34/17 34/17
hand [2]  8/1 32/5
handful [3]  17/8 17/17 23/4
happen [1]  25/11
happened [8]  20/19 21/11 23/3 25/1 25/10 25/13 27/11 34/14
happens [1]  24/25
hard [2]  18/3 38/14
Harnden [2]  2/14 4/10
has [14]  3/11 5/13 15/18 15/21 17/7 19/16 20/5 22/17 25/6 30/10 32/22 33/2 35/4 35/7
hasn't [1]  16/23
have [93]
haven't [1]  19/1
having [1]  26/22
Hayden [1]  16/14
he [4]  8/7 11/11 21/13 21/14
head [1]  8/23
health [4]  1/6 2/9 3/6 16/8
hear [8]  3/20 6/11 6/17 6/21 6/22 18/1 20/16 35/24

heard [2]  34/15 36/19
hearing [6]  4/23 6/16 25/20 29/16 38/3 38/7
hearings [1]  3/12
heat [1]  4/17
Heatherington's [2]  22/23 39/13
heightened [1]  33/23
held [2]  5/6 5/8
helpful [2]  28/14 37/15
helps [1]  9/8
her [35]  9/6 9/13 9/14 9/14 10/11 10/19 11/25 14/3 14/6 14/6 14/12 15/1 15/3 20/7 20/8 20/22 20/23 20/23 20/24 20/25 21/1 21/2 21/4 21/4 21/7 21/19 21/20 22/10 22/11 22/14 23/14 29/12 29/20 29/21 30/17
Herbold [1]  2/11
here [44]
herself [1]  26/24
hide [3]  21/20 33/7 33/22
hiding [1]  33/6
him [1]  16/9
his [5]  20/9 21/13 21/15 29/8 39/20
hit [2]  7/9 18/3
hold [6]  5/10 8/16 13/22 14/5 14/14 21/3
Honor [43]
Honor's [2]  12/1 20/3
HONORABLE [1]  1/16
hope [1]  6/18
hours [1]  22/18
how [9]  4/19 4/19 11/7 13/10 20/16 24/9 26/4 27/5 31/16
However [1]  18/15
hub [2]  5/20 28/22
hunting [1]  18/5
hurt [3]  25/9 31/22 31/22
hurtful [1]  37/15

## I

I'd [5]  5/2 7/11 20/21 32/21 32/24
I'll [10]  5/22 6/10 6/11 30/3 37/24 38/2 38/5 38/6 38/15 39/7
I'm [28]  3/8 3/10 5/21 6/16 6/18 11/3 18/4 20/17 21/5 24/1 24/24 25/5 27/24 27/25 29/9 29/18 31/5 32/24 32/25 33/6 35/20 36/3 38/1 38/5 38/10 38/12 39/6 39/11
I've [8]  4/12 5/21 20/15 36/4

**I**

**I've... [4]**  36/16 36/17 36/17 38/17
**idea [1]**  6/2
**identified [2]**  9/11 26/8
**identify [1]**  26/21
**implementation [17]**  9/17 15/8 15/11 15/18 15/24 16/2 16/5 16/10 16/19 16/21 16/24 17/10 19/7 23/5 23/15 23/17 37/17
**implemented [3]**  15/15 36/12 37/9
**important [6]**  4/19 11/22 19/7 28/12 30/20 31/12
**importantly [2]**  10/5 17/4
**impose [2]**  4/24 5/23
**improve [1]**  3/18
**INC [2]**  1/3 3/6
**inclination [1]**  5/10
**inclined [1]**  38/23
**including [5]**  9/12 10/2 25/25 35/9 37/9
**indicate [1]**  8/24
**indicated [1]**  7/4
**indicates [2]**  8/3 26/25
**indications [2]**  7/5 7/17
**indicia [1]**  7/5
**individuals [3]**  16/24 19/13 19/14
**infer [2]**  36/19 36/23
**inference [11]**  5/25 5/25 19/24 35/21 35/22 35/22 35/23 35/25 36/3 38/1 38/2
**inferences [2]**  9/4 37/13
**information [19]**  6/25 7/7 7/24 9/12 11/21 14/22 17/16 27/14 27/16 27/21 27/23 28/2 28/3 28/20 30/21 31/1 31/3 33/15 38/25
**inquiry [5]**  14/22 30/11 31/15 31/23 31/25
**instance [4]**  16/25 17/14 20/6 21/13
**instructed [1]**  23/4
**instructing [1]**  36/10
**instruction [7]**  15/8 19/21 35/6 35/8 36/9 36/14 37/3
**instructions [2]**  35/10 36/18
**instructive [1]**  20/4
**instrumental [1]**  9/16
**intention [1]**  21/9
**intentional [1]**  21/17
**intentionality [3]**  20/20 33/6 33/11

**intentionally [2]**  21/20 30/14
**interrogatories [1]**  22/19
**interrupted [1]**  30/2
**intervening [1]**  39/1
**introduce [1]**  3/7
**introducing [1]**  25/15
**involve [2]**  12/6 23/24
**involved [1]**  19/6
**involves [2]**  6/5 23/25
**involving [1]**  12/20
**is [140]**
**isn't [6]**  6/3 19/8 26/23 30/19 30/23 33/24
**issue [10]**  5/3 6/12 8/21 11/18 13/3 14/15 24/6 35/7 39/17 39/21
**issued [1]**  28/16
**issues [1]**  9/17
**it [67]**
**it's [26]**  4/14 5/4 5/11 6/7 7/17 8/6 8/22 9/21 13/8 15/20 17/9 18/14 20/18 21/1 26/2 26/7 28/12 30/15 32/14 32/14 33/23 34/1 35/14 38/18 38/19 39/16
**items [4]**  4/15 4/20 5/19 6/4
**its [8]**  8/14 8/17 16/20 24/8 25/23 27/8 32/23 37/11
**itself [1]**  38/13

