**Stephen F. English** (OSB No. 730843)
SEnglish@perkinscoie.com
**Thomas R. Johnson** (OSB No. 010645)
TRJohnson@perkinscoie.com
**Matthew J. Mertens** (OSB No. 146288)
MMertens@perkinscoie.com
**Sasha Petrova** (OSB No. 154008)
SPetrova@perkinscoie.com
PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Telephone: 503.727.2000
Facsimile:  503.727.2222

**Matthew P. Gordon** (admitted *pro hac vice*)
MGordon@perkinscoie.com
**David B. Robbins** (OSB No. 070630)
DRobbins@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: 206.359.8000
Facsimile:  206.359.9000

*Attorneys for Plaintiff FamilyCare, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **FAMILYCARE, INC.**, an Oregon non-profit corporation,<br><br>     Plaintiff,<br><br>  v.<br><br>**OREGON HEALTH AUTHORITY**, an agency of the State of Oregon, and **LYNNE SAXTON**,<br><br>     Defendants. | Case No. 6:18-cv-00296-MO<br><br>**DECLARATION OF WILLIAM MURRAY IN SUPPORT OF FAMILYCARE'S OPPOSITION TO OHA'S MOTION FOR SUMMARY JUDGMENT** |

DECLARATION OF WILLIAM MURRAY

155563551.1

I, William Murray, declare as follows:

1.      I make this declaration based on my personal knowledge and am competent to testify to the matters herein.

### A.      History of CCO leadership and experience with OHA

2.      I am the Chief Operating Officer of FamilyCare, Inc. ("FamilyCare") and have served in that role since 2013.  Prior to my position at FamilyCare, I served as the Chief Executive Officer for another Oregon Medicaid managed care organization ("MCO") for 10 years.  I have also been active in Oregon's administrative and legislative process in the healthcare field, including serving on the Oregon Health Policy Board's Health Incentives and Outcomes Committee that helped develop Oregon's Coordinated Care Organization ("CCO") model that is in effect today. I have over 30 years of leadership, business management, information systems, finance, and regulatory experience. I began my career as a certified public accountant (CPA) with an international accounting firm and subsequently ran my own healthcare-focused CPA practice for seven years.  I make this declaration based on my personal knowledge and am competent to testify to the matters herein.

3.      In my earlier role as CEO of an MCO, I was responsible for the planning and day-to-day management of an entity that provided Oregon Health Plan Medicaid services to approximately 10,000 covered beneficiaries with annual revenues in excess of $30 million.  I regularly interacted with Oregon Health Authority ("OHA") executive leadership and rate-setting personnel concerning rate-setting processes, data quality and validation. In my role as FamilyCare's Chief Operating Officer, I have been responsible for leading the day-to-day operations of the organization, including overseeing reporting and monitoring of the organizational performance, striving to stay current on changes in the healthcare industry, including the Oregon Medicaid payor and provider markets, and adjusting business operations as required. I was also directly involved in preparing and submitting the specific financial and

1-      DECLARATION OF WILLIAM MURRAY

155563551.1

operational data and information that FamilyCare, as a CCO, was required to submit to OHA, including the data and information used by OHA and its outside actuary, Optumas, in the rate-setting process. I was directly involved in communicating with OHA and Optumas about those submissions and the rate-setting process in general. I participated in nearly all meetings and exchanges of information with OHA that relate to this case and was involved in the negotiation and execution of FamilyCare's contracts with OHA and amendments thereto.

**B.      Formation of five-year contract between FamilyCare and OHA and FamilyCare's reasonable expectations under the Contract**

4.       In 2014, FamilyCare entered a five-year contract with OHA to manage and coordinate health care services to Oregonians enrolled in the Oregon Health Plan (the "Contract").  As FamilyCare's COO, I worked with other executives and the board in relation to FamilyCare's decision to enter into the Contract and have familiarity with FamilyCare's expectations in relation to that Contract and the reasons FamilyCare had such expectations.

5.       Under the Contract, OHA offered initial rates for calendar year 2014 and was obligated to recalculate proposed capitation rates annually thereafter. I understand, based on my own experience, and interaction with other FamilyCare executives, that when FamilyCare and OHA entered into the Contract, FamilyCare's executive group and board expected that OHA would present FamilyCare with annual rates that were timely, reasonable, unbiased, actuarially sound, adequate, and free of errors in underlying data and methodology.  This expectation was consistent with my informed understanding of Oregon Medicaid industry standards and expectations.

