Oregon Health Policy Board



# Coordinated Care Organizations
## Implementation Proposal

House Bill 3650
Health System Transformation
January 24, 2012

**www.health.oregon.gov**

Exhibit 1
Page 1 of 142

FCI0517127
CTRL_01214878

## Oregon Health Policy Board

The Oregon Health Policy Board (OHPB) serves as the policy-making and oversight body for the Oregon Health Authority. The Board is committed to providing access to quality, affordable health care for all Oregonians and to improving population health. Board members are nominated by the Governor and are confirmed by the Senate. Board members serve a four-year term of office.

Eric Parsons
Chair, Portland

Lillian Shirley, BSN, MPH, MPA
Vice Chair, Portland

Mike Bonetto, PhD, MPH, MS
Bend

Carlos Crespo, MS, DrPH
Portland

Felisa Hagins
Portland

Chuck Hofmann, MD, MACP
Baker City

Joe Robertson, MD, MBA
Portland

Nita Werner, MBA
Beaverton

Exhibit 1
Page 2 of 142

FCI0517128
CTRL_01214878

# Table of contents

1.  Executive summary ...................................................................................................................I

2.  Existing market environment and industry analysis ..................................................................2

    Target population ......................................................................................................................2

    Current delivery system for target population...........................................................................3

    Population characteristics and health status ............................................................................4

3.  Opportunities for achieving the Triple Aim: improving health, improving health care and reducing
    cost ...........................................................................................................................................9

    Financial projections for greater system efficiency and value ..................................................9

4.  Coordinated Care Organization (CCO) certification process....................................................12

    Alternative dispute resolution .................................................................................................13

5.  Coordinated Care Organization (CCO) criteria.......................................................................15

    Governance and organizational relationships .........................................................................15

    Patient rights and responsibilities, engagement and choice ...................................................18

    Health equity and eliminating health disparities .....................................................................23

    Payment methodologies that support the Triple Aim ..............................................................24

    Health information technology ................................................................................................26

6.  Global budget methodology ...................................................................................................28

    Populations included in global budget calculations ................................................................29

    Service/program inclusion and alignment ..............................................................................29

    Global budget development ....................................................................................................30

7.  Accountability.........................................................................................................................34

    OHA accountability in supporting the success of CCOs .........................................................34

    CCO accountability ................................................................................................................35

    Shared accountability for long-term care ...............................................................................37

8.  Financial reporting requirements to ensure against risk of insolvency ...................................38

    Audited statements of financial position and guarantees of ultimate financial risk .................38

    Financial solvency ..................................................................................................................39

    OHA monitoring and oversight ...............................................................................................41

    Public disclosure of information .............................................................................................42

Exhibit 1
Page 3 of 142

FCI0517129
CTRL_01214878

CCO licensure ....................................................................................................................... 42

Corporate assets and financial management ........................................................................ 43

9.  **Medical liability** ..........................................................................................................**44**

10. **Implementation plan**...................................................................................................**46**

Transition strategy ................................................................................................................ 46

Transitional provisions in HB 3650 ...................................................................................... 46

Implementation timeline ...................................................................................................... 47

11. **Appendices**.................................................................................................................**48**

Exhibit 1
Page 4 of 142
FCI0517130
CTRL_01214878

## Coordinated Care Organization (CCO) Implementation Proposal
## House Bill 3650 Health Care Transformation

### 1. Executive summary

Health care costs are increasingly unaffordable — to businesses, individuals, as well as the federal and state government. The growth in Medicaid expenditures far outpaces the growth in General Fund revenue, yet there has not been a correlating improvement in health outcomes.

In 2011 the Oregon Legislature and Governor John Kitzhaber created CCOs in House Bill 3650, aimed at achieving the Triple Aim of improving health, improving health care and lowering costs by transforming the delivery of health care. The legislation builds on the work of the Oregon Health Policy Board since 2009. Essential elements of that transformation are:

- Integration and coordination of benefits and services;
- Local accountability for health and resource allocation;
- Standards for safe and effective care; and
- A global Medicaid budget tied to a sustainable rate of growth.

CCOs are community-based organizations governed by a partnership among providers of care, community members and those taking financial risk. A CCO will have a single global Medicaid budget that grows at a fixed rate, and will be responsible for the integration and coordination of physical, mental, behavioral and dental health care for people eligible for Medicaid or dually eligible for both Medicaid and Medicare. CCOs will be the single point of accountability for the health quality and outcomes for the Medicaid population they serve. They will also be given the financial flexibility within available resources to achieve the greatest possible outcomes for their membership.

CCOs are the next step forward for Oregon's health reform efforts that began in 1989 with the creation of the Oregon Health Plan. Today's managed care organizations, mental health organizations and dental care organizations that serve our state's Medicaid population have done a good job in keeping health care costs down, but the current structure limits their ability to maximize efficiency and value by effectively integrating and coordinating person-centered care. Each entity is paid separately by the state and manages its distinct element of a client's health. Additionally, the current payment system provides little incentive for the prevention or disease management actions that can lower costs, and OHP clients face a sometimes dizzying array of plans and rules while health care costs continue to outpace growth in income or state revenues.

Conventional wisdom is that there are three approaches to controlling what is spent on health care: reduce provider payments; reduce the number of people covered; or reduce covered benefits. Over the years these approaches have proven unsuccessful in reducing the actual cost of care and can squelch investments in health improvement that lead to lower future costs.

Exhibit 1
Page 5 of 142
FCI0517131
CTRL_01214878

CCO Implementation Proposal – Section 1: Executive Summary

In the creation of CCOs, HB 3650 lays the foundation for a fourth pathway: Rather than spending less into an inefficient system, change the system for better efficiency, value and health outcomes.

To implement CCOs in our state, lawmakers called on the Oregon Health Authority to develop a proposal for governance, budgeting and metrics. This proposal has been developed through the Oregon Health Policy Board and is the result of the work of the board and four work groups comprising 133 people who met over four months, a series of eight community meetings around the state that brought input from more than 1,200 people, and public comment at the monthly Oregon Health Policy Board meetings.

*Financial projections for greater system efficiency and value*
There is ample evidence from initiatives in our local communities that the kind of transformation pointed to by HB 3650 can improve health outcomes and lower costs. National efforts show the same results.

Included in the proposal is work conducted on behalf of OHA and the Oregon Health Policy Board by Health Management Associates (HMA) that estimates total Medicaid spending in Oregon can be reduced by over $1 billion in the next three years and $3.1 billion over the next five years. In year one, the savings equate to $155 million to $308 million in total fund ($58 million to $115 million general fund) cost reductions, net of new investment. HMA believes these projections are conservative as there are certain opportunities that would move the system beyond what we currently understand as well-managed. It is also possible that greater potential savings could be achieved with faster implementation. Full details of HMA's analysis are included in the proposal.

This proposal outlines operational and key qualification guidelines for CCOs as recommended by the Oregon Health Policy Board, including:

- *Global budget*: CCO global budgets will be developed by OHA to cover the broadest range of funded services for the largest number of beneficiaries possible. OHA will construct the CCO global budgets starting with the assumption that all Medicaid funding associated with a CCO's enrolled population is included. Global budgets will include services that are currently provided under managed care in addition to Medicaid programs and services that have been provided outside of the managed care system. This inclusive approach will enable CCOs to fully integrate and coordinate services and achieve economies of scale and scope. The global budget approach also allows CCOs maximum flexibility to dedicate resources toward the most efficient forms of care.

  Once CCOs are phased in, quality incentives will be incorporated in the global budget methodology to reward CCOs for improving health outcomes in order to increasingly pay for quality of care rather than quantity of care.

Exhibit 1
Page 6 of 142
FCI0517132
CTRL_01214878

- *Accountability*: CCOs will be accountable for outcomes that bring better health and more sustainable costs. HB 3650 directed that CCOs be held accountable for their performance through public reporting of metrics and contractual quality measures that function both as an assurance that CCOs are providing quality care for all of their members and as an incentive to encourage CCOs to transform care delivery in alignment with the direction of HB 3650. Accountability measures and performance expectations for CCOs will be introduced in phases to allow CCOs to develop the necessary measurement infrastructure and enable OHA to incorporate CCO data into performance standards.

  An external stakeholder group established a set of principles and recommendations for dimensions of measurement for OHA to use as a guide when establishing outcomes and quality metrics. Upon legislative approval to go forward, the next step is to establish a committee of technical experts from health plans and health systems to further define these metrics and a reporting schedule. The technical work group  will be asked to establish both minimum expectations for accountability as well as targets for outstanding performance. *(See Appendix G.)*

- *Application process*: Beginning in spring/early summer of 2012, prospective CCOs will respond to a non-competitive request for applications (RFA) much like the process developed by the federal government for Medicare Advantage plans. The RFA will describe the criteria outlined in this proposal that organizations must meet to be certified as a CCO, including relevant Medicare plan requirements. The request for applications will be open to all communities in Oregon and will not be limited to certain geographic areas.

- *Governance*: CCOs will have a governing board with a majority interest consisting of representation by entities that share financial risk as well as representation from the major components of the health care delivery system. CCOs will also convene community advisory councils (CAC) to assure a community perspective; a member of the CAC will serve on the CCO governing board.

- *CCO criteria*: In their applications for certification, CCOs will demonstrate how they intend to carry out the functions outlined in HB 3650 including *(See Appendix D)*:
  - Ensuring access to an appropriate delivery system network centered on patient-centered primary care homes;
  - Ensuring member rights and responsibilities;
  - Working to eliminate health disparities among their member populations and communities;
  - Using alternative provider payment methodologies to reimburse on the basis of outcomes and quality;

---

Oregon Health Authority                                                                                             III

Exhibit 1
Page 7 of 142

FCI0517133
CTRL_01214878

CCO Implementation Proposal – Section 1: Executive Summary

- o  Developing a health information technology (HIT) infrastructure and participating in health information exchange (HIE);
- o  Ensuring transparency, reporting quality data, and;
- o  Assuring financial solvency.

Assuming legislative approval, CCO criteria, the request for applications (RFA), and a model CCO contract will be publicly posted in spring 2012 so that communities interested in forming CCOs can begin preparing applications.

The Oregon Health Authority and the Oregon Health Policy Board are poised to begin implementation of the transformational change represented in HB3650.

### Timeline

| Federal permissions submitted | March 2012 |
| CCO criteria publicly posted | Spring 2012 |
| Request for application (RFA) and model contract posted | Spring 2012 |
| Letters of intent submitted to OHA | Spring 2012 |
| Evaluation of initial CCO applications | Spring/early summer 2012 |
| First CCOs certified | June 2012 |
| First CCOs begin enrolling Medicaid members | July 2012 |

Additional information and resources about Medicaid transformation and CCOs can be found at: www.health.oregon.gov.

Exhibit 1
Page 8 of 142
FCI0517134
CTRL_01214878

CCO Implementation Proposal – Section 2: Existing Market Environment and Industry Analysis

## 2. Existing market environment and industry analysis

### *Target population*

#### Projected enrollment

The target population includes all current and future Oregon Health Plan (OHP) enrollees. Between 2010 and 2011, enrollment grew rapidly, due primarily to growth within the expansion group. OHP staff estimates project modest (3%) annual enrollment growth through state fiscal year 2014, followed by a rapid increase between 2014 and 2015 when the Affordable Care Act Medicaid expansion goes into effect. (See Figure 1) While the vast majority of new enrollees are expected to be non-disabled adults, OHP is projecting that the annual rate of growth among the disabled and dual-eligibles, which is approximately 6 percent (excluding the year of the Medicaid expansion), will be roughly three times that of the TANF-related population's 2 percent. This trend is critical, as the disabled and dually eligible populations are, on average, far more costly than their TANF-related counterparts, and also stand to benefit most from effective care management.



Figure 1: Projected Enrollment by Sub-group

Table 1 shows the demographic distribution of the Oregon Medicaid population in 2011. The racial/ethnic makeup of the population has remained virtually unchanged over the last three years. The age profile of the Oregon Medicaid population has also remained stable over the last three years, though there has been a slight shift from the 0–18 age group to the adult group. This trend is expected to be much larger beginning in 2014, as the majority of new Medicaid enrollees will be previously uninsured adults. Approximately 56 percent of Medicaid enrollees are women and 44 percent are men. While this distribution has remained constant over the last several years, it is expected to shift somewhat toward men when the 2014 expansion is implemented.

Exhibit 1
Page 9 of 142
FCI0517135
CTRL_01214878

CCO Implementation Proposal – Section 2: Existing Market Environment and Industry Analysis

### Table 1: Oregon Medicaid Demographics (2011)

| Demographic | % |
|---|---|
| **Race/Ethnicity** | |
| White | 61% |
| African American | 4% |
| Hispanic or Latino | 22% |
| Asian, Native Hawaiian or Other Pacific Islander | 3% |
| American Indian or Alaska Native | 2% |
| Other/Unknown | 8% |
| **Age (in years)** | |
| 0-18 | 56% |
| 19-64 | 37% |
| 65+ | 7% |
| **Gender** | |
| Male | 44% |
| Female | 56% |

Table 1: Data were extracted from the demographic reports published by the Oregon Health Plan, July 2011.

### Current delivery system for target population

The current OHP program is fragmented, resulting in diluted accountability for patient care and likely duplication of infrastructure and services. Care is delivered through a system that includes three kinds of health plans (16 physical health organizations, 10 mental health organizations and eight dental care organizations), while some individuals continue to receive care on a fee-for-service basis. Specifically:[1]

- Approximately 78 percent of OHP clients are enrolled in physical health managed care.
- Nearly 90 percent of OHP clients are enrolled in managed dental care.
- Approximately 148,000 clients not enrolled in managed care receive services on a fee-for-service (FFS) arrangement — providers bill the state directly for their services based on a set fee schedule. Some providers receiving FFS also get a case management fee (in areas where there are no managed care plans).
- Approximately 88 percent of OHP enrollees are enrolled in capitated mental health organizations (MHOs). In many cases, the state provides capitated mental health organization (MHO) payments to the counties and the counties administer the programs. The counties function as the MHO, bearing full risk for the services and contract with panels of providers for direct services to enrollees. Addiction services for Medicaid clients are covered in fully capitated health plans, not through MHOs or counties.

Please see Appendix A for detailed information on current plan types and service areas.

---

[1] Oregon Health Authority. Oregon Health Policy Board meeting slides, Jan. 18, 2011

---

Oregon Health Authority                                                                                                    3

Exhibit 1
Page 10 of 142

FCI0517136
CTRL_01214878

CCO Implementation Proposal – Section 2: Existing Market Environment and Industry Analysis

## Population characteristics and health status

The need for more effective service integration and care management for OHP enrollees is evident in statewide and Medicaid-specific data. This section provides an overview of several key indicators of population health. Many of these indicators are also reflective of major cost-drivers within the Medicaid program.

- *Perinatal indicators.* Maternal and child health indicators are important factors in assessing the relative health of a community. Risk factors for poor birth outcomes such as low birth weight, short gestation, maternal smoking, inadequate maternal weight gain during pregnancy and substance abuse can often be addressed as a woman receives prenatal care.

- *Chronic conditions.* Experts estimate that chronic diseases are responsible for 83 percent of all health care spending.[2] Health care spending for a person with one chronic condition on average is 2-1/2 times greater than spending for someone without any chronic conditions.[3]

- *Smoking.* Direct Oregon Medicaid costs related to smoking are an estimated $287 million per year. This is equivalent to approximately 10 percent of total annual expenditures for Medicaid in Oregon.[4] While overall tobacco use rates in Oregon are below national levels and trending downward, adult Medicaid clients are nearly twice as likely to smoke as Oregon adults in general.[5] Specifically, 37 percent of adult Medicaid clients smoke, compared to 17 percent of Oregon adults. In addition, studies have shown that economic status is the single greatest predictor of tobacco use.[6]

- *Obesity.* Similarly, Medicaid payments for obesity-related care accounted for nearly nine percent of Medicaid costs between 2004 and 2006, a figure that has likely grown as obesity rates have increased.[7]

Figure 2 shows statewide trends in perinatal indicator rates for the Medicaid population. Teen birth rates and low birth rate babies have remained relatively constant over the past 10 years. However, rates of late prenatal care have shown a troubling increase, and the percentage of Medicaid enrollees who smoke during their pregnancy has increased after dropping off in 2007.

---

[2] Partnership for Solutions, Chronic Conditions: Making the Case for Ongoing Care. September 2004 Update.
[3] Ibid
[4] Oregon Health Plan, Tobacco Cessation Services: 2011 Survey of Fully Capitated Health Plans and Dental Care Organizations. May 2011.
[5] Ibid.
[6] Ibid.
[7] Portland Pulse, from 2007 Oregon DHS data. See: http://www.portlandpulse.org/node/37.

Exhibit 1
Page 11 of 142
FCI0517137
CTRL_01214878

CCO Implementation Proposal – Section 2: Existing Market Environment and Industry Analysis



## Figure 2: Perinatal Indicators for the OHP Population

Figure 2: Oregon Vital Statistics Annual Reports 2005-2009

Figure 3 shows the variation across the state when looking at the prevalence of chronic conditions among current OHP enrollees based on diagnosis codes. The statewide bar shows the average across all seven regions for each of the seven chronic conditions. The regions are defined as follows:

- Region 1: Clatsop, Columbia, Tillamook, Lincoln
- Region 2: Coos, Curry
- Region 3: Benton, Clackamas, Linn, Marion, Multnomah, Polk, Washington, Yamhill
- Region 4: Douglas, Jackson, Josephine, Lane
- Region 5: Crook, Deschutes, Gilliam, Grant, Hood River, Jefferson, Morrow, Sherman, Wasco, Wheeler
- Region 6: Baker, Umatilla, Union, Wallowa
- Region 7: Klamath, Lake, Harney, Malheur

In many instances, there are large disparities across regions. For example, Region 2's population has a diabetes prevalence rate that exceeds the statewide average by more than 55 percent and exceeds the Region 5 prevalence rate by 96 percent. Similarly, Region 2's population has an asthma prevalence rate that exceeds the statewide average by 14 percent and the Region 6 rate by 25 percent.

Exhibit 1
Page 12 of 142
FCI0517138
CTRL_01214878



Figure 3: Oregon Health Authority Division of Medical Assistance Programs 8/15/2011.

Figure 4 illustrates the overweight/obesity trend in Oregon and nationally. The lower portion of each stack represents the percent of the population considered "obese" according to their body mass index (BMI). The total stack represents the percentage of the population considered "overweight or obese." While the percentage of the Oregon population considered "overweight or obese" has stayed relatively stable from 2002–2009, the portion that are classified as "obese" has grown. While overall rates of obesity in Oregon are below national levels, this is a troubling trend, as obesity is one of the most important risk factors for developing diabetes, as well as numerous other chronic conditions and certain types of cancer.



Figure 4: The lower stacks represent the percentage of the population classified as "obese." The total stacks represent the percentage of the population considered "overweight." The data comes from the Behavioral Risk Factor Surveillance System, accessed 12/2011.

Exhibit 1
Page 13 of 142
FCI0517139
CTRL_01214878

CCO Implementation Proposal – Section 2: Existing Market Environment and Industry Analysis

<u>Racial and ethnic disparities</u>

In addition to overall rates of chronic disease and utilization of preventive services, it is important to look at disparities among racial and ethnic groups. A 2008 study by the Oregon Division of Medical Assistance Programs compared racial and ethnic disparities in Oregon and in the Oregon Health Plan and found that disparities exist but vary by race/ethnic group.[8] The prevalence of chronic disease is worse among certain minority groups compared to whites. For Oregon Health Plan clients, asthma prevalence was higher for American Indians and Alaska Natives than for any other group — and other minority groups' prevalence was lower than whites'. For Oregon Health Plan clients, all minority groups had a higher prevalence of diabetes, except for African Americans, where the prevalence was the same as for whites.

In its 2011 "State of Equity Report," the Department of Human Services and the Oregon Health Authority identified two disparities in key performance measures across race and ethnicity. For the first measure, the utilization rate of preventative services for children from birth to 10 years of age covered by the Oregon Health Plan, a higher rate is favorable. When comparing across the benchmark of non-Hispanic Whites, Figure 5 shows Native Americans utilizing preventive services at a rate of less than 75 percent of the utilization seen in the White population.

## Figure 5: Utilization Rate of Preventive Services for Children 0-10 Years Old Covered by the OHP Per Person Year - 2009

Figure 5: Data extracted from the "State of Equity Report" published by the Department of Human Services and the Oregon Health Authority in June 2011. Rates reflect the number of preventive services provided per person year.

In the second measure, the rate of ambulatory care sensitive condition hospitalizations of OHP clients, a lower rate is more favorable. As Figure 6 shows, when comparing rates to the benchmark of non-Hispanic Whites, the Native American population has a higher rate of potentially avoidable hospitalizations. . High rates of hospitalization for ambulatory care sensitive conditions indicate that a condition is not being properly managed. These two disparities together highlight a population in which there is a lack of health care needs being met and indicate a need for outreach and interventions targeted to specific groups.

---

[8] Division of Medical Assistance Programs and the Public Health Division, Oregon Department of Human Services' Efforts to Reduce Racial and Ethnic Health Care Disparities. May 23, 2008.

---

Oregon Health Authority                                                                                          7

Exhibit 1
Page 14 of 142
FCI0517140
CTRL_01214878

CCO Implementation Proposal – Section 2: Existing Market Environment and Industry Analysis



Figure 6: Rate of Ambulatory Care Sensitive Condition Hospitalizations of OHP Clients per 100,000 Person Years - 2009

Figure 6: Data extracted from the "State of Equity Report" published by the Department of Human Services and the Oregon Health Authority in June 2011.

Unsustainable cost growth

Without implementing transformation, Health Management Associates estimates that Oregon's Medicaid costs will continue to surge at an average of 10 percent annual growth over the next seven years due to a combination of enrollment growth, increased utilization and inflation in the cost of medical products and services. This greatly exceeds the projected growth rate of General Fund revenue.

Exhibit 1
Page 15 of 142
FCI0517141
CTRL_01214878

CCO Implementation Proposal – Section 3: Opportunities for Achieving the Triple Aim

## 3. Opportunities for achieving the Triple Aim: improving health, improving health care and reducing cost

### Financial projections for greater system efficiency and value

Current state

For the year ending June 30, 2013, total Oregon Medicaid expenditures are expected to approach $3.2 billion. Oregon's Medicaid enrollment has been growing in recent years and the base cost for services has increased historically and is expected to continue to do so. Inflationary factors include higher wages for care providers, changes in medical practice, and the introduction of new treatment protocols and new drugs and technology.

Based upon projected enrollment growth and anticipated cost inflation, total Medicaid expenditures may grow to as much as $11.7 billion in the FY 2017-2019 biennium with more than 950,000 individuals enrolled in the program. This figure includes approximately 250,000 newly eligible under federal health reform expansion provisions that take effect in 2014.

HB 3650 directs OHA to "prepare financial models and analyses to demonstrate the feasibility of a coordinated care organization being able to realize health care cost savings." OHA contracted with Health Management Associates to conduct this analysis.

Estimates of health transformation savings provided by Health Management Associates

The HMA analysis projects potential savings in six areas. The savings figures in parentheses represent anticipated percentage reductions in expenditures for that component that would take place after implementation is complete and fully scaled, which HMA estimates will take approximately three to five years. *(See Appendix B for more detailed tables)*:

- Improved management of the population (11–15% savings);
- Integration of physical and mental health (10–20% savings);
- Implementation of the Mental Health Preferred Drug List ($0 in the 2011–2013 biennium, $16 million in the 2013–2015 biennium);
- Increased payment recovery efforts (2% savings);
- Patient-centered primary care homes (4–7% savings);
- Administrative savings from MCO reductions (0.2–0.4% savings).

Improve to a well-managed system of care

In 2011, a report by Milliman for the Portland area Oregon Health Leadership Council projected savings for a well-managed Medicaid sub-population (Temporary Assistance for Needy Families, which is largely pregnant women and children) between $118 million and $141 million statewide. According to Milliman, well-managed status reflects attainment of utilization at defined levels equal to optimal benchmarks. Savings reflect the difference between existing service levels and those benchmarks. HMA

Exhibit 1
Page 16 of 142
FCI0517142
CTRL_01214878

CCO Implementation Proposal – Section 3: Opportunities for Achieving the Triple Aim

projected those findings to the entire Medicaid population by extending Milliman projections to the additional Medicaid groups: the aged, blind and disabled population as well as  the expansion population. HMA considers these projections conservative because the complexity and level of chronic disease in these groups is higher and generally yields higher savings.

HMA states that the overall integration of care and payment mechanisms would reduce costs primarily on the Medicare side for dually eligible individuals. Based upon a study by the Lewin Group and in conjunction with the report from Milliman, HMA has estimated this rate at 8.5 percent. These savings come primarily from Medicare expenditures; a shared savings arrangement with Medicare is essential to obtaining a benefit to the state.

### Integration of physical and mental health
A key strategy in Oregon's health system transformation efforts includes the integration of mental health and physical health. A study of integration savings projected results as high as 20 percent to 40 percent; however, HMA assumed a lower figure of 10 percent to 20 percent given the extent of other savings already applied in Oregon. This includes both the integration of physical health with certain mental health settings as well as the addition of mental health with physical health settings. Further, while HMA did not estimate the benefit of integrating dental health into the overall system, increased coordination should also reduce costs and increase the quality of the consumer's experience.

### Implementation of Mental Health Preferred Drug List
This strategy will require legislative approval, so no savings are projected for year one. Clear evidence exists to demonstrate savings while maintaining the same level of treatment outcomes.

### Increased payment recovery efforts
CCOs will audit claims to review Medicaid coverage criteria, inappropriate coding assignments, medical necessity, third party liability, coordination of benefits and other targeted areas, and recoup of overpayments.

### Patient-centered primary care homes
The statewide implementation of the patient-centered primary care home model can further reduce costs. Early implementation of similar models has been shown to reduce total expenditures by up to 7 percent. By further enhancing the abilities of these homes through connections to specialty care and improving care transitions between levels of care, HMA believes Oregon can go beyond well-managed.

### Administrative savings from MCO reductions
CCOs will be larger and more comprehensive than existing MCOs and MHOs. Consequently, economies of scale are available from the consolidation and redesign of current administrative functions.

### Electronic health records and health information exchange
While not included in the table below, the savings from electronic connectivity and reduction in duplicate testing should be noted. Witter & Associates, LLC, estimate avoided services savings at $16

---

Oregon Health Authority                                                                    10

Exhibit 1
Page 17 of 142

FCI0517143
CTRL_01214878

CCO Implementation Proposal – Section 3: Opportunities for Achieving the Triple Aim

million a year from the widespread adoption and use of health information exchange (HIE). While implementation of statewide HIE is projected to take four to five years, the resultant savings over time are substantial. These estimates are not net of implementation costs. However, the federal investment in provider incentive payments is providing considerable financial support for these efforts. Additionally, we believe that the savings would be measurable if the costs of implementation could be shared across other payers.

### HMA Estimates of Achievable Medicaid Savings Due to Health System Transformation
(each column represents expenditures and savings for that period only)

| Low Savings – Total Funds | 7/12 to 6/13 | 7/13 to 6/15 | 7/15 to 6/17 | 7/17 to 6/19 |
|---|---|---|---|---|
| Average Enrolled | 672,430 | 733,522 | 887,750 | 955,475 |
| Projected Expenditures | $3,178,000,000 | $7,439,550,000 | $10,018,650,000 | $11,680,350,000 |
| Improve to "Well Managed" | ($43,700,000) | ($311,050,000) | ($972,900,000) | ($1,282,700,000) |
| Integration of Physical and Mental Health | ($31,300,000) | ($285,100,000) | ($678,400,000) | ($1,039,800,000) |
| Mental Health Preferred Drug List | $0 | ($16,000,000) | ($27,000,000) | ($53,100,000) |
| Program Integrity | ($62,700,000) | ($142,600,000) | ($180,900,000) | ($208,000,000) |
| Patient Centered Primary Care Homes | ($11,000,000) | ($99,800,000) | ($237,500,000) | ($363,900,000) |
| Admin Savings from MCO Reductions | ($6,300,000) | ($14,300,000) | ($18,100,000) | ($20,800,000) |
| Savings from Redesign | ($155,000,000) | ($868,850,000) | ($2,114,800,000) | ($2,968,300,000) |
| Projected Expenditures with Redesign | $3,023,000,000 | $6,570,700,000 | $7,903,850,000 | $8,712,050,000 |
| Percentage Change in Expenditures | -4.9% | -11.7% | -21.1% | -25.4% |

| High Savings – Total Funds | 7/12 to 6/13 | 7/13 to 6/15 | 7/15 to 6/17 | 7/17 to 6/19 |
|---|---|---|---|---|
| Average Enrolled | 672,430 | 733,522 | 887,750 | 955,475 |
| Projected Expenditures | $3,178,000,000 | $7,439,550,000 | $10,018,650,000 | $11,680,350,000 |
| Improve to "Well Managed" | ($65,500,000) | ($401,050,000) | ($1,113,400,000) | ($1,603,850,000) |
| Integration of Physical and Mental Health | ($124,500,000) | ($703,900,000) | ($1,781,100,000) | ($2,015,300,000) |
| Mental Health Preferred Drug List | $0 | ($16,000,000) | ($27,000,000) | ($51,800,000) |
| Program Integrity | ($62,300,000) | ($140,800,000) | ($178,100,000) | ($201,500,000) |
| Patient Centered Primary Care Homes | ($43,600,000) | ($246,300,000) | ($623,400,000) | ($705,400,000) |
| Admin Savings from MCO Reductions | ($12,500,000) | ($28,200,000) | ($35,600,000) | ($40,300,000) |
| Savings from Redesign | ($308,400,000) | ($1,536,250,000) | ($3,758,600,000) | ($4,618,150,000) |
| Projected Expenditures with Redesign | $2,869,600,000 | $5,903,300,000 | $6,260,050,000 | $7,062,200,000 |
| Percentage Change in Expenditures | -9.7% | -20.6% | -37.5% | -39.5% |

Exhibit 1
Page 18 of 142
FCI0517144
CTRL_01214878

CCO Implementation Proposal – Section 4: CCO Certification Process

## 4. Coordinated Care Organization (CCO) certification process

Pending direction and approval by the Legislature during the February 2012 session, the Oregon Health Authority will begin a non-competitive request for applications (RFA) procurement process that specifies the criteria organizations must meet to be certified as a CCO. Prospective CCOs will be asked to submit applications to OHA describing their capacity and plans for meeting the goals and requirements established by HB 3650, including being prepared to enroll all eligible persons within the CCO's proposed service area. Contracts with certified CCOs will be for multi-year periods, with annual renewal based on CCO compliance with DCBS and OHA requirements; this is similar to Medicare Advantage contract renewals. Health insurers certified by the Oregon Department of Consumer and Business Services Insurance Division retain their certification as long as they are in compliance with DCBS and OHA requirements, including financial solvency. For CCOs, OHA will establish a public recertification process in administrative rule.

In early spring 2012, OHA will promulgate administrative rules describing the CCO application process and criteria. Once the criteria have been finalized, the application process for prospective CCOs is planned as follows (see Section 9 of this document for a timeline):
- CCO criteria will be posted online by OHA.
- OHA will release a "Request for CCO Application."
- CCO applicants will submit letters of intent to OHA.
- CCO applicants will submit applications to OHA.
- OHA will evaluate CCO applications with a public review process.
- OHA will certify CCOs.
- CMS will collaborate with OHA evaluation of applications and certification of CCOs, or may follow with a separate certification with respect to individuals who are dually eligible.

Because CCOs will be responsible for integrating and coordinating care for individuals who are dually eligible for Medicare and Medicaid, the application will include the relevant Medicare plan requirements that will build on the existing CMS Medicare Advantage application process, streamlining the process for any plans that have previously submitted Medicare Advantage applications. The request for applications will be open to all communities in Oregon and will not be limited to certain geographic areas.

Evaluation of CCO applications will account for the developmental nature of the CCO system. CCOs, OHA and partner organizations will need time to develop capacity, relationships, systems and experience to fully realize the goals envisioned by HB 3650. Particular attention will be paid to community involvement in the governance of the CCO, and to the CCO's community needs assessment conducted with its community partners. In all cases, CCOs will be expected to have plans in place for meeting the criteria laid out in the application process and making sufficient progress in implementing plans and realizing the goals established by HB 3650.

Exhibit 1
Page 19 of 142
FCI0517145
CTRL_01214878

### Alternative dispute resolution
**HB 3650:**

- *Section 8(4) A health care entity may not unreasonably refuse to contract with an organization seeking to form a coordinated care organization if the participation of the entity is necessary for the organization to qualify as a coordinated care organization.*
- *Section 8 (5) A health care entity may refuse to contract with a coordinated care organization if the reimbursement established for a service provided by the entity under the contract is below the reasonable cost to the entity for providing the service.*
- *Section 8 (6) A health care entity that unreasonably refuses to contract with a coordinated care organization may not receive fee-for-service reimbursement from the authority for services that are available through a coordinated care organization either directly or by contract.*
- *Section 8 (7) The authority shall develop a process for resolving disputes involving an entity's refusal to contract with a coordinated care organization under subsections (4) and (5) of this section. The process must include the use of an independent third party arbitrator. The process must be presented to the Legislative Assembly for approval in accordance with section 13 of this 2011 Act.*

HB 3650 requires the development of a dispute resolution process in establishing CCOs. If a health care entity (HCE) is necessary for an organization to qualify as a CCO, but the HCE refuses to contract with the organization, a process will be available to those parties that includes the use of an independent third-party arbitrator. Because "reasonable cost" is not defined, OHA will clarify in the rule-making process, to the best extent possible, the definition of reasonable cost.

A more complete description of the proposed process is provided in Appendix C. A summary of the primary objectives and components of the process is provided here.

A dispute resolution process using an arbitrator will follow after a good faith effort between the parties to agree to mutually satisfactory contract terms. If there is a question about whether the HCE is "necessary" for the certification of the CCO, the parties can consult with OHA. If there are technical questions that OHA can assist the parties with concerning the certification process, this consultation will be available. However, the primary goal is for the parties necessary to the certification of a CCO work together to agree upon the terms of a contract. Evidence of good faith negotiations should include at least one face-to-face meeting between the chief executive officer and/or chief financial officer of the HCE and of the organization applying for CCO certification, to discuss the contract offer that has been made and the reasons why the HCE has not accepted the offer. If that process does not result in a contract, either party can request the use of an arbitrator.

This dispute resolution process using an arbitrator applies when (and only when) an HCE is necessary for an organization to qualify as a CCO, but the HCE refuses to contract with the organization. This process is designed to be completed within 60 calendar days. When one party initiates the dispute resolution process, the other party and OHA will receive written notification. The parties will then identify a mutually acceptable arbitrator, who must be familiar with health care issues and HB 3650, and who agrees to follow the dispute resolution process described in Appendix C. In the first 10 days, both parties

Exhibit 1
Page 20 of 142

FCI0517146
CTRL_01214878

CCO Implementation Proposal – Section 4: CCO Certification Process

must send their most reasonable contract offer to each other and the arbitrator, or an explanation of why no contract is desired; in the next 10 days, the parties can file a written explanation for why the offer or refusal to contract is reasonable or unreasonable. The arbitrator has 15 days to review these materials and issue a decision about whether the HCE refusal to contract is reasonable or unreasonable. Having received the decision, the parties have an additional 10 days to resolve their dispute and agree on a contract. At any point in the process, the parties can agree on terms and enter into a contract, or mutually agree to withdraw from the dispute resolution process.

OHA realizes that occasions may arise when a CCO refuses to contract with an HCE. As part of implementation planning, a dispute resolution process will be developed to evaluate the reasonableness of such a refusal and to facilitate review of the dispute.

Exhibit 1
Page 21 of 142
FCI0517147
CTRL_01214878

CCO Implementation Proposal – Section 5: CCO Criteria

## 5. Coordinated Care Organization (CCO) criteria

In order to be certified as a CCO, an organization will be asked to address the criteria outlined in Sections 4 through 13 of HB 3650 and to illustrate how the organization and its systems support the Triple Aim. OHPB recommendations for CCO criteria, outlined below, were developed from a combination of stakeholder work group input, public comment, OHPB-sponsored community meetings held throughout the state, and public and invited testimony at board meetings, as well as board deliberations. Appendix D contains a consolidated list of the proposed CCO criteria along with minimum and transformational expectations for each criterion.

