# APPLICATION FOR AMENDMENT AND RENEWAL
# Oregon Health Plan
# 1115 Demonstration Project

## Medicaid and Children's Health Insurance Program

MARCH 1, 2012



*Oregon Health Plan–Project Numbers 11-W-00160/10 & 21-W-00013/10*

Exhibit 2
Page 1 of 28

*March 1, 2012*

# APPLICATION FOR AMENDMENT AND RENEWAL
## Oregon Health Plan
## 1115 Demonstration Project

## Table of Contents

| AMENDMENT AND RENEWAL REQUEST | |
| --- | --- |
| **Topic** | **Page** |
| I.    Policy Context | 4 |
| II.   Conditions on the Ground in Oregon - Legacy of OHP | 6 |
| III.  Integration of Care for Medicare and Medicaid Enrollees | 8 |
| IV.   Stakeholder and CMS Collaboration | 10 |
| V.    Oregon's Medicare-Medicaid Demonstration Design Contract | 12 |
| VI.   Certification of CCOs | 13 |
| VII.  Design Elements of CCOs | 13 |
| VIII. Federal Authority Requests | 20 |
| IX.   Budget Neutrality | 24 |
| X.    Evaluation Plan | 27 |

Exhibit 2
Page 2 of 28

*March 1, 2012*

| APPENDICES | |
|---|---|
| **Title** | **Appendix** |
| CCO Application Timelines | A |
| Oregon Health Plan Transformation Public Process | B |
| CCO implementation proposal | C |
| CCO populations and schedule for inclusion in global budget | D |
| State Fund Only Program List | E |
| Initial Proposed CCO Accountability Metrics | F |
| CCO Proposed Measures--Crosswalk to Medicaid Adult, CHIPRA and Medicare ACO Measures | G |
| Summary of federal authority matrix | H |
| Federal authority matrix | I |
| Budget neutrality – Base | J |
| Budget neutrality – Change | K |
| Budget neutrality – Combined | L |
| Inventory of Medicaid services and timeline for inclusion in global budget | M |

*March 1, 2012*

RENEWAL AND AMENDMENTS TO
Oregon Health Plan
Medicaid and Children's Health Insurance Program
1115 Demonstration Project
February 2012


I.   Policy Context

This document outlines proposed modifications to Oregon's existing Demonstration under Section 1115(a) of the Social Security Act. Since established in 1994, the Oregon Health Plan Demonstration has provided the state's most vulnerable residents with high-quality, evidence-based health care while containing spending growth, saving the federal and state government more than $15 billion over the life of the waiver. With this renewal and amendment, Oregon seeks to build on our long history of demonstrated leadership and to meet three key goals:

1.  Transform Oregon's Medicaid delivery system to  focus on prevention, integration, and coordination of health care across the continuum of care with the goal of improving outcomes and bending the cost curve;

2.  Promote the Triple Aim of better health, better health care, and lower per capita costs; and

3.  Establish supportive partnerships with CMS to implement innovative strategies for providing high-quality, cost-effective, person-centered health care under Medicaid and Medicare.

We estimate that there will be approximately 200,000 additional Oregonians eligible for Medicaid with the implementation of federal health reform in 2014. This proposal envisions a system anchored by the creation of community-based Coordinated Care Organizations (CCOs) that focus on prevention and primary care and the needs of their particular communities. With these reforms, we believe Oregon will be well-positioned to provide access to health care for newly eligible people, meet the three goals outlined above, and, at the same time, effectively leverage federal and state resources to support integrated care.  As Oregon forges ahead to implement its most ambitious health care transformation plan to date, focusing on integrated, coordinated care and alignment of incentives, we are also requesting approval to use federal savings earned under the OHP waiver to help launch our initiatives.

While Oregon will be requesting some new flexibilities, in addition to those in the state's current 1115 Demonstration authorities for the CCOs to effectively integrate and coordinate care, these flexibilities are not comprehensive and are not intended to supplant current federal and state statute governing health insurance and Medicaid managed care. Nor are the waivers requested in this application intended to reduce any current flexibilities under Oregon's 1115 Demonstration waivers.

The ultimate goal of the CCOs is to move from fragmentation to integration and deliver the right care in the right place at the right time within a patient-centered care model. CCOs will integrate and coordinate care across physical, behavioral, and oral health care services through a strong focus on primary and preventive care, evidence-based services, and more effective management of care.  Not

Exhibit 2
Page 4 of 28

*March 1, 2012*

only will CCOs change how services are delivered, but this new model will also serve a broader population by enrolling beneficiaries who would otherwise receive care on a fee-for-service basis, including those dually eligible for both Medicare and Medicaid.  Experience in enrolling new beneficiary groups will help prepare CCOs to transform health care delivery for the expanded Medicaid population that will become eligible in 2014.

Oregon and its stakeholders are committed to transforming the delivery system without compromising the overall capacity to provide care.  This will require a phased implementation of CCO requirements.  However, the sustainability of Oregon's Medicaid program depends on successfully achieving system transformation in a timely manner.  As outlined below, in order to proceed apace, Oregon may certify and contract with CCOs to provide care to Medicaid clients before the state's planning to integrate dually eligible beneficiaries is completed with CMS *(See Appendix A, CCO Application Timelines).* The Medicare-Medicaid Coordination Office is prepared to do the same with respect to integrated care for individuals who are dually eligible for Medicare and Medicaid beginning in January 2013.  Regardless, Oregon will work with CMS to ensure that CCOs can successfully meet the needs enrollees, including those eligible for both Medicare and Medicaid.

Oregon's proposed health care transformation was initially outlined in the Oregon Legislature under House Bill 3650 of 2011,[1] which was passed with broad bipartisan support.  The law creates a new delivery model for Oregon called the Integrated and Coordinated Health Care Delivery System in which CCOs are used to improve health; increase the quality, reliability, availability and continuity of care; and reduce the cost of care.  Using alternative payment methodologies, and ongoing community needs assessments, CCOs will provide medical assistance recipients with integrated health care services that focus on prevention and use patient-centered primary care homes, evidence-based practices, health information technology and employ a broader use of non-traditional health care workers (e.g., community health workers, peer wellness specialists) to improve health and reduce health disparities. Within a fixed global budget, CCOs will be accountable for care management and provision of integrated and coordinated health care for their members. Care coordination will be an integral part of CCOs, which will provide services in a patient-centered primary care home setting to the maximum extent possible. Patients will choose or be assigned to a consistent provider/clinic or team to increase continuity and ensure individual responsibility for care coordination functions.

CCOs will  developed a person-centered plan for beneficiaries with high or special health care needs, based both on their needs and personal preferences. Care plans will address key access, tracking, referral, and care coordination goals.  There is a strong expectation that there will most likely be co-management for beneficiaries with mental health or substance abuse diagnoses and specialty services and supports for people with developmental disabilities and others who may need long term care and services and supports. Co-location of behavioral health and primary care is strongly encouraged. Patient-centered primary care homes (PCPCH)/health home services will function under the direction of a licensed health professionals, including physicians, physician assistants, nurse practitioners, nurses, social workers, or professional counselors.

