UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


FAMILYCARE, INC., an Oregon non-profit
corporation,


                    Plaintiff,


vs.                                    Case No. 6:18-cv-00296-MO


OREGON HEALTH AUTHORITY, an
agency of the State of Oregon, and
PATRICK ALLEN, both individually and in
his official capacity as director of the
Oregon Health Authority, and LYNNE SAXTON,
                    Defendants.



CONTINUED VIDEOTAPED DEPOSITION OF

LAURA ROBISON

THURSDAY, AUGUST 16, 2018

9:45 a.m.

VOLUME II

Exhibit 22
Page 1 of 14

Page 237

discussions with CCOs to arrive at the base data set that is used for this calculation. Each CCO --

Q. Ms. Robison --

A. -- is provided with its base data set.

Q. Okay. So does OHA have documents reflecting how these calculations were done? Have you seen them or do you know of them?

A. So I -- in my preparation, I don't recall reviewing a specific document that detailed the calculations.

But I have in my preparation discussed the -- the underlying -- the underlying data and how that calculation is performed. It's possible that that document exists, but I don't recall that I reviewed it in my preparation.

Q. Exhibit 1222 talks about the 2018 reimbursement review.

And I understand that there was a similar calculation performed with respect to the 2018 reimbursement review, i.e., a calculation of implied rate of growth for the CCOs; is that right?

Exhibit 22
Page 2 of 14

Page 238

A.    There was a calculation of the rate of growth, which was based on a comparison of -- for the 2018 redevelopment process, that would have been the 2015 base data compared to the 2016 base data.

And I should clarify that the 2015 base data that was used in this calculation was the base data after the application of the reimbursement adjustment policy that was done for the 2017 rate development.

Q.    And why was the decision made to use 2015 base data after application of the reimbursement adjustment?

A.    The decision to use the 2015 base data after the application of the reimbursement adjustment was made because that was the final base data used in the 2017 rate development.

Q.    But that did not reflect actual expenditures during 2015, right?

A.    So the final 2015 base data used in the 2017 rate development process did use actual expenditures in calendar

Exhibit 22
Page 3 of 14

Page 239

year 2015.

And as I've described it, the base data is completed by using the encounter data and going through the triangulation process, and then a supplemental data may be included to address any gaps.

And then the reimbursement adjustment was applied to get to the final base data.

Q.    Right.  But the -- what I'm saying is the base data for 2015, after the reimbursement adjustment, that number does not reflect the actual expenditures that the CCOs made in 2015 because they actually made the expenditures that were removed during the reimbursement adjustment, correct?

A.    So the 2015 base data used in the 2017 rate development process -- and this is the final base data -- it did reflect that expenditures had been removed from the base data per the reimbursement policy, but it did include expenditures that were made by CCOs.  It was the final base data was used in the 2017 rate

Exhibit 22
Page 4 of 14

Page 240

development.

Q.    So the rate of growth that was calculated with respect to the 2018 reimbursement review, used 2015 data that was less than the amount actually expended because it reflected the reimbursement review adjustment, correct?

A.    So the 2015 final base data that was used in the rate of growth calculation for the 2018 rate development process, that -- that base data set did have removed from it the expenditures that were removed per the reimbursement policy.

But it -- it does reflect the expenditures that were made by CCOs that were included in that base data for 2017 rate development.

Q.    Sure.  It just doesn't include all the expenditures, right?

A.    The 2015 base data, final base data used for the 2018 rate of growth calculation does reflect the removal of the expenditures per the reimbursement policy.

That was the final base data

Exhibit 22
Page 5 of 14

Robison, Laura - Vol. 2                                     August 16, 2018

Page 241

used for 2017 rate development.

Q.   So the implied rate of growth is calculated for the 2018 reimbursement review would be higher for any CCO that had money removed from it during the 2017 reimbursement review than if the 2015 data that was used for that was fully reflective of all the costs and did not have those expenditures; is that right?

A.   Would you just repeat the question?  I might have missed something in the beginning.

Q.   Well, when you use the 2015 base data, less the reimbursement expenditures or -- strike that.

If you use as your starting point, 2015 base data that reflects the reimbursement adjustment, you're starting with a lower number for those CCOs that had the reimbursement adjustment applied, correct?

A.   So for those CCOs whose contribution to the regional base data was -- had expenditures removed for the reimbursement policy, yes, the starting point of the expenditures would reflect

Robison, Laura - Vol. 2                                    August 16, 2018

Page 259

to primary care providers?

MR. MARKOWITZ:  I'm going to object to this question as vague as to time period.

Q.    At any time.

A.    Can you clarify what you mean by communicating to FamilyCare that it should not?

Q.    Well, let's back up.  Let's take a look at Exhibit 1237.

(Exhibit No. 1237 marked for identification.)

Q.    This is, as you'll see, Ms. Robison, this was marked as Exhibit 1021 in the Hoffman deposition.

Is this the report that you were referencing in your testimony?

A.    It appears to be the report that I was thinking of in my testimony, yes.

Q.    Okay.  And in this report, did OHA identify FamilyCare's increase reimbursement to primary care providers as a promising practice?

