|  |  |  |
|---|---|---|
| PATRICK ALLEN, in his official capacity as DIRECTOR OF OREGON HEALTH AUTHORITY, an agency of the State of Oregon, | ) ) ) ) ) | |
| | ) | Case No. 3:18-cv-00212-MO (Leading) |
| Plaintiff, | ) | |
| | ) | Case No. |
| vs. | ) | 6:18-cv-00296-MO |
| | ) | (Trailing) |
| FAMILYCARE, INC., an Oregon non-profit corporation, | ) ) | |
| | ) | VOLUME I |
| | ) | |
| Defendant. | ) | VIDEOTAPED FRCP |
| | ) | 30(b)(6) |
| | ) | DEPOSITION OF |
| | ) | |
| FAMILYCARE, INC., an Oregon non-profit corporation | ) ) | WILLIAM MURRAY |
| | ) | Taken in Behalf of |
| Plaintiff, | ) | Defendants |
| | ) | |
| vs. | ) | July 16, 2018 |
| | ) | |
| OREGON HEALTH AUTHORITY, an agency of the State of Oregon, and PATRICK ALLEN, both individually and in his official capacity as director of the Oregon Health Authority, | ) ) ) ) ) ) ) | 1120 N.W. Couch Street, 10th Floor Portland, OR 97209 |
| | ) | |
| Defendants. | ) ) | |

Teresa L. Dunn,

Court Reporter

CSR, CCR, RPR

Exhibit 1
Page 1 of 9

in preparation for today never initiated any discussions where it sought to close its doors or not continue in the Medicaid line of business.

Q.   Well, I'm talking about internally within FamilyCare either among executives or board or anyone else, when did the consideration begin about the possibility that because the rates were set as they were that the company may need to shut its Medicaid and Medicare business?

A.   The company did have a board meeting, I'm not sure of the exact date, in the summer of 2017 where there was an update and discussion of where the rates were at.

And there was discussion by the board at that point in time that if the rates were to generate a significant loss to FamilyCare again that the board would seriously consider not signing a contract if it were to substantially -- result in a substantial loss to FamilyCare.

Q.   And did you participate in that board meeting?

A.   I was actually not at that board meeting because I had a previous planned vacation at

that time.  So I did not attend that board meeting.

Q.   And how are you personally aware of what took place?

A.   From discussions with Jeff Heatherington before and after that board meeting.

Q.   Did you review any notes or minutes of that meeting on this topic?

A.   Yes, I saw the minutes for that meeting.

Q.   What was the level of loss that -- that FamilyCare concluded that if it suffered it would exercise the closure option?

MR. JOHNSON:  Object to the form of the question, lacks foundation.

THE WITNESS:  There was never a specific dollar amount that FamilyCare or the board identified.

It was all meant to be in the context of what was offered in the contact -- contract and the direction of where that relationship was headed with the Oregon Health Authority.

Q.   (By Mr. Markowitz) Well, you said that the board concluded that if there was a substantial ongoing loss that closure would be a viable option.

What was meant by substantial?

A.   Substantial was meant by a loss that FamilyCare believed was not an indication that future rates would correct that and that FamilyCare would not be able to continue in business for a longer period of time.

Q.   Was there any benchmark established regarding the company's reserves that if the reserves dropped to a particular level closure would be a likely option?

A.   There was not a benchmark established.

Q.   Was there any -- as of the summer of 2017 was there any expectation as to what level of loss would trigger the decision to shut?

A.   Could you repeat the question?

Q.   I will repeat it.  As of the summer of 2017 and throughout the rest of the year was there any understanding within the company as to the level of loss which if suffered would trigger a shut-down of the company?

A.   There was no specific amount determined. It was meant to be an assessment based on what the contract ultimately resolved as far as rates and an indication of where we thought that would be going in the future.

There were additional items that FamilyCare and OHA were discussing with regards to that.

So there was ongoing discussion that there would be a change to the rates. We were trying to understand what the magnitude of that change would be to be able to inform our decision about signing or not signing the contract.

Q. What was ultimately determined as to the magnitude of those changes?

A. So ultimately there was a rate adjustment for 2018 that resulted in about a $20 million annualized rate increase to FamilyCare's rates.

FamilyCare still -- and still does have concerns about that rate adjustment for 2018, but those were the numbers that OHA generated subsequent to FamilyCare's termination.

Q. And when were they generated?

A. Not until, I don't have the exact date, but I believe it was the end of January.

Q. At the end of the one-month extension period?

A. I don't remember if it was before or

a contract that would create a substantial loss?

A.    That's correct.

Q.    Other than the delta between revenue and expenses that would have generated a 75 or $95 million loss in 2018, was there any other motive for the decision to shut the business?

A.    No, not that I -- no.   FamilyCare desired to stay in business.

Q.    Was the protection of the reserves that had been accumulated factored into the decision to shut the business?

A.    What FamilyCare did in making that decision about the impact of the contract was to assess the financial status of the company if it signed the contract or if it did not sign the contract.

Q.    Okay.  You haven't answered my question so I will repeat it.

        Was the protection of the reserves one of the reasons why the decision was made to close the business?

A.    The decision was made because if we signed the contract we would not have reserves -- sufficient reserves to be able to continue in business throughout the end of 2018.

Q.   Did FamilyCare do anything to attempt to avoid its closure other than seek higher rates from OHA?

A.   I think FamilyCare had a long history of trying to avoid that through efforts to bring more transparency to the process, its efforts to run a successful enterprise for a number of years.

There's a lot -- the answer to your question is, yes, there's lots that FamilyCare tried to do.

Q.   What did FamilyCare do during the last half of 2017 to remain in business in 2018 other than seek higher rates from OHA?

MR. JOHNSON:  Object to the form of the question.  This is subjective now.

THE WITNESS:  We talked about -- previously about our budget process where we looked at expenses as well as revenue and went through that process.

Q.   (By Mr. Markowitz) Anything else?

A.   In the last half of 2017 I believe that was the primary focus of our evaluation process.

Q.   And other than getting more money from OHA was there anything else that FamilyCare

needed to get in order to remain in business in 2018?

A.   That was an integral part.  And as we talked about FamilyCare was looking at all of its expenses into its programs and the ability to change programs, to change its expense structure, to change its revenue structure to be able to stay in business.

Q.   Was the dispute with OHA that -- strike that.

Other than more in increased rates, was there anything else that FamilyCare wanted OHA to do in the latter half of 2017 in order to allow it to stay in business?

A.   To allow it to stay in business the principal request obviously was the -- the change in rates.

There was always other discussions about administrative requirements and those type of things that add to costs, but the primary thrust obviously was the revenue change.

Q.   Was there ever a memo or other writing generated that listed expenses that were going to be reduced in 2018 if the business continued?

A.   That would be part of that budget

C E R T I F I C A T E

I, Teresa L. Dunn, a Certified Shorthand Reporter for Oregon, do hereby certify that, pursuant to stipulation of counsel for the respective parties hereinbefore set forth, WILLIAM MURRAY personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and that the foregoing transcript, pages 1 to 141, both inclusive, constitutes a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof. Witness my hand and CSR stamp at Vancouver, Washington, this 18th day of July, 2018.

_____
TERESA L. DUNN
Certified Shorthand Reporter
Certificate No. 00-0367
Commission Expires: 6/30/20

Schmitt Reporting & Video, Inc.
(360) 695-5554 -- (503) 245-4552 -- (855) 695-5554

Exhibit 1
Page 9 of 9