**Stephen F. English**, OSB No. 730843
SEnglish@perkinscoie.com
**Thomas R. Johnson**, OSB No. 010645
TRJohnson@perkinscoie.com
**Julia E. Markley, OSB No. 000791**
JMarkley@perkinscoie.com
**Matthew J. Mertens**, OSB No. 146288
MMertens@perkinscoie.com
**Sasha Petrova,** OSB No. 154008
SPetrova@perkinscoie.com
**PERKINS COIE LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Telephone: 503.727.2000
Facsimile:  503.727.2222

**Matthew Gordon**, (admitted *pro hac vice* )
MGordon@perkinscoie.com
**David B. Robbins**, OSB No. 070630
DRobbins@perkinscoie.com
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

*Attorneys for Plaintiff FamilyCare, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| FAMILYCARE, INC., an Oregon non-profit corporation,<br><br>           Plaintiff,<br><br>      v.<br><br>OREGON HEALTH AUTHORITY, an agency of the State of Oregon, and LYNNE SAXTON,<br><br>           Defendants. | Case No. 6:18−cv−00296−MO<br><br>**PLAINTIFF'S LAY WITNESS STATEMENTS** |

PLAINTIFF'S LAY WITNESS STATEMENTS

## I.    INTRODUCTION

Plaintiff FamilyCare, Inc. ("FamilyCare") respectfully submits the lay witness statements below pursuant to the Court's Amended Trial Management Order (ECF 503).  FamilyCare expects to present the following witnesses in its case-in-chief to appear live and to testify primarily about the subjects discussed below.  FamilyCare expects to eliminate redundant testimony based upon the order of witness testimony.  FamilyCare reserves the right to revise, modify, and supplement this list and narratives as developments before and during trial warrant. FamilyCare further reserves the right to identify on March 28, 2022, witnesses as rebuttal to any timely witness statement offered by the Oregon Health Authority ("OHA") and Lynne Saxton (collectively, "Defendants") pursuant to the Court's Amended Trial Management Order.

In addition to the witnesses listed below, FamilyCare may present the following lay witnesses in its case-in-chief by offering their deposition testimony:  Pat Allen, Zach Aters, Lori Coyner, Courtney Crowell, BethAnne Darby, Mark Fairbanks, Anne Karl, Jackie Lee, Laura Robison, and Steven Schramm.  FamilyCare will identify the specific portions of those depositions it may submit in lieu of live testimony on March 21, 2022, in accordance with the Court's Amended Trial Management Order.

## II.    WITNESS STATEMENTS

**A.    Dr. Richard Barsotti, pediatrician with Metropolitan Pediatrics (est. 60 minutes for direct testimony)**

Dr. Richard Barsotti is a pediatrician and was an owner of Metropolitan Pediatrics and a former member of the FamilyCare Board of Directors (the "Board").  Dr. Barsotti will discuss his educational background, including his medical degree, internship, and residency.  Dr. Barsotti will also discuss his further training and general professional experience since completing his residency, including the growth of his own private practice as well as the growth of Metropolitan Pediatrics and his administrative roles at that practice.

Dr. Barsotti will testify, from his perspective as a provider, about the mission and structure of the Oregon Health Plan and the Coordinated Care Organization ("CCO") model in

2-    PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

Oregon. Dr. Barsotti will testify, from his perspective as a provider, about the importance of investing in primary care, behavioral health, and other support measures in order to promote health, positive patient outcomes, and savings, including his awareness of a study conducted by Portland State University discussing these concepts. Dr. Barsotti will testify about his experience as a provider who worked with FamilyCare and other payers.

Dr. Barsotti will testify, from his perspective as a provider, that FamilyCare was superior to other CCOs that he has worked with in light of its overall patient-focused and common-sense approach to healthcare. Dr. Barsotti will describe how FamilyCare's patient-centered primary care home model benefitted patients and providers. He will testify how, as a provider, he valued FamilyCare's approach, including its willingness to invest in preventative care and behavioral health so that providers could, among other things, spend more time on patient care. Dr. Barsotti will testify how, in his experience as a provider, FamilyCare compared favorably to Health Share of Oregon ("Health Share") in its innovation and provider support. Dr. Barsotti will testify that FamilyCare worked with his practice on its own quality metrics, and required his practice to maintain quality metrics for the benefit of patients.

Dr. Barsotti will also testify that FamilyCare had an innovative approach to primary care, including specific examples of how FamilyCare approached primary care differently than other CCOs, such as its willingness to provide reimbursement for prescriptions and healthcare products that other payers did not, as well as the benefits and cost savings associated with FamilyCare's approach, not to mention patient advantage.

Dr. Barsotti will testify about FamilyCare's Patient Provider Oriented Resource Team ("PPORT") program, which gave providers one phone number to call to make decisions about patient care. Dr. Barsotti will explain that a patient care team was assigned to each member and was responsible for providing case management and care coordination for those members. He will testify that this program made it easier for providers to ensure their patients got what they

3-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

needed, and how this program helped him as a provider, Metropolitan Pediatrics as a clinic, and his patients.

Dr. Barsotti will testify regarding the innovative approach that FamilyCare took with respect to behavioral health, and how its increased reimbursement rates and per-member, per-month capitation allowed Metropolitan Pediatrics to utilize their own internal behavioral health teams for the betterment of patient care.  Dr. Barsotti will testify how this feature of FamilyCare's relationship with providers improved the care his clinic provided to patients.

Dr. Barsotti will discuss the impact that FamilyCare's closure had on his practice, and on Metropolitan Pediatrics.

**B.      Kevin Clancy, former VP of Finance for Family Care (est. 3 hours for direct testimony)**

Kevin Clancy was the Vice President of Finance and Interim Chief Operating Officer ("COO") of FamilyCare, a role in which he served from October 2014 until March 2018.  Mr. Clancy will discuss his background in accounting, finance, insurance underwriting, health care, and Medicaid.  He will testify that he has managed the Medicaid lines of business for multiple managed care organizations and insurance companies in multiple states and has worked with several state agencies that administer their respective Medicaid programs.

Mr. Clancy will testify about his day-to-day responsibilities at FamilyCare, including his day-to-day leadership of financial and budgeting operations of the organization.  He will describe his responsibilities regarding financial reporting, budget analysis, financial operations, healthcare analytics, provider relations, utilization management, and information services.  He will also testify about his focus on the integration of physical, behavioral, dental, and vision health while addressing social determinants of health for FamilyCare's members.  He will testify that FamilyCare was a complex business that required multiyear investments in personnel, provider relationships, and third-party contracts.  He will also testify regarding FamilyCare's long-term plans to facilitate innovative healthcare for its members, consistent with the CCO model of healthcare transformation.

4-    PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

Mr. Clancy will testify about FamilyCare's policy of paying higher reimbursement rates to primary care and behavioral health providers to ensure that FamilyCare's patients enjoyed better access to these providers. Mr. Clancy will explain that an OHA-sponsored Portland State University study touted immense fiscal savings from increasing spending on a primary care model that FamilyCare used extensively. He will testify that FamilyCare's practice of paying higher reimbursement rates for primary and preventative care was reasonable and sensible from a business, budget, and accounting standpoint. He will testify about how FamilyCare's policy improved the overall health of its members while also reducing the overall cost of care, especially in the long run. Mr. Clancy will testify about other indicia, like his regular monitoring of healthcare utilization, that demonstrated that FamilyCare's primary care investments were effective in improving care and reducing care costs. Mr. Clancy will describe how the large changes in FamilyCare's membership from the Affordable Care Act ("ACA") expansion and OHA's member redetermination efforts, and OHA's actions that forced FamilyCare to forfeit its contract at the end of 2017, hindered FamilyCare's ability to measure the full impact of FamilyCare's primary care investments on member health. Mr. Clancy will describe his efforts to obtain utilization data of other CCOs, including Health Share, so that FamilyCare could more precisely compare its primary care investment outcomes to those of other CCOs. Mr. Clancy will testify how OHA obstructed these efforts.

Mr. Clancy will testify that a large part of his position at FamilyCare involved communicating with OHA and its actuary, Optumas, about FamilyCare's Medicaid rates and the rate-setting process in general. He will testify that he participated in many meetings and exchanges of information with OHA. Mr. Clancy will testify about FamilyCare's concerns with the Medicaid rates provided by OHA beginning in 2014 for the 2015 rates. He will explain that, in October 2015, he attended a meeting between FamilyCare, OHA, and an actuary from Optumas (Zachary Aters), about OHA's 2016 rates. Mr. Clancy will recount some of

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

155844695.3

FamilyCare's concerns expressed to OHA and Optumas about the 2016 rates, as well as OHA's responses to those concerns.

Mr. Clancy will testify about FamilyCare's concerns regarding the 2017 and 2018 rate development. He will describe his repeated communications to and with OHA and Optumas regarding shortcomings in the 2017 and 2018 rate development process, including FamilyCare's concerns over data quality and OHA and Optumas's unwillingness (or inability) to properly reconcile FamilyCare's data; member month assignment errors; risk scoring errors; inadequately supported or improperly calculated trend factors; and other problems with the rates. He will testify that OHA and Optumas did not meaningfully respond to FamilyCare's concerns, repeatedly failed to provide requested data or explanations after agreeing to do so, and rebuffed FamilyCare's requests for greater transparency into the 2017 rate development process. Mr. Clancy will describe FamilyCare's communications to and meeting with CMS regarding FamilyCare's concerns over the inadequacy of the 2017 rates. Mr. Clancy will testify about his review and analysis of the 2017 rate certification that Optumas submitted to CMS.

Mr. Clancy will testify about how FamilyCare suffered operating losses as a result of its receipt of insufficient and inadequate rates from OHA over multiple years. Mr. Clancy will testify that, in response, FamilyCare made significant efforts to reduce operating losses, including cutting a variety of administrative expenses. Mr. Clancy will explain that FamilyCare's administrative expenses were reasonable and within budget and, based on Mr. Clancy's experience working for other managed care organizations and health insurance companies, normal for an organization like FamilyCare.

Mr. Clancy will testify that FamilyCare's cost-cutting efforts included eliminating high-cost employment positions at FamilyCare; implementing a hiring freeze and holding unfilled positions open; stopping the payment of discretionary bonuses; renegotiating contracts with stop-loss carriers; renegotiating contracts with FamilyCare's transportation providers; renegotiating contracts with FamilyCare's risk-scoring consultant and contractor, Inovalon; and discontinuing

6-  PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

155844695.3

or curtailing FamilyCare's community investment program.  Mr. Clancy will explain why FamilyCare did not cut primary care reimbursement as part of its cost reduction efforts.

As part of his efforts to manage expenses, Mr. Clancy will discuss the compensation that FamilyCare paid its employees.  Mr. Clancy will testify that, in carrying out his responsibilities with respect to FamilyCare's budget, Mr. Clancy monitored FamilyCare's spending on employee compensation and relied on market data to determine reasonable compensation for FamilyCare employees.  Mr. Clancy will also discuss other necessary expenses of FamilyCare, including necessary capital infusions from FamilyCare to FamilyCare Health Plans, Inc. ("FHP") to ensure that FHP remained compliant with Oregon regulations and the regulatory oversight of FamilyCare Health Plans by the Division of Financial Regulations, Oregon Department of Consumer & Business Insurance.

Mr. Clancy will also testify about FamilyCare's spending on charitable donations.  He will testify about his idea to form the Heatherington Foundation for Innovation and Education in Health Care, Inc. ("Foundation") and his idea to donate to the Foundation during a period of surplus at FamilyCare.  He will testify that how those donations appeared in FamilyCare's financial statements.  Mr. Clancy will describe how FamilyCare encouraged discussion about where donations should be made.  Mr. Clancy will explain the collaborative process by which decisions were made within the executive leadership team and how these decisions were made carefully with consideration of FamilyCare's budget and expenses.  Mr. Clancy will also describe how FamilyCare reinvested particular revenue, like quality pool payments from OHA received due to the high quality of FamilyCare's services.

Mr. Clancy will testify regarding FamilyCare's consistently excellent performance on OHA's quality metrics, including FamilyCare regularly earning 100% of its available quality pool dollars from OHA.  Mr. Clancy will explain how he was responsible for tracking results of the OHA quality metrics and other quality metrics identified by FamilyCare and, in turn, how FamilyCare used quality metrics to incentivize providers to improve care and outcomes over

7-    PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

time.  Mr. Clancy will testify that FamilyCare's quality metrics were consistently as good as, or better than, Health Share's quality metrics, including in the category of access to care.

Mr. Clancy will testify that, on October 24, 2017, he attended a meeting of FamilyCare's Board of Directors and presented a financial report to Board members.  Mr. Clancy will recount the details of that report, which included details about FamilyCare's operating losses due to OHA's insufficient rates and projections about FamilyCare's ability to stay in business based on the limited and incomplete information OHA had provided about the 2018 rates and OHA's member redetermination efforts.

Mr. Clancy will testify about his review and analysis of the original 2018 rate certification that Optumas submitted to CMS, including the manifold questions that FamilyCare raised to OHA and Optumas that went unanswered.  Mr. Clancy will testify about his interactions with Chelsea Guest, Laura Robison, and Pat Allen and the detailed information FamilyCare provided them regarding the shortcomings and problems with the 2018 rates.  Mr. Clancy will testify that OHA first provided FamilyCare with the tentative 2018 rates on October 31, 2017, but those were merely preliminary, as OHA expressly noted that the rates may change based on the outcome of, among other things, a redetermination analysis that was to be completed by late November.  Mr. Clancy will testify that the redetermination analysis referred to a problem with the rates that FamilyCare had previously brought to OHA's attention— namely, that because OHA's "redetermination" had removed from Medicaid thousands of relatively healthier people, the 2018 rates would be insufficient to cover the cost of health care for the relatively sicker people who remained in Medicaid and were assigned to FamilyCare. Mr. Clancy will testify that he and others at FamilyCare repeatedly informed OHA that the initial rates were so low that they would lead to FamilyCare suffering significant additional losses in 2018, and that without higher rates, FamilyCare would likely be forced to reject the 2018 Rate Amendment and cease doing business as a CCO.

