**Edwin A. Harnden,** OSB No. 721129
eharnden@barran.com
**Chris M. Morgan,** OSB No. 175384
cmorgan@barran.com
Barran Liebman LLP
601 SW Second Avenue, Suite 2300
Portland, Oregon 97204-3159
Telephone: (503) 228-0500
Facsimile No.: (503) 274-1212
Attorneys for Defendant Lynne Saxton

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Eugene Division

| | |
|---|---|
| **FAMILYCARE, INC.**, an Oregon non-profit corporation,<br><br>            Plaintiff,<br><br>    v.<br><br>**OREGON HEALTH AUTHORITY**, an agency of the State of Oregon, and **LYNNE SAXTON**,<br><br>            Defendants. | **Case No. 6:18-cv-00296-MO**<br><br>**DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM** |

This case is scheduled for trial beginning on April 25, 2022.  Defendant Lynne Saxton ("Saxton") hereby submits the following trial memorandum.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Page 1 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

**TABLE OF CONTENTS**

I.  FACTUAL BACKGROUND ..................................................................................................2

    A.  Background ..............................................................................................................2

        i.  OHA is accountable to the federal government to provide rates for CCOs that meet Medicaid rules and regulations.........................................2

        ii.  FamilyCare chose to increase its costs.......................................................4

        iii.  Ms. Saxton Becomes Director of the OHA. ...............................................6

        iv.  OHA engaged Optumas to develop capitation rates, which CMS then approved.......................................................................................................7

        v.  Optumas and OHA recognized in 2015—before the Settlement Agreement—that growth in CCO medical expenditures was unsustainable, and informed the legislature, the public, and the CCOs it would need to be addressed. ...............................................................8

        vi.  OHA implemented a reimbursement policy to ensure that CCO rates did not lead to unsustainable cost growth that would endanger OHA's ability to provide health care for Oregonians. .............................................9

        vii.  FamilyCare and OHA entered a settlement agreement in which FamilyCare acknowledged that OHA has authority to set CCO rates subject only to CMS approval...................................................................11

        viii.  FamilyCare disputes the 2017 rates. ........................................................12

        ix.  FamilyCare attempts to undermine OHA by circulating the unused OHA communications plan..........................................................................12

        x.  Ms. Saxton resigns. ..................................................................................13

II.  ARGUMENT ...................................................................................................................14

    A.  FamilyCare Cannot Establish Saxton Violated Its First Amendment Rights. .......14

        i.  FamilyCare's speech was a matter of private, not public concern. ...........15

        ii.  Saxton did not take retaliatory adverse action against FamilyCare..........16

        iii.  FamilyCare cannot establish that its speech was a substantial or motivating factor. ......................................................................................16

    B.  Saxton is Entitled to Qualified Immunity. .............................................................17

    C.  Damages...................................................................................................................18

        i.  FamilyCare cannot establish Saxton caused it financial harm...................18

        ii.  FamilyCare failed to mitigate its damages................................................19

III.  CONCLUSION.................................................................................................................19

Page i – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

# TABLE OF AUTHORITIES

**Cases**

*Allen v. FamilyCare, Inc.*, 812 F. App'x 413, 420 (9th Cir. 2020)............................................. 18
*Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002) ............................................................ 16
*Alpha Energy Savers, Inc. v. Hansen* (*Alpha Energy*), 381 F.3d 917, 923 (9th Cir. 2004).......... 15
*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987) ....................................... 17
*Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981)................................. 18
*Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) .................................................................... 17
*Austin v. Univ. of Or.*, 205 F. Supp. 3d 1214, 1227 (D. Or. 2016) ......................................... 15
*Avalos v. Baca*, 596 F.3d 583, 587 (9th Cir. 2010)............................................................... 15
*Awabdy v. City of Adelanto*, 368 F.3d 1062, 1071 (9th Cir. 2004)......................................... 16
*Caldwell v. City & Cty. of S.F.*, 889 F.3d 1105, 1115 (9th Cir. 2018) ................................... 18
*Chavez v. Tempe Union High Sch. Dist.*, 565 F.2d 1087, 1095 (9th Cir. 1997)........................ 15
*Colonial Banking Co. v. Mountain Title Co. Inc.*, 94 Or. App. 491, 495, 766 P.2d 411 (1988) .. 19
*Commodity Credit Corp. v. Resenberg Bros. & Co.*, 243 F.2d 504, 511 (9th Cir. 1957)............. 19
*Connick v. Myers*, 461 U.S. 138, 147-48 (1983) ................................................................... 15
*Greisen v. Hanken*, 252 F. Supp. 3d 1042, 1057 (D. Or. 2017) .............................................. 16
*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) .................. 17
*Harper v. City of L.A.*, 533 F.3d 1010, 1026 (9th Cir. 2020) ....................................... 15, 18
*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005)....................................... 15
*Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019)................................................. 17
*Long v. Cty. of L.A.*, 442 F.3d 1178, 1158 (9th Cir. 2006) .................................................. 14
*Metro Lights, LLC v. City of L.A.*, 2007 U.S. Dist. LEXIS 27618, at *5 (C.D. Cal. Jan. 24, 2007)
.................................................................................................................................... 19
*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co.*, 943 F.3d
   1243, 1248-49 (9th Cir. 2019) ..................................................................................... 18
*Saved Magazine v. Spokane Police Dep't*, No. 20-36073, 2021 U.S. App. LEXIS 36304, at *10
   (9th Cir. Dec. 9, 2021) ................................................................................................ 17
*Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994)............................................................... 17
*White v. Pauly*, 137 S. Ct. 548, 551-53 (2017) .................................................................... 17

