**Edwin A. Harnden,** OSB No. 721129
eharnden@barran.com
**Chris M. Morgan,** OSB No. 175384
cmorgan@barran.com
Barran Liebman LLP
601 SW Second Avenue, Suite 2300
Portland, Oregon 97204-3159
Telephone: (503) 228-0500
Facsimile No.: (503) 274-1212
Attorneys for Defendant Lynne Saxton

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

Eugene Division

| | |
|---|---|
| **FAMILYCARE, INC.**, an Oregon non-profit corporation,<br><br>         Plaintiff,<br><br>  v.<br><br>**OREGON HEALTH AUTHORITY**, an agency of the State of Oregon, and **LYNNE SAXTON**,<br>         Defendants. | **Case No. 6:18-cv-00296-MO**<br><br>**DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS** |

### A. WITNESS STATEMENT OF LYNNE SAXTON

Counsel for Defendant Lynne Saxton ("Ms. Saxton") anticipates that this direct testimony will take 3 hours.  Ms. Saxton reserves the right to adopt the information contained in the witness statement for Ms. Saxton which will be presented by Defendant Oregon Health Authority ("OHA" or "Agency").  Ms. Saxton reserves the right to exclude portions of her witness statement contingent upon the exclusion of certain subject matter view in pretrial motions.  Counsel for Ms. Saxton expects that Ms. Saxton will testify as follows:

#### *Personal and Educational Background*

Ms. Saxton will testify that she grew up primarily in Portland, Oregon, where she attended Harvey Scott Elementary, Shaver Elementary, and Fremont Junior High School.  Ms. Saxton then

Page 1 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

attended Parkrose High School before moving to Anchorage, Alaska, where she graduated from East Anchorage High School.  Ms. Saxton then attended the University of Alaska for one year, before transferring to Willamette University.  Ms. Saxton graduated from Willamette University in 1976, where she majored in urban and regional government, as well as Political Science.  Ms. Saxton later attended an executive, non degree program at the University of Michigan Business School.

## *Current Personal and Professional Life*

Ms. Saxton is currently retired and has been since her resignation from the OHA. Currently, Ms. Saxton spends her time caring for her two grandsons, and serving on the Board of Trustees at Willamette University.  Ms. Saxton recently served as Chair of the Board of Trustees at Willamette University.

## *Career Prior to Appointment as Director of the OHA*

Ms. Saxton was appointed by then Governor John Kitzhaber ("Governor Kitzhaber") as Director of the OHA in December of 2014.  The Oregon Legislature confirmed Ms. Saxton's appointment as Director of the OHA in March of 2015.

Prior to that, Ms. Saxton was employed in the following roles:

- Campaign Manager for Lisa Rudd of the Alaska legislature.
- Tariff Specialist at the Alaska Public Utilities Commission.
- Acting Director of Consumer Protection for the Alaska Public Utilities Commission.
- Salesperson at Miller and Rhoads.
- Investor Relations at Portland General Electric Company.
- Branch Manager of Public Affairs at Portland General Electric Company.
- President of Lynne's Talking Books.
- Marketing Director for Barney & Worth.
- Field Director for the Ron Saxton for Governor Campaign.
- Executive Director of the Christie School.

Page 2 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

- Executive Director of Youth Villages Oregon.

### *Development of Management Style*

Ms. Saxton will testify to the development of her leadership and management skills over time. Ms. Saxton will describe her experience working with large organizations, and the importance of relying on subject matter experts where necessary to achieve organizational goals and objectives—including compliance with any applicable objectives or requirements set forth by governmental authorities.

Ms. Saxton will also testify that her general management style emphasizes positive and constructive feedback for employees, as opposed to harsh or negative feedback. If she does need to provide more direct or negative feedback to an employee, it would be typical of her to do so in person as opposed to via email or even over the telephone. That was true during her time as Director of the OHA as well as in her prior leadership positions.

### *Prior Work as Executive Director of the Christie School and Youth Villages Oregon*

Ms. Saxton will testify that, prior to becoming Director of the OHA, she was the Executive Director of an organization called the Christie School. The Christie School was a psychiatric residential treatment center for youth struggling with emotional and behavioral health problems. Through its programs, the Christie School provided comprehensive treatment of a wide range of behavioral health difficulties, including self-abuse, depression, and aggression.

In 2011, the Christie School merged into what is now Youth Villages Oregon ("Youth Villages"). Youth Villages initially absorbed the psychiatric residential treatment programs available through the Christie School. In addition, they provide services which include in-home treatment, specialized crisis intervention, and "lifeset" programs—which aim to assist older youth in their transition to adulthood. In her role as Director, Ms. Saxton became personally and emotionally invested in the outcomes of the individuals whom The Christie School and Youth Villages served.

/ / /

Page 3 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Upon the merger, Ms. Saxton became Executive Director of Youth Villages Oregon. In her role as Executive Director, Ms. Saxton oversaw roughly 200 employees and a large annual budget. As a nonprofit organization, Youth Villages was funded through federal and state tax dollars, as well as private donations. This funding included Medicaid. Although Ms. Saxton had some previous experience with government rate setting processes during her time with the Alaska Public Utilities Commission, it was at Christie School / Youth Villages where Ms. Saxton became familiar with the interaction between the federal and state government in administering the Medicaid program. The majority of the clients at Christie School / Youth Villages were Medicaid recipients.

Medicaid is an extremely valuable and critical resource for providing necessary physical and behavioral health services to low income and indigent populations. Ideally, Medicaid would fund any and every need, but that is just not the case. Medicaid dollars are limited, not infinite, and the organizations who receive Medicaid dollars must allocate and use those dollars wisely within their larger organizational budget.

Although Ms. Saxton was much closer to the implications of rate setting prior to the merger of Christie School and Youth Villages, her work with Medicaid reimbursement continued in her new Executive Director role at Youth Villages. The funds that Christie School / Youth Villages received through Medicaid were limited. Youth Villages, through Ms. Saxton's leadership, had to take this into consideration when looking at the organization's operational budget and their plan for delivery of services. Medicaid funding did not cover the entire cost of care for children in the Christie School / Youth Villages program, nor was there any promise that it would. Ms. Saxton, then, was tasked with addressing that "gap" and other issues related to funding, including the initiation and continuity of care when Medicaid funding fell short of the actual cost to run the programs and provide necessary health services.

/ / /

/ / /

Page 4 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

### *Circumstances Leading Up to Appointment as Director of the OHA*

Ms. Saxton will testify that, in 2014, she was approached by Governor Kitzhaber. Ms. Saxton knew Governor Kitzhaber from her prior tenure on the Oregon Land Conservation and Development Commission and the Oregon Early Learning Council. Ms. Saxton will testify that she recalls two specific conversations with Governor Kitzhaber about the position. In the first call, Governor Kitzhaber asked Ms. Saxton for names of competent individuals who might be interested and willing to take on the role as the next Director of the OHA.

In the second call, after Ms. Saxton had provided Governor Kitzhaber's team with some names to consider, Governor Kitzhaber asked Ms. Saxton if she might consider doing the job herself. Although Ms. Saxton was offered the position during this call, she did not immediately accept. Ms. Saxton performed research on the OHA and took some time to consider the offer before finally accepting the position in December 2014. Prior to starting her role, Ms. Saxton was also interviewed by a panel of health care stakeholders who had been convened by Governor Kitzhaber. Ms. Saxton began serving as Director of the OHA in the last week of January 2015 and was confirmed by the Oregon Legislature in March 2015.

The Director of the OHA serves at the pleasure of the Governor. Ms. Saxton will testify that she intended only to be the Director of the OHA for a short period of time (about 12 to 18 months), in order to tackle a number of large projects, including redetermining the Medicaid population, addressing Medicaid enrollment issues, overseeing and effectuating requisite change in light of the expansion of the Affordable Care Act ("ACA"), supporting the Oregon State Hospital, and restructuring the internal personnel of the OHA itself, as there had been a lot of turnover within the Agency. Ms. Saxton was not a career politician or career state administrator. There was a need, and Ms. Saxton took the job to do a public service and to make a positive difference.

/ / /

/ / /

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

### *Understanding of CCOs and FamilyCare*

When she started in the role as Director of the OHA, Ms. Saxton knew that FamilyCare was one of 16 state coordinated care organizations ("CCOs"). Prior to the creation of the Oregon CCO system, entities called managed care organizations ("MCOs") managed either physical, behavioral, or dental health care for the Medicaid population. With the MCO model, the Oregon Department of Human Services ("DHS") served the Medicaid population and paid providers / contractors (such as Christie School) directly.

When the ACA was passed, the state of Oregon received approval from the federal government to create the CCOs as a coordinated, performance-based system of care. The state of Oregon put the OHA in charge of the expanded Medicaid population, with the CCOs coordinating the provision of services.

During Ms. Saxton's tenure, the CCOs instead acted like an insurance company, contracting with mental, physical, and dental health service providers to provide services to members and to review members' claims. A CCO is similar to an insurance company in that it receives payments (like premiums) from the OHA for each of its members based on a per month "capitation" rate. The CCO uses those payments to reimburse its health care providers for the provision of services.

The CCOs in Oregon have different business models and corporate structures. Some are aligned with traditional private, for profit entities—while others, like FamilyCare, were organized as nonprofit organizations. Ms. Saxton will testify that, notwithstanding their individual corporate structure, each CCO receives a global budget based on capitation rates and the number of members served. Ms. Saxton will testify that this global budget is the CCO's piece of the overall funding pot—a fixed amount of money received from the federal government and supplemented by the state's contribution. All of this funding came through federal and state taxpayer dollars. Accordingly, the CCOs were stewards of taxpayer money for the specific purpose of providing health care to the Medicaid population in Oregon. Every single dollar paid to the CCOs was

Page 6 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

intended to be used for that purpose; and the CCOs were regulated for financial and patient services consistent with Oregon Health Plan requirements and federal Medicaid regulations.

Ms. Saxton will testify that with a global budget approach, each CCO is given the flexibility to pay for health care services for its members in the manner it deems most likely to improve outcomes for its members and reduce overall medical costs—in other words, to innovate as it saw fit—but always with the global budget in mind. This means that the CCO is responsible to stay within its own budget. Spending too much in one area or failing to cut costs where needed would lead to a deficit that the CCO was obligated to remedy, not the OHA. Ms. Saxton will testify that the CCO had to meet patient achievement metrics, meaning it was responsible for the health outcomes of its members. Ms. Saxton will testify that the CCOs also received financial incentives for meeting or improving on quality measures.

Ms. Saxton will testify that each CCO is tied to a particular geographic community or coverage area, pushing the CCO to deepen ties to that particular community to the benefit of their members. Ms. Saxton will testify that while she was Director of the OHA, members in the Portland Metro area could choose between two CCOs, Health Share or FamilyCare.

When she transitioned into the role as Director of the OHA, she was familiar with FamilyCare only because she interacted with them as a provider in her role as Executive Director at Youth Villages. She had no personal negative opinions or animosity towards FamilyCare or its CEO, Jeff Heatherington ("Mr. Heatherington").

### *Challenges Facing the Transition*

Upon her transition to Director of the OHA, there were a number of significant challenges facing the OHA. This included the following: vacant executive roles; internal issues with morale and employee turnover; the launch of a revised eligibility computer system; the subsequent Medicaid redetermination the legalization of marijuana; the need to improve mental and behavioral health services.

/ / /

Page 7 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

### *Overview of Job Duties as Director of the OHA*

The OHA is an extremely large, diverse organization. Ms. Saxton will testify that she, as Director, managed a budget of approximately $20 billion and roughly 4,300 employees.

Ms. Saxton will testify that she was responsible for overseeing the management, implementation, and regulation of the OHA's diverse priorities and programming. Under Ms. Saxton, seven executive level appointments were responsible for everything from public health education, behavioral health services, addiction services, public crisis lines, the Oregon Health Plan, Medicare and Medicaid, the Oregon State Hospital, the Oregon Health Policy Board, the Oregon Women, Infant, and Children ("WIC") Program, prescription drug programs, illness prevention and wellness, injury and violence prevention, safe surrender assistance, environmental investigations and data, as well as acute, communicable, and chronic disease. The OHA monitors federal, state, and local legislative, policy, and executive issues.

Given the extensive programming and responsibilities of the OHA, Ms. Saxton will testify that she relied on the skills of the OHA Division Executives to implement the OHA's initiatives, services, and programs. Ms. Saxton had a seven-person executive team, with each of those individuals reporting directly to her. This included the following positions: Chief Financial Officer; Director of Health Policy and Analytics; Director of Health Systems; Director of Public Health; Director of the Office of Equity and Inclusion; Director of External Relations; and Superintendent of the Oregon State Hospital.

Ms. Saxton will testify that her role, as Director, was to manage executives and maintain relationships with the Governor's office, legislators, contractors, and other stakeholders. Ms. Saxton also was responsible for organizing the agency to ensure there was executive level leadership and management of key agency portfolios. These portfolios included: health policy; health operations; public health; finance; equity; external relations; and the Oregon State Hospital. The individual executives overseeing these portfolios were subject matter experts with a great deal of skill, knowledge, commitment, and experience.

Page 8 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

In any given day, Ms. Saxton performed a number of diverse tasks, much of which involved attending meetings with various outside interests and stakeholders, including the state and federal government, and communicating internally with employees in the various programs.  Ms. Saxton will testify that she was generally involved in the OHA's implementation of any particular program or initiative at a high level.  Through use of the OHA's chain of command, Ms. Saxton's executive team synthesized relevant information and key issues, which allowed Ms. Saxton to maintain working knowledge of the OHA's progress on initiatives and responsibilities.

Ms. Saxton will testify that the OHA's interactions with its contracted CCOs were but a piece of the broader framework of the OHA and its programming.  FamilyCare, was one of 16 CCOs with which the OHA contracted, was an individual entity operating within the much larger CCO context, which was operating within the even larger Medicaid system, and worked in tandem with policy and legislative conversations that were occurring about the ACA at both the state and federal level.

Ms. Saxton will testify that, during her time as Director of the OHA, she primarily communicated with staff and outside stakeholders via email, in person, and over the telephone. She used texting as a form of communication on a limited basis.

### *Creation of the External Relations Division*

Ms. Saxton will testify that she created an external relations division within the OHA to enhance and manage communications with stakeholders, including both the legislature and the public; and to create access and understanding of health care complexity.  The decision to create the external relations division was made for the purpose of increasing transparency and streamlining the Agency's communications.

### *Medicaid and the OHA Broadly*

Medicaid is but one of the many programs that the OHA administers.  Ms. Saxton will testify that, when she became Director of the OHA, she had general knowledge of the Medicaid system, particularly as it related to behavioral health.  However, Ms. Saxton did not have personal

Page 9 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

knowledge of how exactly the Medicaid capitation rates were formulated for purposes of disbursement to the CCOs who contracted with the OHA. Ms. Saxton had no direct experience with OHA's rate setting practices or the infrastructure in place for the disbursement of Medicaid funds to Oregon's CCOs at the start of the ACA, and prior to 2015.

Ms. Saxton will testify that there were several Medicaid-related issues facing the OHA when she became Director. This included accounting for the continued expansion of the Medicaid population under the ACA, development of a sustainable methodology based upon CCO concerns regarding the rates; development of new software to facilitate Medicaid and other OHA programs, compliance with the terms of the Section 1115 Demonstration Waiver, redevelopment of the 2015 Medicaid capitation rates, development of the 2016 Medicaid capitation rates, and redetermination of the Medicaid population. Ms. Saxton will testify that she did not have any knowledge there may be substantive "issues" with the original 2015 rates until several weeks into her tenure as Director.

### *ACA Expansion*

Ms. Saxton will testify that, prior to her joining the OHA, the Medicaid population in Oregon increased significantly. This meant that a large number of individuals would now be eligible for Medicaid and would need to be properly enrolled to receive services. Ms. Saxton will testify that she became Director of the OHA in the midst of Oregon's ACA expansion. Under Ms. Saxton's leadership, the OHA was tasked with overseeing this ongoing expansion, which included enrolling approximately 455,000 new Medicaid members.

Ms. Saxton will testify that, in hindsight, one of the inevitable difficulties in accounting for the expanding Medicaid population was the lack of underlying information available with respect to new members. Underlying information, such as age, is typically used as part of the larger rate development process. This lack of member information inevitably led to uncertainty regarding the amount of money that would be necessary to serve the expanding population through the newly created CCO system.

Page 10 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

### *Section 1115 Demonstration Waivers*

Ms. Saxton will testify that, when she became Director, the OHA's Medicaid program operated under a Section 1115 Medicaid Demonstration Waiver (the "Waiver"). Section 1115 of the Social Security Act gives the Secretary of Health and Human Services authority to approve experimental or demonstration projects that are likely to assist in promoting the objectives of the Medicaid program. Ms. Saxton will testify that the Waiver is intended to give states like Oregon the flexibility to design and improve their Medicaid programs through new policy approaches, such as eligibility expansion, innovative service delivery systems, increased efficiencies, or cost controls. In turn, the federal government promises to contribute a certain amount of funds to the state's project.

Ms. Saxton maintained high-level knowledge of the contents of the OHA's Waivers that were in effect while she was Director, and was in charge of overseeing compliance with their provisions. Ms. Saxton will testify that, through the Waiver, which was effectively a five-year agreement between Oregon and the federal government, Oregon established CCOs and the coordinated care model. This means that Oregon began contracting with CCOs, and the CCOs would then contract with health care professionals and organizations to provide services to Medicaid members.

Under the Waiver, if Oregon met the applicable regulatory requirements, the federal government, through CMS, provided a large amount of funds to Oregon to administer its Medicaid program. In return for funding, Ms. Saxton will testify that Oregon committed to reducing the statewide Medicaid spend by 2%, from 5.4% to an average of 3.4%, during the operative five-year Waiver period. This meant that the State committed to limit growth of the amount of money spent on Medicaid to 3.4%, on average per year over the five-year period year over year. This was not "per CCO" -- but holistically for the entire state. This 3.4% cost containment was not a secret—it was known by all of the CCOs.

/ / /

Page 11 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Ms. Saxton will testify that, when she became Director of the OHA, she became responsible for compliance with, and achievement of, terms and objectives outlined in the Waiver. If Oregon failed to do so, it risked losing federal funding for Oregon's ACA expansion. Ms. Saxton will also testify that the OHA agreed to pay the federal government large monetary penalties if it failed to meet the rate of growth goal over the operative Waiver period. Accordingly, her primary goal was to ensure compliance with federal requirements, which would in turn ensure that the State of Oregon continued to receive funds to serve its expanding Medicaid population, and did not have to pay large sums of money back to the federal government. Ms. Saxton will also testify that she oversaw the OHA's application process for the 2017 Waiver.

### *Meeting with CMS*

Ms. Saxton will testify that, early on in her tenure as Director of the OHA, she had an introductory meeting with representatives from the Centers for Medicaid and Medicare Services ("CMS") to discuss the Medicaid program as it was being administered in Oregon. This meeting took place in person at the CMS office in Baltimore, Maryland. Both Ms. Saxton and Leslie Clement, the OHA's Director of Health Policy and Analytics, attended on behalf of the OHA.

Ms. Saxton will testify to the substance of the meeting. This conversation was not specific to Medicaid capitation rates. It was about how the Medicaid system in Oregon had been functioning in general following the initial 2012 Waiver, and prior to Ms. Saxton's tenure. Oregon had received an extremely large amount of money (approximately 1.8 billion dollars) for its Medicaid program prior to the beginning of Ms. Saxton's tenure, and CMS was concerned, in part, about the effectiveness of Oregon's Medicaid program.

At the conclusion of that meeting, Ms. Saxton expressed her intent to work closely with CMS to accomplish the goals of the Medicaid system in Oregon. This included what the OHA referred to as the "Triple Aim" – (1) improving the health of Oregonians; (2) increasing the quality of care or patient experience; and (3) lowering the per capita cost of care ("better health, better

Page 12 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

care, lower costs"). It also included compliance with the terms of the Waiver, which contained the specific cost control measures on the average rate of growth.

### *Redevelopment of 2015 Capitation Rates and Methodology*

Ms. Saxton will testify that one of her first tasks as Director of the OHA was to oversee the redevelopment of CCO Medicaid capitation rates for the 2015 year for the purpose of creating a sustainable methodology for Oregon's Medicaid program. It had become clear in the first 90 days of her tenure that there was some sort of problem. One of Ms. Saxton's initial goals was to first understand if there were issues with the initial 2015 capitation rates and, if so, understand what exactly the problem was and ensure that the problem was resolved. Another one of Ms. Saxton's goals was to ensure that the OHA could effectively explain to stakeholders, including the CCOs and legislators, how the rate setting process was going to work moving forward. This, in turn, also required a clear explanation of provisions in the ACA which were going to shift additional Medicaid cost contributions to the State in the coming years. As a result of these changes, the State was going to take on a larger role in funding contributions to the Medicaid system.

Ms. Saxton realized that the OHA needed to identify and hire someone with significant experience and expertise, and asked executive leadership for assistance in finding an actuarial firm that could assist with the 2015 rate redevelopment. Optumas, an actuarial firm based in Arizona, was proposed as a competent firm that had significant experience in Medicaid rate development for other states. Optumas had recently done other work with the OHA, and they had done a quality job. In addition, OHA administrators suggested that CMS was familiar with Optumas' work. Ms. Saxton asked staff to invite representatives from Optumas to visit Oregon and meet with the OHA representatives (including Ms. Saxton).

After meeting with Optumas and subsequently engaging with all of the CCOs in a joint work group to discuss the rates process, the OHA decided to hire Optumas in April of 2015 to redevelop the 2015 capitation rates to create a sustainable methodology for rate setting. After

Page 13 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Optumas was hired, the OHA (including Ms. Saxton, in some cases) met with representatives from all of the CCOs, explained to them that there was going to be a redeveloped process for setting capitation rates, and that the OHA had hired Optumas to do that work. The response from CCOs was supportive.

Ms. Saxton will testify that, with passage of the ACA, Oregon had a new Medicaid expansion population which required successful implementation of Oregon's new health care management framework. Ms. Saxton's overarching goal going into the 2015 rate redevelopment process was to develop a methodology that the OHA could rely on in future years that kept CMS engaged and financially contributing to the program, while also enabling Oregonians to afford the increasing financial impact of the law.

Ms. Saxton will testify that her primary objectives with respect to redevelopment of the 2015 CCO capitation rates, as well as future rate development, was ensuring that the rates were financially sustainable, approved by CMS, and achieved the mission of providing access to health care for indigent Oregonians. Particularly given the prior concern raised by CMS, it was extremely important to Ms. Saxton that the Medicaid program was managed and administered in a fiscally responsible way, including ensuring that the year over year Medicaid spend could not exceed 3.4% on average across the entirety of the state for five years, pursuant to the 2012 Waiver. Ms. Saxton knew that Oregonians' health care, particularly indigent Oregonians' health care, depended on CMS' approval of the capitation rates.

