**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR  97201
Tele:  (503) 295-3085
Fax:  (503) 323-9105

Special Assistant Attorneys General for Defendant Oregon
Health Authority, an agency of the State of Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| FAMILYCARE, INC., an Oregon non-profit corporation, | Case No. 6:18-cv-00296-MO |
| Plaintiff, | **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS** |
| v. | |
| OREGON HEALTH AUTHORITY, an agency of the State of Oregon, and LYNNE SAXTON, | |
| Defendants. | |

## INTRODUCTION

Defendant Oregon Health Authority ("OHA") expects to present the following witnesses.  OHA expects to eliminate redundant testimony based upon the order of witness testimony.  OHA reserves the right to revise, modify, and supplement this list and narratives as developments before and during trial warrant, including based on the outcome of pretrial and trial motion practice.

**Page 1 -     DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

## WITNESS STATEMENTS

### I.    Patrick Allen (2 hours direct testimony)

#### A.    Mr. Allen's background.

Mr. Allen will testify regarding his decades-long career of public service prior to joining OHA.  Mr. Allen began his career in banking before transitioning to the public sector.  Mr. Allen will testify that he worked as a field director for Representative Kopetski.  After that, he joined the State of Oregon's Economic and Community Development Department before joining the Department of Consumer and Business Services ("DCBS").  During his fifteen-year career at DCBS, Mr. Allen moved up the ranks to director of the agency.  Mr. Allen will explain that at DCBS he gained extensive experience managing a state agency responsible for regulating large industries (e.g., banks, credit unions, insurance companies).  While director of DCBS, Mr. Allen was involved with implementing the Affordable Care Act ("ACA"), including the administration of Oregon's state-based health insurance marketplace.

#### B.    Mr. Allen will testify regarding his role in the 2018 rate setting.

Mr. Allen will testify about his experiences with FamilyCare, Inc. ("FamilyCare") after joining OHA in September of 2017.  He will explain that when he joined the agency, the 2018 rate-setting process was almost complete.  He will explain that he did not direct anyone at OHA to take any action or make any decision regarding FamilyCare's 2018 capitation rates in retaliation for FamilyCare's complaints about OHA's rate-setting process or because of the May 22, 2016 Settlement Agreement between FamilyCare and OHA ("Settlement Agreement").  He will also testify that he is not aware of any employee, contractor, or agent of OHA that took any action or made any decision regarding FamilyCare's 2017 or 2018 capitation rates in retaliation for FamilyCare's complaints about OHA's rate-setting process or because of the 2016 rates or 2016 Settlement Agreement.  Mr. Allen will testify that he did not discriminate against FamilyCare in the rate-setting process and is not aware of any employee, contractor, or agent of OHA that discriminated against FamilyCare in the rate-setting process.

Page 2 -    **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

C.    **Mr. Allen will testify that there was no plan to put FamilyCare out of business.**

Mr. Allen will testify that he did not create or implement a policy or plan to force FamilyCare to exit the Medicaid market.  Mr. Allen will testify that he is not aware of any OHA employee, contractor, or agent that had any intention of forcing FamilyCare to exit the Medicaid market.  Mr. Allen will testify that when he joined OHA as director he believed that it would benefit the Oregon Health Plan if FamilyCare would sign a 2018 Rate Amendment and continue serving Oregon Health Plan members.  Mr. Allen will testify that there are advantages to having two different providers in the Tri-County Region.  FamilyCare had a different panel of providers than the other CCO in the Tri-County Region, Health Share.  The presence of two CCOs in the region gave advocates and others an opportunity to suggest which CCO a member should be enrolled in based on their needs.  Mr. Allen will testify that he tried to reach out to FamilyCare to resolve their concerns and keep them in the Medicaid market.  Mr. Allen will describe a meeting he had with FamilyCare leadership in September 2017 (discussed below) in which he attempted to learn about FamilyCare's concerns with rate setting and repair the relationship between OHA and FamilyCare.

Mr. Allen will testify that the draft communications plan developed prior to his directorship was not something he asked for.  Mr. Allen will testify that he did not carry out or intend to carry out the draft communications plan directly, or through any employee, contractor, or agent of OHA.  Mr. Allen will testify that he did not read the draft communications plan's contents until he addressed it at a legislative hearing on September 18, 2017.  Mr. Allen testified during that hearing that the draft communications plan is not the type of work product he would have developed and he would not pursue the draft communications plan as director.  Mr. Allen will testify that he did not himself implement the draft communications plan or direct anyone to implement that plan.  To the best of Mr. Allen's knowledge, the draft communications plan had not been implemented prior to him joining the agency.

Mr. Allen will testify that he made staffing changes at the executive management level at OHA to bring in his own team of individuals with whose work he was familiar and who shared

Page 3 -    **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

his leadership values.  This included changes to personnel overseeing rate setting, adding Laura Robison as Chief Financial Officer, who was responsible for overseeing the Actuarial Services Unit.  Kris Kautz became Chief Operating Officer and was later promoted to Deputy Director.  Mr. Allen will testify about his limited communications with Ms. Saxton prior to and after taking over.

**D.      Mr. Allen will testify that OHA hired outside consultants to assess FamilyCare's concerns regarding the fairness and appropriateness of the rates.**

Mr. Allen will testify regarding his efforts to respond to FamilyCare's concerns regarding the rate-setting process.  For instance, on September 15, 2017, shortly after joining the agency, Mr. Allen and OHA's Director of the External Relations Division, Dawn Jagger, attended a meeting in FamilyCare's offices and listened to a FamilyCare presentation in which FamilyCare described its work and its concerns with the rates.  FamilyCare's CEO, Jeff Heatherington, and other FamilyCare senior managers, including Bill Murray, attended that meeting.  That meeting focused on FamilyCare's Patient/Provider Oriented Resource Teams (P2ORTs) system for coordinating care.  Mr. Murray, Mr. Heatherington, and additional FamilyCare officials discussed rate setting.  Mr. Allen will testify that he also had a meeting with Mr. Heatherington to discuss FamilyCare's concerns.  Mr. Heatherington and Mr. Allen met at Mr. Heatherington's brother's house in Salem.  Mr. Allen will testify that after this meeting, he and Mr. Heatherington settled an on approach whereby OHA would hire outside consultants to engage in a "second look" at the rate-setting process.

OHA released proposed 2018 capitation rates for FamilyCare and the other 15 CCOs at the end of October 2017.  The proposed rates were delivered to FamilyCare and the other CCOs within the time limits imposed by statute.

Mr. Allen will testify that OHA then hired two outside consultants to perform legal and actuarial reviews of the rate-setting process to determine if FamilyCare's concerns were well founded and to act on them if necessary.  The legal review was performed by Manatt Phelps & Phillips, LLP, a law firm with a specialty in Centers for Medicare & Medicaid Services

**Page 4 -       DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

("CMS") regulations. The actuarial review was performed by Lewis & Ellis, Inc., an actuarial group. OHA chose Lewis & Ellis, in part, because they lacked a relationship with OHA or the CCOs. The purpose of the reviews was to review OHA's rate-setting process for compliance with legal and actuarial standards and to determine if there was any anti-FamilyCare bias in the rate-setting processes. The reviews were designed to assess whether the rate-setting process complied with legal and actuarial standards, but not necessarily whether the policy decisions regarding rate setting were correct.

The scope of each review was designed to determine whether the rates were developed without inappropriate bias and according to legal and actuarial rules and standards. The legal review addressed, among other things, whether the reimbursement review was consistent with law and Medicaid rules and regulations, whether federal law pertaining to actuarial soundness required that each rate cell for each CCO be actuarially sound, whether withholding base data from public view based on trade secret designations violated state or federal law. Similarly, the actuarial review, addressed whether OHA's rate-setting methodology was actuarially sound and consistent and unbiased across all CCOs. Although the actuarial reviewer was directed not to opine on the policy rationale for OHA's rate-setting decisions (e.g., the reimbursement review), the actuary's scope of work did include review of those decisions for actuarial soundness, consistency, and bias.

Mr. Allen will testify that given the tight timeframe for the review and the interest in the review remaining independent, the independent reviewers' work did not require the reviewers to obtain direct feedback from the CCOs. Mr. Allen will testify that each independent reviewer was tasked with reviewing OHA's rate-setting methodology in approximately a month. Mr. Allen will testify that the reviewers did not request any direct contact with any CCO, and if either reviewer requested to meet with the CCOs, OHA would have facilitated that contact. Mr. Allen will also testify that if either review revealed a basis for altering the rate-setting methodology, OHA would have taken appropriate corrective action.

Mr. Allen will testify that assessing the propriety of OHA policy decisions was beyond the scope for the reviews, which instead addressed whether the rate-setting methodology was

**Page 5 -**    **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

unbiased, consistent, and compliant with actuarial and legal principles. However, Mr. Allen did direct Ms. Robison to review the efficacy of the policy decisions regarding the reimbursement review. Ms. Robison's review did not provide Mr. Allen with any basis for changing or altering the 2018 reimbursement review. Mr. Allen did not find any indication that there was a conspiracy to discriminate against FamilyCare when he arrived at OHA. He did not find any evidence that Ms. Saxton retaliated against FamilyCare through the rate-setting process.

The legal and actuarial reviews were completed in December 2017. Neither review revealed any basis to alter the proposed 2018 rates. Because the reviews described did not provide a basis for altering the 2018 rate-setting methodology, Mr. Allen will testify that OHA moved forward with the rates.

On December 13, Mr. Allen and OHA held a webinar for legislators regarding the results of the independent reviews. Prior to that, Mr. Allen and OHA held a similar webinar for the public. In both webinars, OHA explained that the independent reviews did not reveal any basis for altering the 2018 rate-setting methodologies.

E.    **Mr. Allen will testify that he did not give FamilyCare a 24-hour ultimatum to sign the 2018 Rate Amendment.**

Mr. Allen will testify that on December 14, 2017, he met with FamilyCare at FamilyCare's offices in the hopes of settling the dispute regarding FamilyCare's proposed 2018 Rate Amendment. Mr. Heatherington and Mr. Murray attended for FamilyCare, and Mr. Allen and Ms. Robison attended for OHA. Prior to that meeting, Mr. Allen had conversations with FamilyCare's communications consultant, Brian Gard. In those conversations, Mr. Gard suggested that a change in FamilyCare's rates that increased FamilyCare's 2018 revenues by approximately $10 million might be sufficient for FamilyCare to accept the rates and continue in the Medicaid market.

Mr. Allen will testify that the December 14, 2017 meeting did not go as expected, based on the information from Mr. Gard. FamilyCare's officials renewed their concerns about the rate-setting process and also raised new concerns regarding the third-party reviews that OHA had obtained. Mr. Allen broached the subject of a potential settlement and mentioned the $10

**Page 6 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

million figure that Mr. Gard had suggested. Mr. Heatherington then stated that FamilyCare was going to lose $75 million in 2018 and any adjustment to the rates needed to result in that level of revenue increase. Mr. Allen will testify that Mr. Heatherington's proposed settlement amount surprised him because it differed significantly from the amount that FamilyCare's own consultant, Mr. Gard, had suggested. Mr. Heatherington eventually blew up, telling OHA officials that he was not stupid and had been in this business for 30 years. Mr. Allen responded that he had been in public service for 25 years.

During that same meeting, Ms. Robison then met separately with Mr. Murray. Eventually all four reconvened and discussed the ongoing work to redetermine the eligibility status of Oregon Health Plan ("OHP") members as a result of the technological failure of Cover Oregon. Because the redetermination work would remove relatively healthy individuals from the Medicaid population, the rates would likely increase for the population that remained. Mr. Allen will testify that OHA informed FamilyCare that OHA would not have the final results of the rate redetermination by the end of the year, but OHA would try to provide FamilyCare with a sense of whether the rate increases would be "small, medium, or large" before the end of the year.

On December 15, Ms. Robison and Mr. Murray had a separate conversation as did Mr. Heatherington and Mr. Allen. Mr. Allen will testify that following those conversations, the parties agreed to begin working on a contingency plan to minimize disruption to OHP members if FamilyCare decided not to sign the 2018 Rate Amendment.

On December 15, FamilyCare held an all-staff meeting and began providing notices of termination to staff. The next day, Senator Laurie Monnes Anderson forwarded Mr. Allen an email from FamilyCare stating that FamilyCare's board had voted to reject the proposed 2018 Rate Amendment. Mr. Allen will testify that OHA also began receiving phone calls from staff members, health care providers, and even OHP members stating that they heard FamilyCare was going out of business.

Mr. Allen was concerned about FamilyCare's plans to leave the market because it would require OHA to transition FamilyCare's members to other CCOs. This process would require

**Page 7 -**    **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

transitioning approximately 115,000 members very quickly. Mr. Allen's highest priority was to ensure that OHP members retained access to services and health care during the transition. Mr. Allen will testify that waiting until the last day of the month to implement a transition plan would lead to a very abrupt transition for FamilyCare's members.

Mr. Allen will testify that OHA officials met with FamilyCare officials on December 18 and 19 to discuss the process of transitioning FamilyCare's members to other CCOs. Although Mr. Allen did not attend these additional meetings, the OHA attendees informed him of their substance.

OHA also called a meeting with FamilyCare officials on December 20, 2017. Mr. Allen will testify that he and Ms. Robison attended for OHA. FamilyCare's attendees included Mr. Murray and Kevin Clancy. Mr. Allen will testify that he explained that based on the last conversation, OHA was working to provide FamilyCare information regarding the size of the rate adjustments due to eligibility redeterminations, but that OHA had heard that FamilyCare had already made the decision to go out of business. Mr. Allen will testify that he asked FamilyCare representatives the courtesy of providing an indication of their intent with respect to the 2018 Rate Amendment within 24 hours. Mr. Allen will testify that he requested this information because FamilyCare's contract was set to terminate at the end of the month, and if FamilyCare was leaving the Medicaid market, the agency needed to take concrete steps to implement a transition plan for FamilyCare's 115,000 members. In light of information suggesting that FamilyCare was preparing to not continue its contract, OHA needed to move from contingency planning to the implementation of a contingency plan. However, the implementation was merely a contingency and FamilyCare was free to accept the Rate Amendment through the end of the time allowed by law.

Mr. Allen will testify that he did not provide FamilyCare with a take-it-or-leave-it contract, or any other ultimatum, with just 24 hours' notice. Mr. Allen will testify that OHA provided FamilyCare with its 2018 Rate Amendment on October 31, 2017, and gave FamilyCare until the end of the year to sign the Rate Amendment. Mr. Allen will testify that he understood that the law allowed FamilyCare until the end of the year to sign the 2018 Rate Amendment. Mr.

**Page 8 -** **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Allen would have accepted the 2018 Rate Amendment even if FamilyCare signed it at the end of 2017. Mr. Allen will testify that he only wanted to know if FamilyCare had already reached a decision regarding the 2018 Rate Amendment, but the agency would have accepted a signed 2018 Rate Amendment from FamilyCare up until the end of the year. Mr. Allen will testify that the conversation was difficult but that he did not lose his temper.

Mr. Allen will testify that after this December 20, 2021 meeting, he had a conversation with Mr. Heatherington in which Mr. Heatherington indicated that FamilyCare would not be signing the 2018 Rate Amendment. Mr. Allen will testify that, given the brief ten-day period until the end of the year, FamilyCare and OHA entered into a one-month extension to allow for a smoother transition of FamilyCare's members to a new CCO.

The one-month extension amendment provided for FamilyCare to receive the rates OHA proposed in October for the month of January 2018. OHA later amended FamilyCare's January 2018 rates to the higher, revised 2018 rates. CMS approved both OHA's initial 2018 rates and revised 2018 rates for FamilyCare. As compensation for entering into this one-month extension, OHA paid FamilyCare an additional $5 million. Mr. Allen will testify that some legislators opposed him extending FamilyCare's contract for one month and providing it this additional compensation, but FamilyCare's last minute decision left OHA no other choice that would also maintain appropriate care for FamilyCare's members.

**F.    Mr. Allen will testify that OHA did not delay the eligibility redeterminations in 2018 due to FamilyCare's complaints or the 2016 Settlement Agreement.**

Mr. Allen will also testify that when he joined OHA as director, the redetermination of the eligibility status of some OHP members and related actions, such as the adjustment of rates based on the redetermination, was substantially complete.

In particular, Governor Brown instructed the agency to complete the work of processing eligibility renewals by the end of August 2017, which it did. Mr. Allen will testify that Medicaid recipients were allowed a 90-day period to appeal any decision removing them from Medicaid. Accordingly, OHA did not know the final results of the eligibility renewals work until the end of

**Page 9 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

November 2017. At that time, OHA worked to determine the impact of the eligibility renewals on the 2018 rates and to determine if the rates would need to be redeveloped.

Mr. Allen will testify that he never personally delayed this work, nor did he direct staff to do so. Mr. Allen will also testify that he is not aware of any employee, contractor, or agent of OHA taking any action to delay the redetermination work in retaliation for FamilyCare's complaints about OHA's rate-setting process, including this lawsuit and previous lawsuits, or because of the 2016 rates or 2016 Settlement Agreement. The results of this work were released and implemented upon its completion.

Mr. Allen will testify that consistent with OHA's previous assurances to FamilyCare, on December 29, 2017, Ms. Robison sent FamilyCare a preliminary analysis of the projected effect of the eligibility redeterminations on FamilyCare's 2018 rates. That analysis concluded that redetermining the rates would likely increase FamilyCare's rates by 0-5%.

G. **Mr. Allen will testify that Health Share took on most of FamilyCare's former population for the remainder of 2018 at the same regional rate that would have been in place if FamilyCare would have continued participating in the CCO program.**

Mr. Allen will testify that he did not direct anyone at OHA to take any action or make any decision regarding Health Share's 2018 capitation rates following FamilyCare's departure from the Medicaid market in retaliation for FamilyCare's complaints about OHA's rate-setting process, because of the 2016 rates or the 2016 Settlement Agreement, or because of any other form of anti-FamilyCare bias. He will also testify that he is not aware of any employee, contractor, or agent of OHA that took any action or made any decision regarding Health Share's 2018 rates for any of these reasons. Mr. Allen will testify that the policy change regarding base data exclusions in rate year 2020 was not related to FamilyCare or its exit from the Medicaid market two years earlier. Instead, Mr. Allen will testify that changes in the base data policy were part of a comprehensive suite of changes to the CCO contracts called "CCO 2.0."

Mr. Allen will testify that after FamilyCare left the CCO market at the end of January 2018, its members transitioned to other CCOs. Most, but not all, of FamilyCare's members transitioned to the other CCO in the Tri-County region, Health Share. FamilyCare's 2018

Page 10 -     **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

capitation rates were lower than Health Share's 2018 rates because of FamilyCare's lower risk scores. Accordingly, Health Share's rates went down in 2018 as a result of accepting FamilyCare's former members. Health Share did not complain that the rates for FamilyCare's former population were inappropriately created or based on errors. After taking on FamilyCare's former population, Health Share did not complain to Mr. Allen that its rates were inadequate to cover its members, including FamilyCare's former population. Health Share performed its contract for 2018 with FamilyCare's former members and remains in the CCO program. Mr. Allen will testify that no other CCO has sued OHA over its rate-setting methodology for 2017 and 2018 even though the methodology incorporates the same actuarial decisions that FamilyCare criticizes as unreasonable and inadequate.

## II.    Zachary Aters (3 hours direct testimony)

Mr. Aters will testify that he has a B.A. in mathematics from Indiana University Southeast. He is a member of the American Academy of Actuaries and an Associate in the Society of Actuaries. Mr. Aters joined Optumas in 2011. Prior to joining Optumas, Mr. Aters worked for Mercer as an actuary. Mr. Aters is a credentialed actuary.

Mr. Aters will testify that he was the signing actuary for OHA for OHA's redeveloped 2015 CCO capitation rates, and for 2016, 2017, 2018, and 2019 rates. He was also the lead actuary for Optumas working on OHA's rates for CCOs in 2015 – 2019. Mr. Aters has also developed and signed rates at various times, sometimes in conjunction with another actuary, for New Mexico, Kansas, Iowa, North Dakota, Nebraska, and Colorado.

Mr. Aters will testify that in around 2014 and 2015, after passage of the ACA, which allowed states to expand Medicaid programs, CMS was preparing a new set of federal Medicaid regulations governing rate development. The regulations are sometimes called the "Mega Rule." Around the same time, CMS started issuing guides on rate development. The guides informed state Medicaid programs how to comply with Medicaid regulations when developing rates. Mr. Aters will testify that CMS may also ask states questions about their rate development.

**Page 11 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
             STATEMENTS**

Mr. Aters will testify that around the same time CMS was working on the Mega Rule, CMS started exercising more oversight in how rates were developed. Mr. Aters will testify that as an example of this additional oversight CMS was more likely to ask questions about a state's rate development.

Mr. Aters will testify that Optumas was already working with Oregon when he joined the firm in 2011. Mr. Aters worked with Steve Schramm, the CEO of Optumas. Mr. Schramm is not an actuary, but he advised OHA on the development of their Medicaid program. Mr. Aters will testify that in late 2014 or early 2015, he learned that CMS had asked OHA to update its rate-setting process to make it consistent with federal Medicaid regulations and new guidance.

Mr. Aters will testify that in 2014, OHA initially developed the 2015 rates with its in-house actuary, Dennis Tang. Mr. Aters learned that the CCOs and CMS raised a number of questions about the initial 2015 rates developed by Mr. Tang. Mr. Aters and Mr. Schramm traveled to Oregon and met OHA and CCOs about the rate-development process on or around March 4, 2015. Mr. Aters and Mr. Schramm made a presentation about rate development and answered questions from CCOs. Mr. Aters and Mr. Schramm walked the CCOs through the rate-development process over the course of several slides.

Mr. Aters will testify that not too long after that meeting in Oregon, OHA asked Optumas to redevelop the 2015 rates. OHA informed Optumas that it wanted more structure and transparency in its rate-setting process. Mr. Aters became the new signing actuary.

As the signing actuary, Mr. Aters must develop rates according to federal Medicaid regulations and CMS guidance. CMS has a department with actuaries that reviews the rates submitted by states. Mr. Aters will testify that he signed the rate certification that OHA submitted to CMS for approval for the 2017 and 2018 rates. Mr. Aters will testify that as the signing actuary he is ultimately responsible for the actuarial methodology used to develop the rates. Mr. Aters must attest to the actuarial soundness of the rates.

Mr. Aters will testify that Optumas' redeveloped 2015 rates responded to many of the concerns raised by FamilyCare and other CCOs. Mr. Aters will testify that Optumas

**Page 12 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
STATEMENTS**

developed the rates relying on CCOs' claims data from prior years. Mr. Aters will testify that Optumas discussed CCOs' base data reconciliation with them. Mr. Aters will testify that Optumas applied actuarial standards of practice and complied with federal Medicaid regulations. Mr. Aters and Optumas redeveloped the 2015 rates and submitted them to CMS in around August 2015. Mr. Aters will testify that CMS approved the redeveloped rates.

Mr. Aters will testify about rate development. He will explain that CCO rates consist of a per member, per month amount, sometimes known as a capitation rate or PMPM rate. Mr. Aters will explain that capitation rates do not reimburse CCOs for the costs of services provided to the CCO's members. Capitation rates are payments made to CCOs based on the estimated total expense of a hypothetical CCO paying for the care of its members in an upcoming year. Entities receiving capitation rates accept the risk that rates may not cover all their actual expenses during that year. Mr. Aters will testify that they also receive the benefit of potentially receiving more in rates than they actually need to pay for their members' care, thus earning a profit.

Mr. Aters will testify that the population enrolled in the Oregon Health Plan is divided into several different categories, known as categories of aid, or COAs. COAs are related to financial status or health characteristics. For example, there are COAs for several age ranges, such as 6-18 and 19-44. There are also COAs for children in adoptive or foster case and individuals in the Temporary Assistance to Needy Families program. Mr. Aters will testify that OHA pays CCOs a different capitation rate for each COA.

Mr. Aters will testify that the major components of rate development include collection and reconciliation of data, development of projection factors such as trend and policy changes, application of risk factors, and application of non-medical load. Mr. Aters will explain each of these components of rate development. Mr. Aters will testify that decisions around the development of the rates are made in a collaborative fashion between OHA, Optumas, and the CCOs. Mr. Aters will testify that after vetting the decisions, the signing actuary must be comfortable that the decisions that were made were in line with CMS guidance.

Page 13 -      **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Mr. Aters will testify that OHA made the decision to develop rates on a regional basis. OHA divided the state into four regions. Mr. Aters will testify that for the 2017 and 2018 rate years, until FamilyCare left the market, two or more CCOs operated in each region. In Mr. Aters' experience, other states use regional rate setting and it is acceptable practice. Mr. Aters will testify that two CCOs, FamilyCare and Health Share, operated in the Portland metro region, known as the Tri-County Region.

In regional rate setting, Mr. Aters will testify, the state actuary develops a regional rate for all the CCOs in the region. The regional rates are the same for all CCOs in the region. Once a regional rate is developed, OHA and Optumas apply risk scores to some of the COAs. Mr. Aters will testify that OHA and Optumas may also apply "add-ons," which account for things like taxes and payments for a small number of medical services that are not included in the regional rates. Mr. Aters will testify that the rates between two CCOs in the same region can vary only because of risk scores and add-ons. Otherwise, all the work that OHA and Optumas do to develop the rates affects the rates of all the CCOs in the region, not any one CCO individually.

Mr. Aters will testify about each of the major components of rate development. Mr. Aters will testify about how Optumas receives all the CCOs' encounter and financial data from OHA, which is responsible for collecting the data from the CCOs. Once Optumas receives the data, it reconciles the data. Mr. Aters will testify that Optumas has discussions with OHA and each of the CCOs to attempt to discern whether there are issues with the CCO underreporting or overreporting claims or financial data to OHA. Mr. Aters will testify that there is sometimes some variation between the data reported to OHA in encounter data and financial data. Mr. Aters will testify that some degree of variation is acceptable; the certifying actuary is permitted discretion under the actuarial standards of practice to exercise their judgment about acceptable levels of variation.

Mr. Aters will testify that once Optumas has reconciled the encounter and financial data Optumas may make adjustments to the data to account for excessive or unexpected costs. The final data is often called base data.

**Page 14 -     DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Mr. Aters will testify that the development of projection factors is the process by which historical base data is projected into a future period so that the actuary can estimate the amount of rates that are needed to pay for projected future costs. Mr. Aters will testify that to set rates for calendar year 2017, for example, Optumas obtained and used base data from 2015. Working in 2016, Optumas used projection factors to estimate what the costs reflected in the base data from 2015 were likely to be in the then future 2017 period. Mr. Aters will testify that Optumas used those estimated future costs to set rates for the CCOs in the future period.

Mr. Aters will testify that one of the common projections factors is trend. Trend is subjective by its nature. Mr. Aters will testify that mathematical models that evaluate historical data can help guide an actuary when developing trend, but models are only a guide. Mr. Aters will testify that actuaries, including those at CMS, understand that trend is not set on historical data alone. There is no mathematical model that can develop the perfect or correct trend for projecting base data into rates for a future period. In addition to using models, an actuary must use their judgment to evaluate other sources of information and to choose the right assumptions and values for trend. Mr. Aters will testify that an actuary can consider a number of factors in addition to models to development trend. For example, an actuary might consider the size and credibility of the base data. They could consider the time period involved and whether any changes were made to the services available in the programs during that time. They might look at the trend experienced by other programs in the state or in other locations. Ultimately, Mr. Aters will testify, an actuary uses their best professional judgment to analyze all the potential influences on trend to reach a trend to apply during the rate-setting process.

