**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR  97201
Tele:  (503) 295-3085
Fax:  (503) 323-9105

Special Assistant Attorneys General for Defendant Oregon
Health Authority, an agency of the State of Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| FAMILYCARE, INC., an Oregon non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>OREGON HEALTH AUTHORITY, an agency of the State of Oregon, and LYNNE SAXTON,<br><br>Defendants. | Case No. 6:18-cv-00296-MO<br><br>**TRIAL MEMORANDUM OF DEFENDANT OREGON HEALTH AUTHORITY** |

**TRIAL MEMORANDUM OF DEFENDANTS OREGON HEALTH AUTHORITY**

# TABLE OF CONTENTS

I.  Background ...................................................................................................... 1

    A.  To obtain funds necessary to support the Oregon Health Plan, OHA is accountable to the federal government to provide rates for CCOs that meet Medicaid rules and regulations. ................................................... 1

    B.  FamilyCare chose to increase its costs ................................................ 2

    C.  OHA engaged Optumas to develop capitation rates, which CMS then approved ............................................................................................... 4

    D.  Optumas and OHA recognized in 2015—before the Settlement Agreement—that growth in CCO medical expenditures was unsustainable, and informed the legislature, the public, and the CCOs it would need to be addressed. ........................................................ 5

    E.  OHA implemented a reimbursement policy to ensure that CCO rates did not lead to unsustainable cost growth that would endanger OHA's ability to provide health care for Oregonians. ....................................... 7

    F.  FamilyCare and OHA entered a Settlement Agreement in which FamilyCare acknowledged that OHA has authority to set CCO rates subject only to CMS approval ........................................................... 8

    G.  FamilyCare disputes the 2017 rates. ................................................... 9

    H.  FamilyCare attempts to undermine OHA by circulating the unused OHA communications plan ............................................................... 10

    I.  Despite a rate increase and independent review, FamilyCare disputes the 2018 rates. ................................................................................... 11

II.  Argument ...................................................................................................... 11

    A.  OHA did not breach the Settlement Agreement (Second Claim for Relief). ................................................................................................ 11

        1.  Elements of breach of contract ................................................ 11

        2.  OHA's factual and legal contentions ..................................... 12

            a.  Section 8 of the Settlement Agreement means that OHA may not use FamilyCare's 2016 rates or the Settlement Credit as a factor in its rate-setting methodology. ....................... 12

            b.  Even if the jury adopts FamilyCare's interpretation of Section 8, FamilyCare will be unable to prove that OHA breached the Settlement Agreement. ............................................. 13

        3.  Affirmative defenses ............................................................... 16

            a.  Mitigation of damages and avoidable consequences ................... 16

            b.  Release ......................................................................... 16

   c. Limitation of Liability.................................................... 17

B. OHA did not breach the implied duty of good faith and fair dealing in the CCO Contract (Third Claim for Relief)..................................... 17

 1. Elements of breach of the implied duty of good faith ............................. 17

 2. OHA's factual and legal contentions ........................................ 18

  a. FamilyCare had no objectively reasonable contractual expectation that it could challenge OHA's proposed rates. ................................................................ 18

  b. Even if FamilyCare can prove that the parties had additional objectively reasonable expectations, OHA met those expectations. ................................................ 20

  c. OHA provided FamilyCare a "timely" Rate Amendment in 2018. ................................................................ 20

  d. The timeline for Medicaid eligibility redeterminations was not objectively unreasonable or biased against FamilyCare. ................................................................ 21

  e. The "ultimatum" and rate redetermination were immaterial to FamilyCare's decision to reject the 2018 Rate Amendment. ................................................ 23

  f. FamilyCare cannot recover for breach because it failed to perform its notice obligations under the CCO Contract. ................................................................ 24

 3. OHA's affirmative defenses .............................................. 25

  a. Estoppel. ..................................................................... 25

  b. Mitigation of damages and avoidable consequences ..................... 26

  c. Release ....................................................................... 26

  d. Limitation of Liability..................................................... 26

## TABLE OF AUTHORITIES

Page(s)

Cases

*Allen v. FamilyCare, Inc.*,
 812 F. App'x 413 (9th Cir. 2020), as amended ................................................... 21
*AMC, LLC v. Nw. Farm Food Coop., No. 6:17-CV-00119-AA*,
 2019 WL 6312557 (D. Or. Nov. 25, 2019) ........................................................... 17
*Atlas Mut. Ins. Co. v. Moore Dry Kiln Co.*,
 38 Or. App. 111 (1979) ................................................................................. 17, 27
*Bixler v. First Nat. Bank of Oregon*,
 49 Or. App. 195 (1980) ................................................................................. 16, 26
*Enco, Inc. v. F.C. Russell Co.*,
 210 Or. 324 (1957) ....................................................................................... 16, 26
*Fleshman v. Wells Fargo Bank*,
 27 F. Supp. 3d 1127 (D. Or. 2014) ....................................................................... 19
*Hayes v. Wells Fargo Bank, N.A.*,
 No. 3:15-CV-00651-PK, 2015 WL 5707054 (D. Or. Sept. 28, 2015) .............................. 24, 25
*Klamath Off-Project Water Users, Inc. v. Pacificorp*,
 237 Or. App. 434 (2010) ................................................................................... 18
*K-Lines, Inc. v. Roberts Motor Co.*,
 273 Or. 242 (1975) ....................................................................................... 17, 27
*Malot v. Hadley*,
 86 Or. App. 687 (1987) ..................................................................................... 24
*Moini v. Hewes*,
 93 Or. App. 598 (1988) ..................................................................................... 23
*Nelson v. Liberty Ins. Corp.*,
 314 Or. App. 350 (2021) ................................................................................... 25
*Oregon Univ. Sys. v. Oregon Pub. Emps. Union, Local 503*,
 185 Or. App. 506 (2002) ................................................................................... 19
*Prop. Holdings, LLC v. Aequitas Capital Mgmt., Inc.*,
 284 Or. App. 316 (2017) ................................................................................... 18
*Slover v. Oregon State Bd. of Clinical Soc. Workers*,
 144 Or. App. 565 (1996) ........................................................................... 11, 12, 17
*Tolbert v. First Nat. Bank of Oregon*,
 312 Or. 485 (1991) ......................................................................................... 19
*Vukanovich v. Kine*,
 302 Or. App. 264 (2020) ................................................................................... 25
*Zerkel v. Lindsey*,
 270 Or. 517 (1974) ..................................................................................... 24, 25

Statutes

42 U.S.C. § 1305 ...................................................................................................... 1

42 U.S.C. § 1315 .................................................................................................. 2
42 U.S.C. § 1396b(m)(2)(A)(iii) ......................................................................... 2
ORS 414.025(11) ............................................................................................... 19
ORS 414.652 ...................................................................................................... 20
ORS 414.652(4) ................................................................................................. 19

Regulations

42 C.F.R. 435.916 .............................................................................................. 21
42 C.F.R. 438.2 .................................................................................................... 1
42 C.F.R. § 438.4(b) ............................................................................................ 2
42 C.F.R. § 438.806(c) ........................................................................................ 2
OAR 410-141-3000(35) ..................................................................................... 19

## I.    Background[1]

### A.    To obtain funds necessary to support the Oregon Health Plan, OHA is accountable to the federal government to provide rates for CCOs that meet Medicaid rules and regulations.

Medicaid is a national program that funds medical care for people of any age with lower incomes. Medicaid is jointly financed by the state and federal governments. OHA administers Oregon's Medicaid program, the Oregon Health Plan ("OHP"), pursuant to both state and federal law. *See generally* ORS Ch. 414; 42 U.S.C. § 1305 *et seq.*; 42 C.F.R. Part 438. The goal of OHA is to meet the "triple aim" of providing better health, better care, and lower costs.

To provide care to members of the OHP, OHA contracts with managed care organizations known as coordinated care organizations ("CCOs"). In 2017 there were 16 CCOs in Oregon, operating in four regions throughout Oregon. Oregonians eligible for OHP join CCOs operating in their region. The CCOs, in turn, contract with health care providers, like physicians, behavioral health centers, and hospitals, to provide care for their members. (Expert Rep. of Nancy F. Nelson ("Nelson Report") ¶ 46.) OHA pays the CCOs a per member per month ("PMPM" or "capitation"[2]) rate to cover the projected costs of providing health care for their members. (*Id.* ¶ 48.)

