**Stephen F. English**, OSB No. 730843
SEnglish@perkinscoie.com
**Thomas R. Johnson**, OSB No. 010645
TRJohnson@perkinscoie.com
**Matthew J. Mertens**, OSB No. 146288
MMertens@perkinscoie.com
**Sasha Petrova,** OSB No.  154008
SPetrova@perkinscoie.com
**PERKINS COIE LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Telephone: 503.727.2000
Facsimile:  503.727.2222

**Matthew Gordon**, *pro hac vice*
MGordon@perkinscoie.com
**David B. Robbins**, OSB No. 070630
DRobbins@perkinscoie.com
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

*Attorneys for Plaintiff FamilyCare, Inc.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| FAMILYCARE, INC., an Oregon non-profit corporation,<br><br>　　　　　　Plaintiff,<br>　　v.<br><br>OREGON HEALTH AUTHORITY, an agency of the State of Oregon, and LYNNE SAXTON,<br>　　　　　　Defendants. | No. 6:18−cv−00296−MO<br><br><br>FAMILYCARE, INC.'S TRIAL MEMORANDUM |

PLAINTIFF FAMILYCARE, INC.'S
TRIAL MEMORANDUM

156198765.5

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION...................................................................................................1

II.   FACTUAL BACKGROUND..............................................................................1

    A.    OHA administers Oregon's Medicaid system by contracting with CCOs............1

    B.    FamilyCare operates as an OHA-contracted CCO for more than thirty years.........................................................................................................................3

    C.    OHA and FamilyCare enter into a contract in 2014 for OHA to continue serving Medicaid beneficiaries in Oregon. ........................................................3

    D.    FamilyCare publicly challenges OHA's rate-setting processes—and OHA and Ms. Saxton retaliate.......................................................................................4

    E.    FamilyCare and OHA settle their dispute over the 2015 and 2016 rates...............5

    F.    Ms. Saxton and OHA continue to retaliate against FamilyCare in rate-setting for 2017 and 2018.....................................................................................5

    G.    FamilyCare seeks transparency regarding the 2017 rate-setting process and OHA retaliates with a disparagement campaign that, when discovered, results in Ms. Saxton being forced to resign. ...........................................................6

    H.    Ms. Saxton's resignation does not solve the problem, and OHA continues its efforts to drive FamilyCare out of its role as an OHA-contracted CCO..........7

    I.    OHA's removal of FamilyCare as a CCO harms Oregon's Medicaid system and Medicaid beneficiaries...................................................................11

III.  CLAIMS AND DEFENSES ...............................................................................12

    A.    FamilyCare's Claims...........................................................................................12

        1.    FamilyCare's claim against OHA for breach of the Settlement Agreement....................................................................................................12

        2.    FamilyCare's claim against OHA for violation of the implied duty of good faith and fair dealing in the Five-Year Contract.......................13

        3.    FamilyCare's claim against Ms. Saxton for violation of 42 U.S.C. § 1983 .................................................................................................14

    B.    Defendants' Affirmative Defenses ......................................................................17

        1.    Failure to mitigate.....................................................................................18

        2.    Release of claims.......................................................................................19

        3.    Estoppel. ....................................................................................................19

        4.    Limitation of liability................................................................................20

        5.    Qualified immunity....................................................................................20

IV.   REMEDIES ........................................................................................................22

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

**TABLE OF CONTENTS**
**(continued)**

                                                                              Page

A.    FamilyCare's damages for OHA's breach of the Settlement Agreement...........22

B.    FamilyCare's damages for OHA's violation of the implied duty of good
      faith and fair dealing in the Five-Year Contract.................................................22

C.    FamilyCare's damages and attorney's fees for Ms. Saxton's violation of
      42 U.S.C. § 1983......................................................................................................22

V.    CONCLUSION.......................................................................................................23

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

156198765.5

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Alpha Energy Savers, Inc. v. Hansen,*
381 F.3d 917 (9th Cir. 2004) .............................................................................. 14, 17, 21

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................. 16

*Best v. U.S. Nat. Bank of Or.,*
303 Or. 557, 739 P.2d 554 (1987) .......................................................................... 13

*Borunda v. Richmond,*
885 F.2d 1384 (9th Cir. 1988) ............................................................................... 22

*Carey v. Piphus,*
435 U.S. 247 (1978) ................................................................................................. 22

*Coszalter v. City of Salem,*
320 F.3d 968 (9th Cir. 2003) (evaluating § 1983 claim of government
employees) ........................................................................................................ 15, 16, 21

*David Hill Dev., LLC v. City of Forest Grove,*
688 F. Supp. 2d 1193 (D. Or. 2010) ....................................................................... 22

*Eng v. Cooley,*
552 F.3d 1062 (9th Cir. 2009) ............................................................................... 15

*Fleming v. Kids and Kin Head Start,*
71 Or. App. 718, 693 P.2d 1363 (1985) ................................................................. 12

*Hope v. Peltzer,*
536 U.S. 730 (2002) ................................................................................................. 21

*Hyland v. Wonder,*
972 F.2d 1129 (9th Cir. 1992) ............................................................................... 15

*Iron Horse Eng'g Co., Inc. v. Nw. Rubber Extruders, Inc.,*
193 Or. App. 402, 89 P.3d 1249 (2004) ................................................................. 13

*Nelson v. City of Davis,*
685 F.3d 867 (9th Cir. 2012) ................................................................................. 21

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000

# TABLE OF AUTHORITIES
## (continued)

Page

*Nelson v. Liberty Ins. Co.*,
    314 Or. App. 350, 498 P.3d 861 (2021) .......................................................................... 19

*O'Connor v. Cty. of Clackamas*,
    No. 3:11-CV-1297-SI, 2013 WL 3818143 (D. Or. July 22, 2013)..................................... 17

*Robinson v. York*,
    566 F.3d 817 (9th Cir. 2009).......................................................................................... 15

*Roe v. City & Cty. of San Francisco*,
    109 F.3d 578 (9th Cir. 1997)........................................................................................... 15

*Schneider v. Cty. of San Diego*,
    285 F.3d 784 (9th Cir. 2002).......................................................................................... 23

*Shook v. Travelodge of Or., Inc.*,
    63 Or. App. 137, 663 P.2d 1280 (1983) ........................................................................ 22

*Soranno's Gasco, Inc. v. Morgan*,
    874 F.2d 1310 (9th Cir. 1989) ...................................................................................... 21

*Vukanovich v. Kine*,
    302 Or. App. 264, 461 P.3d 223 (2020) ........................................................................ 19

**Statutes**

42 U.S.C. § 1983 ....................................................................................................*passim*

42 U.S.C. § 1988(b)..................................................................................................... 23

ORS 30.273................................................................................................................. 18

ORS 413.032................................................................................................................. 2