**J**

**January [1]**  24/12
**job [1]**  7/11
**Joyce [2]**  2/10 4/5
**JUDGE [4]**  1/17 8/5 8/6 8/9
**judgment [1]**  25/20
**July [1]**  41/9
**June [2]**  1/6 3/2
**jury [13]**  15/9 19/23 23/3 23/4 35/6 35/8 35/11 35/18 35/23 36/9 36/10 36/14 37/4
**just [32]**  3/18 5/5 6/18 9/1 11/23 12/14 13/24 17/20 18/11 20/1 20/15 20/17 21/5 21/25 23/15 26/23 27/3 27/8 27/16 29/10 30/16 31/6 31/8 31/11 32/24 33/7 35/15 37/14 38/12 38/19 39/11 39/22

**K**

**keep [1]**  17/11
**key [8]**  14/22 16/20 16/24 17/14 23/19 23/19 30/13 30/13
**kicked [1]**  14/13
**kind [3]**  3/12 7/3 36/2
**knew [2]**  14/7 26/6

**know [33]**  6/5 6/5 6/20 8/19 9/7 9/9 9/20 10/5 10/12 13/1 13/10 13/15 16/1 19/21 20/22 21/16 25/9 25/10 26/4 26/5 26/5 27/5 28/10 28/19 28/24 31/20 33/7 34/11 34/13 34/13 36/6 36/22 38/6
**knowing [1]**  17/24
**knowledge [2]**  13/4 13/8
**Knute [1]**  16/12
**Kolmer [1]**  16/7

**L**

**laid [1]**  35/12
**large [1]**  32/22
**larger [2]**  26/11 27/5
**Last [1]**  13/1
**later [5]**  10/10 11/8 14/13 36/3 36/5
**latter [1]**  7/12
**Laura [2]**  2/10 4/3
**law [1]**  5/4
**lawmakers [2]**  19/17 22/21
**leads [1]**  22/16
**least [4]**  5/21 26/15 30/14 30/24
**leave [4]**  3/14 3/18 6/18 36/5
**leaves [1]**  36/2
**leaving [1]**  26/11
**left [1]**  16/11
**legalese [1]**  13/18
**legislators [2]**  16/21 25/15
**legislature [1]**  10/14
**Leslie [1]**  16/15
**less [3]**  32/14 33/6 33/6
**let [4]**  6/20 18/23 22/3 38/11
**let's [4]**  18/14 24/21 33/20 35/21
**level [5]**  5/24 20/11 20/13 32/6 32/6
**Liebman [1]**  2/15
**like [13]**  4/14 7/12 9/12 12/7 14/18 20/21 20/23 21/10 32/15 35/19 36/22 38/18 39/20
**likelihood [1]**  27/5
**likely [5]**  9/12 11/20 14/9 18/6 32/14
**limited [2]**  28/2 39/21
**limits [1]**  39/6
**lines [1]**  11/3
**link [1]**  19/8
**list [1]**  25/21
**litigant [1]**  14/2
**litigation [17]**  13/5 13/9 13/15 13/21 13/24 14/1 14/1 14/3

**L**

**litigation... [9]** 14/5 14/8 14/11 14/13 14/14 14/16 21/3 24/23 25/18
**little [4]** 3/18 17/20 18/24 30/15
**LLP [3]** 2/3 2/6 2/15
**logically [1]** 8/11
**look [11]** 3/18 7/1 7/3 7/9 7/10 7/11 9/3 19/11 32/1 32/3 39/13
**looked [1]** 38/17
**looking [6]** 19/11 32/21 32/24 32/25 33/3 33/23
**Lorissa [1]** 16/13
**lose [1]** 6/16
**lost [2]** 5/13 21/15
**lot [5]** 4/17 17/22 31/21 31/21 33/1
**low [1]** 7/24
**LYNNE [5]** 1/7 2/14 4/10 9/6 10/12

**M**

**made [5]** 5/17 10/21 12/2 26/14 28/18
**mail [1]** 20/5
**mails [1]** 18/6
**main [1]** 9/17
**make [6]** 9/4 13/2 20/2 21/24 31/24 31/25
**making [2]** 18/7 19/1
**mandatory [6]** 5/25 35/6 35/7 35/22 36/14 37/3
**many [8]** 12/3 14/15 18/18 19/15 19/15 27/5 29/24 29/25
**Marie [1]** 2/10
**mark [1]** 22/13
**Markowitz [3]** 2/9 2/11 4/1
**mask [2]** 3/13 3/15
**masks [3]** 3/18 6/15 6/17
**matrix [3]** 12/14 27/2 27/17
**Matt [1]** 3/24
**matter [1]** 15/5
**matters [6]** 13/3 18/4 18/11 18/12 18/25 20/20
**Matthew [3]** 2/3 2/6 3/22
**may [17]** 4/15 4/18 7/23 7/25 7/25 8/23 11/22 11/22 19/12 21/23 25/7 31/17 36/19 37/4 38/3 38/16 38/21
**McShane [3]** 8/6 8/6 8/9
**me [15]** 3/10 3/19 6/15 6/20 6/21 11/4 17/22 18/23 22/3 28/13 32/4 33/17 35/23 36/15