6.       FamilyCare's expectations about the rates and how they would be set were based in part on the five-year term of the Contract and the legislative mandate and underlying rationale for that newly extended term, including: the nature of the Coordinated Care Organization ("CCO") model; the legislature's and OHA's stated desire for stability and longer-term investment in the Oregon Medicaid program and CCO market specifically, including CCO rates

2-       DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1

meant to encourage payor and provider participation in the Oregon Health Plan and corresponding improvement in care delivery and access; Oregon Medicaid industry standards, which are largely dictated by the state agency that administers the program, OHA; OHA's communications and statements about CCO "global budgets" and OHA's rate-setting process, including prior interactions with MCOs like FamilyCare and about a commitment to transparency to ensure the accuracy and adequacy of rates; OHA's communications and statements to FamilyCare and others about the CCO model; OHA's communications and statements about its intention and actions to transform health care delivery in Oregon, including its repeated characterization of the CCOs as its partners in delivering this transformed care during the Contract's term; and the complete absence of any stated intentions by OHA or the legislature to diminish CCOs, or offer inadequate, inaccurate, error-riven, biased or actuarially unsound rates, much less to structure its interactions or rates to put any CCOs out of business.

**C.    The Contract's five-year duration was intended to promote long-term investments in health transformation**

7.    Building out the infrastructure necessary to operate as a CCO is an enormous undertaking. FamilyCare needed hundreds of additional employees to fulfill its responsibilities under the Contract. FamilyCare needed to negotiate individual contracts with hundreds of medical, dental, and behavioral health providers to provide services for more than 125,000 Medicaid members. FamilyCare needed to identify and negotiate with key administrative and technological third-party contractors and then implement the resulting service agreements to create the necessary infrastructure to manage the care for its Medicaid population. Operating FamilyCare was a tremendously complex endeavor that cost hundreds of millions of dollars and required multiyear investments in personnel, provider relationships, and third-party contracts. Transforming healthcare in the way the CCO model envisioned required even more substantial long-term investment. In my experience, neither FamilyCare nor any other CCO would invest in the necessary infrastructure to sustain operations if they expected OHA to set biased, inadequate,

3-    DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

155563551.1

error-driven, or actuarially unsound rates that were intended to put, or would result in putting, it out of business.

8. The OHA is the single state agency that administers the Medicaid program in Oregon. In that respect, industry standards for Medicaid in Oregon reflect OHA's historical interaction with CCOs, which before 2011 were known as MCOs.

9. The Oregon legislature and Governor Kitzhaber enacted legislation to propose the creation of the CCOs in 2011 with the long-term goal of improving health, improving health care, and lowering costs by transforming the delivery of health care. They accordingly directed OHA to implement the CCO model. I was involved in numerous discussions with OHA representatives and others about the CCO model and the expectations behind it. The CCO model was designed and publicized as a long-term partnership between OHA and CCOs to transform health care in Oregon. OHA envisioned a partnership between OHA and the CCOs to "change the system for better efficiency, value, and health outcomes." (*See* February 2012 Implementation Proposal, attached as Exhibit 1, at 6.) OHA represented that "OHA must work in partnership with CCOs to ensure health system transformation success."[1] Recognizing that transforming health care was no simple task, OHA characterized the CCO program as a long-term play, calling it "developmental" and recognizing that CCOs would "need time to develop capacity, relationships, systems and experience to fully realize the goals" of the program.[2] Accordingly, accountability measures and performance expectations would be introduced in phases to allow CCOs time to "develop the necessary measurement infrastructure."[3]

10. Among the "essential elements" of the health care transformation was the concept that CCOs would "have a single global Medicaid budget *that grows at a fixed rate*" and "will be

---

[1] Ex. 1 at 48.
[2] *Id.* at 19.
[3] *Id.* at 7.

4-    DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

*given the financial flexibility within available resources to achieve the greatest possible outcomes for their membership.*"[4]

11.    As part of the global budget concept, OHA committed to creating rates based on "the most reliable cost data" while addressing "actuarial soundness, CCO viability *and* access to appropriate care."[5]  OHA informed CCOs that the cost data would "indicate the lowest rates a CCO can accept" and that it would be used "as the foundation for the CCO capitation rates."[6]

12.    OHA repeatedly characterized the CCO model as a partnership between the agency and the CCOs and promised to "be an active partner in health care transformation" and "support CCOs" through the process.[7]

13.    OHA made similar representations in its application to amend and renew its Demonstration Project under Section 1115(a) of the Social Security Act, an application that was submitted to CMS and made publicly available, and is attached as Exhibit 2.  The application, which sought permission from CMS to administer Medicaid, proposed and detailed the CCO model.  Given my professional role and involvement with the CCO model, I was very familiar with that application and the representations CCO made therein, which were consistent with other statements and representations OHA made to potential CCOs. OHA's proposal was to "[t]ransform" Medicaid in Oregon through its "most ambitious health care transformation plan to date" through a system "anchored by" CCOs who were meant to "focus on prevention and primary care."[8] OHA represented that "CCOs will fundamentally reform the current delivery model" by among other things avoiding "preventable specialty care and unnecessary hospitalizations and emergency care."[9]  And OHA reiterated the importance of the global budgets and the flexibility to innovate that CCOs would enjoy within those parameters, noting

---

[4] *Id.* at 5 (emphases added).
[5] *Id.* at 37 (emphasis added).
[6] *Id.* at 37-38.
[7] *Id.* at 41.
[8] Ex. 2 at 4.
[9] *Id.* at 7.