### *Governance and organizational relationships*
*HB 3650:*

- *Section 4(1)(o)(A-C): (o) Each CCO has a governance structure that includes: (A) a majority interest consisting of persons that share the financial risk of the organization; (B) the major components of the health care delivery system, and (C) the community at large to ensure that the organization's decision-making is consistent with the values of the members of the community.*
- *Section 4(1)(i) Each CCO convenes a community advisory council (CAC) that includes representatives of the community and of county government, but with consumers making up the majority of membership and that meets regularly to ensure that the health care needs of the consumers and the community are being met.*
- *Section 4(2) The Authority shall consider the participation of area agencies and other nonprofit agencies in the configuration of CCOs.*
- *Section 4(3) On or before July 1, 2014, each CCO will have a formal contractual relationship with any DCO in its service area.*
- *Section 24(1-4): CCOs shall have agreements in place with publicly funded providers to allow payment for point of contact services including immunizations, sexually transmitted diseases and other communicable diseases, family planning, and HIV/AIDS prevention services. Additionally, a CCO is required to have a written agreement with the local mental health authority in the area served by the coordinated care organization, unless cause can be shown why such an agreement is not feasible under criteria established by the Oregon Health Authority.*

Governing board

CCO organizational structures will vary to meet the needs of the communities they will serve. There is no single governance solution, and there is risk in being too prescriptive beyond the statutory definition of a CCO governing board. Instead, governing board criteria will support a sustainable, successful organization that can deliver the greatest possible health within available resources, where success is defined through the Triple Aim. HB3650 requires that CCOs have a governance structure that includes a majority interest consisting of persons that share the financial risk of the organization. In the context of CCO governance, an entity has financial risk when it assumes risk for Medicaid health care expenses or service delivery either through contractual agreements or resulting from the administration of a global

Oregon Health Authority                                                                                          15

Exhibit 1
Page 22 of 142

FCI0517148
CTRL_01214878

CCO Implementation Proposal – Section 5: CCO Criteria

budget. Entities are also considered at financial risk if they have provided funds that have a demonstrated risk of loss.

As part of the certification process, a CCO should articulate:

- How entities bearing financial risk for the organization make up the governing board's majority interest;
- How the governing board includes members representing major components of the health care delivery system;
- How consumers will be represented in the portion of the governing board that is not composed of those with financial risk in the organization;
- How the governing board makeup reflects the community needs and supports the goals of health care transformation; and
- The criteria and process for selecting members on the governing board, CAC and any other councils or committees of the governing board.

Community advisory council (CAC)

HB 3650 requires that each CCO convene a community advisory council (CAC) that includes representatives of the community and of county government, but with consumers making up the majority of membership. It further requires that the CAC meets regularly to ensure that the health care needs of the consumers and the community are being met.

At least one member from the community advisory council (chair or co-chairs) will also serve on the governing board to ensure accountability for the governing board's consideration of CAC policy recommendations. There must be transparency and accountability for the governing board's consideration and decision making regarding recommendations from the CAC.

Clinical advisory panel

Potential CCOs will establish an approach to assuring best clinical practices. This approach will be subject to OHA approval, and may include a clinical advisory panel. If the CCO convenes a clinical advisory panel, this group should have representation on the governing board.

In addition, the CCO will need to address the following in its application:

- How will the CAC and any other councils or committees of the governing board support and augment the effectiveness of governing board decision making?
- What are the structures initially and over time that will support meaningful engagement and participation of CAC members, and how will they address barriers to participation?

Partnerships

HB 3650 encourages partnerships between CCOs and local mental health authorities and county governments in order to take advantage of and support the critical safety net services available through county health departments and other publicly supported programs. Unless it can be shown why such arrangements would not be feasible, HB 3650 requires CCOs to have agreements with the local mental health authority regarding maintenance of the mental health safety net and community mental health

Exhibit 1
Page 23 of 142
FCI0517149
CTRL_01214878

CCO Implementation Proposal – Section 5: CCO Criteria

needs of CCOs members, and with county health departments and other publicly funded providers for payment for certain point-of-contact services. OHPB directs OHA to review CCO applications to ensure that statutory requirements regarding county agreements are met.

Community needs assessment

CCOs should partner with their local public health authority and hospital system to develop a shared community needs assessment that includes a focus on health disparities in the community. The needs assessment will be transparent and public in both process and result. Although community needs assessments will evolve over time as relationships develop and CCOs learn what information is most useful, OHA is expected to work with communities and other relevant bodies such as the OHA Office of Equity and Inclusion and the Health Information Technology Oversight Council (HITOC) to create as much standardization as possible in the components of the assessment and data collection so that CCO service areas can be meaningfully compared, recognizing that there will be some differences due to unique geographic settings and community circumstances.

In developing a needs assessment, CCOs should meaningfully and systematically engage representatives of critical populations and community stakeholders to create a plan for addressing community need that builds on community resources and skills and emphasizes innovation. OHA will define the minimum parameters of the community needs assessment with the expectation that CCOs will expand those as necessary to identify the needs of the diverse communities in the CCO service area. The Public Health Institute's "Advancing the State of the Art in Community Benefit" offers a set of principles that provide guidance for this work[9]:

- Emphasis on disproportionate unmet, health-related need, including disparities;
- Emphasis on primary prevention;
- Building a seamless continuum of care;
- Building community capacity;
- Emphasis on collaborative governance of community benefit.

---

[9] Public Health Institute, Advancing the State of the Art in Community Benefit: A User's Guide to Excellence and Accountability. November, 2004.

---

Exhibit 1
Page 24 of 142
FCI0517150
CTRL_01214878

*Patient rights and responsibilities, engagement and choice*
*HB3650:*

- *Section 4(1)(a) Each member of the CCO receives integrated person-centered care and services designed to provide choice, independence and dignity.*
- *Section 4(1)(h) Each CCO complies with safeguards for members as described in Section 8, Consumer and Provider Protections of HB 3650:*
  - *Section 8(1) The Oregon Health Authority shall adopt by rule safeguards for members enrolled in coordinated care organizations that protect against underutilization of services and inappropriate denials of services. In addition to any other consumer rights and responsibilities established by law, each member:*
  - *(a)  Must be encouraged to be an active partner in directing the member's health care and services and not a passive recipient of care.*
  - *(b) Must be educated about the coordinated care approach being used in the community and how to navigate the coordinated health care system.*
  - *(c) Must have access to advocates, including qualified peer wellness specialists where appropriate, personal health navigators, and qualified community health workers who are part of the member's care team to provide assistance that is culturally and linguistically appropriate to the member's need to access appropriate services and participate in processes affecting the member's care and services.*
  - *(d) Shall be encouraged within all aspects of the integrated and coordinated health care delivery system to use wellness and prevention resources and to make healthy lifestyle choices.*
  - *(e) Shall be encouraged to work with the member's care team, including providers and community resources appropriate to the member's needs as a whole person.*

- *Section 4(1)(k) Members have a choice of providers within the CCOs network and that providers participating in the CCO: (A) work together to develop best practices for care and delivery to reduce waste and improve health and well-being of members, (B) are educated about the integrated approach and how to access and communicate with the integrated system about patient treatment plans and health history, (C) emphasize prevention, healthy lifestyle choices, evidence-based practices, shared decision-making and communication, (D) are permitted to participate in networks of multiple CCOs, (E) include providers of specialty care, (F) are selected by CCOs using universal application and credentialing procedures, objective quality information and removed if providers fail to meet objective quality standards, (G) work together to develop best practices for culturally appropriate care and service delivery to reduce waste, reduce health disparities and improve health and well-being of members.*

Members enrolled in CCOs should be actively engaged partners in the design and, where applicable, implementation of their treatment and care plans through ongoing consultation regarding preferences and goals for health maintenance and improvement. Member choices should be reflected in the development of treatment plans; member dignity will be respected. Under this definition, members will

Exhibit 1
Page 25 of 142

FCI0517151
CTRL_01214878

CCO Implementation Proposal – Section 5: CCO Criteria

be better positioned to fulfill their responsibilities as partners in the primary care team at the same time that they are protected against under-utilization of services and inappropriate denials of services.

In addition to any other consumer rights and responsibilities established by law, each CCO should demonstrate how it will:
- Use community input and the community needs assessment process to help determine the best methods for patient activation, with the goal of ensuring that patients act as equal partners in their own care;
- Encourage members to be active partners in their health care and, to the greatest extent feasible, develop approaches to patient engagement and responsibility that account for the social determinants of health relevant to their members;
- Engage members in culturally appropriate ways;
- Educate members on how to navigate the coordinated care approach;
- Encourage members to use wellness and prevention resources and to make healthy lifestyle choices;
- Meaningfully engage the community advisory council to monitor patient engagement and activation;
- Provide plain language narrative that informs patients about what they should expect from the CCO with regard to their rights and responsibilities.

None of the patient rights and responsibilities identified above is intended to supplant Medicaid or Medicare law or rule.

### Delivery system: access, patient-centered primary care homes, care coordination and provider network requirements
HB3650:
- *Section 4(1)(b) Each member has a consistent and stable relationship with a care team that is responsible for providing preventive and primary care, and for comprehensive care management in all settings.*
- *Section 4(1)(c) Supportive and therapeutic needs of each member are addressed in a holistic fashion, using patient-centered primary care homes and individualized care plans to the extent feasible.*
- *Section 4(1)(d) Members receive comprehensive transitional care, including appropriate follow-up, when entering or leaving an acute care facility or long-term care setting.*
- *Section 4(1)(e) Members receive assistance in navigating the health care delivery system and in accessing community and social support services and statewide resources, including through the use of certified health interpreters, community health workers, and personal health navigators who meet competency standards developed by the Authority.*
- *Section 4(1)(f) Services and supports are geographically located as close to where members reside as possible and are, if available, offered in non-traditional settings that are accessible to families, diverse communities and underserved populations.*

Exhibit 1
Page 26 of 142
FCI0517152
CTRL_01214878

CCO Implementation Proposal – Section 5: CCO Criteria

- *Section 4(1)(j) Each CCO prioritizes working with members who have high health care needs, multiple chronic conditions, mental illness or chemical dependency and involves those members in accessing and managing appropriate preventive, health, remedial and supportive care and services.*
- *Sec 4(1)(k)(G) Members have a choice of providers within the coordinated care organization's network and that providers participating in a coordinated care organization: Work together to develop best practices for culturally appropriate care and service delivery to reduce waste, reduce health disparities and improve the health and well-being of members.*
- *Section 4(1)(n) Each CCO participates in the learning collaborative described in ORS 442.210(3).Section 6(2) Each CCO shall implement, to the maximum extent feasible, patient centered primary care homes, including developing capacity for services in settings that are accessible to families, diverse communities and underserved populations. The CCO shall require its other health and services providers to communicate and coordinate care with patient-centered primary care homes in a timely manner using health information technology.*
- *Section 6(3) Standards established by the authority for the utilization of patient centered primary care homes by CCOs may require the use of federally qualified health centers, rural health clinics, school-based health clinics and other safety net providers that qualify as patient centered primary care homes to ensure the continued critical role of those providers in meeting the needs of underserved populations.*
- *Sec 20(4) 'Community health worker' means an individual who:*
  - c) *To the extent practicable, shares ethnicity, language, socioeconomic status and life experiences with the residents of the community where the worker serves;*
  - d) *Assists members of the community to improve their health and increases the capacity of the community to meet the healthcare needs of its residents and achieve wellness;*
  - e) *Provides health education and information that is culturally appropriate to the individuals being served;*

Transformation relies on ensuring that CCO members have access to high-quality care. This will be accomplished by the CCO through a provider network capable of meeting health systems' transformation objectives. The following criteria focus on elements of a transformed delivery system critical to improving the member's experience of care as a partner in care rather than as a passive recipient of care.

Patient-centered primary care homes

Integral to transformation is the patient-centered primary care home (PCPCH), as currently defined by Oregon's statewide standards. These standards were developed through a public process as directed by HB 2009 to advance the Triple Aim goals of better health, better care, lower costs by focusing on wellness and prevention, coordination of care, active management and support of individuals with special health care needs, a patient and family-centered approach to all aspects of care, and an emphasis on whole-person care in order to address a patient's (and family's) physical and behavioral health care needs.

Exhibit 1
Page 27 of 142
FCI0517153
CTRL_01214878

CCO Implementation Proposal – Section 5: CCO Criteria

Building on this work, each CCO will demonstrate how it will use PCPCH capacity to achieve the goals of health system transformation including:

- How the CCO will partner with and/or implement a network of patient-centered primary care homes as defined by Oregon's standards to the maximum extent feasible, as required by HB 3650.;
- How the CCOs will require their other contracting health and services providers to communicate and coordinate care with the PCPCH in a timely manner using electronic health information technology, where available, as required by HB 3650;
- How the CCO will incent and monitor improved transitions in care so that members receive comprehensive transitional care, as required by HB 3650, and members' experience of care and outcomes are improved (coordinated care, particularly for transitions between hospitals and long-term care, is key to delivery system transformation);
- How the CCO's patient-centered primary care home delivery system elements will ensure that members receive integrated, person-centered care and services, as described in the bill, and that members are fully informed partners in transitioning to this model of care;
- How members will be informed about access to non-traditional providers, if available through the CCO. As described in HB 3650, these providers may include personal health navigators, peer wellness specialists where appropriate, and community health workers who, as part of the care team, provide culturally and linguistically appropriate assistance to members to access needed services and participate fully in all processes of care.

Care coordination

Care coordination is a key activity of health system transformation. Without it, the health system suffers costly duplication of services, conflicting care recommendations, medication errors and member dissatisfaction, which contribute to poorer health outcomes and unnecessary increases in medical costs.

CCOs should demonstrate the following elements of care coordination in their applications for certification:

- How they will support the flow of information, identify a lead provider or care team to confer with all providers responsible for a member's care and, in the absence of full health information technology capabilities, how they will implement a standardized approach to patient follow-up;
- How they will work with their providers to develop the partnerships necessary to allow for access to and coordination with social and support services, including long-term care services and crisis management services;
- How they will develop a tool for provider use to assist in the education of members about care coordination and the responsibilities of each in the process of communication;
- How they will meet state goals and expectations for coordination of care for individuals receiving Medicaid-funded long-term care services given the exclusion of Medicaid-funded long-term services from CCO global budgets.

Exhibit 1
Page 28 of 142
FCI0517154
CTRL_01214878

CCO Implementation Proposal – Section 5: CCO Criteria

CCO applicants should be able to describe the evidence-based or innovative strategies they will use within their delivery system networks to ensure coordinated care, especially for members with intensive care coordination needs, as follows:

- *Assignment of responsibility and accountability:* CCOs must demonstrate that each member has a primary care provider or primary care team that is responsible for coordination of care and transitions, as required by HB 3650.
- *Individual care plans:* As required by HB 3650, CCOs will use individualized care plans to the extent feasible to address the supportive and therapeutic needs of each member, particularly those with intensive care coordination needs. Plans will reflect member or family/caregiver preferences and goals to ensure engagement and satisfaction.
- *Communication*: CCOs will demonstrate that providers have the tools and skills necessary to communicate in a linguistically and culturally appropriate fashion with members and their families or caregivers and to facilitate information exchange between other providers and facilities ((e.g., addressing issues of health literacy, language interpretation, having electronic health record (her) capabilities, etc.)).

Effective transformation requires the development of a coordinated and integrated delivery system provider network that demonstrates communication, collaboration and shared decision making across the various providers and care settings. OHPB understands this work will occur over time. As each CCO develops, it will be expected to demonstrate the following:

- The CCO will ensure a network of providers to serve members' health care and service needs, meet access-to-care standards, and allow for appropriate choice for members as required by HB 3650. The bill also requires that services and supports should be geographically as close to where members reside as possible and, to the extent necessary, offered in non-traditional settings that are accessible to families, diverse communities and underserved populations.
- The CCO will build on existing provider networks and transform them into a cohesive network of providers.
- The CCO will work to develop formal relationships with providers, community health partners, and state and local government support services in its service area(s), as required by HB 3650, and how it will participate in the development of coordination agreements among those groups.

Care integration

- *Mental health and chemical dependency treatment:* Outpatient mental health and chemical dependency treatment will be integrated in the person-centered care model and delivered through and coordinated with physical health care services by the CCO. HB 3650 requires OHA to continue to renew contracts or ensure that counties renew contracts with providers of residential chemical dependency treatment until the provider enters into a contract with a CCO, but no later than July 1, 2013.
- *Oral health:* By July 1, 2014, HB 3650 requires each CCO to have a formal contractual relationship with any dental care organization that serves members of the CCO in the area where they reside. Shared financial accountability will encourage aligned financial incentives for cost-effectiveness and to discourage cost shifting.

Exhibit 1
Page 29 of 142

FCI0517155
CTRL_01214878

CCO Implementation Proposal – Section 5: CCO Criteria

- *Hospital and specialty services:* Adequate, timely and appropriate access to hospital and specialty services will be required. Hospital and specialty service agreements should be established that include the role of patient-centered primary care homes and that specify the following: processes for requesting hospital admission or specialty services; and performance expectations for communication and medical records sharing for specialty treatments, at the time of hospital admission or discharge, for after-hospital follow up appointments. CCOs should demonstrate how hospitals and specialty services will be accountable to achieve successful transitions of care.

Quality assurance and improvement

It is a continued goal of the OHA to require contracted Medicaid providers to meet established standards for quality assessment and improvement. As part of the certification process, CCOs will describe planned or established mechanisms for:

- A complaint/grievance and appeals resolution process, including how that process will be for communicated to members and providers;
- Establishing and supporting an internal quality improvement committee that develops and operates under an annual quality strategy and work plan with feedback loops;
- Participating in data collection and/or reporting for OHA accountability metrics;
- Implementing an internal utilization review oversight committee that monitors utilization against practice guidelines and treatment planning protocols/policies.

## Health equity and eliminating health disparities
### HB 3650:

- *Section 2(2). The Oregon Health Authority shall seek input from groups and individuals who are part of underserved communities, including ethnically diverse populations, geographically isolated groups, seniors, people with disabilities and people using mental health services, and shall also seek input from providers, coordinated care organizations and communities, in the development of strategies that promote person centered care and encourage healthy behaviors, healthy lifestyles and prevention and wellness activities and promote the development of patients' skills in self-management and illness management.*
- *Section 2(3)(b). The authority shall regularly report to the Oregon Health Policy Board, the Governor and the Legislative Assembly on the progress of payment reform and delivery system change including progress toward eliminating health disparities.*
- *Sec 4(1)(f) Services and supports are geographically located as close to where members reside as possible and are, if available, offered in nontraditional settings that are accessible to families, diverse communities and underserved populations.*
- *Section 4(1)(k)(G). [Providers participating in a Coordinated Care Organization] work together to develop best practices for culturally appropriate care and service delivery to reduce waste, reduce health disparities and improve the health and well-being of members.*
- *Sec 19(1)(L) The authority shall: Implement policies and programs to expand the skilled, diverse workforce as described in ORS 414.018 (4).*

---

Oregon Health Authority                                                                                           23

Exhibit 1
Page 30 of 142

FCI0517156
CTRL_01214878

CCO Implementation Proposal – Section 5: CCO Criteria

- *Sec 30(1)(a) Workforce data collection. Using data collected from all health care professional licensing boards, including but not limited to boards that license or certify chemical dependency and mental health treatment providers and other sources, the Office for Oregon Health Policy and Research shall create and maintain a healthcare workforce database that will provide information upon request to state agencies and to the Legislative Assembly about Oregon's health care workforce, including:*
  *(a) Demographics, including race and ethnicity.*
  *(f) Incentives to attract qualified individuals, especially those from underrepresented minority groups, to health care education.*

Health equity means reaching the highest possible level of health for all people. Historically, health inequities result from health, economic and social policies that have disadvantaged communities. These disadvantages result in tragic health consequences for vulnerable populations and increased health care costs to the entire system; these costs are borne by taxpayers, employers, workers and the uninsured. CCOs will ensure that everyone is valued and health improvement strategies are tailored to meet the individual needs of all members, with the ultimate goal of eliminating health disparities.

HB 3650 encourages CCOs and their associated providers to work together to develop best practices of culturally appropriate care and service delivery to reduce health disparities and improve health and well-being of members. Through their community needs assessment, CCOs will be expected to identify health disparities associated with race, ethnicity, language, health literacy, age, disability, gender, sexual orientation, geography or other factors in their service areas. Although community needs assessments will evolve over time as relationships develop and CCOs learn what information is most useful, the OHA Office of Equity and Inclusion should assist in identifying standard components (e.g., workforce) that CCOs should address in the assessment to ensure that all CCOs have a strong and comparable set of baseline data on health disparities.

CCOs will be expected to collect or maintain race, ethnicity and primary language for all members on an ongoing basis in accordance with standards jointly established by OHA and the Oregon Department of Human Services. CCOs can then track and report on any quality measure by these demographic factors and will be expected to develop, implement and evaluate strategies to improve health equity among members.

**Payment methodologies that support the Triple Aim**
**HB 3650:**

- *Section 5(1). The OHA shall encourage CCOs to use alternative payment methodologies that: (a) reimburse providers on the basis of health outcomes and quality instead of the volume of care; (b) hold organizations and providers responsible for the efficient delivery of quality care; (c) reward good performance; (d) limit increases in medical costs; (e) use payment structures that create incentives to promote prevention, provide person-centered care, and reward comprehensive care coordination.*

Oregon Health Authority                                                                                     24

Exhibit 1
Page 31 of 142

FCI0517157
CTRL_01214878

CCO Implementation Proposal – Section 5: CCO Criteria

To achieve improvements in quality and efficiency in the delivery system, it will be necessary for CCOs to move from a traditionally fee-for-service payment system to alternative methods that link payment to desired outcomes, promote patient-centered care, and compensate providers for prevention, care coordination, and other activities necessary for keeping people healthy. These methods should include transparent measurement of outcomes aligned with the Triple Aim and be guided by the principles outlined by the OHPB Incentives and Outcomes Committee in 2010:

- *Equity* - Payment for health care should provide incentives for delivering evidence-based care (or emerging best practices) to all people.
- *Accountability* - Payment for health care should create incentives for providers and health plans to deliver health care and supportive services necessary to reach Oregon's Triple Aim goals.
- *Simplicity* - Payment for health care should be as simple and standardized as possible to reduce administrative costs, increase clarity and lower the potential for fraud and abuse.
- *Transparency* - Payment for health care should allow consumers, providers and purchasers to understand the incentives created by the payment method, the price of treatment options and the variations in price and quality of care across providers.
- *Affordability* (cost containment) - Payment for health care should create incentives for providers and consumers to work together to control the growth of health care costs by encouraging prevention and wellness, discouraging care that does not improve health, and rewarding efficiency.

In their applications for certification, CCOs will be expected to describe how they will use alternative payment methods alone or in combination with delivery system changes to achieve better care, controlled costs and better health for their members. Examples include but are not limited to:

- Per-member per-month or other payments designed to support patient-centered primary care homes;
- Bundled payments (case rates, fee-for-service rates with risk sharing, or other) for acute episodes, or for episodes of chronic care defined by a calendar period;
- Incentives for service agreements between specialty and primary care physicians;
- Gain-sharing arrangements with providers, if volume is sufficient;
- Quality bonuses or other payment incentives for performance improvement on Triple Aim-focused quality, efficiency and outcomes metrics; and
- Incentives for the use of evidence-based and emerging best practices and health information technology.

While CCOs will have flexibility in the payment methodologies they choose to use, CCOs are encouraged to rely on previously developed and tested payment approaches where available. Efforts to create incentives for evidence-based and best practices will be expected to increase health care quality and patient safety and to result in more efficient use of health care services. To ensure successful transition to new payment methods, it will be necessary for CCOs to build network capacity and to help restructure systems and workflows to be able to respond effectively to new payment incentives.

CCO Implementation Proposal – Section 5: CCO Criteria

### *Health information technology*
### *HB 3650:*

- ***Section 4(1)(g) Each CCO uses health information technology to link services and care providers across the continuum of care to the greatest extent possible.***

OHPB requested that the Health Information Technology Oversight Council (HITOC) provide advice on appropriate health information technology (HIT) certification criteria for CCOs. In order to ensure that coordinated care delivery is enabled through the availability of electronic information to all participants, HITOC suggests that CCOs will need to develop the HIT capabilities described below. CCOs will span different provider types across the continuum of care and different geographic regions across the state, each of which is at different stages of HIT adoption and maturity. The proposed approach for achieving advanced HIT capability is to meet providers and communities where they are and require improvement over time. CCOs will ultimately need to achieve minimum standards in foundational areas of HIT use (electronic health records, health information exchange) and to develop their own goals for transformational areas of HIT use (analytics, quality reporting, patient engagement and other health IT).

#### Electronic health records systems (EHRs)

CCOs should facilitate providers' adoption and meaningful use of EHRs. EHRs are a foundational component of care coordination because they enable providers to capture clinical information in a format that can be used to improve care, control costs, and more easily share information with patients and other providers. In order to achieve advanced EHR adoption and meaningful use, CCOs will be expected to:

- Identify EHR adoption rates (rates may be divided by provider type and/or geographic region);
- Develop and implement strategies to increase adoption rates of certified EHRs;
- Consider establishing minimum requirements for EHR adoption over time (requirements may vary by region or provider type).

#### Health information exchange (HIE)

CCOs will facilitate electronic health information exchange in a way that allows all providers to exchange patients' health information with any other provider in that CCO. HIE is a foundational component of care coordination because it enables providers to access pertinent health information when and where it is needed to provide the best care possible and to avoid performing duplicative services. CCOs will be expected to ensure that every provider is:

- **Either** registered with a statewide or local direct-enabled health information service provider (HISP);
  - ○ Direct is a way for one provider to send secure information directly to another provider without using sophisticated information systems. Direct secure messaging will be available to all providers as a statewide service. While EHR vendors will continue to develop products with increasingly advanced direct functionality, using direct secure messaging does not require an EHR system. Registration will ensure the proper identification of participants and secure routing of health care messages, and the email address provided with direct secure

Exhibit 1
Page 33 of 142

FCI0517159
CTRL_01214878

> messaging registration will be accessible from a computer, smart phone or tablet, and through EHR modules over time.

- **Or** is a member of an existing health information organization (HIO) with the ability for providers on any EHR system (or with no EHR system) to be able to share electronic information with any other provider within the CCO network.

CCOs should also consider establishing minimum requirements for HIE, including rates of e-prescribing and electronic lab orders, over time.

CCOs will leverage HIT tools to transform from a volume-based to a value-based delivery system. In order to do so, CCOs should initially identify their current capacity and develop and implement a plan for improvement (including goals/milestones, etc.) in the following areas:

- Analytics (to assess provider performance, effectiveness and cost-efficiency of treatment, etc.);
- Quality reporting (to facilitate quality improvement within the CCO as well as to report the data on quality of care that will allow the OHA to monitor the performance of the CCO);
- Patient engagement through HIT (using existing tools such as email, etc.);
- Other HIT (telehealth, mobile devices, etc.).

Exhibit 1
Page 34 of 142

FCI0517160
CTRL_01214878

CCO Implementation Proposal – Section 6: Global Budget Methodology

## 6. Global budget methodology

*HB 3650:*

- **Section 13(2)(b) Using a meaningful public process, the Oregon Health Authority shall develop...a global budgeting process for determining payments to CCOs and for revising required outcomes with any changes to global budgets.**

CCO global budgets are designed to cover the broadest range of funded services for the most beneficiaries possible. The construction of global budgets start with the assumption that all Medicaid funding associated with a CCO's enrolled population is included. Global budgets should include services that are currently provided under Medicaid managed care in addition to Medicaid programs and services that have been provided outside of the managed care system. This inclusive approach will enable CCOs to fully integrate and coordinate services and achieve economies of scale and scope. The global budget approach also allows CCOs maximum flexibility to dedicate resources toward the most efficient forms of care.

Once CCOs are phased in, quality incentives will be incorporated into the global budget methodology to reward CCOs for improving health outcomes in order to increasingly pay for quality of care rather than quantity of care.

CCO global budgets will be comprised of two major components: capitated and non-capitated. The capitated portion will include funding for all services that can be disbursed to CCOs in a prospective per-member per-month payment. Initially, the capitated portion should include all services currently provided by physical health, mental health and — by 2014 if not before — dental care organizations. The non-capitated portion of the global budget calculation will be for programs and services that are currently provided outside of managed care. The CCO will receive payment and be accountable for the provision of those services.

This approach provides a flexible format that recognizes that not all current Medicaid funding lends itself neatly to a per-member per-month calculation. As the CCO develops and more experience is gained with the global budget, the breadth of funding incorporated into the capitated portion of the global budgets may expand.

**Primary components of the CCO global budgets and shared accountability arrangements:**

| Medicaid services currently capitated under managed care | Medicaid services **not** currently capitated under managed care | Exclusions from CCO global budgets |
|---|---|---|
| Physical health services | Physical health services | Long-term care services |
| + Mental health services | + Mental health services | + Mental health drugs |
| + Oral health services (if included) | + Medicaid-funded public health services | + Services postponed from inclusion |
| *Per-member per-month capitated payment* | *Non-capitated portion; payment basis may vary.* | *Shared accountability for outcomes and costs may be possible.* |

**CCO Global Budget**

---

Oregon Health Authority                                                                 28

Exhibit 1
Page 35 of 142

FCI0517161
CTRL_01214878

CCO Implementation Proposal – Section 6: Global Budget Methodology

### Populations included in global budget calculations

With very few exceptions, all Medicaid populations in Oregon are to be enrolled in CCOs and paid under the global budget methodology. An overview of the eligible CCO populations and their current managed care enrollment can be found in Appendix E. Approximately, 78 percent of people who are eligible for Medicaid are enrolled in a capitated physical health plan, 88 percent in a mental health organization, and 90 percent in a dental care organization.[10] HB 3650 directs OHA to enroll as many of the remaining eligible individuals (including those who are currently in fee-for-service Medicaid) into a CCO as possible. Section 28 of HB 3650 specifically exempts American Indians, Alaska Natives and related groups from mandatory enrollment in CCOs.

### Service/program inclusion and alignment

One of the primary goals of the global budget concept is to allow CCOs flexibility to invest in care that may decrease costs and achieve better outcomes. The more programs, services and funding streams that are included in CCO global budgets, the more flexibility and room for innovation exist for CCOs to provide comprehensive, person-centered care. In addition, leaving necessary care outside of the global budget creates conflicting incentives where the action of payers outside of the CCO, who have little reason to contribute to CCO efficiencies, may have an undue effect on costs and outcomes within the CCO.

In considering which Medicaid funding streams should be included in the global budget, the budget will start with the presumption that all Medicaid dollars are in the global budget (with the exception of the services explicitly excluded by HB 3650.) See Appendix F for a list of the services funded by Medicaid funds. Without exception, funding and responsibility for all current services provided by managed physical and mental health organizations as well as non-emergent transportation will be included in each CCO's global budget. The services that are currently capitated under physical and mental health organizations account for approximately 80 percent of Oregon's non-long-term care Medicaid expenditures. Non-emergent transportation represents another 2 percent of expenditures.

Currently, 5 percent of Oregon's non-long-term care Medicaid expenditures are associated with payments for dental care through DCOs. Dental expenditures will be included in global budgets based on individual CCO determination, as HB 3650 allows until July 1, 2014 to incorporate these services.

With respect to the remaining 13 percent of non-long-term care Medicaid expenditures, OHPB believes exceptions to service or program inclusion in the global budgets should be minimal. However, consideration could be given to CCO requests to postpone inclusion of one or more services or programs on the grounds that their inclusion would negatively affect health outcomes by reducing available funding, access or quality. CCOs are strongly encouraged to develop strategic partnerships within their communities in order to successfully manage comprehensive global budgets.

---

[10] Citizen Alien Waived Emergent Medical (CAWEM) beneficiaries and individuals who are partially dual eligible for Medicaid and Medicare—including qualified Medicare beneficiaries (QMB) and specified low-income Medicare beneficiaries (SLMB)—are not included in this calculation.

---

Exhibit 1
Page 36 of 142

FCI0517162
CTRL_01214878

CCO Implementation Proposal – Section 6: Global Budget Methodology

In the case of services that are postponed or excluded from CCO global budgets, it is anticipated that CCOs will enter into shared accountability arrangements for the cost and health outcomes of these services in order to ensure that incentives are aligned in a manner that facilitates optimal coordination. HB 3650 excludes mental health drugs and long-term-care services from CCO global budgets. As described in the Accountability section below, these and other exclusions from CCO global budgets weaken incentives for coordinated care, which must be addressed.

### Global budget development

The overall global budget strategy will hold CCOs accountable for costs but not enrollment growth. This strategy suggests an overall budgeting process that builds off of the current capitation rate methodology, but also includes a broader array of Medicaid services and/or programs. CCOs' first-year global budgets will include two Medicaid components:

A capitated portion that includes the per-member per-month payments for services currently provided through the OHP physical health plans, mental health organizations and (if included) dental care organizations; and,

An add-on component to the capitated portion for the remaining Medicaid services or programs not currently included in capitation payments.

Additionally, CCO global budgets will also include Medicare funding to blend with their Medicaid funding to care for individuals eligible for both programs. After the development of an initial baseline of quality and outcome data, OHA will develop a quality incentive component to the global budget methodology to reward CCOs for improved health care outcomes and controlling costs.

#### Capitated portion of the global budget methodology

At least initially, the capitated portion of CCO capitation rate setting would combine the information provided by organizations seeking CCO certification with a method similar to the lowest cost estimate approach OHA took in setting rates for the first year of the 2011–13 biennium. This approach provides a key role for plans in determining appropriate rates and potential efficiencies that can be realized under a transformed delivery system tailored to meet the needs of the communities the CCOs serve.
Under this approach, potential CCOs will submit a completed base cost template using internal cost data that is representative of a minimum base population. This will not be a competitive bidding process, but OHA actuaries will review the submission for completeness and soundness in order to establish a base rate. Once a base rate is established, the state actuaries will use a risk adjustment methodology to arrive at rates for previously uncovered populations and areas.

More specifically, in order to establish rates, OHA will gather estimated costs that use the most reliable cost data from potential CCOs in order to produce a base cost while addressing actuarial soundness, CCO viability and access to appropriate care. This cost data will indicate the lowest rate a CCO can accept in its base region, based on current population, geographic coverage and benefit package (the CCO Base Cost Template referenced above). OHA will use the CCO Base Cost Template as the foundation

---

Exhibit 1
Page 37 of 142
FCI0517163
CTRL_01214878

CCO Implementation Proposal – Section 6: Global Budget Methodology

for the CCO capitation rates. If CCOs propose to operate in geographic areas where they have little or no experience, state actuaries will use a population-based risk adjustment methodology based on the currently used Chronic Illness and Disability Payment System (CDPS), to develop the rates in these new areas.

It is anticipated that initial CCO global budget amounts be established for one year, but that stakeholders and OHA will explore the possibility of establishing global budgets that could be enacted on a biennial or multi-year basis thereafter. For subsequent years, stakeholders have indicated support for continuing to adjust payments to CCOs based on member risk profiles under the current CDPS process. Stakeholders have encouraged OHA to investigate the possibility of including pharmacy data and expanded demographic data into CDPS.

Pending direction and approval by the Legislature during the February 2012 session, it is expected that OHA carry out the following process for prospective CCOs (see Section 10 of this document for a timeline):

- Finalize CCO definition/scope and process;
- Release  CCO estimated cost submission process document;
- Collect comments on estimated cost submission process document;
- Make final changes to estimated cost submission process;
- Release of CCO base cost template;
- Release notice of intent to contract as CCO;
- Collect base cost template from prospective CCOs;
- Review and certification of CCO rates;
- Conduct final review of CCO capitation rates;
- Submit CCO capitation rates to CMS;
- Submit contracts to CCOs.

CCO contractors will provide a notice of intent to contract as a CCO followed by a submission of base costs to OHA not later than the beginning of May 2012. OHA's Actuarial Services Unit will be available for technical assistance and work closely with potential CCOs to help them prepare and submit their base cost estimates. If a potential CCO declines to provide a base cost template, OHPB does not recommend certifying a capitation rate for the CCO or issuing the CCO a contract.

The CCO's submitted rates will be reviewed by OHA's actuary and assessed for reasonableness based on documentation that the CCO is capable of:

- Attaining identified efficiencies without endangering its financial solvency;
- Providing adequate access to services for its enrollees; and
- Meeting all necessary federal standards, including but not limited to explanatory notes detailing planned actions, such as initiatives to increase efficiency.