---

[1] http://www.leg.state.or.us/11reg/measpdf/hb3600.dir/hb3650.en.pdf

*March 1, 2012*

HB 3650 required OHA to submit specific proposals detailing CCO criteria for qualification and a CCO global budget methodology before the state would proceed with requests for federal flexibilities or implementation of the Medicaid delivery system transformation outlined in the legislation.  Through a robust public process *(See Appendix B, Oregon Health System Transformation Public Process)*, the Oregon Health Policy Board developed a detailed CCO Implementation Plan *(See Appendix C, CCO Implementation Proposal)* that included the CCO criteria for qualification and the CCO global budget methodology.  The Implementation Plan was submitted to the legislature for consideration in late January 2012.  Senate Bill 1580, which essentially approves the CCO criteria and global budget process and enables the creation of CCOs, was introduced by Governor John Kitzhaber, at the request of the Oregon Health Authority (OHA) on February 1, 2012.  SB 1580 was passed with broad bipartisan support (53-7) on February 23, 2012.[2]

Building on the current managed care structure, Oregon's health system transformation efforts are the next stage of evolution for the state's Medicaid system. While there are similarities between CCOs and Medicare Accountable Care Organizations, Oregon's CCOs are risk-bearing entities.  The CCO model emphasizes community-driven rather than provider-led governance; community needs assessments; person-centered care management; alternative payment methodologies; global budgets that increase at a fixed rate of growth, and a focus on metrics and outcomes. The key elements of the state's approach are patient-centered primary care homes, improved coordination of care, and aligned incentives that reward providers and beneficiaries for achieving good outcomes.

## II.  Conditions on the Ground in Oregon - Legacy of Oregon Health Plan

From 2009-2011, Oregon's Medicaid expenditures increased at an unsustainable annual rate that far outpaced the growth in general fund revenue. This growth in expenditures occurred despite the success of the Oregon Health Plan (OHP), which has saved the state and federal government an estimated $16 billion since its inception in 1994.

The Centers for Medicare & Medicaid Services (CMS) granted Oregon its initial section 1115 Demonstration to implement the innovative OHP nearly two decades ago, phasing in coverage under the initial Demonstration beginning in 1994.  CMS approved Oregon's current section 1115 Demonstration, known as Oregon Health Plan 2 (OHP2), in 2002. The Demonstration has been renewed on several occasions and is currently scheduled to expire in October 2013.  With this amendment, Oregon requests an extension of this Demonstration under Section 1115(a) of the Social Security Act, through October 31, 2016.  Under the OHP2, the state currently provides coverage to more than 650,000 Oregonians and is available to individuals with incomes at or below 100 percent of the federal poverty level regardless of age, disability, or family status. The primary objectives of OHP2 are to achieve:

- Health care coverage for uninsured Oregonians;
- A basic benefit package of effective services;
- Broad participation by health care providers;
- Decreases in cost-shifting and charity care;

---

[2] http://www.leg.state.or.us/12reg/measpdf/sb1500.dir/sb1580.en.pdf

Exhibit 2
Page 6 of 28

*March 1, 2012*

- A rational process for making decisions about resources and the provision of health care for Oregonians; and
- Control over health care costs.

Under OHP2, the majority of Oregonians covered through Medicaid and the Children's Health Insurance Program (CHIP) receive services through a combination of physical, behavioral, and dental managed care entities. Oregon's Demonstration is unique in its longstanding use of a prioritized list of health care conditions and treatments that enables the state to focus resources on prevention and use of the prioritized list as a method to control health care costs and assure accountability. It is envisioned that under this waiver modification, the prioritized list would continue to be used.

In 2009, Oregon established the Oregon Health Authority (OHA) as the guiding structure for the state's health and health care purchasing agencies, including the state employee's health program. OHA is overseen by the Oregon Health Policy Board (OHPB), a nine-member citizen board. OHA's mission focuses on "helping people and communities achieve optimum physical, mental and social well-being through partnership, prevention and access to quality, affordable health care." As part of a larger agency dedicated to the vision of a healthy Oregon, the Medicaid program and OHP2 are well-positioned to serve as an essential and leading component of the transformation of the Oregon health system.

As mentioned above, the OHP2 provides an important foundation to support the health system transformation to CCOs. Oregon's transformed system will leverage lessons learned from its managed care, behavioral health, and dental care organizations. The CCOs will build on the successes of current pilot programs focused on coordinating care for high-need, high-cost Medicaid beneficiaries. The state anticipates that CCOs will fundamentally reform the current delivery model by providing improved quality and benefits across all Oregon communities, paying providers for prevention and outcomes, and coordinating care for individuals with chronic conditions to achieve improved health outcomes and avoid preventable specialty care and unnecessary hospitalizations and emergency care.

While health plan performance is generally strong, there are still significant opportunities to enhance access to care, improve care delivery, and advance health outcomes at the community level. Although the number of children and adults served by the Oregon Health Plan who receive preventive services has increased annually, barriers still exist including health care providers that do not accept Medicaid and lack of knowledge among some beneficiaries and their families regarding the importance of routine health visits. Similarly, although appropriate prenatal visits have increased annually, there is still a lack of beneficiary understanding concerning the importance of prenatal visits, even when a pregnancy is going normally.

With the transition to CCOs, Oregon will be positioned to improve the satisfaction of beneficiaries with both their ability to get care and the quality of care they receive. At the same time, the CCOs will help the state achieve a sustainable level of health care spending through global payment strategies and reductions in unnecessary health care costs through better coordination of chronic care and a reduction of health disparities.

*March 1, 2012*

## Economic conditions and revenue constraints

Oregon, like the rest of the United States, is experiencing a slow and tenuous economic recovery. The state's jobless rate has improved, showing a decline from 10.4 percent unemployment in January 2011, to 8.9 percent in December 2011, but it is still above the national unemployment rate of 8.5 percent during the same period. In addition, while Oregon is seeing slight increases in state revenues, overall revenues to the state have decreased, in part due to the expiration of the enhanced Medicaid Federal Medical Assistance Percentage (FMAP) funds. Oregon's budget reality is that state expenditures are outpacing revenues. This shortfall is driven in part by a rate of increase in Medicaid and public employees' health care expenditures, one area of spending that is growing faster than statewide general revenue. Without a change in its health care spending trajectory, Oregon is faced with making serious reductions in payments to Medicaid providers or adjustments to covered benefits to achieve its budget targets in FY2013.

This weak fiscal climate creates not only an imperative, but a unique opportunity for Oregon to do what it has done time and again – innovate. Through the CCO initiative, Oregon has developed an innovative redesign of the State's health care delivery system to achieve better value for all stakeholders while improving outcomes. With 80 percent of health care dollars spent on 20 percent of the patients, Oregon sees an opportunity to focus its health care transformation, in part, on improving coordination for patients with chronic health issues and increasing integration across physical, mental, dental and other health care services to enhance outcomes and reduced costs. If successful, this transformation will help Oregon reduce future costs to the OHP, stabilize the delivery system, and preserve available services.

## III. Stakeholder and CMS Collaboration

OHA initiated discussions with CMS about the CCO model in early fall of 2011 and specifically addressed the state's desire to begin the transition to the CCO model beginning July 1, 2012. Through the CMS Medicaid State Technical Assistance Team (MSTAT) process, weekly calls and consultation have kept CMS officials informed of Oregon's progress, and a series of concept papers have more fully described components of Oregon's proposed health system transformation. Within Oregon, preparations and a robust stakeholder and public engagement process related to Oregon's waiver request began in the early days of the State's consideration of the new system. *(See Appendix B, Oregon Health Plan Transformation Public Process)*:

- In February, 2011, Governor Kitzhaber appointed 44 stakeholders to the "Health System Transformation Team." This group was made up of representatives of major components of the health care system, advocacy organizations and Oregon's tribes. It met every Wednesday evening in three-hour sessions over eight weeks to develop a conceptual framework for transformation of Oregon's health system. The work of this group resulted in the legislative concept that became HB 3650, which was signed by the Governor on July 1, 2011.
- In August 2011, Governor Kitzhaber selected 133 people—from nearly 500 applicants—to serve on four workgroups to inform the development of the CCO Implementation Proposal. The four work groups, chartered under the Oregon Health Policy Board (OHPB), included:

*March 1, 2012*

- CCO Criteria;
- Global Budget Methodology;
- Outcomes, Quality and Efficiency Metrics; and
- Medicare-Medicaid Integration of Care and Services.