A.    So on page 44 of this

Exhibit 22
Page 7 of 14

Page 260

document -- and this is actually part of a larger section of promising practices that highlights several CCOs.  There is a section here about FamilyCare's increasing rates that it's paying to primary care providers from 50 to $75 per visit.

And it should be clear, these were -- these were promising practices.  This -- that's what the label was here.  There's no assessment in here of whether -- whether the goals that were set out had been achieved or what the -- kind of the result was of any of these practices.

Q.    So did OHA communicate to FamilyCare any time before implementing the 2017 reimbursement review that FamilyCare would have -- strike that, please.

Did OHA communicate to FamilyCare, any time before implementing the 2017 reimbursement review, that OHA would remove costs related with increased professional reimbursement from FamilyCare's base data?

A.    So OHA had communicated with

Exhibit 22
Page 8 of 14

Robison, Laura - Vol. 2                    August 16, 2018

Page 284

identification.)

THE VIDEOGRAPHER:  Time is 11:16. We're back on the record.

BY MR. GORDON:

Q.    Ms. Robison, I'd like to ask you about the top email on Exhibit 1239, the first email on the first page, which would be the most recent one.

A.    So is this the email that I says I think it should show 4.8 growth?

Q.    I'm sorry.  Actually, I wanted to ask about the third one down, where Barry says, "After reducing physician encounters by 7 and a half percent."  Do you see that?

A.    Yes, I do.  This is the July 23rd email from 11:26 p.m.?

Q.    Correct.

He says, "This also brings a statewide rate of growth down from 5.0 percent to 4.8 percent."

Do you see that?

A.    I do see that statement.

Q.    Is 4.8 percent the rate of growth that OHA was targeting in 2017 rate development?

Exhibit 22
Page 9 of 14

Page 285

A.    So, OHA does not develop the rates to achieve a specific rate of growth.   It's not a process by which OHA can determine what the rate of growth should be and then backs into the rate that would result in that rate of growth.

Q.    Is there anything significant about the 4.8 percent rate of growth number?

A.    So, in my preparation, and in reviewing this document, you know, I don't recall any significance to the 4.8 percent figure.

What I understand was that this was in the context of the reimbursement policy for the 2017 rate development process, and that adjustments were being made to the base data as part of that reimbursement analysis and policy implementation.

Q.    Can you look at Exhibit 1240 now, please?  And can you also pull up Exhibit 1221, which is the 2017 reimbursement review, please.

A.    Okay.  Give me just a moment to find that.  1221 and 1240?

Exhibit 22
Page 10 of 14

Page 325

Q.    Ms. Robison, last time we talked we talked about some various enrollment and eligibility errors that OHA has discovered in connection with rate setting, including the dual eligible error.  Do you recall that?

A.    I do recall the dual eligible error.  I don't recall all of the discussion about it from our last meeting, all details.

Q.    Fair enough.  Okay.  I'm not asking you to recall every detail about it.

I want to refresh your memory about various errors in enrollment or in eligibility that OHA's identified.

There was a dual eligible error.  There was the error that led to the redetermination analysis, where people were determined not to be eligible for Medicaid.  You know what I'm talking about there?

A.    I wouldn't characterize that as an error.

Q.    Okay.

A.    But I am aware of the redeterminations and the analysis that OHA and Optumas undertook to amend the rates

Exhibit 22
Page 11 of 14

as a result of the redetermination.

Q.    And there was also an error related to the payment versus PERC code that particularly affidavit zero-to-one-child category of aid?

A.    I am aware of the PERC code category of aid issue, which was also adjusted for in the 2018 rate amendment.

Q.    When did OHA first become aware that there was a mismatch between payment and PERC codes?

A.    So OHA had received feedback from FamilyCare.  I can't recall off the top of my head if other CCOs had raised similar issues, possible, about mismatches between enrollment data and their categorization.

And my understanding is that those issues have been raised, I think as early as, based on my preparation and review of documents, as some time in 2016. It's possible that that occurred sooner.

And that those were raised in the context of understanding mismatches in that information between what OHA provided

Page 327

versus the information that CCOs had.

My understanding is that OHA, based on my preparation, is that OHA had not conducted an analysis to understand the reason for that mismatch until the fall of 2017.

Q.    The redetermination in 2018 that addressed this payment versus PERC error, that just amended the 2018 rates to account for that, correct?

A.    The 2018 rate amendment did just address the 2018 capitation rates.

Q.    Has OHA done anything to rectify rates for previous years to account for the payment versus PERC error?

A.    So OHA has not -- has not retroactively changed rates for years prior to 2018.

And based on my preparation for this topic, the impact of that issue was not as significant in prior years due to the population that it affected and the nature of the aging up of those individuals in that timeline.

My understanding was that that

Exhibit 22
Page 13 of 14

Page 359

CERTIFICATE

State of Oregon

County of Multnomah

I, Mary C. Soldati, Registered Professional Reporter, CSR No. 3406 and Notary Public in and for the State of Oregon, do hereby certify that LAURA ROBISON, was satisfactorily identified and was duly sworn by me, and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to nor employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand this 20th day of August, 2018.


                    Mary C. Soldati, RPR



My commission expires:

October 5, 2018

Exhibit 22
Page 14 of 14