8-    PLAINTIFF'S LAY WITNESS STATEMENTS

155844695.3

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

Mr. Clancy will describe meetings in December 2017 with OHA where FamilyCare presented information about the problems they had identified with the rates and requested that OHA provide them with responsive information, including information about the revised 2018 rates. Mr. Clancy will describe how he and Mr. Murray arrived at the December 20, 2017, meeting expecting to continue that dialogue but instead Allen informed them that he was not interested in the rate problems FamilyCare had identified, declared that the L&E and Manatt reviews had resolved FamilyCare's concerns, and wanted to work on transitioning FamilyCare's members to Health Share. Mr. Clancy will explain how at that meeting Mr. Allen issued an ultimatum—within 24 hours, FamilyCare needed to either accept the 2018 rates (without knowing what they would be) or shut down. Mr. Clancy will testify that FamilyCare was unable to agree with OHA to tentative rates that would cause FamilyCare to run a deficit in 2018 exceeding the amount of its available reserves, and without any information from OHA about what compensation FamilyCare would actually receive in 2018 upon the correction of OHA's acknowledged data errors, FamilyCare could not in good faith agree to sign the 2018 rate amendment on December 21, 2017. Mr. Clancy will explain that, if FamilyCare exhausted its reserves mid-year in 2018, it would abruptly interrupt the health care of thousands of Medicaid patients and the care delivered by hundreds of providers.

Mr. Clancy will testify regarding the annual budgeting process at FamilyCare, including the process for the 2018 budget. Mr. Clancy will testify that FamilyCare's projected $95 million deficit for 2018, based on what OHA told FamilyCare in late 2017 about its 2018 rates and on what FamilyCare believed its expenses would be, was predicated on the best available information to FamilyCare at the time, which was the incomplete and stunted rate-related information OHA had provided to FamilyCare. Mr. Clancy will testify that FamilyCare's revenue should have been at least $20 million higher than initially projected, because of Optumas and OHA fixing some of the problems FamilyCare had long identified in the 2018 rates. Moreover, Mr. Clancy will testify that FamilyCare's 2018 expenses would have been tens

9-    PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

155844695.3

of millions of dollars lower than originally projected, because (unbeknownst to FamilyCare) OHA had virtually finished member redetermination efforts by the end of 2017.  Mr. Clancy will testify that had OHA timely provided accurate revenue and redetermination information, FamilyCare would have been able to forecast its position more accurately before being forced to decide upon a contract amendment missing an essential term at the end of 2017, which would have dramatically diminished the originally projected $95 million deficit, and allowed FamilyCare's board to decide whether to stay in business for 2018 without the specter of such grievous losses.  Mr. Clancy will testify that OHA's incomplete and inaccurate information about FamilyCare's projected 2018 rates and medical expenses was material to FamilyCare's decision to reject the initial 2018 Rate Amendment and start winding down operations.  Mr. Clancy will testify that receiving complete and accurate information would have signaled to FamilyCare that Mr. Allen was actually changing the agency's negative disposition and associated ratemaking maneuvers towards FamilyCare.

Mr. Clancy will testify that OHA and Optumas issued a revised 2018 rate amendment— after OHA had driven FamilyCare from the market—incorporating an increased "redetermination adjustment" for which Mr. Clancy had been pushing for months.  Mr. Clancy will further testify that OHA's revised 2018 rates were the very type of information FamilyCare needed to know in 2017 and would have been material to FamilyCare's decision whether to stay in business for the entirety of 2018.  Mr. Clancy will testify that the same is true regarding the significant rate increases that OHA doled out to the surviving CCOs in 2019.

Finally, Mr. Clancy will testify about the winding down of FamilyCare's business, including the expenses, policies, and procedures associated with that process.  He will discuss FamilyCare's reasonable decisions in closing the business.  Mr. Clancy will explain that it was necessary to terminate over 300 FamilyCare employees including, eventually, himself, to preserve FamilyCare's funds.  He will explain how FamilyCare staged employee exits based on business needs, focusing largely on the highest paid employees.  He will also describe

10-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

FamilyCare's decision to pay reasonable severances to departing employees and additional retention payments for a select few employees that were strictly necessary to continue working with FamilyCare in 2018 to transition FamilyCare's members to Health Share and to otherwise wind down FamilyCare's business. Mr. Clancy will testify that FamilyCare offloaded all equipment and furnishings and consolidated remaining employees on one floor. He will also explain how he arranged for a sub-lessor to replace FamilyCare so that FamilyCare would not be liable for rent payments for the duration of its long-term lease. Mr. Clancy will testify that his last day at FamilyCare was on April 1, 2018.

**C.    Robb Cowie (est. 30 minutes for direct testimony)**

FamilyCare intends to call Robb Cowie, OHA's current Communications Director, as a hostile witness in FamilyCare's case-in-chief. Mr. Cowie is expected to testify about his background and employment history at OHA.

Mr. Cowie is expected to testify that, in 2016 and 2017, he reported to BethAnne Darby, former Director of OHA's External Relations Division. Courtney Crowell, a communications officer on the communications team, reported to Robb Cowie. Mr. Cowie is expected to testify about his responsibilities at OHA, including his involvement in drafting and disseminating communications planning materials, legislative reports (including the Health System Transformation Quarterly Legislative Reports), and press releases. Mr. Cowie is expected to testify about OHA's communications with legislators to disseminate information in connection with the CCO program.

Mr. Cowie is expected to testify about his role in preparing communications planning materials related to FamilyCare in 2016 and 2017. Mr. Cowie is expected to testify about his role in responding to the public records request submitted to OHA by a Portland Tribune journalist in connection with OHA's January 2017 communications plan targeting FamilyCare ("2017 Communications Plan"), and his role in responding to inquiries about the 2017 Communications Plan after it was made public.

11-    PLAINTIFF'S LAY WITNESS STATEMENTS

155844695.3

**D.    BethAnne Darby (est. 45 minutes for direct testimony)**

FamilyCare intends to call BethAnne Darby, former Director of OHA's External Relations Division, as a hostile witness in FamilyCare's case-in-chief. She is expected to testify that she is now a Director at Moda Health.

Ms. Darby is expected to discuss her education and background. Ms. Darby is expected to testify that she was employed at OHA from November 2015 to August 2017. Her job responsibilities at OHA included oversight over the government relations and communications programs. Ms. Darby reviewed and approved OHA's press releases.

Ms. Darby reported to former director Lynne Saxton for the entire duration of her time at OHA. Ms. Darby's direct reports were Jeston Black, Robb Cowie, and Ellen Pinney. Ms. Darby is expected to testify that she left OHA due to a leadership transition in OHA's directors.

Ms. Darby is expected to testify about her involvement in OHA's lobbying efforts during her tenure at OHA. Ms. Darby was aware of FamilyCare's efforts to pass legislation in 2016 and 2017. Ms. Darby is expected to testify that she met with legislators to discuss FamilyCare-sponsored legislation.

Ms. Darby is expected to testify that she was involved in creating and disseminating OHA's legislative reports, including the Health System Transformation Quarterly Legislative Report. Lynne Saxton was responsible for final approval of those reports. Ms. Darby was aware that Health Share had a different organizational structure than FamilyCare. Ms. Darby is expected to testify about the Oregon Secretary of State's audit of OHA's Medicaid eligibility records.

Ms. Darby is expected to testify that OHA researched the transition of Medicaid members with high-cost medical issues (such as HIV) from Health Share to FamilyCare. She is expected to testify about her efforts to understand that research.

Ms. Darby is expected to testify that she texted with OHA employees, employees from the Governor's office, and legislators as part of her job at OHA. Ms. Darby is expected to testify

12-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

that she did not receive a notification from OHA instructing her to preserve documents relating or relevant to the litigation with FamilyCare.

Ms. Darby is expected to testify about her role in preparing communications planning materials related to FamilyCare in 2016 and 2017. In 2016, Ms. Darby was involved in preparing a draft communications plan related to FamilyCare. She provided the draft communications plan to Ms. Saxton, and she would have been responsible for answering Lynne Saxton's questions about it. Ms. Darby is also expected to testify that, in 2017, she was directed by Lynne Saxton to develop the 2017 Communications Plan. Ms. Darby directed her team to prepare those materials. Ms. Darby is expected to testify about the implementation of the 2017 Communications Plan.

Ms. Darby is expected to testify about her role in responding to inquiries about the 2017 Communications Plan after it was released to the public.

Ms. Darby is expected to testify about her involvement in discussions between OHA and CMS. She is also expected to testify about her interactions with Optumas, including rate-setting tutorials presented to her by Optumas.

## E.    Chelsea Guest (est. 45 minutes for direct testimony)

FamilyCare intends to call Chelsea Guest, manager of OHA's Actuarial Services Unit, as a hostile witness in FamilyCare's case-in-chief.

Ms. Guest is expected to testify about her educational background, work experience, and professional training. She is expected to testify about her knowledge of rate development generally. She is expected to testify about her involvement in developing the 2017 and 2018 capitation rates. Ms. Guest is expected to testify about her communications with other OHA personnel and Optumas personnel about capitation rate development of the 2016, 2017, and 2018 rates. Ms. Guest is expected to testify about her communications with other OHA personnel and Optumas personnel about FamilyCare's rate development questions regarding the 2016, 2017, and 2018 rates. She is expected to testify about communications with FamilyCare about its rate

13-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

development questions regarding the 2016, 2017, and 2018 rates.  Ms. Guest is expected to testify regarding her communications with Optumas about rate development issues arising from the 2016, 2017, and 2018 rates.  She is expected to testify about data quality issues with the 2017 and 2018 rates.  She is expected to testify about changes to the 2019 and 2020 rate-setting process and specifically about changes that addressed issues that FamilyCare had previously identified with prior years' rates.

Ms. Guest is expected to testify about her communications with Optumas and OHA personnel about CCO subcapitation and related party arrangements.  She is expected to testify about OHA's transition analysis of HIV positive members in the Tri-County area.  Ms. Guest is expected to testify about her understanding of the 3.4% growth figure in the Section 1115 Medicaid waiver and how the 3.4% growth figure affected OHA's capitation rate development.  She is expected to testify about the development of the 2017 and 2018 reimbursement reviews, pursuant to which OHA and Optumas cut FamilyCare's primary-care-related base data.  She is expected to testify about the implementation of the base data cuts in 2017 and 2018.  Ms. Guest is expected to testify about her knowledge of and involvement in OHA's 2017 communications plan against FamilyCare.  She is expected to testify about her understanding of why Lynne Saxton resigned as director of OHA.

## F.    Dr. Cynthia Gulick, DO (est. 45 min. for direct testimony)

Dr. Cynthia Gulick is a family medicine physician at Southwest Family Physicians. Besides family medicine, Dr. Gulick specializes in preventative care and lifestyle medicine and is board certified in medical bariatrics, or obesity medicine.  Dr. Gulick earned her Doctor of Osteopathic Medicine degree from Michigan State University College of Human Medicine.  Dr. Gulick will testify that she completed her internship and family medicine residency program at the former Eastmoreland Hospital in Portland.

Dr. Gulick will testify about the history and nature of her medical practice and how she has participated in maintaining the osteopathic medical tradition of focused attention to working

14-  PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

with preventative medical perspectives, particularly since multiple chronic medical conditions are over-represented in underserved populations. Dr. Gulick will testify about Southwest Family Physicians where she practices, the clinic's mission, and how the clinic developed the variety of specialties that are offered today. Dr. Gulick will describe the populations that her practice treats. She will testify that the practice organically evolved to become a "medical home" or patient centered primary care home where patients may receive high quality primary care, pediatric care, gynecologic care, psychiatric care, immunizations, preventative medicine, mental health counseling, lifestyle medicine, physical therapy, midwifery, massage, nutritional services, acupuncture, and other health services. Dr. Gulick will testify that this "medical home" model provides important value to patients because her practice is able to address patients' needs in a holistic, integrated, and non-siloed manner. She will also testify that this model has evolved over time and that her career experiences and research have informed her decision-making as the practice owner.

Dr. Gulick will testify that, over her decades as a provider and practice owner, she has worked with multiple commercial and non-commercial health insurers on her patients' behalf. Dr. Gulick will describe her experience working with FamilyCare as a contracting partner. She will testify that FamilyCare had what she viewed to be a unique approach to health care in the local market. Dr. Gulick will testify that FamilyCare's approach resulted in positive results for the patients, the providers and efficient administration of the plan by FamilyCare. She will testify that FamilyCare "walked their talk" by empowering primary care physicians to make important decisions about their patients' care. Dr. Gulick will testify that, historically, insurers prioritized, or did not aggressively seek out available evidence-based alternatives to, expensive and invasive medical interventions, like invasive surgical interventions and prolonged end-of-life hospitalizations. Dr. Gulick is familiar with the concept of "upstream preventive medicine" and its enhancement of patient care and cost efficiencies or reduction in overall health care costs. She will testify that she was not aware of a managed care organization or commercial insurer that

15-  PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

implemented policies consistent with this research as effectively as FamilyCare did. Dr. Gulick will testify that her practice offered off-hours (e.g., evenings and Saturdays) to decrease times during which patients would otherwise have sought care at emergency rooms or other high-cost care venues. She will also describe how FamilyCare's emphasis on primary care and related services created or increased access to and facilitated services that allowed management of patient care by the provider and patient alike to obtain the most effective and efficient care and to steer clear of unnecessary high-cost services. She will testify that FamilyCare allowed her practice to offer lifestyle coaching and behavioral approaches to patients to help them achieve their health goals without costly interventions. Dr. Gulick will testify that FamilyCare's policies and compensation allowed her practice to actively encourage patients to use in-house mental health and behavioral services in order to address some of the psycho-social causes of healthcare issues and impediments to rapid or effective treatment thereof.