**Statutes**

42 U.S.C. § 1305 *et seq.*............................................................................................................ 2
42 U.S.C. § 1315............................................................................................................................ 3
42 U.S.C. § 1396b(m)(2)(A)(iii)................................................................................................. 3
42 U.S.C. § 1983........................................................................................................ 14, 16, 19
ORS Ch. 414 .................................................................................................................................. 2

**Other Authorities**

Comment, Ninth Circuit Model Instruction 9.3 1983 Claim Against Defendant in Individual
   Capacity—Elements and Burden of Proof...................................................................... 15
Comment, Ninth Circuit Model Instruction 9.4 Section 1983 Claim Against Supervisory
   Defendant in Individual Capacity—Elements and Burden of Proof ................................ 15

**Regulations**

42 C.F.R. § 438.4(b) ..................................................................................................................... 3
42 C.F.R. § 438.806(c).................................................................................................................. 3
42 C.F.R. 438.2 ............................................................................................................................. 2
42 C.F.R. Part 438......................................................................................................................... 2

Page ii – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

## I.    FACTUAL BACKGROUND

**A.    Background[1]**

### i.    OHA is accountable to the federal government to provide rates for CCOs that meet Medicaid rules and regulations.

Medicaid is a national program that funds medical care for people of any age with lower incomes. Medicaid is jointly financed by the state and federal governments. OHA administers Oregon's Medicaid program, the Oregon Health Plan ("OHP"), pursuant to both state and federal law. *See generally* ORS Ch. 414; 42 U.S.C. § 1305 *et seq.*; 42 C.F.R. Part 438. The goal of OHA is to meet the "triple aim" of providing better health, better care, and lower costs.

To provide care to members of the OHP, OHA contracts with managed care organizations known as coordinated care organizations ("CCOs"). In 2017, there were 16 CCOs in Oregon, operating in different regions throughout Oregon. Oregonians eligible for OHP join CCOs operating in their region. The CCOs, in turn, contract with health care providers, like physicians, behavioral health centers, and hospitals, to provide care for their members. (Expert Rep. of Nancy F. Nelson ("Nelson Report") ¶ 46.) OHA pays the CCOs a per member per month ("PMPM" or "capitation"[2]) rate to cover the projected costs of providing health care for their members. (*Id.* ¶ 48.)

OHA issues revised capitation rates to each CCO, determined by a health care actuary, in contract amendments each year. (2017 CCO Contract, Ex. C, § 10, Pl. Ex. 12, ("The parties intend to amend this Contract to supply Capitation Rates and an Actuarial Report for dates starting on

---

[1] Saxton does not concede that the information contained in this section is admissible. Saxton will file motions in limine to limit the scope of evidence before the jury.

[2] "Capitation," defined in 42 C.F.R. 438.2 and elsewhere, is a fixed, periodic payment for each enrolled state health plan beneficiary. "Rates" used herein throughout refer to the amount of the capitation payments set in the contract.

Page 2 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

[the first of each year]); *id.* at Ex. D § 20(c) ("Per capita rates are actuarially certified annually. Rates will be amended annually[.]")) OHA and its actuary set the rates for each year before the start of that year; for example, OHA set and proposed the 2016 rates to the CCOs in 2015. CCOs can choose to accept or reject the proposed rates for the coming year. If they accept the rates, the contract continues. If they reject the rates, the CCO Contract terminates automatically: "If the parties have not entered into a Rate Amendment by the [first day of the year], then this Contract will terminate on the [first day of the year] automatically and without any requirement for notice between the parties." (*Id.* at Ex. C, § 10.) Additionally, OHA in "its sole discretion" can terminate the CCO Contract at any time "[w]ithout cause" by providing the CCO 90 days' notice. (*Id.* at Ex. D, § 10(e).)

CCOs have discretion in how they handle costs. CCOs that effectively manage healthcare provider costs and coordinate their members' care across their network of providers, while also managing their own expenses, can profit from this arrangement. (Nelson Report ¶ 55.) The OHP is only possible with the financial participation of the federal government. The Centers for Medicare and Medicaid Services ("CMS") funds the majority of OHA's capitation payments. CMS will only provide federal funding if OHA adheres to federal Medicaid laws and regulations. 42 C.F.R. § 438.4(b); 42 U.S.C. § 1396b(m)(2)(A)(iii). Specifically, CMS must approve OHA's rates for CCOs each year; if CMS does not approve the rates, the federal government will not provide federal funding. 42 C.F.R. § 438.4(b); 42 C.F.R. § 438.806(c); 42 U.S.C. § 1396b(m)(2)(A)(iii).