During the OHA's redevelopment, and CMS' subsequent approval, of the 2015 capitation rates, Ms. Saxton communicated directly with the CCOs, members of the Optumas team (including Zachary Aters and Steve Schramm), Lori Coyner ("Ms. Coyner") (the OHA's Director of Health Analytics and later Medicaid Director), and members of the OHA's Actuarial Services Unit ("ASU"). Ms. Saxton also communicated with her executive team, as needed. Ms. Saxton's role was to ensure that the collaborative process between the CCOs and the OHA would produce a methodology and rates that were approved by CMS. Ms. Saxton connected the leaders of the

Page 14 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

CCOs with the OHA's Project Lead, initially Ms. Coyner and later OHA's Chief Financial Officer Mark Fairbanks ("Mr. Fairbanks"), as well as Optumas and the OHA's experienced team of actuaries. Ms. Saxton will testify that FamilyCare was actively involved in this process.

### *FamilyCare's Position with Respect to 2015 Rate Redevelopment Process*

By May of 2015, FamilyCare filed a lawsuit against the OHA for breach of its CCO contract, alleging issues with the 2015 rates. By June of 2015, the rates had been redeveloped by Optumas using a new methodology. Ms. Saxton understood that the new methodology developed in consultation with the CCOs and implemented by Optumas was transparent, actuarially sound, met the goals of the Triple Aim, and met any applicable CMS requirements for approval. CMS subsequently approved these rates.

Despite redevelopment of the rates, and approval from CMS, Ms. Saxton will testify that FamilyCare was the only CCO out of 16 who refused to agree to the rates and sign an amendment to their CCO contract. Furthermore, FamilyCare initially refused to agree to the subsequent 2016 rates which were developed using the new methodology.

Ms. Saxton will testify that, as a result, the OHA began to ask other CCOs in late 2015 if they had the capacity to take on FamilyCare members in the event that FamilyCare defaulted on its obligations under the CCO contract to facilitate health care services for its Medicaid members. In the event of FamilyCare's continued refusal to accept the rates, the OHA would be forced to shift FamilyCare's members to other CCOs. Ms. Saxton did not prefer to go this route, but nonetheless had the responsibility to take proactive steps to explore other options in the event FamilyCare defaulted on its obligations under its CCO contract.

### *2016 Rates*

Ms. Saxton will testify that CMS approved the 2016 rates. FamilyCare again challenged the 2016 rates, and at first was unwilling to accept them. Months later, FamilyCare ultimately did accept the rates, and the OHA was not forced to transition FamilyCare's members to other CCOs as a result of FamilyCare defaulting on obligations under the CCO contract.

Page 15 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

*2016 Settlement Agreement*

Ms. Saxton will testify that, as part of the redevelopment of the 2015 rates, it was discovered that there had been an overpayment to four CCOs. FamilyCare was one of those CCOs, and it was discovered that they had been overpaid in the amount of roughly $54,000,000.00. This money was owed back to the OHA.

Ms. Saxton will testify that she had become aware that FamilyCare had previously filed lawsuits against the OHA challenging its rates. Ms. Saxton will testify that, in May of 2016, the OHA and FamilyCare engaged in negotiations with FamilyCare to address both the pending legal actions filed by FamilyCare and the approximate $54,000,000.00 that was owed back to the OHA.

For many reasons, in the interest of moving forward under this new rate-setting framework and to allow the OHA to focus on its myriad of responsibilities, the OHA agreed to resolve the two pending lawsuits between FamilyCare and the OHA. Under the negotiated Settlement Agreement, the OHA allowed FamilyCare to retain $24,800,000.00 of the approximate $54,000,000.00 overpayment that it owed back to the OHA.

In turn, as part of the 2016 Settlement Agreement, FamilyCare expressly acknowledged and agreed that: (i) it was the OHA's responsibility under the contracts between the OHA and each CCO to set rates and submit them to CMS for approval; (ii) the rates submitted to CMS for approval must be actuarially sound; and (iii) the OHA was not obligated, as part of the rate setting process, to adjust the rates paid to any CCO to ensure that such rates cover all of the costs that a CCO may incur during a given rate year.

Nonetheless, even after the 2016 Settlement Agreement, FamilyCare continued to challenge the OHA's process for setting rates in both the 2016 and 2017 rate years. FamilyCare was persistently dissatisfied, despite their express acknowledgements in the 2016 settlement agreement that the OHA had the ability to develop and submit rates for approval, and despite the fact that CMS approved the rates.

/ / /

Page 16 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

*Ms. Saxton's Knowledge of Substantive Capitation Rate Development*

Ms. Saxton will testify that she had a very high level understanding of the process for setting Medicaid capitation rates. She understood that, based upon underlying data that was submitted annually by each CCO to the OHA and Optumas, Optumas would develop capitation rates for each CCO which would then be submitted to CMS for approval. Ms. Saxton understood that the OHA had an obligation to develop these rates on an annual basis, and that the rates needed to be actuarially sound. CMS would only approve the rates if they were in fact actuarially sound.

Ms. Saxton will testify that, at a high level, she became generally familiar with key actuarial terms. Ms. Saxton also generally understood that, after the data was compiled, specific adjustments could be made to account for things like "trend" or the "risk scores" of particular CCO members. For example, Ms. Saxton knew that, beginning with the 2015 rate redevelopment, Optumas made adjustments on a regional geographic basis. Ms. Saxton relied on her executive team, project leads, and subject matter experts to interpret policy impacts produced by the rate-setting methodology, as well as the attainability of the Triple Aim.

However, Ms. Saxton is not an actuary. Ms. Saxton had an understanding of the confines in which the rates needed to be developed, but she did not review the underlying data submitted by the CCOs as part of the rate development processes, nor did she review or use that data to determine which rates would ultimately be submitted to CMS for approval. These tasks were the job of Optumas, in conjunction with project leads and individuals within the OHA's ASU. Ms. Saxton was involved at a high level to listen to the CCOs' questions or concerns and to review the OHA's analyses of and responses to the same. This included participating in some meetings between the OHA, Optumas, and the CCOs. However, she was not involved in the actual development of the rates themselves, including development of the underlying methodologies. Ms. Saxton will testify that she simply did not have the education or experience to design Medicaid rate methodologies, and was not hired to do so. To the extent a question or concern arose in a meeting or other conversation with a CCO, Ms. Saxton relied on Optumas, as well as her project

Page 17 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

leads and their staff, to respond or perform the requisite analysis to understand the perspective of the CCO.

At no point during Ms. Saxton's tenure as Director of the OHA did she participate in actually developing, calculating, or setting the capitation rates that were developed by Optumas for submission to CMS. At no point during Ms. Saxton's tenure as Director of the OHA did she direct anyone at the OHA, or anyone at Optumas, to target FamilyCare to receive lower capitation rate payments. At no point during Ms. Saxton's tenure as Director of the OHA did she direct anyone at the OHA, or Optumas, to target FamilyCare.

### Ms. Saxton's Interactions with the CCOs Throughout the Rate Development Process

Ms. Saxton will testify that, as Director of the OHA, she occasionally met personally with CCO representatives, including FamilyCare representatives. To the extent that any CCO, including FamilyCare, communicated questions or concerns directly to Ms. Saxton, she would turn to her project leads and their staff if further context was necessary to be able to respond or she would direct Optumas and/or her project leads to perform additional analyses to determine the legitimacy of the question or concern at hand.

Ms. Saxton will also testify that, in time, she became aware of tension between FamilyCare and Health Share, two CCOs operating within the same Tri-County region. Ms. Saxton will testify that her goal was not to intervene between CCOs, or to give either preferential treatment. She did not prefer one over the other. However, she came to understand that FamilyCare was persistently unhappy with its rates, and believed they were not getting rates that were fair in comparison to other CCOs—most prominently in comparison to Health Share.

When FamilyCare would raise concerns, Ms. Saxton would ask the experts, including the project leads, ASU, and Optumas, if FamilyCare was somehow being treated unfairly. The answer was "no."

/ / /

/ / /

Page 18 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

*Ms. Saxton's Interactions with Optumas Throughout the Rate Development Process*

With respect to the Medicaid rate setting process, and in addition to Ms. Coyner (Project Lead) and Mr. Fairbanks, Ms. Saxton will testify that she communicated most frequently with Optumas through Zach Aters ("Mr. Aters"). Mr. Aters is an actuary at Optumas who worked closely on Oregon's account to analyze data and develop capitation rates to be submitted to CMS. Ms. Saxton also communicated with Steve Schramm ("Mr. Schramm"), the Founder and Managing Director at Optumas. At times, both Mr. Aters and Mr. Schramm were asked to engage with Medicaid stakeholders, including FamilyCare, to discuss the rate setting process. This included attempting to address concerns brought forth by FamilyCare regarding its own rates. On no occasion did Saxton ever direct Mr. Aters, Mr. Schramm, or anyone else at Optumas to target FamilyCare.

*Ms. Saxton's Interactions with the Media Throughout the Rate Development Process*

Ms. Saxton will testify that the media often inquires about matters related to the OHA and its work. This is not insular to Medicaid. However, in the context of Medicaid, the media was generally aware that FamilyCare had persistent complaints regarding the rates that it was receiving through its contract with the OHA. To Ms. Saxton's understanding, the media's awareness was largely a result of FamilyCare's representatives, including its lobbyists, contacting the media and members of the legislature to complain about the rates that it was receiving.

Beginning with the redevelopment of the 2015 capitation rates, the OHA was in a position of needing to persistently respond to media inquiries regarding FamilyCare. It therefore made sense for the OHA to have clear information available, including formal talking points, to effectively communicate its position regarding equity and sustainability in its rate setting process. This was particularly important given the complexity of the rate setting process and the OHA's desire to communicate those complexities effectively.

/ / /

/ / /

Page 19 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

*Preface to the Draft Communications Plan*

Developing Medicaid capitation rates is a very complex, arduous process that involves the compilation and assessment of a large volume of data. Ms. Saxton will testify that the OHA struggled to explain the Medicaid rate setting process to the public, the media, and the legislature. In particular, the OHA struggled to effectively communicate its position in response to criticism from FamilyCare about the rate setting process. The need to effectively communicate was heightened by the passage of the ACA, which was a volatile and complicated subject in its own right. The OHA briefed legislators in 2015 and 2016 to provide a foundational understanding of Oregon's Medicaid program, as well as the role that rate setting played in achieving the Triple Aim and preparing the state to assume a portion of the Medicaid costs. However, the complexity of the rate-setting process was difficult to grasp. Understanding by the Oregon Legislature was key, as the Waiver required the State to assume more financial responsibility for the Medicaid expansion.

As a result, in December 2016, Ms. Saxton identified a need to develop an internal draft document that OHA staff could potentially reference in educating the press, legislature, public, and other stakeholders. With the array of critical issues and upcoming legislation that the OHA was tasked with addressing, simply responding to FamilyCare's misrepresentations and mischaracterizations to stakeholders about the development of capitation rates took up a significant and disproportionate amount of the OHA's time and resources. Ms. Saxton identified that the OHA was spending a disproportionate amount of time trying to elevate FamilyCare and the public's understanding of the new, sustainable rate methodology—especially in light of FamilyCare's contributions to the public's confusion relating to the rate-setting process.

During her tenure at the OHA, Ms. Saxton constantly sought ways to be more articulate and clear in the OHA's discussions of critical issues related to the ACA and Medicaid. The ACA was a new, complicated federal law, the scope of which was enormous. The rate setting process was also extremely complex. The need to communicate effectively was critical, and Ms. Saxton

Page 20 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

hoped to reposition the OHA to be proactive and efficient in its interactions with the press, legislature, public, and other stakeholders.

In January 2017, Ms. Saxton asked BethAnne Darby ("Ms. Darby"), the Director of External Relations, to have the OHA communications team put together a draft plan to be used in educating and communicating with the public, press, legislature, and other stakeholders regarding the OHA's adopted and CMS approved rate setting process, and FamilyCare. The purpose of the draft communications plan was not to "smear" FamilyCare; it was to develop clear and consistent talking points for the OHA staff to underscore the fact that the OHA's process for development of the capitation rates was sustainable and actuarially sound—and why that was critical to the success of the Oregon Medicaid System. The OHA's obligation was to achieve the State's objectives by developing an effective rate methodology for CCOs, and submitting them to CMS for approval. The OHA developed rates for every CCO, including FamilyCare, and submitted them to CMS for approval. CMS approved the rates, including FamilyCare's rates, every year.

Yet, FamilyCare publicly perpetuated untruths, including but not limited to the following: (1) the OHA was unfairly picking on FamilyCare and treating them differently than other CCOs; (2) the OHA was intentionally giving FamilyCare capitation rates which were unfairly lower than other CCOs; (3) the OHA only wanted a single CCO in the Portland Metro marketplace; and (4) the OHA was not being transparent in how the capitation rates themselves were being developed. The purpose of the prospective plan was not to "attack" FamilyCare—it was to educate about the development of Oregon's rates and rate methodology and to, as needed, counter FamilyCare's misinformation by presenting the actual truth, and to provide foundational education as to how Oregon's Medicaid system functioned.

In asking for a draft communications plan to be developed, Ms. Saxton did not believe that she was violating any laws, or somehow depriving FamilyCare of its constitutional free speech rights. In asking for a draft communications plan to be developed, Ms. Saxton was not intending to retaliate against FamilyCare in any way. She was merely attempting to develop a clear, concise,

Page 21 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

and streamlined strategy for communicating effectively with the public, the media, and the legislature with respect to Oregon's rate methodology, Medicaid system and, if needed, respond to the ongoing criticism from FamilyCare. She was unaware at the time that she asked for the draft communications plan to be developed of what the substance of the draft plan would ultimately include.

### The Draft Communications Plan

Ms. Saxton did not personally draft any communications plan—including the 2017 "draft communications plan." Ms. Saxton did not redline or otherwise edit the draft communications plan. She did not direct anyone to highlight FamilyCare as an "outlier." Ms. Saxton did not ask or direct anyone to highlight the possible transition of HIV patients from FamilyCare to Health Share in the draft communications plan. Instead, Ms. Saxton directed Ms. Darby to oversee the development of a draft communications plan. Ms. Saxton was later made aware that Ms. Darby had delegated authorship of the rough draft to Courtney Crowell ("Ms. Crowell"). After this discussion with Ms. Darby regarding the development of a communications plan, Ms. Saxton did not review any draft of a communications plan until more than six weeks later.

### First Time Reading the Draft Communications Plan

Ms. Saxton will testify that she first read a draft in mid-February of 2017 while she was on an airplane on the way back to Portland, Oregon from Washington, D.C. The was an email from Ms. Crowell and contained the draft that was sent weeks earlier, on January 26, 2017. While Ms. Saxton was in Washington D.C., it became apparent that the new presidential agenda (under then-President Donald Trump) could have a significant impact on both Medicaid, the ACA, and Oregon.

While reading the draft communications plan for the first time, it became apparent to Ms. Saxton that the plan was not what she was looking for. She did not redline the draft, or otherwise take steps to revise it. Instead, in a haste, she stated via email on February 18, 2017: "*Hi all- I had the chance to review this on the plane. There are some new developments that I think will build on the already good start you had outlined. Please have Mikayla convene us for a conversation.*

Page 22 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

*It does not need to be the coming week.  Please embed this attachment in the invite, Mikayla. Thank you*."

Ms. Saxton will testify that she did not intend for the communications plan to move forward, and it did not move forward.  Ms. Saxton subsequently met with Ms. Darby, and a decision was made to shelve the communications plan in its entirety.  No further iterations of the draft were completed, and Ms. Saxton did not take any further steps to review, approve, or in any way implement the draft plan.

### *Resignation Agreement*

Also in February of 2017, Ms. Saxton will testify that she had a conversation with Nik Blosser ("Mr. Blosser"), the Governor's Chief of Staff, in which they discussed the appropriate departure timeline for the end of her tenure with the OHA.  When Ms. Saxton initially agreed to serve as Director of the OHA, she agreed to serve for a period of twelve to eighteen months.  Given that Ms. Saxton had become Director in January 2015, she had then served for over two years.  During this conversation between Ms. Saxton and the Governor's office, they agreed that Ms. Saxton would resign at some point in the near future.  Mr. Blosser and Ms. Saxton ultimately agreed upon February of 2018.

### *Public Records Request*

In early August of 2017, Ms. Saxton was made aware that, over six months after the draft communications plan had been sent to Ms. Saxton, a copy of the draft communications plan had been obtained by reporter Nick Budnick ("Mr. Budnick") of *The Portland Tribune*, and that Mr. Budnick intended to run a story in the paper regarding the draft communications plan.  *The Portland Tribune* did publish an article, which described the draft communications plan and painted it as attempt to "smear" FamilyCare in the press.  Ms. Saxton was surprised, given that the draft plan had been shelved shortly after she had the opportunity to read it, and that no subsequent action in furtherance of the plan had ever been taken.

/ / /

Page 23 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

### *Letter to Jeff Heatherington*

Ms. Saxton will testify that, on August 7, 2017, a letter was sent to Mr. Heatherington from Ms. Saxton. Ms. Saxton wrote the letter herself.  The letter apologized to Mr. Heatherington for the draft communications plan and stated, "*I am writing to express my sincere regret that a draft communications plan implied that the OHA thought sharing negative information about FamilyCare with media was an acceptable strategy.*" The letter goes on to clarify that the draft plan was not implemented or acted on in any way.

Ms. Saxton was not personally involved in the drafting of the communications plan, nor did she take any action to implement it.  Nonetheless, she recognized that the appearance of the draft communications plan itself could reasonably be interpreted as a means to speak negatively about FamilyCare.  Ms. Saxton is a professional, and she apologized because it was the appropriate thing to do.  Ms. Saxton will testify that, as a leader, she was not going to publicly blame a subordinate or anyone else.  As the head of the agency, sending an apology to Mr. Heatherington was the appropriate thing to do.

### *Circumstances of Resignation*

On August 8, 2017, Ms. Saxton received a phone call from Mr. Blosser and Berri Leslie ("Ms. Leslie").  Ms. Leslie also worked in the Governor's office alongside Mr. Blosser.  At the time that she received the call, Ms. Saxton was physically in a meeting with CMS, in which CMS was expressing how satisfied they were with the current state of the Medicaid system in Oregon.

 Mr. Blosser conveyed that the Governor's office decided that now was the appropriate time for Ms. Saxton's resignation.  However, they asked that she agree to stay on until the end of August 2017 to facilitate the completion of the OHA's redetermination of Medicaid members.  Ms. Saxton does not recall Mr. Blosser mentioning FamilyCare or the draft communications plan on that phone call.  Thereafter, Ms. Saxton's resignation was announced.

Ms. Saxton will testify that she did not resign over the draft communications plan, or any one thing.  The resignation had been planned at that point for several months.  Ms. Saxton served

Page 24 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

at the pleasure of the Governor; and if the Governor thought that "now" was the correct time for her resignation, Ms. Saxton was going to accept that and resign. After Ms. Saxton resigned, she had a telephone conversation with Governor Brown where Governor Brown thanked Ms. Saxton for her contributions to the Agency.

Ms. Saxton stayed on at the OHA until August 31, 2017, at the request of the Governor's office, to see through the successful completion of the Medicaid redeterminations.

### *Annual Rate Approval*

Ms. Saxton will testify that CMS approved the developed rates for 2015 as actuarially sound. CMS also approved the rates for 2016 and 2017 as actuarially sound. At no time during her tenure as Director of the OHA did CMS *not* approve the capitation rates for each CCO, including FamilyCare, which were developed by Optumas and submitted to CMS for approval.

### *Accomplishments at the OHA*

Ms. Saxton will testify to the myriad of things accomplished during her short tenure as Director of the OHA. This includes: achieving approved rates from CMS in 2015, 2016, 2017; launching the new Medicaid eligibility system; achieving a 3.4% average cost containment pursuant to the Waiver; achieving 95% statewide insured access; renewal of the 5-year Waiver from CMS; securing a Performance Plan with the United States Department of Justice for behavioral health; initiating a successful tribal care coordination program with Oregon tribes and CareOregon; restructuring the OHA and implementing a performance management system; launching a new OHA website; and reducing the OHA Agency spend by implementing cost controls for budget growth from 2015 – 2017.

### *After OHA*

Ms. Saxton will testify that her last day of employment with the OHA was August 31, 2017. After that date, she had no involvement whatsoever with OHA policies, procedures, controls, or the OHA's subsequent interactions with FamilyCare over the development of its 2018 rates.

Page 25 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

*Conclusion*

Ms. Saxton will testify that she did not direct anyone at the OHA to take any action or make any decisions regarding FamilyCare in retaliation for FamilyCare's alleged engagement in "protected speech" or for raising concerns about the capitation rate development process. Ms. Saxton never told anyone at the OHA to target FamilyCare. Ms. Saxton never told anyone at the OHA or at Optumas to manipulate the rate development process. Ms. Saxton did not take any other actions or inactions which were targeted or intended to harm FamilyCare. Furthermore, Ms. Saxton did not undertake any actions or make any decisions which she believed to be illegal or in violation of any law, rule, or regulation, including the United States Constitution.

**B.      WITNESS STATEMENT OF ROBB COWIE**

Ms. Saxton anticipates that Mr. Cowie's direct testimony will take approximately 2 hours. Ms. Saxton reserves the right to adopt the information contained in the witness statement for Mr. Cowie which will be presented by Defendant Oregon Health Authority ("OHA" or "Agency"). Counsel for Ms. Saxton anticipates that Mr. Cowie will testify as follows:

*Educational Background*

Mr. Cowie obtained a Bachelor of Arts in English from Hobart and William Smith Colleges. Mr. Cowie later obtained a Master of Arts in Environment and Community from Antioch University Seattle.

*Professional Background*

Mr. Cowie became the Communications Director at the OHA 2016. Prior to joining the OHA, Mr. Cowie gained extensive experience in developing, managing, and implementing both internal and external communication strategies through the following roles:

- Deputy Director for State Policy, Legal Action Center in New York, New York

- Deputy Director, Biodiversity Project

- Policy and Communications Manager, Multnomah County Department of Community Justice

Page 26 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

- Executive Director of Community Involvement and Public Affairs, Portland Public Schools

- Assistant Director of Internal Communications, Cambia Health Solutions

Through his work in both the private and public sectors, Mr. Cowie developed an understanding of the requisite tones of various forms of communication within both sectors. For example, a private organization with a particular legislative goal in mind, or a political office hoping for reelection, will tend to take a more adversarial tone in their communications. In general, these adversarial communications tend to define an opponent and take a sharper view of the issue(s) at hand.

However, a public agency, such as the OHA, strives for balanced communications with a neutral tone and posture. Because the OHA's role is to serve and safeguard the health of Oregonians, even when faced with conflict between or amongst stakeholders, the OHA views each stakeholder as a partner in increasing the quality of and access to health care across Oregon.