Mr. Aters will testify that after projecting the rates into the future period, the actuary develops a regional rate for each COA based on the projected future costs. Mr. Aters will testify that the regional rate is the same for all CCOs in the region.

Then, Mr. Aters will testify, Optumas and OHA develop and apply risk scores. Risk scores are based on each OHP members' overall health, as recorded by diagnoses collected by doctors when they see the member. Mr. Aters will testify that CCOs receive the diagnosis codes from the health care providers and report them to OHA. Mr. Aters will testify that OHA

**Page 15 -**      **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

handles much of the risk scores analysis using a tool called CDPS+Rx, and then shares that analysis with Optumas, which reviews it. Mr. Aters will testify that sometimes a member is too new to a CCO or OHP to have a risk score. In such an event, Optumas and OHA apply a CCO's' average risk score for people in the same COA as the unscored person. Mr. Aters will testify that this is a common and accepted practice, and it reflects the fact that CCOs tend to attract members with similar health profiles. Mr. Aters will testify that CCOs with healthier populations get lower risk scores. Mr. Aters will testify that CCOs with sicker populations get higher risk scores.

Mr. Aters will explain that the risk scores for each COA are normalized across a region and multiplied to the regional rate for that COA. Thus, Mr. Aters will explain, a CCO with a healthier population in a particular COA receives a somewhat lower rate in that COA because the risk analysis shows that CCO will likely have to spend less to care for their healthier members. The reverse is also true. If a CCO's' members in a particular COA are on average sicker than those in the same COA at another CCO in the same region, then the CCO will receive a higher capitation rate for that COA.

Mr. Aters will testify that the final element of rate development is the application of add-ons, such as additional amounts to the capitation rates to cover things like taxes and a small set of additional medical expenses that are not otherwise covered in the rates.

Mr. Aters will testify that he had regular communications with Lynne Saxton while working on Oregon's rates. Mr. Aters will testify that his relationship with Ms. Saxton was professional, not personal. Ms. Saxton called Mr. Aters to let him know that she would be resigning. It was a short call and Ms. Saxton did not tell Mr. Aters why she was resigning. Mr. Aters did not ask. Mr. Aters will testify that he liked working with Ms. Saxton and was disappointed that she resigned.

Mr. Aters will testify that Ms. Saxton never told Mr. Aters to alter or reduce FamilyCare's rates in any year, including for the 2017 and 2018 rates. Mr. Aters will testify that no one at OHA told Mr. Aters to alter or reduce FamilyCare's rates. Mr. Aters will testify that Ms. Saxton never told Mr. Aters to discriminate against FamilyCare. Mr. Aters will testify

**Page 16 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

that no one at OHA told Mr. Aters to discriminate against FamilyCare or any CCOs.  Mr. Aters will testify that Ms. Saxton never directed Mr. Aters to do anything at all with respect to FamilyCare that was inconsistent with FamilyCare receiving equitable treatment.  Mr. Aters will testify that no one at OHA directed Mr. Aters to do anything at all with respect to FamilyCare that was inconsistent with FamilyCare receiving equitable treatment.  Mr. Aters will testify that Optumas did not take any actions to improperly reduce FamilyCare's rates. Mr. Aters will testify that Optumas developed FamilyCare's rates according to the same methodology it developed the rates for all 15 other CCOs.  Mr. Aters would not have acted on any request to discriminate against FamilyCare or any other CCO.  Mr. Aters will testify that he always treated FamilyCare, and all CCOs, equitably in the rate-development process and, to his knowledge, so did his colleagues at Optumas and OHA.  The rates Mr. Aters signed each year were actuarily sound.

Mr. Aters will testify that Oregon and the federal government are parties to an agreement known as the Section 1115 Waiver ("1115 Waiver").  Mr. Aters will testify that under the terms of the 1115 Waiver, OHA committed to hold the overall rate of growth in Oregon's Medicaid program to 3.4% per year on average over five years.  Mr. Aters will testify that the rate of growth target set in the 1115 Waiver is not risk adjusted.  Mr. Aters will testify that Optumas does not set rates to comply with the 3.4% target in the 1115 Waiver.  Mr. Aters will testify that Optumas sets rates that are compliant with actuarial standards of practice and federal Medicaid rules.

Mr. Aters will testify that when evaluating data from 2014 and 2015, Optumas observed that there were significant increases in the base data between 2014 and 2015.  The growth between those two periods outpaced the sustainable growth rate of 3.4% in the 1115 Waiver.   Mr. Aters will testify that OHA and Optumas sought to understand what was driving the high rates of growth.  Mr. Aters will testify that they discovered that increases in reimbursements and incentives paid to doctors contributed to the increase, along with other factors outside of the CCOs' control.

**Page 17 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
             STATEMENTS**

Mr. Aters will testify that OHA made a policy choice known as the reimbursement policy. Mr. Aters will testify that OHA only made this policy decision after deliberation with Mr. Aters and Optumas and other stakeholders. Although OHA made the policy decision, it was still necessary for Mr. Aters to agree that the resulting rates would be actuarially sound such that he could certify them. Mr. Aters will testify that he informed OHA that he could only sign rates that were reasonable, appropriate, and attainable, and, therefore, the 3.4% rate of growth target could only be used to evaluate unsustainable drivers of growth, not limit CCO rates to achieve the target. Mr. Aters will testify that OHA understood and agreed. Mr. Aters will testify that the rates Optumas developed in both 2017 and 2018 were reasonable, appropriate, and attainable and met federal Medicaid requirements after implementing the reimbursement policy.

Mr. Aters will testify that OHA and Optumas implemented a reimbursement policy in both 2017 and 2018. Mr. Aters will testify that he helped author a document describing the reimbursement policy for the 2017 rates.

Mr. Aters will describe the implementation of the 2017 and 2018 reimbursement policies. Mr. Aters will testify that in reviewing CCO per member spending from 2014 to 2015, Optumas found that on aggregate CCOs' per member costs grew at 8.6%. That growth rate far exceeded the sustainable rate of growth set by the Section 1115 Waiver. Mr. Aters will testify that Optumas did not risk adjust the population when computing the rate of growth; it is not appropriate or common to perform a risk adjustment when evaluating rates of growth as part of a reimbursement review. He made the decision not to risk adjust the population himself. Mr. Aters will testify that Optumas learned, in its evaluation of the CCO rate of growth for 2014 to 2015, that some of the growth was being driven by increased reimbursements and incentive payments to providers.

Mr. Aters will testify that the 2018 reimbursement policy also examined implied rates of growth across prior years. Mr. Aters followed a similar procedure to the 2017 reimbursement policy to compute the rate of growth when implementing the 2018 policy.

Mr. Aters will testify that after determining the rates of growth for each CCO, Optumas and OHA identified certain CCOs that had rates of growth that were unsustainable. Mr. Aters will testify that Optumas adjusted the base data for some CCOs to remove excess costs that were the result of CCOs' business decisions, such as increased reimbursements and incentive payments. Mr. Aters will testify that adjusting base data is an iterative process that can include multiple rounds of adjustment. At each iteration, Optumas adjusted the base data by removing excess costs. Then, Optumas conducted an analysis to make sure that the resulting rates were still reasonable, appropriate, and attainable for each region. Mr. Aters will testify that Optumas looked at other CCOs in the same region to review how much they reimbursed providers in various categories of service to ensure that CCOs had adequate resources to pay reasonable, appropriate, and attainable reimbursements for health services for their members.

Mr. Aters will testify that for the 2017 rates, OHA and Optumas adjusted the base data of nine of the 16 CCOs. Optumas, in collaboration with OHA, conducted four iterations of adjustments to the base data. Mr. Aters will testify that the iterations addressed both excess incentive payments and excess reimbursement to health care providers. Not all nine CCOs that received adjustments were affected by each iteration. The last iteration affected only FamilyCare. In that iteration, OHA and Optumas removed excessive cost increases in FamilyCare's payments to primary care physicians. Mr. Aters will testify that after each iteration, Optumas ensured that the resulting rates would still be reasonable, appropriate, and attainable. Mr. Aters will testify that about $34 million in excess cost was removed from FamilyCare's base data.

Mr. Aters will testify that OHA and Optumas also implemented a reimbursement policy for the 2018 rates. Mr. Aters will describe that policy. Once again, Mr. Aters will explain that OHA and Optumas did not adjust base data to obtain a specific rate of growth. OHA and Optumas evaluated CCO data to reveal drivers of cost growth. Mr. Aters will testify that in 2018, Optumas adjusted the reimbursement and/or incentive payments in the base data of eight of the 16 CCOs. Mr. Aters will testify that Optumas again ensured that the resulting rates would still be reasonable, appropriate, and attainable.

**Page 19 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Mr. Aters will testify that no one at OHA or in Optumas directed Mr. Aters to adjust FamilyCare's base data—in the development of either the 2017 or 2018 rates—in retaliation against FamilyCare for the 2016 Settlement Agreement or because of FamilyCare's speech about rate setting. Mr. Aters himself did not adjust FamilyCare's base data because of the 2016 Settlement Agreement, FamilyCare's 2016 rates, or the Settlement Credit in the Settlement Agreement. Mr. Aters will testify that the reimbursement policy was not an attempt to clawback money from FamilyCare because of the 2016 Settlement Agreement and he is unaware of anyone at OHA or Optumas who thought that it was. Mr. Aters will testify that the reimbursement policy was an acceptable actuarial process. Mr. Aters will testify that the reimbursement policy was developed fairly and applied with the goal of wisely managing state and federal resources. Mr. Aters will testify that CMS approved the 2017 and 2018 rates.

Mr. Aters will testify that adjustments to base data like those performed in the 2017 and 2018 reimbursement policies do not affect CCOs in isolation. Adjusting the base data on one CCO affects the rates of every CCO in the region because the rates are developed on a regional basis. Thus, adjusting FamilyCare's base data did not just affect FamilyCare's CCO rates, it also affected Health Share rates, the other CCO in the region.

Mr. Aters will testify that OHA and Optumas adjusted base data for CCOs both before and after the 2017 and 2018 rate-development process. Before the 2017 and 2018 rates, Optumas worked collaboratively with Kaiser, which was part of Health Share's network, to remove excess cost in its base data. And OHA and Optumas continued the reimbursement policy in 2019, after FamilyCare left the market. Mr. Aters will describe the 2019 reimbursement policy, which also adjusted CCOs base data, including physician reimbursement in CCOs' base data. Mr. Aters will testify that reimbursement adjustments like the ones OHA and Optumas used in 2017 and 2018 are used in other states Mr. Aters has worked in. There is nothing unique or special about the methodologies and approaches utilized in the 2017 and 2018 reimbursement policies.

Mr. Aters will testify that OHA underwent an analysis to redetermine whether OHP members were eligible to receive benefits and remain in the program. That analysis was

**Page 20 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

delayed because of technology issues. The redetermination analysis was not complete in time to completely incorporate it into the proposed 2018 rates released in October 2017. Mr. Aters will testify that Optumas developed revised rates when the redetermination analysis was complete. Mr. Aters will testify that Optumas made two adjustments to account for redeterminations in eligibility for OHP members in the 2018 rates. Optumas made one adjustment in the original 2018 rates and a second adjustment in the revised 2018 rates, which were completed in the first part of 2018. Optumas made the adjustments as quickly as it could once receiving the redetermination analyses from OHA. Optumas did not slow down the redetermination adjustments to prejudice FamilyCare and no one at OHA asked Optumas to slow the process down. When developing the 2018 rates, Mr. Aters took the redetermination analysis into account when preparing trend. Mr. Aters will testify that Optumas made an acuity adjustment in the trend model to account for the redetermination process.

Mr. Aters will testify that development of trend is not an empirical calculation. It involves an actuary's judgment. Optumas did not develop trend to discriminate FamilyCare. Mr. Aters will testify that Optumas applied the same trend to both FamilyCare and Health Share, the two CCOs in the Tri-County Region. Mr. Aters will explain that Optumas' development of trend was supported and based on appropriate models and actuarial judgment.

Mr. Aters will explain that in Medicaid rate development the actuary develops rates for the program or region, not for any individual CCO. Mr. Aters will testify that OHA and Optumas are not obligated to adjust the rates paid to any CCO to ensure that the rates cover the CCOs' costs.

Mr. Aters will explain OHA and Optumas' treatment of CCOs' patient case management costs. Mr. Aters will testify that Optumas reclassified some of FamilyCare's case management costs from medical expense to administrative expense. This reclassification did not affect just FamilyCare; because the reclassification occurred in the base data, it affected both FamilyCare and Health Share. Reclassification of excessive case management costs is an acceptable actuarial practice within the judgment of the signing actuary.

**Page 21 -     DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
              STATEMENTS**

Mr. Aters will explain margin allowances in CCO rate development. Mr. Aters will testify that Optumas made reductions to the risk margins allowance for all CCOs in 2017 and 2018. As the base data for CCOs became more stable in 2015 and 2016, after the ACA's expansion, less risk margin was required because CCOs had more historical knowledge about the likely costs of providing care for their members. The adjustments to risk margin were applied to all CCOs, not just FamilyCare.

Mr. Aters will explain how Optumas developed non-benefit expense allowances in the rates. Mr. Aters will testify that Optumas applied a reasonable, appropriate, and attainable non-benefit load for a reasonably run CCO. Mr. Aters will explain that because rates are not developed for individual CCOs, Optumas does not establish non-benefit expense allowances based on an individual CCOs experience or requests.

Mr. Aters will explain that in 2017, after discussions with FamilyCare, Optumas and OHA elected to use Paid COA to map CCO members to rate cells. Mr. Aters will explain that the change was made in the revised 2018 rates that Optumas certified in early 2018. Mr. Aters will explain that the change to Paid COA increased FamilyCare's rates and affected all CCOs. Mr. Aters will testify that the timing of the change to Paid COA was not designed to prejudice FamilyCare.

Mr. Aters will testify that using a one year of base data is credible. Credibility is typically defined by number of covered members, not years of data. The Tri-County area involves large populations, including at a rate cell level. The size of population was sufficient for the base data to be credible.

Mr. Aters will explain that OHA and Optumas had sufficient information to risk adjust COAs in the Tri-County Region. Mr. Aters will testify that when developing rates in 2017 and before, Optumas consulted with the State regarding the use of four diagnosis codes to build the risk scores. Mr. Aters will testify that OHA wanted to ensure that CCOs were on more equal footing and using four diagnosis codes instead of more helped achieve that. Mr. Aters will testify that after time had elapsed, allowing CCOs to improve the capture of diagnosis codes, the State moved to evaluating more codes to develop risk scores.

**Page 22 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
           STATEMENTS**

Mr. Aters will testify that Oregon endeavored to have a transparent rate-development process.  Mr. Aters will testify that Optumas had frequent meetings with CCOs, including multiple webinars, rate workgroups, and individual meetings with CCOs.  Mr. Aters will testify that Optumas met with CCOs individually to review their base data submissions. Optumas and OHA answered many questions from CCOs about the rate-development process, frequently through email.  Mr. Aters will testify that Optumas and OHA were open to feedback.  Optumas and OHA answered questions from the CCOs and submitted the questions and answers to CMS as part of the rate certification.  Mr. Aters will testify that even though CCOs considered some of their internal financial and payment data confidential and did not want to share it with competitor CCOs, OHA and Optumas often shared aggregate data.  Mr. Aters will testify that Oregon was by far the most transparent state Mr. Aters worked with in setting rates.

## III.     Jeston Black (1 hour direct testimony)

In addition to the testimony included in this statement, OHA reserves the right to adopt the information contained in the witness statement for Mr. Black that will be presented by Defendant Lynne Saxton.

### A.     Mr. Black will testify regarding his professional experience.

Mr. Black will testify that he received a bachelor's degree in political science and government from the University of Oregon in 1999.  He joined OHA in February 2016 as the head of Government Relations within the External Relations Division.

### B.     Mr. Black will testify about his job duties with OHA.

Mr. Black will testify that while at OHA, he led a small team of legislative coordinators. Collectively, they handled the legislative interactions for OHA, including coordinating and tracking policy during the legislative and post-legislative implementation processes. Significant legislative communications from OHA would go through Mr. Black or leave the agency with his knowledge.  He will testify that it was his responsibility to stay abreast of important OHA topics so that he could answer questions from legislators or other stakeholders.  If a bill was enacted

**Page 23 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
                 STATEMENTS**

that implicated OHA, Mr. Black would identify the department in charge of implementation and work with that department to coordinate progress reports to legislators or stakeholders.

Mr. Black will testify that he reported directly to BethAnne Darby, the director of the External Relations Division for OHA. BethAnne Darby reported to OHA Director Lynne Saxton. The External Relations Division included the government relations program, the ombudsman program, the peer support team, and the communications arm led by Robb Cowie.

### C.    Mr. Black will testify regarding FamilyCare's 2017 legislative bills.

Mr. Black will testify that FamilyCare introduced three legislative bills to the 2017 session (through Senator Sara Gelser Blouin, chair of the Senate Interim Committee on Human Services and Early Childhood). Those were Senate Bills 233, 234, and 236. Mr. Black will testify to the impacts of those bills on several OHA responsibilities, including OHA oversight of the Medicaid expansion population, Medicaid rate setting and data reporting, the 1115 Waiver, and CCO contracts. For example, Senate Bills 234 and 236 would have shifted significant portions of OHA's rate-setting authority and oversight—including a de novo review of OHA's rate-setting determinations—to the Department of Consumer and Business Services, which was headed by Pat Allen.

Mr. Black will testify that OHA did not take a position for or against Senate Bills 233, 234 or 236. Nevertheless, OHA was called on to provide subject matter expertise, fiscal impact, and policy feedback on these bills, including through individual meetings with legislators for this purpose. He will testify that OHA provided Senator Monnes Anderson with a written analysis of the impacts of Senate Bill 233 at Senator Monnes Anderson's request. From Mr. Black's perspective, OHA declined to orally testify because it sought to stay out of the debate regarding these bills to the extent permitted by its subject matter expertise and related need to support the legislature on topics that impacted OHA and the Oregon Health Plan. Mr. Black will testify that OHA did not take a position for or against any of these FamilyCare bills or speak negatively about the bills because they were introduced by FamilyCare. Rather, OHA provided factual information to legislators about the impact of the proposed legislation on the entire system and how those bills fit within the Triple Aim.

Page 24 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
            STATEMENTS

Mr. Black will testify that the CCOs were not united in supporting Senate Bills 233, 234 or 236—in particular, some CCOs did not want to reveal to their competitors how much they paid providers, which they viewed as trade secret or proprietary information.  One CCO affiliate, CareOregon, testified in opposition to parts of the bills.

Mr. Black will testify that the legislature did not enact Senate Bills 233, 234, and 236 during the 2017 legislative session.

**D.      Mr. Black will testify regarding FamilyCare's relationship with other CCOs.**

Mr. Black will testify that outside of OHA, FamilyCare was known for being an outlier among the other CCOs.  He will testify that many of the CCOs worked collaboratively on legislative initiatives.  Mr. Black understood from staff and lobbyists for other CCOs that FamilyCare took an adversarial approach to the other CCOs, choosing to believe that they were trying to pull something over on FamilyCare.  For example, Mr. Black will testify that when the other CCOs proposed legislation to fund navigators to assist individuals in enrolling in Medicaid, he observed FamilyCare oppose the legislation because it believed that Health Share, the other CCO in the Tri-County area, would attempt to use the navigators to sign up more Medicaid members for itself.  Mr. Black will testify that he observed that other CCOs felt FamilyCare tended to be adversarial when it did not get what it wanted.

**E.      Mr. Black will testify regarding the 2017 draft communications plan.**

Mr. Black will testify that communications plans are tools used in a variety of situations both inside and outside of OHA.  There is nothing unusual about the use of a communications plan—in fact, it is a best practice tool.  Communications plans help keep people coordinated, avoid overlapping work, and ensure everyone is headed in the same direction.

Mr. Black will testify that he does not recall seeing the 2017 draft communications plan or having any conversations about it with others within OHA until OHA received a public records request for this information in the summer of 2017.  By contrast, Mr. Black had meetings regarding budget virtually every day.

Mr. Black will testify that communications and information that went to legislators would flow through him, particularly on Medicaid-related issues.  He will testify that the portions of the

**Page 25 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
                 STATEMENTS**

2017 draft communications plan dealing with contact with the legislature were not implemented. He will testify that OHA did not seek to create buzz to cause the legislature to question FamilyCare's legislative efforts or complaints. And OHA did not attempt to use legislators, legislative staff, or lobbyists to spread information or pitch stories to news media. He will testify that, from a practical perspective, it would have been nearly impossible to implement any efforts to use legislators or other lobbyists to pitch stories on OHA's behalf, even if OHA had attempted to do so (which it did not).

Mr. Black will testify that he is not aware of any employee, contractor, or agent of OHA who sought to retaliate against FamilyCare or who took any action or made any decision regarding the 2017 and 2018 capitation rates for FamilyCare for its complaints about OHA's rate-setting process or due to the 2016 Settlement Credit or rates paid to FamilyCare for 2016. He is also not aware of any plan by any employee, contractor, or agent of OHA to discriminate or retaliate against FamilyCare in the rate-setting process.

**F.    Mr. Black will testify about OHA's redetermination efforts.**

Mr. Black will testify that the redetermination process looks at a Medicaid member's eligibility to continue in the Medicaid program. Following the Cover Oregon failure, OHA worked to complete redetermination for thousands of Medicaid members, but the process was slow due to ongoing technology issues. OHA was communicative with CMS about the redetermination delays in order to avoid potentially jeopardizing OHA's federal Section 1115 Waiver with CMS.

Mr. Black will testify that he never observed any OHA employee, contractor, or agent intentionally delaying eligibility redetermination efforts during his time at OHA. In fact, during the action plan in 2017, OHA and members of the Governor's office met regularly to track and examine the information regarding members awaiting redetermination.

Page 26 -    **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

**G.    Mr. Black will testify regarding the Oregon's Health System Transformation Quarterly Legislative Reports.**

Mr. Black will testify that OHA produced Oregon's Health System Transformation Quarterly Legislative Reports ("quarterly legislative reports") to give legislators more information about the status of the Oregon Health Plan.  The reports provided legislators with information in a consolidated and regular manner and helped to avoid fielding the same questions repeatedly from different sources.  The reports included CCO financial information, which originated from data submitted directly to OHA from the CCOs.  Mr. Black will testify that he assisted the communications team by providing feedback on the layout and presentation from the perspective of a legislator to ensure that it would be easily digestible by the legislative audience.

Mr. Black will testify that FamilyCare complained about the inclusion in the quarterly legislative reports of a graph showing the level of CCO financial reserves.  It was Mr. Black's understanding that all of the information in that graph was collected directly from the CCOs, including FamilyCare.  Further, it was not unusual for OHA to be required by statute to provide reports to the legislature, particularly in public health.  Stakeholders would often build reporting obligations into bills to keep a clear line of sight on implementation progress.

Mr. Black will testify that in addition to legislative reports, OHA strived to maintain a high level of communication with legislators.  OHA sent frequent email reports to legislators on issues that might come up from other sources.  The reports and proactive legislative messaging allowed OHA to efficiently provide legislators with information all at once without waiting for individual questions; it also fostered transparency that was important for good relations with legislators because it demonstrated to legislators that OHA was not trying to hide the ball.

**H.    Mr. Black will testify that OHA handled many significant projects and issues in 2016 and 2017.**

Mr. Black will testify to the issues OHA handled during his time with the government relations program.  Some of those projects included the Cleaner Air Oregon Initiative, Toxic Free Kids, Cover All Kids, the expansion of reproductive-health equity, public health

**Page 27 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

modernization, issues with the aid-and-assist population at the Oregon State Hospital, budget challenges, behavioral health access and integration (with CCOs and counties), adult foster home licensing, midwives, Medicaid population redetermination, and dental benefits.

Mr. Black will testify that some of these issues were unexpected and, thus, unexpectedly required significant time and attention from OHA staff. Other issues were coalition-built projects like the public health modernization effort that required years to culminate. Because OHA was always juggling its resources to meet both critical and time sensitive safety issues and initiatives, OHA was necessarily stretched thin for time and personnel resources.

## I.    Mr. Black will testify regarding his work with Optumas and rate setting.

Mr. Black will testify that he attended several meetings in 2016 with Optumas and CCOs to learn about the nuts and bolts of the rate-setting process and to better understand what CCOs were asking for and the issues they were raising. These meetings offered individual CCOs the opportunity to discuss how the OHA financial team processed the CCO's data and calculated their rates.

Mr. Black will testify that he did not participate in rate setting at OHA; however, a general understanding of the actuarial process helped him to better communicate with legislators and respond to their concerns at a high-level regarding Oregon's Medicaid system. He will testify that it was helpful for his legislative work to attend meetings with the CCOs and Optumas because it provided him with insights into the concerns that CCOs were likely to raise with legislators. CCOs often complained to legislators that they had the riskiest populations and should receive more money as a result.

Mr. Black will testify that only a few legislators wanted to achieve more than a general understanding of the rate-setting process. For those legislators, OHA arranged a few meetings with Optumas to deepen their understanding of rate setting in Oregon. OHA was willing to offer this educational opportunity to legislators interested in learning more.

**Page 28 -     DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
STATEMENTS**

**J.       Mr. Black will testify to OHA's involvement in legislative session.**

Mr. Black will testify that OHA took a position for or against a legislative bill only when directed to do so by the governor.  OHA would remain neutral on all other bills.  He will testify that OHA was regularly called on to provide advice and information to the legislature for any bills that might impact OHA or for which OHA could provide subject matter expertise—even when OHA did not take a position for or against that bill.  Mr. Black will testify as to the steps OHA would engage in when it took a position for or against a legislative bill.

Mr. Black will testify that OHA's subject matter expertise was not shared exclusively with the legislature.  OHA also offered subject matter expertise on Medicaid issues to stakeholders more broadly.  It was not unusual for OHA to meet with groups involved in the legislative process (including CCOs) to discuss Medicaid issues or OHA's budget and to share information that stakeholders needed to pursue their own policy or legislative goals.

OHA tracked over a thousand bills in the 2017 legislative session.  Mr. Black will testify that of those bills, OHA actively supported approximately 30 bills.  Of the bills that it tracked, OHA spent significant time and effort working on hundreds of bills on which OHA did not take a position for or against—typically because OHA served as a subject matter expert and provided policy information, fiscal impact, or contextual information to the legislature for those bills.

Mr. Black will testify that when OHA acted in only a subject matter expert, fiscal impact reporter, or policy advisory role, OHA might still invest significant time and energy into that bill.  When asked about the impacts of policy changes, OHA would provide feedback on whether a bill or portions of a bill might have unintended negative consequences.  This feedback might result in a better and more successful bill.  For example, Mr. Black will testify that House Bill 3391, the Reproductive Health Equity Act, was passed in the 2017 legislative session.  OHA did not take a position on House Bill 3391, but was asked to provide technical information, advice on policy implications, fiscal impact, and testimony for the bill.  Mr. Black will testify that following passage, OHA was tasked with implementation of several portions of House Bill 3391 and provided the legislature with statutory progress reports.