OHA issues revised capitation rates to each CCO, determined by a health care actuary, in contract amendments each year. (2017 CCO Contract, Ex. C, § 10, Pl. Ex. 12, ("The parties intend to amend this Contract to supply Capitation Rates and an Actuarial Report for dates starting on [the first of each year]"); *id.* at Ex. D § 20(c) ("Per capita rates are actuarially certified annually. Rates will be amended annually[.]")) OHA and its actuary set the rates for each year before the start of that year; for example, OHA set and proposed the 2016 rates to the CCOs in 2015. CCOs can choose to accept or reject the proposed rates for the coming year. If they accept the rates, the contract continues. If they reject the rates, the CCO Contract

---

[1] OHA does not concede that the information contained in this section is admissible. OHA will file motions in limine to limit the scope of evidence before the jury.

[2] "Capitation," defined in 42 C.F.R. 438.2 and elsewhere, is a fixed, periodic payment for each enrolled state health plan beneficiary. "Rates" used herein throughout refer to the amount of the capitation payments set in the contract.

terminates automatically: "If the parties have not entered into a Rate Amendment by the [first day of the year], then this Contract will terminate on the [first day of the year] automatically and without any requirement for notice between the parties." (*Id*. at Ex. C, § 10.)  Additionally, OHA in "its sole discretion" can terminate the CCO Contract at any time "[w]ithout cause" by providing the CCO 90 days' notice. (*Id*. at Ex. D, § 10(e).)

CCOs have discretion in how they handle costs.  CCOs that effectively manage healthcare provider costs and coordinate their members' care across their network of providers, while also managing their own expenses, can profit from this arrangement.  (Nelson Report ¶ 55.)

The OHP is only possible with the financial participation of the federal government. CMS funds the majority of OHA's capitation payments.  CMS will only provide federal funding if OHA adheres to federal Medicaid laws and regulations.  42 C.F.R. § 438.4(b); 42 U.S.C. § 1396b(m)(2)(A)(iii).  Specifically, CMS must approve OHA's rates for CCOs each year; if CMS does not approve the rates, the federal government will not provide federal funding.  42 C.F.R. § 438.4(b); 42 C.F.R. § 438.806(c); 42 U.S.C. § 1396b(m)(2)(A)(iii).

OHA is also accountable to the federal government according to terms of a waiver agreement.  Section 1115 of the Social Security Act, 42 U.S.C. § 1315, authorizes CMS to approve demonstration projects that give states additional flexibility to design and improve their Medicaid programs, including by innovating service delivery systems.  (Nelson Report ¶ 49.) These CMS approvals for state Medicaid projects are known as "Section 1115 waivers."  CMS has approved a Section 1115 waiver for OHA, under which OHA operates the CCO program. (Pl. Ex. 447.)  According to terms of its 1115 Waiver, OHA must hold the overall rate of growth for health care costs to 3.4% per year on average or risk losing substantial federal funds.  (*Id.* at 61, 63.)

### B.    FamilyCare chose to increase its costs.

Plaintiff FamilyCare, Inc. was a CCO.  In March 2013, FamilyCare increased its "conversion factor"—the amount of money it paid a healthcare provider for a unit of work—for primary care physicians from $35 to $50.  (7/17/18 FamilyCare FRCP 30(b)(6) Dep. 155:2-

156:3, 171:11-19.)  FamilyCare increased its conversion factor again in 2015 to $65.  (*Id.*
171:11-19.)  By comparison, the conversion factor that Medicaid paid providers directly was
$27.  (*Id.* at 155:2-156:3.)  Thus, FamilyCare made the business decision to reimburse its
providers at a reimbursement more than double the rate the providers would have received under
a traditional fee-for-service model.  (2/12/2013 press release, Def. Ex. 1204; *also* 7/17/18
FamilyCare FRCP 30(b)(6) Dep. 171:11-19.)  By mid-2015, FamilyCare had amended its
contracts with healthcare providers to include the increased reimbursement.  (7/17/18
FamilyCare FRCP 30(b)(6) Dep. Tr.  at 172:2-173:12.)  From 2014 to 2015, FamilyCare
reported a rate of cost growth of 17.6%.  (Pl. Ex. 94 at 2).

FamilyCare's CCO, Jeff Heatherington, decided to increase FamilyCare's primary care
reimbursements without in-depth discussion among either FamilyCare's board or its executive
team.  (6/5/18 Heatherington Dep. 91:6-94:7; *see also* 7/17/18 FamilyCare FRCP 30(b)(6) Dep.
161:7-162:8, 170:1- 171:10, 173:134-175:18.)  Heatherington hypothesized, by his own
admission without evidence, that increased provider payments would result in lower costs overall
and improved quality of care.  (2/12/2013 press release, Def. Ex. 1204; 6/5/18 Heatherington
Dep. 91:6-94:7; *see also* 7/17/18 FamilyCare FRCP 30(b)(6) Dep. Tr. 161:7-162:8, 170:1-
171:10 (noting that increased primary case spending was meant to produce "better health
outcomes").)

FamilyCare's increased primary care reimbursements did not lower FamilyCare's overall
costs.  (Def. Exs. 1742-1747.)  FamilyCare's increase in primary care physician reimbursements
resulted in no discernible difference in non-physician cost trends as compared to the other CCO
in FamilyCare's region.  (Nelson Report ¶ 130.)  The increased reimbursements also did not
cause FamilyCare's members to utilize primary care physicians more often.  (*Id.* ¶ 129.)  All
told, FamilyCare's total reported costs in the primary care, specialist, and mental health
categories increased significantly between 2014 and 2017 on a per member per month
("PMPM") basis, while costs for hospital services and radiology combined only declined
slightly.  (Morones Report ¶ 39.)

**Page 3 -   TRIAL MEMORANDUM OF DEFENDANT OREGON HEALTH
AUTHORITY**

Prior to increasing provider reimbursements, FamilyCare did not conduct any studies testing its hypothesis that increasing provider payments would result in reduced costs or improved healthcare overall.  (*See* 6/10/2018 Clancy Dep. Tr. 10:23-12:15; *see also* 7/17/18 FamilyCare FRCP 30(b)(6) Dep. Tr. 173:134-175:18.)  Instead, after increasing provider reimbursements, FamilyCare conducted what its Chief Financial Officer described as an "initial study" with "little credibility" due to its lack of data.  (*Id.*)  FamilyCare never followed up on this initial study with a full study based on a sufficient data to draw conclusions.  (*Id.* at 12.)  FamilyCare had the ability and opportunity to conduct such a study, but it chose not to.  "[B]etween the 2013 announcement of the increased payment rates and its implementation throughout 2014, and FamilyCare's December 2017 decision to reject OHA's rates for 2018, FamilyCare, as a large and sophisticated health plan, would have had both data and opportunity to design and complete a robust study to understand whether other costs were being reduced as a result of the higher physician payment levels."  (Nelson Report ¶ 153.)

Although its decision to increase primary care physician reimbursements did not reduce its costs, FamilyCare took no steps to change its policies.  (*Id.* ¶ 152 ("FamilyCare appears to have taken no steps to reduce the costs of medical expenses for its members, physician or otherwise, despite those costs being the largest category of expense for a health plan.").)

### C.    OHA engaged Optumas to develop capitation rates, which CMS then approved.

In August 2014, CMS raised concerns with OHA's "cost template" methodology, which OHA had used to develop the 2014 rates.  (Def. Ex. 1206.)  CMS instructed OHA to stop using the cost template methodology and to instead rely on more objective data regarding services obtained and reimbursement claims paid (called "encounter data") to set rates.  (Def. Ex. 1207; *see also* Pl. Ex. 133 and Def. Ex. 1206.)

In the first quarter of 2015, in response to CMS's instructions and concerns raised by several CCOs, OHA engaged an independent actuary, Optumas, to re-develop the 2015 rates and serve as Oregon's signing actuary.  (Def. Ex. 1301; Pl. Ex. 133; Optumas contract amendment number 4, Def. Ex. 2258.)  Optumas re-developed the 2015 rates using a methodology approved

by CMS. (*Id*.) By using this methodology, OHA intended to match payments to the riskiness of each CCO's population, improve the credibility of the rates by looking at actual costs and payments across each region, and incorporate the emerging data from the new Affordable Care Act population.[3] (Def. Ex. 1267.) OHA and Optumas's methodology was based on regions, so that rates were built for all CCOs in a region, and then adjusted for the relative health of each CCO's membership.