ORS 414.018............................................................................................................... 13

ORS 414.025................................................................................................................. 2

ORS 414.065............................................................................................................... 14

ORS 414.570................................................................................................................. 2

ORS 414.572................................................................................................................. 2

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

ORS 414.590........................................................................................2, 5, 8, 14

ORS 414.591................................................................................................ 2

**Regulations**

42 C.F.R. § 438.2 ....................................................................................... 3

42 C.F.R. § 438.4(a)................................................................................... 3

42 C.F.R. § 438.5 ....................................................................................... 2

**Other Authorities**

U.S. Const. amend. I.............................................................................*passim*

v-    TABLE OF AUTHORITIES

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000

156198765.5

## I.    INTRODUCTION

FamilyCare, Inc. ("FamilyCare"), an Oregon-based non-profit managed healthcare organization, publicly challenged the Medicaid rate-setting processes used by the Oregon Health Authority ("OHA"), the agency that administers the Medicaid public health insurance program in Oregon, and OHA's former director, Lynne Saxton. In response to FamilyCare's advocacy for transparency, accuracy, and fairness in the agency's practices, OHA and Ms. Saxton—in conjunction with OHA's actuary, Optumas—wrongfully acted to drive FamilyCare out of the remainder of its five-year contract with OHA to manage healthcare services for tens of thousands of Oregon Medicaid beneficiaries as an OHA-contracted Coordinated Care Organization ("CCO"), and ultimately out of business. OHA also used Optumas and the rate-setting process to recoup $24.8 million that OHA agreed to irrevocably provide to FamilyCare (the "Settlement Credit") as part of OHA's contribution to a 2016 settlement agreement with FamilyCare that resolved disputes relating to 2015 and 2016 rates (the "Settlement Agreement"). FamilyCare seeks relief based on (a) OHA's breach of the Settlement Agreement, (b) OHA's violation of the implied covenant of good faith and fair dealing in FamilyCare's CCO contract with OHA (the "Five-Year Contract"), and (c) Ms. Saxton's violation of 42 U.S.C. § 1983 for orchestrating the retaliation against FamilyCare for exercising its constitutional rights in critiquing OHA and Saxton.

## II.    FACTUAL BACKGROUND

### A.    OHA administers Oregon's Medicaid system by contracting with CCOs.

Medicaid is a cooperative federal-state program that funds healthcare services for persons of limited means. The program is jointly funded by the federal government and participating states and, subject to federal and state legal requirements, is administered at the state level. The U.S. Department of Health & Human Services' Centers for Medicare & Medicaid Services ("CMS") oversees the federal government's participation in the Medicaid programs. Each state's Medicaid program is administered by a single state agency subject to input and oversight from the federal

1-    PLAINTIFF FAMILYCARE, INC.'S
TRIAL MEMORANDUM

156198765.5

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

government. Oregon's program is administered by OHA, *see* ORS 413.032(i), and is called the Oregon Health Plan.

OHA enters into contracts with CCOs, which manage and pay for the delivery of healthcare services to Medicaid-eligible Oregonians. *See* ORS 414.025(8), 414.572, 414.591. OHA also is legally tasked with structuring reimbursement for providers of Medicaid services to reward comprehensive management of disease, quality outcomes and resources, and to promote cost-effective treatment, including primary care, preventive health, dental, and other health care services. *See* ORS 413.032(k). By law, OHA's contracts with CCOs have five-year terms. *See* ORS 414.590(2)(a). The legislature's creation of a legal requirement that extended CCO contract duration from one to five years was designed to allow CCOs to "transform" healthcare delivery in the state by investment in providers, services, and infrastructure that would allow covered Medicaid care to be rendered in a higher quality, more accessible, and more cost-efficient manner.

OHA assigns Medicaid members to CCOs and pays CCOs fixed per-member, per-month—or "capitated"—rates. The CCO must operate under a corresponding fixed global budget, to cover the total expenditures required to provide Medicaid covered services for the members assigned to it. *See* ORS 414.570(1), 414.572(1)(d). Each year, OHA develops the capitation rates for each CCO for the following year based upon historic costs of rendering the services.

By federal regulation, capitation rates are set by actuaries based on historical healthcare cost data and reflect certain actuarial assumptions and forecasts. *See* 42 C.F.R. § 438.5. CCOs use the capitation payments from OHA to pay healthcare providers for delivering the services required by the CCO's members. *See* ORS 414.572. CCOs are responsible for paying providers for all services covered by the global budget, and the costs of administering the CCO regardless of the actual cost of those services and costs. As a result, if a CCO's capitation rates are set too low, the CCO may not be able to cover its foreseeable, reasonably-incurred costs of providing healthcare services to Medicaid members assigned to it. To avoid that outcome, OHA is required to set rates

2-    PLAINTIFF FAMILYCARE, INC.'S
       TRIAL MEMORANDUM
156198765.5

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

that are "projected to provide for all reasonable, appropriate, and attainable costs that are required under the terms of the contract and for the operation of the [CCO] for the time period and the population covered under the terms of the contract[.]" 42 C.F.R. § 438.4(a); *see also* § 438.3(c)(1).

**B.    FamilyCare operates as an OHA-contracted CCO for more than thirty years.**

From 1985 until January 2018, FamilyCare managed the care of Medicaid members pursuant to a series of contracts with the State of Oregon, serving as many as 134,000 individuals through a network of more than 4,000 healthcare providers in and around the Portland metropolitan area. FamilyCare brought an innovative, patient-focused, common-sense approach to this role. FamilyCare's investments in primary care, preventative care, and behavioral healthcare, in particular, improved health outcomes for Medicaid beneficiaries in Oregon. FamilyCare's primary-care-focused model also was more cost-effective than the care model of other CCOs, particularly that of the only other CCO in the Tri-County area, Health Share of Oregon ("Health Share"), whose constituent providers focused on secondary, tertiary, and quaternary care. This, the evidence will show, is true even after adjusting for the relative health or cost risk of the two Tri-County CCOs' respective members.

**C.    OHA and FamilyCare enter into a contract in 2014 for OHA to continue serving Medicaid beneficiaries in Oregon.**

In 2014, OHA and FamilyCare entered into the Five-Year Contract, set to run until December 31, 2018, which, because of statewide extensions of the CCO contracts, would have run through 2019 had FamilyCare not been forced by OHA to forfeit the Five-Year Contract's remaining term in December 2017. In accordance with the contract and governing law, OHA was required to set annual capitation rates for FamilyCare that were actuarially sound. *See* 42 C.F.R. § 438.2 (defining "rating period" as twelve months); *see also* §§ 438.3(c)(1)(ii), 438.4(a).