38/11
**mean [2]** 17/23 27/22
**Meaning [1]** 34/11
**means [1]** 5/15
**measure [1]** 38/14
**mechanism [1]** 39/15
**media [6]** 10/20 11/1 11/2 11/7 16/19 16/21
**member [1]** 16/19
**mentioned [5]** 3/10 5/14 11/12 29/25 37/3
**merely [1]** 12/19
**Mertens [4]** 2/3 3/24 10/24 32/10
**message [10]** 11/6 11/11 12/10 12/12 16/4 16/7 16/9 18/18 18/18 22/12
**messages [65]**
**messages: [1]** 16/12
**messages: one [1]** 16/12
**metadata [4]** 16/9 26/9 26/21 27/6
**MICHAEL [1]** 1/16
**microphone [1]** 6/14
**middle [1]** 37/1
**might [15]** 3/17 4/20 4/20 5/15 6/4 6/4 6/6 6/8 7/3 22/12 22/17 31/4 31/25 32/23 39/12
**mind [3]** 13/2 17/11 21/2
**minor [1]** 4/25
**minute [1]** 10/10
**misleading [1]** 23/12
**missing [41]** 4/15 4/20 6/4 6/7 7/6 7/7 7/24 8/22 9/2 12/4 12/4 12/7 12/8 12/8 12/9 12/11 12/18 12/19 12/25 14/21 18/10 18/18 20/17 20/19 22/1 22/5 28/23 29/3 29/6 31/19 31/20 32/22 33/8 33/24 33/25 34/1 34/6 36/24 38/4 39/13 39/19
**misunderstanding [1]** 20/23
**MO [2]** 1/4 3/5
**moment [1]** 33/20
**month [1]** 27/16
**months [1]** 39/1
**more [18]** 17/4 18/5 18/24 24/6 25/16 28/19 30/3 31/5 32/14 32/14 32/22 36/22 37/8 37/16 38/14 38/25 39/8 39/12
**Moreover [3]** 15/18 16/1 17/19
**Morgan [2]** 2/15 4/7
**morning [1]** 3/24
**MOSMAN [1]** 1/16
**most [14]** 8/15 10/5 10/17 12/5 12/5 14/14 17/1 26/10 30/14

30/16 32/12 32/17 37/25 38/1
**motion [3]** 35/16 39/7 39/15
**motions [2]** 4/14 39/12
**motive [18]** 23/18 23/18 23/18 23/21 23/22 24/2 24/2 24/10 24/18 24/24 24/25 25/2 25/7 25/9 25/11 25/17 32/15 37/17
**move [2]** 39/18 39/19
**Mr [5]** 2/3 2/6 2/9 2/14 2/15
**Mr. [9]** 10/3 10/24 10/24 20/8 21/13 22/10 22/23 29/8 39/13
**Mr. Cowie [6]** 10/3 10/24 20/8 21/13 22/10 29/8
**Mr. Heatherington's [2]** 22/23 39/13
**Mr. Mertens [1]** 10/24
**Ms [4]** 2/10 2/10 13/3 28/12
**Ms. [58]**
**Ms. Beane's [1]** 15/21
**Ms. Darby [3]** 10/3 10/25 29/19
**Ms. Darby's [1]** 29/10
**Ms. Salerno [2]** 11/14 28/12
**Ms. Saxton [46]**
**Ms. Saxton's [4]** 12/11 23/18 28/16 28/24
**Ms. Stephens [1]** 3/10
**much [11]** 5/4 8/13 15/5 23/7 24/19 26/7 26/11 27/5 27/19 27/19 31/16
**multiple [2]** 27/2 27/3
**must [2]** 15/9 19/23
**my [9]** 5/10 6/16 12/17 13/2 13/11 19/20 22/22 24/1 25/10

**N**

**N.W [1]** 2/4
**nail [1]** 39/17
**narrow [1]** 23/10
**nearly [2]** 12/10 18/16
**need [4]** 10/9 10/11 24/14 37/4
**negative [2]** 36/21 38/4
**negligence [3]** 20/19 20/22 21/16
**never [1]** 21/19
**next [5]** 10/9 18/21 18/23 19/19 19/20
**no [25]** 1/4 3/5 3/13 4/25 8/11 13/10 13/25 14/1 14/13 19/5 19/22 25/4 27/10 27/21 27/21 27/22 27/24 27/24 28/6 29/4 29/16 29/22 33/11 34/9 34/17
**nobody [1]** 6/18
**non [2]** 1/3 31/17
**non-profit [1]** 1/3
**non-spoliating [1]** 31/17

**N**

**None [1]** 27/11
**nonjury [1]** 3/11
**nonprofit [1]** 16/8
**normal [1]** 39/4
**normally [1]** 13/16
**not [61]**
**notable [1]** 21/1
**note [3]** 6/24 35/3 36/1
**noted [2]** 8/9 36/4
**nothing [5]** 12/22 16/5 21/6 21/16 29/12
**notice [3]** 14/5 14/14 16/25
**notices [1]** 6/19
**notion [1]** 26/19
**now [7]** 3/20 6/18 6/22 25/20 29/2 29/15 33/10
**number [18]** 9/5 12/23 17/22 17/25 18/10 18/12 19/3 23/11 23/11 23/13 25/12 26/1 26/4 26/8 28/18 30/1 34/10 36/1
**numbers [4]** 20/2 20/3 34/23 34/24

**O**

**o0o [1]** 41/2
**obligation [2]** 13/21 14/13
**obtained [1]** 31/10
**obtaining [2]** 36/11 37/5
**obvious [1]** 20/18
**occasions [1]** 36/16
**occurred [2]** 3/19 27/22
**October [3]** 9/21 14/2 14/10
**October 2016 [2]** 9/21 14/10
**off [3]** 3/13 3/15 13/16
**Official [1]** 41/11
**oftentimes [1]** 36/2
**oh [1]** 21/25
**OHA [35]** 8/4 9/11 10/19 12/15 14/11 14/12 15/19 15/22 16/22 17/19 19/15 19/16 20/5 21/25 22/22 23/24 25/24 26/8 26/8 26/12 27/2 27/8 27/13 27/15 28/16 28/17 30/10 32/1 36/10 36/12 36/21 37/4 37/9 38/4 39/2
**OHA's [3]** 10/1 34/22 37/15
**OHA-issued [1]** 28/16
**old [1]** 6/16
**Omnigen [1]** 8/8
**once [7]** 5/21 6/9 8/10 10/20 15/15 22/7 38/16
**one [40]** 3/13 3/17 4/25 5/12 5/18 6/1 7/9 7/9 7/12 8/7 8/22