5-        DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

155563551.1

that the global budget would allow CCOs "maximum flexibility" to decide how to allocate resources toward efficient care and that "[o]ne of the primary goals of the global budget concept is to allow CCOs flexibility to invest in care that may decrease costs and achieve better outcomes."[10] OHA also recognized that because of the "evolutionary nature" of CCOs, the organizations would "need time" to develop the necessary capacity, relationships, and experience.[11]

14.     At the outset of the CCO model, OHA continued its historical practice of executing one-year contracts with MCOs. However, to address diminishing access and care for Medicaid beneficiaries in Oregon, the Oregon Legislature enacted former ORS 414.652(1)(a)) in 2013, requiring that future contracts between CCOs and OHA have five-year terms. The Contract was to be the first five-year MCO contract in the modern history of the Oregon Medicaid program. It followed advocacy by CCOs, including FamilyCare, that the shorter contract terms forced CCOs to negotiate the agreements' essential terms—including rates—on a frequent and unpredictable basis which in turn impeded long-term investment and planning to enhance care and quality. FamilyCare and other CCOs advocated for the five-year term specifically to encourage long-term investments that were necessary to help bend the cost curve (i.e., slow the rate of growth of health care expenditures) while improving care access and quality.

15.     The legislative action to mandate the five-year term followed much discussion between the MCOs, OHA and legislators. I was directly involved in many of those discussions. The law's passage confirmed the Oregon Medicaid program's desire for CCO contracts to encourage long-term CCO investments in transforming the health care delivery system to improve access and care to Medicaid beneficiaries and to obtain associated efficiencies in care by allowing CCOs to make longer-term investments in new modes of care and to cultivate

---

[10] *Id.* at 13-14.
[11] *Id.* at 13.

6-          DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

155563551.1

providers to accept and provide comprehensive care to Medicaid beneficiaries. It also reflected that successfully changing the health care delivery system with strategic investments takes time—much more than a year—and that long-term investments might yield transformational gains that would not be fully realized for several years. OHA projected that implementing the CCO model could reduce total Medicaid spending by $3.1 billion over the first five years following implementation, with most of those savings in years 4-5 of the program.[12]

**D.    OHA intended for the CCO "global budget" to provide financial predictability for CCOs**

16.     OHA recognized the legislative intent in many communications, statements, and publications about the Contract and its ensuing implementation. Among those were communications pertaining to the CCO "global budget." The global budget was supposed to account for the CCOs' actual costs and increase by a predictable, stable rate year-over-year for the Contract term so that CCOs would have the financial predictability needed to make long-term investments in people and systems. Examples of these communications and statements abound. Attached as Exhibit 3 is an OHA published document stating that CCOs have "one global budget with a fixed rate of growth" to provide mental, physical, and dental care to their members. Attached as Exhibit 4 is an OHA document stating that CCO "budgets grow at 3.4% per capita per year," which is a "sustainable, fixed rate" meant to "incent positive health outcomes."

17.     These publications and statements by OHA about the CCO global budget furthered FamilyCare's expectations under the Contract that OHA's annual rate amendments would be timely, reasonable, unbiased, adequate, and free of errors in underlying data and methodology. And, under the global budget approach, the annual rate amendments would result in predictable and consistent rate increases for each CCO, providing the financial stability and certainty required to make long-term investments in healthcare transformation over the entire five-year term. FamilyCare believed OHA would work collaboratively and in partnership with

---

[12] Ex. 1 at 6.

7-        DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

FamilyCare to accurately increase CCO budgets at a fixed, steady rate and allow FamilyCare "maximum flexibility to dedicate resources toward the most efficient forms of care," including augmenting preventative and primary care to avoid high-cost health services, like hospitalization and emergency visits.  Creating rate amendments that were untimely, unreasonable, biased, inadequate, and tainted by errors in the underlying data and methodology is entirely inconsistent with OHA's representations to FamilyCare and other CCOs about the purpose of CCO program and its "global budget."  It is also inconsistent with the underlying rationale of the law's requirement for an extended Contract term—that is, incentivizing long-term CCO investments to promote improved access and efficiency of care delivery as part of health care transformation.