Exhibit 1
Page 38 of 142

FCI0517164
CTRL_01214878

CCO Implementation Proposal – Section 6: Global Budget Methodology

OHA's actuary will assess actuarial soundness at the CCO and region level, and will confer with the CCO regarding any questions or issues that need to be resolved. Additional calculations may be required to ensure that CCO rates in aggregate meet the 2011–2013 legislatively approved budget.

Non-capitated or supplemental portion of the Global Budget Methodology

As previously stated, the OHPB recommended approach to global budgets starts with the assumption that all Medicaid funding associated with a CCO's enrolled population is included. The non-capitated portion of the global budget calculation will encompass programs and services that are currently provided outside of managed care. The CCO will now receive payment and be accountable for the provision of those services.

However, the board recognizes that it may not be feasible or optimal to initially wrap all Medicaid services that have been traditionally outside of managed care capitation into a per-member per-month payment calculation. This may be the case when communities provide the state matching funds for certain Medicaid services. New financing arrangements between the state, CCO and county will be needed to ensure the ability to match local funds is not compromised. In other cases, there may not be adequate experience to comfortably base a per-member per-month calculation, at least initially.

As the CCO develops and more experience is gained with the global budget, the breadth of funding incorporated into the capitated portion of the global budgets may expand.

Blended funding for individuals who are dually eligible for Medicare and Medicaid

In HB 3650, the Legislature directed OHA to seek federal waivers and permissions necessary to allow CCOs to provide Medicare and Medicaid services to individuals who are eligible for both programs. Inclusion of dually eligible enrollees in the CCOs and the associated Medicare funding in the global budget is important for a number of reasons. Medicare spending covers the majority of the costs for individuals who are dually eligible, and the vast majority of costs not associated with long-term care. Medicare is the primary payer for dually eligible beneficiaries, and therefore covers the preponderance of medical services. Including Medicare funding in the global budget creates a larger pool of funding to leverage and will allow CCOs to find economies of scope and scale. Including Medicare funding also will provide a significant opportunity to use these funding streams more flexibly and integrate care more effectively. Better coordination of care for Oregon's dually eligible population holds promise for better health and health care for them and lower Medicare and Medicaid spending.

Quality incentive payments

CCO global budget payments should be connected to quality metrics for both clinical processes and health outcomes. However, the board recognizes such an incentive structure will be difficult to initiate in the first year of CCO operation. So initially, metrics will be used to ensure adequate CCO performance for all programs or funding streams in the global budget and to create a data baseline. After the initial period, metrics should be used to determine exceptional performers who would qualify for incentive rewards. The board supports Oregon's discussions with CMS on developing an incentive program as early as possible and is following the progress of the Massachusetts Blue Cross/Blue Shield Alternative

Exhibit 1
Page 39 of 142
FCI0517165
CTRL_01214878

CCO Implementation Proposal – Section 6: Global Budget Methodology

Quality Contract and other new incentive models such as the Five-Star Quality Rating for Medicare Advantage plans to garner lessons that may be applied to CCO global budget development. The board has emphasized that any incentive design should include shared savings approaches so that CCOs are not penalized for successfully lowering costs.

Oregon Health Authority                                                                    33

Exhibit 1
Page 40 of 142

FCI0517166
CTRL_01214878

## 7. Accountability

### *OHA accountability in supporting the success of CCOs*

OHA will be an active partner in health care transformation and support CCOs by:

- Providing accurate and timely data and feedback to CCOs.
- Implementing and supporting learning collaboratives in partnership with CCOs, as required by HB 3650.
- Identifying and sharing information on evidence-based best practices, emerging best practices and innovative strategies in all areas of health care transformation, including patient engagement and activation.
- Providing technical assistance to CCOs to develop and share their own best practice approaches. OHA should develop a system to monitor the development of best practices and the accumulation of evidence supporting new practices or innovations, and should then support widespread adoption of the innovations or best practices.
- Reducing and streamlining administrative requirements.

Further, HB 3650 requires that OHA report back to the Legislature regularly on the progress of payment reform and delivery system change. It further directs OHA to publish data on quality, costs and outcomes at the CCO level.

### *HB 3650:*

- *Sec 2(3)(b) The authority shall regularly report to the Oregon Health Policy Board, the Governor and the Legislative Assembly on the progress of payment reform and delivery system change including:*
  - *a) The achievement of benchmarks;*
  - *b) Progress toward eliminating health disparities;*
  - *c) Results of evaluations;*
  - *d) Rules adopted;*
  - *e) Customer satisfaction;*
  - *f) Use of patient-centered primary care homes;*
  - *g) The involvement of local governments in governance and service delivery; and*
  - *h) Other developments with respect to coordinated care organizations.*
- *Section 10(2) The authority shall evaluate on a regular and ongoing basis key quality measures, including health status, experience of care and patient activation, along with key demographic variables including race and ethnicity, for members in each coordinated care organization and for members statewide.*
- *Section 10(3) Quality measures identified by the authority under this section must be consistent with existing state and national quality measures. The authority shall utilize available data systems for reporting and take actions to eliminate any redundant reporting or reporting of limited value.*
- *Section 10(4) The authority shall publish the information collected under this section at aggregate levels that do not disclose information otherwise protected by law. The information published must report, by coordinated care organization:*
  *(a) Quality measures;*

---

Exhibit 1
Page 41 of 142
FCI0517167
CTRL_01214878

CCO Implementation Proposal – Section 7: Accountability

> (b) Costs;
>> (c) Outcomes; and
>> (d) Other information, as specified by the contract between the coordinated care organization and the authority, that is necessary for the authority, members and the public to evaluate the value of health services delivered by a coordinated care organization.

## CCO accountability

### HB 3650:

- Section 10(1) The Oregon Health Authority through a public process shall identify objective outcome and quality measures and benchmarks, including measures of outcome and quality for ambulatory care, inpatient care, chemical dependency and mental health treatment, oral health care and all other health services provided by CCO contracts to hold the organizations accountable for performance and customer satisfaction requirements.

Accountability for each aspect of the Triple Aim — better health, better care and lower costs — is a central tenet of health system transformation. As required by HB 3650, CCOs will be held accountable for their performance on outcomes, quality and efficiency measures identified by OHA through a robust public process and in collaboration with stakeholders. CCO accountability metrics will function both to ensure that CCOs are providing quality care for all of their members and as an incentive to encourage CCOs to transform care delivery in alignment with the goals of HB 3650. Further, members and the public deserve to know about the quality and efficiency of their health care so metrics of outcomes, quality and efficiency will be publicly reported. Health care transparency provides consumers with the information necessary to make informed choices and allows the community to monitor the performance of their community CCO.

Accountability measures for CCOs will build on OHPB committee work during the past two years, beginning with the Incentives and Outcomes Committee and followed by the Outcomes, Quality and Efficiency Metrics Work Group. The next stage of metrics development will be for OHA to establish a technical advisory group of experts from health plans, health systems and to include consumers to build measure specifications, including data sources, and to finalize a reporting schedule. This stage of the work will be completed by May 2012. Further technical work, such as establishing benchmarks based on initial data, will follow as outlined below.

Measurement and reporting requirements

Accountability measures for CCOs will be phased in over time to allow CCOs to develop the necessary organizational infrastructure and enable OHA to incorporate CCO data into performance standards. In the first year, accountability will be for reporting only. In future years, CCOs will be accountable for meeting specified performance benchmarks (see accountability standards below). Initially, years will be based on the effective date of each CCO's contract; that is, year one for a CCO that starts operation in July 2012 run through June 2013 and year one for a CCO that is certified in November 2012 will run through October 2013. However, all CCOs must meet performance benchmarks by January 2014. CCOs that begin operation less than a year before that date will have a shorter reporting-only accountability period and CCOs that start on or after January 2014 will have no phase-in period at all.

Oregon Health Authority                                                                                    35

Exhibit 1
Page 42 of 142
FCI0517168
CTRL_01214878

CCO Implementation Proposal – Section 7: Accountability

Depending on the measure and data source, reports may flow from CCOs to OHA or the reverse. For example, it may be advantageous for OHA to collect member experience data on behalf of CCOs just as the agency does now for MCOs. Likewise, metrics developed from claims data can come from the OHA All-Payer All-Claims (APAC) database rather than be individually collected from CCOs. While annual reporting will serve as the basis for holding CCOs accountable to contractual expectations, OHA will assess performance more frequently (e.g., quarterly or semi-annually) on an informal basis to facilitate timely feedback, mid-course corrections and rapid improvement.

Specific areas of CCO accountability metrics
Based on input from OHPB-sponsored stakeholder workgroups, CCO metrics will include both core and transformational measures of quality and outcomes:
- Core measures will be Triple-Aim oriented measures that gauge CCO performance against key expectations for care coordination, consumer satisfaction, quality and outcomes. They will be uniform across CCOs and will encompass the range of services included in CCO global budgets (e.g., behavioral health, hospital care, women's health, etc.).
- Transformational metrics will assess CCOs' progress toward the broad goals of health systems transformation and will therefore require systems transitions and experimentation in effective use. This subset may include newer kinds of indicators (for which CCOs have less measurement experience) or indicators that entail collaboration with other care partners.

The initial set of CCO accountability metrics and data sources will be established in consultation with the CMS and the technical advisory group in early 2012, in advance of the request for CCO applications. See Appendix G for examples of potential CCO accountability metrics and an example of how accountability for transformation can be shared across the system.

Accountability standards, monitoring and oversight
With the assistance of the technical advisory work group, OHA will establish two levels of CCO performance standards: minimum expectations for accountability and targets for outstanding performance. Performance relative to targets will affect CCOs' eligibility for financial and non-financial rewards. CCOs' performance with respect to minimum expectations will be assessed as part of OHA monitoring and oversight; subpar performance will lead to progressive remediation building on current accountability mechanisms for MCOs including technical assistance, corrective action plans, financial and non-financial sanctions, and, ultimately, non-renewal of contracts. (See OHA Monitoring and Oversight in the next section.) As outlined in proposed CCO criteria, CCOs will be expected to assess their own performance, to develop quality improvement plans and goals, and to demonstrate progress toward those goals over time. However, OHA will facilitate the provision of technical assistance to assist CCOs to improve their performance with respect to accountability metrics.

As with the reporting expectations, accountability standards will be introduced over time. During every phase of reporting:

Exhibit 1
Page 43 of 142
FCI0517169
CTRL_01214878

CCO Implementation Proposal – Section 7: Accountability

- Year one — accountability for reporting only, reporting without budgetary or contractual consequences;
- Years two and three — CCOs expected to meet or exceed minimum performance expectations set for core measures and to improve on past performance for transformational measures.

Quality incentive payments may be offered after year one. The board supports Oregon's discussions with CMS to develop an incentive program as early as possible.

OHA, in cooperation with the technical advisory group described above, will use data from CCOs' first reporting periods to establish baselines and to set benchmarks for both minimum and outstanding performance using those baselines. The technical work group will also advise OHA on adopting and retiring measures or on moving "transformational" measures to the core set.

Annual review of CCO accountability metrics

The board expects that CCO accountability metrics will evolve over time based on ongoing evaluation of the metrics' appropriateness and effectiveness. OHA will establish an annual review process that draws on technical work group expertise and ensures participation from representatives of CCOs and other stakeholders, including consumers and community partners.

## Shared accountability for long-term care

Medicaid-funded long-term care services are legislatively excluded in HB 3650 from CCO global budgets and will be paid for directly by the state, creating the possibility of misaligned incentives and cost-shifting between the CCOs and the long-term care (LTC) system. Cost-shifting is a sign that the best care for a beneficiary's needs is not being provided. In order to prevent cost-shifting and ensure shared responsibility for delivering high quality, person-centered care, CCOs and the LTC system will need to share accountability, including financial accountability.

A shared financial accountability system will be developed based on incentives and/or penalties linked to performance metrics applied to the CCO and/or to the LTC system. Other elements of shared accountability between CCOs and the LTC system will include: contractual elements, such as specific requirements for coordination between the two systems; requirements to clearly define roles and responsibilities between the two systems through a memorandum of understanding, a contract or other mechanism; and reporting of metrics related to better coordination between the two systems.

Further, since individuals receiving Medicaid-funded LTC services and supports represent a significant population served by CCOs, CCOs should include these individuals and the LTC delivery system in the community needs assessment processes and policy development structure.

Exhibit 1
Page 44 of 142
FCI0517170
CTRL_01214878

## 8. Financial reporting requirements to ensure against risk of insolvency

*HB 3650:*

- *Section 13(3) The Authority, in consultation with the Department of Consumer and Business Services shall develop a proposal for the financial reporting requirements for CCOs to be implemented under ORS 414.725(1)(c) to ensure against the organization's risk of insolvency. The proposal must include, but need not be limited to recommendations on:*

  a) *The filing of quarterly [statements] and annual audited statements of financial position, including reserves and retrospective cash flows, and the filing of quarterly and annual statements of projected cash flows;*

  b) *Guidance for plain-language narrative explanation of the financial statements required in paragraph a) of this subsection;*

  c) *The filing by a CCO of a statement of whether the organization or another entity, such as a state or local government agency or a reinsurer, will guarantee the organization's ultimate financial risk;*

  d) *The disclosure of a CCO's holdings of real property and its 20 largest investment holdings, if any;*

  e) *The disclosure by category of administrative expenses related to the provision of health services under the CCO's contract with the authority;*

  f) *The disclosure of the three highest executive salary and benefit packages of each CCO;*

  g) *The process by which a CCO will be evaluated or audited for financial soundness and stability and the organization's ability to accept financial risk under its contracts, which process may include the use of employed or retained actuaries;*

  h) *A description of how the required statements and the final results of evaluations and audits will be made available to the public over the Internet at no cost to the public;*

  i) *A range of sanctions that may be imposed on a CCO deemed to be financially unsound and the process for determining the sanctions, and;*

  j) *Whether a new category of license should be created for CCOs recognizing their unique role but avoiding duplicative requirements by Department of Consumer and Business Services (DCBS).*

OHA will collaborate with DCBS, as required by HB 3650, to review CCO financial reports and evaluate financial solvency. HB 3650 specifies that CCOs should not be required to file financial reports with both OHA and DCBS; DCBS will be the recipient of these reporting requirements. The following section provides an overview of proposed requirements related to the above items and addresses additional information on organizational structure, corporate status and structure, existing contracts and books of business, and risk management capacities that CCOs shall report.

### Audited statements of financial position and guarantees of ultimate financial risk

The Department of Consumer and Business Services defines the purpose of financial regulations of insurers as being to:

Exhibit 1
Page 45 of 142

FCI0517171
CTRL_01214878

CCO Implementation Proposal – Section 9: Implementation Plan

"[E]nsure that insurers possess and maintain the financial resources needed to meet their obligations to policyholders. The pursuit of financial soundness begins with the initial licensing determination about which insurance companies are admitted to do business in Oregon and continues with ongoing financial reviews of existing companies. The Insurance Code establishes a floor of $2.5 million of capital and surplus for an insurer to be authorized to transact insurance. This floor increases as the company assumes more insurance risk. Capital and surplus is the amount a company's assets exceed liabilities." "Health Insurance in Oregon," DCBS; January 2009; p8

CCOs will submit financial information consistent with that required for insurers, including the use of statutory accounting principles (SAP). Application of these principles would allow for standardization of accountability and solvency assurances across health plans enrolling Medicaid, Medicare and commercial populations, and will address the CMS's interest in having organizations that enroll Medicare beneficiaries regulated by the state's Insurance Division. The filing requirements include: quarterly and annual statements of financial position using the form developed by the National Association of Insurance Commissioners (NAIC); annual actuarial certification of unpaid claim reserves, annual calculation of risk-based capital; and annual audited financial statements (using SAP). Included in the NAIC form is a schedule of retrospective cash flows and quarterly and annual statements of projected cash flows. A plain language narrative explanation of the required statements of financial position, statements of projected cash flow, and statements of the sources and uses of public funds will be developed and made publicly available as required by statue (HB 3650 Section 13(3)(b)).

A key element for monitoring financial solvency is an understanding of a CCO's relationship and transactions with its parent, subsidiaries and affiliates. CCOs will be required to submit holding company information consistent with that required for insurers. Such information would include description of any management, service or cost-sharing arrangements and an annual consolidated audited financial statement.

Further, to the extent permissible, financial information collected as required by HB 3650 should be transparent and made available online. This kind of transparency will enable the community to evaluate the financial condition of the CCO and increase confidence in the effectiveness of its governance. A high level of transparency also will enable the CCO board to take early corrective actions. It is critical that CCOs provide understandable, comprehensive and reliable information about their financial status and performance.

### *Financial solvency*

It is expected that information from the NAIC financial reports will be used by financial analysts from DCBS and the Division of Medical Assistance Programs and by OHA's Actuarial Services Unit to track the financial solvency of CCOs as they gain (or lose) enrollment over time and build their financial reserves and other risk management measures commensurately. In addition, CCOs will be subject to periodic on-site financial examinations consistent with those performed on insurers. The factors below have been identified as gauges of a CCO's financial solvency; final financial reporting and solvency terms will be negotiated with CMS, which will participate regarding inclusion of Medicare funding for individuals who are dually eligible:

---

Oregon Health Authority                                                                                     39

Exhibit 1
Page 46 of 142

FCI0517172
CTRL_01214878

CCO Implementation Proposal – Section 9: Implementation Plan

- *Risk-bearing entity*: As required by HB 3650, the CCO will identify whether the CCO itself or some other entity (such as a state or local government agency, or a reinsurer) will guarantee the CCO's ultimate financial risk, in full or in part. In some cases, CCOs may enter into contracts with hospitals, physician groups, or other providers to share in the financial risk (and rewards) associated with the difference between targeted or projected expenditures and actual expenditures. The extent to which these arrangements reduce the risk borne by the CCO itself will be factored into an actuary's determination of the CCO's reserves.
- *Reinsurance*: Provided through the state or purchased individually by CCOs, reinsurance will act to limit the financial risk of the CCO by capping its risk exposure on either a case-by-case or aggregate basis.
- *Claims reserves*: An adequate amount of liquid assets to satisfy claims liability is required of health plans providing commercial, Medicare and Medicaid coverage in Oregon. Claims reserve requirements for CCOs will be actuarially determined to reflect the CCO's enrollment level and its mix of covered lives based on rate category.
    - *Medical loss ratio*: This is the ratio of expenditures (or claims) incurred for the provision of health care services divided by total health care service revenue. Expenditure incurred for health care services is the amount paid plus the change in the unpaid claim liability. The unpaid claim liability is an estimate for claims already reported but not yet paid and an estimate of the claims for health care services used by a member that have not yet been submitted for payment.
    - *Size of the organization and risk characteristics*: Total number of insured lives and the risk characteristics across all lines of business will be considered ("risk-based capital").
    - *Enrollment level*: The predictability of CCO expenditures and the ability of the CCO to bear risk are reduced at lower enrollment levels. CMS currently requires that Medicare Advantage Plans have a minimum enrollment level of 5,000 beneficiaries. OHPB recommends that CCOs be required to file their actual and projected enrollment levels by rate category.
    - *Organizational liability*: As required by HB 3650, CCOs will be required to file a statement identifying the entity that will be the guarantor of the CCO's ultimate financial risk and any other entities or persons sharing in that risk (in addition to identifying contracting providers bound by risk-sharing agreements with the CCO).
    - *Real property, investments and executive compensation*: As required by HB 3650, each CCO will be required to disclose their real property holdings, their 20 largest investment holdings, and executive compensation. The NAIC form for annual statements includes schedules that provide details on each of these items.
    - *Operating budget*: As described below, OHPB recommends that each CCO be required to describe an annual operating budget including projected revenue and investments, projected utilization levels by key categories of service, and projected expenditures reflecting any alternative payment methodologies implemented. This operating budget will serve both to indicate the financial soundness of the CCO and to demonstrate that the CCO has developed its budget to reflect the requirements and objectives of health systems transformation.

---

Oregon Health Authority                                                                 40

Exhibit 1
Page 47 of 142

FCI0517173
CTRL_01214878

CCO Implementation Proposal – Section 9: Implementation Plan

    ○  *Administrative expenses*: As required by HB 3650, each CCO will be required to outline, by category, administrative expenses relating to provision of services under its CCO contract. The NAIC form for annual statements includes a schedule of expenses by expense category. The expense schedule would show CCO expenses for all of its populations — those incurred under its CCO contract as well as contracts for other populations, including Medicare, PEBB, OEBB and other commercial insurance. Other schedules and note disclosures required by the NAIC form will provide information about expense arrangements with a parent or affiliate organization and detail amounts paid for such service arrangements. A comprehensive understanding of CCO administrative expenses will make possible a more accurate evaluation of the CCO's overall sustainability.

### OHA monitoring and oversight

OHA must work in partnership with CCOs to ensure health system transformation success. OHA will institute a system of progressive accountability that maximizes the opportunity to succeed but also protects the public interest. Actions taken when access, quality or financial performance are jeopardizing members should be aligned with the categories that currently exist with DCBS. These categories reflect that OHA would become increasingly involved over time if an entity continues to miss performance guidelines with increased monitoring, technical assistance and supervision. To the extent permissible, OHA monitoring and oversight efforts and documents will be made public.

Quality, access and financial monitoring

Measures for monitoring and oversight in these areas should be aimed initially at root cause analysis and assisting the CCO in developing improvement strategies. Technical assistance for performance improvement will be the primary strategy in the first year of CCOs' operation, when their accountability will be for reporting only. Informal interim reporting (quarterly or semi-annually) will facilitate timely feedback and allow for mid-course corrections such that CCOs will be prepared to meet specified quality standards in year two, whether those standards are absolute benchmarks or expected improvement on past performance. When the evidence indicates that a CCO is not meeting performance standards, steps taken should be progressive, building on current accountability mechanism for MCOs, and may include:

- Technical assistance to identify root causes and strategies to improve;
- Increased frequency of monitoring efforts;
- Corrective action plan;
- Restricting enrollment;
- Financial penalties;
- Non-renewal of contracts.

Conversely, OHA may choose to offer a simplified, streamlined recertification or contracting process to high performing CCOs, in addition to the possibility of financial performance incentives.

If quarterly reports or other evidence suggest that a CCO's financial solvency is in jeopardy, OHA and DCBS will act as necessary to protect the public interest. These measures have two objectives: first, to

---

Oregon Health Authority

41

Exhibit 1
Page 48 of 142

FCI0517174
CTRL_01214878

CCO Implementation Proposal – Section 9: Implementation Plan

restore financial solvency as expeditiously as possible; and second, to identify the causes of the threat to solvency and implement measures to prevent such threats in the future. Actions may include:

- Increased reinsurance requirements;
- Increased reserve requirements;
- Market conduct constraints;
- Financial examinations.

The ultimate action, if no effective remedy is feasible, will be loss of licensure and liquidation of assets as necessary to meet financial obligations.

### Public disclosure of information

Current DCBS rules require the public disclosure of information pertaining to licensed insurers. As required by HB 3650, OHA will ensure that CCO financial information is transparent and made available online.

### CCO licensure

A new licensure category will be created for CCOs by DCBS in collaboration with OHA. This new licensure category will reflect the unique requirements and objectives of health systems transformation. This will also allow the application of certain insurance code provisions to CCOs that will allow for consistency of reporting and financial solvency and comparability among CCOs and insurers but will not subject CCOs to insurance code provisions that are not necessary given their unique contracting relationship with OHA. A separate licensure category also will facilitate the blend of flexibility and accountability that will be needed for successful implementation and operation of CCOs. DCBS and OHA staff will determine whether statutory changes are required to implement a licensure category specific to CCOs, and propose such changes through the 2012 legislative process. In the interim, existing licensure categories will be used as appropriate to the populations covered.

CCOs will be expected to provide information on corporate status, participation in the Oregon Health Plan, and other contracts:

- Corporate status: where incorporated; affiliated corporate entity or entities involved under potential CCO contract; current Department of Consumer and Business Services (DCBS) licensure/certification;
- Oregon Health Plan MCO or MHO status: current OHA MCO or MHO contractor status; organizational changes involved in CCO application; whether CCO is formed through MCO or MHO partnership; and MCO or MHO service area vs. CCO service area;
- Other state contracts: Oregon Medical Insurance Pool (OMIP); Healthy Kids/Kids Connect; PEBB; OEBB;
- Medicare contracts: CMS contracts with CCO to provide Medicare services;
- Commercial contracts: both group and individual markets;
- Administrative services or other management contracts.

Exhibit 1
Page 49 of 142
FCI0517175
CTRL_01214878

CCO Implementation Proposal – Section 9: Implementation Plan

### Corporate assets and financial management

As part of the certification process, CCOs will provide information relating to assets and financial and risk management capabilities, including:

- Tangible net equity and other assets;
- Risk reserves, current and scheduled, based on enrollment and projected utilization;
- Risk management measures;
- Delegated risk;
- Reinsurance and stop-loss;
- Incurred but not reported (IBNR) tracking;
- Claims payment;
- Participation in the All Payer All Claims reporting program as required by Section 4(k)(L);
- Internal auditing and financial performance monitoring;
- Administrative cost allocation across books of business (including Medicaid, Medicare and commercial).

Exhibit 1
Page 50 of 142

FCI0517176
CTRL_01214878

CCO Implementation Proposal – Section 9: Implementation Plan

## 9. Medical liability

*HB 3650:*

- *SECTION 16. Health care cost containment. (1) The Oregon Health Authority shall conduct a study and develop recommendations for legislative and administrative remedies that will contain health care costs by reducing costs attributable to defensive medicine and the overutilization of health services and procedures, while protecting access to health care services for those in need and protecting their access to seek redress through the judicial system for harms caused by medical malpractice. The study and recommendations should address but are not limited to:*
  - *(a) An analysis of the cost of defensive medicine within the Oregon health care delivery system and its potential budget impact, and containment and savings that would result from recommended changes.*
  - *(b) Identification of costs within the health care delivery system, including costs to taxpayers and consumers related to care and utilization rates impacted by defensive medical procedures or medical malpractice concerns.*
  - *(c) An analysis of utilization, testing, services ordered, prescribed or delivered through centers or facilities in which there is a financial interest between the provider requesting a test or service and the entity or individual providing the test or service, including an examination of Stark laws exceptions and exemptions.*
  - *(d) Establishment of criteria for evaluation and reduced utilization of services and procedures where the health of those served is not negatively impacted or necessarily improved.*
  - *(e) Identification and analysis of the benefits and impact of caps on medical liability insurance premiums as well as the benefits and potential cost saving from the extension of coverage through the Oregon Tort Claims Act to those who serve or act as agents of the state.*
  - *(f) A path for a cap on damages for those acting on behalf of the state and serving individuals who receive medical assistance or have medical coverage through other publicly funded programs.*
  - *(g) An examination of the possible clarifications and limitations on joint and several liability requirements for coordinated care organizations so that these organizations can assume the risk of their actions but are not liable for the actions of others within the coordinated care organization or its contracted services.*
  - *(h) The effectiveness of binding and nonbinding medical panels in addressing claims of medical malpractice.*
- *(2) The authority shall coordinate with the Department of Consumer and Business Services and other appropriate agencies, including nongovernmental agencies, in order to collect and analyze the data generated by the study and to make complete recommendations to the Legislative Assembly.*
- *(3) The authority shall secure assistance and input from stakeholder organizations in an effort to secure the best information available relevant to the impacts on administrative costs resulting from litigation, as well as to identify cost containment or cost reduction mechanisms.*
- *(4) The authority shall focus its efforts on the medical malpractice marketplace and coverage throughout Oregon and the impact of implementing medical malpractice liability caps, in order to provide complete information to the Legislative Assembly as it studies the collective elements of health system transformation.*
- *(5) The authority shall present the study and recommendations for addressing health care cost containment and cost reductions to the Legislative Assembly at the same time that the coordinated care organization qualification criteria and global budgeting process are presented to the Legislative Assembly for approval under section 13 of this 2011 Act.*

---

Oregon Health Authority                                                                                       44

Exhibit 1
Page 51 of 142
FCI0517177
CTRL_01214878

CCO Implementation Proposal – Section 9: Implementation Plan

Section 16 of HB 3650 directed the Oregon Health Authority (OHA) to conduct a study and develop recommendations for legislative and administrative remedies that will contain health care costs by reducing costs attributable to defensive medicine and the overutilization of health services and procedures. Specifically, Section 16 directed the OHA to explore the costs, benefits and impacts of defensive medicine and consider several types of medical liability reform options.

To accomplish this work, OHA contracted with consultants with expertise in the areas of medical liability reform and health care data analysis and worked with the Oregon Department of Justice (DOJ) on a legal analysis of related policy. OHA also solicited input from stakeholders regarding medical liability reform options in the Oregon marketplace. Final reports for each of the analyses can be viewed at www.oregon.gov/OHA/OHPR/ by clicking on the "Documents, Reports, Presentations" page.

These analyses do not suggest that there is any single solution that will solve all the issues of the health care system. The medical liability system is a critical aspect of an efficient health care system, but it also has an impact on Oregon's work force as it relates to provider education, retention and recruitment. Further, it strains work force capacity when time is spent providing unnecessary lab or X-ray studies, or hospital stays ordered for defensive medicine purposes.

Ultimately, any reforms chosen need to balance three key factors: reduction of costs, improved patient safety, and equity for those individuals who are injured as a result of medical errors.

Therefore, OHA recommends that the appropriate body or — in the case that no appropriate body is identified, the Oregon Health Policy Board— review these studies in detail, outline advantages and disadvantages as to how options meet the desired policy goals and, as appropriate, draft legislative concepts for the 2013 Legislature. Such suggestions may include:

- Consider the key next steps for an Administrative Compensation System (ACS) in Oregon. This evaluation should include assessing the best design for such a system and include an actuarial evaluation, specifically estimating the premiums paid and the potential number of injured, including a definition of "fault" vs. "no-fault," and setting payment thresholds.

- Evaluate the suggested refinements to Oregon's Joint and Several Liability statutes and assess the feasibility of making those changes in the 2013 legislative session.

- Evaluate the feasibility and affordability of extending the OTCA or another type of liability funding arrangement for Oregon providers.

- Evaluate the viability of pursuing caps on non-economic damages, considering our current partial caps for wrongful death, prenatal and perinatal injury.

- Evaluate how CCOs could partner with hospitals in their community to adopt optimal apology and offer arrangements among their networks, and assess any needed statutory changes or other barriers to implementation.

- Evaluate the use of safe harbors through establishing a standard of care, with consideration of the results of Oregon's AHRQ grant-funded analysis of safe harbor closed-claims analysis.

Exhibit 1
Page 52 of 142

FCI0517178
CTRL_01214878

## 10. Implementation plan

### Transition strategy

In addition to accommodation through appropriate levels of flexibility, incentives to form CCOs as early as possible should be integrated into the CCO certification process. OHPB recommendations for such incentives include, but are not limited to, the following options:

- *Financial incentives*: Global budget adjustments, annual trend rates, and incentive payments or enhanced federal financial payments, if available, could be structured to support CCOs, providing financial incentives to form the new organization early. This approach provides not only strong incentives and resources for CCOs, but also underscores the urgency and priority of health system transformation.

- *Enrollment incentives*: Building sufficient enrollment to mitigate risk is essential for CCO start-up. New eligibles and those due for annual redetermination should be automatically enrolled in CCOs. This strategy will need to take into account the choice and notification of enrollees, including those eligible for both Medicare and Medicaid.

- *Flexibility incentives*: Efforts to provide flexibility in service delivery and administration should be directed first and foremost to CCOs.

- *Technical assistance and training incentives*: CCOs will benefit from the learning collaborative that OHA will establish, as required by HB 3650, and from state-level work to accumulate evidence about and disseminate information on innovative service delivery practices. If OHA successfully applies for and receives enhanced federal financial contributions for workforce training, then these funds would also be made available to CCOs that invest in developing the alternative workforce identified in HB 3650, including community health workers, peer wellness specialists, and personal health navigators.

### Transitional provisions in HB 3650

In the case of an area of the state where a CCO has not been certified, Sections 13 and 14 of HB 3650 require continued contracting with one or more prepaid managed care health services organizations in good standing and already serving that area. In addition, HB 3650 requires these organizations to fulfill a substantial portion of CCO responsibilities including specific service offerings, organizational structure, patient-centered primary care homes and other system delivery reforms, consumer protections, and quality measures. Continued contracting with prepaid managed care health services organizations will reflect these statutory requirements. MCO contracts will be amended to reflect the requirements of HB 3650 parallel to the certification process for CCOs.

Exhibit 1
Page 53 of 142

FCI0517179
CTRL_01214878

CCO Implementation Proposal – Section 9: Implementation Plan

## Implementation timeline

The sequence below indicates key time frames for MCOs and MHOs transitioning to CCO status (dates are approximate and subject to legislative and CMS approval):

Rules:

| | |
|---|---|
| March 2012 | OHA will release temporary administrative rules defining CCO criteria and other administrative rule changes as necessary. |
| June-September 2012 | OHA administrative rules process to finalize CCO/MCO changes that include the required Rules Advisory Committee. |

CCO applications:

| | |
|---|---|
| March 2012 | OHA will release CCO application, with Letter of Intent. |
| April 2012 | CCO applicants will submit applications to demonstrate that they meet CCO criteria to OHA. |
| April-May 2012 | OHA will evaluate CCO applications. |
| June 2012 | OHA will certify CCOs (CMS will approve CCOs for enrollment of the dually eligible). |

Contracts:

| | |
|---|---|
| March 2012 | CCO estimated cost submission process defined (including public comment process) and release of CCO Base Cost template. |
| April 2012 | CCO applicants will submit notices of intent to contract and, subsequently, base cost estimates. |
| April-July 2012 | State to negotiate CCO contracts and budget (CMS will participate regarding inclusion of Medicare funding for the dually eligible). |
| April-May: | OHA review and certification of CCO rates |
| May: | Final review of CCO budget |
| June: | CCO budget submitted to CMS |
| June: | Contract to CCO |
| July 1: | Effective date of CCO contract |
| July 31: | Three-way contracts signed between CCO/state/CMS (may come behind OHA contracts, as a contract amendment or rider) |

Implementation:

| | |
|---|---|
| June-August 2012 | State and CMS conduct "readiness review" of certified CCOs for inclusion of the dually eligible (CMS will participate regarding inclusion of Medicare funding for the dually eligible). |
| July-September 2012 | CCOs passing Medicare "readiness review" can begin preparing for enrolling dually eligible individuals for Medicare services. |
| July 2012 | First CCOs enroll Medicaid beneficiaries. |
| July 2012 | HB 3650 Sections 4, 6, 8, 10 and 12 take effect for MCOs. |
| Sept. 30, 2012 | Current MCO contracts due for renewal. |
| January 2013 | CCOs begin providing Medicare services to dually eligible beneficiaries. |

Exhibit 1
Page 54 of 142
FCI0517180
CTRL_01214878

CCO Implementation Proposal – Chapter 10: Appendices

## 11. Appendices

- A. Managed care plan types and service areas
- B. Financial projections and potential savings tables
- C. Proposed Alternative Dispute Resolution (ADR) process
- D. CCO Criteria Detail Matrix
- E. Table of eligibles for CCO enrollment and current managed care enrollment status
- F. Program list
- G. Accountability framework and examples

Exhibit 1
Page 55 of 142
FCI0517181
CTRL_01214878

CCO Implementation Proposal : Appendix A

# Appendix A: Current managed care plans and service areas

## Fully capitated health plans (FCHP) and physician care organizations (PCO)

| Plan | Organization type | Counties served |
|------|-------------------|-----------------|
| Care Oregon, Inc. | FCHP | Clackamas, Clatsop, Columbia, Coos, Douglas, Jackson, Klamath, Lincoln, Marion, Morrow, Multnomah, Polk, Tillamook, Umatilla, Washington, Yamhill |
| Cascade Comprehensive Care, Inc. | FCHP | Klamath |
| DCIPA, LLC | FCHP | Douglas |
| Docs of the Coast South | FCHP | Coos, Curry |
| Family Care, Inc. | FCHP | Clackamas, Clatsop, Jackson, Josephine, Marion, Morrow, Multnomah, Umatilla, Washington |
| Intercommunity Health Network | FCHP | Benton, Lincoln, Linn, Tillamook |
| Kaiser Permanente or Plus, LLC | PCO | Clackamas, Marion, Multnomah, Polk |
| Lane Individual Practice Association | FCHP | Benton, Lane, Linn |
| Marion Polk Community | FCHP | Benton, Clackamas, Linn, Marion, Polk, Yamhill |
| Mid-Rogue Holding Company | FCHP | Curry, Douglas, Jackson, Josephine |
| ODS Community Health, Inc. | FCHP | Baker, Clatsop, Columbia, Jackson, Malheur, Union, Wallowa, Yamhill |
| Oregon Health Management Services | FCHP | Douglas, Jackson, Josephine |
| Pacific Source Community Solutions, Inc. | FCHP | Crook, Deschutes, Grant, Harney, Hood River, Jefferson, Klamath, Lake, Sherman, Wasco, Wheeler |
| Providence Health Assurance | FCHP | Clackamas, Multnomah, Washington, Yamhill |
| Tuality Health Alliance | FCHP | Washington |

Exhibit 1
Page 56 of 142
FCI0517182
CTRL_01214878

CCO Implementation Proposal : Appendix A

## Mental health organizations (MHO) and dental care organizations (DCO)

| Plan | Organization type | Counties served |
|---|---|---|
| Access Dental Plan, LLC | DCO | Clackamas, Multnomah, Washington |
| Accountable Behavioral Health | MHO | Benton, Lincoln |
| Advantage Dental | DCO | Baker, Benton, Clackamas, Clatsop, Columbia, Coos, Crook, Curry, Deschutes, Douglas, Gilliam, Grant, Harney, Hood River, Jackson, Jefferson, Josephine, Klamath, Lake, Lane, Lincoln, Linn, Marion, Malheur, Morrow, Multnomah, Polk, Sherman, Umatilla, Union, Wallowa, Wasco, Washington, Wheeler, Yamhill |
| Capitol Dental Care, Inc. | DCO | Benton, Clackamas, Clatsop, Columbia, Hood River, Jackson, Josephine, Klamath, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Umatilla, Wasco, Washington, Yamhill |
| Clackamas Mental Health Organization | MHO | Clackamas, Hood River, Sherman, Wasco |
| Family Care, Inc. | MHO | Clackamas, Multnomah, Washington |
| Family Dental Care | DCO | Clackamas, Multnomah, Washington |
| Greater Oregon Behavioral Health, Inc. | MHO | Baker, Clatsop, Columbia, Douglas, Gilliam, Grant, Harney, Lake, Malheur, Morrow, Umatilla, Union, Wallowa, Wheeler |
| Jefferson Behavioral Health | MHO | Coos, Curry, Jackson, Josephine, Klamath |
| Lane Care | MHO | Lane |
| Managed Dental Care of Oregon | DCO | Clackamas, Multnomah, Washington |
| Mid Valley Behavioral Care Network | MHO | Linn, Marion, Polk, Tillamook, Yamhill |
| Multicare Dental | DCO | Clackamas, Multnomah, Washington |

A-2

Exhibit 1
Page 57 of 142
FCI0517183
CTRL_01214878

CCO Implementation Proposal : Appendix A

| Plan | Organization type | Counties served |
|---|---|---|
| Verity Integrated Behavioral Healthcare Systems | MHO | Multnomah |
| ODS Community Health, Inc. | DCO | Baker, Benton, Clackamas, Clatsop, Columbia, Crook, Deschutes, Hood River, Jackson, Jefferson, Josephine, Lane, Linn, Marion, Malheur, Multnomah, Polk, Tillamook, Wallowa, Wasco, Washington, Yamhill |
| Pacific Source Community Solutions, Inc. | MHO | Crook, Deschutes, Jefferson, Klamath |
| Washington County Department of Mental Health | MHO | Washington |
| Willamette Dental Group | DCO | Benton, Clackamas, Clatsop, Columbia, Deschutes, Douglas, Jackson, Josephine, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill |

A-3

Exhibit 1
Page 58 of 142
FCI0517184
CTRL_01214878

CCO Implementation Proposal: Appendix B

## Appendix B: HMA financial projections and savings estimates implementation of "well-managed" by program

Data are by calendar year but were prorated and accumulated into state fiscal years for the summary report.