The workgroups, which ranged in size from 35 to 40 members, were selected to represent the diversity of Oregon health care stakeholders. The workgroups met monthly for three-hour sessions, between August and November, each month providing input to the OHPB.  All of the meetings were public, and the discussion topics and meeting materials were posted online for additional public comment.[3] Because of the size of the workgroups, the meetings were structured so that organizational and background information was presented in a large group setting, followed by structured, facilitated discussions in small group breakouts of 12 to 15 members each. The discussions from each of the workgroup meetings were summarized and presented to the OHPB along with a summary of public input.

- The Medicaid Advisory Committee considered issues related to Oregon's health system transformation in March, April, July, September and October 2011, and in January and February 2012.

- The Oregon Health Authority engaged with Oregon tribes about health system transformation in consultations and in regular meetings with tribal health care leadership in February, April, May, June, July, August, November, and December of 2011 and in January and February of 2012.

- The Oregon Health Authority engaged and held discussions of health system transformation with Federally Qualified Health Center (FQHC) and Rural Health Clinic (RHC) representatives in May, June, August, September, November and December of 2011 and in February 2012.

- In late August and early September 2011, more than 1,200 Oregonians provided input through eight public meetings that were held around the state (Portland, Medford, Astoria, Bend, Roseburg, Eugene, Florence, and Pendleton; and through online surveys.

- Each month since the passage of HB 3650, the Oregon Health Policy Board meetings have focused on specific aspects of the CCO Implementation Proposal with both invited testimony and open public testimony.  Two meetings were held in January 2012 to finalize the OHPB's recommendations to the legislature. These meetings are always live-streamed on the web.

- There were two open public comment periods on the Board's CCO Implementation Proposal in December 2011 and January 2012.

---

[3] http://health.oregon.gov/OHA/OHPB/health-reform/workgroups/index.shtml

*March 1, 2012*

## IV.  Integration of Care for Medicare and Medicaid Enrollees

Integration of Medicare and Medicaid services and financing for dually eligible Medicare-Medicaid enrollees is key to realizing Oregon's Triple Aim of better health, better health care, and lower costs.  Medicare-Medicaid enrollees are a disproportionately high-cost population, making up 15 percent of the Medicaid population nationally, but accounting for 39 percent of Medicaid costs.[4]  In Oregon, Medicare-Medicaid enrollees make up 17 percent of the Medicaid population, but account for 40 percent of the state's Medicaid expenditures for acute and long-term services and supports (LTSS).   Similarly, Medicare-Medicaid enrollees make up 21 percent of the Medicare population nationally (15 percent in Oregon), but account for 36 percent of Medicare costs.[5] There are approximately 59,000 Medicare-Medicaid enrollees in Oregon.

Under the Demonstration authority for Medicare-Medicare enrollees (hereafter referred to as the "Medicare-Medicaid Demonstration"), financial alignment will result in savings for this population, for example, through:

- Reductions in avoidable hospitalizations and emergency room utilization;
- Reductions in avoidable specialty care
- Reductions in unnecessary or duplicative drug utilization; and
- Administrative efficiencies from new flexibilities to align Medicare and Medicaid regulatory and administrative requirements.

Enrollees participating in the Medicare-Medicaid Demonstration will receive primary, acute, mental health and chemical dependency care, and prescription drugs through their CCO. The CCOs will not directly provide long-term services and supports (LTSS); however, in order to reduce costs in both systems and ensure shared responsibility for delivering high-quality, person-centered care, the CCOs and LTSS system will coordinate care and share both programmatic and financial accountability.

Promising models and pilot projects exist in Oregon for better coordinating care between the medical and LTSS systems.  Practices that are used in these projects (alone or in combination) are described below.

- *Co-Location or Team Approaches:*  These models include co-location of staff such as LTSS case managers in medical settings (hospitals or primary care), care coordination positions jointly funded by the LTSS and medical systems, or team approaches such as a multi-disciplinary care team including LTSS representation.
- *Services in Congregate Settings:* In these models, a range of LTSS and medical services are provided in congregate settings to a group of common beneficiaries. Services can be limited to one type of service, such as personal care provided in an apartment complex.

---

[4] 2007 data - The Kaiser Family Foundation Program on Medicare Policy. (January 2011). *The Role of Medicare for the People Dually Eligible for Medicare and Medicaid*. Menlo Park. CA: Jacobson, Gretchen, Neuman, Tricia, Damico, Anthony, Lyons, Barbara. http://www.kff.org/medicare/upload/8138.pdf Oregon specific data: Kaiser Family Foundation, State Health Facts (2007 data). www.statehealthfacts.org
[5] Ibid.

Exhibit 2
Page 10 of 28

March 1, 2012

- *Physician Extender/Home-Based Programs:*  These models rely on the use of nurse practitioners, physician assistants or registered nurses who perform assessments, plan treatments, and provide interventions to the person in their home, or another community-based setting, or a nursing facility setting.

To achieve system-wide alignment, models such as these will be brought to scale under the Medicare-Medicaid Demonstration and supported by mechanisms that promote shared accountability. A shared financial accountability system will be developed based on incentives and/or penalties linked to performance metrics applied to the CCO and/or to the LTSS system, including those that reflect better coordination between the two systems.  Other elements of shared accountability between CCOs and the LTSS system will include:

- Contractual elements, including specific requirements for coordination between the two systems;
- Requirement to clearly define roles and responsibilities between the two systems through a memorandum of understanding, contract, or other mechanism between the CCO and the local Area Agency on Aging (AAA) or the state's Aged and People with Disabilities (APD) local office; and
- Reporting of metrics related to better coordination between the two systems.

As with the rest of the CCO development process, in establishing these structures for shared accountability across CCOs and the LTSS system, it will be important to balance prescriptiveness and local flexibility.  OHA and Oregon's Department of Human Services (DHS) will set broad goals for integration of care for Medicare-Medicaid enrollees, and local entities interested in becoming CCOs will propose approaches within their individual capacity to address the needs of beneficiaries.  OHA and DHS will approve proposals that reduce the cost-shifting and uncoordinated care that can result in fragmented care and poor outcomes for beneficiaries.

The CCO care delivery model is uniquely suited to meet the needs of complex populations through its patient-centered approach and community focus.  It provides an ideal platform for development of the Medicare-Medicaid Demonstration. Oregon will work with CMS to align the CCO design and and model requirements with the Medicare Advantage Model of Care standards in order to ensure that the final three-way contract includes the elements necessary to meet the needs of Medicare-Medicaid enrollees.  The final Memorandum of Understanding (MOU) will outline the clinical and non-clinical care elements to be provided through the Demonstration.

For example, in the MOU, CMS and the state will agree on how to align enrollment processes and beneficiary safeguards, such as appeals.  In addition, guidelines for beneficiary information will be included  in the Medicare-Medicaid Demonstration MOU and three-way contracts with CCOs.  Beneficiary information about options for enrollment will be integrated with Medicare to the extent possible, and be accessible and understandable to beneficiaries, including those with disabilities or limited English proficiency. CMS and the state will prior approve all outreach and marketing materials, subject to a consistent and integrated single set of rules.

Exhibit 2
Page 11 of 28

*March 1, 2012*

## V.  Oregon's Medicare-Medicaid Demonstration Design Contract

In April 2011, Oregon was selected to receive a $1 million contract from CMS for a 12-month planning process to design a new approach to integrate care for dually eligible Medicare and Medicaid enrollees. OHA is preparing a formal implementation proposal, through which CMS may offer additional funding for the Medicare-Medicaid Demonstration.  This proposal is due in April 2012.  This proposal will closely follow the Capitated Financial Alignment model, in order to take advantage of the new opportunity to pursue three-way contracts between health plans, the state, and CMS for blended Medicare and Medicaid payment to plans. The blended rates, which will be paid to CCOs, will reflect savings for both Medicare and Medicaid.  However, as a design contract state, Oregon is not limited to proposing this model, and as such the proposal to CMS may also be an opportunity to pursue other promising models, such as housing with services and a more flexible Program of All-Inclusive Care for the Elderly (PACE) program.