Dr. Gulick will testify that FamilyCare's reimbursement model encouraged its contracting providers to spend more time with their FamilyCare patients, which in turn provided better and timelier access to care and more trusting relationships with their patients, all of which led to better patient health outcomes. She will testify that her clinic documented these improved outcomes and that her clinic earned incentive payments from FamilyCare based on these outcomes.

Dr. Gulick will testify that FamilyCare was innovative and responsive to the ideas of practitioners. Dr. Gulick will testify that FamilyCare was supportive of a variety of non-traditional treatment modalities. Dr. Gulick worked on effective treatment of diabetes and resultant renal issues, which can be facilitated through medically managed weight loss regimens. As a complementary service, FamilyCare also covered the cost of care by the practice's nutritionist. She will testify that this investment in patients has lowered the utilization of more expensive interventions, facilities and specialists, while providing effective care. She will testify that her current CCO does not cover these services.

16-   PLAINTIFF'S LAY WITNESS STATEMENTS

155844695.3

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

Dr. Gulick will explain how mental health care has been integrated with physical health care to foster improved patient outcomes, again with the early encouragement of FamilyCare policies and procedures. Dr. Gulick will describe the challenges Medicaid beneficiaries face when seeking mental health care and how their care is compromised thereby. For example, under her contract with her current CCO, Dr. Gulick's patients cannot receive compensated care from her in-house embedded mental health therapists. Instead, they must receive their mental health treatment elsewhere, requiring that they wait significant lengths of time for scarce services, arrange for such services, initiate new provider relations and transport themselves to new locations. Dr. Gulick will testify that FamilyCare's policies encouraging providers to invest in mental and behavioral health services removed those impediments and inconveniences that might lead patients in need to defer or not seek such care.

Dr. Gulick will testify about the impact that FamilyCare's termination and transition of its assigned members to another CCO in January 2018 had on her practice's patients. Dr. Gulick will testify that reassigning patients disrupted the patients' continuity and timeliness of care because the patients were abruptly reassigned based on an algorithm that primarily utilized geography. Dr. Gulick will testify that, while her practice sought to help beneficiaries who requested assignment to her practice, the logistics, paperwork and other issues involved led many to be assigned to other practices when FamilyCare closed. Dr. Gulick will testify that while she sought to maintain her strong commitment to Medicaid practice thereafter, only about half of her assigned enrollment survived the disruption.

Dr. Gulick will testify that she now contracts with Health Share of Oregon (through its partner CareOregon), a different CCO for caring for Medicaid patients. She will testify that her practice gets significantly lower reimbursement rates than FamilyCare paid, including lower RVU based compensation and smaller incentives. She will testify that this current contract adversely affects her practice's ability to provide patient care because, for example, established counseling relationships have been terminated based upon CCO policy, or lifestyle coaching

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

support to address behavioral or social issues affecting care have been cut off.  She will testify that her patients' psychiatric care is more pharmaceutical-oriented because support for non-drug-based treatments for behavioral health issues has been limited.

Dr. Gulick will testify that her current CCO has more bureaucracy and has limited the type of care Dr. Gulick's practice can provide to patients.  Dr. Gulick will testify that the current reimbursement rates for Medicaid patient care do not cover the time practitioners should spend connecting with, diagnosing and treating patients.  Dr. Gulick will testify that this means working with Medicaid patients is at times done without compensation, and with additional costs.  This is particularly troubling for an otherwise underserved or more economically disadvantaged population that tends to have more social and environmental issues that confound or increase the complexity of the care they need to address their healthcare needs.  Dr. Gulick will testify that the elimination of FamilyCare from the market has led to a discernible increase in cost for the practice, decrease in access, and decrease in overall health and outcomes.

### G.    Melissa Hanks (est. 30 minutes for direct testimony)

FamilyCare intends to call Melissa Hanks, Deputy Director of CCO 2.0 Operations, as a hostile witness in FamilyCare's case-in-chief.

Ms. Hanks is expected to testify about the Oregon Secretary of State's audit of OHA's problems with timely completing the redetermination of OHA's Medicaid member population. She is expected to testify about FamilyCare's shutdown and subsequent transition of FamilyCare's members to Health Share.  She is expected to testify about her role spearheading the implementation of OHA's "CCO 2.0" project.  Ms. Hanks is expected to testify about changes in the CCO 2.0 model that FamilyCare had previously requested but that were not put into place until after FamilyCare shut down.

### H.    Jeff Heatherington, LHD (Hon) (est. 1 day for direct testimony)

Jeff Heatherington is the Chief Executive Officer ("CEO"), President, and co-Founder of FamilyCare.  Mr. Heatherington will discuss his distinguished career in healthcare, non-profit

18-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

management, and his role in helping to shape managed care services for Medicaid recipients in Oregon. Mr. Heatherington, a graduate of Willamette University, will also testify as to his work history, charitable community involvement, and educational background. Mr. Heatherington will describe his passion for the work of community-level health solutions and the development and virtues of an Oregon-based solution regarding access to, and receipt of, quality healthcare for Oregon's historically underserved and lower-income populations.

Mr. Heatherington will testify about the general purpose, evolution, function, and role of the Oregon Health Plan and managed care organizations ("MCOs"), with respect to both providers and recipients of healthcare services, within the healthcare system, especially in Oregon. He will testify to his role and responsibilities at FamilyCare, including business decisions, employment decisions, public relations duties, interactions with the legislature and executive agencies, and helping to shape the organization's mission. Mr. Heatherington will describe FamilyCare's history, non-profit status, organizational structure, size, function, decision-making, and governing documents and mechanisms. Mr. Heatherington will testify about FamilyCare Health Plan, a related entity to FamilyCare, and its function as a Medicare Advantage plan.

Mr. Heatherington will testify generally about the nature of Medicaid and the populations that rely on Medicaid for health insurance coverage. Mr. Heatherington will generally explain how MCOs and CCOs work in Oregon, how these entities were developed in this state in response to public health and medical needs, and how they provide and manage healthcare services. Mr. Heatherington will also testify about the inception of the Oregon Health Plan, its role in the health care marketplace, and the valuable role that CCOs serve within the system. Mr. Heatherington will describe the funding structures of CCOs generally and FamilyCare specifically, including the concepts of "global budgets" and capitation payments. Mr. Heatherington will also describe the capital and reserve requirements necessary to provide services and ensure that FamilyCare could fulfill its obligations to its members (the Medicaid

19- PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

beneficiaries) and the providers with whom FamilyCare contracts to provide healthcare services. Mr. Heatherington will explain how CCOs are required to maintain reserve funds and how CCOs absorb losses by utilizing reserve funds. Mr. Heatherington will also testify generally about how the Affordable Care Act ("ACA") changed Medicaid eligibility and the impact these changes had on CCOs and MCOs.

Mr. Heatherington will discuss how FamilyCare was founded in 1984 to improve healthcare delivery and effectiveness for economically disadvantaged populations in Oregon. Mr. Heatherington will describe the approximately thirty-five-year history of FamilyCare's management and coordination of healthcare service delivery to Oregon Medicaid beneficiaries and FamilyCare's history of interaction with the state and federal agencies that administer and oversee the Medicaid program. In that period, FamilyCare grew to become the second largest MCO/CCO in Oregon, managing and coordinating integrated physical, mental, and dental health services for more than 120,000 Oregon Health Plan members in the Tri-County area and in Marion County. Mr. Heatherington will testify about how FamilyCare's innovative approaches promoted patient interests and care above other considerations. Mr. Heatherington will testify about how FamilyCare cultivated a network of healthcare providers to provide excellent and effective service and emphasized prompt patient access to care with appropriate providers in settings well-suited to the delivery of effective diagnoses, treatment, and preventive care.

Mr. Heatherington will discuss the challenges that exist in communities that receive Medicaid-funded health insurance coverage generally and specifically in Oregon, including limited access to timely and quality care due to the historically low rates of reimbursement offered to providers through the Oregon Medicaid program. Mr. Heatherington will explain how FamilyCare approached its role in the communities it served to provide culturally appropriate, responsive, and community-based solutions to address inequity in the social and economic determinants of health. Mr. Heatherington will describe how FamilyCare's model implemented key innovations to foster and deliver efficient, timely, and holistic care to members that

20-    PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

emphasized both preventative as well as remedial care. Mr. Heatherington will testify about FamilyCare's strategies and the decisions it made to further this innovative mission and how FamilyCare improved overall care for its members.

Mr. Heatherington will testify that when Oregon's CCO model was implemented in 2013, FamilyCare created a unique delivery system of fully integrated service teams to give providers and members a streamlined system where both providers and members could draw on care management support and obtain the support services they required with just one phone contact, rather than being managed by multiple FamilyCare employees. In more traditional models, the customer service department is balkanized, with different personnel in charge of addressing provider issues (and separated further among medical, dental, and behavioral health care), customer concerns, treatment options, financing issues, and the like. FamilyCare integrated these services into teams to holistically address the needs of its members and corresponding providers so that coordination of the patient's care was largely a one-stop affair which furthered care effectiveness and efficiency. Recognizing the interdependence of physical and behavioral/mental health care, Mr. Heatherington will discuss how FamilyCare initiated and pursued a more integrated approach to member physical and behavioral health care, knitting together a member's primary care providers with that member's behavioral health providers to promote diagnostic accuracy and care effectiveness.

Mr. Heatherington will testify that many Oregon healthcare providers—most particularly, primary care providers like family medicine physicians, nurse practitioners, OB/GYNs, and others—limit availability to Medicaid beneficiaries, both in accepting patients and allotting time, because of low reimbursement levels and increased care complexity within that population. Mr. Heatherington will also explain how lower access to care often leads to higher utilization of high-cost providers (e.g., hospital emergency rooms, operating rooms, etc.). Mr. Heatherington will testify that FamilyCare was aware, through historical experience and review of pertinent literature, that patients often get time and attention from providers commensurate with the

21-  PLAINTIFF'S LAY WITNESS STATEMENTS

155844695.3

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

reimbursement rate paid to those providers and based on whether the primary care services are reimbursed in a time-based manner.

Mr. Heatherington will testify that, in an effort to address these challenges, and in order to promote faster, better, and more thorough care, FamilyCare raised the reimbursement rates it paid to certain key providers (e.g., primary care and behavioral care services) to levels closer to those commonly paid by commercial insurance companies. Mr. Heatherington will testify about FamilyCare's business decision to increase reimbursement rates so that it could better ensure that FamilyCare's patients benefitted from access to primary care equivalent to the general population and the role that the addition of ACA expansion members had in FamilyCare's decision. Mr. Heatherington will testify about expectations FamilyCare had of providers regarding increased care and access. Mr. Heatherington will also testify about how its model offered quality healthcare services to patients with intensive medical needs, including patients living with HIV/AIDS. Mr. Heatherington will testify about how FamilyCare's policy improved the overall health of its members while also reducing the cost of care.

Mr. Heatherington will testify that FamilyCare's decision to increase reimbursement rates was known to, and encouraged by, public officials and OHA, and was consistent with known OHA policy. Mr. Heatherington will describe how OHA and other CCOs recognized the value and success of FamilyCare's innovative efforts. Mr. Heatherington will testify that FamilyCare's policy of enhanced reimbursement payments made it a pioneer among its fellow CCOs.

Mr. Heatherington will describe FamilyCare's role as a leader among the CCOs and his role as an advocate for improvements in Medicaid funding, OHA transparency, and coordination of care on behalf of all CCOs. Mr. Heatherington will testify about how FamilyCare worked with third-party consultants, lobbyists, and other professionals to achieve business goals and to advocate for FamilyCare's interests as well as the interests of other CCOs. Mr. Heatherington will testify about his role in creating the Coalition for a Healthy Oregon ("COHO"), an organization of Oregon MCOs/CCOs to lobby for legislation and administrative rules to improve

22- PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

the Oregon Health Plan, his role as chair of that group, and his role in forging a resolution leading to CCO execution of the 2014 contract. He will describe his spoken and written concerns about OHA leadership and its decisions, accuracy, transparency, actuarial analysis, and good faith in the rate-setting processes. Mr. Heatherington will testify about FamilyCare's communications to third parties regarding OHA's rate-setting process and outcomes.