OHA is also accountable to the federal government according to terms of a waiver agreement. Section 1115 of the Social Security Act, 42 U.S.C. § 1315, authorizes CMS to approve

Page 3 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

demonstration projects that give states additional flexibility to design and improve their Medicaid programs, including by innovating service delivery systems. (Nelson Report ¶ 49.) These CMS approvals for state Medicaid projects are known as "Section 1115 waivers." CMS has approved a Section 1115 waiver for OHA, under which OHA operates the CCO program. The evidence will show that, according to the terms of its 1115 Waiver, OHA must hold the overall rate of growth for health care costs to 3.4% per year on average or risk losing substantial federal funds.

### ii.    FamilyCare chose to increase its costs.

Plaintiff FamilyCare, Inc. was a CCO. The evidence will show that, in March 2013, FamilyCare increased its "conversion factor"—the amount of money it paid a healthcare provider for a unit of work—for primary care physicians from $35 to $50. The evidence will show that FamilyCare subsequently increased its conversion factor to $65 in 2015. By comparison, the evidence will show that the conversion factor that Medicaid paid providers directly was $27. Thus, FamilyCare made the business decision to reimburse its providers at a reimbursement more than double the rate the providers would have received under a traditional fee-for-service model. The evidence will show that, by mid-2015, FamilyCare had amended its contracts with healthcare providers to include the increased reimbursement. As a result, from 2014 to 2015, the evidence will show that FamilyCare's reported rate of cost growth increased significantly to levels which far exceeded the required 3.4% average rate of growth.

The evidence will show that FamilyCare's CEO, Jeff Heatherington ("Mr. Heatherington"), decided to increase FamilyCare's primary care reimbursements without in-depth discussion among either FamilyCare's board or its executive team. The evidence will show that

Page 4 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

Mr. Heatherington hypothesized, by his own admission without evidence, that increased provider payments would increase access, and result in lower costs overall and improved quality of care.

The evidence will show that FamilyCare's increased primary care reimbursements did not actually lower FamilyCare's overall costs. FamilyCare's increase in primary care physician reimbursements resulted in no discernible difference in non-physician cost trends as compared to the other CCOs in FamilyCare's region. (Nelson Report ¶ 130.) The increased reimbursements also did not cause FamilyCare's members to utilize primary care physicians more often. (*Id.* ¶ 129.) All told, FamilyCare's total reported costs in the primary care, specialist, and mental health categories increased significantly between 2014 and 2017 on a per member per month ("PMPM") basis, while costs for hospital services and radiology combined only declined slightly. (Morones Report ¶ 39.)

Prior to increasing provider reimbursements, the evidence will show that FamilyCare did not conduct any studies testing its hypothesis that increasing provider payments would result in reduced costs or improved healthcare overall. Instead, after increasing provider reimbursements, FamilyCare conducted what its Chief Financial Officer described as an "initial study" with "little credibility" due to its lack of data. (*Id.*). FamilyCare never followed up on this initial study with a full study based on a sufficient data to draw conclusions. (*Id.* at 12.) FamilyCare had the ability and opportunity to conduct such a study, but it chose not to. "[B]etween the 2013 announcement of the increased payment rates and its implementation throughout 2014, and FamilyCare's December 2017 decision to reject OHA's rates for 2018, FamilyCare, as a large and sophisticated health plan, would have had both data and opportunity to design and complete a robust study to

Page 5 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

understand whether other costs were being reduced as a result of the higher physician payment levels." (Nelson Report ¶ 153.)

Although its decision to increase primary care physician reimbursements did not reduce its costs, FamilyCare took no steps to change its policies. (*Id.* ¶ 152 ("FamilyCare appears to have taken no steps to reduce the costs of medical expenses for its members, physician or otherwise, despite those costs being the largest category of expense for a health plan.").)

### iii.    Ms. Saxton Becomes Director of the OHA.

In 2014, Lynne Saxton ("Ms. Saxton") was approached by then Oregon Governor John Kitzhaber ("Governor Kitzhaber") and asked for the names of some competent individuals who might be interested and willing to take on the role of Director of the OHA. Governor Kitzhaber subsequently asked Ms. Saxton if she might consider doing the job herself. Ms. Saxton accepted the position in December 2014; began serving as Director of the OHA in the last week of January 2015; and was formally confirmed by the Oregon Legislature in March 2015.

As Director, Ms. Saxton was tasked with managing executives and maintaining relationships with the Governor's office, legislators, contractors, and other stakeholders. Ms. Saxton also was responsible for organizing the agency to ensure there was executive level leadership and management of key agency portfolios. These portfolios included: health policy; health operations; public health; finance; equity; external relations; and the Oregon State Hospital. The individual executives overseeing these portfolios were subject matter experts with a great deal of skill, knowledge, commitment, and experience.

Page 6 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

      **iv.**      **OHA engaged Optumas to develop capitation rates, which CMS then approved.**

The evidence will show that, in August 2014, CMS raised concerns with OHA's "cost template" methodology, which OHA had used to develop the 2014 rates. This was prior to Ms. Saxton beginning her tenure at the OHA. CMS instructed OHA to stop using the cost template methodology and to instead rely on more objective data regarding services obtained and reimbursement claims paid (called "encounter data") to set rates.