### *Work at the OHA*

Mr. Cowie will testify that he was hired as the OHA's Communications Director in February 2016. The OHA has the largest operational budget in the State and is responsible for a vast array of health programs including public health education, behavioral health services, addiction services, public crisis lines, the Oregon Health Plan, Medicare and Medicaid, the Oregon State Hospital, the Oregon Health Policy Board, the Oregon WIC Program, prescription drug programs, illness prevention and wellness, injury and violence prevention, safe surrender assistance, environmental investigations and data, as well as acute, communicable, and chronic disease. The OHA monitors federal, state, and local legislative efforts that relate to its programs.

Mr. Cowie assists in communicating to stakeholders the OHA's role in protecting and advancing the health of Oregonians and transforming Oregon's health care system. Mr. Cowie also manages a team of Communications Officers at the OHA. In general, Communications Officers are assigned to specific Portfolios that encompass specific divisions within the OHA.

Page 27 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Communications Officers are then tasked with media outreach, as well as responding to inquiries, relating to their Portfolio. Mr. Cowie manages communications relating to all of the OHA's programs. Between 2016 and 2018, Mr. Cowie reported to the Director of External Relations, BethAnne Darby ("Ms. Darby"). Ms. Darby reported directly to Ms. Saxton.

Mr. Cowie primarily oversaw the OHA's communications with members of the media. Mr. Cowie's role was to stay apprised of OHA business and operations, so he and his team were prepared to provide accurate and comprehensive information in response to inquiries from the media.

In addition, Mr. Cowie will testify that the Communications Team also assisted with the preparation of the OHA's statutorily required legislative reports. For example, Communications Officers assisted with the compilation of relevant information, assembly of graphics and layout, review to ensure the substance was appropriate for the intended audience, and edit spelling and grammar.

If his Communications Team needed to contact a legislator or legislative staff, that effort would involve the OHA's Government Relations team. Mr. Cowie has never asked, nor directed a Communications Officer to ask, a legislator to pitch a story to a reporter for the benefit of the OHA.

### OHA Interactions with Members of the Press

Mr. Cowie will testify that, as Communications Director, Mr. Cowie frequently interacted with members of the press. These interactions included formal and informal communications, pitches to reporters, as well as conversations that occurred both "on" and "off" the record.

Mr. Cowie will testify that a statement "on" the record can be attributed to the person who makes the statement. This means that a journalist can quote and provide the name of the speaker of any statement made "on" the record. In contrast, a statement "off" the record is one that cannot be specifically attributed to the person making the statement. However, a statement made "off"

Page 28 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

the record can still be published by a reporter, but only if the reporter obtains the information from an independent source or sources.

Mr. Cowie will testify that, in practice, he and his Communications Officers generally negotiate with a reporter in advance to determine whether a conversation will be held "on" or "off" the record. Because conversations "off" the record require advance negotiations, these conversations are generally viewed as being formal. Conversations "off" the record are used for the purpose of providing background or context, and are generally viewed as an important way to provide information and insight. These "off" the record conversations are a tool that allows information to be shared more freely.

### *OHA Communications Plans: In General*

Mr. Cowie will testify as to the purpose of communications plans. At the OHA, communications plans are planning tools routinely used as a means to inform the public regarding issues related to health and health care. Mr. Cowie's goal for any communications plan was to put complicated issues into focus for the public. Given the vast number of issues the OHA was responsible for managing, it was critical that OHA staff could reference a single document to understand the Agency's goals, including how to achieve those goals. In addition, the exercise of developing a communications plan provides the space for the Communications Team to brainstorm the many different ways the OHA can provide, and the key audience(s) can access, the clearest, most accurate information. Particularly in the early stages of developing a communications plan, Mr. Cowie encouraged the Communications Officers to use the plans as a way to test-drive messages or strategies. Mr. Cowie's goal was to create an environment where his staff felt comfortable testing or brainstorming new ideas. Through the revision process, these ideas would be refined into the final messaging.

The OHA's communications plan template was developed to cover the basic elements of a plan:

/ / /

Page 29 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

- What is the context;

- Who are the key audiences the Agency is trying to reach;

- What actions does the Agency want people inside or outside the OHA to take;

- What is the core message the Agency is trying to deliver;

- What are the tactics the Agency is going to use to attempt to reach the key audiences; and

- How is the Agency measuring success.

Mr. Cowie will testify that the OHA developed communications plans for a variety of issues. For example, between 2016 and 2018, Mr. Cowie assisted in the development of communications plans relating to air quality and pollution issues, such as Cleaner Air Oregon; the Medicaid eligibility and redetermination systems; the potential repeal of the Affordable Care Act; the audit by the Secretary of State; the OHA's budget presentations; and more. Throughout 2016, Mr. Cowie also developed a communications plan and materials relating to FamilyCare, including the OHA's negotiations with FamilyCare.

### Interactions with Director Lynne Saxton

Mr. Cowie will testify as to his experience working at the OHA under Director Ms. Saxton's leadership, including his observations of Ms. Saxton's management style. Mr. Cowie will testify that Ms. Saxton generally provided substantive feedback on written materials. In general, if written material was elevated to Ms. Saxton, she not only reviewed the substance of the materials, but frequently requested meetings with the drafter to provide feedback and stayed involved throughout the revision process.

### Development of OHA Communications Plans: In General

Mr. Cowie will testify as to the process through which the OHA develops communications plans. In general, Mr. Cowie directs a Communications Officer to draft the initial document. Mr. Cowie then reviews the draft document and works in collaboration with that Communications Officer to revise the draft. This process may include Mr. Cowie providing feedback regarding

Page 30 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

content or messaging, commenting on language in the draft document, and asking questions as to what the Communications Officer intended.

Where appropriate, once Mr. Cowie and the Communications Officer have finalized a draft communications plan, the document will be sent to OHA leadership for approval. In general, draft communications plans were only elevated to Ms. Darby or Ms. Saxton if the substance of the plan involved a certain level of operational complexity or multiple key stakeholders. If the draft document was sent to Ms. Darby or Ms. Saxton, the draft generally underwent an additional revision process, including redlines, comments, and/or questions.

### The OHA Communications Team and Capitation Rate Setting

Mr. Cowie will testify that he maintained high level knowledge of the Oregon Medicaid program, including business relating to Coordinated Care Organizations ("CCOs") in general, so that he was prepared to coordinate and manage the development of the OHA's communications and respond to general inquiries relating to Oregon's Medicaid program.

Mr. Cowie was not involved in the OHA's development of Medicaid capitation rates. Mr. Cowie's staff was not involved in the OHA's development of Medicaid capitation rates. Between 2016 and 2018, Mr. Cowie occasionally participated in meetings discussing the Medicaid capitation rate setting process at a high level, so that he was prepared to coordinate communications and respond to general inquiries relating to the process.

Mr. Cowie will testify that he generally understood that Oregon operated its Medicaid program in accordance with a five-year, federal Section 1115 Waiver (the "Waiver"). Simply put, the Waiver represented a contract between Oregon and the Centers for Medicare and Medicaid Services ("CMS"), the federal agency that regulates state Medicaid programs. The Waiver required that the year-to-year costs of Oregon's Medicaid program could not exceed 3.4% on average annually over a five-year period. In return, the federal government provided funding to Oregon for the purpose of the State's Medicaid program. Mr. Cowie understood that, if Oregon

Page 31 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

could not stay within this 3.4% average growth cap, the OHA risked losing, or being required to return, hundreds of millions of dollars in Medicaid funding to the federal government.

Mr. Cowie will also testify that he observed Ms. Saxton participating in the development of capitation rates at a very high level. Mr. Cowie observed that Ms. Saxton was not actively or consistently involved in the rate-setting process. Mr. Cowie never observed Ms. Saxton interfere with the Medicaid rate-setting methodology or process with an intent to hurt FamilyCare. Mr. Cowie never observed Ms. Saxton direct, either through express statement or implication, OHA or Optumas staff to interfere with the rate-setting process. Mr. Cowie never observed Ms. Saxton direct, either through express statement or implication, OHA or Optumas staff to interfere with the rate-setting process to disadvantage FamilyCare or otherwise interfere with FamilyCare's business. Mr. Cowie never observed Ms. Saxton direct, either through express statement or implication, a rate-setting policy be adopted or implemented with an intent to hurt FamilyCare. Mr. Cowie never observed Ms. Saxton retaliate against FamilyCare or direct the OHA or Optumas staff to retaliate against FamilyCare.

### *FamilyCare and Ongoing Litigation*

Mr. Cowie will testify that, when Mr. Cowie joined the OHA, he had no opinion of FamilyCare and was unaware of any litigation between FamilyCare and the OHA.

Sometime after Mr. Cowie started working at the OHA, he became aware the OHA and FamilyCare had been engaged in a dispute regarding the development of Medicaid capitation rates. Mr. Cowie understood that a group of CCOs had objected to the initial rates set for 2015, and that the OHA had agreed to reexamine those rates. Mr. Cowie will also testify that, while all other CCOs were satisfied by the methodology and calculations relied upon by the OHA in its redevelopment of the 2015 capitation rates, as well as the development of future capitation rates, FamilyCare continued to seek higher rates for itself. Mr. Cowie observed that FamilyCare simultaneously complained that it was being treated differently by the OHA in terms of the

Page 32 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Medicaid capitation rates it received, while also continuously requesting Medicaid capitation rates that they could only receive if the OHA was to treat them differently.

Mr. Cowie will testify that, between 2016 and 2018, members of the media frequently reached out to him and his direct reports seeking the OHA's comment or response to inaccurate information and mischaracterizations of the capitation rate-setting process disseminated by FamilyCare. Mr. Cowie will testify that FamilyCare frequently compared its rates to the other CCO that operated within the same region as FamilyCare, Health Share of Oregon ("Health Share"). In doing so, FamilyCare often neglected to share that the rates were developed, at least in part, with the risk of each CCO's members in mind. Mr. Cowie understood, through his participation in meetings relating to the rate development process, that Health Share had a riskier membership population than FamilyCare.

In response to inquiries from the media, Mr. Cowie and his Communications Team tried to counter the misinformation with facts, by putting the complex rate-setting process in as clear terms as possible. Mr. Cowie's goal was to highlight the objectivity of the rate-setting process. Mr. Cowie will testify that it was difficult to keep the media engaged in the OHA's responses, as the process was very complex. The more nuanced the OHA was, the less people cared to listen.

In addition, Mr. Cowie will testify that he understood that FamilyCare was a financial sponsor of *The Lund Report*. At times, Mr. Cowie was frustrated that *The Lund Report's* reporting did not consistently capture the complexity of the Medicaid capitation rate setting process.

### *Interactions with Communications Officer Courtney Crowell*

Mr. Cowie will testify that Courtney Crowell ("Ms. Crowell") was one of the Communications Officers that reported to him on his Communications Team. When Ms. Crowell joined the OHA, Mr. Cowie understood that her background primarily involved the development of political campaign strategy and related communications.

Mr. Cowie primarily worked from the OHA's office in Salem, Oregon, but occasionally commuted to Portland, Oregon for meetings. On days he needed to be in Portland, Mr. Cowie

Page 33 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

would work from the OHA's downtown Portland office.  While working from the downtown Portland office, Mr. Cowie shared an office space with a Communications Officer, Ms. Crowell. Mr. Cowie never overheard Ms. Crowell contact a legislator or lobbyist to pitch a story.  If Ms. Crowell had contacted a legislator or lobbyist to pitch a story, Mr. Cowie would expect that he would have been informed of such contact.

### The Draft Communications Plan

In January 2017, Mr. Cowie became aware that Ms. Saxton requested a communications plan be developed relating to FamilyCare, to assist the OHA in coordinating its response to FamilyCare's messaging to the legislature and press. Mr. Cowie understood that the goal of the communications plan was to explain to the public and the press that FamilyCare's rates were reasonable, and the rate-setting process was fair.  Mr. Cowie learned that Ms. Darby and Ms. Crowell would take lead on drafting the communications plan.  Mr. Cowie shared with Ms. Crowell a prior communications plan that he had developed in relation to FamilyCare.  Mr. Cowie was not asked to assist in developing the draft communications plan.

Mr. Cowie will testify that he reviewed the draft communications plan for the first time when it was released by the media.  In his review of the draft plan, Mr. Cowie concluded the plan was clearly in draft form, as there was information listed in the wrong sections, incorrect information, and tasks assigned to individuals within the OHA that do not perform those tasks. For example, Mr. Cowie will testify that reporters are not an "audience" for purposes of a communications plan and that, through the revisions process, the reference to reporters would have been deleted from the "audience" section.  In addition, Mr. Cowie will testify that "pitching" a story is generally not a strategy, but a tactic.  Mr. Cowie would expect that the "pitching" concept would also have been edited out of the "strategy" section through the revision process.

Mr. Cowie will also testify that he noticed a reference in the draft document that certain conversations would take place "off" the record.  Mr. Cowie will testify that, when he first read

Page 34 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

this, he was confused, because he knew his Communications Team was already having similar conversations on those topics with reporters "on" the record.

Finally, Mr. Cowie will testify that the Communications Team did not provide information to legislators. Communications with legislators were the prerogative of the OHA's Government Relations Team. For that reason, the Communications Team would not have directly contacted a legislator or lobbyist and asked that they pitch a story on their behalf. Mr. Cowie will testify that, if the draft communications plan was reviewed or pursued in any substantive way, he would have expected this inaccurate information to have been revised.

Mr. Cowie will testify that he did not implement any aspect of the draft communications plan. Mr. Cowie was not asked to implement any aspect of the draft communications plan. Ms. Saxton never directed Mr. Cowie to implement any aspect of the draft communications plan.

To the extent any action items listed in the draft communications plan came to fruition, those actions would have been taken in the ordinary course of the OHA's business, regardless of whether those actions were enumerated in a communications plan.

## C.    WITNESS STATEMENT OF COURTNEY CROWELL

Counsel for Ms. Saxton anticipates that Ms. Crowell's direct testimony will take approximately 1 hour. Ms. Saxton reserves the right to adopt the information contained in the witness statement for Ms. Crowell which will be presented by Defendant Oregon Health Authority ("OHA" or "Agency"). Counsel for Ms. Saxton anticipates that Ms. Crowell will testify as follows:

### *Educational Background*

Ms. Crowell will testify that she earned a Bachelor of Science in Political Science from the University of Oregon.

### *Professional Background*

Ms. Crowell became a Communications Officer at the OHA in 2016. Prior to joining the OHA, Ms. Crowell had several years of political advocacy and communications experience in the

Page 35 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

following roles:

- Intern, Senator Ron Wyden, Eugene, Oregon

- Intern, Democratic National Committee, Washington, D.C.

- Field Organizer, Yes for Libraries Bond Campaign, Vancouver, Washington

- Intern, Finance Department, Ted Kulongoski for Governor Re-Election Campaign

- Deputy Finance Director, Ted Kulongoski for Governor Re-Election Campaign

- Public Affairs Coordinator, Oregon Economic and Community Development Department

- Communications Manager, Office of Governor Ted Kulongoski

- Various Communications Roles, including State Communications Director, Office of Senator Jeff Merkley

Ms. Crowell will testify as to her experience developing communication strategies within the political context.  While working for Senator Merkley's Office, Ms. Crowell was responsible for all press and media events that occurred in the State of Oregon.  Ms. Crowell coordinated with policy advisors and the communications team housed in Washington, D.C. to develop strategies relating to various issues being addressed by Congress.  Ms. Crowell assisted in preparations for town halls, communicated with the media, and drafted speeches.

Ms. Crowell will testify that, prior to joining the OHA, she had gained considerable experience taking complex data and information and distilling it into a form that could be understood by the general public.

### *Work at the OHA*

Ms. Crowell will testify that she was hired as a Communications Officer at the OHA in September 2016.  Prior to joining the OHA, Ms. Crowell had been introduced to the Director of External Relations, BethAnne Darby ("Ms. Darby"), and the Director of Government Relations, Jeston Black ("Mr. Black"), while working in her prior roles.

/ / /

Page 36 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Ms. Crowell will testify that, as a Communications Officer, Ms. Crowell was part of the OHA's Communications Team and drafted official communications to internal and external stakeholders for her "Portfolio," which included the Health Policy and Analytics Division and Office of Equity and Inclusion. In general, the Health Policy and Analytics Division is tasked with developing and coordinating the delivery of health care services. The Office of Equity and Inclusion is tasked with connecting people with programs to help eliminate health gaps and improve the health of all Oregonians. Specific to her Portfolio, Ms. Crowell was responsible for drafting press releases, speeches, newsletters, executive summaries of various reports issued by the OHA, communications plans, and presentation materials, as well as engaging in media outreach and responding to media inquiries. Ms. Crowell reported to the Director of Communications, Robb Cowie ("Mr. Cowie"). Mr. Cowie reported to Ms. Darby. Ms. Darby reported to Ms. Saxton, Director of the OHA.

Ms. Crowell will testify that she received the majority of her projects from and worked closely with Mr. Cowie. On occasion, Ms. Crowell also received projects directly from Ms. Darby.

Ms. Crowell will testify that she was a Communications Officer at the OHA for a duration of nine months, between September 2016 and June 2017. During those nine months, Ms. Crowell drafted communications and responded to inquiries relating to her Portfolio, including but not limited to the OHA's budget approval process, the potential Affordable Care Act ("ACA") repeal, reports issued by the OHA's Health Policy and Analytics Division, performance of Coordinated Care Organizations ("CCOs"), or the implementation of Oregon's Medicaid Program in general.

Ms. Crowell also assisted in the OHA's development of quarterly legislative reports. Ms. Crowell was also involved in preparations for the Centers of Medicare & Medicaid Services' ("CMS") visits to Oregon. Although, in her nine months with the Agency, Ms. Crowell was unable to become an expert in any particular program area, she worked to develop a high-level knowledge of the key terms and issues and relied on individuals within the OHA to assist her in drafting and communicating the OHA's responses to inquiries from the media.

Page 37 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Ms. Crowell generally worked from the OHA's Portland location, but she also spent a considerable amount of time in late 2016 and early 2017 in Salem assisting with communications relating to the Joint Committee on Ways and Means.

### Interactions with Director Lynne Saxton

Ms. Crowell will testify that she first met Ms. Saxton at an event while working for Governor Kulongoski. Following that meeting, Ms. Crowell occasionally saw Ms. Saxton at a variety of social functions. Ms. Saxton remains a friend of Ms. Crowell's family, through Ms. Crowell's husband's side of the family.

Ms. Crowell will testify as to her experience working at the OHA under Ms. Saxton's leadership, including her observations of Ms. Saxton's management style. In Ms. Crowell's experience, Ms. Saxton preferred to provide constructive criticism via telephone or in person conversations. In addition, Ms. Crowell observed that Ms. Saxton was often an active participant in the editing process. In her reviews of written materials, Ms. Saxton consistently provided specific feedback, in the form of redlines or comments, and requested meetings to discuss that feedback and resolve any potential questions. Ms. Saxton also frequently prepared action items, outlining next steps.

### General Interactions with the Media

Ms. Crowell will testify that she was responsible for engaging with the media on matters that related to her Portfolio. When the media inquired as to matters relating to her Portfolio, those inquiries were generally directed to Ms. Crowell, who was responsible for communicating the OHA's response. In other words, Ms. Crowell was the point of contact for all inquiries relating to her Portfolio. In some cases, Ms. Crowell drafted the OHA's response herself. In other cases, Ms. Crowell collaborated with other members of the Communications Team, including Mr. Cowie, in preparing the response. If Ms. Crowell did not have the subject matter expertise to respond to a particular inquiry, Ms. Crowell frequently identified and reached out to the appropriate individual within the OHA to better understand how the Agency should respond. For example, if Ms. Crowell

Page 38 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

received a media inquiry relating to a specific data point included in a report issued by the Health Policy and Analytics Division, Ms. Crowell would seek out a subject matter expert within the OHA to assist her in providing a comprehensive response to the inquiry.    Ms.    Crowell    will testify that she was not directed to, nor did she observe that others were directed to, discredit FamilyCare in the media.  Ms. Crowell never shared information she knew to be false relating to FamilyCare with members of the media. Ms. Crowell never observed Ms. Saxton direct anyone to disparage FamilyCare or retaliate against FamilyCare in any way.

### *Understanding of Medicaid and Development of Capitation Rates*

Ms. Crowell will testify that, prior to joining the OHA, she had very limited knowledge of Oregon's Medicaid program, including the role of CCOs.  Shortly after she joined the OHA, Ms. Crowell spoke with other individuals within the OHA in an effort to get up to speed on the OHA's programs that were encompassed by, or interacted with, her Portfolio and the work being done within each division.

Ms. Crowell will testify that, specific to Medicaid, Ms. Crowell learned about the innovative features of Oregon's Medicaid Program.  Ms. Crowell understood that Oregon had obtained a Section 1115 Waiver, which created the CCO Model in Oregon.  Ms. Crowell also understood that the Section 1115 Waiver incorporated a cost containment of 3.4%, which meant that the federal and state funding would not increase more than 3.4% on average annually over a five-year period.  Ms. Crowell was not involved in either drafting or obtaining CMS approval of the Section 1115 Waivers, but responded to related media inquiries, as it was encompassed within her Portfolio.

Ms. Crowell will testify she also learned, as part of the CCO Model, that the state and federal government distributed taxpayer dollars to CCOs in the form of "capitation rates." Ms. Crowell understood these rates were approved by CMS each year, and that CMS' approval was critical to the continuation of Oregon's Medicaid program.  Ms. Crowell was also generally familiar with Optumas, the actuarial firm with which the OHA contracted to provide actuarial

Page 39 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

services and analyses to the State of Oregon. However, Ms. Crowell did not directly interact with Optumas or its staff.

Ms. Crowell will testify that she also understood that there were ongoing efforts within the Agency to enroll members into the Medicaid systems. Ms. Crowell did not participate in these enrollment efforts and did not have any other knowledge relating to the enrollment of Medicaid members.

Ms. Crowell will testify that, given the complexity of the Medicaid Program, Ms. Crowell did not become a Medicaid expert. However, she obtained enough information to have a working knowledge of the Medicaid Program, so that she could understand and respond to inquiries from members of the media. For example, Ms. Crowell understood the overarching goals of the OHA in relation to the Medicaid Program, such as transparency, maintaining a sustainable rate of growth, and providing better care at lower costs. However, Ms. Crowell did not understand the nuances of these goals, how the goals were developed, or the application of the goals in practice.

### FamilyCare and Ongoing Litigation

Ms. Crowell will testify that, prior to joining the OHA, she had no knowledge or opinion of FamilyCare or its leadership. Ms. Crowell was unaware of any litigation between FamilyCare and the OHA.

Ms. Crowell will testify that, sometime within the first few weeks of starting at the OHA, she became aware of past litigation between FamilyCare and the OHA. Ms. Crowell understood the past litigation related to FamilyCare's dissatisfaction with its capitation rates. Ms. Crowell had no memorable reaction to the lawsuits filed by FamilyCare.

### OHA Quarterly Legislative Reports

Ms. Crowell will testify that she was also involved in the preparation of the OHA's quarterly legislative reports while she was at the OHA. The quarterly legislative reports were required by statue. Ms. Crowell understood the purpose of these reports was to provide information to the Oregon Legislature and the public.