**Page 29 -       DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Similarly, Mr. Black will testify that OHA took a neutral position on House Bill 2838 (introduced in the 2017 legislative session), which sought to allocate resources to non-profits assisting Medicaid members in navigating enrollment. Although OHA did not take a position for or against House Bill 2838, OHA provided subject matter and policy feedback, as well as fiscal impact information on the bill. House Bill 2838 was not enacted into law in the 2017 legislative session.

Mr. Black will testify that during the 2017 legislative session, legislative initiatives would typically flow through him. From Mr. Black's perspective, other than budget-related legislation, Director Saxton did not play a large role in OHA's day-to-day legislative work. He will testify to his approach to utilizing the right team members for legislative communications. Mr. Black and his reports would handle most issues unless it called for subject matter expertise or a particular approach more suited to someone else on the OHA team.

### K.    Mr. Black will testify to the legislature's perspective on the Oregon Medicaid system.

Mr. Black will testify that from his observation, the legislature was very supportive of the Oregon Medicaid model, and in particular, of the 3.4% growth target under the 1115 Waiver. It was Mr. Black's perception that the legislature was unlikely to ever authorize more funding for the Oregon Health Plan budget than what was required by the state match under the 1115 Waiver. Mr. Black will testify that another Medicaid program called the K Plan (that does not fall under the 1115 Waiver) experienced a significant budgetary spike without the cost containment cap imposed on the Oregon Health Plan by the 1115 Waiver.

## IV.    Caroline Brown (1 hour direct testimony)

Caroline Brown is an attorney, formerly with Covington and Burling. Ms. Brown specializes in legal matters pertaining to federally funded health and benefit programs (e.g., Medicaid and Medicare). Ms. Brown represented OHA during its early 2016 negotiations with FamilyCare over FamilyCare's lawsuits challenging the 2015 CCO rates and Optumas's rate-setting methodology. Ms. Brown will provide testimony regarding those negotiations and the regulatory background surrounding them.

Page 30 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
                STATEMENTS

**A.    Ms. Brown will testify that beginning in fall 2013, CMS increased its oversight of state rate setting for Medicaid plans.**

As background, Ms. Brown will explain that pursuant to 42 CFR 438.6, CMS must "review and approve" all CCO contracts.  Historically, CMS did not "look behind" actuarial certifications submitted by a State in support of its contract payment rates.  That changed in the fall of 2013, as CMS and the States began to prepare for the Medicaid expansion scheduled to take effect on January 1, 2014.  For the first time, CMS involved the CMS Office of the Actuary (which previously had focused primarily on the Medicare program) in reviewing States' rate-setting processes.  In consultation with the Office of the Actuary, CMS issued a "rate-setting consultation guide," held in-depth consultation meetings with States and their consulting actuaries to discuss the guidance, and identified key elements that needed to be described in the filed rate methodologies.  In February 2015, the Government Accountability Office published a report on "high-risk" federal programs and specifically faulted CMS for its lack of oversight over state Medicaid rate setting for managed care organizations.

As a result of these initiatives, starting in 2014, States were subject to a much higher level of scrutiny regarding their managed care rates than had previously been the case.  Ms. Brown will testify that in the course of her practice representing a number of state Medicaid agencies across the country, she heard from a number of states that the rate review process, which used to be fairly routine, would drag on for months and often involved answering hundreds of questions from the Office of the Actuary regarding the data on which the rates are based and the methodology used to calculate them.

If CMS does not approve a state's managed care capitation rates, the federal government will not fund its share of those payments, and can disallow (recoup) any federal funds that the State has drawn to make unapproved payments.

**B.    Ms. Brown will testify that this increased federal oversight resulted in OHA altering its rate-setting methodology and hiring Optumas as its certifying actuary.**

Ms. Brown will testify that she advised OHA officials regarding this increased federal oversight of managed care rate setting in a letter addressed to Governor Kate Brown.  Ms.

**Page 31 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Brown will testify that she also sent the Governor's letter to other OHA officials including Lynne Saxton and Lori Coyner.

Ms. Brown will also testify about the effect of this increased federal oversight on OHA. OHA sets its capitation rates for CCOs on a calendar year basis. From 2011 to 2014, OHA established CCO rates using a methodology referred to as the "cost template." The cost template was a rate-setting model created by OHA in-house actuaries. The cost template was provided to CCOs to report their financial costs and anticipated trends. The CCO projections were reviewed for reasonableness, and rates were restricted to an aggregate target increase/decrease in costs to align with the target growth rate forecasted in the OHP demonstration project.

When OHA submitted its rates for 2014 for CMS approval, those rates were subject to the more intense scrutiny from CMS described above. After several months of discussions and review, CMS informed OHA by letter dated August 7, 2014, that it had "identified issues that are endemic to the state's rate-setting methodology that will require improvements on a prospective basis." Specifically, CMS took the position that OHA's process of reviewing the CCO's proposals for reasonableness was "not a substitute for an evaluation that would be necessary to attest to the actuarial soundness of the assumptions, methodologies, and subsequent final rates." CMS requested a plan within 120 days that would "result in improvements in your rate-setting methodology in the 2015 rating period."

As a result of the August 2014 letter from CMS, OHA needed to change its process for developing the rates for calendar year 2015, and the rates were not released until December 24, 2014, for the contract period beginning January 1, 2015. As set forth in the "Oregon Capitation Rate Development Action Plan" submitted to CMS on January 15, 2015, among other changes, OHA used detailed event-level encounter data for setting the 2015 capitation rate ranges instead of relying on CCO developed cost estimate templates. Some CCOs had a reduction in their global budget, and most CCOs did not have an increase in rates for their Medicaid expansion population. On January 29, 2015, ten CCOs signed a letter to then-Governor Kitzhaber expressing concern about the rates. A chief complaint was that there was

**Page 32 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

not a 3.4% rate increase for the ACA expansion population. CCOs also expressed concern about the very late date for release of the 2015 rates.

In March 2015, OHA met with the CCOs to discuss their concerns, and raised the possibility of bringing in an outside actuary to redevelop the rates. Also in March, OHA received more than a hundred questions from CMS regarding how the rates were set. OHA engaged Optumas, an outside actuarial firm with extensive experience in rate setting for Medicaid managed care, to reexamine the 2015 rate methodology. Optumas redeveloped the 2015 rates, and OHA released the redeveloped 2015 rates in August 2015.

### C.    Ms. Brown will testify about the parties' negotiation of the terms of the 2016 Settlement Agreement.

Ms. Brown will testify about the circumstances that led to the 2016 Settlement Agreement. In 2015 and 2016, FamilyCare filed lawsuits against OHA challenging the rate-setting methodology OHA employed to set the original 2015 rates, the redeveloped 2015 rates, and the 2016 rates. In addition, FamilyCare refused to sign the amendment with the redeveloped 2015 capitation rates, which were significantly lower than its 2014 rates and which would result in FamilyCare needing to repay approximately $54 million in overpayments to OHA. CMS would not approve OHA's 2015 and 2016 contracts with FamilyCare because FamilyCare had not signed the 2015 Rate Amendment.

Ms. Brown will testify that OHA and FamilyCare held negotiations to resolve the dispute over the 2015 rates and FamilyCare's refusal to sign the 2015 Rate Amendment. Ms. Brown will testify that during those negotiations, FamilyCare was represented by Kelly Knivila and Timothy Hatfield at Stoel Rives. Ms. Brown was joined by her colleague Phillip Peisch. During those negotiations, on behalf of OHA, Ms. Brown presented a framework for potential settlement that would leave OHA and Optumas's rate-setting methodology intact but under which OHA would make financial concessions to reduce the amount of funds that FamilyCare would pay back to OHA related to the 2015 overpayment.

As to financial concessions, OHA would provide FamilyCare with a monetary credit of $24.8 million on FamilyCare's rate overpayments for 2015. The Settlement Credit was

**Page 33 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
        STATEMENTS**

roughly equivalent to the difference in capitation rates attributable to the risk adjustment methodology used by Optumas and the one preferred by FamilyCare, which was one of many challenges that FamilyCare had raised with respect to the 2015 rate setting.

Ms. Brown explained to FamilyCare that in exchange for this financial concession, OHA needed assurances that FamilyCare would not continue to nit-pick actuarially-set rates in future rate years. During negotiations, Ms. Brown explained to FamilyCare's representatives that OHA could not and would not agree to specific parameters on the 2017 rate-setting methodology because OHA would not agree to any restrictions on its ability and authority to set actuarially sound rates in the future.

Ms. Brown also explained that OHA sought specific assurances about its discretion to apply an actuarially sound rate-setting methodology even if that rate-setting methodology did not produce rates that covered the costs of every CCO. OHA sought FamilyCare's agreement that OHA has authority to set CCO rates; that CMS reviews those rates and confirms that they are actuarially sound; and that OHA is not obligated to adjust the rates to ensure that they cover all of a CCO's costs. These concessions were ultimately memorialized in the "Rate Development Process" section of the parties' Settlement Agreement.

Ms. Brown will testify that, during settlement negotiations, FamilyCare expressed a belief that each year's rates used the previous year's rates as a starting point. FamilyCare therefore wanted a settlement that included an increase to its capitation rates for 2015 and 2016, because it believed that any increase would support additional increases in future rate years; conversely, FamilyCare was concerned that if it agreed to accept lower capitation rates in 2015 and 2016, there would be a limit as to any increases that it might otherwise get in 2017 and thereafter. Ms. Brown will testify that she and Mr. Peisch explained to FamilyCare's representatives that the rates for each year were based on actuarial factors and not on the rates for the previous year.

Ms. Brown will testify that the Settlement Agreement term stating that the 2016 capitation rates or the Settlement Credit shall not be "a basis for limiting the amount that can be paid to FamilyCare in future rate years" was intended only to confirm that neither would be

used as an input by the actuaries to cap any rate increases in future years. Similarly, at FamilyCare's request, the Settlement Agreement also included a provision stating that in any public documents showing "year-over-year" comparisons between rates paid in 2015, 2016, and 2017, OHA should note that "there was settlement of litigation that resulted in a settlement payment to FamilyCare outside the capitation rate" to address any perception that FamilyCare's rates had increased substantially. Ms. Brown will testify that there was not any discussion that this provision would provide FamilyCare with a contractual right to challenge the rates in future years by citing subjective animus engendered by the Settlement Agreement.

## V.      Lori Coyner (2 hours direct testimony)

Lori Coyner will testify that she joined OHA in 2013 and was promoted to Director of Health Analytics in June 2014. Ms. Coyner was promoted to State Medicaid Director in December 2015. Ms. Coyner resigned from OHA in July 2017. In February 2019, Ms. Coyner rejoined the agency as Medicaid Director. In July 2021, she again stepped down as Medicaid Director. Ms. Coyner is currently a senior policy advisor for renewal of Oregon's Section 1115 Waiver.

### A.      Ms. Coyner will testify about Oregon's Section 1115 Waiver and the development of the coordinated care model in Oregon.

Ms. Coyner will testify about Oregon's 1115 Waiver. Ms. Coyner will testify that the 1115 Waiver permits OHA to waive some requirements from its Medicaid state plan to test new approaches to paying for and delivering covered services and defining benefit packages. Oregon's 1115 Medicaid Demonstration is known as the Oregon Health Plan and was first established in 1994. In 2012, Oregon received approval through 2017 for its 1115 Waiver to establish the coordinated care model. The 1115 Waiver allowed Oregon to contract with Coordinated Care Organizations ("CCOs"), enroll individuals in health plans, establish integrated benefit packages and budgets, and use quality metrics and quality improvement strategies.

As State Medicaid Director, Ms. Coyner oversaw Oregon's 1115 Waiver renewal. Oregon's 1115 Waiver renewal for the period January 12, 2017 through June 30, 2022, was

**Page 35 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

approved by CMS in January 2017 and expands the elements of the 2012 1115 Waiver. The 1115 Waiver, and its renewal, established a target of not more than 3.4% for health care cost growth. Ms. Coyner will testify that OHA's failure to meet the cost growth targets in rate years 2012 to 2017 would result in a reduction in federal matching funds. The Oregon legislature also set a similar limit on annual rate of growth for OHA's budget.

**B.      Ms. Coyner will testify about OHA's efforts to redevelop its rate-setting methodology in 2015 in response to increased federal oversight.**

Due to the ACA Medicaid expansion, an influx of new Medicaid enrollees joined Oregon's Medicaid population in 2014. OHA had significant experience with the traditional Medicaid population, but the ACA expansion brought in a new population of Medicaid enrollees. Ms. Coyner will testify that in her role as Director of Health Analytics, she supervised OHA's Actuarial Services Unit ("ASU"). ASU managed capitation rate development for CCOs and other managed care entities. Ms. Coyner will testify that originally, in 2014 and 2015, the CCO rates assumed a higher level of utilization of health care services than was ultimately experienced by the ACA expansion population during those years. Accordingly, the rates overestimated the costs of insuring this population.

The federal government was funding the majority of the ACA population's Medicaid expenses. Ms. Coyner will testify that this increased federal funding coincided with increased federal oversight. In particular, on August 7, 2014, CMS sent OHA a letter explaining that the state was not in compliance with rate-setting standards for 2015. CMS instructed OHA to start using base data and claims data to calculate the rates. In response, OHA developed the Oregon Capitation Rate Development Action Plan (the "Plan"). In the Plan, OHA committed to redeveloping rates following CMS guidance.

To comply with the Plan, OHA's in-house actuary Dennis Tang initially developed rates for 2015, which OHA issued to the CCOs in December 2014. In January 2015, the CCOs sent a letter expressing concern with the 2015 rates and rate-setting process used by Tang. In March 2015, CMS sent OHA 103 questions regarding OHA's 2015 rate-setting process. OHA

Page 36 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
                  STATEMENTS

and Optumas, a third-party actuary that OHA had been working with for years, subsequently met with the CCOs to hear the CCOs' specific concerns and determine a path forward.

In April 2015, OHA engaged Optumas to be Oregon's signing actuary and redevelop the 2015 rates. Ms. Coyner will testify that FamilyCare was a proponent of having the 2015 rates redeveloped by Optumas. Ms. Coyner will testify that OHA explained to the CCOs, including FamilyCare, that there was no guarantee that rates would increase if Optumas redeveloped the rates and it was likely some CCOs would see reductions in revenue.

Optumas redetermined the 2015 rates which were ultimately approved by CMS. Ms. Coyner will testify that Optumas used a similar rate-setting methodology in rate year 2016, and CMS approved those rates as well.

> **C.      Ms. Coyner will testify that all CCOs, including FamilyCare, had ample access to OHA and Optumas to raise concerns regarding the rate-setting process.**

Ms. Coyner will testify that OHA held frequent meetings with FamilyCare and other CCOs to discuss rate setting for 2015 and 2016. For instance, during the rate-setting period for the 2015 and 2016 rates, OHA held monthly meetings with all CCOs and monthly meetings with each CCO individually. Optumas also held weekly meetings with all CCOs. During these meetings, Optumas and OHA gave the CCOs, including FamilyCare, the opportunity to ask questions and raise concerns regarding the rate-setting methodology. OHA took CCO concerns seriously and worked to try to provide CCOs with additional information regarding rate setting. However, OHA was unable to provide information that other CCOs considered trade secret.

Ms. Coyner will also testify that OHA held additional meetings with CCOs after releasing the rates for 2015 and 2016. For instance, OHA officials met with FamilyCare during February and March of 2015 to discuss their concerns regarding the original 2015 rates.

> **D.      Ms. Coyner will testify that OHA did not retaliate against FamilyCare due to the 2016 Settlement Agreement.**

In May 2015 and March 2016, FamilyCare filed lawsuits against OHA challenging the rate-setting methodology OHA employed to set the original 2015 rates, the redeveloped 2015

**Page 37 -       DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

rates, and the 2016 rates.  Ms. Coyner will testify that OHA and FamilyCare held negotiations to resolve the dispute over the 2015 rates and Optumas's rate-setting methodology more generally.  Ms. Coyner will testify that in May 2016, the parties entered into the Settlement Agreement to resolve their dispute.  She will testify that she is unaware of any efforts at OHA, during the rate-setting processes for 2017 or 2018, to manipulate the rates to retaliate against FamilyCare for any settlement in prior litigation.  Ms. Coyner did not—on her own initiative or at the direction of anyone else—direct Optumas to develop the 2017 or 2018 rates with the intention of recovering any amount of money credited to FamilyCare in the Settlement Agreement.

> **E.    Ms. Coyner will testify that OHA's rate-setting methodology and policies were not designed to discriminate or retaliate against FamilyCare.**

Ms. Coyner will testify that in 2015, OHA began to notice significant increases to FamilyCare's professional reimbursements and professional costs in the 2014 and 2015 financial data reported to OHA.  In October 2015, OHA contacted FamilyCare, seeking an explanation for those increases.  FamilyCare did not respond.  OHA again reached out to FamilyCare on this issue, this time in December 2015.  Again, FamilyCare did not respond.  Two weeks later, and three days before the end of the year, OHA contacted FamilyCare a third time.  FamilyCare responded to OHA's final request with additional information but did not address OHA's inquiry into the reasons for the increased physician reimbursements.

In 2016 OHA and Optumas developed a reimbursement policy for 2017 rates.  Ms. Coyner will testify that she was asked to provide feedback to OHA regarding this policy.  Ms. Coyner will also testify that she spoke to CMS about this policy.  Ms. Coyner spoke to Jim Golden, Director of Managed Care Plans for CMS, and Chris Truffer at CMS's Office of the Actuary about the reimbursement review policy.  Ms. Coyner will testify that these CMS officials informed her that the base data adjustments under the reimbursement review policy were reasonable and other states used similar types of adjustments.

Ms. Coyner will testify that the reimbursement policy was not motivated by anti-FamilyCare bias or animus.  Ms. Coyner will testify that the reimbursement review policy was

**Page 38 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

not designed to retaliate against FamilyCare for the Settlement Agreement, Settlement Credit, 2016 rates, or its First Amendment speech. Instead, the reimbursement policy was designed to ensure that the state was judicious in its use of Medicaid dollars and retained substantial federal funding. Ms. Coyner will testify that OHA began discussing unsustainable cost growth and high physician reimbursements with Optumas in September 2015, eight months prior to the Settlement Agreement. Further, OHA reached out to FamilyCare for additional information on physician reimbursements in October and December 2015.

Ms. Coyner will testify that she never observed Lynne Saxton, or anyone else at OHA, take any action towards FamilyCare intended to discriminate against FamilyCare. Neither Ms. Saxton, nor anyone else, directed Ms. Coyner to lower FamilyCare's rates. Neither Ms. Saxton, nor anyone else, asked Ms. Coyner to direct Optumas to take any action that would be biased or discriminatory against FamilyCare. Ms. Coyner did not herself discriminate against FamilyCare or alter the rate-setting process in any way to retaliate against FamilyCare. Ms. Coyner is unaware of any OHA employee altering the rate-setting process due to anti-FamilyCare bias or discrimination. Ms. Coyner notified OHA that she planned to resign from her position as State Medicaid Director in May 2017. Ms. Coyner officially resigned from this position in July 2017 and left OHA.

**F.      Ms. Coyner will testify that OHA's redetermination of eligibility and enrollment information was not designed to discriminate or retaliate against FamilyCare.**

Ms. Coyner will testify that the timeline of redetermination of eligibility and enrollment information for OHP members was not dictated by anti-FamilyCare animus, bias, or retaliation. In 2014, the technology platform used by Oregonians to apply for health coverage in OHP, Cover Oregon, failed. Federal law required OHA to renew the eligibility of Medicaid recipients every year. But in September 2015, CMS granted Oregon approval to delay Medicaid eligibility renewals to prevent Oregonians from losing health benefits due to this flawed technology. Consistent with this federal guidance, in March 2016, OHA restarted the

Medicaid renewal processing for a total of over 950,000 OHP members. Ms. Coyner will testify Oregon continued to keep CMS informed of Oregon's progress.

Ms. Coyner will testify that she briefed various CMS officials about the technological failure and the need to redetermine the eligibility and enrollment information. Ms. Coyner will testify that CMS told Ms. Coyner that OHA was a good partner that worked diligently to fix the enrollment and eligibility issues. Ms. Coyner will testify that CMS supported OHA's timeline for completing the redetermination work and supported OHA's decision to resolve the underlying technological issues before completing the renewals.

Ms. Coyner will testify that the timeline of the eligibility and enrollment redetermination work was not designed to retaliate against FamilyCare, nor was it motivated by anti-FamilyCare bias or animus. Instead, the renewals were impacted due to the failure of Cover Oregon and OHA worked diligently to redetermine the eligibility after this technological issue was resolved.

## VI.    Robb Cowie (1 hour direct testimony)

In addition to the testimony included in this statement, OHA reserves the right to adopt the information contained in the witness statement for Mr. Cowie that will be presented by Defendant Lynne Saxton.

### A.    Mr. Cowie will testify about his professional history.

Mr. Cowie will testify that he was first introduced to the communications field while working at a public interest law firm for 13 years in New York. He combined his interest in the environment with his communication skills by subsequently taking a position with the Biodiversity Project, an organization that provided communications support to environment organizations nationally.

Mr. Cowie will testify that he moved into government work in the early 2000s when he served with the Multnomah County Department of Community Justice doing communications and policy work for six years. Because Multnomah County was a leader in juvenile justice reform and eliminating minority detention rates, and, as a result, received local and national

**Page 40 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

media attention, Mr. Cowie received significant media interaction in his role with the County.
After leaving Multnomah County, Mr. Cowie was recruited to run communications for Portland
Public Schools for six years. At that point, Mr. Cowie took a two-year break from public service
and joined Cambia Health Solutions doing internal communications. He rejoined the public
sector by accepting a position as communications manager with OHA in February 2016.

**B.      Mr. Cowie will testify about the Oregon Health Authority and his job duties with the agency.**

Mr. Cowie will testify that OHA has a current biennial budget of approximately $30
billion. OHA is a complex organization that addresses critical health issues affecting every
person and community in the state. OHA is responsible for a wide range of health programs,
including management of the Oregon Health Plan, the Public Employee Benefit Board, the
Oregon Educators Benefit Board, the public health division and its initiatives (environmental
health, WIC, quality assurances in medical settings), the statewide behavioral health system, and
the state hospital (which employs 2,400 Oregonians). Mr. Cowie will testify that Oregon is
relatively unique in its implementation of the CCO model. Thanks, in part, to that model and
OHA's other efforts, 95% of adult Oregonians have access to health care.

When he joined OHA, Mr. Cowie reported directly to BethAnne Darby, the Director of
External Relations for OHA. BethAnne Darby, in turn, reported directly to OHA Director Lynne
Saxton. The External Relations Division included the government relations program and
provided full-service communications support to all OHA divisions. The division also included
the peer support team and the ombudsman program, which helped OHP members.

Mr. Cowie will testify that he supervised a team of approximately 12 people at OHA,
which included communications officers who supported individual divisions within OHA
through speech writing, drafting press releases and other written external communications, and
advising on stakeholder outreach.

Mr. Cowie will testify that the communications team also assisted with preparing
statutorily required legislative reports by, among others, incorporating the relevant information

Page 41 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
               STATEMENTS

from different agency divisions into a draft, assembling the graphics and layout of copy, and editing for spelling and grammar.

**C.    Mr. Cowie will testify that OHA's resources were needed on many large projects in 2016 and 2017.**

Mr. Cowie will testify that on his very first day at OHA in February 2016, he received notification that the Portland Mercury would publish a story the following day that Bullseye Glass in Southeast Portland was emitting heavy metals into the surrounding neighborhood.  He will testify that this issue continued to occupy the front page of the news cycle for the next six months and became a focus of OHA's work for the first two years Mr. Cowie was with the agency (ultimately resulting in the Cleaner Air Oregon initiative).  Mr. Cowie and Director Saxton met regularly on this issue, and Director Saxton met with stakeholders multiple times each week.

Mr. Cowie will testify that OHA faced a number of other time-intensive issues, including an escalating situation with the aid-and-assist population at the State Hospital; challenges with behavioral health placing an immense strain on the State Hospital; the stand-up of the Oregon Eligibility ("ONE") System to assist with Medicaid eligibility and redetermination; a campaign to monitor and address a proposed ACA repeal; a $20 billion budgetary ask to the legislature; and active engagement as a subject matter expert in the 2017 legislative session.

**D.    Mr. Cowie will testify that OHA had limited personnel resources.**

Mr. Cowie will testify that despite OHA's size and budget, half of OHA's employees worked at the Oregon State Hospital.  Most of OHA's divisions were leanly staffed.  For example, OHA had one ombudsperson for handling any problems or concerns that could be raised by the more than one million OHP members.  And OHA had only one person to handle member communications and one person who was responsible for all Medicaid provider communications.  In short, OHA had finite resources and a great need to use those resources efficiently.

**Page 42 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

E.    **Mr. Cowie will testify that he never observed any retaliatory action against FamilyCare.**

Mr. Cowie will testify that he was not involved in rate-setting decisions at OHA. His understanding of OHA's rate-setting methodology was generally limited to what he needed to know to communicate externally on behalf of OHA on rate-setting issues. Mr. Cowie will testify that he understood that under the five-year federal 1115 Waiver granted to Oregon by CMS in 2012, Oregon's statewide growth rate could not exceed 3.4% on average annually over five years.

Mr. Cowie will testify that he understood FamilyCare's complaints to focus on Medicaid rates that FamilyCare felt were unsatisfactory. Mr. Cowie will testify that he has never seen or heard of any efforts by Director Saxton to implement policy relating to Medicaid rates with an intent to hurt FamilyCare. Further, he is not aware of any instance in which Director Saxton or any employee, contractor, or agent of OHA sought to retaliate against FamilyCare or took any action or made any decision regarding the 2017 and 2018 capitation rates for FamilyCare due to (1) its complaints about OHA''s rate-setting process or (2) the 2016 Settlement Credit or rates paid to FamilyCare for 2016. And he is not aware of any plan or conspiracy by any employee, contractor, or agent of OHA to discriminate or retaliate against FamilyCare in the rate-setting process.

F.    **Mr. Cowie will testify that FamilyCare positioned itself as an outlier.**

Mr. Cowie will testify that "outlier" is a term commonly used to describe something that is atypical of others within a group or class. He will testify that, consistent with that definition, it appeared as if FamilyCare sought to make itself an outlier within the CCO community. All CCOs other than FamilyCare accepted the revised rates in 2015 and the rates set with the same methodology every year since. During Mr. Cowie's time at OHA, no other CCO had sued OHA over the rates. FamilyCare was the only CCO to complain to the Oregon Health Policy Board and CMS about OHA's rate-setting process. And FamilyCare's messaging that OHA should change the actuarially sound rates based on FamilyCare's needs was also unique among the CCOs—no other CCO sought that type of special treatment.