Optumas released the redeveloped 2015 rates in August 2015. CMS approved the redeveloped rates. (12/28/15 approval letter, Def. Ex. 1324.) The mid-year rate redevelopment resulted in CCOs, including FamilyCare, owing money back to OHA for the insupportably higher rates OHA had paid to them during the first half of 2015. (*See* Pl.'s Ex. 14, Settlement Agreement, Recitals, p. 2, and Financial Terms and Resolution of Pending Disputes, p. 4, ¶1.b.i.)

FamilyCare refused to sign the Rate Amendment for the redeveloped 2015 rates and for the 2016 rates, which were developed on the same basis, and filed two lawsuits against OHA. (Oregon Cir. Ct., County of Marion, Case No. 15CV13782; Oregon Cir. Ct., County of Marion, Case No. 16CV10253.)

> **D.    Optumas and OHA recognized in 2015—before the Settlement Agreement— that growth in CCO medical expenditures was unsustainable, and informed the legislature, the public, and the CCOs it would need to be addressed.**

In December 2015, OHA observed that systemwide cost growth was increasing and if carried forward would exceed the sustainable rate of growth described in the Section 1115 Waiver. (Def. Ex. 1325.) From 2014 to 2015 the statewide growth of costs per member per month was 8.6%, significantly higher than the 3.4% rate of growth CMS approved for Oregon under the 1115 Waiver. (Pl. Ex. 94.)

OHA and Optumas informed the legislature in 2015 that for the 2017 rate cycle, they would "work with the CCOs to understand drivers of any differences between the actual growth and the pre-determined 'Sustainable Growth.'" (*See* 9/28/15 presentation to Oregon House Healthcare Committee, Def. Ex. 1281.) OHA also communicated this need to control growth to

---

[3] The Affordable Care Act expanded the Medicaid population to include new enrollees.

**Page 5 -    TRIAL MEMORANDUM OF DEFENDANT OREGON HEALTH
                      AUTHORITY**

the CCOs.  In October 2015, OHA met with FamilyCare and the other CCOs, and explained that in future years any growth in the "total per member growth" "above 3.4% per year . . . will result in a budget challenge."  (Def. Ex. 1289 at 7.)  In that meeting, OHA further explained that the 2016 capitation payments achieved this "sustainable rate of growth" but that cost growth was on the high end at 2.9%, "which is an early warning sign."  (*Id*. at 18.)  OHA also reached out to FamilyCare in October 2015 noting that OHA was "trying to better understand the significant increase in [FamilyCare's] Physician/Professional Services costs between 2014 and 2015."  (Def. Ex. 1381.)  FamilyCare did not respond to OHA's email for months.  (*Id.*)

In March 2016, OHA explained to FamilyCare and the other CCOs the timeline for 2017 rate development.  (Def. Ex. 1358.)  OHA explained that it would collect initial base data from the CCOs by April 30.  (*Id.* at p. 3.)  OHA would then meet the CCOs again in June 2016 to discuss base data "[a]nalysis."  (*Id.* at p. 4.)  In July 2016, OHA would meet with the CCOs to discuss base data "[a]djustments" and "[w]aiver [c]oncepts."  (*Id.*)

On May 22, 2016, OHA and FamilyCare settled their outstanding lawsuits.  (See infra section F.)  The Settlement Agreement had no effect on the rate-setting schedule.  True to the schedule OHA had set before signing the Settlement Agreement, Optumas spent the months of May and June 2016 reconciling base data gathered from different sources.  (*See* Def. Ex. 1395 (June 27 email circulating "CY15 datasets"); *see also* Def. Ex. 1389).  At the June 24, 2016 meeting with all the Oregon CCOs, OHA explained that across all regions, cost growth had exceeded the 3.4% sustainable rate of growth.  (Def. Ex. 1394.)  OHA engaged the CCOs in this June 2016 meeting in a "brainstorming session" to discuss "possible solutions going forward." (Def. Ex. 1393.)  In particular, OHA sought the CCOs' input on "lower[ing] costs on the ground."  (Def. Ex. 1394.)

Consistent with the schedule it had set months before the May 2016 Settlement Agreement, OHA explained during a July 2016 meeting with the CCOs that:

- Optumas "analyzed reimbursement and adjusted outliers based on OHA's direction when a CCO has a high implied rate of growth."

- "Optumas analyzed average reimbursement for services longitudinally from 2014 through 2015 for each CCO."

- Optumas analyzed "[p]rofessional [r]eimbursement" and "[h]ospital [r]eimbursement."

- "Some CCOs have higher reimbursement; however, they are also containing costs under or at a sustainable rate of growth."

- "For CCOs that were outliers in terms of reimbursement and with a high rate of growth adjustments were made in incentives and/or [fee-for-service] payments."

(Pl. Ex. 519.)

### E. OHA implemented a reimbursement policy to ensure that CCO rates did not lead to unsustainable cost growth that would endanger OHA's ability to provide health care for Oregonians.

After observing the unstainable rate of growth in medical expenditures from 2014 to 2015, in the first half of 2016 OHA directed Optumas to identify the drivers of growth. Optumas identified four key drivers: (1) increased reimbursement to providers, (2) provider incentive payments, over which the CCOs had control, (3) increased pharmacy, and (4) hospital expenditures, over which the CCOs did not have control. (*Id.*; Def. Ex. 1483.) Optumas identified nine of 16 CCOs whose 2015 costs exceeded OHA's sustainable rate of growth. (*Id.*)

FamilyCare was one of those nine. As noted above, FamilyCare had increased its primary care physician reimbursements by almost 100% to a conversion factor of $65. Accordingly, Optumas identified FamilyCare's rate of growth increasing at a staggering 17.6% in 2015. (FamilyCare's Base Data Exhibit, Def. Ex. 1408.) FamilyCare also had high provider incentive payments. While other CCOs paid providers incentives for hitting performance measures, FamilyCare's incentive payments included end-of-year payments regardless of performance. (Pl. Ex. 94.) In total, in the 2017 rate-setting process, Optumas identified $34 million in excess costs in the base data FamilyCare submitted. (Pl. Ex. 250.)

For those nine CCOs with excessive costs, the CCO itself or Optumas and OHA adjusted their base data to eliminate excess costs. (OHA called this process the "reimbursement policy.") (*Id.*) "Eliminating" costs from base data means that Optumas did not count excessive provider

payments or excessive provider bonuses when building rates from the base encounter data.  In other words, Optumas set rates based on the amounts that the CCOs would have paid to providers had they not made excessive payments or bonus payments.

Base data adjustments occurred in all regions and were not targeted at the Tri-County region or FamilyCare.  (Pl. Ex. 354; Pl. Ex. 250; Pl. Ex. 85 at 20.)  Because the regional rate model spread the effects of base data adjustments across all the CCOs in a region, the reimbursement policy affected the rates of all 16 CCOs.  Of the dollar value of base data cuts for 2017, 70% occurred in the other three regions and therefore had no effect on FamilyCare's rates.  (Pl. Ex. 85 at 20.)  OHA and Optumas reduced FamilyCare's base data by the largest amount of any CCO, but the reason was simple: FamilyCare was one of the largest CCOs in state and it had the highest excess costs.  (Pl. Ex. 94; Pl. Ex. 250.)

Because rates are set by region, adjusting FamilyCare's base data reduced the rates of both FamilyCare and Health Share.  (Pl. Ex. 94; Nelson Report ¶ 134.)  Optumas applied the reimbursement policy uniformly across the state.  CMS approved the resulting 2017 and 2018 rates as actuarially sound.  (Def. Ex. 1497 and Ex. 1741.)  The base data adjustments were consistent with actuarial standards of practice.  (Nelson Report ¶ 135.)