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

### D.    FamilyCare publicly challenges OHA's rate-setting processes—and OHA and Ms. Saxton retaliate.

In December 2014, OHA unexpectedly announced a change in its rate-setting methodology—one that reduced FamilyCare's 2015 rates by almost 10%. FamilyCare responded by identifying errors in rates and methodologies and by requesting information from OHA necessary to evaluate the new methodology. Despite having previously purported to act as a partner to the CCOs, OHA ignored the requests. Thereafter, FamilyCare voiced its concerns regarding the 2015 rates to the Oregon legislature and CMS, as well as to OHA. In addition to alerting OHA's main constituents about the insufficiency of the rates to cover necessarily incurred healthcare costs, FamilyCare also expressed concerns about OHA's management of the Medicaid program and the impact of OHA's policies and practices on the system as a whole in caring for lower-income Oregonians. Ms. Saxton took charge of OHA in January 2015, around the time FamilyCare began raising these concerns.

In May 2015, after months of futile attempts to obtain information from OHA about its rate setting, FamilyCare filed suit against OHA, seeking an order compelling OHA to fix errors in the 2015 capitation rates. Thereafter, Ms. Saxton directed her staff to consider the "message content and focus" of the agency's release of CCO financial information. Ms. Saxton subsequently directed her staff to develop the first of a series of "communications plans" related to FamilyCare and the issues it was raising. That summer, OHA "redeveloped" the 2015 rates, cutting FamilyCare's payment even further. FamilyCare again requested that OHA provide the data necessary to assess the methodology underlying the redeveloped 2015 rates, and again, OHA refused.

FamilyCare's public advocacy continued in the fall of 2015. FamilyCare's chief executive officer, Jeff Heatherington, criticized OHA's lack of transparency at a conference attended by many Oregon healthcare industry representatives—as well as Ms. Saxton, who gave the keynote address. Mr. Heatherington also testified before the Oregon legislature in September 2015, leading to harsh media coverage of OHA and Ms. Saxton and criticism of the agency by legislators.

Following a meeting that Ms. Saxton, OHA, and Optumas held with FamilyCare and legislators, at which Mr. Heatherington expressed similar concerns, Ms. Saxton, OHA, and Optumas portrayed FamilyCare's reimbursement as higher than other CCOs, an effort that ultimately would lead to further cuts in FamilyCare's rates for 2017 and 2018.

Meanwhile, FamilyCare's public dispute with OHA and its leadership continued to escalate. After FamilyCare refused to sign a contract amendment containing the redeveloped 2015 rates, OHA threatened to terminate the Five-Year Contract. FamilyCare was forced to file a lawsuit in state court and obtain a court order enjoining OHA from terminating the Five-Year Contract. FamilyCare also sought redress through legislative action. In early 2016, FamilyCare promoted legislation, which was subsequently enacted, that established a 60-day minimum notice requirement for CCO contract changes (including rate amendments) and restricted OHA's ability to make such changes retroactively. *See* ORS 414.590(5). In response, Ms. Saxton and her staff redoubled their efforts to discredit and undermine FamilyCare.

> ### E.    FamilyCare and OHA settle their dispute over the 2015 and 2016 rates.

In May 2016, FamilyCare and OHA settled the dispute over FamilyCare's 2015 and 2016 rates. Under the Settlement Agreement, FamilyCare received the $24.8 million Settlement Credit referenced above, and OHA agreed not to use that credit as a basis for reducing FamilyCare's rates in future years. OHA would later breach the Settlement Agreement by doing precisely what it agreed to not do, *i.e.*, by manipulating the rate-setting processes for 2017 and 2018 to recoup the Settlement Credit.

> ### F.    Ms. Saxton and OHA continue to retaliate against FamilyCare in rate-setting for 2017 and 2018.

Shortly after the Settlement Agreement was entered, Ms. Saxton and OHA implemented a "reimbursement policy" to slash FamilyCare's 2017 rates by removing millions of dollars from FamilyCare's historic costs ("base data") to reduce FamilyCare's resulting rates. While publicly portraying it as a way to manage the growth rate in CCO costs, OHA's reimbursement policy was

based on a pretextual and inaccurate calculation of the rate of growth fashioned to single out and portray FamilyCare as an outlier, compared to other CCOs, by specifically targeting for reduction the cost categories FamilyCare had invested in heavily, particularly primary care. OHA implemented the policy in a series of cuts to base data, including a final round that targeted only FamilyCare. When OHA was finished, the cuts to FamilyCare were nearly twice as deep as to any other CCO. As a result, the 2017 rates offered by OHA to FamilyCare were again, on average, lower than those offered to the state's other fifteen CCOs and insufficient to cover FamilyCare's reasonable, appropriate, and attainable costs of providing services. Ms. Saxton and OHA perpetuated the reimbursement policy in 2018, again cutting millions more from FamilyCare's base data than from any other CCO, and again reducing FamilyCare's rates by millions of dollars.

> ### G.    FamilyCare seeks transparency regarding the 2017 rate-setting process and OHA retaliates with a disparagement campaign that, when discovered, results in Ms. Saxton being forced to resign.

Immediately after the reimbursement adjustment was announced, FamilyCare requested that OHA provide the data underlying the 2017 rates and information about the OHA policy decisions cutting its base data so that FamilyCare could understand the policy and ensure that the costs being removed were consistent with the policy and were being properly calculated. OHA refused. FamilyCare again complained to legislators, CMS, and OHA. FamilyCare's outreach included its executives testifying before the Oregon legislature about OHA's practices.

At the end of 2016, FamilyCare and OHA entered into a dispute resolution process to address FamilyCare's concerns about the paucity of the 2017 rates. In reliance on OHA's promise to meet in good faith to discuss and exchange data about the adequacy of the 2017 rates, FamilyCare qualifiedly agreed to sign the 2017 contract amendment on the strength of that promised good faith interaction. But those discussions instead were taken by OHA to simply engage in a new round of disparagement of FamilyCare. Rather than make a genuine effort to resolve FamilyCare's concerns, Ms. Saxton and OHA staff used the data and presentation provided

by FamilyCare during the dispute resolution process to develop another, even more aggressive "communications plan"—what Oregon journalists called a "smear campaign" after they unearthed it through a public records request. The plan was expressly designed to portray FamilyCare as "more concerned with the bottom line and increasing revenues than the health of Oregonians" and "hurt [FamilyCare's] credibility in the news" while promoting the only other CCO in the Portland metropolitan area, Health Share, as the more "inclusive" CCO by sharing "discreet examples of OHP members with high cost medical issues (i.e. HIV)" who chose Health Share over FamilyCare. Given OHA's refusal to participate in the dispute resolution process in good faith, FamilyCare was again left with no avenue for relief other than in the courts.

Over the next several months, FamilyCare continued to speak out about OHA's mismanagement and decision-making, including through statements to the media, meetings with legislators, and filings in court. FamilyCare also continued to seek a legislative solution.