9/16 12/12 13/17 16/2 16/12 16/13 16/14 16/15 16/17 18/6 18/8 18/11 18/18 18/25 19/22 19/22 20/18 23/13 24/5 28/6 31/2 32/1 32/23 33/3 33/16 33/17 37/4 37/7 38/24
**ones [1]** 34/21
**only [13]** 4/15 9/6 12/19 15/15 18/17 20/6 20/8 26/20 26/22 31/18 33/16 34/5 34/20
**opponent [1]** 30/22
**opportunity [5]** 21/18 22/18 22/23 39/6 39/13
**oral [2]** 1/14 3/5
**order [1]** 33/22
**OREGON [13]** 1/2 1/3 1/6 1/7 1/8 2/9 3/6 4/2 4/4 4/6 4/8 16/12 16/14
**Oregonian [2]** 11/9 11/11
**original [2]** 31/2 41/6
**other [36]** 5/2 5/18 8/1 12/3 12/5 12/6 12/13 12/13 12/16 12/17 13/16 17/13 18/11 19/12 21/8 21/12 22/4 22/8 22/9 22/20 27/5 28/6 28/13 28/22 29/13 29/23 30/6 30/16 31/1 32/5 32/23 34/1 34/2 34/5 34/15 35/10
**others [1]** 18/18
**otherwise [3]** 3/14 20/12 36/13
**ought [1]** 30/20
**our [4]** 10/22 22/2 23/17 35/12
**out [15]** 3/9 7/4 8/17 14/5 16/16 18/4 22/11 25/14 25/15 26/10 27/3 27/8 30/22 35/12 36/15
**outside [2]** 15/19 39/5
**outsized [1]** 33/2
**over [11]** 4/17 14/3 18/16 20/7 20/9 22/6 25/13 25/21 25/23 26/22 27/16
**overall [3]** 26/20 27/4 30/19
**Owens [5]** 2/10 4/3 11/14 28/12 28/12
**own [1]** 14/3

**P**

**page [2]** 10/23 23/16
**papers [1]** 16/4
**parameter [1]** 15/23
**paraphrasing [1]** 11/3
**part [6]** 5/15 10/1 10/13 20/5 24/1 26/3
**particular [3]** 19/6 29/24 36/23
**particularly [1]** 35/5

**parties [1]** 14/10
**partly [2]** 19/2 19/3
**party [5]** 8/1 8/11 8/12 20/11 31/17
**pause [1]** 3/8
**PC [1]** 2/11
**people [14]** 9/10 9/11 9/12 9/15 9/20 10/4 11/16 15/19 15/21 16/22 17/9 17/18 19/6 34/5
**percent [5]** 20/4 30/10 30/22 31/9 31/9
**percentage [1]** 31/19
**percentage-wise [1]** 31/19
**perfection [6]** 20/1 30/8 30/9 30/11 30/12 30/18
**perfectly [1]** 18/19
**perhaps [1]** 10/17
**period [5]** 9/23 14/9 14/24 15/17 21/2
**Perkins [2]** 2/3 2/6
**permissive [8]** 5/24 35/7 35/21 35/25 36/9 37/3 37/25 38/2
**person [3]** 5/18 30/13 33/8
**persuaded [2]** 37/25 38/1
**phase [1]** 16/19
**phone [9]** 9/6 12/11 21/13 21/14 21/15 28/17 29/8 29/15 34/6
**phones [3]** 12/16 12/18 34/20
**picture [1]** 32/22
**piece [4]** 13/17 32/22 32/25 37/8
**place [1]** 3/5
**placed [1]** 8/1
**Plaintiff [2]** 1/4 2/3
**plan [30]** 9/16 9/18 9/24 9/25 10/2 10/10 10/13 10/16 10/21 11/2 11/18 11/19 15/2 15/12 15/14 15/14 16/25 17/15 24/6 24/12 24/14 24/16 24/21 32/4 32/5 32/7 36/13 37/9 37/17 37/18
**plans [1]** 24/22
**plausibility [1]** 19/11
**plausible [6]** 17/6 17/9 19/2 19/5 19/13 26/24
**played [2]** 16/24 36/15
**playing [2]** 20/11 20/13
**please [1]** 6/20
**point [14]** 11/22 16/16 18/7 18/8 18/21 18/23 19/19 19/20 20/3 21/23 22/16 22/22 23/10 31/11
**points [2]** 18/9 30/6