  **E.**  **OHA praised FamilyCare's decision to increase access to primary care**

  18.  OHA praised CCOs' allocation of resources to primary care as part of its incentivization of long-term investments in health care transformation. Attached as Exhibit 5 is an OHA document from January 2014 stating that "every CCO is living within its global budget" and that the state is seeing "promising signs of improvements in quality and cost and a shifting of resources to primary care."  And OHA *specifically* praised FamilyCare—before FamilyCare entered into the Contract—for paying primary care providers more to increase member access to primary care resources. OHA's first Health System Transformation Quarterly Progress Report, published in May 2013 and attached as Exhibit 6, reiterated OHA's focus on primary care investments to bend the cost curve and specifically identified FamilyCare's increased reimbursement rates for primary care providers in order to improve access to care as a "promising practice."[13] Specifically, FamilyCare paid primary care providers at rates comparable to those paid by private health insurers to incentivize primary care providers to accept FamilyCare's members as patients.  FamilyCare relied on OHA's representations that increased payment to primary care providers was a "promising practice" and had a reasonable expectation

---

[13] Ex. 5 at 44.

8-  DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1

that OHA would not subsequently penalize FamilyCare in rate-setting by cutting these increased primary care payments out of FamilyCare's cost data.

**F.      OHA publicly and privately committed to treating the CCOs as "partners"**

19.      OHA repeatedly characterized CCOs as "partners" in public and private statements about the CCO model, foreshadowing and confirming a transparency and collaboration in getting the rates, among other terms, right.  For example, prior to and for the initial period of Optumas's involvement with rate-setting, OHA invited all CCOs to monthly meetings with OHA representatives to discuss the rate-setting process.  OHA referred to this monthly gathering of CCO representatives as the "OHA Rates Workgroup" and worked with the CCO representatives in an iterative process to discuss and revise the projected capitation rates for the upcoming calendar year.  I participated on FamilyCare's behalf in the OHA Rates Workgroup.  Attached as Exhibit 7 is an OHA communication to CCOs in which Lori Coyner—OHA's then Medicaid Director—thanked the CCO representatives in the OHA Rates Workgroup "for your commitment to the process to develop actuarially sound rates that set the basis for health system transformation in Oregon moving forward. All totaled we met on more than 100 occasions to create a coordinated and transparent process for rate setting that will set the tone for our partnership. I appreciate your diligence, patience and cooperation across the last 9 months and look forward to continued work in the future."  Lynne Saxton forwarded Ms. Coyner's email to OHA's "CCO Partners," including Jeff Heatherington, and adding, "Thank you for your partnership!" *Id.*  Attached as Exhibit 8 is an OHA document in which Saxton tells senior OHA leadership that her two operational objectives with the CCOs are to "establish and maintain a productive, accountable business relationship producing results" and to "provide CCOs with clarity as to processes, timelines, deliverables and expectations" about rates and the rate-setting process.  Saxton states her expectation that any adjustments will be communicated "on a regular

9-      DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1

basis to our CCO partners." *Id.*  Similar sentiments were routinely expressed by OHA to the CCOs, and the CCOs expected no less of its governmental "partner".

20.    OHA also touted its collaboration with CCOs and purportedly transparent operations in communications to external stakeholders.  Attached as Exhibit 9 is an OHA communication to CMS in which OHA assures CMS that its "strong partnership with CCOs," including working with the CCOs to improve data validation and rate-setting processes, will help OHA ameliorate the problems CMS identified with OHA's original 2015 capitation rates. Again, OHA published such sentiments to the CCOs with regularity and made them publicly available.

21.    As noted above, FamilyCare's experience with OHA prior to executing the Contract (*see* Exhibit 7) was that the rate-setting process was iterative and collaborative.  OHA notified the CCOs of initial proposed rates, and an actuarial rates workgroup comprised of CCO representatives provided feedback in an iterative process with OHA.  This collaboration previously gave FamilyCare an opportunity to interact with, comment on, and refine the proposed rates to make them accurate, reasonable, free of error, actuarially sound and adequate to cover reasonably projected costs.  Exhibit 7 is reflective of, and consistent with, that history. FamilyCare entered the Contract believing that an iterative, transparent, fair, and reasonable process with OHA would continue and be strengthened, based on the legislature's determination that a five-year contract was appropriate for the CCOs to promote long-term investments in health.

**G.    OHA's communications and conduct informed FamilyCare's contractual expectations**

22.    These aspects of OHA's communications and conduct—that is, OHA's repeated representations of CCO partnership in the ratemaking process, promoting transparency, working cooperatively to develop fair and adequate rates, and providing consistent rate increases while accurately reflecting projected costs—reflected a consistent theme from OHA preceding the

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1

entry into the Contract.  FamilyCare expected that this would continue throughout the term of the Contract.

23.     FamilyCare also expected OHA to set fair and bias-free rates designed to further the long-terms goals of the CCO model and the OHA-CCO partnership. This was because OHA is a governmental agency obligated to broker Medicaid dollars honestly for the benefit of Medicaid beneficiaries and to work in good faith with the vendors it selected for this purpose.