**TANF**

|  | Enrolled | Projected paid | Low savings | "Well-managed" | High savings | "Well-managed" | Difference |
|---|---|---|---|---|---|---|---|
| 2010 | 351,738 | $1,312,400,000 | $0 | $1,312,400,000 | $0 | $1,312,400,000 | $0 |
| 2011 | 398,997 | $1,528,000,000 | $0 | $1,528,000,000 | $0 | $1,528,000,000 | $0 |
| 2012 | 422,055 | $1,658,900,000 | ($12,200,000) | $1,646,700,000 | ($24,700,000) | $1,634,200,000 | ($12,500,000) |
| 2013 | 430,829 | $1,738,200,000 | ($38,900,000) | $1,699,300,000 | ($51,800,000) | $1,686,400,000 | ($12,900,000) |
| 2014 | 435,565 | $1,803,600,000 | ($67,100,000) | $1,736,500,000 | ($94,000,000) | $1,709,600,000 | ($26,900,000) |
| 2015 | 444,300 | $1,888,300,000 | ($140,600,000) | $1,747,700,000 | ($168,600,000) | $1,719,700,000 | ($28,000,000) |
| 2016 | 453,200 | $1,977,300,000 | ($220,700,000) | $1,756,600,000 | ($235,500,000) | $1,741,800,000 | ($14,800,000) |
| 2017 | 462,300 | $2,070,300,000 | ($246,500,000) | $1,823,800,000 | ($308,100,000) | $1,762,200,000 | ($61,600,000) |
| 2018 | 471,500 | $2,167,800,000 | ($258,100,000) | $1,909,700,000 | ($322,800,000) | $1,845,000,000 | ($64,700,000) |
| 2019 | 480,900 | $2,270,100,000 | ($270,300,000) | $1,999,800,000 | ($338,000,000) | $1,932,100,000 | ($67,700,000) |

**Disabled Non-dual**

|  | Enrolled | Projected paid | Low savings | "Well-managed" | High savings | "Well-managed" | Difference |
|---|---|---|---|---|---|---|---|
| 2010 | 49,000 | $745,800,000 | $0 | $745,800,000 | $0 | $745,800,000 | $0 |
| 2011 | 50,300 | $800,100,000 | $0 | $800,100,000 | $0 | $800,100,000 | $0 |
| 2012 | 53,500 | $872,300,000 | ($4,800,000) | $867,500,000 | ($9,800,000) | $862,500,000 | ($5,000,000) |
| 2013 | 55,100 | $946,200,000 | ($15,900,000) | $930,300,000 | ($21,300,000) | $924,900,000 | ($5,400,000) |
| 2014 | 56,700 | $1,024,800,000 | ($28,800,000) | $996,000,000 | ($40,200,000) | $984,600,000 | ($11,400,000) |
| 2015 | 60,700 | $1,115,600,000 | ($62,600,000) | $1,053,000,000 | ($75,100,000) | $1,040,500,000 | ($12,500,000) |
| 2016 | 64,300 | $1,214,700,000 | ($102,200,000) | $1,112,500,000 | ($108,900,000) | $1,105,800,000 | ($6,700,000) |
| 2017 | 68,100 | $1,322,500,000 | ($118,500,000) | $1,204,000,000 | ($148,300,000) | $1,174,200,000 | ($29,800,000) |
| 2018 | 72,100 | $1,440,100,000 | ($129,200,000) | $1,310,900,000 | ($161,400,000) | $1,278,700,000 | ($32,200,000) |
| 2019 | 76,400 | $1,568,000,000 | ($140,700,000) | $1,427,300,000 | ($175,800,000) | $1,392,200,000 | ($35,100,000) |

B-1

Exhibit 1
Page 59 of 142

FCI0517185
CTRL_01214878

CCO Implementation Proposal: Appendix B

**Expansion**

|      | Enrolled | Projected paid | Low savings | "Well-managed" | High savings | "Well-managed" | Difference |
|------|----------|----------------|-------------|----------------|--------------|----------------|------------|
| 2010 | 40,572   | $219,500,000   | $0          | $219,500,000   | $0           | $219,500,000   | $0         |
| 2011 | 68,806   | $389,400,000   | $0          | $389,400,000   | $0           | $389,400,000   | $0         |
| 2012 | 58,851   | $348,400,000   | ($2,600,000) | $345,800,000  | ($5,200,000) | $343,200,000   | ($2,600,000) |
| 2013 | 58,550   | $362,600,000   | ($8,100,000) | $354,500,000  | ($10,800,000) | $351,800,000  | ($2,700,000) |
| 2014 | 62,199   | $402,900,000   | ($15,000,000) | $387,900,000 | ($21,000,000) | $381,900,000  | ($6,000,000) |
| 2015 | 198,550  | $1,345,300,000 | ($100,200,000) | $1,245,100,000 | ($120,100,000) | $1,225,200,000 | ($19,900,000) |
| 2016 | 211,050  | $1,495,800,000 | ($167,000,000) | $1,328,800,000 | ($178,200,000) | $1,317,600,000 | ($11,200,000) |
| 2017 | 223,550  | $1,657,300,000 | ($197,300,000) | $1,460,000,000 | ($246,600,000) | $1,410,700,000 | ($49,300,000) |
| 2018 | 236,050  | $1,830,500,000 | ($217,900,000) | $1,612,600,000 | ($272,600,000) | $1,557,900,000 | ($54,700,000) |
| 2019 | 248,550  | $2,016,100,000 | ($240,100,000) | $1,776,000,000 | ($300,200,000) | $1,715,900,000 | ($60,100,000) |

**Dual-eligibles -- Medicaid data**

|      | Enrolled | Projected paid | Low savings | "Well-managed" | High savings | "Well-managed" | Difference |
|------|----------|----------------|-------------|----------------|--------------|----------------|------------|
| 2010 | 58,100   | $168,300,000   | $0          | $168,300,000   | $0           | $168,300,000   | $0         |
| 2011 | 61,600   | $182,300,000   | $0          | $182,300,000   | $0           | $182,300,000   | $0         |
| 2012 | 65,200   | $201,800,000   | ($1,100,000) | $200,700,000  | ($2,300,000) | $199,500,000   | ($1,200,000) |
| 2013 | 70,300   | $227,600,000   | ($3,800,000) | $223,800,000  | ($5,100,000) | $222,500,000   | ($1,300,000) |
| 2014 | 75,500   | $255,700,000   | ($7,200,000) | $248,500,000  | ($10,000,000) | $245,700,000  | ($2,800,000) |
| 2015 | 79,400   | $281,300,000   | ($15,800,000) | $265,500,000 | ($18,900,000) | $262,400,000  | ($3,100,000) |
| 2016 | 84,200   | $314,600,000   | ($26,500,000) | $288,100,000 | ($28,200,000) | $286,400,000  | ($1,700,000) |
| 2017 | 89,300   | $351,900,000   | ($31,500,000) | $320,400,000 | ($39,500,000) | $312,400,000  | ($8,000,000) |
| 2018 | 94,700   | $393,600,000   | ($35,300,000) | $358,300,000 | ($44,100,000) | $349,500,000  | ($8,800,000) |
| 2019 | 100,400  | $440,500,000   | ($39,500,000) | $401,000,000 | ($49,400,000) | $391,100,000  | ($9,900,000) |

B-2

Exhibit 1
Page 60 of 142
FCI0517186
CTRL_01214878

CCO Implementation Proposal: Appendix C

## Appendix C:
## Alternative dispute resolution (ADR) process outline

HB 3650 required the development of a process that involves the use of an independent third party arbitrator to resolve disputes when a necessary health care entity (HCE) refuses to contract with an organization seeking to form a coordinated care organization (CCO). The process must be presented to the Legislative Assembly for approval. This outline was developed by the Oregon Health Authority (OHA), with input from an external stakeholder work group.

**HB 3650 Section 8(4) to (7)** provides as follows:

(4) A health care entity may not unreasonably refuse to contract with an organization seeking to form a coordinated care organization if the participation of the entity is necessary for the organization to qualify as a coordinated care organization.

(5) A health care entity may refuse to contract with a coordinated care organization if the reimbursement established for a service provided by the entity under the contract is below the reasonable cost to the entity for providing the service.

(6) A health care entity that unreasonably refuses to contract with a coordinated care organization may not receive fee-for-service reimbursement from the authority for services that are available through a coordinated care organization either directly or by contract.

(7) The authority shall develop a process for resolving disputes involving an entity's refusal to contract with a coordinated care organization under subsections (4) and (5) of this section. The process must include the use of an independent third party arbitrator. The process must be presented to the Legislative Assembly for approval in accordance with section 13 of this 2011 Act.

**Scope:** Section 4 shows that this statutory process applies when an organization is seeking to form a CCO and participation by a health care entity (HCE) is necessary for the organization to qualify as a CCO. As a result, the proposed process is limited to the certification of CCOs and only when the HCE is necessary for the organization to qualify as a CCO. This limited scope also is consistent with the substantial statutory remedy in subsection (6) for an unreasonable refusal to contract by an HCE.

**Who is qualified to serve as an arbitrator?** Statute is silent about who is qualified to serve as an arbitrator in this process, except to require the "use of an independent third party arbitrator." OHA recommends that the CCO applicant and the HCE use any qualified independent third party arbitrator that they agree upon. The proposed process provides some minimal recommendations for the qualifications of the arbitrator. The arbitrator must:

- Be knowledgeable and experienced as an arbitrator, and generally familiar with health care matters; and
- Agree to follow the terms and conditions specified for the arbitration process, described below, and become familiar with HB 3650.

**Length of time for the arbitration process:** Since Section 8 establishes this arbitration process when an organization is seeking to become qualified as a CCO, a dispute with a necessary HCE should be resolved

C-1

Exhibit 1
Page 61 of 142

FCI0517187
CTRL_01214878

CCO Implementation Proposal: Appendix C

promptly. A timeline of 60 calendar days is recommended once an arbitration process is initiated by one of the parties. Extending the time should require the written agreement of both parties.

### Process for resolving disputes under Section 8(4) to (7)

**Preliminary good faith negotiations: GOAL – the parties voluntarily agree on terms and enter into contracts.**

1. Organization is seeking to become certified as a CCO ( Applicant) and:
   a. Applicant asserts that a health care entity (HCE) is necessary for Applicant to qualify as a CCO;
   b. An HCE asserts that its inclusion is necessary for Applicant to be certified as a CCO; or
   c. OHA, in reviewing Applicant information, identifies the HCE as necessary for Applicant to qualify as a CCO.
2. If there is disagreement between an Applicant and HCE regarding whether the HCE is "necessary," the Applicant or HCE can request review from OHA about whether the HCE may be considered "necessary" for an Applicant to qualify as a CCO.
   a. If the specific HCE is deemed by OHA as not "necessary" for Applicant to be certified as a CCO, then this specific process does not apply per Section 8.
   b. The process described below only applies where an HCE is deemed by OHA as "necessary" for the Applicant to be certified as a CCO (or the parties agree that the HCE is "necessary" for an Applicant to qualify as a CCO), in accordance with Section 8.
3. If deemed by OHA as "necessary" or the parties agree that the HCE is "necessary," the HCE and Applicant participate in contract negotiations.
   a. Goal: Applicant and HCE agree on terms and enter into a contract.
4. Request for technical assistance from OHA – voluntary.
   a. Either Applicant or HCE may request OHA technical assistance.
   b. OHA may offer technical assistance. OHA assistance will be confined to clarification of the CCO certification process and criteria, and other program requirements.
5. Before requesting referral to this dispute resolution process, the parties should take the following actions in an attempt to reach a good faith resolution between the Applicant and the HCE:
   a. The Applicant has provided a written offer of terms and conditions to the HCE and the HCE has explained to the Applicant the source of disagreement, if any.
   b. Before referral, the CFO or CEO of each organization has had at least one face-to-face meeting in a good faith effort to resolve the source of disagreement.
   c. Goal: Applicant and HCE agree on terms and enter into a contract.
6. If the Applicant and HCE are unable to reach agreement on contract terms within 10 calendar days of the HCE and Applicant face-to-face meeting in 5(b), either party can notify the other party in writing to initiate referral to an independent third party arbitrator. (At that time, the party initiating the referral will provide a copy of the notification to the OHA.) The arbitrator must:

C-2

Exhibit 1
Page 62 of 142

FCI0517188
CTRL_01214878

CCO Implementation Proposal: Appendix C

   a.  Be knowledgeable and experienced as an arbitrator, and generally familiar with health care matters; and

   b.  Agree to follow the terms and conditions specified for the arbitration process, described below, and become familiar with HB 3650.

**Arbitration process: NOTE – At any point in this process, the CCO and HCE can agree on terms and enter into a contract, or mutually agree to withdraw from the dispute resolution process.**

1. After notification that arbitration is being initiated, the parties agree upon the arbitrator and complete paperwork required to secure the arbitrator's services – costs for arbitration to be borne by the parties. (Estimated 15 calendar days.)

   a.  In consideration of potentially varied financial resources as between the parties that should not pose a barrier to the use of this process, the arbitrator should be permitted to respond to requests to allocate costs among the parties.

   b.  Any changes to the time periods described in this process will require the written agreement of both parties.

2. Once referral is completed (step 1), the Applicant and HCE have 10 days to submit to each other and the arbitrator their most reasonable contract offer (10 calendar days) or submit a statement from the HCE that no contract is desired and why this is reasonable.

3. The parties then have 10 days from receipt of the other party's offer, or HCE statement that no contract is desired, to submit to the arbitrator and the other party their advocacy briefs regarding whether the HCE is reasonably or unreasonably refusing to contract with the Applicant. (10 calendar days.)

   a.  Legal standards for arbitration:

      i.  An HCE may reasonably "refuse to contract with a CCO if the reimbursement established for a service provided by the entity under the contract is below the reasonable cost to the entity for providing the service" – per Section 8(5).
           *NOTE: Where federal or state statute or regulation establishes particular reimbursement requirements (e.g., Type A and B hospitals, federally qualified health centers, rural health centers, providers of Indian health services), those laws shall be applied.*

      ii.  In addition to subparagraph (i), an HCE may reasonably refuse to contract if that refusal is justified in fact or by circumstances, taking into consideration the legislative policies described in HB 3650. Some examples of facts or circumstances pertinent to what is a "reasonable" or "unreasonable" refusal to contract include, but are not limited to:

         1.  Whether participation in the CCO contract imposes demands on the HCE that the HCE cannot reasonably meet without significant negative impact on HCE costs, or HCE obligations or structure, in the context of the proposed reimbursement arrangement or other CCO requirements, including, but not limited to, use of electronic health records, service delivery requirements, or quality or performance requirements.

         2.  Whether refusal to contract by the HCE impacts access to covered services in the community that should be provided by the CCO. This factor alone should not be used to find a refusal to contract unreasonable, but it is recognized that HCEs and

C-3

Exhibit 1
Page 63 of 142

FCI0517189
CTRL_01214878

CCO Implementation Proposal: Appendix C

CCOs should be encouraged to make a good faith effort to work out differences in order to achieve beneficial community objectives and the policy objectives of HB 3650.

3.  Whether the HCE has entered into a binding obligation to participate in the network of a different CCO, and that HCE participation significantly reduces HCE capacity to participate in the Applicant's CCO.

4.  Arbitrator determination and final opportunity to settle:

    a.  The arbitrator must evaluate the final offers/statement of refusal to contract and the advocacy briefs from each party and issue a determination within 15 calendar days of the receipt of the parties' arguments about whether the refusal to contract is reasonable or unreasonable. (15 calendar days.)

    b.  The arbitrator's determination will be provided to the parties and not disclosed publicly to the OHA for a period of 10 calendar days, to allow the parties an opportunity to resolve the contract issue themselves. (10 calendar days.)

    c.  If the parties have not voluntarily reached an agreement regarding contract terms after the 10-day period, the arbitrator's decision must be released to OHA. Once released to OHA, the arbitrator's decision will be a public record, subject to protection of trade secret information if identified by one of the parties prior to submission to OHA.
        (Total time = 60 calendar days.)

C-4

Exhibit 1
Page 64 of 142

FCI0517190
CTRL_01214878

CCO Implementation Proposal: Appendix D

## Appendix D: Draft matrix of suggested CCO criteria
## Based on OHPB action plan, OHPB and work group discussions, and public input

This document reflects the statement of work and certification criteria for Coordinated Care Organizations (CCOs) that will contract with OHA under HB 3650 and has been developed through the work of the Oregon Health Policy Board and its four work groups, a series of eight community meetings around the state, public comment at the monthly Oregon Health Policy Board meetings, and comment from the legislature. **This is a working document and is for discussion purposes only.**

| Criteria from *HB 3650* | OHPB baseline expectations | OHPB transformational expectations |
|---|---|---|
| **Governance structure:** Each CCO has a governance structure that includes: <br>• A majority interest consisting of the persons that share the financial risk of the organization; <br>• The major components of the health care delivery system; and <br>• The community at large, to ensure that the organization's decision making is consistent with the values of the members of the community. | CCO will clearly articulate: <br>• How it will meet governance structure criteria from HB 3650; <br>• How the governing board makeup reflects community needs and supports the goals of health care transformation; <br>• What criteria will are/were used to select for governing members; <br>• How it will assure transparency in governance. | NA |
| **Community advisory council:** Each CCO convenes a community advisory council (CAC) that includes representatives of the community and of county government, but with consumers making up the majority of the membership and that meets regularly to ensure that the health care needs of the consumers and the community are being met | • A member of the CAC must sit on the governing board to ensure accountability for the governing board's consideration of CAC policy recommendations. | |
| **Dental care organizations:** On or before 7/1/14, each CCO will have a formal contractual relationship with any DCO in its service area. | • CCO adheres to HB 3650 requirements regarding DCOs. | • CCO enters into shared financial accountability arrangement with DCOs before 2014, to encourage aligned financial incentives for cost-effectiveness and discourage cost shifting. |

D-1

Exhibit 1
Page 65 of 142
FCI0517191
CTRL_01214878

CCO Implementation Proposal: Appendix D

## Appendix D: Draft matrix of suggested CCO criteria
## Based on OHPB action plan, OHPB and work group discussions, and public input

| Criteria from *HB 3650* | OHPB baseline expectations | OHPB transformational expectations |
|---|---|---|
| **Partnerships:**<br>CCOs shall have agreements in place with publicly funded providers to allow payment for point-of-contact services including immunizations, sexually transmitted diseases and other communicable diseases, family planning and HIV/AIDS prevention services. Additionally, a CCO is required to have a written agreement with the local mental health authority in the area served by the coordinated care organization, unless cause can be shown why such an agreement is not feasible under criteria established by the Oregon Health Authority. | • OHA to review CCO applications to ensure that statutory requirements regarding county agreements are met. | |
| **Person-centered care:**<br>Each member receives integrated person-centered care and services designed to provide choice, independence and dignity. | • CCO describes how it will use PCPCH capacity to deliver person-centered care per HB 3650 and ensure members are fully informed partners in transitioning to this model of care. | |
| **Safeguards for members:**<br>OHA shall adopt rules for member safeguards including: protections against underutilization of services and inappropriate denials; access to qualified advocates; education and engagement to help members be active partners in their own care. | • CCO adheres to HB 3650 requirements regarding member safeguards, including access to qualified peer wellness specialists where appropriate, personal health navigators, and qualified community health workers, and to applicable Medicare and Medicaid regulations not waived.<br>• CCOs will describe planned or established mechanisms for a complaint/grievance and appeals resolution process, including how that process will be for communicated to members and providers. | |

D-2

Exhibit 1
Page 66 of 142

FCI0517192
CTRL_01214878

CCO Implementation Proposal: Appendix D

## Appendix D: Draft matrix of suggested CCO criteria
## Based on OHPB action plan, OHPB and work group discussions, and public input

| Criteria from *HB 3650* | OHPB baseline expectations | OHPB transformational expectations |
|---|---|---|
| **Patient engagement:**<br>**CCO operates in a manner that encourages patient engagement, activation and accountability for the member's own health.** | • CCO actively engages members in the design and, where applicable, implementation of their treatment and care plans<br>• CCO ensures that member choices are reflected in the development of treatment plans and member dignity is respected. | • CCO uses community input and the community needs assessment process to help determine the best methods for patient activation<br>• CCO develops approaches to patient engagement and responsibility that account for the social determinants of health relevant to their members<br>• CCO meaningfully engages the community advisory council to monitor patient engagement and activation. |
| **Member access and provider responsibilities:**<br>**Members have *access* to a choice of providers within the CCO's network and providers in the network:**<br>• **Work together to develop best practices for care and service delivery to reduce waste and improve health and well-being of members;**<br>• **Are educated about the integrated approach and how to access and communicate with the integrated system about patient treatment plans and health history;**<br>• **Emphasize prevention, healthy lifestyle choices, evidence-based practices, shared decision making and communication;**<br>• **Are permitted to participate in networks of multiple CCOs;**<br>• **Include providers of specialty care;**<br>• **Are selected by CCOs using universal** | CCO describes:<br>• How it will work with their providers to develop the partnerships necessary to allow for access to and coordination with social and support services, including long-term care services and crisis management services;<br>• How it will develop a tool for provider use to assist in the education of members about care coordination and the responsibilities of both parties in the process of communication;<br>• How members will be informed about access to non-traditional providers, if available through the CCO, including personal health navigators, peer wellness specialists where appropriate, and community health workers. | |

D-3

Exhibit 1
Page 67 of 142
FCI0517193
CTRL_01214878

CCO Implementation Proposal: Appendix D

## Appendix D: Draft matrix of suggested CCO criteria
## Based on OHPB action plan, OHPB and work group discussions, and public input

| Criteria from *HB 3650* | OHPB baseline expectations | OHPB transformational expectations |
|---|---|---|
| application and credentialing procedures, objective quality information; are removed if providers fail to meet objective quality standards;<br>• Work together to develop best practices for culturally appropriate care and service delivery to reduce waste, reduce health disparities and improve health and well-being of members. | | |
| **Member and care team:**<br>Each member has a consistent and stable relationship with a care team that is responsible for providing preventive and primary care, and for comprehensive care management in all settings. | • CCO demonstrates how it will support the flow of information, identify a lead provider or care team to confer with all providers responsible for a member's care, and use a standardized patient follow-up approach. | |
| **Holistic care through primary care homes:**<br>Supportive and therapeutic needs of each member are addressed in a holistic fashion, using patient-centered primary care homes and individualized care plans to the extent feasible. | • CCO adheres to HB 3650 requirements regarding individualized care plans, particularly for members with intensive care coordination needs.<br>• Care plans reflect member or family/caregiver preferences and goals to ensure engagement and satisfaction. | |
| **Transitional care:**<br>Members receive comprehensive transitional care, including appropriate follow-up, when entering or leaving an acute care facility or long-term care setting. | • CCO demonstrates how it will incent and monitor improved transitions in care so that members receive comprehensive transitional care, as required by HB 3650, and members' experience of care and outcomes are improved. Coordinated care, particularly for transitions between hospitals and long-term care, is key to delivery system transformation.<br>• CCOs should demonstrate how hospitals and specialty services will be accountable to achieve successful transitions of care and establish service agreements that include the role of patient-centered primary care homes. | |

D-4

Exhibit 1
Page 68 of 142

FCI0517194
CTRL_01214878

CCO Implementation Proposal: Appendix D

## Appendix D: Draft matrix of suggested CCO criteria
## Based on OHPB action plan, OHPB and work group discussions, and public input

| Criteria from *HB 3650* | OHPB baseline expectations | OHPB transformational expectations |
|---|---|---|
| **Navigating the system:**<br>Members receive assistance in navigating the health care delivery system and in accessing community and social support services and statewide resources, including through the use of certified health care interpreters, community health workers and personal health navigators who meet competency standards established by the Oregon Health Authority. | • CCO demonstrates how members will be informed about access to non-traditional providers, if available through the CCO, including personal health navigators, peer wellness specialists where appropriate, and community health workers. | |
| **Accessibility:**<br>Services and supports are geographically located as close to where members reside as possible and are, if available, offered in non-traditional settings that are accessible to families, diverse communities and underserved populations. | • CCO adheres to HB 3650 requirements for access to services and supports. | |
| **High need members:**<br>Each CCO prioritizes working with members who have high health care needs, multiple chronic conditions, mental illness or chemical dependency; CCO involves those members in accessing and managing appropriate preventive, health, remedial and supportive care and services to reduce the use of avoidable ED visits and hospital admissions. | • CCO uses individualized care plans to the extent feasible to address the supportive and therapeutic needs of each member, particularly those with intensive care coordination needs. Plans will reflect member or family/caregiver preferences and goals to ensure engagement and satisfaction. | |
| **Learning collaborative:**<br>Each CCO participates in the learning collaborative described in ORS 442.210. | • CCO adheres to HB 3650 requirements for participation in learning collaborative. | |
| **Patient-centered primary care homes:**<br>Each CCO shall implement, to the maximum extent feasible, patient-centered primary care homes, including developing capacity for services in settings that are accessible to families, diverse | • CCO adheres to HB 3650 requirements for patient-centered primary care homes.<br>• CCO demonstrates how the patient-centered primary care home delivery system elements will ensure that members receive integrated, person-centered care and | • All members enrolled in a PCPCH; member experience of care exceeds benchmarks; PCPCH's in advanced tiers. |

D-5

Exhibit 1
Page 69 of 142
FCI0517195
CTRL_01214878

CCO Implementation Proposal: Appendix D

## Appendix D: Draft matrix of suggested CCO criteria
## Based on OHPB action plan, OHPB and work group discussions, and public input

| Criteria from *HB 3650* | OHPB baseline expectations | OHPB transformational expectations |
|---|---|---|
| communities and underserved populations. The CCO shall require its other health and services providers to communicate and coordinate care with patient-centered primary care homes in a timely manner using health information technology. | services, as described in the bill, and that members are fully informed partners in transitioning to this model of care. | |
| **Health equity:**<br>**Health care services focus on improving health equity and reducing health disparities.**<br><br>Ensuring health equity (including interpretation/cultural competence) and elimination of avoidable gaps in health care quality and outcomes, as measured by gender, race, ethnicity, language, disability, sexual orientation, age, mental health and addictions status, geography, and other cultural and socioeconomic factors. | • CCO identifies health disparities associated with race, ethnicity, language, health literacy, age, disability, gender, sexual orientation, geography, or other factors through community needs assessment.<br>• CCO collects or maintains race, ethnicity and primary language for all members on an ongoing basis in accordance with standards jointly established by OHA and Oregon Department of Human Services. | |
| **Alternative payment methodologies:**<br>**OHA encourages CCOs to use alternative payment methodologies that:**<br>• **Reimburse providers on the basis of health outcomes and quality measures instead of the volume of care;**<br>• **Hold organizations and providers responsible for the efficient delivery of quality care;**<br>• **Reward good performance;**<br>• **Limit increases in medical costs;**<br>• **Use payment structures that create incentives to promote prevention, provide person-centered care, and reward comprehensive care coordination.** | • CCO describes how it will use alternative payment methods alone or in combination with delivery system changes to achieve better care, controlled costs and better health for members. | |

D-6

Exhibit 1
Page 70 of 142
FCI0517196
CTRL_01214878

CCO Implementation Proposal: Appendix D

## Appendix D: Draft matrix of suggested CCO criteria
## Based on OHPB action plan, OHPB and work group discussions, and public input

| Criteria from *HB 3650* | OHPB baseline expectations | OHPB transformational expectations |
|---|---|---|
| **Health information technology:**<br>**Each CCO uses health information technology to link services and care providers across the continuum of care to the greatest extent practicable.** | • CCO documents level of electronic health record adoption and health information exchange infrastructure and capacity for collecting and sharing patient information electronically, and develops a HIT improvement plan for meeting transformation expectations.<br>• CCO participates in a health information organization (HIO) or is registered with a statewide or local direct-enabled health information service provider. | • CCO providers have EHR/HIE capacity to send and receive patient information in real time, and CCOs have the analytic capacity to assess patient outcomes of care coordination. |
| **Outcome and quality measures:**<br>**Each CCO reports on outcome and quality measures identified by the Oregon Health Authority under Section 10 and participates in the All Payer All Claims data reporting system.** | • CCO reports and demonstrates an acceptable level of performance with respect to OHA-identified metrics.<br>• CCO submits APAC data in a timely manner according to program specifications. | • CCO demonstrates exceptional performance with respect to identified metrics. |
| **Transparency:**<br>**CCO is transparent in reporting progress and outcomes.** | • CCO will clearly articulate how it will assure transparency in governance.<br>• Financial, outcomes, quality and efficiency metrics will be transparent and publicly reported and available on the internet for each CCO. | |
| **Best practices:**<br>**Each CCO uses best practices in the management of finances, contracts, claims processing, payment functions and provider networks.** | • CCO describes capacity and plans for ensuring best practices in areas identified by HB 3650.<br>• CCO establishes a clinical advisory panel (CAP) or uses other means to ensure clinical best practices. The CAP, if one is formed, should be represented on the CCO governing board, similar to the CAC.<br>• CCO describes plans for: an internal quality improvement committee that develops and operates under an annual quality strategy and work plan with feedback loops; and an internal utilization review oversight committee that monitors utilization against practice guidelines and treatment planning protocols/policies. | |

D-7

Exhibit 1<br>Page 71 of 142
FCI0517197<br>CTRL_01214878

CCO Implementation Proposal: Appendix E

# Appendix E: Overview of CCO eligible populations

**Oregon Medicaid caseload for inclusion in Coordinated Care Organization (CCO) global budgets (includes managed care and fee-for-service)**

| Populations included in CCO global budgets | Total eligibles | Medical | | Dental | | Mental health | |
|---|---|---|---|---|---|---|---|
| | | FCHP + PCO* | FFS | DCO | FFS | MHO | FFS |
| OHP Plus (categorical pops) | 362,182 | 287,049 | 75,132 | 320,790 | 41,392 | 314,177 | 48,005 |
| SCHIP (ages 0-18) | 58,473 | 52,236 | 6,237 | 55,721 | 2,753 | 55,314 | 3,160 |
| OHP Standard (1115 expansion population) | 46,206 | 38,471 | 7,735 | 42,084 | 4,122 | 42,058 | 4,148 |
| Fully dual-eligible | 58,675 | 33,967 | 24,709 | 52,080 | 6,595 | 50,532 | 8,143 |
| **Subtotal** | **525,537** | **411,723** | **113,813** | **470,674** | **54,862** | **462,080** | **63,456** |
| **To be decided** | | | | | | | |
| Citizen Alien Waived Emergent Medical - Prenatal | 1,138 | – | 1,138 | – | 1,138 | – | 1,138 |
| Citizen Alien Waived Emergent Medical | 22,558 | – | 22,558 | – | – | – | – |
| Breast and Cervical Cancer Program - Medical | 444 | – | 444 | – | 444 | – | 444 |
| **Subtotal** | **24,140** | **–** | **24,140** | **–** | **1,582** | **–** | **1,582** |
| **Grand total** | **549,677** | **411,723** | **137,954** | **470,674** | **56,445** | **462,080** | **65,039** |

\* FCHP - Fully capitated health plan
PCO - Physician care organization

**Notes:**
- Medical, dental and mental health eligibles should *not* be added together to reach totals. Rather, most beneficiaries are eligible for all three types of services and are therefore counted separately under each.
- OHP Plus includes: Temporary Assistance to Needy Families-Medical, Poverty Level Medical Adults, Poverty Level Medical Children, Aid to the Blind and Aid to the Disabled, Old Age Assistance, and Foster Care, Substitute or Adoptive Care Children.
- SCHIP includes ages 0 to 18, excludes CAWEM Prenatal.
- Eligibility categories do not include Family Health Insurance Assistance Program, Healthy KidsConnect, CHIP employer-sponsored insurance.