Oregon will work with CMS to negotiate the terms and program structure for the Medicare-Medicaid enrollee population to ensure that its proposal meets Oregon's requirements and CMS standards and conditions for including Medicare funding for Medicare-Medicaid enrollees. After signing an MOU between the state and CMS, CMS will participate in the contracting process as relevant for Medicare funding, likely on a timeline following the state contracting process, leading to the signing of three-way contracts among CMS, the state, and CCOs.

Through the Medicare-Medicaid Demonstration, regular calls and meetings have kept CMS officials abreast of Oregon's progress. Oregon state officials have engaged internal and external stakeholders to gather feedback about the current system and how to most effectively structure the proposed new system.  Staff attended focus groups organized by CMS that provided valuable insights into how consumers interact with and view the current system and areas of potential improvements.  One of the external stakeholder workgroups established by Governor Kitzhaber to assist in developing the CCO framework focused specifically on integration of care and services for Medicare-Medicaid enrollees.  This workgroup included participants from a variety of perspectives, including consumers, medical and LTSS providers, local AAAs, health insurance plans, unions, and advocates.  The workgroup met four times to address:

- What is working and what needs to improve in the delivery of coordinated, integrated services for dually eligible individuals;
- Development of metrics that reflect the needs of this population;
- Strategies for structuring care coordination and transitions of care; and
- Strategies for shared accountability with long-term care

Staff also conducted listening groups with Medicare-Medicaid enrollees and participated in workgroups with state leadership and subject matter experts to analyze policy options and ensure that the needs of individuals who are dually eligible are addressed throughout Oregon's health system transformation effort.

*March 1, 2012*

## VI. Certification of CCOs

Throughout the stakeholder process, OHPB received recommendations about the key certification requirements for CCOs.  In March 2012, OHA will begin a non-competitive request for applications (RFA) procurement process that specifies the criteria that organizations must meet to be certified as a CCO (*See Appendix A, CCO Application Timelines*). Prospective CCOs will be asked to submit applications to OHA describing their capacity and plans for meeting the requirements established by HB 3650 and its successor laws, including being prepared to enroll all eligible persons within each CCO's proposed service area. Contracts with certified CCOs will be for multi-year periods, with annual renewal based on CCO compliance with OHA requirements; this is similar to Medicare Advantage contract renewals. Certification will be for six-year periods; CCOs will retain their certification between certification periods as long as they are in compliance with OHA requirements, and in the future, with Division of Insurance requirements. Recertification will include public process to be established in rule by OHA.

In mid spring 2012, OHA will promulgate administrative rules describing the CCO application process and criteria. Once the criteria have been finalized, the state will initiate the application process for prospective CCOs in March 2012.  It is expected that CMS will provide guidance to OHA in its evaluation of applications and certification of CCOs in order to be certified to take Medicare risk.

Because CCOs will be responsible for integrating and coordinating care for Medicare-Medicaid enrollees, the application will build on the existing CMS Medicare Advantage application process, streamlining the process for any plans that have previously submitted Medicare Advantage applications. The request for applications will be open to all communities in Oregon and will not be limited to certain geographic areas.  Evaluation of CCO applications will account for the evolutionary nature of the CCO system. CCOs, OHA, and partner organizations will need time to develop capacity, relationships, systems, community needs assessments, and the experience necessary to fully comply with HB 3650.

## VII.   Design Elements of CCOs

In a final report in January 2012, OHPB made the following recommendations for the key design elements of the CCOs. *(See Appendix A, CCO Application Timelines)*

### a.   Global budget

CCO global budgets are designed to cover the broadest range of funded services for the most beneficiaries possible. The construction of global budgets start with the assumption that all Medicaid funding associated with a CCO's enrolled population is included. Global budgets will  include services that are currently provided under Medicaid managed care in addition to  Medicaid programs and services that have been  provided outside of the managed care system. This inclusive approach will enable CCOs to fully integrate and coordinate services, achieve economies of scale and scope and to contain per capita costs to a sustainable fixed rate of growth. The global budget approach also allows CCOs maximum flexibility to dedicate resources toward the most efficient forms of care.

Exhibit 2
Page 13 of 28

*March 1, 2012*

**Medicaid Populations Included in Global Budget Calculations.** With very few exceptions, all Medicaid populations in Oregon are to be enrolled in CCOs and paid under the global budget methodology. An overview of the eligible CCO populations and their current managed care enrollment can be found in *Appendix D, CCO populations and schedule for inclusion in global budget*. Approximately, 78 percent of people who are eligible for Medicaid are enrolled in a capitated physical health plan, 88 percent in a mental health organization, and 90 percent in a dental care organization.[6] HB 3650 directs OHA to enroll as many of the remaining eligible individuals (including those who are currently in fee-for-service Medicaid) into a CCO as possible. Section 28 of HB 3650 specifically exempts American Indians, Alaska Natives and related groups from mandatory enrollment in CCOs.

**Medicaid Service/Program Included in Global Budgets.** One of the primary goals of the global budget concept is to allow CCOs flexibility to invest in care that may decrease costs and achieve better outcomes. The more programs, services and funding streams that are included in CCO global budgets, the more flexibility and room for innovation exist for CCOs to provide comprehensive, person-centered care. In addition, leaving necessary care outside of the global budget creates conflicting incentives where the action of payers outside of the CCO, who have little reason to contribute to CCO efficiencies, may have an undue effect on costs and outcomes within the CCO.

The inclusion of Medicaid services in CCO global budgets will be phased in to balance accountability, incentives, and enrollee care concerns. *Appendix M, Inventory of Medicaid services and timeline for inclusion in global budget*, provides an inventory of Medicaid funded services and the current plan for inclusion of those services in CCO global budgets.

Without exception, funding and responsibility for all current services provided by managed physical and mental health organizations will be included in each CCO's global budget. The services that are currently included in capitationunder physical and mental health organizations account for approximately 70 percent of Oregon's non-long-term care Medicaid expenditures.

Currently, five percent of Oregon's non-long-term care Medicaid expenditures are associated with payments for dental care through DCOs. Dental expenditures will be included in global budgets based on individual CCO determination, as HB 3650 allows until July 1, 2014 to incorporate these services.

With respect to the remaining non-long-term care Medicaid expenditures, *Appendix D* provides the schedule for inclusion in the global budget. Careful consideration needs to be given to when and how these services are folded in. CCOs are strongly encouraged to develop strategic partnerships within their communities in order to successfully manage comprehensive global budgets. While these partnerships are developing we do not want to fold in services that may reduce the quality or access of current high need or targeted services. Over time, the OHPB feels strongly that all exclusions need to be addressed to ensure a robust CCO global budget structure.

---

[6] Citizen Alien Waived Emergent Medical (CAWEM) beneficiaries and individuals who are partially dual eligible for Medicaid and Medicare—including qualified Medicare beneficiaries (QMB) and specified low-Income Medicare beneficiaries (SLMB)—are not included in this calculation.

March 1, 2012

**Components of the Global Budgets.** The overall global budget strategy will hold CCOs accountable for costs but not enrollment growth. This strategy suggests an overall budgeting process that builds on the current capitation rate methodology, but includes a broader array of Medicaid services and/or programs.  After establishing the baseline global budget, the State proposes to contain CCO global budgets to a sustainable, fixed rate of per capita cost growth and would like to work with CMS to develop that methodology.

Major components of the CCO global budgets include:

*A capitated portion* that includes the per-member per-month payments for services currently provided through the OHP physical health plans, mental health organizations and (if included) dental care organizations.