Mr. Heatherington will testify that FamilyCare raised concerns over rates and the rate-setting process to OHA in numerous ways, including: Requesting information necessary to evaluate OHA's rate-setting decisions; notifying OHA when historical costs were inaccurately accounted for; notifying OHA that the rates were incorrect and unsound and identifying errors in the data and methodology used to set the rates; requesting that OHA correct and redress the rates; communicating with the Oregon Legislature, the media, the Governor's office, other CCOs, and CMS about the Oregon Health Plan and OHA's failure to act in a transparent manner, rate-setting concerns, and concerns about OHA's inaccurate comparisons of FamilyCare to other CCOs; introducing legislation regarding improvements in rate-making and policy necessary to improve the Oregon Health Plan and the CCO program; proposing policy changes to increase transparency and improve the administration of Medicaid in Oregon; raising concerns about OHA's compliance with state and federal law (including OHA's failure to meet required deadlines) and procedural and systemic irregularities in the administration of the agency; submitting public records requests to OHA; and filing lawsuits against Defendants, including this suit. Mr. Heatherington will also describe his pointed public criticism at legislative hearings, including on September 28, 2015 and again at a public forum on October 2, 2015, regarding rate-setting concerns, OHA and agency officials, and OHA's general lack of transparency in the rate-setting process. Mr. Heatherington will also describe the history of FamilyCare's litigation against OHA, the May 22, 2016, Settlement Agreement ("Settlement Agreement"), and the aftermath of the Settlement Agreement, including OHA's and Lynne Saxton's failure to address

23-  PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

rate deficiencies and their use of FamilyCare data for the purpose of waging a public relations campaign against FamilyCare.

Mr. Heatherington will discuss his involvement on FamilyCare's behalf in negotiating Medicaid contracts with OHA since 1985. Mr. Heatherington will testify that, between 1985 and 2014, when FamilyCare entered into the five-year contract with OHA (together with the amendments thereto, the "Contract"), negotiations with OHA were largely collaborative, straightforward, and transparent. Mr. Heatherington will testify that OHA gave the MCOs necessary and relevant rate-setting data, including individual MCO cost and utilization data, risk scores, and adjustments. Mr. Heatherington will describe how disagreements about the rates for a given year, whether involving some or all of the MCOs, were resolved, and the collaborative nature of the relationship that he developed with OHA leadership. Mr. Heatherington will testify about how, despite any differences between MCOs and OHA, FamilyCare understood how OHA came up with the rates they offered to pay MCOs.

Mr. Heatherington will testify that, until approximately 2015, FamilyCare's interactions with OHA regarding rates were open, transparent, and mutually cooperative. Mr. Heatherington will testify about the process FamilyCare deployed to estimate and calculate the sufficiency of rates paid by OHA, and FamilyCare's overall management of expenses.

Mr. Heatherington will describe how this changed dramatically in 2015 when FamilyCare (along with some other CCOs) challenged the original rates that OHA set—rates that CMS rejected based on the flaws that FamilyCare and others identified. Mr. Heatherington will testify about how, after receiving FamilyCare's criticisms regarding rate setting that year, OHA's policy of transparency regarding the specifics of the rate-setting process changed, and that OHA refused from that time forward to show FamilyCare meaningful data underlying OHA's future rate calculations. Mr. Heatherington will testify OHA's first refusal to share data stated that it was necessary to protect the State's own "trade secrets." When the legislature challenged the trade secret concept, OHA sent a letter soliciting the other CCOs to raise their own trade secret

155844695.3

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

objections to sharing data with FamilyCare.  Mr. Heatherington will testify about how this was a marked departure from OHA's historical transparency in rate-related interactions with FamilyCare from 1985 to 2015.

Mr. Heatherington will testify that, when FamilyCare negotiated and entered the Contract with OHA, FamilyCare's expectations about the rates and how they would be set were based in part on the five-year term of the Contract and the legislative mandate and underlying rationale for that newly extended term, including: the nature of the CCO model; the legislature's and OHA's stated desire for stability and longer-term investment in the Oregon Medicaid program and CCO market specifically, including CCO rates meant to encourage payor and provider participation in the Oregon Health Plan and corresponding improvement in care delivery and access; Oregon Medicaid industry standards, which are largely dictated by the state agency that administers the program, OHA; OHA's communications and statements about CCO "global budgets" and OHA's rate-setting process, including prior interactions with MCOs like FamilyCare and about a commitment to transparency to ensure the accuracy and adequacy of rates; OHA's communications and statements about its intention and actions to transform health care delivery in Oregon by "bending the cost curve" with up-front investments in health that would pay off over time; OHA's repeated characterization of the CCOs as its partners in delivering this transformed care during the Contract's term; the governmental role of OHA as the single state agency administering the Medicaid program; Oregon laws regarding OHA and CCOs, federal regulations regarding capitation rate-setting, OHA's professed commitment to professionalism, transparency, and neutrality in its actions toward FamilyCare; and the complete absence of any stated intentions by OHA or the legislature to diminish CCOs, or offer inadequate, inaccurate, error-filled, biased or actuarially unsound rates, much less to structure its interactions or rates to put any CCOs out of business.

Mr. Heatherington will testify that FamilyCare reasonably expected that it would be given certain latitude to transform healthcare delivery to Medicaid beneficiaries in Oregon so as

25-   PLAINTIFF'S LAY WITNESS STATEMENTS

155844695.3

to ensure better access to care, increased availability, and better access to information through emphasis on promoting primary care. Mr. Heatherington will testify about FamilyCare's communications with CMS in an attempt to get CMS to provide oversight to OHA and OHA's reaction to these contacts. Mr. Heatherington will testify about FamilyCare's process of negotiating the Contract with OHA, FamilyCare's expectations under the Contract, and FamilyCare's attempts to pursue "dual-track" discussions with OHA in December 2017 to simultaneously try to obtain corrected 2018 rates and plan for a possible transition of FamilyCare's members.

Mr. Heatherington will testify about the role of the legislature in overseeing and regulating OHA, CCOs, and related industries. Mr. Heatherington will describe how FamilyCare was engaged in public affairs efforts and worked with Oregon legislators to propose legislative solutions to problems it saw in the administration of the Oregon Medicaid program, for which OHA was the single state agency that administered the program. Mr. Heatherington will describe how FamilyCare tried to work with OHA and other CCOs to address concerns expressed by FamilyCare and other CCOs about OHA's administration of the Oregon Medicaid program. Mr. Heatherington will describe how CCOs sometimes coordinated efforts to address concerns and to meet with and propose suggestions to OHA. Mr. Heatherington will testify about communications among the CCOs that existed at the time of this dispute and will describe shared concerns about OHA's conduct. Mr. Heatherington will describe that OHA's actions allowed harmful rumors to spread about FamilyCare to the CCO community, providers, and patients.

Mr. Heatherington will testify about FamilyCare's history of litigation with OHA since entering the Contract. Mr. Heatherington will explain why informal dispute resolution methods were unsuccessful, resulting in litigation between the parties (including OHA's effort to terminate FamilyCare's contract). Mr. Heatherington will testify about the Settlement Agreement, including the anti-clawback provision and how FamilyCare understood it to work.

26-  PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

Mr. Heatherington will testify that the ongoing dispute with OHA influenced FamilyCare's business decisions and internal projections used to engage in long-term business planning. Mr. Heatherington will describe how OHA's actions taken during the litigation harmed FamilyCare's reputation among CCOs, providers, patients, legislators, and the public, including by releasing confidential information received in the course of litigation to the entire CCO community and communicating misleading conclusions regarding the state of negotiations to stakeholders.

Mr. Heatherington will testify about the content and impact of the 2017 Communications Plan on negotiations over FamilyCare's rates and on FamilyCare's reputation. Mr. Heatherington will describe his understanding of the way OHA implemented the 2017 Communications Plan. Mr. Heatherington will describe FamilyCare's relationship with OHA after leadership changes occurred in 2017, like the hiring of Pat Allen. Mr. Heatherington will describe the 2018 rate-setting process (which was well underway by the time Ms. Saxton's tenure ended due to the communications plan) and how Mr. Allen's new leadership failed to address FamilyCare's concerns that the rates would put it out of business. Mr. Heatherington will testify regarding communications he had with Mr. Allen in late 2017 regarding the rates and how the rates that OHA sought to impose would put FamilyCare out of business. Mr. Heatherington will testify that OHA's selection of the actuarial firm Lewis & Ellis to perform the actuarial review and the law firm Manatt, Phelps, & Phillips LLP to perform the regulatory review was portrayed as an independent review. Mr. Heatherington will also testify that Mr. Allen moved the deadline for making a decision up by ten days in violation of state law, even though OHA had not addressed FamilyCare's major concerns regarding the incomplete and stunted information about the 2018 rates

Mr. Heatherington will discuss FamilyCare's decision not to sign the 2018 contract amendment containing unspecified rates, including any proposals considered by FamilyCare to avert closure. Mr. Heatherington will discuss the guidance and resolutions provided by FamilyCare's governing board regarding FamilyCare's closure, and the organization's

27- PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

155844695.3

obligations to its members.  Mr. Heatherington will testify that FamilyCare believed that, despite the reserves it had accrued over the years, it calculated that it might not be able to fulfill its obligations to its Medicaid members, providers, employees, and vendors under the flawed 2018 rates offered by OHA.  Mr. Heatherington will describe FamilyCare's board resolutions and deliberations, and the ultimate decision not to sign an amendment at then-unknown rates.  Mr. Heatherington will discuss FamilyCare's decision to enter a one-month extension of the Contract to transition FamilyCare's members to other CCOs, and the terms of that extension.  Mr. Heatherington will also attest to the wind-down period and the impact on the members, providers, and employees of FamilyCare.

Mr. Heatherington will testify why insurance reserves are necessary and how the Insurance Division and OHA require and monitor reserves.  Mr. Heatherington will testify how reserves of a CCO are owned by the CCO, and how OHA has reacted to the disposition of reserves when CCOs have disbanded, have been sold, or have otherwise exited the market.

Mr. Heatherington will explain FamilyCare's compensation policies and severance packages.  Mr. Heatherington will testify about steps taken to exit the market with the least disruption to patients, providers, and other CCOs.  Mr. Heatherington will testify about the employees who remain employed by FamilyCare.  Mr. Heatherington will describe how FamilyCare's exit from the marketplace affected the CCO market.

Mr. Heatherington will describe how FamilyCare would have reconsidered its position during the December 2017 negotiations if the information about the actual 2018 rates had been provided by OHA and if OHA indicated that it would be addressing the rate-setting problems going forward.

Mr. Heatherington will describe his compensation as the CEO of FamilyCare and how his compensation package was determined and approved by the Board of Directors.  Mr. Heatherington will describe how FamilyCare utilized consultants and outside experts to inform FamilyCare's policies and procedures, including compensation policies.  Mr. Heatherington will

28-  PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

testify how his salary compared to other CCO CEOs' salaries.  Mr. Heatherington will discuss the process to determine management salaries.

Mr. Heatherington will testify that FamilyCare made charitable donations to promote community health initiatives and support the local community.  Mr. Heatherington will testify regarding charitable donations that FamilyCare made to organizations, including the Heatherington Foundation.  Mr. Heatherington will testify about FamilyCare's values and mission, and the Heatherington Foundation's mission to promote causes related to osteopathic medicine, research regarding innovation in healthcare, and promote health in the community.

Mr. Heatherington may also testify about any other matter described in his declarations, depositions, and previous testimony in this action and prior legal proceedings between FamilyCare and OHA.

## I.    Bill Murray, Chief Operating Officer of FamilyCare (est. 1.5 days for direct testimony)

William Murray is the Chief Operating Officer ("COO") of FamilyCare, a role he has served in since 2013.  Mr. Murray will discuss his educational and employment history, including his background in health care, finance, business management, information systems, and regulatory compliance.  He will testify that he began his career as a certified public accountant ("CPA") with an international accounting firm and subsequently ran his own healthcare-focused CPA practice for seven years.  Mr. Murray will testify that he has been active in Oregon's administrative and legislative initiatives and processes affecting healthcare in Oregon, including serving on the Oregon Health Policy Board's ("OHPB") Health Incentives and Outcomes Committee that helped develop Oregon's CCO model that is in effect today.

Mr. Murray will describe his prior experience as CEO of another Oregon MCO for 10 years.  He will describe his responsibility for the planning and day-to-day management and operations of this MCO that provided Oregon Health Plan Medicaid services to approximately 10,000 covered beneficiaries with annual revenues in excess of $30 million, including the organization's provider contracting, provider reimbursement methodology and payments made to

29-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

its primary care providers. Mr. Murray will testify that in doing so, he regularly interacted with OHA executive leadership and rate-setting personnel concerning rate-setting processes, data quality and validation. He will describe the general nature, quality, and transparency of these interactions.

Mr. Murray will testify as to when and why he joined FamilyCare and describe his day-to-day responsibilities as COO of FamilyCare. He will describe his day-to-day leadership of operations of the organization, including overseeing reporting, monitoring, and analysis of the organizational performance, striving to stay current on changes in the healthcare industry, including the Oregon Medicaid program and Oregon Medicaid payor and provider markets, and overseeing adjustments to business operations as required or appropriate. Mr. Murray will testify that he was directly involved in preparing and submitting the specific financial and operational data and information that FamilyCare, as a CCO, submitted to OHA, including the data and information used by OHA and its outside actuary, Optumas, in the rate-setting process. He will describe his involvement in FamilyCare's communications with OHA and Optumas about those submissions and the rate-setting process in general. He will testify that he participated in nearly all meetings and exchanges of information with OHA that relate to this case and was involved in the negotiation and execution of FamilyCare's Contract with OHA and amendments thereto.