In the first quarter of 2015, in response to CMS's instructions and concerns raised by several CCOs, OHA engaged an independent actuary, Optumas, to re-develop the 2015 rates and serve as Oregon's signing actuary. Hiring Optumas to come in with a new, sustainable rate development methodology was one of the first large tasks overseen by Ms. Saxton. It was critical that this new methodology be consistent with the terms of the Waiver, and be approved by CMS consistent with their guidelines for rate setting. By using this methodology, OHA intended to match payments to the health risk of each CCO's population, improve the credibility of the rates by looking at actual costs and payments across each region, and incorporate the emerging data from the new Affordable Care Act population.

The evidence will show that Optumas released the redeveloped 2015 rates in August 2015, and that CMS approved the redeveloped rates. The mid-year rate redevelopment resulted in CCOs, including FamilyCare, owing money back to OHA for the insupportably higher rates OHA had paid to them during the first half of 2015. FamilyCare refused to sign the Rate Amendment for the redeveloped 2015 rates and for the 2016 rates, which were developed on the same basis, and filed two lawsuits against OHA. (Oregon Cir. Ct., County of Marion, Case No. 15CV13782; Oregon Cir. Ct., County of Marion, Case No. 16CV10253.)

Page 7 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

**v.      Optumas and OHA recognized in 2015—before the Settlement Agreement—that growth in CCO medical expenditures was unsustainable, and informed the legislature, the public, and the CCOs it would need to be addressed.**

In December 2015, OHA observed that systemwide cost growth was increasing and if carried forward would exceed the sustainable rate of growth described in the Section 1115 Waiver. The evidence will show that, from 2014 to 2015 the statewide growth of costs per member per month was 8.6%, significantly higher than the 3.4% rate of growth CMS approved for Oregon under the 1115 Waiver.

OHA and Optumas informed the legislature in 2015 that for the 2017 rate cycle, they would "work with the CCOs to understand drivers of any differences between the actual growth and the pre-determined 'Sustainable Growth.'" (*See* 9/28/15 presentation to Oregon House Healthcare Committee, Def. Ex. 1281.)  OHA also communicated this need to control growth to the CCOs. In October 2015, OHA met with FamilyCare and the other CCOs, and explained that in future years any growth in the "total per member growth" "above 3.4% per year . . .  will result in a budget challenge." (Def. Ex. 1289 at 7).  In that meeting, OHA further explained that the 2016 capitation payments achieved this "sustainable rate of growth" but that cost growth was on the high end at 2.9%, "which is an early warning sign." (*Id.* at 18.)  OHA also reached out to FamilyCare in October 2015 noting that OHA was "trying to better understand the significant increase in [FamilyCare's] Physician/Professional Services costs between 2014 and 2015." (Def. Ex. 1381)  FamilyCare did not respond to OHA's email for months.

On May 22, 2016, OHA and FamilyCare settled their outstanding lawsuits.  The Settlement Agreement had no effect on the rate-setting schedule.  True to the schedule OHA had set before signing the Settlement Agreement, Optumas spent the months of May and June 2016 reconciling base data gathered from different sources.  (*See* Def. Ex. 1395; *See also* Def. Ex. 1389).  At the

Page 8 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

June 24, 2016 meeting with all the Oregon CCOs, OHA explained that across all regions, cost growth had exceeded the 3.4% sustainable rate of growth.  (Def. Ex. 1394)  OHA engaged the CCOs in this June 2016 meeting in a "brainstorming session" to discuss "possible solutions going forward."  (Def. Ex. 1393)  In particular, OHA sought the CCOs' input on "lower[ing] costs on the ground."  (Def. Ex. 1394)

Consistent with the schedule it had set months before the May 2016 Settlement Agreement, OHA explained during a July 2016 meeting with the CCOs that:

- Optumas "analyzed reimbursement and adjusted outliers based on OHA's direction when a CCO has a high implied rate of growth."

- "Optumas analyzed average reimbursement for services longitudinally from 2014 through 2015 for each CCO."

- Optumas analyzed "[p]rofessional [r]eimbursement" and "[h]ospital [r]eimbursement."

- "Some CCOs have higher reimbursement; however, they are also containing costs under or at a sustainable rate of growth."

- "For CCOs that were outliers in terms of reimbursement and with a high rate of growth adjustments were made in incentives and/or [fee-for-service] payments."

(Pl. Ex. 519.)

vi.    **OHA implemented a reimbursement policy to ensure that CCO rates did not lead to unsustainable cost growth that would endanger OHA's ability to provide health care for Oregonians.**

After observing the unstainable rate of growth in medical expenditures from 2014 to 2015, in the first half of 2016 OHA directed Optumas to identify the drivers of growth.  Optumas identified four key drivers:  (1) increased reimbursement to providers, (2) provider incentive payments, over which the CCOs had control, (3) increased pharmacy, and (4) hospital

Page 9 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212

expenditures, over which the CCOs did not have control. (*Id.*; Def. Ex. 1483.)  Optumas identified

nine of 16 CCOs whose 2015 costs exceeded OHA's sustainable rate of growth. (*Id.*)

FamilyCare was one of those nine.  As noted above, FamilyCare had increased its primary

care physician reimbursements by almost 100% to a conversion factor of $65.  Accordingly,

Optumas identified FamilyCare's rate of growth increasing at a very large amount in 2015.