Page 40 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Ms. Crowell will testify that her role was to gather information from across the Agency for purposes of incorporating it into the reports. Ms. Crowell relied on prior legislative reports to understand the structure and information contained within the legislative reports. Ms. Crowell then gathered information and content from the requisite OHA divisions and personnel, reviewed the provided information to ensure it could be understood by the intended audience, made any requisite edits to the grammar or spelling, and incorporated the information into the reports. Ms. Crowell did not make any determinations with regard to what information would ultimately be included in the final reports. To the extent different legislative reports contained different topics or information, Ms. Crowell did not participate in those decisions and has no knowledge as to why certain information was, or was not, incorporated into the legislative reports.

Ms. Crowell also assisted in drafting the Director's Message and worked on the graphics, colors, and general layout. Aside from the Director's Message, Ms. Crowell did not draft the substantive content of the legislative reports. Ms. Crowell was not the ultimate decision-maker in terms of deciding which information would be included in the legislative reports. Ms. Crowell did not participate in developing or analyzing the data incorporated into the legislative reports. Ms. Crowell will testify that the preparation of the legislative reports was a collective effort across the Agency and involved a number of different individuals.

### The Development of OHA Communications Plans: In General

Ms. Crowell will testify as to the purpose of communications plans at the OHA. Communications plans enabled individuals on the communications team, along with others within the OHA, to quickly respond to inquiries from Oregon Legislators, the media, and other stakeholders. Ms. Crowell will testify that, if a communications plan called for media outreach, the revision process was extensive. Ms. Crowell will testify that her first drafts generally underwent multiple rounds of edits and review with Mr. Cowie and/or Ms. Darby, prior to their finalization and dissemination to stakeholders.

/ / /

Page 41 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

### *The Draft Communications Plan: In General*

Ms. Crowell will testify that, in December 2016, Ms. Darby informed her that she may be tasked with drafting a communications plan relating to FamilyCare, the ongoing dispute resolution process, and anticipated litigation. However, Ms. Crowell did not receive formal direction from Ms. Darby until early January 2017. Similar to other drafts she had developed while at the OHA, Ms. Crowell anticipated this would be a collaborative process, requiring multiple rounds of edits and review.

Ms. Crowell will testify that she was asked to develop the draft communications plan. Ms. Crowell understood the goal of the draft communications plan was to ensure the legislature and public understood the truth about the OHA's capitation rate-setting process. Ms. Crowell also understood the draft plan was intended to put the OHA in a proactive, as opposed to reactive, position. Neither Ms. Saxton nor Ms. Darby gave her any specifics on what exactly should be in the draft communications plan.

Ms. Crowell will testify that Mr. Cowie and Ms. Darby shared prior communications plans and work product relating to FamilyCare, to assist her in drafting the communications plan. Aside from receiving those documents, Ms. Crowell was not provided additional guidance from either Mr. Cowie or Ms. Darby as to how she should go about developing the plan. Ms. Crowell did not have any conversations with Mr. Cowie or Ms. Darby regarding the materials they provided her.

Ms. Crowell will testify that, at no point in time was she instructed by Mr. Cowie, Ms. Darby, or Ms. Saxton to disparage FamilyCare or its leadership in any way in the draft communications plan. Nor did she ever observe Mr. Cowie, Ms. Darby, or Ms. Saxton disparage FamilyCare or its leadership in any way either to individuals within the OHA or individuals external to the OHA.

### *The Draft Communications Plan: Developing the Draft*

Ms. Crowell will testify that her approach to drafting the communications plan was to test out ideas and messages. Ms. Crowell was not directed to incorporate any specific language or

Page 42 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

strategies into the draft document.

Ms. Crowell will testify that, when she was asked to draft the communications plan, she was unfamiliar with the underlying disputes between FamilyCare and the OHA. Ms. Crowell was similarly unfamiliar with the nuances of the capitation rate-setting process. However, Ms. Crowell understood that FamilyCare was generally unhappy about the capitation rates it had received. As she drafted the communications plan, she relied on information contained in the OHA's legislative reports to gain the requisite background information relating to the rate-setting process. In doing so, Ms. Crowell identified tension between FamilyCare's concern, that it was not receiving enough money, and the amount of money FamilyCare appeared to have, as described in the legislative reports. As a result, Ms. Crowell incorporated messages relating to FamilyCare's finances into the draft document.

In addition, Ms. Crowell will testify she noticed that FamilyCare appeared to have more money on hand than other CCOs, which appeared to make them an outlier. Ms. Crowell also understood that FamilyCare was the only CCO pursuing litigation against the OHA. Accordingly, Ms. Crowell characterized FamilyCare as an "outlier" in the draft communications plan.

Ms. Crowell will testify that, on January 17, 2017, she received an email from Ms. Darby, forwarding a presentation slide deck created by FamilyCare and inquiring into the "eta" for the draft communications plan. Ms. Crowell will testify that, on January 20, 2017, she sent the draft communications plan via email to Ms. Darby for review. Ms. Crowell did not confirm the accuracy of the contents of the draft document with others at the OHA, because she understood the draft would ultimately be reviewed for accuracy prior to its finalization. As part of her email to Ms. Darby, Ms. Crowell told Ms. Darby that she was unaware of the expected time frame for the draft document. Ms. Darby responded later that same day, informing her that they were "talking about a session-long strategy." Ms. Darby did not provide any specific feedback regarding the initial draft document.

/ / /

Page 43 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Ms. Crowell will testify that, at no point in time, did Ms. Darby direct Ms. Crowell to incorporate any strategies relating to Medicaid members with high cost medical concerns. At no point in time did Ms. Darby direct Ms. Crowell to incorporate any strategies relating to the relative number of Medicaid members with HIV, between FamilyCare and Health Share. At no point in time did Ms. Darby direct Ms. Crowell to highlight FamilyCare as an "outlier." At no point in time did Ms. Darby direct Ms. Crowell to discuss whether FamilyCare was solely concerned about its profits.

Ms. Crowell will testify that, sometime between January 20 and 26, she spoke with specific OHA staff to gain additional background information relating to the capitation rate-setting process for purposes of the draft communications plan, including Chelsea Guest ("Ms. Guest"), Janell Evans ("Ms. Evans"), Kate Nass ("Ms. Nass"), and Jeff Fritsche ("Mr. Fritsche"). Ms. Crowell understood that Ms. Guest was Team Lead of the OHA's Actuarial Services Unit ("ASU"), and that the ASU was involved in the CCO rate-setting process. Ms. Crowell will testify that she had a conversation with Ms. Guest and Ms. Nass to help her understand risk pools and the rate-setting process. Ms. Crowell will testify that, during these meetings, she did not share the draft communications plan or discuss its contents. These meetings were for informational purposes, only.

Ms. Crowell will also testify that at no point during her meetings with Ms. Guest, Ms. Nass, Ms. Evans, or Mr. Fritsche, was she directed to incorporate information disparaging to FamilyCare in the draft communications plan. Nor did she observe any of the individuals that she met with disparage FamilyCare.

Ms. Crowell will testify that, on January 26, 2017, six days after her initial email to Ms. Darby, Ms. Crowell emailed Ms. Darby a revised draft communications plan. Later that same day, Ms. Crowell received an email from Ms. Darby, in which Ms. Darby forwarded the draft communications plan to Ms. Saxton for her review.

/ / /

Page 44 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

At the same time as she was drafting the communications plan, Ms. Crowell was also responsible for assisting in a number of different OHA priorities, including but not limited to preparations for the upcoming legislative session, preparing information and communications for stakeholders relating to the potential repeal of the ACA, and commuting to Salem to assist in matters relating to the Joint Committee on Ways and Means.

Ms. Crowell will testify that she never received substantive feedback regarding the draft communications plan from Mr. Cowie, Ms. Darby, or Ms. Saxton. Following the decision to shelve the draft plan, Ms. Crowell never heard any updates or participated in any conversations outlining next steps relating to the draft plan.

### The Draft Communications Plan Was Not Implemented

Ms. Crowell will testify that the draft communications plan was not implemented in any way. If the Agency sought to implement the draft document, Ms. Crowell would have expected to be involved in a series of revisions and conversations relating to the document, including addressing redlines and comments from Mr. Cowie, Ms. Darby, and Ms. Saxton. Ms. Crowell also would have expected there to be emails, on which she would be copied, and multiple meetings relating to the revisions and implementation. Instead, however, no further action was taken.

### Ms. *Crowell's Resignation*

Ms. Crowell will testify that she resigned from the OHA in April 2017 to move to Eastern Oregon. In April 2017, Ms. Crowell applied for and obtained a position as the Eastern Oregon Regional Solutions Coordinator for the State of Oregon. Ms. Crowell left the OHA in June 2017.

## D.    WITNESS STATEMENT OF JESTON BLACK

Counsel for Ms. Saxton anticipates that Jeston Black's ("Mr. Black") testimony will take approximately 1 hour. Ms. Saxton reserves the right to adopt the information contained in the witness statement for Mr. Black which will be presented by Defendant Oregon Health Authority ("OHA" or "Agency"). Counsel for Ms. Saxton anticipates that Mr. Black will testify as follows:

/ / /

Page 45 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

*Educational Background*

Mr. Black received his Bachelor of Science in Political Science and Government from the University of Oregon.

*Professional Background*

Mr. Black has a long history of working for and with elected officials and advocacy organizations prior to joining the OHA in 2016.  Through his work for the Oregon Education Association ("OEA"), Planned Parenthood, and Kaiser Permanente, Mr. Black gained experience working with health care entities and advocating for various health care policies or legislation. Different from his roles at the OEA and Planned Parenthood, which were more geared toward advocacy work, at Kaiser Permanente, Mr. Black served as a subject matter expert regarding public purchasers of health care and assisted Kaiser Permanente in negotiations with those public purchasers.

*Work at the OHA*

Mr. Black was hired as the OHA's Director of Government Relations in February 2016. Mr. Black reported to the OHA's Director of External Relations, BethAnne Darby ("Ms. Darby").

As Director of Government Relations, Mr. Black was responsible for managing and coordinating the OHA's interactions with the legislature, including individual legislators and their staff.  Mr. Black managed the OHA's Legislative Coordinators.  Each Legislative Coordinator was responsible for their own portfolio of policies they would help track during legislative sessions and as those policies were implemented.  Mr. Black stayed apprised of and was directly involved in conversations with legislators relating to policies and proposed legislation that had a potential impact on the OHA, its budget, or the population it serves.  Prior to the start of each legislative session, Mr. Black met with Ms. Darby and Ms. Saxton to brief them on upcoming legislation and its anticipated impact.

To be effective in his role, Mr. Black stayed apprised of key initiatives and concerns involving the OHA.  This included maintaining surface level knowledge of the Medicaid rate-

Page 46 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

setting process and attending both internal meetings as well as meetings between coordinated care organizations ("CCOs") and the OHA's external actuary, Optumas, so that he was prepared to answer questions that may arise during his meetings with legislators and their staff.

Over the course of his tenure at the OHA, Mr. Black tracked and provided information regarding a number of health care related policies, including but not limited to legislation relating to reproductive equity, Cover All Kids, public health modernization, and more.

In addition, Mr. Black reviewed the OHA's Legislative Reports, prior to submission to the legislature, for accuracy, consistency, and to ensure the substance was appropriate for the intended audience(s).  Because many of the issues contained in the Legislative Reports had an impact on the OHA's budget, it was important the Reports were both comprehensive and comprehensible. Mr. Black also fielded and answered questions from legislators and their staff relating to the Legislative Reports.

### OHA's Approach to Government Relations and Proposed Legislation

The OHA does not take a position in favor of or against any proposed legislation, unless it is directed to do so by the Governor.  The OHA rarely took a position on proposed legislation. Absent a directive from the Governor to support, or not support, any given piece of legislation, the OHA's role is to be a resource for and an information-providing partner to legislators.  Where the OHA took a neutral position on legislation, Mr. Black interacted with members of the legislature in the following ways:

- Provided both solicited and non-solicited information regarding the impact of legislation on the OHA's budget and staffing decisions;

- Described who may be impacted by the legislation;

- Described how individuals or entities may be impacted by the legislation;

- Provided perspective on the underlying policy issues driving the legislation;

- Introduced subject matter experts to legislators to explain complex policies or processes; and/or

Page 47 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

- Discussed the intent of the legislation and informed as to other ways that same intent may be effectuated.

Mr. Black's goal in meeting with legislators and their staff was to provide the full scope of any particular proposed policy or legislation, including but not limited to its cost or impact. Even when the OHA took a neutral position on legislation, legislators commonly shared how they intended to vote on a particular issue. In the rare event a legislator did not openly share or discuss how they intended to vote on any given issue, Mr. Black may have inquired, to ensure the OHA remained informed and prepared to implement any pending legislation. Mr. Black's approach to coordinating the OHA's response to questions from legislators was to involve subject matter experts or OHA leadership on an as-needed basis only.

Mr. Black will testify that, specific to Medicaid, he participated in approximately 3-4 meetings between the OHA's external actuary, Optumas, and legislators. Mr. Black recalls these meetings were open to all legislators and were an opportunity for legislators to ask, and for Optumas to address, any questions relating to Medicaid and the OHA's rate-setting process that legislators may have had.

### *Knowledge of FamilyCare and Ongoing Litigation*

Mr. Black will testify that, when he joined the OHA, he had no opinion of FamilyCare or its leadership. Sometime after Mr. Black started working at the OHA, he became aware the OHA and FamilyCare had been engaged in a legal dispute regarding the development of Medicaid capitation rates.

Mr. Black will testify that he recalls that FamilyCare proposed three Senate bills at the start of the 2017 legislative session that, if passed, would have had a big budgetary impact on the OHA. Mr. Black recalls that other CCOs were not in agreement with and did not support FamilyCare's legislative efforts.

Mr. Black will also testify that he does not recall receiving any direction from Ms. Saxton regarding how to address those three Senate bills. Mr. Black and his direct reports addressed

Page 48 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

FamilyCare's proposed legislation the same way it approached any other proposed legislation.

### Interactions with Coordinated Care Organizations

Mr. Black will testify that each CCO hired lobbyists to advocate on their behalf. As Director of Government Relations, Mr. Black observed CCOs' lobbyists interact with other CCOs' lobbyists, legislators, and legislative staff. In Mr. Black's experience, CCOs tended to form coalitions based on how they approached policies. To the extent some, or all, CCOs may have been united on any particular policy, the approach of the Government Relations Division was the same: provide information relating to the policy's impact and respond to legislators' inquiries.

Mr. Black will testify that he observed that FamilyCare was often adversarial toward other CCOs' policy and legislative initiatives. Mr. Black observed other CCOs' lobbyists express frustration about FamilyCare's approach to group conversations. Mr. Black observed FamilyCare approach conversations as though it believed other CCOs were intentionally trying to harm FamilyCare. For example, Mr. Black observed FamilyCare's reaction to a Navigator bill, introduced with support from other CCOs during the 2017 legislative session. The bill was intended to facilitate Medicaid enrollment and was anticipated to benefit all CCOs. Mr. Black will testify that FamilyCare, however, was convinced the bill was an attempt by other CCOs to steal its Medicaid members. Mr. Black observed FamilyCare representatives engaging with representatives of other CCOs in a very aggressive and confrontational manner.

### Interactions with Director Lynne Saxton

Mr. Black will testify as to his interactions with Ms. Saxton. Although Mr. Black was not one of Ms. Saxton's direct reports, his cubicle was located directly outside of her office at the OHA's Salem location. As Ms. Saxton left from or returned to her office, Ms. Saxton and Mr. Black would frequently exchange pleasantries. On occasion, Ms. Saxton may have asked Mr. Black how the legislative session was going. In response, Mr. Black would provide a brief overview of recent events. These conversations were an opportunity for Mr. Black to share information with Ms. Saxton.

Page 49 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Mr. Black will testify that he occasionally participated in meetings with Ms. Saxton. For example, Mr. Black was involved in meetings to discuss presentations relating to the OHA's budget, sub-committees, or the upcoming legislative session. Aside from occasional meetings with Ms. Saxton, Mr. Black did not frequently send written work product to Ms. Saxton.

### *The Draft Communications Plan*

Mr. Black had no role in the development of the draft communications plan involving FamilyCare. Mr. Black did not draft, review, revise, or contribute to the draft communications plan in any way. Mr. Black did not meet or discuss the draft communications plan with Courtney Crowell.

To the extent the draft communications plan set out any intent to coordinate or communicate with legislators, such coordination or communication would have necessarily involved Mr. Black. However, Mr. Black was neither aware of the development of the draft communications plan, nor did he approach legislators to discuss or implement the contents of the draft plan.

Mr. Black never characterized FamilyCare as an outlier in his meetings with legislators or legislative staff. Mr. Black never positioned FamilyCare against Health Share in his meetings with legislators or legislative staff. Mr. Black never disseminated financial information to legislators that only pertained to a single CCO. Mr. Black never met with, or directed any OHA staff to meet with, legislators, legislative staff, or lobbyists with the intent to harm FamilyCare, or to solicit their assistance in disseminating information which was intended to harm FamilyCare.

Neither Ms. Saxton nor Ms. Darby directed Mr. Black to perform or oversee any of the activities referenced herein. Mr. Black did not observe Ms. Saxton or Ms. Darby direct others to perform or oversee any of the activities referenced herein.

### *Resignation from the OHA*

Mr. Black will testify that he resigned from the OHA in October 2017.

/ / /

Page 50 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

### E.    WITNESS STATEMENT OF CAROLINE BROWN

Counsel for Ms. Saxton anticipates that Caroline Brown's ("Ms. Brown") testimony will take approximately 1 hour.  Ms. Saxton reserves the right to adopt the information contained in the witness statement for Ms. Brown which will be presented by Defendant Oregon Health Authority ("OHA" or "Agency"). Counsel for Ms. Saxton anticipates that Ms. Brown will testify as follows:

Ms. Brown is an attorney, formerly with Covington and Burling.  Ms. Brown specializes in legal matters pertaining to federally funded health and benefit programs (e.g., Medicaid and Medicare).  Ms. Brown represented OHA during its early 2016 negotiations with FamilyCare over FamilyCare's lawsuits challenging the 2015 CCO rates and Optumas' rate-setting methodology.  Ms. Brown will provide testimony regarding those negotiations and the regulatory background surrounding them.

As background, Ms. Brown will explain that pursuant to 42 CFR 438.6, the Centers for Medicare & Medicaid Services ("CMS") must "review and approve" all CCO contracts. Historically, CMS did not "look behind" actuarial certifications submitted by a State in support of its contract payment rates.  That changed in the fall of 2013, as CMS and the States began to prepare for the Medicaid expansion scheduled to take effect on January 1, 2014.  For the first time, CMS involved the CMS Office of the Actuary (which previously had focused primarily on the Medicare program) in reviewing States' rate-setting processes.  In consultation with the Office of the Actuary, CMS issued a "rate-setting consultation guide," held in-depth consultation meetings with States and their consulting actuaries to discuss the guidance, and identified key elements that needed to be described in the filed rate methodologies.  In February 2015, the Government Accountability Office published a report on "high-risk" federal programs and specifically faulted CMS for its lack of oversight over state Medicaid rate-setting for managed care organizations.

/ / /

Page 51 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

As a result of these initiatives, starting in 2014, States were subject to a much higher level of scrutiny regarding their managed care rates than had previously been the case. Ms. Brown will testify that during the course of her practice representing a number of state Medicaid agencies across the country, she heard from a number of states that the rate review process, which used to be fairly routine, would drag on for months and often involved answering hundreds of questions from the Office of the Actuary regarding the data on which the rates are based and the methodology used to calculate them.

If CMS does not approve a State's managed care capitation rates, the federal government will not fund its share of those payments, and can disallow (recoup) any federal funds that the State has drawn to make unapproved payments.

Ms. Brown will testify that she advised OHA officials regarding this increased federal oversight of managed care rate-setting in a letter addressed to Governor Kate Brown. Ms. Brown will testify that she also sent the Governor's letter to other OHA officials including Lynne Saxton and Lori Coyner.

Ms. Brown will also testify about the effect of this increased federal oversight on OHA. OHA sets its capitation rates for CCOs on a calendar year basis. From 2011 to 2014, OHA established CCO rates using a methodology referred to as the "cost template." The cost template was a rate-setting model created by OHA in-house actuaries. The cost template was provided to CCOs to report their financial costs and anticipated trends. The CCO projections were reviewed for reasonableness, and rates were restricted to an aggregate target increase/decrease in costs to align with the target growth rate forecasted in the OHP demonstration project.

When OHA submitted its rates for 2014 for CMS approval, those rates were subject to the more intense scrutiny from CMS as described above. After several months of discussions and review, CMS informed OHA by letter dated August 7, 2014, that it had "identified issues that are endemic to the state's rate-setting methodology that will require improvements on a prospective basis." Specifically, CMS took the position that OHA's process of reviewing the

Page 52 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

CCO's proposals for reasonableness was "not a substitute for an evaluation that would be necessary to attest to the actuarial soundness of the assumptions, methodologies, and subsequent final rates." CMS requested a plan within 120 days that would "result in improvements in your rate-setting methodology in the 2015 rating period."

As a result of the August 2014 letter from CMS, OHA needed to change its process for developing the rates for calendar year 2015, and the rates were not released until December 24, 2014, for the contract period beginning January 1, 2015. As set forth in the "Oregon Capitation Rate Development Action Plan" submitted to CMS on January 15, 2015, among other changes, OHA used detailed event-level encounter data for setting the 2015 capitation rate ranges instead of relying on CCO developed cost estimate templates. Some CCOs had a reduction in their global budget, and most CCOs did not have an increase in rates for their Medicaid expansion population. On January 29, 2015, ten CCOs signed a letter to then-Governor Kitzhaber expressing concern about the rates. A chief complaint was that there was not a 3.4% rate increase for the ACA expansion population. CCOs also expressed concern about the very late date for release of the 2015 rates.

In March 2015, OHA met with the CCOs to discuss their concerns, and raised the possibility of bringing in an outside actuary to redevelop the rates. Also in March 2015, OHA received more than a hundred questions from CMS regarding how the rates were set. OHA engaged Optumas, an outside actuarial firm with extensive experience in rate-setting for Medicaid managed care, to reexamine the 2015 rate methodology. Optumas redeveloped the 2015 rates, and OHA released the redeveloped 2015 rates in August 2015.

Ms. Brown will testify about the circumstances that led to the 2016 Settlement Agreement. In May 2015 and March 2016, FamilyCare filed lawsuits against OHA challenging the rate-setting methodology OHA employed to set the original 2015 rates, the redeveloped 2015 rates, and the 2016 rates. In addition, FamilyCare refused to sign the amendment with the re-developed 2015 capitation rates, which were significantly lower than its 2014 rates and which would result

Page 53 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

in FamilyCare needing to repay approximately $54 million in overpayments to OHA. CMS would not approve OHA's 2015 and 2016 contracts with FamilyCare because FamilyCare had not signed the 2015 rate amendment.