**Page 43 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

### G. Mr. Cowie will testify regarding communications plans at OHA.

Mr. Cowie will testify that given the vast number of issues OHA was responsible for managing, it was important to be effective with OHA's resources. Communications plans are a best practice approach that ensure the development of consistent and unambiguous messaging and efficient dissemination of the message once conceived. They provide an opportunity at the outset to coordinate resources, to flesh out goals, and to share those goals with partners within the agency or with other agencies or stakeholders to prompt buy-in and coordination. For example, in the event of a health and safety issue—like a foodborne outbreak of salmonella or a cyanotoxin water contamination—a communications plan is critical to effectively and timely planning warnings to affected communities. A communications plan will outline how OHA will warn key audiences about the health concern. It will ensure that OHA, along with its state and local partners, considers how to leverage the most effective and important channels to reach those audiences. As the communications plan is going through internal review and approval, subject matter experts will weigh in on what type of messaging is likely to be viable and effective. Because having the best health information in the world will have only minimal impact if not properly communicated to the public, tools like communications plans work to make health care more effective.

Mr. Cowie will testify that communications plans were very common at OHA. They were used wherever possible, from relatively mundane tasks like the roll out of legislative reports to complicated multi-stakeholder messaging with significant dimensionality like the kind developed for the two-year Cleaner Air Oregon initiative. Cleaner Air Oregon engaged neighborhood organizations, industry voices, and state and local partners like the Department of Environmental Quality and the City of Portland.

Mr. Cowie will testify that he has always encouraged his team to just put ideas down on paper and then figure out if they are worth pursuing. He will testify that developing a communications plan is an iterative process—the act of winnowing and reevaluating is a crucial part of the communication development process and is essential to the ability to create a first draft knowing that much of the brainstorming will be revised out of the final form. It would be

**Page 44 -     DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

unusual for work product at OHA to be final and implemented before it had been revised, sometimes many times. A communications officer drafting a communications plan would not have finalized or acted on that draft without specific direction from leadership to move forward with implementation and approval of a final, revised draft of the plan.

Mr. Cowie will testify that communications plans often utilize tasks and steps that OHA is already completing for other regular-course OHA business reasons. This is because a communications plan is typically just a tool for ensuring that communications are cohesive and efficient—they are not designed to remake the communications wheel.

**H.      Mr. Cowie will testify regarding the 2017 draft communications plan.**

Mr. Cowie will testify that OHA is committed to staying true to its Triple Aim goals: better health, better care, and lower costs. OHA strives to reach that Triple Aim through its 3.4% cost containment pledge and sound rate-setting process. And OHA's messaging surrounding rate setting, including the quarterly legislative reports and related news releases, seeks to demonstrate to stakeholders OHA's progress towards the Triple Aim, health transformation, and the CCOs' overall performance. Mr. Cowie will testify that any communications plan relating to rate setting or the FamilyCare rate-setting disputes would have to focus on a proactive approach to sharing information with the public and stakeholders about OHA's rate-setting process. In other words, any communications plan would have to provide information that helped stakeholders to understand that OHA's rate setting was sound and that any complaints in FamilyCare's anticipated lawsuit were the result of its own choices—not any disparity or retribution by OHA.

Mr. Cowie will testify that he did not take an active or engaged role in the request for a communications plan addressing the threatened FamilyCare litigation in early 2017 because he was fully occupied with work on the Cleaner Air Oregon initiative and a potential ACA repeal. However, as the head of the communications team, Mr. Cowie was copied on several exchanges relating to the draft communications plan and he was generally aware of the progress of the request and ensuing draft. Mr. Cowie will testify that he never heard any OHA team member— including Ms. Darby, Ms. Crowell, or Director Saxton—indicate a desire to do anything with the

requested communications plan other than ensure that accurate information was shared with stakeholders to provide factual context regarding the rate-setting dispute.

Mr. Cowie will testify that some of the tone in the draft communications plan is largely a product of Ms. Crowell's background in politics.

He will testify that it would be consistent with Director Saxton's leadership style to address any reworking or concerns with a draft document in a meeting rather than by email. For Director Saxton, a meeting is where the constructive feedback occurs, not in writing. Mr. Cowie will testify that if Director Saxton had intended to pursue Ms. Crowell's draft communications plan, she would have edited it, discussed it further with the team, and provided specific input.

Mr. Cowie will testify that, to his knowledge, no one at OHA ever implemented the draft communications plan that Ms. Crowell put together in January 2017. Specifically, Mr. Cowie will testify that, to his knowledge, no one at OHA: (1) identified or contacted an OHP member with high-cost medical issues, like HIV, who chose Health Share over FamilyCare; (2) tried to look for opportunities to hurt FamilyCare's credibility in the news; (3) published an op-ed from Director Saxton in the Lund Report; (4) identified key legislators to provide information to about FamilyCare practices and financial information; or (5) used key legislators to pitch stories to news media about FamilyCare.

Rather, routine steps like gathering CCO financial information for the quarterly legislative reports or sharing the reports with stakeholders would have been accomplished in the ordinary course of OHA duties and do not indicate that the draft plan was implemented in any way. Mr. Cowie will testify that OHA provided information to local reporters and issued press releases relevant to FamilyCare's newly filed lawsuit against OHA in late February 2017. This media engagement was, in part, responsive to reporter outreach to OHA that was often generated by FamilyCare itself; it was not indicative of any implementation of the draft, shelved communications plan. Further, Mr. Cowie will testify that the emails sent to reporters updating them on the 2017 FamilyCare lawsuit were not pitches, they were follow-up to existing news releases and reporter requests. A story is pitched by contacting a reporter to offer the story that no one else is covering that might be a good fit for that reporter. A news release is not a pitch.

**Page 46 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

I.      Mr. Cowie will testify about member redetermination.

As a result of technology failures, OHA engaged Deloitte to stand up a replacement enrollment and eligibility system called the ONE System.  Mr. Cowie will testify that while OHA was working to launch the ONE System, it was simultaneously working to complete redetermination for existing Medicaid members using paper forms and manual data entry and review.  Redetermination is the review of a Medicaid member's continuing eligibility for the Medicaid program.  During this time, OHA stayed in regular contact with CMS about the progress of the redetermination process.

Mr. Cowie will testify that the Governor declared a deadline, requiring redetermination completion by August 31, 2017.  OHA staff worked from May through August 2017 to meet the deadline.  Following completion, Mr. Cowie prepared a report detailing OHA's engagement and communications with CMS during the redetermination process.  That report was shared with CMS.

Mr. Cowie will testify that he has never observed any OHA employee, contractor, or agent delaying or instructing others to delay efforts to complete the eligibility redetermination of the Medicaid population with the intention of impacting FamilyCare adversely.

VII.   Courtney Crowell (2 hours direct testimony)

In addition to the testimony included in this statement, OHA reserves the right to adopt the information contained in the witness statement for Ms. Crowell that will be presented by Defendant Lynne Saxton.

A.      Ms. Crowell will testify regarding her background.

Ms. Crowell will testify that she is a native Oregonian.  She grew up in Baker City and attended the University of Oregon where she received a Bachelor of Science in political science.  Ms. Crowell will testify that while in college she interned with the field office of Senator Ron Wyden, the marketing department at North Face, and the Democratic National Committee.

Ms. Crowell will testify that following college graduation, she worked as a field organizer for a library bond measure campaign in Vancouver, Washington.  She subsequently

served on Governor Kulongoski's re-election campaign as the Deputy Finance Director. Ms. Crowell will testify that she later took positions with the State of Oregon, first as a public affairs coordinator with the Oregon Economic and Community Development Department where she did a combination of policy and communications work, and later as the communications manager for the Economic Recovery Executive Team with Governor Kulongoski's office. She will testify that as communications manager for the Economic Recovery Executive Team, she worked to translate for the public what was happening with the American Recovery and Reinvestment Act.

Ms. Crowell will testify that immediately before joining the Oregon Health Authority, she worked for Senator Jeff Merkley; there, she served in multiple positions, ending her employment with Senator Merkley as his State Communications Director. In that role, she wrote speeches, attended town hall events, planned press events around the state, and communicated with the media on Senator Merkley's behalf. Ms. Crowell will testify that her communications with the public as State Communications Director included health care policy issues.

B.      **Ms. Crowell will testify regarding her work with the Oregon Health Authority.**

Ms. Crowell will testify that she worked as a communications officer with OHA from September 2016 until her departure from OHA in 2017.

Ms. Crowell will testify that each division within OHA generally had an assigned communications officer. Ms. Crowell was assigned to the Health Policy and Analytics Division and the Office of Equity & Inclusion.

Ms. Crowell will testify that as a communications officer, she reported to Robb Cowie, the communications manager for OHA. Mr. Cowie reported directly to BethAnne Darby, the External Relations Division Director, who, in turn, reported to Lynne Saxton, the Director of OHA. Ms. Crowell will testify that at times and depending on the project, she also worked directly with BethAnne Darby or Director Saxton. For example, Ms. Crowell might work directly with Director Saxton when writing speeches or preparing op-ed articles.

Ms. Crowell will testify that in her role at OHA she often drafted communications and related materials, which included press releases, newsletters, executive summaries of reports, and

speeches.  She will testify that media outreach was a significant part of her job—she regularly contacted news reporters and was regularly contacted by news reporters regarding OHA's various initiatives and other issues of public concern.  Ms. Crowell will testify that it was standard for reporters to reach out to OHA for comment or background information on stories or newsworthy issues, and that she would typically field those questions (with the assistance of internal subject matter experts) when they touched on the divisions to which she was assigned.  She also sometimes reached out to reporters to provide press releases or other background information on stories they might be developing or be interested in developing.

Ms. Crowell will testify that she was responsible for preparing the PowerPoint slide decks for OHA's budget presentations before the legislature, as well as for a variety of other legislative presentations during session.  Ms. Crowell will testify that the legislative session typically represented the busiest time of year for the External Relations Division team as they were often called on to assist the legislature and media with subject matter and fiscal impact questions.

Ms. Crowell will testify that she assisted with preparing regular legislative reports while at OHA.  In particular, she will testify that she assisted with preparing the Oregon Health System Transformation Quarterly Legislative Report and the Primary Care Spending in Oregon Report.  Ms. Crowell will testify that she did not select the substantive content that was incorporated into those reports; instead, she collected relevant information from different agency divisions, incorporated the information into a draft, assisted with preparing the Director's Message, assembled the graphics and layout of copy, and edited for spelling and grammar.

Ms. Crowell will testify that she had no involvement with, or input into, rate setting while at OHA.  She received a very basic, high-level overview from the actuarial team and others at OHA on how rates were set, but only to the extent necessary to speak to the issue with stakeholders and the media.  For example, Ms. Crowell will testify that based on her conversations with subject matter experts within OHA, she understood generally that OHA structured its rate-setting policies to, among others, promote cost containment to meet the requirements of the 1115 Waiver.  She relied on OHA subject matter experts to provide content

**Page 49 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

when asked to respond to media inquiries or prepare press releases or statements surrounding the rate-setting process.

Ms. Crowell will testify that when she joined OHA, Mr. Cowie provided her with copies of several communication tools or documents—including a few communications plans—as background information for her work with OHA. Communications plans are a best-practice framework typically used to ensure an efficient and cohesive message within an organization on a particular topic or issue. Although she had been employed in the communications field for several years, much of Ms. Crowell's prior experience lay principally in the political arena where communications planning and planned messaging had been structured differently. She will testify that OHA often used communications plans, including with almost every report the Health Policy & Analytics team produced.

**C.      Ms. Crowell will testify about the 2017 draft communications plan.**

Ms. Crowell will testify that she had been employed with OHA for approximately four months when Ms. Darby directed her to prepare a communications plan sometime at the end of December 2016 or early January 2017. Ms. Darby asked for a plan to address messaging related to Medicaid rate setting and, in particular, ongoing rate-setting disputes with FamilyCare. Ms. Crowell generally understood that the requested communications plan was intended to provide a robust and proactive, "going on the offensive," approach to sharing information with the public and stakeholders about OHA's rate-setting process if FamilyCare elected to file a third lawsuit. Ms. Darby told Ms. Crowell to create a plan that sought to explain the rate-setting framework— including obligations to CMS under the federal 1115 Waiver—in a more proactive manner than prior communications. In other words, the requested plan should anticipate opportunities to share OHA's message rather than wait for questions to arise from stakeholders. That proactive approach would reassure stakeholders of the integrity of the rate-setting process and would improve efficiencies within OHA by creating a bank of approved talking points and communications for use on these issues.

She will testify that she was not directed by Ms. Darby, Director Saxton, or anyone else at OHA as to the specific bullet points or content that must be included in the communications

**Page 50 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

plan that she was asked to prepare—as she understood the assignment, she was to create a brain dump of all potential ideas on how to communicate regarding the dispute with FamilyCare.

Ms. Crowell will testify that she worked under Ms. Darby on this assignment because Mr. Cowie was fully engaged with work on the Cleaner Air Oregon initiative.

**D.        Preparing the draft communications plan.**

Ms. Crowell will testify that she spoke with Ms. Darby in early January 2017 regarding the format of the requested draft communications plan.  She will testify that she received as an example a copy of a 2016 OHA communications plan addressing earlier litigation with FamilyCare.  She believed she was being asked to prepare a new communications plan that substantially mirrored the format and outline of the 2016 example communications plan.

Ms. Crowell will testify that on January 17, 2017, she received a copy of a PowerPoint slide deck provided by FamilyCare's counsel to Mr. Fairbanks during a dispute resolution meeting.  She was told to review the FamilyCare PowerPoint when preparing the draft communications plan.  However, Ms. Crowell did not find the PowerPoint helpful and did not ultimately utilize it in preparing the initial draft communications plan.

Ms. Crowell will testify that she struggled with the drafting assignment because she had little experience with this type of project and felt that she had not received adequate guidance at the outset to successfully produce the work product desired or intended.  She will testify that although she had general conversations with Mr. Cowie, Ms. Darby, and others within OHA who could provide historical information and a better understanding of the claims FamilyCare had threatened to file, she prepared the first draft of the communications plan on her own without specific direction from Ms. Darby or any others at OHA regarding the particular content.

Because of this lack of direction, most of the elements of the draft communications plan were an exercise in floating a broad array of ideas to see what stuck.  Ms. Crowell will testify that because this process was a draft, she expected her supervisors to edit what she put down on paper.  She did not expect that what she wrote would be implemented without further discussion or revision as that was not the normal process at OHA for a project addressing an issue like this one.

**Page 51 -        DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Ms. Crowell will testify that much of the thematic content she prepared for the draft communications plan reflected her recent review of the legislative quarterly reports, which contained a collection of data provided directly to OHA by the CCOs.  After reviewing those reports, it struck Ms. Crowell that the financial information FamilyCare reported appeared quite high and yet FamilyCare was suing OHA to obtain additional taxpayer funds.  She noted that no other CCO disputed their rates in this manner.  She will also testify that she understood that FamilyCare paid its providers at commercial rates that were higher than Medicaid rates; she had not heard of any other CCO paying providers commercial rates.  Ms. Crowell will testify that the term "outlier" seemed appropriate for a CCO behaving in a manner inconsistent with all other CCOs.

Ms. Crowell will also testify that she included in the draft communications plan a bullet point directed to OHP members with high-cost medical issues, like HIV, who chose Health Share over FamilyCare because, based on her background discussions, she understood that a concern had been previously raised within the agency that the enrollment numbers showed movements of high-cost members from FamilyCare to Health Share.  At the time of the background conversation, Ms. Crowell requested additional internal analysis to determine if this was, in fact, true.

Ms. Crowell will testify that she completed the early steps of the Timelines section of the draft communications plan using tasks or goals that would, in large part, be completed by a team member for regular OHA business purposes unrelated to the draft communications plan.  For example, Ms. Crowell will testify that the compiling of CCO financial information is a task that OHA would regularly do for the legislative quarterly reports.

Ms. Crowell will testify that she marked the draft communications plan with "attorney-client privilege" because she believed she was supposed to use that designation when discussing matters that implicated pending or anticipated litigation.  She will testify that at the time she prepared this draft communications plan, Ms. Crowell understood that a third lawsuit from FamilyCare was likely to be filed.  In fact, FamilyCare did file a third lawsuit against OHA regarding its rates within a month of Ms. Crowell's draft.

**Page 52 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
                 STATEMENTS**

E.    **The draft communications plan is circulated to Director Saxton and shelved.**

Ms. Crowell will testify that she provided a very rough draft communications plan to Ms. Darby on January 20, 2017. Ms. Darby responded that same day by email requesting revisions to the draft to include a legislative approach. Ms. Crowell will testify that she followed up on information she had received from members of the OHA finance team and updated the draft plan to reference that information and to address Ms. Darby's request.

Ms. Crowell will testify that on January 26, 2017, Ms. Darby directed her to complete the draft. Ms. Crowell provided a draft to Ms. Darby, who forwarded the draft to Director Saxton that same day.

Ms. Crowell will testify that she did not receive any additional feedback and she did not make any additional revisions following her January 26, 2017 draft.

Ms. Crowell will testify that, having not heard further from Ms. Darby or Director Saxton by mid-February 2017, she followed up on, and received, information from OHA's actuarial services unit related to members with high-cost medical needs. However, after receiving that additional information, Ms. Crowell did nothing further with it. Specifically, she did not identify or reach out to any OHP members with high-cost medical needs to discuss their services with either Health Share or FamilyCare.

In fact, Ms. Crowell did not hear from Ms. Darby, Director Saxton, or any member of the communications team regarding the draft communications plan until she received a short email from Director Saxton on February 18, 2017, indicating that a future meeting would be scheduled to discuss the draft. Ms. Crowell will testify that in her experience with Director Saxton, it was typical for Director Saxton to deliver constructive critiques of work product in person or on the phone and not in writing. Ms. Crowell was scheduled to participate in a March 2, 2017 meeting regarding the draft communications plan and expected that the draft would be workshopped in a new direction at that meeting.

Ms. Crowell will testify that the March 2, 2017 meeting regarding the draft communications plan did not occur. She received no further feedback or edits regarding the draft following receipt of Director Saxton's email on February 18, 2017. She will testify that it would

**Page 53 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

have been highly unusual for a rough draft of a project of this nature to continue to the implementation process without several rounds of significant edits and input from communications team leadership. As the author of the draft, Ms. Crowell expected she would have participated in any significant revisions. Ms. Crowell will testify that it was Director Saxton's personal practice to edit and discuss work product she reviewed.

At some point prior to the summer of 2017, Ms. Crowell came to understand that the draft plan was not, and would not be, implemented. She will testify that she does not recall hearing anything further regarding the draft after it was shelved.

Ms. Crowell will testify that no one at OHA ever implemented the draft communications plan. She was never asked to take action on any part of the draft communications plan. She will testify that she communicated with reporters, including Jeff Manning, Nigel Jaquiss, Elizabeth Hayes, and others regarding the dispute with FamilyCare, but not because of the draft communications plan. Rather, those communications were prompted by FamilyCare's filing of its third lawsuit against OHA. Ms. Crowell sent out information in response to questions from reporters about FamilyCare's lawsuit, or in conjunction with OHA's practice of communicating with the media and public about recent issues facing OHA, namely, FamilyCare's recently filed lawsuit against OHA. Additionally, Ms. Crowell will testify that she (1) never identified key legislators to use to pitch stories to news media regarding the legislative reports, audited financial reports, or data to explain risk scores; (2) never approached the Lund Report regarding an op-ed for Director Saxton; (3) never developed an "offensive" plan to distribute data, information, and stories about FamilyCare within the Capitol; (4) never looked for opportunities to hurt FamilyCare's credibility in the news; and (5) never collected stories from OHP members who chose Health Share over FamilyCare. She took no actions that fell outside the typical business practices for the communications division of a large organization like OHA, and at no point did she act with any intent to implement any portion of the draft communications plan.

**Page 54 -** **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

### F.     OHA was handling other significant projects in early 2017.

Ms. Crowell will testify that in January 2017, OHA was preparing a complicated and time-intensive budget presentation for the legislature seeking over $20 billion in budgetary appropriations.  She will testify that OHA was also focused on the pending legislative session.

Ms. Crowell will testify that at the end of January and early February 2017, OHA leadership, including Director Saxton, was occupied with preparing for a trip to visit the Oregon caucus in Washington D.C. to discuss a proposed repeal to the ACA.  In addition, OHA continued to work to complete redetermination efforts for Medicaid members.  Despite experiencing significant technological issues, OHA worked to process Medicaid eligibility redeterminations while Ms. Crowell was at OHA.  Ms. Crowell will testify that she never observed anyone at OHA delaying or instructing others to delay redetermination efforts for the purpose of negatively impacting FamilyCare.

### G.     Ms. Crowell will testify that there was no plan to target or retaliate against FamilyCare.

Ms. Crowell will testify that she did not retaliate against FamilyCare, nor is she aware of any employee, contractor, or agent of OHA who sought to retaliate against FamilyCare.  Ms. Crowell will also testify that she is not aware of any employee, contractor, or agent of OHA (including herself) who took any action or made any decision regarding the 2017 capitation rates for FamilyCare (1) in response to FamilyCare's complaints about OHA's rate-setting process or (2) due to the 2016 Settlement Credit or rates paid to FamilyCare for 2016.  Ms. Crowell will testify that she is not aware of any plan or conspiracy by any employee, contractor, or agent of OHA to discriminate or retaliate against FamilyCare in the rate-setting process.

### H.     Ms. Crowell will testify that she left OHA in the summer of 2017.

Ms. Crowell will testify that she accepted a position as the Eastern Oregon coordinator for Regional Solutions in April 2017 and left OHA for that position in the summer of 2017.  Ms. Crowell will testify that she accepted the position at Regional Solutions to move back to Baker City where she was raised and where her family still resides.  Ms. Crowell will testify that in her role as the Eastern Oregon Regional Solutions Coordinator—which she currently still holds—she

helps to coordinate different state agencies around economic and community development projects in the Eastern Oregon region. More recently, Ms. Crowell has taken on a second role with the Governor's office as a water policy advisor.

## VIII.    BethAnne Darby (3 hours direct testimony)

### A.    Ms. Darby will testify about her background and her role at OHA.

Ms. Darby will testify that she received a Bachelor of Arts in humanities from the University of California at Berkeley in 1990, followed by a law degree from Willamette University College of Law in 1995. Ms. Darby served as a legislative liaison for the Board of Chiropractic Examiners during the 1997 legislative session. She was the Executive Director for the Board of Psychologist Examiners for two years before joining the Oregon Education Association ("OEA") in 2000.

Ms. Darby will testify that she worked with OEA for over fifteen years; during the last seven of those years, she led the public policy and communications team as the Assistant Executive Director for Public Affairs. In that role, she supervised approximately 15 to 20 direct reports and worked with the board of directors to ensure that organizational communications were aligned with OEA's mission and values. During Ms. Darby's time there, OEA utilized communications plans to effectively organize and track messaging on important issues.

Ms. Darby will testify that while working with OEA, she served on policy-related committees around, among others, health insurance issues, PERS reform, and school budgets. At OEA, she also helped to craft legislation that created the Oregon Educators Benefits Board ("OEBB")—the health insurance pool for Oregon school districts—which OHA now manages. Ms. Darby will testify that she joined OHA in November 2015 as the Director of the External Relations Division. She led a team of approximately 20 to 25 people, which included the communications team, public policy and legislative team, peer support team, and the ombudsperson. Ms. Darby hired the key members of her own team.

Ms. Darby will testify that Director Saxton created the External Relations Division to address the concerns raised by the legislature relating to transparency and communication under

Page 56 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
                STATEMENTS

the prior OHA director.  As the head of a division and a part of the OHA executive leadership team, Ms. Darby was a direct report to Director Saxton.  She will testify to her experience working under Director Saxton, including the methods of communications between herself and Director Saxton; Director Saxton's management style; Director Saxton's manner of providing feedback to Ms. Darby and other of Director Saxton's reports; and Director Saxton's level of involvement in communications work within OHA.

Ms. Darby will testify that OHA had seven key divisions under Director Saxton's leadership.  The External Relations Division worked across those internal OHA divisions to break down silos and facilitate clear inter-division communications; to ensure that both internal and external audiences were aware of OHA's work; and to avoid divisions working at cross purposes with one another.  If the communications team produced work product intended for external release, including, for example, press releases and legislative reports, Ms. Darby generally reviewed and approved that work product before it left OHA.

**B.      Ms. Darby will testify about her interactions with rate setting at OHA.**

Ms. Darby will testify that she was generally not involved in OHA's rate-setting decisions; instead, she was looped into rate-setting conversations at what would typically be considered an executive level in order to stay informed for communications purposes.  Through her involvement at this level, Ms. Darby came to understand the basics of FamilyCare's dispute regarding its rates, including its allegations that its capitation rates were too low.  As part of FamilyCare's dispute, Ms. Darby learned that FamilyCare paid its providers at commercial rates. She will testify that her interactions with OHA's actuarial contractor, Optumas, were typically limited to receiving information from Optumas regarding the rate-setting process to better inform Ms. Darby's communications on these issues both inside and outside OHA.  Ms. Darby will testify that she also facilitated meetings between legislators and Optumas to educate legislators on the methodology of rate setting in Oregon.

Ms. Darby will testify that she never observed Director Saxton expressly or impliedly direct anyone at OHA or Optumas to develop or change rates in an effort to disadvantage,

**Page 57 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
                STATEMENTS**

discriminate, or retaliate against FamilyCare.  Director Saxton also instructed her direct reports to work to ensure that all CCOs were treated equitably.

**C.     Ms. Darby will testify that OHA handled many issues of significance in 2015, 2016, and 2017.**

Ms. Darby will testify that OHA was the agency with the second largest budget in Oregon when she was employed there.  OHA dealt with important issues during Ms. Darby's time with the External Relations Division.  Ms. Darby will testify to the communications that OHA developed regarding many of those issues, including the following:

- Rules and statutes addressing toxic toys;

- Rulemaking and measuring progress with the Medicaid population and CCOs;

- Cleaner Air Oregon initiative to restrict air toxin releases;

- Medical marijuana regulation;

- Doulas;

- Grant making and health equity;

- ONE System standup and Medicaid redetermination;

- Behavioral Health Collaborative launch; and

- Cover All Kids.

**D.     Ms. Darby will testify regarding the communications team's work on the Oregon Health System Transformation Quarterly Legislative Reports.**

Ms. Darby will testify that the Oregon Health System Transformation Quarterly Legislative Reports ("quarterly legislative reports") were edited and disseminated by the communications team.  The first quarterly legislative report was published in 2016.

Ms. Darby will testify that an Oregon statute required the production of the quarterly legislative reports to the legislature and dictated some of the contents of the reports, including the reporting of CCO financial data, like reserves and projected cash flow.  She will testify that the financial information in the quarterly legislative reports was drawn directly from information submitted to OHA by each CCO.

**Page 58 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Ms. Darby will testify that due to the extensive data that the quarterly legislative reports contained, OHA shared them with legislators and other interested stakeholders.  Doing so increased transparency into OHA and the CCO program for legislators and created efficiencies for the External Relations Department by reducing the number of times her staff answered the same questions from different sources.