**F.    FamilyCare and OHA entered a Settlement Agreement in which FamilyCare acknowledged that OHA has authority to set CCO rates subject only to CMS approval.**

In May 2016, after OHA and Optumas already began developing the reimbursement policy, FamilyCare and OHA settled FamilyCare's lawsuits.  (Pl. Ex. 14.)  In the Settlement Agreement, FamilyCare agreed to sign the 2015 and 2016 contract amendments containing the rates developed by Optumas.  (*Id.*)  OHA agreed to provide FamilyCare with a $24.8 million credit towards capitation rate overpayments that FamilyCare owed back to OHA.  (*Id.*)  OHA and FamilyCare released all claims related to the 2015 and 2016 rates.  (*Id.*)

The Settlement Agreement included a provision, Section 8, that prohibited OHA from "us[ing]" the Settlement Credit or the 2016 rates "as a basis" for reducing FamilyCare's rates in the future.  (*Id.* ¶ 8.)  In full, that provision stated: "Other than application of the terms of the

Section 1115 Demonstration Project to aggregate state expenditures, OHA shall not use rates paid to FamilyCare under the Contract for 2016 or the Settlement Credit as a basis for limiting the amount that can be paid to FamilyCare in future rate years." (*Id.*)

In addition, Section 8 permitted OHA to enact statewide policies, such as the reimbursement policy, to comply with the cost containment mandated by OHA's Section 1115 wavier with CMS, because such statewide policies did not consider the Settlement Credit or the rates paid to FamilyCare in prior years. (*See* OHA FRCP 30(b)(6) Dep. 29:21-31:13 (describing meaning of the provision).)

As part of the Settlement Agreement, FamilyCare also made a number of express representations that confirmed that OHA had authority to set CCO rates subject only to CMS's review. FamilyCare agreed in the 2016 Settlement Agreement that "OHA has the authority to set the CCO rates under which OHA contracts with CCOs, subject to CMS approval." (Settlement Agreement § 1.a.) FamilyCare also agreed that CMS is the arbiter of whether rates are actuarially sound: "OHA must establish to the satisfaction of CMS that the rates are actuarially sound[.]" (*Id.* § 1.b.) And FamilyCare agreed that OHA was not obligated to adjust FamilyCare's rates to cover FamilyCare's costs: "OHA is not obligated to adjust the rates paid to any CCO to ensure that such rates cover all costs that a CCO has incurred during a rate year[.]" (*Id.* § 1.d.)

### G.     FamilyCare disputes the 2017 rates.

OHA announced the 2017 rates in October 2016, and FamilyCare's rate increased 2.4% as compared to 2016. (Def. Ex. 1437.) FamilyCare complained that the rates were insufficient to cover its high costs. (Pl. Ex. 74.) To voice its concerns, FamilyCare hired lobbyists and a communications firm and engaged in an aggressive communications strategy, criticizing OHA's rate-setting methodology in the legislature and in the media. (7/16/18 FamilyCare FRCP 30(b)(6) Dep. 127:5- 129:19; Def. Ex. 1510.)

In December 2016, FamilyCare again threatened to sue OHA over the rates. (Dep. Ex. 150.) Afterwards, and under continued threat of litigation, OHA briefly contemplated its own communications plan to provide critical information to key stakeholders (including the

legislature, media, and the public) regarding the rates and complexity of the rate-setting process. An OHA communications officer prepared a draft of a plan in January 2017; OHA leadership did not approve or implement that plan.  That plan had proposed defending OHA's rate-setting methodology against FamilyCare's attacks.  (Pl. Ex. 227; OHA's and Saxton's Lay Witness Statements.)  OHA Director Lynne Saxton "rejected" the plan.  (OHA's and Saxton's Lay Witness Statements; Pl. Ex. 232.)  After settlement negotiations fell through, FamilyCare filed this lawsuit in February 2017.  (Dkt. No. 1-1, Original Compl.)

### H.    FamilyCare attempts to undermine OHA by circulating the unused OHA communications plan.

In August 2017, after OHA disclosed the draft communications plan in response to a public records request, Director Lynne Saxton sent a letter to FamilyCare's CEO Jeff Heatherington apologizing for the draft plan's contents.  (Pl. Ex. 232.)  In this letter, Saxton confirmed that the plan was "not implemented or acted on in any way."  (*Id.*)

FamilyCare officials saw the public release of the draft communications plan as a way to garner sympathy for FamilyCare's position regarding the rates.  (6/5/18 Heatherington Dep. 153:8-53:13.)  Consistent with this view, FamilyCare and its lobbying and press relations firms circulated the draft communications plan widely, including to legislators and medical providers. (7/16/18 FamilyCare FRCP 30(b)(6) Dep. 134:6-135:20.)

FamilyCare identifies four statements by OHA that it claims OHA made in furtherance of the communications plan.  First, OHA Director Lynne Saxton gave a statement to the *Portland Business Journal* in response to FamilyCare's lawsuit, in which she characterized the disagreement between OHA and FamilyCare as being driven "by FamilyCare's goal to be paid more Medicaid dollars."  (Pl. Ex. 87; 5th Am. Compl. ¶ 55.)  Second, in a press release, again responding to FamilyCare's lawsuit, Saxton stated that it "is unfortunate that since [FamilyCare] didn't get the rate they wanted for 2017" FamilyCare was initiating additional litigation.  (Pl. Ex. 46; 5th Am. Compl. ¶ 55.)  Third, in a press release OHA announced it filed a motion to dismiss FamilyCare's lawsuit.  (Pl. Ex. 231; 5th Am. Compl. ¶ 55.)  Fourth, in a January 2017 Quarterly Legislative Report, OHA accurately reported FamilyCare's operating margins and described

OHA's reimbursement policy process as affecting "outlier" CCOs.  (4th Am. Compl. ¶ 55.)
Evidence will show that the factual assertions made in these statements are true and appropriate.

In August 2017, Director Saxton resigned and was replaced by Director Patrick Allen.

## I.   Despite a rate increase and independent review, FamilyCare disputes the 2018 rates.

In September 2017, OHA announced the capitation rates for 2018.  FamilyCare's 2018
rates were 9% higher than FamilyCare's 2017 rates.  (Def. Ex. 1700.)  As it did for the 2017
rates, OHA and Optumas implemented a reimbursement policy for the 2018 rates.  (Pl. Ex. 563)
FamilyCare's physician reimbursements in the 2016 base data, which Optumas and OHA used to
set the 2018 rates, were higher than every other CCO.  (Nelson Report ¶ 144, Figure 9.)  The
reimbursement policy again identified CCOs that had costs growing at an unsustainable rate and
made reductions to CCOs' base data that reflected unsustainable costs.

After taking the helm of OHA near the end of the summer in 2017, Director Patrick Allen
suggested that OHA engage an independent actuary and an independent law firm to review the
rate-setting process for bias and legality.  (6/15/18 Allen Dep. 187:10-188:18.)  The independent
actuary and law firm confirmed the legality and lack of bias in the rate-setting process.  (Pl. Ex.
95 at 21 and Pl. Ex. 225 at 1.)  After receiving these independent reviews confirming the
integrity of the rate-setting process, OHA declined to make any changes to its rate-setting
process.  (6/15/18 Allen Dep. 234:5-235:7, 236:2-23.)  FamilyCare declined to renew its CCO
Contract and chose to leave Oregon's Medicaid market at the end of January 2018.

## II.   Argument

### A.   OHA did not breach the Settlement Agreement (Second Claim for Relief).

#### 1.   Elements of breach of contract

The elements of a claim for breach of contract are:

1. The existence of a contract and relevant terms;

2. Plaintiff's full performance and lack of breach;

3. Defendant's breach; and

4. Resulting in damages to plaintiff.

**Page 11 - TRIAL MEMORANDUM OF DEFENDANT OREGON HEALTH
         AUTHORITY**

*Slover v. Oregon State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (1996) ((elements of breach of contract are "the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff") (quotation marks and citation omitted)).

FamilyCare's second claim for relief alleges that OHA breached Paragraph 8 of the Settlement Agreement. Paragraph 8 provides that "OHA shall not use rates paid to FamilyCare under the Contract for 2016 or the Settlement Credit as a basis for limiting the amount that can be paid to FamilyCare in future rate years." (Pl. Ex. 14 at 6.)