In July 2017, after repeatedly stalling, OHA turned over its "communications plan" and related documents in response to a journalist's public records request. Outrage ensued. Shortly after the plan was made public, Ms. Saxton apologized for the campaign and acknowledged that it was unacceptable for OHA to target FamilyCare for mistreatment. The following day, Ms. Saxton tendered her resignation as Director of OHA, effective August 31, 2017. Governor Brown's spokesman confirmed that Ms. Saxton had resigned as a consequence of the anti-FamilyCare campaign. Several of the agency's other leaders also promptly departed.

## H.    Ms. Saxton's resignation does not solve the problem, and OHA continues its efforts to drive FamilyCare out of its role as an OHA-contracted CCO.

Unfortunately, the process started under Ms. Saxton did not end with her departure because, at the time she resigned, the 2018 rate-setting process was largely complete. The appointment of Patrick Allen as interim director of OHA appeared to bring new promise, but it was short-lived, and Mr. Allen did not revise the course Ms. Saxton had set. Soon after he took the helm of OHA, Mr. Allen met with representatives of FamilyCare to discuss "repairing" the

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

FamilyCare and OHA relationship. At the meeting, FamilyCare sought to dispel myths that had animated OHA's mistreatment of FamilyCare and provided detailed information regarding FamilyCare's concerns about the rate-setting process generally and the 2018 rates specifically. But rather than address the data errors and other problems identified by FamilyCare, Mr. Allen instead chose to whitewash them by commissioning two narrowly-circumscribed, hastily assembled reports with the aim of inoculating OHA from FamilyCare's complaints and thus perpetrating the errors that were known to result in inadequate rates for FamilyCare. Notably, OHA expressly excluded from the scope of the review the "reimbursement policy" that OHA had implemented to punish FamilyCare and recoup the Settlement Credit.

OHA continued its effort to starve FamilyCare of resources and push it to forfeit its contract during the remainder of the 2018 contract renewal process. On November 1, 2017, OHA furnished FamilyCare with the proposed 2018 rate amendment, which OHA acknowledged contained rates that were merely tentative and "may change based on the outcome of the pending independent reviews and redetermination analysis." The "redetermination analysis" was necessitated by errors in Medicaid recipient eligibility determinations (errors FamilyCare had previously raised to OHA) and was originally slated to be complete well before the December 31, 2017 deadline for signing the 2018 amendment. However, despite knowing that the insufficient 2017 rates would leave FamilyCare with worse losses than it suffered in 2017, and that adequate rates for 2018 would be essential to FamilyCare's continued viability—and despite the fact that state law required a full 60-days' advance notice of the terms of a CCO contract amendment, *see* ORS 414.590(5)—OHA did not provide FamilyCare with a requested analysis of the errors and inadequacy or otherwise provide FamilyCare with a sense of what its actual rates would be.

On December 4, 2017, the same day OHA issued a public press release announcing the results of Mr. Allen's orchestrated rate reviews, claiming "independent reviewers find CCO rate-setting process actuarially sound, unbiased" and stating the "state does not expect to change the

8-    PLAINTIFF FAMILYCARE, INC.'S
       TRIAL MEMORANDUM
       156198765.5

                                    **Perkins Coie LLP**
                              1120 N.W. Couch Street, 10th Floor
                                  Portland, OR  97209-4128
                                   Phone:  503.727.2000

2018 rates," OHA issued a paradoxical *private* communication to FamilyCare and the other CCOs, confirming that the redetermination analysis and "other emerging issues" (errors FamilyCare had previously raised to OHA) could "materially affect rates" for 2018. FamilyCare again voiced its concerns about errors that disproportionately affected its rates and protested OHA's insistence that FamilyCare sign the 2018 amendment prior to resolution of the errors and clarity about the 2018 rates. At a December 14, 2017 meeting, FamilyCare provided detailed information about the impact of the identified errors and how FamilyCare's rates would change if the rate-setting problems were addressed, and how those changes would permit FamilyCare to accept the 2018 rates and continue serving its members. OHA responded by informing FamilyCare that at most it would furnish "preliminary" results of the redetermination analysis by December 29. FamilyCare continued its efforts to have OHA address the rate problems, but also began a "dual-track" approach of planning for a potential transition of members in the event that FamilyCare was unable to continue, a process that OHA itself claimed was going well.

OHA did commit to providing an assessment of its data validation errors by December 19. But again, OHA failed to honor its commitments, and rather than provide the promised December 19 assessment, Mr. Allen unceremoniously terminated the dialogue with FamilyCare and illegally forced FamilyCare into a forfeiture decision.

On December 20, 2017, OHA and FamilyCare were scheduled to meet to discuss FamilyCare's concerns and share information about the impact of the rate redetermination. FamilyCare believed the meeting would be a continuation of the prior discussions about rates and whether they might change in time for FamilyCare to remain in business. But unbeknownst to FamilyCare, OHA had an entirely different agenda for the meeting. Despite not having provided any of the promised analysis about what FamilyCare's 2018 rates would actually be, at that meeting Mr. Allen informed FamilyCare that he was no longer interested in discussing the 2018 rates and demanded, in violation of Oregon law, that FamilyCare notify OHA by noon the

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000

following day (December 21) whether FamilyCare would sign the 2018 amendment, In response to OHA's ultimatum, FamilyCare asked whether OHA would provide the promised rate redetermination analysis within the next 24 hours, to allow FamilyCare to review that information prior to deciding whether to accept the 2018 amendment. OHA responded that it would not provide any additional information prior to the new signing deadline and stated that OHA was no longer contingency planning for a *potential* transition of FamilyCare out of Oregon's Medicaid marketplace, but was in fact implementing a transition plan to move FamilyCare's members and providers to other CCOs. OHA even issued a press release confirming the ultimatum.

Unable to agree to tentative rates that were insufficient to keep FamilyCare in business and lacking any information from OHA about what compensation FamilyCare would actually receive in 2018 upon the correction of the acknowledged data errors, FamilyCare was unable to agree to sign the amendment on December 21, as demanded by OHA. Shortly thereafter, OHA offered and FamilyCare entered a one-month contract extension to allow FamilyCare's members time to transition to Health Share prior to cessation of FamilyCare's Medicaid business at the end of January 2018. The extension was limited to one at OHA's insistence.