**Portland [5]** 1/8 2/4 2/12 2/16 2/20

**position [4]** 8/13 8/22 13/22 14/12

**possible [3]** 23/11 37/13 38/25

**possibly [1]** 27/4

**postdate [2]** 14/15 14/16

**potential [1]** 7/6

**precise [1]** 38/14

**predate [1]** 24/10

**prefer [1]** 6/13

**prejudice [3]** 8/12 22/17 31/15

**prejudiced [1]** 31/17

**preponderance [1]** 8/7

**present [1]** 13/5

**presented [1]** 19/1

**preservation [2]** 20/1 20/4

**preserved [3]** 18/20 20/5 30/10

**president [1]** 16/8

**press [9]** 17/20 24/7 25/14 27/14 27/14 27/14 27/15 27/15 27/15

**pressure [1]** 3/14

**presume [4]** 15/9 23/4 36/10 37/4

**presume a [1]** 23/4

**pretrial [1]** 38/16

**pretty [2]** 18/3 35/19

**prevent [3]** 36/11 37/5 37/14

**principle [1]** 31/6

**prior [4]** 15/4 24/22 24/22 25/18

**probably [3]** 10/5 30/13 38/12

**problem [1]** 26/3

**proceedings [3]** 1/15 40/2 41/5

**process [3]** 9/24 27/20 28/19

**produce [1]** 31/23

**produced [13]** 12/15 18/16 20/7 20/9 22/6 31/9 31/10 31/21 32/2 33/1 34/9 34/9 34/18

**production [1]** 5/3

**profit [1]** 1/3

**proof [5]** 5/4 8/3 8/4 8/7 8/11

**proportionate [1]** 19/24

**proportionately [1]** 32/23

**prove [2]** 6/3 20/12

**proven [1]** 6/7

**provide [2]** 28/17 28/20

**provided [3]** 12/15 27/2 31/1

**provides [1]** 19/25

**proving [4]** 5/7 5/8 5/11 8/17

**public [4]** 10/1 10/21 22/20 25/21

**publicly [1]** 17/16

**punitive [1]** 24/5

**purpose [1]** 20/20

**purposes [6]** 9/7 9/19 11/16 13/5 13/22 14/13

**put [1]** 18/14

## Q

**question [17]** 5/1 5/1 5/12 6/1 12/1 12/17 13/1 14/21 17/5 17/12 20/17 21/24 24/1 28/5 31/2 38/19 38/21

**questions [7]** 4/22 5/2 5/16 27/13 30/3 31/2 37/22

**quite [1]** 12/23

**quote [1]** 8/5

## R

**raised [1]** 30/7

**range [3]** 35/4 35/11 37/12

**rate [1]** 24/5

**rates [3]** 9/21 9/23 14/3

**ratio [1]** 30/19

**read [3]** 20/15 33/11 33/11

**readily [1]** 7/23

**real [2]** 28/15 28/18

**realize [1]** 22/24

**realized [1]** 22/7

**really [18]** 4/13 5/4 7/8 9/5 9/16 13/17 14/22 15/5 17/22 19/1 25/13 28/5 30/10 31/22 31/22 32/25 33/6 33/22

**reason [4]** 15/6 28/4 28/7 28/8

**reasonably [1]** 13/8

**reasons [2]** 19/12 19/13

**rebut [2]** 6/7 6/8

**rebuttal [1]** 23/17

**recall [2]** 10/13 13/23

**receive [1]** 30/1

**received [3]** 12/22 12/23 33/16

**receivers [2]** 5/19 19/4

**recess [4]** 38/8 38/9 39/25 40/1

**recipients [1]** 19/3

**record [6]** 3/7 29/17 29/17 38/10 39/8 41/5

**records [9]** 7/19 10/1 28/15 28/17 34/6 34/22 39/1 39/18 39/22

**recover [6]** 9/10 16/3 21/22 22/2 22/5 22/8

**recoverable [1]** 29/14

**recovered [1]** 21/21

**reduction [3]** 27/7 27/22 28/4

**referenced [2]** 28/13 32/8

**referring [1]** 13/6

**reflective [1]** 32/8

**refused [1]** 28/17

**regurgitates [1]** 11/10

**relate [2]** 22/12 23/15

**related [2]** 9/8 34/21

**relations [1]** 9/15

**release [2]** 9/23 9/25

**released [1]** 9/22

**relevance [1]** 6/12

**relevant [13]** 4/20 9/12 9/20 9/21 10/4 10/5 14/24 15/16 16/18 23/14 24/15 27/4 30/11

**remain [1]** 6/14

**remedies [2]** 23/15 23/16

**remedy [2]** 6/9 22/17

**removing [1]** 21/6

**reopen [1]** 39/16

**repetitive [1]** 37/21

**replicability [1]** 5/21

**replicable [2]** 4/22 31/3

**replicate [1]** 12/2

**replicated [2]** 5/15 5/20

**replication [1]** 21/23

**reply [3]** 10/22 21/10 23/8

**report [1]** 9/25

**reporter [4]** 2/19 11/9 11/11 41/11

**represent [1]** 34/19

**representation [1]** 23/14

**representations [1]** 34/23

**representative [2]** 16/13 16/14

**representatives [3]** 17/1 17/3 19/15

**representing [2]** 4/9 4/10

**request [2]** 10/1 35/13

**requested [4]** 35/12 36/8 36/14 39/2

**requests [3]** 22/19 22/19 22/20

**requirement [1]** 13/4

**resignation [2]** 10/19 15/3

**resigned [1]** 15/16

**resolution [1]** 9/24

**resolve [1]** 36/6

**respect [2]** 6/23 29/13

**respond [1]** 14/18

**responsible [4]** 5/6 5/8 5/11 7/20

**responsive [1]** 26/10

**rests [1]** 19/2

**resulted [1]** 8/12

**retaliate [8]** 24/2 24/3 24/24 25/1 25/2 25/7 25/11 25/17

**retaliated [3]** 25/22 25/22

**R**

retaliated... [1]  36/13
retaliating [2]  23/22 37/10
retaliation [3]  23/25 23/25 24/10
retrieved [1]  30/23
reveal [1]  32/14
reviewed [1]  4/12
RFPs [1]  28/13
right [21]  3/20 6/22 6/24 10/18 17/5 17/23 17/25 18/7 19/8 20/24 25/8 25/23 28/11 31/24 32/19 34/19 35/16 35/18 36/25 37/1 37/19
rights [1]  37/11
RMR [2]  2/19 41/10
Robb [2]  9/13 11/8
role [1]  16/24
Room [1]  2/20
rule [16]  3/9 3/11 7/2 7/3 7/21 7/22 8/3 8/18 8/18 19/25 19/25 31/6 35/6 35/8 38/23 39/7
ruled [2]  26/10 27/8