24.     All of the foregoing specifically informed FamilyCare's expectations that OHA would implement its contractual obligations fairly and in good faith, and in particular would provide FamilyCare with annual rate adjustments in a timely, reasonable, unbiased, manner and that the rates would be free of errors in underlying data and methodology that would prejudice the CCOs providing Medicaid services.  This meant that the rate adjustments would be fair, predictable, reflective of accurate data, free of patent or latent error (or corrected when the errors were identified by CCOs, OHA or third parties), impartially applied, and accurately projected to compensate FamilyCare for service costs reasonably incurred.  Conversely, FamilyCare had no expectation that OHA would implement its obligations unilaterally, in bad faith, unfairly, with bias towards FamilyCare, in a manner inconsistent with the law, without striving to provide rates that covered FamilyCare's reasonably projected costs to provide the required services, and with the goal of driving FamilyCare out of business rather than promoting the long-term partnership toward health transformation.   It did not occur to FamilyCare that OHA would act to deprive FamilyCare of timely access to the basic information to determine if the rates offered would put FamilyCare out of business or cause it egregious harm.  Certainly, neither OHA nor the legislature gave FamilyCare any hint that they had harbored any such remarkable intentions prior to entering the Contract.

11-      DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1

**H.      OHA's post-Contract conduct and communications changed significantly**

25.      Yet OHA's behavior changed after FamilyCare executed the Contract.  OHA cut FamilyCare and other CCOs out of the process; OHA cancelled regular meetings of the longstanding and collaborative CCO Rates Workgroup, even though Coyner and Saxton had previously praised the participating CCOs for their "partnership" and their "diligence, patience, and cooperation." OHA, in conjunction with its new third-party actuary Optumas, began to develop the rates for the rate amendments as a siloed exercise, at the conclusion of which OHA informed the CCOs of the results, with limited patience or tolerance for feedback and little interaction once FamilyCare identified errors.  While OHA and Optumas periodically called "rate-development" meetings with OHA-dictated agendas, the process was unilateral, high-handed, and largely opaque.  As to FamilyCare, the result was that OHA and Optumas failed to account for, or eliminated, reasonably incurred projected costs (such as those for primary care) and failed to account for or correct identified errors, ultimately resulting in rate adjustments that foreseeably caused FamilyCare to suffer massive losses. OHA acted in defiance of the legislative directive underlying the Contract to encourage CCOs like FamilyCare to enter long-term contracts with providers at rates designed to improve access and timely provide needed care. FamilyCare made a commitment to pay primary care providers more based in part on OHA's representations about the value of primary care as a long-term investment in member health. More primary care providers signed up for FamilyCare's network as a result.  OHA then implemented adjustments that specifically deprived FamilyCare of the resources to support these commitments.  If FamilyCare had responded by cutting primary reimbursement, providers would have dropped out of FamilyCare's network and Medicaid members would have lost access to their doctors.

12-      DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1

**I.     The Settlement Agreement demonstrated OHA's commitment to adhering to the parties' jointly shared contractual expectations**

26.     This sea-change to OHA's rate-setting process, coupled with OHA's newfound unwillingness to consider the feedback of FamilyCare and other CCOs about the redeveloped 2015 and 2016 capitation rates, resulted in FamilyCare's first lawsuit against OHA in early 2016. FamilyCare wanted to bring OHA back to the table and confirm that OHA would abide by the parties' jointly shared expectations under the Contract.  And, after failing to convince a state court to allow it to void FamilyCare's contract, OHA did precisely that in the parties' May 22, 2016, settlement agreement ("Settlement Agreement"), which I assisted in negotiating. It is attached as Exhibit 10.

27.     In the express terms of the Settlement Agreement, OHA confirmed its desire to renew CCO confidence in OHA's professionalism. In the Settlement Agreement's section on "Future Rate Amendments," its very first paragraph reflects that:

> "***It is the Parties intent to work in a professional manner to address any concerns regarding rate amendments in the future.***  To that end, if FamilyCare has a disagreement in the future with any new rates proposed by OHA…FamilyCare may submit a written request to OHA to engage in a Discussion Period concerning the New Rates within five (5) calendar days of receiving the rates and OHA's actuary's certification report."[14]

Paragraph 6 goes on to provide: "***It is OHA's goal that all CCOs have confidence in the rate-setting process***.  To achieve that goal, OHA agrees to establish a process for CCOs to request a verification from an Independent Consulting Actuary, with reasonable limits on the scope and timeline for requests for verification."[15]

---

[14] Exhibit 10 at 6 (emphasis added).
[15] *Id.* at 8 (emphasis added).

13-      DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1

28.    OHA's reaffirmation in the Settlement Agreement of its intent to return to professionalism and dispute-resolving discussions to instill confidence in the rate-making process signified a return to normalcy and the expected transparent and collaborative process.