**Staff reference:**
09-11 Dec Rebal; includes FFS and managed care.

E-1

Exhibit 1
Page 72 of 142
FCI0517198
CTRL_01214878

CCO Implementation Proposal: Appendix F

## Appendix F: Example List of Medicaid Services and Programs For Inclusion in CCO Global Budgets

| Medicaid program/services | Description | Current intermediate entity, if any (e.g., counties, MHOs, FCHPs, etc.) | In Current Cap Rates? | % of Non-LTC Medicaid Spend |
|---|---|---|---|---|
| **Physical health programs*** | | | | |
| Physical health coverage, including emergency transport, FCHP administrative, hospital reimbursement allowances, FQHC wraparound, and pass through. | Depending on benefit package, includes medical care from a physician, nurse practitioner or physician assistant; hospital care; hospice care; laboratory and x-ray; medical equipment and supplies; emergency medical transportation; physical, occupational and speech therapy; prescription drugs (excluding mental health drugs); vision services and other covered services. | Fully capitated health plans, physician care organizations | Y | 52% |
| | | FFS only | | 18% |
| Dental coverage, including DCO administrative** | Includes basic dental services, urgent/immediate treatment and other services. | Dental care organizations | Y | 5% |
| Non-emergency medical transportation | Includes wheelchair van, taxi, stretcher car, bus passes and tickets, secured transportation for Medicaid eligibles to access OHP covered services when no alternative transportation is available. | Transportation brokerages and FFS | | 2% |
| Citizen Alien Waived Emergent Medical (CAWEM) | Emergency medical services to non-citizens who are eligible for medical assistance except they do not meet the Medicaid citizenship and immigration status requirements. | FFS only | | 1% |
| Citizen Alien Waived Emergent Medical (CAWEM) Prenatal Program | Prenatal care to pregnant women who are currently only eligible for CAWEM Emergency Medical (only in select counties; voluntary enrollment only). | FFS only | | <1% |
| Breast and Cervical Cancer Program - Medical | Provides access to medical care for low-income, uninsured, and medically underserved women diagnosed with breast or cervical cancers | FFS only | | <1% |
| Behavioral Rehabilitation Services (leverage) | Services provided by a child care agency in a shelter, residential or therapeutic foster care placement setting to remediate psychosocial, emotional and behavioral disorders. | FFS only | | <1% |
| Targeted Case Management (leverage) | Assists eligible clients in gaining access and effectively using medical, social, educational and other services. | FFS only | | <1% |

* Class 7 and 11 mental health drugs are not included in this list because House Bill 3650 excludes them from CCO global budgets. However, they are included in the total expenditures used to calculated percentages in this table.

** Dental care organizations are not required to enter into contracts with CCOs until July 1, 2014, but may do so at an earlier date.

F-1

Exhibit 1
Page 73 of 142

FCI0517199
CTRL_01214878

CCO Implementation Proposal: Appendix F

## Appendix F: Example List of Medicaid Services and Programs For Inclusion in CCO Global Budgets

| Medicaid program/services | Description | Current intermediate entity, if any (e.g., counties, MHOs, FCHPs, etc.) | In Current Cap Rates? | % of Non-LTC Medicaid Spend |
|---|---|---|---|---|
| **Addictions and Mental Health programs** | | | | |
| Mental health coverage including MHO administrative | Medicaid-funded ambulatory assessment and treatments (based on the prioritized list) of mental health conditions provided in community-based settings by licensed practitioners or non-licensed personnel employed by agencies with a certificate of approval by OHA/AMH. | Mental health organizations | Y | 8% |
| | | FFS only | | 1% |
| Adult community residential mental health services | Mental health services provided in a residential setting. | CMHP | | 3% |
| Addiction health coverage | Ambulatory assessment and treatments (based on the prioritized list) of substance use disorders provided by licensed professionals or non-licensed personnel employed by agencies. | FCHPS and PCOs | Y | 1% |
| | | FFS only | | <1% |
| Adult residential alcohol and drug treatment*** | Alcohol and drug treatment provided in a residential setting. | CMHP and direct contracts w/providers | | <1% |
| Residential mental health for non-forensic children | Mental health services provided in a residential setting. | MHO plus provider direct billing to DMAP for non-MHO enrolled children | Y | <1% |
| Youth residential alcohol and drug treatment *** | Alcohol and drug treatment services provided in a residential setting | None - direct contracts with all providers | | <1% |
| Psychiatric day treatment service for children | Psychiatric day treatment service delivered in a facility-based setting. | MHO-provider direct billing to DMAP for non-MHO enrolled kids | Y | <1% |
| Statewide Children's Wraparound | Services and supports for children with complex behavioral health needs and their families. | MHO | Y | <1% |
| Personal Care 20 client-employed provider for people with mental illness | Intensive community or in-home supports to assist Medicaid-eligible, disabled individuals with activities of community living. | Client employs provider | | <1% |

*** Residential alcohol and drug treatment providers are not required to enter into contracts with CCOs until July 1, 2013, but may do so at an earlier date.

F-2

Exhibit 1
Page 74 of 142
FCI0517200
CTRL_01214878

CCO Implementation Proposal: Appendix F

## Appendix F: Example List of Medicaid Services and Programs For Inclusion in CCO Global Budgets

| Medicaid program/services | Description | Current intermediate entity, if any (e.g., counties, MHOs, FCHPs, etc.) | In Current Cap Rates? | % of Non-LTC Medicaid Spend |
|---|---|---|---|---|
| **Aging and People with Disabilities** | **Descriptions** | | | |
| Payment of Medicare premiums for dual-eligibles | Medicare premium payments for dual-eligibles paid by Medicaid | N/A | Y | 4% |
| Cost-sharing for Medicare skilled nursing facility care (day 21-100) | Applicable deductibles, coinsurance and copayment amounts for dually eligible enrollees. | N/A | | <1% |
| OHP Post-Hospital Extended Care | Provides a stay of up to 20 days in a nursing facility to allow for discharge from a hospital to a nursing facility | FFS Only | Y | <1% |
| **Public Health** | **Descriptions** | | | |
| School-Based Health Center services | Comprehensive primary care clinics that provide physical, mental and preventive health services to school-aged children in a school-based setting. | Local public health authority (LPHA) | | 1% |
| Babies First! | A Medicaid-funded nurse home visiting program for families with babies and young children up to 5, with significant health and social risks. Provides health assessments, aligns community resources, strengthens parenting skills, and improves infant health outcomes. | Local health departments | | <1% |
| Maternity Case Management | An education and support program for pregnant women on Medicaid with social or health concerns during pregnancy to improve health outcomes. | Local health departments (DMAP provides reimbursement for MCM services to a broader community of prenatal care providers not under the public health program) | | <1% |

F-3

Exhibit 1
Page 75 of 142
FCI0517201
CTRL_01214878

CCO Implementation Proposal: Appendix G

## Appendix G: Principles, domains and example CCO accountability metrics
### OHPB Stakeholder Work Group on Outcomes, Quality and Efficiency Metrics

Potential CCO performance measures

At a minimum, any selected performance measure should meet standard scientific criteria for reliability and face validity. Potential measures also should be evaluated against the principles below, with the goal of establishing a set of CCO performance measures that reasonably balances the various criteria. OHA should re-examine selected measures on a regular basis to ensure that they continue to meet the criteria.

| Principle | Selection criteria | Change criteria |
|---|---|---|
| Transformative potential | o Measure would help drive system change | o Measure reinforces the status quo rather than prompting change |
| Consumer engagement | o Measure successfully communicates to consumers what is expected of CCOs | o Measure is not understandable or not meaningful to consumers |
| Relevance | o Condition or practice being measured has a significant impact on issues of concern or focus* <br> o Measure aligns with evidence-based or promising practices | o Lack of currency — measure no longer addresses issues of concern or focus* |
| Consistency with existing state and national quality measures, with room for innovation when needed | o Measure is nationally validated (e.g., NQF endorsed) <br> o Measure is a required reporting element in other health care quality or purchasing initiative(s) <br> o National or other benchmarks exist for performance on this measure | o Measure loses national endorsement <br> o Measure is unique to OHA when similar standard measures are available |
| Attainability | o It is reasonable to expect improved performance on this measure (can move the meter) | o CCO or entity performance is "topped out" <br> o Measure is too ambitious |
| Accuracy | o Changes in CCO performance will be visible in the measure <br> o Measure usefully distinguishes between different levels of CCO performance | o Measure is not sensitive enough to capture improved performance <br> o Measure is not sensitive enough to reflect variation between CCOs |

Exhibit 1
Page 76 of 142
FCI0517202
CTRL_01214878

CCO Implementation Proposal: Appendix G

| Feasibility of measurement | o Measure allows CCOs and OHA to capitalize on existing data flows (e.g., state All Payer All Claims reporting program or other established quality reporting systems)<br>o Data collection for measure will be supported by upcoming HIT and HIE developments | o Burden of data collection and reporting outweighs the measure's value |
|---|---|---|
| Reasonable accountability | o CCO has some degree of control over the health practice or outcome captured in the measure | o Measure reflects an area of practice or a health outcome over which CCO has little influence |
| Range/diversity of measures | o Collectively, the set of CCO performance measures covers the range of topics, health services, operations and outcomes, and populations of interest | o There is a surplus of measures for a given service area or topic<br>o Measure is duplicative<br>o Measure is too specialized |

* These issues include, but are not limited to: health status, health disparities, health care costs and cost-effectiveness, access, quality of care, delivery system functioning, prevention, patient experience/engagement, and social determinants of health.

Domains of measurement

OHA should assess CCO performance in these domains:

- Accountability for system performance in all service areas for which the CCO is responsible:
    - Adult mental health;
    - Children's mental health;
    - Addictions;
    - Outpatient physical;
    - Inpatient physical;
    - Women's health;
    - Dental;
    - Prevention;
    - End-of-life care.

- Accountability for transformation:
    - Care coordination and integration;
    - Patient experience and activation;
    - Access;
    - Equity;
    - Efficiency and cost control;
    - Community orientation.

G-2

Exhibit 1
Page 77 of 142
FCI0517203
CTRL_01214878

CCO Implementation Proposal: Appendix G

## Potential CCO performance measures
### *Examples only*

| Measure | Data Type | Other initiatives that use the measure |
|---|---|---|
| Rate of tobacco use among CCO enrollees | Survey or medical record | 7 |
| Obesity rate among CCO enrollees | Survey or medical record | |
| Low birth weight | Vital statistics /medical record | 2 |
| Well child visits | Claims/encounter data | 2, 5, 6 |
| Dental visits (% of members with any visit in past year) | Claims/encounter data | 6, 7 |
| Depression screening | Medical record | 1, 3, 4, 5 |
| Initiation and engagement in drug, alcohol, and mental health treatment | Claims/encounter data | 3, 5, 6 |
| Penetration rate for mental health and chemical dependence treatment | Survey and administrative data | |
| Cholesterol control for patients with diabetes | Medical record | 5 |
| Glucose control for diabetics | Medical record | 4 |
| Cancer screening (1 of: cervical, breast or colorectal) | Claims/encounter data | 1, 2, 4, 5, 6 |
| Effective contraceptive use and unintended pregnancy | Survey | |
| Chlamydia screening | Claims/encounter data | 1, 2, 5, 6 |
| Fall risk screening (older adults) | Claims/encounter data | 4, 6 |
| Service engagement (% members who received no health services at all in x period) | Claims/encounter and administrative data | |
| Member or patient experience with:<br>· Getting needed care and getting care quickly<br>· Shared decision making and participation in care planning<br>· Care coordination<br>· Chronic disease self-management support<br>· Primary provider or provider team<br>· Overall experience of care | Survey | 1, 2, 4, 5, 6 |
| Primary care-sensitive hospital admissions (AHRQ PQIs) | Claims/encounter data | 1, 4 |
| ED visits by primary diagnosis (e.g. mental health, substance abuse, dental, other) | Claims/encounter data | |
| Hospital acquired infection rates | CDC reporting system | |
| Medication management (e.g., % discharges where medications were reconciled within 7 days) | | 4, 6 |
| Follow-up after hospitalization (visit within 7 days of discharge for physical or mental health diagnosis) | Claims/encounter data | 1, 2, 6 |
| Readmission rates (30 day risk-adjusted for hospital and inpatient psychiatric) | Claims/encounter data | 1, 4, 6 |
| End of life care preferences (e.g. % dual eligibles or age-specified members who have a POLST form on file) | Administrative data | |
| Health/functional status improvement | Survey | 4 |

1 – Medicaid Adult Core Measures
2 – CHIPRA Core Measures
3 – Medicaid Health Home Core Measures
4 – Medicare ACO Quality Measures

5 – Oregon PCPCH
6 – HEDIS
7 – National Quality Strategy

G-3

Exhibit 1
Page 78 of 142
FCI0517204
CTRL_01214878

CCO Implementation Proposal: Appendix G

<u>Accountability by level</u>

*Illustrative examples for discussion purposes only*
**Example domain: Care coordination**

| | CCO criteria (structure) | Process metrics | Outcome metrics | Triple Aim |
|---|---|---|---|---|
| **Macro: OHA** | Establish recognition process for PCPCHs<br><br>Administer EHR incentive program; facilitate HIE (e.g., connect regional HIOs, Direct Project) | • # of PCPCHs recognized<br><br>• % of eligible providers and hospitals meeting Meaningful Use | • % of OHA-covered lives with access to PCPCH<br>• OHA roll-up: ambulatory care-sensitive hospital admissions<br><br>• Statewide EHR adoption<br>• Statewide HIE participation<br>• OHA roll-up: Medication errors, duplicate testing | Better care, lower costs |
| **Meta: CCO** | Incorporate OHA-recognized PCPCHs into CCO network<br><br>Support clinical information exchange among CCO providers (e.g., act as or participate in regional HIO; use Direct) | • Member experience of care coordination (e.g., shared decision making composite)<br>• % members with individual care plan<br><br>• Medication management — % members with medications reconciled within 7 days of hospital discharge | • Rate of ambulatory care-sensitive hospital admissions<br>• Member experience of care overall<br><br>• Medication errors<br>• Duplicate testing | Better health, lower costs<br><br><br><br>Better care |
| **Micro:**<br>**Practice or provider** | Implement PCPCH standards, seek recognition<br><br>Identify, track and proactively manage patient care electronically using up-to-date information | • % members assigned to personal provider or team<br><br>• Screening for depression and follow-up plan | • Benchmark for continuity of care<br><br>• % patients showing improvement on clinically valid depression tool | Better care<br><br><br>Better care, lower costs |

▨ Collected by OHA

G-4

Exhibit 1
Page 79 of 142
FCI0517205
CTRL_01214878

*March 1, 2012*                                                Appendix D

Forecasted Average Monthly Caseload for 2011-2013 Biennium; Includes Managed Care and Fee-For-Service

| Populations Included in CCO Global Budgets | Total Eligibles | Medical | | Dental | | Mental Health | |
|---|---|---|---|---|---|---|---|
| | | FCHP + PCO* | FFS | DCO | FFS | MHO | FFS |
| OHP Plus (Categorical Pops) | 419,390 | 345,012 | 74,378 | 389,398 | 29,992 | 371,350 | 48,040 |
| SCHIP (ages 0-18) | 72,713 | 63,410 | 9,303 | 67,845 | 4,868 | 61,584 | 11,129 |
| OHP Standard (1115 Expansion Population) | 59,612 | 50,680 | 8,932 | 54,211 | 5,401 | 54,056 | 5,556 |
| Fully Dual Eligible | 65,360 | 35,024 | 30,336 | 58,906 | 6,454 | 57,888 | 7,472 |
| Breast and Cervical Cancer Program - Medical | 638 | - | 638 | - | 638 | - | 638 |
| Subtotal | 617,713 | 494,126 | 123,587 | 570,360 | 47,353 | 544,878 | 72,835 |
| **Optional Populations** | | | | | | | |
| Citizen Alien Waived Emergent Medical - Prenatal | 1,728 | - | 1,728 | - | 1,728 | - | 1,728 |
| Subtotal | 1,728 | - | 1,728 | - | 1,728 | - | 1,728 |
| Grand Total | 619,441 | 494,126 | 125,316 | 570,360 | 49,082 | 544,878 | 74,563 |

\* FCHP - Fully Capitated Health Plan
PCO - Physician Care Organization

Notes:
• Medical, Dental and Mental Health eligibles should *not* be added together to reach totals. Rather, most beneficiaries are eligible for all three types of services and are therefore counted separately under each.
• OHP Plus includes: Temporary Assistance to Needy Families-Medical, Poverty Level Medical Adults, Poverty Level Medical Children, Aid to the Blind and Aid to the Disabled (without Medicare), Old Age Assistance (without Medicare), and Foster Care, Substitute or Adoptive Care Children.
• SCHIP includes ages 0 to 18, excludes CAWEM Prenatal.
• Eligibility categories do not include Family Health Insurance Assistance Program, Healthy Kids Connect, CHIP Employer-Sponsored Insurance.

Staff reference:
11-13 Fall 2011 Rebal; includes FFS and Managed Care.

*Oregon Health Plan– Project Numbers 11-W-00160/10 21-W-00013/10*                                    1

Exhibit 1
Page 80 of 142
FCI0517206
CTRL_01214878

## Appendix E — State Fund Only Program List

| | |
|---|---:|
| **Community Mental Health Program** | |
| 20 Non-Residential Adult | $8,106,392 |
| 22 Child and Adolescent | $680,649 |
| 24 Regional Acute Psychiatric Inpatient | $14,185,239 |
| 25 Community Crisis | $10,208,134 |
| 27 Residential Treatment for Youth | $241,446 |
| 34 Adult Foster Care | $406,568 |
| 35 Older/Disabled Adult | $587,176 |
| 37 Special Projects | $4,323,061 |
| 38 Support Employment | $723,108 |
| 39 Homeless | $500,000 |
| 28 Residential Treatment | $15,010,022 |
| 201 Non-Residential Adult (Designated) | $560,803 |
| **Total CMH Program** | **$55,532,595** |
| | |
| **Alcohol and Drug Treatment Program** | |
| 01 Local Admin | |
| 60 A & D-Special Projects | $1,902,603 |
| 61 A & D Residential Treatment - Adult | $4,049,316 |
| 66 Continuum of Care | $10,397,186 |
| **Total A&D Treatment Program** | **$16,349,105** |
| | |
| **State Hospitals (OSH and BMRC)** | |
| - Civil | 31,845,689 |
| - Forensic | 94,397,533 |
| - Gero-Neuro | 13,687,590 |
| **Total Oregon State Hospital** | **$139,930,811** |
| | |
| **Children, Adults and Families** | |
| System of Care | $ 1,162,626 |
| Community Based Sexual Assault | $ 36,600 |
| Community Based Domestic Violence | $ 198,966 |
| Youth Investment Program | $ 194,075 |
| Family Based Services | $ 3,687,007 |
| Foster Care Prevention | $ 261,272 |
| Regular Foster Care | $ 5,339,250 |
| Enhanced Supervision | $ 2,219,528 |
| Client Transportation | $ 1,331,619 |
| Independent Living Services | $ 224,058 |
| Nursing Assessments | $ 8,348 |
| Foster Family Shelter Care | $ 1,220,850 |
| Other Medical | $ 1,449,526 |

*Oregon Health Plan– Project Numbers 11-W-00160/10 21-W-00013/10*

Exhibit 11
Page 81 of 142

FCI0517207
CTRL_01214878

1-Mar-12

| | | |
|---|---|---|
| IV-E Waiver (Demo Project for Parenting, mentoring, enhanced superv | $ | 33,995 |
| Contracted Foster Care | $ | 79,133 |
| **Interstate Compacts** | $ | 139,801 |
| Personal Care | $ | 419,306 |
| Tribal | $ | 25,869 |
| Residential Treatment | $ | 4,229,340 |
| Target Children | $ | 1,200,382 |
| **Total CAF** | **$** | **23,461,546** |
| | | |
| | | |
| **Seniors and Persons with Disabilities:** | | |
| Oregon Project Independence | $ | 4,592,500 |
| Oregon Supplemental Income Program | $ | 2,895,000 |
| SE #150 Family Support | $ | 1,254,500 |
| SE #151 Children Long-Term Support | $ | 2,732,880 |
| SE #45 Nursing Facility Special Services | $ | 83,608 |
| **Total SPD** | **$** | **11,558,488** |
| | | |
| **Public health services vital for healthy communities** | | |
| Emergency Medical Services | $ | 1,950,000 |
| Vaccine Purchase | $ | 2,250,000 |
| General Microbiology | $ | 420,863 |
| Virology | $ | 440,229 |
| Lab Compliance | $ | 11,467 |
| Chlamydia | $ | 800,000 |
| Other Test Fees | $ | 150,000 |
| Newborn Screening | $ | 2,400,000 |
| Prescription Drug Monitoring Program | $ | 800,000 |
| HIV Community Services | $ | 575,000 |
| HST (HIV/Sexually Transmitted Disease/Tuberculosis) | $ | 1,488,042 |
| Sexually Transmitted Disease | $ | 60,000 |
| **Total Public Health** | **$** | **12,695,600** |
| | | |
| **Other Programs Supporting Transformation** | | |
| Oregon Medical Insurance Pool | $ | 219,947,958 |
| Undergraduate and graduate education -OHSU | | 27,989,281 |
| | | |
| **Department of Community Colleges and Workforce Development:** | | |
| One-year health services certificates | $ | 18,760,000 |
| AAS (two-year) health services degrees | $ | 47,400,000 |
| | | |
| **Oregon University System:** | | |

*Oregon Health Plan– Project Numbers 11-W-00160/10 21-W-00013/10*

Exhibit 12
Page 82 of 142

FCI0517208
CTRL_01214878

*1-Mar-12*

| | | |
|---|---|---|
| Enrollment Funding for Health Professions | | $7,932,612 |
| Health Professions - Targeted Program | | $2,933,018 |
| Collaborative Nursing - Targeted Program | | $88,610 |
| | | |
| **Department of Corrections:** | | |
| Drug and Alcohol Treatment | $ | 6,841,106 |
| Mental Health Treatment | $ | 15,044,154 |
| | | |
| **Oregon Youth Authority:** | | |
| Drug and Alcohol Treatment | $ | 2,900,000 |
| Mental Health Treatment | $ | 5,500,000 |
| **Total Other Programs Supporting Transformation** | $ | **107,399,499** |

### TOTAL STATE FUND ONLY PROGRAMS  $    446,944,790

FCI0517209
CTRL_01214878

March 1, 2012

**Appendix F**                    **Initial Proposed CCO Accountability Metrics (transparency metrics also listed)**

| CCO Accountability Measures – tied to contractual accountability & incentives | | Transparency Measures – Collected/reported by OHA for public reporting , evaluation, etc. |
| --- | --- | --- |
| **Core Measures** | **Transformational Measures** | |
| 1. Experience of Care*^ – Key domains TBD from member experience survey (version TBD and may alternate by year) <br> *Domain(s):Member experience & activation* <br> *Data type: Survey (collected by OHA)* <br> *Also part of: Medicaid Adult Core, CHIPRA, Medicare ACOs, Medicare Part C, OR PCPCH, others* <br><br> 2. Rate of tobacco use among CCO enrollees*^ <br> *Domain(s): Prevention, outpatient physical, overall health status, cost control* <br> *Data type: Survey* <br> *Also part of: Nat'l Quality Strategy* <br><br> 3. Access – Outpatient and ED utilization per member-month*^ <br> *Domain(s):Access, community engagement* <br> *Data type: Claims/encounter* <br> *Also part of: CHIPRA Core, NCQA HEDIS* <br><br> 4. BMI assessment & follow-up plan*^ / Weight assessment and counseling for children and adolescents <br> *Domain(s): Prevention, outpatient physical* <br> *Data type: Medical record* <br> *Also part of: Medicare ACOs, OR PCPCH, CHIPRA* <br><br> 5. Screening for clinical depression and follow-up plan^ <br> *Domain(s):Mental health* <br> *Data type: medical record* <br> *Also part of: Adult Medicaid Core, Medicare ACOs* | 1. Rate of early childhood caries <br> *Domain(s):Oral health* <br> *Data type: Medical record* <br> *Also part of: HP 2020* <br><br> 2. Wrap-around care for children – **TBD** (% Children who receive a mental health assessment within 30 days of DHS custody or other wraparound initiative measure) <br> *Domain(s):Care coordination, mental health* <br> *Data type: TBD* <br> *Also part of: TBD* <br><br> 3. Effective contraceptive use - % reproductive age women who do not desire pregnancy using an effective method <br> *Domain(s):Women's health, prevention* <br> *Data type: Survey* <br> *Also part of:* <br><br> 4. Planning for end-of-life care: % members over 65 with a POLST form or advanced care plan or surrogate decision maker documented /on file (or documented that these were declined) <br> *Domain(s):End-of-life care, care coordination* <br> *Data type: Administrative or medical record* <br> *Also part of: Pending* <br><br> 5. Health and functional status – (1) % members who report the same or better mental and physical health | CMS Adult Core Measures including: <br> · Flu shots for adults 50-64 <br> · Breast & cervical cancer screening <br> · Chlamydia screening <br> · Elective delivery & antenatal steroids, prenatal and post-partum care <br> · Annual HIV visits <br> · Controlling high BP, comprehensive diabetes care <br> · Antidepressant and antipsychotic medication management or adherence <br> · Annual monitoring and for patients on persistent medications <br> · Transition of care record <br><br> CHIPRA Core Measures including: <br> · Childhood & adolescent immunizations <br> · Developmental screening <br> · Well child visits <br> · Appropriate treatment for children with pharyngitis and otitis media <br> · Annual HbA1C testing <br> · Utilization of dental, ED care (including ED visits for asthma) <br> · Pediatric CLABSI <br> · Follow up for children prescribed |

Oregon Health Plan– Project Numbers 11-W-00160/10 & 21-W-00013/10                    Page 1

Exhibit 1
Page 84 of 142
FCI0517210
CTRL_01214878

March 1, 2012

| CCO Accountability Measures – tied to contractual accountability & incentives | | Transparency Measures – Collected/reported by OHA for public reporting , evaluation, etc. |
|---|---|---|
| **Core Measures** | **Transformational Measures** | |
| 6. Alcohol misuse - Screening, brief intervention, referral for treatment (SBIRT)^ <br> *Domain(s):Addictions* <br> *Data type: medical record* <br> *Also part of: OR PCPCH* | status than 1 year ago*; (2) % members with Medicaid LTC benefit with improvement or stabilization in functional status <br> *Domain(s): overall health outcomes* <br> *Data type: Survey* <br> *Also part of: Medicare ACOs, MA star ratings(1), SNP(2)* | ADHD medications <br><br> SAMSHA National Outcome Measures including: <br> · Improvement in housing (adults) <br> · Improvement in employment (adults) <br> · Improvement in school attendance (youth) <br> · Decrease in criminal justice involvement (youth) <br><br> Others TBD, for example: <br> · Time from enrollment to first encounter and type of first encounter (urgent or non-urgent, physical, mental, etc. <br> · Initiation and engagement of mental health treatment |
| 7. Initiation & engagement in of alcohol and drug treatment^ <br> *Domain(s):Addictions* <br> *Data type: Claims/encounter* <br> *Also part of: Medicaid Adult Core, HEDIS, Meaningful Use, OR PCPCH* | 6. ED visits – Potentially avoidable or other categorization TBD (*^) <br> *Domain(s):Outpatient physical, care coordination, cost control* <br> *Data type: Claims/encounter* <br> *Also part of: TBD* | |
| 8. Low birth weight <u>or</u> adequacy of prenatal care <br> *Domain(s):Overall health status, MCH* <br> *Data type: Claims/encounter* <br> *Also part of: CHIPRA* | 7. Access - % of primary care providers who report no difficulty obtaining specialty care (including behavioral health services) for members <br> *Domain(s):Access, coordination and integration* <br> *Data type: Survey* <br> *Also part of: Unknown* | |
| 9. Primary-care sensitive hospital admissions (PQIs) for chronic conditions like diabetes, asthma, CHF, and COPD*^ <br> *Domain(s): Outpatient physical, prevention, cost control* <br> *Data type: Encounter/hospital discharge* <br> *Also part of: Adult Medicaid Core, Medicare ACOs* | 8. Improvement on disparities in health status or quality of health care identified by CCO in community needs assessment <br> *Domain(s):Equity, cost control, potentially others* <br> *Data type: mixed* <br> *Also part of: Unknown* | |
| 10. Healthcare-acquired conditions – TBD <br> *Domain(s):Inpatient care* <br> *Data type: Clinical* <br> *Also part of: CDC and OR HAI reporting, Medicare value-* | 9. Community Orientation - TBD | |

Oregon Health Plan– Project Numbers 11-W-00160/10 & 21-W-00013/10                    Page 2

Exhibit 1 <br> Page 85 of 142 <br> FCI0517211 <br> CTRL_01214878

*March 1, 2012*

| CCO Accountability Measures – tied to contractual accountability & incentives | | Transparency Measures – Collected/reported by OHA for public reporting , evaluation, etc. |
| Core Measures | Transformational Measures | |
|---|---|---|
| *based purchasing, CHIPRA*<br><br>11. Follow-up after hospitalization^ - % of members with follow-up visit within 7 days after hospitalization for mental illness<br>  *Domain(s):Care coordination*<br>  *Data type: Claims/encounter*<br>  *Also part of: Adult Medicaid Core*<br><br>12. Readmission rates: (1) Plan all-cause readmissions*^;<br>(2) readmissions to psychiatric care^<br>  *Domain(s):Care coordination, cost control*<br>  *Data type: Claims/encounter*<br>  *Also part of: Adult Medicaid Core, Medicare ACOs*<br><br>13. High needs care coordination – TBD (e.g. % of members identified as high need assigned to intensive care coordination)<br>  *Domain(s):Care coordination*<br>  *Data type: TBD*<br>  *Also part of: TBD*<br><br>14. Medication management –TBD<br>  *Domain(s):Care coordination*<br>  *Data type: TBD*<br>  *Also part of: TBD*<br><br>15. MLR - % of global budget spent on health care and services<br>  *Domain(s):Efficiency, cost control* | *Domain(s):TBD*<br>*Data type: TBD*<br>*Also part of: TBD*<br><br>10. Timely transmission of transition record - % of patients discharged from any inpatient facility to home or any other site of care for whom a transition record was transmitted to the facility or health care professional within 24 hours<br>  *Domain(s):Care coordination*<br>  *Data type: Attestation*<br>  *Also part of: Adult Medicaid Core* | |

*Oregon Health Plan– Project Numbers 11-W-00160/10 & 21-W-00013/10*                    Page 3

Exhibit 1<br>Page 86 of 142

FCI0517212<br>CTRL_01214878

*March 1, 2012*

| CCO Accountability Measures – tied to contractual accountability & incentives | | Transparency Measures – Collected/reported by OHA for public reporting , evaluation, etc. |
|---|---|---|
| **Core Measures** | **Transformational Measures** | |
| *Data type: Administrative*<br>*Also part of: Unknown* | | |
| **CCO-LTC System Joint Accountability Measures** | | |
| 1. Care planning - % of members with Medicaid-funded LTC benefits who have a care plan in place.<br>    *Domain(s):Care coordination*<br>    *Data type: Administrative*<br>    *Also part of: Pending* | 1. Transitions of care - % of LTC patients discharged from any inpatient facility to home or any other site of care for whom a transition record was transmitted to the care manager or AAA/APD within 1 business day<br>    *Domain(s):Care coordination*<br>    *Data type: Administrative*<br>    *Also part of: Unknown* | |

\* Report separately for members with severe and persistent mental illness

^ Report separately for individuals with Medicaid-funded Long-Term Care (LTC) benefit

Exhibit 1<br>Page 87 of 142

FCI0517213<br>CTRL_01214878

*March 1, 2012*

**Duals / Medicare 3-way Contract Accountability Measures – TBD pending negotiation with CMS**
- Additional measures may apply related to quality and experience, outcomes, etc. for dually eligible individuals
- These measures will be determined in consultation with CMS by June 2012.
- Rewards for strong performance on these measures would come in part from the incentives that CMS has specified as part of the state demonstration to integrate care for dually eligible individuals, possibly in the form of a quality withhold.