At least initially, the capitated portion of CCO capitation rate setting would combine the information provided by organizations seeking CCO certification with a method similar to the lowest cost estimate approach OHA took in setting rates for the first year of the 2011–13 biennium. This approach provides a key role for plans in determining appropriate rates and potential efficiencies that can be realized under a transformed delivery system tailored to meet the needs of the communities the CCOs serve.  Under this approach, potential CCOs will submit a completed base cost template using internal cost data that is representative of a minimum base population. This will not be a competitive bidding process, but OHA actuaries will review the submission for completeness and soundness in order to establish a base rate. Once a base rate is established, the state actuaries will use a risk adjustment methodology to arrive at rates for previously uncovered populations and areas.

*CCO optional services* that can be included in individual CCO global budgets if all integral community partners support the inclusion.  These services include residential alcohol and drug treatment services, OHP dental coverage, and selected targeted case management programs that are offered in only one or a few counties. HB 3650 specifies that the first two are optional for inclusion until July 1, 2013 and July 1, 2014 respectively. We anticipate that they could be paid on a per member per month basis.  The reimbursement methodology for the selected targeted case management programs is under development as local matching funds serve as the state Medicaid match.  *Appendix D* provides a timeline for statewide inclusion of these and any remaining Medicaid funded services not listed here.  In the interim, Medicaid services not included in the global budget initially will continue to be reimbursed as they are currently.

*CCO transformation incentive payments* that will be outside of the capitated portion to provide 1) infrastructure for metric reporting and delivery system transformation efforts in year 1 of the global budgets, and 2) incentive for continual transformation and improvement through meeting both cost and health outcomes metrics.

 Additionally, CCO global budgets will include Medicare funding to blend with Medicaid funding to provide care and services to individuals eligible for both programs.  Discussion of this methodology is addressed in the State's proposal for the Medicare-Medicaid Demonstration.

Exhibit 2
Page 15 of 28

March 1, 2012

Finally, Oregon would like to explore with CMS the implications of phasing non-emergency medical transportation (NEMT) into the CCO global budgets during the first contract year. Oregon operates this program under a 1915(b) waiver.

### b.  Accountability

CCOs will be accountable for outcomes associated with better health and more sustainable costs. HB 3650 directed that CCOs be held accountable for their performance through public reporting of metrics and contractual quality measures. These strategies function both as an assurance that CCOs are providing quality care for all of their members and as an incentive to encourage CCOs to transform care delivery in accordance with HB 3650. Accountability measures and performance expectations for CCOs will be phased in to allow CCOs time to develop the necessary measurement infrastructure and enable OHA to incorporate CCO data into performance standards. An external stakeholder group established as part of Oregon's health system transformation developed a set of measurement recommendations for OHA to use as a guide. SB 1580 creates a nine-member Metrics and Scoring Committee within OHA, to be appointed by the Director.  This group is directed to identify "objective outcome and quality measures including measures of outcome and quality for ambulatory care, inpatient care, chemical dependency and mental health treatment, oral health care and all other health services provided by coordinated care organizations."  It further requires that quality measures adopted by the committee must be consistent with existing state and national quality measures.[7]

### i.  Quality Measurement

OHA has distinguished CCO accountability metrics (including both core and transformational measures as described below) from measures and reporting requirements designed to promote CCO transparency and community engagement and to enable state and federal monitoring and evaluation of CCO structure and operations.

As defined by the OHPB and its Quality, Outcomes, and Efficiency workgroup, there are two types of CCO accountability measures:

- *Core Measures*: Triple-Aim oriented measures that gauge CCO performance against key expectations for care coordination, consumer satisfaction, quality and outcomes in the selected domains.
- *Transformational Measures*: Measures that assess CCO's progress toward the broad goals of health systems transformation, which may require systems transitions and experimentation in effective use. This subset may include newer kinds of indicators (for which CCOs have less measurement experience) or indicators that entail collaboration with other care partners.

To conduct this measurement, it will be important for reports and data to flow from CCOs to OHA and from OHA to CCOs. While annual reporting will serve as the basis for holding CCOs accountable to contractual

---

[7] http://www.leg.state.or.us/12reg/measpdf/sb1500.dir/sb1580.en.pdf

Exhibit 2
Page 16 of 28

*March 1, 2012*

expectations, OHA will assess performance more frequently (e.g., quarterly or semi-annually) on an informal basis to facilitate timely feedback, mid-course corrections, and rapid improvement.

Initial core and transformational measures are shown in *Appendix F*, and, where applicable, alignment with national quality measure sets is also exhibited.[8]  Many of the measures proposed for CCO accountability are the same as or closely aligned with items used in federal measurement initiatives including Medicaid Adult and CHIPRA core sets, Medicare Advantage reporting requirements, and Medicare's Shared Savings (ACO) and Hospital Value-based Purchasing programs.  *Appendix G* exhibits both proposed core measures and transformational measures.  In addition, Oregon will collect and report other measures, also shown in *Appendix G*, to satisfy federal reporting requirements and to provide communities with information about the performance of their CCO(s). Oregon will continue to work with CMS as part of the Medicare-Medicaid Demonstration to identify performance measures to promote joint accountability between CCOs and the long-term services and supports system (LTSS).

Accountability measures for CCOs will be phased in over time to allow CCOs to develop the necessary organizational infrastructure and enable OHA to incorporate CCO data into performance standards. *(See Figure 1 below).* In year 1, CCO accountability will be for reporting only.  In years 2 and 3, CCOs will be accountable for meeting minimum standards on core measures and improving on their past performance for transformational measures. OHA plans to offer incentives to reinforce these reporting and performance expectations, with the specific incentive design to be determined.

Initially, these accountability years will be based on the effective date of each CCO's contract; that is, year 1 for a CCO that starts operation in July 2012 will be July 2012-June 2013, and year 1 for a CCO that starts operation in November 2012 will be November 2012-October 2013. However, all CCOs will be required to meet minimum accountability standards by January 2014, regardless of their start date. CCOs that begin operation less than a year before that date will have a shorter reporting-only period and CCOs that start on or after January 2014 will have no phase-in period at all, as depicted in Figure 1 below.

---

[8]Appendix F represents measures currently under consideration, not a final list.  The next stage of metrics development will be for OHA to establish a technical advisory group of internal and external experts (including consumers) to build measure specifications, including data sources, and to finalize a reporting schedule.  Development of joint CCO-LTSS accountability measures will also be part of this task.  Further technical work, such as establishing benchmarks based on initial data, will follow.

Exhibit 2
Page 17 of 28

*March 1, 2012*

**Figure1: Phasing in of CCO Accountability Measures**

| | CCO 1 Start: July 2012 | CCO 2 Start: Jan 2013 | CCO 3 Start: July 2013 | CCO 4 Start: Jan 2014 |
|---|---|---|---|---|
| July 2012 | ● | | | |
| Jan 2013 | | ● | | |
| July 2013 | ● ● | ● | ● | |
| Jan 2014 | | ● ● | ● ● | ● |
| July 2014 | | | | |
| Jan 2015 | ● | ● | ● | ● |

● - - - ●  Accountability for reporting only
●———●  Accountability for performance

CCO accountability metrics will evolve over time based on ongoing evaluation of the metrics' appropriateness and effectiveness. OHA's Metrics and Scoring Committee will establish an annual review and revision process that draws on the expertise of the technical workgroup described above and that ensures participation from representatives of CCOs and other stakeholders, including consumers and community partners. To guide its annual review, OHA and the Committee will utilize the OHPB's Quality, Outcomes, and Efficiency workgroup principles for measure selection and revision along with national frameworks like the Institute of Medicine's stepwise approach to "measuring what matters."[9]

## ii.    Quality Assurance and Performance Improvement (QAPI)

CCOs will be required to maintain QAPI plans, as managed care organizations do today, including requirements for utilization guidelines and review, member protections, quality and access reporting, and fraud and abuse protections.  In keeping with Oregon's goals for health system transformation and the proposed structural and operational criteria for CCOs, the following are likely focus areas for quality assurance and performance improvement (QAPI) at the state and CCO levels:

- *Person-(or patient) Centered Care* -- Patient engagement and activation including shared decision making; involvement of patients in developing a plan of care and planning for care transitions; and mechanisms for engaging patients outside the health care setting and improving self-management skills, including planning for end-of-life care.
- *Governance and Partnerships* – Collaboration with safety net providers, dental care organizations and residential chemical dependency service providers (if not incorporated into CCO initially), local public and mental health authorities, the long-term care system, and other systems or agencies like the Governor's Early Learning Council; and involvement of consumers (or beneficiaries) in CCO governance.