Mr. Murray will testify that he was involved in numerous discussions with OHA representatives and others about the CCO model and the legislative, bureaucratic, and MCO expectations behind it, a model that was designed and publicized as a long-term partnership between OHA and CCOs to transform health care in Oregon. Mr. Murray will describe FamilyCare's history, non-profit status, reputation in the field, organizational structure, size, function, decision-making, and governing documents and mechanisms. Mr. Murray will testify about how FamilyCare worked with third-party consultants, lobbyists, and other professionals to achieve business goals and to advocate for FamilyCare's interests as well as for the interests of

30-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

other CCOs. Mr. Murray will testify about FHP and its function as a Medicare Advantage Plan. Mr. Murray will testify about the necessary capital infusions from FamilyCare to FHP to ensure that FHP remained compliant with Oregon regulations and the regulatory oversight of FHP by the Division of Financial Regulations, Oregon Department of Consumer & Business Insurance.

Mr. Murray will describe the funding structures of CCOs generally and FamilyCare specifically, including the concepts of "global budgets," capitation, medical loss ratios, and capital and reserve requirements and development to provide the services and ensure that FamilyCare could fulfill its obligations to its members (e.g., Medicaid beneficiaries), and the providers with whom it contracts to provide healthcare services.

Mr. Murray will testify about the basics of Medicaid capitation rate-setting, including the development of base data; the application of trend factors, including cost and utilization, to the base data; the development of add-ons to the base rate; the development of the non-benefit component of the rate; making various adjustments to account for changes in base data, programmatic changes, member mix, and member acuity; how the health risk of a CCO's member population is determined; how the "risk scoring" of these individual members relates to the Medicaid capitation rates that a CCO receives; and consideration of the medical loss ratio in rate development. Mr. Murray will testify as to his extensive experience with Oregon Medicaid capitation rate-setting and his familiarity with the rate-setting process.

Mr. Murray will testify about his role in helping FamilyCare negotiate and execute the Contract with OHA to manage and coordinate health care services to Oregonians enrolled in the Oregon Health Plan. Mr. Murray will testify that as FamilyCare's COO, he worked with other executives and the Board in relation to FamilyCare's decision to enter into the Contract. He will testify that he is familiar with FamilyCare and OHA's reasonable and manifested expectations regarding the Contract, OHA's role in implementing the Contract, and the reasons for such expectations. Mr. Murray will testify that when FamilyCare and OHA entered into the Contract, he, along with FamilyCare's executive group and Board, expected that OHA would present

31-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

FamilyCare with annual rates that were timely, reasonable, unbiased, actuarially sound, adequate, and free of errors in underlying data and methodology. He will further testify that this expectation was consistent with his informed understanding of Oregon Medicaid industry standards and expectations.

Mr. Murray will testify that FamilyCare's expectations about the rates and how they would be set were based in part on the five-year term of the Contract and the legislative mandate and underlying rationale for that newly extended term, including: the nature of the CCO model; the legislature's and OHA's stated desire for stability and longer-term investment in the Oregon Medicaid program and CCO market specifically, including CCO rates meant to encourage payor and provider participation in the Oregon Health Plan and corresponding improvement in care delivery and access; Oregon Medicaid industry standards, which are largely dictated by the state agency that administers the program, OHA; OHA's communications and statements about CCO "global budgets" and OHA's rate-setting process, including prior interactions with MCOs like FamilyCare and about a commitment to transparency to ensure the accuracy and adequacy of rates; OHA's communications and statements about its intention and actions to transform health care delivery in Oregon by "bending the cost curve" with up-front investments in health that would pay off over time; OHA's repeated characterization of the CCOs as its partners in delivering this transformed care during the Contract's term; the governmental role of OHA as the single state agency administering the Medicaid program; Oregon laws regarding OHA and CCOs, federal regulations regarding capitation rate-setting, OHA's professed commitment to professionalism, transparency, and neutrality in its actions toward FamilyCare; and the complete absence of any stated intentions by OHA or the legislature to diminish CCOs, or offer inadequate, inaccurate, error-filled, biased or actuarially unsound rates, much less to structure its interactions or rates to put any CCOs out of business.

Mr. Murray will testify about the considerable infrastructure required to operate FamilyCare. He will testify about the size and nature of FamilyCare's workforce; the need for

32-   PLAINTIFF'S LAY WITNESS STATEMENTS

155844695.3

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

FamilyCare to negotiate and implement hundreds of individual provider contracts to service FamilyCare's more than 125,000 assigned Medicaid members; and the need for FamilyCare to identify and negotiate with key administrative and technological third-party contractors and then implement the resulting service agreements to create the necessary infrastructure to manage the care for, and interaction with, its assigned Medicaid population. He will testify that operating FamilyCare was a tremendously complex endeavor that cost hundreds of millions of dollars and required multiyear investments in recruiting and maintaining skilled and expert personnel; sustaining relationships with accessible and high-quality providers; developing and implementing appropriate and effective third-party contracts; and planning, designing, and purchasing key infrastructure such as claims payment, financial, management and customer service software and hardware. He will also testify that transforming healthcare in the way the CCO model envisioned required even more substantial long-term investment by FamilyCare. He will testify that in his experience, neither FamilyCare nor any other CCO would invest in the necessary infrastructure to sustain operations if they expected OHA to set biased, inadequate, error-filled, or actuarially unsound rates that were intended to put, or would result in putting, it out of business.

Mr. Murray will testify that he is familiar with the origin, development, and components of Oregon's CCO model from multiple sources, including through his experience on the OHPB Health Incentives and Outcomes Committee, discussions with legislators about the CCO model, OHA's public statements about the CCO model, his decade of experience as CEO of an MCO, and interactions with key architects of the CCO model. Mr. Murray will testify that the concept of a "global budget" that grew at a predictable fixed rate and allowed CCOs financial flexibility to make care-related investments for their members was an integral part of the transformation that OHA envisioned. He will testify that as part of the global budget concept, OHA committed to creating rates based on the most reliable cost data while addressing actuarial soundness, CCO viability, and access to appropriate care. He will testify that OHA informed CCOs that the cost

33-  PLAINTIFF'S LAY WITNESS STATEMENTS

155844695.3

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

data would indicate the lowest rates a CCO can accept and that it would be used as the foundation for the CCO capitation rates. Mr. Murray will testify regarding OHA's communications, statements, and publications about the purpose of the global budget, including OHA's representations that the global budget would grow at a sustainable, fixed rate meant to incent positive health outcomes. Mr. Murray will testify as to how OHA's publications and statements about the CCO global budget furthered FamilyCare's expectations under the Contract that OHA's annual rate amendments would be timely, reasonable, unbiased, sound, adequate, and free of errors in underlying data and methodology.

Mr. Murray will testify that OHA repeatedly characterized the CCO model as a partnership between the agency and the CCOs and promised to be an active partner in health care transformation and support CCOs through the process. Mr. Murray will testify that OHA consistently made these representations publicly and in private statements to FamilyCare and the other CCOs. Mr. Murray will testify as to how OHA's characterization of the CCOs as "partners" in Oregon's health system transformation furthered FamilyCare's expectations under the Contract that OHA's annual rate amendments would be timely, reasonable, unbiased, sound, adequate, and free of errors in underlying data and methodology.

Mr. Murray will testify about OHA's Section 1115 waiver ("Waiver") with CMS. He will testify that OHA's Waiver application sought permission from CMS to administer Medicaid and proposed and detailed the CCO model. He will testify that given his professional role and involvement with the CCO model, he was familiar with the Waiver application and the representations OHA made therein, which were consistent with other statements and representations OHA made to potential CCOs. He will testify that the Waiver application described OHA's ambitious plan to transform Medicaid in Oregon through a CCO-anchored system that was meant to focus on prevention and primary care. He will describe OHA's representations that CCOs would fundamentally reform the current delivery model by avoiding preventable specialty care, avoiding unnecessary hospitalizations and emergency care, and

34-   PLAINTIFF'S LAY WITNESS STATEMENTS

155844695.3

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

fostering improved access to care. He will also testify as to OHA's representations in the Waiver application that the global budget would give the CCOs maximum flexibility to invest in care that may decrease costs, achieve better outcomes, and because of the evolutionary nature of CCOs, the organizations would need time to develop the necessary capacity, relationships, and experience.

Mr. Murray will also testify that the ostensible 3.4% per year "cap" on CCO revenue growth imposed by the Waiver did not impede OHA's ability to pay CCOs, including FamilyCare, rates that were reasonable, unbiased, sound, adequate, and free of errors in underlying data and methodology. Mr. Murray will testify that OHA had ample additional room under the 3.4% "cap" to pay the CCOs rates that were reasonable, sound, unbiased, adequate, achievable, and free of errors in underlying data and methodology. Mr. Murray will testify that OHA and Ms. Saxton relied on the 3.4% growth "cap" as pretext to cut FamilyCare's rates.

Mr. Murray will testify that after OHA implemented the CCO model, FamilyCare and other CCOs advocated that contracts between OHA and the CCOs have five-year terms. He will testify that the previous one-year terms forced FamilyCare and the CCOs to negotiate the agreements' essential terms—including rates—on a frequent and unpredictable basis which in turn impeded their long-term investment and planning to enhance care and quality. He will testify that FamilyCare and other CCOs advocated for the five-year term specifically to encourage long-term investments in provider relations, innovative modes of care, development of evidence-based protocols, integration of behavioral care and the like that were necessary to help bend the cost curve (i.e., slow the rate of growth of health care expenditures) while improving care access and quality. Mr. Murray will testify to his involvement in many of the legislative discussions among the MCOs, OHA, and the legislature regarding the statutory requirement of a five-year contract term, the subsequent implementation of the five-year Contract term, and the rationale for requiring the five-year term.

35- PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

Mr. Murray will testify that OHA's behavior changed after FamilyCare's public criticism of OHA regarding the original 2015 rates. Mr. Murray will explain how OHA and Optumas eliminated or diminished the role of FamilyCare in the rate-development process, which was considerably different than the collaborative efforts that OHA, FamilyCare, and the other CCOs enjoyed prior to the Contract's execution. Mr. Murray will describe how OHA and Optumas developed the rates as a siloed exercise, at the conclusion of which OHA informed the CCOs of the results, with limited patience or tolerance for feedback and little meaningful interaction once FamilyCare identified errors.

Mr. Murray will testify about FamilyCare's business decision to increase reimbursement rates to closer to a commercial level so that it could better ensure that FamilyCare's patients benefitted from access to primary care equivalent to the general population. Mr. Murray will testify that FamilyCare needed more primary health and behavioral health providers to support the massive influx of ACA members in the Tri-County area, which nearly tripled FamilyCare's member population. He will testify that FamilyCare's increased primary care reimbursement rates allowed FamilyCare to add new contracted primary care providers to its panel, as well as increasing capacity for Medicaid patients among its existing primary care providers. He will describe how the limited primary care capacity in the Tri-County area influenced FamilyCare's decision to pay increased primary care rates to guarantee access for FamilyCare's members. He will testify that FamilyCare tied its increased primary care reimbursements to FamilyCare's increased expectations for these providers—for example, providers had to commit to accept more Medicaid patients to receive the higher reimbursement rates. Mr. Murray will also testify about how FamilyCare's model offered quality healthcare services to patients with intensive medical needs, including members living with HIV/AIDS, and he will testify about provider access for FamilyCare's members living with HIV/AIDS. Mr. Murray will testify about how FamilyCare's policy improved the health of its members while also reducing the cost of care. Mr. Murray will testify that FamilyCare's primary-care-focused care model was more cost-

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

effective than the care model of the other CCO in the Tri-County area, Health Share, even after adjusting for the relative risk of their respective member populations. Mr. Murray will testify about the other various indicia demonstrating that FamilyCare's primary care investments were effective in reducing the cost of care for FamilyCare's member population, increasing access to care and improving outcomes, including patient satisfaction.  Mr. Murray will testify that FamilyCare pursued a strategy of increased reimbursement for behavioral health providers while also contracting with smaller practices, which allowed FamilyCare members to obtain better access to behavioral health care than through the county system upon which Health Share primarily relied. Mr. Murray will describe the negative impact of OHA's member redetermination efforts and OHA's decision to force FamilyCare out of business at the end of 2017 on FamilyCare's ability to longitudinally and statistically measure the full impact of FamilyCare's primary care investments on member health.  Mr. Murray will describe his efforts to obtain utilization data for other CCOs, including Health Share, so FamilyCare could more precisely compare its primary care investment outcomes to those of other CCOs.  Mr. Murray will testify that OHA stymied these efforts.

Mr. Murray will testify that OHA praised the CCOs' allocation of resources to primary care as part of its incentivization of long-term investments in health care transformation and pushed CCOs to invest in primary care.  Mr. Murray will testify about OHA's repeated public statements regarding the benefits of primary care in "bending the cost curve" and the foundational importance of expanded primary care to the CCO model.  Mr. Murray will testify about OHA's promotion of "patient-centered primary care homes" (or PCPCHs) as providing cost savings and health benefits to Medicaid members.  Mr. Murray will testify about OHA's annual primary care spending reports, which publicly tracked primary care spending on a CCO-by-CCO basis and set baseline targets for primary-care-related spending as a percentage of CCO revenue.  Mr. Murray will testify that OHA specifically praised FamilyCare—before FamilyCare entered into the Contract—for paying primary care providers more to increase member access to

37-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

primary care resources.  He will testify that OHA publicly described FamilyCare's increased reimbursement rates for primary care providers in order to improve access to care as a "promising practice."  He will describe an OHA-sponsored Portland State University study that touted immense fiscal savings from increasing spending on primary care.  He will testify that FamilyCare relied on OHA's representations that increased payment to primary care providers was a "promising practice" and had a reasonable expectation that OHA would not subsequently penalize FamilyCare in rate-setting by cutting these increased primary care payments out of FamilyCare's cost data.  Mr. Murray will also testify regarding FamilyCare's levels of primary care payments and total provider payments compared with other CCOs, based on reports and information that OHA made publicly available, such as OHA's annual primary care spending reports.  Mr. Murray will testify about how his prior experience as CEO of another MCO influenced his understanding of CCO reimbursement of primary care providers.