FamilyCare also had high provider incentive payments.  While other CCOs paid providers

incentives for hitting performance measures, the evidence will show that FamilyCare's incentive

payments included end-of-year payments regardless of performance.  In total, in the 2017 rate-

setting process, Optumas identified $34 million in excess costs in the base data FamilyCare

submitted.

For those nine CCOs with excessive costs, the CCO itself or Optumas and OHA adjusted

their base data to eliminate excess costs.  (OHA called this process the "reimbursement policy.")

"Eliminating" costs from base data means that Optumas did not count excessive provider payments

or excessive provider bonuses when building rates from the base encounter data.  In other words,

Optumas set rates based on the amounts that the CCOs would have paid to providers had they not

made excessive payments or bonus payments.  Base data adjustments occurred in all regions and

were not targeted at the Tri-County region or FamilyCare.

Because the regional rate model spread the effects of base data adjustments across all the

CCOs in a region, the reimbursement policy affected the rates of all 16 CCOs.  Of the dollar value

of base data cuts for 2017, 70% occurred in the other three regions and therefore had no effect on

FamilyCare's rates. (Pl. Ex. 85 at 20)  OHA and Optumas reduced FamilyCare's base data by the

Page 10 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212

largest amount of any CCO, but the reason was simple:  the evidence will show that FamilyCare was one of the largest CCOs in state, and that it had the highest excess costs.

Because rates are set by region, adjusting FamilyCare's base data reduced the rates of both FamilyCare and Health Share.  (Pl. Ex. 94; Nelson Report ¶ 134.)  Optumas applied the reimbursement policy uniformly across the state.  CMS approved the resulting 2017 and 2018 rates as actuarially sound.  (Def. Ex. 1497 and Ex. 1741.)  The base data adjustments were consistent with actuarial standards of practice.  (Nelson Report ¶ 135.)

> **vii.    FamilyCare and OHA entered a settlement agreement in which FamilyCare acknowledged that OHA has authority to set CCO rates subject only to CMS approval.**

In May 2016, after OHA and Optumas already began developing the reimbursement policy, FamilyCare and OHA settled FamilyCare's lawsuits.  (Pl. Ex. 14)  In the Settlement Agreement, FamilyCare agreed to sign the 2015 and 2016 contract amendments containing the rates developed by Optumas.  (*Id.*)  OHA agreed to provide FamilyCare with a $24.8 million credit towards capitation rate overpayments that FamilyCare owed back to OHA.  (*Id.*)  OHA and FamilyCare released all claims related to the 2015 and 2016 rates.  (*Id.*)

As part of the Settlement Agreement, FamilyCare made a number of express representations that confirmed that OHA had authority to set CCO rates subject only to CMS's review.  FamilyCare agreed in the 2016 Settlement Agreement that "OHA has the authority to set the CCO rates under which OHA contracts with CCOs, subject to CMS approval."  (Settlement Agreement § 1.a.)  FamilyCare also agreed that CMS is the arbiter of whether rates are actuarially sound:  "OHA must establish to the satisfaction of CMS that the rates are actuarially sound[.]"  (*Id.* § 1.b.)  And FamilyCare agreed that OHA was not obligated to adjust FamilyCare's rates to cover

Page 11 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

FamilyCare's costs: "OHA is not obligated to adjust the rates paid to any CCO to ensure that such rates cover all costs that a CCO has incurred during a rate year[.]" (*Id.* § 1.d.)

FamilyCare should be estopped from now taking a position inconsistent with that which it took in the 2016 Settlement Agreement.

### viii.   FamilyCare disputes the 2017 rates.

OHA announced the 2017 rates in October 2016, and FamilyCare's rate increased 2.4% as compared to 2016. (Def. Ex. 1437) FamilyCare complained that the rates were insufficient to cover its high costs. The evidence will show that FamilyCare then hired lobbyists and a communications firm and engaged in an aggressive communications strategy, criticizing OHA's rate-setting methodology in the legislature and in the media.

In December 2016, FamilyCare again threatened to sue OHA over the rates. Afterwards, and under continued threat of litigation, the OHA briefly contemplated its own communications plan to provide critical information to key stakeholders (including the legislature, media, and the public) regarding the rates and complexity of the rate setting process. An OHA communications officer prepared a draft of a plan in January 2017; OHA leadership did not approve or implement that plan.

### ix.   FamilyCare attempts to undermine OHA by circulating the unused OHA communications plan.

In August 2017, after OHA disclosed the draft communications plan in response to a public records request, Ms. Saxton sent a letter to FamilyCare's CEO Jeff Heatherington apologizing for the draft plan's contents. Pl. Ex. 232. In this letter, Saxton confirmed that the plan was "not implemented or acted on in any way." (*Id.*)

Page 12 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

The evidence will show that FamilyCare officials saw the public release of the draft communications plan as a "blessing."  Although the draft plan was never implemented, the evidence will show that Mr. Heatherington believed that the plan's contents would garner sympathy for FamilyCare's position regarding the rates.  Consistent with this view, the evidence will show that FamilyCare and its lobbying and press relations firms circulated the draft communication plan widely, including to legislators and medical providers.