Ms. Brown will testify that OHA and FamilyCare held negotiations to resolve the dispute over the 2015 rates and FamilyCare's refusal to sign the 2015 rate amendment. Ms. Brown will testify that during those negotiations, FamilyCare was represented by Kelly Knivila and Timothy Hatfield at Stoel Rives. Ms. Brown was joined by her colleague Phillip Peisch ("Mr. Peisch"). During those negotiations, on behalf of OHA, Ms. Brown presented a framework for potential settlement that would leave OHA and Optumas' rate-setting methodology intact but under which OHA would make financial concessions to reduce the amount of funds that FamilyCare would pay back to OHA related to the 2015 overpayment.

As to financial concessions, OHA would provide FamilyCare with a monetary credit of $24.8 million on FamilyCare's rate overpayments for 2015. The settlement credit was roughly equivalent to the difference in capitation rates attributable to the risk adjustment methodology used by Optumas and the one preferred by FamilyCare, which was one of many challenges that FamilyCare had raised with respect to the 2015 rate-setting.

Ms. Brown explained to FamilyCare that in exchange for this financial concession, OHA needed assurances that FamilyCare would not continue to nit-pick actuarially-set rates in future rate years. During negotiations, Ms. Brown explained to FamilyCare's representatives that OHA could not and would not agree to specific parameters on the 2017 rate-setting methodology because OHA would not agree to any restrictions on its ability and authority to set actuarially sound rates in the future.

Ms. Brown also explained that OHA was very concerned that FamilyCare lacked the long-term financial stability to cover its costs under the actuarially sound rates developed by Optumas and OHA. Ms. Brown explained that OHA cannot be in a situation where every year FamilyCare's precarious financial position leads to challenges to the rate-setting methodology.

Page 54 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Instead, OHA sought specific assurances about its discretion to apply an actuarially sound rate-setting methodology even if that rate-setting methodology did not produce rates that covered the costs of every CCO. OHA sought FamilyCare's agreement that OHA has authority to set CCO rates; that CMS reviews those rates and confirms that they are actuarially sound; and that OHA is not obligated to adjust the rates to ensure that they cover all of a CCO's costs. These concessions were ultimately memorialized in the "Rate Development Process" section of the parties' Settlement Agreement.

Ms. Brown will testify that, during settlement negotiations, FamilyCare expressed a belief that each year's rates used the previous year's rates as a starting point. FamilyCare therefore wanted a settlement that included an increase to its capitation rates for 2015 and 2016, because it believed that any increase would support additional increases in future rate years; conversely, FamilyCare was concerned that if it agreed to accept lower capitation rates in 2015 and 2016, there would be a limit as to any increases that it might otherwise get in 2017 and thereafter. Ms. Brown will testify that she and Mr. Peisch explained to FamilyCare's representatives that the rates for each year were based on actuarial factors and not on the rates for the previous year.

Ms. Brown will testify that the Settlement Agreement term stating that the 2016 capitation rates or the Settlement Credit shall not be "a basis for limiting the amount that can be paid to FamilyCare in future rate years" was intended only to confirm that neither would be used as an input by the actuaries to cap any rate increases in future years. Similarly, at FamilyCare's request, the Settlement Agreement also included a provision stating that in any public documents showing "year-over-year" comparisons between rates paid in 2015, 2016, and 2017, OHA should note that "there was settlement of litigation that resulted in a settlement payment to FamilyCare outside the capitation rate" to address any perception that FamilyCare's rates had increased substantially. Ms. Brown will testify there was no discussion that this provision would provide

Page 55 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

FamilyCare with a contractual right to challenge the rates in future years by citing subjective animus engendered by the Settlement Agreement.

## F.    WITNESS STATEMENT OF CHELSEA GUEST

Counsel for Ms. Saxton anticipates that Chelsea Guest's ("Ms. Guest") testimony will take approximately 1 hour. Ms. Saxton reserves the right to adopt the information contained in the witness statement for Ms. Guest which will be presented by Defendant Oregon Health Authority ("OHA" or "Agency"). Counsel for Ms. Saxton anticipates that Ms. Guest will testify as follows:

Ms. Guest will testify that she has a degree from Willamette University in economics and a master's in biomedical informatics from Oregon Health & Science University. Before joining the OHA's Actuarial Services Unit ("ASU" or "Unit"), she was a lead data analyst in OHA's and the Department of Human Services' joint Office of Information Services.

Ms. Guest will testify that she joined ASU in 2014. From 2014 through the end of 2018, ASU managed capitation rate development for coordinated care organizations ("CCOs") and other managed care entities. It also provided other actuarial analysis services for OHA when required. Ms. Guest's first position at the ASU was as a Team Lead. As a Team Lead, Ms. Guest was involved in policy discussions with OHA staff and leadership about actuarial polices for CCO rate-setting, but she was not a policy decision-maker herself. She was in charge of policy management and project management for the Unit and communicating the Unit's policies.

Ms. Guest will testify that in 2015, Ms. Guest became manager of the ASU. As manager of the ASU, Ms. Guest managed the Team Lead, a team of actuaries, and others. She also communicated with internal staff, other agencies, and external stakeholders such as CCOs. She was the primary point of contact for Optumas, OHA's external consulting actuary. As manager, she reported first to Mark Fairbanks and later to Laura Robison.

Ms. Guest will testify that in 2014, when she started with the ASU, CMS had notified OHA that it needed to prepare a plan to bring its rate-setting methodology in line with CMS's requirements. Ms. Guest helped prepare OHA's response. In its response, OHA committed to

Page 56 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

adjusting its rate-setting methodology to bring it in line with CMS's new regulations and review standards. Ms. Guest understands that OHA is accountable to CMS to develop rates according to a methodology approved by CMS and that is consistent with federal Medicaid regulations. OHA puts federal participation funds at risk if CMS does not approve OHA's rates for CCOs. CMS can compel OHA to change rates if they do not meet CMS requirements.

Ms. Guest will testify that in 2014, OHA worked to develop rates for the CCOs for 2015. At the time, OHA had an employee named Dennis Tang ("Mr. Tang"). Mr. Tang was an actuary. Mr. Tang led a team in 2014 that developed the 2015 rates and Mr. Tang certified them as actuarially sound. OHA submitted the rates to CMS for approval and issued rate amendments to the CCOs that contained the proposed rates.

Ms. Guest will testify that CMS neither approved nor disapproved the initial 2015 rates. Instead, CMS issued approximately 100 questions about the rates and their development process. CMS also provided a guide on rate-setting. OHA decided to redevelop the 2015 rates. In around March 2015, OHA asked Optumas to become the certifying actuary for Oregon. Ms. Guest will testify that OHA responded to CMS by letter, stating that it had retained Optumas to be the certifying actuary and pledging to "develop[] rate methodologies to align with recent CMS guidance."

Ms. Guest will testify that OHA provided the CCOs with two memoranda that explained the changes to OHA's rate-setting methodology. The memoranda were posted on OHA's website. In August 2015, CMS expressly approved OHA's new rate-development policies in a letter to Leslie Clement, the acting Medicaid Director.

Ms. Guest will testify that OHA used Optumas to re-develop the rates for 2015. Optumas became the certifying actuary for the re-developed 2015 rates and for the 2016, 2017, and 2018 rates. As certifying actuary, Optumas was directed by OHA to develop rates that met CMS's regulations and guidance. Ms. Guest will testify that CMS approved the rates Optumas re-developed in 2015, and the rates it developed with OHA in 2016, 2017, and 2018.

Page 57 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Ms. Guest will testify that as a certifying actuary, Optumas handled base data development, trend development, program change, and determination of non-benefit (administrative) load. Optumas also performed analyses related to OHA policy development. OHA and Optumas both worked on risk scores when developing the 2017 and 2018 rates. Optumas and OHA worked in a collaborative fashion.

Regarding rate-setting for CCOs, Ms. Guest will testify that in 2016 she managed the rate-setting work to develop the 2017 rates, including coordinating inquiries from CCOs and CMS; drafting responses to those inquiries or assigning others to draft responses; drafting other internal and external communications regarding rate-setting or assigning others to draft communications; drafting or reviewing OHA policies regarding rate-setting; and setting up and facilitating meetings with CCOs and other stakeholders.

Ms. Guest will testify that she communicated frequently with FamilyCare and all other CCOs. OHA endeavored to answer CCOs' questions about rate-setting completely and to treat all CCOs, including FamilyCare, fairly and openly. CCOs consider some of their internal financial information confidential or trade secret, and do not allow OHA to share it with other CCOs, so in some cases, OHA cannot share all information with every CCO. Ms. Guest organized work groups with the CCOs to provide information about rate-setting methodologies. Ms. Guest had in-person meetings with CCOs to discuss their base data. Ms. Guest will testify that OHA published documents about rate-setting on OHA's website, including rate certifications and documents about OHA's rate-setting methodology. Ms. Guest will testify that OHA tracked its communications with CCOs.

Ms. Guest will testify that OHA had multiple in-person meetings one-on-one with FamilyCare in 2016 and 2017. Ms. Guest will testify that OHA also answered dozens of emails from FamilyCare and issued its own questions to FamilyCare. Ms. Guest will testify that OHA was responsive to FamilyCare inquiries even if FamilyCare did not like or failed to understand OHA's response. Ms. Guest will testify that OHA explained to FamilyCare its rate-setting

Page 58 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

methodologies and choices.  OHA published FamilyCare's questions and OHA's answers in addenda to OHA's rate-certifications and published those addenda online.

Ms. Guest will testify that she was aware that FamilyCare sued OHA in 2015 regarding the 2015 rates, and that it filed another lawsuit in 2016.  Ms. Guest was not directly involved in the lawsuits.  She knows that OHA and FamilyCare settled the lawsuits in May 2016.  She was not directly involved in the settlement negotiations.

Ms. Guest will testify that she does not decide OHA policy on rates, but sometimes drafts policy papers with recommendations.  She is not responsible for reviewing the technical aspects of rate development.  She performs a high-level review of Optumas' rate certification, asking questions and raising concerns with Optumas and making sure it is consistent with Oregon's program and CMS regulations to the best of her ability.  She does not review the certification as an actuary or for actuarial soundness.

Ms. Guest will testify that in 2016, as part of the development of the 2017 rates, OHA formalized a policy that removed excess costs from the base data.  This policy has been called the "reimbursement policy" or "reimbursement review."  Ms. Guest will describe the sequence of events that led to the policy.  OHA was aware in 2015, based on CCO financial reporting, that CCO expenditures were growing rapidly.  Ms. Guest will testify that OHA observed that FamilyCare's physician reimbursements and professional costs had grown especially fast from 2014 to 2015.  In fall 2015, OHA notified FamilyCare that it was concerned about FamilyCare's rapidly escalating physician reimbursements. Ms. Guest will testify that OHA asked FamilyCare for a response.  FamilyCare did not respond for two months and then failed to provide an explanation.  Ms. Guest will testify that FamilyCare never told her that it needed to increase reimbursements to add to its physician panel.  To the best of her knowledge, FamilyCare did not tell anyone else at OHA that they needed to increase reimbursements to add to its physician panel.

/ / /

Page 59 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Ms. Guest will testify that OHA used the CCOs' 2015 encounter data and financial submissions as of around the end of March 2016 to inform the 2017 CCO capitation rate development process. OHA asked Optumas to perform a rate of growth analysis on the CCOs' costs to understand what factors were driving the growth in CCO expenditures. Optumas observed that some CCOs' overall base data growth was rising at unsustainable rates. The reason Optumas learned this was due to some CCOs, including FamilyCare, having significantly increased provider reimbursement and incentive payments. OHA decided to adjust those CCOs' base data to remove excessive physician reimbursement and incentive payments. Adjustments to base data like those in the reimbursement policy does not affect only the CCO that has its base data adjusted. Because OHA used a regional approach to rate setting, cutting the base data of a CCO in one region affects the rates of all CCOs in that region.

Ms. Guest will testify that OHA implemented the policy to contain costs and keep the overall rate of growth of the Medicaid program sustainable, as required by the Section 1115 Demonstration Waiver ("1115 Waiver") agreement with the federal government to retain substantial federal financing. Ms. Guest will testify that some other states reduce eligibility to Medicaid or cut health benefits to control costs. OHA is committed to not cutting Oregonians' eligibility or health benefits. Ms. Guest will testify that the reimbursement policy allowed OHA to control costs without limiting eligibility or health benefits to Oregonians. The policy affected many CCOs, not just FamilyCare.

Ms. Guest will testify that Oregon's 1115 Waiver sets a sustainable rate of growth for Oregon's Medicaid program. The target is 3.4%. The 1115 Waiver is not the only reason Optumas and OHA evaluate the rate of growth of CCO expenditures. Ms. Guest will explain that state budget provisions are also a significant reason. Ms. Guest will testify that OHA's CCO rates are not governed or determined by a budget target. The goal of the reimbursement review was to contain unsustainable and excess costs while developing actuarially sound rates, not to hit a specific target. Ms. Guest will testify that Optumas reviewed costs of CCOs' reporting

Page 60 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

costs exceeding sustainable rates of growth and sought to understand what was driving those unsustainable costs.

Ms. Guest will testify that she helped draft a document that explained the reimbursement policy and she wrote emails and communicated information about the policy to CCOs and stakeholders.

Ms. Guest will testify that in 2018, OHA also removed excess costs from several CCOs' encounter data. Ms. Guest was on maternity leave for a portion of 2017, and therefore did not have a direct role in much of the rate development for 2018 rates. Ms. Guest returned from leave in the fall of 2017. In late October, OHA issued proposed 2018 rates to the CCOs, including FamilyCare. Ms. Guest submitted those rates to CMS for approval on Nov. 1, 2017. OHA later issued revised rates in the first quarter of 2018. Ms. Guest also submitted those rates to CMS for approval. Ms. Guest will testify that CMS reviewed and approved both the initial and revised 2018 rates.

Ms. Guest will testify that risk scores were applied according to a standard methodology uniformly to all CCOs, including FamilyCare and Health Share.

Ms. Guest will testify that she had no knowledge of a "communications plan" directed towards FamilyCare other than what she read in the media. Ms. Guest does not know the reason Ms. Saxton resigned.

Ms. Guest did not report directly to Ms. Saxton. Ms. Guest will testify that they did not have frequent communication. Ms. Guest will testify that Ms. Saxton did not direct her to make any changes to FamilyCare's rates. Neither Ms. Saxton nor anyone else directed Ms. Guest to make any changes to the rate-setting process designed to hurt or discriminate against FamilyCare or any other CCO. Ms. Guest will testify that she is not aware of anyone at OHA doing anything to discriminate against FamilyCare. Neither Ms. Saxton nor anyone else directed Ms. Guest to tell Optumas to make any changes to FamilyCare's rates. Ms. Guest did not, herself, engage in any activity with respect to rates—at all—designed to discriminate against FamilyCare. She is

Page 61 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

not aware of Optumas doing anything designed to discriminate against FamilyCare.  OHA directed Optumas to develop rates to be approved by CMS and to meet the requirements of federal Medicaid regulations and the 1115 Waiver.

Ms. Guest will testify that she was aware of the 2016 Settlement Agreement between the OHA and FamilyCare.  Ms. Guest did not—on her own initiative or at the direction of anyone else—direct Optumas to develop the 2017 or 2018 rates with the intention of recovering any amount of money credited to FamilyCare in the 2016 Settlement Agreement or paid to FamilyCare in its 2016 rates.

## G.    WITNESS STATEMENT OF BETHANNE DARBY

Counsel for Ms. Saxton anticipates that BethAnne Darby's ("Ms. Darby") testimony will take approximately 3 hours.  Ms. Saxton reserves the right to adopt the information contained in the witness statement for Ms. Darby which will be presented by Defendant Oregon Health Authority ("OHA" or "Agency").  Counsel for Ms. Saxton anticipates that Ms. Darby will testify as follows

### *Ms. Darby will testify about her background and her role at OHA*

Ms. Darby will testify that she received a Bachelor of Arts in humanities from the University of California at Berkeley in 1990, followed by a law degree from Willamette University College of Law in 1995.  Ms. Darby served as a legislative liaison for the Board of Chiropractic Examiners during the 1997 legislative session.  She was the Executive Director for the Board of Psychologist Examiners for two years before joining the Oregon Education Association ("OEA") in 2000.

Ms. Darby will testify that she worked with OEA for over fifteen years; during the last seven of those years, she led the public policy and communications team as the Assistant Executive Director for Public Affairs.  In that role, she supervised approximately 15 to 20 direct reports and worked with the board of directors to ensure that organizational communications were aligned

Page 62 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

with OEA's mission and values.  During Ms. Darby's time there, OEA utilized communications plans to effectively organize and track messaging on important issues.

Ms. Darby will testify that while working with OEA, she served on policy-related committees around, among others, health insurance issues, PERS reform, and school budgets.  At OEA, she also helped to craft legislation that created the Oregon Educators Benefits Board ("OEBB")—the health insurance pool for Oregon school districts—which the Oregon Health Authority now manages.

Ms. Darby will testify that she joined OHA in November 2015, as the Director of the External Relations Division.  She led a team of approximately 20 to 25 people, which included the communications team, public policy and legislative team, peer support team, and the ombudsperson.  Ms. Darby hired the key members of her own team.

Ms. Darby will testify that the Director of the OHA, Lynne Saxton ("Ms. Saxton"), created the External Relations Division to address the concerns raised by the legislature relating to transparency and communication under the prior OHA director.  As the head of a division and as part of the OHA executive leadership team, Ms. Darby was a direct report to Ms. Saxton.  She will testify to her experience working under Ms. Saxton, including the methods of communications between herself and Ms. Saxton; Ms. Saxton's management style; Ms. Saxton's manner of providing feedback to Ms. Darby and other of Ms. Saxton's reports; and Ms. Saxton's level of involvement in communications work within OHA.

Ms. Darby will testify that, prior to her joining the OHA, she had met Jeff Heatherington ("Mr. Heatherington"), the Chief Executive Officer of the CCO, FamilyCare, as part of her prior work.  Prior to joining the OHA, Ms. Darby generally knew that FamilyCare was a CCO, but she had not developed opinions relating to FamilyCare as an organization.  However, she was aware of Mr. Heatherington's reputation for being impolite, demanding, and condescending.  Ms. Darby will testify to a particular occasion prior to joining the OHA in which Mr. Heatherington approached her in the hallway of the Capitol building in Salem.  At the time, Ms. Darby was

Page 63 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

working at OEA.   Heatherington stopped her in the hallway, proceeded to get his face approximately six inches from her face, and emphatically tried to convince her to include FamilyCare as part of legislation Ms. Darby had been working to pass.   Ms. Darby recalls Mr. Heatherington speaking to her in a loud and aggressive manner, as though he was trying to intimidate her into taking his side.   Ms. Darby had never met Mr. Heatherington, prior to this interaction.

Ms. Darby will testify that OHA had seven key divisions under Ms. Saxton's leadership. The External Relations Division worked across those internal OHA divisions to break down silos and facilitate clear inter-division communications; to ensure that both internal and external audiences were aware of OHA's work; and to avoid divisions working at cross purposes with one another.   If the communications team produced work product intended for external release, including, for example, press releases and legislative reports, Ms. Darby generally reviewed and approved that work product before it left OHA.

### *Ms. Darby will testify about her interactions with rate-setting at OHA*

Ms. Darby will testify that she was generally not involved in OHA's rate-setting decisions; instead, she was looped into rate-setting conversations at what would typically be considered an executive level in order to stay informed for communications purposes.   Through her involvement at this level, Ms. Darby came to understand the basics of FamilyCare's dispute regarding its rates, including its allegations that its capitation rates were too low.   As part of FamilyCare's dispute, Ms. Darby learned that FamilyCare paid its providers at commercial rates.   She will testify that her interactions with OHA's actuarial contractor, Optumas, were typically limited to receiving information from Optumas regarding the rate-setting process to better inform Ms. Darby's communications on these issues both inside and outside OHA.   Ms. Darby will testify that she also facilitated meetings between legislators and Optumas to educate legislators on the methodology of rate-setting in Oregon.

/ / /

Page 64 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Ms. Darby will testify that she never observed Ms. Saxton expressly or impliedly direct anyone at OHA or Optumas to develop or change rates in an effort to disadvantage, discriminate, or retaliate against FamilyCare. Ms. Saxton also instructed her direct reports to work to ensure that all coordinated care organizations ("CCOs") were treated equitably.

### *Ms. Darby will testify that OHA handled many issues of significance in 2015, 2016, and 2017*

Ms. Darby will testify that OHA was the agency with the second largest budget in Oregon when she was employed there. OHA dealt with important issues during Ms. Darby's time with the External Relations Division. Ms. Darby will testify to the communications that OHA developed regarding many of those issues, including the following:

- Rules and statutes addressing toxic toys;
- Rulemaking and measuring progress with the Medicaid population and CCOs;
- Cleaner Air Oregon initiative to restrict air toxin releases;
- Medical marijuana regulation;
- Doulas;
- Grant making and health equity;
- One Eligibility System standup and Medicaid redetermination;
- Behavioral Health Collaborative launch; and
- Cover All Kids.

### *Ms. Darby will testify regarding the communications team's work on the Oregon Health System Transformation Quarterly Legislative Reports*

Ms. Darby will testify that the Oregon Health System Transformation Quarterly Legislative Reports ("quarterly legislative reports") were edited and disseminated by the communications team. The first quarterly legislative report was published in 2016.

Ms. Darby will testify that an Oregon statute required the production of the quarterly legislative reports to the legislature and dictated some of the contents of the reports, including the reporting of CCO financial data, like reserves and projected cash flow. She will testify that the

Page 65 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

financial information in the quarterly legislative reports was drawn directly from information submitted to OHA by each CCO.

Ms. Darby will testify that due to the extensive data that the quarterly legislative reports contained, OHA shared them with legislators and other interested stakeholders. Doing so increased transparency into OHA and the CCO program for legislators and created efficiencies for the External Relations Department by reducing the number of times her staff answered the same questions from different sources.

***Ms. Darby will testify that FamilyCare and OHA regularly engaged with legislative sessions—the External Relations Division led the efforts for OHA***

Ms. Darby will testify that the OHA government relations team, including herself and Jeston Black, handled the typical government relations work for OHA. They brought in subject matter experts from other OHA divisions to testify, discuss issues, or run fiscals when needed for the legislature.

Ms. Darby will testify that OHA would not take a position for or against a proposed bill unless directed to do so by the Governor's office. She will testify that even when OHA did not take a position on legislation, OHA's role as a state agency was to educate and inform the legislature about potential impacts of policies. As a result, OHA would often proactively provide information and respond to legislator or committee questions regarding a proposed bill or a portion of a proposed bill without taking a position on the bill itself. That engagement could include providing details of fiscal or policy impacts to enable legislators to better understand the context of a proposed bill. Ms. Darby will testify that this type of engagement applied to a broad swath of bills.