Ms. Darby did not draft the OHA's legislative reports.  Ms. Darby was not involved in procuring or gathering the relevant information for purposes of drafting the legislative reports.  Ms. Darby's role was to review the draft legislative reports for accuracy and consistency, as well as assist in disseminating the reports to the relevant groups or individuals.  Following her review, Ms. Darby would forward the draft report to Ms. Saxton for final review and approval.

**E.       Ms. Darby will testify that FamilyCare and OHA regularly engaged with legislative sessions—the External Relations Division led the efforts for OHA.**

Ms. Darby will testify that the OHA government relations team, including herself and Jeston Black, handled the typical government relations work for OHA.  They brought in subject matter experts from other OHA divisions to testify, discuss issues, or run fiscals when needed for the legislature.

Ms. Darby will testify that OHA would not take a position for or against a proposed bill unless directed to do so by the Governor's office.  She will testify that even when OHA did not take a position on legislation, OHA's role as a state agency was to educate and inform the legislature about potential impacts of policies.  As a result, OHA would often proactively provide information and respond to legislator or committee questions regarding a proposed bill or a portion of a proposed bill without taking a position on the bill itself.  That engagement could include providing details of fiscal or policy impacts to enable legislators to better understand the context of a proposed bill.  Ms. Darby will testify that this type of engagement applied to a broad swath of bills.

Ms. Darby will testify that in addition to answering questions for legislative committees and individual legislatures, OHA also had to prepare and present a very complicated budget to the legislature every two years.  This was a time-consuming task that required participation from

**Page 59 -        DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

the OHA team, including the External Relations Division. Ms. Darby will testify that public hearings and work sessions for the 2017 OHA budget continued for most of the 2017 session. Ms. Darby will testify as to OHA's participation in those public hearings and work sessions. In addition, OHA presented annual budgetary updates to the legislature.

**F.      Ms. Darby will testify that FamilyCare used its access to State legislators and lobbyists to voice its concerns.**

Ms. Darby will testify that, prior to her joining the OHA, she had met Jeff Heatherington, the Chief Executive Officer of FamilyCare, as part of her prior work. Ms. Darby generally knew that FamilyCare was a CCO, but she had not developed opinions relating to FamilyCare as an organization. However, she was aware of Mr. Heatherington's reputation for being impolite, demanding, and condescending. Ms. Darby will testify to a particular occasion prior to joining the OHA in which Mr. Heatherington approached her in the hallway of the Capitol building in Salem. At the time, Ms. Darby was working at OEA. Mr. Heatherington stopped her in the hallway, proceeded to get his face approximately six inches from her face, and emphatically tried to convince her to include FamilyCare as part of legislation Ms. Darby had been working to pass. Ms. Darby recalls Mr. Heatherington speaking to her in a loud and aggressive manner, as though he was trying to intimidate her into taking his side. Ms. Darby had never met Mr. Heatherington prior to this interaction.

Ms. Darby will testify that she observed that through financial contributions and years of extensive lobbying and fundraising activities, FamilyCare had ready access to legislators and the Secretary of State. FamilyCare used that access to frequently lobby for proposed legislation; present arguments to legislators that it was being treated unfairly by OHA; and complain to legislators about other CCOs and OHA's practices, rules, and rates.

For example, FamilyCare made significant contributions to many legislators through FamilyCare or an associated CCO lobbying coalition, Coalition for a Healthy Oregon. This included contributions to legislators on the House and Senate Health Committees and the Ways and Means Committee, and an especially large sum to Senator Bates. At FamilyCare's request, Senator Bates introduced legislation seeking to change OHA's rate-setting process.

**Page 60 -       DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
STATEMENTS**

Ms. Darby will testify that OHA did not interfere with FamilyCare's communications with legislators and the Secretary of State. OHA did answer questions from legislators and provided accurate information to help legislators weigh the potential impacts of FamilyCare's requests. OHA offered this same support to legislators on many legislative initiatives, not only those that involved FamilyCare. OHA's interactions with legislators were not designed to, nor did they, stop FamilyCare from communicating with legislators. To Ms. Darby's knowledge, no one at OHA took any actions designed to tarnish FamilyCare's image with legislators.

**G.    Ms. Darby will testify regarding FamilyCare's 2017 legislative bills.**

Ms. Darby will testify that in the 2017 legislative session, FamilyCare introduced three bills—Senate Bills 233, 234, and 236—through the Senate Interim Committee on Human Services and Early Childhood, chaired by Senator Sara Gelser Blouin. Ms. Darby will testify to the impacts of those bills on rate setting, data reporting, the 1115 Waiver, and CCO contracts, along with other impacts on the agency and OHP. Ms. Darby will testify that another non-profit health care insurance services organization, CareOregon, testified in opposition to parts of those bills.

Ms. Darby will testify that, to her knowledge, the Governor did not direct OHA to take a position on those bills. At the request of legislators and consistent with OHA's role as a subject matter expert, OHA provided written testimony and information on the bills' impacts to the agency's goals for health care systems transformation. That engagement as a subject matter expert included meetings with legislators to discuss the potential benefits and consequences of the policy questions and fiscal impacts raised by those bills.

Ms. Darby will testify that those three bills were not enacted during the 2017 legislative session.

**H.    Ms. Darby will testify that FamilyCare sought the same rate-setting changes from the Oregon Health Policy Board.**

Ms. Darby will testify that the Oregon Health Policy Board ("OHPB"), a nine-member citizen board, was created in 2009 to oversee and develop policy for OHA. OHPB was charged with guiding OHA's implementation of health care policy.

Ms. Darby will testify that as the 2017 legislative session closed without passage of Senate Bills 233, 234, or 236, FamilyCare sought to obtain its desired rate-setting changes by complaining to OHPB instead.  To this end, FamilyCare submitted a letter to OHPB in July 2017.  FamilyCare's July 2017 letter asked OHPB to conduct a rigorous review of OHA's rate-setting process, complaining that FamilyCare's rates were the lowest in the state.

Ms. Darby will testify that in an August 2017 response to FamilyCare's letter, Health Share disagreed that FamilyCare's payment rates were the lowest, noting instead that FamilyCare had fewer members in the highest risk and highest cost rate categories.  In a similar letter response in August 2017, CareOregon highlighted that FamilyCare's receipt of a lower overall rate did not mean it was being treated unfairly or unequally to other CCOs.

## I.    Ms. Darby will testify regarding draft communications plans at OHA.

Ms. Darby will testify that communications plans were used by OHA as internal tools to organize resources, themes, goals, and methods for explaining those goals to the OHA executive team to generate buy-in and alignment.  She will testify that communications plans are a normal part of any large agency operations; they were used by OHA and by Ms. Darby's former employers alike.  Communications plans create a roadmap to monitor progress; to ensure the team had a thoughtful plan for its efforts to communicate; and to encourage wise resource use.  Communications plans at OHA were intended to be fluid—to be revised and then revised again, as situations evolve.

Ms. Darby will testify that communications plans were very common at OHA.  As an example, she will testify that OHA used a communications plan for its Cleaner Air Oregon campaign to address air toxin issues.  OHA also used a communications plan for preparing and circulating statutorily required reports, like the quarterly legislative reports.

## J.    Ms. Darby will testify regarding the 2017 draft communications plan.

Ms. Darby will testify that Director Saxton requested a proactive approach to address FamilyCare's complaints in late 2016.  Ms. Darby will testify that this request came as FamilyCare was threatening to file a third lawsuit against OHA due to FamilyCare's

**Page 62 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
            STATEMENTS**

dissatisfaction with the 2017 rates. Because of the complexity of the rate-setting process, legislators and other stakeholders rarely seemed to understand the explanations of the legitimate reasons FamilyCare's rates were lower than other CCOs, particularly with FamilyCare's narrative further confusing the issues. This resulted in considerable inefficiencies and duplication of efforts on OHA's part and consumed a disproportionate amount of OHA's time compared to other CCOs.

Director Saxton's request for a communications plan was designed to reduce OHA's time resources dedicated to FamilyCare's demands by getting out in front of the misinformation that FamilyCare had been circulating and, based on previous experience, seemed likely to continue promoting before and during its impending lawsuit. In other words, Director Saxton wanted to proactively address the issues in play instead of waiting for them to percolate and expand.

Given the number of failed past efforts to communicate regarding the dense and highly technical issue of rate setting, Ms. Darby understood that Director Saxton felt OHA needed to get out in front with messaging that would adequately communicate to stakeholders the key information regarding FamilyCare's ongoing complaints with OHA's rates—rates that CMS had approved each year since Director Saxton had started as Director of OHA. Ms. Darby will testify that the requested communications plan would seek to explain that OHA's rate setting was sound. Ms. Darby will testify that she was never told to produce a communications plan that would do anything other than ensure that stakeholders received accurate information about the rate-setting dispute.

Ms. Darby will also testify to what she told Ms. Crowell when asking her to prepare a draft of the communications plan. Ms. Darby will testify that she does not recall directing Ms. Crowell to mark correspondence relating to the draft communications plan as "attorney-client privileged." She will testify that she thinks Ms. Crowell marked those documents attorney-client privileged because it was related to litigation with FamilyCare.

In creating the substance of the draft plan, Ms. Darby did not direct Ms. Crowell regarding particular content to be included; for example, she did not instruct Ms. Crowell to include specific material or make certain points in the draft plan. However, in an effort to

**Page 63 -** **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

provide Ms. Crowell with a framework for the project, Ms. Darby forwarded to Ms. Crowell several documents relating to a prior communications plan. And on January 17, 2017, Ms. Darby forwarded to Ms. Crowell a PowerPoint presentation created by FamilyCare that addressed many of FamilyCare's rate-setting concerns.

Ms. Crowell worked on a "brain dump" draft in early 2017 that was provided to Ms. Darby on January 20, 2017. Ms. Darby will testify that she only cursorily reviewed the draft and provided minimal feedback to Ms. Crowell on January 20, 2017. She will testify that she understood the draft to be Ms. Crowell's attempt to put all possible ideas on paper—a "throw spaghetti at the wall" exercise. Ms. Darby will testify that she intended to let Director Saxton review the draft and decide any next steps from there. Ms. Crowell provided a second draft to Ms. Darby on January 26, 2017, which Ms. Darby forwarded to Director Saxton that day without comment or revision.

Ms. Darby will testify that she did not hear from Director Saxton in response to the draft until February 18, 2017. Ms. Darby will testify what she understood Director Saxton's comments in that email, including the phrase "this is a good start," to mean.

Ms. Darby will testify that the February 18, 2017 email was Director Saxton's only written response to the draft. Ms. Darby will testify that a communications plan of this kind that was going to be implemented would have undergone significant revisions. In her experience working with Director Saxton, Ms. Darby observed that Director Saxton would comment on or redline documents when she intended to use them, and multiple iterations of the document would be produced and circulated within the communications team. Yet, to Ms. Darby's knowledge, Director Saxton did not edit or revise Ms. Crowell's draft communications plan.

In addition, the requested meeting to discuss the draft plan did not occur as scheduled on March 2, 2017 or at any other time. Instead, Ms. Darby spoke with Director Saxton in person about Ms. Crowell's draft of a communications plan in late February 2017. Director Saxton and Ms. Darby agreed during their late February conversation that the draft communications plan was not suitable and would not be implemented or used by OHA. They also discussed that

Page 64 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
            STATEMENTS

instead of the draft communications plan, OHA could use a recent letter drafted by DOJ regarding FamilyCare.

Ms. Darby will testify that the draft communications plan was shelved and never implemented. She did not observe others within OHA reviewing or referencing the draft or its contents after it was shelved until it was the subject of a public records request later that year. She will testify that common business tasks for OHA—including gathering financial data from CCOs, responding to inquiries from reporters, preparing and circulating the quarterly legislative reports, and communicating with legislators—were part of OHA's normal business routine before the creation of the draft communications plan. The fact that those normal business activities happened are not an indication that the draft communications plan was implemented. In response to FamilyCare's filing of its third lawsuit against OHA, OHA issued a public statement and shared it with local news sources. OHA also responded to questions from reporters regarding the lawsuit, and shared background information with reporters to provide necessary context for FamilyCare's decision to file suit. Ms. Darby will testify that each of those actions were well within the typical scope of OHA's external communications on newsworthy issues and did not constitute implementation of the draft communications plan, which had been shelved.

Ms. Darby will testify that she did not observe Director Saxton direct anyone at OHA to implement any element of the draft communications plan. In particular, Director Saxton never directed Ms. Darby to intentionally discredit FamilyCare in the media or to legislators. Ms. Darby also did not observe Director Saxton asking others to do so. Ms. Darby never shared information, or directed others to share information, with stakeholders regarding FamilyCare that Ms. Darby knew to be false. And Ms. Darby never observed Director Saxton direct anyone within OHA to share information with stakeholders that she knew to be false.

Ms. Darby will testify that she has never seen or heard of any efforts by Director Saxton to develop or implement policy relating to Medicaid rates with an intent to hurt FamilyCare or recoup money from FamilyCare. Further, she will testify that she is not aware of any instance in which Director Saxton or any employee, contractor, or agent of OHA sought to retaliate against

**Page 65 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

FamilyCare or took any action or made any decision regarding the 2017 and 2018 capitation rates for FamilyCare due to FamilyCare's complaints about OHA's rate-setting process or the 2016 Settlement Credit or rates paid to FamilyCare for 2016.  She is also not aware of any plan or conspiracy by any employee, contractor, or agent of OHA to discriminate or retaliate against FamilyCare in the rate-setting process.

**K.      Ms. Darby will testify about OHA's redetermination efforts.**

Ms. Darby will testify that redetermination is the review of a Medicaid member's continuing eligibility for the Medicaid program.  A member cannot simply be cut off from benefits under Medicaid but must go through a redetermination process that determines eligibility and incorporates a 90-day period for a response from the member.  She will testify that the process can be lengthy, and it became a significant issue for OHA due to technology troubles.  OHA subsequently contracted with Deloitte, an information technology contractor, to set up an eligibility and enrollment system called the ONE System.  In the meantime, OHA hired data entry specialists to help complete redetermination for existing Medicaid members using paper forms and manual data entry and review.  That work continued even as OHA and Deloitte worked to launch the ONE System.  Ms. Darby will testify that because of the time-intensive nature of this process, OHA maintained regular contact with CMS about the progress of the redetermination process.

Ms. Darby will testify that OHA staff completed redetermination efforts by August 2017, as required by the Governor's deadline.

Ms. Darby will testify that she is not aware of any employee, contractor, or agent of OHA who took any action to delay redetermination efforts in retaliation for FamilyCare's complaints about OHA's rate-setting process in any forum or before any organization or body or because of the 2016 rates or 2016 Settlement Agreement.

**L.      Ms. Darby will testify regarding her departure from OHA in 2017.**

Ms. Darby will testify that she left OHA in October 2017 after Director Saxton's departure.  She made the decision to leave the agency following discussions with the new

**Page 66 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
                 STATEMENTS**

director, Pat Allen, shortly after he took over for Director Saxton. She will testify that she felt it was respectful to allow Mr. Allen to establish his own leadership team and that she was ready to move to another position.

## IX.    Chelsea Guest (1.5 hours direct testimony)

### A.    Ms. Guest will testify about her background.

Chelsea Guest will testify that she has a degree from Willamette University in economics and a master's in biomedical informatics from Oregon Health & Science University. Before joining OHA's ASU, she was a lead data analyst in OHA's and the Department of Human Services' joint Office of Information Services.

### B.    Ms. Guest will testify about her work history with OHA.

Ms. Guest will testify that she joined ASU in 2014. From 2014 through the end of 2018, ASU managed capitation rate development for coordinated care organizations and other managed care entities. It also provided other actuarial analysis services for OHA when required. Ms. Guest's first position at ASU was as a Team Lead. As a Team Lead, Ms. Guest was involved in policy discussions with OHA staff and leadership about actuarial polices for CCO rate setting, but she was not a policy decision-maker herself. She was in charge of policy management and project management for the unit and communicating the unit's policies.

Ms. Guest will testify that in 2015, she became manager of ASU. As manager of ASU, Ms. Guest managed the Team Lead, a team of actuaries, and others. She also communicated with internal staff, other agencies, and external stakeholders such as CCOs. She was the primary point of contact for Optumas, OHA's external consulting actuary. As manager, she reported first to Mark Fairbanks and later to Laura Robison.

### C.    Ms. Guest will testify about OHA's communications with CMS leading up to the redeveloped 2015 rates.

Ms. Guest will testify that in 2014, when she started with ASU, CMS had notified OHA that it needed to prepare a plan to bring its rate-setting methodology in line with CMS's requirements. Ms. Guest helped prepare OHA's response. In its response, OHA committed to

**Page 67 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

adjusting its rate-setting methodology to bring it in line with CMS's new regulations and review standards. Ms. Guest understands that OHA is accountable to CMS to develop rates according to a methodology approved by CMS and that is consistent with federal Medicaid regulations. OHA puts federal participation funds at risk if CMS does not approve OHA's rates for CCOs. CMS can compel OHA to change rates if they do not meet CMS requirements.

Ms. Guest will testify that in 2014, OHA worked to develop rates for the CCOs for 2015. At the time, OHA had an employee named Dennis Tang. Mr. Tang was an actuary. Mr. Tang led a team in 2014 that developed the 2015 rates and Mr. Tang certified them as actuarially sound. OHA submitted the rates to CMS for approval and issued rate amendments to the CCOs that contained the proposed rates.

Ms. Guest will testify that CMS neither approved nor disapproved the initial 2015 rates. Instead, CMS issued approximately 100 questions about the rates and their development process. CMS also provided a guide on rate setting. OHA decided to redevelop the 2015 rates. In March 2015, OHA asked Optumas to become the certifying actuary for Oregon. Ms. Guest will testify that OHA responded to CMS by letter, stating that it had retained Optumas to be the certifying actuary and pledging to "develop[] rate methodologies to align with recent CMS guidance."

Ms. Guest will testify that OHA provided the CCOs with two memoranda that explained the changes to OHA's rate-setting methodology. The memoranda were posted on OHA's website. In August 2015, CMS expressly approved OHA's new rate-development policies in a letter to Leslie Clement, the acting Medicaid Director.

**D.      Ms. Guest will testify regarding rate development.**

Ms. Guest will testify that OHA used Optumas to redevelop the rates for 2015. Optumas became the certifying actuary for the redeveloped 2015 rates and for the 2016, 2017, and 2018 rates. As certifying actuary, Optumas was directed by OHA to develop rates that met CMS's regulations and guidance. Ms. Guest will testify that CMS approved the rates Optumas redeveloped in 2015, and the rates it developed with OHA in 2016, 2017, and 2018.

**Page 68 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
              STATEMENTS**

Ms. Guest will testify that as certifying actuary, Optumas handled base data development, trend development, program change, and determination of non-benefit (administrative) load. Optumas also performed analyses related to OHA policy development. OHA and Optumas both worked on risk scores when developing the 2017 and 2018 rates. Optumas and OHA worked in a collaborative fashion.

Regarding rate setting for CCOs, Ms. Guest will testify that in 2016 she managed the rate-setting work to develop the 2017 rates, including coordinating inquiries from CCOs and CMS; drafting responses to those inquiries or assigning others to draft responses; drafting other internal and external communications regarding rate setting or assigning others to draft communications; drafting or reviewing OHA policies regarding rate setting; and setting up and facilitating meetings with CCOs and other stakeholders. Ms. Guest will testify that OHA submitted the 2017 rates to CMS for approval in the fall of 2016.

Ms. Guest will testify that she communicated frequently with FamilyCare and all the other CCOs. OHA endeavored to answer CCOs' questions about rate setting completely and to treat all CCOs, including FamilyCare, fairly and openly. CCOs consider some of their internal financial information confidential or trade secret, and do not allow OHA to share it with other CCOs, so in some cases, OHA cannot share all information with every CCO. Ms. Guest organized work groups with the CCOs to provide information about rate-setting methodologies. Ms. Guest had in-person meetings with CCOs to discuss their base data. Ms. Guest will testify that OHA published documents about rate setting on OHA's website, including rate certifications and documents about OHA's rate-setting methodology. Ms. Guest will testify that OHA tracked its communications with CCOs.

Ms. Guest will testify that OHA had multiple in-person meetings one-on-one with FamilyCare in 2016 and 2017. Ms. Guest will testify that OHA also answered dozens of emails from FamilyCare and issued its own questions to FamilyCare. Ms. Guest will testify that OHA was responsive to FamilyCare inquiries even if FamilyCare did not like or failed to understand OHA's response. Ms. Guest will testify that OHA explained to FamilyCare its

rate-setting methodologies and choices.  OHA published FamilyCare's questions and OHA's answers in addenda to OHA's rate-certifications and published those addenda online.

Ms. Guest will testify that she was aware that FamilyCare sued OHA in 2015 regarding the 2015 rates, and that it filed another lawsuit in 2016.  Ms. Guest was not directly involved in the lawsuits.  She knows that OHA and FamilyCare settled the lawsuits in May 2016.  She was not directly involved in the settlement negotiations.

Ms. Guest will testify that she does not decide OHA policy on rates, but sometimes drafts policy papers with recommendations.  She is not responsible for reviewing the technical aspects of rate development.  She performs a high-level review of Optumas' rate certification, asking questions and raising concerns with Optumas and making sure it is consistent with Oregon's program and CMS regulations to the best of her ability.  She does not review the certification as an actuary or for actuarial soundness.

**E.      Ms. Guest will testify regarding the reimbursement policy.**

Ms. Guest will testify that in 2016, as part of the development of the 2017 rates, OHA formalized a policy that removed excess costs from the base data.  This policy has been called the "reimbursement policy" or "reimbursement review."  Ms. Guest will describe the sequence of events that led to the policy.  OHA was aware in 2015, based on CCO financial reporting, that CCO expenditures were growing rapidly.  Ms. Guest will testify that OHA observed that FamilyCare's physician reimbursements and professional costs had grown especially fast from 2014 to 2015.  In fall 2015, OHA notified FamilyCare that it was concerned about FamilyCare's rapidly escalating physician reimbursements.  Ms. Guest will testify that OHA asked FamilyCare for a response.  FamilyCare didn't respond for two months and then failed to provide an explanation.  Ms. Guest will testify that FamilyCare never told her that it needed to increase reimbursements to add to its physician panel.  To the best of her knowledge, FamilyCare did not tell anyone else at OHA that they needed to increase reimbursements to add to its physician panel.

Ms. Guest will testify that OHA used the CCOs' 2015 encounter data and financial submissions as of around the end of March 2016 to inform the 2017 CCO capitation rate-

**Page 70 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

development process.  OHA asked Optumas to perform a rate of growth analysis on the CCOs' costs to understand which factors were driving the growth in CCO expenditures.  Optumas did and observed that some CCOs' overall base data growth was rising at unsustainable rates.  The reason, Optumas learned, was some CCOs, including FamilyCare, had significantly increased provider reimbursement and incentive payments.  OHA decided to adjust those CCOs' base data to remove excessive physician reimbursement and incentive payments.  Adjustments to base data like those in the reimbursement policy do not affect only the CCO that has its base data adjusted.  Because OHA used a regional approach to rate setting, cutting the base data of a CCO in one region affects the rates of all CCOs in that region.

Ms. Guest will testify that OHA implemented the policy to contain costs and keep the overall rate of growth of the Medicaid program sustainable, as required by the 1115 Waiver agreement with the federal government to retain substantial federal financing.  Ms. Guest will testify that some other states reduce eligibility to Medicaid or cut health benefits to control costs.  OHA is committed to not cutting Oregonians' eligibility or health benefits.  Ms. Guest will testify that the reimbursement policy allowed OHA to control costs without limiting eligibility or health benefits to Oregonians.  The policy affected many CCOs, not just FamilyCare.

Ms. Guest will testify that Oregon's 1115 Waiver sets a sustainable rate of growth for Oregon's Medicaid program.  The target is 3.4%.  The 1115 Waiver is not the only reason Optumas and OHA evaluate the rate of growth of CCO expenditures.  Ms. Guest will explain that state budget provisions are also a significant reason.  Ms. Guest will testify that OHA's CCO rates are not governed or determined by a budget target.  The goal of the reimbursement review was to contain unsustainable and excess costs while developing actuarially sound rates, not to hit a specific target.  Ms. Guest will testify that Optumas reviewed costs of CCOs reporting costs exceeding sustainable rates of growth and sought to understand what was driving those unsustainable costs.

**Page 71 -     DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
            STATEMENTS**

Ms. Guest will testify that she helped draft a document that explained the reimbursement policy and she wrote emails and communicated information about the policy to CCOs and stakeholders.

Ms. Guest will testify that in 2018, OHA also removed excess costs from several CCOs' encounter data. Ms. Guest was on maternity leave for a portion of 2017, and therefore did not have a direct role in much of the rate development for 2018 rates. Ms. Guest returned from leave in the fall of 2017. In late October, OHA issued proposed 2018 rates to the CCOs, including FamilyCare. Ms. Guest submitted those rates to CMS for approval on November 1, 2017. OHA later issued revised rates in the first quarter of 2018. Ms. Guest also submitted those rates to CMS for approval. Ms. Guest will testify that CMS reviewed and approved both the initial and revised 2018 rates.

Ms. Guest will testify that risk scores were applied according to a standard methodology uniformly to all CCOs, including FamilyCare and Health Share.

### F. Ms. Guest will testify regarding her interactions with Ms. Saxton and that neither Ms. Guest nor anyone else to Ms. Guest's knowledge took actions designed to hurt FamilyCare.

Ms. Guest will testify that she had no knowledge of a "communications plan" directed towards FamilyCare other than what she read in the media. Ms. Guest does not know the reason Ms. Saxton resigned.

Ms. Guest did not report directly to Ms. Saxton. Ms. Guest will testify that they did not have frequent communication. Ms. Guest will testify that Ms. Saxton did not direct her to make any changes to FamilyCare's rates. Neither Ms. Saxton nor anyone else directed Ms. Guest to make any changes to the rate-setting process designed to hurt or discriminate against FamilyCare or any other CCO. Ms. Guest will testify that she is not aware of anyone at OHA doing anything to discriminate against FamilyCare. Neither Ms. Saxton nor anyone else directed Ms. Guest to tell Optumas to make any changes to FamilyCare's rates. Ms. Guest did not, herself, engage in any activity with respect to rates designed to discriminate against FamilyCare. She is not aware of Optumas doing anything designed to discriminate against

FamilyCare.  OHA directed Optumas to develop rates to be approved by CMS and to meet the requirements of federal Medicaid regulations and the 1115 Waiver.

Ms. Guest will testify that she was aware of the 2016 Settlement Agreement between OHA and FamilyCare.  Ms. Guest did not—on her own initiative or at the direction of anyone else—direct Optumas to develop the 2017 or 2018 rates with the intention of recovering any amount of money credited to FamilyCare in the 2016 Settlement Agreement or paid to FamilyCare in its 2016 rates.