**2.    OHA's factual and legal contentions**

**a.    Section 8 of the Settlement Agreement means that OHA may not use FamilyCare's 2016 rates or the Settlement Credit as a factor in its rate-setting methodology.**

OHA will contend that Section 8 of the Settlement Agreement means that OHA may not use FamilyCare's 2016 rates or the Settlement Credit as a factor in its rate-setting methodology. FamilyCare argues for a more expansive, but unreasonable, meaning: OHA may not reduce FamilyCare's future rates with the motive of recouping the amounts paid or credited to FamilyCare in the 2016 rates and the Settlement Credit. OHA will present evidence at trial from Caroline Brown, the individual who negotiated the Agreement for OHA, that the parties intended Section 8 to have the meaning OHA ascribes.

If the jury finds that the parties' intended Section 8 to have the meaning OHA advances, FamilyCare must prove that OHA incorporated FamilyCare's 2016 rates or the Settlement Credit into OHA's and Optumas' rate-setting methodology used to develop the CCO rates for 2017 and 2018. No evidence suggests that OHA or Optumas used FamilyCare's 2016 rates or the Settlement Credit to set or alter FamilyCare's 2017 and 2018 rates; the evidence will show that OHA and Optumas set the 2017 and 2018 rates based on a methodology approved by CMS and applied fairly and equally to all CCOs. OHA's witnesses will testify that FamilyCare's 2016 rates and the Settlement Credit were not a factor used in the methodology to determine the 2017 and 2018 rates. The 2017 and 2018 Rate Certifications make clear that OHA's CCO rates were

based on appropriate methodologies and were designed to provide CCOs with reasonable, appropriate, and attainable rates that controlled unsustainable cost increases.  (*See generally* 2017 Reimbursement Review, Pl. Ex. 94; *see generally* 2017 Rate Certification, Pl. Ex. 354; 2018 Rate Certification, Pl. Ex. 144.)  CMS approved both the 2017 and 2018 rates. (Def. Exs. 1497 and 1741.)

> **b.    Even if the jury adopts FamilyCare's interpretation of Section 8, FamilyCare will be unable to prove that OHA breached the Settlement Agreement.**

If the jury finds that the parties' intended Section 8 to have the meaning FamilyCare advances, FamilyCare must prove that OHA and Optumas limited FamilyCare's 2017 and 2018 rates because of FamilyCare's 2016 rates or the Settlement Credit.

FamilyCare will be unable to meet its burden of proof at trial because there is no evidence that OHA used FamilyCare's 2016 rates or the Settlement Credit to limit FamilyCare's 2017 or 2018 rates.  Instead, the evidence will show that OHA set FamilyCare's 2017 and 2018 rates based on an impartial methodology and implemented to control costs while at the same time providing reasonable, attainable, and appropriate rates.

OHA's witnesses will testify that OHA and Optumas did not use FamilyCare's 2016 rates or the Settlement Credit as basis for limiting the amount paid to FamilyCare in future rate years. And they will testify that FamilyCare's 2016 rates and the Settlement Credit did not motivate OHA to make any rate-setting decisions limiting FamilyCare's 2017 and 2018 rates.

FamilyCare has advanced only a single theory to argue that OHA impermissibly limited its 2017 and 2018 rates: It contends that OHA implemented the reimbursement policy in order to limit FamilyCare's rates, breaching the Settlement Agreement.  (Pl.'s Resp. in Opp'n to OHA's Mot. for Summ. J. at 22 (Dkt. 222 at 29).)

The reimbursement policy did not breach the Settlement Agreement.  There are several reasons. *First*, there is no evidence for FamilyCare's theory that OHA implemented the policy because of FamilyCare's 2016 rates or the Settlement Credit.  (Statement of counsel for FamilyCare at 9/21/18 Hearing on OHA's Mot. for Summ. J. at Tr. 59:25-60:2 (Dkt. 259)

("There's no direct evidence that says [OHA is] going to use the settlement credit as basis for reducing the rates.").) Rate-setting is a complex process that involves dozens of people across OHA, Optumas, and CMS. If OHA had intended to implement the reimbursement policy because of FamilyCare's 2016 rates or the Settlement Credit, and cover it up, OHA would have had to engage in an extensive multi-year conspiracy involving the leadership of OHA in 2016 and 2017, its new leadership in 2018, its Actuarial Services Unit, and Optumas. Indeed, because the reimbursement policy continued for the 2018 rate year, the supposed conspiracy would also have to have coordinated with OHA's independent second-look reviewers at Manatt Phelps and Lewis & Ellis, neither of which contested the validity of the reimbursement policy. Yet despite the dozens of people that would have needed to coordinate the scheme, acting over at least two years, and keep it secret for several more years, there is not a single piece of evidence of it: not a single email, or a single line of testimony—out of more than a million pages of documents and 120 hours of testimony—linking the reimbursement policy to FamilyCare's 2016 rates or the Settlement Credit.

*Second*, the reimbursement policy was a legal and proper exercise of OHA's discretion to set capitation rates. Optumas, which was responsible for certifying the rates it developed to CMS, implemented the policy and certified the rates. CMS, which is responsible for approving the rates, approved the rates as sound. (Def. Exs. 1497 and 1741.) OHA's actuarial expert, who studied Optumas' work, concludes that it is reasonable actuarial practice. (Nelson Report ¶ 135.)

*Third*, OHA began implementing the reimbursement policy before it signed the Settlement Agreement, demonstrating that the Settlement Agreement could not have been a basis for the reimbursement policy. OHA and Optumas identified unsustainable increases in health care costs in September 2015, eight months before the Settlement Agreement. OHA explained to the legislature that unsustainable cost growth would be an issue in the 2017 rate cycle. (See 9/28/15 presentation to Oregon House Healthcare Committee, Def. Ex. 1281.) The next month, in a presentation to FamilyCare and the other CCOs, OHA warned that in rate year 2017 "total per member growth" could pose a "budget challenge." (Def. Ex. 1289.) OHA also notified FamilyCare in October 2015 that it was concerned about FamilyCare's high physician

**Page 14 - TRIAL MEMORANDUM OF DEFENDANT OREGON HEALTH AUTHORITY**

reimbursement rates, noting that OHA was "trying to better understand the significant increase in [FamilyCare's] Physician/Professional Services costs between 2014 and 2015." (Def. Ex. 1381.)

OHA announced to the CCOs in March 2016, two months before signing the Settlement Agreement, that it would be making base data "[a]djustments." (Def. Ex. 1358.) Optumas received raw base data from the CCOs on April 30, 2016, a few weeks before OHA signed the Settlement Agreement. (Def. Ex. 1395.) Consistent with the schedule set before the Settlement Agreement, Optumas spent May and June reconciling this base data. Thus, the evidence will not support FamilyCare's "suspicious timing" theory purporting to link the 2017 and 2018 rates to the settlement.

*Fourth*, OHA implemented the reimbursement policy for a straight-forward reason: to meet its responsibility as a steward of taxpayer money. That responsibility—which OHA owed to the State, CMS, and their constituents—required OHA to contain health care costs, including FamilyCare's profligate spending. As described above, the Section 1115 waiver required OHA to contain growth in average annual Medicaid expenses. OHA's witnesses will testify that FamilyCare and some other CCOs were overpaying providers, driving up the costs of health care in Oregon, and endangering OHA's ability to comply with the terms of its commitments to the federal government, which funds much of the OHP. They will testify that OHA implemented the reimbursement policy to deliver rates that met federal Medicaid regulations and controlled costs. As explained in the 2017 Rate Certification, Optumas examined the drivers of the increased growth rates and then adjusted base data for those drivers that the CCOs had control over. (*See generally* 2017 Rate Certification, Pl. Ex. 354.)

Furthermore, evidence will show that OHA did not single FamilyCare out. OHA and Optumas' adjustments to FamilyCare's base data were congruent with OHA and Optumas' adjustments to other CCOs' base date. For example, for the 2018 rates, Optumas adjusted the base data of six other CCOs. As a percentage of base data dollars, FamilyCare's adjustments were in the middle of the range. (Nelson Report ¶ 121.)

*Fifth*, FamilyCare's contention that the reimbursement policy was targeted at FamilyCare is nonsensical. As multiple witnesses will testify, reductions in base data are spread across

**Page 15 - TRIAL MEMORANDUM OF DEFENDANT OREGON HEALTH AUTHORITY**

regions as rates are developed.  Thus, OHA's reductions to FamilyCare's base data did not just reduce FamilyCare's rates, it also reduced Health Share's rates, just as reductions to Health Share's base data would have reduced FamilyCare's rates.  The reimbursement policy did not—and could not have—accomplished the goal FamilyCare attributes to it.