At 4:54 PM on December 29—with just six minutes left in the last business day of the year—OHA emailed FamilyCare confirming that the agency's rate setting process had indeed been materially impacted by the data errors long identified by FamilyCare. Although the "Preliminary Redetermination Analysis" provided some additional information about the scope of those errors' impact, OHA still failed to provide an estimate of what FamilyCare's rates would have been under the 2018 amendment, confirming only a "potential impact of 0-5% on 2018 Tri-County rates[.]" In other words, addressing just this one error might well, and ultimately would, have increased FamilyCare's rates by tens of millions of dollars. Indeed, soon after OHA left FamilyCare no choice but to transition its members to another CCO, OHA announced that the 2018 rates would increase significantly. And in 2019, OHA increased rates by even more, particularly for those

categories of beneficiaries who were overrepresented among FamilyCare's member population, and made other changes to the rate-setting process for which FamilyCare had advocated and that would have resulted in much higher rates for FamilyCare had they been made earlier.

OHA has offered no reasonable explanation for why it withheld the important information about rate increases or acted illegally by accelerating FamilyCare's deadline for agreeing to the then-unidentified actual 2018 rates to force FamilyCare to make the difficult decision to transition its members after more than thirty years as an OHA-contracted CCO. Nor did it offer an explanation as to why the contract deadline could not have been extended, as OHA had done in the past, to allow FamilyCare to learn what its actual rates would be. Had FamilyCare known of the actual 2018 rates, FamilyCare could have reconsidered its position.

OHA finally achieved what it first tried to do in 2015 (but was stopped from doing by court order), and what it had been trying to engineer for the subsequent three years: it forced FamilyCare out of its more than 30-year role as an OHA-contracted CCO and silenced the voice of a CCO that expressed pointed criticism of OHA.

**I.      OHA's removal of FamilyCare as a CCO harms Oregon's Medicaid system and Medicaid beneficiaries.**

It was not only FamilyCare that was harmed by Defendants' actions: Oregon's Medicaid system and Medicaid beneficiaries are worse off as well, in terms of higher costs, decreased access, and diminished health outcomes. FamilyCare's approach, particularly its investments in primary care and behavioral healthcare, was pioneering and unique among Oregon CCOs and was markedly different from the other CCO in the Portland area, Health Share. The removal of FamilyCare as a pillar of Oregon's Medicaid system is particularly troubling given that the patients affected are underserved, economically disadvantaged, and tend to have more social and environmental issues that confound or increase the complexity of the care they need. FamilyCare's model improved care access and quality for Medicaid beneficiaries and improved overall economy for the Medicaid program.

11- PLAINTIFF FAMILYCARE, INC.'S
TRIAL MEMORANDUM
156198765.5

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

III.     **CLAIMS AND DEFENSES**

A.     **FamilyCare's Claims.**

FamilyCare asserts three claims: **(1)** that OHA breached the Settlement Agreement; **(2)** that OHA violated the implied covenant of good faith and fair dealing in the Five-Year Contract; and **(3)** that Ms. Saxton retaliated against FamilyCare's exercise of its First Amendment rights, in violation of 42 U.S.C. § 1983. At trial, the evidence will show that FamilyCare is entitled to relief on all three of its claims.

1.     <u>FamilyCare's claim against OHA for breach of the Settlement Agreement</u>.

To prevail on its breach of contract claim, FamilyCare must prove (1) the existence of the Settlement Agreement, (2) its relevant terms, (3) FamilyCare's performance, (4) OHA's breach, and (5) damages to FamilyCare. *See Fleming v. Kids and Kin Head Start*, 71 Or. App. 718, 721, 693 P.2d 1363 (1985). Apart from the amount of damages, discussed below, the only element FamilyCare expects to be in dispute is whether OHA breached the Settlement Agreement.

The Settlement Agreement requires that "OHA shall not use rates paid to FamilyCare under the Contract for 2016 or the Settlement Credit as a basis for limiting the amount that can be paid to FamilyCare in future rate years." But this is precisely what OHA did.

The evidence will show that, despite OHA's history of encouraging CCOs to invest in primary care, praising FamilyCare for doing so, and finding that it saved Medicaid overall expenditures, in July 2016—less than two months after OHA signed the Settlement Agreement—OHA made significant cuts to FamilyCare's base data for 2017 rates by removing costs for reimbursements and incentive payments to primary care providers. OHA made similar cuts for 2018. This was unprecedented; OHA made no such cuts in developing 2015 or 2016 rates. The evidence will further show that OHA's decision to remove primary care costs was unjustified, invalid, and aimed at penalizing FamilyCare and recouping the Settlement Credit. Finally, the evidence also will show that after FamilyCare's members were transitioned to another CCO, OHA

modified the reimbursement policy to no longer target primary care reimbursement—further proof that OHA's justifications were pretextual and that its actions specifically targeted FamilyCare.

      2.   <u>FamilyCare's claim against OHA for violation of the implied duty of good faith and fair dealing in the Five-Year Contract.</u>

The implied covenant of good faith and fair dealing requires that each party to a contract refrain from any act that would "have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Iron Horse Eng'g Co., Inc. v. Nw. Rubber Extruders, Inc.*, 193 Or. App. 402, 421, 89 P.3d 1249 (2004) (citation omitted). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party[.]" *Best v. U.S. Nat. Bank of Or.*, 303 Or. 557, 562-63, 739 P.2d 554 (1987) (quoting Restatement (Second) of Contracts § 205, *comment a* (1979)); *see also id.* at 563 ("The court has not attempted set forth a comprehensive definition of good faith. But in line with the Restatement and traditional principles of contract law, the court has sought through the good faith doctrine to effectuate the reasonable contractual expectations of the parties."). A party violates the implied covenant of good faith and fair dealing when it undermines the agreed common purpose or frustrates the parties' expectations, depriving the other party of the benefit of the bargain. *See id.*

FamilyCare's objectively reasonable expectations under the Five-Year Contract were clear and straightforward: OHA would present annual rate amendments that were timely, reasonable, unbiased, actuarially sound, adequate, and free of errors in underlying data and methodology. The evidence of the objective reasonableness of these expectations abounds in the Five-Year Contract, state and federal laws that govern both the Medicaid program and how government agencies must and are expected to act, industry standards, and past practices. Indeed, FamilyCare's expectations are based on fundamental aspects of Oregon's Medicaid system, including "transparent and public" interactions between OHA and the CCOs, *see* ORS 414.018(3)(g); prospective determination of reimbursement, including reasonable global payments, to cover the reasonably

incurred costs of delivering and managing covered healthcare services required by Medicaid beneficiaries assigned to the CCO, *see* ORS 414.065(1)(a)(A), (D); and a 5-year contract term allowing CCOs to make long-term investments in care management and to innovate and transform the healthcare delivery system to realize efficiencies, improve beneficiary access to care, and bend the cost curve, *see* ORS 414.590(2)(a).