**S**

S.W [3]  2/11 2/16 2/20
said [12]  8/6 8/7 8/10 11/25 14/6 14/9 14/11 26/24 27/8 27/17 29/7 30/20
Salerno [4]  2/10 4/3 11/14 28/12
same [6]  11/8 29/10 31/3 32/2 35/22 39/15
sanction [4]  13/12 13/12 14/23 35/15
sanctions [14]  4/23 4/24 5/23 5/24 8/1 15/7 15/7 20/10 20/13 20/18 31/12 35/5 35/9 35/11
SAXTON [56]
Saxton's [4]  12/11 23/18 28/16 28/24
say [12]  6/17 25/6 27/15 30/3 30/4 30/5 30/10 31/8 32/11 32/18 33/1 38/11
saying [6]  14/2 18/1 27/24 27/25 32/11 33/10
says [11]  5/5 7/22 8/4 10/11 11/3 14/4 24/14 24/20 26/8 26/8 29/10
scope [1]  23/14
screen [2]  21/6 21/13
Sean [1]  16/7
seated [1]  6/14
Seattle [1]  2/7

second [5]  2/16 5/14 9/9 16/23 24/5
see [15]  5/20 10/7 10/8 10/10 10/17 11/6 11/8 24/20 27/2 28/15 32/5 34/23 38/13 38/14 39/23
seek [3]  15/8 23/15 23/16
seeks [2]  15/7 19/21
seen [1]  38/17
selective [1]  34/2
selectively [3]  12/24 12/25 29/25
selectivity [4]  33/4 33/6 33/23 33/25
senate [1]  17/2
Senator [1]  16/3
senators [1]  17/3
senders [2]  5/19 19/4
sending [1]  27/3
sends [1]  14/2
senior [1]  16/8
sentence [1]  3/9
set [1]  3/5
sets [1]  26/8
setting [1]  24/5
settled [1]  13/25
several [3]  4/13 5/2 25/20
severe [1]  19/22
she [50]
she's [2]  21/20 24/15
shifts [1]  8/11
short [2]  27/12 27/18
should [9]  3/14 5/6 5/8 8/13 8/22 9/1 30/24 36/10 39/4
shouldn't [1]  32/18
show [6]  7/14 7/18 8/11 8/13 33/5 33/23
shown [3]  8/10 17/7 33/2
shows [1]  16/9
shrink [1]  23/13
Shumway [3]  2/19 41/9 41/10
side [1]  36/21
signaled [1]  15/1
signature [2]  41/7 41/7
signing [1]  41/4
similarly [1]  28/21
since [4]  6/16 38/23 38/24 39/7
single [1]  30/14
sit [1]  22/9
six [3]  15/24 19/7 26/1
size [1]  32/23
sledgehammers [1]  21/9
small [3]  23/11 33/1 33/2
smear [1]  24/7
smoking [2]  31/20 32/24

so [90]
some [22]  3/17 4/22 5/16 8/20 12/21 12/21 12/22 18/17 21/21 22/3 26/14 27/9 27/12 28/1 28/2 29/21 30/3 31/19 31/21 34/18 34/24 34/25
somebody's [1]  32/15
something [15]  6/6 8/17 8/24 9/2 11/3 11/4 24/25 25/10 27/7 28/4 30/19 31/14 32/15 35/19 36/25
Sometimes [1]  38/13
sorry [3]  15/20 25/5 38/10
sort [6]  5/2 5/7 5/20 18/5 28/22 36/25
speak [3]  6/14 21/23 31/20
speaking [2]  25/14 25/15
special [4]  4/1 4/3 4/5 4/7
specialists [1]  9/14
specific [5]  36/17 36/22 37/8 37/16 37/22
specifically [1]  37/16
spin [2]  11/7 11/19
spoliating [1]  31/17
spoliation [3]  8/10 8/12 31/16
staff [4]  11/5 11/13 16/13 16/15
standard [4]  13/8 20/1 30/8 30/9
start [5]  6/10 7/12 20/21 35/21 39/22
started [1]  24/12
starting [3]  6/10 6/16 31/11
state [11]  1/7 4/2 4/4 4/6 4/8 16/12 16/14 17/1 17/3 17/3 22/13
statement [3]  29/7 29/15 29/19
statements [2]  25/21 29/5
STATES [3]  1/1 1/17 2/19
step [1]  6/9
Stephens [1]  3/10
still [1]  29/12
stop [1]  21/4
story [2]  11/1 11/7
stranger [2]  14/1 14/1
Street [1]  2/4
subject [1]  33/5
submitted [2]  4/12 25/21
subsequent [1]  10/1
successful [1]  22/3
such [3]  7/24 20/6 21/9
suffer [1]  22/18
suggest [3]  11/19 16/10 37/13
suggested [1]  37/4
suggesting [1]  36/3

**suggests [1]**  8/18
**Suite [3]**  2/7 2/11 2/16
**summary [1]**  25/20
**support [1]**  37/6
**suppose [1]**  18/4
**supposes [1]**  7/3
**suppression [2]**  5/25 6/1
**sure [9]**  3/10 7/13 13/2 13/13 14/7 21/21 31/7 36/8 38/5
**surprised [1]**  38/18
**surprising [1]**  32/12
**surrounding [1]**  28/23