**J.    OHA failed to abide by its representations in the Settlement Agreement and instead offered 2017 and 2018 rates beset with problems**

29.    Unfortunately, shortly after entering into the Settlement Agreement, OHA's unprofessional, biased, and bad faith behavior towards FamilyCare resumed. Almost immediately, OHA directed Optumas to make unprecedented cuts to FamilyCare's base data under the guise of a "reimbursement policy," resulting in significantly lower 2017 rates for FamilyCare.  OHA specifically singled out and cut the increased primary care reimbursement that OHA had previously lauded as a "promising practice" to help bend the cost curve. OHA made no similar cuts in developing the 2015 or 2016 rates. FamilyCare again tried to work with OHA to address the problems, but OHA's promise to engage in good faith in a collaborative process to resolve the parties' differences proved empty.  At the first dispute-resolution meeting thereafter, which I attended, OHA provided absolutely no response to FamilyCare's concerns and instead took the slide deck that FamilyCare shared for dispute resolution purposes and used it as a tool for its disparagement campaign against FamilyCare that led to Ms. Saxton's resignation and apology.  Ms. Saxton's January 17, 2017, email forwarding the slide deck I helped prepare and noting that it "will be helpful to us in developing our communication strategy and timeline" is attached as Exhibit 11.

30.    The following year, during 2018 rate-setting, OHA again implemented a "reimbursement policy" targeting FamilyCare's primary care reimbursement to lower FamilyCare's rates.  OHA also provided FamilyCare with initial rates for 2018 that it knew were erroneous—because FamilyCare so informed OHA—and knew would be revised. I and others at FamilyCare repeatedly notified OHA of its concerns and disputes as to the accuracy and sufficiency of the rates.  We requested that OHA provide updated and corrected rates before the

14-        DECLARATION OF WILLIAM MURRAY

155563551.1

end-of-year deadline for FamilyCare to sign the 2018 rate amendment. Attached as Exhibit 12 is a November 10, 2017, letter that FamilyCare prepared and sent to the legislature regarding problems with the rate-setting process, which FamilyCare then forwarded to OHA. Attached as Exhibit 13 is a December 7, 2017, email from myself to Ms. Robison and Mr. Allen explaining that the OHA-commissioned rate reviews did not resolve the rate-related issues FamilyCare had identified. I and others at FamilyCare repeatedly informed OHA that the initial rates were so low that they would lead to FamilyCare suffering significant additional losses in 2018, and that without higher rates, FamilyCare would likely be forced to reject the 2018 Rate Amendment and cease doing business as a CCO. Despite those requests, OHA did not provide FamilyCare with final 2018 rates until after the end-of-year deadline, and until after FamilyCare had notified OHA that it could not accept the offered rates and undertake the involved year-long obligations to the Medicaid beneficiaries it served and the providers with whom it contracted.

**K.    OHA refused to timely provide FamilyCare with 2018 rates or timely correct the rate errors that FamilyCare had identified**

31.    FamilyCare had a reasonable expectation that it would receive proposed Rate Amendments with at least 60 days' prior notice based on the express statutory requirement under ORS 414.652(5), as well as on the historical relationship of the parties and the express terms of the Settlement Agreement that OHA would treat FamilyCare professionally, not act in bad faith to end FamilyCare's contract rights, and to instill confidence in, among other things, the rate amendment process.

32.    FamilyCare's expectations were also informed by OHA's prior acknowledgment and admission that Oregon law required OHA to provide CCOs with 60 days to review rate amendments under the Contract, that CCOs were "*entitled to the full 60-day period guaranteed by statute,*" and its prior practice of affording CCOs time beyond the end of the year to consider the rates and sign the rate amendments when OHA provided such rates less than 60 days before December 31. Exhibit 16 is a letter from OHA emailed to other CCO representatives and me on

15-        DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

155563551.1

December 22, 2015.  OHA acknowledges in this letter that the CCOs "are entitled to the full 60-day period guaranteed by statute" to review the 2016 rate amendments, and that because OHA had provided those rates on November 10, 2015, CCOs had "the legal right" to wait until January 9, 2016 to sign the 2016 amendment.  Moreover, OHA informs the CCOs that the rate amendment would be considered timely if it was submitted "any time up to midnight, Saturday January 9[.]"

33.    OHA first provided FamilyCare with the tentative 2018 rates on October 31, 2017, but those were merely preliminary, as OHA expressly noted that the rates "may change" based on the outcome of, among other things, a "redetermination analysis" that was to be completed by late November.[16]  *See* Exhibit 14, a true and correct copy of an October 31, 2017 email that I received.  The redetermination analysis referred to a problem with the rates that FamilyCare had previously brought to OHA's attention—namely, that because OHA's "redetermination" had removed from Medicaid thousands of relatively healthier people, the 2018 rates would be insufficient to cover the cost of health care for the relatively sicker people who remained in Medicaid and were assigned to FamilyCare.