Exhibit 1
Page 88 of 142

FCI0517214
CTRL_01214878

March 1, 2012

**Appendix G**    **CCO Proposed Measures--Crosswalk to Medicaid Adult Core Set, CHIPRA Core Set, and Medicare ACO Set**

| NQF ID | Measure owner | Measure name | CCO Measures Core | CCO Measures Transform-ational | Medicaid Adult Core | Medicare ACOs | CHIPRA Core |
|---|---|---|---|---|---|---|---|
| **Access / Availability** | | | | | | | |
| | NCQA/ HEDIS | % of children & adolescents (12 mo - 19 yrs) with visit to primary care pracitiner (4 breakdowns) | | | | | X |
| | NCQA/ HEDIS | Ambulatory care: Outpatient and ED visits per member month | X | | | | X |
| | | ED visits – Potentially avoidable or other categorization TBD | | X | | | |
| | | Access to specialty care: % of primary care providers who report no difficulty obtaining specialty care (including behavioral health services) for members | | X | | | |
| | | Measure of community orientation TBD | | X | | | |
| **Experience of Care, Patient & Family Engagement** | | | | | | | |
| 0007 | AHRQ | CAHPS Health Plan Survey (adult, child, children with special healthcare conditions, etc.) | | | X | | X |
| 0005 | NCQA | CG CAHPS<br>- Timeliness<br>- Doctor Communication<br>- Rating of Doctor<br>- Access to specialists<br>- Health promotion & education<br>- Shared decision-making | X - (Specific instrument and domains TBD ) | | | X | |
| 0006 | | Self-reported Health Status/Functional Status from Medicare Advantage HOS | Under consideration - Transformatio | | | X | |
| | | Improvement in functional status | Under consideration - Transformatio | | | | |
| **Care Coordination, including transitions & medication management** | | | | | | | |
| 0097 | NCQA | Medication Reconciliation: Reconciliation after discharge from an inpatient facility (acute inpatient or psychiatric) | Under consideration | | | X | |
| 0021 | NCQA | Annual Monitoring for Patients on Persistent Medications (ACE inhibitors or ARBs, digoxin, dieuretics, anti-convulsants) | | | X | | |
| 0648 | AMA-PCPI | Timely Transmission of Transition Record to Health Professional (Inpatient Discharges to Home/ Self-Care or Any Other Site of Care). | | Under consideration | X | | |
| | NCQA/ HEDIS | Follow-up care for children prescribed attention-deficit/hyperactivity disorder (ADHD) medication (Continuation and Maintenance Phase) | | | | | X |
| 0576 | NCQA | Followup After Hospitalization for Mental Illness | X | | X | | X |
| NA ... | NCQA | Plan All-Cause Readmission rate (also report separately for psychiatric) | X | | X | X | |
| | | High needs care coordination TBD - e.g. % of members identified as high need assigned to intensive care coordination | X | | | | |
| | | Wrap-around care for children – TBD (% Children who receive a mental health assessment within 30 days of DHS custody or other wraparound initiative measure) | | X | | | |
| **Physical Health Screenings, Immunizations, Prevention** | | | | | | | |
| *Children* | | | | | | | |
| 0038 | | Childhood immunization status at 2 years (incl Tdap, polio, MMR, HiB, Hep A, Hep B, chicken pox, pneumococcal, rotavirus, and flu) | | | | | X |
| NA | NCQA | Adolescent immunizations - 13 year olds (incl meningococcal, Tdap or Td) | | | | | X |
| NA | NCQA/ HEDIS | % patients with all recommended well child visits to 15 mos | | | | | X |
| NA | NCQA/ HEDIS | Well-child visits years 3-6 (% 3-6 year olds with a well-child visit during measurement year) | | | | | X |
| NA | NCQA/ HEDIS | Adolescent well-care: % patients age 12-21 with at least on well-case visit to PCP or OB-GYN during measurement year | | | | | X |
| NA | CAHMI | % of patients w/ at least one validated developmental screening tool (ASQ, MCHAT, etc) by 36 mos | | | | | X |

*Oregon Health Plan– Project Numbers 11-W-00160/10 21-W-00013/10*

Exhibit 1
Page 89 of 142

FCI0517215

CTRL_01214878

March 1, 2012

| NQF ID | Measure owner | Measure name | Core | Transform-ational | Medicaid Adult Core | Medicare ACOs | CHIPRA Core |
|---|---|---|---|---|---|---|---|
| 0024 | | Child/Adolescent weight screening | X | | | | X |
| **Adults** | | | | | | | |
| 421/other | CMS | Adult BMI/Weight Screening (and follow-up) | X | | (X) | X | X |
| 0039, 0041 | NCQA | Flu Shots for Adults Ages 50 and above | | | X | X | |
| 0043, 0044 | | Pneumococcal Vaccination (ages 65 and over) | | | | X | |
| 0027, 0028 | NCQA | Medical Assistance With Smoking and Tobacco Use Cessation (age 18+) | | | X | X | |
| | | Rate of tobacco use among members | X | | | | |
| 0031 | NCQA | Breast Cancer Screening (women 40-69; mammography within last 24 months) | | | X | X | |
| 0032 | NCQA | Cervical Cancer Screening | | | X | | |
| 0034 | | Colorectal cancer screening (50-75 years) | | | | X | |
| 0033 | | Chlamydia screening | | | X | | X |
| 0101 | NCQA/HEDIS | Fall risk screening - % patients age 65 and older screened for fall risk within 12 months | | | | X | |
| **Behavioral Health Screening and Treatment** | | | | | | | |
| NA ... | RAND | Alcohol Misuse: Screening, Brief Intervention, Referral for Treatment (SBIRT) | X | | | | |
| 0418 | CMS | Screening for Clinical Depression and Follow-up Plan | X | | X | X | |
| 0004 | NCQA/HEDIS | Initiation and Engagement of Alcohol and Other Drug Dependence Treatment | X | | X | | |
| 0105 | NCQA | Antidepression Medication Management | | | X | | |
| NA ... | CMS-QMHAG | Adherence to antipsychotics for individuals with schizophrenia | | | X | | |
| **Maternal & Child Health** | | | | | | | |
| | | Effective contraceptive use - % reproductive age women who do not desire pregnancy using an effective method | | X | | | |
| | NCQA/HEDIS | Frequency of ongoing prental care (% distribution of pregnancies in previous year by completion of expected prenatal visits) | Under consideration | | | | X |
| | NCQA/HEDIS | Prenantal and Post-partum care: Timeliness of prenatal care (% live births where prenatal care started in first trimester OR within 43 days of enrollment) | | | | | X |
| 0469 | Hospital Corp. of America | Elective delivery prior to 39 completed weeks gestation | | | X | | |
| | CA | Cesarean rate: % of women with first, live, singleton birth (not breach) who had cesarean | | | | | X |
| | CDC | Low birth weight (<2,500g) births as % of total | Under consideration | | | | X |
| 0476 | Providence | Appropriate Use of Antenatal Steroids. | | | X | | |
| 1391 | NCQA/HEDIS | Prenatal and Postpartum Care: Postpartum Care Rate | | | X | | |
| **Management of Chronic Conditions** | | | | | | | |
| *Ambulatory-care sensitive hospital admissions* | | | | | | | |
| 0272 | AHRQ | PQI 01: Diabetes, short-term complications | X (tentative) | | X | | |
| 0273 | AHRQ | PQI 02: Perforated appendicitis | | | | | |
| 0274 | AHRQ | PQI 03: Diabetes, long-term complications | | | | | |
| 0275 | AHRQ | PQI 05: Chronic obstructive pulmonary disease | X (tentative) | | X | X | |
| 0276 | AHRQ | PQI 07: Hypertension | | | | | |
| 0277 | AHRQ | PQI 08: Congestive heart failure | X (tentative) | | X | X | |
| 0280 | AHRQ | PQI 10: Dehydration | | | | | |
| 0279 | AHRQ | PQI 11: Bacterial pneumonia | | | | | |
| 0281 | AHRQ | PQI 12: Urinary Tract Infection Admission Rate | | | | | |
| 0282 | AHRQ | PQI 13: Angina without procedure. | | | | | |
| 0638 | AHRQ | PQI 14: Uncontrolled Diabetes Admission Rate | | | | | |
| 0283 | AHRQ | PQI 15: Adult asthma. | X (tentative) | | X | | |
| 0285 | AHRQ | PQI 16: Lower extremity amputations among patients with diabetes | | | | | |
| *Cardiovascular Disease, Diabetes, Asthma, Heart Failure, Etc.* | | | | | | | |
| | CMS | BP Screening - % adults 18+ with BP measured in last 2 years | | | | X | |

Oregon Health Plan– Project Numbers 11-W-00160/10 21-W-00013/10

Exhibit 1
Page 90 of 142

FCI0517216
CTRL_01214878

March 1, 2012

| NQF ID | Measure owner | Measure name | Core | Transform-ational | Medicaid Adult Core | Medicare ACOs | CHIPRA Core |
|---|---|---|---|---|---|---|---|
| 0018 | NCQA | Controlling High Blood Pressure (% 18-85 years with hypertension diagnosis whose blood pressure is < 140/90 mm Hg) | | | X | X | |
| 0074 | AMA-PCPI | Coronary Artery Disease (CAD): Drug Therapy for Lowering LDL Cholesterol. | | | | X | |
| 0075 | NCQA | Comprehensive Ischemic Vascular Disease Care: Complete Lipid Profile and LDL-C control rates. | | | | X | |
| 0068 | | Use of aspirin or other antithrombotic for Ischemic Vascular Disease | | | | X | |
| 0066 | | ACE Inhibitor or ARB Therapy for Patients with CAD and Diabetes and/or Left Ventricular Systolic Dysfunction (LVSD) | | | | X | |
| 0063 | NCQA | Diabetes: Lipid profile. | | | X | | |
| 0057/ other | NCQA | Hemoglobin A1c testing | | | X | | X |
| 0059 | NCQA | Diabetes: poor control (HbA1C > 9) | | | | X | |
| 0729 | | Diabetes composite (Hemoglobin A1c Control (<8%); Low Density Lipoprotein (<100); Tobacco Non Use; Blood Pressure <140/90; Aspirin Use) | | | | X | |
| 0083 | AMA-PCPI | Heart Failure: Beta-Blocker Therapy for Left Ventricular Systolic Dysfunction (LVSD) | | | | X | |
| | | Annual number of asthma patients (> 1 year-old) with > 1 asthma related ER visit | | | | | X |

**Other**

| NQF ID | Measure owner | Measure name | Core | Transform-ational | Medicaid Adult Core | Medicare ACOs | CHIPRA Core |
|---|---|---|---|---|---|---|---|
| 0403 | NCQA | HIV/AIDS: Annual medical visit. | | | X | | |

**Management of Acute Conditions + Safety**

| NQF ID | Measure owner | Measure name | Core | Transform-ational | Medicaid Adult Core | Medicare ACOs | CHIPRA Core |
|---|---|---|---|---|---|---|---|
| 0002 | NCQA | Appropriate testing for kids with pharyngitis: % of children 2-18 years of age who were diagnosed with pharyngitis, dispensed an antibiotic and received a group A streptococcus (strep) test for the episode | | | | | X |
| | AMA-PCPI | Otitis Media with Effusion - avoidance of inappropriate use of systemic antimicrobials | | | | | X |
| 0298 | | Health Care Acquired Conditions - TBD | X | | | | X (CLABSI) |

**Dental**

| NQF ID | Measure owner | Measure name | Core | Transform-ational | Medicaid Adult Core | Medicare ACOs | CHIPRA Core |
|---|---|---|---|---|---|---|---|
| | CMS (EPSDT) | Preventive dental services: % of eligibles age 1-20 who received preventive service | | | | | X |
| | CMS (EPSDT) | Dental Tx: % of eligibles age 1-20 who received dental treatment services | | | | | X |
| | | Rate of early childhood caries | | X | | | |

**HIT Use / Capacity**

| NQF ID | Measure owner | Measure name | Core | Transform-ational | Medicaid Adult Core | Medicare ACOs | CHIPRA Core |
|---|---|---|---|---|---|---|---|
| | CMS | % of PCPs who successfully qualify for Meaningful Use incentive | | | | X | |

**Efficiency**

| NQF ID | Measure owner | Measure name | Core | Transform-ational | Medicaid Adult Core | Medicare ACOs | CHIPRA Core |
|---|---|---|---|---|---|---|---|
| | | MLR - % of global budget spent on health care and services | X | | | | |

**Equity**

| NQF ID | Measure owner | Measure name | Core | Transform-ational | Medicaid Adult Core | Medicare ACOs | CHIPRA Core |
|---|---|---|---|---|---|---|---|
| | | Improvement on disparities (# TBD) in health status or quality of health care identified by CCO in community needs assessment | | X | | | |

**End-of-Life Care**

| NQF ID | Measure owner | Measure name | Core | Transform-ational | Medicaid Adult Core | Medicare ACOs | CHIPRA Core |
|---|---|---|---|---|---|---|---|
| | | Planning for end-of-life care: % members over 65 with a POLST form or advanced care plan or surrogate decision maker documented /on file (or documented that these were declined) | | X | | | |

*March 1, 2012*                    **Appendix H**

# Federal authority to implement Coordinated Care Organizations (CCO) and Transform Managed Care Organizations (MCO) in Oregon
## Summary

In addition to Oregon's existing waiver authority, the state will work with CMS to determine whether the state needs additional waiver authority to allow the following:

### *Potential new waiver authorities*

| Issue | CFR/SSA Reference |
|---|---|
| • Flexibility to make payment in excess of 105 percent of the approved capitation payments attributable to the enrollees or services covered by the incentive arrangement | 42 CFR § 438.6 |
| • Alternative provider payment methodologies to reimburse on the basis of outcomes and quality, including payment structures that incentivize prevention, person-centered care, and comprehensive care coordination | |
| • Flexibility to create PMPM payments to support Patient Centered Primary Care Homes for the remaining FFS Medicaid/SCHIP populations that do not meet the ACA sec. 2703 multiple chronic condition requirements. *(Oregon has submitted a SPA for the ACA Sec. 2703 population)* | |
| • Latitude to set rates inclusive of non-encounterable medical services (1902(a)(30)) | |
| • Flexibility to provide services that may not always traditionally be reimbursed as a Medicaid State Plan service but help keep people living in the community | |
| • Latitude to set a sustainable fixed rate of per capita cost growth within CCO global budgets | |
| • Flexibility in design, implementation and scoring of performance improvement plans (PIPS) to align with Medicare processes | |
| • An alternative payment methodology for FQHCs to allow a unique FQHC prospective payment system (PPS)/alternative payment methodology (APM) | SSA § 1902(bb) |
| • Expansion of definition of "health care professional" expansion to include naturopathic physicians and other state-licensed providers | 42 CFR § 438.2 |
| • Flexibility for the state to optimize the use of electronic communications to OHP members where written materials are required, at member's request, as well as contractors and providers | 42 CFR §422.128, 208, 210; 42 CFR § 431. 200, 211, 213, 214, 220, 230, CFR § 438. 6, 10, 56, 100, 102, 104, 210, 224, 228, 400-424, 702, 706, 708, |

Exhibit 1
Page 92 of 142
FCI0517218
CTRL_01214878

*March 1, 2012*                           **Appendix H**

| Issue | CFR/SSA Reference |
|---|---|
|  | 722; 42 CFR § 455.1; 42 CFR § 489 |
| • Flexibility in marketing requirements for CCOs that serve Medicaid, Medicare, and commercial populations | 42 CFR § 438.104 |
| • Ability to streamline and simplify due process rights to reflect person-centered primary care and to align Medicaid and Medicare consumer protection processes to the greatest extent possible (1902(a)(3)) | 42 CFR § 438.400-424 42 CFR § 431.244 |
| • Ability to fold non-emergency medical transportation into global budget in first contract year. This program is under a 1915(b) waiver. | 42 CFR § 431.53; SSA § 1915(b) |

## Potential new expenditure authorities

| Issue | CFR/SSA Reference |
|---|---|
| Federal financial participation (FFP) for designated state-funded health care programs (DSHP) |  |
| An additional 6 percentage points in federal medical assistance percentage (FMAP) for current HCBS waivers |  |
| County intergovernmental transfers as partial state match |  |

## Potential changes to 1115 Demonstration Special Terms and Conditions (STC) narrative where no waivers are necessary

- Changes in selection and contracting policies and procedures
- Description of integrated delivery system elements such as coordinated care teams that include non-traditional providers and other workers, and streamlined referral and prior authorization procedures for those who use specialty care
- Network adequacy criteria
- Medicaid enrollment processes applicable to clients eligible for both Medicaid and Medicare under current waiver authority
- Changes in Medicaid appeals and other consumer protections processes to integrate with Medicare protections
- The Medicaid impact of the streamlining of Medicare/Medicaid EQRO reviews

## Medicaid State Plan Amendments related to Health Systems Transformation

- Non-traditional workforce – e.g. CHW, personal health navigators, peer wellness specialists and doulas
- Patient-centered primary care homes (PCPCH)
- To restructure the FQHC alternative payment system (APM) under the CCO structure

Exhibit 1
Page 93 of 142
FCI0517219
CTRL_01214878

*March 1, 2012*

**Appendix I**                **Federal authority to implement Coordinated Care Organizations (CCO) and**

**Transform Managed Care Organizations (MCO) in Oregon[1]**

| Issue | Change needed- Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| **CCO selection and contracting** | • Request for Applications (RFA) much like the process developed by the federal government for Medicare Advantage plans<br>• Ability to contract with CCO entity, adding the CCO delivery system to the State's current managed care delivery system | • 42 CFR 431.50– Statewide-ness and uniformity<br>• 42 CFR § 431.51– freedom of choice | • State has a *waiver in place* (of 42 CFR 431.50) for contracting with managed care entities and other insurers.<br>• State believes this would apply to CCOs.<br>• State has a *waiver in place* (of 42 CFR 431.50) to allow local variation in service delivery. | • *State's 1115 Demonstration Special Terms and Conditions will reflect changes in selection and contracting policies and procedures.* | | State will address selection and contracting provisions in Request for Application (RFA) approval process. |

---

[1] The preamble to 42 CFR, part 438, specifies that states that had 1115 Demonstrations in place prior to the passage of the Balanced Budget Act (1997) and part 438, and whose waivers have continued to be renewed, will have continuing waiver authority under the ongoing demonstrations. Thus, Oregon will not need additional waivers of part 438 provisions that are covered by previous waiver authority under the SSA or parts other than 438 of the Code of Federal Regulations (CFR). The state must act in accordance with provisions in part 438 that are not currently waived, or seek additional waivers if necessary.

FCI0517220
CTRL_01214878

Exhibit 1
Page 94 of 142

March 1, 2012

| Issue | Change needed- Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| **Delivery systems**<br>• Inclusive physical,<br><br>• Integrated care,<br>  ○ Hospital care<br>  ○ Specialty care<br>  ○ Services provided<br><br><br><br><br>  ○ Patient-centered | • Single integrated, inclusive systems<br>• CCO prioritizes working with members with high health care needs, multiple chronic conditions, mental illness or chemical dependency.<br>• Patient-centered primary care homes (PCPCH)<br>• Ability to establish per member/per month (pm/pm) payment for care coordination under PCPCH for clients who do not experience multiple chronic conditions (as described in the ACA, section 2703)<br>• Use of non-traditional workforce | • 42 CFR 431.51– Freedom of choice<br>• SSA § 1902(a)(10)– services required<br>• 42 CFR § 438.12 provider discrimination prohibited<br>• 42 CFR §438.608 and §610– program integrity<br>• 42 CFR § 438.2– definitions | • State has a *waiver in place* (of 42 CFR 431.51) to allow:<br>  ○ Mandatory enrollment and auto-enrollment in managed care delivery system;<br>  ○ State to define the types of insurers to include in the delivery system; and<br>  ○ State to offer Federally Qualified Health Center (FQHC) and Rural Health Clinic (RHC) services only where available | • *Potential 1115 Demonstration amendment* to allow PMPM payments to support Patient Centered Primary Care Homes for Medicaid/SCHIP populations that do not meet the ACA sec. 2703 multiple chronic condition requirements as described in the ACA, section 2703<br>• as described in the ACA, section 2703.<br>• *State's 1115 Demonstration Special Terms and Conditions will reflect* | • Patient-centered primary care homes (PCPCH) – (SPA submitted)<br>• Non-traditional workforce – e.g. CHW, personal health navigators, peer wellness specialists and doulas (SPA in progress) | |

FCI0517221
CTRL_01214878

Exhibit 1
Page 95 of 142

*March 1, 2012*

| Issue | Change needed- Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| (PCPCH)<br>o Care coordination<br>o Special continuity of care services for vulnerable populations | • Flexibility for local system design elements and local governance based on community needs assessments | • 42 CFR § 438.214– provider selection, credentialing and non-discrimination<br>• 42 CFR § 440.168– Primary care case management | through managed care providers.<br>• State has a *waiver in place* (of 42 CFR 431.50) to allow local variation in service delivery. | the description of integrated delivery system elements such as coordinated care teams that include non-traditional providers and other workers and streamlined referral and prior authorization procedures for those needing specialty care. | | |
| **Global budget**<br>• Integrated funding for physical, dental, mental health and chemical dependency, possibly to include other Medical Assistance programs– e.g. School-Based | • Development of rates in tandem with CCOs based on spending and anticipated shared savings<br>• Plan and provider accountability<br>• Multiple integrated | • 42 CFR § 438.6– actuarial soundness– Capitation rates must not include | | • *Potential 1115 Demonstration amendment* to integrate funding<br>• *Potential 1115 Demonstration amendment* due to | • State has a SPA in progress to restructure the | • Pre-approval of rate-setting methodology would serve as the basis for the Global Budget. |

FCI0517222<br>CTRL_01214878

Exhibit 1
Page 96 of 142

March 1, 2012

| Issue | Change needed- Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| Health Center Services, Babies First!, Maternity Case Management, non-emergency medical transportation | funding sources<br>• Ability to pay for non-encounterable medical services – expanded understanding of *actuarial soundness*<br>• Blended Medicare and Medicaid funding through 3-way contract for dually eligible individuals<br>• Ability to establish per member/per month (pm/pm) payment for care coordination under PCPCH for clients who do not experience multiple chronic conditions as described in the ACA, section 2703 | services plans perform outside contract.<br>• 42 CFR § 436.6– certification of MCO data for rate setting<br>• SSA § 1905(a)– services eligible for reimbursement<br>• SSA § 1902(bb)– payments to FQHCs/RHCs<br>• 42 CFR § 433.51–funds | | unique FQHC Prospective payment system (PPS) and Alternative payment methodology (APM)<br>• *Potential 1115 Demonstration amendment* to allow PM/PM care coordination payments to PCPCH providers (outside of PCCM regulations) for providers serving PCPCH clients who do not experience multiple chronic conditions as described in the ACA, section 2703 | FQHC Alternative Payment System (APM) under the CCO structure. | |

FCI0517223
CTRL_01214878

Exhibit 1
Page 97 of 142

*March 1, 2012*

| Issue | Change needed-Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| | | from units of government | | | | |
| **Global budget**<br>• Financial solvency, including reinsurance and reserves | • Financial solvency requirements–State is considering brokering re-insurance or stop-loss insurance. | • 42 C.F.R. § 434.50–protection against insolvency<br>• 42 CFR § 438.116–solvency standards | • No new federal authority necessary<br>• State will require CCOs to comply with federal solvency standards. | | | • State will address financial solvency provisions in CCO contracts for approval by CMS. |
| **Global budget**<br>Risk arrangements | • CCOs are expected to have comprehensive risk contracts.<br>• State is considering potential options for risk-sharing arrangements. | • 42 CFR § 434.20 and 21–basic HMO and PHP rules and contract requirements<br>• SSA § | State has current federal CNOM (costs not otherwise matchable) authority under 42 CFR § 434.20 and 21 for State to contract for comprehensive services on a prepaid *or other risk* | | | |

FCI0517224
CTRL_01214878

Exhibit 1
Page 98 of 142

*March 1, 2012*

| Issue | Change needed-Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| | | 1902(a)(30): Payments must be consistent with efficiency, economy, and quality of care.<br>• 42 CFR § 438.6(b)– comprehen-sive risk contracts | basis. | | | |
| **Global Budget**<br>Incentive payments to CCOs for performance of infrastructure development, measurement and reporting of clinical practices and quality measures, and | • Ability to provide existing MCOs and potential CCOs with the incentive and resources to operationalize the CCO care model<br>• Ability to shift the basis | 42 CFR § 438.6 | | *Potential 1115 Demonstration amendment* to allow for payment in excess of 105 percent of the approved capitation payments attributable to the | | |

FCI0517225<br>CTRL_01214878

Exhibit 1
Page 99 of 142

*March 1, 2012*

| Issue | Change needed-Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| enrollee health outcomes | of payment over time from the provision of service to the attainment of health outcomes.<br><br>• | | | enrollees or services covered by the incentive arrangement.<br><br>*State's Special Terms and Conditions will reflect* the principles for CCO incentives and procedures for developing benchmarks and incentive payments. | | |
| **Global Budget**<br>Alternative payment methodologies – CCOs to providers | • Alternative provider payment methodologies to reimburse on the basis of outcomes and quality<br>• Payment structures that incentivize prevention, person-centered care, and comprehensive care coordination | • SSA § 1902(a)(30)<br>• 42 CFR § 430–grants to states for Medical Assistance<br>• 42 CFR § 438.6– | | • *Potential 1115 Demonstration amendment* to allow flexibility in alternative payment methodologies<br>• *State's 1115 Demonstration* | | |

FCI0517226
CTRL_01214878

Exhibit 1
Page 100 of 142

*March 1, 2012*

| Issue | Change needed-Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| | | contract requirements | | *Special Terms and Conditions will reflect new methodologies.* | | |
| **Global Budget**<br>Non-emergency medical transportation (NEMT) | Explore the possibility of folding NEMT into global budget in first contract year | • 42 CFR § 431.53<br>• SSA § 1915(b<br><br>This program is under a 1915(b) waiver. | | | | *The state would like to explore with CMS the possibility of folding NEMT into the global budget during the first contract year.* |
| **Network adequacy** | • Revised criteria for network adequacy to more closely align with Medicare and use of team-based person-centered primary care<br>• Fully integrated care across physical, dental, mental health and chemical dependency.<br>• Inclusion of non-traditional workforce e.g. | • 42 CFR § 438.206– availability of services and credentialed providers; responsibili-ties of health care professionals | | • *State's 1115 Demonstration Special Terms and Conditions will reflect network adequacy criteria.* | • Patient-centered primary care homes (PCPCH) – (SPA submitted)<br>• Non-traditional workforce – e.g. Community Health Workers (CHW) (SPA in progress) | |

FCI0517227
CTRL_01214878

Exhibit 1
Page 101 of 142

*March 1, 2012*

| Issue | Change needed-Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| | Community Health Workers and Healthcare Navigators | | | | | |
| **Eligibility/enrollment**<br>• Mandatory<br>• Auto<br>• Choice of plan<br>• Lock-in | No changes to current eligibility and enrollment policies and procedures | • 42 CFR § 431.51– freedom of choice<br>• 42 § 438.52– choice of plan<br>• 42 CFR § 438.50(f)(2)– equitable distribution of enrollees<br>• 42 CFR §438.6– contract requirements<br>• 42 CFR §438.10– required | • State has a *waiver in place (of 42 CFR 431.51)* to allow mandatory managed care enrollment, auto-enrollment without choice of plan, and lock-in for Medicaid-eligible populations, including for those dually eligible for Medicaid and Medicare.<br>• State will continue to provide choice among providers in plan. | • *State's 1115 Demonstration Special Terms and Conditions will describe* Medicaid enrollment processes applicable to clients eligible for both Medicaid and Medicare. | | • Medicare enrollment will be addressed in duals demonstration MOU/3-way contracts |

FCI0517228
CTRL_01214878

Exhibit 1
Page 102 of 142

*March 1, 2012*

| Issue | Change needed-Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| | | information, including available providers | | | | |
| **Consumer protections**<br>• Access<br>• Grievances, Appeals,<br>• Hearings<br>• Accessibility<br>• Cultural/linguistic appropriateness | • Ability to streamline and simplify due process rights such as complaints, appeals, and grievances to reflect person-centered primary care<br>• Ability to have Medicaid consumer protection processes come more in line with the Medicare process–e.g. require clients to go through plan-level appeal prior to seeking a state fair hearing | • 42 CFR § 431.244– hearing decisions<br>• 42 CFR § 438 Part F<br>• 42 CFR § 438.206– availability of services and credentialed providers<br>• § 438.207– assurances of adequate capacity<br>• § 438.208– coordination/ | | • *Potential 1115 Demonstration amendment* to allow state to integrate Medicaid and Medicare processes<br>• *State's 1115 Demonstration Special Terms and Conditions will reflect changes in Medicaid appeals and other consumer protections processes to more closely align with Medicare.* | | • State will make internal modifications to the Medicaid program's grievance and appeals processes to align with Medicare.<br>• State will continue to comply with 42 CFR § 438 Part F. |

FCI0517229
CTRL_01214878

Exhibit 1
Page 103 of 142

*March 1, 2012*

| Issue | Change needed-Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| | | continuity of care <br> • § 438.209– direct access to specialists <br> • § 438.210– coverage and authorization <br> • § 438.228– grievance systems | | | | |
| **Benefits** <br> • Benefit package that integrates physical, dental , mental health and chemical dependency services [2] | • Latitude to include non-encounterable medical services | • SSA § 1902(a)(10)(A); 1902(B) <br> • 42 CFR § 440.230-250– sufficiency of amount, | State has a *waiver in place* (of 42 CFR 440.230-250) to: <br> • Use the Prioritized List of Health Services. <br> • Offer different | • *Potential 1115 Demonstration amendment* to include non-encounterable medical services in capitation rates. | | |

---

[2] There will be a separate long-term care benefit that will not be under CCO)s.

FCI0517230
CTRL_01214878

Exhibit 1
Page 104 of 142

*March 1, 2012*

| Issue | Change needed- Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| | | duration, and scope<br>• 42 CFR § 400-424- grievances and appeals<br>• 42 CFR § 438.6(c)– services in addition to those covered under the State Plan that cannot be included when determining payment rates | benefits to different populations. | • State's 1115 Demonstration Special Terms and Conditions will reflect changes in scope of capitation payments. | | |
| Quality improvement/assu- | • Ability to streamline and consolidate, including alignment of Medicaid | • 42 CFR § 438.206<br>• 42 CFR §§ | | • State's 1115 Demonstration Special Terms and | | PIP requirements will be included in the 3-way contract to |

FCI0517231
CTRL_01214878

Exhibit 1
Page 105 of 142

March 1, 2012

| Issue | Change needed- Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| rance reporting<br>• Performance improvement plans (PIP)<br>• Quality incentives, including physician incentives | and Medicare requirements for quality assurance and performance improvement, including performance incentives<br>• Flexibility in validation of performance improvement plans (PIP) and required protocols used by External Quality Review Organizations (EQRO) | 438.200-204, 438.240 (a)(2) and (d), 438.364 and 438.358– validation of PIPs and protocols for EQROs<br>• 42 CFR § 438.240 (a)(2)–PIP topics<br>• 42 CFR § 438.310– EQRO requirements<br>• 42 CFR § 417.479(i)– physician incentive requirements | | *Conditions will reflect State flexibility in establishing an integrated quality/ performance improvement program for CCOs with efficient and effective EQRO protocols and standards that meet Medicare and Medicaid requirements for external quality reviews.*<br>• *State's 1115 Demonstration Special Terms and Conditions will reflect the Medicaid impact of the streamlining of* | | combine the Medicare and state review of PIPs in order to streamline quality administration. |

FCI0517232
CTRL_01214878

Exhibit 1
Page 106 of 142

*March 1, 2012*

| Issue | Change needed- Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| | | (422.208-Medicare) | | Medicare/ Medicaid PIP reviews. | | |
| **Workforce**<br>• Non-traditional | • Ability to use a non-traditional workforce such as Community health workers, personal health navigators, peer wellness specialists and doulas<br>• Ability for State to determine qualification and certification standards.<br>• Expand definition of "health care professional" to include naturopathic physicians, acupuncturists, and other licensed providers. | • SSA §1905(a) 42 USC § 1396–services<br>• 42 CFR § 438.2– definition of health care professional<br>• 42 CFR § 438.6 and § 438.206-210 health care professional<br>• 42 CFR § 38.12– provider non-discrimination | | *Potential 1115 Demonstration amendment* to expand the definition of "health care professional" in 42 CFR § 438.2 to include naturopathic physicians and other state-licensed providers | SPA to provide authority for payment for non-traditional workforce – e.g. CHW, personal health navigators, peer wellness specialists and doulas – (SPA in progress) | |

FCI0517233
CTRL_01214878

Exhibit 1
Page 107 of 142

*March 1, 2012*

| Issue | Change needed- Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| **Administrative Simplification and regulatory relief** | **Fraud and Abuse**<br>• Ability for CCOs and their provider networks to work within antitrust, Stark, anti-kickback and Civil Monetary Penalty Laws<br>• Ability to implement administrative simplification and streamlining strategies in areas such as reporting requirements, coordination of managed care reporting to multiple state regulatory agencies and encounter data | • SSA § 1877<br>• 42 CFR §411– Stark physician referral law<br>• 41 U.S.C. § 51–anti-kickback law<br>• 42 CFR § 438.416– managed care reporting requirements<br>• 42 CFR § 438.210– managed care communica-tion with clients | | | | Pursuant to Section 17 of HB 3650, State may seek from the DHHS OIG:<br>• Waivers or expansion of safe harbors related to the anti-kickback statutes, and<br>• Waiver of or exemption from Stark laws as necessary to permit certain physician referrals related to integrated care and formation of CCOs. |

FCI0517234
CTRL_01214878

Exhibit 1
Page 108 of 142

*March 1, 2012*

| Issue | Change needed- Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| **Communications and Marketing** | Flexibility in marketing requirements for CCOs that serve Medicaid, Medicare and commercial populations. | Marketing activities: 42 CFR § 438.104—restrictions on marketing by MCOs<br><br>Communications: 42 CFR §422.128, 208, 210<br><br>42 CFR § 431. 200, 211, 213, 214, 220, 230,<br><br>42 CFR § 438. 6, 10, 56, 100, 102, 104, 210, 224, 228, 400-424, 702, 706, 708 | *Potential 1115 Demonstration amendment to provide marketing latitude for CCOs that would not violate Medicaid restrictions.* | • *State's 1115 Demonstration Special Terms and Conditions will reflect CCO marketing protocols.*<br>• *State's 1115 Demonstration Special Terms and Conditions will reflect optimal use of electronic communications, including to OHP consumers, with consumer's permission.* | | The MOU and 3-way contract will determine marketing rules. |

FCI0517235
CTRL_01214878

Exhibit 1
Page 109 of 142

*March 1, 2012*

| Issue | Change needed- Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| **Federal Financial Participation (FFP)** Selected state designated health programs (DSHP) | Ability to receive federal financial participation (FFP) for certain state-funded health care programs | SSA § 1115(a) | | *Costs not otherwise matchable authority (CNOM) under SSA § 1115(a) for federal financial participation (FFP)* | | |

FCI0517236
CTRL_01214878

Exhibit 1
Page 110 of 142

*March 1, 2012*

| Issue | Change needed-Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| **Federal Financial Participation (FFP)** Home and Community Based Services (HCBS) programs | An additional 6 percentage points in federal medical assistance percentage (FMAP) for current HCBS waivers, including: <br>• Aged and physically disabled waiver <br>• DD comprehensive services waiver <br>• DD support services waiver <br>• DD children's model waivers | | | | | |

FCI0517237
CTRL_01214878

Exhibit 1
Page 111 of 142

*March 1, 2012*

| Issue | Change needed- Medicaid | Applicable federal Medicaid law or regulation | Medicaid authority | | | Other/ Comments |
|---|---|---|---|---|---|---|
| | | | Current 1115 Demonstration | Potential 1115 Demonstration amendment or change to Special Terms and Conditions (STC) | State Plan Amendments (SPA) | |
| **Financial Participation** County funds to be used for portion of state' matchable funds | Flexibility to accept local county funds for state match | | | | | |

FCI0517238
CTRL_01214878

Exhibit 1
Page 112 of 142

*March 1, 2012*

## Citations from the Code of Federal Regulations (CFR) and the Social Security Act

| References to 42 CFR § 438 | Other CFR references | Social Security Act references |
|---|---|---|
| • 42 CFR § 438.2–Definitions<br>• 42 CFR § 438.6– Contract requirements; actuarial soundness; entities eligible for comprehensive risk contracts; certification of MCO data for rate setting; services not covered under state plan<br>• 42 CFR §438.10–Required information, including available providers<br>• 42 CFR § 438.12 Provider discrimination prohibited<br>• 42 CFR § 438.50(f)(2)–Equitable distribution of enrollees<br>• 42 § 438.104–Marketing activities<br>• 42 CFR § 438.116–Solvency standards<br>• 42 CFR §§ 438.204–Elements of state quality strategies<br>• 42 CFR § 438.206 – Availability of services and credentialed providers; responsibili-ties of health care professionals<br>• 42 CFR § 438.207–Assurances of adequate capacity<br>• 42 CFR § 438.208–Coordination/ continuity of care<br>• 42 CFR § 438.209–Direct access to specialists<br>• 42 CFR § 438.210–Coverage and authorization; communications with clients; EQRO requirements<br>• 42 CFR § 438.240 (a)(2)–PIP topics<br>•  42 CFR §§ 438.608 and 610–program integrity<br>• 42 CFR § 438.228–Grievance systems<br>• 42 CFR § 438.240–Quality assessment and program performance improvement<br>• 42 CFR § 438.416–Managed care reporting requirements<br>• 42 CFR § 438. 6, 10, 56, 100, 102, 104, 210, 224, 228, 400-424, 702, 706, 708–Member communications | • 42 C.F.R. § 430– Grants to states for Medical Assistance programs<br>• 42 CFR § 431.51–Freedom of choice; funds from units of government<br>• 42 CFR § 434.20 and 21–Basic HMO and PHP rules and contract requirements<br>• 42 C.F.R. § 434.50–Protection against insolvency<br>• 42 CFR § 417.479(i)–Physician incentive requirements (422.208-Medicare)<br>• 42 CFR §422.128, 208, 210; 42 CFR § 431. 200, 211, 213, 214, 220, 230–Communications<br>• 42 CFR § 431.53 | • SSA § 1902(a)(10)(A)–Services required<br>• SSA § 1902(a)(10)(B)–Amount, duration and scope<br>• SSA § 1902(bb)–Payments to FQHCs/RHCs<br>• SSA § 1905(a)–Services eligible for reimbursement<br>• SSA § 1115(a)–costs not otherwise matchable (CNOM) authorities<br>• SSA § 1915(b |

FCI0517239
CTRL_01214878

Exhibit 1
Page 113 of 142

March 1, 2012
**Appendix J**

Exhibit 2.1
Base Model
OHP Section 1115 Demonstration
Summary In Total Funds

| Federal Fiscal Year | | Neutrality Ceiling | | Actual/Projected Expenditures | | Surplus/Deficit |
|---|---|---|---|---|---|---|
| **Original Waiver Period** | | | | | | |
| 1994 Actual | $ | 390,951,750 | $ | 346,190,634 | $ | 44,761,116 |
| 1995 Actual | $ | 818,988,036 | $ | 827,254,935 | $ | (8,266,899) |
| 1996 Actual | $ | 892,465,451 | $ | 885,011,152 | $ | 7,454,299 |
| 1997 Actual | $ | 1,040,624,108 | $ | 895,762,310 | $ | 144,861,798 |
| 1998 Actual | $ | 1,224,165,720 | $ | 1,051,592,807 | $ | 172,572,913 |
| Jan-99 | $ | 112,450,962 | $ | 95,260,442 | $ | 17,190,520 |
| Total Original Waiver | $ | 4,479,646,027 | $ | 4,101,072,280 | $ | 378,573,747 |
| **First Waiver Extension (beginning February 1999)** | | | | | | |
| 1999 Actual (Feb - Dec) | $ | 1,236,961,227 | $ | 1,071,151,312 | $ | 165,809,915 |
| 2000 Actual | $ | 1,448,108,685 | $ | 1,275,376,104 | $ | 172,732,581 |
| 2001 Projection (1) | $ | 1,602,109,256 | $ | 1,398,528,881 | $ | 203,580,375 |
| Jan-02 | $ | 152,138,992 | $ | 132,715,597 | $ | 19,423,395 |
| Total First Waiver Extension | $ | 4,439,318,160 | $ | 3,877,771,894 | $ | 561,546,266 |
| **Second Waiver Extension (beginning February 2002)** | | | | | | |
| 2002 Actuals (Feb to Sept) | $ | 1,253,756,577 | $ | 1,051,310,479 | $ | 202,446,098 |
| **OHP2 Waiver Amendment** | | | | | | |
| DY 1 (FFY 03 Actual) | $ | 1,987,913,110 | $ | 1,542,201,604 | $ | 445,711,506 |
| DY 2 (FFY 04 Actual) | $ | 2,093,044,450 | $ | 1,494,082,316 | $ | 598,962,134 |
| DY 3 (FFY 05 Actual) | $ | 2,278,562,238 | $ | 1,733,929,530 | $ | 544,632,708 |
| DY 4 (FFY 06 Actual) | $ | 2,454,368,136 | $ | 1,558,038,076 | $ | 896,330,060 |
| DY 5 (FFY 07 Actual) | $ | 2,588,680,697 | $ | 1,488,456,119 | $ | 1,100,224,578 |
| Total Second Waiver | $ | 11,402,568,631 | $ | 7,816,707,645 | $ | 3,585,860,986 |
| **OHP2 Waiver Extension** | | | | | | |
| DY 6 (FFY 08 Actual) | $ | 3,047,303,332 | $ | 1,980,350,291 | $ | 1,066,953,041 |
| DY 7 (FFY 09 Actual) | $ | 3,210,937,225 | $ | 1,857,765,840 | $ | 1,353,171,385 |
| DY 8 (FFY 10 Actual ) | $ | 3,882,351,591 | $ | 2,275,008,353 | $ | 1,607,343,238 |
| DY 9 (FFY 11 Actual) | $ | 4,521,446,161 | $ | 2,847,833,594 | $ | 1,673,612,567 |
| DY 10 (FFY 12 Actual/Projection-9 mos) | $ | 3,761,911,867 | $ | 2,075,993,645 | $ | 1,685,918,222 |
| Total OHP2 Waiver Extension | $ | 18,423,950,176 | $ | 11,036,951,723 | $ | 7,386,998,453 |
| **OHP2 Waiver - Health System Transformation** | | | | | | |
| DY 10 (FFY 12 Projection-3 mos) | $ | 1,253,970,622 | $ | 691,997,882 | $ | 561,972,741 |
| DY 11 (FFY 13 Projection) | $ | 5,484,794,646 | $ | 3,101,031,746 | $ | 2,383,762,900 |
| DY 12 (FFY 14 Projection) | $ | 7,144,866,029 | $ | 4,031,369,406 | $ | 3,113,496,623 |
| DY 13 (FFY 15Projection) | $ | 8,206,432,253 | $ | 4,736,820,942 | $ | 3,469,611,311 |
| DY 14 (FFY 16 Projection) | $ | 9,109,244,685 | $ | 5,227,654,170 | $ | 3,881,590,515 |
| DY 15 (FFY 17Projection) | $ | 10,084,599,193 | $ | 5,756,796,180 | $ | 4,327,803,013 |
| Total Waiver Extension | $ | 41,283,907,428 | $ | 23,545,670,326 | $ | 17,738,237,103 |
| Cumulative Total | $ | 81,283,146,999 | $ | 51,429,484,347 | $ | 29,853,662,652 |