---

[9] Institute of Medicine. (April 2011).  Child and Adolescent Health and Health Care Quality: Measuring What Matters. Available at: http://www.iom.edu/Reports/2011/Child-and-Adolescent-Health-and-Health-Care-Quality/Report-Brief.aspx

*March 1, 2012*

- *Care Coordination and Integration* – Use of OHA-recognized patient-centered primary care homes (PCPCHs); timely communication between PCPCHs and other services; providers using electronic health information technology where available; real or virtual co-location of services; use of alterative payment methodologies to encourage coordination and integration of care; and coordination of care for individuals receiving Medicaid-funded long term care services given the legislative exclusion of Medicaid funded long-term services from CCO global budgets.
- *Capacity and Access* – Adequacy of provider network in relation to member needs and choice of providers; use of non-traditional health workers and availability of care in non-traditional settings; timely and appropriate access to hospital and specialty services; and use of population health management tools and strategies.
- *Reduction of Health Disparities* – Development of a needs assessment process to identify community needs, and health disparities; prioritization of health disparities for reduction in the community action plan;  use of best practices and provision of culturally and linguistically appropriate care; and maintenance of data on member race, ethnicity, and primary language in accordance with state standards.

The focus areas above reflect many service expectations for CCOs that cannot be tracked using traditional medical coding systems. The state's QAPI activities and QAPI requirements for CCOs will allow for strong oversight of these services without imposing new and potentially burdensome reporting mechanisms that run counter to the CCO model and the intent of transformation. Oregon will work with CMS to develop a process to identify QAPI focus areas that include Medicare quality improvement priorities for dual eligibles.

The CCO accountability measures described above and related incentives will be core elements of the state's Quality Strategy. The measures will allow OHA to set clear expectations for care delivery and health systems transformation and to monitor CCOs' performance against those expectations.  The state will work with independent entities (QIO/EQRO) to review CCO performance. While Oregon plans to utilize the QIO/EQRO for audits, the state will retain the responsibility to monitor CCOs as they come into compliance after findings are presented and as they maintain compliance. OHA will institute a system of progressive accountability that maximizes the opportunity to succeed but also protects the public interest.

Technical assistance for performance improvement will be the primary strategy in the first year of CCOs' operation, when their accountability will be for reporting only. Informal interim reporting (quarterly or semi-annually) will facilitate timely feedback and allow for mid-course corrections such that CCOs will be prepared to meet specified quality standards in year 2, whether those standards are absolute benchmarks or expected improvement on past performance.  When the evidence indicates that a CCO is not meeting performance standards, steps taken will build on current accountability mechanisms for Medicaid MCOs and Medicare Advantage plans, and may include:
- Technical assistance;
- Increased frequency of monitoring efforts;
- Corrective action plan;

Exhibit 2
Page 19 of 28

*March 1, 2012*

- Restricting enrollment;
- Financial penalties; and
- Non-renewal of contracts.

These consequences would phase in over time if sub-standard performance continues. For CCOs that perform well on accountability metrics and meet other contractual expectations, OHA may choose to offer a simplified, streamlined recertification or contracting process in addition to the possibility of financial performance incentives.

### c. Application process

Beginning in March 2012, prospective CCOs will respond to a non-competitive RFA. The RFA will describe the criteria outlined in this proposal that organizations must meet to be certified as a CCO, including relevant Medicare plan requirements to the extent that these are known at that time. The RFA will be open to all communities in Oregon and will not be limited to certain geographic areas.  OHA is required to contract with all certified CCOs. (*See Appendix A, CCO Application Timelines*)

### d. Governance

CCOs will be required to have a governing board with a majority interest consisting of representation by entities that share financial risk as well as representation from the major components of the health care delivery system. In addition, the governance structure must include at least two health care providers in active practice, at least one whose practice is primary care; and a mental health or chemical dependency treatment provider.  At least two members must be from the community at large.  CCOs will also convene community advisory councils to provide a community perspective and a member of the council will serve on the CCO governing board.

### e. Criteria

In their applications for certification, CCOs will demonstrate how they intend to carry out the functions outlined in HB 3650 and SB 1580, including:
Ensuring access to an appropriate delivery system network centered on patient-centered primary care homes;

- Ensuring member rights and responsibilities within the context of patient-centered care with the member as part of the primary care team;
- Addressing health disparities among member populations and communities, both to improve outcomes and the health of the community, and as an investment in containing costs;
- Using alternative provider payment methodologies to reimburse on the basis of outcomes and quality;
- Developing a health information technology (HIT) infrastructure and participating in health information exchange (HIE);
- Ensuring transparency through reporting of quality data; and

---

*Oregon Health Plan–Application for Amendment and Renewal*
*Project Numbers 11-W-00160/10 & 21-W-00013/10*

Exhibit 2
Page 20 of 28

*March 1, 2012*

- Complying with financial reporting requirements and assuring financial solvency.

(*For detailed criteria, go to:* health.oregon.gov *for a draft copy of the Request for Applications*)

## VIII.  Federal Authority Requests

With this waiver amendment, Oregon requests that its existing Medicaid waiver authority remain in place, both to waive certain provisions of the Social Security Act and to maintain authority for Costs Not Otherwise Matchable (CNOM).  Oregon is also requesting additional waiver authority, new requests for CNOM as outlined below.

### a.  Waiver Authority

As detailed in the attached matrix, *Appendix I, Federal Authority to Implement Coordinated Care Organizations (CCOs) and Transform Managed Care Organizations (MCOs) in Oregon*, there are several changes that will occur to the OHP based on this amendment, but the state believes that its existing authority already allows for many of the proposed changes to the OHP.  The state does anticipate significant changes to its Special Terms and Conditions to reflect the proposed programmatic changes. In addition, as described in *Appendices H and I*, the state will also be requesting state plan amendments to implement some features of the transformation, including the ability to use a non-traditional workforce.

Specifically, Oregon's current waiver includes authority that the state wishes to maintain. This authority allows the state to:

- Contract with managed care entities and insurers;
- Mandatorily enroll and auto-enroll individuals within managed care, and lock-in enrollment;
- Define types of insurers;
- Offer Federally Qualified Health Centers (FQHCs) and Rural Health Clinic (RHC) services only where available through managed care providers;
- Use Oregon's Prioritized List of Health Services;
- Provide different benefits to different eligible populations; and,
- Contract for comprehensive services on a prepaid or other risk basis.