Mr. Murray will testify about OHA's efforts in 2016 to put FamilyCare out of business and how FamilyCare sought court intervention to prevent OHA from doing so.  Mr. Murray will describe OHA's solicitations of other CCOs to take over FamilyCare's service area and membership. He will testify that OHA's attempts to shut FamilyCare down in 2016 came on the heels of FamilyCare publicly identifying massive problems with the original 2015 rates to CMS and the Oregon legislature.   He will testify as to FamilyCare's ongoing identification and public disclosure of problems and errors made by OHA and Ms. Saxton. He will also testify that FamilyCare notified OHA of its increase to primary care reimbursement prior to implementing it without negative feedback or questioning from OHA.

Mr. Murray will testify about FamilyCare and OHA settling the 2016 lawsuit and the resultant Settlement Agreement between the parties.  Mr. Murray will testify as to why FamilyCare insisted that the "anti-clawback" provision in Section 8 of the Settlement Agreement be included and FamilyCare's understanding of what that provision meant.  Mr. Murray will testify that notwithstanding Section 8 of the Settlement Agreement, OHA clawed back an

155844695.3

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

amount equivalent to the $24.8 million settlement credit by slashing FamilyCare's primary care spending from the 2017 and 2018 base data. Mr. Murray will also testify that the recitals in the Settlement Agreement related to future rate setting and dispute resolution reinforced FamilyCare's Contract expectations that that OHA would present FamilyCare with annual rates that were timely, reasonable, unbiased, actuarially sound, adequate, and free of errors in underlying data and methodology.

Mr. Murray will testify about FamilyCare's concerns regarding the 2017 rate development. He will describe his repeated communications to and with OHA and Optumas regarding shortcomings in the 2017 rate development process, including FamilyCare's concerns over data quality and OHA and Optumas's unwillingness (or inability) to properly reconcile FamilyCare's data; member month assignment errors; risk scoring errors; inadequately supported or improperly calculated trend factors; and other problems with the rates. He will testify that OHA and Optumas were nonresponsive to FamilyCare's concerns, repeatedly failed to provide requested data or meaningful explanations after agreeing to do so, and rebuffed FamilyCare's requests for greater transparency into the 2017 rate development process. Mr. Murray will testify about FamilyCare's public statements to various stakeholders finding fault with OHA, Ms. Saxton, Optumas, and the 2017 rates and rate-setting process, including public statements to CMS, legislators, and the press. Mr. Murray will describe FamilyCare's communications to and meeting with CMS regarding FamilyCare's concerns over the inadequacy of the 2017 rates. Mr. Murray will testify about his review and analysis of the 2017 rate certification that Optumas submitted to CMS. Mr. Murray will also testify to the losses that FamilyCare suffered due to the 2017 rate inadequacies and that the 2017 rates set for FamilyCare were not reasonably attainable for FamilyCare's member population. Mr. Murray will testify that OHA set rates for FamilyCare that were consistently among the lowest paid to CCOs in Oregon and significantly lower than its competitor, Health Share.

39- PLAINTIFF'S LAY WITNESS STATEMENTS

155844695.3

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

Mr. Murray will describe FamilyCare's decision to enter the Dispute Resolution Agreement ("DRA") between OHA and FamilyCare in January 2017. Mr. Murray will testify that under the DRA, FamilyCare and OHA agreed to a series of good-faith meetings in which OHA agreed to provide rate-setting methodological information to FamilyCare to help FamilyCare understand why its rates were consistently the lowest among all CCOs in Oregon. Mr. Murray will testify about a detailed presentation that FamilyCare gave to OHA in the first meeting under the DRA, in which FamilyCare identified its concerns with the rates and the methodology. Mr. Murray will testify that, rather than engaging in good faith, OHA provided no substantive response and instead used FamilyCare's detailed rates presentation to help develop an anti-FamilyCare communications plan.

Mr. Murray will describe the timing and circumstance of Ms. Saxton apologizing to FamilyCare and issuing a public apology for her and OHA's conduct in developing the communications plan. Mr. Murray will testify about his understanding of the length of the ratemaking processes and how development of the 2018 rates was well underway when Ms. Saxton left the agency. Mr. Murray will describe OHA's repeated publication of misleading information and comparisons of FamilyCare to other CCOs, including suggesting FamilyCare's 2014 and 2015 surpluses were higher than that of other CCOs. Mr. Murray will testify about the differing organizational structures of Health Share and FamilyCare, including the subcapitation arrangements of Health Share, Health Share's related-party transactions, and how these subcapitation arrangements affect Health Share's reported profits. Mr. Murray will testify that comparing Health Share and FamilyCare's respective profitability and other financial indicators is an apples-and-oranges comparison. Mr. Murray will testify that OHA knew or should have known that Health Share's subcapitated structure made profitability and other comparisons to FamilyCare meaningless, yet OHA wrongly held out FamilyCare as being more profitable than other CCOs, including Health Share, in attacking FamilyCare's credibility with key stakeholders.

40-  PLAINTIFF'S LAY WITNESS STATEMENTS

155844695.3

Mr. Murray will testify about FamilyCare's concerns with the 2018 rate development process. He will describe his repeated communications to and with OHA and Optumas regarding shortcomings in the 2018 rate development process, including FamilyCare's concerns over data quality and OHA and Optumas's unwillingness (or inability) to properly reconcile FamilyCare's data; member month assignment errors; risk scoring errors; inadequately supported or improperly calculated trend factors; and other problems with the rates. He will explain that some of these 2018 rate errors were the same errors that he had previously identified to OHA and Optumas in the 2017 rate development process, but OHA and Optumas continued to refuse to address them. He will testify that he informed OHA and Optumas of significant variance in how the CCOs completed their OHA-required financial templates, which flowed through into the rate development process, but OHA and Optumas ignored him. Mr. Murray will testify about his review and analysis of the original 2018 rate certification that Optumas submitted to CMS, including the manifold questions that FamilyCare raised to OHA and Optumas that went unanswered. He will testify that OHA and Optumas issued a revised 2018 rate amendment—only after OHA had forced FamilyCare to decide whether to forfeit its Contract and driven FamilyCare out of business—that addressed some of these repeated errors.

Mr. Murray will testify about OHA's member redetermination efforts in 2016 and 2017. He will describe the outsized impact the member redetermination had on FamilyCare because of FamilyCare's disproportionate share of the ACA expansion population. He will testify that FamilyCare's post-redetermination member mix was significantly less healthy than the members who had been disenrolled from Medicaid eligibility, thereby substantially increasing FamilyCare's 2017 per-member expenses and projected 2018 per-member expenses. He will testify that he repeatedly warned OHA and Optumas that they had failed to adequately account for the post-redetermination riskiness of FamilyCare's member population, but the warnings were ignored. He will testify that OHA and Optumas issued a revised 2018 rate amendment—

41-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

only after OHA had driven FamilyCare out of business—incorporating an increased "redetermination adjustment" for which Mr. Murray had been pushing for months.

Mr. Murray will testify that the risk of FamilyCare's membership was deteriorating, that the capitation rates were insufficient to cover the resulting higher per-member expenses, and that he so informed OHA. Mr. Murray will testify that the tool used by OHA for relative risk adjustment relied on diagnoses, about differences between FamilyCare and Health Share that affected the efficiency of diagnosis capture, and that OHA did not appear to consider those differences when calculating risk scores and adjusting rates for FamilyCare and Health Share on that basis. Mr. Murray will discuss the Milliman MARA risk score tool that FamilyCare used to evaluate the risk of its members and what MARA revealed about the changing risk profile of the membership. Mr. Murray will also testify that most Tri-County Medicaid members were automatically assigned between Health Share and FamilyCare. Mr. Murray will testify that Health Share's members organizations are relatively larger integrated healthcare systems, such as Providence Health, Kaiser Permanente, Oregon Health & Science University and Care Oregon, many of which have Medicare Advantage programs, and that in contrast FamilyCare contracted directly with a variety of providers, including many smaller provider clinics.

Mr. Murray will testify that the 2017 and 2018 "CCO rate of growth" calculations singled out FamilyCare in a misleading way. Mr. Murray will testify that the rate of growth calculations were not risk-adjusted. He will testify that OHA and Optumas's decision to not risk-adjust the rate of growth calculations had a particularly negative impact on FamilyCare because of FamilyCare's enrollment mix, which included a disproportionately high number of ACA members. Mr. Murray will testify as to the close temporal proximity between the Settlement Agreement and the implementation of the 2017 "reimbursement adjustment"; the fact that OHA and Ms. Saxton had never previously made such an adjustment; OHA and Ms. Saxton's decision to target only one year of growth (2014 to 2015), which was a time period in which OHA and Ms. Saxton knew FamilyCare had increased primary care reimbursements; OHA and Ms. Saxton's

42-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

decision to target only enhanced provider reimbursements for review, instead of hospitalization or other in-patient treatment costs, where Health Share spent significantly more money on a per capita basis than FamilyCare; and the fact that OHA had previously praised CCO expenditures on primary care and had specifically praised FamilyCare's increased primary care provider payments as a "promising practice."

Mr. Murray will testify regarding FamilyCare's efforts to reduce operating losses during 2017, including stopping payment of discretionary bonuses, implementing a hiring freeze, and discontinuing or curtailing FamilyCare's community investment program.  Mr. Murray will explain why FamilyCare did not cut primary care payments during 2017 as part of its cost reduction efforts, including the negative impact it would have on access to care.

Mr. Murray will testify regarding FamilyCare's consistently excellent performance on OHA's quality metrics, including FamilyCare regularly earning 100% of its available quality pool dollars from OHA.  Mr. Murray will testify that FamilyCare's quality metrics were consistently as good as, or better than, Health Share's quality metrics, including in the category of access to care.  Mr. Murray will testify that FamilyCare's member satisfaction was higher than Health Share's, and FamilyCare had considerably fewer patient complaints than did Health Share.  Mr. Murray will testify that OHA's own public reports show this information.

Mr. Murray will testify about the reviews of the 2018 rate development process by Lewis and Ellis ("L&E") and by Manatt Phillips Phelps ("Manatt").  Mr. Murray will explain how OHA limited the focus and scope of these reviews.  Mr. Murray will describe his efforts to convince OHA to allow FamilyCare to speak with L&E and Manatt about FamilyCare's concerns with the 2018 rates, but OHA refused.  Mr. Murray will testify about how FamilyCare's own analysis of the Manatt and L&E reports identified shortcomings with the reports— shortcomings that OHA did not discuss when touting these reports to third parties.  Mr. Murray will testify about FamilyCare's communications with the OHPB, CMS, and legislators about the shortcomings of the Manatt and L&E reports.

43-  PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

Mr. Murray will testify about his interactions with Laura Robison and Pat Allen regarding 2018 rate issues after Ms. Saxton resigned. Mr. Murray will describe the detailed information he provided to Ms. Robison and Mr. Allen regarding the shortcomings and problems with the 2018 rates. He will explain how after Mr. Allen initially met with Messrs. Heatherington and Murray in September 2017, Mr. Allen went months without substantively responding to FamilyCare's questions and observations. Mr. Murray will testify that OHA first provided FamilyCare with the tentative 2018 rates on October 31, 2017, but those were merely preliminary, as OHA expressly noted that the rates might change based on the outcome of, among other things, a redetermination analysis that was to be completed by late November. Mr. Murray will testify that the redetermination analysis referred to a problem with the rates that FamilyCare had previously brought to OHA's attention—namely, that because OHA's "redetermination" had removed from Medicaid thousands of relatively healthier people, the 2018 rates would be insufficient to cover the cost of health care for the relatively sicker people who remained in Medicaid and were assigned to FamilyCare. Mr. Murray will testify that he and others at FamilyCare repeatedly informed OHA that the initial rates were so low that they would lead to FamilyCare suffering significant additional losses in 2018, and that without higher rates, FamilyCare would likely be forced to reject the 2018 Rate Amendment and cease doing business as a CCO. Mr. Murray will testify that FamilyCare repeatedly requested that OHA provide updated accurate 2018 rates well before the end of 2017 so that FamilyCare could make an informed decision about the 2018 rate amendment. Mr. Murray will testify about his interactions with FamilyCare's board during November and December 2017, including what he told the board about FamilyCare's ongoing negotiations with OHA and the information that OHA had agreed to provide to FamilyCare to help FamilyCare decide whether to sign the 2018 contract.

Mr. Murray will explain how on December 20, 2017, Mr. Allen issued an ultimatum—within 24 hours, FamilyCare needed to either accept the 2018 rates (without knowing what they would be) or shut down. Mr. Murray will testify that Mr. Allen was angry in this meeting, which

44-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

followed FamilyCare's public criticisms of the shortcomings of the L&E and Manatt reports. Mr. Murray will testify that Mr. Allen's position was an abrupt change from OHA's prior representations that it would timely provide FamilyCare with information about the revised 2018 rates to assist FamilyCare's determination of whether it could stay in business for 2018. He will also testify that there was already a two-pronged path in place whereby FamilyCare was simultaneously working to stay in business and assisting OHA with a backup transition plan if FamilyCare was unable to sign the 2018 Rate Amendment by the end of the year. Mr. Murray will testify that Mr. Allen's "sign or be shut down" ultimatum was unnecessary for this reason. Mr. Murray will testify that Mr. Allen's ultimatum was inconsistent with FamilyCare's prior experiences with OHA, in which FamilyCare had the requisite 60 days to review and sign a rate amendment once proposed. Mr. Murray will testify that FamilyCare was unable to agree to tentative rates that would cause FamilyCare to run a deficit in 2018 exceeding the amount of its available and required reserves, and without any information from OHA about what compensation FamilyCare would actually receive in 2018 upon the correction of OHA's acknowledged data errors, FamilyCare could not in good faith agree to sign the 2018 rate amendment on December 21, 2017.