FamilyCare identifies four statements by OHA that it claims OHA made in furtherance of the communications plan.  First, Ms. Saxton gave a statement to the *Portland Business Journal* in response to FamilyCare's lawsuit, in which she characterized the disagreement between OHA and FamilyCare as being driven "by FamilyCare's goal to be paid more Medicaid dollars."  (Pl. Ex. 87*)* Second, in a press release, again responding to FamilyCare's lawsuit, Ms. Saxton stated that it "is unfortunate that since [FamilyCare] didn't get the rate they wanted for 2017" FamilyCare was initiating additional litigation.  (Pl. Ex. 46)  Third, in a press release OHA announced it filed a motion to dismiss FamilyCare's lawsuit.  (Pl. Ex. 231)  Fourth, in a January 2017 Quarterly Legislative Report, OHA accurately reported FamilyCare's operating margins.  The evidence will show that the factual assertions made in these statements were true and appropriate.

### x.      Ms. Saxton resigns.

On August 8, 2017, Ms. Saxton received a phone call from Mr. Blosser and Berri Leslie ("Ms. Leslie").  Ms. Leslie also worked in the Governor's office alongside Mr. Blosser. At the time that she received the call, Ms. Saxton was physically in a meeting with CMS, in which CMS was expressing how satisfied they were with the current state of the Medicaid system in Oregon.

Page 13 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212

Mr. Blosser conveyed that the Governor's office decided that now was the appropriate time for Saxton's resignation. However, they asked that she agree to stay on until the end of August 2017 to facilitate the completion of the OHA's redetermination of Medicaid members. Thereafter, Ms. Saxton's resignation was announced. Her last day as Director of the OHA was on August 31, 2017. After that date, she had no involvement whatsoever with OHA policies, procedures, controls, or the OHA's subsequent interactions with FamilyCare over the development of its 2018 rates.

## II.    ARGUMENT

FamilyCare alleges that Ms. Saxton violated FamilyCare's First Amendment rights under Section 1983 and that, as a result, Ms. Saxton is liable in her personal capacity to FamilyCare in an unspecified amount in excess of $125,000,000.00.

FamilyCare will ultimately be unable to prove that Ms. Saxton deprived FamilyCare of its constitutional rights; or that Ms. Saxton was the actionable cause (both cause in fact and proximate cause) of any alleged monetary damages suffered by FamilyCare. Even if FamilyCare could establish that elements of such deprivation (as well as causation), it cannot establish that, based upon the law and Saxton's knowledge at the time of the alleged action(s), it was so "clearly established" that a "every reasonable officer" in her position would have known that Ms. Saxton's conduct violated FamilyCare's First Amendment rights. Accordingly, Ms. Saxton is entitled to qualified immunity.

## A.    FamilyCare Cannot Establish Saxton Violated Its First Amendment Rights.

To prevail on its Section 1983 claim against Ms. Saxton, FamilyCare must prove that Ms. Saxton deprived FamilyCare of its particular rights under the First Amendment to the United States Constitution.[3]  *See, e.g., Long v. Cty. of L.A.*, 442 F.3d 1178, 1158 (9th Cir. 2006). To do

---

[3] FamilyCare and Saxton have stipulated that, for purposes of FamilyCare's claim against Saxton under 42 U.S.C. § 1983, Saxton was acting "under color of state law."

Page 14 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

so, FamilyCare must prove (1) FamilyCare engaged in expressive conduct that addressed a matter of public concern; (2) Saxton took adverse action against FamilyCare; and (3) FamilyCare's expressive conduct was a substantial or motivating factor for the adverse action. *E.g., Alpha Energy Savers, Inc. v. Hansen* (*Alpha Energy*), 381 F.3d 917, 923 (9th Cir. 2004).

FamilyCare must prove Ms. Saxton personally participated in the deprivation of FamilyCare's First Amendment rights, and that Saxton acted intentionally and with a retaliatory motive. *See, e.g., Avalos v. Baca*, 596 F.3d 583, 587 (9th Cir. 2010); *Austin v. Univ. of Or.*, 205 F. Supp. 3d 1214, 1227 (D. Or. 2016); *Chavez v. Tempe Union High Sch. Dist.*, 565 F.2d 1087, 1095 (9th Cir. 1997); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005).[4]  Further, FamilyCare must prove that Saxton was the actionable cause of its alleged injury—meaning that Ms. Saxton must be both the "cause in fact" and "proximate cause" of that harm. *Harper v. City of L.A.*, 533 F.3d 1010, 1026 (9th Cir. 2020).

### i. FamilyCare's speech was a matter of private, not public concern.

FamilyCare must first prove that its speech was on a matter of public, not private concern. Whether an employee's speech addresses a matter of public concern is a pure question of law that must be determined "by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  The intent of FamilyCare's speech was, and is, to get higher Medicaid capitation rates (and in turn, more money) for itself. This is not about transparency or health care or any other CCO.  It is and has been about FamilyCare making more money.  That is a matter of private, not public, concern.