Ms. Darby will testify that in addition to answering questions for legislative committees and individual legislatures, OHA also had to prepare and present a very complicated budget to the legislature every two years. This was a time-consuming task that required participation from the OHA team, including the External Relations Division. Ms. Darby will testify that public hearings

Page 66 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

and work sessions for the 2017 OHA budget continued for most of the 2017 session.  Ms. Darby will testify as to OHA's participation in those public hearings and work sessions.  In addition, OHA presented annual budgetary updates to the legislature.

### *Ms. Darby will testify that FamilyCare used its access to State legislators to voice its concerns*

Ms. Darby will testify that she observed through financial contributions and years of extensive lobbying and fundraising activities, FamilyCare had ready access to legislators and the Secretary of State.  FamilyCare used that access to frequently lobby for proposed legislation; present arguments to legislators that it was being treated unfairly by OHA; and to complain to legislators about other CCOs and OHA's practices, rules, and rates.

For example, FamilyCare made significant contributions to many legislators through FamilyCare or an associated CCO lobbying coalition, Coalition for a Healthy Oregon.  This included contributions to legislators on the House and Senate Health Committees and the Ways and Means Committee, and an especially large contribution to Senator Alan Bates ("Senator Bates").  At FamilyCare's request, Senator Bates introduced legislation seeking to change OHA's rate-setting process.

Ms. Darby will testify that OHA did not interfere with FamilyCare's communications with legislators and the Secretary of State.  OHA did answer questions from legislators and provided accurate information to help legislators weigh the potential impacts of FamilyCare's requests. OHA offered this same support to legislators on many legislative initiatives, not only those that involved FamilyCare.  OHA's interactions with legislators were not designed to, nor did they, stop FamilyCare from communicating with legislators.  To Ms. Darby's knowledge, no one at OHA took any actions designed to tarnish FamilyCare's image with legislators.

### *Ms. Darby will testify regarding FamilyCare's 2017 legislative bills*

Ms. Darby will testify that in the 2017 legislative session, FamilyCare introduced three bills—Senate Bills 233, 234, and 236—through the Senate Interim Committee on Human Services and Early Childhood, chaired by Senator Sara Gelser Blouin.  Ms. Darby will testify to the impacts

Page 67 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

of those bills on rate-setting, data reporting, the 1115 Waiver, and CCO contracts, along with other impacts on the Agency and the Oregon Health Plan. Ms. Darby will testify that another non-profit health care insurance services organization, CareOregon, testified in opposition to parts of those bills.

Ms. Darby will testify that, to her knowledge, the Governor did not direct OHA to take a position on those bills. At the request of legislators and consistent with OHA's role as a subject matter expert, OHA provided written testimony and information on the bills' impacts to the Agency's goals for healthcare systems transformation. That engagement as a subject matter expert included meetings with legislators to discuss the potential benefits and consequences of the policy questions and fiscal impacts raised by those bills.

Ms. Darby will testify that those three bills were not enacted during the 2017 legislative session.

### *Ms. Darby will testify that FamilyCare sought the same rate-setting changes from the Oregon Health Policy Board*

Ms. Darby will testify that the Oregon Health Policy Board ("OHPB"), a nine-member citizen board, was created in 2009 to oversee and develop policy for OHA. OHPB was charged with guiding OHA's implementation of health care policy.

Ms. Darby will testify that as the 2017 legislative session closed without passage of Senate Bills 233, 234, or 236, FamilyCare sought to obtain its desired rate-setting changes by complaining to OHPB instead. To this end, FamilyCare submitted a letter to OHPB in July 2017. FamilyCare's July 2017 letter asked OHPB to conduct a rigorous review of OHA's rate-setting process, complaining that FamilyCare's rates were the lowest in the state.

Ms. Darby will testify that in an August 2017 response to FamilyCare's letter, Health Share disagreed that FamilyCare's payment rates were the lowest, noting instead that FamilyCare had fewer members in the highest risk and highest cost rate categories. In a similar letter response in

Page 68 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

August 2017, CareOregon highlighted that FamilyCare's receipt of a lower overall rate did not mean it was being treated unfairly or unequally to other CCOs.

### *Ms. Darby will testify regarding draft communications plans at OHA*

Ms. Darby will testify that communications plans were used by OHA as internal tools to organize resources, themes, goals, and methods for explaining those goals to the OHA executive team to generate buy-in and alignment.  She will testify that communications plans are a normal part of any large agency operations; they were used by OHA and by Ms. Darby's former employers alike.  Communication plans create a roadmap to monitor progress; to ensure the team had a thoughtful plan for its efforts to communicate; and to encourage wise resource use. Communications plans at OHA were intended to be fluid—to be revised and then revised again, as situations evolve.

Ms. Darby will testify that communications plans were very common at OHA.  As an example, she will testify that OHA used a communications plan for its Cleaner Air Oregon campaign to address air toxin issues.  OHA also used a communications plan for preparing and circulating statutorily required reports, like the quarterly legislative reports.

### *Ms. Darby will testify regarding the 2017 draft communications plan*

Ms. Darby will testify that Ms. Saxton requested a proactive approach to address FamilyCare's complaints in late 2016. Ms. Darby will testify that this request came as FamilyCare was threatening to file a third lawsuit against OHA due to FamilyCare's dissatisfaction with the 2017 rates.  Because of the complexity of the rate-setting process, legislators and other stakeholders rarely seemed to understand the explanations of the legitimate reasons FamilyCare's rates were lower than other CCOs, particularly with FamilyCare's narrative further confusing the issues.  This resulted in considerable inefficiencies and duplication of efforts on OHA's part and consumed a disproportionate amount of OHA's time compared to other CCOs.

Ms. Saxton's request for a communications plan was designed to reduce OHA's time and resources dedicated to FamilyCare's demands by getting out in front of the misinformation that

Page 69 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

FamilyCare had been circulating and, based on previous experience, seemed likely to continue promoting before and during its impending lawsuit. In other words, Ms. Saxton wanted to proactively address the issues in play instead of waiting for them to percolate and expand.

Given the number of failed past efforts to communicate regarding the dense and highly technical issue of rate-setting, Ms. Darby understood that Ms. Saxton felt OHA needed to get out in front with messaging that would adequately communicate to stakeholders the key information regarding FamilyCare's ongoing complaints with OHA's rates—rates that CMS had approved each year since Ms. Saxton had started as Director of OHA. Ms. Darby will testify that the requested communications plan would seek to explain that OHA's rate-setting was sound. Ms. Darby will testify that she was never told to produce a communications plan that would do anything other than ensure that stakeholders received accurate information about the rate-setting dispute.

Ms, Darby will also testify to what she told Courtney Crowell ("Ms. Crowell") when asking her to prepare a draft of the communications plan.

In creating the substance of the draft plan, Ms. Darby did not direct Ms. Crowell regarding particular content to be included; for example, she did not instruct Ms. Crowell to include specific material or make certain points in the draft plan. However, in an effort to provide Ms. Crowell with a framework for the project, Ms. Darby forwarded to Ms. Crowell several documents relating to a prior communications plan. And on January 17, 2017, Ms. Darby forwarded to Ms. Crowell a PowerPoint presentation created by FamilyCare that addressed many of FamilyCare's rate-setting concerns.

Ms. Crowell worked on a "brain dump" draft in early 2017 that was provided to Ms. Darby on January 20, 2017. Ms. Darby will testify that she only cursorily reviewed the draft and provided minimal feedback to Ms. Crowell on January 20, 2017. She will testify that she understood the draft to be Ms. Crowell's attempt to put all possible ideas on paper—a "throw spaghetti at the wall" exercise. Ms. Darby will testify that she intended to let Ms. Saxton review the draft and

Page 70 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

decide any next steps from there.  Ms. Crowell provided a second draft to Ms. Darby on January 26, 2017, which Ms. Darby forwarded to Ms. Saxton that day without comment or revision.

Ms. Darby will testify that she did not hear from Ms. Saxton in response to the draft until February 18, 2017.  Ms. Darby will testify what she understood Ms. Saxton's comments in that email, including the phrase "this is a good start," to mean.

Ms. Darby will testify that the February 18, 2017, email was Ms. Saxton's only written response to the draft.  Ms. Darby will testify that a communications plan of this kind that was going to be implemented would have undergone significant revisions.  In her experience working with Ms. Saxton, Ms. Darby observed that Ms. Saxton would comment on or redline documents when she intended to use them, and multiple iterations of the document would be produced and circulated within the communications team.  Yet, to Ms. Darby's knowledge, Ms. Saxton did not edit or revise Ms. Crowell's draft communications plan.

In addition, the requested meeting to discuss the draft plan did not occur as scheduled on March 2, 2017, or at any other time.  Instead, Ms. Darby spoke with Ms. Saxton in person about Ms. Crowell's draft communications plan in late February 2017.  Ms. Saxton and Ms. Darby agreed during their late February conversation that the draft communications plan was not suitable and would not be implemented or used by OHA.  They also discussed that instead of the draft communication plan, OHA could use a recent letter drafted by the Department of Justice ("DOJ") regarding FamilyCare.

Ms. Darby will testify that the draft communications plan was shelved and never implemented.  She did not observe others within OHA reviewing or referencing the draft or its contents after it was shelved until it was the subject of a public records request later that year.  She will testify that common business tasks for OHA—including gathering financial data from CCOs, responding to inquiries from reporters, preparing and circulating the quarterly legislative reports, and communicating with legislators—were part of OHA's normal business routine before the creation of the draft communications plan.  The fact that those normal business activities happened

Page 71 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

are not an indication that the draft communications plan was implemented. In response to FamilyCare's filing of its third lawsuit against OHA, OHA issued a public statement and shared it with local news sources. OHA also responded to questions from reporters regarding the lawsuit, and shared background information with reporters to provide necessary context for FamilyCare's decision to file suit. Ms. Darby will testify that each of those actions were well within the typical scope of OHA's external communications on newsworthy issues and did not constitute implementation of the draft communications plan, which had been shelved.

Ms. Darby will testify that she did not observe Ms. Saxton direct anyone at OHA to implement any element of the draft communications plan. In particular, Ms. Saxton never directed Ms. Darby to intentionally discredit FamilyCare in the media or to legislators. Ms. Darby also did not observe Ms. Saxton asking others to do so. Ms. Darby never shared information, or directed others to share information, with stakeholders regarding FamilyCare that Ms. Darby knew to be false. And Ms. Darby never observed Ms. Saxton direct anyone within OHA to share information with stakeholders that she knew to be false.

Ms. Darby will testify that she has never seen or heard of any efforts by Ms. Saxton to develop or implement policy relating to Medicaid rates with an intent to hurt FamilyCare or recoup money from FamilyCare. Further, she will testify that she is not aware of any instance in which Ms. Saxton or any employee, contractor, or agent of OHA sought to retaliate against FamilyCare or took any action or made any decision regarding the 2017 and 2018 capitation rates for FamilyCare due to FamilyCare's complaints about OHA's rate-setting process, the 2016 Settlement Credit, or rates paid to FamilyCare for 2016. She is also not aware of any plan or conspiracy by any employee, contractor, or agent of OHA to discriminate or retaliate against FamilyCare in the rate-setting process.

### Ms. Darby will testify about OHA's redetermination efforts

Ms. Darby will testify that redetermination is the review of a Medicaid member's continuing eligibility for the Medicaid program. A member cannot simply be cut off from benefits

Page 72 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

under Medicaid but must go through a redetermination process that determines eligibility and incorporates a 90-day period for a response from the member. She will testify that the process can be lengthy, and it became a significant issue for OHA due to technology troubles. OHA subsequently contracted with Deloitte, an information technology contractor, to set up an eligibility and enrollment system called the One Eligibility System. In the meantime, OHA hired data entry specialists to help complete redetermination for existing Medicaid members using paper forms and manual data entry and review. That work continued even as OHA and Deloitte worked to launch the One Eligibility System. Ms. Darby will testify that because of the time-intensive nature of this process, OHA maintained regular contact with CMS about the progress of the redetermination process.

Ms. Darby will testify that OHA staff completed redetermination efforts by August 2017, as required by the Governor in her 90-day action plan.

Ms. Darby will testify that she is not aware of any employee, contractor, or agent of OHA who took any action to delay redetermination efforts in retaliation for FamilyCare's complaints about OHA's rate-setting process in any forum or before any organization or body or because of the 2016 rates or 2016 Settlement Agreement.

### *Ms. Darby will testify regarding her departure from OHA in 2017*

Ms. Darby will testify that she left OHA in October 2017 after Ms. Saxton's departure. She made the decision to leave the Agency following discussions with the new director, Pat Allen ("Mr. Allen"), shortly after he took over for Ms. Saxton. She will testify that she felt it was respectful to allow Mr. Allen to establish his own leadership team and that she was ready to move to another position.

## H.    WITNESS STATEMENT OF LORI COYNER

Counsel for Ms. Saxton anticipates that Lori Coyner's ("Ms. Coyner") testimony will take approximately 2 hours. Ms. Saxton reserves the right to adopt the information contained in the witness statement for Ms. Coyner which will be presented by Defendant Oregon Health Authority

Page 73 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

("OHA" or "Agency").  Counsel for Ms. Saxton anticipates that Ms. Coyner will testify as follows:

Ms. Coyner will testify that she joined OHA in 2013 and was promoted to Director of Health Analytics in June 2014.  Ms. Coyner was promoted to State Medicaid Director in December 2015.  Ms. Coyner resigned from OHA in July 2017.  In February 2019, Ms. Coyner rejoined the Agency as Medicaid Director.  In July 2021, she again stepped down as Medicaid Director.  Ms. Coyner is currently a senior policy advisor for renewal of Oregon's Section 1115 Medicaid Demonstration Waiver ("1115 Waiver").

### *Ms. Coyner will testify about Oregon's Section 1115 Waiver and the development of the coordinated care model in Oregon*

Ms. Coyner will testify about Oregon's 1115 Waiver.  Ms. Coyner will testify that the 1115 Waiver permits OHA to waive some requirements from its Medicaid state plan to test new approaches to paying for and delivering covered services and defining benefit packages. Oregon's 1115 Medicaid Demonstration is known as the Oregon Health Plan and was first established in 1994.  In 2012, Oregon received approval through 2017 for its 1115 Waiver to establish the coordinated care model.  The 1115 Waiver allowed Oregon to contract with coordinated care organizations ("CCOs"), enroll individuals in health plans, establish integrated benefit packages and budgets, and use quality metrics and quality improvement strategies.

As State Medicaid Director, Ms. Coyner oversaw Oregon's 1115 Waiver renewal. Oregon's 1115 Waiver renewal for the period January 12, 2017 through June 30, 2022, was approved by the Centers for Medicare & Medicaid Services ("CMS") in January 2017 and expands the elements of the 2012 1115 Waiver.  The 1115 Waiver, and its renewal, established a target of not more than 3.4% on average for health care cost growth.  Ms. Coyner will testify that OHA's failure to meet the cost growth targets in rate years 2012 to 2017 would result in a reduction in federal matching funds.  The Oregon legislature also set a similar limit on annual rate of growth for OHA's budget.

/ / /

Page 74 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

*Ms. Coyner will testify about OHA's efforts to redevelop its rate-setting methodology in 2015 in response to increased federal oversight*

Due to the Affordable Care Act's ("ACA") Medicaid expansion, an influx of new Medicaid enrollees joined Oregon's Medicaid population in 2014. OHA had significant experience with the traditional Medicaid population, but the ACA expansion brought in a new population of Medicaid enrollees. Ms. Coyner will testify that in her role as Director of Health Analytics, she supervised OHA's Actuarial Services Unit ("ASU"). ASU managed capitation rate development for CCOs and other managed care entities. Ms. Coyner will testify that originally, in 2014 and 2015, the CCO rates assumed a higher level of utilization of health care services than was ultimately experienced by the ACA expansion population during those years. Accordingly, the rates overestimated the costs of insuring this population.

The federal government was funding the majority of the ACA population's Medicaid expenses. Ms. Coyner will testify that this increased federal funding coincided with increased federal oversight. In particular, on August 7, 2014, CMS sent OHA a letter explaining that the state was not in compliance with rate-setting standards for 2015. CMS instructed OHA to start using base data and claims data to calculate the rates. In response, OHA developed the Oregon Capitation Rate Development Action Plan (the "Plan"). In the Plan, OHA committed to re-developing rates following CMS guidance.

To comply with the Plan, OHA's in-house actuary Dennis Tang ("Mr. Tang:") initially developed rates for 2015, which OHA issued to the CCOs in December 2014. In January 2015, the CCOs sent a letter expressing concern with the 2015 rates and rate-setting process used by Mr. Tang. In March 2015, CMS sent OHA 103 questions regarding OHA's 2015 rate setting process. OHA and Optumas, a third-party actuary that OHA had been working with for years, subsequently met with the CCOs to hear the CCOs' specific concerns and determine a path forward.

/ / /

Page 75 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

In April 2015, OHA engaged Optumas to be Oregon's signing actuary and re-develop the 2015 rates. Ms. Coyner will testify that FamilyCare was a proponent of having the 2015 rates re-developed by Optumas. Ms. Coyner will testify that OHA explained to the CCOs, including FamilyCare, that there was no guarantee that rates would increase if Optumas re-developed the rates, and it was likely some CCOs would see reductions in revenue.

Optumas redetermined the 2015 rates which were ultimately approved by CMS. Ms. Coyner will testify that Optumas used a similar rate-setting methodology in rate year 2016, and CMS approved those rates as well.

### *Ms. Coyner will testify that all CCOs, including FamilyCare, had ample access to OHA and Optumas to raise concerns regarding the rate-setting process*

Ms. Coyner will testify that OHA held frequent meetings with FamilyCare and other CCOs to discuss rate-setting for 2015 and 2016. For instance, during the rate-setting period for the 2015 and 2016 rates, OHA held monthly meetings with all CCOs and monthly meetings with each CCO individually. Optumas also held weekly meetings with all CCOs. During these meetings, Optumas and OHA gave the CCOs, including FamilyCare, the opportunity to ask questions and raise concerns regarding the rate-setting methodology. OHA took the CCOs'concerns seriously and worked to try to provide CCOs with additional information regarding rate-setting. However, OHA was unable to provide information that other CCOs considered trade secret.

Ms. Coyner will also testify that OHA held additional meetings with CCOs after releasing the rates for 2015 and 2016. For instance, OHA officials met with FamilyCare during February and March of 2015, to discuss their concerns regarding the original 2015 rates.

### *Ms. Coyner will testify that OHA did not retaliate against FamilyCare due to the 2016 Settlement Agreement*

In May 2015 and March 2016, FamilyCare filed lawsuits against OHA challenging the rate-setting methodology OHA employed to set the original 2015 rates, the redeveloped 2015

Page 76 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

rates, and the 2016 rates. Ms. Coyner will testify that OHA and FamilyCare held negotiations to resolve the dispute over the 2015 rates and Optumas' rate-setting methodology more generally. Ms. Coyner will testify that in May 2016, the parties entered into a Settlement Agreement to resolve their dispute. She will testify that she is unaware of any efforts at OHA, during the rate-setting processes for 2017 or 2018, to manipulate the rates to retaliate against FamilyCare for any settlement in prior litigation. Ms. Coyner did not—on her own initiative or at the direction of anyone else—direct Optumas to develop the 2017 or 2018 rates with the intention of recovering any amount of money credited to FamilyCare in the 2016 Settlement Agreement.

***Ms. Coyner will testify that OHA's rate-setting methodology and policies were not designed to discriminate or retaliate against FamilyCare***

Ms. Coyner will testify that in 2015, OHA began to notice significant increases to FamilyCare's professional reimbursements and professional costs in the 2014 and 2015 financial data reported to OHA. In October 2015, OHA contacted FamilyCare, seeking an explanation for those increases. FamilyCare did not respond. OHA again reached out to FamilyCare on this issue, this time in December 2015. Again, FamilyCare did not respond. Two weeks later, and three days before the end of the year, OHA contacted FamilyCare a third time. FamilyCare responded to OHA's final request with additional information but did not address OHA's inquiry into the reasons for the increased physician reimbursements.

In 2016 OHA and Optumas developed a reimbursement policy for 2017 rates. Ms. Coyner will testify she was asked to provide feedback to OHA regarding this policy. Ms. Coyner will also testify that she spoke to CMS about this policy. Ms. Coyner spoke to Jim Golden, Director of Managed Care Plans for CMS, and Chris Truffer at CMS's Office of the Actuary about the reimbursement review policy. Ms. Coyner will testify that these CMS officials informed her that the base data adjustments under the reimbursement review policy were reasonable and other states used similar types of adjustments.

Page 77 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Ms. Coyner will testify that the reimbursement policy was not motivated by anti-FamilyCare bias or animus. Ms. Coyner will testify that the reimbursement review policy was not designed to retaliate against FamilyCare for the 2016 Settlement Agreement, settlement credit, 2016 rates, or its First Amendment speech. Instead, the reimbursement policy was designed to ensure that the state was judicious in its use of Medicaid dollars and retained substantial federal funding. Ms. Coyner will testify that OHA began discussing unsustainable cost growth and high physician reimbursements with Optumas in September 2015, eight months prior to the 2016 Settlement Agreement. Further, OHA reached out to FamilyCare for additional information on physician reimbursements in October and December 2015.

Ms. Coyner will testify that she never observed Lynne Saxton ("Ms. Saxton"), or anyone else at OHA, take any action towards FamilyCare intending to discriminate against FamilyCare. Neither Ms. Saxton, nor anyone else, directed Ms. Coyner to lower FamilyCare's rates. Neither Ms. Saxton, nor anyone else, asked Ms. Coyner to direct Optumas to take any action that would be biased or discriminatory against FamilyCare. Ms. Coyner did not herself discriminate against FamilyCare or alter the rate-setting process in any way to retaliate against FamilyCare. Ms. Coyner is unaware of any OHA employee altering the rate-setting process due to anti-FamilyCare bias or discrimination. Ms. Coyner notified OHA that she planned to resign from her position as State Medicaid Director in May 2017. Ms. Coyner officially resigned from this position in July 2017 and left OHA.

***Ms. Coyner will testify that OHA's redetermination of eligibility and enrollment information was not designed to discriminate or retaliate against FamilyCare***

Ms. Coyner will testify that the timeline of redetermination of eligibility and enrollment information for Oregon Health Plan ("OHP") members was not dictated by anti-FamilyCare animus, bias, or retaliation. In 2014, the technology platform used by Oregonians to apply for health coverage in OHP, Cover Oregon, failed. Federal law required OHA to renew the eligibility of Medicaid recipients every year. But in September 2015, CMS granted Oregon

Page 78 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

approval to delay Medicaid eligibility renewals to prevent Oregonians from losing health benefits due to this flawed technology. Consistent with this federal guidance, in March 2016, OHA restarted the Medicaid renewal processing for a total of over 950,000 OHP members. Ms. Coyner will testify Oregon continued to keep CMS informed of Oregon's progress.

Ms. Coyner will testify that she briefed various CMS officials about the technological failure and the need to redetermine the eligibility and enrollment information. Ms. Coyner will testify that CMS told Ms. Coyner that OHA was a good partner that worked diligently to fix the enrollment and eligibility issues. Ms. Coyner will testify that CMS supported OHA's timeline for completing the redetermination work and supported OHA's decision to resolve the underlying technological issues before completing the renewals.