## X.    Jeff Heatherington (30 minutes direct testimony)

OHA intends to call Jeff Heatherington, the Chief Executive Officer, President, and co-Founder of FamilyCare, as a hostile witness in OHA's case-in-chief.[1]  Mr. Heatherington is expected to testify about his deletion of text messages from his phone.  Mr. Heatherington is expected to testify that from November 2016 to November 2017 he sent or received text messages that may be relevant to this case and that cannot be recovered from either him or the other party.  Mr. Heatherington is expected to testify that he and his lawyers did not inform OHA of his permanent deletions until September 24, 2018, after the close of discovery, so OHA had no opportunity to conduct discovery regarding the deletions by Mr. Heatherington and the other custodians.  Mr. Heatherington is expected to testify that the custodians of these deleted text messages are employees of FamilyCare's public relations firms and key FamilyCare employees, all of whom have relevant information about the dispute between FamilyCare and OHA.

## XI.    Janet Meyer (30 minutes direct testimony)

Ms. Meyer will testify that she is the former Chief Executive Officer of Heath Share of Oregon, a CCO, from 2012-2018.  She has recently announced her retirement from Health Management Associates, where she has provided consulting services since 2019.

---

[1] OHA is amenable to covering these topics during Mr. Heatherington's cross examination when he is called in FamilyCare's case-in-chief.  OHA will seek stipulation from FamilyCare that it will not object to the cross being beyond the scope of direct even if FamilyCare opts not to address Mr. Heatherington's deletion of text messages in its direct examination of him.  If the parties cannot reach a stipulation, then OHA shall call Mr. Heatherington as a hostile witness in its case-in-chief.

**Page 73 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
            STATEMENTS**

Ms. Meyer will testify about the background of Health Share and its work as a CCO within the Oregon Health Plan. She will testify that Health Share understood that under its contract with OHA, OHA had authority to develop CCO rates, subject to approval by CMS, and that OHA was not obligated to develop rates that covered a CCO's expenses. Ms. Meyer understood that Health Share and its partners might need to adjust their systems to accommodate OHA's annual rate allocations; but that they could be innovative and creative to serve its patient members efficiently and effectively with the rates they obtained. Ms. Meyer will testify that OHA hired a new actuary, Optumas, in 2015. All of the CCOs met with and provided input to Optumas. Among the items discussed with OHA and Optumas was what information the CCOs would be willing to share with one another.

Ms. Meyer will testify that she told OHA that Health Share would not and could not consent to sharing unit cost data with the other CCOs or releasing it to the public. She will explain that such information was proprietary to each of Health Share's partners, such as Kaiser Permanente and Providence Health & Services.

Ms. Meyer will testify that Health Share was expected to maintain confidentiality of partner data to competitors and the public and to maintain a firewall between individual partners. In other words, Health Share's partners were not entitled to see one another's data. The aggregate information was so proprietary that it was only accessible at Health Share by Ms. Meyer and a narrow set of authorized staff, such as the contracted actuarial team. Ms. Meyer will testify that some of the partners' contractual agreements with health care providers specifically prohibited disclosure of negotiated rates.

Ms. Meyer will testify that Health Share and other CCOs are entrusted with taxpayer money for the purpose of providing the best care to the most people in a specific population, namely Medicaid recipients. She will explain that CCOs have a fiduciary responsibility to use taxpayer money wisely. Ms. Meyer will testify that this goal is served by the competitive aspect of CCOs in Oregon. She will explain that, if Health Share (or other CCOs) was required to disclose its unit cost data, another CCO could buy a provider out from contracting with Health Share by paying the provider at a higher rate. She will testify that this would

**Page 74 -     DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
          STATEMENTS**

likely cause the provider to refuse care to Health Share members in favor of providing care at higher prices to the other CCO.

Ms. Meyer will testify that safeguarding their pricing models (and other information about their business model) is central to maintaining competition in this sector. She will explain that this competition encourages CCOs to innovate and improve members' health status, and retain those members in their plan. Ms. Meyer will testify that CCOs add value in their community by engaging providers and supporting members – this is what differentiates one CCO from another. She will explain that, in her view, Health Share had specific attributes that maximized its ability to serve the community and connect with providers, ensuring the best care and satisfaction to all involved at rates withing the norm for Medicaid. Ms. Meyer will testify that, in this way, CCOs can influence providers to better serve the community and improve outcomes.

Ms. Meyer will testify that she and Jeff Heatherington are well acquainted and that their relationship has persevered. Ms. Meyer will explain that, before she became CEO of Health Share, she worked for Mr. Heatherington.

Ms. Meyer will testify that she told Mr. Heatherington directly that FamilyCare was overpaying for primary care. In particular, she told Mr. Heatherington that providers would provide services well under the commercial rates FamilyCare was paying.

Ms. Meyer will testify that her statement in an August 18, 2017 letter to the Oregon Health Policy Board about increased "transparency between CCOs" did not refer to the disclosure of unit cost data, *i.e.* negotiated rates. Rather, inasmuch as Health Share worked with partners under sub-capitated arrangements, not only did Health Share disclose to OHA its financial statements, it also provided those of its partners. Mr. Heatherington's assertion that Health Share was "hiding partners profits" was not accurate because Health Share was transparent with the financials of their partners.

Ms. Meyer will testify that one of its partners, Kaiser Permanente, paid its standard rates to providers for some services regardless of whether they were private insurance or Medicaid. OHA discounted those payments in its rate setting as an outlier. Ms. Meyer will

**Page 75 -** **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

testify that, in her view, OHA generally treated the CCOs consistently and FamilyCare was not singled out or punished.

## XII.   Kate Nass (45 minutes direct testimony)

Kate Nass will testify that she joined the OHA in January 2015 as a Deputy Director of Finance and that she continued in that role until September 2017.  In 2015, Ms. Nass was not involved in the CCO rate-setting process.  Ms. Nass will testify that in 2016 she became involved in the CCO rate-setting process for the 2017 rates.

### A.   Ms. Nass will testify that the 2017 and 2018 rate-setting processes were not biased against FamilyCare.

Ms. Nass will testify her role was not that of an actuary, but instead to provide guidance and recommendations to agency leadership regarding agency finances.  Ms. Nass attended meetings with OHA's external consulting actuary, Optumas, and discussed the budget impact of various rate-setting decisions.  In particular, Ms. Nass worked with Optumas on implementation of new benefits (e.g., the back pain benefit) and discussing how those benefits were captured in the rates.

While at OHA, Ms. Nass worked with Ms. Guest, who led the ASU at OHA.  While Ms. Guest was on parental leave in 2017, Ms. Nass helped oversee the rate-setting process for the 2018 rates.  Although she did not review the underlying data, Ms. Nass helped oversee the reconciliation process for the claims and encounter data that was eventually used to create the 2018 rates.  Ms. Nass reviewed medical cost trends and risk scores with Optumas.

Ms. Nass will testify that she did not direct anyone to set the CCO rates in either 2017 or 2018 in a way that was biased against FamilyCare.  Ms. Nass will testify that she did not direct anyone to manipulate the rate-setting process in a way that discriminated against FamilyCare.  Ms. Nass was not aware of anyone that attempted to set the rates in a way that was biased against or that discriminated against FamilyCare.  Ms. Nass was not aware of any plan within OHA to set the rates in a way that forced FamilyCare out of business.

Ms. Nass did not report directly to Ms. Saxton.  They did not have frequent communication.  Ms. Nass will testify that neither Ms. Saxton, nor anyone else, directed her to

**Page 76 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

make any changes to FamilyCare's rates. Neither Ms. Saxton, nor anyone else, directed Ms. Nass to make any changes to the rate-setting process designed to hurt FamilyCare. Neither Ms. Saxton, nor anyone else, directed Ms. Nass to tell Optumas to make any changes to FamilyCare's rates or to the rate-setting process. To the best of Ms. Nass's knowledge, neither Ms. Saxton nor anyone else at OHA had any intention to discriminate against FamilyCare.

Ms. Nass will testify that during her time at OHA, the agency held monthly meetings with all CCOs, including FamilyCare, to discuss rate setting and other issues pertaining to coordinated care in Oregon. These meetings lasted several hours. During the meetings, CCOs were given the opportunity to raise issues of concern for them.

**B.      Ms. Nass will testify that the rate redetermination process for the 2018 rates was not delayed in order to harm FamilyCare.**

Ms. Nass will testify that she was involved in the eligibility redetermination process involving the 2018 rates. In 2014, the technology platform used by Oregonians to apply for health coverage in OHP, Cover Oregon, failed. Federal law required OHA to renew the eligibility of Medicaid recipients every year. But in September 2015, Centers for Medicare & Medicaid Services granted Oregon approval to pause Medicaid eligibility renewals to prevent Oregonians from losing health benefits due to this flawed technology. Consistent with this federal guidance, in March 2016, OHA restarted the Medicaid renewal processing for a total of over 950,000 OHP members.

Additionally, Ms. Nass will testify that OHA experienced issues with its method for mapping categories of aid for OHP members. These issues with mapping categories of aid were exacerbated by the failure of Cover Oregon.

Ms. Nass will testify that OHA explored various options for fixing this issue, including redetermining the eligibility for specific categories of aid instead of the entire Medicaid population. However, OHA ultimately determined that due to problems stemming from Cover Oregon's failure, OHA would need to redetermine the eligibility and enrollment information for every OHP member. In May 2017, Governor Brown instructed OHA to complete this

**Page 77 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

redetermination work by the end of August 2017. Ms. Nass will testify that her work was specific to tracking the redetermination work and monitoring relevant deadlines.

Ms. Nass will testify that the eligibility redetermination process was not delayed or altered in order to harm FamilyCare. She will further testify that OHA did not delay the redetermination process until after FamilyCare's CCO contract expired in order to deprive FamilyCare of the benefit of the redetermination. Ms. Nass will testify that she was pushing to get the redetermination work done as soon as possible, as were her colleagues.

**C.    Ms. Nass will testify that she is not aware of any effort to retaliate against FamilyCare for a settlement it received in prior litigation.**

Ms. Nass will testify that, while at OHA, she was aware of litigation with FamilyCare regarding the 2015, 2016, and 2017 rates. While at the agency, Ms. Nass was not aware of how that litigation with FamilyCare was resolved. She will testify that she is unaware of any efforts at OHA, during the rate-setting process for 2017 and 2018, to manipulate the rates as a result of any settlement with FamilyCare. Ms. Nass did not—on her own initiative or at the direction of anyone else—direct Optumas to develop the 2017 or 2018 rates with the intention of recovering any amount of money credited to FamilyCare in a prior settlement agreement.

## XIII.   Laura Robison (1.5 hours direct testimony)

Laura Robison will testify that she attended Boston University and earned a degree in mathematics and economics. She then studied to become an actuary. She became a property and casualty actuary and worked for companies in Boston, Massachusetts and San Francisco, California. Ms. Robison is not a health actuary. In 2011, when she came to Oregon, Ms. Robison became a casualty actuary for the Department of Consumer and Business Services. Ms. Robison later became chief actuary of DCBS and then Insurance Commissioner for the State of Oregon. Pat Allen appointed Ms. Robison Insurance Commissioner. Ms. Robison will testify that she worked for OHA from September 2017 to August 2018 as the Chief Financial Officer.

Ms. Robison will testify that as CFO of OHA, she supervised the ASU. The head of ASU, Chelsea Guest, reported to Robison. ASU was charged with overseeing rate

**Page 78 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

development for CCOs.  Optumas was OHA's outside actuary that was tasked with certifying OHA's proposed CCO rates each year.  OHA must develop CCO rates according to federal regulations and CMS guidance in order to obtain federal funds supporting Oregon's Medicaid program.  Ms. Robison will testify to the significance of federal funding to the Oregon Health Plan.  Ms. Robison will testify that CMS must approve the rates as actuarially sound for OHA to receive federal funds.  Ms. Robison will testify that OHA is accountable to CMS for the development of the rates according to the federal government's regulations and guidance.

When Ms. Robison joined OHA in 2017, she will explain, the proposed 2018 rates had been largely developed.  Ms. Robison learned that OHA and Optumas had developed a reimbursement policy to address the rising costs of physician reimbursements and incentives made by some CCOs.  As part of the policy, OHA and Optumas investigated the drivers of the cost growth in the CCOs and adjusted the base data of those CCOs with unsustainable physician reimbursements and incentives.  Ms. Robison reviewed the reimbursement policy.

Ms. Robison will testify that she had discussions with Optumas and OHA's actuarial services unit about the reimbursement policy and reviewed examples of the individual CCOs' year-over-year costs.  Based on her discussions and review of materials, Ms. Robison affirmed the reimbursement policy.

Because rates are developed on a regional basis, Ms. Robison will explain, adjusting base data of one CCO in a region affects the resulting rates of all CCOs in the region.  The reimbursement policy resulted in adjustments to FamilyCare's base data because FamilyCare was reimbursing physicians at high levels.  Ms. Robison will testify that OHA and Optumas adjusted FamilyCare's base data to provide for physician reimbursements that were more reasonable.  The adjustments to FamilyCare's base data affected the CCO rates of both FamilyCare and Health Share.  After adjusting base data under the reimbursement policy, Optumas affirmed that the resulting rates were actuarially sound, which meant that the rates were reasonable, appropriate, and attainable.

Ms. Robison will testify that the Oregon legislature set a target rate of growth for the Oregon Health Plan of 2.7% per year.  In addition, the Section 1115 Waiver contains a target

**Page 79 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
                STATEMENTS**

3.4% rate of growth.  The target requires an average year-over-year rate of growth of 3.4%, but individual years may vary.   CCO capitation payments are included in the calculation, but so are other payments.  Ms. Robison will testify that the Oregon legislature's target and the 1115 Waiver's target are considered when OHA and Optumas set CCO rates, but CCO rates are not set to achieve the targets.  They are set to be actuarially sound and in compliance with federal Medicaid regulations.

Ms. Robison will testify that in 2017, OHA hired two outside consultants to perform legal and actuarial reviews of the rate-setting process to determine if FamilyCare's concerns were well founded and to act on them if necessary.  Mr. Allen made the ultimate decision to carry out the reviews; Ms. Robison agreed that the reviews would be helpful to get an independent assessment of whether OHA had problems with bias in its rate-development process.  The legal review was performed by Manatt Phelps & Phillips, LLP, a law firm with a specialty in CMS regulations. The actuarial review was performed by Lewis & Ellis, Inc., an actuarial group.  Ms. Robison will testify that the purpose of the reviews was to determine whether the CCO rates were developed without inappropriate bias and according to legal and actuarial rules and standards. The legal review addressed, among other things, whether the reimbursement review was consistent with law and Medicaid rules and regulations.  Although the actuarial reviewer was directed not to opine on the policy rationale for OHA's rate-setting decisions (e.g., the reimbursement review), the actuary's scope of work did include review of the implementation of those decisions.  Ms. Robison will testify that the scope of the reviews did not include the independent reviewers engaging directly with the CCOs.

Ms. Robison will testify that the reviews were completed in December 2017.  The reviews concluded that the reimbursement policy was implemented in accordance with Medicaid rules and regulations and actuarial standards, and the rates were developed without inappropriate bias.  The reviews did not reveal any bias against FamilyCare or any basis to alter the proposed 2018 rates.

Ms. Robison will testify that she did not direct anyone at OHA to take any action or make any decision regarding FamilyCare's 2018 capitation rates in retaliation for FamilyCare's

**Page 80 -     DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

complaints about OHA's rate-setting process or because of the 2016 Settlement Agreement. She will also testify that she is not aware of any employee, contractor, or agent of OHA that took any action or made any decision regarding FamilyCare's 2017 or 2018 capitation rates in retaliation for FamilyCare's complaints about OHA's rate-setting process or because of the 2016 rates or 2016 Settlement Agreement. Ms. Robison will testify that she did not discriminate against FamilyCare in the rate-setting process and is not aware of any employee, contractor, or agent of OHA that discriminated against FamilyCare in the rate-setting process due to anti-FamilyCare bias. Ms. Robison will testify that she did not observe any indication that there was a conspiracy to discriminate against FamilyCare when she arrived. She did not observe any evidence that Lynne Saxton retaliated against FamilyCare through the rate-setting process.

Ms. Robison will testify that she did not create or implement a policy or plan to force FamilyCare to exit the Medicaid market. She is unaware of anyone in Oregon state government having such a policy or plan and she would not have carried it out if there were such a plan. Ms. Robison will testify that she is not aware of any OHA employee, contractor, or agent that had any intention of forcing FamilyCare to exit the Medicaid market. Ms. Robison will testify that she worked throughout the fall and winter of 2017 to develop clear communication about the rate-setting work with all CCOs, including FamilyCare.

Ms. Robison will testify that in November and December 2017, FamilyCare expressed frustration with OHA's proposed 2018 rates for FamilyCare, contending that the rates were too low. Ms. Robison will testify that she engaged in email communication with FamilyCare throughout the fall and winter of 2017 explaining the proposed 2018 rates, OHA's redetermination analysis, validation of eligibility data, and the timelines for OHA's analyses. She also responded to other issues raised by FamilyCare.

Ms. Robison will testify that she and Mr. Allen met with FamilyCare at FamilyCare's offices on or around December 14, 2017, in an effort to resolve the dispute regarding FamilyCare's proposed 2018 Rate Amendment. Mr. Heatherington and Mr. Murray attended for FamilyCare. During the meeting, Mr. Heatherington stated that FamilyCare was going to lose a

**Page 81 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
              STATEMENTS**

large amount of money in 2018 and any adjustment to the rates needed to be close to the amount FamilyCare expected to lose.

Ms. Robison will testify that the meeting paused and both groups met separately. The parties discussed the ongoing Medicaid eligibility redetermination and its potential effect on FamilyCare's rates. Ms. Robison will testify that she and Mr. Allen informed FamilyCare that OHA would not have the final results of the eligibility redetermination by the end of the year, but OHA would try to provide FamilyCare with a sense of the magnitude of the rate adjustments before the end of the year. Ms. Robison followed up in an email to Mr. Murray shortly after the meeting explaining OHA's work and timelines in detail.

Ms. Robison will testify that approximately two days after the December 14, 2017 meeting, she was forwarded an email in which FamilyCare notified an Oregon legislator that FamilyCare's board had voted not to sign the 2018 Rate Amendment and FamilyCare's work as a CCO was coming to an end. Ms. Robison will testify that she also learned that FamilyCare held an all-staff meeting and began providing notices of termination to staff. Ms. Robison will testify that OHA learned of a FamilyCare townhall meeting in which FamilyCare announced it was leaving the CCO market.

Ms. Robison will testify that she and OHA leadership were concerned about FamilyCare's plans to leave the market because it would be disruptive for FamilyCare's members. Ensuring seamless health care for Oregonians was Ms. Robison and OHA's highest priority. If FamilyCare left the market at the end of December 2017, it would require transitioning more than 100,000 members to new CCOs very quickly. Ms. Robison will testify that OHA's highest priority was to ensure that OHP members retained access to services and health care during the transition.

Ms. Robison will testify that OHA called a meeting with FamilyCare officials on December 20, 2017. Ms. Robison and Mr. Allen attended for OHA. FamilyCare's attendees included Mr. Murray and Kevin Clancy. The meeting was held at OHA's offices in Portland. During the meeting, Mr. Allen explained that based on the last conversation, OHA was working to provide FamilyCare information regarding the size of the rate adjustments due to eligibility

**Page 82 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
           STATEMENTS**

redeterminations, but that OHA had heard that FamilyCare had already made the decision to go out of business. Ms. Robison will testify that OHA wanted to know if that was true. Ms. Robison will testify that Mr. Allen asked FamilyCare representatives to provide an indication of their intent with respect to the 2018 Rate Amendment within 24 hours. OHA needed this information because if FamilyCare was leaving the Medicaid market, the agency needed to take concrete steps to implement a transition plan for FamilyCare's more than 100,000 members. Ms. Robison will testify that OHA was concerned that it would be especially challenging to transition FamilyCare's members during and right after the holiday. A transition plan would be an enormous undertaking. Ms. Robison will testify that OHA had nothing to gain from FamilyCare leaving the market.

Ms. Robison will testify that OHA provided FamilyCare with its 2018 Rate Amendment on October 31, 2017, and gave FamilyCare until the last day of 2017 to sign the Rate Amendment. Ms. Robison will testify that she understood that the law allowed FamilyCare until December 31, 2017 to sign the 2018 Rate Amendment. OHA would have accepted the 2018 Rate Amendment even if FamilyCare signed it at the last minute. At the December 20, 2017 meeting, OHA wanted to know if FamilyCare had already reached a decision regarding the 2018 Rate Amendment, as she had heard that they had. Ms. Robison will testify that the conversation was firm but that neither she nor Mr. Allen lost their temper.

Ms. Robison will testify that shortly after the December 20, 2017 meeting, Ms. Robison learned definitively that FamilyCare would not be signing the 2018 Rate Amendment. OHA entered into a one-month contract covering only the month of January 2018 to allow for a smoother transition of FamilyCare's members to a new CCO. Ms. Robison will testify that OHA also paid FamilyCare an additional $5 million over and above its rates to help with the transition.

When Ms. Robison joined OHA as CFO, the redetermination of the eligibility status of some Oregon Health Plan members was underway. The results of this work were released and implemented upon its completion. Ms. Robison will testify that she never personally delayed this work, nor did she direct staff to do so. Ms. Robison will also testify that she is not aware of

**Page 83 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

any officer, employee, contractor, or agent of OHA taking any action to delay the redetermination work in retaliation for FamilyCare's complaints about OHA's rate-setting process, including this lawsuit or previous lawsuits, or because of the 2016 Settlement Agreement, the Settlement Credit in that Agreement, or FamilyCare's 2016 rates.

Ms. Robison will testify that OHA communicated the status of the redetermination analysis proactively with the CCOs, including FamilyCare, and sought their input. Ms. Robison will testify that OHA had to balance FamilyCare's requests for information and rate changes with OHA's obligations to CMS and the Oregon Health Plan.

## XIV.  Lynne Saxton (5 hours direct testimony)

In addition to the testimony included in this statement, OHA reserves the right to adopt the information contained in the witness statement for Ms. Saxton that will be presented by Defendant Lynne Saxton.

### A.    Ms. Saxton will testify about her background.

Ms. Saxton will testify to her employment experiences in regulated industries and with Medicaid care providers, both of which were instrumental in building the skills needed as the Director of OHA.

Ms. Saxton will testify that she was employed with the Alaska Public Utilities Commission from 1976 to 1978 as a tariff specialist, consumer protection and information officer, and acting director of consumer protection and information. Ms. Saxton will also testify that she served in the investor relations department at Portland General Electric Company for six months and as a public affairs representative from 1979 to 1988.

Ms. Saxton will testify that she has, for decades, served on boards and commissions, including the State Land Conservation & Development Commission and the Early Learning Council (commissions), Metropolitan Family Services, the OHSU Neuropsychiatric Institute, and Willamette University (boards).

**Page 84 -     DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

B.    **Ms. Saxton will testify about OHA and Medicaid expansion in Oregon.**

Ms. Saxton will testify that Medicaid is a federal program that funds medical, dental, and behavioral care for low-income individuals. She will testify that Oregon received federal approval for the OHP, Oregon's Medicaid expansion program, in 1993. OHP was jointly funded by state and federal dollars and was administered under both state and federal law.

Ms. Saxton will testify that the legislature created OHA in 2009 to consolidate most health programs into a single agency. The legislature also created the OHPB, a nine-member citizen board, in 2009 to oversee and develop policy for OHA. OHPB was charged with guiding OHA's implementation of health care policy.

Ms. Saxton will testify that when she was Director, OHA, among other programs, administered: the portion of the OHP that included the expanded population from when the 2010 ACA made more Oregonians eligible for Medicaid; the Oregon State Hospital; the Public Employees Benefits Board and Oregon Educators Benefits Board; and the Oregon Medical Marijuana Program. It also oversaw the state's public health services through the Public Health Division, which addressed issues in fields as varied as environmental health (like clean drinking water and climate change), communicable diseases, pandemics, and maternal and infant health (WIC program).

Ms. Saxton will testify that OHA's largest areas of responsibility included the state hospital (Salem and Junction City campuses), the public health division, and the OHP.

Ms. Saxton will testify that OHA had the second largest agency budget in the State of Oregon. OHA's budget was made up of a combination of General Fund, Lottery Fund, Other Fund, and Federal Fund dollars. Ms. Saxton will testify that she, as Director, managed a budget of approximately $20 billion and roughly 4,300 employees.

Ms. Saxton will testify that OHA's interactions with its contracted CCOs were but a piece of the broader framework of OHA and its programming. FamilyCare, as one of 16 CCOs with which OHA contracted, was an individual entity operating within the much larger CCO context. The CCO program was, itself, operating within the even larger Medicaid system and

worked in tandem with policy and legislative conversations that were occurring about the ACA at both the state and federal levels.

Ms. Saxton will testify that the 2010 ACA led to Medicaid expansions in some participating states to cover nondisabled adults with incomes at or below approximately 133% of the poverty line.  She will testify that Oregon was one of those states; Oregon received approval and funding in 2012 from CMS, the federal agency responsible for administering Medicaid.  The expansion added approximately 455,000 Medicaid members in Oregon by May of 2016.

Ms. Saxton will testify to what is generally referred to as the Section 1115 Waiver, which was an agreement between Oregon and the federal government to explore innovative models to deliver health care under the Medicaid program.  Oregon's 1115 Waiver allowed it more flexibility in working with CCOs to deliver health care to Medicaid members under the OHP.  In this system, Oregon paid CCOs a per-member rate, and in return, CCOs were responsible for managing the delivery of physical, behavioral, and dental care to their members through their independently contracted care providers.  As with a standard health insurance company, CCOs accepted the risk that the rates they received from Oregon may not cover the cost of care they were contractually obligated to pay to their providers.  By bearing that risk, CCOs were pushed to innovate in how they delivered care through their budget, which helped Oregon with its goals of increasing access and improving the quality of health care and outcomes for its Medicaid members while also managing costs.

Initially, the federal government contributed most of the funds needed to pay the CCO per-member rates to cover the expansion population.  In fact, 100% of Oregon's initial Medicaid expansion was funded by the federal government in 2014; this percentage phased down over time.  In 2017, the federal government paid 95% of expansion.  In the 1115 Waiver, Oregon committed to reducing the statewide rate of growth in Medicaid health care costs, including payments to CCOs, by 2% from 5.4% to 3.4% on average during the five-year waiver period. This 3.4% cost containment was not a secret—it was known by all of the CCOs.  Ms. Saxton will testify that OHA agreed to pay the federal government penalties if it failed to meet its reduced rate of growth goal over the life of the 1115 Waiver.

**Page 86 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Ms. Saxton will testify that Oregon's total Medicaid enrollment increased from approximately 600,000 members in 2013 (pre-ACA expansion) to approximately 1.1 million by May of 2016.  The approximately one million Oregonians enrolled in Medicaid represented one in four Oregonians and almost 40% of residents in some counties.  Approximately 90% of OHP members were enrolled in a CCO.  Thanks, in part, to the Oregon Health Plan, almost 95% of Oregonians had health care coverage as of 2017.

Ms. Saxton will testify that in support of its mission of helping Oregonians achieve optimum physical, behavioral, and social well-being through partnerships, prevention, and access to quality, affordable health care, OHA adopted the Institute for Healthcare Improvement's "Triple Aim" policy goals of (1) improving the health of Oregonians, (2) increasing the quality of care or patient experience, and (3) lowering the per capita cost of care ("better health, better care, lower costs").  That Triple Aim guided OHA's policy goals throughout Ms. Saxton's tenure at OHA.