Defendants took legal and appropriate actions to control costs and create rates that complied with federal Medicaid law.  CMS approved both the 2017 and 2018 rates as being in accordance with federal law and regulation.  (Def. Exs. 1497 and 1741.)  FamilyCare's own actuary consultant, Ben Diederich, concluded that the rates for 2017 and 2018 were actuarially sound.  (7/10/18 Ben Diederich Dep. Tr. 126:20-127:18.)  OHA's actuary expert will agree and testify that the reimbursement policy was a valid actuarial practice.  (Nelson Report ¶ 135.)

### 3.   Affirmative defenses

#### a.   Mitigation of damages and avoidable consequences

OHA has raised the defense of mitigation of damages.  (OHA's Answer (Dkt. 501) ¶ 115).  Mitigation of damages is a proper defense to a breach of contract claim.  *Enco, Inc. v. F.C. Russell Co.*, 210 Or. 324, 339 (1957) ("It is well-settled that a party injured by breach of contract or tort should do what reasonable care and business prudence require to minimize his loss.") (citations omitted).  FamilyCare also has the responsibility to avoid enhancing its damages.  *Bixler v. First Nat. Bank of Oregon*, 49 Or. App. 195, 203 (1980) ("Under general contract law, a plaintiff is required to take reasonable steps to avoid the enhancement of his damages[.]")

OHA will argue that FamilyCare took no steps to control its costs.  FamilyCare has no supportable basis to claim damages resulting from its own failures to mitigate its costs.  (*See, e.g.,* Morones Report ¶ 8.)

#### b.   Release

OHA asserts the defense of release.  (OHA's Answer ¶ 117).  The 2016 Settlement Agreement contains a release.  (Pl. Ex. 14, Settlement Agreement, § 4, pg. 9.)  To the extent FamilyCare attempts to make claims, including for damages, based on OHA's 2015 and 2016

rates for FamilyCare, or any other conduct released by the Settlement Agreement, OHA will contend that such claims and damages are released.

### c.    Limitation of Liability

OHA asserts the defense of limitation of liability.  (OHA's Answer ¶ 127.)  Beginning with the first CCO Contract in 2014, every year's CCO Contract contains a limitation of liability that prohibits FamilyCare from recovering any damages other than unpaid CCO rates.  The CCO Contract provides that FamilyCare's "sole remedy shall be a Claim for any unpaid CCO Payments . . . .  In no event shall OHA be liable to [FamilyCare] for any expenses related to termination of this Contract or for anticipated profits."  (2017 CCO Contract, Pl. Ex. 12, Ex. D, § 10(d).)  It also states: "neither party shall be liable for incidental or consequential damages arising out of or related to this contract."  (*Id.* § 11.)  FamilyCare's claim for breach of the 2016 Settlement Agreement arises out of and relates to the CCO Contract.

Limitations on liability are enforceable under Oregon law.  *Atlas Mut. Ins. Co. v. Moore Dry Kiln Co.*, 38 Or. App. 111, 114 (1979) (limitations on liability enforceable under Oregon law); *K-Lines, Inc. v. Roberts Motor Co.*, 273 Or. 242, 254 (1975) (same).

OHA will argue in pretrial and trial damages motions that FamilyCare's damages are limited as a matter of law by the CCO Contract's limitation of liability.  To the extent those motions leave open factual questions, OHA will request a jury instruction and verdict form questions providing for the jury to resolve the questions.

### B.    OHA did not breach the implied duty of good faith and fair dealing in the CCO Contract (Third Claim for Relief).

### 1.    Elements of breach of the implied duty of good faith

To state a claim for breach of the implied duty of good faith, plaintiff must prove the elements of a breach of contract: the existence of a contract, its relevant terms, plaintiff's performance, defendant's breach, and damages.  *Slover*, 144 Or. App. at 570 (elements of breach of contract); *AMC, LLC v. Nw. Farm Food Coop.*, No. 6:17-CV-00119-AA, 2019 WL 6312557, at *3 (D. Or. Nov. 25, 2019) ("In a breach of good faith and fair dealing claim, the elements are the same, except the duty at issue is the implied duty of good faith and fair

dealing that exists in every contract.").  In addition, because the implied duty is not express, plaintiff must prove that the alleged implied duty is part of the contract by proving that it is necessary to effectuate the parties' objectively reasonable contractual expectations.  *Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445-46 (2010) ("[T]he dispositive question in this case is whether it is appropriate to imply a duty for [defendant] to refrain from requesting an increase in the rate, in order to effectuate the parties' objectively reasonable expectations").

2.      **OHA's factual and legal contentions**

a.      **FamilyCare had no objectively reasonable contractual expectation that it could challenge OHA's proposed rates.**

Evidence will show that FamilyCare had no objectively reasonable contractual expectation that it could challenge OHA's proposed rates.  "[T]he reasonable contractual expectations of the parties are shown by the express terms of the contract," *W. Prop. Holdings, LLC v. Aequitas Capital Mgmt., Inc.*, 284 Or. App. 316, 325 (2017).  Here, the CCO Contract provided two—and only two—express limits on OHA's discretion to determine capitation rates in a contract amendment: OHA had to i) provide rates that were actuarially set and certified and ii) submit the rates to CMS for approval.  (2017 CCO Contract, Pl. Ex. 12, § I.A, Ex. C, § 6, Ex. D § 20.c, Jindal Decl. Ex. 1.)  The 2016 Settlement Agreement confirms that those are the parties' only objectively reasonable expectations.  In the Settlement Agreement, FamilyCare agreed that "OHA has the authority to set the CCO rates under which OHA contracts with CCOs, subject to CMS approval."  (Pl. Ex. 14, 2016 Settlement Agreement § 1.a.)  FamilyCare also agreed that "OHA is not obligated to adjust the rates paid to any CCO to ensure that such rates cover all costs that a CCO has incurred during a rate year[.]"  (*Id*.)  Given its express agreement to OHA's authority, FamilyCare cannot have any reasonable expectations that the CCO Contract implicitly imposed a duty on OHA limiting that authority.  Accordingly, FamilyCare's only reasonable expectation was that OHA would actuarially set and certify rates and submit those rates to CMS.  Evidence at trial will demonstrate that OHA met these expectations.

Relatedly, the evidence at trial will demonstrate that FamilyCare had no reasonable contractual expectation that OHA would provide FamilyCare with rates that "cover[ed] FamilyCare's operating expenses." Instead, FamilyCare was responsible for managing its own costs within its global budget. *See* ORS 414.025(11) (defining global budget); OAR 410-141-3000(35) (same). The parties' 2016 Settlement Agreement, specifically stated that "OHA is not obligated to adjust the rates paid to any CCO to ensure that such rates cover all costs that a CCO has incurred during a rate year." (Pl. Ex. 14, Settlement Agreement § 1d.) Further, under the coordinated care model, CCOs were expected to manage their own expenses. Thus, FamilyCare had no objectively reasonable contractual expectation that the rates would cover its expenses.

In addition, the parties do not have an objectively reasonable expectation that OHA would provide "timely" rate amendments. The only basis FamilyCare has alleged for this expectation is a statute: ORS 414.652(4). But the implied duty of good faith does not incorporate statutory law into contracts unless there is specific evidence that the parties intended the law to be enforced through an implied duty. *Oregon Univ. Sys. v. Oregon Pub. Emps. Union, Local 503*, 185 Or. App. 506, 518 (2002) (Rejecting incorporation of statute into duty of good faith where plaintiff "has not cited any evidence . . . supporting the proposition that these parties expected that general labor law rights and obligations would be enforced by means of a duty implied in their [collective bargaining agreement]."); *see also Fleshman v. Wells Fargo Bank*, 27 F. Supp. 3d 1127, 1134 (D. Or. 2014) (where a contract acknowledges that a party must follow "applicable laws," the relevant laws are not themselves "actual contract terms" giving rise to damages under the implied duty of good faith and fair dealing). OHA will show at trial that there is no evidence that the parties intended to incorporate ORS 414.652(4) into the implied duty of good faith.