The evidence of OHA's violation of its duty of good faith and fair dealing includes, without limitation, OHA's error-ridden, biased, and unsupported rate setting processes, in particular its actions to reduce FamilyCare's 2017 and 2018 rates in a variety of ways, substantially increasing the likelihood that the rates would be insufficient to cover the costs of healthcare services under the contract; OHA's "communications plan" to isolate and undermine FamilyCare by, among other things, covertly spreading disparaging comments through "off the record" discussions with the media, including through third parties "if possible," indisputably showing OHA's anti-FamilyCare animus and a lack of good faith and fair dealing; OHA's violation of the 60-day notice requirement; OHA's failure to provide timely and complete rates, in particular its gamesmanship in December 2017 to make it impossible for FamilyCare to continue in its role; and, once OHA had forced FamilyCare out of its position, OHA's retroactive amendment of the 2018 rates and significant rate increases and rate-setting changes in 2019 and 2020 that addresses problems FamilyCare had long raised and that inured to the benefit of the CCO to which FamilyCare's members had been transitioned.

**3.** <u>FamilyCare's claim against Ms. Saxton for violation of 42 U.S.C. § 1983</u>.

To prevail on its § 1983 claim against Ms. Saxton, FamilyCare must prove that (a) FamilyCare engaged in expressive conduct that addressed a matter of public concern, (b) Ms. Saxton took an adverse action against FamilyCare, and (c) FamilyCare's conduct was a substantial or motivating factor for the adverse action. *See Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004).

      **a.**    FamilyCare engaged in expressive conduct that addressed matters of public concern.

A government contractor's speech is "protected under the First Amendment if it addresses 'a matter of legitimate public concern.'" *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (citation omitted) (evaluating § 1983 claim of government employees); *see also Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009) ("The public concern inquiry is purely a question of law[.]"). Under the Ninth Circuit's "liberal construction" of the public concern requirement, "[s]peech that can be fairly be considered as relating to any matter of political, social, or other concern to the community is constitutionally protected." *Roe v. City & Cty. of San Francisco*, 109 F.3d 578, 585-86 (9th Cir. 1997) (citation omitted).

The evidence will show that FamilyCare engaged in expressive conduct that addressed matters of public concern, including, without limitation, public statements at healthcare industry events; correspondence and meetings with legislators; comments in media reports and other publications; correspondence with CMS; discussions with OHA and others regarding the rate-setting processes and errors in the same; requests for information about OHA's policies and practices; litigation; and legislative testimony.

Because the content of FamilyCare's statements related to the "functioning of government" and was "relevan[t] to the public's evaluation of the performance of government agencies[,]" they "addresse[d] matters of public concern" and accordingly were entitled to First Amendment protection. *Eng v. Cooley*, 552 F.3d 1062, 1072-73 (9th Cir. 2009) (citations omitted); *see also Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992) ("[T]he inept, inefficient, and potentially harmful administration of a governmental entity" is "a classic topic of public concern[.]"). The form and context of FamilyCare's speech also support a finding of First Amendment protection. There can be no dispute that FamilyCare took efforts to inform the public about its concerns with OHA and its leadership. And FamilyCare's speech related to its ability to provide healthcare

15- PLAINTIFF FAMILYCARE, INC.'S
TRIAL MEMORANDUM

156198765.5

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000

services to as many as 134,000 Oregonians and to the integrity and functionality of Oregon's Medicaid system as a whole.

**b.**    Ms. Saxton took adverse actions against FamilyCare.

An adverse action is an act taken by a government official that is "reasonably likely to deter" a government employee or contractor from exercising its First Amendment rights. *See Coszalter*, 320 F.3d at 976 (citation omitted). "The precise nature of the retaliation is not critical to the inquiry . . . The goal is to prevent, or redress, actions . . . that 'chill the exercise of protected' First Amendment rights." *Id.* at 974-75 (citation omitted). Even if certain acts "considered individually" may not constitute an adverse action, those acts "taken together" may reflect a "sustained campaign" and "reasonably likely to deter plaintiffs from engaging in speech protected under the First Amendment." *Id.* at 976-77 (internal quotation marks omitted).

Ms. Saxton may be held liable either directly or in her supervisory capacity. As the Supreme Court has explained, in a § 1983 action "the term 'supervisory liability' is a misnomer" and a state official "is only liable for . . . her own misconduct[,]" regardless of whether the official's misconduct consisted of taking an action herself or deliberately setting in motion (or refusing to stop) a series of events that have the same effect of violating another's rights. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Thus, what matters here is whether Ms. Saxton acted, or knowingly refused to act, to retaliate against FamilyCare for its exercise of First Amendment rights. Whether she did so alone, as a supervisor of subordinates, or both, she can be held liable under § 1983.

The evidence will show that Ms. Saxton took actions that individually and collectively were adverse to FamilyCare. These actions included, without limitation, the development and implementation of so-called "reimbursement policies" with the purpose and effect of reducing FamilyCare's capitation rates by making sharp cuts to the FamilyCare base data used in formulating the rates; directing the development of "communications plans" designed to denigrate FamilyCare and undermine its attempts to promote transparency and accuracy in the rate-setting

16- PLAINTIFF FAMILYCARE, INC.'S
TRIAL MEMORANDUM

156198765.5

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

process; and failure to correct errors in rate-setting that were known to harm FamilyCare. The evidence also will show that Ms. Saxton sought to insulate her agency from criticism by marginalizing its most vocal critic through a series of actions that disrupted and ultimately ended FamilyCare's more than 30-year role as an OHA-contracted managed care organization.

      **c.**    FamilyCare's expressive conduct was a substantial or motivating factor for Ms. Saxton's actions.

FamilyCare may establish that Ms. Saxton's retaliatory intent was a "substantial" or "motivating" factor through circumstantial evidence, which requires that FamilyCare "(1) prove that the official engaging in the alleged retaliatory acts knew of the plaintiff's protected conduct, and (2) (i) establish proximity in time between [the plaintiff's] expressive conduct and the allegedly retaliatory actions; (ii) produce evidence that the defendants expressed opposition to [the plaintiff's] speech, either to [the plaintiff] or to others; or (iii) demonstrate that the defendants' proffered explanations for their adverse actions were false and pretextual." *O'Connor v. Cty. of Clackamas*, No. 3:11-CV-1297-SI, 2013 WL 3818143, at *18 (D. Or. July 22, 2013) (citing *Alpha Energy Savers*, 381 F.3d at 929), *aff'd sub nom. O'Connor v. Cty. of Clackamas, Or.*, 627 F. App'x 670 (9th Cir. 2015).

The evidence will show that FamilyCare's expressive conduct was a substantial or motivating factor for Ms. Saxton's adverse actions, and that Ms. Saxton would not have taken the same actions but for FamilyCare's speech. This evidence includes, without limitation, the temporal proximity between FamilyCare's expressive activity and OHA's base data cuts (multiple rounds of cuts in 2017, as well as the 2018 reimbursement policy) and communications plans (including the smear campaign); Ms. Saxton's expressed opposition to FamilyCare's speech; and Ms. Saxton's false and pretextual explanations for her and her agency's actions.