**T**

**take [11]**  3/13 3/15 6/9 23/2 27/8 30/20 30/24 30/25 37/24 38/12 39/20
**takes [1]**  14/12
**talk [3]**  6/8 23/17 23/18
**talked [4]**  11/10 18/13 23/19 30/8
**talking [11]**  10/8 11/6 11/24 15/24 28/16 30/11 30/12 30/16 32/3 32/5 32/10
**talks [1]**  32/1
**Taylor [1]**  21/10
**tell [10]**  11/4 15/9 17/22 21/25 27/18 27/19 29/20 35/2 35/18 35/23
**telling [2]**  10/17 35/20
**tells [1]**  11/11
**temporal [1]**  23/13
**ten [2]**  29/23 34/5
**terms [3]**  25/3 25/4 25/6
**testified [3]**  9/6 21/19 33/15
**testify [2]**  19/22 23/6
**testimony [3]**  14/7 21/7 29/10
**text [55]**
**texted [4]**  9/10 9/19 10/6 29/14
**texting [5]**  10/4 10/15 11/1 19/12 27/1
**texts [31]**  8/19 9/7 9/9 10/6 10/7 10/8 10/22 11/20 20/23 24/15 26/9 26/23 26/23 26/25 26/25 27/3 27/6 28/16 28/23 32/7 33/8 34/6 34/9 34/10 34/12 34/14 34/17 34/18 34/20 35/24 38/4
**than [11]**  13/16 14/13 18/6 18/11 24/20 26/7 26/11 27/5 32/23 33/7 34/15
**Thank [11]**  4/11 6/13 14/17 14/19 19/18 23/7 23/9 37/19

**that [252]**
**that's [42]**
**their [16]**  7/19 8/4 11/1 12/18 12/19 16/4 20/13 27/15 28/23 29/1 29/9 29/23 34/6 34/12 34/14 34/20
**them [32]**  6/18 7/9 9/11 11/4 11/6 11/18 12/1 12/3 12/5 13/18 14/15 16/2 17/1 17/24 21/20 21/21 21/22 26/10 27/7 27/16 29/2 29/24 30/15 30/15 30/16 31/22 31/23 34/22 34/25 35/20 35/20 36/17
**themselves [1]**  20/3
**then [23]**  5/14 5/20 5/22 8/21 10/5 10/10 11/7 13/16 20/13 22/14 27/9 27/17 29/2 29/22 30/23 31/11 32/9 33/5 33/20 34/25 36/22 37/8 37/16
**theory [5]**  19/2 19/5 19/8 24/17 25/17
**there [24]**  3/8 4/12 4/14 7/6 8/2 8/20 13/12 14/8 18/8 18/15 19/8 19/12 19/13 21/8 22/7 25/12 28/9 29/13 30/22 31/18 34/8 34/25 35/11 37/12
**there's [11]**  4/16 5/2 7/8 15/22 19/5 21/6 26/14 28/9 29/16 33/11 34/17
**therefore [1]**  38/5
**these [24]**  7/19 10/7 12/2 12/5 12/15 16/17 16/18 16/24 17/8 18/17 19/4 19/8 19/12 19/14 19/14 19/17 19/23 19/23 21/25 32/2 33/15 34/14 35/24 36/19
**they [45]**
**they'll [1]**  35/24
**they're [5]**  4/21 11/1 11/7 32/10 32/10
**thing [6]**  4/15 6/24 17/11 29/10 31/22 35/3
**things [13]**  4/13 9/5 13/16 16/17 23/12 23/14 24/5 31/19 32/11 32/15 33/3 33/18 39/7
**think [45]**
**thinks [2]**  6/6 10/12
**Third [2]**  2/7 2/20
**this [59]**
**those [16]**  4/22 5/19 8/19 16/1 21/14 22/2 24/9 26/10 28/17 29/24 30/1 31/4 34/2 35/12 39/1 39/7
**though [2]**  8/24 39/5
**thought [5]**  3/19 20/23 21/3

22/12 26/6
**through [9]**  9/22 9/25 11/23 13/24 22/10 27/20 28/19 39/4 39/15
**throughout [1]**  21/2
**throwing [1]**  21/9
**time [17]**  3/4 9/20 9/22 10/5 10/18 14/7 14/10 14/24 15/16 15/24 21/2 24/13 25/24 29/16 39/6 39/8 39/17
**timing [2]**  11/15 13/2
**today [6]**  24/6 29/8 34/4 34/15 36/6 38/7
**told [2]**  11/4 13/18
**took [2]**  21/14 27/16
**tools [1]**  22/5
**topic [3]**  10/6 10/15 11/18
**topics [2]**  19/16 32/2
**total [1]**  30/21
**totality [7]**  5/7 7/4 7/8 7/9 7/11 18/13 23/1
**transcript [3]**  1/15 41/5 41/6
**transparency [1]**  25/16
**trial [6]**  6/3 38/13 38/15 38/20 38/24 38/24
**trials [1]**  3/11
**tried [2]**  12/2 28/14
**tries [1]**  23/10
**true [4]**  18/14 30/9 32/15 36/24
**truly [1]**  4/16
**try [6]**  5/5 6/3 7/10 10/2 22/17 38/12
**trying [3]**  18/4 23/13 39/17
**two [6]**  7/8 16/1 24/4 26/12 26/22 33/11

**U**

**ultimately [1]**  21/21
**unanimous [1]**  3/17
**unclear [1]**  30/15
**uncover [1]**  38/25
**under [7]**  7/5 7/21 7/22 35/6 35/8 37/24 38/11
**undermine [1]**  24/8
**understand [7]**  13/15 13/17 17/21 20/2 31/16 32/13 32/17
**understanding [2]**  5/18 21/7
**understood [3]**  13/21 21/5 35/13
**undisputed [1]**  4/16
**unfair [1]**  8/18
**unfortunately [1]**  22/22
**UNITED [3]**  1/1 1/17 2/19
**universe [7]**  22/8 26/11 26/20 26/20 27/4 28/15 30/21

## U

**unknown [1]** 22/13
**unless [1]** 37/22
**unrecoverable [8]** 15/10 15/22 16/18 17/8 17/18 18/15 20/7 22/24
**unrecovered [1]** 17/6
**unresolved [2]** 5/3 5/4
**unresponsive [2]** 27/9 27/18
**until [7]** 15/2 15/16 22/24 38/14 38/19 38/24 38/24
**up [5]** 5/22 18/24 20/24 20/25 38/12
**upon [1]** 38/3
**us [7]** 27/17 27/18 27/18 27/19 29/20 32/12 32/17
**use [1]** 20/13
**used [4]** 9/6 9/19 11/16 20/11
**useful [2]** 11/20 30/23
**using [2]** 22/4 32/24