34.    In early November, FamilyCare notified OHA that unless the errors were corrected—errors, to be clear, that FamilyCare had alerted OHA to, some of which had occurred for several years—and the tentative 2018 rates adjusted accordingly, FamilyCare would not be able to continue to serve our members. OHA stated, multiple times, that the redetermination analysis would be complete by late November.  But OHA did not provide FamilyCare with the

---

[16] Receiving "preliminary" rates was not helpful to FamilyCare and was inconsistent with FamilyCare's expectations under ORS 414.652(4). I was present during most of the legislative discussions related to creating the 60-day notice requirement.  Based on these discussions, FamilyCare believed we would receive *final* rates 60 days in advance of year-end to assess the rates, but more importantly, because we contracted with numerous providers on an annual basis, the 60-day term was to provide us enough time to update provider contracts for the coming year and insure an adequate panel of providers for our members. Having OHA provide "preliminary or estimated rates" that it knew were likely to substantially change completely fails to meet FamilyCare's expectations and the legislative intent of the statute.

16-        DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1

results of the redetermination analysis in the timeframe promised, or the final 2018 rates reflecting that analysis, until after the contractual deadline had passed for FamilyCare to sign the 2018 rate amendment.  And to make matters worse, OHA then accelerated the end-of-year deadline and demanded that FamilyCare decide whether to sign the 2018 rate amendment by no later than December 21, 2017.

35.    On December 15, I met with OHA director Patrick Allen and OHA Chief Financial Officer Laura Robison to discuss problems with the 2018 rates. In advance, FamilyCare provided detailed information about how correcting the identified errors would affect FamilyCare's 2018 rates and permit it to stay in business. The next day, Ms. Robison and Mr. Allen informed FamilyCare that OHA would furnish only preliminary results of its redetermination analysis and its investigation of other issues affecting the 2018 rates by December 29—the last business day of the year to sign the 2018 amendment—and made clear that, even by December 29th, OHA would not commit to FamilyCare what the actual rates for 2018 would be.

36.    In addition to not providing FamilyCare with the actual 2018 rates before the end of 2017, OHA required that FamilyCare decide about signing the 2018 rate amendment even earlier.  On December 20, other FamilyCare representatives and I met with Mr. Allen.  The meeting was supposed to be a further discussion of the 2018 rate problems and how fixing them could allow FamilyCare to stay in business, but instead Mr. Allen said that he was no longer interested in further discussions with FamilyCare and instead demanded that FamilyCare notify OHA by noon the following day, December 21,whether FamilyCare would sign the 2018 contract amendment. In response to Mr. Allen's demand and deadline, we asked whether OHA would provide the rate analysis that it previously promised in time to allow FamilyCare to review that information before deciding whether to accept or reject the 2018 amendment. Mr. Allen responded that OHA would not be providing any additional information prior to the new signing deadline and stated that, regardless, OHA was already implementing a transition plan to

17-        DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1

move FamilyCare's members and providers to other CCOs on the assumption that FamilyCare would not sign the 2018 rate amendment and would exit the market. Unable to agree to tentative rates that would cause FamilyCare to run a deficit in 2018 exceeding the amount of its available reserves, and lacking any information from OHA about what compensation FamilyCare would actually receive in 2018 upon the correction of OHA's acknowledged data errors, FamilyCare could not in good faith agree to sign the 2018 rate amendment on December 21.

37.    At 4:54 PM on December 29—with six minutes left in the last business day of the year—OHA emailed a "Preliminary Redetermination Analysis" to FamilyCare, which confirmed that data errors that FamilyCare had long identified had materially affected the agency's rate-setting process. Yet even this belated and inadequate information was not helpful for FamilyCare, as OHA had already forced FamilyCare to sign a one-month Contract extension through January 2018 to allow time to transition its Medicaid members—prior to conveying the preliminary redetermination analysis to FamilyCare. This extension forbade the parties from further extending the arrangement or entering an amendment.  In other words, the eleventh-hour "preliminary redetermination analysis" was a token gesture, and it provided FamilyCare no reprieve from the conditions that forced it to effectively forfeit the Contract.  To add insult to injury, in February 2018, after FamilyCare's one-month contract had expired and its members had been disenrolled and transitioned to other CCOs, OHA announced that, because of the redetermination analysis and the correction of other errors, OHA would retroactively amend and significantly increase the 2018 rates.

38.    In my time as FamilyCare COO or as CEO of my prior MCO, which collectively spanned more than 15 years, this was the first time OHA had knowingly not completed work that it knew would have a significant impact on the rates. This violated FamilyCare's expectations pursuant to statute and the parties' historical relationship that FamilyCare would receive final rates with at least 60 days' prior notice, not preliminary or incomplete rates that were knowingly subject to change.