Exhibit 1
Page 114 of 142
FCI0517240
CTRL_01214878

March 1, 2012

Appendix J

Exhibit 1921
Base Model
OHP Section 1115 Demonstration
Allowable Expenditures
In Total Funds

| With Requested Trends Using Actual and Projected Member Months | Actual DY 10 | Projection DY 11 | Projection DY 12 | Projection DY 13 | Projection DY 14 | Projection DY 15 |
|---|---|---|---|---|---|---|
| | FFY 12 | FFY 13 | FFY 14 | FFY 15 | FFY 16 | FFY 17 |
| **MEMBER MONTHS** | | | | | | |
| **Base Populations Member Months (1)** | | | | | | |
| AFDC | 2,224,527 | 2,272,493 | 2,207,540 | 2,251,669 | 2,296,680 | 2,342,591 |
| PLM-W | 159,316 | 154,106 | 157,630 | 161,890 | 166,266 | 170,760 |
| PLM-C | 1,779,064 | 1,796,580 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 |
| Old Age Assistance | 425,497 | 447,480 | 468,617 | 489,363 | 511,029 | 533,654 |
| Aid to Blind/Disabled | 973,761 | 1,033,516 | 1,208,233 | 1,295,406 | 1,388,868 | 1,489,074 |
| Foster Care & SAC | 220,238 | 217,037 | 240,391 | 245,236 | 250,179 | 255,221 |
| New Mandatory Adults (ACA) | - | - | 1,728,000 | 2,400,000 | 2,550,000 | 2,700,000 |
| Total Base | 5,782,403 | 5,921,212 | 7,810,411 | 8,643,564 | 8,963,022 | 9,291,300 |
| **Expansion Member Months (2)** | | | | | | |
| General Assistance | | | | | | |
| Parents | 249,052 | 268,092 | | | | |
| Adults/Couples | | | | | | |
| FHIAP - All Title XIX | | | | | | |
| FHIAP - Existing | | | | | | |
| FHIAP - Medicaid | 9,849 | 8,698 | - | - | - | - |
| FHIAP - Non-Medicaid | | | | | | |
| Total Expansion | 258,901 | 276,790 | - | - | - | - |
| **Total Member Months** | 6,041,305 | 6,198,002 | 7,810,411 | 8,643,564 | 8,963,022 | 9,291,300 |
| **ALLOWED PER MEMBER PER MONTH COSTS (PMPM)** | | | | | | |
| *National Health Expenditures Growth Rate* | CMS Approved PMPM | CMS Approved PMPM | 8.30% | 5.90% | 6.30% | 6.00% |
| **Base Population PMPM** | | | | | | |
| AFDC | $ 474.53 | $ 503.95 | $ 545.78 | $ 577.98 | $ 614.39 | $ 651.25 |
| PLM-W | $ 1,806.87 | $ 1,917.09 | $ 2,076.21 | $ 2,198.70 | $ 2,337.22 | $ 2,477.46 |
| PLM-C | $ 691.61 | $ 734.48 | $ 795.44 | $ 842.37 | $ 895.44 | $ 949.17 |
| Old Age Assistance | $ 602.15 | $ 632.26 | $ 684.74 | $ 725.14 | $ 770.82 | $ 817.07 |
| Aid to Blind/Disabled | $ 1,959.64 | $ 2,073.30 | $ 2,245.38 | $ 2,377.86 | $ 2,527.67 | $ 2,679.33 |
| Foster Care & SAC | $ 830.04 | $ 881.50 | $ 954.66 | $ 1,010.99 | $ 1,074.68 | $ 1,139.16 |
| New Mandatory Adults (ACA) | $ - | $ - | $ 531.05 | $ 562.38 | $ 597.81 | $ 633.68 |

Exhibit 1
Page 115 of 142
FCI0517241
CTRL_01214878

Appendix J

Base Model
OHP Section 1115 Demonstration
Allowable Expenditures
In Total Funds

| With Requested Trends Using Actual and Projected Member Months | Actual DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| **Expansion Population PMPM** | | | | | | |
| General Assistance | | | | | | |
| Parents | $ 367.33 | $ 389.74 | | | | |
| Adults/Couples | | | | | | |
| FHIAP - All Title XIX | | | | | | |
| FHIAP - Existing | | | | | | |
| FHIAP - Medicaid | $ 332.13 | $ 352.72 | $ - | $ - | $ - | $ - |
| FHIAP - Non-Medicaid | | | | | | |
| | | | | | | |
| **TOTAL ALLOWABLE EXPENDITURES ( Member Months x PMPM)** | | | | | | |
| | | | | | | |
| **Base Population Expenditures** | | | | | | |
| AFDC | 1,055,604,797 | $ 1,145,222,847 | $ 1,204,826,435 | $ 1,301,416,819 | $ 1,411,060,450 | $ 1,525,623,840 |
| PLM-W | 287,863,302 | $ 295,435,072 | $ 327,272,741 | $ 355,948,315 | $ 388,600,748 | $ 423,050,482 |
| PLM-C | 1,230,418,455 | $ 1,319,552,078 | $ 1,431,795,312 | $ 1,516,271,235 | $ 1,611,796,323 | $ 1,708,504,103 |
| Old Age Assistance | 256,213,019 | $ 282,923,705 | $ 320,879,671 | $ 354,855,265 | $ 393,911,749 | $ 436,032,662 |
| Aid to Blind/Disabled | 1,908,221,005 | $ 2,142,788,723 | $ 2,712,946,926 | $ 3,080,296,119 | $ 3,510,595,572 | $ 3,989,715,931 |
| Foster Care & SAC | 182,806,348 | $ 191,318,116 | $ 229,492,754 | $ 247,931,071 | $ 268,862,882 | $ 290,738,315 |
| New Mandatory Adults (ACA) | - | $ - | $ 917,652,190 | $ 1,349,713,429 | $ 1,524,416,961 | $ 1,710,933,860 |
| Total Base | 4,921,126,926 | $ 5,377,240,541 | $ 7,144,866,029 | $ 8,206,432,253 | $ 9,109,244,685 | $ 10,084,599,193 |
| | | | | | | |
| **Expansion Population Expenditures** | | | | | | |
| General Assistance | - | $ - | $ - | $ - | $ - | $ - |
| Parents | $ 91,484,271 | $ 104,486,176 | $ - | $ - | $ - | $ - |
| Adults/Couples | $ - | $ - | $ - | $ - | $ - | $ - |
| FHIAP - All Title XIX | $ - | $ - | $ - | $ - | $ - | $ - |
| FHIAP - Existing | $ - | $ - | $ - | $ - | $ - | $ - |
| FHIAP - Medicaid | $ 3,271,292 | $ 3,067,929 | $ - | $ - | $ - | $ - |
| FHIAP - Non-Medicaid | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Expansion | $ 94,755,563 | $ 107,554,105 | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Additional Health Services Expenditures** | | | | | | |
| | | | | | | |
| **Total Base + Expansion Allowable Expenditures** | $ 5,015,882,489 | $ 5,484,794,646 | $ 7,144,866,029 | $ 8,206,432,253 | $ 9,109,244,685 | $ 10,084,599,193 |

\* As of November 1st, 2007; General Assistance, Adults/Couples, FHIAP Non-Medicaid & FHIAP Existing, do not count toward Allowable Expenditures.

Exhibit 1
Page 116 of 142
FCI0517242
CTRL_01214878

Exhibit 2.3
Base Model
OHP Section 1115 Demonstration
Actual and Projected Demonstration Expenditures

| | Actual DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| **MEMBER MONTHS** | | | | | | |
| | | | | | | |
| **Base Populations Member Months (1)** | | | | | | |
| AFDC | 2,224,527 | 2,272,493 | 2,207,540 | 2,251,669 | 2,296,680 | 2,342,591 |
| PLM-W | 159,316 | 154,106 | 157,630 | 161,890 | 166,266 | 170,760 |
| PLM-C | 1,779,064 | 1,796,580 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 |
| Old Age Assistance | 425,497 | 447,480 | 468,617 | 489,363 | 511,029 | 533,654 |
| Aid to Blind/Disables | 973,761 | 1,033,516 | 1,208,233 | 1,295,406 | 1,388,868 | 1,489,074 |
| Foster Care & SAC | 220,238 | 217,037 | 240,391 | 245,236 | 250,179 | 255,221 |
| New Mandatory Adults (ACA) | - | - | 1,728,000 | 2,400,000 | 2,550,000 | 2,700,000 |
| **Total Base** | 5,782,403 | 5,921,212 | 7,810,411 | 8,643,564 | 8,963,022 | 9,291,300 |
| | | | | | | |
| **Expansion Member Months (2)** | | | | | | |
| General Assistance (3) | | | | | | |
| Parents | 249,052 | 268,092 | | | | |
| Adults/Couples (3) | | | | | | |
| FHIAP - All Title XIX | | | | | | |
| FHIAP - Existing (3) | | | | | | |
| FHIAP - Medicaid | 9,849 | 8,698 | - | - | - | - |
| FHIAP - Non-Medicaid | | | | | | |
| **Total Expansion** | 258,901 | 276,790 | - | - | - | - |
| | | | | | | |
| **Non-Allowable Expansion Population Member Months** | | | | | | |
| General Assistance | | - | - | - | - | - |
| Adults/Couples | 491,298 | 420,011 | - | - | - | - |
| FHIAP - Existing | 2,995 | 2,777 | - | - | - | - |
| FHIAP – Non-Medicaid | 54,564 | 40,767 | - | - | - | - |
| **Total Non-Allowable Expansion** | 548,857 | 463,555 | - | - | - | - |
| | | | | | | |
| **Total Member Months** | 6,590,164 | 6,661,557 | 7,810,411 | 8,643,564 | 8,963,022 | 9,291,300 |

Exhibit 2.3
Base Model
OHP Section 1115 Demonstration
Actual and Projected Demonstration Expenditures

| | Actual DY 10 FFY 12 | | Projection DY 11 FFY 13 | | Projection DY 12 FFY 14 | | Projection DY 13 FFY 15 | | Projection DY 14 FFY 16 | | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **PER MEMBER PER MONTH COSTS (PMPM) (1)** | | | | | | | | | | | |
| *National Health Expenditures Growth Rate* | | | | | 8.3% | | 5.9% | | 6.3% | | 6.0% |
| | | | | | | | | | | | |
| **Base Populations PMPM** | | | | | | | | | | | |
| AFDC | 286.08 | $ | 285.12 | $ | 308.78 | $ | 327.00 | $ | 347.60 | $ | 368.46 |
| PLM-W | 1,164.12 | $ | 1,162.29 | $ | 1,258.76 | $ | 1,333.03 | $ | 1,417.01 | $ | 1,502.03 |
| PLM-C | 210.06 | $ | 214.85 | $ | 232.68 | $ | 246.41 | $ | 261.93 | $ | 277.65 |
| Old Age Assistance | 188.01 | $ | 177.43 | $ | 192.16 | $ | 203.49 | $ | 216.31 | $ | 229.29 |
| Aid to Blind/Disables | 916.92 | $ | 888.43 | $ | 962.17 | $ | 1,018.94 | $ | 1,083.13 | $ | 1,148.12 |
| Foster Care & SAC | 456.23 | $ | 463.64 | $ | 502.12 | $ | 531.75 | $ | 565.25 | $ | 599.16 |
| New Mandatory Adults (ACA) | | $ | | $ | 531.05 | $ | 562.38 | $ | 597.81 | $ | 633.68 |
| **Expansion Population PMPM** | | | | | | | | | | | |
| General Assistance (3) | $ - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Parents | $ 353.24 | $ | 353.09 | $ | - | $ | - | $ | - | $ | - |
| Adults/Couples (3) | | | | | | | | | | | |
| FHIAP - All Title XIX | | | | | | | | | | | |
| FHIAP - Existing (3) | | | | | | | | | | | |
| FHIAP - Medicaid | $ 23.41 | $ | 31.02 | $ | - | $ | - | $ | - | $ | - |
| FHIAP - Non-Medicaid | | | | | | | | | | | |
| | | | | | | | | | | | |
| **Non-Allowable Expansion Population PMPM** | | | | | | | | | | | |
| General Assistance | $ - | $ | - | $ | - | $ | - | $ | - | $ | - |
| Adults/Couples | $ 579.63 | $ | 577.96 | $ | - | $ | - | $ | - | $ | - |
| FHIAP - Existing | $ 97.21 | $ | 74.79 | $ | - | $ | - | $ | - | $ | - |
| FHIAP - Non-Medicaid | $ 217.09 | $ | 253.35 | $ | - | $ | - | $ | - | $ | - |

Exhibit 1
Page 118 of 142
FCI0517244
CTRL_01214878

Exhibit 2.3
Base Model
OHP Section 1115 Demonstration
Actual and Projected Demonstration Expenditures

| | Actual DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| **TOTAL EXPENDITURES (1)** | | | | | | |
| **Base Populations Expenditures** | | | | | | |
| AFDC | 636,388,175 | $ 647,930,520 | $ 681,655,182 | $ 736,303,130 | $ 798,336,264 | $ 863,152,770 |
| PLM-W | 185,462,153 | $ 179,115,146 | $ 198,418,428 | $ 215,804,384 | $ 235,600,292 | $ 256,486,190 |
| PLM-C | 373,710,983 | $ 386,003,322 | $ 418,828,590 | $ 443,539,477 | $ 471,482,464 | $ 499,771,412 |
| Old Age Assistance | 79,999,681 | $ 79,394,194 | $ 90,047,799 | $ 99,582,496 | $ 110,542,738 | $ 122,362,975 |
| Aid to Blind/Disables | 892,858,666 | $ 918,208,416 | $ 1,162,525,171 | $ 1,319,937,991 | $ 1,504,326,124 | $ 1,709,633,687 |
| Foster Care & SAC | 100,478,248 | $ 100,626,869 | $ 120,705,784 | $ 130,403,773 | $ 141,413,065 | $ 152,919,024 |
| New Mandatory Adults (ACA) | - | $ - | $ 917,652,190 | $ 1,349,713,429 | $ 1,524,416,961 | $ 1,710,933,860 |
| Total Leverages | 113,980,333 | $ 441,536,262 | $ 441,536,262 | $ 441,536,262 | $ 441,536,262 | $ 441,536,262 |
| Total Base | $ 2,382,878,239 | $ 2,752,814,729 | $ 4,031,369,406 | $ 4,736,820,942 | $ 5,227,654,170 | $ 5,756,796,180 |
| **Expansion Population Expenditures** | | | | | | |
| General Assistance (3) | | | | | | |
| Parents | 87,974,422 | 94,660,351 | $ - | $ - | $ - | $ - |
| Adults/Couples (3) | | | | | | |
| FHIAP - All Title XIX | | | | | | |
| FHIAP - Existing (3) | | | | | | |
| FHIAP - Medicaid | $ 230,587 | $ 269,837 | $ - | $ - | $ - | $ - |
| FHIAP - Non-Medicaid | | | | | | |
| Total Expansion | $ 88,205,009 | $ 94,930,188 | $ - | $ - | $ - | $ - |
| **Non-Allowable Expansion Population Expenditures** | | | | | | |
| General Assistance | $ - | $ - | $ - | $ - | $ - | $ - |
| Adults/Couples | 284,771,824 | $ 242,750,746 | - | - | - | - |
| FHIAP - Existing | $ 291,175 | $ 207,723 | $ - | $ - | $ - | $ - |
| FHIAP - Non-Medicaid | $ 11,845,280 | $ 10,328,360 | $ - | $ - | $ - | $ - |
| Total Non-Allowable Expansion | $ 296,908,279 | $ 253,286,829 | $ - | $ - | $ - | $ - |

Print Date: 3/1/2012 11:47 AM    Page 6 of 9    Appendix J-Budget neutrality-Base.xls

Exhibit 1
Page 119 of 142
FCI0517245
CTRL_01214878

Exhibit 2.3
Base Model
OHP Section 1115 Demonstration
Actual and Projected Demonstration Expenditures

| | Actual DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| Additional Health Services Expenditures | | | | | | |
| Health System Transformation Expenditures | | | | | | |
| DSHP | | | | | | |
| Total Base + Expansion Expenditures | $ 2,767,991,527 | $ 3,101,031,746 | $ 4,031,369,406 | $ 4,736,820,942 | $ 5,227,654,170 | $ 5,756,796,180 |

Exhibit 2.3
Base Model
OHP Section 1115 Demonstration
Actual and Projected Demonstration Expenditures

| | Actual DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| | | | | | | |

Exhibit 1
Page 121 of 142

FCI0517247
CTRL_01214878

| | FFY 13 | FFY 14 | FFY 15 | FFY 16 | FFY 17 |
|---|---|---|---|---|---|
| NHE Growth Rate | | 8.30% | 5.90% | 6.30% | 6.00% |

Exhibit 1
Page 122 of 142

FCI0517248
CTRL_01214878

March 1, 2012

**Appendix K**

Exhibit 2.1
Change Model
OHP Section 1115 Demonstration
Summary In Total Funds

| Federal Fiscal Year | Neutrality Ceiling | | Actual/Projected Expenditures | | Surplus/Deficit | |
|---|---|---|---|---|---|---|
| **Original Waiver Period** | | | | | | |
| 1994 Actual | | | | | | |
| 1995 Actual | | | | | | |
| 1996 Actual | | | | | | |
| 1997 Actual | | | | | | |
| 1998 Actual | | | | | | |
| Jan-99 | | | | | | |
| Total Original Waiver | $ | - | $ | - | $ | - |
| **First Waiver Extension (beginning February 1999)** | | | | | | |
| 1999 Actual (Feb – Dec) | | | | | | |
| 2000 Actual | | | | | | |
| 2001 Projection (1) | | | | | | |
| Jan-02 | | | | | | |
| Total First Waiver Extension | $ | - | $ | - | $ | - |
| **Second Waiver Extension (beginning February 2002)** | | | | | | |
| 2002 Actuals (Feb to Sept) | | | | | | |
| **OHP2 Waiver Amendment** | | | | | | |
| DY 1 (FFY 03 Actual) | | | | | | |
| DY 2 (FFY 04 Actual) | | | | | | |
| DY 3 (FFY 05 Actual) | | | | | | |
| DY 4 (FFY 06 Actual) | | | | | | |
| DY 5 (FFY 07 Actual) | | | | | | |
| Total Second Waiver | $ | - | $ | - | $ | - |
| **OHP2 Waiver Extension** | | | | | | |
| DY 6 (FFY 08 Actual) | | | | | | |
| DY 7 (FFY 09 Actual) | | | | | | |
| DY 8 (FFY 10 Actual ) | | | | | | |
| DY 9 (FFY 11 Actual) | | | | | | |
| DY 10 (FFY 12 Actual/Projection) | | | | | | |
| DY 11  (FFY 13 Projection) | | | | | | |
| DY 12 (FFY 14 Projection) | | | | | | |
| DY 13 (FFY 15 Projection) | | | | | | |
| DY 14 (FFY 16 Projection) | | | | | | |
| DY 15 (FFY 17 Projection) | | | | | | |
| Total OHP2 Waiver Extension | $ | - | $ | - | $ | - |
| **OHP2 Waiver - Health System Transformation** | | | | | | |
| DY 10 (FFY 12 Projection) | $ | 10,688,104 | $ | 231,535,785 | $ | (220,847,681) |
| DY 11  (FFY 13 Projection) | $ | 140,907,240 | $ | 1,033,271,771 | $ | (892,364,531) |
| DY 12 (FFY 14 Projection) | $ | 235,873,371 | $ | 740,715,774 | $ | (504,842,403) |
| DY 13 (FFY 15 Projection) | $ | 258,774,969 | $ | 435,293,949 | $ | (176,518,980) |
| DY 14 (FFY 16 Projection) | $ | 262,333,774 | $ | (467,652,851) | $ | 729,986,625 |
| DY 15 (FFY 17 Projection) | $ | 263,142,134 | $ | (801,444,836) | $ | 1,064,586,970 |
| Total Waiver Extension | $ | 1,171,719,592 | $ | 1,171,719,592 | $ | (0) |
| Cumulative Total | $ | **1,171,719,592** | $ | **1,171,719,592** | $ | - |

*Oregon Health Plan– Project Numbers 11-W-00160/10 21-W-00013/10*

Exhibit 17
Page 123 of 142

FCI0517249
CTRL_01214878

Change Model
OHP Section 1115 Demonstration
Allowable Expenditures
In Total Funds

| With Requested Trends Using Actual and Projected Member Months | Actual/Projection DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| **MEMBER MONTHS** | | | | | | |
| | | | | | | |
| **Base Populations Member Months (1)** | | | | | | |
| AFDC | | | | | | |
| PLM-W | | | | | | |
| PLM-C | | | | | | |
| Old Age Assistance | | | | | | |
| Aid to Blind/Disabled | | | | | | |
| Foster Care & SAC | | | | | | |
| New Mandatory Adults (ACA) | | | | | | |
| Total Base | - | - | - | - | - | - |
| **Expansion Member Months (2)** | | | | | | |
| | | | | | | |
| General Assistance | | | | | | |
| Parents | | | | | | |
| Adults/Couples | | | | | | |
| FHIAP - All Title XIX | | | | | | |
| FHIAP - Existing | | | | | | |
| FHIAP - Medicaid | | | | | | |
| FHIAP - Non-Medicaid | | | | | | |
| Total Expansion | - | - | - | - | - | - |
| | | | | | | |
| **Total Member Months** | - | - | - | - | - | - |
| | | | | | | |
| **ALLOWED PER MEMBER PER MONTH COSTS (PMPM)** | | | | | | |
| | | | | | | |
| **Base Population PMPM** | | | | | | |
| AFDC | | | | | | |
| PLM-W | | | | | | |
| PLM-C | | | | | | |
| Old Age Assistance | | | | | | |
| Aid to Blind/Disabled | | | | | | |
| Foster Care & SAC | | | | | | |
| New Mandatory Adults (ACA) | | | | | | |

Exhibit 21
Change Model
OHP Section 1115 Demonstration
Allowable Expenditures
In Total Funds

| With Requested Trends Using Actual and Projected Member Months | Actual/Projection DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| **Expansion Population PMPM** | | | | | | |
| General Assistance | | | | | | |
| Parents | | | | | | |
| Adults/Couples | | | | | | |
| FHIAP - All Title XIX | | | | | | |
| FHIAP - Existing | | | | | | |
| FHIAP - Medicaid | | | | | | |
| FHIAP - Non-Medicaid | | | | | | |
| **TOTAL ALLOWABLE EXPENDITURES ( Member Months x PMPM)** | | | | | | |
| **Base Population Expenditures** | | | | | | |
| AFDC | $ - | $ - | $ - | $ - | $ - | $ - |
| PLM-W | $ - | $ - | $ - | $ - | $ - | $ - |
| PLM-C | $ - | $ - | $ - | $ - | $ - | $ - |
| Old Age Assistance | $ - | $ - | $ - | $ - | $ - | $ - |
| Aid to Blind/Disabled | $ - | $ - | $ - | $ - | $ - | $ - |
| Foster Care & SAC | $ - | $ - | $ - | $ - | $ - | $ - |
| New Mandatory Adults (ACA) | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Base | $ - | $ - | $ - | $ - | $ - | $ - |
| **Expansion Population Expenditures** | | | | | | |
| General Assistance | | | | | | |
| Parents | $ - | $ - | $ - | $ - | $ - | $ - |
| Adults/Couples | $ - | $ - | $ - | $ - | $ - | $ - |
| FHIAP - All Title XIX | $ - | $ - | $ - | $ - | $ - | $ - |
| FHIAP - Existing | $ - | $ - | $ - | $ - | $ - | $ - |
| FHIAP - Medicaid | $ - | $ - | $ - | $ - | $ - | $ - |
| FHIAP - Non-Medicaid | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Expansion | $ - | $ - | $ - | $ - | $ - | $ - |
| **Additional Health Services Expenditures** | $ 10,688,104 | $ 140,907,240 | $ 235,873,371 | $ 258,774,969 | $ 262,333,774 | $ 263,142,134 |
| **Total Base + Expansion Allowable Expenditures** | $ 10,688,104 | $ 140,907,240 | $ 235,873,371 | $ 258,774,969 | $ 262,333,774 | $ 263,142,134 |

* As of November 1st, 2007; General Assistance, Adults/Couples, FHIAP Non-Medicaid & FHIAP Existing, do not count toward Allowable Expenditures.

Print Date: 3/1/2012 11:48 AM                    Page 3 of 7                    Appendix K-Budget Neutrality-Change.xls Exhibit 22

Exhibit 1
Page 125 of 142

FCI0517251
CTRL_01214878

Exhibit 2.3
Change Model
OHP Section 1115 Demonstration
Actual and Projected Demonstration Expenditures

| | Actual/Projection DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| **MEMBER MONTHS** | | | | | | |
| **Base Populations Member Months (1)** | | | | | | |
| AFDC | | | | | | |
| PLM-W | | | | | | |
| PLM-C | | | | | | |
| Old Age Assistance | | | | | | |
| Aid to Blind/Disables | | | | | | |
| Foster Care & SAC | | | | | | |
| New Mandatory Adults (ACA) | | | | | | |
| Total Base | - | - | - | - | = | - |
| **Expansion Member Months (2)** | | | | | | |
| General Assistance (3) | | | | | | |
| Parents | | | | | | |
| Adults/Couples (3) | | | | | | |
| FHIAP - All Title XIX | | | | | | |
| FHIAP - Existing (3) | | | | | | |
| FHIAP - Medicaid | | | | | | |
| FHIAP - Non-Medicaid | | | | | | |
| Total Expansion | - | - | - | - | - | - |
| **Non-Allowable Expansion Population Member Months** | | | | | | |
| General Assistance | | | | | | |
| Adults/Couples | | | | | | |
| FHIAP - Existing | | | | | | |
| FHIAP - Non-Medicaid | | | | | | |
| Total Non-Allowable Expansion | - | - | - | - | - | - |
| **Total Member Months** | 1,510,326 | 6,198,002 | 7,810,411 | 8,643,564 | 8,963,022 | 9,291,300 |

Exhibit 2.3
Change Model
OHP Section 1115 Demonstration
Actual and Projected Demonstration Expenditures

| | Actual/Projection DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| **PER MEMBER PER MONTH COSTS (PMPM) (1)** | | | | | | |
| | | | | | | |
| **Base Populations PMPM** | | | | | | |
| AFDC | | | | | | |
| PLM-W | | | | | | |
| PLM-C | | | | | | |
| Old Age Assistance | | | | | | |
| Aid to Blind/Disables | | | | | | |
| Foster Care & SAC | | | | | | |
| New Mandatory Adults (ACA) | | | | | | |
| **Expansion Population PMPM** | | | | | | |
| General Assistance (3) | | | | | | |
| Parents | | | | | | |
| Adults/Couples (3) | | | | | | |
| FHIAP - All Title XIX | | | | | | |
| FHIAP - Existing (3) | | | | | | |
| FHIAP - Medicaid | | | | | | |
| FHIAP - Non-Medicaid | | | | | | |
| | | | | | | |
| **Non-Allowable Expansion Population PMPM** | | | | | | |
| General Assistance | | | | | | |
| Adults/Couples | | | | | | |
| FHIAP - Existing | | | | | | |
| FHIAP - Non-Medicaid | | | | | | |
| | | | | | | |
| **HEALTH SYSTEM TRANSFORMATION PMPM** | $ (51.11) | $ (49.82) | $ (89.37) | $ (119.53) | $ (216.41) | $ (244.77) |

Exhibit 31
Page 127 of 142
FCI0517253
CTRL_01214878

Exhibit 2.3
Change Model
OHP Section 1115 Demonstration
Actual and Projected Demonstration Expenditures

| | Actual/Projection DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| **TOTAL EXPENDITURES (1)** | | | | | | |
| | | | | | | |
| **Base Populations** | | | | | | |
| **Expenditures** | | | | | | |
| AH90 | | | | | | |
| PLM-W | | | | | | |
| PLM-C | | | | | | |
| Old Age Assistance | | | | | | |
| Aid to Blind/Disables | | | | | | |
| Foster Care & SAC | | | | | | |
| New Mandatory Adults (ACA) | | | $ - | $ - | $ - | $ - |
| Total Base | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Expansion Population** | | | | | | |
| **Expenditures** | | | | | | |
| General Assistance (3) | | | | | | |
| Parents | | | | | | |
| Adults/Couples (3) | | | | | | |
| FHIAP - All Title XIX | | | | | | |
| FHIAP - Existing (3) | | | | | | |
| FHIAP - Medicaid | | | | | | |
| FHIAP - Non-Medicaid | | | | | | |
| Total Expansion | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Non-Allowable Expansion** | | | | | | |
| **Population Expenditures** | | | | | | |
| General Assistance | | | | | | |
| Adults/Couples | | | | | | |
| FHIAP - Existing | | | | | | |
| FHIAP - Non-Medicaid | | | | | | |
| Total Non-Allowable Expansion | $ - | $ - | $ - | $ - | $ - | $ - |

Exhibit 1
Page 128 of 142
FCI0517254
CTRL_01214878

Exhibit 2.3
Change Model
OHP Section 1115 Demonstration
Actual and Projected Demonstration Expenditures

|  | Actual/Projection DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| Additional Health Services Expenditures | $ 10,688,104 | $ 140,907,240 | $ 235,873,371 | $ 258,774,969 | $ 262,333,774 | $ 263,142,134 |
| Health System Transformation Expenditures | $ (77,197,144) | $ (308,788,576) | $ (698,044,526) | $ (1,033,158,439) | $ (1,939,664,045) | $ (2,274,264,390) |
| DSHP | $ 298,044,826 | $ 1,201,153,107 | $ 1,202,886,929 | $ 1,209,677,419 | $ 1,209,677,419 | $ 1,209,677,419 |
| Total Base + Expansion Expenditures | $ 231,535,785 | $ 1,033,271,771 | $ 740,715,774 | $ 435,293,949 | $ (467,652,851) | $ (801,444,836) |

March 1, 2012

**Appendix L**

Exhibit 2.1
Combined Model
OHP Section 1115 Demonstration
Summary In Total Funds

| Federal Fiscal Year | Neutrality Ceiling | Actual/Projected Expenditures | Surplus/Deficit |
|---|---|---|---|
| **Original Waiver Period** | | | |
| 1994 Actual | $ 390,951,750 | $ 346,190,634 | $ 44,761,116 |
| 1995 Actual | $ 818,988,036 | $ 827,254,935 | $ (8,266,899) |
| 1996 Actual | $ 892,465,451 | $ 885,011,152 | $ 7,454,299 |
| 1997 Actual | $ 1,040,624,108 | $ 895,762,310 | $ 144,861,798 |
| 1998 Actual | $ 1,224,165,720 | $ 1,051,592,807 | $ 172,572,913 |
| Jan-99 | $ 112,450,962 | $ 95,260,442 | $ 17,190,520 |
| Total Original Waiver | $ 4,479,646,027 | $ 4,101,072,280 | $ 378,573,747 |
| **First Waiver Extension (beginning February 1999)** | | | |
| 1999 Actual (Feb – Dec) | $ 1,236,961,227 | $ 1,071,151,312 | $ 165,809,915 |
| 2000 Actual | $ 1,448,108,685 | $ 1,275,376,104 | $ 172,732,581 |
| 2001 Projection (1) | $ 1,602,109,256 | $ 1,398,528,881 | $ 203,580,375 |
| Jan-02 | $ 152,138,992 | $ 132,715,597 | $ 19,423,395 |
| Total First Waiver Extension | $ 4,439,318,160 | $ 3,877,771,894 | $ 561,546,266 |
| **Second Waiver Extension (beginning February 2002)** | | | |
| 2002 Actuals (Feb to Sept) | $ 1,253,756,577 | $ 1,051,310,479 | $ 202,446,098 |
| **OHP2 Waiver Amendment** | | | |
| DY 1 (FFY 03 Actual) | $ 1,987,913,110 | $ 1,542,201,604 | $ 445,711,506 |
| DY 2 (FFY 04 Actual) | $ 2,093,044,450 | $ 1,494,082,316 | $ 598,962,134 |
| DY 3 (FFY 05 Actual) | $ 2,278,562,238 | $ 1,733,929,530 | $ 544,632,708 |
| DY 4 (FFY 06 Actual) | $ 2,454,368,136 | $ 1,558,038,076 | $ 896,330,060 |
| DY 5 (FFY 07 Actual) | $ 2,588,680,697 | $ 1,488,456,119 | $ 1,100,224,578 |
| Total Second Waiver | $ 11,402,568,631 | $ 7,816,707,645 | $ 3,585,860,986 |
| **OHP2 Waiver Extension** | | | |
| DY 6 (FFY 08 Actual) | $ 3,047,303,332 | $ 1,980,350,291 | $ 1,066,953,041 |
| DY 7 (FFY 09 Actual) | $ 3,210,937,225 | $ 1,857,765,840 | $ 1,353,171,385 |
| DY 8 (FFY 10 Actual ) | $ 3,882,351,591 | $ 2,275,008,353 | $ 1,607,343,238 |
| DY 9 (FFY 11 Actual/) | $ 4,521,446,161 | $ 2,847,833,594 | $ 1,673,612,567 |
| DY 10 (FFY 12 Actual/Projection-9 mos) | $ 3,769,927,946 | $ 2,075,993,647 | $ 1,693,934,299 |
| Total OHP2 Waiver Extension | $ 18,431,966,255 | $ 11,036,951,725 | $ 7,395,014,530 |
| **OHP2 Waiver - Health System Transformation** | | | |
| DY 10 (FFY 12 Projection-3 mos) | $ 1,256,642,649 | $ 923,533,666 | $ 333,108,982 |
| DY 11 (FFY 13 Projection) | $ 5,633,570,577 | $ 4,142,172,208 | $ 1,491,398,369 |
| DY 12 (FFY 14 Projection) | $ 7,380,739,399 | $ 4,772,085,180 | $ 2,608,654,219 |
| DY 13 (FFY 15 Projection) | $ 8,465,207,222 | $ 5,172,114,891 | $ 3,293,092,331 |
| DY 14 (FFY 16 Projection) | $ 9,371,578,459 | $ 4,760,001,319 | $ 4,611,577,140 |
| DY 15 (FFY 17 Projection) | $ 10,347,741,327 | $ 4,955,351,344 | $ 5,392,389,983 |
| Total Waiver Extension | $ 42,455,479,633 | $ 24,725,258,608 | $ 17,730,221,024 |
| | | | |
| Cumulative Total | $ 82,462,735,282 | $ 52,609,072,631 | $ 29,853,662,651 |