In addition to Oregon's existing waiver authority, the state will work with CMS to determine whether the state needs additional waiver authority to allow for:

| Issue | CFR/SSA Reference |
|---|---|
| <ul><li>Flexibility to make payment in excess of 105 percent of the approved capitation payments attributable to the enrollees or services covered by the incentive arrangement</li><li>Alternative provider payment methodologies to reimburse on the basis of outcomes and quality, including payment structures that incentivize prevention, person-centered care, and comprehensive care coordination</li><li>Flexibility to create PMPM payments to support Patient Centered Primary</li></ul> | 42 CFR § 438.6 |

Exhibit 2
Page 21 of 28

*March 1, 2012*

| Issue | CFR/SSA Reference |
|---|---|
| Care Homes for the remaining FFS Medicaid/SCHIP populations that do not meet the ACA sec. 2703 multiple chronic condition requirements. *(Oregon has submitted a SPA for the ACA Sec. 2703 population)*<br><br>• Latitude to set rates inclusive of non-encounterable medical services (1902(a)(30))<br>• Flexibility to provide services that may not always traditionally be reimbursed as a Medicaid State Plan service but help keep people living in the community<br>• Latitude to set a sustainable fixed rate of per capita cost growth within CCO global budgets<br>• Flexibility in design, implementation and scoring of performance improvement plans (PIPS) to align with Medicare processes | |
| • An alternative payment methodology for FQHCs to allow a unique FQHC prospective payment system (PPS)/alternative payment methodology (APM) | SSA § 1902(bb) |
| • Expansion of definition of "health care professional" expansion to include naturopathic physicians and other state-licensed providers | 42 CFR § 438.2 |
| • Flexibility for the state to optimize the use of electronic communications to OHP members where written materials are required, at member's request, as well as contractors and providers | 42 CFR § 422.128, 208, 210; 42 CFR § 431. 200, 211, 213, 214, 220, 230;<br><br>42 CFR § 438.6, 10. 56. 100,102, 104, 210, 224, 228, 400-424, 702, 706, 708, 722;<br><br>42 CFR § 455.1;42 CFR § 489 |
| • Flexibility in marketing requirements for CCOs that serve Medicaid and Medicare, and commercial populations | 42 CFR § 438.104 |
| • Ability to streamline and simplify due process rights to reflect person-centered primary care and to align Medicaid and Medicare consumer protection processes to the greatest extent possible (1902(a)(3)) | 42 CFR § 438.400-424<br><br>42 CFR § 431.244 |
| • Ability to fold non-emergency medical transportation into global budget in first contract year | 42 CFR § 431.53 |

### b. Expenditure Authority

**Designated State Health Programs (DSHP).**  In addition to the additional waiver authorities outlined above, Oregon is requesting an amendment to our OHP 1115 Demonstration to authorize federal financial participation (FFP) for selected state designated health programs (DSHP).  These programs would be

*March 1, 2012*

authorized by Section 1115(a) cost not otherwise matchable authority (CNOM).  Our target request is approximately $450 million per year (which represents approximately $750 million (FFP) in approved DSHP programs.

A list of identified programs is included as *Appendix E, State Fund Only Program List*.  These programs are vital for the success of health system transformation, spanning mental health, public health, community services, and child health services.  Currently, state funds support these services and programs to meet health needs that Medicaid, as it is currently structured, does not.  Many of the Oregonians served by these dollars receive services along side of people who are Medicaid eligible, and many of them are individuals who churn in and out of Medicaid eligibility, creating a confusing and inefficient system for consumers and communities to navigate.  We ask for federal investment in these programs in recognition that they are vital to improving the health of Medicaid enrollees and the communities in which they live.

The additional expenditures outlined in *Appendix E* will serve as a down payment on health reform in Oregon that will yield results in support of the triple aim.  Oregon's request to CMS is patterned after similar approved requests in other states (e.g., California, New York and Massachusetts), and Oregon hopes to be given the same opportunity.  The state anticipates that this additional federal investment can be ramped down as we approach implementation of federal reform in 2014 and begin to realize the additional savings from health system transformation.  CMS approval of this request will allow Oregon to move forward with our mutual reform goals without eroding services that are vital for transformation.

Finally, the State would also like to explore with CMS the mechanism for using county Intergovernmental Transfers  (IGT).

**Additional FFP for Oregon's Home and Community Based Services (HCBS) programs.**   Oregon would also like to pursue a request for an additional 6 percentage points FFP for our current HCBS waiver, increasing the opportunity to connect long term care and services to Oregon's health system transformation.  Oregon has long been a leader in placing eligible beneficiaries in community-based settings and is therefore not eligible for the CMS rebalancing incentives. While long term care is not part of the global budget that will be paid to Coordinated Care Organizations, Oregon is pursuing the same management strategies that would exist if long term care was included.  Oregon is partnering and establishing strong accountability expectations between the acute and long term care systems.  This strategy is comprehensive and is presented with specifics in Oregon's Dual Design proposal.

Currently, Oregon is serving a remarkably low 16.2% of its aged and physically disabled long term care population in nursing facilities.  Zero percent of our developmental disability population is served in institutions.  While this is outstanding from a cost/ independence factor, it does make care coordination more challenging as care coordination is easier when residents are served in large institutional settings.  Approval of this request will facilitate additional investment towards ensuring Oregon's initiatives are successful.

Exhibit 2
Page 23 of 28

*March 1, 2012*

Specifically, we are requesting:

1) An additional 6 percent FF for the aged and physically disabled waiver.

2) An additional 6 percent FF for the DD comprehensive services waiver.

3) An additional 6 percent in FF for the DD support services waiver.

4) An additional 6 percent in FF for the DD children's model waivers.

## IX.    Budget Neutrality

Oregon understands that the state must demonstrate budget neutrality for the Oregon Health Plan (OHP) Demonstration. Budget neutrality means that Oregon may not receive more federal dollars under the Demonstration than it would have received without it. The state is requesting amendment to its Section 1115 Demonstration in order to implement Oregon's health system transformation (HST) initiative. This document discusses the budget neutrality tests for the Section 1115 Demonstration.

The Section 1115 budget neutrality test performed for this Demonstration amendment will build upon the methodology that was adopted for the OHP Demonstration approvals that were originally granted in 1993 and most recently extended in 2010.

When submitting a combined Section 1115, states are required to include an initial showing that the Demonstration is expected to be budget neutral. This is the state's best estimate of cost and caseload at the time it submits its request. The test for budget neutrality will be applied according to the terms and conditions for the Demonstration that have been agreed to by the state and CMS, and will be measured periodically throughout the course of the Demonstration approval period and will finally be measured at the conclusion of the Demonstration.

This section is organized into three parts:

- Oregon's management tools to manage budget neutrality;

- The components of the budget neutrality test; and,

- Oregon's cost and caseload estimates, the key assumptions that underlie those estimates.

Additional details of the cost and caseload estimates are reflected in a series of exhibits.

### a.    Budget Neutrality Management Tools

While the design of the Demonstration must satisfy the requirements for federal budget neutrality in order to be approved by CMS, it must also satisfy the requirements for state budget neutrality in order to be implemented by Oregon.

In order to provide for administrative efficiency and management flexibility, the Demonstration is designed so that the state may invoke any of the budget neutrality management strategies, with appropriate notice to CMS. Oregon requests continuation of this flexibility which has included two primary management tools:

March 1, 2012

- The adjustable enrollment cap used to limit the size of the OHP Standard and FHIAP Demonstration populations, and is established based on funding availability and/or budget neutrality capacity.

- An adjustable benefit level through moving the coverage line further up or down the Oregon Prioritized List of Health Care Services for both OHP Standard and OHP Plus populations, subject to Legislative direction and CMS approval.   Additionally the state has the flexibility to add or remove services that are not part of the fixed set of OHP Standard services, depending on available state funds.

In addition to these two very important budget management tools, the state is working toward the implementation of global budgets that will provide certainty in funding over time for both the state and Coordinated Care Organizations.  Please see "Global Budget" p. 10 for discussion of the global budget methodology.

### b. Components of the Budget Neutrality Test

Oregon requests that the current Section 1115 Demonstration methodology be used for the purpose of evaluating budget neutrality for the five year HST extension period. This methodology uses a set of specified annual per capita costs multiplied by the actual or allowed enrollment for each year of the five year Demonstration. The result of this calculation is an aggregate allowable expenditure level. *Appendices J, K and L* contain all budget neutrality calculations.

Oregon proposes to continue use of the CMS approved DY 2010 per capita costs for the various eligibility groups under the current Demonstration extension for determination of the base year allowable costs.