Mr. Murray will testify that FamilyCare's projected $95 million deficit for 2018 was predicated on the best available information to FamilyCare at the time, which was the incomplete and stunted rate-related information OHA had provided to FamilyCare. Mr. Murray will testify that FamilyCare's revenue would have been at least $20 million higher than initially projected, because of Optumas and OHA fixing certain problems Mr. Murray had long identified in the 2018 rates. Moreover, Mr. Murray will testify that FamilyCare's expenses would have been tens of millions of dollars lower than originally projected for 2018, because (unbeknownst to FamilyCare) OHA had essentially completed member redetermination efforts by the end of 2017. Mr. Murray will testify that had OHA timely provided accurate revenue and redetermination information, FamilyCare would have been able to forecast its position more

45-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

accurately before being forced to decide upon a Contract amendment missing an essential term at the end of 2017, which would have dramatically diminished the originally projected $95 million deficit, and allowed FamilyCare's board to decide whether to stay in business for 2018 without the specter of such grievous losses. Mr. Murray will testify that OHA's incomplete and inaccurate information about FamilyCare's projected 2018 rates and medical expenses was material to FamilyCare's decision to reject the initial 2018 Rate Amendment and start winding down operations. Mr. Murray will testify that receiving complete and accurate information would have signaled to FamilyCare that Mr. Allen was actually changing the agency's negative disposition and associated ratemaking maneuvers towards FamilyCare.

Mr. Murray will testify about FamilyCare's shutdown and the transition of FamilyCare's members to Health Share. He will testify about OHA and FamilyCare's one-month contract extension for FamilyCare to assist the transition of members during January 2018, including OHA's insistence on the inclusion of contract language prohibiting the extension of this one-month contract. He will testify that OHA never identified any reason why FamilyCare's one-month contract could not be extended until OHA issued the revised 2018 rates, thereby allowing FamilyCare to determine whether to stay in business for all of 2018 with the benefit of up-to-date revenue and medical expense information. Mr. Murray will testify about his understanding of how the transition affected FamilyCare's former members and panel providers.

Mr. Murray will testify about OHA's changes to the rate-setting process in 2019 and 2020—after OHA had driven FamilyCare from the market—and how these changes addressed many of the issues that FamilyCare had identified when it was in business. He will testify that in 2019 OHA substantially increased the rates paid to Health Share for FamilyCare's members that were transitioned to Health Share. He will testify as to his calculation that in 2019, OHA paid Health Share $82.5 million more to care for FamilyCare's members than what FamilyCare would have received under the 2018 Rate Amendment, or an increase of more than 16%.

46-   PLAINTIFF'S LAY WITNESS STATEMENTS

155844695.3

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

Mr. Murray will testify that he experienced considerably different treatment from OHA in his role as COO of FamilyCare than what he experienced during the ten years he was CEO of a different CCO/MCO, prior to employment at FamilyCare. He will testify that in his prior role, the company's relationship with OHA was far more collaborative, and he received timely answers to questions resolving the issues he raised. He will explain that OHA's behavior towards Mr. Murray's inquiries changed when he began to make them on FamilyCare's behalf, and OHA's treatment of Mr. Murray was starkly different in the lack of responsiveness and professionalism he received in response to his FamilyCare-based questions.

Mr. Murray will testify about certain calculations he performed at the request of the Cogence Group to support the Cogence damages analysis, including adjusting PricewaterhouseCoopers' 2017 and 2018 lost capitation revenue calculations for FamilyCare to net out certain hospital reimbursement adjustments from FamilyCare's portion of 2017 and 2018 lost capitation revenue. Mr. Murray will testify his calculations reduced the amount of the lost capitation revenue calculated by PricewaterhouseCoopers for purposes of the Cogence analysis. Mr. Murray will testify that FamilyCare's lost revenue for 2017 and 2018 did not allow FamilyCare to avoid any additional costs in 2017 and would not have allowed FamilyCare to avoid any additional costs in 2018. He will testify that FamilyCare incurred considerable extraordinary expenses and costs directly related to ceasing its Medicaid operations.

Mr. Murray may also testify about any other matter described in his sworn and filed declarations in this lawsuit, his depositions, or his previous trial testimony in the prior litigation.

**J.     Dr. Robin Richardson, Chair and Member of Board of Directors of FamilyCare (est. 2 hours for direct testimony)**

Dr. Robin Richardson is a physician and chairman of the Board of Directors of FamilyCare. He will testify that he has served on the Board since approximately 2010 and has been chairman since 2015. He was also the part-time medical director of FamilyCare from 2003 to 2008. He will testify that, apart from his duties for FamilyCare, he is an assistant professor of family medicine at the College of Osteopathic Medicine of the Pacific Northwest and an

47-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

employee of Western University of the Northwest. He will testify that he runs a clinic where he provides training and supervision for newly graduated physician assistants and nurse practitioners. In his spare time, he cares for veterans at the Oregon Veterans' Home.

Dr. Richardson will testify about his experience as a provider who worked with FamilyCare and other CCOs to care for Medicare and Medicaid patients. As he will explain, he began private practice in 1987 and continued until about 2008, when he transitioned into medical education partly because it became too difficult to sustain a practice that largely served Medicare and Medicaid patients. Dr. Richardson will testify that Medicaid reimbursement decreased so much Medicaid would reimburse providers at only 50% or 60% of the rates that private insurers would reimburse providers. Because of this decrease, Dr. Richardson was unable to sustain the expenses of his practice if he continued to serve many Medicaid patients.

Dr. Richardson will testify about the value of investing in primary care, behavioral care, and other support measures to promote health outcomes. He will describe how FamilyCare's patient-centered primary care focus benefitted both patients and providers and that a basic tenet of FamilyCare was to apply a holistic, integrated approach to patient care and create better access to providers

He will explain from his experience as a practicing doctor how low reimbursement rates in primary care generally disincentivize providers from offering primary care to Medicaid patients, thus reducing patients' access to timely and needed care.

Dr. Richardson will testify about his role as a Corporate Member and Chairman of the FamilyCare Board of Directors. He will testify about the function of the Board in making policy-level decisions for FamilyCare and interacting with FamilyCare management. He will describe how board members regularly reviewed financial and clinical data reports and tracked FamilyCare's performance as a CCO. Dr. Richardson will testify that changes to FamilyCare's medical utilization trends over time indicated that FamilyCare's investments in preventative and primary care were yielding desired results because access to primary care was increasing and

48- PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

patients' use of certain types of more expensive services, like emergency rooms, surgical or specialty services, was decreasing.

Dr. Richardson will explain that the Board regularly monitored FamilyCare's spending, including its spending on charitable donations. Dr. Richardson will recount the Board's consideration of a few donations, including two donations to medical school scholarship funds totaling $4,000,000 in 2015 and 2016. Dr. Richardson will explain that the Board approved those donations because it furthered the Board's commitment to increase the number of primary care physicians in Oregon. Dr. Richardson will also explain how the donated funds were accrued by FamilyCare over many years of service and were not otherwise encumbered by debts or reserve obligations.

Dr. Richardson will testify that the Board also monitored and gave management feedback on other aspects of FamilyCare's spending, including aggregate spending on employee compensation. Dr. Richardson will explain that, although the Board did not vote on compensation for individual employees, the Board voted on budget proposals from FamilyCare's finance committee, which involved consideration of aggregate spending on categories of administrative expenses, including employee compensation. Dr. Richardson will testify that, historically, the Board took the position that FamilyCare should compensate employees commensurately with the market compensation survey range for their positions to reward their expertise, experience, and effectiveness, and to encourage them to remain with FamilyCare and not lose them to competitive offers. Dr. Richardson will testify that FamilyCare spent within its approved budget, budgets that the Board considered to be prudent and reasonable.

Dr. Richardson will testify that the Board determined the compensation of FamilyCare's chief executive officer, Jeff Heatherington. Dr. Richardson will explain that FamilyCare contracted with an outside consultant to give neutral, objective recommendations about compensation for all executive-level positions at FamilyCare, and that the Board approved compensation for the chief executive officer consistent with that consultant's recommendations.

49- PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

Dr. Richardson will testify that the Board provided appropriate oversight over the decision to shut down in 2017 and early 2018. In July 2017, the Board discussed serious concerns about the insufficiency of the rates proposed and provided by OHA to cover reasonably anticipated costs, resulting in significant losses. Dr. Richardson will recount the Board's discussion in July 2017, which led to a discussion about what to do if OHA again provided insufficient rates for FamilyCare in 2018 such that FamilyCare could not sustain its operation, maintain its finances, and fulfill its obligations to the assigned Medicaid members and to contracted providers. As a consequence, the Board was prepared to face a circumstance where FamilyCare would have to shut down. That said, the Board wanted to avoid shutting down and forfeiting the remaining term of its contract with OHA if at all possible. It was the Board's intention for management to continue working with OHA to get corrected and appropriate rates from OHA despite the recent history of adverse actions by OHA toward FamilyCare.

Dr. Richardson will testify that, in December 2017, the Board met to discuss the insufficiency of OHA's proposed 2018 rates in the context of whether FamilyCare could remain in business. Bill Murray, FamilyCare's COO, attended the meeting and apprised the Board of the status of FamilyCare's ongoing 2017 lawsuit against OHA, how the 2018 rates would impact FamilyCare, and of the ongoing negotiations with OHA. As Dr. Richardson will explain, based on the information available at the time, OHA's 2018 rates would cause FamilyCare to incur an approximate $95 million deficit. Accordingly, if FamilyCare were to sign the 2018 contract, FamilyCare was estimated to exhaust its finances on or around August 2018, prior to the end of the amendment year.

Dr. Richardson will recount how the Board discussed that, notwithstanding the 2017 lawsuit, OHA still was refusing to provide FamilyCare with certain information that FamilyCare needed to accurately project whether OHA would provide sufficient rates for 2018 that would allow FamilyCare to remain in business or to correct the rates in a way that would stem or significantly reduce the projected losses. Dr. Richardson will explain that, in light of the

50-  PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

information available at the time, the Board voted to reject the 2018 rate amendment proposed by OHA, but that the vote did not foreclose FamilyCare from accepting revised 2018 rates. Dr. Richardson will testify that Mr. Murray told the Board that he was still working with OHA on obtaining corrected rates for 2018 and was hopeful that he would make progress, and that the Board discussed that, if OHA provided FamilyCare with corrected, more accurate and sufficient rates—or if FamilyCare made sufficient progress with OHA such that the Board felt confident that OHA would do so—the Board would revisit its decision and reconsider whether FamilyCare could stay in business.

Dr. Richardson will further testify that OHA's rate corrections, and the increased rates that OHA made in February 2018 and in subsequent years would have been material to the Board's decision whether to continue in business, and that had the Board known in December 2017 that OHA would later increase rates for 2018, and then increase them significantly in 2019, the Board might well have made a different decision.

However, Dr. Richardson will testify that, because OHA did not provide additional information as to any revised rates, and gave a premature deadline for deciding, FamilyCare decided (consistent with prior Board direction) that it was better for the Medicaid beneficiaries, employees, and providers to not sign the amendment and start an orderly wind-up rather than disrupting provision of needed care in unpredictable and potentially precipitous fashion. Dr. Richardson will also testify about the Board's oversight of FamilyCare during and after the shutdown of its Medicaid and Medicare businesses, including what to do with FamilyCare's remaining funds. Dr. Richardson will explain that, in light of FamilyCare's charitable mission and history of devotion to providing high quality healthcare to underserved Oregonians, the Board resolved to direct the proceeds of any judgment or settlement of claims in this lawsuit to charitable organizations with the express requirement that the funds be used to fund needed health services in Oregon, with an emphasis on expanding access to such services for Oregon's economically or socially disadvantaged, indigent, or needy communities.

51-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

**K.      Lynne Saxton, former Director of Oregon Health Authority (est. 75 minutes)**

Lynne Saxton is the former Director of the Oregon Health Authority ("OHA") and is a defendant in this case.  She is expected to testify that she is now retired and serving on the Board of Trustees for Willamette University.  Ms. Saxton is expected to discuss her education and background.

In late 2014, Governor Kitzhaber asked Ms. Saxton for suggestions regarding who could serve as director of OHA.  Ultimately, Governor Kitzhaber offered the position to Ms. Saxton, and she accepted.  Ms. Saxton started as Director of OHA in late January 2015.  At that time, OHA's annual budget was approximately $20 billion.  Ms. Saxton is expected to testify regarding the role of OHA in administering the Oregon Medicaid program and the agency's responsibility for setting Medicaid capitation rates for CCOs.  Ms. Saxton is expected to identify her duties and responsibilities during her tenure as director of OHA, including her supervisory role relative to OHA employees and agents.