---

[4] Consistent with FamilyCare's Fifth Amended Complaint ("FAC") and briefings filed with the Court, FamilyCare's sole theory of liability is that Saxton personally participated in the deprivation of FamilyCare's First Amendment rights. *See, e.g.,* ECF 429, ¶ 82; ECF 512, at 1.  A supervisory theory of liability is separate and distinct from a personal participation theory of liability. *See, e.g.,* Comment, Ninth Circuit Model Instruction 9.4 Section 1983 Claim Against Supervisory Defendant in Individual Capacity—Elements and Burden of Proof ("If the plaintiff alleges a supervisor personally participated in a constitutional violation, use Instruction 9.3[.] . . .  If the plaintiff alleges a subordinate committed a constitutional violation and there is a causal connection between the violation and the supervisor's wrongful conduct, use this instruction."); Comment, Ninth Circuit Model Instruction 9.3 1983 Claim Against Defendant in Individual Capacity—Elements and Burden of Proof ("Use this instruction only in conjunction with an applicable 'particular rights' instruction, such as Instructions 9.9–9.33.").

Page 15 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

### ii.   Saxton did not take retaliatory adverse action against FamilyCare.

FamilyCare alleges Ms. Saxton personally retaliated against FamilyCare by (1) "setting rates that were unreasonable, biased, actuarially unsound, and based on erroneous data and methodology"; (2) "refusing to correct known errors in data and methodology"; (3) "developing and implementing a smear campaign against FamilyCare"; (4) "refusing to grant FamilyCare the procedural protections guaranteed by law"; and (5) "implementing a policy decision and plan to put FamilyCare out of business."[5]   ECF 429, ¶ 82.

FamilyCare will be unable to satisfy its burden that Ms. Saxton, directly and in her personal capacity, undertook any of these actions, including those which have no identifiable basis in fact or the evidence (e.g., refusing to grant FamilyCare unidentified procedural protections). Furthermore, FamilyCare cannot now rely upon a supervisory theory of liability under Section 1983 which is inconsistent with its own pleadings and its position throughout these proceedings that Ms. Saxton personally and directly undertook the alleged retaliatory actions.

### iii.   FamilyCare cannot establish that its speech was a substantial or motivating factor.

FamilyCare will be unable to establish that FamilyCare's speech was a substantial or motivating factor for Ms. Saxton taking any alleged adverse act(s) against FamilyCare. *See, e.g., Greisen v. Hanken*, 252 F. Supp. 3d 1042, 1057 (D. Or. 2017) (citing *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1071 (9th Cir. 2004). The evidence will show that any actions or inactions undertaken by Ms. Saxton were not in "retaliation" for FamilyCare's speech. Further, the evidence will show that any alleged adverse action that was undertaken by Ms. Saxton would have been undertaken irrespective of FamilyCare's alleged protected speech.  For example, any alleged decisions related to the rate setting process would have been undertaken absent FamilyCare's alleged protected speech.

---

[5] Saxton intends to move to exclude FamilyCare's presentation of evidence related to the adverse actions identified in the FAC, because FamilyCare plainly cannot establish, and has altogether failed to pursue, these allegations.

Page 16 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

**B.    Saxton is Entitled to Qualified Immunity.**

Qualified immunity "shields government officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). The doctrine of qualified immunity provides Saxton a complete defense against FamilyCare's claim for damages under Section 1983. *See, e.g., White v. Pauly*, 137 S. Ct. 548, 551-53 (2017); *Saved Magazine v. Spokane Police Dep't*, No. 20-36073, 2021 U.S. App. LEXIS 36304, at *10 (9th Cir. Dec. 9, 2021) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)).

FamilyCare cannot establish that Ms. Saxton deprived FamilyCare of its First Amendment rights. *See Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  But even if FamilyCare can establish such deprivation, it cannot establish that, based on the law and Saxton's knowledge at the time of the alleged action(s), it was so "clearly established" that a "every reasonable officer" in her position would have known that Saxton's conduct violated FamilyCare's First Amendment rights. *See, e.g., Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987).

In other words, FamilyCare cannot establish that, by setting rates that would ultimately be approved by CMS and asking her staff to draft a communications plan to educate Medicaid stakeholders and counter misinformation, every reasonable officer in Saxton's position, knowing what she knew at the time, would have known that those actions clearly violated FamilyCare's First Amendment right. *Id.*

Page 17 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

While the issue of qualified immunity is a legal question, the Court has not yet determined whether Saxton is entitled to exercise the defense.[6] Saxton hereby preserves the complete defense of qualified immunity.

## C.    Damages.

### i.    FamilyCare cannot establish Saxton caused it financial harm.

FamilyCare asserts it is entitled to recover at least $125 million from Saxton, as a result of her alleged deprivation of its First Amendment rights. ECF 429, ¶¶ 79-89. However, in the years it has pursued its claim against Ms. Saxton, FamilyCare has not been able to draw any plausible causal connections between Saxton's alleged actions and the damages that it seeks.

To establish it is entitled to recover any amount of damages from Saxton, FamilyCare must prove (1) that but-for Saxton's conduct, it would not have suffered its claimed damages; and (2) Saxton proximately caused FamilyCare's claimed damages. *See, e.g., Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2020); *Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981). FamilyCare cannot satisfy its burden of proof as to either.