Ms. Coyner will testify that the timeline of the eligibility and enrollment redetermination work was not designed to retaliate against FamilyCare, nor was it motivated by anti-FamilyCare bias or animus. Instead, the renewals were impacted due to the failure of Cover Oregon and OHA worked diligently to redetermine the eligibility after this technological issue was resolved.

## I.    WITNESS STATEMENT OF STEVE SCHRAMM

Counsel for Ms. Saxton anticipates that Steve Schramm's ("Mr. Schramm") testimony will take approximately 1 hour. Ms. Saxton reserves the right to adopt the information contained in the witness statement for Mr. Schramm which will be presented by Defendant Oregon Health Authority ("OHA" or "Agency"). Counsel for Ms. Saxton anticipates that Mr. Schramm will testify as follows:

Mr. Schramm will testify that he is the former CEO and sole owner of Schramm Health Partners, LLC, which did business as Optumas. Mr. Schramm started Optumas in 2006. CBIZ, Inc. acquired Schramm Health Partners, LLC in June 2021. Mr. Schramm is now the Senior Managing Director and Business Unit President of CBIZ Optumas.

From 2006 through its acquisition in 2021, Optumas was an independent health care strategy and actuarial firm. It provided services in several areas, including assisting state

Page 79 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Medicaid programs with the development of actuarially certified rates for managed care organizations. It also provided strategic guidance on running Medicaid programs.

Mr. Schramm will testify that he has a degree in economics from Arizona State University. He has a master's degree in health economics, policy, and management from the London School of Economics. He is presently working on a PhD in actuarial science from the City University, University of London. Mr. Schramm is not a credentialed actuary. He has been consulting on Medicaid managed care for more than 30 years.

Mr. Schramm will testify that Optumas began working with the Oregon Health Authority in 2009. Optumas answered a request for proposal from the State. Optumas' contract was awarded competitively and ran through 2012. Optumas reviewed the work performed by OHA's actuaries and advised Oregon's certifying actuary, Dennis Tang ("Mr. Tang"), as requested. Mr. Schramm personally worked with OHA as part of this engagement. Mr. Schramm assisted OHA with assumptions behind and structure of the state's rate-development methodology. Optumas would inform OHA what other states were doing in rate setting. Prior to 2015, Optumas role was advisory only; Optumas did not develop Oregon's Medicaid capitation rates itself.

Mr. Schramm will testify that in 2012 Optumas again bid for actuarial work with OHA. It won the competitive bid. Under this new contract, Mr. Schramm provided strategy consulting for OHA on its Medicaid program. The contract remained in effect through 2018 and was amended several times. The initial version of this contract did not provide for Optumas to develop OHA's rates for coordinated care organizations ("CCOs"); rather it provides for Optumas to continue advising and consulting with OHA's certifying actuary, Mr. Tang. In 2012, Optumas also entered contracts to provide actuarial services to Nebraska and Kansas. Optumas also had an actuarial services contract with Colorado.

Mr. Schramm will testify that in around 2014 and 2015, Optumas learned that CMS intended to tighten regulations on states that pay rates to managed care organizations. In 2014 and 2015, many CCOs in Oregon, including FamilyCare, received rates that far exceeded their

Page 80 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

expenditures on medical care for their members, allowing them to add tens of millions of dollars to their net assets.

Mr. Schramm will describe changes to federal Medicaid regulations around this time, particularly the adoption of the "Mega rule," a set of Medicaid rules governing state rate-setting for managed care organizations like CCOs that CMS began developing in early 2010 and that was finalized in 2016. CMS began to publish rate-setting guides in or around 2014 that outlined the methodology states must use to set rates for managed care entities.

Mr. Schramm will testify that, under federal Medicaid rules, CCO rates must be projected to provide for all reasonable, appropriate, and attainable costs that are required under the terms of the CCO Contract. States are accountable to CMS for the development of rates that meet CMS's standards under federal Medicaid regulations. In around late 2014, OHA informed Optumas that CMS asked it to develop a plan to conform its rate-setting to CMS rules and guidance. Optumas helped OHA respond to CMS. OHA wanted a more rigorous process for creating CCO rates that met CMS's new guidance. Other states Optumas worked with also received communications from CMS regarding requests for changes to their rate-setting processes.

Mr. Schramm will testify that following CMS guidance and federal rules and regulations is critical for states. All states receive at least half of their Medicaid funding from the federal government. The federal government will not provide that funding if states do not develop rates that CMS approves. Hundreds of millions of dollars are on the line if OHA failed to develop rates that met federal rules and regulations. Beginning around 2014, CMS began having its Office of the Actuary review states' rates to see if the rates met federal rules, regulations, and guidelines.

Mr. Schramm will testify that OHA developed two sets of rates for calendar year 2015. The first time it developed rates using its in-house certifying actuary, Mr. Tang. Optumas advised OHA on its first set of rates, but Optumas did not, itself, develop those rates. In early

Page 81 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

2015, CMS asked OHA to answer questions about Mr. Tang's rate development process.

Mr. Schramm will testify that in early 2015, OHA informed Mr. Schramm that several CCOs, including FamilyCare, had concerns about Mr. Tang's development of rates. Mr. Schramm and his colleague Zach Aters (Mr. Aters"), a certified actuary, flew to Oregon to meet with OHA and CCOs, including FamilyCare, about rate development on or around March 4, 2015. During the meeting, Optumas explained the rate development process and presented slides. Not long after that meeting, OHA asked Optumas to independently redevelop the capitation rates for 2015 and have one of its actuaries serve as the certifying actuary. Mr. Schramm assigned Mr. Aters, who had joined Optumas in 2011, to serve as the lead actuary for Oregon.

Mr. Schramm will testify that as Optumas re-developed the 2015 rates, it participated in a series of actuarial work groups with the CCOs to address their feedback. Optumas re-developed the rates in accordance with CMS's guidance, federal rules and regulations, and actuarial standards of practice. Mr. Aters, as a credentialed actuary, certified the rates. Optumas completed the re-development in the middle of 2015. CMS approved Optumas' re-developed rates. It is not unusual for an actuary to issue more than one rate certification in a single year.

Mr. Schramm will testify that as Optumas worked with OHA and the CCOs to re-develop the 2015 rates, Optumas learned from the CCOs that they wanted a more transparent process. Mr. Schramm will testify that OHA also made clear that they wanted a transparent process. Optumas developed an open, transparent process that involved frequent meetings and lots of opportunities to share information. Mr. Schramm will testify that as of around 2016, Optumas was the certifying actuary of record for eight states: Maryland, North Dakota, Alabama, Iowa, Kansas, Nebraska, Colorado, and Oregon. Throughout 2015-2018, Oregon was the most transparent state Optumas worked with.

Mr. Schramm will testify that the 2015 rates that Optumas developed were generally lower than the 2014 rates. The reason was that Optumas developed rates based on the CCOs'

Page 82 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

BARRAN LIEBMAN LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

reasonable, appropriate, and attainable costs for providing care for their members, as required by CMS's guidance. That included reviewing CCOs' actual prior year experience.

Mr. Schramm will testify that in Optumas' work on rate setting for Oregon, Mr. Schramm did not personally perform rate setting work at a detailed level. But he was involved in conversations about the steps involved in the rate development process in Oregon. Mr. Schramm will testify that he participated in conference calls and meetings with the OHA and Optumas teams to discuss and strategize about the major steps in the rate-setting process. Mr. Schramm participated in feedback work group sessions with the CCOs. Mr. Schramm will describe the many meetings he had with CCOs to share information.

Mr. Schramm will testify that the major steps in the rate-setting process are the collection, review, and preparation of the base data, application of programmatic/policy changes, development and application of trend, assessment of non-medical load, risk adjustment, and application of rate add-ons. Optumas uses a rate development methodology that is consistent with the Actuarial Standards of Practice ("ASOPs") and the managed care guidance produced by CMS. It followed the steps required by both CMS and the ASOPs when developing rates for OHA in 2015, 2016, 2017, and 2018.

Mr. Schramm will testify that the overall steps are consistent for all states that use managed care to deliver Medicaid. Mr. Schramm will testify that Optumas, like all actuarial firms, uses some proprietary models, but it uses them across all the states it works with, and they are consistent with CMS guidance, federal rules and regulations, and the ASOPs.

Mr. Schramm will testify that development of trend is not an empirical calculation. It involves an actuary's judgment. An actuary can consider a number of factors to development of trend. For example, an actuary might consider the size and credibility of the base data. They could consider the time period involved and whether any changes were made to the services available in the programs during that time. They might look at the trend experienced by other programs. Optumas did not develop trend to discriminate against FamilyCare.

Page 83 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Mr. Schramm will testify that a state's certifying actuary—Mr. Aters for Oregon for the 2017 and 2018 rates—has the final call on all changes to rate-setting methodology that are not policy related. In some cases, the certifying actuary must agree with programmatic/policy decisions that affect final rates. The certifying actuary does not make final decisions on program/policy.

Mr. Schramm will testify that when developing rates, Optumas presented OHA with a narrow range of potential rates. OHA then makes a policy decision to select rates at one level within the range. As long as the rates OHA chose were within the range, Optumas certified the rates to CMS as actuarially sound. The certifying actuary certifies to the rates OHA chooses, not to the rate range.

Mr. Schramm will testify that Optumas developed rates on a regional basis. Optumas used regional rates in other states as well in 2017 and 2018.

Mr. Schramm will testify that he occasionally met and discussed rate-setting with Lynne Saxton ("Ms. Saxton") after she joined OHA around the beginning of 2015. Ms. Saxton's staff and OHA informed Mr. Schramm and Optumas that it wanted Optumas to continue to use an open and engaged process to develop rates.

Mr. Schramm will testify that in 2015, Optumas developed OHA's 2016 rates for the CCOs. It again followed all CMS guidance, federal rules and regulations, and the ASOPs. FamilyCare initially refused to accept the proposed 2016 rates. Mr. Schramm is aware that FamilyCare sued OHA regarding the rates and that OHA and FamilyCare entered a settlement agreement in the spring of 2016.

Mr. Schramm will testify that Ms. Saxton never told Mr. Schramm to alter or reduce FamilyCare's rates in any year, including 2017 and 2018. No one at OHA told Mr. Schramm to alter or reduce FamilyCare's rates. Ms. Saxton never told Mr. Schramm to discriminate against FamilyCare. No one at OHA told Mr. Schramm to discriminate against FamilyCare or any other CCO. Ms. Saxton never directed Mr. Schramm to do anything at all with respect to FamilyCare

Page 84 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

that was inconsistent with FamilyCare receiving fair and equal treatment. No one at OHA directed Mr. Schramm to do anything at all with respect to FamilyCare that was inconsistent with FamilyCare receiving fair and equal treatment. Optumas did not take any actions to improperly reduce FamilyCare's rates. Mr. Schramm will testify that Optumas developed rates fairly for all CCOs, including FamilyCare, and to obtain CMS approval; CMS would not have approved rates that improperly discriminated against one CCO.

Mr. Schramm will testify that he is aware that FamilyCare received a credit in the 2016 Settlement Agreement. Ms. Schramm will testify that Optumas did not take any action to attempt to recoup that credit or any payments made to FamilyCare under OHA's 2016 rates by reducing FamilyCare's 2017 and 2018 rates. No one at OHA—including Ms. Saxton—ever directed Optumas to take any action to alter FamilyCare's 2017 and 2018 rates because of the settlement credit or FamilyCare's 2016 rates. Mr. Schramm will testify that the settlement credit was *de minimis* in the scheme of the entire CCO program—it made up less than 1% of the overall amount of the program.

Mr. Schramm will testify that Optumas can review CCOs' reimbursement rates to providers like physicians as part of the rate-setting process. They do so to ensure that reimbursements are reasonable, appropriate, and attainable. Optumas accomplishes this by several types of analyses, including looking at the average unit cost for a service in each category of aid. Optumas also compares the amounts CCOs pay by provider types and with Medicaid and Medicare fee schedules. Optumas also considers whether there are incentive arrangements in the reimbursement agreements between the CCO and the provider. As part of this analysis, Optumas considers how the program and underlying risk had changed over time.

Mr. Schramm will testify that one of Oregon's Section 1115 Waiver requirements, is a special term and condition specifying that the overall rate of growth in health care spending in Oregon should not increase more than 3.4% on average per year over a five-year period.

/ / /

Page 85 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Mr. Schramm will testify that when Optumas developed OHA's rates for 2017 and 2018, Optumas conducted a review of CCO reimbursement rates. In 2016, as it was developing rates for calendar year 2017, Optumas analyzed the 2015 base data and CCOs' financial data. Optumas tracked the rates of growth in CCOs' expenditures from 2014 to 2015. Optumas observed, and communicated to OHA, that the rates of growth in health care spending by some CCOs exceeded 3.4%. OHA directed Optumas to determine what was driving these unsustainable rates of growth.

Mr. Schramm will testify that Optumas determined that some CCOs, including FamilyCare, were paying providers reimbursement rates and incentive payments that were greater than what was reasonable. Optumas adjusted the base data to remove approximately $113 million in excess costs; this amount reflected CCOs' payments to providers that exceeded reasonable rates. For the 2017 rates, Optumas adjusted down the base data in the Tri-county Region by $34 million. The Tri-county Region is the region in which FamilyCare and Health Share are the only CCOs. In 2017, the excess costs all came from FamilyCare, mostly in unreasonable reimbursements and incentive payments to primary care physician businesses. Optumas and OHA adjusted the base data of many other CCOs in Oregon for the 2017 rates.

Mr. Schramm will testify that in performing the reimbursement adjustments, Optumas ensured that the adjustments allowed CCOs to make reasonable payments to providers. After the adjustment, Optumas' rate models showed that the assumed unit and utilization costs for CCOs were reasonable, appropriate, and attainable. Because rates are developed on a regional basis, the adjustments affect every CCO in the region. Thus, the 2017 reimbursement adjustment reduced the rates of both FamilyCare and Health Share.

Mr. Schramm will testify that Optumas also made base data adjustments when developing the 2018 rates. Optumas again removed excess physician reimbursement costs from FamilyCare's base data. Optumas also adjusted the base data of several other CCOs in Oregon for the 2018 rates. Just like with the 2017 rates, adjustments to FamilyCare's base data affected

Page 86 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

the CCO rates for both Health Share and FamilyCare, not just FamilyCare. Reimbursement adjustments are not unusual. Optumas worked with other states in 2017 and 2018—and before and after 2017 and 2018—that made reimbursement adjustments.

## J. WITNESS STATEMENT OF ZACHARY ATERS

Counsel for Ms. Saxton anticipates that Zachary Aters' ("Mr. Aters") testimony will take approximately 1 hour. Ms. Saxton reserves the right to adopt the information contained in the witness statement for Mr. Aters which will be presented by Defendant Oregon Health Authority ("OHA" or "Agency"). Counsel for Ms. Saxton anticipates that Mr. Aters will testify as follows:

Mr. Aters will testify that he has a Bachelor of Arts in Mathematics from Indiana University Southeast. He is a member of the American Academy of Actuaries and an Associate in the Society of Actuaries. Mr. Aters joined Optumas in 2011. Prior to joining Optumas, Mr. Aters worked for Mercer as an actuary. Mr. Aters is a credentialed actuary.

Mr. Aters will testify that he was the signing actuary for OHA's redeveloped 2015 CCO capitation rates, and for OHA's 2016, 2017, 2018, and 2019 rates. He was also the lead actuary for Optumas working on OHA's rates for CCOs in 2015 – 2019. Mr. Aters has also developed and signed rates at various times, sometimes in conjunction with another actuary, for New Mexico, Kansas, Iowa, North Dakota, Nebraska, and Colorado.

Mr. Aters will testify that in or around 2014 and 2015, after passage of the Affordable Care Act, which allowed states to expand Medicaid programs, CMS was preparing a new set of federal Medicaid regulations governing rate development. The regulations are sometimes called the "Mega Rule." Around the same time, CMS started issuing guides on rate development. The guides informed state Medicaid programs how to comply with Medicaid regulations when developing rates. Mr. Aters will testify that CMS may also ask states questions about their rate development.

Mr. Aters will testify that around the same time CMS was working on the Mega Rule, CMS started exercising more oversight in how rates were developed. Mr. Aters will testify that

Page 87 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

as an example of this additional oversight, CMS was more likely to ask questions about a state's rate development.

Mr. Aters will testify that Optumas was already working with Oregon when he joined the firm in 2011. Mr. Aters worked with Steve Schramm ("Mr. Schramm"), the CEO of Optumas. Mr. Schramm is not an actuary, but he advised OHA on the development of their Medicaid program. Mr. Aters will testify that in late 2014 or early 2015, he learned that CMS had asked OHA to update its rate setting process to make it consistent with federal Medicaid regulations and new guidance.

Mr. Aters will testify that in 2014, OHA initially developed the 2015 rates with its in-house actuary, Dennis Tang ("Mr. Tang"). Mr. Aters learned that the CCOs and CMS raised a number of questions about the initial 2015 rates developed by Mr. Tang. Mr. Aters and Mr. Schramm traveled to Oregon and met with OHA and CCOs about the rate development process on or around March 4, 2015. Mr. Aters and Mr. Schramm made a presentation about rate development and answered questions from CCOs. Mr. Aters and Mr. Schramm walked the CCOs through the rate development process over the course of several slides.

Mr. Aters will testify that not too long after that meeting in Oregon, OHA asked Optumas to redevelop the 2015 rates. OHA informed Optumas that it wanted more structure and transparency in its rate-setting process. Mr. Aters became the new signing actuary.

As the signing actuary, Mr. Aters must develop rates according to federal Medicaid regulations and CMS guidance. CMS has a department with actuaries that reviews the rates submitted by states. Mr. Aters will testify that he signed the rate certification that OHA submitted to CMS for approval for the 2017 and 2018 rates. Mr. Aters will testify that as the signing actuary he is ultimately responsible for the actuarial methodology used to develop the rates. Mr. Aters must attest to the actuarial soundness of the rates.

Mr. Aters will testify that Optumas' redeveloped 2015 rates responded to many of the concerns raised by FamilyCare and other CCOs. Mr. Aters will testify that Optumas developed

Page 88 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

the rates relying on CCOs' claims data from prior years. Mr. Aters will testify that Optumas discussed CCOs' base data reconciliation with them. Mr. Aters will testify that Optumas applied actuarial standards of practice and complied with federal Medicaid regulations. Mr. Aters and Optumas redeveloped the 2015 rates and submitted them to CMS in around August 2015. Mr. Aters will testify that CMS approved the redeveloped rates.

Mr. Aters will testify about rate development. He will explain that CCO rates consist of a per member, per month amount, sometimes known as a capitation rate or PMPM rate. Mr. Aters will explain that capitation rates do not reimburse CCOs for the costs of services provided to the CCOs' members. Capitation rates are payments made to CCOs based on the estimated total expense of a hypothetical CCO paying for the care of its members in an upcoming year. Entities receiving capitation rates accept the risk that rates may not cover all their actual expenses during that year. Mr. Aters will testify that they also receive the benefit of potentially receiving more in rates than they actually need to pay for their members' care, thus earning a profit.

Mr. Aters will testify that the population enrolled in the Oregon Health Plan is divided into several different categories, known as categories of aid, or COAs. COAs are related to financial status or health characteristics. For example, there are COAs for several age ranges, such as 6-18 and 19-44. There are also COAs for children in adoptive or foster case and individuals in the Temporary Assistance to Needy Families program. Mr. Aters will testify that OHA pays CCOs a different capitation rate for each COA.

Mr. Aters will testify that the major components of rate development include collection and reconciliation of data, development of projection factors such as trend and policy changes, application of risk factors, and application of non-medical load. Mr. Aters will explain each of these components of rate development. Mr. Aters will testify that decisions around the development of the rates are made in a collaborative fashion between OHA, Optumas, and the CCOs. Mr. Aters will testify that after vetting the decisions, the signing actuary must be comfortable that the decisions that were made were in line with CMS guidance.

Page 89 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Mr. Aters will testify that OHA made the decision to develop rates on a regional basis. OHA divided the state into four regions. Mr. Aters will testify that for the 2017 and 2018 rate years, until FamilyCare left the market, two or more CCOs operated in each region. In Mr. Aters' experience, other states use regional rate-setting and it is acceptable practice. Mr. Aters will testify that two CCOs, FamilyCare and Health Share, operated in the Portland metro region, known as the Tri-county Region.

In regional rate setting, Mr. Aters will testify, the state actuary develops a regional rate for all the CCOs in the region. The regional rates are the same for all CCOs in the region. Once a regional rate is developed, OHA and Optumas apply risk scores to some of the COAs. Mr. Aters will testify that OHA and Optumas may also apply "add-ons," which account for things like taxes and payments for a small number of medical services that are not included in the regional rates. Mr. Aters will testify that the rates between two CCOs in the same region can vary only because of risk scores and add-ons. Otherwise, all the work that OHA and Optumas do to develop the rates affects the rates of all the CCOs in the region, not any one CCO individually.

Mr. Aters will testify about each of the major components of rate development. Mr. Aters will testify about how Optumas receives all the CCOs' encounter and financial data from OHA, which is responsible for collecting the data from the CCOs. Once Optumas receives the data, it reconciles the data. Mr. Aters will testify that Optumas has discussions with OHA and each of the CCOs to attempt to discern whether there are issues with the CCO underreporting or overreporting claims or financial data to OHA. Mr. Aters will testify that there is sometimes some variation between the data reported to OHA in encounter data and financial data. Mr. Aters will testify that some degree of variation is acceptable; the certifying actuary is permitted discretion under the actuarial standards of practice to exercise their judgment about acceptable levels of variation.

/ / /

Page 90 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Mr. Aters will testify that once Optumas has reconciled the encounter and financial data, Optumas may make adjustments to the data to account for excessive or unexpected costs. The final data is often called base data.

Mr. Aters will testify that the development of projection factors is the process by which historical base data is projected into a future period so that the actuary can estimate the amount of rates that are needed to pay for projected future costs. Mr. Aters will testify that to set rates for calendar year 2017, for example, Optumas obtained and used base data from 2015. Working in 2016, Optumas used projection factors to estimate what the costs reflected in the base data from 2015 were likely to be in the then future 2017 period. Mr. Aters will testify that Optumas used those estimated future costs to set rates for the CCOs in the future period.

Mr. Aters will testify that one of the common projections factors is trend. Trend is subjective by its nature. Mr. Aters will testify that mathematical models that evaluate historical data can help guide an actuary when developing trend, but models are only a guide. Mr. Aters will testify that actuaries, including those at CMS, understand that trend is not set on historical data alone. There is no mathematical model that can develop the perfect or correct trend for projecting base data into rates for a future period. In addition to using models, an actuary must use their judgment to evaluate other sources of information and to choose the right assumptions and values for trend. Mr. Aters will testify that an actuary can consider a number of factors in addition to models to development of trend. For example, an actuary might consider the size and credibility of the base data. They could consider the time period involved and whether any changes were made to the services available in the programs during that time. They might look at the trend experienced by other programs in the state or in other locations. Ultimately, Mr. Aters will testify, an actuary uses their best professional judgment to analyze all the potential influences on trend to reach a trend to apply during the rate setting process.