### C.    OHA must set annual rates, subject to CMS approval.

Ms. Saxton will testify that during her time as Director, OHA developed annual rates through a process with CCOs.  Every year, OHA collected financial and member use information from each CCO.  Using that information, OHA attempted to accurately project how much a CCO would reasonably spend on each individual member in the upcoming year.  That projection was applied to set a rate that OHA would pay to a CCO for each member.  Because the rate paid to a CCO was tied to the likelihood and frequency that the CCO's members would need medical services in the upcoming year, a CCO with a healthier population would receive lower rates (less money per member) and a CCO with a sicker population would receive higher rates (more money per member).

Ms. Saxton will testify that, to receive federal taxpayer funds for Medicaid expansion, Oregon was required to submit its annual rates to CMS for review and approval.  CMS reviewed the rates to ensure they were sound before approving or rejecting them.

**Page 87 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

**D.      Ms. Saxton will testify that she accepted the appointment as OHA Director for a limited duration in order to make positive change within the behavioral health community and in the lives of underserved Oregonians.**

Ms. Saxton will testify that Governor Kitzhaber contacted Ms. Saxton in late 2014 to discuss her recommendations for candidates to fill the role of Director of OHA.  The Governor had obtained an approximately $1.8 billion grant to fund the ACA Medicaid expansion in Oregon through the 1115 Waiver.  Ms. Saxton knew that whoever filled the role would be the fourth OHA Director in 16 months.

Ms. Saxton will testify to her discussions with the Governor regarding the position, including the Governor's request for candidate names and his ultimate offer to Ms. Saxton to join OHA as Director for a limited duration to address the competing, urgent priorities the agency faced.

Ms. Saxton will testify that she was reluctant to leave her current position at the Youth Villages Oregon so close to her planned retirement.  But she felt the OHP was the first opportunity to serve low-income Oregonians who were otherwise left out of the health care conversation; with the ACA expansion, she saw an opportunity to improve care for youth with critical behavioral issues and improve behavioral health overall.  Ms. Saxton was passionate about OHA's mission.  Medicaid is about serving the underserved in Oregon.

Ms. Saxton will testify that she believed in the federal-state agreement in the 1115 Waiver, with CCOs integrating care and Oregon committing to a reasonable rate of growth of 3.4%; she believed the system made an expansion possible in Oregon and balanced the real benefit to rural and underserved Oregonians against the need to avoid a situation where the state's budget was consumed by unchecked Medicaid costs.  Ms. Saxton admired the accountability and transformation promoted under the Oregon Health Plan where a CCO was responsible for innovating to help contain costs in line with Oregon's budget.

Ms. Saxton will testify that she discussed the Oregon Health Plan with health care leaders in other states who had elected not to pursue Medicaid expansion because of the increased annual step-up in the state's financial contribution under the state-federal Medicaid agreement

(each year the federal contribution would reduce and the state contribution would increase until a plateau was reached). Those state health care leaders believed the medical costs from the new, and previously uninsured, population would balloon and consume their Medicaid and state budgets—something that Oregon's growth cap measures were designed to avoid.

When she accepted the role as OHA Director, Ms. Saxton intended to serve in the position for about a year, to address specific issues and stabilize the Medicaid expansion operations. Ms. Saxton will testify that shortly after she began, Governor Kitzhaber unexpectedly resigned, and Kate Brown became governor.

### E.    Ms. Saxton will testify about major legacy initiatives facing OHA when Ms. Saxton became Director.

Ms. Saxton will testify that upon her transition to Director of OHA, there were a number of significant challenges facing OHA, including challenges at the Oregon State Hospital and in the roll out of Oregon's health care exchange (Cover Oregon).

In addition, the Medicaid expansion was just beginning. Ms. Saxton will also testify regarding new issues or events that emerged during her tenure that were unexpected and commanded significant leadership attention, including toxic air issues (and related legislation), the expansion of reproductive health equity, public health modernization, issues with capacity to serve the aid-and-assist population at the Oregon State Hospital, budgetary gaps, and proposed federal changes to Medicaid expansion, as well as ongoing efforts to overturn the ACA. Given OHA's extensive responsibilities and the complex nature of the programs and services provided, Ms. Saxton will testify that she relied on subject matter experts skilled in analyzing and implementing OHA's services and programs.

### F.    Ms. Saxton will testify regarding her role in rate setting, legislative efforts, and communications at OHA.

Ms. Saxton will testify that as Director of the entire agency with seven direct executive reports, she was not involved in the details of rate setting. However, she was involved in the policy work and policy decisions that informed the rate-setting work at OHA.

**Page 89 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

She was focused on ensuring that OHA's rates (1) fit within the 3.4% rate of growth framework, (2) were approved by CMS, (3) met the obligations of OHA's contracts with the CCOs, and (4) achieved the Triple Aim. She signed off on each of OHA's major rate-setting decisions, but her involvement was high-level and did not involve granular analysis. Ms. Saxton will testify that as an educated layperson, she understood the broad brushstrokes of ratemaking, but as she was not a certified actuary, she could not have explained all the details of rate setting. She understood that Oregon's actuary of record was ultimately responsible for certifying the rates to CMS.

Ms. Saxton will testify that when she joined OHA, she had a track record of working effectively with people on both sides of the political aisle. Prior to becoming the Director of OHA, Ms. Saxton was a long-time member of the Oregon Republican Party, although she was appointed by both Republican and Democratic governors to serve in roles like, for example, the State Land Conservation & Development Commission. Ms. Saxton hired an established Democrat, BethAnne Darby, to act as the External Relations Director of OHA. Ms. Darby and Jeston Black handled the government relations work for OHA but frequently brought in subject matter experts from other divisions of OHA's team to talk with the legislature when needed. Ms. Saxton was a problem solver: she believed in a bi-partisan approach to OHA's and the state's challenges because that is what would solve problems.

### G. Ms. Saxton will testify regarding her role in OHA's communications activities.

Ms. Saxton will testify that she created the External Relations Division within OHA to enhance education and communications with the legislature, the public, and other agency stakeholders. She wanted to improve access to and understanding of health care complexity. Ms. Darby headed the External Relations Division and worked directly with Robb Cowie, the communications manager, who, in turn, worked with a number of communications officers.

Ms. Saxton will testify that communications plans are part of standard communications management tools; they are developed and followed in order to ensure an organization's messaging on important topics is consistent and effectively shared. As with many organizations'

**Page 90 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

communications departments, it was standard practice of OHA's External Relations Division to develop and follow communications plans, beginning with initial drafts and followed by a final executive-approved draft.

Communications plans at OHA changed often as situations evolved and facts developed. Communications plans were used for a number of other initiatives at OHA, including Cleaner Air Oregon, the OHA leadership team's visit to Washington D.C. in early 2017 (regarding the ACA), and the production and circulation of statutorily mandated legislative reports.

Ms. Saxton will testify that she did not typically participate in communications planning at a ground level, but she did review, offer necessary substantive revisions, and approve communications plans that landed on her desk before they were implemented.

**H.    Ms. Saxton will testify about OHA's work to establish a new methodology and revised rates in 2015.**

Ms. Saxton will testify that in March 2015, CMS issued a request to OHA for responses to 103 questions related to the original 2015 rates that had been set prior to Ms. Saxton's tenure. CMS expressed concern that the 2014 rates did not include sufficient supporting encounter data and assumed much higher costs for the newly eligible Medicaid members brought in under the ACA than historical data suggested could be correct (resulting in higher payments to the CCOs). CMS asked OHA to prepare an action plan to bring OHA's rate-setting methodology in line with new CMS guidance.

Given the concern raised by CMS, it was extremely important to Ms. Saxton that the Medicaid program was managed and administered in a fiscally responsible way, including ensuring that the year over year growth met the 3.4% growth target, pursuant to the 2012 1115 Waiver. Ms. Saxton knew that Oregonians' health care, particularly indigent Oregonians' health care, depended on CMS's approval of the capitation rates.

Ms. Saxton will also testify that within weeks of the start of her tenure at OHA, she received complaints from CCOs about perceived issues with the 2015 rates set by OHA. Ms. Saxton took the CCOs' concerns very seriously and discussed them immediately with the then-existing Medicaid Director and then-existing Health Policy Advisor for the Governor's office.

**Page 91 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

She asked professional staff within OHA for the names of outside actuaries who had expertise in health care rate setting.  Ms. Saxton will testify that she was told OHA had worked with Optumas, an outside actuarial service, on projects.  She learned that Optumas had a national reputation for work in the health care policy field.

Ms. Saxton will testify that OHA leadership met with all CCOs in a work session in March 2015 to discuss the issue of their concern with 2015 rates.  She also introduced Optumas to the CCOs.  It was agreed that OHA would hire an actuarial consultant to work with OHA to redevelop the 2015 rates.  Ms. Saxton will testify that she asked Optumas to redevelop the 2015 rates and develop a sustainable methodology to apply to future rate years.  There was broad support from the CCOs to have Optumas redevelop the rates.  Ms. Saxton asked Lori Coyner to lead the redevelopment effort.  Ms. Saxton also tasked Ms. Coyner with resolving each of CMS's 103 questions as they worked through the rate redevelopment process.

Ms. Saxton will testify to the numerous meetings OHA had with the CCOs to increase collaboration and transparency around the rate-setting process.  OHA regularly brought Zach Aters and Steve Schramm of Optumas into the scheduled conversation and meetings with CCOs to offer CCOs the opportunity to ask questions and obtain relevant information directly from OHA's certifying actuaries.

Ms. Saxton's overarching goal going into the 2015 rate redevelopment process was to develop a methodology that OHA could rely on in future years that kept CMS engaged and financially contributing to the program.  Ms. Saxton also wanted to ensure that the rates were financially sustainable, approved by CMS, and achieved the mission of providing access to health care for indigent Oregonians.

## I.    OHA and Optumas successfully develop a new rate methodology.

OHA, with assistance from Optumas and in cooperation with the CCOs, developed an action plan.  OHA shared its planned revisions to the rate-setting methodology with the CCOs.  OHA intended to utilize this revised rate-setting methodology in future years.  Ms. Saxton will testify that OHA and Optumas worked diligently during 2015 to develop revised rates and a rate-setting methodology consistent with CMS guidance and in frequent consultation with the CCOs.

**Page 92 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Ms. Saxton will testify that, by summer 2015, OHA had developed revised 2015 rates through an entirely new methodology. She will testify that her role was to supervise and support the collaboration between OHA's actuaries, the Optumas team, the CCOs, and CMS to reach this result. Some CCOs personally thanked her for the hard work of producing new rates in a transparent manner. It was important for OHA to redevelop the rates according to CMS guidance because without approval from CMS, Oregon would not receive the federal funding that would allow the OHP to continue to serve its members. Ms. Saxton approved the new methodology because it was equitable, it would fit Oregon's needs, it would satisfy CMS's requirements, and it would meet the Triple Aim. OHA and Optumas met with the CCOs individually and as a group to explain the new rates.

**J.    FamilyCare files its first lawsuit against OHA.**

Ms. Saxton will testify that by May 2015, FamilyCare had filed a lawsuit against OHA for breach of the 2015 CCO contract, alleging that the original 2015 rates were actuarially unsound and demanding redeveloped, actuarially sound rates. FamilyCare filed the lawsuit before OHA completed its 2015 rate redevelopment process; FamilyCare did so knowing that the redevelopment process was in progress.

**K.    CMS approves the revised 2015 rate-setting methodology.**

OHA submitted the revised rates to CMS for approval in August 2015. In August 2015, CMS approved the methodology used in the redeveloped 2015 rates. Ms. Saxton will testify that OHA sent to all CCOs the CMS letter supporting OHA's revised methodology and scheduled individual meetings with each CCO to discuss the revised rates. OHA circulated contract amendments to each CCO making the new rates retroactive to January 1, 2015. CMS requested the January 1, 2015 retroactive date for the revised rates. Fifteen CCOs signed the contract amendments containing the CMS-approved redeveloped rates. Only FamilyCare refused to sign the contract amendment.

**L.        The 2015 revised rates required OHA to recoup overpayments from CCOs.**

Ms. Saxton will testify that the rate revisions resulted in mandatory recoupments from many of the CCOs, including FamilyCare.  If OHA had not produced revised rates that met CMS's standards for actuarial soundness, CMS may not have fully funded the OHP, endangering the program's stability and the health care of Oregonians.

Under the revised rates, FamilyCare owed OHA approximately $54 million for 2015, which FamilyCare refused to return.  Other CCOs were also required to return overpayments resulting from the revised 2015 rates and each of those CCOs complied.

**M.        FamilyCare is unhappy about OHA's rates and applies pressure through legal action, legislative action, and direct appeals to CMS, the OHPB, and the Oregon public.**

Ms. Saxton will testify that notwithstanding OHA's significant efforts to prepare revised rates and a methodology that resolved CMS's 103 pending questions regarding the 2015 rates, and despite OHA's ultimate success in obtaining CMS approval for those rates, and in the face of every other CCO accepting the revised rates, FamilyCare would not accept the redeveloped 2015 rates.  The 2016 rates were developed based on the same, revamped rate-setting methodology.

**N.        OHA's efforts to educate stakeholders on the rate-making process.**

Ms. Saxton will testify that OHA began developing information in 2015 and 2016 to educate stakeholders on the process of setting Oregon Health Plan rates and establishing a sustainable methodology for Oregon.  FamilyCare was engaged in broad dissemination of misinformation to stakeholders about the rate-setting process and ignoring the importance of the 3.4% federally mandated growth cap in an attempt to apply pressure to OHA to obtain the rates FamilyCare wanted included.  FamilyCare's misinformation could have caused lawmakers to approve rates that would put the Oregon Health Plan's funding from the federal government at risk.  Therefore, OHA undertook efforts to educate stakeholders on the rate-making process and why it mattered to the Oregon Health Plan.

OHA was also required by Oregon statute to produce the Oregon Health System Transformation Quarterly Legislative Report ("quarterly legislative reports"); that statute

**Page 94 -        DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

dictated some of the contents of the reports, including the reporting of CCO financial data, like reserves and projected cash flow. The quarterly legislative reports kept the legislature and other stakeholders informed on the health of Oregon's Medicaid system and CCOs. This was critical as Oregon taxpayers would soon be required to invest in Medicaid expansion. All the CCO information used in the quarterly legislative reports was provided by the CCOs themselves.

Ms. Saxton will testify that the quarterly legislative reports contained a set of common financial metrics used when summarizing financial information, that the information came directly from financials provided by the CCOs, and that it was not changed or edited by OHA. Ms. Saxton did not instruct OHA staff to track FamilyCare's cash flow and net worth beyond what they were already tracking for all CCOs. Ms. Saxton never instructed staff to skew how CCO profits should be displayed or characterized in the legislative quarterly reports. Her expectation was that the reports discussed all CCOs objectively and clearly for broad layperson understanding.

**O.      CMS approves the 2016 rates, and OHA and FamilyCare resolve FamilyCare's two pending lawsuits.**

Ms. Saxton will testify that OHA received CMS approval in May 2016 for the 2016 rates. Ms. Saxton will testify that, also in May 2016, OHA and FamilyCare engaged in settlement negotiations to address FamilyCare's two pending actions against OHA, pursuant to negotiation protocol. For many reasons, in the interest of moving forward under this new rate-setting framework and to allow OHA to devote more time and focus to its myriad responsibilities beyond rate development for CCOs, OHA agreed to resolve the two pending lawsuits with FamilyCare. The parties entered into the Settlement Agreement, which resulted in a one-time forgiveness of $24.8 million of the 2015 overpayment to FamilyCare. This is called the "Settlement Credit." FamilyCare returned the remainder of the approximately $54 million owed to OHA, resulting in a repayment to OHA of approximately $29.6 million.

Ms. Saxton will testify that as part of the Settlement Agreement, FamilyCare expressly acknowledged and agreed that: (1) "OHA has the authority to set the CCO rate under which OHA contracts with CCOs, subject to CMS approval"; (2) "OHA must establish to the

**Page 95 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

satisfaction of CMS that the rates are actuarially sound, in accordance with the Medicaid Act, 42 C.F.R. Part 438, applicable Actuarial Standards of Practice and CMS guidance (collectively, 'Actuarially Sound Principles')"; (3) "Medicaid regulations require OHA to establish rates for each rate cell that are adequate for reasonable, appropriate and attainable benefit and non-benefit Medicaid costs"; (4) "OHA is not obligated to adjust the rates paid to any CCO to ensure that such rates cover all costs that a CCO has incurred during a rate year"; (5) "OHA must comply with the terms of the Section 1115 [Waiver] or risk loss of federal funds"; and (6) "CMS approves CCO contracts and the rates contained therein that CMS finds to be actuarially sound and developed in accordance with Actuarially Sound Principles, based on the information provided to it by OHA and its actuaries."

Ms. Saxton will testify that at the time OHA entered into the Settlement Agreement, it reasonably relied on these rate-setting process concessions by FamilyCare. For instance, she will testify that it was important to OHA that (1) FamilyCare acknowledge that OHA was not obligated to set FamilyCare's future rates to ensure that the rates cover all of FamilyCare's costs and (2) FamilyCare acknowledge that OHA had the authority to set the CCO rates, subject to CMS approval. These acknowledgements were material inducements for OHA to enter into the Settlement Agreement because OHA wanted to avoid future lawsuits over its rate setting, provided the rates it set were approved by CMS.

### P.    OHA begins the 2017 rate-setting cycle.

Ms. Saxton will testify that OHA began the 2017 rate-setting cycle in April 2016 with the collection of initial base data from the CCOs. This was followed by a base data and individual financial analysis with each CCO in June 2016, and CCO meetings in July to consider base data adjustments. With the 2015 rate redevelopment process completed and the CCOs generally satisfied with OHA's rate methodology moving forward, Ms. Saxton used this time to transfer the OHA actuary team from the Health & Analytics Division to the Finance Division and begin stepping even further back from CCO meetings.

OHA continued discussions with the CCOs regarding 2017 rate setting through September 2016. Ms. Saxton will testify that OHA submitted the 2017 rates to CMS for

**Page 96 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

approval in October 2016 and contemporaneously presented the annual rate amendment for 2017 to FamilyCare.

  **Q.  FamilyCare continues to contest OHA's rates in multiple forums.**

  Ms. Saxton will testify that while FamilyCare pressed for its desired rate-setting change through the legislature, it submitted additional public records requests seeking, among other things, trade secret financial information of its CCO competitors. FamilyCare submitted an extensive public records request to OHA in October 2016 seeking to obtain information relating to the 2017 rate-development process, including information that other CCOs believed to be trade secrets. OHA asked all 16 CCOs to identify the data they considered their trade secrets (in an attempt to satisfy the public records request). Ms. Saxton will testify that the Attorney General's office concluded in April 2017 that certain information sought by FamilyCare, including the Tri-County regional rate model and the raw risk score data for the Tri-County Region, constituted trade secret information that FamilyCare was not entitled to obtain.

  Ms. Saxton will testify that shortly after FamilyCare submitted its public records request in October 2016, the parties entered into a dispute resolution agreement in December 2016. Yet, even as FamilyCare entered into this dispute resolution agreement with OHA, it engaged in a letter-writing campaign to CMS, seeking to appeal directly to CMS to intervene on FamilyCare's behalf in rate setting. Ms. Saxton will testify that FamilyCare met with CMS representatives in person in December 2016. Ms. Saxton will testify that despite FamilyCare's direct appeals to CMS, CMS rejected FamilyCare's arguments and approved OHA's rates as actuarially sound every year from 2015 (as revised) through 2017.

  Ms. Saxton will testify that, also simultaneous to these dispute resolution efforts, FamilyCare sought to introduce three legislative bills for the 2017 legislative session, attempting to force OHA to implement many of FamilyCare's desired rate-setting changes; the proposed bills also introduced additional changes designed to benefit FamilyCare and to reduce OHA's oversight of the rate-setting process.

  When FamilyCare was unsuccessful with each of these efforts to pressure OHA into setting rates that were preferential to FamilyCare, it turned to the OHPB, the citizen board that

**Page 97 -  DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

oversaw and developed policy for OHA.  FamilyCare submitted letters and provided testimony at OHPB's August 2017 board meeting, urging OHPB to implement FamilyCare's desired changes. Other CCOs responded to FamilyCare's requests to OHPB, noting the mischaracterizations in FamilyCare's complaints.  After reviewing FamilyCare's materials, OHPB elected not to take FamilyCare's requested action.

At the same time, FamilyCare filed its third lawsuit against OHA (this current lawsuit) in late February 2017.

### R. FamilyCare's flurry of activity overlaps with other significant OHA obligations in 2017.

Ms. Saxton will testify that the FamilyCare lawsuits and other attempts to pressure OHA overlapped with the 2017 legislative session.  She will testify that is typically a very busy period for OHA.  OHA provides subject matter expertise to legislators at each legislative session.  It also presented to the legislature in 2017 in support of its 2017-2019 biannual budget requests. The regular rate-setting cycle typically begins around June, just as the legislative cycle is wrapping up, thus creating no space between these two major tasks.

### S. Ms. Saxton will testify about the 2017 draft communications plan.

Ms. Saxton will testify that she wanted to educate OHA's stakeholders about the CCO program and rate setting within the context of the state's overarching goals: the 3.4% containment commitment and the Triple Aim.  She was concerned that this lack of fundamental understanding of how the process worked resulted in OHA spending an inordinate and disproportionate amount of time responding to the same questions again and again about how OHA set CCO rates.  For instance, despite CMS approving the rates that were developed for FamilyCare, FamilyCare continued alleging that OHA was targeting them and not treating them fairly.  Without adequate rate-setting knowledge within the context of the state's goals for sustainable health care, stakeholders' trust in OHA suffered due to FamilyCare's repeated and deliberate mischaracterizations about the rate-setting process.  Ms. Saxton felt it was essential to improve stakeholder understanding of Oregon's CCOs and rate-setting process.

**Page 98 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Ms. Saxton will testify that as OHA was headed into the next rate-setting year, she invited reporters from the Oregonian to spend one hour with actuaries from OHA to receive training on the rate-setting process under Oregon's system; the offer was rejected. Ms. Saxton asked Mr. Aters from Optumas and members of her actuarial team to explain the rate-setting process to legislators on multiple occasions, which they did.

**T.      Ms. Saxton will testify regarding the background and events surrounding the 2017 draft communications plan.**

Ms. Saxton will testify that in an attempt to improve stakeholders' understanding of the rate-setting process, she requested that the communications team draft a proactive communications strategy on December 23, 2016. When she requested this strategy, she believed it was likely that FamilyCare would elect to file a lawsuit soon. She wanted to ensure that OHA's stakeholders understood the process at the heart of the dispute between OHA and FamilyCare and felt that OHA could be more efficient in communicating that process. Without an accurate understanding, these stakeholders were unlikely to have confidence in the state's administration of the ACA expansion and would not be prepared for assuming the state's share of expansion costs.

Ms. Saxton also asked Ms. Darby for a draft communications plan sometime between December 23, 2016 and January 3, 2017, with the goal of ensuring that OHA communicated in a way that people could begin to understand the role of rate setting in the context of the Oregon Health Plan. Ms. Saxton wanted a draft communications plan that would facilitate improved education and communication for all the parties so that they could move forward more quickly and effectively.

Ms. Saxton will testify that although she understood a meeting was scheduled between OHA and FamilyCare on January 17, 2017, relating to the dispute resolution process involving FamilyCare's latest issues with the rates, she did not know that FamilyCare would give a presentation at that meeting. Ms. Saxton will testify that she received a copy of a PowerPoint presentation provided by FamilyCare's counsel to Mark Fairbanks during the January 17, 2017 meeting and that she forwarded that PowerPoint to Ms. Darby on that same day. Ms. Saxton did

**Page 99 -      DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

so because she felt the PowerPoint provided a concise summary of FamilyCare's position regarding rate setting. She felt that it suited both parties' goals to try to resolve the ongoing dispute, and stakeholders' lack of clarity regarding the issues was furthering the dispute. Clearer messaging that accurately reflected FamilyCare's underlying concerns was in both parties' best interests.

Ms. Saxton will testify that she was interested in including the communications team in this discussion because they would field questions from stakeholders regarding FamilyCare's potential lawsuit and they could best serve OHA, the CCOs, and all stakeholders by creating thoughtful and proactive discussions about rate setting in advance.

Ms. Saxton did not receive a draft of a communications plan until January 26, 2017, and she did not review that draft until mid-February 2017. On January 26, 2017, Ms. Darby emailed Ms. Saxton a draft communications plan prepared by Courtney Crowell. Ms. Saxton will testify that she did not receive a subsequent draft from Ms. Darby, Ms. Crowell, or anyone else at OHA.

Ms. Saxton will testify that in late January and early February 2017, she spent significant time preparing for a visit to Washington, D.C. to discuss the possibility that Congress would repeal the ACA, which would have significantly changed the Oregon Health Plan. While Saxton was in Washington, D.C., it became apparent that the new presidential agenda (under then-President Donald Trump) could have a significant impact on Medicaid, the ACA, and Oregon.

Ms. Saxton first reviewed the draft from Ms. Darby approximately three weeks later in mid-February 2017. Ms. Saxton will testify that she felt the draft missed the mark for the communications plan she had requested. As Director of OHA, it was not her style to disparage her employee's work in writing. Instead, she has found it to be most constructive to start with something positive so that criticism can be absorbed. Ms. Saxton will testify that "good start" signals for her that something did not meet expectations or standards. The "start" signals that all she received was a beginning, but that significant work remained to be done.

Ms. Saxton will testify that she had a face-to-face conversation with Ms. Darby in late February 2017 regarding the draft plan. Ms. Saxton and Ms. Darby agreed that the draft plan was not the right approach and that it would be shelved immediately and not implemented. The

**Page 100 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
            STATEMENTS**

draft plan was, in fact, shelved and never implemented. Any actions by OHA staff that appear to indicate implementation of the draft communications plan were merely actions that OHA staff would take regardless of whether there was or was not a communications plan in place. Those actions were simply part of staff's regular duties; they were not performed pursuant to the draft communications plan.

Ms. Saxton will testify that she did not personally reprimand anyone at OHA in conjunction with the draft communications plan, but that she made it clear to Ms. Darby that the draft was not an acceptable approach for OHA. Performance reviews occurred annually in December for Ms. Saxton's direct reports at OHA. It was her practice to provide each of her direct reports with written and oral feedback during those reviews. However, Ms. Saxton left OHA before the 2017 review process occurred.

Ms. Saxton will testify that the draft communications plan remained shelved until Nick Budnick, a reporter for the Portland Tribune, submitted a public records request in May 2017 seeking the specific draft document and communications surrounding it.

Ms. Saxton will testify that she believed the draft communications plan that she received in February 2017 was marked "attorney-client privilege" because staff understood that designation to be appropriate and necessary whenever they discussed matters that implicated pending or anticipated litigation or OHA's attorneys were part of the conversation. Ms. Saxton will testify that Jeff Wahl, OHA's legal counsel, was likely included on conversations surrounding the draft communications plan because he was involved in the ongoing dispute resolution with FamilyCare and likely would be involved in any litigation FamilyCare was threatening to file. She reasonably believed that FamilyCare had or would file a lawsuit.