The implied duty of good faith describes the objectively reasonable expectations of the parties. *Tolbert v. First Nat. Bank of Oregon*, 312 Or. 485, 494 (1991) ("We emphasize that it is only the objectively reasonable expectations of parties that will be examined in determining whether the obligation of good faith has been met."). FamilyCare's witnesses are expected to testify about FamilyCare's subjective expectations about the CCO Contract, not the parties'

**Page 19 - TRIAL MEMORANDUM OF DEFENDANT OREGON HEALTH AUTHORITY**

*objectively* reasonable expectations.  (Pl.s' Lay Witness Statements (Dkt. 541) at 25-26, 30-32, 34 (describing FamilyCare's expectations).)  FamilyCare's subjective expectations about performance of the CCO Contract are irrelevant, especially where the parties objectively agreed in the Settlement Agreement that "OHA has the authority to set the CCO rates under which OHA contracts with CCOs, subject to CMS approval."  (Pl. Ex. 14, 2016 Settlement Agreement § 1.a.)

> **b.      Even if FamilyCare can prove that the parties had additional objectively reasonable expectations, OHA met those expectations.**

OHA's witnesses will testify that OHA and Optumas developed rates that were unbiased, reasonable, adequate, timely, and based on appropriate and accurate data and methodologies. OHA's fact witnesses will testify that OHA was not biased against FamilyCare and no one adjusted the rates out of bias against FamilyCare.  OHA's experts and witnesses from Optumas and OHA's actuarial services unit will testify that OHA's rates were unbiased, reasonable, adequate, and based on appropriate and accurate data and methodologies.  As discussed above, OHA adopted valid rate-setting policies to control costs while delivering reasonable, attainable, and appropriate rates to CCOs.  CMS approved OHA's rates for 2017 and 2018.

> **c.      OHA provided FamilyCare a "timely" Rate Amendment in 2018.**

FamilyCare contends that OHA failed to provide it a "timely" 2018 Rate Amendment. Even if the Court or jury determines that the parties had an objectively reasonable contractual expectation of timely rates, evidence produced at trial will demonstrate that OHA provided the 2018 Amendment in a timely fashion.  OHA provided FamilyCare the 2018 Rate Amendment, with an effective date of January 1, 2018, on October 31, 2017.  (Pl. Ex. 144.)  The Rate Amendment was, therefore, timely under former ORS 414.652, which required OHA to provide FamilyCare the 2018 Rate Amendment with 60 days' notice prior to the effective date.

Furthermore, Director Allen and OHA's Chief Financial Officer Laura Robison will testify that OHA did not issue an ultimatum and FamilyCare was free to sign the 2018 Rate Amendment right up until January 1, 2018.

**Page 20 - TRIAL MEMORANDUM OF DEFENDANT OREGON HEALTH
          AUTHORITY**

Evidence will show that Director Allen asked FamilyCare about its plans regarding the 2018 Rate Amendment because FamilyCare appeared to be closing its Medicaid business.  On December 14, 2017, FamilyCare's board voted to reject OHA's proposed 2018 Rate Amendment.  (7/16/18 FamilyCare FRCP 30(b)(6) Dep. 47:18-48:21, Pl. Ex. 212).  On December 15, FamilyCare gave notice to employment regulators that it "plan[ned]" and "expect[ed]" to conduct layoffs and close its Medicaid business.  (Def. Ex. 2256.)  FamilyCare's CEO confirmed this planned closure in various media interviews.  (Allen Dep. at 242:7-17 (noting that OHA learned of FamilyCare's planned closure).)  During this time, OHA and Director Allen received complaints from FamilyCare members and providers regarding the closure.  (Def. Ex. 1666.)

Director Allen's testimony and contemporaneous evidence will show that after learning of this impending withdrawal, he asked that FamilyCare provide OHA with its present intent regarding the 2018 Amendment so that OHA could plan for an orderly transition of FamilyCare's members to other CCOs.  Director Allen understood that FamilyCare had until the end of the year to sign the amendment, and he would have accepted a signed amendment up until that date.  (*See* Allen Dep. Tr. 242:7-243:19.)  Thus, OHA's evidence will establish that Director Allen was motivated by the desire to provide an orderly transition for over 100,000 Oregonians and did not issue an "ultimatum."  *See Allen v. FamilyCare, Inc.*, 812 F. App'x 413, 419 (9th Cir. 2020), *as amended* (May 7, 2020) (rejecting FamilyCare's claim that Allen violated FamilyCare's constitutional rights by issuing "empty threats").

> **d.    The timeline for Medicaid eligibility redeterminations was not objectively unreasonable or biased against FamilyCare.**

OHA's evidence will show that OHA's initial 2018 Rate Amendment, proposed to FamilyCare in October 2017, was appropriate and approved by CMS, and its subsequently revised 2018 Rate Amendment was not delayed to prejudice FamilyCare.  In 2014, the technology platform used by Oregonians to apply for health coverage in OHP (Cover Oregon) failed.  Federal law required OHA to renew the eligibility of Medicaid recipients every year.  *See, e.g.*, 42 C.F.R. 435.916.  But in September 2015, CMS granted Oregon approval to delay

Medicaid eligibility renewals to prevent Oregonians from losing health benefits due to this flawed technology. (Def. Ex. 1564.) Consistent with this federal guidance, in March 2016, OHA restarted the Medicaid renewal processing for an eventual total of over 950,000 OHP members. (*Id.*) In May 2017, Governor Brown instructed OHA to complete this renewal work by the end of August 2017. (*Id.*) Consistent with this instruction, OHA completed the renewal work on August 31, 2017. (*Id.*) During this seventeen-month effort, OHA processed over 115,000 Medicaid eligibility renewal applications. (*Id.*) Members determined to be ineligible as a result of this process had 90 days to appeal that determination. (*Id.*) In other words, the last set of OHP members affected by these eligibility redeterminations had until the end of November 2017 to appeal the eligibility redetermination. After this appeals period ended, OHA and Optumas worked to redetermine the 2018 rates based on the new 2016 eligibility information. OHA and Optumas completed that work on January 23, 2018, less than two months later. (5th Am. Compl. at ¶ 75.)

Evidence at trial will prove that OHA communicated with all 16 CCOs, including FamilyCare, about the process and timeline for redetermined 2018 rates. At trial, no evidence will support FamilyCare's theory that OHA delayed the timeline of the eligibility redeterminations because it was "biased" against FamilyCare. As the above timeline indicates, the schedule of eligibility redeterminations was determined by a technological breakdown, related guidance from CMS and the Governor regarding eligibility redeterminations, and the legally-mandated period for appealing those eligibility redeterminations.

Furthermore, OHA will produce evidence and testimony at trial that OHA's initial 2018 rates, offered to FamilyCare on October 31, 2017, were unbiased, reasonable, adequate, and based on appropriate and accurate data and methodologies. OHA's actuary expert will provide this testimony. (*See, e.g.,* Nelson Report ¶ 37.) OHA's fact witnesses involved in rate-setting will also provide such testimony. CMS approved both OHA's initial and revised 2018 rates. (Def. Ex. 1497 and Ex. 1741)

   e.   **The "ultimatum" and rate redetermination were immaterial to FamilyCare's decision to reject the 2018 Rate Amendment.**

Evidence at trial will demonstrate that, even if actionable, the supposed ultimatum and 2018 eligibility redetermination did not cause FamilyCare to reject the 2018 Rate Amendment and therefore did not cause FamilyCare any damages.  Damage is an essential element of a breach of contract claim.  *E.g.*, *Moini v. Hewes*, 93 Or. App. 598, 602 (1988).  FamilyCare's board voted to reject the 2018 Rate Amendment on December 14, 2017, one week before the supposed "ultimatum."  Thus, even if Director Allen truncated FamilyCare's time to decide whether to sign the 2018 Rate Amendment, his conduct did not damage FamilyCare.  By December 20, 2017, FamilyCare had already decided to reject the 2018 Rate Amendment.