    **B.**    **Defendants' Affirmative Defenses**

Eliminating duplication, Defendants collectively pled eighteen affirmative defenses. *See* Df. Lynne Saxton's Answer and Affirm. Defs. to Pl.'s Fifth Amend. Compl., Nov. 24, 2021

17-   PLAINTIFF FAMILYCARE, INC.'S
      TRIAL MEMORANDUM
  156198765.5

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000

("Saxton Answer"), Affirm. Defs. 1-8 (ECF No. 500); Df. OHA's Answer to Pl.'s Fifth Amend. Compl., Nov. 24, 2021 ("OHA Answer"), Affirm. Defs. 1-14 (ECF No. 501). Based on the information available, including Defendants' proposed jury instructions and verdict form, it appears that Defendants continue to rely on the following: **(1)** failure to mitigate; **(2)** release of claims; **(3)** estoppel; **(4)** limitation of liability; and **(5)** qualified immunity. Therefore, FamilyCare will address below the five affirmative defenses upon which FamilyCare understands that Defendants continue to rely.[1]

      1.     <u>Failure to mitigate</u>.

Defendants assert that FamilyCare failed to mitigate its damages. *See* Saxton Answer (ECF No. 500), Affirm. Def. #4; OHA Answer (ECF No. 501), Affirm. Def. #3. To prevail on this defense, Defendants must prove that (a) FamilyCare failed to use reasonable efforts to mitigate damages, and (b) the amount by which damages would have been mitigated. *See* 9th Cir. Model Civil Jury Instructions, 5.3. Defendants cannot prove that FamilyCare failed to use "reasonable efforts" to mitigate damages. To the contrary, the evidence will show that FamilyCare's efforts included, without limitation, eliminating high-cost employment positions at FamilyCare; implementing a hiring freeze and holding unfilled positions open; stopping the payment of discretionary bonuses; renegotiating contracts with stop-loss carriers; renegotiating contracts with

---

[1] To the extent Defendants' trial memorandum or other pre-trial filings reveal that, notwithstanding the Court's prior rulings and Defendants' proposed jury instructions and verdict form, Defendants continue to assert any other affirmative defenses, FamilyCare reserves its right and stands ready to present supplemental briefing and/or argument. For reference, the additional affirmative defenses pled by Defendants in their answers were: (6) failure to state a claim; (7) unclean hands; (8) statute of limitations; (9) judicial proceedings and executive privileges; (10) waiver/consent; (11) mootness; (12) discretionary immunity; (13) damage limitation under ORS 30.273; (14) lack of subject matter jurisdiction; (15) failure to exhaust administrative remedies; (16) sovereign immunity; (17) Family Care's nonprofit status; and (18) Saxton's limitation of liability defense, on which the Court has now granted summary judgment to FamilyCare (ECF No. 530). *See* Saxton Answer (ECF No. 500), Affirm. Defs. ## 1, 5, 7-8; OHA Answer (ECF No. 500), Affirm. Defs. ## 1, 4, 6-13.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

FamilyCare's transportation providers; renegotiating contracts with FamilyCare's risk-scoring consultant and contractor; and curtailing FamilyCare's community investment program.

### 2. Release of claims.

Defendants assert that FamilyCare's claims were released by the Settlement Agreement. *See* Saxton Answer (ECF No. 500), Affirm. Def. #6, OHA Answer (ECF No. 501), Affirm. Def. #5. The Settlement Agreement released Defendants "from any and all claims, whether raised or not, that relate to the Dispute . . . through and including the Effective Date[.]" The Settlement Agreement defined "the Dispute" as "claims that either Party brought or could have been brought against the other Party, as of the date of this Settlement Agreement [May 22, 2016] relating to FamilyCare's 2015 and 2016 capitation rates and the implementation or execution of the Contract amendments incorporating those rates." To the extent Defendants argue that FamilyCare's claim for violation of the implied duty of good faith and fair dealing on the Five-Year Contract was released by the Settlement Agreement, they are wrong, because FamilyCare's claim is about the 2017 and 2018 rates and is therefore not within the scope of "the Dispute." And, of course, FamilyCare's claim for breach *of* the Settlement Agreement could not itself have been released *by* the Settlement Agreement.

### 3. Estoppel.

OHA asserts that FamilyCare should be estopped from seeking relief based on the terms of the Settlement Agreement. *See* OHA Answer (ECF No. 501), Affirm. Def. #2. To prove estoppel, OHA must show that (1) FamilyCare made a false representation (2) with knowledge of the truth (3) while OHA was ignorant of the truth (4) made with the intention that OHA rely on it, and (5) reliance by OHA. *See Nelson v. Liberty Ins. Co.*, 314 Or. App. 350, 359, 498 P.3d 861 (2021). Moreover, "the false representation must be one of existing material fact." *Vukanovich v. Kine*, 302 Or. App. 264, 282, 461 P.3d 223 (2020) (citation omitted). Here, OHA hopes to prove estoppel with only two facts: that (a) FamilyCare made a representation and (b) OHA relied on it. But OHA

19- PLAINTIFF FAMILYCARE, INC.'S
TRIAL MEMORANDUM

156198765.5

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000

cannot prove (1) the falsity of any representation, (2) materiality, (3) knowledge of whatever OHA contends is the "truth," (4) OHA's ignorance, or (5) FamilyCare's intention that OHA rely on a falsity. OHA will be unable to prove these elements.

### 4.    Limitation of liability.

OHA asserts that its liability is limited by a bar on "incidental or consequential damages" in the Five-Year Contract. *See* OHA Answer (ECF No. 501), Affirm. Def. #14. As a threshold matter, this plainly would not apply to OHA's breach of the Settlement Agreement. Nor does it apply to OHA's violation of the implied duty of good faith and fair dealing in the Five-Year Contract. But even if the limitation of liability clause could be construed to apply to an implied-duty claim generally, it does not bar the specific damages sought by FamilyCare here, *i.e.*, FamilyCare's "direct," benefit-of-the-bargain damages. Because OHA is a monopsonist for managed Medicaid services in Oregon, it knew that by presenting inadequate and flawed rate amendments that were insufficient to cover FamilyCare's reasonably incurred costs, FamilyCare would necessarily have to discontinue its role as an OHA-contracted CCO, FamilyCare's only line of business. Moreover, OHA did not merely know that its misconduct would force FamilyCare to cease operating as a CCO—that was what OHA intended. FamilyCare's loss of enterprise value and its lost profits are accordingly forms of direct damages. Finally, even if this clause could be construed to bar such damages generally, it should be set aside here based on OHA's willful misconduct and/or gross negligence.