## V

**vaccinated [2]** 3/12 3/15
**vague [4]** 36/17 36/18 36/21 38/2
**valuable [3]** 4/19 5/12 7/18
**value [28]** 4/25 5/1 5/7 5/9 5/13 6/12 6/23 7/6 7/10 7/10 7/14 7/24 8/21 8/22 8/24 9/2 14/21 17/12 17/22 17/24 18/5 19/2 23/2 23/2 23/10 32/22 33/2 33/23
**variety [2]** 19/16 25/24
**various [1]** 25/25
**varying [1]** 34/9
**venues [1]** 25/24
**verbally [1]** 11/12
**version [1]** 38/3
**versus [2]** 3/6 20/19
**very [9]** 10/15 14/9 19/25 22/2 23/7 25/24 27/13 28/2 32/6
**vice [1]** 16/8
**view [1]** 19/3
**vote [1]** 3/17

## W

**WA [1]** 2/7
**waiver [1]** 30/3
**Walden [1]** 16/14
**want [22]** 3/15 3/17 6/11 13/2 14/20 15/8 16/16 17/4 17/20 20/2 21/24 31/19 31/21 31/23 33/7 33/22 35/15 35/23 36/6 37/21 39/3 39/16
**wanted [3]** 28/19 30/2 30/6

**wants [1]** 3/14
**was [56]**
**wasn't [2]** 17/2 33/2
**way [11]** 4/22 5/18 6/6 8/23 19/8 26/17 28/6 32/1 33/23 36/15 38/25
**ways [2]** 33/3 33/11
**we [113]**
**We'd [1]** 39/20
**we'll [5]** 6/8 31/8 38/8 39/22 39/25
**we're [9]** 11/23 15/24 16/11 19/11 28/16 29/16 30/11 30/12 30/16
**we've [10]** 20/8 24/4 25/19 27/7 33/16 35/8 35/11 36/1 36/8 36/14
**week [1]** 26/23
**welcome [1]** 3/13
**well [11]** 6/17 6/20 18/3 24/4 24/11 24/19 26/3 26/19 29/7 30/25 32/1
**went [7]** 20/17 22/1 22/1 27/20 28/19 29/3 29/5
**were [34]** 7/20 9/7 9/8 9/10 9/13 9/15 9/22 10/12 12/2 12/15 12/24 20/23 20/24 21/21 22/2 22/5 22/11 22/24 25/12 26/21 27/6 29/12 29/13 29/20 29/21 29/24 29/25 30/4 30/6 34/8 34/16 34/20 34/21 34/25
**weren't [3]** 7/18 21/21 29/14
**what [78]**
**what's [10]** 4/25 5/1 5/12 13/22 17/12 17/24 20/16 23/1 23/19 24/17
**wheel [1]** 28/22
**when [18]** 9/21 14/25 15/2 15/23 17/11 18/21 19/11 19/11 20/8 20/11 23/14 24/17 25/1 25/11 33/16 33/17 35/18 38/11
**where [11]** 8/19 10/25 14/11 20/7 21/8 24/13 26/20 31/18 32/10 36/23 39/23
**whether [6]** 5/20 5/23 28/10 30/15 31/12 38/6
**which [16]** 4/21 8/2 10/18 12/12 13/3 13/20 14/21 16/19 18/16 19/21 24/6 26/23 27/3 31/8 37/13 38/3
**while [1]** 38/24
**who [12]** 3/13 5/6 5/8 9/10 9/13 9/15 12/13 13/14 14/18 16/7 19/15 30/13
**whole [1]** 5/15

**whom [1]** 15/22
**whose [4]** 4/17 7/11 7/11 29/14
**why [26]** 7/14 10/11 11/25 15/4 18/4 18/10 18/25 19/12 20/17 20/19 21/4 21/21 24/15 27/10 27/22 28/23 29/3 29/5 29/11 29/20 29/23 29/24 30/19 30/23 31/11 34/16
**wife [1]** 25/10
**will [2]** 36/5 36/6
**window [2]** 27/10 27/21
**winnowed [1]** 19/6
**winnowing [1]** 26/15
**wise [1]** 31/19
**wish [1]** 37/20
**without [2]** 17/24 41/6
**witnesses [1]** 23/5
**wondering [1]** 39/11
**word [1]** 27/8
**words [3]** 5/18 14/4 32/24
**worth [1]** 39/17
**would [21]** 6/13 14/18 14/19 16/10 24/9 24/15 25/2 27/17 28/14 31/14 35/3 35/22 36/1 36/24 37/6 37/8 37/15 37/16 37/25 38/1 39/1
**wouldn't [7]** 27/18 27/19 31/11 33/5 36/22 38/18 38/18
**wrap [1]** 18/24
**written [1]** 27/12
**wrongdoing [1]** 8/14

## Y

**yeah [2]** 25/19 31/21
**years [4]** 25/20 25/22 26/13 26/22
**yes [12]** 5/24 6/15 9/1 13/7 18/2 18/14 28/2 33/1 35/17 38/22 39/10 39/15
**you [134]**
**you'd [4]** 28/22 31/19 31/21 33/3
**you'll [2]** 16/25 39/22
**you're [15]** 3/12 3/15 3/15 6/24 13/6 18/1 18/5 18/5 18/7 19/1 26/25 27/1 33/22 36/7 36/25
**you've [5]** 4/12 7/9 19/6 34/5 36/18
**your [70]**
**yours [1]** 8/25
**yourself [1]** 3/7

## Z

**zero [2]** 27/23 27/23