18-        DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1

**L.      OHA's unlawful 2018 rate "ultimatum" undermined FamilyCare's dual-track efforts to correct the rates and simultaneously plan for transition**

39.      I was present at the meeting on December 14, 2017, when  FamilyCare's board of directors ("Board") voted to reject the 2018 rate amendment. The Board specifically discussed that this vote did not foreclose FamilyCare from accepting revised 2018 rates, the analysis of which it anticipated receiving thereafter. In particular, at that meeting, I discussed with the Board how I was still working with OHA on obtaining corrected rates for 2018 and was hopeful that we would make progress.  Among other things, the Board and I specifically discussed how if OHA provided FamilyCare with corrected, higher rates—or even if we made sufficient progress with OHA such that the Board felt confident that OHA would do so—the Board would revisit its decision and reconsider whether FamilyCare could stay in business.

40.      FamilyCare recognized the immense disruption in care of its members if it was unable to continue in business and that planning for this potential transition was critical. At the same time, FamilyCare wanted to stay in business in 2018 and was working diligently to obtain corrected rates that would allow it to do so.  FamilyCare's expectation of receiving timely corrected rates would have been realistic with a partner acting in good faith given that OHA had acknowledged problems with the rates it offered and was ostensibly in the process of correcting them.

41.      After the December 14 Board vote, FamilyCare continued to work with OHA to try to obtain information about the new rates to determine whether the forthcoming revised rates would permit FamilyCare to continue in the Contract in 2018.  As mentioned above, on December 15, and with the knowledge of the Board, I (and others from FamilyCare) met with Ms. Robison and Mr. Allen to further discuss the problems that FamilyCare had identified with the rates and determine the timeline on which FamilyCare would receive updated rate information.  Between December 14 and December 20 (when FamilyCare received Mr. Allen's ultimatum), and again with Board knowledge, FamilyCare sought the assistance of Oregon

19-      DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1

legislators, the Oregon Health Policy Board, and state Governor Kate Brown to meaningfully address and remedy the issues with OHA's proposed 2018 rates for FamilyCare.

42.     The Board's action was taken to begin planning for a transition *in the event that* OHA and FamilyCare could not obtain more data from OHA to assess whether continuing in the Contract was viable.  If the Board's December 14 decision had ruled out accepting revised 2018 rates, then FamilyCare would not have continued rate discussions with OHA up to the date of Mr. Allen's illegal ultimatum.  Moreover, because FamilyCare was already simultaneously cooperating with OHA on the "dual track" of potential transition planning and attempting to obtain the corrected 2018 rates, Mr. Allen's December 20th ultimatum was even more egregious—there was no need for the ultimatum because FamilyCare was working diligently with OHA on a back-up transition plan in case the corrected rates were insufficient for FamilyCare to continue in business. *Mr. Allen himself* acknowledged this dual-pronged approach after the December 14 Board vote.  (*See* Exhibit 15—December 16, 2017, text message from Allen to The Oregonian/OregonLive reporter Jeff Manning stating that "[FamilyCare and OHA] are working two tracks: resolution and transition.") The lack of need for an ultimatum was further demonstrated by the one-month contract amendment for January 2018, under which FamilyCare continued to serve its 100,000+ members to allow for a more orderly transition of members to other CCOs.  Neither Mr. Allen nor anybody else at OHA explained to me why, if OHA was willing to enter into a contract for January 2018 to allow more time for the transition of members, OHA required FamilyCare to respond and decide about the 2018 Rate Amendment by December 21, 2017, or why OHA couldn't have allowed FamilyCare to continue as a CCO and defer a final decision until after OHA had provided the actual 2018 rates.

43.     The revised 2018 rates would have paid FamilyCare an additional approximately $20 million if FamilyCare had remained in business for the entirety of 2018.  Had OHA timely provided FamilyCare with these final rates for 2018—which OHA presented only *after* FamilyCare had already closed its doors, and only *after* OHA made sure that FamilyCare could

20-          DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1

not re-enter the Medicaid market via express language in the parties' one-month contract, the inclusion of which OHA insisted on—FamilyCare's board could have voted to accept those rates so that FamilyCare could stay in business long enough to try to bridge the budgetary gap created by OHA's faulty rate-setting. This is particularly so given that the 2019 rates were significantly higher than even the revised 2018 rates, and if FamilyCare had been in business in October 2018 to receive notice of the higher 2019 rates, FamilyCare could have planned to rebuild its financial reserves in 2019.

### M.    OHA demonstrated unique hostility toward FamilyCare

44.    The pattern of unprofessional, biased, bad faith and unfair conduct from OHA described above is far different from the treatment that I experienced during the ten years I was CEO of a different CCO/MCO, prior to employment at FamilyCare. In my prior role, our relationship with OHA was far more collaborative, and we received timely answers to questions with none left unresolved. OHA's behavior towards my inquiries changed when I began to make them on FamilyCare's behalf. OHA's treatment of me was starkly different in the lack of responsiveness and professionalism I received in response to my FamilyCare-based questions.

*I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.*

DATED: January 14, 2022                      */s/ William Murray*
                                             William Murray

21-         DECLARATION OF WILLIAM MURRAY

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

155563551.1