*Oregon Health Plan– Project Numbers 11-W-00160/10 21-W-00013/10*

Exhibit 1
Page 130 of 142

FCI0517256
CTRL_01214878

Exhibit 20
Combined Model
OHP Section 1115 Demonstration
Allowable Expenditures
In Total Funds

| With Requested Trends Using Actual and Projected Member Months | Actual/Projection DY 10 | Projection DY 11 | Projection DY 12 | Projection DY 13 | Projection DY 14 | Projection DY 15 |
|---|---|---|---|---|---|---|
| | FFY 12 | FFY 13 | FFY 14 | FFY 15 | FFY 16 | FFY 17 |

**MEMBER MONTHS**

**Base Populations Member Months (1)**

| | | | | | | |
|---|---|---|---|---|---|---|
| AFDC | 2,224,527 | 2,272,493 | 2,207,540 | 2,251,669 | 2,296,680 | 2,342,591 |
| PLM-W | 159,316 | 154,106 | 157,630 | 161,890 | 166,266 | 170,760 |
| PLM-C | 1,779,064 | 1,796,580 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 |
| Old Age Assistance | 425,497 | 447,480 | 468,617 | 489,363 | 511,029 | 533,654 |
| Aid to Blind/Disabled | 973,761 | 1,033,516 | 1,208,233 | 1,295,406 | 1,388,868 | 1,489,074 |
| Foster Care & SAC | 220,238 | 217,037 | 240,391 | 245,236 | 250,179 | 255,221 |
| New Mandatory Adults (ACA) | - | - | 1,728,000 | 2,400,000 | 2,550,000 | 2,700,000 |
| Total Base | 5,782,403 | 5,921,212 | 7,810,411 | 8,643,564 | 8,963,022 | 9,291,300 |

**Expansion Member Months (2)**

| | | | | | | |
|---|---|---|---|---|---|---|
| General Assistance | | | | | | |
| Parents | 249,052 | 268,092 | | | | |
| Adults/Couples | | | | | | |
| FHIAP - All Title XIX | | | | | | |
| FHIAP - Existing | | | | | | |
| FHIAP - Medicaid | 9,849 | 8,698 | - | - | - | - |
| FHIAP - Non-Medicaid | | | | | | |
| Total Expansion | 258,901 | 276,790 | - | - | - | - |

| **Total Member Months** | **6,041,304** | **6,198,002** | **7,810,411** | **8,643,564** | **8,963,022** | **9,291,300** |

**ALLOWED PER MEMBER PER MONTH COSTS (PMPM)**

| | CMS Approved PMPM | CMS Approved PMPM | | | | |
|---|---|---|---|---|---|---|

**Base Population PMPM**

| | | | | | | |
|---|---|---|---|---|---|---|
| AFDC | $ 474.53 | $ 503.95 | $ 545.78 | $ 577.98 | $ 614.39 | $ 651.25 |
| PLM-W | $ 1,806.87 | $ 1,917.09 | $ 2,076.21 | $ 2,198.70 | $ 2,337.22 | $ 2,477.46 |
| PLM-C | $ 691.61 | $ 734.48 | $ 795.44 | $ 842.37 | $ 895.44 | $ 949.17 |
| Old Age Assistance | $ 602.15 | $ 632.26 | $ 684.74 | $ 725.14 | $ 770.82 | $ 817.07 |
| Aid to Blind/Disabled | $ 1,959.64 | $ 2,073.30 | $ 2,245.38 | $ 2,377.86 | $ 2,527.67 | $ 2,679.33 |
| Foster Care & SAC | $ 830.04 | $ 881.50 | $ 954.66 | $ 1,010.99 | $ 1,074.68 | $ 1,139.16 |
| New Mandatory Adults (ACA) | $ - | $ - | $ 531.05 | $ 562.38 | $ 597.81 | $ 633.68 |

**Expansion Population PMPM**

| | | | | | | |
|---|---|---|---|---|---|---|
| General Assistance | | | | | | |
| Parents | $ 367.33 | $ 389.74 | $ - | $ - | $ - | $ - |
| Adults/Couples | | | | | | |
| FHIAP - All Title XIX | | | | | | |
| FHIAP - Existing | | | | | | |
| FHIAP - Medicaid | $ 332.13 | $ 352.72 | $ - | $ - | $ - | $ - |
| FHIAP - Non-Medicaid | | | | | | |

Exhibit 22
Combined Model
OHP Section 1115 Demonstration
Allowable Expenditures
In Total Funds

| With Requested Trends Using Actual and Projected Member Months | Actual/Projection DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| **TOTAL ALLOWABLE EXPENDITURES ( Member Months x PMPM)** | | | | | | |
| **Base Population Expenditures** | | | | | | |
| AFDC | $ 1,055,604,797 | $ 1,145,222,847 | $ 1,204,826,435 | $ 1,301,416,819 | $ 1,411,060,450 | $ 1,525,623,840 |
| PLM-W | $ 287,863,301 | $ 295,435,072 | $ 327,272,741 | $ 355,948,315 | $ 388,600,748 | $ 423,050,482 |
| PLM-C | $ 1,230,418,453 | $ 1,319,552,078 | $ 1,431,795,312 | $ 1,516,271,235 | $ 1,611,796,323 | $ 1,708,504,103 |
| Old Age Assistance | $ 256,213,019 | $ 282,923,705 | $ 320,879,671 | $ 354,855,265 | $ 393,911,749 | $ 436,032,662 |
| Aid to Blind/Disabled | $ 1,908,221,006 | $ 2,142,788,723 | $ 2,712,946,925 | $ 3,080,296,119 | $ 3,510,595,572 | $ 3,989,715,931 |
| Foster Care & SAC | $ 182,806,350 | $ 191,318,116 | $ 229,492,754 | $ 247,931,071 | $ 268,862,882 | $ 290,738,315 |
| New Mandatory Adults (ACA) | $ - | $ - | $ 917,652,190 | $ 1,349,713,429 | $ 1,524,416,961 | $ 1,710,933,860 |
| Total Base | $ 4,921,126,926 | $ 5,377,240,541 | $ 7,144,866,028 | $ 8,206,432,253 | $ 9,109,244,685 | $ 10,084,599,193 |
| **Expansion Population Expenditures** | | | | | | |
| General Assistance | | | | | | |
| Parents | $ 91,484,272 | $ 104,486,176 | $ - | $ - | $ - | $ - |
| Adults/Couples | $ - | $ - | $ - | $ - | $ - | $ - |
| FHIAP - All Title XIX | $ - | $ - | $ - | $ - | $ - | $ - |
| FHIAP - Existing | $ - | $ - | $ - | $ - | $ - | $ - |
| FHIAP - Medicaid | $ 3,271,292 | $ 3,067,929 | $ - | $ - | $ - | $ - |
| FHIAP - Non-Medicaid | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Expansion | $ 94,755,564 | $ 107,554,105 | $ - | $ - | $ - | $ - |
| **Additional Health Services Expenditures** | $ 10,688,104 | $ 148,775,931 | $ 235,873,371 | $ 258,774,969 | $ 262,333,774 | $ 263,142,134 |
| **Total Base + Expansion Allowable Expenditures** | $ 5,026,570,594 | $ 5,633,570,577 | $ 7,380,739,399 | $ 8,465,207,222 | $ 9,371,578,459 | $ 10,347,741,327 |

\* As of November 1st, 2007; General Assistance, Adults/Couples, FHIAP Non-Medicaid & FHIAP Existing, do not count toward Allowable Expenditures.

Exhibit 1
Page 132 of 142
FCI0517258
CTRL_01214878

March 2, 2012

| Appendix L | Actual/Projection DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| **MEMBER MONTHS** | | | | | | |
| **Base Populations Member Months (1)** | | | | | | |
| AFDC | 2,224,527 | 2,272,493 | 2,207,540 | 2,251,669 | 2,296,680 | 2,342,591 |
| PLM-W | 159,316 | 154,106 | 157,630 | 161,890 | 166,266 | 170,760 |
| PLM-C | 1,779,064 | 1,796,580 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 |
| Old Age Assistance | 425,497 | 447,480 | 468,617 | 489,363 | 511,029 | 533,654 |
| Aid to Blind/Disables | 973,761 | 1,033,516 | 1,208,233 | 1,295,406 | 1,388,868 | 1,489,074 |
| Foster Care & SAC | 220,238 | 217,037 | 240,391 | 245,236 | 250,179 | 255,221 |
| New Mandatory Adults (ACA) | - | - | 1,728,000 | 2,400,000 | 2,550,000 | 2,700,000 |
| Total Base | 5,782,403 | 5,921,212 | 7,810,411 | 8,643,564 | 8,963,022 | 9,291,300 |
| **Expansion Member Months (2)** | | | | | | |
| General Assistance (3) | | | | | | |
| Parents | 249,052 | 268,092 | - | - | - | - |
| Adults/Couples (3) | | | | | | |
| FHIAP - All Title XIX | | | | | | |
| FHIAP - Existing (3) | | | | | | |
| FHIAP – Medicaid | 9,849 | 8,698 | - | - | - | - |
| FHIAP - Non-Medicaid | | | | | | |
| Total Expansion | 258,901 | 276,790 | - | - | - | - |
| **Non-Allowable Expansion Population Member Months** | | | | | | |
| General Assistance | | | | | | |
| Adults/Couples | 491,298 | 420,011 | - | - | - | - |
| FHIAP - Existing | 2,995 | 2,777 | - | - | - | - |
| FHIAP - Non-Medicaid | 54,564 | 40,767 | - | - | - | - |
| Total Non-Allowable Expansion | 548,857 | 463,555 | - | - | - | - |
| **Total Member Months** | 6,590,161 | 6,661,557 | 7,810,411 | 8,643,564 | 8,963,022 | 9,291,300 |

March 2, 2012

| Appendix L | Actual/Projection DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| **PER MEMBER PER MONTH COSTS (PMPM) (1)** | | | | | | |
| *National Health Expenditures Growth Rate* | | | 8.3% | 5.9% | 6.3% | 6.0% |
| **Base Populations PMPM** | | | | | | |
| AFDC | $ 286.08 | $ 285.12 | $ 308.78 | $ 327.00 | $ 347.60 | $ 368.46 |
| PLM-W | $ 1,164.12 | $ 1,162.29 | $ 1,258.76 | $ 1,333.03 | $ 1,417.01 | $ 1,502.03 |
| PLM-C | $ 210.06 | $ 214.85 | $ 232.68 | $ 246.41 | $ 261.93 | $ 277.65 |
| Old Age Assistance | $ 188.01 | $ 177.43 | $ 192.16 | $ 203.49 | $ 216.31 | $ 229.29 |
| Aid to Blind/Disables | $ 916.92 | $ 888.43 | $ 962.17 | $ 1,018.94 | $ 1,083.13 | $ 1,148.12 |
| Foster Care & SAC | $ 456.23 | $ 463.64 | $ 502.12 | $ 531.75 | $ 565.25 | $ 599.16 |
| New Mandatory Adults (ACA) | | | $ 531.05 | $ 562.38 | $ 597.81 | $ 633.68 |
| **Expansion Population PMPM** | | | | | | |
| General Assistance (3) | | | | | | |
| Parents | $ 353.24 | $ 353.09 | $ - | $ - | $ - | $ - |
| Adults/Couples (3) | | | | | | |
| FHIAP – All Title XIX | | | | | | |
| FHIAP – Existing (3) | | | | | | |
| FHIAP – Medicaid | $ 23.41 | $ 31.02 | $ - | $ - | $ - | $ - |
| FHIAP – Non-Medicaid | | | | | | |
| **Non-Allowable Expansion Population PMPM** | | | | | | |
| General Assistance | $ - | $ - | $ - | $ - | $ - | $ - |
| Adults/Couples | $ 579.63 | $ 577.96 | $ - | $ - | $ - | $ - |
| FHIAP – Existing | $ 97.21 | $ 74.79 | $ - | $ - | $ - | $ - |
| FHIAP – Non-Medicaid | $ 217.09 | $ 253.35 | $ - | $ - | $ - | $ - |
| **HEALTH SYSTEM TRANSFORMATION PMPM** | $ (51.11) | $ (49.82) | $ (89.37) | $ (119.53) | $ (216.41) | $ (244.77) |

Exhibit 1
Page 134 of 142
FCI0517260
CTRL_01214878

March 2, 2012

| Appendix L | Actual/Projection DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| **TOTAL EXPENDITURES (1)** | | | | | | |
| | | | | | | |
| **Base Populations Expenditures** | | | | | | |
| APDC | $ 636,388,175 | $ 647,930,520 | $ 681,655,182 | $ 736,303,130 | $ 798,336,264 | $ 863,152,770 |
| PLM-W | $ 185,462,153 | $ 179,115,146 | $ 198,418,428 | $ 215,804,384 | $ 235,600,292 | $ 256,486,190 |
| PLM-C | $ 373,710,983 | $ 386,003,322 | $ 418,828,590 | $ 443,539,477 | $ 471,482,464 | $ 499,771,412 |
| Old Age Assistance | $ 79,999,681 | $ 79,394,194 | $ 90,047,799 | $ 99,582,496 | $ 110,542,738 | $ 122,362,975 |
| Aid to Blind/Disables | $ 892,858,667 | $ 918,208,416 | $ 1,162,525,171 | $ 1,319,937,991 | $ 1,504,326,124 | $ 1,709,633,687 |
| Foster Care & SAC | $ 100,478,249 | $ 100,626,869 | $ 120,705,784 | $ 130,403,773 | $ 141,413,065 | $ 152,919,024 |
| New Mandatory Adults (ACA) | $    – | $    – | $ 917,652,190 | $ 1,349,713,429 | $ 1,524,416,961 | $ 1,710,933,860 |
| Total Leverages | $ 113,980,333 | $ 441,536,262 | $ 441,536,262 | $ 441,536,262 | $ 441,536,262 | $ 441,536,262 |
| Total Base | $ 2,382,878,241 | $ 2,752,814,729 | $ 4,031,369,406 | $ 4,736,820,942 | $ 5,227,654,170 | $ 5,756,796,180 |
| | | | | | | |
| **Expansion Population Expenditures** | | | | | | |
| General Assistance (3) Parents | $ 87,974,422 | $ 94,660,351 | $ | $    – | $    – | $ |
| Adults/Couples (3) | | | | | | |
| FHIAP – All Title XIX | | | | | | |
| FHIAP – Existing (3) | | | | | | |
| FHIAP – Medicaid | $ 230,587 | $ 269,837 | $    – | $    – | $    – | $ |
| FHIAP – Non-Medicaid | | | | | | |
| Total Expansion | $ 88,205,009 | $ 94,930,188 | $    – | $    – | $    – | $    – |
| | | | | | | |
| **Non-Allowable Expansion Population Expenditures** | | | | | | |
| General Assistance Adults/Couples | $ 284,771,824 | $ 242,750,746 | $    – | $    – | $    – | $    – |
| FHIAP – Existing | $ 291,175 | $ 207,723 | $    – | $    – | $    – | $    – |
| FHIAP – Non-Medicaid | $ 11,845,280 | $ 10,328,360 | $    – | $    – | $    – | $    – |
| Total Non-Allowable Expansion | $ 296,908,279 | $ 253,286,829 | $    – | $    – | $    – | $    – |

Exhibit 1
Page 135 of 142
FCI0517261
CTRL_01214878

March 2, 2012

| Appendix L | Actual/Projection DY 10 FFY 12 | Projection DY 11 FFY 13 | Projection DY 12 FFY 14 | Projection DY 13 FFY 15 | Projection DY 14 FFY 16 | Projection DY 15 FFY 17 |
|---|---|---|---|---|---|---|
| Additional Health Services Expenditures | $ 10,688,104 | $ 148,775,931 | $ 235,873,371 | $ 258,774,969 | $ 262,333,774 | $ 263,142,134 |
| Health System Transformation Expenditures | $ (77,197,144) | $ (308,788,576) | $ (698,044,526) | $ (1,033,158,439) | $ (1,939,664,045) | $ (2,274,264,390) |
| DSHP | $ 298,044,826 | $ 1,201,153,107 | $ 1,202,886,929 | $ 1,209,677,419 | $ 1,209,677,419 | $ 1,209,677,419 |
| Total Base + Expansion Expenditures | $ 2,999,527,315 | $ 4,142,172,208 | $ 4,772,085,180 | $ 5,172,114,891 | $ 4,760,001,319 | $ 4,955,351,344 |

FCI0517262
CTRL_01214878



February 29, 2012

JOHN A. KITZHABER, MD
Governor

The Honorable Kathleen Sebelius
Secretary of Health and Human Services
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

Dear Secretary Sebelius,

I am pleased to share with you the State of Oregon's request of the federal government to approve amendments to the Oregon Health Plan Waiver Demonstration under Section 1115(a) of the Social Security Act. With these amendments, the Demonstration will serve to transform and improve the health care delivery system for Oregonians for years to come by improving health, improving health care and containing costs.

As Oregon forges ahead to implement its most ambitious health care transformation plan to date, focusing on integrated, coordinated care and alignment of incentives, we are also requesting approval to use federal savings earned under the OHP waiver to help launch our initiatives. Specifically, Oregon is requesting an amendment to our OHP 1115 Demonstration to authorize federal financial participation (FFP) for selected state designated health programs (DSHP). These programs would be authorized by Section 1115(a) cost not otherwise matchable authority (CNOM).

Since established in 1994, the Oregon Health Plan Waiver Demonstration has provided the state's most vulnerable residents with high-quality, evidence-based health care while containing spending growth, saving the federal and state government more than $15 billion over the life of the waiver.

As we look to the future, Oregon is ready to build on that success and to take it further to meet three goals:

1.  Transform Oregon's Medicaid delivery system to focus on prevention, integration, and coordination of health care across the continuum of care with the goal of improving outcomes and bending the cost curve;

2.  Promote the Triple Aim of better health, better health care, and lower per capita costs; and

3.  Establish supportive partnerships with CMS to implement innovative strategies for providing high-quality, cost-effective, person-centered health care under Medicaid and Medicare.

254 STATE CAPITOL, SALEM OR 97301-4047 (503) 373-3111 FAX (503) 378-4863
WWW.OREGON.GOV

Exhibit 1
Page 137 of 142

FCI0517263
CTRL_01214878

The Honorable Kathleen Sebelius
February 29, 2012
Page Two

We estimate that there will be approximately 200,000 additional Oregonians eligible for Medicaid with the implementation of federal health reform in 2014. This proposal envisions a system anchored by the creation of community-based Coordinated Care Organizations (CCOs) that focus on prevention and primary care and the needs of their particular communities. With these reforms, we believe Oregon will be well-positioned to provide access to health care for newly eligible people, meet the three goals outlined above, and, at the same time, effectively use federal and state resources to support integrated care.

CCOs will integrate and coordinate care across physical, behavioral, and oral health care services through a strong focus on primary and preventive care, evidence-based services, and more effective management of care. The CCOs will not directly provide long-term services and supports (LTSS) at this time; however, in order to reduce cost-shifting and ensure shared responsibility for delivering high-quality, person-centered care, the CCOs and LTSS system will coordinate care and share both programmatic and financial accountability.

With this waiver amendment, Oregon is requesting, first, that all of the state's existing 1115 Demonstration authorities remain in place. These authorities will allow the State to implement a significant portion of the transformed system, including contracting with CCOs; enrolling individuals, including those eligible for Medicaid and Medicare, in managed care and establishing integrated benefit packages. Specific new flexibilities are outlined in our attached request. The State also requests approval of a three-year extension through October 31, 2016. The current Demonstration is scheduled to expire October 31, 2013.

Our desire is to continue to work collaboratively with CMS in moving these requests forward as expeditiously as possible. Oregon expects to contract with the first CCOs in July 2012. In order to accomplish that, we respectfully request expedited CMS review and approval. Our target date for approval of our DSHP request is April 1, 2012 and of the overall waiver amendments and extension, June 1, 2012.

The State of Oregon looks forward to your support and to working with you as we implement health system transformation and enter a new 1115 Demonstration renewal period and as we continue to fulfill the mission of the Oregon Health Authority: Helping people and communities achieve optimum physical, mental and social well-being through partnerships, prevention and access to quality, affordable health care.

Exhibit 1
Page 138 of 142

FCI0517264
CTRL_01214878

The Honorable Kathleen Sebelius
February 29, 2012
Page Three

Thank you for your consideration of these amendment and extension requests. If you have any questions or would like further information, please do not hesitate to contact our Medicaid Director, Judy Mohr Peterson at (503) 945-5768.

Sincerely,

John A. Kitzhaber, M.D.
Governor

C:
The Honorable Jeff Merkley, U.S. Senator
The Honorable Ron Wyden, U.S. Senator
The Honorable Earl Blumenauer, U.S. Representative
The Honorable Peter DeFazio, U.S. Representative
The Honorable Kurt Schrader, U.S. Representative
The Honorable Greg Walden, U.S. Representative
The Honorable Suzanne Bonamici, U.S. Representative
Bruce Goldberg, Director, Oregon Health Authority
Michael Bonetto, Office of Governor John Kitzhaber, Senior Health Policy Advisor
Sean Kolmer, Office of Governor John Kitzhaber, Assistant Health Policy Advisor
Judy Mohr Peterson, Director, Division of Medical Assistance Programs, Oregon Health Authority
Bruce Hanna, Speaker, House of Representatives
Arnie Roblan, Speaker, House of Representatives
Peter Courtney, Senate President
Cindy Mann, Director, CMCS
Terri Fraser, CMCS
Carol Peverly, CMS Region X Administrator
Cecile Greenway, CMS, Region X
Wendy Hill-Petras, CMS, Region X

Exhibit 1
Page 139 of 142
FCI0517265
CTRL_01214878

Month 1, 2012

**Appendix M**
Proposed CCO Global Budget Inclusion/Exclusion of Oregon Medicaid Services Programs

| Program Area | Program/Service/Function | Notes | % of non-LTC Medicaid Expenditures (based on 09-11) | Timeline for Inclusion in Global Budgets | | | | Payment Methodology | | New to Budget Neutrality in Waiver Amendme | FFY 12 | FFY 13 | FFY 14 | FFY 15 | FFY 16 | FFY 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | July 1, 2012 | Jan. 1, 2013 | Jan. 1, 2014 | Not currently planned | Pre-CCO Global Budget | Under CCO Global Budget | | | | | | | |
| Physical health care | OHP physical health coverage for clients enrolled in managed care and FFS. (Includes emergency transport) | Currently paid through capitation; clients receiving coverage FFS would be moved into CCOs as well. | 58% | X | | | | Capitation/FFS | Capitation | No | | | | | | |
| Mental Health | OHP mental health coverage for clients enrolled in managed care and FFS | Currently paid through capitation; clients receiving coverage FFS would be moved into CCOs as well. | 9% | X | | | | Capitation/FFS | Capitation | No | | | | | | |
| Dual Eligible Specific | Payment of Medicare cost sharing (not including skilled nursing facilities) and Medicare Advantage premiums for dual eligibles | Basis of payment currently depends on whether or not a beneficiary is enrolled in a Medicare Advantage plan, Medicaid physical health managed care plan. | Included in OHP physical health coverage above | X | | | | FFS/Capitation | Capitation | No | | | | | | |
| Addictions | OHP addiction health coverage for clients enrolled in managed care and FFS | Currently paid through capitation; clients receiving coverage FFS would be moved into CCOs as well. | 2% | X | | | | Capitation/FFS | Capitation | No | | | | | | |
| Additional Enrollees | Breast and Cervical Cancer Medical (BCCM) (not inclusive of screening) | Clients currently receive care on a FFS basis, but would benefit from coordinated care. Benefits mirror those currently paid through capitation. | < 1% | X | | | | FFS | Capitated? Specifics under development | Yes | $ 4,004,905 | $ 16,756,501 | $ 16,756,501 | $ 16,756,501 | $ 16,756,501 | $ 16,756,501 |
| Additional Enrollees | Eligible clients with third party insurance | Approach under development | < 1% | X | | | | FFS | Capitation portion? Specifics under development | No | | | | | | |
| Dual Eligible Specific | Cost-sharing for Medicare skilled nursing facility care (day 21-100) | Cost sharing for Medicare eligibles also eligible for a full Medicaid benefit and enrolled in a CCO will be included in blended capitation rates under CMS demonstration. | < 1% | X | | | | FFS | Capitation portion | Yes | $ 1,946,099 | $ 7,806,803 | $ 8,179,617 | $ 8,453,716 | $ 8,791,864 | $ 9,197,643 |
| Mental Health | Children's Statewide Wraparound Projects | Services and supports for children with complex behavioral health needs and their families. Paid in the capitation rate for 3 MHOs currently. | < 1% | X | | | | Capitation | Capitation | No | | | | | | |
| Mental Health | Exceptional Needs Care Coordinators | Specialized case management service provided to clients identified as aged, blind or disabled who have complex medical needs. Currently paid through capitation | < 1% | X | | | | Capitation | Capitation portion | No | | | | | | |
| Mental Health | Non-forensic intensive treatment services for children | Currently paid through capitation for managed care enrolled clients and FFS for eligible clients not enrolled in managed care. | < 1% | X | | | | Capitation/FFS | Capitation portion | No | | | | | | |
| Physical health care | OHP Post Hospital Extended Care (for non-Medicare eligibles) | Currently in the capitation rate for those in managed care for the first 20 days of care. | < 1% | X | | | | Capitation/FFS | Capitation portion | No | | | | | | |
| Addictions | Substance Abusing Pregnant Women and Substance Abusing Parents with Children under Age 18 (Targeted Case Management) | Program currently operates in a limited number of counties. | < 1% | Optional in counties where currently operating | X | | | Invoiced | TBD | Yes | $ - | $ 2,192,325 | $ 2,961,100 | $ 2,996,634 | $ 3,044,580 | $ 3,050,573 |
| Addictions | Youth residential alcohol and drug treatment (OHP carve out) | HB 3650 states that OHA shall continue to renew contracts or ensure that counties renew contracts with providers of residential chemical dependency treatment until the provider enters into a contract with a coordinated care organization but no later than July 1, 2013. | < 1% | Optional | Optional until July 1, 2013 | | | FFS | Capitation? | Yes | $ 939,800 | $ 3,823,106 | $ 3,872,807 | $ 3,919,280 | $ 3,981,989 | $ 3,989,828 |
| Mental Health | Adult residential alcohol and drug treatment (OHP carve out) | HB 3650 states that OHA shall continue to renew contracts or ensure that counties renew contracts with providers of residential chemical dependency treatment until the provider enters into a contract with a coordinated care organization but no later than July 1, 2013. | < 1% | Optional | Optional until July 1, 2013 | | | FFS | Capitation? | Yes | $ 3,797,300 | $ 15,447,416 | $ 15,648,233 | $ 15,836,012 | $ 16,089,388 | $ 16,121,060 |

Oregon Health Plan– Project Numbers 11-W-00180/10 21-W-00013/10

1

Exhibit 1
Page 140 of 142

FCI0517266
CTRL_01214878

Month 1, 20YY

**Appendix M**
Proposed CCO Global Budget Inclusion/Exclusion of Oregon Medicaid Services Programs

| Program Area | Program/Service/Function | Notes | % of non-CFC Medicaid Expenditures (based on 09-11) | July 1, 2012 | Jan. 1, 2013 | Jan. 1, 2014 | Not currently planned | Pre-CCO Global Budget | Under CCO Global Budget | Budget Neutrality in Waiver Amendme | FFY 12 | FFY 13 | FFY 14 | FFY 15 | FFY 16 | FFY 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Targeted Case Management | Asthma - Healthy Homes (Targeted Case Management) | Program is only one year old and has only operated in one county, with one additional county likely to begin operation soon. | < 1% | Optional in counties where currently operating | X | | | Invoiced | TBD | No | | | | | | |
| Transportation | Non-Emergent Medical Transportation | Not currently in capitated rates, but inclusion necessary for coordination and access to care. Includes wheelchair van, taxi, stretcher car, bus passes and tickets, secured transportation. | 2% | | X | | | Payment to brokerages on per ride basis | Methodology TBD | Yes | $ - | $ 23,606,072 | $ 31,474,762 | $ 31,474,762 | $ 31,474,762 | $ 31,474,762 |
| Mental Health | Adult Residential (Mental Health Services) | High-cost, low-frequency services linked to management of census at state hospitals. CCOs will need to manage utilization and develop alternative services such as access to housing with necessary supports for independent living. | 2% | | X | | | FFS | Methodology TBD | Yes | $ - | $ 70,675,805 | $ 95,459,454 | $ 96,604,967 | $ 98,150,647 | $ 98,343,857 |
| Targeted Case Management | HIV/AIDS Targeted Case Management | Overall services supported by Medicaid and CDC block grant funds. | < 1% | | X | | | Invoiced | TBD | No | | | | | | |
| Targeted Case Management | Nurse Home Visiting program: Babies First! And CaCoon | Considering inclusion in second year of CCO operation or later in order to determine how to best integrate public health nurses into transformation. | < 1% | | X | | | Invoiced | TBD | Yes | $ - | $ 599,213 | $ 798,950 | $ 798,950 | $ 798,950 | $ 798,950 |
| Targeted Case Management | Nurse Home Visiting program: Maternity Case Management (MCM) | Considering inclusion in second year of CCO operation or later in order to determine how to best integrate public health nurses into transformation. | < 1% | | X | | | Invoiced | TBD | No | | | | | | |
| Dental | OHP dental coverage | HB 3650 states that dental care organizations may choose to operate until 7/1/14 or opt to become part of a CCO sooner. | 5% | Optional | Optional | Optional Until July 1, 2014 | | Capitation | Capitation | No | | | | | | |
| Additional Enrollees | Citizen Alien-Waived Emergency Medical (CAWEM) Prenatal | Program currently operates in a limited number of counties. | 1% | Optional | Optional | X | | FFS | TBD | No | | | | | | |
| Mental Health | Community crisis services, immediate mental health crisis assessment, triage, and intervention services available 24/7 | Services are delivered by community mental health programs and are paid on a monthly basis to the counties. Excluded initially to avoid service disruption. | < 1% | | | X | | Monthly allotment | TBD | Yes | $ - | $ - | $ 9,381,089 | $ 12,658,217 | $ 12,860,748 | $ 12,886,065 |
| Mental Health | Young Adults in Transition Mental Health Residential | Clients age 15-26 yrs. Eligibility currently determined by state. Integration with non-Medicaid funding sources and limited number of providers make it difficult to include in GB initially. | < 1% | | | X | | FFS | TBD | Yes | $ - | $ - | $ 1,766,314 | $ 2,383,346 | $ 2,421,480 | $ 2,426,246 |
| Mental Health | Personal Care 20 Client Employed Provider | Providers are individuals selected by service recipient who require minimal ADL assistance (no more than 20 hours per month). Small volume makes inclusion initially in GB difficult. | < 1% | | | X | | FFS | TBD | Yes | $ - | $ - | $ 902,783 | $ 1,218,155 | $ 1,237,645 | $ 1,240,082 |
| Mental Health | Community adult outpatient MH treatment services, case management, vocational and social services, locating housing, peer delivered services | A mix of county, Medicaid, general fund, and federal block grant funding. | 1% | | | X | | Monthly allotment | TBD | Yes | $ - | $ - | $ 32,264,667 | $ 43,535,791 | $ 44,232,364 | $ 44,319,435 |
| Mental Health | Mental health support services including supported employment, community geriatric psych specialists, preadmission screening/resident review (PASRR), housing renovations, homelessness supports, housing development | County funding that is a mix of Medicaid, general fund, and federal block grant. Difficult to put into GB initially due to this complexity. | 1% | | | X | | Monthly allotment | TBD | No | $ - | $ - | $ 16,407,094 | $ 22,138,638 | $ 22,492,857 | $ 22,537,134 |
| Long Term Care | Long term care institutional and community supports | Specifically excluded from CCO global budgets by statute | N/A | | | | X | Varies | | No | | | | | | |
| Mental Health | OHP-covered mental health drugs | Specifically excluded from CCO global budgets by statute | 3% | | | | X | FFS | | No | | | | | | |

2

Exhibit 1
Page 141 of 142

FCI0517267
CTRL_01214878

March 1, 2012

**Appendix M**
Proposed CCO Global Budget Inclusion/Exclusion of Oregon Medicaid Services Programs

| Program Area | Program/Service/Function | Notes | % of non-LTC Medicaid Expenditures (based on 09-11) | July 1, 2012 | Jan. 1, 2013 | Jan. 1, 2014 | Not currently planned | Pre-CCO Global Budget | Under CCO Global Budget | Budget Neutrality in Waiver Amendme | FFY 12 | FFY 13 | FFY 14 | FFY 15 | FFY 16 | FFY 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other | Hospital Leverages: DSH, GME, Pro-Share, and UMG | | 3% | | | | X | FFS/reconciliation | | No | | | | | | |
| Other | FQHC Full-Cost Settlements | | 2% | | | | X | FFS/reconciliation | | No | | | | | | |
| Additional Enrollees | Citizen Alien-Waived Emergency Medical (emergency only, excludes CAWEM prenatal) | Emergency services only. Not predictable enough to forecast. | 1% | | | | X | FFS | | No | | | | | | |
| Developmental Disabilities | Developmental Disabilities Comprehensive Waiver & Model Waivers (Targeted Case Management) | Program provides assessments, care plans, referrals and related activities specific to the developmentally disabled population, which CCOs may not have the experience to manage at this time. | < 1% | | | | X | FFS | | No | | | | | | |
| Developmental Disabilities | Developmental Disabilities Self-Directed Support Services Waiver Only (Targeted Case Management) | Program provides assessments, care plans, referrals and related activities specific to the developmentally disabled population, which CCOs may not have the experience to manage at this time. | < 1% | | | | X | FFS | | No | | | | | | |
| Mental Health | State Hospital Care - Forensic | | < 1% | | | | X | Direct Expenditure | | No | | | | | | |
| Mental Health | State Hospital Care - Civil, Neuropsychiatric and Geriatric populations | | < 1% | | | | X | Direct Expenditure | | No | | | | | | |
| Mental Health | State Inpatient for forensic kids (includes Stabilization Transition Services, the Secure Children Inpatient Program and the Secure Adolescent Inpatient Program) | This is a state hospital level of care. Low frequency-high cost utilization makes inclusion in cap difficult. The youth are court committed or transferred by OYA due to crisis. | < 1% | | | | X | Direct Expenditure | | No | | | | | | |
| Mental Health | State Inpatient non-forensic kids (SCIP/SAIP/STS) - Payment for services. Note: Team assessment of need included in GB | If determined necessary, care is provided at the state hospital and paid on a FFS basis. Low frequency - high cost utilization makes inclusion in capitation initially difficult. | < 1% | | | | X | FFS | | No | | | | | | |
| Mental Health | Supervision services for persons under the jurisdiction of the Psychiatric Security Review Board (PSRB) | These are monitoring and reporting functions done by the community mental health programs on behalf of the PSRB and are paid monthly by AMH to the counties. | < 1% | | | | X | Monthly payment | | No | | | | | | |
| Other | A & B Hospital Facilities Settlements | | < 1% | | | | X | Settlement | | No | | | | | | |
| Targeted Case Management | Child Welfare Youth (Targeted Case Management) | Difficult to initially put in CCO scope of work. | < 1% | | | | X | Direct Expenditure | | No | | | | | | |
| Targeted Case Management | Early Intervention services or Early Childhood in Special Education (Targeted Case Management) | Education based service provided by school or ESD staff. | < 1% | | | | X | Invoiced? | | No | | | | | | |
| Targeted Case Management | Self-Sufficiency Jobs for Teens and Adults (Targeted Case Management) | Difficult to initial put in CCO scope of work. | < 1% | | | | X | Direct Expenditure | | No | | | | | | |
| Targeted Case Management | Tribal Targeted Case Management | Program is managed by tribes. State statute prohibits mandatory enrollment of tribal members into CCOs. | < 1% | | | | X | Invoiced | | No | | | | | | |
| | | | | | | | | | | Total | $ 10,688,104 | $ 140,907,240 | $ 235,873,371 | $ 258,774,969 | $ 262,333,774 | $ 263,142,134 |

Exhibit 1
Page 142 of 142

FCI0517268
CTRL_01214878