**Trending Factors.**  The base year allowable per capita rates are trended by CMS approved trend rates through Demonstration year (DY) 11 (FFY 2013).  The proposed Demonstration extension is based on the Medicaid specific National Health Expenditure projected trend rates of 8.3 percent for DY 12 (FFY 2014), 5.9 percent for DY 13 (FFY 2015), 6.3 percent for DY 14 (FFY 2016), and 6.0 percent for DY 15 (FFY 2017).

With the implementation of health system transformation, Oregon anticipates savings over the five year waiver.  These savings, based on recent modeling performed for the state by Health Management Associates (HMA), are incorporated into the budget neutrality calculations through a per member per month adjustment to the projected per capita spending estimates.

**Beneficiaries and Services Included.** In the implementation of health system transformation, Oregon proposes to include individuals diagnosed with breast and cervical cancer and Citizen/Alien-Waived Emergency Medical (CAWEM) pregnant women. Per capita calculations are included for these populations for both the allowable and actual spending estimates in *Appendices J, K and L*.

The budget neutrality test will be expanded beyond the historical Oregon acute care and behavioral health programs that have been included.  *The State Fund Only Program List at Appendix E* outlines the additional services that Oregon expects to be affected under this HST extension period.  Budget neutrality calculations provide a per capita adjustment applied equally to the allowable and actual waiver estimates to account for these additional services as a "pass through".   Medicaid services and populations (e.g., QMB/SLMB, long-term care) for which the state has no immediate plans to move into CCO global budgets are excluded from budget neutrality calculations.

*March 1, 2012*

**Historical Savings.** Oregon is a demonstrated leader in delivering high quality care and containing spending growth in its Medicaid program.  Oregon is requesting to continue use of the historical Demonstration savings (currently estimated at $16 billion total funds).  This figure reflects the savings estimates identified by Oregon and CMS through the twenty year life of the OHP Demonstration.

Administrative costs will continue to be reimbursed based on the current federal matching rates of 50 percent, 75 percent and/or 90 percent of the administrative expense and are not subject to the budget neutrality test.

### c.   Caseload and Cost Estimates

This section describes the caseload and cost estimates for this Demonstration amendment request, as well as additional background information and key assumptions that underlie the estimates.

**Demonstration Renewal Time Frame.** The State also requests approval of a three-year extension through October 31, 2016. The current Demonstration is scheduled to expire October 31, 2013.

For purposes of budget neutrality, CMS has previously instructed Oregon to use Federal Fiscal Years ending September 30, 2013.  This is how budget neutrality is presented for this waiver extension. The proposed flexibility policy options, for purposes of budget neutrality, are projected to begin on July 1, 2012. The cost and caseload estimates are based on these begin and end dates.

**Caseload Estimates.** All populations are reported as the average number of persons covered for the entire period. These estimates , were prepared by the Office of Forecasting, Research and Analysis, Department of Human Services, with the exception of the FHIAP caseload provided by the Office of Private Health Partnerships and initial estimates of enrollment increases attributable to federal reform in 2014 provided by the Office for Health Policy and Research.

**Cost Estimates.** Budget neutrality spreadsheets provide the forecast of expenditures for the Title XIX program and present the budget neutrality for the requested Section 1115 demonstration.  These spreadsheets provide:

- the budget neutrality summary from the beginning of the OHP demonstration project through this extension request.

-  the calculation of Oregon' budget neutrality ceiling using allowable per capita and projected populations; and,

-  the state's actual and projected expenditures. At the end of the seventeen-year demonstration, the state is projecting a surplus of $16.3 billion total funds.

**Designated State Health Programs.**  Oregon is requesting approval to use federal savings earned under the OHP demonstration to help launch health system transformation.  Oregon proposes to receive Medicaid matching funds on certain state only funded programs to support the implementation of the state's health system transformation.  That request of $750 million in federal funds a year for five years is included in

Exhibit 2
Page 26 of 28

*March 1, 2012*

*Appendices K and L*.  CMS can provide Oregon with a "down payment" on health reform that will yield results in support of the CMS triple aim.

## X.     Evaluation Plan

As described within this waiver amendment, Oregon's goal is to create a health care system that emphasizes prevention and integrates financing and care delivery for physical, behavioral, and oral health care services within community-based CCOs. Each community-based CCO will operate within a global budget such that the CCO has flexibility to achieve the greatest possible health within available resources and is held accountable for improved quality and outcomes.  Oregon recognizes the importance of closely assessing the performance of the transformed delivery system. Thus, the state will maintain a robust monitoring of system performance and will continue to assure that standards of access, program operation, and quality are met and that standards evolve to match progress in achieving the policy objectives of health system transformation.  Many oversight mechanisms used today will continue in the future; the transition from managed physical and mental health care organizations (and dental care organizations, over time) to CCOs probably has greater implications for QAPI focus areas than for methods of oversight.

Oregon is also committed to working with CMS and our local partners on a robust evaluation of the system transformation and its impact on patient experience and safety, improved care outcomes, and costs.

### a.   Evaluating the Transformation Initiative

While it is closely linked to performance measures and quality improvement, the evaluation component of Oregon's Demonstration will focus on the implementation and impact of Medicaid reform and of health system transformation as a whole. As mentioned throughout this waiver amendment, Oregon's Medicaid transformation initiative is firmly grounded in the Triple Aim of better health, better health care, and lower costs. Accordingly, the state expects that the proposed changes in financing and delivery will lead to improvements in health status and in the quality of care provided to Medicaid and dual eligible beneficiaries and that these improvements, along with greater efficiency and a sustainable growth rate for expenditures, will help bend the cost curve. The state also believes that these reforms can be expanded to commercial insurance through adoption by the PEBB and OEBB programs, which administer health insurance for state employees and for education districts, respectively.

**Transformation Elements, System Change, Triple Aim Goals**



Exhibit 2
Page 27 of 28

*March 1, 2012*

Using the framework of the Triple Aim to assess the implementation and outcomes of Medicaid transformation suggests overall evaluation questions such as:

- *Better health*: What impact does the transition to CCOs have on health status, health equity, or health behaviors among Medicaid eligibles, including important subsets of members like dual eligibles or children with special healthcare needs? What elements of CCO design or operation are associated with improved health? How does the transition to CCOs impact the health of all communities within the CCO service area?

- *Better care*: What impact does the transition to CCOs have on care integration and coordination, as measured by care processes, utilization, client outcomes, member experience, and costs? What elements of CCO design or operation are associated with improved care integration and coordination?

- *Lower or controlled costs*: What impact does the transition to CCOs have on overall costs, cost growth, distribution of expenditures by service type or payor (Medicaid or Medicare), or costs for unnecessary or inappropriate care? What elements of CCO design or operation are associated with improved cost control (or reduced cost growth) and potential savings?  Do savings or efficiencies lead to reinvestment in improved care? Do investments in improved care for Medicaid and dually eligible members improve care or improve health for the community at large?

Oregon will work with CMS and with local partners, including the active health services research community in Oregon that has led the Oregon Health Study, to produce a draft evaluation design in accordance with standard waiver Terms and Conditions within 120 days of the waiver's approval.  The state will also collaborate with the Research Triangle Institute (RTI) and the Urban Institute to align the evaluation design with national plans for evaluating state Demonstrations to integrate care for dual eligibles.

### b.  Evaluation Plan for Medicare-Medicaid Demonstration

In addition to the state's own monitoring and evaluation activities, the Medicare-Medicaid Demonstration requires active participation in a national evaluation conducted by CMS' evaluation contractor.  OHA will cooperate with all aspects of CMS' evaluation activities, including submitting required data to the contractor. The state will follow the preferred Medicare-Medicaid alignment process of an integrated quality and performance improvement process for CCOs and request an exemption from existing Medicaid standards for performance improvement projects as negotiated through the MOU and three-way contract process.