Ms. Saxton is expected to testify about her removal or deletion of text messages from her OHA-issued iPhone.  She used her OHA-issued phone, 503.930.3614, only for OHA-related business.  Before this lawsuit was filed on February 27, 2017, Ms. Saxton knew that there was a litigation hold in place on communications within OHA.  She had received Bill Murray's email of April 4, 2015, asking OHA to preserve all relevant documents relating to FamilyCare's rate dispute, after which she made efforts to ensure OHA project leads were in compliance.  Ms. Saxton's standard practice was to delete texts from her phone on a daily basis.  Ms. Saxton continued to delete texts from her phone on a daily basis even after she understood that litigation with FamilyCare was likely, and after this lawsuit was filed.  Ms. Saxton claims to have believed that those deleted text messages were recoverable, but she did not confirm her belief with anyone.  She did not change her standard practice of deleting texts daily for the duration of her role as Director of OHA, from January 2015 to August 2017.  She did not have a conversation with anyone about the litigation hold to clarify her understanding of it.  She is expected to describe the process by which she deleted the texts.  Ms. Saxton is expected to testify that she

52-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

does not know why certain texts sent by her to other recipients are also not recoverable from the phones of those other recipients. She claims to not remember the content of the text messages she deleted.

Ms. Saxton is expected to testify that she was involved in Medicaid rate-setting as Director of OHA and that she participated in making policy decisions in connection with that rate-setting process during her tenure at OHA. She is expected to testify that the annual capitation rate development for the 2015-2018 rate-setting years typically takes months.

In late 2014 to early 2015, after FamilyCare identified problems with OHA's rate-setting methodology, CMS required OHA to re-develop the 2015 rates. Ms. Saxton is expected to testify that OHA hired a contractor, Optumas, to redevelop the 2015 rates and to assist with setting Oregon's capitation rates in subsequent years. Ms. Saxton worked closely with Optumas on rate-setting beginning in 2015. She is expected to testify about a dispute between OHA and FamilyCare in connection with the 2015 rates. Ms. Saxton is expected to testify that, in response to that dispute, in Spring 2016, she asked that OHA staff create a communication strategy to respond to FamilyCare's criticisms of OHA. Ms. Saxton is expected to testify about the communications plan developed by OHA in March 2016 (the "2016 Communications Plan"). Ms. Saxton included Optumas in OHA's discussions and planning in connection with the 2016 Communications Plan. Ms. Saxton is expected to testify that Optumas was included in OHA's response to FamilyCare's legislative outreach and criticisms of OHA and the rate-setting process. Ms. Saxton is expected to testify about FamilyCare's lawsuit, filed on March 29, 2016, in connection with the redeveloped 2015 rates and the 2016 rates, and about OHA's effort to terminate FamilyCare's contract.

Ms. Saxton is expected to testify about OHA's analysis of the transition of HIV positive members from FamilyCare to Health Share (the "transition analysis") beginning in late 2015. Optumas assisted with the transition analysis. In February 2016, Ms. Saxton approved further work on the transition analysis, and later checked on its progress in April and May 2016. In June

53- PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

2016, Ms. Saxton was informed that the HIV analysis was not as conclusive as expected. Ms. Saxton is expected to testify that she considered the outcome of this analysis to be critical to the resolution of OHA's dispute with FamilyCare.

Ms. Saxton is expected to testify that she was aware of FamilyCare's concerns, beginning in 2015 and continuing through 2017, regarding OHA's rate-setting processes and FamilyCare's rates. FamilyCare complained about the lack of transparency in OHA's rate-setting and identified errors in the underlying rate-setting data and rate-setting methodology. Ms. Saxton is expected to testify that she was aware of FamilyCare's complaints to OHA, the legislature, CMS, the Governor's office, and the media regarding problems in the rate-setting process and problems with FamilyCare's rates. She is expected to testify that she was aware of FamilyCare's statements to the media and the public regarding the ongoing disputes between FamilyCare and OHA, and that she was aware of the lawsuits FamilyCare filed against OHA alleging improper rate-setting and other problems at OHA. Ms. Saxton is expected to testify that she was aware of, and communicated with OHA and Optumas personnel regarding, Mr. Heatherington's public criticism of Ms. Saxton and OHA during testimony to the Oregon Legislature in so-called "legislative days" sessions.

Ms. Saxton is expected to testify about FamilyCare's concerns about rates beginning in 2015 and throughout her tenure. She is expected to testify that, in the first half of 2015, she had frequent contact (once per week) with Optumas (with Zach Aters for rate-development process and with Steve Schramm) and Lori Coyner about the scope of the work and process. Ms. Saxton is expected to testify that she was aware of FamilyCare's decision to increase investments in primary care spending to facilitate access to care for its members, and that OHA initially praised FamilyCare's decision to invest in primary care. Ms. Saxton is expected to testify that primary care was a focus of the CCO model, through which OHA sought to transform health care by achieving better patient outcomes at lower costs.

Ms. Saxton is expected to testify about the development and implementation of a

54- PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

reimbursement policy that was applied in setting the 2017 and 2018 capitation rates. She is expected to testify that the reimbursement policy was intended to reduce the rate of growth in CCO medical costs to 3.4% per year. Pursuant to the reimbursement policy, OHA removed certain costs historically and actually incurred by FamilyCare (costs incurred to reimburse primary care providers who had treated Medicaid beneficiaries assigned to FamilyCare) from the rate-setting process.

Ms. Saxton is expected to testify about the Oregon Secretary of State's audit of OHA's Medicaid eligibility records starting approximately May 2017 and the resulting audit report. Ms. Saxton is expected to testify about her management style, which includes holding people accountable for their job performance.

Ms. Saxton is expected to testify about the communications plan that OHA prepared at her request in January 2017 ("2017 Communication Plan") and her August 2017 apology letter to Mr. Jeff Heatherington about that plan. On December 30, 2016, OHA and FamilyCare signed a dispute resolution agreement pursuant to which the parties agreed to participate in good faith discussions regarding their rate disputes. On January 3, 2017, Ms. Saxton asked BethAnne Darby, OHA Director of External Relations, for a communications plan with respect to FamilyCare in connection with the dispute resolution process that the parties were conducting. On January 17, 2017, while the first dispute resolution process meeting was underway, FamilyCare shared with OHA a copy of its dispute resolution slide deck presentation on rate setting issues and, upon receipt, Ms. Saxton emailed the slide deck to Ms. Darby with a request that Ms. Darby use the slide deck in drafting the 2017 Communications Plan. When she later received a draft of that plan, Ms. Saxton told her staff that the draft was a "good start" that they should continue to build on. Ms. Saxton is expected to testify that "good start" meant that the draft plan missed the mark.

Ms. Saxton is expected to testify about her role in responding to the public records request submitted to OHA by a Portland Tribune journalist in connection with the 2017

55-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

155844695.3

Communications Plan.  Ms. Saxton is expected to testify that, the revelation of the 2017 Communications Plan in The Portland Tribune on Friday, August 4, 2017, led to her apology letter to Mr. Heatherington on Monday, August 7, 2017.  Ms. Saxton is expected to testify that the 2017 Communications Plan exceeded the boundaries of OHA's responsibilities to the public trust.  Ms. Saxton is expected to testify that, on August 8, 2017, the Governor's office called for her resignation from OHA.  Ms. Saxton resigned on August 8, 2017, effective August 31, 2017.  In Spring 2017, Ms. Saxton had talked with the Governor's office about resigning at a good time, in February 2018.  She is expected to testify that she has no idea whether the revealing of the 2017 Communications Plan in The Portland Tribune on Friday, August 4, 2017, the subsequent media coverage of the issue, and her apology letter to Mr. Heatherington on Monday, August 7, 2017, had anything to do with her being asked to resign by the Governor on August 8, 2017.

**L.      Dr. Troy Stoeber (est. 45 min. for direct testimony)**

Dr. Troy Stoeber is a pediatrician at Oregon City Pediatrics.  Dr. Stoeber will testify about his education and background.  Dr. Stoeber received his undergraduate degree and went to medical school at Creighton University in Omaha, Nebraska.  Dr. Stoeber received specialty training in pediatrics at the University of Kansas School of Medicine-Wichita.  He will also describe his work experience.

Dr. Stoeber will describe his medical practice and the patient populations he works with. He will also describe how he interacts with health payors, including the differences among private insurers, Medicare payors, and Medicaid CCOs.  Dr. Stoeber will testify that there can be tension between business decisions that payors make, and healthcare decisions that providers must make, but that FamilyCare was different from other payors because its business model was not to unnecessarily deny or delay healthcare, and especially primary care, because FamilyCare understood that patients benefited from making sure its members had prompt access to good healthcare services.  FamilyCare was revolutionary in this regard because FamilyCare aligned

155844695.3

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

the best interests of the patients and the insurance company, especially with respect to the social determinants of health.

From July 1, 2010, to January 1, 2018, Oregon City Pediatrics, through Children's Health Alliance, had a contract with FamilyCare. Dr. Stoeber will testify that FamilyCare's approach to contracting with providers and delivering care to its members was innovative. FamilyCare prioritized primary care, which Dr. Stoeber will testify led to better outcomes for his patients. Dr. Stoeber will testify regarding payments from FamilyCare for his healthcare services and the quality metrics he was required to meet related to his care. Dr. Stoeber will testify that FamilyCare communicated with its providers to keep them informed about developments at FamilyCare.

Dr. Stoeber will testify that he was a member of FamilyCare's medical advisory panel for three years. Dr. Stoeber will testify that the panel met with FamilyCare's medical directors once every two months to discuss metrics and best practices. Dr. Stoeber will testify that being a member of this panel gave him insight into FamilyCare.

Dr. Stoeber will testify that FamilyCare was responsive to research showing that upfront investments in primary care resulted in overall cost savings and improved patient outcomes because patients with adequate access to preventative care were more likely to get health care problems addressed earlier, less likely to have complications, and more likely to avoid high-cost services such as visits to the emergency room and unnecessary specialty care. Dr. Stoeber will testify that FamilyCare made policy decisions to make sure FamilyCare members had access to primary care providers, particularly given the demand in Portland for such services. Dr. Stoeber will testify that FamilyCare's approach to primary care reimbursement incentivized primary care providers to adopt practices that were in the best interests of patients. For example, FamilyCare's higher reimbursement rates incentivized primary care providers to stay open longer to make sure FamilyCare members had access to care to address problems earlier, spend more time with patients, and avoid costly specialty services and emergency room visits because

57-    PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

of primary care unavailability. Dr. Stoeber will testify that FamilyCare conditioned higher reimbursement levels on whether a provider was open to FamilyCare members, the hours the provider kept, and the ease of access to integrated behavioral health services at that provider's offices.

Dr. Stoeber will also testify that FamilyCare offered innovative solutions to common problems providers face in treating Medicaid patients. Dr. Stoeber will testify that one of FamilyCare's greatest innovations was the PPORT program. The PPORT program was an efficient communication system that put all of the people necessary to make a decision about medical coverage in one room. Dr. Stoeber will testify that providers were given one telephone number to call and one point person to contact with questions for FamilyCare. This allowed Dr. Stoeber to quickly resolve questions and get his patients the care they needed.

Dr. Stoeber will also testify that FamilyCare offered innovative solutions to common problems Medicaid recipients face in accessing health care. Dr. Stoeber will describe the unique challenges Medicaid recipients face in the healthcare system and how they require more care management services, including services that are traditionally offered in a social work setting rather than in a medical setting. FamilyCare implemented programs to address these unique challenges, including offering transportation to medical appointments and implementing systematic follow-up practices to anticipate the needs of high utilizing members.

Dr. Stoeber will describe the relationship between mental and behavioral health care and physical health care. Dr. Stoeber will testify that most patients who visit primary care doctors also have behavioral health issues. He will describe the challenges that providers face in ensuring that their patients get adequate access to behavioral health. Dr. Stoeber will testify that FamilyCare's integrated model of care led to better health outcomes because patients were provided with access to behavioral health care in a primary care setting. Dr. Stoeber will describe how FamilyCare was at the forefront of this innovation.

58-   PLAINTIFF'S LAY WITNESS STATEMENTS

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: 503.727.2000

Dr. Stoeber will describe the effect that FamilyCare's closure had on his practice and patients. Dr. Stoeber will talk about meetings that FamilyCare held, both with his staff, and amongst primary care physicians within its network, in order to increase knowledge and patient outcomes. Dr. Stoeber will testify that he no longer has a personal relationship with the successor CCO, and the CCO does not emphasize primary care like FamilyCare did. Dr. Stoeber will testify that, after FamilyCare's closure, his office has to spend more time figuring out who to call and how to get approvals to get patients the care they need. Dr. Stoeber will testify that the increased administrative time means he has less time for his medical practice and patients.

DATED: March 14, 2022.                              **PERKINS COIE LLP**

By:*/s/ Julia E. Markley*
    **Stephen F. English**, OSB No. 730843
    SEnglish@perkinscoie.com
    **Thomas R. Johnson,** OSB No. 010645
    TRJohnson@perkinscoie.com
    **Julia E. Markley, OSB No. 000791**
    JMarkley@perkinscoie.com
    **Matthew J. Mertens**, OSB No. 146288
    MMertens@perkinscoie.com
    **Sasha Petrova**, OSB No. 154008
    SPetrova@perkinscoie.com
    1120 N.W. Couch Street, Tenth Floor
    Portland, Oregon 97209-4128
    Telephone: 503.727.2000
    Facsimile: 503.727.2222

    **Matthew P. Gordon** (admitted *pro hac vice*)
    MGordon@perkinscoie.com
    **David B. Robbins**, OSB No. 070630
    DRobbins@perkinscoie.com
    1201 Third Avenue, Suite 4900
    Seattle, Washington 98101-3099
    Telephone: 206.359.8000
    Facsimile: 206.359.9000

    *Attorneys for Plaintiff FamilyCare, Inc.*

59- PLAINTIFF'S LAY WITNESS STATEMENTS

155844695.3