First, FamilyCare cannot prove that Saxton was the but-for cause of its damages. *See Harper*, 533 F.3d at 1026; *Arnold*, 637 F.2d at 1355. Instead, Saxton will present evidence establishing that it was FamilyCare's own business decisions, or lack thereof, that caused it to exit the Medicaid business. Second, FamilyCare cannot prove that Saxton is the legal cause of its damages. *See Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co.*, 943 F.3d 1243, 1248-49 (9th Cir. 2019); *Caldwell v. City & Cty. of S.F.*, 889 F.3d 1105, 1115 (9th Cir. 2018). Instead, Saxton will present evidence as to the multiple intervening causes that

---

[6] On appeal, the Ninth Circuit Court of Appeals, "taking the facts in the light most favorable to FamilyCare," held that the issue of qualified immunity could not be resolved at the summary judgment stage. *Allen v. FamilyCare, Inc.*, 812 F. App'x 413, 420 (9th Cir. 2020). Since that appeal, neither this Court nor the Ninth Circuit have determined whether Saxton is entitled to qualified immunity.

Page 18 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

break the chain of causation between the alleged adverse acts and FamilyCare's purported damages.

### ii.    FamilyCare failed to mitigate its damages.

Even if FamilyCare were able to show that Ms. Saxton was both the factual and legal cause of any alleged monetary damages, it failed to take requisite reasonable efforts to avoid or reduce its damages.  *See, e.g., Commodity Credit Corp. v. Resenberg Bros. & Co.*, 243 F.2d 504, 511 (9th Cir. 1957); *Colonial Banking Co. v. Mountain Title Co. Inc.*, 94 Or. App. 491, 495, 766 P.2d 411 (1988); *see also Metro Lights, LLC v. City of L.A.*, 2007 U.S. Dist. LEXIS 27618, at \*5 (C.D. Cal. Jan. 24, 2007) (duty to mitigate applies to claims brought under Section 1983).  As opposed to mitigating its damages, Ms. Saxton expects the evidence to show that FamilyCare actually took action that increased and enhanced its alleged damages.

### III.    CONCLUSION

FamilyCare will be unable to prevail on its claim against Saxton for First Amendment retaliation under Section 1983.

DATED this 21st day of March, 2022

BARRAN LIEBMAN LLP


By   *s/ Edwin A. Harnden*
    Edwin A. Harnden, OSB No. 721129
    eharnden@barran.com
    Chris M. Morgan, OSB No. 175384
    cmorgan@barran.com

    Attorneys for Defendant Lynne Saxton

Page 19 – DEFENDANT LYNNE SAXTON'S TRIAL MEMORANDUM

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of March 2022, I caused the foregoing **DEFENDANT**

**LYNNE SAXTON'S TRIAL MEMORANDUM** to be:

☒    electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| **Stephen F. English**<br>SEnglish@perkinscoie.com<br>**Thomas R. Johnson**<br>TRJohnson@perkinscoie.com<br>**Alletta S. Brenner**<br>abrennerr@perkinscoie.com<br>**Matthew J. Mertens**<br>MMertens@perkinscoie.com<br>**Sasha A. Petrova**<br>SPetrova@perkinscoie.com<br>**Alex Van Rysellberghe**<br>AVanRysselberghe@perkinscoie.com<br>**Garmai J. Gorlorwulu**<br>GGorlorwulu@perkinscoie.com<br>**Julia E. Markley**<br>jmarklely@perkinscoie.com<br>Perkins Coie LLP<br>1120 N.W. Couch Street, 10th Floor<br>Portland, OR 97209-4128<br><br>**Matthew Gordon**, *pro hac vice*<br>MGordon@perkinscoie.com<br>**David B. Robbins**<br>DRobbins@perkinscoie.com<br>**Brian William Grimm**, *pro hac vice*<br>bgrimm@perkinscoie.com<br>**Heath Hyatt**, *pro hac vice*<br>hhyatt@perkinscoie.com<br>Perkins Coie LLP<br>1201 Third Avenue, Suite 4900<br>Seattle, WA 98101-3099<br><br> Counsel for Plaintiff | **David B. Markowitz**<br>davidmarkowitz@mhgm.com<br>**Matthew A. Levin**<br>mattlevin@markowitzherbold.com<br>**Vivek A. Kothari**, *pro hac vice*<br>vivekkothari@markowitzherbold.com<br>**Anit K. Jindal**<br>anitjindale@markowitzherbold.com<br>**Dallas S. DeLuca**<br>dallasdeluca@markowitzherbold.com<br>**Harry B. Wilson**<br>harrywilson@markowitzherbold.com<br>**Laura R. Salerno Owens**<br>laurasalerno@markowitzherbold.com<br>Markowitz Herbold PC<br>1455 SW Broadway, Suite 1900<br>Portland, OR 97201<br><br>**Carla Scott**<br>Carla.a.scott@doj.state.or.us<br>Oregon Department of Justice<br>100 SW Market Street<br>Portland, Or 97201<br><br>Counsel for Defendant Oregon Health Authority |

CERTIFICATE OF SERVICE

☐    hand delivered to the following non-CM/ECF participants:

☐    faxed and mailed by first class United States mail, postage prepaid, to the following non-CM/ECF participants:

_____*s/Edwin A. Harnden*_____
Edwin A. Harnden

CERTIFICATE OF SERVICE

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500 FAX (503) 274-1212