/ / /

/ / /

Page 91 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Mr. Aters will testify that after projecting the rates into the future period, the actuary develops a regional rate for each COA based on the projected future costs.  Mr. Aters will testify that the regional rate is the same for all CCOs in the region.

Then, Mr. Aters will testify, Optumas and OHA develop and apply risk scores.  Risk scores are based on each OHP member's overall health, as recorded by diagnoses collected by doctors when they see the member.  Mr. Aters will testify that CCOs receive the diagnosis codes from the health care providers and report them to OHA.  Mr. Aters will testify that OHA handles much of the risk scores analysis using a tool called CDPS+Rx, and then shares that analysis with Optumas, which reviews it.  Mr. Aters will testify that sometimes a member is too new to a CCO or OHP to have a risk score.  In such an event, Optumas and OHA apply a CCOs' average risk score for people in the same COA as the unscored person.  Mr. Aters will testify that this is a common and accepted practice, and it reflects the fact that CCOs tend to attract members with similar health profiles.  Mr. Aters will testify that CCOs with healthier populations get lower risk scores.  Mr. Aters will testify that CCOs with sicker populations get higher risk scores.

Mr. Aters will explain that the risk scores for each COA are normalized across a region and multiplied to the regional rate for that COA.  Thus, Mr. Aters will explain, a CCO with a healthier population in a particular COA receives a somewhat lower rate in that COA because the risk analysis shows that CCO will likely have to spend less to care for their healthier members.  The reverse is also true.  If a CCO's members in a particular COA are on average sicker than those in the same COA at another CCO in the same region, then the CCO will receive a higher capitation rate for that COA.

Mr. Aters will testify that the final element of rate development is the application of add-ons, such as additional amounts to the capitation rates to cover things like taxes and a small set of additional medical expenses that are not otherwise covered in the rates.

Mr. Aters will testify that he had regular communications with Lynne Saxton (Ms. Saxton") while working on Oregon's rates.  Mr. Aters will testify that his relationship with Ms.

Page 92 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Saxton was professional, not personal. Ms. Saxton called Mr. Aters to let him know that she would be resigning. It was a short call and Ms. Saxton did not tell Mr. Aters why she was resigning. Mr. Aters did not ask. Mr. Aters will testify that he liked working with Ms. Saxton and was disappointed that she resigned.

Mr. Aters will testify that Ms. Saxton never told Mr. Aters to alter or reduce FamilyCare's rates in any year, including for the 2017 and 2018 rates. Mr. Aters will testify that no one at OHA told Mr. Aters to alter or reduce FamilyCare's rates. Mr. Aters will testify that Ms. Saxton never told Mr. Aters to discriminate against FamilyCare. Mr. Aters will testify that no one at OHA told Mr. Aters to discriminate against FamilyCare or any CCOs. Mr. Aters will testify that Ms. Saxton never directed Mr. Aters to do anything at all with respect to FamilyCare that was inconsistent with FamilyCare receiving equitable treatment. Mr. Aters will testify that no one at OHA directed Mr. Aters to do anything at all with respect to FamilyCare that was inconsistent with FamilyCare receiving equitable treatment. Mr. Aters will testify that Optumas did not take any actions to improperly reduce FamilyCare's rates. Mr. Aters will testify that Optumas developed FamilyCare's rates according to the same methodology it developed the rates for all 15 other CCOs. Mr. Aters would not have acted on any request to discriminate against FamilyCare or any other CCO. Mr. Aters will testify that he always treated FamilyCare, and all CCOs, equitably in the rate-development process and, to his knowledge, so did his colleagues at Optumas and OHA. The rates Mr. Aters signed each year were actuarily sound.

Mr. Aters will testify that Oregon and the federal government are parties to an agreement known as the Section 1115 Waiver ("1115 Waiver"). Mr. Aters will testify that under the terms of the 1115 Waiver, OHA committed to hold the overall rate of growth in Oregon's Medicaid program to 3.4% per year on average over five years. Mr. Aters will testify that the rate of growth target set in the 1115 Waiver is not risk adjusted. Mr. Aters will testify that Optumas does not set rates to comply with the 3.4% target in the 1115 Waiver. Mr. Aters will testify that

Page 93 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

**BARRAN LIEBMAN LLP**
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

Optumas sets rates that are compliant with actuarial standards of practice and federal Medicaid rules.

Mr. Aters will testify that when evaluating data from 2014 and 2015, Optumas observed that there were significant increases in the base data between 2014 and 2015. The growth between those two periods outpaced the sustainable growth rate of 3.4% in the 1115 Waiver. Mr. Aters will testify that OHA and Optumas sought to understand what was driving the high rates of growth. Mr. Aters will testify that they discovered that increases in reimbursements and incentives paid to doctors contributed to the increase, along with other factors outside of the CCOs' control.

Mr. Aters will testify that OHA made a policy choice known as the reimbursement policy. Mr. Aters will testify that OHA only made this policy decision after deliberation with Mr. Aters and Optumas and other stakeholders. Although OHA made the policy decision, it was still necessary for Mr. Aters to agree that the resulting rates would be actuarially sound such that he could certify them. Mr. Aters will testify that he informed OHA that he could only sign rates that were reasonable, appropriate, and attainable, and, therefore, the 3.4% rate of growth target could only be used to evaluate unsustainable drivers of growth, not limit CCO rates to achieve the target. Mr. Aters will testify that OHA understood and agreed. Mr. Aters will testify that the rates Optumas developed in both 2017 and 2018 were reasonable, appropriate, and attainable and met federal Medicaid requirements after implementing the reimbursement policy.

Mr. Aters will testify that OHA and Optumas implemented a reimbursement policy in both 2017 and 2018. Mr. Aters will testify that he helped author a document describing the reimbursement policy for the 2017 rates.

Mr. Aters will describe the implementation of the 2017 and 2018 reimbursement policies. Mr. Aters will testify that in reviewing CCO per member spending from 2014 to 2015, Optumas found that on aggregate, CCOs' per member costs grew at 8.6%. That growth rate far exceeded the sustainable rate of growth set by the 1115 Waiver. Mr. Aters will testify that Optumas did

Page 94 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

not risk adjust the population when computing the rate of growth; it is not appropriate or common to perform a risk adjustment when evaluating rates of growth as part of a reimbursement review. He made the decision not to risk adjust the population himself.  Mr. Aters will testify that Optumas learned, in its evaluation of the CCO rate of growth for 2014 to 2015, that some of the growth was being driven by increased reimbursements and incentive payments to providers.

Mr. Aters will testify that the 2018 reimbursement policy also examined implied rates of growth across prior years.  Mr. Aters followed a similar procedure to the 2017 reimbursement policy to compute the rate of growth when implementing the 2018 policy.

Mr. Aters will testify that after determining the rates of growth for each CCO, Optumas and OHA identified certain CCOs that had rates of growth that were unsustainable.  Mr. Aters will testify that Optumas adjusted the base data for some CCOs to remove excess costs that were the result of CCOs' business decisions, such as increased reimbursements and incentive payments.  Mr. Aters will testify that adjusting base data is an iterative process that can include multiple rounds of adjustment.  At each iteration, Optumas adjusted the base data by removing excess costs.  Then, Optumas conducted an analysis to make sure that the resulting rates were still reasonable, appropriate, and attainable for each region.  Mr. Aters will testify that Optumas looked at other CCOs in the same region to review how much they reimbursed providers in various categories of service to ensure that CCOs had adequate resources to pay reasonable, appropriate, and attainable reimbursements for health services for their members.

Mr. Aters will testify that for the 2017 rates, OHA and Optumas adjusted the base data of nine of the 16 CCOs.  Optumas, in collaboration with OHA, conducted four iterations of adjustments to the base data.  Mr. Aters will testify that the iterations addressed both excess incentive payments and excess reimbursement to health care providers.  Not all nine CCOs that received adjustments were affected by each iteration.  The last iteration affected only FamilyCare.  In that iteration, OHA and Optumas removed excessive cost increases in FamilyCare's payments to primary care physicians.  Mr. Aters will testify that after each

Page 95 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

iteration, Optumas ensured that the resulting rates would still be reasonable, appropriate, and attainable. Mr. Aters will testify that about $34 million in excess cost was removed from FamilyCare's base data.

Mr. Aters will testify that OHA and Optumas also implemented a reimbursement policy for the 2018 rates. Mr. Aters will describe that policy. Once again, Mr. Aters will explain that OHA and Optumas did not adjust base data to obtain a specific rate of growth. OHA and Optumas evaluated CCO data to reveal drivers of cost growth. Mr. Aters will testify that in 2018, Optumas adjusted the reimbursement and/or incentive payments in the base data of eight of the 16 CCOs. Mr. Aters will testify that Optumas again ensured that the resulting rates would still be reasonable, appropriate, and attainable.

Mr. Aters will testify that no one at OHA or Optumas directed Mr. Aters to adjust FamilyCare's base data—in the development of either the 2017 or 2018 rates—in retaliation against FamilyCare for the 2016 Settlement Agreement or because of FamilyCare's speech about rate-setting. Mr. Aters himself did not adjust FamilyCare's base data because of the 2016 Settlement Agreement, FamilyCare's 2016 rates, or the settlement credit in the 2016 Settlement Agreement. Mr. Aters will testify that the reimbursement policy was not an attempt to clawback money from FamilyCare because of the 2016 Settlement Agreement and he is unaware of anyone at OHA or Optumas who thought that it was. Mr. Aters will testify that the reimbursement policy was an acceptable actuarial process. Mr. Aters will testify that the reimbursement policy was developed fairly and applied with the goal of wisely managing state and federal resources. Mr. Aters will testify that CMS approved the 2017 and 2018 rates.

Mr. Aters will testify that adjustments to base data like those performed in the 2017 and 2018 reimbursement policies do not affect CCOs in isolation. Adjusting the base data on one CCO affects the rates of every CCO in the region because the rates are developed on a regional basis. Thus, adjusting FamilyCare's base data did not just affect FamilyCare's CCO rates, it also affected Health Share rates, the other CCO in the region.

Page 96 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Mr. Aters will testify that OHA and Optumas adjusted base data for CCOs both before and after the 2017 and 2018 rate development process. Before the 2017 and 2018 rates, Optumas worked collaboratively with Kaiser, which was part of Health Share's network, to remove excess cost in its base data. And OHA and Optumas continued the reimbursement policy in 2019, after FamilyCare left the market. Mr. Aters will describe the 2019 reimbursement policy, which also adjusted CCOs base data, including physician reimbursement in CCOs' base data. Mr. Aters will testify that reimbursement adjustments like the ones OHA and Optumas used in 2017 and 2018 are used in other states Mr. Aters has worked in. There is nothing unique or special about the methodologies and approaches utilized in the 2017 and 2018 reimbursement policies.

Mr. Aters will testify that OHA underwent an analysis to redetermine whether OHP members were eligible to receive benefits and remain in the program. That analysis was delayed because of technology issues. The redetermination analysis was not complete in time to completely incorporate it into the proposed 2018 rates released in October 2017. Mr. Aters will testify that Optumas developed revised rates when the redetermination analysis was complete. Mr. Aters will testify that Optumas made two adjustments to account for redeterminations in eligibility for OHP members in the 2018 rates. Optumas made one adjustment in the original 2018 rates and a second adjustment in the revised 2018 rates, which were completed in the first part of 2018. Optumas made the adjustments as quickly as it could once receiving the redetermination analysis from OHA. Optumas did not slow down the redetermination adjustments to prejudice FamilyCare and no one at OHA asked Optumas to slow the process down. When developing the 2018 rates, Mr. Aters took the redetermination analysis into account when preparing trend. Mr. Aters will testify that Optumas made an acuity adjustment in the trend model to account for the redetermination process.

Mr. Aters will testify that development of trend is not an empirical calculation. It involves an actuary's judgment. Optumas did not develop trend to discriminate FamilyCare. Mr. Aters will testify that Optumas applied the same trend to both FamilyCare and Health Share,

Page 97 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

the two CCOs in the Tri-County Region.  Mr. Aters will explain that Optumas' development of trend was supported and based on appropriate models and actuarial judgment.

Mr. Aters will explain that in Medicaid rate development the actuary develops rates for the program or region, not for any individual CCO.  Mr. Aters will testify that OHA and Optumas are not obligated to adjust the rates paid to any CCO to ensure that the rates cover the CCO's costs.

Mr. Aters will explain OHA and Optumas' treatment of CCOs' patient case management costs.  Mr. Aters will testify that Optumas reclassified some of FamilyCare's case management costs from medical expense to administrative expense.  This reclassification did not affect just FamilyCare; because the reclassification occurred in the base data, it affected both FamilyCare and Health Share.  Reclassification of excessive case management costs is an acceptable actuarial practice within the judgment of the signing actuary.

Mr. Aters will explain margin allowances in CCO rate development.  Mr. Aters will testify that Optumas made reductions to the risk margins allowance for all CCOs in 2017 and 2018.  As the base data for CCOs became more stable in 2015 and 2016, after the ACA expansion, less risk margin was required because CCOs had more historical knowledge about the likely costs of providing care for their members.  The adjustments to risk margin were applied to all CCOs, not just FamilyCare.

Mr. Aters will explain how Optumas developed non-benefit expense allowances in the rates. Mr. Aters will testify that Optumas applied a reasonable, appropriate, and attainable non-benefit load for a reasonably run CCO.  Mr. Aters will explain that because rates are not developed for individual CCOs, Optumas does not establish non-benefit expense allowances based on an individual CCO's experience or requests.

Mr. Aters will explain that in 2017, after discussions with FamilyCare, Optumas and OHA elected to use paid COA to map CCO members to rate cells.  Mr. Aters will explain that the change was made in the revised 2018 rates that Optumas certified in early 2018.  Mr. Aters

Page 98 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

will explain that the change to paid COA increased FamilyCare's rates and affected all CCOs. Mr. Aters will testify that the timing of the change to paid COA was not designed to prejudice FamilyCare.

Mr. Aters will testify that using one year of base data is credible. Credibility is typically defined by number of covered members, not years of data. The Tri-County area involves large populations, including at a rate cell level. The size of population was sufficient for the base data to be credible.

Mr. Aters will explain that OHA and Optumas had sufficient information to risk adjust COAs in the Tri-County Region. Mr. Aters will testify that when developing rates in 2017 and before, Optumas consulted with the State regarding the use of four diagnosis codes to build the risk scores. Mr. Aters will testify that OHA wanted to ensure that CCOs were on more equal footing and using four diagnosis codes instead of more, helped achieve that. Mr. Aters will testify that after time had elapsed, allowing CCOs to improve the capture of diagnosis codes, the State moved to evaluating more codes to develop risk scores.

Mr. Aters will testify that Oregon endeavored to have a transparent rate development process. Mr. Aters will testify that Optumas had frequent meetings with CCOs, including multiple webinars, rate workgroups, and individual meetings with CCOs. Mr. Aters will testify that Optumas met with CCOs individually to review their base data submissions. Optumas and OHA answered many questions from CCOs about the rate development process, frequently through email. Mr. Aters will testify that Optumas and OHA were open to feedback. Optumas and OHA answered questions from the CCOs and submitted the questions and answers to CMS as part of the rate certification. Mr. Aters will testify that even though CCOs considered some of their internal financial and payment data confidential and did not want to share it with competitor CCOs, OHA and Optumas often shared aggregate data. Mr. Aters will testify that Oregon was by far the most transparent state Mr. Aters worked with in setting rates.

/ / /

Page 99 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

**K.    WITNESS STATEMENT OF JEFF HEATHERINGTON**

Counsel for Ms. Saxton intends to call Jeff Heatherington ("Mr. Heatherington") as an adverse witness.  Counsel for Ms. Saxton anticipates that such testimony will take approximately 45 minutes.  Counsel for Ms. Saxton anticipates that Mr. Heatherington will testify as follows:

Mr. Heatherington will testify that he is the Chief Executive Officer ("CEO"), President, and co-Founder of FamilyCare, Inc. ("FamilyCare").

Mr. Heatherington will testify that FamilyCare is a nonprofit organization.  Mr. Heatherington will testify that he is also the CEO of the Heatherington Foundation for Innovation and Education in Health Care.

Mr. Heatherington will testify that he hired public relations firms to aid FamilyCare in its communications strategy with the press and the Oregon legislature.  Mr. Heatherington will testify that FamilyCare financially supported media organizations, including *The Lund Report*.  Mr. Heatherington will testify that FamilyCare made financial donations to the legislators who advocated for FamilyCare's proposed legislation, including Senator Alan Bates.  Beginning in at least 2015, Mr. Heatherington was persistently unhappy with the Oregon Health Authority ("OHA").  To that end, Mr. Heatherington will testify that part of FamilyCare's strategy was designed to show the legislature where there were "improper" or "inaccurate" decisions being made at the OHA.  Mr. Heatherington will testify that he believes FamilyCare was being treated unfairly in comparison to other Coordinated Care Organizations ("CCOs") in Oregon.

Mr. Heatherington will testify that FamilyCare implemented a plan to pay primary care providers at commercial rates, as opposed to the Medicaid rates typically paid to primary care providers.  Mr. Heatherington will testify that this decision was made because of "access" – and to ensure that FamilyCare's members could compete for time with primary care providers who were receiving commercial rates from commercial insurance payers.  Mr. Heatherington will testify that multiple primary care providers sat on the FamilyCare Board of Directors at the time that this business decision was made.

Page 100 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

Mr. Heatherington will testify that the reason FamilyCare went out of business was because of the capitation rates that it received as one of 16 CCOs in Oregon. Mr. Heatherington will testify that "virtually everything that the OHA has done has been designed to harm FamilyCare, including the rate setting process."

Mr. Heatherington will testify that, when FamilyCare went out of business, it had more than $100,000,000.00. Mr. Heatherington will testify that, in his view, it would cost maybe $100,000,000.00 to start a brand new CCO. Mr. Heatherington will testify that he can recall zero instances or examples of FamilyCare "misspending" its money. Mr. Heatherington will testify that he cannot recall any examples of mismanagement by FamilyCare. Mr. Heatherington will testify that FamilyCare, as a nonprofit organization, often made donations to other organizations, including other nonprofit organizations. Mr. Heatherington will testify that, prior to asserting it was forced to go out of business as a result of its capitation rates, FamilyCare did not take affirmative steps to alter its business model or decrease spending.

With respect to the 2017 draft communications plan, Mr. Heatherington will testify that Ms. Saxton was a "sacrificial lamb." Mr. Heatherington will testify that he believes that Ms. Saxton was in over her head at the OHA, and that she "being led more than she was leading in the agency." Mr. Heatherington will testify that he cannot recall an instance in which Ms. Saxton was dishonest with him directly; but there were occasions where he believed that Ms. Saxton was not honest with the public or with legislators. This was based upon Ms. Saxton's "letter of apology" to him—in which Ms. Saxton said that the communications plan "was never developed and never implemented." Mr. Heatherington will testify that he believes that Governor Kate Brown was dishonest in her dealings with FamilyCare. Mr. Heatherington is expected to testify that from November 2016 to November 2017, he sent or received text messages that may be relevant to this case and that cannot be recovered from either him or the other party.

Mr. Heatherington will testify that he is not aware of any reduction in health care services as a result of "any communication from OHA about anything." Mr. Heatherington will testify that

Page 101 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

he is not aware of "any statement made by anyone from OHA, at any time, about anything" that caused any members to leave FamilyCare.  Mr. Heatherington will testify that he is not aware of "any statement made by anyone from OHA, at any time, about anything" that caused any providers to leave FamilyCare.  Mr. Heatherington will testify that he believes the OHA communications "indirectly" caused FamilyCare monetary damages.

DATED this 21st day of March, 2022

BARRAN LIEBMAN LLP

By   *s/ Edwin A. Harnden*
     Edwin A. Harnden, OSB No. 721129
     eharnden@barran.com
     Chris M. Morgan, OSB No. 175384
     cmorgan@barran.com

     Attorneys for Defendant Lynne Saxton

Page 102 – DEFENDANT LYNNE SAXTON'S LAY WITNESS STATEMENTS

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of March 2022, I caused the foregoing **DEFENDANT**

**LYNNE SAXTON'S LAY WITNESS STATEMENTS** to be:

☒    electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| **Stephen F. English** | **David B. Markowitz** |
| SEnglish@perkinscoie.com | davidmarkowitz@mhgm.com |
| **Thomas R. Johnson** | **Matthew A. Levin** |
| TRJohnson@perkinscoie.com | mattlevin@markowitzherbold.com |
| **Alletta S. Brenner** | **Vivek A. Kothari** |
| abrennerr@perkinscoie.com | vivekkothari@markowitzherbold.com |
| **Matthew J. Mertens** | **Anit K. Jindal** |
| MMertens@perkinscoie.com | anitjindale@markowitzherbold.com |
| **Sasha A. Petrova** | **Dallas S. DeLuca** |
| SPetrova@perkinscoie.com | dallasdeluca@markowitzherbold.com |
| **Alex Van Rysselberghe** | **Harry B. Wilson** |
| AVanRysselberghe@perkinscoie.com | harrywilson@markowitzherbold.com |
| **Garmai J. Gorlorwulu** | **Laura R. Salerno Owens** |
| GGorlorwulu@perkinscoie.com | laurasalerno@markowitzherbold.com |
| **Julia E. Markley** | Markowitz Herbold PC |
| jmarklely@perkinscoie.com | 1455 SW Broadway, Suite 1900 |
| Perkins Coie LLP | Portland, OR 97201 |
| 1120 N.W. Couch Street, 10th Floor | |
| Portland, OR 97209-4128 | **Carla Scott** |
| | Carla.a.scott@doj.state.or.us |
| **Matthew Gordon**, *pro hac vice* | Oregon Department of Justice |
| MGordon@perkinscoie.com | 100 SW Market Street |
| **David B. Robbins** | Portland, Or 97201 |
| DRobbins@perkinscoie.com | |
| **Brian William Grimm**, *pro hac vice* | Counsel for Defendant Oregon Health Authority |
| bgrimm@perkinscoie.com | |
| **Heath Hyatt**, *pro hac vice* | |
| Perkins Coie LLP | |
| 1201 Third Avenue, Suite 4900 | |
| Seattle, WA 98101-3099 | |
| | |
| Counsel for Plaintiff | |

CERTIFICATE OF SERVICE

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212

☐     hand delivered to the following non-CM/ECF participants:

☐     faxed and mailed by first class United States mail, postage prepaid, to the following non-CM/ECF participants:

                    *s/Edwin A. Harnden*
                    Edwin A. Harnden

CERTIFICATE OF SERVICE

01090217.1

**BARRAN LIEBMAN** LLP
601 SW SECOND AVENUE, SUITE 2300
PORTLAND, OR 97204-3159
PHONE (503) 228-0500  FAX (503) 274-1212