Ms. Saxton will also testify that OHA initially redacted materials responsive to Mr. Budnick's May 2017 public records request on a good faith belief that they were protected by privilege. OHA later produced to Mr. Budnick unredacted versions of the requested materials.

In asking for a draft communications plan to be developed, Ms. Saxton did not believe that she was violating any laws, or somehow depriving FamilyCare of its constitutional free speech rights. In asking for a draft communications plan to be developed, Ms. Saxton was not

**Page 101 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
STATEMENTS**

intending to retaliate against FamilyCare in any way. She was merely attempting to develop a clear, concise, and streamlined strategy for communicating effectively. She was unaware at the time that she asked for the draft communications plan to be developed of what the substance of the draft plan would ultimately include.

U.    **Ms. Saxton will testify that she never edited or approved the draft communications plan and it was never moved out of draft form or implemented in any way.**

Ms. Saxton will testify that the 2017 draft communications plan was not her plan, she did not approve it, or give it any meaningful review or edit. The draft provided to Ms. Saxton was not reflective of what she had requested or wanted. The draft plan was far too political for a state agency and introduced suggestions and actions that made no sense for OHA to pursue: her intent was for OHA to educate the public on rate setting and how Medicaid funding (and their tax dollars) was spent to support the success of the Oregon Health Plan.

Ms. Saxton will testify that although she disagreed with any use by OHA of the draft communications plan and shelved it without further thought, she believes that some of the points in the plan were factually accurate.

Ms. Saxton will testify that, from a statistical perspective, FamilyCare was an outlier—15 CCOs went one way and one CCO went the other. FamilyCare was the only CCO that refused to accept OHA's rates; FamilyCare was the only CCO to refuse to agree to the recoupment process when it was paid too much; FamilyCare was the only CCO to pay its providers a commercial rate; and FamilyCare was the only CCO to sue OHA over rates or to attempt to contact CMS directly to influence OHA's rate setting. Despite FamilyCare's subjective feelings about being an "outlier," the term accurately, and without malicious intent, described the position that FamilyCare took during Ms. Saxton's time at OHA.

V.    **Ms. Saxton will testify that there was no plan to hurt FamilyCare and the 2017 rates were not established in a way that was designed to harm FamilyCare.**

Ms. Saxton will testify regarding OHA's rate-setting process in 2017. Ms. Saxton will testify that she did not take any action or make any decision regarding the 2017 capitation rates

Page 102 -    **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

for FamilyCare that considered, in any manner, the 2016 Settlement Credit (as defined in the Settlement Agreement), rates paid to FamilyCare for 2016, or FamilyCare's complaints (informal or formal) about rate setting. Rather, she was focused on developing a rate-setting process, through OHA's outside actuaries, that would ensure the viability of the Oregon Health Plan as a whole.

Ms. Saxton will testify that she did not personally discriminate or retaliate against FamilyCare in the rate-setting process. She also did not develop or implement any plan to discriminate or retaliate against FamilyCare in the rate-setting process, and she is not aware of any plan by any other employee, contractor, or agent of OHA to discriminate or retaliate against FamilyCare in the rate-setting process.

Further, Ms. Saxton will testify that she is not aware of any employee, contractor, or agent of OHA who sought to retaliate against FamilyCare or who took any action or made any decision regarding the 2017 capitation rates for FamilyCare based on its complaints about OHA's rate-setting process, or due to the 2016 Settlement Credit, or rates paid to FamilyCare for 2016.

Ms. Saxton will testify that she never instructed anyone at OHA or Optumas to make choices designed to harm or target FamilyCare. She will testify that where rate-setting choices were made, the OHA team considered various possibilities and made the rate-setting decision that would best serve Oregon Health Plan members, meet CMS requirements, and satisfy the Triple Aim. The state had committed to contain costs at 3.4% and the CCOs were at a growth rate of over 8%. Those decisions had nothing to do with whether they would or would not impact FamilyCare. In setting the 2017 rates, Ms. Saxton and OHA did not consider or use the 2016 Settlement Credit or rates paid to FamilyCare for 2016.

Ms. Saxton will also testify that FamilyCare's allegations that OHA or Ms. Saxton sought to drive FamilyCare from the market through rate setting are demonstrably inaccurate.

**Page 103 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

**W.    Ms. Saxton will testify regarding redetermination and the Secretary of State audit.**

Ms. Saxton will testify that following the Cover Oregon failure, OHA worked to complete redetermination for Medicaid members.  Redetermination is the review of a Medicaid member's continuing eligibility for the Medicaid program.  OHA stayed in regular contact with CMS about the progress of the redetermination process.

Ms. Saxton will testify that the Governor directed OHA to complete redetermination by August 31, 2017.  OHA initiated an action plan to meet the Governor's deadline by completing redetermination by hand.

**X.    The OHA team is engaged in standing up the ONE System.**

Ms. Saxton was working on standing up, among other challenges, the ONE System in 2015 and early 2016.  Once operable, the ONE System was used to enroll Medicaid members, and later, to determine or redetermine Oregon residents' eligibility for Medicaid.  Ms. Saxton will testify regarding the ONE System's operations.  The ONE System was necessarily a key priority for her in early 2016 because OHA had been processing applications by hand.  The ONE System launched in March 2016.

Ms. Saxton will testify that completing redetermination and implementing the ONE System was one of OHA's priorities during her time with the agency.  OHA worked with consultants from KPMG to assist with this process.  To this end, Ms. Saxton met with KPMG staff daily.  However, due to ongoing technical difficulties, OHA was forced to hire employees to process thousands of redetermination applications by hand.  At no point did anyone from OHA deliberately slow the agency's efforts to process Medicaid redeterminations during Ms. Saxton's tenure as Director.

**Y.    Ms. Saxton's text messages.**

Ms. Saxton will testify that she was issued an iPhone from OHA that was used for only work-related purposes.  All work-related communications that occurred on a cell phone occurred using that OHA iPhone.  Ms. Saxton was not a frequent text message user, but she occasionally exchanged text messages with others on her OHA iPhone regarding OHA-related work.

Ms. Saxton will testify that it was her daily practice to clear the messages on her OHA iPhone screen. Clearing her messages in this manner was her standard business practice throughout her employment at OHA and that she did so in order to maintain an orderly and manageable text message inbox. She followed the same general practice with her OHA emails for the same reason. It was her understanding that removing her text messages from her phone would not remove them from OHA's archiving system, just as emails exchanged through OHA devices are archived by OHA even if moved or deleted from an inbox. She did not realize that her text messages had not been archived and that her editing had resulted in the permanent deletion of the selected messages. Ms. Saxton first learned of this misunderstanding in archiving practices when questioned about the text messages a year after she left employment with OHA.

Ms. Saxton will testify that she did not remove text messages from her OHA iPhone with any intent to destroy or otherwise shield them from review. She will further testify that the messages that she removed from her OHA iPhone were not targeted due to any relationship to activities implicated by this lawsuit and that Ms. Saxton could not recall which messages were removed from her iPhone. Ms. Saxton believed her handling of the text messages on her OHA iPhone complied with the litigation hold issues in this matter, because she believed they were archived. Ms. Saxton will describe the types of messages that she likely removed from her iPhone screen for housekeeping purposes, including messages relating to scheduling, running late to an appointment, or other business logistics.

Ms. Saxton will testify to her general technological aptitude and to her lack of familiarity with the details of new or relatively new technologies. Just as she had in previous positions, at OHA she had an executive assistant managing technology for her executive duties.

Ms. Saxton will testify to the efforts she engaged in to recreate the content of the text messages that were unrecoverable from her OHA iPhone, including reviewing her work calendar and Mr. Cowie's work calendar to identify daily activities and potential areas of likely communication.

**Page 105 -     DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
                 STATEMENTS**

### Z.    Ms. Saxton will testify about her departure from OHA in 2017.

Ms. Saxton will testify that she had a conversation with Nik Blosser, the Governor's chief of staff, in early 2017 about resigning from OHA.  Ms. Saxton accepted the position as Director of OHA with the understanding that it would be a temporary position lasting for no more than one year or 18 months.  As the time of this early 2017 conversation with the Governor's office, she had served as Director of OHA for over two years.  During that conversation, both Ms. Saxton and the Governor's office indicated an interest in getting a firm departure date in place.  Ms. Saxton will testify that as a result of the early 2017 conversation with the Governor's office, she planned to resign from her position at OHA by February 2018.

Ms. Saxton will testify that on August 8, 2017, she had a conversation with Mr. Blosser and Berri Leslie of the Governor's office regarding resignation from her position as Director of OHA.  During that August 8, 2017 conversation, all agreed that Ms. Saxton would resign her position as of August 31, 2017.  The resignation agreed to during the conversation with Mr. Blosser and Ms. Leslie did not identify the draft communications plan or the subsequent Portland Tribune article addressing the plan as the impetus for the resignation.  The Governor's office asked Ms. Saxton to remain in her position until August 31, 2017, to assist with many ongoing projects, including successful completion of the redetermination effort.  At the time she received a call requesting the August 8, 2017 conversation with members of the Governor's office, Ms. Saxton was meeting with representatives of CMS who were highly complementary of what OHA had accomplished with the Oregon Health Plan during Ms. Saxton's time as Director.

### AA.    Letter to Jeff Heatherington from Ms. Saxton.

Ms. Saxton will testify regarding a letter she sent to Mr. Heatherington dated August 7, 2017.  Specifically, she will testify regarding what she meant by the phrases, "the heat of ongoing litigation" and "exceeds the boundaries of a state agency's responsibility to the public trust."  Ms. Saxton will testify as to her reasons for sending the August 7, 2017 letter to Mr. Heatherington, which included an apology for the release of a draft communications plan that

**Page 106 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

was never used and never intended to be seen by anyone outside the few agency employees who were involved with it.

**BB.    Ms. Saxton leaves OHA proud of her team's work.**

Ms. Saxton will testify to the myriad of things accomplished during her short tenure as Director of the OHA.  This includes: achieving approved rates from CMS in 2015, 2016, 2017; launching the new Medicaid eligibility system; achieving a 3.4% aggregate cost containment pursuant to the 1115 Waiver; achieving 95% statewide insured access; renewal of the 5 year 1115 Waiver from CMS; securing a Performance Plan with the United States Department of Justice for behavioral health; initiating a successful tribal care coordination program with Oregon tribes and CareOregon; restructuring OHA and implementing a performance management system; launching a new OHA website; and reducing the OHA agency spend by implementing cost controls for budget growth from 2015 – 2017.

Ms. Saxton will testify that her last day of employment with OHA was August 31, 2017. Ms. Saxton left OHA on August 31, 2017, having overseen her team's successful completion of the deadline to resolve the final phase of Oregon Health Plan member eligibility renewals.  After that date, she had no involvement whatsoever with OHA policies, procedures, controls, or OHA's subsequent interactions with FamilyCare over the development of its 2018 rates.

Ms. Saxton will testify that she did not direct anyone at OHA to take any action or make any decisions regarding FamilyCare in retaliation for FamilyCare's alleged engagement in "protected speech" or for raising concerns about the capitation rate-development process.  Ms. Saxton never told anyone at the OHA to target FamilyCare.  Ms. Saxton never told anyone at OHA or at Optumas to manipulate the rate-development process.  Ms. Saxton did not take any other actions or inactions which were targeted or intended to harm FamilyCare.  Ms. Saxton did not use Settlement Credits in overseeing the setting of FamilyCare's rates after the Settlement Agreement.  Ms. Saxton acted in good faith with respect to the Settlement Agreement. Furthermore, Ms. Saxton did not undertake any actions or make any decisions which she believed to be illegal or in violation of any law, rule, or regulation, including the United States Constitution.

**Page 107 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

**CC.**    **Testimony subject to pending motions in limine, motions to dismiss, and other exclusionary motions.**

OHA will file motions in limine to exclude evidence on a number of topics. Should the Court deny the motions, Ms. Saxton will testify on the following topics:

**1.**    **Decisions made or claims arising prior to the May 22, 2016 Settlement Agreement, including claims relating to the 2015 and 2016 Medicaid capitation rates.**

Ms. Saxton will testify that FamilyCare refused to sign the revised rate amendments for 2015 and 2016, which put FamilyCare in default under its CCO contract with OHA. As a result, OHA began to plan for the possibility of transitioning FamilyCare's members to another CCO. OHA did this in the event that OHA had to declare FamilyCare in default of its CCO contract and shift FamilyCare's members elsewhere. This was not OHA's preferred route, but it had a responsibility to Medicaid recipients to ensure that there would be a CCO home for those members. Ms. Saxton will testify that FamilyCare filed a second lawsuit in April 2016.

**2.**    **Prior lawsuit relating to Entek communications plan.**

Ms. Saxton will testify about a lawsuit filed by Entek to enjoin the implementation of a communications plan produced by the OHA communications team while Ms. Saxton was Director. Ms. Saxton was not involved in the drafting of that communications plan, which focused on potential pollutants. Instead, Lillian Shirley, director of public health for OHA, and Mr. Cowie, communications team manager, were responsible for the communications plan in the Entek matter. In fact, Ms. Saxton first saw the communications plan in a meeting with the members of the Governor's office.

**XV.    Steve Schramm (1 hour direct testimony)**

Mr. Schramm will testify that he is the former CEO and sole owner of Schramm Health Partners, LLC, which did business as Optumas. Mr. Schramm started Optumas in 2006. CBIZ, Inc. acquired Schramm Health Partners, LLC in June 2021. Mr. Schramm is now the Senior Managing Director and Business Unit President of CBIZ Optumas.

From 2006 through its acquisition in 2021, Optumas was an independent health care strategy and actuarial firm. It provided services in several areas, including assisting state

**Page 108 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Medicaid programs with the development of actuarially certified rates for managed care organizations. It also provided strategic guidance on running Medicaid programs.

Mr. Schramm will testify that he has a degree in economics from Arizona State University. He has a master's degree in health economics, policy and management from the London School of Economics. He is presently working on a Ph.D. in actuarial science from the City University, University of London. Mr. Schramm is not a credentialed actuary. He has been consulting on Medicaid managed care for more than 30 years.

Mr. Schramm will testify that Optumas began working with the Oregon Health Authority in 2009. Optumas answered a request for proposals from the State. Optumas' contract was awarded competitively and ran through 2012. Optumas reviewed the work performed by OHA's actuaries and advised Oregon's certifying actuary, Dennis Tang, as requested. Mr. Schramm personally worked with OHA as part of this engagement. Mr. Schramm assisted OHA with assumptions behind and structure of the state's rate-development methodology. Optumas would inform OHA what other states were doing in rate setting. Prior to 2015, Optumas' role was advisory only; Optumas did not develop Oregon's Medicaid capitation rates itself.

Mr. Schramm will testify that in 2012, Optumas again bid for actuarial work with OHA. It won the competitive bid. Under this new contract, Mr. Schramm provided strategy consulting for OHA on its Medicaid program. The contract remained in effect through 2018 and was amended several times. The initial version of this contract did not provide for Optumas to develop OHA's rates for CCOs; rather it provided for Optumas to continue advising and consulting with OHA's certifying actuary, Mr. Tang.

Mr. Schramm will testify that in around 2014 and 2015, Optumas learned that CMS intended to tighten regulations on states that pay rates to managed care organizations. In 2014 and 2015, many CCOs in Oregon, including FamilyCare, received rates that far exceeded their expenditures on medical care for their members, allowing them to add tens of millions of dollars to their net assets.

**Page 109 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Mr. Schramm will describe changes to federal Medicaid regulations around this time, particularly the adoption of the "Mega rule," a set of Medicaid rules governing state rate setting for managed care organizations like CCOs that CMS began developing in the early 2010s and that was finalized in 2016. CMS began to publish rate-setting guides in around 2014 that outlined the methodology states must use to set rates for managed care entities.

Mr. Schramm will testify that, under federal Medicaid rules, CCO rates must be projected to provide for all reasonable, appropriate, and attainable costs that are required under the terms of the CCO Contract. States are accountable to CMS for the development of rates that meet CMS's standards under federal Medicaid regulations. In around late 2014, OHA informed Optumas that CMS asked it to develop a plan to conform its rate setting to CMS rules and guidance. Optumas helped OHA respond to CMS. OHA wanted a more rigorous process for creating CCO rates that met CMS's new guidance. Other states Optumas worked with also received communications from CMS regarding requests for changes to their rate-setting processes.

Mr. Schramm will testify that following CMS guidance and federal rules and regulations is critical for states. All states receive at least half of their Medicaid funding from the federal government. The federal government will not provide that funding if states do not develop rates that CMS approves. Hundreds of millions of dollars are on the line if OHA failed to develop rates that met federal rules and regulations. Beginning around 2014, CMS began having its Office of the Actuary review states' rates to see if the rates met federal rules, regulations, and guidelines.

Mr. Schramm will testify that OHA developed two sets of rates for calendar year 2015. The first time it developed rates using its in-house certifying actuary, Mr. Tang. Optumas advised OHA on its first set of rates, but Optumas did not, itself, develop those rates. In early 2015, CMS asked OHA to answer questions about Mr. Tang's rate-development process.

Mr. Schramm will testify that in early 2015, OHA informed Mr. Schramm that several CCOs, including FamilyCare, had concerns about Mr. Tang's development of rates. Mr. Schramm and his colleague Zach Aters, a certified actuary, flew to Oregon to meet with OHA

**Page 110 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

and CCOs, including FamilyCare, about rate development on or around March 4, 2015. During the meeting, Optumas explained the rate-development process and presented slides. Not long after that meeting, OHA asked Optumas to independently redevelop the capitation rates for 2015 and have one of its actuaries serve as the certifying actuary. Mr. Schramm assigned Mr. Aters, who had joined Optumas in 2011, to serve as the lead actuary for Oregon.

Mr. Schramm will testify that as Optumas redeveloped the 2015 rates, it participated in a series of actuarial work groups with the CCOs to address their feedback. Optumas redeveloped the rates in accordance with CMS's guidance, federal rules and regulations, and actuarial standards of practice. Mr. Aters, as a credentialed actuary, certified the rates. Optumas completed the redevelopment in the middle of 2015. CMS approved Optumas' redeveloped rates. It is not unusual for an actuary to issue more than one rate certification in a single year.

Mr. Schramm will testify that as Optumas worked with OHA and the CCOs to redevelop the 2015 rates, Optumas learned from the CCOs that they wanted a more transparent process. Mr. Schramm will testify that OHA also made clear that they wanted a transparent process. Optumas developed an open, transparent process that involved frequent meetings and lots of opportunities to share information. Mr. Schramm will testify that as of around 2016, Optumas was the certifying actuary of record for eight states: Maryland, North Dakota, Alabama, Iowa, Kansas, Nebraska, Colorado, and Oregon. Throughout 2015-2018, Oregon was the most transparent state Optumas worked with.

Mr. Schramm will testify that the 2015 rates that Optumas developed were generally lower than the 2014 rates. The reason was that Optumas developed rates based on the CCOs' reasonable, appropriate, and attainable costs for providing care for their members, as required by CMS's guidance. That included reviewing CCOs' actual prior year experience.

Mr. Schramm will testify that in Optumas' work on rate setting for Oregon, Mr. Schramm did not personally perform rate setting work at a detailed level. But he was involved in conversations about the steps involved in the rate-development process in Oregon. Mr. Schramm will testify that he participated in conference calls and meetings with the OHA and

Page 111 -    **DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

Optumas teams to discuss and strategize about the major steps in the rate-setting process.  Mr. Schramm participated in feedback work group sessions with the CCOs.  Mr. Schramm will describe the many meetings he had with CCOs to share information.

Mr. Schramm will testify that the major steps in the rate-setting process are the collection, review, and preparation of the base data, application of programmatic/policy changes, development and application of trend, assessment of non-medical load, risk adjustment, and application of rate add-ons.  Optumas uses a rate development methodology that is consistent with the Actuarial Standards of Practice ("ASOPs") and the managed care guidance produced by CMS.  It followed the steps required by both CMS and the ASOPs when developing rates for OHA in 2015, 2016, 2017, and 2018.

Mr. Schramm will testify that the overall steps are consistent for all states that use managed care to deliver Medicaid.  Mr. Schramm will testify that Optumas, like all actuarial firms, uses some proprietary models, but it uses them across all the states it works with and they are consistent with CMS guidance, federal rules and regulations, and the ASOPs.

Mr. Schramm will testify that development of trend is not an empirical calculation.  It involves an actuary's judgment.  An actuary can consider a number of factors to develop trend.  For example, an actuary might consider the size and credibility of the base data.  They could consider the time period involved and whether any changes were made to the services available in the programs during that time.  They might look at the trend experienced by other programs.  Optumas did not develop trend to discriminate against FamilyCare.

Mr. Schramm will testify that a state's certifying actuary—Mr. Aters for Oregon for the 2017 and 2018 rates—has the final call on all changes to rate-setting methodology that are not policy related.  In some cases, the certifying actuary must agree with programmatic/policy decisions that affect final rates.  The certifying actuary does not make final decisions on program/policy.

Mr. Schramm will testify that when developing rates, Optumas presented OHA with a narrow range of potential rates.  OHA then made a policy decision to select rates at one level within the range.  As long as the rates OHA chose were within the range, Optumas certified the

**Page 112 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

rates to CMS as actuarially sound.  The certifying actuary certifies to the rate OHA chooses, not to the rate range.

Mr. Schramm will testify that Optumas developed rates on a regional basis.  Optumas used regional rates in other states as well in 2017 and 2018.

Mr. Schramm will testify that he occasionally met and discussed rate setting with Lynne Saxton after she joined OHA around the beginning of 2015.  Ms. Saxton's staff and OHA informed Mr. Schramm and Optumas that it wanted Optumas to continue to use an open and engaged process to develop rates.

Mr. Schramm will testify that in 2015, Optumas developed OHA's 2016 rates for CCOs.  It again followed all CMS guidance, federal rules and regulations, and the ASOPs. FamilyCare initially refused to accept the proposed 2016 rates.  Mr. Schramm is aware that FamilyCare sued OHA regarding the rates and that OHA and FamilyCare entered into a settlement agreement in the spring of 2016.

Mr. Schramm will testify that Ms. Saxton never told Mr. Schramm to alter or reduce FamilyCare's rates in any year, including 2017 and 2018.  No one at OHA told Mr. Schramm to alter or reduce FamilyCare's rates.  Ms. Saxton never told Mr. Schramm to discriminate against FamilyCare.  No one at OHA told Mr. Schramm to discriminate against FamilyCare or any other CCO.  Ms. Saxton never directed Mr. Schramm to do anything at all with respect to FamilyCare that was inconsistent with FamilyCare receiving equitable treatment.  No one at OHA directed Mr. Schramm to do anything at all with respect to FamilyCare that was inconsistent with FamilyCare receiving equitable and sound treatment.  Optumas did not take any actions to improperly reduce FamilyCare's rates.  Mr. Schramm will testify that Optumas developed rates appropriately for all CCOs, including FamilyCare, and to obtain CMS approval; CMS would not have approved rates that improperly discriminated against one CCO.

Mr. Schramm will testify that he is aware that FamilyCare received a credit in the 2016 Settlement Agreement.  Ms. Schramm will testify that Optumas did not take any action to attempt to recoup that credit or any payments made to FamilyCare under OHA's 2016 rates by reducing FamilyCare's 2017 and 2018 rates.  No one at OHA—including Ms. Saxton—ever

**Page 113 -    DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**

directed Optumas to take any action to alter FamilyCare's 2017 and 2018 rates because of the Settlement Credit or FamilyCare's 2016 rates. Mr. Schramm will testify that the Settlement Credit was *de minimis* in the scheme of the entire CCO program—it made up less than 1% of the overall amount of the program.

Mr. Schramm will testify that Optumas can review CCOs' reimbursement rates to providers like physicians as part of the rate-setting process. They do so to ensure that reimbursements are reasonable, appropriate, and attainable. Optumas accomplishes this by several types of analyses, including looking at the average unit cost for a service in each category of aid. Optumas also compares the amounts CCOs pay by provider types with Medicaid and Medicare fee schedules. Optumas also considers whether there are incentive arrangements in the reimbursement agreements between the CCO and the provider. As part of this analysis, Optumas considers how the program and underlying risk had changed over time.

Mr. Schramm will testify that one of Oregon's Section 1115 Waiver requirements is a special term and condition specifying that the overall rate of growth in health care spending in Oregon should not increase more than 3.4% on average per year over a five-year period.

Mr. Schramm will testify that when Optumas developed OHA's rates for 2017 and 2018, Optumas conducted a review of CCO reimbursement rates. In 2016, as it was developing rates for calendar year 2017, Optumas analyzed the 2015 base data and CCOs' financial data. Optumas tracked the rates of growth in CCOs' expenditures from 2014 to 2015. Optumas observed, and communicated to OHA, that the rates of growth in health care spending by some CCOs exceeded 3.4%. OHA directed Optumas to determine what was driving these unsustainable rates of growth.

Mr. Schramm will testify that Optumas determined that some CCOs, including FamilyCare, were paying providers reimbursement rates and incentive payments that were greater than what was reasonable. Optumas adjusted the base data to remove approximately $113 million in excess costs; this amount reflected CCOs' payments to providers that exceeded reasonable rates. For the 2017 rates, Optumas adjusted down the base data in the Tri-County Region by $34 million. The Tri-County Region is the region in which FamilyCare and Health

**Page 114 -     DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS
                STATEMENTS**

Share are the only CCOs.  In 2017, the excess costs all came from FamilyCare, mostly in unreasonable reimbursements and incentive payments to primary care physician businesses. Optumas and OHA adjusted the base data of many other CCOs in Oregon for the 2017 rates.

Mr. Schramm will testify that in performing the reimbursement adjustments, Optumas ensured that the adjustments allowed CCOs to make reasonable payments to providers.  After the adjustment, Optumas' rate models showed that the assumed unit and utilization costs for CCOs were reasonable, appropriate, and attainable.  Because rates are developed on a regional basis, the adjustments affect every CCO in the region.  Thus, the 2017 reimbursement adjustment reduced the rates of both FamilyCare and Health Share.

Mr. Schramm will testify that Optumas also made base data adjustments when developing the 2018 rates.  Optumas again removed excess physician reimbursement costs from FamilyCare's base data.  Optumas also adjusted the base data of several other CCOs in Oregon for the 2018 rates.  Just like with the 2017 rates, adjustments to FamilyCare's base data affected the CCO rates for both Health Share and FamilyCare, not just FamilyCare. Reimbursement adjustments are not unusual.  Optumas worked with other states in 2017 and 2018—and before and after 2017 and 2018—that made reimbursement adjustments.

DATED this 21st day of March, 2022.

ELLEN ROSENBLUM
ATTORNEY GENERAL
FOR THE STATE OF OREGON

By:   *s/ Laura Salerno Owens*

David B. Markowitz, OSB #742046
DavidMarkowitz@MarkowitzHerbold.com
Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Laura Salerno Owens, OSB #076230
LauraSalerno@MarkowitzHerbold.com

*Special Assistant Attorneys General for Defendant Oregon Health Authority, an agency of the State of Oregon*

1263705

**Page 115 -   DEFENDANT OREGON HEALTH AUTHORITY'S LAY WITNESS STATEMENTS**