Relatedly, FamilyCare's board voted not to accept any 2018 Rate Amendment that would require FamilyCare to incur a "substantial loss" in 2018.  (Pl. Ex. 212.)  FamilyCare's organizational deponent agreed that the revised 2018 rates would have still required FamilyCare to incur "substantial loss" in contravention of the board's direction.  (6/5/2018 Heatherington Dep. 137-4-15; 7/16/2018 FamilyCare FRCP 30(b)(6) Dep. 53:4-54:25.)  FamilyCare's executive William Murray later stated in a declaration that FamilyCare's board "could" have voted to accept the revised 2018 rates, but such testimony is hearsay and, in any event, merely identifies a possibility, not a likelihood.  (Decl. of William Murray in Supp. of FamilyCare's Opp'n to OHA's Mot. for Summ. J. (Dkt. 519) ¶ 43.)  FamilyCare's board could have taken any number of actions; the fact that it could does not mean that it would.  FamilyCare was not damaged by the supposed untimeliness of the 2018 eligibility redetermination because FamilyCare cannot establish that it would have accepted the revised rates even if OHA had presented them to FamilyCare earlier.

FamilyCare also was not under an impossible deadline.  FamilyCare could have signed the 2018 Rate Amendment in December and, if it was unhappy with the revised rates OHA was planning to (and did) release in early 2018, terminate the CCO Contract.  Under the Contract, FamilyCare had the right to declare OHA in default, which gave OHA 30 days to cure.  (2017 CCO Contract, Pl. Ex. 12, Ex. D, § 10(c)(2).)  If OHA did not cure within 30 days, FamilyCare

could terminate the Contract. (*Id.* Ex. D, § 10(e)(4).) FamilyCare could have declared OHA in breach of the implied duty of good faith for insufficient rates and if OHA did not alter the rates, terminate the Contract.

>       **f.    FamilyCare cannot recover for breach because it failed to perform its notice obligations under the CCO Contract.**

To prevail on a breach of contract claim, a plaintiff must prove its full performance of the contract. *Malot v. Hadley*, 86 Or. App. 687, 690 (1987) ("a party to a contract who alleges that the other party has breached must prove performance of the party's own obligations under the contract"). The CCO Contract requires FamilyCare to provide notice of any breach and provide OHA an opportunity to cure before OHA is in default. The notice must state, with specificity, the "term or terms" of the Contract that have been breached. The CCO Contract states: "OHA shall be in default under this Contract if: . . . OHA commits any material breach or default of any covenant, warranty, or obligation under this Contract, and such breach or default is not cured within 30 calendar days after Contractor's notice or such longer period as Contractor may specify in such notice. Any notice of default by Contractor must identify, with specificity, the term or terms of this Contract allegedly breached." (2017 CCO Contract, Pl. Ex. 12, Ex. D, § 10(c) (Dkt. 433-9 at 140).)

OHA will contend that FamilyCare cannot show that it provided notice under the CCO Contract that the 2018 Rate Amendment was untimely in any way, that it provided OHA an opportunity to cure the alleged untimeliness, or that it specifically identified any section of the CCO Contract—including its allegedly implied terms—that OHA breached. OHA will also contend that FamilyCare failed to provide notice of its other alleged breaches because FamilyCare failed to specifically identify any allegedly implied terms that OHA was breaching. FamilyCare only devised the implied terms that OHA supposedly breached when it filed an amended complaint in this lawsuit months after the supposed breaches. It is FamilyCare's burden to establish that it notified OHA of each alleged breach and specific terms of the Contract—express or implied—breached. Failure to comply with notice provisions prevents

recovery for breach of contract. *Zerkel v. Lindsey*, 270 Or. 517, 527-28 (1974); *Hayes v. Wells Fargo Bank, N.A.*, No. 3:15-CV-00651-PK, 2015 WL 5707054, at *5 (D. Or. Sept. 28, 2015).

### 3.    OHA's affirmative defenses

OHA will raise up to four affirmative defenses at trial, depending on the outcome of pretrial and trial motions.

### a.    Estoppel

OHA asserts the affirmative defense of estoppel.  (OHA's Answer (Dkt. 501), ¶ 114). "Estoppel precludes a person, based on the person's acts, conduct, or silence where there was a duty to speak, from asserting a right that otherwise would have been available." *Nelson v. Liberty Ins. Corp.*, 314 Or. App. 350, 359 (2021).  Under Oregon law, equitable estoppel can be a successful defense to a breach of contract claim. *Vukanovich v. Kine*, 302 Or. App. 264, 277 (2020) (affirming trial court's ruling that equitable estoppel defense successfully defeated party's breach of contract claim).

Plaintiff is estopped from asserting that it has rights based on reasonable expectations that the CCO Contract entitled it to rate amendments that were "were timely, reasonable, adequate, actuarially sound, unbiased, and free of errors in underlying data and methodology" because plaintiff expressly disclaimed such expectations.  In the 2016 Settlement Agreement, FamilyCare agreed that "OHA has the authority to set the CCO rates under which OHA contracts with CCOs, subject to CMS approval." (Pl. Ex. 14, Settlement Agreement § 1.a.)  FamilyCare also agreed that CMS is the arbiter of whether rates are actuarially sound: "OHA must establish to the satisfaction of CMS that the rates are actuarially sound[.]"  (*Id.* § 1.b.)  And FamilyCare agreed that OHA was not obligated to adjust FamilyCare's rates to cover FamilyCare's costs: "OHA is not obligated to adjust the rates paid to any CCO to ensure that such rates cover all costs that a CCO has incurred during a rate year[.]"  (*Id.* § 1.d.)  FamilyCare is thus estopped from asserting contrary expectations.

### b.      Mitigation of damages and avoidable consequences

OHA has raised the defense of mitigation of damages.  (OHA's Answer (Dkt. 501) ¶ 115).  Mitigation of damages is a proper defense to a breach of contract claim.  *Enco, Inc.*, 210 Or. at 339 ("It is well-settled that a party injured by breach of contract or tort should do what reasonable care and business prudence require to minimize his loss.").  FamilyCare also has the responsibility to avoid enhancing its damages.  *Bixler*, 49 Or. App. at 203 ("Under general contract law, a plaintiff is required to take reasonable steps to avoid the enhancement of his damages[.]")

OHA will argue that FamilyCare took no steps to control its costs.  FamilyCare has no supportable basis to claim damages resulting from its own failures to mitigate its costs.  (*See, e.g.,* Morones Report ¶ 8.)

### c.      Release

OHA asserts the defense of release.  (OHA's Answer ¶ 117).  The 2016 Settlement Agreement contains a release.  (Pl. Ex. 14, Settlement Agreement, § 4, pg. 9).  To the extent FamilyCare attempts to make claims, including for damages, based on OHA's 2015 and 2016 rates for FamilyCare, or any other conduct released by the Settlement Agreement, OHA will contend that such claims and damages are released.

### d.      Limitation of Liability

OHA asserts the defense of limitation of liability.  (OHA's Answer (Dkt. 501) ¶ 127.)  Beginning with the first CCO Contract in 2014, every year's CCO Contract contains a limitation of liability that prohibits FamilyCare from recovering any damages other than unpaid CCO rates.  The CCO Contract provides that FamilyCare's "sole remedy shall be a Claim for any unpaid CCO Payments . . . .  In no event shall OHA be liable to [FamilyCare] for any expenses related to termination of this Contract or for anticipated profits."  (2016 CCO Contract, Ex. D, § 10(d).)  It also states: "neither party shall be liable for incidental or consequential damages arising out of or related to this contract."  (*Id.* § 11.)

**Page 26 – TRIAL MEMORANDUM OF DEFENDANT OREGON HEALTH AUTHORITY**

Limitations on liability are enforceable under Oregon law. *Atlas Mut. Ins. Co.*, 38 Or.

App. at 114 (limitations on liability enforceable under Oregon law); *K-Lines, Inc.*, 273 Or. at 254

(same).

OHA will argue in pretrial and trial damages motions that FamilyCare's damages are

limited as a matter of law by the limitations on liability. To the extent those motions leave open

factual questions, OHA will request a jury instruction and verdict form questions providing for

the jury to resolve the questions.

DATED this 21st day of March, 2022.

ELLEN ROSENBLUM
ATTORNEY GENERAL
FOR THE STATE OF OREGON

By:    *s/ Harry B. Wilson*
David B. Markowitz, OSB #742046
DavidMarkowitz@MarkowitzHerbold.com
Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Laura Salerno Owens, OSB #076230
LauraSalerno@MarkowitzHerbold.com

*Special Assistant Attorneys General for
Defendant Oregon Health Authority, an
agency of the State of Oregon*

1259415

**Page 27 – TRIAL MEMORANDUM OF DEFENDANT OREGON HEALTH
        AUTHORITY**