### 5.    Qualified immunity.

Ms. Saxton asserts that she has qualified immunity against FamilyCare's § 1983 claim. *See* Saxton Answer (ECF No. 500), Affirm. Def. #3. She does not. Indeed, this Court and the Ninth Circuit have already determined that Ms. Saxton is not entitled to qualified immunity. *See Allen v. FamilyCare, Inc.*, 812 Fed.Appx. 413, 419 (2020); *see also id.* at 420 (reversing award of partial summary judgment relating to qualified immunity regarding public relations campaign).

20- PLAINTIFF FAMILYCARE, INC.'S
TRIAL MEMORANDUM

156198765.5

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000

"Government officials are entitled to qualified immunity only 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Coszalter*, 320 F.3d at 979 (9th Cir. 2003) (citation omitted). Such officials "can be on notice that their conduct violates established law even in novel factual situations." *Hope v. Peltzer*, 536 U.S. 730, 741 (2002). "[T]o show that the right in question . . . was clearly established, [a plaintiff] need not establish that [the defendant's] behavior had been previously declared unconstitutional, only that the unlawfulness was apparent in light of preexisting law." *Nelson v. City of Davis*, 685 F.3d 867, 884 (9th Cir. 2012) (citation omitted).

Ninth Circuit precedent establishes that government officials may not take actions adverse to a government employee or contractor—including the terms and conditions of the employee or contractor's relationship with the state—in response to speech on matters of public concern. *See, e.g.*, *Alpha*, 381 F.3d at 921 (affirming denial of summary judgment on claim that county employees manipulated contracting procedures in order to deny work to contractor in retaliation for his participation in judicial and administrative proceedings). And the Ninth Circuit has repeatedly rejected claims of qualified immunity in First Amendment retaliation cases, finding that where the plaintiff's evidence (or allegations) establish a prima facie case of retaliation, qualified immunity is improper. *See, e.g.*, *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1312-16, 1319 (9th. Cir. 1989) (effort to interfere with plaintiff's business by denying operating permits after plaintiff's public criticisms of, and litigation against, defendants was actionable and not subject to qualified immunity). Ms. Saxton is not entitled to qualified immunity because she was on notice that her retaliation against FamilyCare for its protected speech was unlawful.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000

## IV.    REMEDIES

The evidence will show that FamilyCare is entitled to damages on all three of its claims. FamilyCare also should be awarded its reasonable attorney's fees if it prevails on its § 1983 claim.

### A.    FamilyCare's damages for OHA's breach of the Settlement Agreement.

"The general principle of awarding damages for a breach of contract is to place the injured party in the same position he would have been in if the contract had been performed[.]" *Shook v. Travelodge of Or., Inc.*, 63 Or. App. 137, 144, 663 P.2d 1280 (1983). The evidence will show that FamilyCare should be awarded **$24,800,000** or, alternatively, **$21,800,000**, *i.e.*, the Settlement Credit or portion thereof recouped by OHA through subsequent rate-setting.

### B.    FamilyCare's damages for OHA's violation of the implied duty of good faith and fair dealing in the Five-Year Contract.

Under the standard referenced above, *see Shook*, 63 Or. App. at 144, the evidence will show that FamilyCare should be awarded up to **$306,300,000**, which would compensate FamilyCare for the decrease in its fair market value caused by OHA's actions. *See* Pl.'s Expert Witness Stmts. (Tarbell). Alternatively, the evidence will show that FamilyCare should be awarded at least **$101,245,515**, which would compensate FamilyCare for the economic benefit of the bargain it would have enjoyed through the term of the Five-Year Contract but for OHA's actions. *See id.* (Sickler).

### C.    FamilyCare's damages and attorney's fees for Ms. Saxton's violation of 42 U.S.C. § 1983.

When a plaintiff prevails on a § 1983 claim, the plaintiff is entitled to recover compensatory damages. *See Carey v. Piphus*, 435 U.S. 247, 254-55 (1978). These may include, among other things, "economic harm . . . that results from the violations." *See Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988). How to quantify such damages is "should be determined by the fact-finder, the formula for which shall be established based on the specific facts of [the] case." *David Hill Dev., LLC v. City of Forest Grove*, 688 F. Supp. 2d 1193, 1222 (D. Or. 2010).

The evidence will show that FamilyCare should be awarded up to **$306,300,000**, which would compensate FamilyCare for the decrease in its fair market value. *See* Pl.'s Expert Witness Stmts. (Tarbell). Alternatively, the evidence will show that FamilyCare should be awarded at least **$101,245,515**, which would compensate FamilyCare for the economic benefit it would have received through the term of the Five-Year Contract. *See id.* (Sickler). If FamilyCare proves that Ms. Saxton violated its First Amendment rights but fails to prove the required causation to justify actual (compensatory) damages, FamilyCare must be awarded nominal damages. *See Schneider v. Cty. of San Diego*, 285 F.3d 784, 794 (9th Cir. 2002). If FamilyCare prevails on its § 1983 claim, FamilyCare also may be awarded its reasonable attorney's fees. *See* 42 U.S.C. § 1988(b).

## V.    CONCLUSION

In retaliation for FamilyCare's criticisms of OHA's practices and FamilyCare's advocacy for greater transparency, accuracy, and fairness in the Oregon Medicaid system, Defendants drove FamilyCare out of its more than 30-year role as an OHA-contracted CCO. In doing so, OHA breached the Settlement Agreement and violated its duty of good faith and fair dealing in the Five-Year Contract, and Ms. Saxton violated 42 U.S.C. § 1983. Oregon's Medicaid system is worse off as a result of Defendants' actions. FamilyCare will prove that Defendants are liable on all three of FamilyCare's claims and that FamilyCare should be awarded all of its claimed damages.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000

DATED:  March 21, 2022          **PERKINS COIE LLP**

By: *s/ David B. Robbins*
       **Stephen F. English**, OSB No. 730843
       SEnglish@perkinscoie.com
       **Thomas R. Johnson**, OSB No. 010645
       TRJohnson@perkinscoie.com
       **Matthew J. Mertens**, OSB No. 146288
       MMertens@perkinscoie.com
       **Sasha Petrova**, OSB No. 154008
       SPetrova@perkinscoie.com
       1120 N.W. Couch Street, Tenth Floor
       Portland, Oregon 97209-4128
       Telephone: 503.727.2000
       Facsimile: 503.727.2222

       **Matthew P. Gordon** (admitted *pro hac vice*)
       MGordon@perkinscoie.com
       **David B. Robbins**, OSB No. 070630
       DRobbins@perkinscoie.com
       1201 Third Avenue, Suite 4900
       Seattle, Washington 98101-3099
       Telephone: 206.359.8000
       Facsimile: 206.359.9000

       *Attorneys for Plaintiff FamilyCare, Inc.*

24-  PLAINTIFF FAMILYCARE, INC.'S
     TRIAL MEMORANDUM